UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SAND

'07 CIV 9633

——————————————————— x

LIFE ENRICHMENT FOUNDATION,
Individually and On Behalf of All Others
Similarly Situated,

Plaintiff,

vs.

MERRILL LYNCH & CO., INC., E.
STANLEY O'NEAL, AHMASS L.
FAKAHANY, GREGORY J. FLEMING and
JEFFREY N. EDWARDS,

Defendants.

——————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

FILED
U.S. DISTRICT COURT
2007 OCT 30 PM 2: 23
S.D. OF N.Y.

**INTRODUCTION**

1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Merrill Lynch & Co., Inc. ("Merrill" or the "Company") between February 26, 2007 and October 23, 2007 (the "Class Period"), against Merrill and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.    Merrill is a holding company that provides investment, financing, insurance and related services to individuals and institutions on a global basis through its broker, dealer, banking, insurance and other financial services subsidiaries.

3.    During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Merrill had gone heavily into Collateralized Debt Obligations ("CDOs") which generated higher yields in the short term but which would be devastating to the Company as the real estate market continued to soften and the risky loans led to losses. As a result of defendants' false statements, Merrill stock traded at artificially inflated prices during the Class Period, reaching a high of $95 per share in May 2007. The top officers of Merrill benefited from the false statements and inflated earnings as their compensation was based in large measure on Merrill's reported financial results. The four officers named as defendants herein received more than $126 million in compensation for 2006.

4.    In the summer of 2007, as the credit crisis hit the banking world, defendants continued to conceal Merrill's large exposure to these problems. While Merrill's stock declined with that of other banks in late July 2007, it continued to be artificially inflated due to defendants' false statements.

5.    In early October 2007, Merrill acknowledged it would have to take a $5 billion third quarter 2007 charge for mortgage and credit problems.

6.    Then, on October 24, 2007, before the market opened, Merrill issued a press release

which announced the third quarter charge would be $8 billion instead of $5 billion. The release,

entitled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations of $2.85

Per Diluted Share; Record Net Revenues From Global Private Client, Equity Markets and

Investment Banking for the First Nine Months of 2007," stated in part:

> Merrill Lynch today reported a net loss from continuing operations for the
> third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net
> earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the
> third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding
> the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax)
> related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock
> (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-
> downs and losses attributable to Merrill Lynch's Fixed Income, Currencies &
> Commodities (FICC) business, including write-downs of $7.9 billion across CDOs
> and U.S. subprime mortgages, which are significantly greater than the incremental
> $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-
> release. These write-downs and losses were partially offset by strong revenues in
> Global Wealth Management (GWM), Equity Markets and Investment Banking,
> particularly in regions outside of the U.S. The results described above and herein,
> exclude Merrill Lynch Insurance Group (MLIG), which is reported under
> discontinued operations.

> Third-quarter 2007 total net revenues of $577 million decreased 94 percent
> from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion
> in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was
> $3.5 billion. At the end of the third quarter, book value per share was $39.75, down
> slightly from the end of the third quarter of 2006.

> "Mortgage and leveraged finance-related write-downs in our FICC business
> depressed our financial performance for the quarter. In light of difficult credit
> markets and additional analysis by management during our quarter-end closing
> process, we re-examined our remaining CDO positions with more conservative
> assumptions. The result is a larger write-down of these assets than initially
> anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect
> market conditions for subprime mortgage-related assets to continue to be uncertain
> and we are working to resolve the remaining impact from our positions," Mr. O'Neal
> continued. "Away from the mortgage-related areas, we continue to believe that
> secular trends in the global economy are favorable and that our businesses can
> perform well, as they have all year."

> Net revenues for the first nine months of 2007 were $20.0 billion, down 23
> percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted

share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

\*      \*      \*

### Global Markets & Investment Banking (GMI)

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

- Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

    - FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities.

\*      \*      \*

***Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.***

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected

- 3 -

timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

- Equity Markets net revenues increased 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

- Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

- The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

- GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

- 4 -

7.     On this news, Merrill's stock dropped from $67.12 per share to as low as $61.40 per share, closing at $63.22 per share on volume of 52 million shares.

8.     Subsequently, on October 25, 2007, S&P reduced Merrill's credit rating to negative after the brokerage reported the biggest quarterly loss in its 93-year history, causing Merrill's stock to dramatically drop to $60.90 per share. The stock only began to recover upon speculation that Merrill's Chief Executive Officer ("CEO") might be replaced.

9.     The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     The Company was more exposed to CDOs containing subprime debt than it disclosed; and

(b)     The Company's Class Period statements were materially false due to their failure to inform the market of the ticking time bomb in the Company's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill's portfolio to be impaired.

10.     The size of the charge and its timing caused the market to question Company management's credibility.

11.     On October 25, 2007, *The Wall Street Journal* wrote an article entitled "Implausible Deniability?," which stated in part:

> Stanley O'Neal's credibility just suffered a major blow. It isn't only that Merrill Lynch, the Wall Street firm he runs, took $7.9 billion of write-downs just on subprime mortgages and collateralized debt obligations for the third quarter, more than any of its peers. What is worse is that the hit is a lot larger than the $4.5 billion Mr. O'Neal recently warned of.
>
> How could things change so drastically? After all, the write-downs are tied to a specific point in time, Sept. 28, so market fluctuations since then shouldn't have changed anything.

\*     \*     \*

- 5 -

More worrying for Merrill's investors, it reeks of dilettantish risk management. There have been more than enough signs this year that mortgage markets were cratering. And Merrill was arguably in a better position than most of its peers to judge the extent of the wreckage.

After all, it owns a mortgage lender, First Franklin, for which it paid through the nose. The business – especially its loan-servicing unit – ought to have provided exactly the kind of information on the subprime market that Mr. O'Neal needed to stay ahead of the curve. Merrill also was the top CDO arranger in 2006 and is in second place this year. That should have given it a bird's eye view of the market.

Beyond that, its prime brokerage unit was one of the first lenders to seize and sell assets from two Bear Stearns hedge funds in June. Having kicked off the CDO fire sale, it seems irresponsible that Merrill wasn't much better prepared for the ensuing rush for the exits.

Instead, it appears it was simply too deep into a market that its executives didn't fully understand. To be charitable, Mr. O'Neal and his team aren't alone in that. Still, given the size and circumstances of Merrill's losses, their blushes should be the deepest.

\*     \*     \*

Add another $3 billion-plus to the pain at Merrill Lynch. That is how much value shareholders wiped off the firm's market capitalization after it announced the write-down of asset-backed securities. Shares in rivals like Lehman Brothers Holdings and Morgan Stanley fell, too.

Merrill's decision to supersize the write-downs by 75% just weeks after an initial warning provoked the rare use of the word "startling" by Standard & Poor's, the usually staid credit rater. It also brought home to investors an uncomfortable truth: As far as valuing asset-backed CDOs is concerned, there is no such thing as a "kitchen sink" approach – where a firm dumps all its bad news in one quarter's financial results and moves on.

\*     \*     \*

These "mark-to-model" valuations have proven to be fantasies – or at least wishful thinking – when compared with the price at which anyone will actually buy the stuff. Merrill's write-downs of mortgage-heavy CDOs suggest they are valuing them at 60 cents to 70 cents on the dollar. Meanwhile, some market players reckon they might not change hands for more than 40 cents.

12.     As a result of defendants' false statements, Merrill's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the

- 6 -

Company's shares were hammered by massive sales, sending them down more than 30% from their Class Period high.

## JURISDICTION AND VENUE

13.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

14.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

(b)    Merrill's principal executive offices are located at 4 World Financial Center, New York, New York.

## THE PARTIES

15.    Plaintiff Life Enrichment Foundation purchased Merrill common stock as described in the attached certification and was damaged thereby.

16.    Defendant Merrill offers a broad range of services to private clients, small businesses, institutions and corporations, organizing its activities into two interrelated business segments – Global Markets & Investment Banking Group and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management. Merrill is headquartered in New York, New York.

17.    Defendant E. Stanley O'Neal ("O'Neal") was at all relevant times, a director, Chairman of the Board and CEO of Merrill. O'Neal received a cash bonus of $18.5 million plus a stock grant of $26.8 million for 2006 based on the Company's purported performance. On October 30, 2007, Merrill announced that O'Neal had resigned from his position.

18.    Defendant Ahmass L. Fakahany ("Fakahany") is, and at all relevant times was, President and Chief Operating Officer ("COO") of Merrill. Fakahany received a cash bonus of

$11.65 million plus a stock grant of $16 million for 2006 based on the Company's purported performance.

19.     Defendant Gregory J. Fleming ("Fleming") is, and at all relevant times was, President and COO of Merrill. Fleming received a cash bonus of $13.25 million plus a stock grant of $18.4 million for 2006 based on the Company's purported performance.

20.     Defendant Jeffrey N. Edwards ("Edwards") is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Merrill. Edwards received a cash bonus of $5.625 million plus a stock grant of $8.183 million for 2006 based on the Company's purported performance.

21.     Defendants O'Neal, Fakahany, Fleming and Edwards (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Merrill's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶28, 31-32 and 34.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

22.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Merrill. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Merrill common stock was a success, as it: (i)

- 8 -

deceived the investing public regarding Merrill's prospects and business; (ii) artificially inflated the price of Merrill's common stock; and (iii) caused plaintiff and other members of the Class to purchase Merrill common stock at inflated prices.

23.     Defendants were also motivated by the compensation arrangements of Merrill. For 2006, defendants received the following amounts:

| EXECUTIVE | SALARY | CASH BONUS | STOCK GRANT | MANAGING PARTNER INCENTIVE PROGRAM | TOTAL |
|---|---|---|---|---|---|
| O'NEAL | $700,000 | $18,500,000 | $26,800,000 | $2,000,000 | $48,000,000 |
| EDWARDS | $270,833 | $5,625,000 | $8,183,333 | $666,667 | $14,745,833 |
| FLEMING | $350,000 | $13,250,000 | $18,400,000 | $2,000,000 | $34,000,000 |
| FAKAHANY | 350,000 | $11,650,000 | $16,000,000 | $2,000,000 | $30,000,000 |

## BACKGROUND

24.     Merrill, together with its subsidiaries, provides broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending, and related products and services worldwide. Merrill's Institutional Business segment provides equity, debt, and commodities trading; capital market services; investment banking; and advisory services to corporations, financial institutions, governments, and institutional investors, and also provides clients with financing, securities clearing, settlement, and custody services; and engages in principal and private equity investing. In addition, it offers underwritings and private placements of equity, debt, and related securities; lending and other financing activities; and advisory services to clients on strategic issues, valuation, mergers, acquisitions, and restructurings. The Company's Retail Wealth Management segment provides brokerage, investment advisory, and financial planning services, and also offers commission and fee-based investment accounts; banking, cash management, and credit services; trust and generational planning; retirement services; and insurance products to individuals, small- to mid-size businesses, and employee benefit plans. The Company also provides various

research services through its Global Securities Research & Economics Group, and distributes research focusing on fundamental equity research, fixed income and equity-linked research, economics and foreign exchange research, and investment strategy research.

25.    Prior to the Class Period, Merrill had gotten deep into CDOs for the lucrative fees they generated. As *The Wall Street Journal* reported on October 25, 2007:

> From 2003 to early 2006, Christopher Ricciardi helped transform Merrill from bit player to powerhouse in the lucrative business of bundling loans into salable securities. . . .
>
> . . . . Long before joining Merrill, he helped push Wall Street into risky new areas such as subprime mortgages, those made to home buyers with weak credit. Then he helped turn Merrill into the Wal-Mart of the CDO industry, before leaving behind a roughly $8 million annual paycheck to jump to a small firm that was a Merrill client.

*    *    *

> Merrill, which continued to expand its CDO business aggressively after Mr. Ricciardi left, now is the biggest casualty of the downturn after underwriting many troubled CDOs in the past year. In a conference call with investors yesterday, Merrill CEO Stan O'Neal acknowledged that the firm had fumbled the CDO business: "The bottom line is, we got it wrong by being overexposed to subprime." Mr. O'Neal added that Merrill had misjudged the risk of many CDOs. "It turned out that both our assessment of the potential risk and mitigation strategies were inadequate," he said.

*    *    *

> Long after signs of housing troubles first emerged in mid-2005, [Ricciardi] and his colleagues at Merrill were setting out to smash records by issuing ever more CDOs.
>
> From the manicured lawns at the exclusive Sleepy Hollow Country Club to the ski slopes of Jackson Hole, Wyo., and wood-paneled rooms of Manhattan's Harvard Club, they courted investors with promises of well-managed risk and outsize returns. They helped to build a small army of a new sort of finance professional, people who manage the mountain of complex debt instruments being created.

*    *    *

> Corporate junk bonds provide high yields, but investors soured on them in the post-bubble years of 2001 and 2002 when defaults on corporate bonds spiked. With the housing market surging, mortgage securities seemed to many investors like a better bet. Mr. Ricciardi coached salespeople he worked with to stress that mortgage CDOs offered better interest rates than corporate bonds with similar ratings.

- 10 -

\*    \*    \*

By the summer of 2001, Credit Suisse was selling at least one new CDO a month and vaulting up Wall Street's so-called underwriting league tables. In 2001 Credit Suisse underwrote CDOs worth $12.5 billion, nearly double those of No. 2 Deutsche Bank AG, according to Dealogic.

Merrill, by contrast, had a minuscule presence. Its top brass was determined to get bigger in this growing business. Contacted by a headhunter, Mr. Ricciardi jumped to Merrill in 2003.

Merrill was in transition those days. It had a new CEO, Mr. O'Neal, who was trying to turn the firm into a nimble presence that darted in and out of lucrative, fast-growing businesses. His priorities included debt financing and derivatives, or instruments whose value depends on a change in some other asset's value. Merrill, Mr. Ricciardi told BondWeek magazine in January 2004, "had a good foundation for a good CDO business." What it needed was a "jump start."

\*    \*    \*

Merrill leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.22 billion of deals, to the No. 1 spot on Wall Street in 2004 with $19 billion, according to Dealogic. In 2005 Merrill's underwriting total soared to $35 billion, of which $14 billion were backed mostly by securities tied to subprime mortgages.

\*    \*    \*

Merrill salespeople scoured the globe for buyers of CDOs, selling pieces of them to a wide range of investors such as Woori Bank in Seoul, Korea, AXA SA of France, Uniqa Group of Austria and investment funds in Australia and Singapore. Among the buyers was a wireless-broadband company in Dallas called MetroPCS Communications Inc. Last week, in District Court of Dallas County, Texas, MetroPCS sued Merrill over a $134 million investment made this spring in CDOs that Merrill underwrote between 2003 and 2006, while Mr. Ricciardi was still there.

\*    \*    \*

At Merrill, Mr. Ricciardi courted clients at his country club, Sleepy Hollow, where Merrill held an annual August golf outing for money managers and investors, and Merrill's top brass. One regular at the outings was Ralph Cioffi, who managed two Bear Stearns Cos. hedge funds that invested heavily in Merrill Lynch CDOs. In a major casualty of the subprime mortgage turmoil this summer, the two Bear funds ended up losing as much as $1.6 billion of investors' money.

Merrill distributed some of its riskiest CDO slices through its global network of wealthy private clients. One former Merrill executive recalls attending an event at New York's Harvard Club in 2004 at which salesmen described the merits of CDO

- 11 -

investing to doctors, hedge-fund managers and businessmen. "They were all rich guys. We would explain how CDOs worked, and how much return they could get if losses didn't go above a certain level," says this former executive. A few individuals later agreed to invest.

Within Merrill, Mr. Ricciardi drew attention at the highest levels. His group became an increasingly important profit center for Merrill, which reaped an estimated $400 million in CDO underwriting profits in 2005.

When Mr. Ricciardi left in February of 2006, signs of trouble in the housing market were already abundant, as both home-price appreciation and home builders' orders slowed. Cohen & Co., aiming to go public, offered Mr. Ricciardi an equity stake if he came aboard. He had wanted a bigger job at Merrill that went beyond CDO underwriting. When it didn't come, he jumped to Cohen – taking with him several Merrill bankers, salesmen and a technology expert.

Before he left Merrill, Mr. Ricciardi had budgeted for no growth in 2006 in mortgage CDOs at the firm. But following the departures, Dow Kim, then head of markets and investment banking at Merrill, sought to reassure the CDO group that Merrill remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs, say three people who heard him.

*That year, Merrill sharply boosted subprime-CDO issuance to $44 billion, from $14 billion in 2005. Its fees from CDOs jumped to more than $700 million. Well into 2007, Merrill continued to ramp up deals.*

\*        \*        \*

At a Sleepy Hollow golf outing about a year ago, Mr. Ricciardi remarked to former Merrill colleagues that Merrill was doing business with too many unknown upstarts, now his competitors, according to a person familiar with the conversation.

This summer's meltdown in subprime mortgages and related securities was swift, hurting Cohen as well as Merrill. Mr. O'Neal yesterday vowed to downsize Merrill's business in structured finance.

26.     Thus, prior to the beginning of the Class Period, Merrill's top officers knew it had

problems with CDOs in its portfolio.

27.     On January 18, 2007, Merrill reported its financial results for fourth quarter and full

year 2006, in a release that stated in part:

Merrill Lynch today reported record full-year net revenues, net earnings and earnings per diluted share for 2006, driven by strong growth in the firm's business segments. Net earnings for 2006 were $7.5 billion, or $7.59 per diluted share, as total net revenues increased strongly to $34.7 billion.

- 12 -

Pretax earnings increased to a record $10.4 billion, the pretax profit margin rose to a record 30.1 percent, and the return on average common equity increased to 21.3 percent. Book value per common share was $41.37, up 15 percent from 2005. Merrill Lynch's 2006 results included the one-time net gain arising from the closing of the merger between Merrill Lynch Investment Managers (MLIM) and BlackRock during the third quarter, which was essentially offset by the one-time non-cash compensation costs recorded in the first quarter.

These one-time items, in aggregate, increased both full-year net revenues and non-interest expenses by approximately $2.0 billion, resulting in a slightly negative net impact to 2006 net earnings of $72 million, or 9 cents per diluted share. Adjusted to exclude the impact of those one-time items, full-year 2006 net earnings were $7.6 billion, up 48 percent from 2005, and net earnings per diluted share were $7.68, up 49 percent. On the same basis, pretax earnings of $10.4 billion increased 44 percent, as net revenues rose 26 percent to $32.7 billion; the pretax profit margin was 31.9 percent, up 4.1 percentage points; and the return on average common equity was 21.6 percent, up 5.6 percentage points. . . .

"We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

Fourth-quarter 2006 net earnings were $2.3 billion, and net earnings per diluted share were $2.41, up 71 percent from the year-ago quarter but down 24 percent from the third quarter of 2006, which included the one-time net gain from closing the BlackRock transaction. Similarly, pretax earnings of $3.4 billion were up 65 percent from the year-ago period but down 19 percent from the third quarter, as net revenues of $8.6 billion were up 27 percent from the year-ago quarter and down 13 percent sequentially. The fourth-quarter pretax profit margin was 39.0 percent, and the annualized return on common equity was 25.6 percent.

Excluding the one-time merger-related net benefits in the third quarter of 2006 from the sequential comparisons, Merrill Lynch's fourth-quarter 2006 net earnings and diluted earnings per share were both 21 percent higher than the third quarter; pretax earnings were 42 percent higher; net revenues were 8 percent higher; and all those fourth-quarter results would have set quarterly records.

- 13 -

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28.    On February 26, 2007, Merrill filed its Form 10-K for fiscal 2006, which included

results for the fourth quarter and full year 2006, and included the same financial results as previously

reported. The Form 10-K stated in part:

> During 2006, our GMI business generated record-setting financial performance by continuing to serve clients well, take measured principal risk and execute on a variety of key growth initiatives around the world. Every major GMI business produced revenue growth over 2005 against a market backdrop that was favorable for most of the year. Across all businesses, GMI had a net increase of more than 200 managing directors and directors and 280 vice presidents to its headcount.

> In FICC, we continued to broaden the scope of the commodities trading business in terms of product, geography, and linkage to the broader client franchise, including trading in oil and metals and geographically in the Pacific Rim. We also enhanced our structured finance business with three strategic transactions in the U.S., United Kingdom and South Korea that we expect to provide additional sources of origination and servicing for our non-prime mortgage-backed securitization and trading platform. We also made progress in key investment areas including both interest rate and credit derivatives, principal investing/real estate, and foreign exchange.

> Within FICC, on September 5, 2006, we announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation. We expect First Franklin to accelerate our vertical integration in mortgages, adding scale to our mortgage securitization and trading platform. This acquisition was completed on December 30, 2006, the first day of our 2007 fiscal year.

> In Equity Markets, we continued to enhance our leading cash equity trading platform by adding to our portfolio and electronic trading capabilities through additional investments in personnel and technology, as well as additional acquisitions, partnerships and investments. We also made progress in our equity-linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

- 14 -

29.    On April 19, 2007, Merrill issued its financial results for the first quarter of 2007, in a

release which stated in part:

Merrill Lynch today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion. Net revenues were up 24 percent from the prior-year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), and in all global regions. These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pretax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc.

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pretax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. . . .

- 15 -

**Global Markets & Investment Banking (GMI)**

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

- GMI's first-quarter 2007 net revenues were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

    - Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

    - Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

    - Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

- Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first-quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

**Global Wealth Management (GWM)**

GWM generated strong revenue and pretax earnings growth in the first quarter of 2007. The growth was driven by Global Private Client (GPC), which increased its net revenues year over year for the 10th consecutive quarter, as well as by the contribution of Global Investment Management (GIM), including earnings from Merrill Lynch's investment in BlackRock. GPC continues to focus on delivering a superior product and service offering, positioning Merrill Lynch financial advisors

(FAs) as essential partners to their clients. GPC also continues to invest in technology to further enhance both the efficiency and effectiveness of the FA force, and to invest in growing the FA census globally.

- GWM's first-quarter 2007 net revenues were $3.4 billion, up 16 percent from the first quarter of 2006:

    - GPC's net revenues increased 11 percent to $3.1 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products. Transaction and origination revenues also increased, driven by new issue origination activity, and net interest revenues grew to a new record level.

    - GIM's net revenues increased 151 percent to $261 million, due primarily to revenues from Merrill Lynch's investment in BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment management companies and the business that creates alternative investment products for GPC clients.

- Pretax earnings for GWM in the first quarter of 2007 were $842 million, up 31 percent from the first quarter of 2006, driven by the growth in revenues. The pretax profit margin was 24.7 percent, up from 21.9 percent in the prior-year period, driven by the impact of the investment in BlackRock.

- Turnover among FAs, especially top-producing FAs, remained low. FA headcount reached 15,930 at quarter-end, as GPC continued to exercise discipline in recruiting and training high-quality FAs.

- Client assets in products that generate annuitized revenues ended the quarter at $633 billion, up 13 percent from the first quarter of 2006, and total client assets in GWM accounts were a record $1.6 trillion, up 10 percent. Net inflows of client assets into annuitized-revenue products were $16 billion for the first quarter, and total net new money was $16 billion.

- On January 29, 2007, Merrill Lynch announced that it had reached a definitive agreement to acquire First Republic Bank (NYSE: FRC), a private banking and wealth management firm focused on high-net-worth individuals and their businesses, for approximately $1.8 billion in cash and stock.

30.    By the end of April 2007, Merrill's stock was trading above $90 per share.

31.    Attending a conference in London during the last week of June 2007, O'Neal stated that problems in the subprime area were "reasonably well contained." O'Neal added that, "There

have been no clear signs it's spilling over into other subsets of the bond market, the fix-income

market and the credit market."

32.     On July 17, 2007, Merrill announced its financial results for the second quarter of

2007, in a release which stated in part:

> Merrill Lynch today reported very strong net revenues, net earnings and
> earnings per diluted share for the second quarter of 2007, which enabled the
> company to achieve record net revenues, net earnings and net earnings per diluted
> share for the first half of 2007.

> Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent
> from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion
> in the first quarter of 2007. Year-over-year, strong revenue growth in both Global
> Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as
> well as across all global regions, drove the increase. These are the highest net
> revenues Merrill Lynch has ever generated in a fiscal second quarter and the second
> highest the firm has generated for any quarterly period on an operating basis,
> excluding from the comparison the $2.0 billion one-time, pretax gain that arose from
> the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE:
> BLK) in the third quarter of 2006.

> Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent
> from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26
> for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the
> second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax
> profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage
> points from the prior-year period, and the annualized return on average common
> equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value
> per share was $43.55, up 17 percent from the end of the second quarter of 2006.

> "We delivered another strong quarter in a volatile and, at times, hostile
> market environment," said Stan O'Neal, chairman and chief executive officer of
> Merrill Lynch. "These results reflect our revenue diversification, which makes
> possible strong performance despite uneven market conditions. Our focus on
> business and revenue growth, expense discipline and global expansion continues to
> enhance the earnings power of our franchise."

> Net revenues for the first six months of 2007 set a record, at $19.6 billion, up
> 21 percent from $16.1 billion in the first half of 2006. Record net earnings per
> diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while
> net earnings of $4.3 billion were up 104 percent. Results for the first six months of
> 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred
> in the first quarter of that period. Excluding those expenses, net earnings per diluted
> share were up 37 percent from the prior-year period, while net earnings were up 31

percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review**:

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses.

\*        \*        \*

**Merrill Lynch Investment Managers (MLIM)**

On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

\*        \*        \*

**Income Taxes**

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

**Share Repurchases**

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

33.    During July 2007, most bank stocks declined due to the credit squeeze. Merrill's stock, while dropping, continued to trade at artificially inflated levels due to the concealment of its own mortgage-related problems.

34.    As other banks announced they would take mortgage-related charges in the third quarter of 2007, Merrill also announced a $5.5 billion charge for its third quarter 2007, in early October. O'Neal stated with respect to the charge that, "'Despite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our FICC [fixed income, currencies and commodities] businesses than we expected earlier in the quarter.'" The market did not react adversely to this news as it was in line with other banks' charges.

35.    Then, on October 24, 2007, before the market opened, Merrill issued a press release which announced the third quarter charge would be $8 billion instead of $5 billion. The release, entitled "Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations of $2.85 Per Diluted Share; Record Net Revenues From Global Private Client, Equity Markets and Investment Banking for the First Nine Months of 2007," stated in part:

> Merrill Lynch today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these one-time items. . . .

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

- Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

    - FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities

*     *     *

*Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.*

FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

- Equity Markets net revenues increased 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes.

Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

- Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

- The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

- GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

36.    On this news, Merrill's stock dropped from $67.12 per share to as low as $61.40 per share, closing at $63.22 per share on volume of 52 million shares.

37.    Subsequently, on October 25, 2007, S&P reduced Merrill's credit rating to negative after the brokerage reported the biggest quarterly loss in its 93-year history, causing Merrill's stock to dramatically drop to $60.90 per share. The stock only began to recover upon speculation that Merrill's CEO might be replaced.

38.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

- 23 -

(a)    The Company was more exposed to CDOs containing subprime debt than it

disclosed; and

(b)    The Company's Class Period statements were materially false due to their

failure to inform the market of the ticking time bomb in the Company's CDO portfolio due to the

deteriorating subprime mortgage market which caused Merrill's portfolio to be impaired.

39.    More news confirmed that top management of Merrill had been aware of the risk but

concealed it and continued to make investments in CDOs due to the lucrative fees involved.

40.    On October 25, 2007, *The Wall Street Journal* wrote:

After presiding over one of the biggest losses in Wall Street history, Merrill Lynch & Co. Chief Executive Stanley O'Neal finds himself with a weakened power base as he fends off charges that he let the firm's exposure to risky mortgages get out of hand.

Merrill said yesterday it took a $8.4 billion hit in the third quarter from revaluing bonds backed by mortgages and other write-downs. That was far higher than the $5 billion hit Merrill estimated just two and a half weeks ago – a surprise that led the firm's stock price to fall 5.8% as its credit rating was downgraded.

Overall, Merrill recorded a $2.24 billion loss for the quarter, making it the only one of Wall Street's five biggest investment banks to end the period in the red. Ratings firm Standard & Poor's described the write-downs as "staggering" and blamed "management miscues."

\*        \*        \*

Mr. O'Neal pushed to expand Merrill's role in new kinds of bonds and other financial instruments, which helped propel profits in recent years before leading to trouble. Merrill's annual operating profit averaged $5.22 billion between 2003 and 2006, more than double the $2.11 billion average in the preceding five years.

The $8.4 billion hit leaves it clear that Mr. O'Neal and his team didn't always appreciate the risks they took to achieve the greater profits. The write-downs surpass a $6 billion loss suffered in 2005 by the hedge fund Amaranth LLC, which had stood as the largest single known Wall Street loss.

\*        \*        \*

On the conference call, Mr. O'Neal accepted a share of responsibility, saying, "I am accountable for the mistakes as I am accountable for the performance of the firm overall."

That didn't prevent a tough interrogation by analysts who wondered why Merrill's estimate of its losses a few weeks ago was so far off. When Mr. O'Neal and another Merrill executive noted that Merrill had volunteered more information about its exposure than its Wall Street peers, analyst Mike Mayo of Deutsche Bank AG retorted, "But your peers didn't take an $8 billion write-down."

Merrill's $2.24 billion overall loss for the quarter came to $2.82 a share, compared with a profit of $1.94 billion, or $2 a share, a year earlier, before a one-time gain from the transfer of Merrill's money-management unit to BlackRock. It was Merrill's first quarterly loss since 2001.

\*        \*        \*

Merrill said it had cut in half its exposure to one risky asset class – collateralized debt obligations, which are securities backed by pools of assets including mortgages. It said it now has $15.2 billion in CDOs, down from $32.1 billion three months earlier.

Analysts pushed Merrill to say whether it had cut its exposure by selling the CDOs or by buying hedges in an attempt to balance future losses. Mr. O'Neal declined to give a breakdown.

Merrill has been Wall Street's leading underwriter of CDOs since 2004. In addition to its mortgage and CDO write-downs, Merrill recorded an additional $463 million of losses, or $967 million before deducting fees, from commitments to finance leveraged buyouts and other corporate activities. The firm said it exercised "aggressive and effective risk management" in limiting the corporate loan losses.

\*        \*        \*

For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world. But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging. Many investors felt they had invested enough money in this asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market.

For Merrill, the fees it earned from arranging deals were too lucrative to give up. Its profits averaged 1.25% of the deal volumes it did, or around $12.5 million for each $1 billion CDO. More than 70% of the securities issued by each CDO bore triple-A credit ratings. Traditionally these top-rated securities were insured by a financial guaranty company, which effectively bore the risk of losses. But by mid-

2006, few bond insurers were willing to write protection on CDOs that were ultimately backed by subprime mortgages to people with poor credit histories.

According to people familiar with the matter, Merrill put large amounts of AAA-rated CDOs onto its own balance sheet, thinking they were low-risk assets because of their top credit ratings. Many of those assets dived in value this summer.

41.     As a result of defendants' false statements, Merrill's stock price traded at inflated levels during the Class Period. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down more than 30% from their Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

42.     By misrepresenting Merrill's business, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Merrill's business was not as healthy as represented, Merrill falsely overstated its net income, and falsely concealed the problems with its CDO portfolio.

43.     These omissions caused and maintained the artificial inflation in Merrill's stock price throughout the Class Period and until the truth about its future earnings was revealed to the market.

44.     Defendants' false and misleading statements had the intended effect and caused Merrill stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $95 per share.

45.     On October 24, 2007, before the market opened, defendants were forced to publicly disclose the extent of problems with the Company's CDO portfolio, causing its stock to drop to as low as $61.40 per share on October 24, 2007 – a one day decline of $5.72 per share. As a direct result of defendants' admissions and the public revelations regarding the truth about Merrill's profitability and its actual business prospects going forward, Merrill' stock price dropped more than $5 per share in October 2007 and more than $30 per share from May 2007. This drop removed the

- 26 -

inflation from Merrill's stock price, causing real economic loss to investors who had purchased the
stock during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

46.    Plaintiff incorporates ¶¶1-45 by reference.

47.    During the Class Period, defendants disseminated or approved the false statements
specified above, which they knew or deliberately disregarded were misleading in that they contained
misrepresentations and failed to disclose material facts necessary in order to make the statements
made, in light of the circumstances under which they were made, not misleading.

48.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts
necessary in order to make the statements made, in light of the circumstances under which they were
made, not misleading; or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or
deceit upon plaintiff and others similarly situated in connection with their purchases of Merrill
common stock during the Class Period.

49.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of
the market, they paid artificially inflated prices for Merrill common stock. Plaintiff and the Class
would not have purchased Merrill common stock at the prices they paid, or at all, if they had been
aware that the market prices had been artificially and falsely inflated by defendants' misleading
statements.

- 27 -

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

50.     Plaintiff incorporates ¶¶1-49 by reference.

51.     The Individual Defendants acted as controlling persons of Merrill within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Merrill stock, the Individual Defendants had the power and authority to cause Merrill to engage in the wrongful conduct complained of herein. Merrill controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Merrill common stock during the Class Period (the "Class"). Excluded from the Class are defendants.

53.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Merrill has over 859 million shares of common stock and 2.6 million exchangeable shares outstanding, owned by hundreds if not thousands of persons.

54.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- 28 -

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Merrill's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

55.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

56.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

57.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages, including interest;

C.    Awarding plaintiff's reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 30, 2007

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

ABRAHAM FRUCHTER & TWERSKY LLP
JACK G. FRUCHTER
One Pennsylvania Plaza, Suite 2805
New York, NY 10119
Telephone: 212/279-5050
212/279-3655 (fax)

Attorneys for Plaintiff

- 30 -

## CERTIFICATION OF LIFE ENRICHMENT FOUNDATION
## IN SUPPORT OF CLASS ACTION COMPLAINT

Life Enrichment Foundation (Aplaintiff@) declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff=s counsel or in order to participate in any private action arising under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, plaintiff executed the following transactions in the stock of Merrill Lynch & Co. Inc.  See Attachment A:

5.    In the past three years, plaintiff has not served, nor sought to serve, as a representative party on behalf of a class in an action filed under the federal securities laws.

1.    Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff=s pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29th day of October, 2007.

_____
Life Enrichment Foundation

## ATTACHMENT A

| DATE | ACTION | AMOUNT | PRICE |
|------|--------|--------|-------|
| 06/29/2007 | Bought | 130 | $82.90 |
| 10/19/2007 | Bought | 55 | $67.97 |