UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (LBS)(AJP)(DFE) **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates To: Securities Action, 07cv9633 (LBS) (AJP) (DFE) | JURY TRIAL DEMANDED |

RECEIVED
08 MAY 21 PM 7:57
U.S. DISTRICT COURT
S.D.N.Y.

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.  NATURE AND GENERAL OVERVIEW OF THE CLAIMS .................... 1

II.  JURISDICTION AND VENUE ................................................ 1

III.  CLAIMS AGAINST DEFENDANTS MERRILL, O'NEAL,
     FAKAHANY, FLEMING AND EDWARDS UNDER
     SECTION 10(b) AND RULE 10b-5 AND UNDER SECTION 20(a)
     OF THE EXCHANGE ACT ........................................................ 2

     A.  Overview of the Exchange Act Claims ............................................ 2

          1.  *The Exchange Act Defendants Fundamentally Altered
             Merrill's Risk Exposure by Secretly Accumulating Over
             $40 Billion of U.S. Subprime ABS CDOs Exposures* ................................. 9

          2.  *Prior to and During the Class Period the Exchange Act
             Defendants Knowingly or Recklessly Disregarded the
             Rapidly Deteriorating Market for U.S. Subprime ABS
             CDOs and Failed to Timely and Adequately Fully
             Disclose the True Extent of Merrill's Exposure* ...................................... 16

     B.  The Exchange Act Parties ................................................................ 26

     C.  The Exchange Act Defendants' Role in the Subprime and
         CDO Industry .................................................................................. 29

          1.  *MBSs, CDOs and U.S. Subprime ABS CDOs* ........................................... 31

               a.  Residential Mortgages ....................................................... 31

               b.  Individual Mortgages are "Pooled" and Securitized........................... 32

               c.  CDOs Acquire Assets Such as RMBs, Derivatives
                   or Other CDOs ................................................................... 33

          2.  *The Exchange Act Defendants Knowingly or Recklessly
             Disregarded the Exposure that Merrill Faced* .......................................... 37

               a.  The Exchange Act Defendants Abandoned Merrill's
                   Risk Management Practices and Controls and its
                   Risk Measurement Profiles and Exposures......................................... 37

               b.  Defendants Recklessly Expanded Merrill's CDO
                   Exposure and Hid It From Merrill Shareholders ................................. 40

i

c.  High Level Employees Warn Merrill Executives Including Defendants That They Are Over Exposed to CDO and Other Subprime Debt ...................... 44

d.  Merrill Was Aware of a Material Decline in the Housing Market and a Material Increase in Defaults by Subprime Borrowers ..................... 47

e.  Subprime Loan Originators Filed For Bankruptcy ............................ 49

    i.   ResMAE .................................................................... 50

    ii.  Ownit Mortgage Solutions, Inc. ("Ownit") .................................. 52

    iii. Mortgage Lenders Network USA, Inc. ("MLN") ......................... 54

    iv.  Other Subprime Originators ........................................... 55

f.  Two Key MBS and CDO Indices Suffer Significant Declines Requiring Merrill to Writedown CDO and Subprime-Related Debt ..................... 55

g.  Bear Stearns Hedge Funds Collapse and Merrill Is Unable to Sell Its Assets ..................... 61

h.  Merrill's Misleading and Manipulated Value at Risk Disclosures ..................... 64

i.  Unauthorized Sale of CDOs to Broker Customers ............................ 66

j.  Simultaneously Committing the Same Control Rights on CDOs to More Than One Counterparty ............................ 72

3.  *Stock Offerings and Compensation* .......................................... 75

4.  *Defendants' CDO Scheme Crashes* ......................................... 78

IV.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT CONDUCT DURING THE CLASS PERIOD ....... 79

A.  Financial Results for the Fiscal Quarter Ended September 29, 2006 .......................... 79

B.  Registration Statement Amendment No. 1 (December 7, 2006 Offering) ....................... 87

C.  Financial Results for the Fiscal Year Ended December 29, 2006 .......................... 88

D.  Series 5 Preferred Stock Prospectus
(March 15, 2007 Offering) ............................................................... 106

E.  Registration Statement Amendment No. 2
(April 25, 2007 Offering) ................................................................ 107

F.  Financial Results for the Fiscal Quarter
Ended March 30, 2007 ................................................................... 107

G.  First Republic Acquisition .......................................................... 124

H.  Financial Results for the Fiscal Quarter Ended
June 29, 2007 .............................................................................. 124

I.  Registration Statement Amendment No. 3
(August 15, 2007 Offering) ............................................................ 141

J.  September 14, 2007 Form 8-K ..................................................... 141

K.  Financial Results for the Fiscal Quarter
Ended September 28, 2007 ............................................................ 143

V.          THE CLASS PERIOD ENDS .................................................. 157

VI.         THE EXCHANGE ACT DEFENDANTS'
VIOLATIONS OF GAAP .......................................................... 162

VII.        LOSS CAUSATION/ECONOMIC LOSS ................................ 184

VIII.       FRAUD-ON-THE-MARKET DOCTRINE ............................. 190

IX.         NO SAFE HARBOR ............................................................... 191

COUNT I    (For Violation of Section 10(b) of the Exchange
Act and Rule 10b-5(b) Against Defendants Merrill,
O'Neal, Fakahany, Fleming and Edwards) ................................. 191

COUNT II   (For Violation of Section 10(b) of the Exchange
Act and SEC Rules 10b-5(a) and (c) Against
Defendants Merrill, MLPFS and O'Neal, Fakahany,
Fleming and Edwards) ................................................................ 195

COUNT III  (For Violation of Section 20(a) of the 1934 Act
Against Defendants O'Neal, Fakahany,
Fleming and Edwards) ................................................................ 197

X.          CLAIMS AGAINST DEFENDANTS UNDER
SECTIONS 11, 12, AND 15 OF THE SECURITIES
ACT AND SECTION 14(a) OF THE EXCHANGE ACT ...................... 199

A.  Overview of Securities Act and Proxy Claims ........................................ 199

    1.  *December 7, 2006 Offering* ............................................................... 203

    2.  *March 15, 2007 Offering* ................................................................. 203

    3.  *April 25, 2007 Offering* .................................................................. 204

    4.  *August 15, 2007 Offering* ............................................................... 205

    5.  *First Republic Acquisition* .............................................................. 205

B.  Securities Act and Proxy Claim Plaintiffs ............................................. 207

C.  Securities Act and Proxy Claim Defendants ........................................... 207

D.  Registration Statement Amendment No. 1
    (December 7, 2006 Offering) .................................................................. 210

    1.  *October 17, 2006 Form 8-K* ............................................................ 211

    2.  *False Financial Results for the Fiscal Quarter
        Ended September 29, 2006* ............................................................. 211

E.  Series 5 Preferred Stock Prospectus
    (March 15, 2007 Offering) ..................................................................... 216

    1.  *Merrill's January 18, 2007 8-K* ...................................................... 217

    2.  *False Financial Results for the Year Ended
        December 29, 2006* ....................................................................... 218

F.  Registration Statement Amendment No. 2
    (April 25, 2007 Offering) ...................................................................... 226

    1.  *Merrill'ss April 19, 2007 Form 8-K* ............................................... 226

G.  Registration Statement Amendment No. 3
    (August 15, 2007 Offering) .................................................................... 227

*1.  False Financial Results for the Quarter
    Ended March 30, 2007* ........................................................................... 228

    2.  *Merrill's July 17, 2007 Form 8-K* ................................................... 233

    3.  *False Financial Results for the Quarter
        Ended June 29, 2007* .................................................................... 235

H.  First Republic Registration Statement ................................................... 241

I.   GAAP Violations ........................................................................................ 242

COUNT IV   (Against Defendants Merrill, ML Trust I, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 11 of the Securities Act in Connection with the December 7, 2006 Offering) ...................................................................... 245

COUNT V   (Against Defendants ML Trust I, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the December 7, 2006 Offering) ................................ 247

COUNT VI   (Against Defendants Merrill, O'Neal, Edwards, MLPFS and Deloitte for Violations of Section 11 of the Securities Act in Connection with the March 15, 2007 Offering) ............................. 248

COUNT VII   (Against Defendants Merrill and MLPFS for Violations of Section 12(a)(2) of the Securities Act in Connection with the March 15, 2007 Offering) ............................................................ 250

COUNT VIII   (Against Defendants Merrill, ML Trust II, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte for Violations of Section 11 of the Securities Act in Connection with the April 25, 2007 Offering) ...................................... 251

COUNT IX   (Against Defendants ML Trust II, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the April 25, 2007 Offering) ...................................... 253

COUNT X   (Against Defendants Merrill, ML Trust III, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte for Violations of Section 11 of the Securities Act in Connection with the August 15, 2007 Offering) ................................................................ 254

COUNT XI   (Against Defendants ML Trust III, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the August 15, 2007 Offering) ................................... 256

COUNT XII   (Against Defendants Merrill, O'Neal, Edwards and Deloitte for Violations of Section 11 of the Securities Act in Connection with the First Republic Registration Statement) ................................................................ 257

COUNT XIII (Against Defendant Merrill for Violations of
          Section 12(a)(2) of the Securities Act in Connection
          with the First Republic Registration Statement).......................................259

COUNT XIV (Against Defendants O'Neal, Edwards and Merrill
          for Violations of Section 15 of the Securities Act)....................................260

COUNT XV (Against Defendants Merrill, O'Neal, Edwards and
          Deloitte for Violations of Section 14(a) of the Exchange
          Act and Rule 14a-9 in Connection with the First Republic
          Registration Statement)...............................................................................262

IX.          FRAUD-ON-THE-MARKET DOCTRINE .............................................264

XI.          CLASS ACTION ALLEGATIONS .........................................................264

PRAYER FOR RELIEF ............................................................................................266

Lead Plaintiff State Teachers' Retirement System of Ohio ("Ohio STRS" or "Lead Plaintiff"), by its undersigned counsel, and Plaintiff Gary Kosseff, by his undersigned counsel, individually and on behalf of all other persons who purchased or acquired Merrill Lynch & Co., Inc. ("Merrill" or the "Company") common stock and certain preferred stock during the class period set forth hereafter or securities issued pursuant to the registration statements set forth hereafter, make the following allegations, which are based upon the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of the public announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, press releases, analyst and media reports regarding Merrill, pleadings and other documents filed in other litigations involving Merrill, and certain other public filings.

## I.     NATURE AND GENERAL OVERVIEW OF THE CLAIMS

1.     This is a securities class action brought under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o; Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) 78n(a) and 78t(a); and SEC Rules 10b-5 and 14a-9, 17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9(a).

## II.     JURISDICTION AND VENUE

2.     This court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331, 1337, and 1367.

3.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C.

§§ 1391(b) and (c). Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Merrill maintains its principal office in New York, New York.

4.    In connection with the acts and omissions alleged in this Consolidated Amended Class Action Complaint, all of the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    CLAIMS AGAINST DEFENDANTS MERRILL, O'NEAL, FAKAHANY, FLEMING AND EDWARDS UNDER SECTION 10(b) AND RULE 10b-5 AND UNDER SECTION 20(a) OF THE EXCHANGE ACT

## A.    Overview of the Exchange Act Claims

5.    During the class period, the Exchange Act Defendants (as hereafter defined) built up a huge exposure to U.S. subprime residential mortgage-related and asset backed securities ("ABS"), collateralized debt obligations ("CDOs"), and related exposures and activities (hereinafter referred to "U.S. subprime ABS CDOs" or "U.S. subprime ABS CDO exposures") which reached $40 billion by the end of June 2007. [1]  However, they did not disclose Merrill's huge exposure to these securities, until October 5, 2007, when Merrill first began to disclose its tens of billions of dollars of exposure and began to initiate write-downs. Moreover, even the October 5 disclosure was materially false and misleading.  By January 17, 2008, Merrill had written down over $24 billion in U.S. subprime ABS CDO exposures.

6.    When questions began to arise in April 2007 regarding Merrill's exposure to U.S. subprime ABS CDOs, the Exchange Act Defendants sought to minimize, hide and obscure Merrill's exposure by falsely representing that Merrill's risk controls and hedging

---

[1]  Annexed hereto as Appendix A is an appendix containing definitions of many of the terms used herein.  The terms "ABS" and "CDO" are defined in Appendix A.

techniques were effectively mitigating and minimizing any impact that subprime issues

would have on Merrill.  Moreover, the Exchange Act Defendants falsely led investors to

believe that the impact of subprime issues would be minimal on Merrill by repeatedly

representing that Merrill's revenues from its subprime-related activities were less than 1% of

Merrill's net revenues, without disclosing that Merrill had tens of billions of dollars of U.S.

subprime ABS CDO exposures, which greatly exceeded its reported earnings.  By February

2007, Merrill's U.S. subprime ABS CDO exposures had become substantially impaired and

should have been materially written down by Merrill.

        7.      By the beginning of the Class Period, the Exchange Act Defendants were well

aware of materially declining trends in the U.S. housing market, rising default rates among

subprime borrowers and that Merrill had required Ownit, an originator of subprime

mortgages (in which Merrill had made a substantial investment, which gave a Merrill

executive a seat on Ownit's board), to materially lower its underwriting standards for loans

that Merrill was to purchase from Ownit, which provided Merrill more subprime product for

its securitization and CDO activities.  Of course, materially lowering underwriting standards

virtually guaranteed materially greater defaults which, as set forth herein, did occur.

        8.      Moreover, top Merrill executives were warned in the summer of 2006 by

Jeffrey Kronthal, also a top Merrill executive, that Merrill's U.S. subprime ABS CDO

exposures were ballooning, very risky, and should be curtailed.  Shortly after these warnings,

Kronthal and members of his team were fired by O'Neal and Merrill's CDO business was

further ramped up by, among other things, in late 2006, acquiring First Franklin, a subprime

mortgage originator.

9.      However, the reduction of mortgage underwriting standards which resulted in a substantial increase to Merrill of subprime mortgages did not satisfy Merrill's increasing need for subprime mortgage product to securitize and create mortgage backed securities ("MBSs"), which Merrill needed to feed its CDO machine.  Therefore, Merrill leveraged these subprime mortgages by creating derivative securities such as credit default and total return swaps, which were based upon and mimicked the underlying subprime MBSs.  This multiplied Merrill's revenues and profits in the short term, but also magnified its risks exponentially since these tens of billions of dollars of supposed assets were built on a shaky foundation of subprime mortgages.

10.      Because Merrill was reporting so much revenue from the issuance of U.S. subprime ABS CDOs and because top Merrill management also profited handsomely from the issuance of these CDO products, the Exchange Act Defendants refused to shut down Merrill's CDO machine.  Further, at the very time the market for subprime-related debt was deteriorating, defendants Stanley O'Neal ("O'Neal"), Gregory J. Fleming ("Fleming"), and Ahmass L. Fakahany ("Fakahany") sold millions of dollars worth of Merrill stock and profited handsomely.

11.      Additionally, in July and August 2007 defendants Fleming and Fakahany warned Merrill's Board of Directors about Merrill's exploding U.S. subprime ABS CDO exposures by sending a detailed letter to the Merrill board describing the extensive nature of Merrill's U.S. subprime ABS CDO exposures.

12.      Defendant O'Neal resigned in October 2007 in the wake of Merrill's disclosures beginning that month regarding Merrill's exposure to U.S. subprime ABS CDOs, but exited with a pay package of more than $160 million.  Merrill is now the subject of an

investigation by the SEC, and other regulators and governmental authorities are investigating Merrill's subprime-related issues.

13.    The Exchange Act claims are brought on behalf of a class of purchasers or acquirers of Merrill common stock and the following preferred securities purchased during the period October 17, 2006 through January 16, 2008 (the "Class Period"):

(a) Merrill Lynch Preferred Capital Trust III – 7% Cumulative Trust Originated Preferred Securities ("TOPRS");

(b) Merrill Lynch Preferred Capital Trust IV – 7.12% Cumulative TOPRS;

(c) Merrill Lynch Preferred Capital Trust V – 7.28% Cumulative TOPRS;

(d) Merrill Lynch Series 1 Preferred;

(e) Merrill Lynch Series 2 Preferred;

(f) Merrill Lynch Series 3 Preferred;

(g) Merrill Lynch Series 4 Preferred;

(h) Merrill Lynch Series 5 Preferred;

(i) Merrill Lynch Series 6 Preferred;

(j) Merrill Lynch Series 7 Preferred;

(k) Merrill Lynch Capital Trust I Preferred 6.45% Securities;

(l) Merrill Lynch Capital Trust II Preferred 6.45% Securities; and

(m) Merrill Lynch Capital Trust III Preferred 7.375% Securities.

14.    The Exchange Act defendants are Merrill, O'Neal, Fakahany, Fleming, and Edwards (collectively, the "Exchange Act Defendants").

15.    The Class Period begins on October 17, 2006, the day that Merrill announced its third quarter results.  On that day, Merrill's common stock closed at $84.54 per share.  On

October 5, 2007, Merrill announced a partial write-down of $4.5 billion related to U.S. subprime ABS CDOs exposures.  On October 24, 2007, Merrill announced that the write-down increased to $7.9 billion, more than the $3.0 billion higher than the Company had said on October 5, 2007.  On the news of the October 24, 2007 announcement, Merrill's stock declined from $67.12 per share on October 23, 2007 to $63.22 on October 24, 2007 on volume of more than 52 million shares.  The Class Period ends on January 16, 2008, the day before Merrill announced that it would write down another $16.7 billion related to U.S. subprime ABS CDOs.  On this news, Merrill's stock price declined from $55.09 per share on January 16, 2008 to $49.45 per share on January 17, 2008 on volume of more than 73 million shares.

16.    Lead Plaintiff alleges that the Exchange Act Defendants engaged in manipulative practices and made materially false and misleading statements in Merrill's press releases, conference calls, at Merrill's annual shareholder meeting on April 27, 2007 and in SEC filings, including without limitation, its Registration Statements and reports on Forms 10-K and 10-Q.  As explained in more detail herein,  the Exchange Act Defendants made false and misleading statements and omissions by, among other things:

  a. Failing to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period and over $40 billion of U.S. subprime ABS CDOs by June 29, 2007 (see ¶¶17-33; 74-91);

  b. Failing to disclose that in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk

6

management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-66; 92-115);

c.   Violating generally accepted accounting principles ("GAAP") by falsely representing Merrill's trading assets and liabilities as reported in its 10-Qs for the periods ending March 30, June 29 and September 28, 2007 based on the failure to properly mark to market the true value of its U.S. subprime ABS CDO exposures (see ¶¶142-161; 337-382);

d.   Violating GAAP by falsely representing Merrill's net earnings and earnings per share as reported in its earnings releases and 10-Qs for the periods ending March 30, June 29 and September 28, 2007 based on the failure to properly mark to market the true value of its U.S. subprime ABS CDO exposures (see ¶¶142-161; 337-382);

e.   Representing that it mitigated market and credit risk on trading assets and liabilities by being adequately hedged and that these hedging techniques were supplemented by adequate corporate risk management policies and procedures, when in fact the Exchange Act Defendants had knowingly or recklessly ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶92-115);

f.   Failing to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including companies such as XL Capital Assurance Inc.

("XL") and ACA Capital Holdings Inc. ("ACA"), and thus materially increasing Merrill's counterparty risk (see ¶¶100-107; 179-184);

g.  Understating Merrill's reported VaR by not adequately considering that Merrill's risky U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below and thus falsely convincing analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167);

h.   Failing to disclose that the Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, Mortgage Lenders Network USA, Inc. ("MLN") and Ownit (see ¶¶116-141).  With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards which provided Merrill access to a greater number of subprime mortgages (see ¶¶129-137);

i.  Failing to disclose that as a result of the lowered underwriting guidelines, Merrill, by the beginning of the Class Period, had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶116-141);

j.   Failing to disclose that by at least April 13, 2007 Merrill informed National City Bank that as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006 the value of First Franklin mortgages held for sale were materially overvalued at the time of the First Franklin closing on December 30, 2006 (see ¶¶121-123);

k.   Falsely representing that because of Merrill's hedging techniques and risk management policies, it would not be materially affected by issues related to the subprime market (see ¶¶41-52; 92-107; 179-184);

l.   Obscuring and concealing Merrill's U.S. subprime ABS CDO exposure by falsely representing that Merrill's subprime-related revenue from this exposure was less than 1% of net revenues company-wide (see ¶¶41-45; 168-178); and

m.   Violating GAAP by failing to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶92-99, 142-153; 335-380).

### 1.   The Exchange Act Defendants Fundamentally Altered Merrill's Risk Exposure by Secretly Accumulating Over $40 Billion of U.S. Subprime ABS CDO Exposures

17.   Defendant O'Neal was named to the Company's top executive position near the end of 2002 and set out to expand Merrill's role as a creator, underwriter and trader of U.S. subprime ABS CDOs in order to increase Merrill's reported revenues and profits and thereby increase his own compensation. He moved Merrill away from its traditional role as stockbroker to the average main street investor and refocused its business. According to an article in *USA Today* on October 31, 2007, "[u]nder O'Neal's watch, people skills didn't

matter anymore. Within months of his ascension to the top job, he fired an array of senior executives, some of whom had been his rivals and some of whom had been his biggest supporters. The message: Making it at the new Merrill would be all about performance and whether you followed O'Neal in lockstep. . . .  [A]fter watching other Wall Street banks turbocharge their earnings with investments in CDOs based on subprime mortgages, O'Neal invested heavily in the area."

18.    In 2002, Merrill underwrote approximately $2.2 billion in CDOs and was not a major player in the CDO market, ranking 15th among CDO underwriters.  Subsequently, Merrill ramped up its underwriting of CDOs and by 2004 was the biggest underwriter of CDOs, underwriting $19 billion.  In 2005, Merrill's total underwriting increased to approximately $35 billion, of which $14 billion were backed by securities tied to subprime mortgages.  By 2006, Merrill underwrote $53.7 billion of CDOs, of which more than two-thirds were backed by subprime mortgages.  The reason for Merrill's increased interest in CDOs was clear:  fees on such deals are typically 1.25% to 1.5% of the face value of the debt issued.  For 2005 and 2006, Merrill's fees were approximately $400 million and $700 million, respectively, in underwriting fees alone.  Merrill further profited from securitizing mortgages and trading and investing in U.S. subprime ABS CDOs.

19.    By all public accounts, until October 2007, it appeared that O'Neal's strategy for Merrill was succeeding.  For 2006, Merrill reported total net revenues of $34 billion resulting in reported net earnings of $7.5 billion. Merrill reported total net revenues of $9.9 billion resulting in net earnings of $2.2 billion for the quarter ending March 30, 2007 and net revenues of $9.7 billion resulting in reported net earnings of $2.1 billion for the quarter ending June 29, 2007.

20.    However, what these results did not disclose to investors was that the reported record profits were achieved at the expense of adding tens of billions of dollars of risky U.S. subprime ABS CDO exposures to Merrill's balance sheet, and additional exposure in off-balance sheet arrangements.  The record profits for 2006 and the first two quarters of 2007 would later be more than wiped out by the over $30 billion of write-downs that Merrill would take in the third and fourth quarters of 2007 and the first quarter of 2008.  These write-downs were a direct result of Merrill's exposures to, and activities in, risky U.S. subprime ABS CDOs, as detailed more fully below.

21.    It was not Merrill's role as an underwriter alone that resulted in its write-down of approximately $30 billion of U.S. subprime ABS CDOs.  In 2006, Merrill, through a shift in its CDO and subprime-related activities directed in part by O'Neal, became not only an underwriter of CDOs, but also began to be a major purchaser and holder of U.S. subprime ABS CDOs.  In fact, it was Merrill's move away from its limited role as an underwriter that resulted in it becoming exposed to over $40 billion worth of risky U.S. subprime ABS CDOs by June 29, 2007.  Merrill hid this exposure from its shareholders until it belatedly started to write down these instruments in the third quarter of 2007.

22.    The Exchange Act Defendants' strategy was based on a simple proposition: the more CDOs Merrill sold and the larger those CDOs were, the greater the Company's profits.  But as the number and size of deals increased, the risk retained by Merrill also increased exponentially.  As the business grew, the risk related to U.S. subprime ABS CDO exposures on (and off) Merrill's balance sheet was growing at an undisclosed, but increasing rate.  Beginning in mid-2006 it began to accumulate $5 billion to $6 billion of exposure per quarter on its balance sheet in very risky U.S. subprime ABS CDOs.  Unbeknownst to

Merrill shareholders, the Exchange Act Defendants were excessively and unreasonably leveraging Merrill's balance sheet in an effort to generate reportedly increased revenues and thereby increase the compensation of a few Merrill executives. Such compensation was tied to revenues generated without regard to risk retained (or hidden).

23.    For example, the executives of Merrill's Fixed Income Currencies and Commodities ("FICC"), responsible for underwriting CDOs, were compensated based upon revenues generated. Therefore, this group was motivated to increase the number and size of deals to achieve higher compensation. In a typical deal, the underwriter was paid a 1.25% underwriting fee on the total size of the deal. Prior to the Class Period, for transactions with heavy concentrations of subprime debt, the "usual" size topped out around $500 million, which would generate about $6.25 million in fees for Merrill.

24.    As the chart below clearly demonstrates, there was a direct link between CDO volume, annual profit and O'Neal's and other senior executives' pay.



The *Wall Street Journal*, April 16, 2008 at A14.

25.    Moreover, during the Class Period, defendants O'Neal, Fakahany and Fleming received significant compensation packages and sold Merrill stock at inflated prices. For example:

(a) Defendant O'Neal (Merrill's Chief Executive Officer ("CEO")) sold in excess of $18 million in Merrill stock during the Class Period and received a benefits package of over $160 million of cash and stock at the time of his resignation;

(b) Defendant Fakahany (Merrill's Co-President and Chief Operating Officer ("COO") during the Class Period) sold more than $13 million in Merrill stock and also received significant other compensation; and

(c) Defendant Fleming (Merrill's President and COO during the Class Period) sold more than $4 million in Merrill stock during the Class Period and received other significant compensation.

26.     Traditionally, CDOs were backed by cash assets in the form of MBS created from subprime mortgages.  However, the increased appetite for CDOs related to subprime mortgages created a shortage of subprime mortgages for use in CDOs.  At first, Merrill tried to fill this shortage by relaxing the underwriting guidelines of mortgages used in MBS. However, in 2006, even the relaxed standards for mortgages were not enough to feed Merrill's U.S. subprime ABS CDO machine.  So, it began to create a variety of derivative contracts to include as assets in CDOs to supplement the short supply of subprime residential mortgages.

27.     During the Class Period, the Exchange Act Defendants caused Merrill to be exposed to great risk by heavily leveraging their investments in risky subprime mortgages. Merrill did so by materially lowering the underwriting guidelines for subprime mortgages in order to create more loans that served as the basis for MBSs and CDOs underwritten by Merrill.  At the same time, Merrill invested little equity into its CDOs and instead used leverage to significantly increase the value of its CDOs.

28.    Such heavily leveraged CDOs were called "Synthetic CDOs" because approximately 10% of their assets were actual MBSs and the remaining 90% was comprised of highly speculative derivative contracts. During the Class Period, by using derivative contracts instead of actual MBSs, the size of Merrill CDOs increased from approximately $500 million to approximately $1.5 billion.  This allowed Merrill to reap greater underwriting fees.

29.    In a typical Synthetic CDO with a face value of $1.5 billion, the CDO would purchase approximately $150 million of MBSs or cash assets that generated income streams. Merrill would then enter into derivative contracts with the CDO for the remaining face value of the CDO, or $1.35 billion. In effect, Merrill was making a side bet of $1.35 billion that the underlying $150 million of MBSs would perform as required by the CDO.  This greatly multiplied the risk associated with subprime MBSs.

30.    In effect, the Exchange Act Defendants created a house of cards founded upon risky subprime mortgages.  This "house-of-cards" later collapsed when the value of the underlying subprime assets declined.  As a result of Merrill's extensive use of leverage, its losses were greatly magnified.  These losses caused Merrill to write down the value of its U.S. subprime ABS CDOs by approximately $30 billion.

31.    Moreover, Merrill began to purchase, or commit to purchase, large portions of the debt being issued by the CDO.  In most of the CDOs it underwrote in 2006 and 2007, Merrill retained the super senior portions of the debt.  The super senior debt was rated AAA resulting in a very low rate of return for the investors who held such debt.  As a result, Merrill was often unable to sell those portions of the debt to investors.  The super senior debt retained by Merrill was often as much as 50-75% of the debt issued by the CDO.  In a CDO

of $1.5 billion, Merrill would purchase, or commit to purchase, up to $1 billion of super senior debt.  Even though the super senior debt was rated AAA, it was often backed by assets that were on average only rated BBB.

32.     Because of Merrill's ability to leverage the subprime MBS through CDOs, the CDOs took relatively small amounts of Merrill's capital and, therefore, the CDO line of business was a highly profitable one.  With the potential for high profits, however, came the potential for high losses, as the increased leverage meant that if the underlying subprime collateral defaulted, the consequences would be magnified.  By June 29, 2007, Merrill accumulated over $40 billion worth of U.S. subprime ABS CDO exposures.  The Exchange Act Defendants hid this fact from investors and did not begin to disclose Merrill's exposure to such risky and artificially inflated and leveraged investments until beginning in October 2007, when it wrote down over $7.9 billion of U.S. subprime ABS CDOs and, for the first time, informed shareholders not only of the amount of exposure but also that super senior debt while rated AAA was backed by assets having much lower ratings and greater risk.  The October 2007 write-down and the subsequent write-down in January 2008 of $16.7 billion were a direct result of Merrill taking positions in highly leveraged and risky debt and derivative contracts in U.S. subprime ABS CDO exposures.

33.     Investors in Merrill stock did not know of Merrill's huge CDO exposure or its concentration in the subprime mortgage market. Merrill's financials were so opaque that it was impossible for even a sophisticated reader to decipher the extent of Merrill's exposure to CDOs or subprime debt.  Indeed, despite the fact that Merrill was exposed to billions of dollars of CDOs by the end of 2006, the word "CDO" does not appear in Merrill's annual report on Form 10-K for the period ending December 29, 2006.

15

**2.      *Prior to and During the Class Period the Exchange Act Defendants Knowingly or Recklessly Disregarded the Rapidly Deteriorating Market for U.S. Subprime ABS CDOs and Failed to Timely and Adequately Fully Disclose the True Extent of Merrill's Exposure***

34.      While the billions of dollars Merrill accumulated in U.S. subprime ABS CDOs were hidden from investors, the Exchange Act Defendants were well aware of Merrill's increasing exposure to such risky instruments.  By the beginning of the Class Period, they knew of or received warnings that the market for CDOs was materially deteriorating.  The Exchange Act Defendants chose to knowingly or recklessly ignore these warning signs and instead further ramped up Merrill's exposure to U.S. subprime ABS CDOs.  These warnings continued and intensified throughout the Class Period.  However, despite Merrill's accumulating over $40 billion of exposure to U.S. subprime ABS CDOs, the Exchange Act Defendants never informed shareholders of Merrill's U.S. subprime ABS CDO exposure until Merrill belatedly took its first write-down in October 2007.

35.      In late 2005, American International Group, Inc. ("AIG") advised Merrill that AIG would no longer underwrite insurance to protect Merrill's growing CDO exposure.  Merrill had been relying on insurance purchased from AIG to transfer significant portions of the residual risks created through Merrill's underwriting of CDOs.  Without the backing of a company like AIG, Merrill was forced to turn to other less significant insurers to attempt to protect itself, or in some cases bear the risk of default itself.

36.      In the summer of 2006, Kronthal (head of Merrill's Global Credit Real Estate and Structured Products, Global Markets and Investment Banking), who ran Merrill's fixed income business, including its CDO business, warned top Merrill executives that Merrill was taking too much risk on to its balance sheet and was too exposed to U.S. subprime ABS CDOs.  At or around this time, Merrill's U.S. subprime ABS CDOs were approximately $1

billion.  Nonetheless, top management disregarded this advice and O'Neal fired Kronthal and the members of his group because O'Neal wanted to report allegedly improved results for Merrill, which would enable O'Neal to receive higher compensation through bonuses or otherwise.  According to William D. Dallas ("Dallas") the founder and former chief executive of Ownit, Kronthal was fired because he "couldn't pull the trigger" and defendant O'Neal "wanted to get bigger in this space."  Despite this warning by Kronthal, the Exchange Act Defendants, driven by their revenue addiction, ramped up, rather than pulled back, Merrill's U.S. subprime ABS CDO exposure.  For example, even after the Kronthal warning, Merrill acquired First Franklin, a subprime mortgage originator, precisely to have more subprime product that could be used in creating and underwriting more CDOs.

37.    Additionally, prior to the beginning of the Class Period, the U.S. housing market was materially deteriorating and default rates on home mortgages had begun to materially increase.  For example, Merrill began to exercise "put" rights - *i.e.* rights to return to the originator - certain mortgages that Merrill had purchased from subprime mortgage originators, such as ResMAE, MLN and Ownit, because such mortgages were rapidly defaulting soon after they had been purchased.  Throughout 2006, Merrill exercised more than $400 million in "put rights."

38.    Kronthal had imposed limits on the amount of CDO exposure the firm could keep on its books to approximately $3 - $4 billion.  However, after Kronthal was fired, the Exchange Act Defendants dramatically increased the amount of U.S. subprime ABS CDO exposure on Merrill's books - increasing the exposure to approximately $40 billion in June 2007. In fact, throughout the Class Period, the Exchange Act Defendants continued to

knowingly or recklessly ignore Merrill's risk policies in an attempt to increase short term profits.

39.    Beginning as early as January 2007, in order to help mask the true risk in these CDO investments, Merrill also entered into billions of dollars of credit default swaps ("CDSs") with monoline insurers.  CDSs are essentially insurance contracts.  Although consummated via separate contracts, the economic bottom line of these transactions was that those insurers were supposedly insuring Merrill, or the Merrill-sponsored CDO issuing-entity, against any risk of loss, to either or both principal and interest on CDOs.  Sometimes these insurance policies also purported to insure Merrill or Merrill's CDO issuing-entity on the total return the particular CDO tranche was supposed to yield.  The monoline insurers included entities like ACA, a single A rated insurance company (which insured AAA-rated debt) with severely limited capital, as well as XL, an over leveraged insurer.  These entities were themselves exposed to tens of billions in subprime debt.  However, even as Merrill attempted to obtain insurance from the monolines in an attempt to hedge or reduce its risk, Merrill further exposed itself to the risk of subprime debt by selling billions of dollars in credit protection to hedge funds.

40.    In February 2007, the ABX and the TABX indices (discussed in more detail below in ¶¶142-153), which track prices of certain CDOs and CDO tranches, both start to show signs of material weakening due to rising defaults in subprime mortgages and their impact on MBSs and CDOs.  By the end of the first quarter of 2007, the ABX and TABX had declined significantly by up to 40% at the BBB level, and by at least 15% at the super senior AAA level.  However, the Exchange Act Defendants did not begin to write down Merrill's actual exposure to U.S. subprime ABS CDOs until October 2007.

41.    In April 2007, market analysts began asking questions about the effect the above warning signs would have on Merrill and how much exposure Merrill had to U.S. subprime ABS CDOs.  In response, the Exchange Act Defendants made materially false and misleading statements intended to mislead investors about the impact any such exposure would have on Merrill.  For example, in the April 19, 2007 press release announcing first quarter results, Merrill represented: "Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters."

42.    Defendant Edwards, in a conference call with analysts that same day, added:

As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that *revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters.*  And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.

(Emphasis added).

43.    These comments were designed to minimize any concerns relating to Merrill's exposure to U.S. subprime ABS CDOs.  In that same conference call, the following exchange took place between William Tanona, an analyst for Goldman Sachs, and defendant Edwards:

WILLIAM TANONA, ANALYST, GOLDMAN SACHS: Good morning, Jeff. Obviously, *the environment became a little bit more tricky this first quarter and there were concerns with subprime which you guys seem to have squashed any concerns regarding your exposure ther*e. But I'm wondering if you guys have kind of changed your appetite in this environment or kind of rethinking what you put on your balance sheet or what type of risks you might take or if it has changed how you're approaching the business right now. . . .

Defendant EDWARDS: *risk management, as I said, in the prepared remarks, is a crucial aspect of our business and I think we've done very good job in negotiating these markets as a result of that.* So how are we approaching that? We're certainly looking at new ways to do business where there are opportunities for us to either share risk or presell some of the risk and still do good business. *So I think we're approaching it in a prudent way,* given the environment . . . .

(Emphasis added).

44.     Analyst reports issued following the April 19, 2007 conference call reinforced the idea that Merrill had little risk and exposure related to U.S. subprime ABS CDOs.  For example, in an April 19, 2007 report concerning Merrill, CIBC stated "[t]he quarter was highlighted by record-setting growth in each of its capital markets businesses and strong contribution from its wealth management business…CFO Edwards believes that the subprime mortgage downturn is contained and MER's exposure is small as subprime-related revenue was <1% of firm revs. in the past 5 quarters." According to the April 19, 2007 Wachovia report: "[o]verall sub-prime related revenues for the last five quarters contributed less than 1% to MER's total revenues."  Similarly, in its report dated April 20, 2007, Buckingham Research Group stated "within MBS trading (a source of investor concern) management noted that subprime mortgages represented only 1% of total revenues (and 2% proforma for the recent acquisition of First Franklin)."

45.     The statements made by Edwards were materially false.  First, by the end of the first fiscal quarter of 2007 (March 30, 2007), Merrill was required by GAAP to write down at least 15% of its U.S. subprime ABS CDOs.  By this time, there was a steep decline of at least 40% in the underlying value of mezzanine-related debt securities, which consisted of tranches of CDOs rated below AAA but above the CDOs equity (unrated) tranche and by

at least 15% at the super senior level.  However, Merrill did not timely or properly write down these assets.

46.    As early as April 2007, unable to sell certain debt issued by the CDOs it underwrote, Merrill foisted hundreds of millions of dollars of its less attractive CDOs into the accounts of its large customers without client consent, and contrary to the clients' own requirements that Merrill invest only in liquid, low-risk securities.  This scheme purported to support the Company's claim that it was reducing its concentration in CDOs, but inevitably led to massive customer losses, regulatory investigations, litigation and repayments by Merrill.

47.    In or around April 2007, it began to be disclosed that two hedge funds run by Bear Stearns containing significant subprime holdings including CDOs (some of which were underwritten by Merrill), had become significantly impaired.  Merrill loaned approximately $850 million to the Bear Stearns hedge funds.  In June 2007, Merrill quickly moved to seize the assets that were collateral for its loans. However, as set forth more fully below, Merrill was unable to sell all of these subprime assets or sold only a small portion of them at a steep discount, further indicating that these assets, and other similar assets on Merrill's balance sheet, had severely deteriorated in value.

48.    Still, in its press releases and in statements during conference calls, Merrill and defendants O'Neal and Edwards continued to falsely and repeatedly assure that all was well and that Merrill's financial condition was strong.  Nothing could have been further from the truth.

49.    On July 17, 2007, in connection with its second quarter 2007 earnings conference call, defendant Edwards stated the following:

While we have seen some positive signals, such as improving first-payment default levels for First Franklin, the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize. *Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results.*

\*      \*      \*

[T]his is another example where *I think proactive, aggressive risk management has put us in an exceptionally good position.* Obviously the market has gone through a period of flux. We think that remains the case.

*But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We have seen significant reductions in our exposure to lower-rated segments of the market.* Our warehouse lines are down materially, our whole-loan inventory is down materially.

\*      \*      \*

[Edwards] Well, just to remind everybody, we made the comment[s] in the first quarter that over the previous 5 quarters, all of that activity as broadly as we could define it, represented less than 2% [of net revenues] . . . .

(Emphasis and alteration added).

50.    The above statements concerning Merrill's risk management and hedging were again intended to falsely represent to the market that Merrill's exposure to U.S. subprime ABS CDOs was limited.  As with the first quarter 2007 statements, these statements convinced analysts that Merrill had limited exposure, even though Merrill would later disclose in October 2007 that it had over $40 billion of U.S. subprime ABS CDO exposure as of June 29, 2007.  A Wachovia report concerning Merrill, dated July 17, 2007, stated "[t]his is the second quarter in a row that fears of sub-prime losses have been unfounded."  A Fox-Pitt, Kelton report dated the same day stated "[a]s for CDO/MBS/leveraged loan risk, mgmt was sanguine about Merrill's exposure and implied successful hedging outcomes, although specifics were limited."

22

51.     By the end of June 2007, the ABX and the TABX had continued to decline and the Senior TABX Tranche had dropped in price to the mid 60s losing close to 40% of its value.

52.     Nevertheless, in its June 29, 2007 financials, Merrill took no write-downs on Merrill's subprime debt and continued to assure investors that Merrill's financial position was strong and its exposure to subprime was "contained."  However, the truth was that the value of U.S. subprime ABS CDOs owned by Merrill continued to decline steeply throughout this period.  By June 29, 2007, Merrill's CDOs and MBS were impaired by at least 40%.  Thus, by June 29, 2007, Merrill was required by GAAP to write down at least $16 billion of its U.S. subprime ABS CDO exposure.  Once again, Merrill did not timely or properly effectuate the required write-down.

53.     Beginning in October 2007, Merrill belatedly began to disclose the truth and to take write-downs in connection with its U.S. subprime ABS CDOs.  In fact, the write-downs Merrill ultimately has taken thus far (through the date of this complaint) were over $30 billion which are among the largest taken in the history of U.S. corporate finance.

54.     In early October 2007, Merrill acknowledged it would have to take a $4.5 billion charge in the third quarter of 2007 relating to the value of its U.S. subprime ABS CDOs.

55.     Then, on October 24, 2007, before the market opened, Merrill issued a press release, announcing that the third quarter charge related to U.S. subprime ABS CDOs would be $7.9 billion instead of $4.5 billion.  Merrill's write-down for the quarter ended September 28, 2007 is set forth in the following chart:

**Net Write-downs For the Three Months Ended September 28, 2007 of U.S. ABS CDO and Other Subprime-Related Instruments (in billions)**

AAA-rated super senior exposures:

| | |
|---|---|
| High-grade | ($1.9) |
| Mezzanine | (3.1) |
| CDO-squared | (0.8) |
| Total ABS CDO superior senior exposures | (5.8) |
| Other retained and warehouse exposures | (1.1) |
| **Total ABS CDO-related exposures** | **($6.9)** |
| Total U.S. subprime mortgage-related exposures | (1.0) |
| **Total Net Write-downs** | **($7.9)** |

56.    On this news, Merrill's common stock declined from $67.12 per share on October 23, 2007, to $63.22 per share on October 24, 2007, a decline of $3.90 per share or 5.8% on unusually heavy trading volume of over 52 million shares.

57.    On January 17, 2008, before the market opened, Merrill disclosed it would write down another $16.7 billion related to its U.S. subprime ABS CDO exposure.  Merrill's write down for the quarter ended December 28, 2007 was:

**Net Write-downs For the Three Months Ended Dec. 28, 2007 of U.S. ABS CDOs and Other Subprime-Related Instruments (in billions)**

AAA-rated superior senior exposures:

| | |
|---|---|
| High-grade | ($5.5) |
| Mezzanine | (2.9) |
| CDO-squared | (0.28) |
| Total ABS CDO super senior exposures | (8.7) |
| Other retained and warehouse exposures | (1.1) |
| **Total ABS CDO-related exposures** | **($9.8)** |
| Total U.S. subprime mortgage-related exposures | (1.6) |
| Financial Guarantors | (3.1) |
| U.S. Banks Investment Securities | (2.2) |
| **Total Net Write-downs** | **($16.7)** |

24

58. On this news, Merrill's common stock declined from $55.09 per share on January 16, 2008, to $49.45 per share on January 17, 2008, a drop of $5.64 per share or more than 10% on unusually heavy trading volume of more than 73 million shares.

59. However, this was not the end. On April 17, 2008, Merrill disclosed it would write down another $4.5 billion related to U.S. subprime ABS CDOs.

60. As Merrill has acknowledged in its SEC filings, government regulators, including the SEC, have been investigating the Company's subprime-related activities. In its third quarter 2007 10-Q for the period ended September 28, 2007, Merrill reported that on October 24, 2007 the SEC staff had "initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio." Also, in its Annual Report for the year ended December 28, 2007 filed with the SEC on Form 10-K on February 25, 2008 ("2007 10-K"), Merrill disclosed the following: "*Regulatory Investigations:* Merrill Lynch is cooperating with the SEC and other regulators investigating sub-prime-related activities."

61. On December 6, 2007, the *Washington Post* reported that the FBI had launched a "mortgage fraud task force" and that New York Attorney General Andrew Cuomo had served subpoenas to half a dozen investment banks, including Merrill. The subpoenas sought "information on how billions of dollars in complex securities backed by mortgages were packaged and sold to yield-hungry investors all over the world."

62. On December 18, 2007, the *Wall Street Journal* reported that Merrill "will bring back former bond executive Jeffery Kronthal as a consultant on its portfolio of subprime mortgage assets." Further, the article noted that "Kronthal will advise on the firm's fixed income business and risk management."

63.    On February 2, 2008, the *Wall Street Journal* reported that Massachusetts state authorities had accused Merrill of fraud and misrepresentation related to the Company's sale of debt securities that collapsed during the credit crisis.

64.    On March 22, 2008, the *New York Times* reported that the Justice Department was gathering evidence to determine whether to create a task force to investigate wrongdoing in the mortgage lending industry.

65.    On May 5, 2008, the *Associated Press* reported that prosecutors in the Eastern District of New York were heading a task force to determine, among other things, if Wall Street firms participated in fraud in connection with the mortgage industry.

66.    As of May 20, 2008 Merrill's stock closed at $46.31 per share down over $51.22 per share or approximately 53% from its Class Period high of $97.53 per share on January 24, 2007.

### B.    The Exchange Act Parties

67.    Lead Plaintiff purchased shares of Merrill common stock during the Class Period and acquired Merrill common stock in exchange for First Republic stock and was injured thereby as reflected in its attached supplemental certification.

68.    Defendant Merrill is a Delaware corporation with its principal executive office in New York, New York.  The Company purports to offer a broad range of services to private clients, small businesses, institutions and corporations, organizing its activities into two interrelated business segments - Global Markets and Investment Banking Group ("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management.  FICC is within the Global Markets & Investment Banking Group.

69.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill.  MLPFS provides investment, financing, advisory, insurance, banking, and related products and services.

70.    Defendant O'Neal joined Merrill in 1986 and became head of its junk-bond department in 1989.  O'Neal was appointed Chief Financial Officer ("CFO") in 1998. O'Neal served as Chairman of the Board since July 2002 and CEO since December 2002, positions he held until October 30, 2007, when Merrill announced that O'Neal had resigned from his positions at the Company.  O'Neal sold in excess of $18 million in Merrill stock during the Class Period.  He received a benefit package of over $160 million of cash and stock at the time of his resignation.  During the Class Period, O'Neal signed certain Merrill registration statements or caused such documents to be signed on his behalf.  O'Neal signed (1) Merrill's 2006 10-K; (2) the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 in the quarterly reports filed with the SEC on Form 10-Q for the quarters ended September 29, 2006, March 30 and June 29, 2007 and in Merrill's 2006 10-K.  In addition, throughout the Class Period, O'Neal knew the risks associated with the Company's increased U.S. subprime ABS CDO exposure.  O'Neal knowingly or recklessly ignored these warnings and fired executives who issued warnings about Merrill's increasing exposure to subprime debt because he wanted to report purportedly improved results for Merrill which would enable him to receive higher compensation through bonuses or otherwise.

71.    Defendant Fakahany was Co-President and COO of Merrill from May 2007 until the end of the Class Period.  From 2005 until May 2007, Fakahany served as Vice Chairman and Chief Administrative Officer.  During the Class Period, Fakahany sold more than $13 million in Merrill stock.  Fakahany signed the certification pursuant

to Section 302 of Sarbanes Oxley Act of 2002 ("Sarbanes Oxley"), submitted with Merrill's 10-Q for the quarter ended September 28, 2007. As Co-President of the Company, Fakahany knew the risks associated with increasing U.S. subprime ABS CDO exposure during the Class Period. In fact, in the summer of 2007, on at least two occasions, Fakahany warned Merrill's board of directors and defendant O'Neal of the mounting risk Merrill faced from such exposure. Fakahany, along with Edwards, was responsible for and managed the control groups that managed credit and market risks. On January 28, 2008, Merrill announced that Fakahany would retire from the Company as of February 1, 2008.

72.     Defendant Fleming is, and at all relevant times was, President and COO of Merrill. During the Class Period, Fleming sold more than $4 million in Merrill stock. Fleming signed the certification pursuant to Section 302 of Sarbanes Oxley Act in the 10-Q for the quarter ended September 28, 2007. Fleming knew of the mounting risk facing Merrill through its U.S subprime ABS CDO exposure. In fact, in August 2007, Fleming sent a letter to Merrill's directors, and defendant O'Neal discussing this increasing exposure.

73.     Defendant Edwards is, and at all relevant times was, Senior Vice President and CFO of Merrill. During the Class Period, Edwards signed certain Merrill registration statements or caused such documents to be signed on his behalf. Edwards also signed the following documents: (1) Merrill's 10-Q for the quarter ended September 29, 2006, March 30, June 29 and September 28, 2007; (2) Merrill's Report on Form 10-K for the fiscal year ended December 29, 2006 (the "2006 10-K"); and (3) Merrill's 10-Qs for the quarters ended March 30, June 29 and September 29, 2007. As the top financial officer at Merrill, Edwards knew that throughout the Class Period, Merrill was increasingly exposed to risky subprime-

related securities.  As CFO, Edwards was responsible for and managed the control groups that managed credit and market risks.  Despite such knowledge, Edwards falsely maintained that Merrill's exposure to U.S. subprime ABS CDOs was limited.

**C.**     **The Exchange Act Defendants' Role in the Subprime and CDO Industry**

74.     The Exchange Act Defendants' scheme was based upon their creation of highly complex CDOs which are highly complex debt securities collateralized by other debt instruments.  The foundation of these structures consisted of ABS - i.e., securitized bundles of debt, which were based on underlying assets.  During the Class Period, the underlying assets consisted, in significant part, of subprime residential mortgages.  ABSs typically represented only a small portion, often 10% to 20% of the securitized debt obligations that served as the collateral for the CDOs.  The remainder were typically derivatives such as CDSs, which are contractual obligations relating to the performance of other assets, such as ABSs that may or may not be owned by the CDO.  By using large amounts of leverage, Merrill multiplied the income it could generate from its risky subprime mortgage assets, while greatly multiplying the risks to its stockholders.  The centerpiece of the scheme, however, was these defendants' concealment from investors in Merrill stock of the risks caused by these activities.

75.     The Exchange Act Defendants received huge increases in their compensation as they pressed forward with the CDO scheme. However, their greed, as set forth in detail herein, left Merrill and its shareholders exposed to tens of billions of dollars in undisclosed risk and has, to date, caused Merrill to write down almost $30 billion in losses in U.S. subprime ABS CDO exposure. Merrill may even be forced to take additional write-downs of these assets.

76.    The Exchange Act Defendants took great care to hide the CDO scheme and the risks they were creating from persons who purchased or acquired Merrill securities. Indeed, in their public statements throughout the Class Period, as set forth herein, the Exchange Act Defendants consistently and falsely portrayed that Merrill's exposure was limited, contained, and under control; that its net revenues from subprime-related activities were less than 1% of net revenues; and that it was better positioned and less risky than its competitors in the industry.  The Exchange Act Defendants' statements were recklessly or knowingly false and misleading.

77.    The Exchange Act Defendants' CDO scheme took advantage of, and also helped fuel, the unprecedented growth of mortgage lending to unsophisticated, and/or poor credit borrowers.  The Exchange Act Defendants' limitless appetite to increase revenues, and therefore their compensation of O'Neal and other top Merrill executives, required Merrill to purchase tens of billions of dollars of underlying mortgages and MBSs, which were then repackaged into CDOs.  However, a great majority of the loans that Merrill purchased from loan originators such as Ownit, MLN and ResMAE, as well as those originated by its First Franklin unit, were made to borrowers with poor credit history, no income verification, and/or loans with high loan to value ratios, such as 100% financing (typically referred to as subprime loans). These loans bore a higher degree of risk for the lender as the likelihood of default by the borrower was extremely high. As set forth herein, when the U.S. housing market began to show signs of deterioration in 2006, instead of scaling back their risk, the Exchange Act Defendants increased Merrill's risk dramatically by purchasing subprime lender First Franklin, and by putting their CDO scheme into overdrive.

78.    During 2005, Merrill underwrote approximately $35 billion of CDOs.  In 2006, Merrill ramped up its CDO scheme, underwriting approximately $53 billion worth of CDOs.  In the first half of 2007, that number was over $30 billion, even though the CDO market was materially declining from lack of investor interest.  Further, Merrill played a pivotal role in constructing and facilitating the creation of CDOs from the very most basic ingredient, a subprime residential home loan, to the very end - the design, sale and marketing of interests in the very complex CDOs.

### 1.    *MBSs, CDOs and U.S. Subprime ABS CDOs*

### a.    Residential Mortgages

79.    For all the complexity of the structure of a CDO, it starts with simple consumer debt, such as home mortgages.  As home prices materially increased, the need for more home loans also materially increased.  To meet this need, loan originators, at Merrill's discretion, started to relax their credit underwriting standards for individuals who had previously been unable to obtain home loans, and make loans to subprime borrowers.  These loans were given to individuals who had poor credit histories or provided no proof of income.  Many of these loans required little or no down payment, relied on low "teaser" interest rates that would adjust after one or more years, and would typically have higher coupon or interest rates than prime borrowers.

80.    Merrill served as an originator of subprime mortgages and purchased such mortgages or pools of mortgages from brokers and lenders throughout the U.S.  In September 2006, Merrill agreed to acquire First Franklin, a subprime loan originator, so that it could further feed its need for subprime home loan mortgages.  The transaction closed on December 30, 2006.

### b.    Individual Mortgages are "Pooled" and Securitized

81.    As depicted below, the next step in the construction of a CDO is to take the individual subprime home loans and wrap them into a MBS, often referred to as a Residential Mortgage Backed Security ("RMBS").  A RMBS pools together thousands of individual subprime home loans into a single entity which, in turn, issues debt that can then be sold to investors, or in most cases CDOs.  The debt from the RMBS is paid from the revenue stream of principal and interest payments created by the pool of subprime mortgages.  Merrill issued billions of dollars of RMBS through its subsidiaries Merrill Lynch Mortgage Investors Inc., Merrill Lynch First Franklin Mortgage Loan Trust, and other entities.



Charts in ¶¶81-83 have been adapted from *Wall Street Wizardry Amplified Credit Crisis; A CDO Called Norma  Left 'Hairball of Risk'; Tailored by Merrill Lynch*, THE WALL STREET JOURNAL, By Carrick Mollenkamp and Serena Ng, December 27, 2007, Page 1.

82.    As depicted below, RMBSs created by Merrill were then "bought" by asset managers whose sole purpose was to collect assets in order to form CDOs. Merrill's role at this stage was to finance the asset manager's acquisition of assets through a line of credit or loan, known as a "warehouse."  A warehouse is an industry term used to denote the gathering of assets to form a CDO.  The assets are said to be in a "warehouse" until they are transferred to the CDO.  Merrill supported this "warehousing"

of assets by recruiting asset managers, providing the financial backing, usually hundreds of millions of dollars, and, often, providing the RMBS being sold into the warehouse. Where Merrill provided the financing, the assets remained on Merrill's balance sheet until the CDO was formed, the assets sold to the CDO, and the CDO notes sold to investors.



### c.    CDOs Acquire Assets Such as RMBS, Derivatives or Other CDOs

83.    Each CDO is set up as a new entity, typically an offshore limited liability entity, with its own assets and liabilities.  As set forth below, the CDOs assets are either a collection of ABSs, such as RMBSs, derivatives like credit default swaps (also known as "CDS" which term is defined in Appendix A), or portions of other CDOs.  The CDOs liabilities include debt in the form of promises to pay noteholders from the cash flow generated by the asset side of the CDO.  The liability side of the CDO is most often subdivided into layers or "tranches" of debt.  The lowest tranche of the CDO bears the initial losses, up to a fixed percent of the value of the CDO, but receives the highest rate of interest.  The next lowest tranche is assigned the next level of losses and receives the next highest rate of interest, and so on.  Thus, the highest tranche of the CDO will not

experience losses unless and until all lower tranches have recorded the full amount of losses allocated to them. The tranches are typically rated by major debt rating agencies (i.e., Moody's, Standard & Poor's, and Fitch), and the higher tranches are typically rated higher, signifying lower credit risk.  The chart below depicts the structure of such a CDO issuer in its most basic form.



84.     CDOs structured solely with RMBSs are called "cash CDOs".  Virtually all of the CDOs Merrill structured during the Class Period, however, were backed, in addition to RMBSs, by derivatives or "synthetic securities," which were, in effect, insurance contracts where the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS which it was mimicking, and the counterparty insured against a decline or default in the underlying RMBS security.   In short, a synthetic security is akin to a "side bet" on the performance of certain assets.  Such CDOs are called "Synthetic CDOs".  A CDO that consists of assets that are other CDO notes are called "CDO Squared."

85.     A Synthetic CDO, which may only have 10-20% of cash assets, such as RMBS, needed some form of assets to make up the remaining 80-90% of the CDO.

Merrill generally provided this asset to the CDO in the form of derivative contracts, most likely a CDS. For example, in addition to the $100 million - $200 million in RMBSs referenced above, Merrill entered into a CDS under which Merrill paid premiums to the CDO and in exchange, the CDO would compensate Merrill if the asset referenced by the CDS lost value or some other triggering event occurred. These CDSs would be used by Merrill to hedge derivative contracts, generally in the form of CDSs or total return swaps ("TRS") it had entered into with hedge funds or other sophisticated investors. Through the agreements with such hedge funds or other counterparties, Merrill took on additional risk that if subprime debt referenced in the agreement did not perform, Merrill would be required to make substantial payments to the hedge funds or other counterparties if there were defaults or other "credit events" in the underlying subprime debt which backed the CDS. Merrill also entered into another contract with the CDO, a TRS, for the remaining collateral in the CDO and guaranteed a rate of return to the CDO while Merrill took on the risk of the collateral.

86.    Additionally, Merrill frequently entered into TRSs with the CDO whereby the CDO, at Merrill's direction, would use cash generated by the sale of notes to investors to invest in assets offering a high rate of return, such as other CDOs. The CDO would "swap" the cash flow paid by these assets, including both gains and losses, to Merrill in exchange for Merrill paying the CDO a LIBOR-based interest stream. By using these TRS, Merrill was able to effectively invest in CDOs, including taking on both the risks and the rewards of those investments, by effectively borrowing at LIBOR-based rates the capital belonging to the CDOs that Merrill had created.

87.    One of the primary functions that Merrill, as underwriter, played was determining the marketable size of each CDO. This determination was based on three things: the supply of collateral that would make up the assets of the CDO, the market demand for the securities issued by the CDO and the risk-taking ability of Merrill (i.e., ability to retain unsold CDO securities and to insure the CDO against losses).

88.    Merrill was able to increase the volume and size of the CDOs it underwrote in order to generate more revenues and profits by including an ever greater percentage of "synthetic assets" that referenced an actual cash asset. These synthetic assets in the form of CDSs replicated the performance of a single cash bond many times. Thus, Merrill solved the limited supply of assets and fed its ever growing CDO machine by creating derivative contracts.

89.    Once the cash and synthetic assets were pooled, Merrill started the underwriting process and most importantly tried to pre-sell the debt and equity to be issued by the CDO. As discussed above, the CDO issued different tranches of debt that paid different return rates based on the risk of loss and the priority of payment. Generally, Merrill had difficulty selling the super senior or top AAA portion of the CDO, which often was up to 90% of the entire capital structure and which paid a low rate of interest. When the AAA portion of a CDO could not be sold, Merrill was forced to retain it.

90.    Greater supply and the larger deal sizes caused Merrill to retain unsold notes in the CDO deals. Merrill retained much of the super senior portion of the CDO for at least two reasons: (1) there were no buyers in the market at a price that would allow

Merrill to book any revenues; and (2) Merrill increased the size of the CDO issuance which resulted in tens of millions of dollars more for Merrill as underwriter.

91.    However, despite the fact that large chunks of the debt retained by Merrill was so-called AAA super senior debt, Merrill was still exposed to significant risk with these positions.  This is true because, as discussed above, the assets in the CDO generally had a weighted average rating of BBB, or below investment grade, even though the debt issued by the CDO had certain highly rated tranches, including the AAA super senior tranche.  So, while Merrill was retaining the super senior AAA rated tranches it was issued by a CDO, the assets underlying the CDO were, at best, BBB rated assets.

## 2.    *The Exchange Act Defendants Knowingly or Recklessly Disregarded the Exposure that Merrill Faced*

### a.    **The Exchange Act Defendants Abandoned Merrill's Risk Management Practices and Controls and its Risk Measurement Profiles and Exposures**

92.    Throughout the Class Period, Merrill systematically misstated its risk management policies and controls and did not disclose its overexposure to and concentration of risk in CDOs and subprime-related debt.  As stated above, Merrill often retained an interest in the CDOs it facilitated and underwrote, or entered into swap agreements with the CDO or other parties such as hedge funds.  The exposure that Merrill retained, while often rated AAA, was in almost all cases derived from a CDO that had assets with an average weighted rating of BBB or lower.  Additionally, the swap agreements it entered into, referenced a similarly rated RMBS.  In fact, of the $16 billion Merrill wrote down relating to CDOs alone, nearly half of such CDOs were comprised of assets rated BBB or lower.

93.    Merrill knew how to manage risk.  Merrill had a well-structured risk control process and sophisticated risk measurement capabilities.  At all times during the Class Period, the Company had state-of-the-art risk measurement models and systems.  However, the Exchange Act Defendants chose to override and/or ignore those risk controls, to skew Merrill's risk controls and analyses, and to hide its risk exposure.

94.    Merrill micro-managed its risks on the basis of day-by-day global exposures.  Merrill stated that its earnings came from two core activities: fee income and risk-based income.  As set forth in detail below, the Exchange Act Defendants represented throughout the Class Period that Merrill's Risk Oversight Committee ("ROC") was aware of and appropriately managed Merrill's risk, and that "[t]he Executive Committee pays particular attention to risk concentrations and liquidity concerns."  Defendants O'Neal, Fakahany, Edwards and Fleming were members of the Executive Committee.

95.    However, the Exchange Act Defendants overrode and/or ignored these risk controls for a purported short-term profit.  However, it was risk concentration in CDOs and undisclosed massive credit risks that ultimately required Merrill to write down over $30 billion (thus far) from its exposure to CDOs and related securities.

96.    For all of its risk controls, limits and procedures, the Exchange Act Defendants took hidden risks beyond any reasonable tolerance level in U.S. subprime ABS CDOs and assumed concentrations beyond the limits of any reasonable risk management regimen.

97.    For the first time in Merrill's third quarter 2007 10-Q filing, Merrill began to disclose the truth concerning its risk concentration, as follows:

The losses on U.S. Sub-prime Residential Mortgage-Related and ABS CDO activities in the third quarter reflect a significant concentration in securities that accumulated as a result of our activities as a leading underwriter of CDOs.

To complement VaR and in recognition of its inherent limitations, we use a number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that may result in material losses for Merrill Lynch. VaR, stress tests and other risk measures significantly underestimated the magnitude of actual loss from the unprecedented credit market environment during the third quarter of 2007, in particular the extreme dislocation that affected U.S. sub-prime residential mortgage-related and ABS CDO positions. In the past, these AAA ABS CDO securities had never experienced a significant loss of value.

98.     In fact, Merrill's third quarter 2007 10-Q also purported to blame Merrill's losses on the allegedly "unprecedented credit market environment during the third quarter of 2007, in particular the extreme dislocation that affected U.S. sub-prime residential mortgage-related and ABS CDO positions." However, this statement was itself materially misleading because it was not the allegedly unprecedented credit market environment which caused Merrill's losses, but instead the Exchange Act Defendants' disregard for Merrill's risk management policies and Merrill's huge losses in CDOs and related U.S. subprime ABS CDOs. Indeed, the Exchange Act Defendants knew what those risks were and chose to knowingly or recklessly ignore Merrill's systems and hide the truth from Merrill's shareholders.

99.     Moreover, it was untrue that AAA ABS CDO securities had never experienced a significant loss of value (until the third quarter of 2007). As set forth in detail herein, Merrill's U.S. subprime ABS CDO exposures had lost 15% of their value by the end of the first quarter of 2007 and 40% of their value by the end of the second

quarter of 2007.  Merrill had chosen to hide the losses in its CDO portfolios and

knowingly or recklessly ignore the "dislocation" in U.S. subprime ABS CDO exposures

until after the end of the third quarter of 2007.

> **b.    Defendants Recklessly Expanded Merrill's CDO Exposure and Hid It From Merrill Shareholders**

100.    At the end of 2005, Merrill encountered a material hurdle in its quest to

churn out more CDOs.  At that time, insurance giant AIG reportedly stopped insuring the

AAA rated slice of Merrill CDO deals known as AAA rated "super-senior" pieces of

Merrill's CDOs.  Nevertheless, at no time during the Class Period did Merrill ever

disclose to investors this highly material fact, which was reported after the end of the

Class Period:

> The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005.  As it repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc.  An AIG unit bore the default risk of the CDOs largest and highest-rated chunk, known as the "super-senior" tranche, normally sold to big investors such as foreign banks.
>
> But AIG was keeping a close eye on the housing boom because it had another unit that made subprime loans, those to home buyers with weak credit.  AIG did a review of the market.  Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities.
>
> Merrill was used to having to keep mortgage bonds and pieces of CDOs on its books temporarily before selling them.  But without a firm like AIG providing credit insurance, Merrill had to bear the risk of default itself.
>
> Instead of scaling back its underwriting of CDOs, however, Merrill put the business in overdrive.  It began holding on its own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload.

The *Wall Street Journal*, April 16, 2008 at A1.

101.    With AIG no longer willing to underwrite this insurance, Kronthal (who was in charge of Merrill's CDO business), internally warned top Merrill executives that to continue underwriting these deals would require that the firm assume tens of billions of dollars of market and credit risk.  Kronthal had set limits on the amount of CDO exposure Merrill could keep on its books to between $3-$4 billion.  At one point in the discussions, Kronthal told management that the firm's balance sheet would assume an open-ended risk if these highly illiquid securities ran into credit trouble.  These arguments were reportedly met with skepticism by both then-bond chief Dow Kim and defendant O'Neal because Merrill's CDO business was so lucrative.  Instead of reducing Merrill's CDO exposure, O'Neal fired Kronthal in July 2006.  Again, however, at no time during the Class Period did the Exchange Act Defendants disclose to investors the increasing CDO risks which Kronthal had been warning Merrill executives about internally.

102.    With AIG no longer insuring CDOs, in late 2006 and 2007, Merrill's top managers reportedly embarked on a new plan, internally referred to as the "mitigation strategy."  Knowing that Merrill's CDO exposure had ballooned out of control and fearful of disclosing this to the market, the Exchange Act Defendants attempted to hedge Merrill's exposure through financial guarantee deals with bond insurers.  Further, financial guarantees allowed Merrill to book the present value of interest income from CDOs sooner than it otherwise could have without such protection.  As a result, in order to continue churning out CDOs, Merrill turned to certain monolines or financial guarantors to "hedge" the Company's investment in CDOs.  However, unbeknownst to the market Merrill's hedges were ineffective.

103.    The core business of monolines, such as ACA and XL, was traditionally guaranteeing the debt issued by governmental entities, such as municipal bonds, which have materially different risk profiles than the CDOs Merrill was underwriting.  Due to the poor capitalization or the over leveraged nature of these monolines - of which Merrill was aware – these insurers were unable to provide sufficient protection to hedge all of the exposure that Merrill had, or even the more limited exposure many such monolines undertook to guarantee.  In other words, Merrill convinced investors that risk was being managed, when in fact, it was not and Merrill remained exposed to the risk of billions of dollars in clearly foreseeable losses.

104.    For example, according to allegations in a complaint filed in *Merrill Lynch International v. XL Capital Assurance Inc.* (1:08-cv-02893-JSR)(S.D.N.Y.), starting in January 2007, Merrill insured $3.1 billion of CDOs against losses in a series of transactions with bond insurer XL.  XL, a division of Security Capital Assurance ("SCA"), is a highly leveraged monoline.  The Exchange Act Defendants knew this because, among other things, Merrill was an underwriter of SCA's initial public offering in June 2006.  On February 22, 2008, XL told Merrill that because Merrill allegedly violated the terms of its contract with XL, XL was no longer responsible for its financial obligations under seven credit default swaps worth approximately $3.1 billion.  Merrill filed suit seeking to enforce its contracts with XL.  XL's counterclaim asserted that, in August 2007, Merrill had "launched a desperate campaign . . . to offload or hedge its super senior CDO position in order to remove these risks from its balance sheet and improve the appearance of its financial condition before the quarter close."  According to the counterclaim, Merrill reportedly was aggressively "marketing its super senior CDO

42

positions up and down Wall Street looking for any counterparties willing to take on additional CDO risk" and "Merrill was desperate to get these CDO liabilities off its books during the third quarter."

105.    According to the counterclaim, around the beginning of August 2007, Merrill approached XL with a list of two dozen super senior CDO positions with more than $20 billion in CDO exposure. The Merrill salesperson "implored" that XL could "[p]ick as many trades from the . . . attached spreadsheet that you'd like. We put them all in a basket . . . and you write me the protection . . . Pick your size, it's a very nice deal for XL and a ***big help for ML***." (Emphasis in original).

106.    Merrill also sought to have another bond insurer, MBIA Inc., insure about $5 billion of the securities. However, MBIA reportedly would not cover interest payments. Rather, it would only cover principal payments when they came due, which in some cases was more than 40 years. When MBIA passed on the deal, Merrill used ACA to insure about $6.7 billion of Merrill's CDO securities. However, ACA was poorly capitalized and like XL, was heavily leveraged. By July 2007, ACA was insuring more than $60 billion of debt securities, a third of which were mortgage-related, yet had a capital base of $236 million (a leverage ratio of over 180-to-1) and few other resources to cover claims. Deals with these financial guarantors helped Merrill to report a supposed material reduction of about $11 billion in its CDO exposure for the quarter ended September 29, 2007. Coupled with CDO-related write-downs of $6.9 billion in the quarter, Merrill purportedly reduced its CDO exposure to $15.2 billion by September 29, 2007, from $32.8 billion reported as of June 29, 2007. Thus, it appeared that financial guarantor deals helped materially reduce Merrill's reported third-quarter net loss.

107.    Although Merrill relied on these purported guarantees to avoid timely and properly recording impairment charges for its CDO assets, Merrill's deals with these financial guarantors did not materially reduce the Company's exposure to CDOs. Because of the inability of these insurers to pay, since October 2007 Merrill has written down approximately $6.1 billion in financial guarantees from monolines.  In particular, according to Merrill's January 17, 2008 press release, during the fourth quarter of 2007, Merrill reported a "credit valuation adjustment" relating to the firm's hedges with "financial guarantors" of negative $3.1 billion, including negative $2.6 billion related to U.S. super senior ABS CDOs.  Specifically, Merrill wrote down approximately $1.9 billion from its exposure to ACA.  XL is seeking to avoid paying Merrill under its agreements with Merrill because, according to XL, Merrill violated the terms of their agreements.  Further, on April 17, 2008, Merrill reported that during the quarter ended March 28, 2008, it recorded "credit valuation adjustments related to the firm's hedges with financial guarantors [of] negative $3 billion, including negative $2.2 billion related to U.S. super senior ABS CDOs."

### c.    High Level Employees Warn Merrill Executives Including the Exchange Act Defendants That They Are Over Exposed to CDO and Other Subprime Debt

108.    Throughout the Class Period, senior executives at Merrill knew and warned their superiors, including the Exchange Act Defendants of the risks associated with Merrill's CDO business, specifically regarding Merrill's exposure to subprime debt.

109.    As set forth above, in July 2006, Kronthal warned senior management at Merrill that its CDO business model would expose the Company's balance sheet to potentially massive credit risk.  According to the *Wall Street Journal*, and as noted above,

Kronthal had imposed limits on the total amount of CDO exposure Merrill could keep on its books ($3 billion to $4 billion). In July 2006, O'Neal fired Kronthal and five other veteran bond executives, including Douglas DeMartin and Harry Lengsfield, who were part of his team, as part of a supposed broader shake-up that was ostensibly designed to bring more international orientation to the firm's bond division. In reality, as reported in the *Wall Street Journal* on April 16, 2008, according to current and former Merrill executives, Kronthal and his team were dismissed in the summer of 2006 because they expressed concern to the firm's top management that Merrill's CDO business model was broken and its exposure was too great.

110.    Shortly thereafter, senior Merrill executives asked Ranodeb Roy, a senior trader who had little experience in mortgage securities, to oversee the job of taking CDOs that Merrill could not sell onto its books. Roy initially objected to the practice of loading up Merrill's balance sheet with mortgage securities and CDOs, but ultimately relented, stating that he was simply "following orders." Roy was dismissed from his position at Merrill in or around December 2007.

111.    In August 2006, a Merrill trader warned his superior, Harin De Silva ("De Silva"), one of the heads of Merrill's CDO origination business in the U.S., about the risks associated with retaining on Merrill's balance sheet $975 million of a $1.5 billion CDO named Octans. Nevertheless, De Silva urged the trader to accept the securities despite the fact that the trader stated that he did not know enough about the CDO to feel comfortable committing to the deal. As reported in the *Wall Street Journal* on April 16, 2008, according to individuals familiar with this matter, De Silva believed that Merrill would keep the super-senior tranches and sell the lower tranches to other investors.

Despite the trader's opposition, Merrill ultimately took the $975 million of securities onto the Company's balance sheet which enabled Merrill to book at least $15 million in revenues from the transaction.

112.    It was also recently reported that at the end of July 2007, defendant Fakahany, who had assumed broad responsibility over Merrill's risk exposure, warned Merrill's board of directors and others, including specifically defendant O'Neal, Charles Rossotti (a director in charge of Merrill's Risk Committee), and Rosemary Berkery (General Counsel), of the mounting risk Merrill faced from CDOs and subprime MBS.

113.    On August 9, 2007, Defendants Fakahany and Fleming sent a three-page letter entitled "Board Market Update End July Results: Note from Fakahany and Fleming", to Merrill's directors, O'Neal and Rosemary Berkery, discussing the mounting losses and troubles facing the Company's CDO exposure and explaining that significant deterioration in this business had taken place in July.

114.    In August 2007, Keishi Hotsuki, Merrill's Co-Head of Risk Management, warned his superiors that the Company's exposure to mortgage-related securities was too big.  In November 2007, Hotsuki left Merrill in part due to the position he had taken with respect to the Company's CDO and subprime exposure.

115.    Nevertheless, despite these repeated internal warnings, at no time during the Class Period did the Exchange Act Defendants timely or properly disclose to investors the complete truth concerning Merrill's increasing exposure to U.S. subprime ABS CDOs.

     **d.**     **The Exchange Act Defendants Were Aware of a Material
Decline in the Housing Market and a Material Increase in
Defaults by Subprime Borrowers**

116.    Near the end of 2005 as home price appreciation was materially declining,
the quality of subprime mortgage loans that were securitized was steadily declining.
Starting in late 2005 and extending into 2007, the quality of subprime mortgage loans
that underpinned MBS deals deteriorated with each successive quarter.  In a Standard &
Poor's ("S&P") report for the third quarter of 2006, S&P noted that issuers claimed to be
tightening their underwriting standards in response to rising delinquencies and early
payment defaults.

117.    Moody's Investors Service ("Moody's") observed that there had not
merely been a one-time shift in the quality of loans, but that there appeared to be a trend
of weakening loan quality.  In the first quarter of 2007, Moody's noted that "loans
securitized in the first, second and third quarters of 2006 have experienced increasingly
higher rates of early default than loans securitized in previous quarters."  In June 2007,
Moody's noted that "within the 2006 vintage... the performance of late-2006 pools is
generally worse than that of early-2006 pools," and that "following the pattern of serious
delinquencies... cumulative losses for late 2006 pools have trended higher than those for
early 2006 pools at the same points of seasoning."

118.    By the beginning of the Class Period, many subprime loan originators
were asked by Merrill to buy back loans that experienced early payment defaults.  Many
mortgage originators could not satisfy margin calls as a result of early payment defaults
("EPD").  This resulted in an increasing number of mortgage originators filing for
bankruptcy.

119.    Throughout this period, Merrill continued to buy and originate subprime loans and increase its production, yet it falsely represented in its 2006 10-K, and continued to state in subsequent 10-Qs, that it primarily dealt with "high quality borrowers."

120.    By the start of the Class Period, the Exchange Act Defendants knew that the subprime market had materially declined. Indeed, by the first quarter of 2007, Merrill was aware that a significantly increasing number of borrowers were unable to timely make payments on their mortgages. In connection with the acquisition of First Franklin on December 30, 2006, Merrill also acquired subprime mortgage loans and originated a significant volume of subprime mortgage loans during the first half of 2007. As 2007 developed, delinquencies and defaults in the subprime mortgage loan market materially increased.

121.    In April 2007, Merrill privately admitted knowing that the market for subprime debt had been deteriorating. This information recently became public on April 10, 2008 in a verified petition filed in New York State Supreme Court by Merrill Lynch Bank & Trust Co. against National City Bank. The admissions arose from a dispute between Merrill and National City Bank concerning Merrill's acquisition of First Franklin. Under the terms of National City Bank's sale of First Franklin to Merrill, National City Bank agreed that if First Franklin's estimated final pro forma net asset statement as of December 30, 2006 was lower than the pro forma net asset statement as of June 30, 2006, National City Bank would pay Merrill the difference. According to the verified petition, on March 16, 2007 National City Bank wrote a letter to Merrill in which it indicated that it would adjust the purchase price down by $30 million.

122.    On April 13, 2007, Merrill responded in a letter to National City Bank asserting that a further adjustment of approximately $67 million, for a total of $97 million was required to be paid by National City Bank to Merrill.  In the April 13, 2007 letter, Merrill advised National City Bank of thirteen disputed items requiring adjustments.

123.    According to Merrill, the largest disputed item related to mortgage loans held for sale by First Franklin were acquired by Merrill.  "Merrill Lynch is entitled to an adjustment of $43.65 million because of Nat. City's failure to value these loans appropriately . . . Nat City calculated the value of mortgages held by First Franklin for sale by looking at the historical average of sale prices for comparable mortgage loans during the prior six months . . . This method of valuing First Franklin's mortgage loans held for sale *failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, and resulted in an overstatement of such loans held for sale of approximately $43.65 million.*"  (Emphasis added).

### e.    Subprime Loan Originators Filed For Bankruptcy

124.    With its voracious appetite to underwrite more and more securities with subprime loans as the primary underlying collateral, by at least 2006, Merrill began extending credit to many subprime loan originators that used Merrill's money to underwrite subprime loans.  These loan originators sold the subprime loans to Merrill that bundled them and issued securities for which the subprime loans served as the underlying collateral.  However, by late 2006, Merrill knew that it was facing an increasing early default rate (*i.e.*, borrowers no longer making loan payments within one, two or three months of Merrill acquiring the loan) on hundreds of millions of dollars of subprime loans it purchased, thus calling into serious doubt the value of the collateral underlying

the securities Merrill was issuing.  Moreover, Merrill knew that it was essentially forcing

into bankruptcy subprime loan originators it had been funding.  Merrill attempted to "put

back" the loans it purchased from certain such originators as a result of the borrowers'

early payment defaults on the loans.  However, the "put back" rights were of little value

because these mortgage originators had limited assets and would be unable to buy back

the loans.  In fact, as described below, between December 2006 and March 2007 several

of the loan originators from whom Merrill was buying subprime loans filed for

bankruptcy protection due, in large part, to increasing demands that such originators buy

back from Merrill such defaulting loans.

### i.    ResMAE

125.    ResMAE was a nationwide mortgage banking company which, among

other products, originated, sold and serviced subprime mortgages. By early 2006,

ResMAE claimed to be one of the leading and fastest growing subprime lenders in the

United States.

126.    In order to finance the origination of mortgage loans, ResMAE entered

into agreements with financial institutions (often referred to as a "warehouse lender")

such as Merrill to provide a line of credit to ResMAE.  As a general matter, ResMAE

owned the mortgages for a short period of time during which it was responsible for

collecting payments and otherwise discharging the duties of the lender, which is known

in the industry as "servicing" the mortgage loans.  However, shortly after originating the

loan (usually within 45 to 60 days), ResMAE sold the loans and repaid the warehouse

lender's line of credit.

50

127.    ResMAE sold substantially all the mortgages it originated to securitizers and other financial institutions such as Merrill, which then bundled the purchased loans and used them as collateral in connection with the issuance of securities.  When the mortgages were sold, the servicing obligations were generally also sold to the loan purchaser or its designee.  However, the agreements pursuant to which loan purchasers such as Merrill purchased the loans gave the loan purchaser the right to "put back" loans to ResMAE and require that it repurchase the loans.  Of particular relevance were provisions which provided that if a borrower failed to make its first, second or sometimes even third mortgage payment after the loan purchaser such as Merrill bought the loan from ResMAE (referred to as an "Early Payment Default" or "EPD"), then the loan purchaser could put back the loan to ResMAE or, in other words, demand that ResMAE repurchase the loan.

128.    During calendar year 2006, Merrill was ResMAE's largest loan purchaser by volume, purchasing mortgage loans worth approximately $3.51 billion in unpaid principal balance.  However, Merrill knew throughout the Class Period that it was facing a high early default payment rate on the billions of dollars of loans it purchased from ResMAE.  By at least as early as October 2006 Merrill sent notification to ResMAE that it would be making a large EPD claim.  Further, by about December 12, 2006, Merrill made EPD demands on ResMAE totaling approximately $308 million.  It was this EPD-based demand that Merrill made to ResMAE which was a significant factor in ResMAE's filing for Chapter 11 bankruptcy protection on or about February 12, 2007.

### ii.    Ownit Mortgage Solutions, Inc. ("Ownit")

129.    By 2006, Ownit had become one of the nation's larger originators of subprime loans and, like ResMAE, became a significant source of subprime loans that Merrill bought and used as collateral for the RMBSs it was creating.  In September 2005, Merrill Lynch L.P. Holdings Inc. acquired a 20% stake in Ownit for approximately $100 million, and appointed a Merrill executive to Ownit's board of directors.  According to William D. Dallas ("Dallas"), the founder and chief executive of Ownit, for the period between September 2005 and December 2006, Ownit orginiated approximately $6 billion dollars of loans that were sold to Merrill.

130.    Merrill essentially controlled Ownit for the following reasons: i) Merrill held a 20% ownership interest in Ownit, ii) Merrill extended to Ownit a line of credit of $3.5 billion, and iii) two-thirds of Ownit's originations were sold to Merrill.  Michael Blum ("Blum"), managing director and head of Merrill Lynch's Global Structured Finance & Investments (GSFI) Group, was Merrill's representative on Ownit's board of directors.  Matt Whalen ("Whalen"), a Merrill managing director and a mortgage specialist assisted Blum.  Ketan Parekh ("Parekh"), a Merrill representative, worked out of Ownit's offices to oversee the origination of Ownit's loans for Merrill.

131.    According to Dallas, soon after Merrill acquired its ownership interest, Merrill instructed Dallas to loosen lending standards and originate more stated income loans, which are loans for which lenders do not verify a borrower's source of income.  According to Dallas, Blum, Parekh and Whalen were the Merrill representatives who asked that Ownit lower its underwriting guidelines.  Dallas stated that this was discussed in connection with Ownit's January 2006 preboard meeting in Arizona.

132.    According to Dallas, Merrill wanted more loans with coupon or interest rates of 8% to 8.5%, which were higher than the prevailing rates for prime borrowers. Dallas explained to Blum that the only way this can be achieved is to either (i) raise interest rates for prime loans (which could not be done because prime borrowers would go elsewhere for a lower rate loan), or (ii) by loosening underwriting guidelines and taking more risk.

133.    Specifically, Dallas indicated that the following steps were taken to "loosen" underwriting guidelines: (i) Ownit originated more stated income loans, and (ii) Ownit lowered the acceptable FICO scores for borrowers.  According to Dallas, prior to Merrill's investment in Ownit, 98% of Ownit's loans were fully documented.  After Blum asked for more stated income loans, the number of full-document loans declined to 90%.  In addition, Ownit materially lowered the FICO scores from approximately 669 to 670 at the time Merrill acquired its stake in Ownit, to approximately 646 by the time Ownit filed for bankruptcy in December 2006.  According to Dallas, Merrill "wanted us to be more like New Century or more like First Franklin" and originate loans with higher coupon rates; Merrill was "not concerned with the performance of the loan at all." According to Dallas, the loans originated as a result of these lowered guidelines was approximately $300 million to $400 million in originations per month.

134.    As a direct result of this change in guidelines, in January 2006 through March 2006, Ownit began to experience EPDs and first payment defaults of 1% to 3%. According to Dallas, prior to Merrill's involvement with Ownit, it had never experienced such defaults. In response to Dallas' concerns about the EPDs, Blum told him to "produce your way out of it."

135.    After approximately five months of loosened underwriting guidelines and increased defaults, Dallas tightened underwriting guidelines.  Merrill was not happy with this and, according to Dallas, because of his decision to cut out the higher coupon originations, Merrill sought another source of subprime loans through its acquisition of First Franklin.

136.    On December 28, 2006, Ownit filed for Chapter 11 bankruptcy protection. In connection with such filing, Ownit listed Merrill as its single largest unsecured creditor, with claims of approximately $93 million.  Merrill's claim related to "Repurchase Requests" by Merrill to Ownit to repurchase loans Merrill acquired from Ownit in 2006 that were the subject of EPDs and/or other delinquencies.

137.    However, even after Ownit declared bankruptcy, Merrill continued to pool Ownit originated mortgages for sale to RMBS. For example, in or around May 16, 2007, Merrill underwrote a securitization of subprime loans in which a majority of the loans were originated by Ownit.  At this point, Merrill's "put" rights were worthless because of Ownit's bankruptcy and thereby caused Merrill to bear the risk of any defaults on the subprime loans.

### iii.    Mortgage Lenders Network USA, Inc. ("MLN")

138.    By the third quarter of 2006, MLN was the nation's fifteenth largest subprime loan originator, with $3.3 billion in loan originations.  Merrill Lynch Bank USA and Merrill Lynch Mortgage Capital, Inc. (both wholly owned subsidiaries of Merrill) were together among MLN's four largest warehouse lenders.  In 2006, Merrill's credit line to MLN was approximately $1.7 billion.  As was the case with ResMAE, shortly after originating subprime loans, MLN sold substantially all such loans to its warehouse lenders, including Merrill.  Merrill used MLN as yet another source to fill

54

Merrill's growing appetite for subprime mortgage loans to serve as collateral for the MBS and CDOs it was creating.

139.    Similar to its agreements with ResMAE and Ownit, Merrill was able to put back (or demand that MLN buy back) loans which had EPDs.  Starting in June 2006, Merrill began demanding that MLN buy back loans that it had purchased from MLN.

140.    On or about February 4, 2007, MLN filed for Chapter 11 bankruptcy protection.  In filings made in connection therewith, MLN noted that an increase in EPD and the resulting loan buy back demands made by loan purchasers such as Merrill were among the primary factors leading to MLN's bankruptcy filing.  Indeed, at the time of its bankruptcy petition, MLN listed Merrill Bank USA as its largest unsecured creditor, the nature of which were, *inter alia*, loan repurchase requests.

### iv.    Other Subprime Originators

141.    Other subprime loan originators from which Merrill purchased subprime loans were also filing for bankruptcy at around the same time ResMAE, Ownit and MLN declared their bankruptcies.  For example, on March 20, 2007 subprime loan originator Peoples Choice Home Loan, Inc. ("Peoples Choice") filed for Chapter 11 protection.  In its bankruptcy filings, Peoples Choice listed Merrill as one of its top unsecured creditors.

### f.    Two Key MBS and CDO Indices Suffer Significant Declines Requiring Merrill to Write Down CDO and Subprime-Related Debt

142.    During February 2007, in response to the reported rise of default rates on subprime mortgages and the announced bankruptcy of several subprime mortgage originators, the ABX and TABX indices, two key indices for MBSs and CDOs, declined 15-40% on the very type of debt that Merrill belatedly wrote down in the third and fourth

quarters of 2007. Further, by June 2007, the ABX and TABX had declined further and traded at discounts between 40%-55%. By September 29, 2007, the ABX and TABX had declined further and traded at discounts of at least 65%.

143.   The ABX and TABX in general tracked the values of MBS and CDOs as explained more fully below. As alleged below, the material declines of the ABX and the TABX during the first half of 2007, in conjunction with:  (i) the reported bankruptcy of several subprime originators; (ii) Merrill's knowledge of the actual defaulted loans it was trying to put back to subprime originators such as MLN, Ownit and ResMAE; and (iii) Merrill's inability to sell CDO asset collateral seized from the Bear Stearns hedge funds, required that Merrill timely take material write-downs to its CDO and subprime-related debt for the periods ended March 30, June 29, and September 29, 2007. Merrill knowingly or recklessly failed to write down at least 15% of the value on Merrill's books of the CDOs and MBSs as of March 30, 2007, at least 40% (or $16 billion) of the value of such CDOs and MBSs as of June 29, 2007 and at least 65%, or another $11.5 billion, as of September 29, 2007.

144.   The ABX (also known as ABX.HE) consists of several different credit derivative indices which reference ABSs. The ABX.HE indices track the value of CDS, which are derivatives that provide insurance against default, on MBS. Each ABX.HE index tracks the price of CDS based on different ABS, broken down by rating and vintage/year:  AAA, AA, A and BBB. The ABX is reported by Markit Group of London. As the price of credit protection increases, the ABX index declines.

145.   In February 2007, as certain ABX indices were falling precipitously, Wall Street dealers launched a new product that essentially broke the ABX into pieces or

tranches much like a CDO. That product, known as TABX, divided the BBB- ABX index into a capital structure of six tranches that ranged from the first dollar of loss (those assets with ratings of BBB or lower) to a tranche that looked very much like the AAA tranches of CDOs to which Merrill was, in significant part, exposed.

146.    That AAA tranche was at risk for all losses in excess of the first 40% of losses in the ABX index (the "Senior TABX Tranche"). This was similar to the structure of a CDO since the lower rated tranches had the first risk of loss and the senior tranches had the last risk of loss. However, while the super senior tranches retained by Merrill were the most senior in the CDO, theses tranches would begin to suffer a risk of loss as early as the 35% level. In effect, the TABX recreated the risk levels that were contained within the CDOs that Merrill was both underwriting and exposed to through the Company's accumulation of CDOs on its balance sheet.

147.    According to one analysis, by December 2006, subprime MBS had shown substantial distress:

> Defaults on the riskiest residential loans, known as subprime mortgage securities, already have pushed the main index of those securities to record lows.
>
> The lowest rated "BBB-" index of subprime mortgages fell to 95.26 this week, while spreads widened to about 400 basis points, increasing the costs for investors to buy protection against default, according to Markit.com data. The index traded at 242 basis points in July.
>
> Downgrades on subprime mortgage securities are expected to climb to a record 300 by the end of the year, twice as much as last year, and rise even more in 2007, Fitch Ratings said on Thursday.

*Reuters*, *Housing, Car Markets May Spark Credit Crunch*, December 15, 2006.

148.    As early as the beginning of 2007, as more and more subprime mortgage lenders filed for bankruptcy and/or announced disappointing results and the residential

real estate and subprime loan markets were materially declining, the ABX materially

declined to record lows as investors sought insurance against defaults.   For example, in

February 2007, the ABX index that tracks CDSs on certain risky subprime loans (those

rated BBB) materially declined.  According to *Market Watch,* in early February, the

index was above 90.  Then, the index had declined from 72.71 on February 22, 2007, to

69.39 on February 23, 2007.  An ABS strategist at RBS Greenwich Capital commented in

a *Market Watch* article dated February 23, 2007 that "ABX needs protection sellers badly

. . . Real (not perceived) problems in select mortgage pools and in the subprime mortgage

lending industry do not make for an ideal fundamental opportunity at this time."

149.    Further, immediately upon launch TABX tranches materially declined,

indicating that the value of CDOs materially declined.  Merrill was aware of this decline

because it was one of the 16 licensed market makers in ABX and TABX.  As depicted in

the chart below, the Senior TABX Tranche dropped from a price of nearly 100 in mid-

February 2007, to around 85 by the end February 2007.  Indeed, the TABX continued to

fall significantly in the months after February 2007, also as shown in the chart below

reflecting historical TABX data from Markit Group of London.  Nevertheless, at no time

during the Class Period did Merrill timely disclose the deteriorating state of its U.S.

subprime ABS CDO exposures or timely and properly write down the value of its CDOs.



150.    By the end of the first fiscal quarter of 2007, for the period ending March 30, 2007, given that Merrill was aware of increasing defaults from subprime mortgages (as reported in mortgage remittance reports), materially declining housing prices, and the material decline in certain ABX indices, the Exchange Act Defendants knew that Merrill's total net CDO and MBS exposures were impaired by at least 15%. By this time there was a steep decline in the underlying value of mezzanine-related debt of at least 30%. Nevertheless, Merrill did not write down its exposure at this time.

151.    By July 2007, the ABX.HE index tracking BBB ABS plunged even further and the indices tracking higher quality securities also declined. A *Los Angeles Times* article dated July 17, 2007 stated that on July 16, 2007 the ABX.HE index tracking BBB ABS tumbled 7.5% to record low of 45.28. The article further indicated that this index lost more than half of its value in 2007. In addition, the ABX indices tied to higher quality mortgage bonds – those rated AAA and AA – also fell in the days preceding this

article.  The chart below from Markit Group of London, illustrates the precipitous fall of

the BBB-ABX.



152.    By the end of the second fiscal quarter of 2007 (ended June 29, 2007), the

Senior TABX Tranche had declined to the mid-60s.  However, the Exchange Act

Defendants knowingly or recklessly disregarded or ignored this market information, and

did not reduce the value of Merrill's holdings.  Defendants also failed to timely disclose

to investors that the MBS total net exposures were impaired by at least 40%.  Thus, by

June 29, 2007, Merrill was required by GAAP to write down at least $16 billion of its

U.S. subprime ABS CDO exposure.  Even though the Exchange Act Defendants were

aware of increasing defaults from subprime mortgages (as reported in mortgage

remittance reports), materially declining housing prices, the material decline in certain

ABX indices, and the material difficulty Merrill had in selling assets seized from certain Bear Stearns hedge funds (as alleged below) it did not write down its true exposure in the second quarter of 2007.

153.    It was not until the end of the third quarter of 2007 that Merrill first began to make some disclosures to investors concerning purportedly limited losses in certain of its U.S. subprime ABS CDOs.  But even these disclosures were misleading.  By that time, the TABX Senior Tranche had dropped an additional 20% or into the 40 dollar range, indicating CDO losses exceeded 60% of the value.  Of course, at that time, Merrill only had written down the value of its U.S. subprime ABS CDOs by $7.9 billion.  However, given the continued decline in the ABX and TABX, the rise in subprime defaults and the declining housing prices, Merrill should have taken an additional write-down of $11.5 billion.

g.    **Bear Stearns Hedge Funds Collapse and Merrill Is Unable to Sell Its Assets**

154.    In 2003, the Bear Stearns Companies, Inc. ("BSC") created a hedge fund named the High Grade Structured Credit Strategies Fund and in August 2006, BSC created a second hedge fund with a similar strategy named the High Grade Structured Credit Strategies Enhanced Leverage Fund (collectively, the "Hedge Funds").  At one point, these Hedge Funds reportedly controlled assets of approximately $20 billion.  The Hedge Funds primarily invested in subprime-related assets, including, among other things, CDOs (90% of the Hedge Funds assets were CDOs).

155.    BSC raised approximately $600 million from investors and borrowed additional capital of at least $6 billion from various Wall Street banks, including a loan of $850 million provided by Merrill so that the Hedge Funds could purchase Merrill CDOs.

Merrill's loans to the Hedge Funds was collateralized by the Hedge Funds' CDO assets. Merrill was one of the Hedge Funds' biggest creditors and underwrote a majority of the CDOs that at least one of the Hedge Funds purchased.

156.    In April 2007, both Hedge Funds began to report to their investors material losses principally as a result of the Hedge Funds' investments in CDOs.  Certain of the Hedge Funds' assets had materially declined in value and reportedly were worth substantially less than the values stated on the Hedge Funds' balance sheets.  The losses triggered margin calls from lenders, including Merrill, and demands from investors for the return of capital invested in the Hedge Funds.  By June 2007, the Hedge Funds could no longer satisfy the margin calls.

157.    On June 14, 2007, the Hedge Funds' creditors gathered at a meeting at BSC's offices in New York where attendees discussed the Hedge Funds' financial condition.  The next day, Merrill seized at least $850 million worth of collateral assets and indicated that the assets would be auctioned off.  As reported in the *New York Post* on June 21, 2007, according to data from its auction list, Merrill was lead manager on eight of the 11 separate CDO deals the Hedge Funds purchased, or, put another way, $674 million of the $857 million Merrill sought to auction.

158.    On June 15, 2007, Merrill's bond traders began circulating a list of subprime-related securities which served as collateral for the credit it had extended to the Hedge Funds.  Bids for the subprime-related securities were scheduled to be negotiated starting at 12:00 p.m. on June 18, 2007.  As reported by the *New York Post* on June 22, 2007, one trader who bid on the bonds reportedly stated that had Merrill sold the bonds,

"[the Company] would have locked in a lot of losses for themselves and a large slug of their client base by jamming bonds into the market."

159.    On June 18, 2007, creditors, including Merrill, met at BSC's offices for a further discussion of the Hedge Funds' financial condition.  The manager of the Hedge Funds, Ralph Cioffi, asked Merrill and other creditors to cancel their collateral auctions and their default notices, and accept a 12 month freeze on new margin calls.  According to the *Wall Street Journal* in an article dated June 23, 2007, representatives from Merrill were "taken aback" and the following day, Merrill pursued its plan to auction off the collateral.

160.    On June 20, 2007, the Exchange Act Defendants offered Merrill's $850 million in CDO collateral for sale, seeking bids from investors.  When the bids came in late on June 20, 2007, many of them were materially below prices at which Merrill was willing to sell the securities.  Reportedly, certain bids were as low as 30% of par value and for others there were no bids.  As a result, Merrill only sold a fraction of the assets.

161.    The sale of certain CDOs at materially depressed prices, and the failure to sell other CDO assets seized by Merrill, raised yet another red flag internally within the Company.  This confirmed what the Exchange Act Defendants knew all along, namely that:  (i) the CDO market was increasingly illiquid and had materially declined; and (ii) many CDOs (including CDOs that Merrill underwrote) could be sold only, if at all, for prices materially below par value.  Based on their knowledge of these facts, the Exchange Act Defendants knew or recklessly disregarded that the value of CDOs and other subprime-related assets reported on Merrill's balance sheet had materially declined in

value, were impaired and should have been written down by at least $16 billion by June 29, 2007.

        **h.**      **Merrill's Misleading and Manipulated Value at Risk Disclosures**

    162.    During the Class Period, Merrill's main method for reporting to investors a quantification of the Company's exposure to risk, including, among other exposures, Merrill's U.S. subprime ABS CDO exposure, was "Value at Risk." According to its SEC filings, Merrill defines Value at Risk ("VaR") as "a statistical measure of the potential loss in the fair value of a portfolio due to adverse movements in underlying risk factors." VaR is a risk-management methodology that provides an estimate of what losses might be and the probability of those losses occurring. A VaR analysis considers numerous factors, including whether certain assets are investment grade or AAA or are more risky assets, such as BBB or mezzanine or even lower rated assets. It is the industry standard and all major investment banks and global banks use it to tell investors their respective levels of risk.

    163.    During the Class Period, Merrill's actual VaR was materially greater than reported and Merrill's reported VaR therefore materially understated Merrill's exposure to risk. Merrill's reported VaR conveyed to investors and analysts that the Company's risk profile was materially lower than its peers. For example, on November 15, 2006, Credit Suisse issued a research report after a meeting with defendant Edwards. The report stated, in part, that as of the third quarter of 2006 "[a]s a gauge of risk taking, we look at Merrill's trading VaR . . . VaR as a percentage of tangible equity is low relative to peers. [Bear Stearns, Goldman Sachs, Lehman Brothers and Morgan Stanley] . . . ." On January 19, 2007, Bernstein Research issued a research report stating, in part, that Merrill's VaR

was lower than the industry average.  After a meeting with defendant Fleming and Dow Kim, on February 2, 2007 Credit Suisse stated that while Merrill was taking more risk in many of its businesses, VaR as a percentage of tangible equity was low relative to Merrill's peers.

164.    On May 17, 2007, after a meeting with defendant Edwards, The Buckingham Research Group issued a research report stating that Merrill's "average daily trading VaR as a % of tangible equity [was] 30% below the peer group . . . based on our discussion with management, we believe the representation vs. the peer group is fairly accurate."  On May 21, 2007, after a meeting with defendant O'Neal, Credit Suisse repeated its opinion that while Merrill was taking more risk in many of its businesses, Merrill's VaR as a percentage of tangible equity was low relative to its peers.

165.    Merrill's 2007 10-K on February 25, 2008 disclosed for the first time some of the truth concerning Merrill's U.S. subprime ABS CDO exposures: "If U.S. sub-prime residential ABS CDO and residual securities positions were included under traditional VaR treatment, the daily average VaR for 2007 would have been $83 million and the 2007 year-end VaR would have been $157 million due to the increase in volatility of the sub-prime residential indices used to model the excluded positions."  Merrill's daily average and year end 2007 VaR for its U.S. subprime ABS CDOs were materially higher than its daily average and year end 2007 VaR excluding this exposure – which was $65 million for both.  This had never been disclosed previously.

166.    Merrill's earlier reported VaR during the Class Period was materially false and misleading because, among other things, Merrill either recklessly or intentionally ignored that while its U.S. ABS CDO exposure was purportedly AAA rated debt, such

debt was comprised of assets that had BBB or lower ratings. Indeed, in Merrill's

quarterly report for the period ended September 29, 2007, Merrill for the first time told

investors that its "AAA-rated super senior CDO" exposures were materially comprised of

Mezzanine (BBB) assets or highly risky CDO Squareds.

167.    Had Merrill properly disclosed its U.S. subprime ABS CDO exposure,

Merrill's reported VaR for the quarter ended September 26, 2006, the year ended

December 29, 2006, and the quarters ended March 30 and June 29, 2007 would have

been materially higher than the VaR reported by Merrill for those periods.

### i.        Unauthorized Sale of CDOs to Broker Customers

168.    During the Class Period, defendants Merrill and MLPFS also foisted

CDOs, MBS and related securities upon certain of their brokerage clients without such

clients' authorization. Defendants Merrill and MLPFS undertook such conduct in an

effort to reduce artificially the amount of CDOs on Merrill's own balance sheet. These

actions are further evidence that the Exchange Act Defendants were aware that CDOs

were overvalued and needed to be transferred off Merrill's balance sheet before losses

would be recognized, among other things.

169.    For example, the unauthorized sale of CDOs helped enable defendant

Edwards to claim during Merrill's second quarter 2007 earnings conference call held on

July 17, 2007 that Merrill's allegedly "proactive aggressive risk management has put us

in an exceptionally good position"; that "aggressive risk management I think has

certainly transformed our risk profile since the end of the year"; and that "[w]e have seen

significant reductions in our exposure to lower rated segments of the market." In truth,

however, Merrill's and MLPFS's practices of engaging in unauthorized trading of CDOs

in MLPFS client accounts contributed directly to Merrill's alleged "significant

reductions" in inventory of lower-rated CDO tranches. Further, these unauthorized sales also contributed to creating the appearance of greater secondary market activity in the trading of CDO tranches than actually would have existed absent such unauthorized transactions.

170.    In fact, at least two separate proceedings have been commenced publicly against MLPFS relating to such practices. The first action is captioned *MetroPCS Communications, Inc. and MetroPCS Wireless, Inc. v. Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Incorporated*, Cause No. 07-12430 (District Court of Dallas County, Texas, complaint dated Oct. 18, 2007) (the "MetroPCS litigation"). The second action is an administrative enforcement proceeding filed by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, captioned *In the Matter of Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Carl Kipper and Manuel Choy*, Docket No. 2008-001 (administrative complaint dated Feb. 1, 2008) (the "Massachusetts litigation").

171.    According to the complaint filed in the MetroPCS litigation, Merrill and MLPFS began in May of 2007 to unilaterally invest millions of dollars MetroPCS had entrusted to Merrill, in highly risky and illiquid tranches of several CDOs. MetroPCS alleges that certain of these CDOs were purchased through Merrill's auction rate market program, which was a list of commercial paper and other short-term debt instruments circulated periodically within Merrill that identified certain securities for its brokers to sell. In particular, MetroPCS Communications, Inc. ("MetroPCS") and MetroPCS Wireless, Inc. ("Metro Wireless") allege that Merrill improperly caused MetroPCS and

Metro Wireless to acquire second priority senior tranches of securities from the following nine specific CDOs and in the following specific amounts:

- Alesco I Preferred Funding I, Ltd.              $ 5,950,000

- Broderick CDO Ltd.                             $18,500,000

- Reservoir Funding Ltd.                         $10,000,000

- Jupiter High-Grade CDO III, Ltd.              $10,000,000

- Lakeside CDO I, Ltd.                           $20,000,000

- Lakeside CDO II, Ltd.                          $20,000,000

- Mantoloking 2006-1, Ltd.                       $19,950,000

- Mercury CDO 2004-1, Ltd.                       $ 9,500,000

- TABS 2004-1, Ltd.                              $10,000,000.

In addition, MetroPCS and Metro Wireless allege that Merrill and MLPFS caused them to also purchase an additional security for $10 million that was issued by Athilon Capital Corporation whose value was backed by derivative instruments, which, in turn, were obligated to insure other CDOs. Moreover, these allegedly unauthorized sales by Merrill and MLPFS reportedly occurred during the Class Period – coinciding precisely with the time that Merrill was increasingly desperate to increase its CDO sales and thereby reduce its own inventory.

172.    In total, according to the MetroPCS complaint, defendants Merrill and MLPFS caused MetroPCS and Metro Wireless to improperly invest some $133.9 million in highly risky CDOs. Further, the MetroPCS plaintiffs allege that Merrill and MLPFS engaged in such practices in direct violation of the specific terms of the parties' investment advisory contract which, among other things, provided that the cash assets

were to be invested in a manner that was to preserve capital, provide liquidity and minimize risk.

173.    MetroPCS and Metro Wireless also allege, among other things, that Merrill and MLPFS failed to timely or properly deliver any of the offering memoranda for these CDOs, that Merrill and MLPFS failed to disclose that the collateral backing many of these CDOs had wide-ranging exposure to the subprime mortgage market, making them highly risky, that Merrill had a conflict of interest in marketing and selling these CDOs to MetroPCS and Metro Wireless because Merrill held significant investments of its own in CDOs and related instruments with subprime exposure, and thus stood to lose significantly if the market for such instruments weakened, and that Merrill and MLPFS falsely represented that these CDOs were safe and liquid.  In addition to breach of the parties' investment advisory contract, MetroPCS and Metro Wireless also assert, among other claims, that defendants Merrill and MLPFS breached their fiduciary duties and defrauded MetroPCS and Metro Wireless in connection with the unlawful purchase of these CDOs for MetroPCS and Metro Wireless.

174.    Similarly, the complaint filed by the Massachusetts Securities Division alleges that in April and June of 2007, MLPFS improperly sold the City of Springfield, Massachusetts approximately $14 million in three CDOs.  The three CDOs and the amounts the City of Springfield expended included specifically:

- Centre Square CDO                          $12,625,000

- South Coast Funding V CDO              $    700,000

- Tabs CDO                                          $    625,000.

175.    As with MetroPCS and Metro Wireless, Massachusetts alleges that MLPFS sold these CDOs to the City of Springfield from MLPFS's auction rate market listings, and that these securities were purchased directly from MLPFS's own inventory. Also as with MetroPCS and Metro Wireless, Massachusetts alleges that the City of Springfield did not authorize these CDO purchases.  Further, Massachusetts filed its complaint after receiving certain documents from MLPFS which it obtained privately by subpoena, and also alleges that MLPFS received undisclosed underwriting fees in connection with underwriting these CDOs and additional undisclosed "remarketing fees" in connection with selling pieces of these CDOs; that MLPFS failed to perform any due diligence with respect to the suitability of the CDOs for the City of Springfield's portfolio, or timely or properly disclose to the City of Springfield the risks of transacting in, or even owning, CDOs; and that MLPFS improperly qualified the City of Springfield under SEC Rule 144A as a Qualified Institutional Buyer, reportedly merely to facilitate the sales of these CDOs to the City of Springfield.

176.    By August 2007, MLPFS reported to the City of Springfield that these CDOs had lost between 7-16% of their "estimated market value", according to the Massachusetts complaint.  Consequently, representatives of the City of Springfield approached MLPFS in September 2007 to request that these securities be sold and/or to explore other available options.  The City of Springfield was allegedly then advised by MLPFS that there were few, if any, buyers for these securities, and that these securities could not be sold at any price close to their par value.  However, MLPFS also then flatly denied that it was responsible in any respect to the City of Springfield for these investments.  In fact, in response to additional questions raised by the City of Springfield

concerning these CDOs in conferences on November 15-16, 2007, V. James Mann, First Vice President and Assistant General Counsel of Merrill Lynch, sent a letter dated November 29, 2007 to Salvatore Calvanese, Treasurer of the City of Springfield, disclaiming any such responsibility on the part of Merrill.

177.    However, in direct contrast to its prior disclaimers of any responsibility, by February 1, 2008, Merrill acknowledged that it had, in fact, improperly sold the City of Springfield these CDOs.  According to a February 1, 2008 report by the Associated Press:

> The City of Springfield and the Springfield Financial Control Board have said that neither body approved the purchases of these investments, Merrill Lynch spokesman William Halldin said in a statement.  *After carefully reviewing the facts, we have determined the purchases of these securities were made without the express permission of the City*.
>
> As a result, we are making the City whole and we have taken appropriate steps internally to ensure this conduct is not repeated, the company statement said. *Merrill Lynch had previously said Springfield officials reviewed, approved and authorized all of the investments*.

(Emphasis added).

Further, according to that same *Associated Press* report, Merrill Lynch had also agreed to "reimburse" the City of Springfield the entire $13.9 million principal the City had "invested" in these three CDOs.

178.    The specific unauthorized purchases of CDOs alleged in both the MetroPCS litigation and the Massachusetts litigation occurred largely during the second quarter of 2007.

**j.** **Simultaneously Committing the Same Control Rights on CDOs to More Than One Counterparty**

179.   Allegedly in order to sell some CDOs that were reportedly otherwise unmarketable, Merrill and certain of its operating subsidiaries also improperly committed the same control rights over certain tranches of CDOs simultaneously to more than one counterparty, according to allegations recently filed by XL in its litigation with Merrill, as described more fully below.  Control rights include such things as whether and when the CDO may liquidate collateral, accelerate maturities, or remove a trustee or collateral manager.  Control rights also typically include the power to direct the CDO trustee to institute proceedings to protect the CDOs' underlying assets, and to approve agreements the CDO issuer proposes entering into with the collateral manager, administrator or bank.  Control rights comprise a fundamental part of each CDO.  Some CDOs Merrill issued provided that a single senior tranche of notes would be the "Controlling Class" over certain of the CDOs' control rights.

180.   Desperate to offload or at least try to hedge its massive inventory of CDOs backed by subprime mortgages particularly beginning in late 2006 and through 2007, Merrill and certain of its operating units entered into transactions with third parties pursuant to which the third party would guarantee, via a CDS or other agreement similar in substance to an insurance policy, the payments on certain tranches of CDO notes.  In exchange, Merrill paid the counterparty a fee.  However, to protect the financial guarantee it was obligated to provide, the counterparty guarantor typically required that it be entitled to exercise certain of the voting rights controlling the CDO notes that were the subject of the guarantee.

181.    Merrill entered into a number of these transactions during the Class Period with different third party guarantors.  These third parties purported to provide Merrill with guarantees against shortfalls in interest or principal payments due to investors in the CDOs.  Consequently, these guarantees were extremely attractive to Merrill as they helped enable Merrill to market and sell to investors billions of dollars of CDOs under the guise that these CDOs were financially guaranteed via an enforceable contract.

182.    Unbeknownst to at least certain counterparties, however, Merrill allegedly committed the same voting and control rights over specific CDO tranches simultaneously to two or more third party guarantors.  By doing so, Merrill was able to obtain from these counterparties financial guarantees on certain tranches of CDOs Merrill would otherwise be unable to obtain, and thereby market and sell to investors more CDOs and, thus, purportedly reduce its own inventory and generate reportedly increased revenues and profits.  Meanwhile, the third party guarantor believed that Merrill had committed the particular CDOs' voting and control rights exclusively to that third party.  However, there was no such guarantee.  Therefore, Merrill knew or recklessly disregarded that at least in certain instances these guarantees were worthless since Merrill was breaching the contractual provisions.

183.    Merrill reportedly undertook this scheme with respect to billions of dollars of CDOs during the Class Period.  For example, the counterclaim filed by financial guarantor XL alleges that a subsidiary of Merrill, Merrill Lynch International ("MLI"), undertook such illicit control right practices with respect to seven transactions covering $3.1 billion in CDO securities between January and August 2007 alone, specifically as follows:

(a) on or about January 25, 2007, $375 million on Class A-2 Notes issued by West Trade Funding CDO II, Ltd. and West Trade Funding CDO II, LLC;

(b) on or about April 11, 2007, $437.5 million on Class A-2 Notes issued by Silver Marlin CDO I, Ltd. and Silver Marlin CDO I, LLC;

(c) on or about May 25, 2007, $625 million in Class A-2 Notes issued by West Trade Funding CDO III, Ltd. and West Trade Funding CDO III, LLC;

(d) on or about June 4, 2007, $450 million in Class A-2 Notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC;

(e) on or about June 15, 2007, $525 million in Class A-2 Notes issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC;

(f) on or about June 29, 2007, $385 million in Class A-2 Notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC; and

(g) on or about August 10, 2007, $350 million in Class A-2 Notes issued by Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC.

184.    XL alleges, among other things, that Merrill schemed to improperly commit voting and control rights in the same manner as to these seven CDOs; that bond insurer MBIA was reportedly one of the other specific financial guarantors to which Merrill had improperly committed the same CDO voting and control rights Merrill had previously committed exclusively to XL; and that Merrill's scheme entitled XL to be relieved of any obligation to pay any financial guarantee on these CDOs.  In fact, XL alleges that Merrill's scheme "was in blatant and knowing derogation of MLI's prior

contractual agreements" with XL, and that Merrill "has taken affirmative steps to" conceal from XL this scheme. Merrill denies the allegations generally, has moved for summary judgment, and seeks to hold XL responsible under the parties' agreements.

### 3.    Stock Offerings and Compensation

185.    The Exchange Act Defendants were also motivated to keep Merrill's stock price artificially inflated and its credit rating inflated throughout the Class Period so that Merrill could issue over $5 billion of Preferred Securities and common stock at artificially inflated prices. Merrill's proceeds from its securities issuances during the Class Period included:

| Security | Date | Proceeds |
|---|---|---|
| Merrill Lynch Capital Trust I Preferred | December 14, 2006 | $1.05 billion |
| Merrill Series 5 Preferred | March 20, 2007 | $1.5 billion |
| Merrill Lynch Capital Trust II Preferred | May 2, 2007 | $950 million |
| Merrill Lynch Capital Trust III Preferred | August 22, 2007 | $750 million |

186.    Each of these securities was a direct or indirect obligation of Merrill and each was valued in material part on the basis of Merrill's financial statements, perceived financial strength, and perceived ability to manage risks. Moreover, these shares all traded at prices closely correlated to the price of Merrill's common stock.

187.    In addition, Merrill issued the following securities to former holders of First Republic securities on September 21, 2007:

| Security | Value |
|---|---|
| Merrill Lynch Common Stock | $870 million |
| Merrill Lynch & Co. Series 6 Preferred | $65 million |
| Merrill Lynch & Co. Series 7 Preferred | $50 million |

188.    Had Merrill's common stock traded at lower prices, the First Republic

acquisition would have been more costly to Merrill, Merrill would have had to issue

additional shares, or would not have occurred.  Moreover, the First Republic acquisition

was first announced in January 2007 and did not close until September 21, 2007.  The

Exchange Act Defendants wanted desperately to have this acquisition close and

purposefully delayed any disclosures of subprime problems or write-downs until after the

First Republic acquisition closed.  Indeed, Merrill made their initial disclosures of write-

downs in a matter of days after the closing of the First Republic acquisition.

189.    On December 24, 2007, near the end of the Class Period, and after the first

round of write-downs, Merrill reached agreements with two investors to sell 116.7

million shares of common stock at $48 per share, on purchase dates between December

27, 2007 and January 15, 2008.

190.    On January 15, 2008, Merrill issued a press release titled "Merrill Lynch

Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to

Long-Term Investors" that stated, in part, that Merrill "enhanced its capital position by

reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in

private placements to long-term investors, primarily from Korea Investment Corporation,

Kuwait Investment Authority and Mizuho Corporate Bank."

191.    These transactions would not have been consummated at the price set had

Merrill fully disclosed its true financial condition.

192.    The Exchange Act Defendants were also motivated to provide materially

misleading disclosures in order to conceal Merrill's true financial condition and to

maximize their own compensation, particularly during the fiscal year 2006.   As the chart

from *The Wall Street Journal* below demonstrates, there was a direct link between CDO volume, annual profit and these Defendants' pay.



193.    Absent misrepresentations of Merrill's true performance and risk management practices, the Exchange Act Defendants would have received materially smaller cash bonuses, as well as materially smaller total compensation.

194.    Finally, three of the individual Exchange Act Defendants were motivated to artificially inflate the price of Merrill common stock in order to maximize the price received on sales of their personal holdings of Merrill common stock.

195.    Defendant O'Neal sold 199,887 shares of his personal holdings of Merrill common stock on February 5 and 6, 2007, at prices between $93.90 per share and $94.60 per share, reaping proceeds of $18.4 million.  This was an unusual and suspicious series of transactions for O'Neal, as he had sold much smaller amounts of stock in previous years: $11.2 million of his stock in 2006, $5.8 million in 2005, and reportedly no sales in 2003 and 2004.

196.    Defendant Fleming sold 45,020 shares of his personal holdings of Merrill common stock on February 6, 2007, at prices between $94.00 per share and $94.29 per

share, realizing $4.2 million.  This was also an unusual and suspicious series of transactions for Fleming, as he had reported sales of less than $500,000 in 2006.

197.    Defendant Fakahany sold 66,488 shares of his personal holdings of Merrill on October 24 and 25, 2006 at prices between $85.65 and $86.10 per share, and an additional 77,998 shares between February 5 and 6, 2007, at prices between $94.00 per share and $94.60 per share, reaping proceeds of more than $13 million.  These sales were unusual and suspicious for Fakahany, as he had reported no other stock sales since 2003. These three individual defendants' February 5-6 sales are also unusual and suspicious in timing as they i) occurred the day after MLN filed for bankruptcy and a few days before ResMAE filed for bankruptcy, ii) occurred just prior to the February crash of the ABX, and iii) were near the Class Period high for Merrill common stock of $97.53 per share. These defendants did not buy shares of Merrill on the open market during the Class Period.

### 4.    *Defendants' CDO Scheme Crashes*

198.    On October 4, 2007, the *Wall Street Journal* reported that Merrill fired three executives who were involved in Merrill's investments in subprime debt. Specifically, Merrill fired Osman Semerci, global head of fixed income, Dale Lattanzio, co-head of fixed income for the Americas and Kim, who had overseen the acquisition of First Franklin Corp.  On October 5, 2007, Merrill acknowledged it would have to take a $4.5 billion charge in the third quarter of 2007 due to mortgage and credit problems.

199.    Then, on October 24, 2007, before the market opened, Merrill issued a press release, announcing that the third quarter charge related to CDOs and U.S. subprime mortgages would be $7.9 billion instead of $4.5 billion.  On October 30, 2007,

Merrill disclosed that defendant O'Neal "has decided to retire from the company effective immediately."

200.    On November 1, 2007 it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages. On January 17, 2008, before the market opened, Merrill disclosed it would write down another $16.7 billion related to its CDO and subprime exposure.  On April 17, 2008, Merrill disclosed its financial results for the period ended March 28, 2008 and further write-downs of approximately $9 billion, including the write-down of $1.5 billion of CDOs, and disclosed "credit valuation adjustments related to hedges with financial guarantors" of negative $3.4 billion.

201.    As of May 20, 2008, Merrill's stock closed at $46.31 per share.

## IV. THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT CONDUCT DURING THE CLASS PERIOD

### A.    Financial Results for the Fiscal Quarter Ended September 29, 2006

202.    On October 17, 2006, in Merrill's press release for the quarter ended September 29, 2006, the Exchange Act Defendants represented:

> Net earnings for the third quarter of 2006 were $3.0 billion, or $3.17 per diluted share, as total net revenues increased significantly from both the third quarter of 2005 and the second quarter of 2006, to $9.9 billion.
>
> *        *        *
>
> ■    GMI's third-quarter 2006 net revenues were $4.4 billion, up 21 percent from the year-ago quarter.  Compared with the third quarter of 2005, net revenues increased in all three major business lines:
>
> ■    Fixed Income, Currencies and Commodities (formerly Debt Markets) net revenues increased 26 percent, and were a quarterly record, driven primarily by record results in commodities and an

79

increase from trading credit products, which more than offset declines from principal investing and trading interest rate products.

203.    On October 17, 2006, in Merrill's conference call for the quarter ended September 29, 2006, Defendant Edwards represented the following:

Our CDO business continues to be extremely strong. Overall, it was our second-best quarter there.

204.    The statements above in paragraphs 202-203 were materially false and misleading because the Exchange Act Defendants failed to disclose the following:

(a)    That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period (see ¶¶17-33; 74-91);

(b)    That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-100; 108-115); and

(c)    That increases in Merrill's reported net revenues and earnings for Merrill's fixed income division were achieved, in part, only by exposing Merrill to billions of dollars in highly risky U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91).

205.    On November 3, 2006, Merrill filed with the SEC on Form 10-Q its quarterly report for the quarter ended September 29, 2006 ("November 3, 2006 10-Q"). In the November 3, 2006 10-Q, the Exchange Act Defendants represented the following, *inter alia*, concerning Merrill's risk management policies and practices:

The strategy of maintaining long-term client relationships, **closely monitoring costs and risks, diversifying revenue sources**, and growing fee-based and recurring revenues all continue as objectives to mitigate the effects of a volatile market environment on Merrill Lynch's business as a whole . . . .

\*     \*     \*

Risk-taking is integral to many of the core businesses in which Merrill Lynch operates. In the course of conducting its business operations, Merrill Lynch is exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of Merrill Lynch's core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, there are independent control groups that manage market risk, credit risk, liquidity risk and operational risk, among other functions, which fall under the management responsibility of the Chief Financial Officer. **Along with other control units these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.**

(Emphasis added).

206.    In the November 3, 2006 10-Q, the Exchange Act Defendants made various representations concerning Merrill's market risk management, including *inter alia*:

(a) That Merrill's Market Risk Management Group, who had responsibility for approving the markets and products that Merrill's business units would transact and take risk, used the following methods to assess the risk of Merrill's portfolios and positions:

Market Risk Management quantifies the sensitivities of Merrill Lynch's current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that Merrill Lynch's current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $43 million and:

> To calculate VaR, Market Risk Management aggregates sensitivities to market risk factors and combines them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options . . . .

(c) That in addition to VaR, Merrill also used other risk measurement methods to assess the Company's risk such as:

> These [additional risk measurement methods and tools] include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(d) That risk levels were monitored on a "daily basis to ensure they remain within corporate risk guidelines and tolerance levels."

207.    The statements in paragraphs 205-206 above were materially false and misleading for the reasons set forth above in paragraph 204 as well as because Merrill understated its reported VaR by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below, thereby falsely convincing analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167).

208.    In the November 3, 2006 10-Q, the Exchange Act Defendants represented the following concerning Merrill's credit risk:

*Residential Mortgage Lending*

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when

compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

209.    The statement above in paragraph 208 concerning credit risk was materially false and misleading because the Exchange Act Defendants failed to disclose that:

(a)    Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶129-141).  With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages (see ¶¶129-137); and

(b)    As a result of the lowered underwriting guidelines Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141).

210.    In the November 3, 2006 10-Q, with respect to derivative transactions, the Exchange Act Defendants represented, *inter alia*, that:

. . . to reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agency securities, on certain derivative transactions. From an economic standpoint, Merrill Lynch ***evaluates risk exposures net of related collateral*** . . . .

83

In addition to obtaining collateral, Merrill Lynch **attempts to mitigate its default risk on derivatives whenever possible** by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of its derivative contracts.

(Emphasis added).

211.    The statements above in paragraph 210 were materially false and misleading with respect to Merrill's derivatives related to CDOs and CDO-related assets because the Exchange Act Defendants failed to disclose that it was becoming increasingly difficult to satisfactorily mitigate Merrill's risk with respect to derivatives based on U.S. subprime ABS CDO exposures.  In particular, the Exchange Act Defendants failed to disclose that:

(a)    By 2005, at least one top-tier insurer, AIG, had refused to sell insurance to Merrill to protect the Company's growing exposure to U.S. subprime ABS CDOs (see ¶¶100-102);

(b)    Merrill was having extreme difficulty selling to investors AAA rated tranches of CDOs and resorted to purchasing these AAA rated tranches itself (see ¶¶74-91);

(c)    In increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-61; 92-100; 108-115).

212.    The November 3, 2006 10-Q contained certifications, signed by defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made the following certifications:

1. I have reviewed this quarterly report on Form 10-Q of Merrill Lynch & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrants most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

213.    The statements above in paragraph 212 were materially false and misleading because Merrill failed to disclose the information set forth in paragraphs 204, 209 and 211 herein, including that Merrill had reduced underwriting standards for mortgages which underlay its CDO house of cards while at the same time ramping up the size and number of CDOs by creating derivative contracts which were based upon and mimicked the subprime mortgages which were defaulting in ever greater quantities.

214.    On November 14, 2006, defendant O'Neal spoke at the 2006 Merrill Lynch Banking and Financial Services Investor Conference and stated in part that Merrill would weather any trends in the market as it had "proper controls", "good risk management" and that the First Franklin acquisition would increase returns:

So is it all blue sky from here? — Well, obviously not. There will be bumps in the road and cyclical corrections from these longer-term secular trends, which means that *we have to continue to ensure proper controls, good risk management and adequate liquidity. We have to continue to invest in the people and systems necessary to manage the risks that are inherent in our capital market business. And we're doing that* . . . .

Diversification across products and asset classes is also important to our success. Over the last few years, we have reinvented our fixed income business, *adding scale and balance* . . . .

Results continue to be good. In the third quarter, FICC net revenues set a new record, of $2.1 billion, up 26 percent year-over-year, and were continuing to gain scale and share within a number of business lines. A couple of examples: . . . . In mortgages we've announced three transactions on three continents this year, most notably the acquisition of the First Franklin origination and servicing businesses here in the U.S. Together, ***these acquisitions will help provide an additional attractive source of origination for our mortgage-backed securitization and trading platform, enhancing revenue velocity relative to assets and thereby increasing our returns.***

Additionally, we continue to make progress in both rate and credit derivatives. . .

(Emphasis added).

215.     The statements above in paragraph 214 were materially false and misleading because Merrill failed to disclose the following:

> (a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period (see ¶¶17-33; 74-91); and
>
> (b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115).

**B.     Registration Statement Amendment No. 1 (December 7, 2006 Offering)**

216.     On December 6, 2006, Merrill and Merrill Lynch Capital Trust I ("ML Trust I") filed with the SEC a Post-effective Amendment to a March 31, 2006 automatic shelf registration ("Registration Statement Amendment No. 1").

217.    Registration Statement Amendment No. 1 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, which, as set forth above in paragraphs 205-213, contained misrepresentations and omissions of material fact.

C.    **Financial Results for the Fiscal Year Ended December 29, 2006**

218.    In Merrill's January 18, 2007 press release for the fourth quarter and year ended 2006, the Exchange Act Defendants represented that Merrill had completed its most successful year ever and that it was "positioned better than ever to capitalize on the array of opportunities still emerging around the world":

> "We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer.  "By virtually any measure, our company completed the most successful year in its history.  Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent.  We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

> *    *    *

> ■    GMI generated $18.9 billion in net revenues for the full year 2006, up 37 percent from 2005, driven by record revenues in both Global Markets and Investment Banking.  Pretax earnings were $7.1 billion, up 43 percent from the prior-year period. The pretax profit margin was 37.6 percent, up from 36.0 percent in 2005, demonstrating operating leverage even as substantial investments were made across the business.

> ■    GMI's fourth-quarter 2006 net revenues were $5.4 billion, up 55 percent from the year-ago quarter.  Compared with the fourth quarter of 2005, net revenues increased in all three major business lines:

■     Fixed Income, Currencies and Commodities net revenues of $2.3 billion increased 70 percent, setting a quarterly record, driven by every major business line, in particular record revenues from credit products, commodities and foreign exchange, as well as strong growth from trading interest rate products.

219.    Moreover, on January 18, 2007, in Merrill's conference call for the quarter and year ended December 29, 2006, defendant Edwards made the following statements highlighting "record revenues [and] earnings," "best ever performances in Investment Banking and Fixed Income [C]urrency [and] Commodities," Merrill's status as "Number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space":

> This morning, I'm delighted to report the strongest quarter and year ever for Merrill Lynch. Highlights for both the Fourth Quarter and full year include record revenues, earnings and earnings per share, significant - [INAUDIBLE] return on equity while continuing to grow book value per share, record results in Global Markets and Investment Banking or GMI driven by best ever performances in Investment Banking and Fixed Income [C]urrency [and] Commodities and the full year record inequity Markets as well.

> *     *     *

> All these results demonstrate the breadth and depth we continue to add to our capabilities and positioning across business segments and regions, putting Merrill Lynch on its strongest competitive footing ever as we enter 2007. In the Fourth Quarter, we generated our highest ever quarterly operating revenues at $8.6 billion, up 27% from the Fourth Quarter of 2005 and 8% from the third quarter of 2006. With strong expense control particularly over compensation costs, pre-tax earnings of $3.4 billion were up 65% year on year and 42% sequentially. Record net earnings of $2.3 billion were up 68% year on year and 21% sequentially and earnings per share increased 71% and 21% over the comparable periods to a new high of $2.41.

> *     *     *

89

GMI had nothing short of an outstanding quarter across nearly all businesses and regions, with $5.4 billion in revenues, GMI set a new quarterly record up 21% sequentially and 55% year on year. Pre-tax earnings for the quarter of $2.6 billion up 76% sequentially and 73% from the year ago quarter. GMI's pre-tax margin of 48.4% was an all-time high driven both by strong revenue growth and operating leverage achieved through disciplined overcompensation costs. This record Fourth Quarter completed a record full year for GMI. Net revenues of $18.9 billion were the highest ever, up 37% from 2005 with double digit percentage increases coming from each division and each region. Pre-tax earnings growth was even stronger at 43% to $7.11 billion as GMI achieved solid operating leverage even as significant investments continued to be made across the business. The full year pre-tax margin was 37.6%.

*　　*　　*

Since the Fourth Quarter began, we've closed two previously announced acquisitions. . . on the first day of the new fiscal year, **First Franklin**, a non-prime mortgage origination and servicing franchise, so both these operations **will contribute to our business in 2007**. Second, our Investment Banking business continues to make great strides, ranking Number one for the quarter in global equity and Equity-Linked underwriting lead tables and **Number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space**.

(Emphasis added).

220.    Moreover, defendant Edwards represented that Merrill's growth would not materially alter Merrill's risk profile:

[responding to a question]  Well, as a general matter, I think we've been very explicit in our strategy on risk. Our goal has been to add resources both people and technology to allow us to take more risk and as a general matter, our risk profile has increased over time and that certainly has contributed to growth in revenues. For this quarter itself, we'll publish our VAR statistics as part of our K, but I don't think you'll see a dramatic move in the VAR statistics one way or another particularly. On the leverage front, we have seen, **we have been growing our assets and that has been a contributor as well to our growth and you'll see the continuation of that trend in the Fourth Quarter.**

(Emphasis added).

221.    The statements above in paragraphs 218-220 were materially false and misleading.  The statement in Merrill's press release concerning "record revenues from credit products" omitted to disclose that these "record revenues" were the result of Merrill's decision to materially increase its concentration of assets in highly risky U.S. subprime ABS CDO exposures.  The statement that "by virtually any measure our company completed the most successful year in its history" was materially false and misleading because Merrill failed to disclose that revenue derived from Merrill's U,S, subprime ABS CDO exposures was at the expense of exposing the Company to unprecedented risk.  As stated herein, this risk was in the form of Merrill's ballooning exposure to the subprime market in the form of U.S. subprime ABS CDOs, synthetic CDOs, CDO squared, TRS, and CDS.  While defendant Edwards extolled the virtues of Merrill's GMI division (the division which generated the CDO business) stating that it had "nothing short of an outstanding quarter across nearly all business and regions with $5.4 billion in revenues", Edwards omitted to state that those revenues were earned by exposing Merrill to huge risks that were not disclosed to investors.  Moreover, these statements did not disclose other material negative trends affecting Merrill's business including:

> (a)  That Merrill was increasingly leveraging risky subprime mortgages, which resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91);
>
> (b)  That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other

executives who refused to increase Merrill's exposure to U.S. subprime

ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-100; 108-

115);

(c)  That Merrill falsely represented that it mitigated market and credit risk on

trading assets and liabilities by being adequately hedged and that these

hedging techniques were supplemented by adequate corporate risk

management policies and procedures, when, in fact, the Exchange Act

Defendants had knowingly or recklessly ignored Merrill's risk policies

and guidelines and did not adequately hedge these exposures (see ¶¶34-66;

92-99; 108-115);

(d)  That Merrill had significantly lowered the underwriting guidelines for

subprime loans that were originated and purchased from other subprime

originators, such as ResMAE, MLN and Ownit (see ¶¶ 124-141).  With

respect to Ownit, Michael Blum, a Managing Director and Head of Global

Structure Finance & Investment Group at Merrill and Merrill's representative

on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the

founder of Ownit, to materially lower its underwriting standards, which

provided Merrill access to a greater number of subprime mortgages; (see

¶¶129-137); and

(e)  That as a result of the lowered underwriting guidelines Merrill had

experienced at least $400 million of early payment defaults on loans

purchased from subprime originators and thus began exercising "put" options

forcing the subprime originator to take back the defaulting loans and a major

originator of subprime loans – Ownit – had declared bankruptcy because of
Merrill's exercising its put rights, but that Merrill would continue to package
such loans into MBSs (see ¶¶124-141).

222.    On January 29, 2007, the Company announced it would acquire First
Republic Bank for $1.8 billion.  In a press release, the Company represented:

> "We are very pleased that First Republic will join Merrill Lynch as a
> separately run business that will enable us to enhance the growth of our
> private client organization by leveraging First Republic's very successful
> business model and strategy," said Robert J. McCann, president of Merrill
> Lynch's Global Private Client business.  "First Republic will enable
> Merrill Lynch to accelerate its strategic objective of growing its high net
> worth business.  Our goal is to provide First Republic with the resources
> and support to replicate the firm's success in key markets across the
> country and to benefit from its deep banking expertise.  We look forward
> to supporting First Republic's further expansion with additional capital
> and a greater range of investment products, advice and services.  While
> First Republic will operate as a separate division with its own brand
> identity and strategic goals, we expect our entire private client
> organization to benefit from its outstanding history, excellent credit and
> lending capabilities, and its experienced management team.  First
> Republic's strong culture of client focus and service sets the standard for
> excellence in the private banking industry and is consistent with Merrill
> Lynch's mission and principles."

> *      *      *

> First Republic shareholders will receive $55.00 per share at closing.
> Shareholders will have the ability to elect cash or stock, subject to
> proration, such that the aggregate consideration will be paid with 50
> percent cash and 50 percent Merrill Lynch common stock.  Merrill Lynch
> plans to repurchase in the open market the number of shares equivalent to
> those it will issue in the transaction.  The firm expects to realize synergies
> by eliminating certain of First Republic's costs related to being a listed,
> publicly traded company.  Merrill Lynch also expects to realize benefits
> from the optimization of funding costs.  First Republic and Merrill Lynch
> expect to enhance revenue and earnings growth by accelerating First
> Republic's office expansion and by cross-offering products and services
> between the two organizations.  Such enhancements will initially be
> partially offset by integration costs and retention expenses.  Merrill Lynch
> expects the transaction to be modestly accretive to its earnings and EPS
> and neutral to its ROE by the end of 2008.  First Republic's financial

results will be included in Merrill Lynch's Global Private Client portion of its Global Wealth Management (GWM) segment.

223.    The above statements were materially false and misleading because Merrill failed to disclose that one of the reasons it sought to acquire a high-end net-worth business such as First Republic was because the Exchange Act Defendants knew of the rapid deterioration of the subprime market and Merrill's exploding risks to this market through its U.S. subprime ABS CDO exposures.  Thus, in addition to not disclosing its true exposure to U.S. subprime ABS CDOs, Merrill attempted to further obscure its true exposure by acquiring First Republic.

224.    On February 22, 2007, in a "Letter to Fellow Shareholders and Clients", defendant O'Neal made the following representations:

> I am pleased to report that, by virtually any measure, Merrill Lynch completed the most successful year in its history — financially, operationally, and strategically. After several years of restructuring and investing in our business, all of the components came together to reflect a company capable of strong, disciplined performance with tremendous potential for future success.
>
> Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we offer clients, expanding our geographic footprint, diversifying our revenues, managing and deploying our capital more effectively and investing in top talent from within and outside the company.
>
> *       *       *
>
> We also took a number of steps to further round out our capabilities. We acquired First Franklin, one of the nation's leading originators of residential mortgage loans, adding scale to our mortgage platform and providing a robust source of origination for our securitization and trading operations . . . We reorganized our institutional fixed income division to better manage risks, improve efficient use of the firm's balance sheet and enhance growth prospects . . .

225.    The statements in the paragraph above were materially false and misleading because even though O'Neal stated that Merrill had "completed the most successful year in its history," O'Neal omitted to disclose the material fact that in so doing, Merrill exposed itself to enormous risk in the form of billions of dollars in U.S. subprime ABS CDO exposure.  O'Neal also failed to disclose that as set forth in paragraphs 34-66, 74-99 and 108-115, the Exchange Act Defendants knowingly or recklessly ignored Merrill's risk management models and knowingly or recklessly ignored warnings concerning this ballooning exposure, including those of Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion and were fired because of their views.  Furthermore, O'Neal failed to disclose that Merrill's financials were materially exposed to the mounting risks associated with the declining housing market and increasing default rates of subprime borrowers.  (*See* ¶¶116-141).  Indeed, as set forth herein at paragraphs 142-153, by this time, the ABX and TABX indices had materially declined, which indicated to the Exchange Act Defendants that Merrill's U.S. subprime ABS CDOs were impaired.

226.    On February 27, 2007, Merrill caused to be filed with the SEC, Merrill's 2006 10-K.  The 2006 10-K represented that for fiscal 2006, Merrill reported: (i) net earnings of $7.5 billion, an increase of 47% from fiscal year 2005, and (ii) net earnings per diluted share of $7.59 per share, an increase of 47% from $5.16 per share in fiscal year 2005.

227.    The 2006 10-K makes scant reference to Merrill's involvement with subprime mortgages and contains no disclosures of the nature and extent of Merrill's CDO involvement or its use of subprime mortgage debt in structuring these financial

instruments.  Unlike the 2007 10-K, which  contains four full pages describing "U.S. ABS CDO and Other Mortgage-Related Activities," neither the 2006 10-K nor any of the 10-Qs during the Class Period before the third quarter of 2007 contain any comparable disclosures.  Merrill's 2006 10-K describes the business segment that was responsible for its CDO business using vague generalities that did not give investors any glimpse of what these securities involved or the risks attendant to them:

> *Fixed Income, Currencies and Commodities*
> FICC includes the following groups:
>
> *Global Credit* – responsible on a global basis for credit trading of money market instruments, investment grade debt, credit derivatives, structured credit products, syndicated loans, high-yield debt, distressed and emerging markets debt, as well as collateralized mortgage obligations, asset-backed securities trading, and pass-through mortgage obligations trading;

The 2006 10-K lumps the financial results from CDOs and subprime MBSs together with other specialized debt products and reports that: "In 2006, FICC net revenues of $8.1 billion increased 31% from 2005, as net revenues increased for all major products. The increases in net revenues were primarily driven by record year-over-year results in commodities, credit trading, foreign exchange, and structured finance."  Unlike in the 2007 10-K, the Exchange Act Defendants did not describe the extent of Merrill's holdings in CDOs as of the date of the balance sheet or the risk that those holdings would decline in value.

228.     By the time Merrill filed its 2006 10-K, there was a sharp decline in the ABX and TABX.  Merrill did not disclose that it had billions of dollars of exposure to these U.S. subprime ABS CDOs and that there was a substantial likelihood that the decline in their value would materially negatively impact upon its financials.

229.    With respect to Non-Trading Related Assets and Liabilities, the 2006 10-K represented that Merrill "economically hedge[s]" risk by purchasing credit default swaps:

### Loans, Notes, and Mortgages, Net

Our portfolio of loans, notes, and mortgages includes corporate and institutional loans, residential and commercial mortgages, asset-based loans and other loans to individuals and other businesses. We maintain collateral to mitigate risk of loss in the event of default on some of these extensions of credit in the form of securities, liens on real estate, perfected security interests in other assets of the borrower or other loan parties, and guarantees. We also *economically hedge portions of the credit risk in certain commercial loans by purchasing credit default swaps*. Loans, notes, and mortgages were $73.0 billion at year-end 2006, up 11% from 2005 as a result of strong market demand driven by favorable borrower fundamentals and business growth.

(Emphasis added).

230.    The 2006 10-K further represented, *inter alia*, concerning Residential Mortgage Lending that any additional credit risk resulting from certain mortgage loans it addressed through "adherence to underwriting guidelines," that credit risk was "closely monitored" and that loans were "predominantly extended to high credit quality borrowers":

We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through *adherence to underwriting guidelines* as described below. *Credit risk is closely monitored in order to confirm that reserves are sufficient and valuations are appropriate. These loans are predominantly extended to high credit quality borrowers*.

\*       \*       \*

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform which is focused on originating non-prime residential

mortgage loans through a wholesale network. As a result of this acquisition which was completed in the fiscal first quarter of 2007, *the credit profile of our mortgage lending portfolio may be impacted* in future periods.

(Emphasis added).

231.     The statements above in paragraphs 227-230 were materially false and misleading because during 2006, prior to the First Franklin acquisition, Merrill had greatly expanded its origination and purchasing of subprime mortgages and had reduced its credit standards both as to loans originated and loans purchased, which loans had begun to default in large numbers by the end of the year.  These statements were also materially false and misleading because by the beginning of the Class Period, Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options, forcing the subprime originator to take back the defaulting loans (see ¶¶124-141).  Thus, contrary to Merrill's statements, the credit profile of Merrill's mortgage lending portfolio *had already been* adversely impacted.  Moreover, rather than adhering to underwriting guidelines, Merrill ordered its originators, including Ownit, to lower underwriting guidelines, virtually insuring materially high default rates (see ¶¶124-141).

232.     As set forth below, the Exchange Act Defendants caused Merrill to falsely represent, in great detail, that Merrill had adequate risk policies in place to minimize the exposures of Merrill's portfolio.  However, the Exchange Act Defendants knowingly or recklessly ignored these policies and hid Merrill's true exposure to U.S. subprime ABS CDOs from plaintiffs and the class.  (*See* ¶¶34-66; 92-115).  Indeed, in the 2006 10-K, the Exchange Act Defendants represented that any risk associated with Trading-Related Assets and Liabilities were "mitigated" through "hedging strategies":

Although trading-related balances comprise a significant portion of the Consolidated Balance Sheets, ***the magnitude of these balances does not necessarily result in an increase in risk***. The ***market and credit risks associated with trading-related balances are mitigated through various hedging strategies***, as discussed in the following section. . . .

Trading Assets and Liabilities . . .

We use both "cash instruments" (e.g., securities) and derivatives to manage trading inventory market risks. As a result of these economic hedging techniques, a significant portion of our trading assets and liabilities represents hedges of other trading positions. We may use long positions in U.S. Government securities, for example, to hedge our short positions in interest rate futures contracts. ***These hedging techniques, which are generally initiated at the trading unit level, are supplemented by corporate risk management policies and procedures*** . . .

(Emphasis added).

233.    Further, in Merrill's 2006 10-K, the Exchange Act Defendants represented that Merrill's risk management policies and practices were, *inter alia*, subject to "regular senior management review and control," "clearly defined," and that "[r]isk framework exceptions and violations [were] reported and investigated at predefined and appropriate levels of management."  The Exchange Act Defendants represented the following:

Prudent Governance

We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to regular ***senior management review and control*** through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

\*        \*        \*

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with

99

other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, *these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.* To accomplish this, we have established a risk management process which includes:

> A formal risk governance structure that defines the oversight process and its components;

> A *regular review of the risk management process by the Audit Committee* of the Board of Directors (the "Audit Committee") as well as a *regular review of credit, market and liquidity risks and processes by the Finance Committee* of the Board of Directors ("the Finance Committee");

> *Clearly defined risk management policies and procedures* supported by a rigorous analytical framework;

> Communication and coordination among the businesses, executive management, and risk functions while maintaining *strict segregation of responsibilities, controls, and oversight*; and

> Clearly articulated risk tolerance levels, defined and *regularly reviewed by the ROC*, that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process. While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to mitigate risk-related losses so that they fall within acceptable, predefined levels, under foreseeable scenarios.

*     *     *

Market and credit risk tolerance levels are represented in part by framework limits, which are established by the ROC and *reviewed and approved annually by the Executive Committee*, which must also approve certain intra-year changes. Substantive market and credit risk framework limit changes are reported to the Audit and Finance Committees. The

100

frameworks are reviewed by the Finance Committee in the context of its evaluation of market and credit risk exposures. ***Risk framework exceptions and violations are reported and investigated at predefined and appropriate levels of management***.

Both the Audit Committee and the Finance Committee are provided with ***regular risk updates,*** and significant issues and transactions are reported to the Executive Committee, the Audit Committee and the Finance Committee. Various governance committees exist to create policy, review activity, ***and verify that new and existing business initiatives remain within established risk tolerance levels***. Representatives of the independent risk and control groups participate as voting members of these committees. The activities of these committees are monitored by the ROC.

(Emphasis added).

234.    In the 2006 10-K, the Exchange Act Defendants represented the following concerning Merrill's management of market risk:

(a) That the groups responsible for approving the products and

markets in which Merrill transacts and takes risk include Merrill's

Market Risk Management Group as well as other independent risk

and control groups and that:

. . . this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $52 million and:

To calculate VaR, we aggregate sensitivities to market risk factors and combine them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options.

\*     \*     \*

Trading VaR increased during 2006 due to increased levels of equity, commodity and credit trading. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels.***

To complement VaR and in recognition of its inherent limitations, we use a number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(c) That in addition to VaR, Merrill used other risk measurement

methods to assess the Company's risk including stress testing and

event risk analysis.

235.    In the 2006 10-K, in statements concerning Merrill's management of

credit risk, the Exchange Act Defendants made representations concerning the

creditworthiness of Merrill's counterparties, including that these parties could satisfy

their contractual obligations to Merrill and that their risks were monitored by "senior

management."  However, these statements were materially false and misleading because

these counterparties were undercapitalized and/or highly leveraged.  Therefore,

Defendants failed to disclose that there was a heightened risk of non-performance by these counterparties (see ¶¶100-107) and falsely understated Merrill's VaR (see ¶¶162-167).  Thus, the Exchange Act Defendants represented:

> The Global Credit and Commitments Group uses a variety of methodologies to set limits on exposure and potential loss resulting from an individual, counterparty or issuer failing to fulfill its contractual obligations. The group performs analyses in the context of industrial, regional, and global economic trends and incorporates portfolio and concentration effects when determining tolerance levels. Credit risk limits take into account measures of **both current and potential exposure as well as potential loss and are set and monitored by broad risk type, product type, and maturity**. Credit risk mitigation techniques include, where appropriate, the right to require initial collateral or margin, the **right to terminate transactions or to obtain collateral should unfavorable events occur, the right to call for collateral when certain exposure thresholds are exceeded, the right to call for third party guarantees and the purchase of credit default protection**. **With senior management involvement, we conduct regular portfolio reviews, monitor counterparty creditworthiness, and evaluate potential transaction risks with a view toward early problem identification and protection against unacceptable credit-related losses.** We continue to invest additional resources to enhance Merrill Lynch's methods and policies to assist in managing our credit risk and to address evolving regulatory requirements.
>
> Senior members of the Global Credit and Commitments Group chair various commitment committees with membership across business, control and support units. These committees review and approve commitments, underwritings and syndication strategies related to debt, syndicated loans, equity, real estate and asset-based finance, among other products and activities . . .
>
> Further, to protect against declines in the value of the assets held by SPEs, for which Merrill Lynch provides either liquidity facilities or default protection, **Merrill Lynch economically hedges its exposure through derivative positions that principally offset the risk of loss arising from these guarantees.**

(Emphasis added).

236.    In the 2006 10-K, the Exchange Act Defendants represented, *inter alia*, the following concerning the Company's liquidity and that it had risk management

systems in place to ensure that the Company had sufficient liquidity and that it would not

need to raise additional capital:

> Scenario analysis and stress testing is an important part of our liquidity management process. Our Liquidity Risk Management Group performs regular scenario-based stress tests covering credit rating downgrades and stressed market conditions both market-wide and in specific market segments. . .

> In our scenario analysis, we assume loss of access to unsecured funding markets during periods of financial stress. Various levels of severity are assessed through sensitivity analysis around key liquidity risk drivers and assumptions. Key assumptions that are stressed include diminished access to the secured financing markets, run-off in deposits, draws on liquidity facilities, and derivative collateral outflows. We assess the liquidity sources that can be accessed during the crisis and the residual positions.

> . . . The Liquidity Risk Management Group works with our Credit and Market Risk Management groups to incorporate the results of their judgment and analytics where credit or market risk implications exist. We assess the cash flow exposures under the various scenarios and use the results to refine liquidity assumptions, size our excess liquidity pools and/or adjust the asset-liability profiles.

237.    The 2006 10-K contained certifications, signed by defendants O'Neal and

Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made

substantially the same certifications as set forth above in paragraph 212.

238.    The statements above in paragraphs 232-237 were materially false and

misleading because the Exchange Act Defendants:

> a.    Failed to disclose that Merrill was increasingly leveraging risky subprime
>
> mortgages that resulted in Merrill having billions of dollars of U.S.
>
> subprime ABS CDO exposures (see ¶¶17-33; 74-91);

> b.    Failed to disclose that in increasing its holdings of risky U.S. subprime
>
> ABS CDO exposures, Merrill knowingly or recklessly ignored its risk
>
> management policies and guidelines, including those established by

Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

c.   Misrepresented that Merrill mitigated market and credit risk on trading assets and liabilities by being adequately hedged and that these hedging techniques were supplemented by adequate corporate risk management policies and procedures, when in fact the Exchange Act Defendants had knowingly or recklessly ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶34-66; 92-99; 108-115);

d.   Failed to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including companies such as XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107);

e.   Materially understated Merrill's reported VaR by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167);

f.   Failed to disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶124-141).  With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and

Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages; (see ¶¶129-132);

g. Failed to disclose that as a result of the lowered underwriting guidelines Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141);

h. Misrepresented that because of Merrill's hedging techniques and risk management policies, Merrill would not be materially affected by issues related to the subprime market (see ¶¶41-52); and

i. Misrepresented that Merrill's financial statements conformed to GAAP and failed to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶92-99, 142-153; 337-382).

**D.    Series 5 Preferred Stock Prospectus (March 15, 2007 Offering)**

239.    On March 12, 2007, Merrill filed with the SEC a product supplement related to the March 31, 2006 shelf registration statement and on March 16, 2007, Merrill filed with the SEC a term sheet/prospectus (collectively referred to as "Series 5 Preferred Stock Prospectus") under which it issued 60 million depository shares each representing a 1/1200th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series 5 at $25 per depository share.

240.    The Series 5 Preferred Stock Prospectus incorporated by reference Merrill's November 3, 2006 10-Q and Merrill's 2006 10-K, which, as set forth above in paragraphs 205-213 and 226-238, contained misrepresentations and omissions of material fact.

E.    **Registration Statement Amendment No. 2 (April 25, 2007 Offering)**

241.    On April 23, 2007, Merrill and Merrill Lynch Capital Trust II ("ML Trust II") filed with the SEC a Post-effective Amendment No. 2 to the shelf registration dated March 31, 2006 ("Registration Statement Amendment No. 2").

242.    Registration Statement Amendment No. 2 incorporated by reference Merrill's 2006 10-K, which, as set forth above in paragraphs 226-238, contained misrepresentations and omissions of material fact.

F.    **Financial Results for the Fiscal Quarter Ended March 30, 2007**

243.    On April 19, 2007, in its press release for the quarter ended March 30, 2007, the Exchange Act Defendants represented:

> "This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our customers," said Stan O'Neal, Chairman and Chief Executive Officer.
>
> *            *            *
>
> Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination securitization and trading of non-prime mortgage loans and securities in the U.S. ***Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.***

244.    Defendant O'Neal's statement in paragraph 243 above regarding Merrill's first quarter earnings was materially false and misleading because it failed to disclose that

Merrill's U.S. subprime ABS CDOs had exposed the Company to extreme risk and created exposures to Merrill in the tens of billions of dollars. While O'Neal stated "this was a terrific quarter…" in fact it was not a terrific quarter for Merrill.  During this period, there was a steep drop in the ABX and TABX indices (see paragraphs 142-153), which was yet another fire alarm for Merrill that its U.S. subprime ABS CDO assets were materially overvalued. Moreover, while the housing market was continuing to decline, and defaults were continuing to rise, Kronthal had warned top Merrill executives of the danger of Merrill's exploding exposure to these risky assets (see paragraphs 108-115) and Merrill was having extreme difficulty selling U.S. subprime ABS CDOs it had packaged (see paragraphs 89-91).  Moreover, defendant O'Neal's statement that revenues from activities related to U.S. non-prime mortgages comprised less than 1% of Merrill's total net revenue over the past five quarters was materially false and misleading because the statement obscured the Company's U.S. subprime ABS CDO exposures, was intended to minimize the perceived risk of Merrill's U.S. subprime ABS CDO exposures, and misled Merrill shareholders and analysts.  Indeed, as stated below, the statement convinced analysts that Merrill's exposure was limited.  Thus, even assuming *arguendo* that revenues from activities related to mortgages comprised less than 1% of Merrill's net revenues over the past five quarters, O'Neal failed to disclose that the Exchange Act Defendants fraudulent CDO scheme exposed the Company to billions of dollars of ultra-risky assets in order to generate the 1% of overall revenue.  The Exchange Act Defendants, including defendant O'Neal, were aware of this and concealed this fact from investors.

245.     On April 19, 2007, in its conference call for the quarter ended March 30, 2007, defendant Edwards continued to assert that any problems in the markets related to subprime generally would not "impede the overall momentum" of Merrill, because revenues from subprime activities were less than 1% of net revenues for the past five quarters.  Defendant Edwards represented:

> In key businesses, in both GMI and global wealth management or GWM, we continue to successfully execute our strategy to broaden and deepen our platform.  The benefits of this diversification become especially evident in quarters such as this one, where ***a clear dislocation in an individual market, the subprime mortgage space in the U.S., did not impede the overall momentum of our franchise.***
>
> *       *       *
>
> I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation.  Let me put this business into context.  As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that ***revenues from subprime mortgage-related activities comprise less that 1% of our net revenues for those five quarters.***  And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%. That said, this is an asset class that will continue to be significant both in the U.S. and worldwide. And the strategic importance of the First Franklin acquisition was clearly evident this quarter. ***As having both origination and servicing capabilities, enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.***

246.     Moreover, in the April 19, 2007 conference call, defendant Edwards falsely represented that Merrill's risk management capabilities were "better than ever" and that Merrill was "enhancing" its "already strong underwriting standards."  Edwards represented:

I would also point out that ***our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets. In fact, we've been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned. At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors.***

\*     \*     \*

WILLIAM TANONA, ANALYST, GOLDMAN SACHS: Good morning, Jeff. Obviously, the environment became a little bit more tricky this first quarter and there were concerns with subprime which you guys seem to have squashed any concerns regarding your exposure there. But I'm wondering if you guys have kind of changed your appetite in this environment or kind of rethinking what you put on your balance sheet or what type of risks you might take or if it has changed how you're approaching the business right now. . . .

EDWARDS: ***[R]isk management, as I said, in the prepared remarks, is a crucial aspect of our business and I think we've done very good job in negotiating these markets as a result of that.*** So how are we approaching that? We're certainly looking at new ways to do business where there are opportunities for us to either share risk or presell some of the risk and still do good business. ***So I think we're approaching it in a prudent way,*** given the environment . . . .

WILLIAM TANONA: In terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business. Can you kind of share your thought process as it relates to that and kind of what the trends you're seeing there in the overall business as well as possibly in the subprime space there?

EDWARDS: Okay. Well, it is a very active quarter for securitizations both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw attention in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter. 19 of them were ABS/CDOs, and more than ten of those deals were in the first couple of weeks of March. So while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume.

And on the subprime business, maybe just a couple more comments there. While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. ***And we did that in the background where we were enhancing our already strong underwriting standards***. We rationalized our array of products, eliminating certain products that were performing less well. And we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin and First Franklin originated paper, fall steadily throughout the quarter and they started out and remain at a level far below the industry. So I think the trends there show some signs of positiveness . . . .

\*        \*        \*

ROGER FREEMAN: Okay. That's helpful. Thanks. I guess lastly, can you talk at all to the VAR during the quarter or at least directionally from the fourth quarter?

EDWARDS: Yes. You'll see it in our Q, of course but directionally, it won't surprise you, I don't think, that it will be up consistent with the performance in our trading businesses. We've talked for some time now about our strategy of adding capabilities both people and technology to support growth and risk taking. That risk taking is evident in the results and you'll see the VAR reflect that as well.

247.    Finally, with respect to Merrill's retained interests in CDO deals, which were dramatically increasing, Edwards falsely represented there was "only a small part that reflects the subprime residuals". Edwards represented:

MICHAEL HECHT: . . . Is it possible for you to touch on the level of your overall retained interest for mortgage securitization noninvestment grade in particular and whether you've seen any big shifts since the beginning of the year?

JEFF EDWARDS: If you look at our retained interest in general, one important point to make there is that the majority of them clearly are investment grade rated securities that are either part of our CDO warehouse or that are the result of securitizations that are effectively in inventory that we intend to sell on to investors. ***So, there is only a small part that reflects the subprime residuals.*** And in general, given the level of activity and securitization that I described earlier, you would expect and you'll see retained interests will be up. The residual amount will be up at a much lower rate.

(Emphasis added).

248.    Defendant Edwards' statements in the April 19, 2007 conference call were materially false and misleading. Edwards stated that because of Merrill's diversification, subprime mortgage issues did not impede the overall momentum of Merrill's franchise. In other words, Edwards falsely represented that while there were issues in the subprime market, these issues would not materially affect Merrill's overall business.  In fact, the overall momentum at Merrill was impeded substantially because Merrill faced increasing difficulty in selling CDOs and, therefore, the Exchange Act Defendants had instructed Merrill employees to simply place those CDOs on Merrill's balance sheet at inflated values.  These statements by Edwards were also materially false and misleading for the following reasons:

(a)    Edwards' statement that "[t]he benefits of … diversification become especially evident in quarters such as this one, where a clear dislocation in … the subprime mortgage space in the U.S., did not impede the overall momentum of our franchise" implied that Merrill did not concentrate its assets in any high-risk asset category, and in particular, had not increased its concentration in the subprime mortgage-related area; whereas, in fact, during 2006 and the first quarter of 2007 Merrill had materially increased its concentration of and exposure to U.S. subprime ABS CDOs and related derivatives and greatly increased its risk of loss due to mortgage defaults and the decline in market value of subprime MBSs (see ¶¶17-33; 74-91; 124-141);

112

(b) Edwards' statement that "[a]s we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters" was materially false and misleading because, first, it suggested that Merrill's subprime business was directly discussed in the January 18, 2007 earnings release, which it was not.  Second, the statement suggested that the subprime business was a minor part of Merrill's business.  In fact, subprime MBSs were the principal cash asset backing virtually all of the CDOs and related derivative instruments underwritten, sold, swapped, traded, and held by Merrill, and without this foundation of securitized subprime mortgages, virtually none of the CDOs underwritten and traded by Merrill would have existed (see ¶¶17-33; 74-91);

(c) Edwards' statement concerning First Franklin that "having both origination and servicing capabilities, enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly" was materially false and misleading because he failed to disclose that Merrill lowered underwriting guidelines to increase subprime loans and as a result Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising

"put" options forcing the subprime originator to take back the defaulting

loans (see ¶¶124-141);

(d) Edwards did not disclose that Merrill was increasingly leveraging risky

subprime mortgages that resulted in Merrill having billions of dollars of

U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91);

(e) Edwards did not disclose that Merrill's assets and liabilities were

materially false because they did not account for impairment in the U.S

subprime ABS CDO portfolio by at least 15% (see ¶¶142-153; 337-382);

and

(f) Edwards' statement concerning VaR was materially misleading because

Merrill's reported VaR did not adequately consider that Merrill's risky

exposure to U.S. subprime ABS CDOs were backed by subprime-related

assets many of which were rated BBB or below and thereby falsely

convinced analysts and the market that Merrill was a less risky company

than its peers (see ¶¶162-167).

249.    The Exchange Act Defendants' false statements had convinced the market

that Merrill's exposure to U.S. subprime ABS CDOs was minimal. For example, on April

19, 2007, CIBC issued a report concerning Merrill that stated "[t]he quarter was

highlighted by record-setting growth in each of its capital markets businesses and strong

contribution from its wealth management business…CFO Edwards believes that the

subprime mortgage downturn is contained and MERs exposure is small as subprime-

related revenue was <1% of firm revs. in the past 5 quarters."

250.    Other analyst reports, including Wachovia and Buckingham Research Group repeated this theme. According to an April 19, 2007 Wachovia report: "[o]verall sub-prime related revenues for the last five quarters contributed less than 1% to MERs total revenues." Moreover, in its report dated April 20, 2007, Buckingham Research Group stated "within MBS trading (a source of investor concern) management noted that subprime mortgages represented only 1% of total revenues (and 2% proforma for the recent acquisition of First Franklin)."

251.    On April 27, 2007, Merrill held its 2007 Annual Meeting of Shareholders at the Merrill Lynch Hopewell Campus, 1550 Merrill Lynch Drive, Hopewell, New Jersey. At the meeting, defendant O'Neal discussed Merrill's purchase of First Franklin. O'Neal stated that he remained "very confident" that First Franklin "will be a more valuable franchise over time" partly because so many competitors had "gone bankrupt" or halted making new loans.

252.    On May 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended March 30, 2007 (the "May 7, 2007 10-Q"). In the May 7, 2007 10-Q, the Exchange Act Defendants represented, *inter alia*, that Merrill reported i) net earnings of $2.2 billion, an increase of 24% from the 2006 first quarter year results, and ii) net earnings per share of $2.50 per share and $2.26 per diluted share.

253.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $7.3 billion at March 30, 2007.

254.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that Merrill had mortgage loans of $21.0 billion and commitments to make mortgage loans of $7.995 billion as of March 30, 2007 and allowance for loan losses of $492 million.

255.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that as of March 30, 2007 Merrill had assets of mortgages, mortgage-backed and asset backed assets of $42.8 billion, contractual agreements of $36.3 billion and investment securities of $80.3 billion.

256.    In the May 7, 2007 10-Q, the Exchange Act Defendants categorized Merrill's assets into three types:  levels 1, 2 and 3.  Level 1 purported to represent those assets whose values were based on "unadjusted quoted prices for identical assets in an active market."  Level 2 purported to represent those assets whose values were based on "quoted prices for similar assets in active markets . . . non-active markets  . . . [p]ricing models whose inputs are observable for substantially the full term of the asset  . . . [and] pricing models whose inputs are derived principally from or corroborated by observable market data."  Level 3 assets purported to represent those assets whose values were "based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement."  Merrill represented that its Level 2 and Level 3 assets were the following amounts:

> (a) Level 2: (i) Trading assets, excluding contractual agreements were
> $79.408 billion; (ii) Contractual agreements were $184.552 billion, minus
> a net adjustment of approximately $153 billion, resulting in approximately
> $31 billion; and (iii) Investment securities were $52.360 billion;

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.830 billion; (ii) Contractual agreements were $5.341 billion; and (iii) Investment securities were $5.922 billion.

257.    The May 7, 2007 10-Q represented, *inter alia*, that Merrill's maximum exposure to loan and real estate Variable Interest Entities ("VIEs") was $196 million and $6.425 billion in guaranteed and other funds.

258.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that "The Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

259.    The statements above in paragraphs 251-258 were materially false and misleading and omitted material facts for the following reasons:

(a) The Exchange Act Defendants failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having tens of billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 79-91);

(b) The Exchange Act Defendants failed to disclose that in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-66; 92-115);

(c) The Exchange Act Defendants violated GAAP by falsely representing Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q

based on the failure to properly mark-to-market the true value of the U.S.

subprime ABS CDO exposures by at least 15% (see ¶¶142-153; 337-382);

(d) The Exchange Act Defendants violated GAAP by falsely representing

Merrill's net earnings and earnings per share as reported in its May 7, 2007

10-Q based on the failure to properly mark-to-market the true value of the

U.S. subprime ABS CDO exposures (see ¶¶142-153; 337-382); and

(e) The Exchange Act Defendants violated GAAP by failing to disclose Merrill's

significant concentration of credit risk to U.S. subprime ABS CDOs (see

¶¶337-382).

260.    The May 7, 2007 10-Q barely mentions Merrill's subprime mortgage-

related activity and is silent as to Merrill's use of subprime MBS in structuring CDOs.

The May 7, 2007 10-Q contained a passing reference to subprime mortgage

securitizations as follows:

> Retained interests in securitized assets were approximately $8.7 billion
> and $6.8 billion at March 30, 2007 and December 29, 2006, respectively,
> which related primarily to residential mortgage loan and municipal bond
> securitization transactions. The majority of the retained interest balance
> consists of mortgage-backed securities that have quoted market prices.
> The majority of these retained interests include mortgage-backed
> securities that Merrill Lynch expects to sell to investors in the normal
> course of its underwriting activity, and ***only a small portion of the
> retained interests represent residual interests from subprime mortgage
> securitizations.***

(Emphasis added.)

261.    The statement above was materially misleading because it omitted any

reference to retained interests in CDOs for which subprime mortgage securitizations were

the underlying collateral, and thereby created a materially false and misleading

impression that Merrill's exposure to subprime mortgage-related assets was extremely

limited.

262.    In the May 7, 2007 10-Q, the Exchange Act Defendants made the

following representations concerning residential mortgage lending:

> We originate and purchase residential mortgage loans, certain of which
> include features that may result in additional credit risk when compared to
> more traditional types of mortgages. The potential additional credit risk
> arising from these mortgages is addressed through ***adherence to
> underwriting guidelines.*** Credit risk is ***closely monitored in order to
> ensure that reserves are sufficient and valuations are appropriate***. For
> additional information on residential mortgage lending, see the 2006
> Annual Report.

(Emphasis added).

263.    Included in a section in the 2006 10-K, which the May 7, 2007 10-Q

incorporates by reference, is the statement that Merrill's residential mortgage loans,

including such non-traditional features, "are predominantly extended to high credit

quality borrowers."

264.    The statements above in paragraphs 262-263 were materially false and

misleading because the Exchange Act Defendants:

(a) Failed to disclose that Merrill had significantly lowered the underwriting

guidelines for subprime loans that were originated and purchased from other

subprime originators, such as ResMAE, MLN and Ownit (see ¶¶124-141).

With respect to Ownit, Michael Blum, a Managing Director and Head of

Global Structure Finance & Investment Group at Merrill, and Merrill's

representative on Ownit's board of directors, in January 2006, instructed Bill

Dallas, the founder of Ownit, to materially lower its underwriting standards,

which provided Merrill access to a greater number of subprime mortgages for its CDOs; (see ¶¶129-135);

(b) Failed to disclose that as a result of the lowered underwriting guidelines, Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141); and

(c) Failed to disclose that Merrill knew no later than April 13, 2007 that, as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, the value of First Franklin mortgages for sale were materially overvalued at the time of the First Franklin closing (see ¶¶121-123).

265. In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning derivatives:

Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

*    *    *

Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

266. In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning Merrill's risk management:

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In

addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

267.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning Merrill's management of market risk:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $65 million and:

At March 30, 2007, trading VaR was higher than at year-end 2006 primarily due to increased interest rate exposures along with modest increases to commodity exposures. This increase was offset by reduced equity exposures. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on***

*a daily basis to verify they remain within corporate risk guidelines and tolerance levels* . . . .

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

268. The statements above in paragraphs 266-267 concerning Merrill's derivatives and risk management were materially false and misleading because the Exchange Act Defendants did not disclose the following:

(a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having tens of billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91);

(b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

(c) That Merrill did not properly mitigate market and credit risk on trading assets and liabilities by being adequately hedged and that these hedging techniques were supplemented by corporate risk management policies and procedures, when in fact, the Exchange Act Defendants had knowingly or recklessly

ignored Merrill's risk policies and guidelines and did not adequately hedge
these exposures (see ¶¶100-107; 179-184);

(d) That many of Merrill's hedges on U.S. subprime ABS CDO exposures were
with poorly capitalized or highly leveraged counterparties, including XL and
ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-
107);

(e) That Merrill materially understated its reported VaR because it did not
adequately consider that Merrill's risky exposure to U.S. subprime ABS
CDOs were backed by subprime-related assets, many of which were rated
BBB or below, and thereby falsely convinced analysts and the market that
Merrill was a less risky company than its peers (see ¶¶162-167);

(f) That Merrill had significantly lowered the underwriting guidelines for
subprime loans that were originated and purchased from other subprime
originators, such as ResMAE, MLN and Ownit (see ¶¶124-141).  With respect
to Ownit, Michael Blum, a Managing Director and Head of Global Structure
Finance & Investment Group at Merrill and Merrill's representative on
Ownit's board of directors, in January 2006, instructed Bill Dallas, the
founder of Ownit, to materially lower its underwriting standards so Merrill
had access to a greater number of subprime mortgages (see ¶¶129-135); and

(g) That Merrill disregarded or ignored its hedging techniques and risk
management policies and affirmatively misled investors into believing that
Merrill would not be materially affected by issues related to the subprime
market(see ¶¶34-66; 92-115).

269.    The May 7, 2007 10-Q contained certifications, signed by defendants

O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley which made the same

certifications as set forth above in paragraphs 212 and 237.

270.    The statements above in paragraph 269 were materially false and

misleading for the reasons set forth above in paragraph 268.

**G.    First Republic Acquisition**

271.    On or about May 8, 2007, Merrill filed with the SEC a Registration

Statement on Form S-4 (the "May 8, 2007 S-4"), as amended on June 8, 2007 and June

21, 2007 (the "June 21, 2007 S-4/A"), which became effective on June 22, 2007 and the

Proxy Statement and Prospectus dated June 22, 2007 (the "June 22, 2007

Proxy/Prospectus"). The May 8, 2007 S-4, June 21, 2007 S-4/A and the June 22, 2007

Proxy/Prospectus are collectively referred to as the "First Republic Registration

Statement."

272.    The First Republic Registration Statement incorporated by reference the

following documents:  the 2006 10-K; the November 3, 2006 10-Q; the May 7, 2007 10-

Q; and the July 19, 2007 Joint First Republic and Merrill Lynch Notice to shareholders of

Extension of Cash/Stock election deadline in connection with the pending merger filed

pursuant to Rule 425, each of which contained false statements of material fact as

elaborated above at paragraphs 205-213, 226-238 and 252-270.

**H.    Financial Results for the Fiscal Quarter Ended June 29, 2007**

273.    In June 2007, there was another dramatic drop in the ABX index.  See

paragraphs 151-152.  Moreover, in June 2007 the Bear Stearns Hedge Funds had

collapsed.  See paragraphs 154-161.  Merrill was a large lender to these funds and had

financed the funds' purchases of Merrill CDO assets and seized $850 million in

collateral.  On June 20, 2007, *The New York Times* reported that "an effort to save a

troubled hedge fund at Bear Stearns hit a major hurdle yesterday when Merrill signaled

that it would move forward with its plan to auction $850 million in subprime securities

that had been held as collateral . . . if the assets – securities and bonds backed by

subprime mortgages that can be difficult to value – are sold at prices well below where

they are currently valued, the reverberations across Wall Street would be strong.  Not

only would Merrill be forced to post losses on its holdings, but other banks, hedge funds

and investors owning similar securities would have to mark down the value of those

holdings to new, lower prices."

274.    Further, the Exchange Act Defendants difficulties selling CDO tranches

substantially increased during this period causing Merrill's balance sheet to pile up with

$40 billion of U.S. subprime ABS CDO exposures that could not be sold and had become

impaired due to a decline in value of at least 40 percent. Despite these clear and negative

trends and events, the Exchange Act Defendants did not disclose Merrill's true exposure

and represented that Merrill's exposure to subprime debt was "reasonably well

contained".  Similarly, the Exchange Act Defendants issued a press release falsely

trumpeting "another strong quarter."

275.    On June 27, 2007, *Bloomberg News* reported that at a conference

organized by Euromoney Institutional Investors Plc defendant O'Neal stated the

following: (i) "rising foreclosures on subprime mortgages in the U.S. aren't affecting

other parts of the bond market"; (ii) that Merrill's exposure to subprime debt is

"reasonably well contained"; (iii) "There have been no clear signs its spilling over into

other subsets of the bond market, the fixed-income market and the credit market", and (iv) that "[t]here are risks in some of the structures, in some of the complexities of CDOs, mortgage-backed securities and particularly prime brokerage, but there's no clear sign that there's contagion developing."

276.    The statements above in paragraph 275 were materially false and misleading because defendant O'Neal obscured Merrill's true exposure to U.S. subprime ABS CDOs and misled investors into believing that Merrill's U.S. subprime ABS CDO exposures were minimal and contained.    Further, the Exchange Act Defendants knew, but did not disclose, that Merrill was materially exposed to U.S. subprime ABS CDOs and that those assets were impaired by at least 40 percent or at least $16 billion.

277.    On July 17, 2007, in a press release, Merrill announced its financial results for the quarter ended June 29, 2007.  Despite the continuation of negative trends in housing, subprime and the implosion of the Bear Stearns Hedge Funds, defendant O'Neal touted Merrill's results as the product of "diversification" and "the earnings power of [Merrill's] franchise."  In truth, because of a decline of at least 40 percent in Merrill's U.S. subprime ABS CDO exposures, Merrill's earnings had in fact deteriorated and it should have written down at least $16 billion in U.S. ABS CDO exposures.  The Exchange Act defendants represented the following:

> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

*    *    *

▪    GMI's second-quarter 2007 net revenues were $6.2 billion, up 36 percent from the second quarter of 2006, as net revenues increased in all three major business lines:

▪    Fixed Income, Currencies and Commodities (FICC) net revenues increased 55 percent to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45 percent from 2006, reflecting increased diversity and depth across asset classes.

278.    As analysts became concerned about Merrill's exposure to subprime-related debt, the Exchange Act Defendants falsely assured the market that Merrill's "management, hedging, and cost controls" had "proven to be effective in mitigating the impact of [Merrill's] results" and as a result, Merrill was in an "exceptionally good position." On July 17, 2007, in connection with its second quarter 2007 earnings conference call, defendant Edwards represented the following concerning risk management, hedging controls, CDOs and Merrill's U.S. subprime ABS CDO exposures:

[T]he sequential decline in FICC revenues was driven primarily by credit, commercial real estate, and currencies, which has all set revenue records in the first quarter, as well as commodities. Partially offsetting these declines was a substantial increase from structured finance and investments, which primarily reflects a better performance from ou[r] U.S. subprime mortgage activities and to a lesser extent the continues growth in global rates.

While we have seen some positive signals, such as improving first-payment default levels for First Franklin, the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize. *Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results.*

\*        \*        \*

127

Glenn Schorr - *UBS - Analyst*

[I]n terms of both subprime and CDO exposure . . . You are the largest underwriter of CDOs, and maybe try to give some color around myth versus reality, and how people should think about, A) What is on your books in terms of residuals and exposure, and B) maybe even comment related to some of the Bear hedge funds, what collateral you have taken on your books or have not? And just overall comfort there, as well.

Jeff Edwards - *Merrill Lynch - CFO*

Okay. Well, look, again I want to make two points. The first is, that this is another example where ***I think proactive, aggressive risk management has put us in an exceptionally good position.*** Obviously the market has gone through a period of flux. We think that remains the case.

***But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market.*** Our warehouse lines are down materially, our whole-loan inventory is down materially.  As was the case in the last quarter, we will see a modest increase in our residual position. But it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market . . . .

[T]his is obviously an area that has received a lot of attention, and it receives a lot of attention as we work to risk manage it. But it is only a part of our business, our broader business. It is a part of our structured finance and investment business, which has many other pistons around the world, other asset classes. And in turn, structured finance is only a part of our broader FICC business, which is obviously only a part of GMI, and a part of the firm. I think the importance of diversification came through yet again this quarter in these results . . . .

Obviously we have a very robust process around marking these [CDO and subprime] assets. And we are confident in how they were marked, how they are marked.

(Emphasis added).

279.    Moreover, when questioned regarding what percent of Merrill's earnings were subprime-related, Edwards once again minimized the impact of subprime on Merrill, even though it had an undisclosed exposure of at least $40 billion which was itself more than 40% impaired by this time.  Defendant Edwards represented:

**Mike Mayo** - *Deutsche Bank – Analyst*

[W]hat percent of your earnings are related to mortgage or subprime mortgage?  And if you could include in that CDOs, warehouse lines, or anything else.

**Jeff Edwards** - *Merrill Lynch – CFO*

Well, just to remind everybody, we made the comment in the first quarter that over the previous 5 quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. *I don't think there is anything that would change that comment that I made in the first quarter* . . . .

**Mike Mayo** - *Deutsche Bank - Analyst*

How much of your capital is at risk? How much in total assets do you have that is somehow related to that same category?

**Jeff Edwards** - *Merrill Lynch - CFO*

Well, we obviously have a robust economic capital model that we employ, to address risk around all of our different assets.  From an overall asset standpoint, again the point I would make there, *is that there has been we think an important transformation of the components of that asset base, where the exposure that we retain is in the higher rated tranches of the exposure. And what we have done is reduce exposure in some of the broader lower rated categories.*

**Mike Mayo** - *Deutsche Bank - Analyst*

Okay. Do you have an overall number though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**Jeff Edwards** - *Merrill Lynch - CFO*

We don't disclose our capital allocations against any specific or even broader group.

**Richard Bove** - *Punk, Ziegel & Company - Analyst*

And I guess finally, just overall in the broad high-yield market, it appears that yield on high yield bonds has gone up 65 basis points in the last 5 to 6 weeks. And the ABX index which I guess has a lot of relevance or no relevance, depending upon how you use it, has dropped about 40% over the year. What has that done to the valuation of the overall assets of Merrill Lynch . . . .

**Jeff Edwards** - *Merrill Lynch - CFO*

At any point in time, we have got assets and hedges in place that are directly affected by all of these items. *And in the course of the quarter,*

*we seek to mark all of those things. And again, it highlights, I think the importance of having effective risk management, which we believe thus far we have demonstrated has been very effective.*

\*        \*        \*

**Meredith Whitney** - *CIBC World Markets – Analyst*
I need a little extra help on the values you are describing to the mortgage piece and the CDO piece. I appreciate your comments earlier that you are comfortable how you are valuing them, but for an outsider that doesn't have the benefit of what you see. Can you give a little bit more of a qualitative overview, in terms of what methods you are using to value these securities? How the methods have changed? At what point have you decided the market deserves a revaluation of these securities? Did you revalue and write down these securities during the second quarter? Any extra color you can give that would help me, and a
bunch of others so it would be appreciated.

**Jeff Edwards** - *Merrill Lynch - CFO*
Okay. Well, of course **we are constantly reevaluating these assets and related hedges on a constant basis.** So in some cases, they get marked down, in some cases they get marked up. The offsets sometimes move in other directions. The broad answer to your question is, yes, we absolutely marked all of that, all of those assets and related hedges during the quarter. **In general when there is an active observable market, we have mark to market.** When there are related markets that we can use to interpolate, we also can mark effectively to market. There are some parts, such as the residuals which are more on a mark to model basis, based on inputs that we can observe, such as cumulative default curves, for example. And then there are loans that we also make judgments on, using lower-cost markets. So, that is a broad explanation as to how we look at those assets . . . . Everything will affect our valuations and the related hedges. And we will constantly be updating for all the new input that comes into the market.

**Meredith Whitney** - *CIBC World Markets - Analyst*
Okay. Just one last follow-up in terms of the severity of these marks, would you qualify the second quarter severity to be greater than the first quarter?

**Jeff Edwards** - *Merrill Lynch - CFO*
Well, overall, as I pointed out the business performed better in the second quarter than it did in the first quarter. Still did not perform as well as it did in the second quarter last year. And I think that appropriately gives you a benchmark.

**Meredith Whitney** - *CIBC World Markets - Analyst*

130

Okay. But the indexes are down dramatically from the first quarter this year and the second quarter of last year. So that is really speaking about valuations.

**Jeff Edwards** - *Merrill Lynch - CFO*
***All of which is reflected in those results.***

(Emphasis added).

280.    The statements above in paragraphs 277-279 were materially false and misleading because:

(a) Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

(b) Merrill did not adequately account for the impairment of its U.S. subprime ABS CDO exposures of at least 40% or $16 billion during this quarter (see ¶¶142-153);

(c) Edwards failed to disclose that in increasing Merrill's holdings of risky U.S. subprime ABS CDOs, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶33-66; 92-99; 108-115); and

(d) Edwards failed to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including companies, such as XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107; 179-184).

281.    On July 17, 2007, defendant Edwards represented that Merrill's exposure to the Bear Sterns Hedge Funds was "both limited and well under control," "contained" and "appropriately marked:"

**Richard Bove** - *Punk, Ziegel & Company - Analyst*
I was wondering if you could go further into the Bear Stearns transaction. I don't know if the press reports are anywhere near correct, but they are suggesting that you loaned $800 million to this fund that Bear Stearns put together. And at the present time most of the collateral was still held by Merrill Lynch, and that most of the assets in that fund are not worth $0.10 on the dollar. So I am just wondering, #1) Why would Merrill Lynch lend $800 million if that number is at all correct to a fund which had not been in existence for a year? And secondly, whether the valuations stated in the press are anywhere near correct, and if they are, how you are valuing the collateral that you now hold in that fund . . . .

**Jeff Edwards** - *Merrill Lynch - CFO*
Let me just say that we think **our net exposure in the situation is both limited and well under control.** We obviously have acted in ways that we think are **prudent in managing our risk**. I think again, as a demonstration of our pro-activity here. At this point, we remain in active dialogue with Bear Stearns Asset Management, but I think our exposure here is limited. It is contained. And it is appropriately marked . . . .

We look at all of our hedge fund clients on a individual basis. Obviously providing financing to hedge funds is what the financing and services business is all about. **When we undertake to make such loans, we do so in ways that we believe are structured prudently from a credit perspective.** And we expect to resolve this in a reasonable way and a reasonable amount of time.

(Emphasis added).

282.    Defendant Edwards' statements concerning the Bear Sterns Hedge Funds were materially false and misleading because Edwards falsely stated that Merrill's exposures to the Bear Sterns Hedge Funds were "both limited and well under control."  In addition, Edwards' statements provided the materially false impression that Merrill's risk management controls were effectively managing the risks associated with Merrill's exposure to these funds.  However, Edwards did not disclose that Merrill had knowingly

or recklessly ignored its risk management policies and guidelines, including those of

Kronthal and other executives who refused to increase Merrill's exposure to U.S.

subprime ABS CDO exposures beyond $3-$4 billion. See ¶¶ 34-66; 92-99; 108-115.

Moreover, Edwards failed to disclose that the problems relating to the Bear Sterns Hedge

Funds also existed, on an even larger scale, on Merrill's own balance sheet since Merrill

had more than $40 billion in U.S subprime ABS CDO exposures which itself was

overvalued by more than 40% or $16 billion (see ¶¶142-161).  Moreover, Edwards did

not disclose that Merrill's "loan" to the Bear Stearns hedge fund was in reality a

financing by Merrill so that the hedge fund would purchase Merrill CDO assets.

283.    On July 26, 2007, several days after the July 17 press release and

conference call, the First Republic shareholders voted to approve the merger between

First Republic and Merrill.  If the Exchange Act Defendants had issued correct financials

and had not made false and misleading statements during the July 17 conference call, the

First Republic stockholders most likely would not have approved the merger on the terms

they did.

284.    On August 3, 2007, Merrill caused to be filed with the SEC, Merrill's

report on Form 10-Q for the fiscal quarter ended June 29, 2007 (the "August 3, 2007 10-

Q").  The August 3, 2007 10-Q, represented *inter alia*, that Merrill reported i) net

earnings of $2.1 billion, and ii) earnings per common share of $2.48 per share and $2.24

per diluted share, up 39% and 37%.

285.    The August 3, 2007 10-Q represented that as of June 29, 2007, Merrill had

assets of mortgages, mortgage-backed assets of $34.5 billion, contractual agreements of

$42.9 billion and investment securities of $86.4 billion.

286. The August 3, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $8.6 billion at June 29, 2007.

287. The August 3, 2007 10-Q reported mortgage loans of $18.9 billion and commitments to make mortgage loans of $8.1 billion as of June 29, 2007 and allowance for loan losses of $435 million.

288. The August 3, 2007 10-Q categorized Merrill's assets into three levels: levels 1, 2 and 3. The categories were described in a substantially similar way in the August 3, 2007 10-Q as they were described in Merrill's May 7, 2007 10-Q. Merrill represented that its Level 2 and Level 3 assets were the following amounts:

(a) Level 2: (i) Trading assets, excluding contractual agreements were $86.611 billion; (ii) Contractual agreements were $216.321 billion minus a net adjustment of approximately $180 billion for a total of approximately $36 billion; and (iii) Investment securities were $58.519 billion;

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.648 billion; (ii) Contractual agreements were $6.601 billion; and (iii) Investment securities were $5.784 billion.

289. The August 3, 2007 10-Q represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

290. The statements above in paragraphs 284-289 were materially false and misleading and omitted material facts because the Exchange Act Defendants:

(a) Failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures of over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

(b) Violated GAAP by falsely representing Merrill's trading assets and liabilities as reported in its 10-Qs for the period ending June 29, 2007 based on the failure to properly mark-to-market the true value of its U.S. subprime ABS CDO exposures (see ¶¶142-153; 337-382);

(c) Violated GAAP by falsely representing Merrill's net earnings and earnings per share as reported in its 10-Q for the periods ending June 29, 2007 based on the failure to properly mark-to-market the true value of its U.S. subprime ABS CDO exposures. Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion, and its earnings per diluted share would have declined from a reported profit of $2.24 per share to a loss of $10.30 per share (see ¶¶142-153; 337-382);

(d) Failed to disclose that by at least April 13, 2007, Merrill informed National City Bank that as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, the value of First Franklin mortgages held for sale were materially overvalued at the time of the First Franklin closing (see ¶¶121-123);

(e) Violated GAAP by failing to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶337-382); and

(f) That Merrill was continuing to securitize loans originated by Ownit, which by this time had gone bankrupt (see ¶141).

291. The August 3, 2007 10-Q represented the following concerning residential mortgage lending:

> Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

292. The statements above in paragraph 291 were materially false and misleading because Merrill did not disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated by and purchased from other subprime originators, such as ResMAE, MLN and Ownit, in order to obtain more subprime mortgages for Merrill's CDOs. As a result of the lowered underwriting guidelines, Merrill had experienced at least $400 million of EPD on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141). In addition, Merrill did not disclose the material fact that with respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages (see ¶¶129-135).

136

293.    In the August 3, 2007 10-Q, the Exchange Act Defendants represented the following concerning derivatives:

> Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

> \*    \*    \*

> Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

294.    In the August 3, 2007 10-Q, the Exchange Act Defendants represented that Merrill "continue[d] [its] disciplined risk management" and "manage[d] [its] overall portfolio of positions and exposures" even though in reality, the Exchange Act Defendants knew that Merrill's exposure to U.S. subprime ABS CDOs had spiraled out of control. In so doing, the Exchange Act Defendants were assuring investors that even though there were "challenging market conditions," Merrill's risk was under control:

> While the outlook for growth in most global businesses in which we operate remains strong, the challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. ***We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks.***

> \*    \*    \*

137

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

(Emphasis added).

295.    In the August 3, 2007 10-Q, the Exchange Act Defendants represented that they monitored risk levels on a daily basis "to verify they remain which corporate risk guidelines" and represented the following:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $71 million and:

The average trading VaR was higher in the second quarter than in the first quarter due primarily to higher equity exposures and higher interest and credit spread exposures earlier in the period. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading

activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels***.

(Emphasis added).

      (c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

296. In the August 3, 2007 10-Q, the Exchange Act Defendants represented that Merrill's maximum exposure to loan and real estate VIEs was $220 million and $6.65 billion in guaranteed and other funds.

297. The statements above in paragraphs 293-296 concerning Merrill's derivatives and risk management were materially false and misleading because the Exchange Act Defendants misrepresented and/or did not disclose the following:

      (a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

      (b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

(c) That Merrill did not properly mitigate market and credit risk on trading assets and liabilities by being adequately hedged and misrepresented that these hedging techniques were supplemented by corporate risk management policies and procedures when in fact, the Exchange Act Defendants had knowingly or recklessly ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶100-107; 179-196);

(d) That many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107);

(e) That Merrill's reported VaR was materially understated by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDO exposures was backed by subprime-related assets many of which were rated BBB or below and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167); and

(f) That defendants Merrill and MLPFS had foisted CDOs and related securities upon certain of their brokerage clients without such clients' authorization (see ¶¶168-178).

298.    The August 3, 2007 10-Q contained substantially the same Section 302 statements as those set forth in Merrill's November 3, 2006 10-Q, which are set forth above in paragraphs 212, 237 and 269.   The certifications were materially false and misleading because they failed to disclose that Merrill had overridden its risk control systems.  In addition, the statement that "the financial statements, and other financial

information included in this report, fairly present in all material respects the financial

condition" of the Company, was materially false and misleading because Merrill's

statements of assets and liabilities did not take into consideration an impairment of at

least 40%, or $16 billion, in Merrill's U.S. subprime ABS CDO exposures.

**I.      Registration Statement Amendment No. 3 (August 15, 2007 Offering)**

299.    On August 13, 2007, Merrill and Merrill Lynch Capital Trust III ("ML

Trust III") filed with the SEC a Post-effective Amendment No. 3 to the shelf registration

dated March 31, 2006 ("Registration Statement Amendment No. 3").

300.    Registration Statement Amendment No. 3 incorporated by reference

Merrill's 2006 10-K, as well as Merrill's May 7, 2007 10-Q and August 3, 2007 10-Q,

which, as set forth above in paragraphs 226-238, 252-270 and 284-298, contained

misrepresentations and omissions of material fact.

**J.      September 14, 2007 Form 8-K**

301.    On September 14, 2007, Merrill filed a Form 8-K updating the First

Republic Registration Statement, which stated:

> We are making the following disclosure in anticipation of the closing of
> Merrill Lynch's acquisition of First Republic Bank, which is scheduled for
> September 21, 2007.
>
> As we stated in our Quarterly Report on Form 10-Q for the quarterly
> period ended June 29, 2007: "While the outlook for growth in most global
> businesses in which we operate remains strong, the challenging market
> conditions in certain credit markets that existed during the first half of
> 2007 have intensified in the beginning of the third quarter. Characteristics
> of this environment include increased volatility, wider credit spreads,
> reduced price transparency, lower levels of liquidity, and rating agency
> downgrades. These factors have impacted and may continue to impact the
> sub-prime mortgage market, including certain collateralized debt
> obligations (CDOs), as well as other structured credit products and
> components of the leveraged finance origination market. Merrill Lynch
> continues to be a major participant in these markets with risk exposures

through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks."

Credit market conditions have continued to remain challenging in the third quarter, and the firm, as part of its regular accounting processes, has made requisite fair value valuation adjustments as appropriate to certain of these exposures, which are reflected in our third quarter to date results.

302.    Merrill's statements above in paragraph 301 were materially misleading because Merrill had not in fact made the appropriate "valuation adjustments" to account for its U.S. subprime ABS CDO exposures.  In addition, Merrill continued to hide its true exposure to the U.S. subprime ABS CDOs because its risk management systems had been overridden.  In addition, although the Exchange Act Defendants represented that Merrill's exposure to the "sub-prime mortgage market" could be adversely impacted, in fact the Exchange Act Defendants still did not disclose the level of that exposure (at least $40 billion as of June 29, 2007) or that its exposure had already been adversely impacted. In fact, the Exchange Act Defendants were discussing at that time the announcement of massive write-downs which would not be announced until after the First Republic merger closed.

303.    On September 21, 2007, Merrill filed a Form 8-A with the SEC that registered the Merrill Lynch Series 6 Preferred and the Merrill Lynch Series 7 Preferred pursuant to Section 12(b) of the Exchange Act in connection with the First Republic Acquisition.

304.    The statements above in paragraph 303 was materially false and misleading because Merrill failed to disclose that it was increasingly leveraging risky

subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime

ABS CDO exposures by June 29, 2007 (see ¶¶17-33).

305.    On September 21, 2007, Merrill's acquisition of First Republic closed.

306.    On September 26, 2007, a Goldman Sachs analyst reported that Merrill

might record losses of as much as $4 billion in the third quarter on its fixed-income

assets.  The price of Merrill's common stock declined that day by $0.37 per share, from a

closing price of $72.12 per share on September 25, 2007, to close at $71.75 per share on

exceptionally high trading volume of over 26 million shares, and Merrill stock declined

an additional $0.47 per share over the next two trading days.

**K.    Financial Results for the Fiscal Quarter Ended September 28, 2007**

307.    On October 5, 2007, approximately two weeks after the First Republic

merger closed, in a press release, the Company announced:

> **NEW YORK, October 5, 2007** – Merrill Lynch & Co., Inc.
> (**NYSE:MER**) today announced that challenging credit market conditions
> will have an adverse impact on its net earnings for the third quarter.  The
> company expects to report a net loss per diluted share of up to 50 cents,
> resulting from significant negative mark-to-market adjustments to its
> positions in two specific asset classes: collateralized debt obligations
> (CDOs) and subprime mortgages; and leveraged finance commitments.
> These mark-to-market adjustments primarily affect Merrill Lynch's Fixed
> Income, Currencies & Commodities (FICC) business.  The company
> expects to report revenue growth in excess of 20 percent over the 2006
> third quarter in each of its other major business lines:  Equity Markets
> (excluding the firm's private equity business), Investment Banking and
> Global Wealth Management.  Merrill Lynch expects to report a solid
> revenue performance from the rest of its FICC business, considering
> market conditions, and expects strong performance from its operations
> outside the U.S., led by the Pacific Rim region.
>
> "Despite solid underlying performances in most of our businesses in the
> third quarter, the impact of this difficult market was much more severe in
> certain of our FICC businesses than we expected earlier in the quarter,"
> said Stan O'Neal, chairman and chief executive officer of Merrill Lynch.
> "While market conditions were extremely difficult and the degree of

sustained dislocation unprecedented, we are disappointed in our performance in structured finance and mortgages. **We can do a better job in managing this risk, as we have done with other asset classes**, including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities."

*        *        *

The primary drivers of the FICC net losses in the third quarter were as follows:

- ■   ***Write-downs of an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages.***  These valuation adjustments reflect in part significant dislocations in the highest-rated tranches of these securities which were affected by unprecedented move in credit spreads and a lack of market liquidity in these securities, which intensified during the third quarter.   During the quarter, the company significantly reduced its overall exposure to these asset classes.

- ■   Write-downs of an estimated $967 million on a gross basis, and $463 million net of related underwriting fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing.  These commitments totaled $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter.  The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

"Although the outlook for the fourth-quarter revenues remains difficult to predict, we continue to see evidence of strong long-term growth trends in each of our global businesses.  While it is very early in the current quarter and despite continued challenges in structured finance, we are beginning to see signs of a return to more normal activity levels in a number of markets.  ***Given our strong core operating performance and solid market, liquidity and capital positions, we are confident in our ability to deliver superior returns to shareholders over the long-term***," Mr. O'Neal concluded.

(Emphasis added).

308.    The statements above in paragraph 307 were materially false and misleading because while the Exchange Act Defendants began to disclose their exposure to U.S. subprime ABS CDOs and announced a write-down of approximately $4.5 billion, Merrill should have actually written down an additional $14.9 billion.  Merrill's U.S. subprime ABS CDO exposures were then impaired by approximately 65% and Merrill continued to conceal its true exposure at this time.  In addition, the Exchange Act Defendants failed to disclose the material fact that many of Merrill's hedges on U.S. subprime ABS CDOs were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107).

309.    On October 8, 2007, the trading day following Merrill's October 5, 2007 press release, Merrill's common stock declined $2.55 per share or approximately 3%, from a close on October 5, 2007 of $76.67 per share, to close at $74.12 per share on volume of over 10 million shares.

310.    On October 24, 2007, Merrill issued a press release titled "Merrill Lynch Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations Of $2.85 Per Diluted Share" that stated, in part, the following:

> **NEW YORK, October 24, 2007** — Merrill Lynch (**NYSE: MER**) today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006 . . . .  Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release . . .

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion . . . .

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued . . . .

### Business Segment Review . . .

### Global Markets & Investment Banking (GMI)

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively . . . . Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

> ▪ FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. See below for details.

**Net Exposures at Period End:**

| ($ billions) | Sept. 28, 2007 | June 29, 2007 | Percent Inc / Dec |
|---|---|---|---|
| Total ABS CDO-related exposures | $15.2 | $32.1 | (53) |
| Total U.S. subprime mortgage-related exposures | 5.7 | 8.8 | (35) |

| | Net Exposures at Sept. 28, 2007 | Net Write-downs For the Three Months Ended Sept. 28, 2007 |
|---|---|---|
| AAA-rated super senior exposures: | | |
| High-grade | $8.3 | ($1.9) |
| Mezzanine | 5.3 | (3.1) |
| CDO-squared | 0.6 | (0.8) |
| Total ABS CDO super senior exposures | 14.2 | (5.8) |
| Other retained and warehouse exposures | 1.0 | (1.1) |
| **Total ABS CDO-related exposures** | **$15.2** | **($6.9)** |
| Total U.S. subprime mortgage-related | 5.7 | (1.0) |

exposures

**Total Net Write-downs**                                   **($7.9) . . . .**

> ▪ FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings . . . .

> ▪ The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period . . . .

**Non-Compensation Expenses** . . . .

> ▪ Other expenses were $341 million, an increase of 71 percent, due primarily to the write-off of approximately $100 million of identifiable intangible assets related to First Franklin.

311.    The statements above in paragraph 310 were materially false and misleading because while the Exchange Act Defendants began to disclose Merrill's exposure to U.S. subprime ABS CDOs and announced a write-down of approximately $7.9 billion, the Company should have actually written down an additional $11.5 billion. Merrill's U.S. subprime ABS CDO exposures were impaired by approximately 65% and Merrill continued to conceal its true exposure at this time.  In addition, the Exchange Act Defendants failed to disclose the material fact that many of Merrill's hedges on U.S. subprime ABS CDOs were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107).

312.    On October 24, 2007, Merrill common stock declined from a closing price on October 23, 2007 of $67.12 per share, to close at $63.22 per share, a decline of $3.90 per share or approximately 6% on volume of approximately 52 million shares and on October 25, 2007 Merrill common stock declined an additional $2.32 per share or approximately 4% to close at $60.90 per share, on volume approximately 41 million shares.

313.    On October 30, 2007, Merrill issued a press release titled "Stan O'Neal Retires From Merrill Lynch; Alberto Cribiore To Serve As Interim Non-Executive Chairman And Chair Search Committee" that stated, in part,

> **NEW YORK, October 30, 2007** — Stan O'Neal, chairman and chief executive officer of Merrill Lynch & Co., Inc. (**NYSE: MER**), has decided to retire from the company effective immediately, the company announced today . . . .
>
> The company said Mr. O'Neal and the board of directors both agreed that a change in leadership would best enable Merrill Lynch to move forward and focus on maintaining the strong operating performance of its businesses, which the company last week reported were performing well, apart from sub-prime mortgages and CDOs . . . .
>
> Ahmass Fakahany and Gregory Fleming will continue as Merrill Lynch co-presidents and chief operating officers.

314.    On November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages.  On November 1, 2007, Merrill common stock declined from a closing price on October 31, 2007 of $66.02 per share to close at $62.19 per share, a decline of $3.83 per share or approximately 6% on volume of approximately 20 million shares and on November 2, 2007 Merrill stock declined an additional $4.91 per share or

approximately 8% to close at $57.28 per share on volume of approximately 77 million shares.

315.    On November 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for its fiscal quarter ended September 28, 2007 (the "November 7, 2007 10-Q"). The November 7, 2007 10-Q stated that Merrill reported: i) net losses from continuing operation of $2.3 billion; and ii) losses per diluted share of $2.85 per share earnings.

316.    The November 7, 2007 10-Q stated that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

317.    The statements above in paragraphs 309-310 and 313-316 were materially false and misleading because while these statements regarding third quarter earnings began to disclose the truth regarding Merrill's exposure to subprime-related debt, Merrill did not fully disclose the extent of its true exposure to U.S. subprime ABS CDOs. Merrill represented that it had significantly reduced its overall exposure to U.S subprime ABS CDOs. However, the Exchange Act Defendants knew at this time that their subprime exposure needed to be written down much more than $7.9 billion. As discussed above at paragraphs 100-107, the Exchange Act Defendants failed to disclose that in order to attempt to hedge some of Merrill's subprime exposure, Merrill had entered into credit default swaps and other types of insurance contracts with companies such as ACA and XL, which the Exchange Act Defendants knew were not well capitalized or highly leveraged and whose ability to pay on defaults was highly questionable.

318.    The November 7, 2007 10-Q represented that as of September 28, 2007 Merrill's reported assets of mortgages, mortgage-backed and asset backed assets of $56.3 billion, contractual agreements of $53.3 billion and investment securities of $92.8 billion.

319.    The November 7, 2007 10-Q represented that Merrill retained interests in securitized assets relating to residential mortgage loans were $5.946 billion at September 28, 2007.

320.    The November 7, 2007 10-Q represented that Merrill's maximum exposure to loan and real estate VIEs was $216 million and $2.997 billion in guaranteed and other funds as of September 28, 2007.

321.    The November 7, 2007 10-Q represented the following concerning its mortgage related assets:

### U.S. sub-prime residential mortgage-related and ABS CDO activities

During the third quarter of 2007, **Merrill Lynch recorded a net loss of approximately $7.9 billion related to U.S. ABS CDO securities positions and warehouses, as well as U.S. sub-prime mortgage-related assets including whole loans, warehouse lending, residual positions and residential mortgage-backed securities**. These losses primarily related to assets and liabilities recorded at fair value on a recurring basis and are included in principal transactions losses in the table below.

**At September 28, 2007, the remaining net exposure for these positions was approximately $21.5 billion**. This $21.5 billion net exposure includes:

• Assets and liabilities, including derivative positions, that are recorded at fair value on a recurring basis of $5.0 billion (includes Level 2 and Level 3);

• Assets that are recorded at fair value on a non-recurring basis of $2.3 billion (i.e., loans recorded at lower of cost or market);

• Additional off-balance sheet exposures on derivative positions (i.e., notional amounts) of $13.6 billion; and

• Additional off-balance sheet exposures on loan commitments of $0.6 billion.

In addition, Merrill Lynch through its U.S. bank subsidiaries has SFAS 115 investment securities and *off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion at September 28, 2007*.

Valuation of these exposures will continue to be impacted by external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur. Merrill Lynch's ability to mitigate its risk by selling or hedging its exposures is limited by the market environment. Merrill Lynch's future results may continue to be materially impacted by the valuation adjustments applied to these positions . . . .

(Emphasis added).

322.    As alleged herein, Merrill had material exposure to U.S. subprime ABS CDOs throughout the Class Period.  Indeed, the Exchange Act Defendants had secretly accumulated more than $40 billion in U.S. subprime ABS CDOs by June 29, 2007. Nevertheless, as set forth herein, none of Merrill's 10-Qs during the Class Period before this one described Merrill's exposure to this business.  It was not until the November 7, 2007 10-Q that the Exchange Act Defendants provided detail about Merrill's activities related to U.S. subprime ABS CDOs.  The Exchange Act Defendants represented the following concerning these activities:

At the end of the third quarter, we maintained exposures to these markets through cash positions, loans, derivatives and commitments. During the third quarter, FICC revenues were adversely affected by the substantial deterioration in the value of many of these exposures, particularly towards quarter end. See *U.S. Sub-prime Residential Mortgage-Related and ABS CDO Activities* on page 73 for further detail.

The markets for U.S. ABS CDO exposures remain extremely illiquid and as a result, valuation of these exposures is complex and involves a comprehensive process including the use of quantitative modeling and management judgment. Valuation of these exposures will also continue to be impacted by external market factors including default rates, rating

agency actions, and the prices at which observable market transactions occur. Our ability to mitigate our risk by selling or hedging our exposures is also limited by the market environment. Our future results may continue to be materially impacted by the valuation adjustments applied to these positions.

*     *     *

*U.S. Sub-prime Residential Mortgage-Related Activities*

As part of our U.S. sub-prime residential mortgage-related activities, sub-prime mortgage loans are originated through First Franklin or purchased in pools from third-party originators for subsequent sale or securitization. Mortgage-backed securities are structured based on the characteristics of the underlying mortgage collateral, sold to investors and subsequently traded in the secondary capital markets.

Our U.S. sub-prime residential mortgage net exposure (excluding Merrill Lynch's Bank sub-prime residential mortgage portfolio held for investment purposes which is described *in Sub-prime Mortgage-Related Securities in Merrill Lynch Bank Investment Portfolio*) consists of the following:

• <u>Sub-prime whole loans</u>: We purchase pools of whole loans from third-party mortgage originators. In addition, First Franklin originates mortgage loans through its retail and wholesale channels. Prior to their sale or securitization, whole loans are predominantly reported on the balance sheet in Loans, notes and mortgages and are accounted for as held for sale.

Securitizable whole loans are valued on an "as-if" securitized basis based on estimated performance of the underlying mortgage pool collateral, rating agency credit structure assumptions and market pricing for similar securitizations. Key characteristics include underlying borrower credit quality and collateral performance, mortgage terms and conditions, assumptions on prepayments, delinquencies and defaults. Non-securitizable loans are valued using a combination of discounted liquidation value and re-performing value.

• <u>Residuals</u>: We retain certain mortgage residuals, which represent the subordinated classes and equity/first-loss tranche from our residential mortgage-backed securitization activity. Residuals have been retained from the securitizations of third-party whole loans we have purchased as well as from our First Franklin loan originations.

152

Residuals are valued by modeling the present value of projected cash flows that will accrue to the residual holder, based on actual and projected performance of the mortgages underlying a particular securitization. Key determinants include estimates for borrower prepayments, delinquencies, defaults and loss severities. Modeled performance and loan level loss projections are adjusted monthly as actual borrower performance information is released from trustees and loan servicers.

• Residential mortgage-backed securities ("RMBS"): We retain and purchase securities from the securitizations of loans, including sub-prime residential mortgages. Valuation of RMBS securities is based on observable prices and securitization cash flow model analysis.

• Warehouse lending: Warehouse loans represent collateralized revolving loan facilities to originators of financial assets, such as sub-prime residential mortgages. These mortgages typically serve as collateral for the facility. Loans are generally carried at amortized cost with an allowance for loan losses established for credit losses estimated to exist in the portfolio unless deemed to be permanently impaired. In the case of an impairment, the loan receivable value is adjusted to reflect the valuation of the whole loan collateral underlying the facility if the value is less than amortized cost.

The following table provides a summary of changes in our U.S. sub-prime residential mortgage-related net exposures, excluding net exposures to residential mortgage-backed securities held in our U.S. banks for investment purposes, from June 29, 2007 to September 28, 2007.

*      *      *

*U.S. ABS CDO Activities*

An ABS CDO is a security collateralized by a pool of asset-backed securities. The underlying collateral for these asset-backed securities is primarily residential mortgage loans.

We are engaged in the underwriting and sale of ABS CDOs. There are a number of steps involved in the underwriting process beginning with determining investor interest or responding to inquiries or mandates received. We also engage a CDO collateral manager who is responsible for selection of the ABS securities that will become the underlying collateral for the CDO securities subject to our approval. All CDO securities are rated by one or more rating agencies. The various tranches of the CDO are securitized, priced at representative market rates and distributed to investors, or in some cases, retained by Merrill Lynch.

Our U.S. ABS CDO net exposure primarily consists of our AAA-rated super senior CDO portfolio, as well as retained and warehouse exposures related to our CDO business.

Super senior CDO portfolio

Super senior positions represent our exposure to the senior most tranche in a CDOs capital structure. In bankruptcy, this tranches claims have priority to the proceeds from liquidated cash CDO assets. Our exposure to AAA-rated super senior CDOs includes the following securities, which are primarily held as derivative positions in the form of total return swaps:

• High-grade super senior positions, which are CDOs with underlying collateral having an average credit rating of Aa3/A1 by Moody's Investor Services;
• Mezzanine super senior positions, which are CDOs with underlying collateral having an average credit rating of Baa2/Baa3 by Moody's Investor Services; and
• CDO-squared super senior positions, which are CDOs with underlying collateral consisting of other CDO securities which have collateral attributes typically similar to high grade and mezzanine super senior positions.

Despite the high credit rating of these CDO securities (typically AAA), their fair value at September 28, 2007 reflects unprecedented market illiquidity and the deterioration of underlying sub-prime collateral.

Other Retained and Warehouse Exposures Related to the CDO Business

We have other retained and warehouse exposures related to our CDO business, which consists of RMBS and CDO positions previously held in CDO warehouses awaiting securitization, retained securities from CDO securitizations, and related hedges.

323.    In the November 7, 2007 10-Q, the Exchange Act Defendants revealed the components of Merrill's U.S. subprime ABS CDO exposures, which continued to be a false and misleading representation of Merrill's actual exposure to these activities.  The Exchange Act Defendants represented the following concerning these exposures:

*(dollars in millions)*

| | Net Exposures as of June 29, 2007 | Gain/(Loss) Included in Income (1) | Other Net Changes in Net Exposures (2) | Net Exposures as of Sept. 28, 2007 |
|---|---|---|---|---|
| Super senior CDO net exposures: | | | | |
| High-grade | $   22,648 | $   (1,841) | $   (11,882) | $    8,925 |
| Mezzanine | 8,022 | (3,084) | 299 | 5,237 |
| CDO-squared | 1,454 | (826) | 2 | 630 |
| Total super senior CDO net exposures | 32,124 | (5,751) | (11,581) | 14,792 |
| Other retained and warehouse net exposures | 1,740 | (1,104) | 390 | 1,026 |
| Total CDO-related net exposures | $   33,864 | $   (6,855) | $   (11,191) | $   15,818 |

*(1) Primarily represents unrealized losses on net exposures.*
*(2) Primarily consists of hedging activity such as entering into credit default swaps that are matched to specific CDO securities. This activity is conducted with various third parties, including monoline financial guarantors, insurers and other market participants.*

324.    The statements above in paragraph 318-323 were materially false and misleading because:

(a) Merrill should have actually written down an additional $11.5 billion as a results of the impairment of Merrill's U.S. subprime ABS CDO exposures by at least 65% (see ¶¶142-153);

(b)    The Exchange Act Defendants violated GAAP by falsely representing

Merrill's trading assets and liabilities as reported in its November 7, 2007 10-

Q based on the failure to properly mark to market the true value of the U.S.

subprime ABS CDO exposures (see ¶¶142-153; 337-382);

(c)    The Exchange Act Defendants violated GAAP by falsely representing losses

for net earnings and earnings per share of $2.3 billion and $2.85 per share,

respectively.  Had Merrill's financial statements for the quarterly period ended

September 28, 2007 properly accounted for the impairment of over $16 billion

on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would

have declined from a reported loss of $2.3 billion to a loss of $9.8 billion and

its loss per diluted share would had declined from a reported loss of $2.85 per

share to a loss of $12.03 per share. (see ¶¶337-382); and

(d)    The Exchange Act Defendants failed to disclose that many of Merrill's hedges

on U.S. subprime ABS CDO exposures were with poorly capitalized or highly

leveraged counterparties, including XL and ACA, and thus materially

increased Merrill's counterparty risk (see ¶¶100-107).

325.    The November 7, 2007 10-Q contained certifications, signed by

defendants Fleming, Fakahany and Edwards, pursuant to Section 302 of Sarbanes Oxley

Act of 2002 which made the same certifications as set forth above in paragraphs 212,

237, 269 and 298 and were materially false and misleading for the reasons set forth in

paragraph 324.

326.    On December 6, 2007, the *Washington Post* reported that the Federal Bureau

of Investigation had launched a "mortgage fraud task force" and that the New York Attorney

General had served subpoenas to half a dozen investment banks, including Merrill.  The

subpoenas sought "information on how billions of dollars in complex securities backed by

mortgages were packaged and sold to yield-hungry investors all over the world."

327.    On December 24, 2007, Merrill issued a press release titled "Merrill

Lynch Enhances Its Capital Position By Raising Up To $6.2 Billion From Investors,

Temasek Holdings And Davis Selected Advisors" that stated, in part, the following:

> **NEW YORK, December 24, 2007** — Merrill Lynch (**NYSE: MER**)
> today announced it has enhanced its capital position by reaching
> agreements to raise up to $6.2 billion of newly issued common stock in a
> private placement with Temasek Holdings and Davis Selected Advisors.
> Merrill Lynch expects these transactions to close by mid-January 2008.

328.    On January 15, 2008, Merrill issued a press release titled "Merrill Lynch

Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to

Long-Term Investors" that stated, in part, that Merrill "enhanced its capital position by

reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in private

placements to long-term investors, primarily from Korea Investment Corporation, Kuwait

Investment Authority and Mizuho Corporate Bank."

## V.    THE CLASS PERIOD ENDS

329.    On January 17, 2008, before the market opened, the Company issued a

press release titled "Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing

Operations of $8.6 Billion" that stated, in part, the following:

> **NEW YORK, January 17, 2008** — Merrill Lynch (**NYSE: MER**) today
> reported a net loss from continuing operations for the full year 2007 of
> $8.6 billion, or $10.73 per diluted share, significantly below net earnings
> from continuing operations of $7.1 billion, or $7.17 per diluted share for
> 2006. Merrill Lynch's net loss for the full year 2007 was $7.8 billion, or
> $9.69 per diluted share, significantly below net earnings of $7.5 billion, or
> $7.59 per diluted share for 2006. Net revenues for 2007 were $11.3
> billion, down 67 percent from $33.8 billion in 2006, while the 2007 pretax

loss from continuing operations was $12.8 billion compared to pretax earnings from continuing operations of $9.8 billion for 2006.

The firm's substantially reduced performance in 2007 was primarily driven by significant declines in Fixed Income, Currencies & Commodities (FICC) net revenues for the second half of the year . . . . During the second half of 2007, FICC net revenues were materially impacted by a weaker business environment and net write-downs that included $7.9 billion in the third quarter and $11.5 billion in the fourth quarter related to U.S. ABS CDOs [collateralized debt obligations comprised of asset-backed securities] and U.S. subprime residential mortgages outside of the firm's U.S. bank-related investment securities portfolio. In addition, credit valuation adjustments of $2.6 billion related to hedges with financial guarantors on U.S. ABS CDOs were recorded in the fourth quarter of 2007 . . . .

**Business Segment Review** . . . .

**Global Markets and Investment Banking (GMI)** . . . .

FICC net revenues were negative $15.2 billion for the quarter, impacted primarily by net losses of $11.5 billion related to U.S. ABS CDOs and subprime residential mortgages and $3.1 billion of credit valuation adjustments related to the firm's hedges with financial guarantors . . . .

U.S. ABS CDOs:
At the end of the fourth quarter 2007, net exposures to U.S. ABS CDOs, including both super-senior ABS CDOs and secondary trading, totaled $4.8 billion, down from $15.8 billion at the end of the third quarter 2007. Net write-downs related to these exposures were $9.9 billion in the fourth quarter. The majority of these write-downs were related to the high-grade super-senior ABS CDO exposures, the collateral for which is primarily comprised of 2006 vintage mortgages. The valuation for these securities is based on cash-flow analysis including cumulative loss assumptions. These assumptions are derived from multiple inputs including mortgage remittance reports, housing prices and other market data. Relevant ABX indices are also analyzed as part of the overall valuation process. The value of these positions remains subject to mark-to-market volatility. Please see [the chart below] for details of related exposures. . . .

| (Unaudited) | | | | (dollars in millions) |
|---|---|---|---|---|
| | **Net Exposures as of Sept. 28, 2007** | **Gain/(Loss) Reported in Income (1)** | **Other Net Changes in Net Exposures (2)** | **Net Exposures as of Dec. 28, 2007 (5)** |
| **U.S. ABS CDO net exposures:** | | | | |
| U.S. Super senior ABS CDO net exposures: | | | | |
| High-grade | 8,925$ | (5,531) | $ 986$ | 4,380$ |
| Mezzanine | 5,237 | (2,912) | (141) | 2,184 |

| | | | |
|---|---|---|---|
| CDO-squared | 630 | (280) | (79) | 271 |
| Total super senior ABS CDO net exposures(3) | 14,792 | (8,723) | 766 | 6,835 |
| Secondary trading (4) | 1,026 | (1,141) | (1,882) | (1,997) |
| **Total U.S. ABS CDO-related net exposures** | **$15,818** | **$(9,864)** | **$(1,116)** | **$4,838** |

[Footnotes omitted] . . . .

Financial Guarantors:

During the fourth quarter, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.1 billion, including negative $2.6 billion related to U.S. super-senior ABS CDOs. These amounts reflect the write-down of the firm's current exposure to a non-investment-grade counterparty from which the firm had purchased hedges covering a range of asset classes including U.S. super-senior ABS CDOs . . . .

U.S. Subprime and Other Residential Mortgages:

At the end of the fourth quarter of 2007, net exposures related to U.S. subprime residential mortgages totaled $2.7 billion, down from approximately $5.7 billion at the end of the third quarter. Net write-downs related to these exposures were $1.6 billion during the quarter . . . .

U.S. Banks Investment Securities Portfolio:

Within the investment securities portfolio of Merrill Lynch's U.S. banks, net pretax write-downs of $1.3 billion were recognized through other comprehensive income/(loss) (OCI) and $869 million through the income statement during the fourth quarter of 2007. As of year-end, the pretax OCI balance related to this portfolio was approximately negative $2.2 billion. These write-downs primarily relate to U.S. subprime residential mortgage-related securities and Alt-A residential mortgage-backed securities, and, to a lesser extent, prime residential and commercial mortgage exposures . . . .

**Non-Compensation Expenses** . . . .

▪ Other expenses were $467 million, up 24 percent, due primarily to a $53 million impairment charge on identifiable intangible assets related to First Franklin and increased costs related to consolidated investments.

330.    On January 17, 2008, Merrill common stock declined from a closing price on January 16, 2008 of $55.09 per share, to close at $49.45 per share, a decline of $5.64 per share or approximately 10%, on exceptional volume of over 70 million shares.

331.    On January 28, 2008, Merrill disclosed that Fakahany informed Merrill of his decision to retire effective February 1, 2008.

332.    On February 2, 2008, the *Wall Street Journal* reported that Massachusetts state authorities had accused Merrill of fraud and misrepresentation related to the Company's sale of debt securities that collapsed during the credit crisis.

333.    On March 5, 2008, Merrill issued a press release titled "Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services; Global Wealth Management Mortgage Origination to Continue Through Merrill Lynch Credit Corporation" that stated, in part, the following:

> New York, March 5, 2008 — Merrill Lynch (NYSE: MER) said today that it is discontinuing mortgage origination at its First Franklin subsidiary in the United States and will explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin.
>
> The company said it made the decision to discontinue lending by First Franklin because of the deterioration of the subprime lending market . . . .
>
> "Since July, we have reduced staffing at First Franklin by nearly 70 percent, but after evaluating a number of strategies, we believe it is appropriate to discontinue mortgage origination," said David Sobotka, head of Fixed Income, Currencies & Commodities at Merrill Lynch.

334.    On March 22, 2008, the *New York Times* reported that the Justice Department was gathering evidence to determine whether to create a task force to investigate wrongdoing in the mortgage lending industry.

335.    On April 17, 2008, Merrill issued a press release titled "Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations Of $1.97 Billion" that stated, in part, the following:

> **NEW YORK, April 17, 2008** — Merrill Lynch (**NYSE: MER**) today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from

continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.

In this challenging market environment, which continued to deteriorate during the quarter, first-quarter 2008 net revenues were $2.9 billion, down 69 percent from the prior-year period, primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super-senior ABS CDOs . . . .

**Business Segment Review:**

**Global Markets and Investment Banking (GMI)**
GMI recorded net revenues of negative $690 million and a pretax loss of $4.0 billion for the first quarter of 2008, as the challenging market conditions resulted in net losses in Fixed Income, Currencies and Commodities (FICC) . . . .

Net revenues from GMI's three major business lines were as follows:

▪ FICC net revenues were negative $3.4 billion for the quarter, impacted primarily by net losses related to U.S. ABS CDOs and credit valuation adjustments related to hedges with financial guarantors . . . .

U.S. ABS CDOs:
At the end of the first quarter of 2008, net exposures to U.S. ABS CDOs were $6.7 billion, up from $5.1 billion at the end of 2007 as a reduction of hedges more than offset $1.5 billion of net write-downs . . . .
Financial Guarantors:
During the first quarter of 2008, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.0 billion, including negative $2.2 billion related to U.S. super-senior ABS CDOs.

The hedges with financial guarantors related to U.S. super-senior ABS CDOs declined to $10.9 billion, due to net gains on these hedges and the firm's decision to consider $1.1 billion notional amount of certain hedges with a highly rated financial guarantor as ineffective, which resulted in a write-off of $45 million. The net gains, coupled with the deteriorating environment for financial guarantors, resulted in credit valuation adjustments of negative $2.2 billion during the 2008 first quarter. As a result, the carrying value of these hedges related to U.S. super-senior ABS CDOs was $3.0 billion at quarter end . . . .

Residential Mortgages:

Net exposures related to U.S. subprime residential mortgages declined during the first quarter of 2008 to $1.4 billion, primarily due to additional hedging, asset sales and net write-downs of $306 million during the quarter . . .

336.     On May 5, 2008, the *Associated Press* reported that prosecutors in the Eastern District of New York were heading a task force to determine, among other things, if Wall Street firms participated in fraud in connection with the mortgage industry.

## VI.     THE EXCHANGE ACT DEFENDANTS' VIOLATIONS OF GAAP

337.     The Exchange Act Defendants caused the Company to falsely report its financial position and results of operations as of and for the quarterly periods ended, March 30, 2007; June 29, 2007 and September 28, 2007 (the "relevant timeframe") by, among other things, overstating net earnings and misrepresenting the Company's true financial position. The Company's financial statements for the year ended December 29, 2006 (the "2006 annual financial statements"), and interim financial statements for the quarterly periods ended March 30, 2007, June 29, 2007 and September 28, 2007 (the "relevant 2007 interim financial statements", and collectively, the "relevant financial statements") did not present fairly the Company's financial position and results of operations, and/or were not presented in conformity with GAAP and SEC rules.

338.     Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS"),

followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions

("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of

Position ("SOP"). GAAP provides other authoritative pronouncements including, among

others, the FASB Concept Statements ("FASCON").

339. As a publicly traded company, the Company is responsible and required to

maintain books and records in sufficient detail to reflect the transactions of the Company

and therefore prepare financial statements in accordance with GAAP. Specifically, the

Securities and Exchange Act of 1934, 15 U.S.C. § 78m (b) (2) ("the Exchange Act"),

requires public companies to:

(A)   make and keep books, records, and accounts, which, in reasonable
      detail, accurately and fairly reflect the transactions and dispositions
      of the assets of the issuer; and

(B)   devise and maintain a system of internal accounting controls
      sufficient to provide reasonable assurances that –

    i.   transactions are executed in accordance with management's
      general or specific authorization;

    ii.  transactions are recorded as necessary (i) to permit
      preparation of financial statements in conformity with
      generally accepted accounting principles or any other
      criteria applicable to such statements, and (ii) to maintain
      accountability for assets;

    iii. access to assets is permitted only in accordance with
      management's general or specific authorization; and

    iv.  the recorded accountability for assets is compared with the
      existing assets at reasonable intervals and appropriate
      action is taken with respect to any differences.

340. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial

statements filed with the SEC which are not prepared in compliance with GAAP are

presumed to be misleading and inaccurate, despite footnote or other disclosure.

Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a))

341.    The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing Standards ("AU"), in relevant part:

> The financial statements are management's responsibility… Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management… Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. (Footnote omitted.)

(AU 110.03)

342.    As alleged elsewhere herein, prior to and throughout the relevant timeframe, the Exchange Act Defendants caused the Company to recklessly originate, purchase, create, invest, and trade inherently risky loans, primarily mortgages, and related securities (collectively, the "subprime-related securities"). The Company defines subprime mortgages and subprime mortgage-related securities as follows:

> We view sub-prime mortgages as single-family residential mortgages displaying more than one high risk characteristic, such as: (i) the borrower has a low FICO score (generally below 660); (ii) a high loan-to-value ("LTV") ratio (LTV greater than 80% without borrower paid mortgage insurance); (iii) the borrower has a high debt-to-income ratio (greater than 45%); or (iv) stated/limited income documentation. Sub-prime mortgage-related securities are those securities that derive more than 50% of their value from sub-prime mortgages. (Form 10-K 2007 p. 34)

The Company's practices regarding subprime-related securities exposed the Company to a significant and excessive concentration of subprime-related securities.  That concentration, in combination with certain prevailing market conditions, such as declining home values and increasing credit delinquencies and defaults  (discussed in greater detail elsewhere herein), impaired the Company's financial position and caused significant declines in the Company's results of operations by at least February 26, 2007. The Company's relevant 2007 interim financial statements, however, not only failed to recognize known losses (i.e., impairments) related to the significant declines in the value of its subprime-related securities, but the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 failed to even disclose its exposure to such a significant, let alone excessive, concentration of highly risky securities and related losses.

343.    The Company's assets with exposure to subprime-related securities were materially overstated (or liabilities were materially understated, as applicable), and thereby the Company's net earnings was materially overstated (or net losses were materially understated, as applicable) as reported in the Company's relevant 2007 interim financial statements. Additionally, the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 lacked required (under GAAP) disclosures, omitting material facts regarding the Company's exposure to and losses from subprime-related securities. Additionally, throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, despite repeated certifications signed by certain Defendants and other statements to the contrary.

344.     Further, the Company's relevant financial statements presented the

Company's financial position and results of operations in a manner which, among other

things, also violated the following fundamental accounting principles:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

(b)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

(c)     The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶42);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶50);

(e)     The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

(f)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

(g)    The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97).

345.    Each of the improper accounting practices, misrepresentations and omissions engaged in by the Exchange Act Defendants, and discussed further herein, standing alone, was a material breach of GAAP and/or SEC regulations.

*Overstatement of U.S. ABS CDOs and Other Subprime-related Securities*

346.    The Exchange Act Defendants caused the Company's relevant 2007 interim financial statements to materially overstate the reported values (under GAAP) of U.S. Asset-Backed Securities ("ABS") Collateralized Debt Obligations ("CDOs") and other subprime-related securities. U.S. ABS CDOs are securities collateralized by a pool of asset-backed securities. The underlying collateral of the Company's U.S. ABS CDOs is primarily subprime residential mortgage loans. (Form 10-K 2007 p. 36).

347.    The Company's positions in U.S. ABS CDOs were primarily held as trading assets (or liabilities, as applicable) in the form of mortgages, mortgage-backed, and asset-backed securities; investment securities classified as trading; and derivative instruments (collectively the "U.S. ABS CDO positions"). Trading securities are securities that are held principally for the purpose of selling them in the near term. (FAS No. 115, *Accounting for Investments in Certain Debt and Equity Securities* ("FAS 115"), ¶12a).  Derivative instruments, generally, are financial instruments or other contracts that derive their value from one or more underlying assets. The Company also classified

certain U.S. ABS CDO related securities as available-for-sale ("AFS"). Securities classified as AFS are deemed not to be trading nor intended to be held to maturity. (FAS 115 ¶12b).

348.    GAAP requires debt instruments classified as trading to be measured at fair value in the statement of financial position and changes in fair value (i.e., unrealized gains and losses) to be recognized in earnings. (FAS 115 ¶¶12a, 13).  GAAP requires debt instruments classified as AFS to be measured at fair value in the statement of financial position and requires changes in fair value (i.e., unrealized gains and losses) to be recognized in other comprehensive income (a component of equity) until realized; however, if the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings. (FAS 115 ¶¶12b, 13, 16). Further, GAAP requires derivative instruments, not specially designated as a hedge to be measured at fair value and requires changes in fair value to be recognized currently in earnings.  (FAS No. 133¸ *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), ¶¶17, 18a.  FAS No. 107, *Disclosures about Fair Values of Financial Instruments* ("FAS 107") defines fair value as follows, in relevant part:

> …**[Q]uoted market prices, if available, are the best evidence of fair value of financial instruments.** Prices for financial instruments may be quoted in several markets; generally, the price in the most active market will be the best indicator of fair value.

(FAS 107 ¶20) (Emphasis added.)

> **For financial instruments that do not trade regularly, or that trade only in principal-to-principal markets, an entity should provide its best estimate of fair value.** Judgments about the methods and assumptions to be used in various circumstances must be made by those

who prepare and attest to an entity's financial statements. The following discussion provides some examples of how fair value might be estimated.

(FAS 107 ¶22) (Emphasis added).

> **An estimate of the fair value of a loan or group of loans may be based on the discounted value of the future cash flows expected to be received from the loan or group of loans.** The selection of an appropriate current discount rate reflecting the relative risks involved requires judgment, and several alternative rates and approaches are available to an entity. A single discount rate could be used to estimate the fair value of a homogeneous category of loans; for example, an entity might apply a single rate to each aggregated category of loans reported for regulatory purposes. **An entity could use a discount rate commensurate with the credit, interest rate, and prepayment risks involved, which could be the rate at which the same loans would be made under current conditions. An entity also could select a discount rate that reflects the effects of interest rate changes and then make adjustments to reflect the effects of changes in credit risk. Those adjustments could include (a) revising cash flow estimates for cash flows not expected to be collected, (b) revising the discount rate to reflect any additional credit risk associated with that group of loans, or some combination of (a) and (b).**

(FAS 107 ¶27) (Emphasis added.)

349.    Further, FAS No. 5, *Accounting for Contingencies* ("FAS 5") requires a loss to be recognized in the financial statements when it is both "probable" and "reasonably estimable."  (FAS 5 ¶8).

350.    The Company's relevant 2007 interim financial statements materially overstated the fair value of its U.S. ABS CDO positions.  For the reasons alleged elsewhere herein, the Exchange Act Defendants knew, or recklessly disregarded, that the U.S. ABS CDO positions were primarily concentrated in subprime-related securities and knew of, or recklessly disregarded, the inherent credit risk and the market factors indicating the true value of its subprime-related securities by at least February 26, 2007. Such indications are discussed in greater detail elsewhere herein.

351.    Additionally, the Exchange Act Defendants, because of the nature of the Company's business, had extensive nonpublic credit and market information indicating the true value of its subprime-related securities. The Company, a global financial institution, is involved in the origination, purchasing, trading, investing, structuring, and servicing of subprime-related securities. Further, the Company, by its own acknowledgment, is a "leading underwriter of CDOs." (Form 10-Q Q3 2007 p. 99, Form 10-K 2007 p. 61), and from 2004 to mid-2007 Merrill was the top underwriter of CDOs.

352.    Therefore, the Exchange Act Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. ABS CDO positions. However, Merrill avoided recognizing the related losses, which were *probable and reasonably estimable*, in violation of GAAP (FAS 5, FAS 107, FAS 115, and FAS 133), and thereby overstated its U.S. ABS CDO positions and artificially inflated its net revenues in the Company's relevant 2007 interim financial statements.

353.    In addition to its U.S. ABS CDO positions, the Company had exposure to subprime-related securities with respect to its U.S. subprime residential mortgage-related positions, including whole loans, residuals, residential mortgage-backed securities, and warehouse lending. For the reasons alleged elsewhere herein, the Exchange Act Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. subprime residential mortgage-related positions.  However, the Exchange Act Defendants avoided recognizing losses, which were *probable and reasonably estimable*, in violation of GAAP (FAS 5, FAS 107, FAS 115, and FAS 133) and thereby artificially inflated its U.S. subprime residential mortgage-related positions and artificially inflated its net revenues in the Company's relevant 2007 interim financial statements.

354.    As a result of the material overstatement of the Company's U.S. ABS CDO and U.S. subprime residential mortgage-related positions and the related net revenues, the Company's relevant 2007 interim financial statements also materially overstated net earnings (or understated net losses, as applicable) and earnings per diluted common share (or understated losses per diluted common share, as applicable).  The Company's financial statements for the quarterly period ended June 29, 2007 overstated net earnings and earnings per diluted common share by, assuming the same effective tax rate as reported, respectively, *$11.6 billion and $12.54 per share*. The Company's financial statements for the quarterly period ended September 28, 2007 understated net losses and losses per diluted common share by, assuming the same effective tax rate as reported, respectively, *$7.5 billion and $9.18 per share*.

355.    Thus, statements made regarding the amount of, generally, the Company's results of operations, and more specifically, but not exclusively, revenues, net revenues, operating revenues, earnings, net earnings, and earnings per share or EPS, as described herein, were materially false and misleading, as those amounts disclosed were not derived in conformity with GAAP. Further, statements made regarding the value and/or valuation of, generally, the Company's U.S. ABS CDOs and other subprime-related securities, and more specifically, but not exclusively, mortgages, mortgage-back and asset-backed securities, contractual agreements, and investment securities, as described herein, were materially false and misleading, as those values disclosed were not derived in conformity with GAAP.

356.    For the three months ended September 28, 2007, the Company eventually recognized approximately $8.0 billion of losses on previously undisclosed subprime-

related securities, including at least $6.9 billion of losses on previously undisclosed U.S.

ABS CDO positions with underlying collateral of primarily subprime residential

mortgage loans. Finally, for the year ended December 28, 2007, the Company recognized

at least an additional $12.6 billion, for a total of $20.6 billion of losses on its subprime-

related securities, including at least an additional $9.8 billion, for a total of $16.7 billion

of losses on U.S. ABS CDO positions with underlying collateral of primarily subprime

residential mortgage loans.

*Lack of Sufficient Disclosures*

357.    In addition to the fundamental principles of financial reporting established

by the FASCONs above, GAAP requires certain disclosures to prevent financial

statements from being false and misleading. FAS No. 5, *Accounting for Contingencies*

("FAS 5") states as follows, in relevant part:

> If no accrual is made for a loss contingency because one or both of the
> conditions in paragraph 8 are not met, or if an exposure to loss exists in
> excess of the amount accrued pursuant to the provisions of paragraph 8,
> **disclosure of the contingency shall be made when there is at least a
> reasonable possibility that a loss or an additional loss may have been
> incurred.** [Footnote omitted.] The disclosure shall indicate the nature of
> the contingency and shall give an estimate of the possible loss or range of
> loss or state that such an estimate cannot be made…
>
> **After the date of an enterprise's financial statements but before those
> financial statements are issued, information may become available
> indicating that an asset was impaired or a liability was incurred after
> the date of the financial statements or that there is at least a
> reasonable possibility that an asset was impaired or a liability was
> incurred after that date.** The information may relate to a loss
> contingency that existed at the date of the financial statements, e.g., an
> asset that was not insured at the date of the financial statements. **On the
> other hand, the information may relate to a loss contingency that did
> not exist at the date of the financial statements**, e.g., threat of
> expropriation of assets after the date of the financial statements or the
> filing for bankruptcy by an enterprise whose debt was guaranteed after the
> date of the financial statements. In none of the cases cited in this

paragraph was an asset impaired or a liability incurred at the date of the financial statements, and the condition for accrual in paragraph 8(a) is, therefore, not met. **Disclosure of those kinds of losses or loss contingencies may be necessary, however, to keep the financial statements from being misleading. If disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made. Occasionally, in the case of a loss arising after the date of the financial statements where the amount of asset impairment or liability incurrence can be reasonably estimated, disclosure may best be made by supplementing the historical financial statements with pro forma financial data giving effect to the loss as if it had occurred at the date of the financial statements. It may be desirable to present pro forma statements, usually a balance sheet only, in columnar form on the face of the historical financial statements.** (Emphasis added.) (FAS 5 ¶¶10-11)

358.    For the reasons alleged elsewhere herein, the Exchange Act Defendants knew of or recklessly disregarded the inherent credit risk and the market factors indicating the true value of its subprime-related securities and the resulting significant declines in the fair value of the Company's subprime-related securities by at least February 26, 2007, which was subsequent to the date of the 2006 annual financial statements (December 29, 2006), but prior to the date of issuance of such financial statements (February 26, 2007).  As such, disclosure of the material decline in the fair value and related losses of the Company's subprime-related securities, because of the significance to the financial statements, was necessary to prevent these financial statements from being misleading. Although the losses on its subprime-related securities were, at a minimum, *reasonably possible*, the Company's 2006 annual financial statements, in violation of GAAP (FAS 5), did not include such subsequent event disclosure.

359.    Furthermore, the Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in addition to failing to *recognize* the losses on its subprime-related securities as discussed above, did not even *disclose* such losses, which were, at a minimum, *reasonably possible*, in violation of GAAP (FAS 5), misleading investors with regard to its true financial position and results of operations.

360.    In addition to the aforementioned FAS 5 disclosure requirements, FAS 107, as amended by FAS 133, requires disclosure of all significant concentrations of credit risk arising from all financial instruments, including the following:

a. **Information about the (shared)** activity, region, or **economic characteristic that identifies the concentration**

b. **The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts** and the collateral or other security, if any, for the amount due proved to be of no value to the entity

c. The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments

d. The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk. (FAS 107, as amended by FAS 133, ¶15A) (Emphasis added).

361.    Additionally, SOP No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6") also requires disclosures to be made in financial statements

about the risks and uncertainties existing as of the date of those statements regarding the

following:

> *a.* Nature of operations
>
> *b.* Use of estimates in the preparation of financial statements
>
> *c.* Certain significant estimates
>
> *d.* **Current vulnerability due to certain concentrations**

 (SOP 94-6 ¶8) (Emphasis added.)

362. With respect to disclosures of an entity's vulnerability due to certain

concentrations, SOP 94-6 indicates:

> **Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification.** Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.
>
> Financial statements should disclose the concentrations described in [subsequent paragraph] if, based on information known to management prior to issuance of the financial statements, *all* of the following criteria are met:
>
>> *a.* The concentration **exists at the date of the financial statements**.
>>
>> *b.* The concentration makes the enterprise vulnerable to the risk of a **near-term severe impact**.
>>
>> *c.* It is at least **reasonably possible** that the events that could cause the severe impact will occur in the near term.
>
> Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of [preceding paragraph]. (Group concentrations exist if a number of counterparties or **items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk**.) Some concentrations may fall into more than one category.

> a. *Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor.* The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.
>
> b. **Concentrations in revenue from particular products,** *services, or fund-raising events.* The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.
>
> c. *Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations.* The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.
>
> d. **Concentrations in the market** *or geographic area* [footnote omitted] *in which an entity conducts its operations.* The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this SOP, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

(SOP 94-6 ¶¶20-22) (Certain emphasis in the original, certain emphasis added).

363.    Further, the Company's significant concentration in subprime-related securities represented a material contingency *which was required to be disclosed* in the Company's condensed interim financial statements. APB No. 28, *Interim Financial Reporting* ("APB 28"), states:

> Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial. (APB 28 ¶22) (Footnote omitted.)

364.    The Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in violation of GAAP, lacked the required disclosure regarding its significant concentration in subprime-related securities.

365.    The Company's 2006 annual financial statements contained only one instance of the term "subprime" or "sub-prime."  It appeared *in a footnote, further deemphasized by a diminutive font size,* below a table in the notes to the 2006 annual financial statements.  (Form 10-K 2006 p. 101).  The Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 each contained only one instance of the term "subprime" or "sub-prime."  The Company disclosed "a small portion of the retained interests represent residual interests from subprime mortgage securitizations." (Form 10-Q Q1 2007 p. 31, Form 10-Q Q2 2007 p. 31).

366.    The term "nonprime" is sometimes used synonymously with "subprime." The Company's 2006 annual financial statements contained only one instance of the term "nonprime" or "non-prime." It appeared in the final note to the 2006 annual financial statements which discussed the completion of the First Franklin acquisition in the first quarter of fiscal year 2007 as a subsequent event as follows, in relevant part:

> First Franklin originates non-prime residential mortgage loans through a wholesale network. (Form 10-K 2006 p. 129).

The Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 each contained only one instance of the term "nonprime" or

"non-prime." It appeared in the acquisition note in similar context as excerpted above. (Form 10-Q Q1 2007 p. 48, Form 10-Q Q2 2007 p. 50).

367.    The Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 did not contain any instances of the term "collateralized debt obligation," "collateralized-debt obligation," or "CDO."

368.    Although undisclosed in the 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, the Exchange Act Defendants eventually acknowledged the Company had a significant concentration in subprime-related securities. Merrill disclosed as follows, in relevant part:

> …[L]osses on U.S. sub-prime residential mortgage-related exposures and U.S. ABS CDOs in 2007 reflected **a significant concentration** in securities that accumulated as a result of our activities as a leading underwriter of CDOs. (Form 10-K 2007 p. 61) (Emphasis added).

369.    Further, O'Neal, former-CEO, admitted as follows, in relevant part:

> The bottom line is, we got it wrong by being overexposed to subprime. (Q3 2007 Earnings Conference Call; October 24, 2007; Thomson Preliminary Transcript p. 2)

370.    In addition to the lack of disclosures required by GAAP, certain disclosures were materially false and/or misleading. For instance, in the 2006 annual financial statements, the Exchange Act Defendants caused the Company to disclose that it "originates and purchases portfolios that have certain features that may be viewed as increasing [the Company's] exposure to nonpayment risk by the borrower" including loans with negative amortization features, payment increases, and high loan-to-value

ratios. (Form 10-K 2006 p. 104). The Company disclosed its "exposure" to these types of loans as the dollar amount of the loans. These types of loans are not necessarily "subprime." However, these types of loans, based on the Company's own description, have a higher credit risk than a traditional loan. The lack of disclosure, throughout the 2006 annual financial statements, that the Company also had significant exposures to subprime-related securities through other financial instruments, i.e. U.S. ABS CDO positions, only served to further mislead investors that the Company's exposure to higher credit risk loans *was contained to the disclosure provided*.

371.    Thus, the statements made in the disclosures to, or about, the relevant financial statements regarding, generally, the Company's financial position and results of operations, and more specifically, but not exclusively, its risk profile and exposures, as described herein, were materially false and misleading as those financial statement disclosures were not in conformity with GAAP (FAS 5, FAS 107, FAS 133, and SOP 94-6).

372.    During the three months ended September 28, 2007 and for the year ended December 28, 2007, the Company eventually recognized, respectively, approximately $8.0 billion and $20.6 billion of losses on previously undisclosed subprime-related securities, including, respectively, at least, $6.9 billion and $16.7 billion of losses on previously undisclosed U.S. ABS CDO positions with underlying collateral of primarily subprime residential mortgage loans. For the three months ended September 28, 2007 and for the year ended December 28, 2007, the Company's performance deteriorated from reported net earnings in the previous comparative periods, to net losses.

373.    John Thain, the Company's current CEO, acknowledged:

…But on the trading side in particular as it relates to CDOs, we did not do a good job… Trading businesses don't make money if they don't take risks but the risks they take will be sized appropriately to the businesses. None of the trading businesses should be taking risks either single positions or single trades that wipe out the entire years earnings of their own business and of course **certainly shouldn't take a risk to wipe out the earnings of the entire firm**…

(Emphasis added). (Q4 2007 Earnings Conference Call; January 14, 2008; Thomson Preliminary Transcript p. 3).

374.    The Company did take such a concentrated risk, and the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in violation of GAAP, did not give any indication that the Company had such significant, let alone excessive, exposure concentrated in subprime-related securities.

375.    In addition to the requirements of GAAP, Regulation S-K requires the Company to include certain disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Company's filing with the SEC. Regulation S-K states as follows, in relevant part:

Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. (17 C.F.R. § 229.303(a)(3)(ii)).

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. (17 C.F.R. § 229.303(a)).

376.    The Company's MD&A, filed with the SEC as part of the Company's Form 10-K for the year ended December 29, 2006 and Forms 10-Q for the quarterly periods ended March 30, 2007, June 29, 2007 and September 28, 2007, in violation of

Regulation S-K, did not adequately disclose the material decline in the fair value and related losses of the Company's subprime-related securities indicating the reported financial information was not indicative of the Company's future financial position or results of operations.

*Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting*

377.    The SEC defines "disclosure controls and procedures" as:

…controls and other procedures of an issuer that are designed to ensure that **information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms**…

(SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02)

(Emphasis added). (Footnotes omitted).

378.    Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as follows, in relevant part:

A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with generally accepted accounting principles** and includes those policies and procedures that:

(1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with

generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Note: This definition is the same one used by the SEC in its rules requiring management to report on internal control over financial reporting, except the word "registrant" has been changed to "company" to conform to the wording in this standard.

(See Securities Exchange Act Rules 13a-15(f) and 15d-15(f).2/) (AS 2 ¶7)

(Emphasis added).

379.    Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer") is required to include in its annual report a report of management on the company's internal control over financial reporting… The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective... (AS 2 ¶2).

380.    During the Class Period, the Exchange Act Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. Certain Defendants falsely represented that the Company's disclosure controls and procedures were effective

as of the date of each individual Exchange Act report filed during the Class Period (with the exception of a reclassification required for its cash flow statements for 2005 and 2006). Further, the Company falsely represented that it "maintained effective internal control over financial reporting as of December 29, 2006." (Form 10-K 2006 p. 78).

381.    The Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period, as the Exchange Act Defendants caused the Company to issue the relevant financial statements that were materially misstated with respect to the valuation and disclosure of the Company's exposure concentrated in subprime-related securities. As a result of the Company's failure to maintain effective disclosure controls and procedures and internal control over financial reporting, the Exchange Act Defendants were not only able to delay recognizing material losses on its subprime-related securities, but were also able to avoid even disclosing that the Company had such a significant, let alone excessive, exposure concentrated in subprime-related securities, in violation of GAAP. The Company's true financial condition and results of operations were only further masked with false reassurances that the Company had an effective risk management process and adequate disclosures.

382.    In addition, statements made regarding, generally, the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and more specifically, but not exclusively, the identification, measurement, monitoring, management, and disclosure of risk, as described herein, were materially false and misleading for the reasons set forth above.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

383.    During the Class Period, as alleged herein, the Exchange Act Defendants engaged in a scheme to deceive the market and through a course of conduct that artificially inflated the value of Merrill's securities and operated as a fraud on Class Period purchasers of Merrill securities by misrepresenting the Company's risk management practices, balance sheet, and financial condition and performance.  Later, however, as the chart below reflects, when the truth concerning Merrill's risk management practices, balance sheet, and financial performance entered the market and became apparent to investors, the price of Merrill's securities materially declined as the prior artificial inflation dissipated.  As a result of their purchase of Merrill securities during the Class Period at artificially inflated prices and subsequent disclosures which removed the inflation from such securities, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.



384.    The Exchange Act Defendants' false and misleading statements and omissions caused Merrill's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period and all time high closing price of $97.53 per share on January 24, 2007 (which was two weeks before the lion's share of the Exchange Act Defendants Merrill stock sales).  As a direct and proximate result of the various corrective disclosures set forth below, which, over time, revealed the truth about defendants' false and misleading statements and disclosed facts that had been previously concealed by the Exchange Act Defendants' wrongful conduct, by the end of the Class Period, the common stock had lost 49% of its value. The various issuances of Exchange-Traded Preferred Securities declined between 7% and 28%.  All of the Exchange-Traded Preferred Securities issued in 2007 were also trading below their issuance prices.

385.    On June 20, 2007, the *New York Times* reported that "an effort to save a troubled hedge fund at Bear Stearns hit a major hurdle yesterday when Merrill signaled that it would move forward with its plan to auction $850 million in subprime securities that had been held as collateral . . . [If] the assets – securities and bonds backed by subprime mortgages that can be difficult to value – are sold at prices well below where they are currently valued, the reverberations across Wall Street would be strong.  Not only would Merrill be forced to post losses on its holdings, but other banks, hedge funds and investors owning similar securities would have to mark down the value of those holdings to new, lower prices."

386.    On June 20, 2007, Merrill common stock declined from a closing price on June 19, 2007 of $90.04 per share to close at $87.68 per share, a decline of $2.36 per

share, or approximately 3%, on volume of approximately 7.1 million shares.  Most of the Exchange-Traded Preferred Securities also suffered price declines on this date.

387.    Merrill's securities prices continued to be artificially inflated in part because the Exchange Act Defendants assured the investors that Merrill was not exposed to the risk that caused the Bear Stearns' hedge funds to collapse.  For example, at a conference in London on or about the end of June 2007, defendant O'Neal stated that Merrill's exposure was "reasonably well contained."  Further, on or about July 17, 2007, Defendant Edwards asserted that Merrill's exposure to subprime collateral assets seized from Bear Stearns was "limited" and "contained" and that Merrill's position with respect to the collateral was "appropriately marked."

388.    On July 17, 2007, Punk Ziegel & Co. published an analyst report on Merrill that stated, among other things, that "the confidence in the Company's balance sheet has been shaken by recent events in the high yield and subprime markets.  It is not altogether clear that the firm is marking its book to market, or whether it is making smaller adjustments using a more complex modeling technique.  Questions also exist as to how rigorous the Company's underwriting standards are."

389.    On July 17, 2007, Merrill's common stock declined from a closing price on July 16, 2007 of $87.39 per share to close at $86.20 per share, a decline of $1.19 per share, or approximately 1.36%, on volume of approximately 15.8 million shares.

390.    Merrill's securities prices continued to be artificially inflated, in part because the Company denied that there were issues concerning its accounting for the value of subprime debt on its balance sheet.  Specifically, in response to a question about Merrill's CDO valuation on the Company's July 17, 2007 conference call with investors,

defendant Edwards stated, "[o]bviously, we have a very robust process around marking these assets and we are confident in how they were marked."

391.    On September 26, 2007, a Goldman Sachs analyst reported that Merrill might record losses of as much as $4 billion in the third quarter on its fixed-income assets.  The price declined that day by $0.37 per share, from a closing price $72.12 per share on September 25, 2007, to close at $71.75 per share on exceptionally high trading volume of over 26 million shares, and Merrill's common stock declined an additional $0.47 per share over the next two trading days.  Most of the Preferred Securities declined over this period as well.

392.    On October 5, 2007, the Company issued a press release concerning the impact of market conditions on the Company's financial results for the quarter ended September 28, 2007.  The press release disclosed, among other things, that "challenging credit market conditions will have an adverse impact on its net earnings for the third quarter.  The company expects to report a net loss pre-diluted share of up to $0.50 cents, resulting from significant negative mark-to-market adjustments to its positions in two specific asset classes: collateralized debt obligations (CDOs) and subprime mortgages; and leveraged finance commitments. . . ."  The October 5, 2007 press release stated for the first time that Merrill would take an estimated write-down of $4.5 billion net of hedges.

393.    The next trading day, October 8, 2007, Merrill stock declined $2.55 per share, or approximately 3%, from a close on October 5, 2007 of $76.67 per share, to close at $74.12 per share on volume of over 10 million shares.

394.    On October 24, 2007, Merrill issued a press release that disclosed its financial results for the quarter ended September 28, 2007 and stated, among other things, that "[t]hird-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill disclosed at the time of its earnings pre-release.  This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral. FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing."

395.    On October 24, 2007, Merrill common stock declined from a closing price on October 23, 2007 of $67.12 per share, to close at $63.22 per share, a decline of $3.90 per share, or approximately 6%, on volume of approximately 52 million shares, and on October 25, 2007, Merrill stock declined an additional $2.32 per share, or approximately 4%, to close at $60.90 per share, on volume of approximately 41 million shares.  All of the Exchange-Traded Preferred Securities also suffered price declines on these dates.

396.    On November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages.  On November 1, 2007, Merrill's common stock declined from a closing price on October 31, 2007 of $66.02 per share to close at $62.19 per share, a decline of $3.83 per share, or approximately 6%, on volume of approximately 20 million shares.  On November 2, 2007, Merrill's stock declined an additional $4.91 per share, or approximately 8%, to close at $57.28 per share on volume of approximately 77

189

million shares.  All of the Exchange-Traded Preferred Securities declined on these dates as well.

397.    On January 17, 2008, before the market opened, the Company released its results for the year and quarter ended December 28, 2007, and announced additional write-downs of mortgage-related assets of over $16 billion.

398.    On January 17, 2008, Merrill's common stock declined from a closing price on January 16, 2008 of $55.09 per share, to close at $49.45 per share, a decline of $5.64 per share, or approximately 10%, on exceptional volume of over 70 million shares. All of the Exchange-Traded Preferred Securities declined on this date as well.

399.    The price declines directly and proximately resulting from the above discussed disclosures were not caused by industry news, randomness, or by Merrill-related information unrelated to the alleged fraud.  Each of the above referenced disclosures partially corrected the false and misleading information previously available to the market by the Exchange Act Defendants' wrongful course of conduct.  Lead Plaintiff seeks by this complaint to be compensated for those resulting economic losses.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

400.    At all relevant times, the market for Merrill's securities was an efficient market for the following reasons, among others:

(a) The Company's common stock and each of the Exchange-Traded Preferred Securities listed in paragraph 13 above were actively traded on the New York Stock Exchange, a highly efficient market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC; and

190

(c) The Company regularly had conference calls with investors and issued

press releases which were carried by national news wires.  Each of these

releases was publicly available and entered the public marketplace.

401.    As a result, the market for Merrill's securities promptly digested current

information with respect to Merrill from all publicly available sources and reflected such

information in the price of the Company's securities.  Under these circumstances, all

purchasers of the Company's publicly traded securities during the Class Period suffered

similar injury through their purchase of the publicly traded securities of Merrill at

artificially inflated prices, and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

402.    To the extent that the statutory safe harbor may apply to any of these false

statements alleged herein, the Exchange Act Defendants are liable for those false

forward-looking statements because at the time each of those statements was made the

speaker actually knew the statement was false and the statement was authorized and/or

approved by an executive officer of Merrill who actually knew that those statements were

false when made.

## COUNT I

**(For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against
Defendants Merrill, O'Neal, Fakahany, Fleming, and Edwards)**

403.    Lead Plaintiff incorporates ¶¶1-402 by reference.

404.    During the Class Period, the Exchange Act Defendants named in this

Count: (a) deceived the investing public, including Lead Plaintiff and other Class

members, as alleged herein; (b) artificially inflated and maintained the market price of

Merrill's common stock and certain preferred stock; and (c) caused members of the Class

to purchase Merrill's common stock and certain preferred stock at artificially inflated prices.

405.    The Exchange Act Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the purchasers of Merrill's common stock and certain of Merrill's preferred stock, in an effort to maintain artificially high market prices for Merrill's common stock and certain of Merrill's preferred stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

406.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Exchange Act Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance, so that the market prices of Merrill's publicly traded securities would be based on truthful, complete and accurate information.

407.    The Exchange Act Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, made, or substantially participated in the creation of, untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made about the Company in light of the circumstances under which they were made, not misleading, as set forth herein.

408.    The Exchange Act Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were unavailable to them. The facts alleged herein set forth a strong inference that each of the Exchange Act Defendants named in this Count acted with scienter.

409.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Merrill's common stock and certain of Merrill's preferred stock were artificially inflated throughout the Class Period. In ignorance of the fact that the market prices of Merrill's common stock and certain of Merrill's preferred stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which such shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known or with recklessness disregarded by the Exchange Act Defendants but not disclosed in public statements by these defendants, Lead Plaintiff and the other members of the Class purchased Merrill's common stock and certain of Merrill's preferred stock at artificially high prices, and were damaged thereby.

410.    At the time of said misrepresentations and omissions, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed the false statements to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true nature of the operations of Merrill and the noncompliance

with federal law, which were not disclosed by defendants, Lead Plaintiff and the other members of the Class would not have purchased such stock or, if they had purchased such stock, they would not have done so at the artificially inflated prices which they paid.

411.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Merrill were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.

412.    As alleged herein, the Exchange Act Defendants participated in the fraudulent scheme, by virtue of their receipt of information reflecting the true facts regarding Merrill, their control over, and/or receipt and/or modification of Merrill's allegedly materially misleading misstatements and/or their associations with Merrill which made them privy to confidential proprietary information concerning Merrill, participated in the fraudulent scheme alleged herein.

413.    The Exchange Act Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme alleged herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge or recklessness and complicity of the personnel at the highest level of the Company.

414.    The Exchange Act Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior officers and directors of Merrill, and they issued statements and press releases on

behalf of Merrill and had the opportunity to commit the fraud alleged herein.  As illustrated by the Exchange Act Defendants' respective positions with the Company, they had and used their influence and control to further the scheme alleged herein. The Exchange Act Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results.

415.    The Exchange Act Defendants were privy to and directed the making of financial projections and results. By making the misleading statements contained herein, the Exchange Act Defendants knew or recklessly disregarded that they would artificially inflate the price of the Company's common stock and certain of the Company's preferred stock.  Their respective actions resulted in damage to Lead Plaintiff and the Class.

416.    By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and are liable to Lead Plaintiff and the other members of the Class for damages which they suffered in connection with their purchases of Merrill common stock and certain preferred stock during the Class Period.

### COUNT II

### (For Violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) Against Defendants Merrill, MLPFS and O'Neal, Fakahany, Fleming and Edwards)

417.    Lead Plaintiff incorporates ¶¶ 1-402 by reference.

418.    This Count is brought against the Exchange Act Defendants and MLPFS.

419.    The Exchange Act Defendants and MLPFS knowingly or recklessly employed a manipulative and deceptive device, scheme or artifice to defraud, in violation of SEC Rule 10b-5(a), and engaged in an act, practice or course of business which

operated as a fraud or deceit in violation of SEC Rule 10b-5(c), in connection with the

purchase of Merrill's common stock and other securities during the Class Period by Lead

Plaintiff Ohio STRS and the other members of the proposed Class.  The Exchange Act

Defendants' and MLPFS's manipulative and deceptive devices and practices included,

*inter alia*:  disregarding and, in certain instances, overriding their internal risk controls

and analyses concerning the issuance and sale of CDOs and related financial instruments,

manipulating their pooling of assets within CDOs to issue and sell to investors tranches

of securities with purported AAA ratings despite the fact that significant amounts of the

assets underlying many such CDOs were at best highly risky assets rated less than AAA,

lowering underwriting guidelines for subprime mortgage origination, entering into

purported financial guarantees with insurers Merrill and MLPFS knew or disregarded

were undercapitalized or highly leveraged, merely to create the appearance that Merrill

was properly hedged against losses on CDOs and other financial instruments and

guarantees which Merrill, MLPFS, and other Merrill subsidiaries had retained and/or to

which they were committed, concealing Merrill's guarantee of billions of dollars in

undisclosed liabilities from CDOs, MBSs, CDSs, TRSs, and other derivative contracts

and financial instruments backed by, or relating to, subprime mortgages and foisting upon

certain of MLPFS's brokerage clients' highly risky CDOs and related securities without

such clients' authorization, all as alleged more fully above, and financing the purchase of

CDO assets by Hedge Funds.

  420. As a result of these manipulative and deceptive devices and practices

alleged above, the market prices of Merrill's common stock and other securities were

artificially inflated during the Class Period.  Lead Plaintiff and other members of the

Class who acquired such securities during the Class Period were injured as a direct and proximate result of these manipulative and deceptive devices and practices.

421.    In connection with their manipulative and deceptive devices and practices alleged above, the Exchange Act Defendants and MLPFS used the means or instrumentalities of interstate commerce and the mails.

422.    By virtue of the foregoing, the Exchange Act Defendants and MLPFS have violated section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

423.    As a direct and proximate result of the wrongful conduct of defendants Merrill and MLPFS, Lead Plaintiff and the other members of the Class incurred damages in an amount to be proven at trial.

424.    This Count is brought solely under SEC Rules 10b-5(a) and (c). Accordingly, Lead Plaintiff need not allege nor prove in connection with this Count that the Exchange Act Defendants or MLPFS made any misrepresentation or omission of material fact or otherwise for which these defendants may also be liable under SEC Rule 10b-5(b) and/or any other provision of law.   Likewise, and for that same reason, the statutory safe harbor for certain forward-looking statements does not apply to this Count in any respect, as no false or misleading statements are alleged in this Count.

## COUNT III

### (For Violation of Section 20(a) of the 1934 Act Against Defendants O'Neal, Fakahany, Fleming and Edwards)

425.    Lead Plaintiff incorporates ¶¶1-402 by reference.

426.    Defendants O'Neal, Fakahany, Fleming, and Edwards, by virtue of their respective offices and specific acts alleged above, including stock ownership, were, at the

time of the wrongs alleged herein, controlling persons of Merrill within the meaning of

Section 20(a) of the Exchange Act.

427.    Defendants named in this count, had the power and influence and

exercised the same to cause the Company to engage in the illegal conduct and practices

complained of herein. Defendants O'Neal (Chief Executive Officer), Edwards (Senior

Vice President and CFO), Fakahany (Co-President and COO), and Fleming (Co-President

and COO) each controlled Merrill through their respective executive and/or board

positions.

428.    As senior executive officers and/or directors of Merrill, defendants named

in this count, had a duty to disseminate accurate and truthful information regarding

Merrill's financial statements and to correct any previously issued statements that had

become untrue so that the market price of Merrill's common stock and certain preferred

stock would be based upon truthful and accurate information.

429.    Defendants named in this count, by reason of their executive or directorial

positions with Merrill, were controlling persons of Merrill and had the power and

influence, and exercised the same, to cause Merrill to engage in the conduct complained

of herein. Defendants controlled the contents of Merrill's SEC filings, corporate reports

and press releases. Each of the defendants participated in writing or reviewing the

Company's corporate reports, press releases, and SEC filings alleged to be misleading

and thus had the ability and opportunity to prevent their issuance or cause them to be

corrected and thereby culpably participated in the fraud alleged herein.

430.    Because of their positions and access to material non-public information

available to them, the defendants named in this count knew or recklessly disregarded that

the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. Thus, each of these defendants is legally responsible for the falsification of Merrill's public reports, financial statements, press releases and other statements as alleged herein.

431.    By reason of the conduct alleged herein, defendants named in this count are liable for the aforesaid wrongful conduct, and are liable to Lead Plaintiff and to the other members of the Class for the damages which they suffered in connection with their purchases of Merrill common stock and certain preferred stock during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT AND SECTION 14(a) OF THE EXCHANGE ACT

432.    These counts are in effect a separate complaint. For these claims there is no allegation of fraud, scienter or recklessness. The only claim is that there were misrepresentations or omissions of material fact.

### A.    Overview of Securities Act and Proxy Claims

433.    The Securities Act claims are brought on behalf of persons who purchased or acquired Merrill securities issued under or traceable to the registration statements and prospectuses set forth hereafter. Each of these registration statements and prospectuses contained misrepresentations or omissions of material fact, or incorporated by reference documents that contained misrepresentations or omissions of material fact.

434.    The Securities Act and Proxy claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in paragraphs 5-431, including the allegations of scienter and fraud.

435.    The Securities Act and Proxy claims allege that by the end of 2006, Merrill was materially exposed to complex securities known as CDOs, which are securitized bundles of debt securities.  Specifically, Merrill had billions of dollars in exposure to U.S. subprime ABS CDOs.  Nevertheless, Merrill failed to disclose its U.S. subprime ABS CDO exposure to investors.

436.    Merrill's financials were materially exposed to the declining housing market and increasing default rates of borrowers.  Nevertheless, Merrill failed to disclose that its risk management systems and controls were insufficient and did not adequately protect the Company against the risks associated with the deteriorating housing market and increasing default rates.  Indeed, as reported in the *Wall Street Journal* on January 25, 2008, John Thain, the new CEO of Merrill, who replaced O'Neal, has admitted that Merrill's risk controls and its risk control committee did not function.

437.    The Merrill defendants are Merrill, O'Neal and Edwards (hereinafter referred to the "Merrill Defendants").

438.    The Merrill Defendants did not disclose that by the end of 2005, at least one top insurer, American International Group, Inc. ("AIG"), had advised Merrill that AIG would no longer underwrite insurance to protect Merrill's growing U.S. subprime ABS CDO exposure.  Merrill had been relying on insurance purchased from AIG to transfer significant portions of Merrill's residual risks created in the underwriting of CDOs.

439.    Merrill also entered into billions of dollars of CDSs with monoline insurers.  Although consummated via separate contracts, the economic substance of these transactions was that those insurers were supposedly insuring Merrill or the Merrill-sponsored CDO issuing-entity against any risk of loss to principal and/or interest on CDOs.  Sometimes these

insurance policies also purported to insure Merrill or Merrill's CDO issuing entity on the total return the particular CDO tranche would yield. These undercapitalized or over leveraged insurers included entities like ACA Capital Holdings Inc., ("ACA"), a single A rated insurance company with severely limited capital, as well as XL Capital Assurance Inc. ("XL"). These entities were themselves exposed to tens of billions in subprime debt. The effect of this insurance was that Merrill was buying protection from entities that were, in some instances, less creditworthy than the securities they were insuring and these monoline insurers were incapable of satisfying their insurance obligations.

440. In February 2007, the ABX and TABX indices, two key indices for MBSs and CDOs, declined 15-40% on the very type of debt that Merrill belatedly wrote down in the third and fourth quarters of 2007. Further, by June 2007, the ABX and TABX had declined further and traded at discounts between 40-55%. The decline in these two indices required Merrill to write-down its exposure to U.S. subprime ABS CDOs by the first quarter of 2007.

441. Investors began to learn of the falsity of the statements listed below in October 2007, when Merrill announced a series of write-downs of U.S. subprime ABS CDO exposures causing at least $24 billion in write downs to the Company in the third and fourth quarters of 2007.

442. The particular registration statements and prospectuses issued which are alleged to be materially false and misleading are:

(a) Registration Statement Amendment No. 1 for the December 7, 2006 Offering;

(b) Series 5 Preferred Stock Prospectus for the March 15, 2007 Offering;

(c) Registration Statement Amendment No. 2 for the April 25, 2007 Offering;

(d) Registration Statement Amendment No. 3 for the August 15, 2007 Offering; and

(e) First Republic Registration Statement for the Merrill securities issued in exchange for First Republic securities (these registration statements and prospectuses are collectively referred to as the "Identified Registration Statements and Prospectuses").

443.    By January 17, 2008, all of the securities issued pursuant to the Identified Registration Statements and Prospectuses had declined in value since the date of their issuance.  The largest decline is attributable to common stock issued pursuant to the First Republic Registration Statement, which declined from $75.02 per share at issuance on September 21, 2007, to $49.45 on January 17, 2008, a 34% drop in four months, and Series 5 Preferred, which declined from a $25/share issuance price on March 19, 2007, to $17.60/share on January 17, 2008 a 29.6% decline in less than a year.

444.    By the market's close on May 19, 2008, the price of each security had declined in value since the date of issuance.  Common stock had declined from the $75.02 per share at issuance to First Republic shareholders, to $47.71.  Merrill Lynch Capital Trust I Preferred 6.45% Securities had declined from $25 per share to $21.36.  Series 5 Preferred Stock had declined from $25 per share to $16.40.  Merrill Lynch Capital Trust III 7.375% Preferred Securities had declined from $25 per share to $24.11.  Series 6 Preferred Stock had declined from $25 per share to $23.54.  Series 7 Preferred Stock had declined from $25 per share to $20.36.

### 1.    *December 7, 2006 Offering*

445.    On December 6, 2006, Merrill and Merrill Lynch Capital Trust I ("ML Trust I") filed with the SEC a Post-effective Amendment to a March 31, 2006 automatic shelf registration ("Registration Statement Amendment No. 1").

446.    On December 7, 2006, Merrill and ML Trust I filed with the SEC a Prospectus Supplement whereby Merrill offered 40 million shares of 6.45% Trust I Preferred Securities at $25 per share (the "6.45% Trust I Preferred Prospectus Supplement").

447.    ML Trust I was the issuer of the securities issued under this registration statement ("December 7, 2006 Offering").

448.    The December 7, 2006 Offering raised approximately $1 billion.  After underwriting commissions, ML Trust I realized approximately $968.5 million.

449.    Registration Statement Amendment No. 1 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

### 2.    *March 15, 2007 Offering*

450.    On March 12, 2007, Merrill filed with the SEC a product supplement related to the March 31, 2006 shelf registration statement and on March 16, 2007, Merrill filed with the SEC a term sheet/prospectus (collectively referred to as "Series 5 Preferred Stock Prospectus") under which it offered 60,000,000 depository shares each representing a 1/1200th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series 5 at $25 per depository share that raised $1.5 billion (50,000 shares of Floating Rate Non-Cumulative Preferred Stock, Series 5 were issued with a liquidation preference of $30,000 per preferred share).

451.    The Series 5 Preferred Stock Product Prospectus incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, and Merrill's annual report on Form 10-K for the fiscal year ended December 29, 2006, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

452.    Merrill was the issuer of the securities issued under this prospectus ("March 15, 2007 Offering").

453.    The March 15, 2007 Offering raised approximately $1.5 billion.  After underwriting commissions, Merrill realized approximately $1.47 billion.

### 3.    *April 25, 2007 Offering*

454.    On April 23, 2007, Merrill and Merrill Lynch Capital Trust II ("ML Trust II") filed with the SEC a Post-effective Amendment No. 2 to the shelf registration dated March 31, 2006 ("Registration Statement Amendment No. 2").

455.    On April 25, 2007, Merrill and ML Trust II filed with the SEC a Prospectus Supplement whereby it offered 36 million shares of 6.45% Trust II Preferred Securities at $25 per share (the "6.45% Trust II Preferred Prospectus Supplement").

456.    ML Trust II was the issuer of these securities ("April 25, 2007 Offering").

457.    The April 25, 2007 Offering raised approximately $900 million.  After underwriting commissions, ML Trust II realized approximately $871.6 million.

458.    Registration Statement Amendment No. 2 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, Merrill's annual report on Form 10-K for the fiscal year ended December 29, 2006, and Merrill's report on Form 8-K dated April 19, 2007, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

**4.    *August 15, 2007 Offering***

459.    On August 13, 2007, Merrill and Merrill Lynch Capital Trust III ("ML

Trust III") filed with the SEC a post-effective amendment No. 3 to the shelf registration

dated March 31, 2006 ("Registration Statement Amendment No. 3").

460.    On August 15, 2007, Merrill and ML Trust III filed with the SEC a Final

Prospectus Supplement whereby it offered 30 million shares of 7.375% Trust III Preferred

Securities at $25 per share ("7.375% Trust III Preferred Prospectus Supplement").

461.    ML Trust III was the issuer of these securities ("August 15, 2007 Offering").

462.    The August 15, 2007 Offering raised approximately $750 million.  After

underwriting commissions, ML Trust III realized approximately $726 million.

463.    Registration Statement Amendment No. 3 incorporated by reference Merrill's

quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, Merrill's

annual report on Form 10-K for the fiscal year ended December 29, 2006, Merrill's quarterly

reports on Form 10-Q for the fiscal periods ended March 30, 2007 and June 29, 2007, and

Merrill's reports on Form 8-K dated April 19, 2007, and July 17, 2007, which, as set forth

hereafter, contained misrepresentations and omissions of material fact.

**5.    *First Republic Acquisition***

464.    On January 29, 2007, Merrill announced that it would acquire First

Republic Bank ("First Republic") for $1.8 billion.

465.    On or about May 8, 2007, Merrill filed with the SEC a Registration

Statement on Form S-4 (the "May 8, 2007 S-4"), as amended on June 8, 2007 and June

21, 2007 (the "June 21, 2007 S-4/A"), which became effective on June 22, 2007 and a

Proxy Statement and Prospectus dated June 22, 2007 (the "June 22, 2007

Proxy/Prospectus"), and the registration of Merrill 6.70% Noncumulative Perpetual

Preferred Stock, Series 6 ("Series 6 Preferred Stock") and Merrill 6.25% Noncumulative

Perpetual Preferred stock, Series 7 ("Series 7 Preferred Stock") filed with the SEC on

Form 8-A on September 21, 2007.  The May 8, 2007 S-4, June 21, 2007 S-4/A and the

June 22, 2007 Proxy/Prospectus are collectively referred to as the "First Republic

Registration Statement."

466.    Under the First Republic Registration Statement, Merrill registered with

the SEC common and preferred stock with the SEC.  The preferred stock was issued by

Merrill in two series:  (1) Series 6; and (2) Series 7.

467.    On or about September 21, 2007, Merrill issued 11.6 million shares of

Merrill common stock, registered under the First Republic Registration Statement, to

First Republic shareholders in exchange for First Republic stock ("First Republic

Acquisition").

468.    Pursuant to the First Republic Registration Statement, Merrill also issued:

(1) 2.6 million depository shares, each representing a 1/40th interest in a share of Series 6

Preferred Stock in exchange for First Republic 6.70% Noncumulative Perpetual Preferred

Series A shares; and (2) 2 million depository shares, each representing a 1/40th interest in

a share of Series 7 Preferred Stock in exchange for First Republic 6.25% Noncumulative

Perpetual Preferred Series B shares.

469.    The First Republic Registration Statement incorporated by reference the

following documents:  Merrill's quarterly report on Form 10-Q for the fiscal quarter

ended September 29, 2006, Merrill's annual report on Form 10-K for the fiscal year

ended December 29, 2006, Merrill's quarterly report on Form 10-Q for the fiscal period

ended March 30, 2007, Merrill's April 19, 2007 8-K, Merrill's July 17, 2007 8-K and the

July 19, 2007 Joint First Republic and Merrill Lynch Notice to shareholders of Extension

of Cash/Stock election deadline in connection with the pending merger filed pursuant to

SEC Rule 425, which as set forth hereafter contained misrepresentations and omissions

of material fact.

**B.**     **Securities Act and Proxy Claim Plaintiffs**

470.     Lead Plaintiff Ohio STRS acquired 788 shares of Merrill common stock

pursuant to the First Republic Registration Statement, as reflected in the supplemental

certification of Ohio STRS attached hereto.  Also, Ohio STRS was eligible to vote on the

First Republic Merger.  Ohio STRS is one of the largest pension funds in the nation.  Ohio

STRS serves approximately 400,000 active, inactive and retired Ohio public educators and

has assets of approximately $75 billion.

471.     Plaintiff Gary Kosseff purchased: (1) 6.45% Trust II Preferred Securities in its

initial public offering at the offering price; and (2) 7.375% Trust III Preferred Securities in its

initial public offering at the offering price, as reflected in the Supplemental Certification of

Gary Kosseff attached hereto.

472.     Lead Plaintiff Ohio STRS and Plaintiff Kosseff are hereinafter referred to as

the "Securities Act and Proxy Claim Plaintiffs".

**C.**     **Securities Act And Proxy Claim Defendants**

473.     Defendant Merrill is a Delaware corporation with its principal executive

offices in New York, New York.  The Company purports to offer a broad range of services to

private clients, small businesses, institutions and corporations, organizing its activities into

two interrelated business segments - Global Markets and Investment Banking Group

("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management.  FICC is within the Global Markets & Investment Banking Group.

474.    Defendant ML Trust I is a Delaware statutory trust wholly owned by Merrill and the issuer of the 6.45% Trust I Preferred Securities in connection with the December 7, 2006 Offering.

475.    Defendant ML Trust II is a Delaware statutory trust wholly owned by Merrill and the issuer of the 6.45% Trust II Preferred Securities in connection with the April 25, 2007 Offering.

476.    Defendant ML Trust III is a Delaware statutory trust wholly owned by Merrill Lynch and the issuer of the 7.375% Trust III Preferred Securities in connection with the August 15, 2007 Offering.

477.    Defendant O'Neal was at all relevant times until October 2007, a Director, Chairman of the Board and CEO of Merrill.  O'Neal signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Statement Amendment No. 3; and (5) First Republic Registration Statement.

478.    Defendant Edwards is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Merrill.  Edwards signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Statement Amendment No. 3; and (5) First Republic Registration Statement.

479.    Defendants O'Neal and Edwards, because of their positions with the Company, possessed the power and authority to control the contents of the Identified Registration Statements and Prospectuses.

480.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill.  MLPFS provides investment, financing, advisory, insurance, banking, and related products and services. MLPFS was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) March 15, 2007 Offering; (3) April 25, 2007 Offering; and (4) August 15, 2007 Offering.

481.    Defendant Citigroup Global Markets ("Citigroup") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

482.    Defendant Morgan Stanley & Co. ("Morgan Stanley") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

483.    Defendant UBS Securities ("UBS") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

484.    Defendant Wachovia Capital Services ("Wachovia") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

485.    Defendant Deloitte & Touche LLP ("Deloitte") at all times relevant served as the Company's outside auditor.  Deloitte consented to the incorporation by reference in the First Republic Registration Statement, of its unqualified opinions on the Company's financial

statements and management's assessment of internal controls for the fiscal year ended December 29, 2006.  Deloitte is also named in the Series 5 Preferred Stock Product Supplement/Prospectus in connection with the March 15, 2007 Offering, Registration Statement Amendment No. 2 in connection with the April 25, 2007 Offering and Registration Statement Amendment No. 3 in connection with the August 15, 2007 Offering as having provided unqualified opinions stating that Merrill's consolidated financial statements for the fiscal year ending 2006 were fairly presented, in all material respects, in conformity with GAAP and that Merrill's management report on the effectiveness of internal control was fairly stated in all material respects.  Deloitte's unqualified opinions were materially false and misleading because Deloitte did not perform its audit of Merrill's year end 2006 financial statements in accordance with generally accepted auditing standards and such financial statements were presented in a manner which violated GAAP for the reasons set forth below at paragraph 559.  Deloitte maintains an office in New York, New York.  Deloitte issued unqualified opinions on the Company's financial statements and management's assessment of internal controls for the fiscal year ended December 29, 2006.

D.    **Registration Statement Amendment No. 1 (December 7, 2006 Offering)**

486.    Registration Statement Amendment No. 1 incorporated by reference Merrill's October 17, 2006 report on Form 8-K and Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, both of which contained untrue statements of material fact and omitted material facts as set forth more specifically below.

### 1.    October 17, 2006 Form 8-K

487.    On October 17, 2006, Merrill caused to be filed with the SEC a Form 8-K,

attaching a press release that announced its financial results for the third quarter of 2006.

In that press release, the Merrill Defendants represented:

- ■    GMI's third-quarter 2006 net revenues were $4.4 billion, up 21 percent from the year-ago quarter.  Compared with the third quarter of 2005, net revenues increased in all three major business lines:

- ■    Fixed Income, Currencies and Commodities (formerly Debt Markets) net revenues increased 26 percent, and were a quarterly record, driven primarily by record results in commodities and an increase from trading credit products, which more than offset declines from principal investing and trading interest rate products.

488.    The statements above in paragraph 487 were materially false and

misleading because the Merrill Defendants failed to disclose that the reported increases in

revenues came at the expense of exposing Merrill to billions of dollars of risk in U.S.

subprime ABS CDO exposures.  In addition, Merrill failed to disclose that through these

exposures, Merrill's financials were exposed to the deteriorating housing market and the

material increase in defaults of subprime borrowers.

### 2.    False Financial Results for the Fiscal Quarter Ended September 29, 2006

489.    On November 3, 2006, Merrill caused to be filed with the SEC on Form

10-Q, its financial results for the fiscal quarter ended September 29, 2006 ("November 3,

2006 10-Q").  In the November 3, 2006 10-Q, the Merrill Defendants represented the

following, *inter alia*, concerning Merrill's risk management policies and practices:

Merrill Lynch continually evaluates its businesses for profitability, performance, and client service to ensure alignment with its long-term strategic objectives under varying market and competitive conditions. The

strategy of maintaining long-term client relationships, ***closely monitoring costs and risks, diversifying revenue sources***, and growing fee-based and recurring revenues all continue as objectives to mitigate the effects of a volatile market environment on Merrill Lynch's business as a whole . . . .

*     *     *

Risk-taking is integral to many of the core businesses in which Merrill Lynch operates. In the course of conducting its business operations, Merrill Lynch is exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of Merrill Lynch's core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, there are independent control groups that manage market risk, credit risk, liquidity risk and operational risk, among other functions, which fall under the management responsibility of the Chief Financial Officer. ***Along with other control units these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.***

(Emphasis added).

490.    In the November 3, 2006 10-Q, the Merrill Defendants made various representations concerning its market risk management, including *inter alia*:

(a) That Merrill's Market Risk Management Group, which had responsibility for approving the markets and products that Merrill's business units would transact and take risk, used the following methods to assess the risk of Merrill's portfolios and positions:

> Market Risk Management quantifies the sensitivities of Merrill Lynch's current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that Merrill Lynch's current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall Value at Risk ("VaR") (VaR is defined in Appendix A) was only $43 million and:

212

> To calculate VaR, Market Risk Management aggregates sensitivities to market risk factors and combines them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options . . . .

(c) That in addition to VaR, Merrill also used other risk measurement

methods to assess the Company's risk such as:

> These [additional risk measurement methods and tools] include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(d) That risk levels were monitored on a "daily basis to ensure they remain

within corporate risk guidelines and tolerance levels."

491.    The statements in paragraphs 489-490 above were materially false and

misleading because there were no disclosures concerning the following:

(a) Merrill had billions of dollars in U.S. ABS CDO exposures;

(b) Merrill's risk management systems and controls did not function to limit

Merrill's exposure to U.S. ABS CDOs; and

(c) Merrill's VaR was materially understated.

492.    In the November 3, 2006 10-Q, the Merrill Defendants represented the

following concerning Merrill's credit risk:

*Residential Mortgage Lending*

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence***

> *to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.*

(Emphasis added).

493.    The statements above in paragraph 492 concerning credit risk was materially false and misleading because at this time, Merrill had greatly expanded its origination and purchasing of subprime mortgages and had materially lowered "underwriting guidelines" both as to loans originated and loans purchased.  Thus, contrary to these statements, Merrill's guidelines in originating and purchasing mortgage loans were not adequate.

494.    In the November 3, 2006 10-Q, the Merrill Defendants represented, *inter alia*, that:

> . . . to reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agency securities, on certain derivative transactions. From an economic standpoint, Merrill Lynch *evaluates risk exposures net of related collateral* . . . .
>
> In addition to obtaining collateral, Merrill Lynch *attempts to mitigate its default risk on derivatives whenever possible* by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of its derivative contracts.

(Emphasis added).

495.    The statements above in paragraph 494 were materially false and misleading with respect to Merrill's derivatives related to CDO and CDO-related assets because Merrill failed to disclose that it was becoming increasingly difficult to satisfactorily mitigate its risk with respect to derivatives based on U.S. subprime ABS CDO exposures.  In particular, there were no disclosures that by 2005, at least one top tier insurer, AIG, had refused to sell insurance to Merrill to protect the Company's growing exposure to U.S. subprime ABS CDOs.

496.    The November 3, 2006 10-Q contained certifications, signed by

defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002

which made the following certifications:

1. I have reviewed this quarterly report on Form 10-Q of Merrill Lynch & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

497.    The statement above in paragraph 496 was materially false and misleading because the November 3, 2006 10-Q contained "untrue statement[s] of . . . material fact[s] or omit[ted] to state . . . material fact[s]" including that Merrill's risk control systems were not functioning and Merrill failed to disclose its billions of dollars in exposure to U.S. subprime ABS CDOs.

E.    **Series 5 Preferred Stock Prospectus (March 15, 2007 Offering)**

498.    The Series 5 Preferred Stock Product Prospectus incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's January 18, 2007 8-K, and Merrill's annual report on Form 10-K for the year ended December 29, 2006, all of which contained untrue statements of material fact and/or material omissions.  Merrill's quarterly report on Form 10-Q for the quarter ended September 29, 2006 was materially false and misleading for the reasons set forth above in paragraphs 488-496.

*1.  Merrill's January 18, 2007 8-K*

499.    On January 18, 2007, Merrill caused to be filed with the SEC a Form 8-K, attaching a press release that announced the financial results for the fourth quarter and year end December 29, 2006.

500.    In Merrill's January 18, 2007 press release for the fourth quarter and year ended 2006, the Merrill Defendants represented:

> "We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer.   "By virtually any measure, our company completed the most successful year in its history.  Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent.  We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

> *        *        *

> ■    GMI generated $18.9 billion in net revenues for the full year 2006, up 37 percent from 2005, driven by record revenues in both Global Markets and Investment Banking. Pretax earnings were $7.1 billion, up 43 percent from the prior-year period. The pretax profit margin was 37.6 percent, up from 36.0 percent in 2005, demonstrating operating leverage even as substantial investments were made across the business.

> ■    GMI's fourth-quarter 2006 net revenues were $5.4 billion, up 55 percent from the year-ago quarter.   Compared with the fourth quarter of 2005, net revenues increased in all three major business lines:

> > ■    Fixed Income, Currencies and Commodities net revenues of $2.3 billion increased 70 percent, setting a quarterly record, driven by every major business line, in particular record revenues from credit products, commodities and foreign exchange,

as well as strong growth from trading interest rate products.

501.    The statements above were materially false and misleading because the Merrill Defendants failed to disclose that the reported increases in revenues came at the expense of exposing Merrill to billions of dollars of risk in U.S. subprime ABS CDO exposures.  In addition, Merrill failed to disclose that through these exposures, Merrill's financials were exposed to the deteriorating housing market and the material increase in defaults of subprime borrowers.

### 2.    False Financial Results for the Year Ended December 29, 2006

502.    On February 27, 2007, the Merrill Defendants caused to be filed with the SEC, Merrill's report on Form 10-K for the fiscal year ended December 29, 2006 (the "2006 10-K").  In the 2006 10-K, Merrill reported, *inter alia*, net earnings of $7.5 billion and net earnings per diluted share of $7.59 per share.

503.    By the time Merrill filed its 2006 10-K, there was a sharp decline in the ABX and TABX, indices that tracked the values of U.S. subprime ABS CDOs.  See ¶440.  There was no disclosure that Merrill was materially exposed to these U.S. subprime ABS CDOs and that it was substantially likely that the decline in their value would materially impact its financials.

504.    The 2006 10-K stated the following concerning Non-Trading Related Assets and Liabilities:

**Loans, Notes, and Mortgages, net**

Our portfolio of loans, notes, and mortgages includes corporate and institutional loans, residential and commercial mortgages, asset-based loans and other loans to individuals and other businesses. We maintain collateral to mitigate risk of loss in the event of default on some of these extensions of credit in the form of securities, liens on real estate, perfected

security interests in other assets of the borrower or other loan parties, and guarantees. We also economically hedge portions of the credit risk in certain commercial loans by purchasing credit default swaps. Loans, notes, and mortgages were $73.0 billion at year-end 2006, up 11% from 2005 as a result of strong market demand driven by favorable borrower fundamentals and business growth.

505.    The 2006 10-K represented, *inter alia*, the following concerning

Residential Mortgage Lending:

We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines as described below. ***Credit risk is closely monitored in order to confirm that reserves are sufficient and valuations are appropriate. These loans are predominantly extended to high credit quality borrowers***.

*            *            *

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform which is focused on originating non-prime residential mortgage loans through a wholesale network. As a result of this acquisition which was completed in the fiscal first quarter of 2007, ***the credit profile of our mortgage lending portfolio may be impacted*** in future periods.

(Emphasis added).

506.    The statements above in paragraphs 504-505  were materially false and

misleading because during 2006, prior to the First Franklin acquisition, Merrill had

greatly expanded its origination and purchasing of subprime mortgages and had

materially lowered its credit standards both as to loans originated and loans purchased,

which had begun to default in large numbers by the end of the year and Merrill was

putting back to loan originators mortgages which had defaulted. Thus, contrary to

Merrill's statements, the credit profile of Merrill's mortgage lending portfolio had in fact

been impacted, but there was no disclosure of the actual risks associated with these assets. Moreover, contrary to Merrill's representations Merrill was not adequately hedging risk.

507. As set forth below, the documents incorporated in the Registration Statement falsely represented, in great detail, that Merrill had risk policies in place to minimize the exposures of Merrill's U.S. subprime ABS CDO portfolio. However, Merrill has now admitted that these policies did not function to actually minimize Merrill's true exposure to U.S. subprime ABS CDOs.

508. The 2006 10-K represented the following concerning Trading-Related Assets and Liabilities:

> Although trading-related balances comprise a significant portion of the Consolidated Balance Sheets, ***the magnitude of these balances does not necessarily result in an increase in risk***. The ***market and credit risks associated with trading-related balances are mitigated through various hedging strategies***, as discussed in the following section. . . .

> Trading Assets and Liabilities . . .

> We use both "cash instruments" (e.g., securities) and derivatives to manage trading inventory market risks. As a result of these economic hedging techniques, a significant portion of our trading assets and liabilities represents hedges of other trading positions. We may use long positions in U.S. Government securities, for example, to hedge our short positions in interest rate futures contracts. ***These hedging techniques, which are generally initiated at the trading unit level, are supplemented by corporate risk management policies and procedures*** . . .

(Emphasis added).

509. Merrill's 2006 10-K represented that Merrill's risk management policies and practices were, *inter alia*, subject to regular review and control by senior management and were clearly defined, and that risk framework exceptions and violations were investigated and reported to management.

220

Prudent Governance

We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to regular *senior management review and control* through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

*      *      *

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, *these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.* To accomplish this, we have established a risk management process which includes:

> A formal risk governance structure that defines the oversight process and its components;

> A *regular review of the risk management process by the Audit Committee* of the Board of Directors (the "Audit Committee") as well as a *regular review of credit, market and liquidity risks and processes by the Finance Committee* of the Board of Directors ("the Finance Committee");

> *Clearly defined risk management policies and procedures* supported by a rigorous analytical framework;

> Communication and coordination among the businesses, executive management, and risk functions while maintaining *strict segregation of responsibilities, controls, and oversight*; and

> Clearly articulated risk tolerance levels, defined and *regularly reviewed by the ROC*, that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process. While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to

221

mitigate risk-related losses so that they fall within acceptable, predefined levels, under foreseeable scenarios.

*        *        *

Market and credit risk tolerance levels are represented in part by framework limits, which are established by the ROC and *reviewed and approved annually by the Executive Committee*, which must also approve certain intra-year changes. Substantive market and credit risk framework limit changes are reported to the Audit and Finance Committees. The frameworks are reviewed by the Finance Committee in the context of its evaluation of market and credit risk exposures. *Risk framework exceptions and violations are reported and investigated at predefined and appropriate levels of management*.

Both the Audit Committee and the Finance Committee are provided with *regular risk updates,* and significant issues and transactions are reported to the Executive Committee, the Audit Committee and the Finance Committee. Various governance committees exist to create policy, review activity, *and verify that new and existing business initiatives remain within established risk tolerance levels*. Representatives of the independent risk and control groups participate as voting members of these committees. The activities of these committees are monitored by the ROC.

(Emphasis added).

510.    The 2006 10-K represented the following concerning Merrill's

management of market risk:

(a) That the groups responsible for approving the products and markets in

which Merrill transacts and takes risk include Merrill's Market Risk

Management Group as well as other independent risk and control groups

and that:

. . . this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios

222

would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $52 million and:

To calculate VaR, we aggregate sensitivities to market risk factors and combine them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options.

*      *      *

Trading VaR increased during 2006 due to increased levels of equity, commodity and credit trading. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels.***

To complement VaR and in recognition of its inherent limitations, we use a number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(c) That in addition to VaR, Merrill used other risk measurement methods to

assess the Company's risk including stress testing and event risk analysis.

511.    The 2006 10-K made representations concerning the creditworthiness of

Merrill's counterparties, including that these parties could satisfy their contractual

obligations to Merrill.  However, these statements were materially false and misleading

because these counterparties could not actually satisfy their obligations to Merrill because

they were undercapitalized.  Merrill represented the following concerning the

management of credit risk, which it defined "as the potential for loss that can occur as a

result of an individual, counterparty or issuer being unable or unwilling to honor its

contractual obligations to [Merrill]":

> We have a Global Credit and Commitments Group that assesses the creditworthiness of existing and potential individual clients, institutional counterparties and issuers, and determines firm-wide credit risk levels within the Credit Risk Framework among other tools. This group reviews and monitors specific transactions as well as portfolio and other credit risk concentrations both within and across businesses. This group is also responsible for ongoing monitoring of credit quality and limit compliance and actively works with all of our business units to manage and mitigate credit risk.

> The Global Credit and Commitments Group uses a variety of methodologies to set limits on exposure and potential loss resulting from an individual, counterparty or issuer failing to fulfill its contractual obligations. The group performs analyses in the context of industrial, regional, and global economic trends and incorporates portfolio and concentration effects when determining tolerance levels. Credit risk limits take into account measures of ***both current and potential exposure as well as potential loss and are set and monitored by broad risk type, product type, and maturity***. Credit risk mitigation techniques include, where appropriate, the right to require initial collateral or margin, the ***right to terminate transactions or to obtain collateral should unfavorable events occur, the right to call for collateral when certain exposure thresholds are exceeded, the right to call for third party guarantees and the purchase of credit default protection***. ***With senior management involvement, we conduct regular portfolio reviews, monitor counterparty creditworthiness, and evaluate potential transaction risks with a view toward early problem identification and protection against unacceptable credit-related losses.*** We continue to invest additional resources to enhance Merrill Lynch's methods and policies to assist in managing our credit risk and to address evolving regulatory requirements.

> Senior members of the Global Credit and Commitments Group chair various commitment committees with membership across business, control and support units. These committees review and approve commitments, underwritings and syndication strategies related to debt, syndicated loans, equity, real estate and asset-based finance, among other products and activities . . .

> Further, to protect against declines in the value of the assets held by SPEs, for which Merrill Lynch provides either liquidity facilities or default

protection, ***Merrill Lynch economically hedges its exposure through derivative positions that principally offset the risk of loss arising from these guarantees.***

(Emphasis added).

512.    The 2006 10-K represented, *inter alia*, the following concerning the

Company's liquidity and that it had risk management systems in place to ensure that the

Company had sufficient liquidity and that it would not need to raise additional capital:

> Scenario analysis and stress testing is an important part of our liquidity management process. Our Liquidity Risk Management Group performs regular scenario-based stress tests covering credit rating downgrades and stressed market conditions both market-wide and in specific market segments. . .
>
> In our scenario analysis, we assume loss of access to unsecured funding markets during periods of financial stress. Various levels of severity are assessed through sensitivity analysis around key liquidity risk drivers and assumptions. Key assumptions that are stressed include diminished access to the secured financing markets, run-off in deposits, draws on liquidity facilities, and derivative collateral outflows. We assess the liquidity sources that can be accessed during the crisis and the residual positions.
>
> . . . The Liquidity Risk Management Group works with our Credit and Market Risk Management groups to incorporate the results of their judgment and analytics where credit or market risk implications exist. We assess the cash flow exposures under the various scenarios and use the results to refine liquidity assumptions, size our excess liquidity pools and/or adjust the asset-liability profiles.

513.    The statements above in paragraphs 508-512 were materially false and

misleading because they failed to disclose the following:

> (a) Merrill had accumulated billions of dollars in exposure to U.S. subprime
>
>     ABS CDOs;  and
>
> (b) Merrill's risk management policies and controls did not function.

514.    The Company's year ended December 29, 2006 financial statements were

presented in violation of GAAP for the reason set forth at ¶559 below.

515.     The 2006 10-K contained certifications, signed by defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made substantially similar certifications as set forth above in paragraph 496.  The certifications in the 2006 10-K were materially false and misleading because they contained "untrue statement[s] of material fact[s] or omit[ted] to state material fact[s]" namely that Merrill's risk control systems were not functioning and Merrill failed to disclose its billions of dollars in exposure to U.S. subprime ABS CDOs.

**F.     Registration Statement Amendment No. 2 (April 25, 2007 Offering)**

516.     Registration Statement Amendment No. 2 incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's 2006 10-K and Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007 and April 19, 2007.  The November 3, 2006 10-Q and 2006 10-K were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 489-497 and 502-515 respectively.  Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007 and April 19, 2007 were materially false and misleading and omitted material facts for the reasons set forth in paragraphs 487-488, 499-501 and 517-518 respectively.

**1.     *Merrill's April 19, 2007 Form 8-K***

517.     On April 19, 2007, Merrill filed a Form 8-K, attaching a press release that announced the financial results for the first quarter of 2007, ended March 30, 2007, that reported net earnings of $2.2 billion and (ii) net earnings per share of $2.50 per share, and stated the following:

> "This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our customers," said Stan O'Neal, Chairman and Chief Executive Officer.

\*       \*       \*

Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination securitization and trading of non-prime mortgage loans and securities in the U.S. **Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.**

518.    The statements in the April 19, 2007 8-K were materially false and misleading because Merrill did not disclose that:

(a) The Company had tens of billions of dollars in exposure to U.S. subprime ABS CDOs;

(b) Merrill's assets and liabilities were materially false because they did not account for impairment in the U.S subprime ABS CDO portfolio by at least 15%; and

(c) Merrill's risk management policies and controls did not function.

**G.    Registration Statement Amendment No. 3 (August 15, 2007 Offering)**

519.    Registration Statement Amendment No. 3 incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's 2006 10-K, Merrill's quarterly reports on Form 10-Q for the periods ended March 30, 2007 and June 29, 2007, and Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007, April 19, 2007 and July 17, 2007, which contained untrue statements of material fact and omitted material facts. The Registration Statement and the November 3, 2006 10-Q and 2006 10-K were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 489-497 and 502-515 respectively. Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007, April 19, 2007

and July 17, 2007 were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 487-488, 499-501, 517-518 and 536-537 respectively.

   1.    *False Financial Results for the Quarter Ended March 30, 2007*

   520.    On May 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended March 30, 2007 (the "May 7, 2007 10-Q"). The May 7, 2007 10-Q, represented, *inter alia*, that Merrill reported: (i) net earnings of $2.2 billion, an increase of 24% from the 2006 first quarter year results; and (ii) net earnings per share of $2.50 per share and $2.26 per diluted share.

   521.    The May 7, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $7.3 billion at March 30, 2007.

   522.    The May 7, 2007 10-Q represented that Merrill had mortgage loans of $21.0 billion and commitments to make mortgage loans of $7.995 billion as of March 30, 2007 and allowance for loan losses of $478 million.

   523.    The May 7, 2007 10-Q represented that as of March 30, 2007 Merrill had assets of mortgages, mortgage-backed and asset backed assets of $42.8 billion, contractual agreements of $36.3 billion and investment securities of $80.3 billion.

   524.    The May 7, 2007 10-Q categorized Merrill's assets into three types:  levels 1, 2 and 3.  Level 1 purported to represent those assets whose values were based on "unadjusted quoted prices for identical assets in an active market."  Level 2 purported to represent those assets whose values were based on "quoted prices for similar assets in active markets . . . non-active markets  . . . [p]ricing models whose inputs are observable for substantially the full term of the asset  . . . [and] pricing models whose inputs are

derived principally from or corroborated by observable market data." Level 3 assets purported to represent those assets whose values were "based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement." Merrill represented that its Level 2 and Level 3 assets were the following amounts:

(a) Level 2: (i) Trading assets, excluding contractual agreements were $79.408 billion; (ii) Contractual agreements were $184.552 billion minus a net adjustment of approximately $153 billion resulting in approximately $31 billion; (iii) Investment securities were $52.360 billion; and

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.830 billion; (ii) Contractual agreements were $5.341 billion; (iii) Investment securities were $5.922 billion.

525.    The May 7, 2007 10-Q represented that "The Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

526.    The May 7, 2007 10-Q represented, *inter alia*, that Merrill's maximum exposure to loan and real estate VIEs was $196 million and $6.425 billion in guaranteed and other funds.

527.    The statements above in paragraphs 520-526 were materially false and misleading and omitted material facts, including that the statements were not presented in accordance with GAAP, because they did not disclose the following:

(a) Merrill had billions of dollars in exposure to U.S. subprime ABS CDO exposures;

(b) Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q,
were materially false and misleading and violated GAAP, based on the
failure to properly mark to market the true value of the U.S. subprime
ABS CDO exposures by at least 15%;

(c) Merrill's net earnings and earnings per share as reported in its May 7, 2007
10-Q were materially false and misleading and violated GAAP based on the
failure to properly mark to market the true value of the U.S. subprime ABS
CDO exposures; and

(d) Merrill's risk management policies and controls did not function.

528.    The May 7, 2007 10-Q made representations concerning residential

mortgage lending:

> We originate and purchase residential mortgage loans, certain of which
> include features that may result in additional credit risk when compared to
> more traditional types of mortgages. The potential additional credit risk
> arising from these mortgages is addressed through ***adherence to
> underwriting guidelines.*** Credit risk is ***closely monitored in order to
> ensure that reserves are sufficient and valuations are appropriate***. For
> additional information on residential mortgage lending, see the 2006
> Annual Report.

(Emphasis added).

529.    The May 7, 2007 10-Q incorporated by reference a section of the 2006 10-

K, which stated that Merrill's residential mortgage loans, including such non-traditional

features "are predominantly extended to high credit quality borrowers."

530.    The statements above in paragraphs 528-529 were materially false and

misleading because during the first quarter of 2007, Merrill had greatly expanded its

origination and purchasing of subprime mortgages and had decreased its credit standards

both as to loans originated and loans purchased, which had begun to default in large

numbers by the end of the year.

531.    The May 7, 2007 10-Q represented the following concerning derivatives:

Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

\*        \*        \*

Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

532.    The May 7, 2007 10-Q represented the following concerning Merrill's risk

management:

Risk-taking is integral to the core businesses in which we operate. In the course of conducting our business operations, we are exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

533.    The May 7, 2007 10-Q represented the following concerning Merrill's

management of market risk:

(a) That the groups responsible for approving the products and markets in

which Merrill transacts and takes risk include Merrill's Market Risk

Management Group as well as other independent risk and control groups

and that:

> Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $65 million and:

> At March 30, 2007, trading VaR was higher than at year-end 2006 primarily due to increased interest rate exposures along with modest increases to commodity exposures. This increase was offset by reduced equity exposures. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels*** . . . .

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

534.    The statements above in paragraphs 531-533 concerning Merrill's derivatives and risk management were materially false and misleading because they did not disclose the following:

(a)  Merrill's billions of dollars in exposure to U.S. subprime ABS CDO

exposures;

(b)  Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q,

were materially false and misleading and violated GAAP, based on the

failure to properly mark to market the true value of the U.S. subprime

ABS CDO exposures by at least 15%;

(c)  Merrill's net earnings and earnings per share as reported in its May 7,

2007 10-Q were materially false and misleading and violated GAAP based

on the failure to properly mark to market the true value of the U.S.

subprime ABS CDO exposures; and

(d)  Merrill's risk management policies and controls did not function.

535.    The May 7, 2007 10-Q contained certifications, signed by defendants

O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley which made

substantially similar certifications as set forth above in paragraph 496.  The certifications

were materially false and misleading because they did not disclose that risk management

control systems did not function.  In addition, the statement that "the financial statements,

and other financial information included in this report, fairly present in all material

respects the financial condition" of the Company, was materially false and misleading

because Merrill's assets and liabilities did not take into consideration an impairment of at

least 15% impairment in Merrill's U.S. subprime ABS CDO exposures.

### 2.    *Merrill's July 17, 2007 Form 8-K*

536.    On July 17, 2007, Merrill filed a Form 8-K, attaching a press release that

announced its financial results for the second quarter of 2007.   In that press release, Merrill

announced its financial results for the quarter ended June 29, 2007 and made the following

statements:

> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said **Stan O'Neal**, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

*    *    *

> ▪    GMI's second-quarter 2007 net revenues were $6.2 billion, up 36 percent from the second quarter of 2006, as net revenues increased in all three major business lines:
>
>> ▪    Fixed Income, Currencies and Commodities (FICC) net revenues increased 55 percent to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45 percent from 2006, reflecting increased diversity and depth across asset classes.

537.    The statements above were materially false and misleading because they did

not disclose that:

(a)    The Company had at least $40 billion in exposure to U.S. subprime ABS

CDOs;

(b)    Merrill's assets and liabilities were materially false because they did not

account for impairment in the U.S subprime ABS CDO portfolio by at

least 40%; and

(c)    Merrill's risk management policies and controls did not function.

234

### 3.    False Financial Results for the Quarter Ended June 29, 2007

538.    On August 3, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended June 29, 2007 (the "August 3, 2007 10-Q"). The August 3, 2007 10-Q, represented *inter alia*, that Merrill reported: (i) net earnings of $2.1 billion: and (ii) earnings per common share of $2.48 per share and $2.24 per diluted share, up 39% and 37%.

539.    The August 3, 2007 10-Q represented that as of June 29, 2007, Merrill had assets of mortgages, mortgage-backed and asset backed assets of $34.5 billion, contractual agreements of $42.9 billion and investment securities of $86.4 billion.

540.    The August 3, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $8.6 billion at June 29, 2007.

541.    The August 3, 2007 10-Q reported mortgage loans of $18.9 billion and commitments to make mortgage loans of $8.1 billion as of June 29, 2007 and allowance for loan losses of $435 million.

542.    The August 3, 2007 10-Q categorized Merrill's assets into three levels: levels 1, 2 and 3. The categories were described in a substantially similar way in the August 3, 2007 10-Q as they were described in Merrill's May 7, 2007 10-Q. Merrill represented that its Level 2 and Level 3 assets were the following amounts:

>    (a) Level 2: (i) Trading assets, excluding contractual agreements were
>        $86.611 billion; (ii) Contractual agreements were $216.321 billion minus
>        a net adjustment of approximately $180 billion for a total of

approximately $36 billion; (iii) Investment securities were $58.519 billion; and

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.648 billion; (ii) Contractual agreements were $6.601 billion; (iii) Investment securities were $5.784 billion.

543.    The August 3, 2007 10-Q represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

544.    The statements above in paragraphs 538-543 were materially false and misleading and omitted material facts, including that the statements were not presented in accordance with GAAP, because they did not disclose the following:

(a) Merrill had at least $40 billion in exposure to U.S. subprime ABS CDO exposures;

(b) Merrill's trading assets and liabilities, as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the U.S. subprime ABS CDO exposures by at least 40%;

(c) Merrill's net earnings and earnings per share as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures.  Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO

exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion and its earnings per diluted share would had declined from a reported profit of $2.24 per share to a loss of $10.30 per share; and

(d)  Merrill's risk management policies and controls did not function.

545.    The August 3, 2007 10-Q represented the following concerning residential mortgage lending:

> [Merrill Lynch] originate[s] and purchase[s] residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

546.    The statements above in paragraph 545 were materially false and misleading because Merrill did not disclose that it had greatly expanded its origination and purchasing of subprime mortgages and had decreased its credit standards both as to loans originated and loans purchased, which had continued to default in large numbers during this period.

547.    The August 3, 2007 10-Q represented the following concerning derivatives:

> Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.
>
> *            *            *
>
> Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is

determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

548.    The August 3, 2007 10-Q represented the following concerning Merrill's risk management:

> While the outlook for growth in most global businesses in which we operate remains strong, the challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. ***We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks.***

*    *    *

> Risk-taking is integral to the core businesses in which we operate. In the course of conducting our business operations, we are exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

(Emphasis added).

549.    The August 3, 2007 10-Q represented the following concerning Merrill's management of market risk:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

> Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $71 million and:

> The average trading VaR was higher in the second quarter than in the first quarter due primarily to higher equity exposures and higher interest and credit spread exposures earlier in the period.  If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels***.

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

550. The August 3, 2007 10-Q represented that Merrill's maximum exposure to loan and real estate VIEs was $220 million and $6.65 billion in guaranteed and other funds.

551. The statements above in paragraphs 547-550 were materially false and misleading because they did not disclose the following:

    (a) Merrill had at least $40 billion in exposure to U.S. subprime ABS CDO exposures and activities;

    (b) Merrill's trading assets and liabilities, as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures by at least 40%;

    (c) Merrill's net earnings and earnings per share as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures. Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion and its earnings per diluted share would had declined from a reported profit of $2.24 per share to a loss of $10.30 per share;

    (d) Merrill had billions of dollars worth of credit default swaps with XL and ACA, which were highly leveraged; and

(e)  Merrill's risk control systems did not function.

552.    The August 3, 2007 10-Q repeated substantially the same statements as those set forth in Merrill's November 3, 2006 10-Q, which are set forth above in paragraph 496.   The certifications were materially false and misleading because Merrill failed to disclose that its risk control systems did not function.  In addition, the statement that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of the Company, was materially false and misleading because Merrill's assets and liabilities did not take into consideration an impairment of at least 40% in Merrill's U.S. subprime ABS CDO exposures.

**H.    First Republic Registration Statement**

553.    On or about May 8, 2007, Merrill filed a Registration Statement with the SEC on Form S-4 for shares to be issued pursuant to the First Republic merger.  Defendants O'Neal and Edwards signed the Form S-4, either individually or by an appointed attorney-in-fact.

554.    On June 8, 2007 and again on June 21, 2007, Merrill filed amendments to its Registration Statement with the SEC on Form S-4/A. Defendants O'Neal and Edwards signed the Form S-4/As, either individually or by an appointed attorney-in-fact.

555.    On June 22, 2007, Merrill filed a Proxy/Prospectus for the merger on Form 424B3. The merger was completed on September 21, 2007.

556.    The First Republic Registration Statement incorporated by reference the following documents:  the November 3, 2006 10-Q, the 2006 10-K, the May 7, 2007 10-Q, the July 17, 2007 8-K and the July 19, 2007 Joint First Republic and Merrill Lynch

Notice to shareholders of Extension of Cash/Stock election deadline in connection with the pending merger filed pursuant to Rule 425. Each of these SEC filings were materially false and misleading for the reasons set forth above.

557.    The First Republic Registration Statement was also false because it did not disclose material adverse events. Merrill signed the merger agreement with First Republic on January 29, 2007. The Registration Statement stated that Merrill made representations and warranties to First Republic concerning Merrill's "regulatory reports, financial and other reports and material adverse effects," and assured that "representations and warranties relating to events having a materially adverse effect on First Republic or Merrill…must be true in all respects." The merger agreement stated that the "term 'material adverse effect,' as used with respect to Merrill or First Republic, means an individual or aggregate effect that…has a material adverse effect on the financial condition, results of operations, assets or business of Merrill or First Republic, as the case may be, and their respective subsidiaries, taken as a whole."

558.    The First Republic Registration Statement represented that Merrill earned $7.499 billion in 2006 and $2.158 billion in the first three months of 2007.

I.    **GAAP Violations**

559.    The Company's 2006 annual financial statements, incorporated into the following registration statements or prospectuses: (1) the Series 5 Preferred Stock Prospectus; (2) Registration Statement Amendment No. 2; (3) Registration Statement Amendment No. 3; and (4) the First Republic Registration Statement, were materially false and misleading because such financial statements omitted certain disclosure

regarding the Company's financial position and results of operations in a manner which violated the following, among other, fundamental GAAP:

(a) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

(b) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

(c) The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶42);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

(f)    The principle that financial reporting should be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

(g)    The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81);

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97);

(i)    FAS 5 which requires disclosure be made of losses, including those incurred after the date of the financial statements, but prior to the issuance of such financial statements, that are reasonably possible in order to prevent the financial statements from being misleading (FAS 5 ¶¶10-11);

(j)     FAS 107, as amended by FAS 133, which requires disclosure of all

significant concentrations of credit risk arising from all financial

instruments (FAS 107, as amended by FAS 133, ¶15A); and

(k)     SOP 94-6, which requires disclosure of certain risks and uncertainties,

including an entity's vulnerability due to certain concentrations (SOP

94-6 ¶¶8, 20-22).

560.     The Company's relevant 2007 interim financial statements, incorporated

into Registration Statement Amendment No. 3, and First Republic Registration

Statement, were materially false and misleading because they presented the Company's

financial position and results of operations in a manner which violated the same

fundamental GAAP as was violated in connection with the Company's 2006 annual

financial statements.  In addition, the Company's 2007 interim financial statements were

presented in a manner that also violated FAS 115, FAS 133, and FAS 5, among other

provisions of GAAP, because the Company failed to report its subprime-related assets (or

liabilities, as applicable) at fair value and recognize the related losses due to the decline

in fair value that were both probable and reasonably estimable in such financial

statements.

**COUNT IV**

**(Against Defendants Merrill, ML Trust I, O'Neal, Edwards, MLPFS, Citigroup,
Morgan Stanley, UBS and Wachovia for Violations of Section 11 of the Securities Act in
Connection with the December 7, 2006 Offering)**

561.     Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they

pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For

purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

562.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the December 7, 2006 Offering against Merrill, ML Trust I, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia.

563.    Registration Statement Amendment No. 1 contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

564.    Defendants O'Neal and Edwards signed Registration Statement Amendment No. 1 or authorized it to be signed on their behalf.

565.    Defendant Edwards signed Registration Statement Amendment No. 1 on behalf of defendant Merrill.

566.    ML Trust I is the issuer of Registration Statement Amendment No. 1.  As issuer of the shares, ML Trust I is strictly liable to Plaintiffs and to the members of the Class who purchased shares pursuant to Registration Statement Amendment No. 1 for the materially untrue statements and omissions alleged herein.

567.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters of the December 7, 2006 Offering.

568.    Merrill was the sole structuring advisor and sole bookrunner for the December 7, 2006 Offering.

569.    Class members purchased securities issued under or traceable to Registration Statement Amendment No. 1.

570.    Class members who purchased securities pursuant to Registration Statement Amendment No. 1 were damaged by these defendants as a direct and proximate result of the untrue statements and omissions in Registration Statement Amendment No. 1.

571.    This claim is brought within the applicable statute of limitations.

572.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT V

**(Against Defendants ML Trust I, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the December 7, 2006 Offering)**

573.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

574.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Merrill securities in the December 7, 2006 Offering against ML Trust I, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia in connection with the December 7, 2006 Offering.

575.    ML Trust I was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to Registration Statement Amendment No. 1, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

576. MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters of the December 7, 2006 Offering. As underwriters of the December 7, 2006 Offering, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia participated in the December 7, 2006 Offering and sale of the stock to the investing public.

577. Merrill was the sole structuring advisor and sole bookrunner for the December 7, 2006 Offering.

578. Members of the class who purchased Merrill securities in or traceable to the December 6, 2006 Offering have sustained damages as a result of the untrue statements of material facts and omissions in Registration Statement Amendment No. 1, for which they hereby elect to rescind and tender their shares of Merrill securities to the defendants sued in this count in return for the consideration paid for Merrill securities with interest.

579. This claim is brought within the applicable statute of limitations.

580. By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

### COUNT VI

**(Against Defendants Merrill, O'Neal, Edwards, MLPFS and Deloitte for Violations of Section 11 of the Securities Act in Connection with the March 15, 2007 Offering)**

581. Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

582. This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the March 15, 2007 Offering against Merrill, O'Neal, Edwards, MLPFS, and Deloitte.

583.    The Series 5 Preferred Stock Prospectus filed in connection with the March 15, 2007 Offering contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as alleged more fully above.

584.    Defendants O'Neal and Edwards signed the Series 5 Preferred Stock Prospectus or authorized it to be signed on their behalf.

585.    Merrill is the issuer of the Series 5 Preferred Stock Prospectus.  As issuer of the shares, Merrill is strictly liable to Plaintiffs and to the members of the Class who purchased shares pursuant or traceable to the Series 5 Preferred Stock Prospectus for the materially untrue statements and omissions alleged herein.

586.    MLPFS was the underwriter for the March 15, 2007 Offering.

587.    Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference in the Series 5 Preferred Stock Prospectus with Deloitte's consent.  As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to the Series 5 Preferred Stock Prospectus.

588.    Class members purchased securities pursuant or traceable to the Series 5 Preferred Stock Prospectus.

589.    Class members who purchased securities pursuant or traceable to the Series 5 Preferred Stock Prospectus were damaged as a direct and proximate result of the untrue statements and omissions in the Series 5 Preferred Stock Prospectus.

590.    This claim is brought within the applicable statute of limitations.

591.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT VII

**(Against Defendants Merrill and MLPFS for Violations
of Section 12(a)(2) of the Securities Act in Connection with the March 15, 2007
Offering)**

592.    Plaintiffs repeat and reallege the allegations above at paragraph 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

593.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Merrill securities in or traceable to the March 15, 2007 Offering against Merrill and MLPFS.

594.    Merrill and MLPFS were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Series 5 Preferred Stock Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

595.    Members of the class who purchased Merrill securities in or traceable to the March 15, 2007 Offering have sustained damages as a result of the untrue statements of material facts and omissions in the Series 5 Preferred Stock Prospectus, for which they hereby elect to rescind and tender their Merrill securities to defendants sued in this count in return for the consideration paid for Merrill securities with interest.

596.    This claim is brought within the applicable statute of limitations.

597.    By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT VIII

**(Against Defendants Merrill, ML Trust II, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte for Violations of Section 11 of the Securities Act in Connection with the April 25, 2007 Offering)**

598.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

599.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the April 25, 2007 Offering, against Merrill, ML Trust II, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte.

600.    Registration Statement Amendment No. 2 contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading as alleged more fully above.

601.    Plaintiff Kosseff and other class members purchased securities pursuant to Registration Statement Amendment No. 2.

602.    Defendants O'Neal and Edwards signed Registration Statement Amendment No. 2 or authorized it to be signed on their behalf.

603.    Defendant Edwards signed Registration Statement Amendment No. 2 on behalf of defendant Merrill.

604.    ML Trust II is the issuer of Registration Statement No. 2. As issuer of the shares, ML Trust II is strictly liable to Plaintiff and to the members of the Class who purchased shares pursuant to Registration Statement Amendment No. 2 for the materially untrue statements and omissions alleged herein.

605.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters for the April 25, 2007 Offering.

606.    Merrill was the sole structuring advisor and sole bookrunner for the April 25, 2007 Offering.

607.    Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference to the Registration Statement Amendment No. 2 with Deloitte's consent.  As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to Registration Statement Amendment No. 2.

608.    Plaintiff and class members who purchased securities pursuant or traceable to Registration Statement Amendment No. 2 were damaged as a direct and proximate result of the untrue statements and omissions in Registration Statement Amendment No. 2.

609.    This claim is brought within the applicable statute of limitations.

610.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

**COUNT IX**

**(Against Defendants ML Trust II, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the April 25, 2007 Offering)**

611.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

612.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the April 25, 2007 Offering against ML Trust II, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS, and Wachovia.

613.    ML Trust II was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to Registration Statement Amendment No. 2, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth more fully above.

614.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters for the April 25, 2007 Offering.  By acting as underwriters, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia participated in the April 25, 2007 Offering and sale of the Merrill securities to the investing public.

615.    Merrill was the sole structuring advisor and sole bookrunner for the April 25, 2007 Offering.

616.    Plaintiff Kosseff and other Members of the Class who purchased Merrill securities in or traceable to the April 25, 2007 Offering have sustained damages as a result of

the untrue statements of material facts and omissions in Registration Statement Amendment

No. 2 for which they hereby elect to rescind and tender their Merrill securities to the

defendants named in this count in return for the consideration paid for Merrill securities with

interest.

617.    This claim is brought within the applicable statute of limitations.

618.    By virtue of the foregoing, defendants named in this count violated Section

12(a)(2) of the Securities Act.

## COUNT X

**(Against Defendants Merrill, ML Trust III, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte for Violations of Section 11 of the Securities Act in Connection with the August 15, 2007 Offering)**

619.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they

pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For

purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct.

620.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf

of all purchasers of Merrill securities in or traceable to the August 15, 2007 Offering against

Merrill, ML Trust III, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS,

Wachovia and Deloitte, in connection with the August 15, 2007 Offering.

621.    Registration Statement Amendment No. 3 contained untrue statements of

material facts and omitted material facts required to be stated in order to make the statements

contained therein not misleading as set forth above.

622.    Defendants O'Neal and Edwards signed Registration Statement Amendment

No. 3 or authorized it to be signed on their behalf.

623.    Defendant Edwards signed Registration Statement Amendment No. 3 on behalf of defendant Merrill.

624.    ML Trust III is the issuer of Registration Statement No. 3.  As issuer of the shares, ML Trust III is strictly liable to Plaintiffs and to the members of the Class who purchased shares pursuant to Registration Statement Amendment No. 3 for the materially untrue statements and omissions alleged herein.

625.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters for the August 15, 2007 Offering.

626.    Merrill was the sole structuring advisor and sole bookrunner for the August 15, 2007 Offering.

627.    Plaintiff Kosseff and other members of the class purchased securities pursuant to Registration Statement Amendment No. 3.

628.    Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference to the Registration Statement Amendment No. 3 with Deloitte's consent.  As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to Registration Statement Amendment No. 3.

629.    Plaintiff and class members who purchased securities pursuant to Registration Statement Amendment No. 3 were damaged by these defendants as a direct and proximate result of the untrue statements and omissions in Registration Statement Amendment No. 3.

630.    This claim is brought within the applicable statute of limitations.

631.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT XI

**(Against Defendants ML Trust III, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the August 15, 2007 Offering)**

632.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

633.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Merrill securities in the August 15, 2007 Offering against ML Trust III, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia, in connection with the August 15, 2007 Offering.

634.    ML Trust III was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to Registration Statement Amendment No. 3, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

635.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia acted as underwriters in the August 15, 2007 Offering.  By acting as underwriters, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia participated in the August 15, 2007 Offering and sale of the Merrill securities to the investing public.

636.    Merrill was the sole structuring advisor and sole bookrunner for the August 15, 2007 Offering.

637.    Plaintiff Kosseff and other members of the class who purchased Merrill securities in the August 15, 2007 Offering have sustained damages as a result of the untrue

statements of material facts and omissions in Registration Statement Amendment No. 3 for

which they hereby elect to rescind and tender their securities to defendants sued herein in

return for the consideration paid for Merrill securities with interest

638.    This claim is brought within the applicable statute of limitations.

639.    By virtue of the foregoing, the defendants named in this count violated

Section 12(a)(2) of the Securities Act.

### COUNT XII

**(Against Defendants Merrill, O'Neal, Edwards and Deloitte for Violations of Section 11 of the Securities Act in Connection with the First Republic Registration Statement)**

640.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they

pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For

purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be

construed as alleging or sounding in fraud or intentional or reckless misconduct.

641.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf

of all acquirers of Merrill securities in connection with the First Republic Acquisition,

against Merrill, O'Neal, Edwards, and Deloitte.

642.    The First Republic Registration Statement contained untrue statements of

material facts and omitted material facts required to be stated in order to make the statements

contained therein not misleading.

643.    Defendants O'Neal and Edwards signed the First Republic Registration

Statement or authorized it to be signed on their behalf.

644.    Merrill is the issuer of the securities registered under the First Republic

Registration Statement.  As issuer of the shares, Merrill is strictly liable to Plaintiffs and to

the members of the Class who acquired Merrill shares pursuant to the First Republic Registration Statement for the materially untrue statements and omissions alleged herein.

645.    Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference in the First Republic Registration Statement with Deloitte's consent.  As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to the First Republic Registration Statement.

646.    Deloitte's unqualified opinions on Merrill's 2006 10-K, which were incorporated by reference into Registration Statement Amendment No. 3, were materially false and misleading.  Accordingly, Deloitte's representations contained untrue statements of material fact and failed to state facts necessary to make the statements not misleading.

647.    Lead Plaintiff and other members of the Class acquired Merrill securities pursuant or traceable to the First Republic Registration Statement.

648.    Lead Plaintiff and Class members who acquired securities pursuant or traceable to the First Republic Registration Statement were damaged as a direct and proximate result of the untrue statements and omissions in the First Republic Registration Statement.

649.    This claim is brought within the applicable statute of limitations.

650.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT XIII

### (Against Defendant Merrill for Violations of Section 12(a)(2) of the Securities Act in Connection with the First Republic Registration Statement)

651.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

652.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, against Merrill on behalf of all acquirers of Merrill securities in the First Republic Acquisition.

653.    Merrill was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to the First Republic Registration Statement, which contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading as set forth above.

654.    Lead Plaintiff and other members of the Class who acquired Merrill securities in the exchange for First Republic securities have sustained damages as a result of the untrue statements of material facts and omissions in the First Republic Registration Statement for which they hereby elect to rescind and tender their Merrill securities to Defendants sued herein in return for the consideration paid for Merrill securities with interest.

655.    This claim is brought within the applicable statute of limitations.

656.    By virtue of the foregoing, Merrill violated Section 12(a)(2) of the Securities Act.

## COUNT XIV

### (Against Defendants O'Neal, Edwards and Merrill for Violations of Section 15 of the Securities Act)

657.    Plaintiffs repeat and reallege the allegations contained above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

658.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of plaintiffs and the Class.

659.    Defendants O'Neal and Edwards at the time of each registration statement and prospectus alleged to be false and misleading, participated in the operation and management of Merrill ML Trust I, ML Trust II, ML Trust III and Merrill, and conducted and participated, directly and indirectly, in the conduct of those defendants' business affairs.

660.    Because of their positions of control and authority over Merrill ML Trust I, ML Trust II, ML Trust III and as senior officers of Merrill, defendants O'Neal and Edwards were able to, and did, control the contents of the registration statements and prospectuses that contained materially false and misleading information.  Each signed or caused to be signed on their behalf each registration statement and prospectus.  Defendants O'Neal and Edwards were therefore controlling persons of defendants ML Trust I, ML Trust II, ML Trust III and Merrill within the meaning of Section 15 of the Securities Act.

661.    The conduct alleged herein of ML Trust I, ML Trust II, ML Trust III and Merrill constitutes a violation of Sections 11 and 12 of the Securities Act.

662.    Defendants O'Neal and Edwards are liable to the Securities Act and Proxy Claim Plaintiffs and members of the Class, jointly and severally with and to the same extent as Merrill for violations of Sections 11 and 12.

663.    Defendant Merrill is liable to the Securities Act and Proxy Claim Plaintiffs and members of the Class jointly and severally with and to the same extent as ML Trust I, ML Trust II, and ML Trust III for those entities violations of Sections 11 and 12.

664.    Merrill controlled various defendants including ML Trust I, II, and III, and MLPFS.  For example, with respect to ML Trust I, the 6.45% Trust I Preferred Prospectus Supplement for the December 7, 2006 Offering stated: "We [Merrill] Generally Will Control Merrill Lynch Capital Trust I [ML Trust I] Because [Investors] Voting Rights are Very Limited."  The Prospectus Supplement also stated that proceeds from the offering would be sent by ML Trust I to Merrill, and Merrill would use the proceeds for its own "general corporate purposes."  In addition, Merrill "created" and "organized" ML Trust I.  Further, three of ML Trust Is five trustees were Merrill employees, and Merrill had the "sole right to appoint, remove and replace the trustees of [ML Trust I]."

665.    With respect to ML Trust II and III, virtually identical provisions to those above were contained in the 6.45% Trust II Preferred Prospectus Supplement for the April 25, 2007 Offering and the 7.375% Trust III Preferred Prospectus Supplement for the August 15, 2007 Offering.

666.    Merrill also controlled defendant MLPFS, a wholly-owned subsidiary of Merrill.  The March 12, 2007 product supplement for the March 15, 2007 Offering noted that MLPFS is a "broker-dealer subsidiary of [Merrill]."  Similarly, the 6.45% Trust I Preferred

Prospectus Supplement for the December 7, 2006 Offering stated that "[MLPFS], one of the underwriters in the offering, is an affiliate of [Merrill]."

667.    Thus, Merrill is liable under Section 15 as a controlling person for the underlying violations of Sections 11 and 12 by ML Trust I, II, and III, and MLPFS.

### COUNT XV

**(Against Defendants Merrill, O'Neal, Edwards and Deloitte for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 in Connection with the First Republic Registration Statement)**

668.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 and starting at paragraph 432, as if fully set forth herein. For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

669.    The First Republic Registration Statement, including the June 22, 2007 Proxy/Prospectus, contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

670.    All defendants named in this count, jointly and severally, solicited and/or permitted the use of their names in solicitations contained in the First Republic Registration Statement.

671.    Defendants O'Neal and Edwards signed the First Republic Registration Statement or permitted the use of their names in the statement.

672.    Merrill is the issuer of the First Republic Registration Statement.

673.    Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 Annual Report, which were incorporated by reference in the First Republic Registration Statement and June 22, 2007 Proxy/Prospectus. As such, Deloitte expressly permitted the

use of its name to serve as an accounting expert with respect to the offering of the securities issued pursuant to the First Republic Registration Statement and June 22, 2007 Proxy/Prospectus.

674.    Deloitte's unqualified opinions on Merrill's 2006 Annual Report, which were incorporated by reference into the First Republic Registration Statement and June 22, 2007 Proxy/Prospectus, were materially false and misleading.  Contrary to its representations, Merrill's financial statements were not presented in conformity with GAAP.  Accordingly, Deloitte's representations contained untrue statements of material fact and failed to state facts necessary to make the statements not misleading.

675.    By means of the First Republic Registration Statement, defendants sought to secure Lead Plaintiff's approval of the First Republic merger and solicited proxies from Lead Plaintiff and other members of the Class.

676.    Each defendant acted negligently in making untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

677.    The First Republic Registration Statement was an essential link in the accomplishment of the merger.  As a result of the First Republic Registration Statement, the shareholders of First Republic approved the merger.

678.    Lead Plaintiff and Class members eligible to vote on the merger were damaged as a direct and proximate result of the untrue statements and omissions in the First Republic Registration Statement.

679.    This claim is brought within the applicable statute of limitations.

680. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

## XI.    CLASS ACTION ALLEGATIONS

681. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Merrill common stock and/or the following Merrill securities: (i) the 6.45% Capital Trust I Preferred Securities; (ii) the Series 1, 2, 3, 4, 5, 6, and 7 Preferred Stock; (iii) the 6.45% Capital Trust II Preferred Securities; and (iv) the 7.375% Trust III Preferred Securities during the Class Period, inclusive (the "Class"). Excluded from the Class are defendants in this Action and their affiliates; Temasek Capital (Private) Limited; Davis Selected Advisors LP and their affiliates.  Also excluded are present and former employees of Merrill and its subsidiaries who acquired Merrill securities through exercise of warrants, and /or as compensation.

682. The members of the class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 15, 2008, there were 969,007,029 shares of common stock and 2,542,982 exchangeable shares outstanding owned by many thousands of persons.  The First Republic acquisition required the issuance of 1,600,000 shares of common stock.  Millions of preferred shares at issue in this case were outstanding and traded during the relevant period.

683.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the member of the Class which predominate over questions which may affect individual Class members include:

a.    whether the Exchange Act and/or the Securities Act were violated by defendants;

b.    whether defendants omitted and/or misrepresented material facts;

c.    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    whether the Exchange Act Defendants acted with the requisite state of mind;

e.    whether the price of Merrill securities was artificially inflated; and

f.    the extent of damage sustained by Class members and the appropriate measure of damage.

684.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from the defendants' wrongful conduct.

685.    Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

686.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment as follows:

A.    Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Lead Plaintiff Ohio STRS, Plaintiff Kosseff and the members of the

Class damages, including interest;

C.    Awarding Lead Plaintiff's counsel reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just

and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  May 21, 2008                **KAPLAN FOX & KILSHEIMER LLP**

                                                    By: _____
                                                            Robert N. Kaplan
                                                            Frederic S. Fox
                                                            Joel B. Strauss
                                                            Donald R. Hall
                                                            Jeffrey P. Campisi
                                                            Aviah Cohen Pierson
                                                            850 Third Avenue, 14th Floor
                                                            New York, NY 10022
                                                            Telephone: (212) 687-1980
                                                            Facsimile:  (212) 687-7714

DATED: May 21, 2008

BERGER & MONTAGUE, P.C.

By: _____

Merrill G. Davidoff
Lawrence J. Lederer
Arthur Stock
Lane Vines
Jon Lambiras
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

DATED: May 21, 2008

BARRACK, RODOS & BACINE

By: _____

M. Richard Komins
Jeffrey A. Barrack
Robert A. Hoffman
Beth T. Seltzer
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

- and -

Regina M. Calcaterra
1350 Broadway, Suite 1001
New York, NY 10018
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

*Co-Lead Counsel for the State Teachers'
Retirement System of Ohio and the Proposed
Class*

267

DATED: May 21, 2008

**BERGER & MONTAGUE, P.C.**

By: _____

    Merrill G. Davidoff
    Lawrence J. Lederer
    Arthur Stock
    Lane Vines
    Jon Lambiras
    1622 Locust Street
    Philadelphia, PA 19103
    Telephone: (215) 875-3000
    Facsimile: (215) 875-4604

DATED: May 21, 2008

**BARRACK, RODOS & BACINE**

By _____

    M. Richard Komins
    Jeffrey A. Barrack
    Robert A. Hoffman
    Beth T. Seltzer
    Julie B. Palley
    3300 Two Commerce Square
    2001 Market Street
    Philadelphia, PA 19103
    Telephone: (215) 963-0600
    Facsimile: (215) 963-0838

            - and -

    Regina M. Calcaterra
    1350 Broadway, Suite 1001
    New York, NY 10018
    Telephone: (212) 688-0782
    Facsimile: (212) 688-0783

*Co-Lead Counsel for the State Teachers'
Retirement System of Ohio and the Proposed
Class*

267

**MURRAY, FRANK & SAILER LLP**
Marvin L. Frank
Brian Brooks
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

*Counsel for Plaintiff Gary Kosseff*

**SUPPLEMENTAL CERTIFICATION OF
STATE TEACHERS RETIREMENT SYSTEM OF OHIO
PURSUANT TO THE FEDERAL SECURITIES LAWS**

State Teachers Retirement System of Ohio ("STRS") declares, as follows:

1. STRS has reviewed the Consolidated Amended Class Action Complaint to be filed against Merrill Lynch & Co., Inc. and other defendants in the proceedings captioned *In re Merrill Lynch & Co., Inc. Securities, Derivative and ERISA Litig.*, Master File No. 07cv 9633 (LBS)(AJP)(DFE) (S.D.N.Y.).

2. STRS has retained as co-lead counsel in this litigation the law firms of Kaplan Fox & Kilsheimer LLP, Berger & Montague, P.C. and Barrack Rodos & Bacine. By Order dated March 12, 2008, the Court approved STRS' retention of co-lead counsel. STRS did not purchase the security that is the subject of this action at the direction of its counsel or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3. STRS is willing to serve as a representative party on behalf of the class in this litigation and to testify at deposition and trial, if necessary.

4. STRS's transactions in Merrill Lynch securities that are the subject of the Consolidated Amended Class Action Complaint are set forth on Schedule A attached hereto.

5. STRS has not served as, or sought to serve as, a representative party on behalf of a class action filed under the PSLRA during the three-year period preceding the date on which this Certification is signed, except the following:

  a) *Zuckerman v. Scottish Re Group LTD, et al.*, Case No. 06-cv-5853, U.S. District Court, Southern District of New York (Appointed).

  b) *Freudenberg v. E\*Trade Financial Corp., et al.*, Civil Action No. 07-cv-8538 U. S. District Court, Southern District of New York (Application Pending).

  c) *Bakshi v. Samueli*, No. 2:06-cv-5036, U.S. District Court, Central District of California.[1]

  d) *Saltzman v. Citigroup Inc., et al.*, Civil Action No. 07-9901-SHS, U.S. District Court, Southern District of New York (Application Pending).

---

[1] STRS subsequently withdrew its application for appointment as lead plaintiff in *Bakshi v. Samueli.*

Page 1 of 2

6.    STRS will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery as ordered or approved by the Court and any award to it by the Court of reasonable costs and expenses (including lost wages and travel expenses) directly relating to its representation of the class.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this ___/5th___ day of May, 2008.

State Teachers Retirement System of Ohio

By: _____
    William J. Neville

Title: _____
    General Counsel, STRS Ohio

malta436457-005.wpd

Page 2 of 2

| | | OHIO - STATE TEACHERS RETIREMENT SYSTEM (STRS) | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Merrill Lynch & Co., Inc. | | | | | |
| | | Transactions During Class Period: October 17, 2006 through January 16, 2008 | | | | | |
| Trade Date | Transaction Type | No. Shares Bought | Purchase Price / Share | | No. Shares Sold | Price / Share Sold | |
| | | | | | | | |
| HELD 10/16/06 | | 2,143,900 | | | | | |
| | | | | | | | |
| CLASS PERIOD TRANSACTIONS | | | | | | | |
| 10/19/06 | SELL | | | | 1,500 | $84.0250 | |
| 10/23/06 | BUY | 140,000 | $85.4004 | | | | |
| 11/09/06 | SELL | | | | 900 | $87.8911 | |
| 11/09/06 | SELL | | | | 14,959 | $88.4437 | |
| 11/09/06 | SELL | | | | 5,500 | $88.7550 | |
| 11/10/06 | SELL | | | | 5,341 | $87.8597 | |
| 11/13/06 | SELL | | | | 2,500 | $89.6516 | |
| 11/21/06 | SELL | | | | 2,400 | $91.9030 | |
| 12/11/06 | BUY | 600 | $90.7118 | | | | |
| 01/08/07 | SELL | | | | 1,000 | $92.9965 | |
| 01/09/07 | SELL | | | | 2,400 | $92.8091 | |
| 01/19/07 | SELL | | | | 38,000 | $95.6015 | |
| 01/29/07 | SELL | | | | 200 | $93.1437 | |
| 02/15/07 | BUY | 700 | $93.7159 | | | | |

## OHIO - STATE TEACHERS RETIREMENT SYSTEM (STRS)

### Merrill Lynch & Co., Inc.

### Transactions During Class Period: October 17, 2006 through January 16, 2008

| Trade Date | Transaction Type | No. Shares Bought | Purchase Price / Share | | No. Shares Sold | Price / Share Sold |
|---|---|---|---|---|---|---|
| 02/22/07 | SELL | | | | 2,300 | $92.0082 |
| 02/27/07 | BUY | 25,000 | $84.9600 | | | |
| 03/07/07 | SELL | | | | 7,800 | $82.9799 |
| 03/14/07 | SELL | | | | 175,000 | $79.0333 |
| 03/23/07 | BUY | 53,000 | $85.5342 | | | |
| 04/04/07 | BUY | 12,000 | $85.3588 | | | |
| 04/05/07 | SELL | | | | 2,100 | $85.9413 |
| 04/18/07 | BUY | 36,000 | $90.9394 | | | |
| 04/23/07 | BUY | 110,000 | $91.6215 | | | |
| 04/24/07 | BUY | 70,000 | $90.7283 | | | |
| 05/31/07 | SELL | | | | 57,200 | $92.7300 |
| 06/15/07 | BUY | 2,500 | $90.6837 | | | |
| 06/22/07 | BUY | 2,800 | $85.2750 | | | |
| 06/22/07 | SELL | | | | 20,800 | $84.4800 |
| 06/29/07 | BUY | 50,000 | $83.7298 | | | |
| 06/29/07 | BUY | 25,000 | $83.2596 | | | |

| OHIO - STATE TEACHERS RETIREMENT SYSTEM (STRS) | | | | | | |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co., Inc. | | | | | | |
| Transactions During Class Period: October 17, 2006 through January 16, 2008 | | | | | | |
| **Trade Date** | **Transaction Type** | **No. Shares Bought** | **Purchase Price / Share** | | **No. Shares Sold** | **Price / Share Sold** |
| | | | | | | |
| 07/05/07 | BUY | 28,100 | $83.9786 | | | |
| 07/10/07 | SELL | | | | 7,400 | $84.2045 |
| 07/12/07 | SELL | | | | 192,600 | $84.1803 |
| 07/13/07 | BUY | 40,000 | $86.6457 | | | |
| 07/18/07 | BUY | 50,000 | $84.2665 | | | |
| 07/20/07 | BUY | 15,000 | $80.0400 | | | |
| 07/23/07 | SELL | | | | 36,400 | $80.1080 |
| 07/26/07 | BUY | 25,000 | $75.4144 | | | |
| 07/26/07 | BUY | 25,000 | $74.1078 | | | |
| 08/01/07 | BUY | 30,000 | $72.4041 | | | |
| 08/07/07 | SELL | | | | 1,500 | $75.4683 |
| 08/10/07 | BUY | 6,000 | $73.6891 | | | |
| 08/13/07 | BUY | 4,000 | $74.9555 | | | |
| 08/14/07 | SELL | | | | 29,200 | $71.6183 |
| 08/22/07 | BUY | 20,000 | $77.2384 | | | |
| 08/22/07 | BUY | 70,000 | $76.9249 | | | |

| OHIO - STATE TEACHERS RETIREMENT SYSTEM (STRS) | | | | | | |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co., Inc. | | | | | | |
| Transactions During Class Period: October 17, 2006 through January 16, 2008 | | | | | | |
| Trade Date | Transaction Type | No. Shares Bought | Purchase Price / Share | | No. Shares Sold | Price / Share Sold |
| 08/30/07 | BUY | 10,000 | $72.0906 | | | |
| 09/11/07 | SELL | | | | 2,000 | $73.0152 |
| 09/18/07 | SELL | | | | 2,300 | $74.1677 |
| 09/18/07 | SELL | | | | 4,700 | $74.1089 |
| 09/21/07 | BUY | 11,000 | $74.7300 | | | |
| 09/24/07 | ACQUISITION | 788 | $73.6800 | 1 | | |
| 10/01/07 | SELL | | | | 51,400 | $73.5859 |
| 10/10/07 | SELL | | | | 33,800 | $74.3542 |
| 10/10/07 | SELL | | | | 7,600 | $74.4389 |
| 10/15/07 | SELL | | | | 1,200 | $74.3662 |
| 10/23/07 | BUY | 60,000 | $65.5831 | | | |
| 10/30/07 | BUY | 60,000 | $65.9124 | | | |
| 11/02/07 | BUY | 87,000 | $56.7250 | | | |
| 11/05/07 | BUY | 90,000 | $56.4633 | | | |
| 11/08/07 | BUY | 15,000 | $53.3442 | | | |
| 11/08/07 | BUY | 30,000 | $53.6600 | | | |

| OHIO - STATE TEACHERS RETIREMENT SYSTEM (STRS) | | | | | | |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co., Inc. | | | | | | |
| Transactions During Class Period: October 17, 2006 through January 16, 2008 | | | | | | |
| **Trade Date** | **Transaction Type** | **No. Shares Bought** | **Purchase Price / Share** | | **No. Shares Sold** | **Price / Share Sold** |
| 11/28/07 | SELL | | | | 3,700 | $57.2097 |
| 12/06/07 | SELL | | | | 1,600 | $58.1280 |
| 12/26/07 | SELL | | | | 2,400 | $54.0979 |
| 01/14/08 | SELL | | | | 2,400 | $55.3956 |
| **CLASS PD TOTALS** | | **1,204,488** | | | **720,100** | |
| | | | | | | |
| **HELD 04/15/08** | | **2,628,288** | | | | |
| | | | | | | |
| **CLASS PD. RETAINED** | | **1,204,488** | (Class Pd. purchases held at close on 01/16/08) | | | |
| | | | | | | |
| | | | | | | |
| Note: | | | | | | |
| [1]  Merrill Lynch & Co. shares acquired in acquisition of First Republic | | | | | | |

## SUPPLEMENTAL CERTIFICATION

I, Gary Kosseff, do hereby certify that:

1. I have reviewed the Consolidated Amended Class Action Complaint and have authorized its filing.

2. I purchased the securities of Merrill Lynch & Co., Inc., which are included as a subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to the date of this certification, I have sought to serve or served as a representative party on behalf of a class in an action brought under the federal securities laws in the following actions:

*Gary Kosseff v. MBIA, Inc.*, 08-cv-2362 (SDNY)

5. During the Class Period, November 3, 2006 to November 2, 2007, inclusive, I engaged in the following transactions:

### TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| Buy | 8/15/2007 | 200 (7.375% Trust Preferred) | $25.00 |
| Buy | 4/25/2007 | 300 (6.45% Trust Preferred) | $25.00 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on 5/20/2008          Signature _Gary Kosseff_____
                                                    Gary Kosseff

# APPENDIX A

## APPENDIX A

### Definitions

**Asset-Backed Securities ("ABS"):** An ABS is a security that is backed by pooled assets that produce regular streams of payments, including mortgage loans, credit card receivables, home equity lines of credit, car loans and student loans. Residential Mortgage Backed Securities ("RMBS") are a kind of ABS.

**Collateralized Debt Obligation ("CDO"):** A CDO is a structured finance product that securitizes pools of asset-backed securities into multiple classes of notes from the cash flows generated by such assets. The securities issued by a CDO are divided into tranches of rated and unrated classes of notes and equity. The rating of each note class is determined by its position in the priority of payments and other rating criteria. Payments of interest and principal to the various note classes issued by a CDO are generally made sequentially, such that payment is first made to the most senior class and then to other classes, in the order of their subordination. These payments are made from the cash flows received from the underlying assets, which can include RMBS and CDS.

**CDO Squared:** CDOs with underlying collateral consisting of other CDO securities that have collateral attributes typically similar to high grade and mezzanine super senior positions.

**Credit Default Swap ("CDS"):** A type of credit derivative contract whereby counterparty agrees to make periodic payments to another counterparty in return for making a payment upon default by the obligor of a referenced debt obligation.

**London Interbank Offered Rate ("LIBOR")**:  An interest rate at which banks can borrow funds, in marketable size, from other banks in the London interbank market. The LIBOR is fixed on a daily basis by the British Bankers' Association. The LIBOR is derived from a filtered average of the world's most creditworthy banks' interbank deposit rates for larger loans with maturities between overnight and one full year.

**Mezzanine Debt:** Collateral having an average credit rating of Baa2/Baa3 by Moody's Investor Services.

**Residential Mortgage Backed Securities ("RMBS")**:  Debt obligations that represent claims to the cash flows from pools of mortgage loans on residential property. The CDOs at issue in this Action were typically backed, at least in part, by RMBS. Mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools by the acquiring entity. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization.  During 2006 and throughout the Class Period, most of the RMBSs used as the basis for assets in the CDOs that Merrill underwrote were backed by subprime residential mortgages.

**Synthetic CDO:** CDOs with underlying collateral in part consisting of assets of derivatives, such as CDS.

**Super Senior Positions:** According to Merrill, super senior positions represent its exposure to the senior most tranche in a CDO's capital structure. In bankruptcy, this tranche's claims have priority to the proceeds from liquidated cash CDO assets. Merrill's exposure to AAA-rated super senior CDOs included the following securities, which were primarily held as derivative positions in the form of total return swaps: High-grade super

2

senior positions, which are CDOs with underlying collateral having an average credit rating of Aa3/A1 by Moody's Investor Services; Mezzanine super senior positions, which are CDOs with underlying collateral having an average credit rating of Baa2/Baa3 by Moody's Investor Services; and CDO-squared super senior positions, which are CDOs with underlying collateral consisting of other CDO securities, which have collateral attributes typically similar to high grade and mezzanine super senior positions.

**Total Return Swap ("TRS"):** A Total Return Swap is a bilateral financial transaction where the counterparties swap the total return of a single asset or basket of assets in exchange for periodic cash flows, typically a floating rate such as LIBOR +/- a basis point spread and a guarantee against any capital losses.

**U.S. ABS CDO:** According to Merrill's SEC filings, "an ABS CDO is a security collateralized by a pool of asset-backed securities. The underlying collateral for these asset-backed securities is primarily residential mortgage loans."

During the Class Period, Merrill was "engaged in the underwriting and sale of ABS CDOs." According to Merrill, "[t]here are a number of steps involved in the underwriting process beginning with determining investor interest or responding to inquiries or mandates received. We also engage a CDO collateral manager who is responsible for selection of the ABS securities that will become the underlying collateral for the CDO securities subject to our approval. All CDO securities are rated by one or more rating agencies. The various tranches of the CDO are securitized, priced at representative market rates and distributed to investors, or in some cases, retained by Merrill Lynch."

**Value at Risk ("VaR"):** According to Merrill's SEC filings, VaR is as "a statistical measure of the potential loss in the fair value of a portfolio due to adverse movements in underlying risk factors." Throughout the Class Period, Merrill represented that the VaR disclosed for a particular period was an estimate of the amount that Merrill's current trading portfolios could lose with a specified degree of confidence, over a given time interval. According to Merrill, the aggregate VaR for Merrill's trading portfolios was less than the sum of the VaRs for individual risk categories because movements in different risk categories occur at different times and, historically, extreme movements have not occurred in all risk categories simultaneously. According to Merrill, the difference between the sum of the VaRs for individual risk categories and the VaR calculated for all risk categories disclosed by Merrill for a particular period could be viewed as a measure of the diversification within Merrill's portfolios.

Further Merrill represented that:

> We believe that the tabulated risk measures provide broad guidance as to the amount we could lose in future periods, and we work continually to improve our measurement and the methodology of our VaR. However, the calculation of VaR requires numerous assumptions and thus VaR should not be viewed as a precise measure of risk. In addition, VaR is not intended to capture worst case scenario losses. To calculate VaR, we aggregate sensitivities to market risk factors and combine them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options.

**Certificate of Service**

I, Aviah Cohen Pierson, declare that, on May 21, 2008, I caused a true and correct copy of the Consolidated Amended Class Action Complaint to be filed with the Court.

Copies of the same were served upon counsel listed below via email.

Christopher Malloy
Scott D. Musoff
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
christopher.malloy@skadden.com
scott.musoff@skadden.com

*Counsel for Defendants Merrill Lynch & Co., Inc.;*
*Merrill Lynch Capital Trust I; Merrill Lynch*
*Capital Trust II; Merrill Lynch Capital Trust III;*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated; Stanley O'Neal; Ahmass Fakahany;*
*Gregory Fleming; and Jeffrey N. Edwards*

_____
Aviah Cohen Pierson