financial institutions may also enable them to shift losses elsewhere. And a menu of choices offered to companies by accounting rules allows management to decide whether to recognize certain losses or push bad news into the future. . . .markets are going to have to keep guessing about where losses are and how bad they could be. While serious problems have yet to emerge for many larger financial players, it is "likely that institutions have large embedded losses" that are so far being hidden.

The mystery of 'where are the losses?' has confounded hedge funds searching for opportunities to bet against banks whose day of reckoning has yet to come. 'We've been looking for financials that show losses from these securities on their books, and they've been very difficult to find. It's very opaque" says Keith Long, president of a hedge fund with $150 million in assets.

David Reilly and Karen Richardsom, *Subprime Detectives Search in Dark for Next Victim --- Wall Street Can Bury Mistakes in Fine Print,* Wall St. J., Aug. 2, 2007.

178.    By the end of June 2007, Merrill Lynch had accumulated at least $43 billion in net exposure to CDO securities and subprime mortgages. The warnings of trouble had accumulated since at least September of the previous year, but in its June 2007 10-Q (published in August of 2007), Merrill Lynch did not disclose the extent of their exposure. Commentators have acknowledged that Merrill Lynch was "sitting on rotting piles [of] highly suspect, thinly traded securities [sic] [that nobody wanted to touch]." Tully, *supra.* As described *infra*, Merrill Lynch withheld this information from the public until October 24, 2007, when it first disclosed its CDO and subprime related securities exposure. *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007).

179.    On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy. Associated Press, *American Home Mortgage Seeks Chapter 11 Bankruptcy Protection*, N.Y. Times, Aug. 7, 2007.

180.    On August 9, 2007, French bank BNP Paribas stopped valuing three of its funds and suspended all withdrawals by investors after United States subprime mortgage woes had

caused "a complete evaporation of liquidity." Simon Kennedy, *BNP Suspends Funds Amid Credit-Market Turmoil*, MarketWatch, Aug. 9, 2007.

181.    On August 14, 2007, Thornburg Mortgage, a jumbo mortgage lender, announced it was delaying its dividend after facing margin calls and disruptions in funding mortgages in the commercial paper and asset-backed securities markets. Thornburg shares fell over 46% on the news. Alistair Barr, *Thornburg Mortgage Delays Dividend Amid Margin Calls*, MarketWatch, Aug. 14, 2007.

182.    On August 16, 2007, Countrywide Financial Corporation, the biggest U.S. mortgage lender, narrowly avoided bankruptcy by taking out an emergency loan of $11 billion from a group of banks.[28] "In the wake of the subprime meltdown, Countrywide Financial -- along with many other mortgage lenders-- finds itself with a heavily devalued loan portfolio." Evelyn M. Rusli, *Countrywide Breaks Into the Piggy Bank*, Forbes, Aug. 16, 2007. The price of Countrywide stock dropped 20.9% in one day after news of its liquidity problems was released.

183.    On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts. Steven R. Weisman, *Bush Plans a Limited Intervention on Mortgages*, N.Y. Times, Sept. 1, 2007.

184.    On August 31, 2007, Ameriquest, the largest subprime lender in the U.S. as of 2005, announced it was going out of business. Jonathan Stempel, *Ameriquest Closes, Citigroup Buys Mortgage Assets*, Reuters, Sept.1, 2007.

185.    On September 14, 2007, BBC News reported a run on the bank at Northern Rock Bank (a U.K. bank), which was precipitated by liquidity problems related to the subprime crisis. The Bank of England agreed to give emergency financial support to the Northern Rock, one of

---

[28]    On August 16, 2007, Countrywide announced that its ongoing liquidity problems (due to the drop off in demand for non-agency mortgage backed securities) had forced it to draw on its entire $11.5 billion credit line.

the U.K.'s largest mortgage lenders. *Northern Rock Gets Bank Bail Out*, BBC News, Sept. 13, 2007.

186.    By the Fall of 2007, the government decided to intervene in the credit crisis to prevent further damage to the economy.  On October 15, 2007, a consortium of U.S. banks backed by the U.S. government announced a "Super-SIV" between $75-80 billion to purchase mortgage backed securities whose mark-to-market value plummeted in the subprime collapse. Gillian Tett, Krishna Guha, & David Wighton, *Banks Agree $75bn Mortgage Debt Fund*, Financial Times, Oct.15, 2007.

187.    On December 21, 2007, the plan for the "super fund" was abandoned.  David Ellis and Ben Rooney, *Banks to Abandon 'Super-SIV' fund: Citigroup, JPMorgan and BofA Cancel Plans for a Mortgage Backed Securities Rescue Fund, but Leave the Door Open in Case of More Credit Woes,* CNNMoney.com, Dec. 21, 2007, *available at* http://money.cnn.com/2007/12/21/ news/companies/super_siv/index.htm.

188.    On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200-300 billion.  *The Credit Crunch:  Postcards From the Ledge*, The Economist, Dec. 19, 2007.

189.    On January 11, 2008, Bank of America made an agreement to bailout Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before. *See* Mark DeCambre, *BofA to Buy Countrywide*, TheStreet.com, Jan.11, 2008, *available at* http://www.thestreet.com/s/bofa-buys-countrywide-for-4b/newsanalysis/banking/10398119.html?puc=googlefi.

6.    **Defendant Merrill Lynch Knew the CDO Securities Underwritten and Purchased by Merrill Lynch were Risky and Illiquid Securities Despite their AAA Ratings.**

190.    Given the large number of AAA CDOs that have been downgraded to junk or have defaulted, various investigatory bodies and Wall Street analysts have questioned why any tranche of correlated triple B rated assets should have received a AAA bond rating simply because it had been repackaged into a new security.

191.    For example, 75% of the issuance of one of Merrill Lynch's CDOs, Norma CDO I Ltd. ("Norma"), was initially rated AAA despite the fact that its underlying assets were largely of credit default swaps on "triple B" (the lowest investment-grade rating) mortgage backed securities and securities of other CDOs.  Within less than a year Moody's downgraded seven of the nine tranches to junk and Fitch downgraded all nine tranches to junk.  Mollenkamp & Ng, *supra.*

192.    Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime mortgage related securities (29%).  The three tranches that were downgraded to junk were initially rated AAA , AA  and BBB (all investment grade).

193.    According to Henry Paulson's Policy Statement on Financial Market Developments, underwriters of CDOs "shopped" for credit ratings in the process of issuing new CDO securities.  CDO underwriters often did not disclose to investors in their CDOs the preliminary ratings they received from the Credit Rating Agencies.  *See* The President's Working Group on Financial Markets, *Policy Statement on Financial Market Developments*, Mar. 13, 2008.

375471.2 2

194.    In fact, Mr. Riccardi (head of Merrill Lynch CDO group) "was in frequent contact with rating firms like Moody's Investors Service and Standard & Poor's, say former analysts, pushing to get the best possible ratings on securities issued by his group. A former managing director at one rating firm says Mr. Ricciardi sometimes personally lobbied senior rating executives for better ratings[.]" Ng & Mollenkamp, *Pioneer Helped Merrill Move into CDOs*, *supra*.

195.    Andrew Cuomo, Attorney General of New York, initiated a subprime investigation to determine whether Merrill Lynch had concealed information from credit-rating agencies (i.e., the warnings it received about exceptions or mortgages that did not meet minimum lending standards) in an effort to bolster ratings of mortgage securities and make them more attractive to buyers. *See* Kate Kelly, Amir Efrati & Ruth Simon, *State Subprime Probe Takes a New Track*, Wall St. J., Jan. 31, 2008.

196.    "The whole idea," says Brad Hintz of Bernstein Research, "is taking a pool of risky, illiquid bonds and, through the magic of securitization, offering higher yields than on similarly rated securities." Tully, *Wall Street's Money Machine Breaks Down: The Subprime Mortgage Crisis Keeps Getting Worse-and Claiming More Victims, supra*.

197.    Merrill Lynch received fees every time it securitized and re-securitized subprime mortgages into subprime related securities (e.g., CDO securities).  For example, Merrill Lynch first earned underwriting fees from repackaging (securitizing) subprime mortgages into mortgage backed securities.  Then Merrill Lynch earned additional fees by repackaging mortgage backed securities into CDO securities.  Then Merrill Lynch earned still more fees from repackaging the CDO securities into new CDO securities (known as "CDO squared" securities).  In fact those

CDO securities were then sometimes repackaged again for additional underwriting fees into "CDO cubed" securities.[29]



Note: CDOs that securitize assets comprised of CDO securities are referred to as "CDO squared" and CDOs that add another layer of securitization are referred to as "CDO cubed." Mollenkamp & Ng, *supra*.

198. The practice of re-securitizing subprime related assets that have already been securitized once, twice or even three times generated fees for the handful of big banks who were heavily involved in subprime underwriting without actually adding value in the repackaging process. This was because the purchasers of the CDO securities was a rather small pool of investors (mostly other banks who needed CDO securities to repackage into new CDOs). Normally the purpose of a CDO is to spread the risks of uncorrelated assets among a pool investors willing to take on different amounts of risk through the new CDO securities that are separated into tranches. *Id.*

199. Merrill Lynch's securitization shenanigans produced short-term gains in the form of fees, but exposed the Company to massive and unacceptable risk. "Everyone was passing the risk to the next deal and keeping it within a closed system," says Ann Rutledge, a principal of R&R Consulting, a New York structured-finance consultancy. "If you hold my risk and I hold yours, we can say whatever we think its worth and generate fees from that. It's like . . . creating artificial value." *Id.*

---

[29]/     Merrill Lynch's underwriting fees averaged 1.25% of its total deal volumes, or around $12.5 million for each $1 billion RMBS or CDO issuance (i.e., every time assets were repackaged into new subprime related securities, they took additional underwriting fees).

56

200.    Such cross-selling benefited banks like Merrill Lynch in the short-term because it helped support the flow of new CDOs and underwriting fees. Each CDO sold some of its CDO securities to the next CDO, which could repackage those securities again into a new CDO issuance to provide additional underwriting fees. Critics say the cross-selling reached such proportions that it artificially propped up the prices of CDO securities.[30]  *Id.*

201.    "It is a tangled hairball of risk," according to Janet Tavakoli, a Chicago consultant who specializes in CDOs, who described how risky Norma's CDO securities were in the following terms: "In March of 2007, any savvy investor would have thrown this . . . in the trash bin." Mollenkamp & Ng, *Wall Street Wizardry Amplified Credit Crisis – A CDO Called Norma Left 'Hairball of Risk': Tailored by Merrill Lynch, supra.*

202.    Moreover, the fact that Merrill Lynch paid money to enter credit default swap contracts with non-investment grade counterparties (with doubtful ability to make good on their obligations) to "insure" against the risk of loss of its portfolio of "super senior" CDO and subprime securities, demonstrates that the Company knew that these securities were risky and illiquid assets, despite their initial AAA rating. Since then, the fact that many of Merrill Lynch's CDOs have been downgraded to junk or are in default, confirms that the Company knew long before they disclosed this information to its employees and the investing public.

203.    As the *Wall Street Journal* reported: "There isn't an active market for many CDOs, and they don't have observable prices. Instead, to value such securities, companies and investment funds often rely on quotes from dealers, which may be unrealistic, out of date or based on their own internal investment models." David Reilly and Karen Richardsom, *Subprime*

---

[30]    The Wall Street Journal reported that, according to Greg Medcraft, Chairman of the American Securitization Fourm, the use of derivatives "multiplied the risk," of the newly issued CDO securities. "The subprime mortgage crisis is far greater in terms of potential losses than anyone expected because it is not just physical loans that are defaulting." Mollenkamp & Ng. *supra.*

375471.2 2

*Detectives Search in Dark for Next Victim --- Wall Street Can Bury Mistakes in Fine Print,* Wall St. J., Aug. 2, 2007.

204. In addition, banks like Merrill Lynch with CDO and subprime securities, have sold risky securities into off-balance-sheet vehicles. "In theory, investors shouldn't have to worry once such a sale occurs. But in practice, banks can still bear some risk associated with them." *Id.*

205. Another way companies and banks can hide losses on securities backed by risky mortgages is to classify them for accounting purposes as being "held to maturity." "This effectively precludes a company or bank from selling the security, but also means that it does not have to mark the security to market on its books. Instead, the security stays on the books at its historical cost. Investors won't know if companies tried this maneuver until they file annual results for 2007, in which case they would have to disclose the amount of securities classified this way during the year," said Edward Ketz, an accounting professor at Pennsylvania State University. *Id.* Such conduct by Merrill Lynch contributed to the artificial inflation of Merrill Lynch's stock price during the Class Period.

**B.      Defendants Cause or Permit the Purchase of Merrill Lynch Stock as Defendants Merrill Lynch and O'Neal Tout Merrill Lynch's Financial Health, Despite Knowledge of Merrill Lynch's Inadequately Disclosed Stock Risk.**

206. Throughout the Class Period, Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances to the Plans' participants and the public regarding the sufficiency of its risk-management processes to the Plans' participants. These false statements caused the price of Merrill Lynch stock to be artificially inflated during the Class Period.

207. Defendant Merrill Lynch necessarily knew its own financial condition and O'Neal's position as CEO within the Company indicates that he had access to adverse

58

375471.2 2

undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof, and via reports and other information provided them in connection therewith.

208.    Because of his access to this information, Defendant O'Neal knew or should have known that Merrill Lynch's common stock was an imprudent investment during the Class Period. All of this information about the riskiness of Merrill Lynch shares was within the knowledge of Defendant Merrill Lynch. Because of the steady drumbeat of published warnings, the remaining Defendants should have conducted an independent investigation of the risks posed by Merrill Lynch stock during the Class Period, and had they done so would have learned the extent of the risk. No prudent fiduciary would allow employees to invest in a company facing (and hiding) the tremendous risks Merrill Lynch took on during the Class Period, including subprime and CDO related exposures greater than the total book value of the Company.

209.    Nonetheless, the Plans' fiduciaries continued to offer Merrill Lynch stock as an investment option and permitted the Plans to purchase additional shares even during the time that the stock collapsed in value as a result of the collapse of the CDO and subprime markets. A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans' assets devalued so quickly.

210.    Despite the Defendants' knowledge or what should have been their knowledge of Merrill Lynch's risky business practices during the Class Period, the Company fostered a

positive attitude toward Merrill Lynch stock as an investment for the Plans' assets.

Management, including Defendant O'Neal, touted strong Company performance and stock

benefits. Employees were continually told positive news by Company executives about Merrill

Lynch's growth (e.g., numerous employee newsletters, memos and letters, including a July 2007

memo from Defendant O'Neal to employees, described above) and were led to believe that

Merrill Lynch stock was a good investment, and that the Plans were prudently managed.

211.    Merrill Lynch publicly and repeatedly highlighted favorable operating results,

artificially favorable revenue growth trends, and other positive financial indicators, which were

later found to be misleading, including the following.

212.    In a January 2007 newsletter addressed to employees, Merrill Lynch titled the

cover story: *Precise Execution Yields Record Quarter and Record Year.* The Company stated:

"Dear Colleagues: Congratulations on a great quarter and a great year!" Defendant O'Neal

stated: "By virtually any measure, our company completed the most successful year in its

history."[31] *See* Merrill Lynch January 2007 Memo, *Precise Execution Yields Record Quarter

and Record Year,* Jan. 22, 2007.

213.    When asked about how Merrill Lynch would stay competitive with Goldman

Sachs, Morgan Stanley and Lehman Brothers, Defendant O'Neal highlighted "the principal risk

taking that we've accelerated and developed a lot." Then Dow Kim stated:

> To Stan's point, I think it's fair to say that we have caught up versus a lot
> of these firms - Goldman, Morgan Stanley and Lehman - especially in the
> past 18 months or so, and the momentum is incredibly strong. We have to
> stay disciplined in terms of continuing to invest in some of the key areas,
> but I would say that we no longer have any major gaping holes in any of
> the asset classes, functions or geographic locations. It will be a matter of

---

[31]    During a Q&A session with employees, "Management Update Q & A: 4Q and Full Year 2006," when an employee asked Defendant O'Neal whether the Company should split its stock as it approached $100 per share, Defendant O'Neal did not temper such optimism. Instead he said noted that the level of stock price (close to an all time high) provided options.

375471.2 2

> continuing to build out these major areas as we have done so in the past 18 months. But we are in great shape and we have a tremendous amount of momentum going into 2007.

*Id.*

214.    On January 18, 2007, Merrill Lynch reported its financial results for the fourth quarter and full year 2006, in a release in which Defendant O'Neal touted:

> By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent.

*See* Merrill Lynch Current Report 8-K (Jan. 18, 2007), at Ex. 99.1. On that date, the Company's stock closed at $95.40 per share.

215.    During a Fourth Quarter 2006 Earnings Call on January 18, 2007, Jeffrey N. Edwards, Senior Vice-President and Chief Financial Officer stated:

> [O]ur Investment Banking business continued to make great strides ranking number one for the quarter in global equity and equity linked underwriting league tables and number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space. For the year we also ranked in the top five in global high yield origination for the first time since 1998, and this is the first year since 2003 that any non-commercial bank player has cracked the top five in this crucially important product category.

216.    On February 26, 2007, Merrill Lynch released its 2006 10-K annual report, which mentioned the word "subprime" (or "sub-prime") only three times and never mentioned the word "CDO" (or "Collateralized Debt Obligation"). Merrill Lynch also falsely represented that its "risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management." 2006 10-K. On that date, the Company's stock closed at $86.66 per share.

61

217.    Merrill Lynch also stated in its 2006 10-K that it retained only $6.8 billion worth of all securitizations in 2006, which included CDOs:

> In certain instances, Merrill Lynch retains interests in the senior tranche, subordinated tranche, and/or residual tranche of securities issued by certain SPEs created to securitize assets.
>
> Retained interests in securitized assets were approximately $6.8 billion and $4 billion at December 29, 2006 and December 30, 2005, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities have observable market prices. These retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity.

*Id.*

218.    In a March 9, 2007 memo to employees, Merrill Lynch touted its purchase of First Franklin despite the fact that much had been made in the press at that time about potential credit problems in the U.S. non-prime mortgage markets and the operations of Merrill Lynch and other major securities firms.[32]  *See* Merrill Lynch March 2007 Memo, *Talking Points on MER's Non-Prime Mortgage Business,* Mar. 9, 2007.  The memo stated: "Part of the reason we chose First Franklin, after having looked at many other companies in the space, was the quality of its management team, which, combined with our own risk management expertise gives us confidence in our ability to manage the risks in this business across market cycles."[33]  *Id.*

219.    Strangely, the Company tried to assuage fears among employees about CDO and subprime exposure with its announcement that it had agreed to buy a mortgage originator.  The Company stated: "We do not intend to keep the loans First Franklin originates on our books -- we aim to package them into securitizations as quickly as possible and sell them to investors; this

---

[32]    First Franklin is a mortgage company which catered to subprime borrowers.

[33]    Later, on March 5, 2008, Merrill Lynch announced it was discontinuing mortgage origination at First Franklin due to the deterioration of the subprime lending market.

sometimes means we will keep retained interests in the securitizations on our balance sheet." *Id.*

The Company was optimistic despite concerns about subprime stating: "We are a global

company with many, many other profitable business lines for which the environment is still quite

favorable. While it is easy to be unnerved by one sector having trouble and generating headlines

after a period of time where virtually all our businesses were performing strongly, it is important

to keep the business in its proper perspective." *Id.*

> 220.    The Company went so far as to say:

> Ironically, the current malaise in the sector could prove to be strongly positive for
> Merrill Lynch over the longer term, as the lower-quality participants run the
> marketplace capitulate, we should actually have the opportunity to gain market
> share and be better positioned for the eventual cyclical recovery. While our non-
> prime mortgage business is not immune to the current market environment, it is
> important to note that we have been through many periods in the past where
> individual sectors or regions have seen temporary downturns – this is nothing
> new, and is, in fact, expected. Nearly all of the businesses we operate in have
> some cyclicality to them, and it is for that reason that diversification of revenue
> and earnings sources is a key element of our strategy.

*Id.*

> 221.    On April 19, 2007 Merrill Lynch issued its first quarter 2007 financial results

stating:

> Revenues from mortgage-related activities declined, resulting from a difficult
> environment for the origination, securitization and trading of non-prime mortgage
> loans and securities in the U.S. Revenues from activities related to U.S. non-
> prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total
> net revenues over the past five quarters.

Merrill Lynch Current Report 8-K (Apr. 19, 2007), at Ex. 99.1.

> 222.    Nonetheless, Defendant O'Neal stated: "This was a terrific quarter. In an

environment which was volatile at times, we took full advantage of market opportunities and

delivered value to our clients and our shareholders . . . Our product capabilities and geographic

reach are stronger and broader now than at any point in our history, and we continue to make

63

investments to further enhance our franchise.  We remain focused on disciplined growth to

capitalize on the positive secular trends we continue to see unfold."  *Id.*

  223. In the first quarter conference call with analysts on April 19, 2007, Edwards, the

CFO of Merrill Lynch, stated:

> I want to pause here to make a few comments about our U.S. subprime mortgage
> business, since I know it has been a topic of much discussion and speculation. Let
> me put this business into context.  As we noted in our earnings release, if you
> looked at both last year and the first quarter of this year and added up all of the
> origination, securitization, warehouse lending, trading and servicing revenues,
> both directly in our subprime business as well as our CDO activity involving
> subprime, including all the retained interests, you would see that revenues from
> subprime mortgage-related activities comprise less than 1% of our net revenues
> for those five quarters.  And even if you were to incorporate, pro forma, the
> revenues of First Franklin as if they were a part of our firm for all of 2006, the
> aggregate contribution would still be less than 2%.
>
> That said, this is an asset class that will continue to be significant, both in the U.S.
> and worldwide.  And the strategic importance of the First Franklin acquisition
> was clearly evident this quarter, as having both origination and servicing
> capabilities enabled us to see trends emerge sooner and adjust underwriting
> standards and pricing more rapidly.
>
> I would also point out that our risk management capabilities are better than ever,
> and crucial to our success in navigating turbulent markets.  In fact, we've been
> capitalizing on the market dislocation by recruiting the best talent from
> competitors, and we fully expect to emerge from this cyclical downturn even
> better positioned.
>
> At this point, we believe the issues in this narrow slice of the market remain
> contained and have not negatively impacted other sectors.  Finally, it's important
> to understand that we manage our FICC businesses in aggregate as a portfolio and
> that portfolio delivered record revenues for the quarter.  On a broader basis, most
> FICC markets experienced a continued favorable environment characterized by
> both high levels of client activity and opportunities for proprietary trading,
> enabling outstanding results as we continue to build out our capabilities in areas
> that are poised for growth.

  224. During this April 19, 2007 call, Investment Analyst William Tanona, of Goldman

Sachs, asked Edwards:

> **Q - William Tanona**: …And then, your commentary there in terms of sharing
> risk, obviously I think there is a lot of concern out there because you guys are

64

pretty active on the CDO side and the warehouse side of that business. Can you share your thought process as it relates to that and what the trends you are seeing there in the overall business, as well as possibly even in the subprime space there?

**A - Jeffrey Edwards**: Well, it was a very active quarter for securitizations, both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw the tension in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter, 19 of them were ABS CDOs and more than 10 of those deals were in the first couple of weeks of March, so while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume. And on the subprime business, maybe just a couple of more comments there.

While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. And we did that in a background where we were enhancing our already strong underwriting standards. We rationalized our array of products, eliminating certain products that were performing less well, and we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin, of First Franklin-originated paper fall steadily throughout the quarter. They started out and remain at a level far below the industry.

So I think the trends there show some signs of positiveness, and while it is early to say anything obviously about the second quarter, I'd just point out that we did our First Franklin securitization earlier in the week. It was a $2 billion securitization and we saw spreads tighter really across all tranches from where they were a month ago, as investors have clearly begun to reengage.

*Id.*

225.    On April 24, 2007, in a letter to employees, Defendant O'Neal, stated:

Last week, the firm reported its best first quarter results ever, powered by record net revenues in each of our three main GMI businesses. Our portfolio of businesses generated a record $6.5 billion in revenues for the quarter. This outstanding performance shows the effectiveness of our strategy and affirms our powerful momentum. . . . Thanks to all of you, we've gotten off to a great start for 2007 and have a lot to be proud of. It's clear that the investments we've made to diversify our platform across regions, asset classes and clients are yielding exemplary results. Congratulations on our great start! Stay focused. Stay intense. And expect to win!

*See* Merrill Lynch April 2007 Memo, *GMI Starts 2007 with Best Ever First Quarter*, Apr. 24, 2007.

375471.2 2

226.    Merrill Lynch did not mention concerns expressed by many stock analysts during a recent earnings call about subprime exposure in general and the First Franklin acquisition in particular.[34]

227.    In a letter to employees dated April 30, 2007, the Company stated "We should all have reason to feel proud of our results, which speak directly to our renewed capacity to adjust to swiftly changing market conditions." Defendant O'Neal pointed to the fact that the Company was, **"Racking Up Record Results"** and **"Succeeding in a Volatile Environment"** noting that "We are achieving consistent growth in revenues, earnings and returns through disciplined investing and solid execution, and I am confident that we can continue to deliver outstanding results." *See* Merrill Lynch April 2007 Memo, *A Note from Stan O'Neal: First Quarter Results,* Apr. 30, 2007.

228.    On May 7, 2007, the Company reported that:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices. The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.

Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 30, 2007) (hereinafter, "First Quarter 2007 10-Q").

229.    In a May 23, 2007 letter to employees announcing a "New Organizational Structure and Leadership Team," the Company stated: "Under Stan's leadership, we reshaped, re-engineered and rethought how we do business at Merrill Lynch. The results speak for

---

[34]    *See* discussion *infra, page ?.*

themselves. . . We are excited by the opportunities we see ahead of us -- and confident that by working with each of you -- we will deliver the full potential of Merrill Lynch to our clients, shareholders and employees." *See* Merrill Lynch May 23, 2007 Memo, *New Organizational Structure and Leadership Team*, May 23, 2007.

230.    In July 2007, Merrill Lynch also reported its second-best ever net revenues for the FICC business, with little impact from exposure to mortgage-backed securities but failed to account for the actual valuation of the Company's warehouse of increasingly illiquid CDOs. Merrill Lynch continued to tout the CDO business, citing "continued innovation in the CDO space, including the development of unique new CDO products" among the second quarter highlights for FICC. *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5. Yet, the Company's FICC net revenues were in fact "partially offset by a *decline* in net revenues from the structured finance and investments business, which includes mortgage-related activities." *See* Merrill Lynch Current Report 8-K (July 17, 2007), at Ex. 99.1 (emphasis added).

231.    During the July 17, 2007 earnings call, Merrill Lynch re-affirmed its risk-management capabilities.  Edwards, who was responsible for the Company's independent risk groups, explained that: "[w]hile we have seen some positive signals . . . the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize.  Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and *ours have proven to be effective in mitigating the impact on our results*." *Merrill Lynch Second Quarter 2007 Analyst Conference Call,* July 17, 2007, at 5 (emphasis added).

375471.2 2

232.    Edwards also answered questions from UBS Investment Analyst Glenn Schorr and Deutsche Bank's Mike Mayo during the call and reassured investors and the market that the Company was prepared to weather the volatile CDO market:

**Q - Glenn Schorr**: ... Can we switch to the other one that you brought up, in terms of both subprime and CDO exposure? You are one of the largest – or the largest – underwriter of CDOs, and maybe try to give some color around myth versus reality in how people should think about a) what's on your books in terms of residuals and exposure, and b) maybe even comment on related to some of the Bear hedge funds what collateral you have taken on your books or have not. And just overall comfort there, as well.

**A - Jeffrey Edwards**: Okay. Well, look, again I want to make two points. The first is that this is another example where I think proactive, aggressive risk management has put us in exceptionally good position. Obviously the market has gone through a period of flux. We think that remains the case. But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market. Our warehouse lines are down materially, our whole-loan inventory is down materially. As was the case in the last quarter, we will see a modest increase in our residual position, but it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market. ...

**Q - Glenn Schorr**: Maybe just a last thing, yes or no – obviously, yes – but point of clarification, therefore anything you're financing in your repo business or through your prime brokerage business or on your own books, you've, to the best of your knowledge at the end of quarter is marked to an effective market even if it is a mark to model type of security?

**A - Jeffrey Edwards**: Yeah, that's right. I mean, obviously we have a very robust process around marking these assets, and we're confident in how they were marked, how they'll mark.

*** 

**Q - Mike Mayo**: ...Can you remind us what percent of your earnings are related to mortgage or subprime mortgage, and if you could include in that CDOs and warehouse lines or anything else?

**A - Jeffrey Edwards**: Well, just to remind everybody, we made the comment in the first quarter that over the previous five quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. I don't

think there's anything that would change that comment that I made in the first quarter.

**Q - Mike Mayo**: Then lastly, a tougher question perhaps, how much of your capital is at risk or how much in total assets do you have that's somehow related to that same category?

**A - Jeffrey Edwards**: Well, we obviously have a robust economic capital model that we employ to address risk around all of our different assets. From an overall asset standpoint, again the point I would make there is that there's been, we think, an important transformation of the components of that asset base where the exposure that we retain is in the higher-rated tranches of the exposure, and what we've done is reduce exposure in some of the broader or lower-rated categories.

**Q - Mike Mayo**: Okay. Do you have an overall number, though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**A - Jeffrey Edwards**: We don't disclose our capital allocations against any specific or even broader group.

*Id.*

233.    During the same Second Quarter 2007 Earning Call, Edwards claimed that:

"Proactive aggressive risk management has put us in an exceptionally good position." *Id.*

However, he failed to disclose that the Company had $43 billion dollars in exposure to risky and

illiquid CDO securities and subprime mortgages; that crucial information was withheld until

October 24, 2007. *See* discussion *infra*.[35] *See also* Merrill Lynch Current Report 8-K (Oct. 24,

2007).

234.    According to the *New York Times*, Merrill Lynch's Board of Directors had been

informed of its subprime exposure and CDO obligations as early as April and July 2007,

respectfully.  Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y.

Times, Nov. 4, 2007.  Despite the Company's vast exposure to CDOs and subprime mortgages,

the Board, and in particular Defendant O'Neal, failed to take any action to decrease the risks

---

[35]    The Company first disclosed in its October 24, 2007 8-K that it had $40.1 billion of CDO and subprime related net exposure as of June 29, 2007. *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007). However, in its September 2007 10-Q filed with the SEC on November 7, 2007, the Company restated the value of its June 29, 2007 CDO and subprime net exposure at $42.7 billion. Third Quarter 2007 10-Q.

faced by the Company and the Plans. The Plans' other fiduciaries likewise did nothing to protect the Plans from the increasing risks posed by the acquisition and holding of Merrill Lynch shares particularly in light of the failure to make adequate disclosures.

235.    Disclosing its exposure from its proprietary positions in CDO and subprime securities was critical for employees and investors to understand the true risk of owning Merrill Lynch stock because the subprime crisis would not have been "a dire problem for Merrill if it hadn't gone from simply manufacturing CDOs and reaping fees to becoming a huge investor in the CDOs it created . . . Merrill was willing, even eager, to speculate with its own balance sheet[.]" Tully, *supra*.

236.    In July 2007, Defendant O'Neal sent a memo to employees who were participants in the Plans praising the Company's performance, particularly its risk management. Defendant O'Neal stated that despite scrutiny in the media and by clients, partners, and business prospects, "we demonstrated our discipline, focus and resilience during a period when market conditions were turbulent. . . . confirming the wisdom of our ongoing strategy." *Id.* When addressing Merrill Lynch's CDO exposure, he commented that: "Over the last six months, we have worked successfully to position ourselves for a more difficult market for CDOs and been proactively executing market strategies to significantly reduce our risk exposure. As a result, we are very comfortable with our current exposure to this asset class." *Id.* (emphasis added). Defendant O'Neal stated: "we've been prudent in managing our exposure. . . . As a result, recent shifts in the tenor of the market have not exposed us to significant new downside risk, relative to many of our competitors." *Id.* Defendant O'Neal thus directly communicated with employees/Plan participants about the risks the Company faced and failed to tell the whole story. Without complete and accurate information regarding the true risks that employees' retirement savings

faced, employees lacked information they needed to make informed decisions regarding their investment in Merrill Lynch stock in the Plans.

237.    To summarize, Merrill Lynch became the largest underwriter of CDOs over the past few years.  The Company also purchased CDO securities despite the obvious signs that the subprime and CDO markets were deteriorating.  When those markets collapsed, the Company found itself exposed to billions of dollars in losses from securities it could no longer sell because they were almost completely illiquid and had lost most, if not all, of their value.

238.    Nonetheless, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plans' participants throughout the Class Period. Defendants knew or should have known that the Company's stock price would drop drastically and that Plans' participants would lose billions, once the truth was exposed.

**C.    Merrill Lynch's Belated Disclosure Caused its Stock Price to Plummet.**

239.    On September 10, 2007, Merrill Lynch named a Chief Risk Officer for the first time. *See* Merrill Lynch September 2007 Memo, *Ed Moriarty Named Chief Risk Officer*, Sept. 10, 2007; *See also* Matthew Quin, *Risk Managers Return (Belatedly) to Street*, Financial Week, Nov. 19, 2007.

240.    On October 3, 2007, Merrill Lynch ousted Semerci, the most recent overseer of Merrill Lynch's accumulation of CDOs.  The next day, *Bloomberg News* reported that Merrill Lynch had abandoned its plans to do business with the hedge fund managed by its former executive Dow Kim.  *See* Bradley Keoun, *Merrill Severs Ties With Former Executive Kim's Fund*, Bloomberg News, Oct. 4, 2007.  *Bloomberg News* also reported that: "The company severed ties instead because Kim had been responsible for the mortgage and fixed-income businesses that are now causing losses." *Id.*

71

241.    Unfortunately, the damage to its business had already been done.  On October 5, 2007, Merrill Lynch announced that it would take an estimated $4.5 billion loss related to the Company's exposure to CDO securities and subprime mortgages.

242.    On October 12, 2007, the *New York Times* highlighted for the public the fact that what Merrill Lynch had said to its employees in the July 2007 memo plainly contradicted the Company's true exposure to CDO and subprime securities (which was later disclosed at $43 billion as of June 29, 2007).  The *New York Times* reported that Defendant O'Neal, sent a memorandum to employees outlining the risks he claimed to see in the economy and praising the Company's performance and risk management.  "More than anything else," Defendant O'Neal wrote, "the quarter reflected the benefits of a simple but critical fact:  we go about managing risk and market activity every day at this company."  He stated that the bank was aware of the risks and had taken precautions against them.  "Over the last six months," the memo said, "we have worked successfully to position ourselves for a more difficult market for CDOs and been proactively executing market strategies to significantly reduce our risk exposure."  Anderson, *supra*.

243.    Defendant O'Neal told employees in the July 2007 memo (with $43 billion in CDO and subprime exposure) that managing risk "is what our clients pay us to do, and as you all know, we're pretty good at it."  (*See* July 2007 memo discussed above.)  As described *infra*, on October 25, 2007, O'Neal would report to the press the truth about the Company's CDO and subprime exposure and admit:  "The bottom line is that we got it wrong by being over-exposed to subprime and we suffered as a result of an unprecedented liquidity squeeze and deterioration in that market."  *Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007..

244.    On September 21, 2007, Merrill Lynch closed its purchase of First Republic Bank

for $1.8 billion. Based on the merger agreement, the aggregate consideration would be paid with

50% Merrill Lynch common stock and 50% cash. The exchange rate used to calculate the

number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill

Lynch's average closing price over the five trading days preceding September 21, 2007, which

was $75.02 per share. *See* Merrill Lynch, *Merrill Lynch to Acquire First Republic Bank for $1.8*

*Billion,* Jan. 29, 2007; *See also* Merrill Lynch, *Merrill Lynch and First Republic Bank*

*Successfully Close Merger; Final Results of Election Regarding Merger Consideration*

*Announced,* Sept. 21, 2007.

245.    As described in a lawsuit against Merrill Lynch by First Republic shareholders,[36]

to obtain approval for the merger, Merrill Lynch filed three registration statements (dated May 8,

2007, June 8, 2007 and June 21, 2007) that were materially false and misleading because none

disclosed the truth about Merrill Lynch's CDO and subprime exposure. *See Conn v. Merrill*

*Lynch & Co., Inc., et. al.,* No: 07-11626 (S.D.N.Y Dec. 28, 2007) (Class Action Complaint for

Violation of Federal Securities Laws).

246.    Had Merrill Lynch disclosed the truth about its CDO and subprime losses and

exposure, Merrill Lynch's stock would have dropped in value -- as it did when the Company first

disclosed its write-downs related to its CDO and subprime exposure starting on October 5, 2007

(as described above).

247.    As a result, Merrill Lynch would have had to issue a greater number of shares to

purchase First Republic, which would have had a dilutive effect on its post merger pro forma

earnings per share. As a consequence, the merger may not have been approved by First

---

[36]    The Plaintiffs are now Merrill Lynch shareholders because they exchanged their First Republic shares for
Merrill Lynch shares.

Republic's Board of Directors or its shareholders. Merrill Lynch therefore failed to disclose the truth about its exposure and losses from CDO and subprime securities until three weeks after the merger closed and, therefore, was able to purchase First Republic with inflated stock. *Id.*

248.    In October 2007, Defendant O'Neal addressed Merrill Lynch employees via video and "took pains to pinpoint the date that the credit crunch worsened as the day in early August when European central banks first stepped in to provide liquidity to the banking system, indicating how much conditions had deteriorated." Randal Smith, *Merrill Loss May Be Wider Than Projected,* Wall St. J., Oct. 24, 2007.

249.    Many employees were shocked by the announcement, which directly contradicted the Company's statements in the July 2007 memo to employees that stated the Company had effectively managed risk such that it was in a positive position with respect to its CDO business despite market pressure in this area. Although prohibited from speaking on the record, investment bankers, traders and financial advisers quietly expressed disbelief, frustration and a bit of self-interested concern over what the write-down would do to their pay. "Money at risk doesn't bother me," one senior broker said: "It's the risk of the money. Is it being run intelligently? If you take a $5 billion hit, my question is, do these guys know what they are doing?" Anderson, *supra.*

250.    "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls." Bowley & Anderson, *supra.* Or, as stated by one corporate and securities law professor: "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't." *Id.*

375471.2 2

251.    As summarized by Brian Foley, an executive compensation expert, the Merrill

Lynch situation "looks like a systemic problem in terms of risk management and risk control –

the whole nine yards…. There seems to be some blame to go around." *Id.* But on October 3,

2007, the risks to Merrill Lynch were still understated and only partly disclosed.

252.    On October 25, 2007, Merrill Lynch shocked the market again by taking a write-

down of $7.9 billion.  During a conference call announcing the results, Defendant O'Neal

commented:

> Over the past few weeks, our FICC management team, led by David, has
> worked with our Finance staff to undertake a rigorous and comprehensive
> review of our remaining CDO and subprime related exposures.  This
> collective review has resulted in the use of more conservative valuation
> assumptions, and a total net write-down of approximately $7.9 billion for
> this quarter.
>
> ***
>
> The bottom line is that we got it wrong by being over-exposed to subprime
> and we suffered as a result of an unprecedented liquidity squeeze and
> deterioration in that market.  No one, no one, is more disappointed than I
> am in the result.
>
> ***
>
> Despite the fact that nearly all of our remaining CDO exposure is super
> senior, it turned out that both our assessment of the potential risk and our
> mitigation strategies were inadequate
>
> ***
>
> We're not, I'm not, going to talk around the fact that there were some
> mistakes that were made.  We, I am accountable for these mistakes, just as
> I am accountable for the performance of the firm overall.  And my job, our
> job, the leadership team's job – is to address where we went wrong and
> what changes were necessary, to make sure that we respond to changes in
> risk dynamics early, correctly, and in every asset class at every stage of
> the market's evolution.
>
> ***
>
> So, as I have mentioned, we have made a number of important changes….

75

*Merrill Lynch Third Quarter 2007 Earnings Conference Call*, Oct. 24, 2007.

253.    During the Third Quarter 2007 Conference Call, Defendant O'Neal reiterated the Company's failure to manage its risk and warned that additional write-downs were a possibility. *Id.*

254.    Despite the magnitude of the announcement, both Defendant O'Neal and Edwards refused to provide complete, straight-forward information regarding the Company's disposition of its inventory of CDOs.  One analyst asked the executives about apparent inconsistencies in the accounting of their subprime losses between the second and third quarter of 2007:  "As of the end of June you noted that your ABS CDO related exposure was around $32 billion, $15 billion as of the end of September.  You marked down around $6.  Where did the other $11 go?" *Id.;* *See also* Third Quarter 2007 10-Q.  Defendant O'Neal repeatedly refused to comment.[37]

255.    A Lehman Brothers analyst asked whether the existing CDO exposures were held in broker/dealer accounts or on the Company's balance sheet.  Edwards reportedly declined to answer the question, saying "we've provided an extraordinarily high level of disclosure, which should be sufficient."  Third Quarter 2007 Conference Call., *supra.*

256.    During the analyst call, Standard & Poor's announced that it had downgraded Merrill Lynch's debt to A+ from AA-.  *Id.*  Merrill Lynch shares fell 5.7%, causing further significant losses to the Plans.

257.    Neither Defendant O'Neal nor Defendant Edwards could explain why the Company's write-down of asset values – based on a fixed date in time – had nearly doubled in only three weeks.  In fact, Defendant O'Neal flip-flopped during the call, at one point acknowledging "the amount we're now indicating is one that was within the range of valuations we did at the time." *Id.*  If that statement is true, it is reasonable to infer that the Company

---

[37]    This discrepancy was eventually explained in Third Quarter 2007 10-Q.

realized the massive write-down amount on October 4, 2007, but attempted to mitigate the information's impact on the market by releasing the bad news in increments.

258.    The Company's stock continued to drop over the next days, as rumors swirled regarding Defendant O'Neal's future at the Company and analysts downgraded the Company's stock. News articles chronicled the FICC business's recent personnel changes and documented the risky practices implemented by young bankers who collected tens of millions of dollars in bonuses and fled the Company before its actual financial condition came to light.

259.    On October 30, 2007, Merrill Lynch announced that Defendant O'Neal had retired, effective immediately. That day, the Company's stock closed at $65.56 per share, down 14% from a closing price of $76.00 on October 3, 2007, the day before the Company began publicly discussing its subprime losses.

260.    In its third quarter 10-Q, Merrill Lynch reclassified a significant amount of assets and liabilities from Level 2 to Level 3[38] (primarily related to CDO and subprime related securities), due to a "significant decrease in the observability of market pricing for these assets and liabilities." Third Quarter 2007 10-Q.

**D.    Merrill Lynch Takes Desperate, But Ineffective, Measures To Dump Its CDO And Subprime Exposure.**

261.    Even after the $7.9 billion write-down, analysts questioned how Merrill Lynch had reduced its exposure. On October 24, 2007, the SEC began investigating Merrill Lynch for

---

[38]    Merrill Lynch adopted the new accounting standard SFAS No. 157 in the first quarter of 2007. Under SFAS No. 157, companies are required to assess the fair value of assets on their books. Merrill Lynch was required to label its assets as Level 1, 2, or 3, based on how easy they are to price. The three-level hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). SFAS No. 157 also requires that where no liquid market exists, Merrill Lynch must attempt to value assets using other observable inputs such as: quoted prices for similar assets or liabilities in other markets, whether active or inactive; observable inputs, other than quoted prices, such as interest rates, yield curves, volatilities, prepayment speeds, loss severities, credit risks, and default rates; and inputs that are derived principally from or can be corroborated by market data. Changes in the observability of valuation inputs may result in a reclassification for certain financial assets or liabilities. Second Quarter 2007 10-Q.

engaging in transactions with hedge funds designed to delay reporting its exposure to risky mortgage-backed securities. *See* Susan Pulliam, *Deals with Hedge Funds May Be Helping Merrill Delay Mortgage Losses*, Wall St. J., Nov. 2, 2007.

262.    The Company immediately denied that it had entered into such transactions. On the same day the *Wall Street Journal* article appeared, the Company issued a press release:

> The story is nonspecific and relies on unidentified sources. We have no reason to believe that any such inappropriate transactions occurred. Such transactions would clearly violate Merrill Lynch policy.

Merrill Lynch, *Merrill Lynch Responds to Wall Street Journal Story*, Business Wire, Nov. 2, 2007.

263.    Five days later, on November 7, 2007, the Company issued its quarterly report on Form 10-Q for the third quarter. The securities filing did not address the *Wall Street Journal* article, but stated: "[o]n October 24, 2007, the SEC staff initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio. Merrill Lynch is cooperating fully with the SEC in this matter." Third Quarter 2007 10-Q.

264.    On November 26, 2007, the *Wall Street Journal* issued the following correction:

> On Nov. 2, the Journal published a page-one article on Merrill Lynch & Co. that was based on incorrect information that the firm had engaged in off-balance-sheet deals with hedge funds in a possible bid to delay the recognition of losses connected to the firm's mortgage-securities exposure. In fact, Merrill proposed a deal with a hedge fund involving $1 billion in commercial paper issued by a Merrill-related entity containing mortgage securities. In exchange, the hedge fund would have had the right to sell the mortgage securities back to Merrill after one year for a guaranteed minimum return. However, Merrill didn't complete the deal after the firm's finance department determined it didn't meet proper accounting criteria. In addition, Merrill says it has accounted properly for all its transactions with hedge funds.

*Corrections & Amplifications*, Wall St. J., Nov. 26, 2007.

375471.2 2

265.    The correction apparently assuaged doubts about Merrill Lynch's accounting for the $1 billion hedge-fund transaction previously reported, but it neither resolved the ongoing SEC inquiry into the Company's subprime mortgage portfolio nor mitigated the damage finally revealed on the Company's day of subprime reckoning. In fact, it confirms that Merrill Lynch itself "proposed" the extraordinary hedge fund deal, designed to conceal its actual financial condition.

266.    The Company has been accused repeatedly of using fraud and misrepresentation to find buyers for the CDO securities it was still underwriting in 2007 well after CDO demand fell. Whether or not fraud can be proven, the allegations in these suits demonstrate that Merrill Lynch sought to sell the risky CDOs and subprime securities without full disclosure to the buyers (for no rational buyer with full knowledge would have purchased them), and that these securities became unmarketable before October 2007. Thus, the allegations of these suits provide more evidence that Merrill Lynch itself knew it was overexposed to these risky securities before the October disclosures.

**E.    Merrill Lynch's Improper and Highly Risky Practices Lead to Lawsuits and Governmental Investigations.**

267.    Merrill Lynch is the subject of numerous civil suits and is under investigations by several federal and state authorities for fraud in the sales of CDO and subprime related securities.

268.    Merrill Lynch was sued by MetroPCS Communications, Inc. for fraud and misrepresentation connected with the sale of senior tranch CDO securities in October 2007. *See MetroPCS Communications, Inc. v. Merrill Lynch & Co., Inc., et al.*, No. 07-12430 (Tex. Dallas. County Oct. 18, 2007). MetroPCS hired Merrill Lynch as its investment advisor for its $134 million in cash reserves contingent upon compliance with MetroPCSs Investment Policy that

specifically stated that "MetroPCS's risk tolerance is 'LOW' and that cash must, therefore, be invested to preserve capital and to provide liquidity." (Emphasis in original.)

269.    MetroPCS claims that beginning in May 2007 -- well after the subprime mortgage market had started to show signs of distress:

- Merrill Lynch caused MetroPCS to begin purchasing highly risky CDO securities, which violated its investment policy;

- Merrill Lynch failed to disclose that the collateral backing many of these CDOs had wide ranging exposure to the subprime mortgage market; and

- Merrill Lynch also failed to disclose that it had a conflict of interest in urging MetroPCS to continue to buy these CDO securities because Merrill Lynch was one of the largest underwriters and sellers of such securities and in fact "held significant investments of its own in CDO [securities] and related instruments with subprime exposure and thus stood to lose significantly if the market for such instruments weakened."

*Id.*

270.    MetroPCS asserts that the investments violated its goal of holding only safe, liquid assets but that Merrill Lynch told MetroPCS that the securities were low-risk and highly liquid.

271.    In *Luminent Mortgage Capital v. Merrill Lynch & Co., Inc., et al.,* filed on December 24, 2007, the complaint alleges fraud against Merrill Lynch in the underwriting and sale of mortgage backed securities. *See Luminent Mortgage Capital v. Merrill Lynch, et al.*, No. 07-5423, (E.D. Pa. Dec. 24, 2007). Luminent purchased the mortgage backed securities on August 30, 2005. After doing its own due diligence to gather information about the underlying mortgage loans, Luminent discovered that a substantial portion of those loans did not meet the standard characteristics of "Alt-A" quality loans, and in fact were more akin to subprime loans and that the characteristics of the portfolio as a whole did not comport with the information provided by Merrill Lynch.

272.    In February 2008, the Massachusetts Secretary of State accused Merrill Lynch of fraud in a civil administrative proceeding over its sales of subprime-related debt to the city of Springfield, Massachusetts ("the City"). *See* Jenny Anderson, *Massachusetts Accuses Merrill of Fraud,* N.Y. Times, Feb. 2, 2008.  According to the complaint, Merrill Lynch understood that it was to invest the City's money only in safe-money-market-like investments that would protect the City's principal and as authorized by City personnel. *See Respondents' Administrative Complaint* at 2, 3 and 9, *In the Matter of L Merrill Lynch, et al.,* No. 2008-001 (Feb. 1, 2008 Commw. of Mass. of the Sec'y of the Commonwealth).  Instead, without disclosing the nature of these instruments, Merrill Lynch invested approximately $14 million of the City's funds in the securities of three highly illiquid "CDO squareds." *Id.* at 3, 4.  The instruments appeared with other names on the City's account statements through June 2007, but were "quietly relabeled as CDOs in July." *Id.* at 4.  Shortly after the sale, the market value for CDOs backed by subprime markets began to plummet and the City's accounts began to lose money, prompting the request that the CDOs be sold.  The City was informed that the auctions had failed, the CDOs could not be sold at any price close to their par value, and there were no buyers. *Id.* at 5 and 18.  In a letter dated November 29, 2007, James Mann, First Vice President and Assistant General Counsel of Merrill Lynch, disclaimed responsibility for these investments stating that the City made its own investment decisions. *Id.* at 6.  However, contradicting this disclaimer, in February 2008, Merrill Lynch agreed to buy back the securities at their original value of $13.9 million plus attorneys fees.  Craig Karmin, *Merrill Buys Back CDOs it Sold to Springfield, Mass.,* Wall St. J, Feb. 1, 2008.

273.    Also in February 2008, the Maine State Treasurer's Office, Maine Attorney General, and the Maine Office of Securities began examining the circumstances surrounding

81

Merrill's role in the sale of commercial paper issued by a structured investment vehicle (SIV) to

the State Treasury Department for $20 million. Shortly after the sale, S&P downgraded the SIV

from the highest rating (AAA) to junk status, thereby rendering the assets frozen. Maine is

investigating whether any laws or rules were violated. *See Svea Herbst-Bayliss, Maine*

*Treasurer Criticizes Merrill for Subprime Bet*, Reuters, Nov. 28, 2007. Consequently, Maine

"kicked Merrill Lynch off its bond underwriting team for serving as a broker on a failed state

investment that exposed taxpayers to risky subprime loans, state Treasurer David Lemoine said

on Friday." Anastasija Johnson, *Maine Bans Merrill Lynch From Bond Team*, Reuters Apr. 4,

2008.

274.    On March 18, 2008, Merrill Lynch was sued by ASTAR Air Cargo, Inc. for

negligence, fraud, breach of fiduciary duty, and breach of contract connected with the

recommendation and sale of auction rate securities (ARS). *See In the Matter of Arbitration*

*Between ASTAR Air Cargo, Inc., v. Merrill Lynch & Co., Inc. et al.,* No. . In the Financial

Industry Regulatory Authority ("FINRA") Case, ASTAR asserts that Merrill Lynch

recommended that it purchase ARS, representing that they were completely safe and extremely

liquid and promised that if the company ever needed access to its cash between ARS auctions,

Merrill Lynch itself would buy ASTAR's ARS positions. *Id.* Beginning in the Fall of 2007,

when auctions for ARS began to fail nationwide, Merrill Lynch assured ASTAR that it would

continue to supports its auctions. However, in February 2008, Merrill Lynch advised ASTAR

that it would not support its ARS and refused to repurchase the ARS holdings. Consequently,

ASTAR's investments became illiquid.

275.    Similarly on March 25, 2008, Merrill Lynch was sued for misrepresenting to

investors that auction rate securities were equivalent to cash or money market funds and were

highly liquid, safe investments for short-term investing (in fact, they were just the opposite). *See Burton v. Merrill Lynch & Co., Inc., et al.,* No.08-3037 (S.D.N.Y. Mar. 25, 2008). Merrill Lynch failed to disclose that these securities were only liquid at the time of sale because it artificially supported and manipulated the auction market to maintain the appearance of liquidity and stability. This claim was realized and further supported on February 13, 2008, when 87% of all auction rate securities failed because Merrill Lynch and other major broker-dealers refused to continue to support the auction. The market for auction rate securities subsequently collapsed.

276.    FINRA is also investigating if Merrill Lynch properly sold clients money-losing securities tied to subprime mortgages when the market began to collapse. *See* David Scheer and Jesse Westbrook, *Brokers Probed by FINRA on Mortgage Security Sales, Person Says,* Bloomberg, Jan. 4, 2008.

**F.     Ongoing Concern About Validity Of Merrill Lynch's Financial Statements.**

277.    Analysts continue to speculate that Merrill Lynch has not come clean regarding the full extent of its past misrepresentations and its exposure to subprime-backed securities and CDOs. Mike Mayo, an analyst at Deutsche Bank, aptly summed up the situation: "We have increasingly lost confidence in the financials of Merrill Lynch. It's not enough to say the CEO has gone, problem fixed." Bowley & Anderson, *Where Did the Buck Stop at Merrill?, supra.*

278.    Indeed, the SEC is investigating Merrill Lynch for potentially booking inflated prices of mortgage bonds it held despite knowledge that the valuations had dropped. Pulliam, *Deals with Hedge Funds May Be Helping Merrill Delay Mortgage Losses, supra.*

279.    On January 17, 2008, Merrill Lynch released its 2007 year-end financial results which included $23.2 billion in write-downs from CDO and subprime exposure. *See* Merrill Lynch Current Report 8-K (Jan. 17, 2008), at Ex. 99.1. Merrill Lynch reported back-to-back quarterly losses that exceeded the previous two years' net income.

280.    The Company's net loss from continuing operations for the fourth quarter was
$10.3 billion, or $12.57 per diluted share.  In one quarter, Merrill Lynch lost more than its *record
breaking* earnings of $7.5 billion for the *entire year* of 2006.  John Thain acknowledged that "the
firm's earnings performance for the year is clearly unacceptable[.]" *Id.*  Indeed, Merrill Lynch's
quarterly results were the largest loss in the Company's 94-year history.

281.    On January 17, 2008, during Merrill Lynch's Fourth Quarter 2007 Earnings
conference call, John Thain addressed concerns about the $23.2 billion write-down, which was
more than five times the initial value disclosed on October 5, 2007.  Thain was less than
optimistic about Merrill Lynch's ability to recover some of the $23.2 billion losses and diverted
questions about how Merrill Lynch ended up with such high levels of exposure to CDO and
subprime securities and whether it failed to report this to its risk management systems.  *See
Merrill Lynch Fourth Quarter 2007 Earnings Call Transcript*, Jan. 17, 2008, at 8.  He ended the
call stating that there was very little trading by anyone in the CDO market in the fourth quarter
and that, moving forward, he intended to sell them and reduce Merrill Lynch's absolute position.
*Id.* at 10.

282.    The day after the Company released its fourth quarter earnings on January 18,
2008, Thain appeared on the "Nightly Business Report" on PBS and conveyed that Merrill
Lynch did not have significant remaining exposure to subprime loans and did not expect any
more changes from its asset based securities (which included CDOs).  *See One on One with
Merrill Lynch CEO John Thain, available at* http://www.pbs.org/nbr/site/
onair/transcripts/080117_gharib/, Jan. 19, 2008.

283.    In February 2008, The U.S. Department of Justice ("DOJ") and the U.S.
Attorney's Office in Manhattan initiated another investigation, searching for criminal conduct

84

relating to Merrill Lynch's handling of mortgage bonds. The DOJ is also looking at whether financial firms properly disclosed the risky nature of these bonds to investors and credit-rating firms and improperly accounted for certain off-balance sheet entities that held mortgage bonds and insured these bonds after finding out their value was inflated. *See* Michelle Rama, *DOJ's Manhattan Office May Begin Criminal Probe of Merrill Lynch*, Forbes, Feb. 2, 2008.

284.    On February 25, 2008, Merrill Lynch released its 2007 10-K. The Company provided greater detail on its previously disclosed $23.2 billion in write-downs resulting from CDO and subprime related exposure. The majority of these write-downs were from Merrill Lynch's exposure to CDO securities, which totaled $16.7 billion. In addition, the Company also wrote down $3.2 billion related to U.S. sub-prime residential mortgage exposure, $2.6 billion in credit valuation adjustments related to Merrill Lynch's hedges with financial guarantors (mainly credit default swaps) related to its CDO securities, and $700 million related to subprime related securities in Merrill Lynch's U.S. banks investment securities portfolio. 2007 10-K, at 22.

285.    The Company also reported its remaining net exposure related to CDO securities as $4.8 billion, which was based on Merrill Lynch's long exposure to CDO securities of $30.4 billion (post write-downs) less its $23.6 billion short exposure and less $2.0 billion for "secondary trading." 2007 10-K, at 36. The short position primarily consisted of hedges (such as credit default swaps), which involved risk of loss of capital based on the financial viability of the guarantor (many of which were non-investment grade companies). In fact, Merrill Lynch took $2.6 billion in write-downs from credit valuation adjustments in 2007, demonstrating that some hedging vehicles, such as credit default swaps, introduced new risk of loss to Merrill Lynch's capital base. *Id.* Put plainly, reports of net exposure are inadequate, if not misleading,

when the hedges that contribute to the net exposure number are not working or are themselves fraught with credit risk.

286.    In addition, unrelated to its CDO and subprime exposure, Merrill Lynch also disclosed off-balance sheet exposures it considered "significant" to be $90 billion. This was an increase of 65% from December 2006 and, in fact the majority of that increase was in just one quarter (off-balance sheet exposure rose 52% from September to December of 2007). *See* Merrill Lynch 2007 Annual Report.

287.    The Company also disclosed $70 billion dollars in off-balance sheet "total return swaps" (i.e., repurchase agreements) as of December 2007, which it used to fund selected assets, including CDOs and CLOs and $4.6 *trillion* in derivative contracts (disclosed as the "maximum payout/notional [value]" for such contracts).

288.    On March 5, 2008, Merrill Lynch issued a press release announcing that it was discontinuing mortgage origination at its First Franklin subsidiary and would explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin, due to the deterioration of the subprime lending market. *See* Merrill Lynch, *Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services,* Mar. 5, 2008, *available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_92707_92961. Merrill Lynch bought First Franklin in late 2006 for $1.3 billion. As recently as April 2007, Merrill Lynch boasted on the contribution that First Franklin made to Merrill Lynch's business. The Company will spend $60 million to pay for severance and other real estate costs linked to unwinding First Franklin's operations. More importantly, the First Franklin acquisition left Merrill Lynch with huge potential liabilities.

289.    Merrill Lynch acknowledged in its First Quarter 2008 10-Q that:

375471.2 2

> In connection with residential mortgage loan and other securitization transactions, we typically make representations and warranties about the underlying assets. If there is a material breach of any such representation or warranty, we may have an obligation to repurchase assets or indemnify the purchaser against any loss. For residential mortgage loan and other securitizations, the maximum potential amount that could be required to be repurchased is the current outstanding asset balance. Specifically related to First Franklin activities, there is currently approximately $45 billion (including loans serviced by others) of outstanding loans that First Franklin sold in various asset sales and securitization transactions where management believes we may have an obligation to repurchase the asset or indemnify the purchaser against the loss if claims are made and it is ultimately determined that there has been a material breach related to such loans. We have recognized a repurchase reserve liability of approximately $458 million at March 28, 2008 arising from these residential mortgage sales and securitization transactions.

*See* Merrill Lynch Quarterly Report (Form 10-Q) (Mar. 28, 2008) (hereinafter, "First Quarter 2008 10-Q").

290.    On March 27, 2008, Richard Bove, a stock analyst at Punk Ziegel, more than halved his 2008 earnings forecast for Merrill Lynch and estimated the Company's next write-down would be approximately $6.79 billion. "Estimating the earnings of Merrill Lynch has become a game of estimating what the next write-down will be," Bove said, adding that the various indices that were being used to help Merrill adjust its values were as "fallacious as ever but they are still being used." *UPDATE 1-Punk Ziegel slashes 2008 EPS View for Merrill*, Mar. 27, 2008, *available at* http://www.reuters.com/article/rbssFinancialServicesAndRealEstateNews/ idUSBNG2341820080327.

291.    "Unlike in past cycles, this time around MER has found itself with the largest balance sheet exposure to CDO assets among the large capitalization brokerage firms," Hintz of Bernstein Research wrote, warning: "With $30.4 billion of CDOs still on Merrill's balance sheet at the end of 2007, we believe the 'CDO Overhang' will be an ongoing concern for the firm over the next twenty-four months." Ed Welsch, *2nd UPDATE: Merrill Lynch 1Q Loss, Up To $6 Billion Write-Down Seen*, Dow Jones Newswires, Mar. 27, 2008.

375471.2 2

292.    On April 17, 2008, Merrill Lynch reported large losses related to subprime and CDOs, which appear to contradict Thain's statements on the "Nightly Business Report" on January 19, 2008. (*See* discussion *supra*). In its First Quarter Earnings Statement Merrill Lynch stated an additional $6.6 billion in write-downs from exposure to mortgages, CDOs and leveraged loans. *See* Merrill Lynch Current Report 8-K (Apr. 17, 2008), at Ex. 99.1. These results included about $4.5 billion of write-downs plus $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure. The current total write-downs related to CDO and subprime exposure is $30.8 billion.[39]

293.    On April 17, 2008, John Thain held the Company's First Quarter 2008 Earnings Conference Call. He stated that: "widening of credit spreads forced liquidations, high volatility, [and] the lack of market liquidity for many credit products [e.g., CDO and subprime related securities]." He also stated: "We are planning for a slower and more difficult next couple of months and probably next couple of quarters." *See Merrill Lynch First Quarter 2008 Earnings Call Transcript, available at* http://www.ml.com/index.asp?id=7695_7696_8149_88278_95339_96026.

294.    Thain discussed moving the Company's principal investing for subprime and CDO securities to third party funds but acknowledged that it is "not very likely [that they] will recover value." *Id.* Despite the fact that the Company's long exposure to CDO securities has decreased slightly from $30.4 billion at December 30, 2007 to $26 billion at March 28, 2008, the Company's *net* exposure actually increased from $4.8 billion as of December 30, 2007 to $6.7

---

[39]    As described in footnote six, *supra*, because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure. First Quarter 2008 10-Q; 2007 10-K, pg. 117. *See also*, David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., Apr. 21, 2008.

375471.2 2

billion as of March 28, 2008 due to the failure of its credit default swaps to effectively hedge against the risk of losses from Merrill Lynch's remaining long exposures to CDO securities.

295.    In fact, the financial press has reported that holders of CDO securities, such as Merrill Lynch, purchased credit default swaps for reasons apart from their stated objective (to hedge against the risk of loss to their CDO securities).  A *BusinessWeek* analysis explains that "the insurers' guarantees [i.e., the credit default swaps] turned out to be little more than a subprime shell game" because the "[i]nsurance turned out to be a sort of accounting arbitrage, allowing banks to take advantage of that different set of rules.  By using it, they could offload the price risk to insurers' books to avoid suffering a hit to earnings if the bonds dropped in value." David Henry and Matthew Goldstein, *Death of a Bond Insurer: Wall Street Used ACA to Hide Loads of Subprime Risk. It Worked—Until the Tiny Company Collapsed,* BusinessWeek, Apr. 3, 2008.

296.    "Bond insurance was an accounting strategy.  It reduced banks' mark-to-market worries" according to Michael E. Satz, the founder and former chief executive officer of ACA[40] (a large bond insurer that collapsed in December of 2007).  *Id.*

297.    Federal Reserve Chairman Ben Bernanke stated in testimony before Congress last month that mark-to-market accounting is "one of the major problems we have in the current environment."  *Id.*

298.    Credit default swaps offered banks another advantage:  It allowed them to execute "a negative-basis trade," a strategy that essentially allows banks to book profits on CDOs up front, even though they have not actually collected any money yet and might never do so.  *Id.*

---

[40]    Merrill Lynch was one of ACA's largest clients.

299.    Overall, CDOs boosted Merrill Lynch's profits and reduced the amount of capital it had to set aside on its books for the securities. That freed up money for the Company to funnel back into subprime securities. "The results of the game were bigger profits for banks, more money to continue cranking out securities built on risky subprime mortgages, and far less clarity about the banks' true exposure to the toxic investments." *Id.*

300.    Merrill Lynch released its March 2008 10-Q on May 6, 2008. The Company disclosed that its Level 3 assets rose 69% during the first quarter from $48.6 billion on December 28, 2007 to $82.4 billion on March 28, 2008. First Quarter 2008 10-Q. Merrill Lynch added $7 billion worth of mortgage-laden CDOs to the Level 3 category in the first quarter, along with $2 billion more of derivatives on subprime securities, $18 billion of credit derivatives not related to mortgages, and $7.6 billion in derivatives tied to equities, currencies and commodities. *Id.*

301.    Both stock analysts and the financial press have expressed concern about the 69% increase in Level 3 assets in just one quarter[41] because "Level 3 assets are those whose valuation is essentially a best guess by the investor, because there is virtually no active trading market for the product to use as a pricing guide." *See Merrill Lynch Level 3 Assets Increase Through March,* CNNMoney.com, May 6, 2008 *available at http://money.cnn.com/news/newsfeeds /articles/ apwire/c278ee62746c916ea9e0f9913fd59fcf.htm; See also* Liz Moyer, *Level 3: Merrill Keeps Feeling The Crunch,* Forbes, May 6, 2008.

302.    "The increase in Level 3 represents an incrementally higher probability--but not a certainty--that more write-downs are coming," said Fox Pitt Kelton analyst David Trone, in a research note about Merrill Lynch dated May 6, 2008. *See* Liz Moyer, *For Merrill's Thain, A Tough Road Ahead,* Forbes, May 6, 2008.

---

[41]    It is also important to note that this increase comes after Merrill Lynch's previous reclassification of a significant amount of CDO and subprime securities in the third quarter of 2007.

375471.2 2

303.    Moody's Investors Service said that it has placed Merrill Lynch on review for a possible downgrade after the earnings report,  citing "continued deteriorating conditions in the mortgage market and the increased expected losses on MER's portfolio of super-senior CDOs [sic] as measured in Moody's stress test."  Paul Jackson, *Merrill Posts Quarterly Loss, $4.3 Billion in Mortgage-Related Writedowns,* HousingWire.com, Apr. 17, 2008, *available at* www.housingwire.com/2008/04/17/merrill-posts-quarterly-loss

**G.    Defendants Knew or Should Have Known That Merrill Lynch Stock Was an Imprudent Investment.**

304.    Given the facts described above, it is clear that since the beginning of the Class Period, due to Merrill Lynch's CDO and supbrime exposure, its other off-balance sheet exposure, its highly-leveraged balance sheet, its mismanagement of its risk and liquidity, and its persistent refusal to disclose all material information about its true financial condition, the Company's stock posed an unduly large risk of significant loss, which could not be prudently borne by Merrill Lynch's employee retirement plans.  Defendants Merrill Lynch and O'Neal knew that the Company had accumulated $43 billion in CDO and subprime exposure on its own balance sheet and was effectively betting the entire book value of the Company on these risky and illiquid securities.  Defendants Merrill Lynch and O'Neal ignored the risk that such a large position in risky and illiquid securities presented and indeed, attempted to conceal that information with false and misleading statements, many directed to the Plans' participant in the form of employee memos and other communications, which caused the price of Merrill Lynch stock to be artificially inflated, and exacerbated the problems.  In the end, when the severity of the circumstances came to light, the Plans suffered staggering losses, all or some of which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

375471.2 2

305.    At all relevant times, Defendants Merrill Lynch and O'Neal knew that Merrill Lynch stock was an imprudent investment for the Plans due to the numerous operational problems and risk management deficiencies described above, and the tremendous exposure that Merrill Lynch took on with respect to the CDO and subprime markets.

306.    There is evidence that all Defendants had substantial warnings of the impending subprime crisis because as early as 2006 the imminent collapse of the subprime lending industry was widely documented. To the extent that some of the Defendants did not have actual knowledge of the extent to which Merrill Lynch stock was inflated due to the Company's undisclosed CDO and subprime exposure and the losses not reported until October 2007, the Defendants were on notice of several "red flags" that should have caused them to investigate the risks posed by Merrill Lynch stock; but in fact they conducted no such investigation.

307.    The red flags include:

- During the second half of 2006 the *Wall Street Journal* and other news sources repeatedly reported that demand for CDOs was decreasing;

- Despite the fact that Mr. Ricciardi budgeted no growth in 2006 for underwriting of mortgage related CDOs, Merrill Lynch increased its CDO underwriting deal volume in 2006 and 2007;

- The stagnating CDO market coupled with record breaking CDO underwriting volume indicates that Merrill Lynch must have taken large amounts of CDO securities onto its own balance sheet in 2006 and 2007;

- On September 25, 2006, Merrill Lynch's own analyst (Kenneth Bruce) warned that demand for subprime bonds "could dissipate quickly," and of an "asset fire-sale" which could result in large losses on subprime related securities;

- On September 25, 2006, *Reuters* further reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against the securities since late 2005";

- In early December 2006, Ownit Mortgage Solutions, Inc. (an originator Merrill Lynch purchased mortgages from) declared bankruptcy due to defaulting loans;

- On December 5, 2006, a Merrill Lynch analyst reported that falling home prices could trigger losses not only in riskier classes of mortgage-backed securities, but also in investment grade bonds;

- On December 15, 2006, the *Wall Street Journal* reported that investors were watching to see if the effects of falling RMBS would be felt in CDOs;

- On December 20, 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market;

- Nonetheless, on January 1, 2007, Merrill Lynch purchased a mortgage company focused on subprime borrowers (First Franklin), despite the fact that the market for subprime loans was souring in a hurry when the deal was announced;

- In February of 2007, the Company published its 2006 10-K which showed:

  (1)    off-balance sheet exposure of $54.5 billion; and

  (2)    CDO issuance increased almost four fold from $44 billion to $14 billion in 2005;

- On March 11, 2007, the *New York Times* reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy;

- On March 14, 2007, *Bloomberg* reported that Mark Adelson, head of structured finance research at Nomura Securities, stated that investors "need to worry a good bit" about subprime delinquencies spilling over into the CDO market;

- In March 2007, Lehman Brothers reported that CDOs backed by asset-backed securities had already lost about $20 billion in value as delinquencies increased;

- On March 29, 2007, the *Wall Street Journal* reported that New Century Financial Corp., the largest U.S. subprime lender at the time, was at the "brink of bankruptcy" because it could not pay back loans it took from Wall Street banks;

- On March 30, 2007, *Reuters* reported that CDOs have a growing appetite for derivatives such as credit default swaps and that other CDO securities (to create CDO squared of cubed securities) could potentially lead to an "absolute bloodbath";

- On April 2, 2007, New Century filed for Chapter 11 bankruptcy;

- In April 2007, the Company published its off-balance sheet exposure, which reached an all time high of $65.8 billion, an increase of 21% in just one quarter;

- On May 3, 2007, UBS closed Dillon Read Capital Management due to mortgage losses;

- On May 14, 2007, despite the deteriorating market for CDO and subprime related securities, Dow Kim stated that "we are growing our leading CDO business";

- On June 20, 2007, Merrill Lynch seized $800 million in assets from two Bear Stearns hedge funds that were involved in securities backed by subprime loans, which Merrill Lynch then sold;

- In July 2007, two Bear Stearns subprime hedge funds collapsed;

- In July 2007, the Company published its off-balance sheet exposure for June 2007, which hit an all time high of $69.5 billion;

- Throughout the Summer of 2007, the *Wall Street Journal* published several articles predicting that the banks that were heavily involved in underwriting subprime securities, such as Merrill Lynch, had losses hidden on their books and in off- balance sheet vehicles;

- On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy;

- On August 9, 2007, French bank BNP Paribas stopped valuing three of its funds and suspended all withdrawals by investors because U.S. subprime mortgage woes had caused "a complete evaporation of liquidity";

- On August 14, 2007, Thornburg Mortgage, a jumbo mortgage lender, announced it was delaying its dividend after facing margin calls and disruptions in funding mortgages in the commercial paper and asset-backed securities markets;

- On August 16, 2007, Countrywide Financial Corporation, the largest U.S. mortgage lender, narrowly avoids bankruptcy by taking out an emergency loan of $11 billion from a group of banks;

- On August 31, 2007, President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts;

- On August 31, 2007, Ameriquest, the largest subprime lender in the U.S. in 2005, announced it was going out of business;

- On September 14, 2007, precipitated by liquidity problems related to the subprime crisis, there was a run on the bank at Northern Rock in the U.K.;

- On October 15, 2007, a consortium of U.S. banks backed by the U.S. government announced a "super SIV" of $75 billion to purchase mortgage backed securities whose mark-to-market value plummeted in the subprime collapse;

- In November 2007, Merrill Lynch reportedly engaged in improper transactions with hedge funds that artificially inflated the price of Company stock and were designed to hide the Company's true financial condition;

94

- On December 22, 2007, the *Economist* estimated subprime defaults would reach a level between $200-300 billion;

- From the Fall of 2006 to the end of 2007, the ABX 06-2 index (used to track the value of securities backed by subprime mortgages) lost 80% of its value, falling from 100 to 20; and

**Winning Wager**

This sub-index of the ABX 06-2, a benchmark index reflecting subprime-mortgage-backed securities, tracks the riskiest slices. For much of the year, Goldman had a big bet that it would fall.



Note: Synthetic ABX.HE.BBB-06-2 Index
Sources: Markit

- On January 11, 2008, Bank of America made an agreement to bail out Countrywide for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before.

308.    On information and belief, notwithstanding those red flags, even those Defendants who did not have *actual* knowledge or who had only partial knowledge, failed to fulfill their fiduciary obligation to investigate risks posed by Merrill Lynch stock.

309.    The fact that Merrill Lynch did not disclose the truth about the value of its CDO and subprime related securities and the fact that the other Defendants did not investigate the Company's exposure, given turmoil in the subprime industry, resulted in the Plans purchasing and holding huge amounts of unduly risky Company stock at inflated prices.

310.    Defendants Merrill Lynch and O'Neal disregarded sound business practices and failed to implement risk-management processes despite the numerous warnings from industry

observers and regulators regarding the risks of subprime markets and looming trouble in credit markets.

311.    Despite these facts, Defendants took no meaningful action to protect the heavily Merrill Lynch-invested Plans and their participants from the significant losses that they have incurred.

312.    Prudent fiduciaries of the Plans would not have ignored the numerous red flags described above and allowed the risk of loss to the Plans' participants and beneficiaries to increase to unacceptable levels. Unfortunately, the Defendants did exactly that and for all intents and purposes wiped out a significant portion of the Plans' assets.

313.    As a result of the Company Defendant's knowledge of and implication in creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Merrill Lynch stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

314.    Even in the wake of numerous investigations by the SEC and other federal and state authorities, Defendants failed to conduct an appropriate investigation into whether Merrill Lynch stock was a prudent investment for the Plans and failed to provide the Plans' participants with information regarding Merrill Lynch's risky business plan so that participants could make informed decisions regarding their investments in Company stock in the Plans.

315.    An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Merrill Lynch stock, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

96

316.    Because Defendants knew or should have known that Merrill Lynch stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' continued investment in Company stock.

317.    Accordingly, it was imprudent for the Plans' fiduciaries to continue offering Merrill Lynch stock as a Plan investment option, to continue holding Merrill Lynch stock in the Plans, and/or to continue to make new investments in Company stock during the Class Period. Merrill Lynch stock was an imprudent investment for the Plans as it posed an inordinate risk of significant loss, and this risk is not one that should have been borne by the participants and beneficiaries of the Plans.  The Plans' fiduciaries disregarded the Company's deteriorating and dreadful financial circumstances when it came to managing the Plans' investment in Merrill Lynch stock, and were unwilling or unable to act prudently to rescue the Plans' investments. Under the circumstances, the continued investment of billions of dollars of participants' retirement savings in Merrill Lynch stock was reckless and imprudent, and contrary to the best interests of the Plans' participants and beneficiaries, and an abuse of their discretion as fiduciaries.

318.    Defendants had available to them several different options for satisfying their duties, including:  making disclosures to co-fiduciaries; making appropriate public disclosures as necessary; discontinuing or limiting further investment in Merrill Lynch stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plans; divesting the Plans of Company stock; and/or resigning as fiduciaries of the Plans to the extent that, as a result of their

375471.2 2

employment by Merrill Lynch, they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Merrill Lynch stock.

319.    Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in Merrill Lynch stock.

## H.    Defendants Failed to Provide the Plans' Participants, Beneficiaries, and their Co-Fiduciaries with Complete and Accurate Information about the True Risks of Investment in Merrill Lynch Stock in the Plans.

320.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. *Devlin v. Empire Blue Cross & Blue Shield*, 274 F. 3d 76, 88 (2d Cir. 2001) (a fiduciary has "a duty to deal fairly and honestly with its beneficiaries") (quoting *Ballone v. Eastman Kodak Co*. 109 F. 3d 117, 123-124 (2d Cir. 1997); *Mullins v. Pfizer*, 23 F. 3d 663, 669 (2d Cir. 1994) ("when a plan administrator speaks, it must speak truthfully") (quoting *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993)).

321.    During the Class Period, Defendant Merrill Lynch, the Plan Administrator for all of the Plans, and Defendant O'Neal made direct and indirect communications to Plans participants through numerous employee newsletters, memos and letters, and other public statements regarding the financial health of the Company. The Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company (e.g., numerous employee newsletters, memos and letters, including July 2007 memo and others discussed *supra*) and Company stock which was, far and away, the single largest asset of the Plans.

98

322.    These communications included, but were not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan documents and Plan-related materials and directed to participants through the 401(k) prospectus (which is part of the Summary Plan Description for the SIP) and the Form S-8 pertaining to the SIP, and, thus, were Plan communications undertaken in a fiduciary capacity.  These communications by Defendant Merrill Lynch assured the participants that the Company was not unduly exposed to risks related to subprime lending and CDOs, and that the Company's risk management practices were appropriate, when in fact the extent of the risks faced by the Company was unduly minimized and the extent of the Company's risk management practices was overstated.

323.    Against the background of these misleading communications from Defendant Merrill Lynch and Defendant O'Neal, both Defendant Merrill Lynch and the Administrative Committee Defendants, each of which had assigned responsibility for communicating with the Plans' participants (who had the ability to reduce their own exposure to Company stock through the Plans) and the remaining fiduciaries, failed to disclose facts that would have apprised the Plans' participants of the risks presented by Company stock that , in turn, would have allowed them to conclude that their exposure to Company stock through the Plans should be reduced, or that Company stock was not a prudent retirement investment.

324.    Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press, concerning investment in company stock, including that:

> (a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;
>
> (b)    Out of loyalty, employees tend to invest in company stock;
>
> (c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

375471.2 2

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with it rewards.

Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001), *available at* http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf; *See also* Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans - the Importance of Plan Design*, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series, No. 2002-36 (2002), *available at* http://www.federalreserve.gov/pubs/feds/ 2002/200236/200236 pap.pdf.

325.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plans' funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plans and their participants from their heavy investment in an imprudent retirement vehicle, Merrill Lynch stock.

326.    In addition, Defendants failed to provide participants and beneficiaries, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company. As such, participants in the Plans could not appreciate the true risks presented by investments in Company stock and therefore could not make informed decisions regarding their investments in Company stock in the Plans.