**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE MERRILL LYNCH & CO., INC.    :    Master File No.:
SECURITIES, DERIVATIVE AND ERISA  :    07cv9633(LBS)(AJP)(DFE)
LITIGATION    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This Document Relates to:    :
Securities Action, 07cv9633(LBS)(AJP)(DFE) :
    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS**
**MERRILL LYNCH & CO., INC., MERRILL LYNCH CAPITAL TRUST I, MERRILL**
**LYNCH CAPITAL TRUST II, MERRILL LYNCH CAPITAL TRUST III AND**
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**
**TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND**
**TO STRIKE CERTAIN ALLEGATIONS**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jay B. Kasner
Christopher P. Malloy
Scott D. Musoff
Joanne Gaboriault
Four Times Square
New York, NY  10036
(212) 735-3000

Attorneys for Defendants
  Merrill Lynch & Co., Inc.,
  Merrill Lynch Capital Trust I,
  Merrill Lynch Capital Trust II,
  Merrill Lynch Capital Trust III and
  Merrill Lynch, Pierce, Fenner &
  Smith Incorporated

# TABLE OF CONTENTS

Page

TABLE OF ABBREVIATIONS ........................................................................ v

TABLE OF AUTHORITIES.......................................................................... vi

PRELIMINARY STATEMENT ..................................................................... 1

FACTUAL BACKGROUND ......................................................................... 16

    A.    Merrill and Its Business ............................................................. 16

    B.    Subprime Mortgage Backed Securities and Collateralized Debt
        Obligations ................................................................................ 18

        1.    The Collateralized Debt Obligation Securitization Process ..................... 18

        2.    Merrill's Asset Securitization Business ................................. 20

    C.    As the Housing Market Contracts into the First Half of 2007, Merrill
        Shifts Its Residential Mortgage Exposure Toward Higher Rated Securities ........ 22

        1.    Defaults on Subprime Mortgages Increase But the Market Does
            Not Expect Losses on High-Rated CDO Securities ................................. 22

        2.    Merrill Shifts Its Exposure from Residential Mortgages to Super-
            Senior Tranches of CDOs ........................................................ 23

    D.    Credit Markets Seize Up in the Third Quarter 2007 and the Market for
        Asset Backed Securities Abruptly Dries Up ....................................... 24

    E.    Merrill Announces Third Quarter and Fourth Quarter 2007 Losses ................... 25

ARGUMENT
    THE CONSOLIDATED AMENDED COMPLAINT SHOULD BE DISMISSED ........ 28

I.    PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER
    SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5 ........................... 28

    A.    Standard of Review........................................................................ 28

    B.    Plaintiffs' Allegations Drawn from Press Clippings and Pleadings in Other
        Cases Are Insufficient Under Rule 9(b) and the PSLRA and Certain
        Allegations Should Be Stricken........................................................ 28

    C.    The Amended Complaint Fails To Plead Scienter ............................... 32

1.      Any Inference of Scienter Is Not Cogent and Is Less Compelling
        than Nonfraudulent Inferences ................................................. 33

        (a)     The Complaint Impermissibly Alleges "Fraud By
                Hindsight" .......................................................... 33

        (b)     The More Compelling Inference Is That the Defendants
                Were Reacting Honestly To Unfolding Market Conditions ......... 36

2.      Plaintiffs' Failure to Allege any Motive for the Defendants to
        Commit Fraud Undercuts any Inference of Scienter ....................... 38

        (a)     Plaintiff's Motive Allegations Are Economically Irrational ......... 38

        (b)     The Allegations Concerning Stock Sales by Some, but Not
                All of the Individual Defendants Are Insufficient To Raise
                a Strong Inference of Scienter ...................................... 42

3.      The Complaint Fails To Identify Contemporaneous Facts
        Contradicting Merrill's Public Statements ................................. 44

        (a)     The Allegations Regarding Increasing Subprime Defaults
                and the Lowered Underwriting Standards by Mortgage
                Originators Do Not Give Rise to any Inference of Scienter ......... 45

        (b)     The Complaint Fails to Allege that Merrill "Recklessly
                Expanded" Its CDO Exposures .................................... 46

        (c)     The Allegations Concerning "Warnings" By Employees
                Do Not Give Rise to any Inference of Scienter ..................... 48

        (d)     The Complaint Does Not Allege Facts Showing Merrill
                Should Have Written Down Its CDO Portfolio Sooner Than
                It Did ............................................................... 51

4.      The Complaint Fails to Plead Scienter as to Alleged GAAP
        Violations .............................................................. 56

D.      The Complaint Fails to Plead Loss Causation ................................. 57

1.      Plaintiffs Fail To Account for the Market Wide Collapse of the
        Credit Markets ........................................................... 57

2.      Plaintiffs' Loss Causation Allegations Are Not Plausible and Are
        Riddled with Inconsistencies .............................................. 59

E.      The Complaint Fails To Allege any Actionable Misleading Statement or
        Omission ................................................................. 62

1.    The Complaint Does Not Allege any Misleading Statement or Omission Regarding Merrill's Exposure to CDOs ................................... 63

        (a)     Merrill Had No Duty to Disclose Additional Information About its CDOs ........................................................................ 64

        (b)     Merrill Did Not Falsely Downplay its Subprime Exposure .......... 66

2.    The Complaint Does Not Allege any Misleading Statement or Omission Regarding Merrill's Risk Management and Controls .............. 68

3.    The Complaint Fails To Allege any Actionable False Statements or Omissions Regarding Loan Underwriting Standards ............................... 73

4.    The Complaint Does Not Allege that Merrill's Financial Statements Violated GAAP or Disclosure Rules ..................................... 74

F.    Plaintiffs Have Not Alleged a Claim Under Rule 10b-5(a) and (c) ..................... 76

G.    Plaintiffs Have Failed to Allege that the Preferred Stock Traded on an Efficient Market and Therefore Cannot Rely on any Presumption of Reliance ............................................................................................................ 77

II.   PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER  SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT OR  SECTION 14(A) OF THE EXCHANGE ACT ............................................................................................. 77

A.    Pleading Standards ......................................................................................... 78

1.    Plaintiffs' Claims Sound in Fraud and Are Therefore Subject to the Heightened Pleading Requirements of Rule 9(b) ..................................... 78

2.    Plaintiffs' Claims Also Fail the Twombly Standard ................................ 80

B.    The Complaint Fails to Allege any Untrue Statement or Actionable Omission .......................................................................................................... 81

C.    Plaintiffs Lack Standing Under Section 11 and Section 12(a)(2) With Respect to Certain of the Preferred Stock Offerings ............................................. 82

D.    The Securities Act Claims Should Be Dismissed for Lack of Loss Causation .......................................................................................................... 83

E.    The Complaint Fails to State a Claim under Section 15 of the Securities Act ..................................................................................................................... 83

III.  THE COMPLAINT FAILS TO STATE A CLAIM  UNDER SECTION 14(A) OF THE EXCHANGE ACT ................................................................................ 84

CONCLUSION ................................................................................................................... 85

# TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION |
|---|---|
| Merrill 10-K (2006)………………………… | Merrill Lynch, Annual Report (Form 10-K) (Feb. 26, 2007) |
| Merrill 10-K (2007)…………………………. | Merrill Lynch, Annual Report (Form 10-K) (Feb. 25, 2008) |
| Merrill 10-Q (1Q 2007) …………………….. | Merrill Lynch, Quarterly Report (Form 10-Q) (May 7, 2007) |
| Merrill 10-Q (2Q 2007)……………………… | Merrill Lynch, Quarterly Report (Form 10-Q) (Aug. 3, 2007) |
| Merrill 10-Q (3Q 2007)……………………… | Merrill Lynch, Quarterly Report (Form 10-Q) (Nov. 7, 2007) |
| Merrill 8-K (Oct. 5, 2007)…………………… | Merrill Lynch, Current Report (Form 8-K) (Oct. 5, 2007) |
| Merrill 8-K (Oct. 24, 2007)………………….. | Merrill Lynch, Current Report (Form 8-K) (Oct. 24, 2007) |
| Merrill Earnings Call (2Q 2007)…………….. | Merrill Lynch, 2Q 2007 Earnings Conference Call (July 17, 2007) |
| Merrill Proxy (2007)………………………… | Merrill Lynch, Proxy Statement (Form DEF 14A) (Mar. 16, 2007) |

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

60223 Trust v. Goldman Sachs,
   540 F. Supp. 2d 449 (S.D.N.Y. 2007) ........................................................................ 57, 58

In re 2007 Novastar Finance, Inc. Securities Litigation,
   No. 07-0139-CV, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) ............... 8, 34, 37

Acito v. IMCERA Group, Inc.,
   47 F.3d 47 (2d Cir. 1995) ...................................................................................... 35, 42, 43

In re Aegon N.V. Securities Litigation,
   03 Civ. 0603, 2004 U.S. Dist. LEXIS 11466 (S.D.N.Y. June 28, 2004) ............................. 34

Ackerman v. Northwest Mutual Life Insurance Co.,
   172 F.3d 467 (7th Cir. 1999) ................................................................................................ 29

Albert Fadem Trust v. American Electric Power Co.,
   334 F. Supp. 2d 985 (S.D. Ohio 2004) ................................................................................ 72

In re Alcatel Securities Litigation,
   382 F. Supp. 2d 513 (S.D.N.Y. 2005) .................................................................................. 63

In re Allied Capital Corp. Securities Litigation,
   02 Civ. 3812, 2003 U.S. Dist. LEXIS 6962 (S.D.N.Y. Apr. 21, 2003) ..................... 13, 36, 53

In re AstraZeneca Securities Litigation,
   05 Civ. 2688, 2008 U.S. Dist. LEXIS 43680 (S.D.N.Y. June 3, 2008) ..................... 41, 43, 44

ATSI Communications Inc. v. Shaar Fund, Ltd.,
   493 F.3d 87 (2d Cir. 2007) ...................................................................................... 16, 28, 77

In re Avista Securities Litigation,
   415 F. Supp. 2d 1214 (E.D. Wash. 2005) ...................................................................... 60, 62

In re AXIS Capital Holdings Ltd. Securities Litigation,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) .................................................................................. 65

Azzolini v. CorTS Trust for Provident Financial Trust I,
   03 CV 1003, 2005 U.S. Dist. LEXIS 38454 (E.D. Tenn. Dec. 14, 2005) ............................. 83

In re Bayou Hedge Fund Litigation,
   534 F. Supp. 2d 405 (S.D.N.Y. 2007) .................................................................................. 44

Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007) ............................................................. 28, 57

Bond Opportunity Fund v. Unilab Corp.,
    99 Civ. 11074, 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. May 9, 2003), aff'd, 03-7592,
    2004 U.S. App. LEXIS 2217 (2d Cir. Feb. 10, 2004).............................................. 84

Borochoff v. GlaxoSmithkline, PLC,
    No. 07 Civ. 5574, 2008 U.S. Dist. LEXIS 38784 (S.D.N.Y. May 9, 2008) ......................... 42

In re Bristol-Myers Squibb Securities Litigation,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................................ 29

Caiafa v. Sea Containers Ltd.,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007)................................................................ 30

CALPERS v. Chubb,
    394 F.3d 126 (3d Cir. 2004) ...........................................................31, 32, 51, 68

Cammer v. Bloom,
    711 F. Supp. 1264 (D.N.J. 1989) ..................................................................... 77

In re Canandaigua Securities Litigation,
    944 F. Supp. 1202 (S.D.N.Y. 1996).................................................................. 66

Ciresi v. Citicorp,
    782 F. Supp. 819 (S.D.N.Y. 1991), aff'd mem., 956 F.2d 1161 (2d Cir. 1992) .................... 35

In re CIT Group, Inc., Securities Litigation,
    349 F. Supp. 2d 685 (S.D.N.Y. 2004)................................................................ 81

In re Citigroup, Inc. Securities Litigation,
    330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), aff'd sub nom. Albert Fadem Trust v.
    Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006) ..................................... 64, 70, 71

City of Brockton Retirement System v. Shaw Group, Inc.,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008)................................................................ 44

Condit v. Dunne,
    317 F. Supp. 2d 344 (S.D.N.Y. 2004)................................................................ 16

In re Connetics Corp. Securities Litigation,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) .............................................................. 30

In re Credit Acceptance Corp. Securities Litigation,
    50 F. Supp. 2d 662 (E.D. Mich. 1999) .............................................................. 42

In re Cross Media Marketing Corp. Securities Litigation,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004)................................................................ 72

Davidoff v. Farina,
    04 Civ. 7617, 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 22, 2005).............................. 39

Decker v. Massey-Ferguson, Ltd.,
    681 F.2d 111 (2d Cir. 1982) ................................................................................................ 75

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) .................................................................... 8, 33

DiLeo v. Ernst & Young,
    901 F.2d 624 (7th Cir. 1990) ............................................................................................... 35

Druskin v. Answerthink, Inc.,
    299 F. Supp. 2d 1307 (S.D. Fla. 2004) ........................................................................... 49, 50

In re Duane Reade Inc. Securities Litigation,
    02 Civ. 6478, 2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom.
    Nadoff v. Duane Reade, Inc., 107 F. App'x 250 (2d Cir. 2004)............................................ 67

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005) ................................................................................................. 7, 59, 61

In re Elan Corp. Securities Litigation,
    02 Civ. 865, 2004 U.S. Dist. LEXIS 9913 (S.D.N.Y. May 18, 2004).................................. 84

In re Elan Corp. Securities Litigation,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)................................................................................... 48

Fadem v. Ford Motor Co.,
    02 Civ. 0686, 2003 U.S. Dist. LEXIS 16898 (S.D.N.Y. Sept. 25, 2003) ............................. 34

Fadem v. Ford Motor Co.,
    352 F. Supp. 2d 501 (S.D.N.Y. 2005), aff'd mem., 2005 U.S. App. LEXIS 26839
    (2d Cir. Dec. 7, 2005)................................................................................................... passim

In re FBR Inc. Securities Litigation,
    544 F. Supp. 2d 346 (S.D.N.Y. 2006).................................................................................. 70

In re Federated Department Stores, Inc. Securities Litigation,
    No. 00-CV-6362, 2005 U.S. Dist. LEXIS 4743 (S.D.N.Y. Mar. 23, 2005)........................... 51

In re Flag Telecom Holdings, Ltd. Securities Litigation,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)............................................................................ passim

Field v. Trump,
    850 F.2d 938 (2d Cir. 1988) ............................................................................................... 36

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994) ................................................................................................. 16

viii

Fisher v. Kanas,
    467 F. Supp. 2d 275 (E.D.N.Y. 2006)..................................................................84

Fisher v. Ross,
    93 Civ. 0275, 1996 U.S. Dist. LEXIS 15091 (S.D.N.Y. Oct. 11, 1996)...............................67

Garber v. Legg Mason,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)....................................................57, 60, 82

Geinko v. Padda,
    00 C5070, 2002 U.S. Dist. LEXIS 3316 (N.D. Ill. Feb. 27, 2002)........................................30

In re GeoPharma, Inc. Securities Litigation,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)....................................................................39

In re Glenayre Technology, Inc. Securities Litigation,
    No. 96 Civ. 8252, 1998 U.S. Dist. LEXIS 20344 (S.D.N.Y. Dec. 30, 1998), aff'd sub
    nom. Kwalbrun v. Glenayre Technologies, Inc., 201 F.3d 431 (2d Cir. 1999)......................43

In re Global Crossing, Ltd. Securities Litigation,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)....................................................................82

Hershfang v. Citicorp,
    767 F. Supp. 1251 (S.D.N.Y. 1991)......................................................................29

Higginbotham v. Baxter International, Inc.,
    495 F.3d 753 (7th Cir. 2007) ........................................................................42, 47

Hinerfield v. United Auto Group,
    97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. Jul. 15, 1998)................................81

Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,
    432 F. Supp. 2d 571 (E.D. Va. 2006)....................................................................38

In re Intelligroup Securities Litigation,
    527 F. Supp. 2d 262 (D.N.J. 2007) ......................................................................60

Joffee v. Lehman Brothers,
    410 F. Supp. 2d 187 (S.D.N.Y. 2006), aff'd, 209 F. App'x 80 (2d Cir. 2006) ................57, 61

Johnson v. NYFIX, Inc.,
    399 F. Supp. 2d 105 (D. Conn. 2005) .............................................................52, 79

In re JP Morgan Chase Securities Litigation,
    02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948 (S.D.N.Y. Mar. 29, 2007)..................36, 56, 70

In re JP Morgan Chase Securities Litigation,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)..............................................................passim

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ................................................................33, 37, 41, 44

In re Keyspan Corp. Securities Litigation,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003)....................................................................43

Kramer v. Time Warner,
    937 F.2d 767 (2d Cir. 1991) ..................................................................................16

Lattanzio v. Deloitte & Touche LLP,
    476 F.3d 147 (2d Cir. 2007) ..................................................................................57

Lentell v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005) ........................................................................ passim

Lerner v. FNB Rochester Corp.,
    841 F. Supp. 97 (W.D.N.Y. 1993)..........................................................................34

Lipsky v. Commonwealth United Corp.,
    551 F.2d 887 (2d Cir. 1976) ..................................................................................30

Malin v. XL Capital Ltd.,
    499 F. Supp. 2d 117 (D. Conn. 2007) ..............................................................43, 44

Marsden v. Select Medical Corp.,
    No. 04-4020, 2007 U.S. Dist. LEXIS 9893 (E.D. Pa. Feb. 6, 2007) .....................62

Mathews v. Centex Telemanagement, Inc.,
    C-92-1837, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. June 8, 1994).......................42

McNamara v. Pre-Paid Legal Services, Inc.,
    189 F. App'x 702 (10th Cir. 2006).........................................................................41

In re Merck & Co. Securities Litigation,
    432 F.3d 261 (3d Cir. 2005) ..................................................................................62

Merrill Lynch International v. XL Capital Assurance Inc.,
    08 Civ. 2893, 2008 U.S. Dist. LEXIS 53467 (S.D.N.Y. July 15, 2008)............9, 30

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
    547 U.S. 71 (2006).................................................................................... 7, 9, 28

In re Merrill Lynch & Co. Research Reports Securities Litigation,
    Nos. 02 MDL 1484, 07 CV 6677, 2008 U.S. Dist. LEXIS 37993
    (S.D.N.Y. May 8, 2008) .................................................................................57, 58

In re Merrill Lynch & Co. Research Reports Securities Litigation,
   Nos. 02 MDL 1484, 02 CV 9690, 2008 U.S. Dist. LEXIS 44344
   (S.D.N.Y. June 4, 2008) ........................................................................................ 58

In re Merrill Lynch & Co. Research Reports Securities Litigation,
   218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................................. 30

In re Merrill Lynch & Co. Research Reports Securities Litigation,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ............................................................. 16, 83

In re Merrill Lynch & Co. Research Reports Securities Litigation,
   273 F. Supp. 2d 351 (S.D.N.Y. 2003) .................................................................. 16

In re Merrill Lynch & Co. Research Reports Securities Litigation,
   289 F. Supp. 2d 416 (S.D.N.Y. 2003) ............................................................. 16, 41

Miller v. Lazard, Ltd.,
   473 F. Supp. 2d 571 (S.D.N.Y. 2007) ............................................................. 79, 81

In re New York Community Bancorp, Inc. Securities Litigation,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) ......................................................... 64, 65, 70

In re Nokia Oyj (Nokia Corp.) Securities Litigation,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) .................................................................. 37

Nolte v. Capital One Financial Corp.,
   390 F.3d 311 (4th Cir. 2004) ................................................................................ 65

Novak v. Kasaks,
   216 F.3d 300 (2d Cir. 2000) ..............................................................29, 31, 32, 56

Olkey v. Hyperion 1999 Term Trust, Inc.,
   98 F.3d 2 (2d Cir. 1996) .............................................................................. 71, 80

Oran v. Stafford,
   226 F.3d 275 (3d Cir. 2000) .......................................................................... 60, 76

Panther Partners, Inc. v. Ikanos Communications, Inc.,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) .................................................................. 80

Pavelic & LeFlore v. Marvel Entertainment Group,
   493 U.S. 120 (1989) ............................................................................................ 30

Robbins v. Koger Properties, Inc.,
   116 F.3d 1441 (11th Cir. 1997) ............................................................................ 61

Rombach v. Chang,
   355 F.3d 164 (2d Cir. 2004) ......................................................................... passim

In re Salomon Analyst Level 3 Litigation,
    350 F. Supp. 2d 477 (S.D.N.Y. 2004) ............................................................. 52, 81

In re Salomon Analyst Level 3 Litigation,
    373 F. Supp. 2d 248 (S.D.N.Y. 2005) ....................................................... 50, 52, 72

Santa Fe Industries, Inc. v. Green,
    430 U.S. 462 (1977) ........................................................................................... 36

Schoenhaut v. American Sensors, Inc.,
    986 F. Supp. 785 (S.D.N.Y. 1997) ..................................................................... 80

Sheppard v. TCW/DW Term Trust 2000,
    938 F. Supp. 171 (S.D.N.Y. 1996) ..................................................................... 52

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) ......................................................................... passim

In re Sina Corp. Securities Litigation,
    05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089 (S.D.N.Y. Sept. 25, 2006) ................. 16, 66, 72

Stafford v. Bakke, 02 CV 1132, 2005 U.S. Dist. LEXIS 40525 (S.D. Ind. Jul. 7, 2005) ............. 83

Stavros v. Exelon Corp.,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ................................................................. 35

Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,
    128 S. Ct. 761 (2008) .......................................................................................... 8

Teachers' Retirement System v. Hunter,
    477 F.3d 162 (4th Cir. 2007) ....................................................................... 57, 62

Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,
    Docket No. 06-2902-cv, 2008 U.S. App. LEXIS 13449 (2d Cir. June 26, 2008) ........... passim

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007) ................................................................................ passim

In re Tellium, Inc. Securities Litigation,
    No. 02 CV 5878, 2005 U.S. Dist. LEXIS 26332 (D.N.J. Aug. 26, 2005) ....................... 60, 62

Thor Power Tool Co. v. Commissioner,
    439 U.S. 522 (1979) ........................................................................................... 74

In re Union Carbide Class Action Securities Litigation,
    648 F. Supp. 1322 (S.D.N.Y. 1986) ................................................................... 67

In re Vantive Corp. Securities Litigation,
    110 F. Supp. 2d 1209, 1216 (N.D. Cal. 2000),
    aff'd, 283 F.3d 1079 (9th Cir. 2002) ....................................................... 29, 43, 44

In re Verisign, Inc. Derivative Litigation,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ............................................................ 61

In re Versant Object Technology Corp. Securities Litigation,
    C 98-00299, 2001 U.S. Dist. LEXIS 25009 (N.D. Cal. Dec. 4, 2001) ................................. 48

Zucker v. Quasha,
    891 F. Supp. 1010 (D.N.J. 1995), aff'd mem., 82 F.3d 408 (3d Cir. 1996) ......................... 80

## STATUTES AND RULES

17 C.F.R. § 229.303 (2008) ........................................................................... 76

17 C.F.R. § 229.305(d) (2008) ....................................................................... 72

17 C.F.R. § 240.10b-5 (2008) ......................................................................... 9

17 C.F.R. § 240.14a-9(a) (2008) .................................................................... 84

Fed. R. Civ. P. 9(b) ........................................................................... passim

SEC's Regulation S-K, Item 305, Quantitative and Qualitative Disclosures About Market
    Risk ............................................................................................ 71

SEC Rel. No. 33-7386, 62 F.R. 6044, 6055 (Feb. 10, 1997) .......................................... 66

15 U.S.C. § 77k ................................................................................. 15, 81

15 U.S.C. § 77l ................................................................................... 15

15 U.S.C. § 77o ................................................................................... 83

15 U.S.C. § 78j(b) ........................................................................... passim

15 U.S.C. § 78n(a) ........................................................................... passim

15 U.S.C. § 78u-4(b)(1) ........................................................................ 29, 84

15 U.S.C. § 78u-4(b)(2) ........................................................................... 84

15 U.S.C. § 78u-4(b)(4) ........................................................................ 57, 84

15 U.S.C. § 78u-5(c) .............................................................................. 71

15 U.S.C. § 78u-5(i) .............................................................................. 72

## OTHER MATERIALS

American Institute of Certified Public Accountants, Statement of Position 94-6, Disclosures of Certain Significant Risks and Uncertainties.................................................. 75

William W. Bartlett, Mortgage-Backed Securities:  Products, Analysis, Trading (1989) (Kasner Decl. Ex. A)............................................................... 24

Jennifer E. Bethel et al., Law and Economic Issues in Subprime Litigation (Mar. 2008) 18, 19, 46

Roddy Boyd, Merrill Blinks, New York Post, June 22, 2007 available at http://www.nypost.com/seven/06222007/business/merrill_blinks_business_roddy_bo yd.htm.................................................................................................................... 56

CSI: Credit Crunch, Economist, Oct. 18, 2007 (Kasner Decl. Ex. B)......................................... 24

Don't mark to Markit, Economist, Mar. 6, 2008 ...................................................................... 54

Randall Dodd, Subprime:  Tentacles of a Crisis, Finance & Development (IMF quarterly magazine), Dec. 2007 (Kasner Decl. Ex. C) ....................................................................... 25

John C. Dugan, Comptroller of the Currency, Remarks before the Global Association of Risk Professionals (Feb. 27, 2008) available at http://www.occ.treas.gov/ftp/release/2008-22a.pdf................................................... 4, 19, 20

Excerpts from Frank J. Fabozzi, Credit Enhancements for Nonagency MBS Products, in The Handbook of Mortgage-Backed Securities (Frank J. Fabozzi, ed., 6th ed. 2006) (excerpts in Kasner Decl. Ex. D) .................................................................................. 20, 47

Federal Reserve Board, Open Market Operations, http://www.federalreserve.gov/fomc/fundsrate.htm ........................................................... 22

Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 107, Disclosures about Fair Value of Financial Instruments (2008) ..................................... 75

Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 115, Accounting for Certain Investments in Debt and Equity Securities (2008) .............. 4, 65

Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 157, Fair Value Measurements (2008)...................................................................... 4, 55 56

Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives (Frank J. Fabozzi, ed., 2008) (excerpts in Kasner Decl. Ex. F)................................................................. 46, 53, 54

Rick Green, Lehman Shuts Unit, Bloomberg, Aug. 23, 2007, available at http://www.bloomberg.com/apps/news?pid=20601206&sid= aQBUrPcefMtc&refer=realestate ........................................................................................ 21

Alan Greenspan, The Roots of the Mortgage Crisis, Wall Street Journal, Dec. 12, 2007
(Kasner Decl. Ex. G) ..................................................................... 1, 25

Alan Greenspan, We Will Never Have a Perfect Model of Risk, Financial Times
(London), Mar. 16, 2008 (Kasner Decl. Ex. H) ................................................. 1, 7

Jian Hu, Moody's Investors Services, Structured Finance CDO Ratings Surveillance
Brief: September 2007 (Oct. 23, 2007) (Kasner Decl. Ex. I) ................................... 4

Institute of International Finance, Final Report of the IIF Committee on Market Best
Practices (July 2008), available at http://www.iif.com/ ....................................... 25

International Monetary Fund, Global Financial Stability Report (Apr. 2007), available at
http://www.imf.org/External/Pubs/FT/GFSR/2007/01/pdf/text.pdf ................................. 3, 22

International Monetary Fund, Global Finanacial Stability Report (Apr. 2008), available at
http://www.imf.org/External/Pubs/FT/GFSR/2008/01/pdf/text.pdf ............................... 19, 65

Kevin M. LaCroix, Counting the Subprime Lender Lawsuits (updated July 14, 2008),
http://www.dandodiary.com/2007/04/articles/securities-litigation/counting-the-
subprime-lender-lawsuits/index.html ...................................................... 6

Kevin M. LaCroix, The D&O Diary: Subprime-Related Securities Class Action Lawsuits
(last updated July 14, 2008), http://69.177.1.186/clients/blog/subprimelawsuitslist.doc ......... 6

Kevin M. LaCroix, The D&O Diary: Subprime-Related Derivative Litigation (last
updated June 24, 2008), http://69.177.1.186/clients/blog/subprimederivativelist.doc ............. 6

Ben Logan, The ABX Index:  A Pricing Conundrum, Credit, May 1, 2008
(Kasner Decl. Ex. J) .................................................................... 13, 54

Merrill Press Release, Merrill Lynch Announces Agreement to Acquire First Franklin
from National City Corporation, issued on Sept. 5, 2006 (Kasner Decl. Ex. NN) ................ 21

Floyd Norris, It's a Crisis and Ideas Are Scarce, New York Times, Apr. 11, 2008 ...................... 7

Outlook of the U.S. Economy:  Hearing Before the Joint Economic Committee, 110th
Congress (2006) (testimony of Ben Bernanke) available at
http://www.federalreserve.gov/newsevents/testimony/bernanke20060427a.htm ................. 22

Susan Pulliam, Deals with Hedge Funds May be Helping Merrill Delay Mortgage Losses,
Wall Street Journal, Nov. 2, 2007 (as corrected on Nov. 26, 2007)
(Kasner Decl. Ex. L) ..................................................................... 62

Susan Pulliam et al., Merrill Upped Ante as Boom In Mortgage Bonds Fizzled, Wall
Street Journal, Apr. 16, 2008 (Kasner Decl. Ex. M) ...................................... 13, 31

Allison Pyburn, <u>ML leads banner CDO year</u>, Asset Securitization Report, Jan. 8, 2007 (Kasner Decl. Ex. N)........................................................................................................ 20

Christopher Swann, <u>IMF Says Financial Losses May Swell to $945 Billion (Update 2)</u>, Bloomberg, Apr. 8, 2008 <u>available at</u> http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aK1zAj5FZ9Io ................... 7

Olivia Thetgyi, <u>AIG Steps Back from ABS CDO Super-seniors</u>, Securitization News, Apr. 3, 2006 (Kasner Decl. Ex. O) ............................................................................................. 47

U.S. S.E.C., Consolidated Supervision of Broker-Dealer Holding Companies:  Program Overview and Assessment Criteria (Apr. 16, 2007), <u>available at</u> http://www.sec.gov/divisions/marketreg/cseoverview.htm ................................................ 18

Defendants Merrill Lynch & Company ("Merrill" or the "Company"), Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II, Merrill Lynch Capital Trust III, and Merrill Lynch, Pierce, Fenner & Smith Incorporated submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint (the "Complaint") filed by lead plaintiffs and plaintiff Gary Kosseff ("Plaintiffs") and to strike certain allegations therein.

## PRELIMINARY STATEMENT

*On August 9, 2007 and the days immediately following, financial markets in much of the world seized up. Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged.*[1]

Alan Greenspan later observed that "[t]he current financial crisis in the U.S. is likely to be judged in retrospect as the most wrenching since the end of the second world war."[2] Not surprisingly, Merrill, one of the world's leading underwriters of collateralized debt obligations ("CDOs") for which the underlying collateral included subprime mortgages (i.e., mortgages to less-creditworthy borrowers), was not immune from the unexpected collapse of the credit markets late last summer. As a result, on October 5, 2007, less than a week after the third quarter ended, Merrill voluntarily pre-announced that it would take substantial write-downs to recognize the loss in market value of its CDOs and other subprime related exposures. Like many financial institutions that followed Merrill's lead, Merrill continued to take timely write-downs in the following quarters, as the credit markets continued to deteriorate.

---

[1]    Alan Greenspan, The Roots of the Mortgage Crisis, Wall St. J., Dec. 12, 2007, at A19 (Ex. G). Certain documents referenced in this memorandum are attached to the accompanying Declaration of Jay B. Kasner, dated July 18, 2008. References to "Ex. __ " are to the exhibits to the Kasner Declaration.

[2]    Alan Greenspan, We Will Never Have a Perfect Model of Risk, Fin. Times (London), Mar. 16, 2008 (Ex. H).

Despite its impressive girth, the 686-paragraph, fifteen-count Complaint boils down to a simple and entirely implausible charge of a fraud supposedly engaged in by Merrill and four of its then-senior executives, E. Stanley O'Neal (former CEO), Gregory Fleming (President and Chief Operating Officer), Jeffrey Edwards (former Chief Financial Officer) and Ahmass Fakahany (former Co-President Co-Chief Operating Officer) (the "Individual Defendants").[3]  Plaintiffs allege that, in certain instances, Merrill held onto the highest rated "super-senior" layers, or "tranches," of the CDOs it created and sold.  (Compl. ¶ 31.)  Because CDOs are structured to protect payment to these senior-most tranches even if there are substantial losses to the underlying collateral, the super-senior CDOs were AAA-rated by credit rating agencies and, as Plaintiffs acknowledge, the <u>least</u> risky.  (<u>Id.</u> ¶ 83.)  Nevertheless, according to Plaintiffs, as the housing market slowed in 2006, Merrill and the Individual Defendants supposedly knew that the AAA-rated super-senior CDOs really were "ultra risky" but yet they continued to accumulate them to generate underwriting fees from the CDO business, which Plaintiffs admit represented less than 2% of Merrill's revenues.  (<u>Id.</u> ¶¶ 18, 244.)

In evaluating whether Plaintiffs' theory states a claim for securities fraud, the Court must weigh the competing inferences arising from the facts alleged and matters subject to judicial notice and may permit the case to go forward only if the inference that the defendants acted with scienter is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2510 (2007).  Here, Plaintiffs urge an inference that the Defendants deliberately committed securities fraud because they "refused to shut down Merrill's CDO machine" (Compl. ¶ 10) and "driven by

---

[3]    To the extent applicable, Merrill expressly adopts and incorporates by reference the arguments of the Individual Defendants raised in their motions to dismiss the Complaint.

their revenue addiction, ramped up, rather than pulled back, Merrill's U.S. subprime . . . CDO exposure." (Id. ¶ 36.)  They claim Merrill pursued this course despite supposedly knowing that it would put the Company at serious risk of losing billions of dollars.  So, the central question presented in this case is whether it is more plausible to infer that Merrill's executives knowingly caused the Company to load up on toxic investments, and hid that fact, as Plaintiffs suggest, or that they acted honestly and simply did not fully predict the severity of the liquidity crisis.

        The only cogent and compelling inference is that Merrill, like the market regulators, other financial institutions and the financial press, simply did not predict the crisis that erupted in August 2007 and the magnitude of losses that would be incurred by holders of highly-rated mortgage securities.  For example, Federal Reserve Chairman Ben Bernanke opined in March 2007, only a few months before the August crisis erupted, that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  Testimony of Ben S. Bernanke before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007).  Similarly, the International Monetary Fund reported in April 2007 that studies showed that "even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses."  Int'l Monetary Fund, Global Financial Stability Report, at 7 (Apr. 2007).

        The Complaint is devoid of well pleaded facts showing that the super-senior CDOs were perceived to be "ultra-risky" or declining in value before third quarter 2007.  Instead, Plaintiffs ignore the payment priority afforded to the senior CDO tranches and conflate the securities with the associated underlying subprime mortgages.  AAA-rated debt securities have historically had very low default rates and were rarely downgraded.  It was not until late October

2007 that any significant number of AAA-rated CDOs were downgraded by the rating agencies.[4]

As Comptroller of the Currency John Dugan noted earlier this year:

> These better-than-triple A tranches were supposed to be the <u>least</u> risky parts of the subprime securities pyramid.  Instead they have generated the clear majority of reported subprime writedowns in capital markets, which in turn have been at the core of several of the worst episodes of the market's disruptions . . . .

John C. Dugan, Comptroller of the Currency, Remarks before the Global Association of Risk Professionals, at 1 (Feb. 27, 2008) (hereinafter, "Dugan Remarks").

Nevertheless, Plaintiffs repeatedly insist that Merrill's portfolio of AAA-rated super-senior CDOs was "impaired" and should have been written down as early as the first quarter 2007 (Comp. ¶¶ 6, 40, 45), but they again confuse the analysis.  Merrill's CDOs were not subject to an impairment analysis under the accounting rules.  Rather, Merrill is required to "mark to market" securities it holds for trading purposes, including the CDOs at issue, meaning that it was required to carry these assets at fair market value, with any gains or losses recorded in its income statement.[5]  If the securities at issue were traded in a liquid market, Merrill was required to look to observable market data, such as price quotes or trades in the same or similar securities, to value the CDOs.[6]  Plaintiffs acknowledge that the CDO market remained active in the first half of 2007 (<u>id.</u> ¶¶ 78, 106), and they do not allege any facts showing that actual market

---

[4]  <u>See</u> Jian Hu, Moody's Investors Servs., <u>Structured Finance CDO Ratings Surveillance Brief: September 2007</u>, at 2 (Oct. 23, 2007) (Ex. I) (as of September 30, 2007, only "0.6% of all Aaa [] CDO tranches outstanding, or 0.2% by outstanding balance" were downgraded in 2007).

[5]  <u>See</u> Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 115, <u>Accounting for Certain Investments in Debt and Equity Securities</u>, at 2 (Summary); ¶¶ 12-13, at 5-6 (2008).

[6]  <u>See</u> Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 157, <u>Fair Value Measurements</u>, ¶ 28 (2008).

data showed the need for significant write downs before the third quarter 2007 or that anyone at Merrill knew the methods it was using to value the CDOs were improper.

It was not until the third quarter 2007, when the financial markets seized up worldwide, that the market for asset-backed securities abruptly dried up. Because of reduced liquidity, Merrill and other financial institutions could not rely on market data to value their securities and were instead required to estimate the value for which these securities would sell in a market that had largely ceased to exist. Even the super-senior CDO positions had to be discounted, given the deterioration in the market and the lack of liquidity. (Id. ¶¶ 55, 310.)

Beginning in October 2007, financial institutions began announcing large losses associated with CDOs and other subprime holdings. Merrill was one of the first to alert the market to forthcoming losses when, on October 5, 2007, it voluntarily pre-announced only five days after the end of its quarter that it "estimated" its third quarter write-downs would be "$4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages." Merrill 8-K (Oct. 5, 2007), at 2 (Ex. CC). In contrast to Plaintiffs' theory that fraudulent conduct had thus been revealed, Merrill's stock price rose more than 2.5% that day. On October 24, Merrill announced that its final third quarter subprime-related write-downs were $7.9 billion, after considering, among other things, "more conservative loss assumptions in valuing the underlying collateral" than in the pre-announced estimate earlier that month. Merrill 8-K (Oct. 24, 2007), at 4 (Ex. DD).

Market conditions and asset values continued to deteriorate in the fourth quarter of 2007 and, on January 17, 2008, Merrill announced additional write-downs of $11.5 billion related to CDOs and subprime mortgages. The vast majority of Merrill's write-downs in both the third and fourth quarter related to its super-senior CDO positions. (Compl. ¶¶ 55, 57.) Merrill

was not alone. Citigroup, Morgan Stanley, UBS, Deutsche Bank, Credit Suisse, Wachovia, Bank of America and numerous others recorded substantial write-downs of CDOs and other subprime-backed assets in late 2007 and 2008. See infra nn.13-15. Predictably, securities class action suits such as this one have been filed against virtually every major financial institution with any connection to subprime mortgage assets. More than ninety such lawsuits[7] are winding their way through courts throughout the country.

Economic conditions throughout 2007, coupled with the seizure of the credit markets in August, took their toll on financial stocks. Plaintiffs allege that Merrill's stock declined 49% during the Class Period as a "direct and proximate result" of the alleged fraud. (Compl. ¶ 384.) But other financial stocks declined comparably during 2007. For example, between January 2007 and January 2008, Citigroup stock fell as much as 55% from its high, Morgan Stanley stock fell 47%, and Bear Stearns stock fell 59%. (Exs. R, T & Q.) By October 5, 2007, when Plaintiffs claim the "fraud" was first revealed (Compl. ¶¶ 5, 307-08), Merrill's stock had already dropped more than 20%.

The "post mortem" on the credit crisis will no doubt continue, but market observers already understand that the underlying causes were unforeseen by most and certainly as to Merrill were not, as Plaintiffs attempt to allege, the result of fraudulent conduct. For example, Alan Greenspan recently explained that one root problem was the manner in which risks were modeled:

---

[7] See Kevin M. LaCroix, The D&O Diary: Subprime-Related Securities Class Action Lawsuits (last updated July 14, 2008), http://69.177.1.186/clients/blog/subprimelawsuitslist.doc (tallying securities class action suits relating to subprime crisis); Kevin M. LaCroix, The D&O Diary: Subprime-Related Derivative Litigation (last updated June 24, 2008), http://69.177.1.186/clients/blog/subprime derivativelist.doc (tallying derivative suits relating to subprime crisis); Kevin M. LaCroix, Counting the Subprime Lender Lawsuits (last updated July 14, 2008), http://www.dandodiary.com/2007/04/articles/ securities-litigation/counting-the-subprime-lender-lawsuits/index.html (tallying ERISA suits relating to subprime litigation).

> The essential problem is that our models – both risk models and econometric models – as complex as they have become, are still too simple to capture the full array of governing variables that drive global economic reality. . . . When . . . asset prices, rather than offsetting each other's movements, fell in unison on and following August 9[, 2007], huge losses across virtually all risk-asset classes ensued.

Alan Greenspan, We Will Never Have a Perfect Model of Risk, Fin. Times (London), Mar. 16, 2008 (Ex. H).  The IMF's director of capital and monetary markets offered a similar observation: "There has been a collective failure to appreciate the extent of leverage in the financial system and the associated risks of disorderly unwinding[.]'"  Christopher Swann, IMF Says Financial Losses May Swell to $945 Billion (Update 2), Bloomberg, Apr. 8, 2008.  Floyd Norris of the New York Times observed "there is a limit to the usefulness of finger-pointing.  Most of the critics – myself included – did not anticipate the severity of the credit collapse, and we should not act as if the executives and regulators who failed to prevent it were blind or stupid."  Floyd Norris, It's a Crisis and Ideas Are Scarce, N.Y. Times, Apr. 11, 2008, at C1.

*    *    *    *

When the Complaint is examined against this backdrop, it becomes readily apparent that its charges of securities law violations must be dismissed as a matter of law.  In a series of recent decisions, the Supreme Court has interpreted the heightened pleading requirements and related provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (the "PSLRA") (codified in part at 15 U.S.C. §§ 77z-1, 78u-4), as an "effort to deter or at least quickly dispose of suits whose nuisance value outweighs their merits" and which "placed special burdens on plaintiffs seeking to bring federal securities fraud actions."  Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 82 (2006).  The Court stressed the role of the district courts as gatekeepers in dismissing, at the pleading stage, federal securities claims that do not meet the PSLRA's exacting pleading standards.  See Dura

Pharms., Inc. v. Broudo, 544 U.S. 336, 345-46 (2005) (complaints must allege loss causation); see also Tellabs, 127 S. Ct. at 2509-10 (complaints must allege "strong inference" of scienter); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 770-74 (2008) (rejecting "scheme liability" under the Securities Exchange Act of 1934 (the "Exchange Act")). Since long before these recent Supreme Court decisions, courts have routinely dismissed claims amounting to nothing more than "fraud by hindsight" – attempts to second guess business decisions in the wake of a market downturn, see, e.g., Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.), and have continued to apply this principle in connection with the recent credit crisis, see In re 2007 Novastar Fin., Inc. Sec. Litig., 07-0139-CV, 2008 U.S. Dist. LEXIS 44166, at *15 (W.D. Mo. June 4, 2008) (claims against lender arising out of 2007 credit crisis "are more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community").

Here, Plaintiffs offer a series of such after-the-fact claims, including that Merrill recklessly accumulated AAA-rated super-senior CDO tranches, when it should have known the market would tumble (Compl. ¶¶ 92-107); it should have taken write-downs earlier, because it supposedly knew the value of the AAA-rated super-senior CDOs had declined as early as February 2007 (id. ¶¶ 142-53); Individual Defendants "ignored" or "overrode" Merrill's risk management policies (id. ¶¶ 16(b), 38, 93, 95, 98, 204, 207); and Merrill misrepresented the effectiveness of its risk management procedures and hedging strategies, which failed to prevent losses to assets that were previously considered low-risk (id. ¶¶ 6, 16(e), 50, 221(c)). However, stripped of its hyperbole, its pages of irrelevant quotations from accounting literature, and its Monday-morning quarterbacking, the Complaint suffers from all the typical, interrelated defects

8

of similar cases that have clogged the courts (and which have ultimately been dismissed) after past economic downturns – and it presents precisely the type of case that Congress intended to be dismissed at the pleading stage.

First, Plaintiffs' claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 (2008), are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and Section 21D(b)(l) of the Exchange Act.  One of the principal requirements is that where, as here, plaintiffs level charges of fraud based on "information and belief," they must with particularity "'set forth the facts "on which [a] belief" that a statement is misleading was "formed."'" Dabit, 547 U.S. at 81-82 (quoting Dura, 544 U.S. at 345).  In violation of this requirement, Plaintiffs have based their pleading almost entirely on a collection of press reports, which in turn report the vague, second-hand accounts of unnamed sources; allegations in pleadings from other actions involving Merrill, some of which have already been rejected by Judge Rakoff in granting summary judgment in favor of Merrill affiliates;[8] and ipse dixit assertions with no alleged foundation at all.  See infra, Point I.B.

Second, under Section 21D(b)(2) and Rule 9(b), Plaintiffs are required to allege, with particularity, facts giving rise to a "strong inference" of scienter, i.e., an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 127 S. Ct. at 2504-05.  But the only cogent and the more compelling inference is that Merrill, like its peers and the market regulators, simply failed to predict the severity of the downturn and, in hindsight, Merrill's risk management procedures were unable to prevent losses when a literally

---

[8]    Merrill Lynch Int'l v. XL Capital Assurance Inc., 08 Civ. 2893, 2008 U.S. Dist. LEXIS 53467 (S.D.N.Y. July 15, 2008).

worst case scenario actually materialized.  The Complaint is devoid of allegations showing that Merrill's decision to invest in AAA-rated debt securities amounted to intentional wrongdoing or deliberately reckless misconduct.  Similarly, Plaintiffs cannot allege facts showing that anyone at Merrill knew the super-senior CDOs had lost market value before they were written down. Merrill has not been required to restate any of its financial statements with respect to the CDO valuations and Plaintiffs cannot point to any other major financial institution that took substantial write downs on super-senior CDOs before Merrill did.  The decision whether and when to write down a complex asset is highly judgmental and courts will not infer fraud from allegations that such a write down should have been taken a few months earlier than it was.  See infra, Point I.C.1(a).

Plaintiffs' failure to allege any cogent motive for Merrill to have committed fraud further undermines any possible inference of scienter.  According to Plaintiffs, the Individual Defendants constructed a "house of cards" by causing the Company to pour billions of dollars into CDOs they supposedly knew were destined to generate losses.  But the Individual Defendants are largely compensated in restricted equity, so the notion that they would engage in a short term fraud to increase Merrill's revenues by a minute fraction, in a manner that was sure to cause them great personal loss, is far from cogent.  Indeed, Plaintiffs offer no logical explanation why, if Merrill truly understood the credit markets were going to deteriorate, it did not invest against the market rather than allegedly pouring money into long positions.  Making what turns out in hindsight to be a bad investment is not securities fraud.

Plaintiffs allege that the Individual Defendants were motivated to commit fraud in order to sell stock at inflated prices, but defendant Edwards, the Company's CFO, who made many of the allegedly false statements, did not sell any stock during the Class Period and the

other Individual Defendants held onto the vast majority of their holdings and suffered losses along with other shareholders. Moreover, Merrill itself repurchased more than $5 billion of its stock during the first three quarters of 2007. Plaintiffs cannot allege any plausible (let alone cogent and compelling) set of facts that would explain why Merrill's senior management would have simultaneously acted to "inflate" Merrill's stock price, then use Merrill's cash to repurchase stock, knowing that the Company would soon be required to take substantial losses on the CDOs. See infra, Point I.C.2.

Furthermore, Plaintiffs' attempt to satisfy Tellabs by pleading that Merrill acted with extreme recklessness is precluded by the Second Circuit's recent decision in Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc., Docket No. 06-2902-cv, 2008 U.S. App. LEXIS 13449 (2d Cir. June 26, 2008). Dynex involved a claim that Dynex management must have known about the reasons for the deterioration in bonds backed by manufactured home loans. Applying Tellabs, the Second Circuit reiterated the need for plaintiffs to allege the existence and details of contemporaneous documents or reports that were contrary to the public statements at issue in order to raise a strong inference of scienter. See Dynex, 2008 U.S. App. LEXIS 13449, at *14-15.

Here, as in Dynex, what is missing from the Complaint are well-pleaded allegations showing that Merrill executives knew of, but fraudulently concealed, the extreme risks Plaintiffs claim existed earlier in the Class Period. Essentially, all Plaintiffs offer is the following flimsy narrative:

- Plaintiffs allege that Merrill and the Individual Defendants must have known of increasing defaults on subprime mortgages and the bankruptcies of several loan originators in late 2006 and early 2007. (Compl. ¶¶ 116-41.) They also point to a single instance

11

in which Merrill supposedly "caused" one of the loan originators from which it purchased loans to "loosen" its underwriting standards to generate more loans with high interest rates.  (Id. ¶¶ 132-33.)  These allegations are irrelevant and certainly insufficient under Dynex because they do not show that Merrill's senior officers received reports showing that defaults and recovery rates on subprime loans were so severe as to cause a decline in value of the AAA-rated super-senior CDO tranches.

- Plaintiffs further allege that Merrill must have known that accumulating super-senior CDOs was risky because, according to a newspaper report, at the end of 2005 American International Group ("AIG"), the large insurer, decided to stop "insuring mortgage securities" supposedly because it was concerned about lax home-lending standards.  (Id. ¶ 100.) But there is no allegation that anyone at Merrill knew why AIG stopped insuring mortgage securities.  Plaintiffs also acknowledge that Merrill was able to insure CDOs even into the third quarter 2007 by hedging them with "monoline" bond insurers.  (Id. ¶ 106.)

- Plaintiffs allege that some Merrill employees disagreed with the Company's strategies.  Primarily, Plaintiffs rely on a newspaper article repeating an anonymous source who supposedly stated that Jeff Kronthal, the alleged head of Merrill's CDO business before the Class Period, supposedly warned unnamed "top Merrill executives" that continuing the CDO business would require Merrill to "assume an open-ended risk if these highly illiquid securities ran into credit trouble."  (Id. ¶ 101.)  There are no allegations that Kronthal or anyone else expected the AAA-rated super-senior CDOs to run "into credit trouble" or that he believed the super-senior tranches were declining in value.  The Complaint also lacks any other details regarding the "risk" to which Kronthal was referring or the basis for his concerns.  Critically, the Wall Street Journal article upon which Plaintiffs rely also reported:  "Still, executives believed

12

that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgage securities."  Susan Pulliam et al., <u>Merrill Upped Ante as Boom In Mortgage Bonds Fizzled</u>, Wall St. J., Apr. 16, 2008, at A1 (Ex. M).  None of Plaintiffs' allegations suggests this was not the case.

- Plaintiffs allege that Merrill and the Individual Defendants must have known that the CDOs were overvalued because the so-called ABX and TABX indices, which track a small handful of derivative securities tied to subprime mortgage-backed bonds, were declining during the Class Period.  But Plaintiffs do not allege any facts concerning the factors Merrill considered in valuing its CDOs or why the resulting valuations were fraudulent.  Valuing a portfolio of complex securities such as CDOs is an art, not a science, and Plaintiffs may not proclaim a fraud where "the Complaint establishes nothing more than that plaintiffs disagree with some of [Merrill]'s investment valuations."  <u>In re Allied Capital Corp. Sec. Litig.</u>, 02 Civ. 3812, 2003 U.S. Dist. LEXIS 6962, at *13 (S.D.N.Y. Apr. 21, 2003).  Pointing to the ABX and TABX does not help Plaintiffs because they cannot allege facts showing that these indices represented the value of Merrill's CDOs.  Indeed, Markit, the company that created the ABX and TABX, recently explained the inappropriateness of using its indices to value individual securities:

> The ABX may be a standardised and liquid tradable index but it was not designed to be uncritically extrapolated to the broader [Asset Backed Securities] market, and it was certainly not designed as a valuation tool for individual securities.
>
> Compare the ABX to equity indices.  While movements in the Dow Jones Industrial Average, for example, may provide a snapshot of market performance, the index performance will not give an equity investor information on the performance or value of a specific stock.  You would not mark Vodafone stock using the Dow Jones, of which it is not even a member, nor would you mark Ford bonds using the Markit CDX IG, which does not contain Ford either.

Ben Logan, <u>The ABX Index:  A Pricing Conundrum</u>, Credit, May 1, 2008, at 48 (Ex. J).  Not surprisingly, Plaintiffs cannot allege that it was industry practice to mark down super-senior

CDOs based solely on movements in these indices.  To the contrary, like Merrill, other financial institutions did not start to take significant CDO write downs until the third quarter 2007.

Third, Plaintiffs are required, but have failed, to plead loss causation, i.e., that the subject of the allegedly concealed risk caused the actual loss they suffered.  The Second Circuit has held that "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors,'" as is unquestionably the case here, it becomes less likely the loss was caused by an alleged fraud.  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted).  Plaintiff must allege facts showing "'that its loss was caused by the alleged misstatements as opposed to intervening events.'"  Id. (citation omitted).  Here, Plaintiffs allege that the 49% decline in Merrill's common stock price over the Class Period was "caused" by the purported fraud, but they do not even attempt to account for the effects of the worst economic downturn in recent history that caused similar declines across other financial institution stocks.  They also cannot explain why Merrill's stock rose on October 5, 2007 when the "truth" was supposedly first revealed or why it declined so much before then.  See Point I.D.

Fourth, Plaintiffs fail to plead, with particularity, each of the false or misleading statements upon which their claim is based and the reasons why each statement was misleading, as required by the PSLRA.  It appears that Plaintiffs assert that virtually everything Merrill said about its business was false or misleading because it:  failed to disclose the supposedly "ultra risky" CDO holdings, overvalued these positions beginning in the first quarter of 2007 and misrepresented the effectiveness of its risk management controls and strategies.  Plaintiffs misconstrue many statements or take them out of context.  An overarching flaw, however, is that these allegations all depend on hindsight and Plaintiffs have not alleged that anyone at Merrill

knew earlier that the AAA-rated super-senior CDOs were extremely risky or that they had declined in market value. See infra, Point I.E.

Fifth, the Complaint fails to state a claim under Section 11 or 12 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*, or Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a). Plaintiffs' Securities Act claims are based on several offerings of preferred stock during the Class Period and on Merrill's acquisition of First Republic Bank in September 2007 for cash and Merrill stock, while the claim under Section 14(a) is based on the proxy statement issued in connection with the First Republic transaction. In an apparent attempt to avoid the heightened pleading requirements of Rule 9(b), Plaintiffs divided their Complaint into two pieces, with the second half of the Complaint presenting a watered down version of their fraud tale in support of the Securities Act and Section 14(a) claims. Because these claims are based on the same purported wrongdoing as Plaintiffs' fraud claims, however, they "sound in fraud" and are subject to dismissal under Rule 9(b). Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004). Regardless of the standard applied, the Securities Act and Section 14(a) claims are defective because Plaintiffs have failed to allege, with particularity or otherwise, that the various registration statements and prospectuses they challenge contained or incorporated any untrue statements of material fact or any actionable omissions. See infra, Points II & III.

For these and the additional reasons described below, the Complaint should be dismissed with prejudice.

# FACTUAL BACKGROUND[9]

## A.     Merrill and Its Business

Through its subsidiaries, Merrill provides investment banking, research and brokerage services, among others.  (Compl. ¶ 68.)  Merrill is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, serves as a strategic advisor to corporations, governments, institutions and individuals worldwide, and makes principal investments of its own capital in a number of assets, including mortgage-backed securities and private equity.  See Merrill 10-K (2006), at 21-22 (Ex. V).  For the fiscal year ended December 29, 2006, Merrill had assets of $841 billion and total net revenue of $34.659 billion and managed client assets of approximately $1.6 trillion.  See id. at 21, 28-29, 40.

Merrill's CDO business was part of its Fixed Income, Currencies and Commodities ("FICC") unit.  The CDO business was only one small part of Merrill's overall operations.  In 2006, for example, Plaintiffs allege that Merrill's fee revenue from the CDO

---

[9]     For purposes of a motion to dismiss, "courts must consider . . . sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, 127 S. Ct. at 2509; see also ATSI Comm'cns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (court may consider statements or documents incorporated into complaint by reference, "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit") (citation omitted).  Newspaper articles and press releases are appropriate subjects for judicial notice, see, e.g., Condit v. Dunne, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) (reviewing articles "as evidence of the media frenzy"), as are speeches by government officials, see, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 383-88 (S.D.N.Y. 2003) (speeches by SEC chairman and newspaper and journal articles showed widespread reporting of potential conflicts of interests of securities analysts), stock quotes, see, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003), analyst reports, see, e.g., In re Sina Corp. Sec. Litig., 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089, at *22-26 (S.D.N.Y. Sept. 25, 2006), as well as market phenomena, see, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416, 421 n.6 (S.D.N.Y. 2003) (judicial notice of "the internet bubble and its subsequent crash"); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); Kramer v. Time Warner, 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse).

business was approximately $700 million, which represented only about 2% of Merrill's net revenues for that year.  (Compl. ¶ 18.)

In its public filings, Merrill advised the market that its business involved substantial risks that are inherent to the financial services business, including the very risks that materialized during the Class Period.  For example, Merrill's 2006 10-K contained two pages describing risks that could affect its business, including the following warnings:

- **Market Risk**

  **Our business may be adversely impacted by global market and economic conditions that may cause fluctuations in interest rates, exchange rates, equity and commodity prices and credit spreads.**  We are exposed to potential changes in the value of financial instruments caused by fluctuations in interest rates, exchange rates, equity and commodity prices, credit spreads, and/or other risks. . . . <u>We have a large and increasing amount of proprietary trading and investment positions, which include proprietary trading positions in fixed income, currency, commodities and equity securities, as well as in real estate, private equity and other investments.  We may incur losses as a result of increased market volatility, as these fluctuations may adversely impact the valuation of our trading and investment positions.</u>  Conversely, a decline in volatility may adversely affect the results in our trading business, which depend on market volatility to create client and proprietary trading opportunities.

- **Credit Risk**

  **Our business may be adversely impacted by an increase in our credit exposure related to trading, lending, and other business activities.**

Merrill 10-K (2006), at 23 (boldface in original; emphasis added) (Ex. V).  Merrill further warned that market conditions may affect its ability to value holdings like CDOs:  "[C]omplex instruments may have immature or limited markets.  As a result, the pricing models used for valuation often incorporate significant estimates and assumptions, which may impact the level of precision in the Consolidated Financial Statements."  <u>Id.</u> at 25.

Merrill is a consolidated supervised entity ("CSE") subject to extensive oversight by the Securities and Exchange Commission ("SEC"), specifically with respect to its risk

management practices.  See Merrill 10-K (2006), at 22, 128 (Ex. V).  To qualify as a CSE, Merrill was required to consent to ongoing, firm-wide SEC supervision, including on-site inspections of Merrill's procedures for valuing, or "marking-to-market," complex and less-liquid positions.[10]

**B.      Subprime Mortgage Backed Securities and Collateralized Debt Obligations**

**1.      The Collateralized Debt Obligation Securitization Process**

This case concerns events in a sector of the fixed income securities market that securitizes residential mortgages into mortgage-backed securities ("MBS"), portions of which are often further securitized to create CDOs.  CDOs are complex securities whose value is derived from the cash flows produced by pools of collateral assets that may include a wide variety of debt obligations, including MBSs or other CDOs.  See Jennifer E. Bethel et al., Law and Economic Issues in Subprime Litigation, 12 (Mar. 2008) (Discussion Paper, Harvard, John M. Olin Center for Law, Econ., & Bus.) (hereinafter "Economic Issues").  Because Plaintiffs repeatedly attempt to conflate the supposed risks associated with CDOs with the ultimate underlying collateral, which may include subprime mortgages, it is important to explain the way in which a CDO is structured to allocate risk.

The securitization process starts with the origination or purchase of mortgage loans.  Large numbers of mortgages are pooled together to form the collateral for MBSs.  (Compl. ¶ 81.)  MBSs are divided into a number of senior, mezzanine and equity layers or "tranches," that each bear a different risk profile and credit rating based on the priority in which each tranche is paid the cash created by the underlying loans.  Senior tranches are paid first and are typically

---

[10]    See U.S. Sec. & Exch. Comm'n, Consolidated Supervision of Broker-Dealer Holding Companies: Program Overview and Assessment Criteria (Apr. 16, 2007).

high rated, e.g., AA to AAA.  Mezzanine tranches are paid after the senior tranches and are

typically rated lower, e.g., A to BBB.  Equity tranches – also known as "residuals" – are paid last

and are typically unrated.  Economic Issues at 9, 10.  MBSs, along with other types of collateral,

are then assembled into CDOs.  The following illustration depicts in simplified fashion typical

structures for CDOs ultimately backed by subprime mortgages:



**Source: Int'l Monetary Fund, Global Financial Stability Report (Apr. 2008) at 60.**

CDOs, similar to MBSs, are divided into tranches differentiated by, among other

things, the priority of payments from the cash flows produced by the underlying assets.  (Compl.

¶ 83; Economic Issues at 11.)  Even if the assets in the collateral pool are not AAA-rated, by

subordinating the junior tranches issued by the CDO, the senior tranches can be protected from

credit losses and still earn higher ratings.  See Dugan Remarks at 4.  As Plaintiffs acknowledge,

"the highest tranche of the CDO will not experience losses unless and until all lower tranches

have recorded the full amount of losses allocated to them.  . . . *[T]he higher tranches are*

*typically rated higher, signifying lower credit risk*."  (Compl. ¶ 83 (emphasis added).)

CDOs often have a AAA-rated "super-senior" tranche with payment priority over

even the AAA-rated tranche.  As the Comptroller of the Currency, John Dugan, recently

observed, "[b]y being senior to the triple A tranche, the super-senior tranche would have an even

lower probability of default than triple-A rated securities generally, including triple A-rated corporate securities." Dugan Remarks at 4. CDOs are structured with additional "credit enhancements," including bond insurance, over-collateralization and reserve funds that further protect the senior tranches. See Frank J. Fabozzi, Credit Enhancements for Nonagency MBS Products, in The Handbook of Mortgage Backed Securities 113-22 (Frank J. Fabozzi, ed., 6th ed. 2006) (Ex. D). The subordination of junior tranches and other credit enhancements made the greater than AAA-ratings on the super-senior tranches "a powerful designation of safe credit to the investing community." Dugan Remarks at 4.

Plaintiffs concede that the super-senior tranches posed "lower credit risk." (Compl. ¶ 83.) To characterize them as "ultra-risky" investments (id. ¶ 244), Plaintiffs make the misguided and unsupported allegation that "despite the fact that large chunks of the debt retained by Merrill was so-called AAA super-senior debt, Merrill was still exposed to significant risk with these positions. This is true because . . . the assets in the CDO generally had a weighted average rating of BBB, or below investment grade." (Id. ¶ 91.) Although this is the fulcrum of their Complaint, Plaintiffs do not allege why the subordination and other credit enhancements were insufficient to justify the AAA-ratings and extremely low loss expectations of the super-senior positions. (Id.) Moreover, they admit that less than half of Merrill's CDO losses related to CDOs "comprised of assets rated BBB or lower." (Id. ¶ 92.) Most of Merrill's super-senior CDOs had "collateral having an average credit rating of Aa3/A1." Merrill 10-K (2007), at 36 (Ex. W).

### 2.     Merrill's Asset Securitization Business

By 2006 Merrill's FICC group had become a leader in securitizing and trading structured finance products backed by subprime mortgages. (Compl. ¶ 18.) Merrill's leadership

position in this business was well known to the market.  See, e.g., Allison Pyburn, ML leads banner CDO year, Asset Securitization Report, Jan. 8, 2007 (Ex. N).

Merrill reported the increasing volume of its securitization business.  In its 2006 Form 10-K, Merrill disclosed that it had "securitized assets of approximately $147.2 billion and $90.3 billion for the years ended December 29, 2006 and December 30, 2005, respectively" and that the substantial majority of the assets securitized were residential mortgages.  Merrill 10-K (2006), at 99 (Ex. V).  Merrill also disclosed that its December 2006 acquisition of First Franklin, a subprime mortgage originator of more than $29 billion in loans in 2005 alone, was expected "to accelerate [its] vertical integration in mortgages, adding scale to our mortgage securitization and trading platform."  Id. at 32-33; Merrill Press Release, Merrill Lynch Announces Agreement to Acquire First Franklin from National City Corporation (Sept. 5, 2006) (Ex. NN).[11]  Merrill's 10-Qs for the first two quarters of 2007 show that the volume of its securitization had roughly doubled over the prior year.  E.g., Merrill 10-Q (2Q 2007), at 31 (Merrill "securitized assets of approximately $126.3 billion and $62.8 billion for the six months ended June 29, 2007 and June 30, 2006, respectively") (Ex. Y); Merrill 10-Q (1Q 2007), at 30-31 (Ex. X).

The market was thus well aware of Merrill's exposure to the extensive volume of mortgage-related assets flowing through its business.  As part of the securitization business, the underlying loans, MBSs or other assets, are held in a "warehouse" before being deposited as collateral into a CDO.  (Compl. ¶ 82.)  Once a CDO was completed, lower-rated tranches would be sold and, Plaintiffs allege, Merrill would retain the super-senior tranches outright, or would

---

[11]    Reflecting the optimism for the sector, other financial institutions pursued similar strategies.  See Rick Green, Lehman Shuts Unit (Bloomberg, Aug. 23, 2007) (noting that Fortress, Deutsche Bank, Barclays, Morgan Stanley, Bear Stearns, HSBC, Citigroup and others all purchased mortgage originators in 2006 and 2007), available at http://www.bloomberg.com/apps/news?pid=20601206&sid=aQBUrPcefMtc&refer=realestate.

enter into hedging transactions relating to them.  (Id. ¶¶ 85-86, 89.)  Thus, at any given time, Merrill might have exposure to subprime mortgages through loans and MBSs stored in warehouses, through CDO tranches it had retained, and through derivative contracts relating to the CDOs.  (Id. ¶¶ 82, 85-86, 89.)

**C.     As the Housing Market Contracts into the First Half of 2007, Merrill Shifts Its Residential Mortgage Exposure Toward Higher Rated Securities**

**1.     Defaults on Subprime Mortgages Increase But the Market Does Not Expect Losses on High-Rated CDO Securities**

After a long period of low interest rates and a concomitant increase in house price appreciation, between 2004 and 2006 the Federal Reserve raised interest rates 17 times.  Federal Reserve Board, Open Market Operations, http://www.federalreserve.gov/fomc/fundsrate.htm. By 2006, while a slowdown in the housing market was expected, many market observers generally believed any downturn would be mild.  For example, in testimony before Congress in April of that year, Federal Reserve Chairman Bernanke stated that the available data on the housing market suggested that "this sector will most likely experience a gradual cooling rather than a sharp slowdown."  Outlook of the U.S. Economy:  Hearing Before the Joint Econ. Comm., 110th Cong. (2006) (testimony of Ben Bernanke).

Although in early 2007 delinquency rates on subprime loans were increasing, as noted above, supra page 3, regulators and market participants still did not believe this would lead to broader effects on the economy.  In April 2007, the International Monetary Fund observed that "deterioration in the credit quality of subprime mortgages" "was not likely to pose a serious systemic threat" to tranches rated A and higher:

> Stress tests conducted by investment banks show that, even under scenarios of nationwide house price declines that are historically unprecedented, most investors with exposure to subprime mortgages through securitized structures will not face losses.  [One] stress test illustrate[s] . . . that tranches rated A and higher would not face losses unless house prices fell 4 percent per year for four years.

IMF Global Fin. Stability Report (April 2007), at 7 ("[E]ven the relatively risky BBB tranches only begin to face losses once housing prices fall by 4 percent per year," and noting the most recent data available indicated that "housing price appreciation for the fourth quarter of 2006 running at 5.9 percent year-on-year.").

### 2.    Merrill Shifts Its Exposure from Residential Mortgages to Super-Senior Tranches of CDOs

Merrill released its earnings for the first quarter 2007 on April 19, 2007. (Compl. ¶ 243.) Although it reported near record revenues for the quarter, Merrill acknowledged that revenues would be impacted by the economy: "Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S." (Id.)

Similarly, Merrill had a strong second quarter 2007, but warned of a "decline in net revenues from the structured finance and investment business, which includes mortgage-related activities." (Id. ¶ 277.) Merrill further cautioned that:

> [T]he challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the subprime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. *Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact those exposures and results of operations.*

(Id. ¶ 294 (emphasis added).) Thus, Merrill did not hide its substantial exposure to the subprime market, including CDOs, and that its business could suffer if conditions worsened.

Plaintiffs allege that, as problems in the subprime mortgage market emerged, Merrill accelerated its CDO underwriting and retained an increasing amount of the super-senior

tranches, which were supposedly more difficult to sell given their low yields.  (Id. ¶¶ 21, 22, 31.)

Plaintiffs may challenge Merrill's strategy in hindsight, but Merrill did not conceal that it was

holding onto higher-rated securities.  Merrill disclosed that it was engaging in "proactive,

aggressive risk management" which involved transforming the exposure it faced from higher-risk

subprime loans and lower-rated MBSs in its "warehouse" to the least risky, higher-rated

securities, such as the super-senior CDOs.  (Id. ¶ 49.)  For example, during Merrill's July 17,

2007 investor conference, defendant Edwards stated:

> But aggressive risk management, I think has certainly helped transform our risk
> profile since the end of the year.  We have seen significant reductions in our
> exposure to lower rated segments of the market.  Our warehouse lines are down
> materially, our whole loan inventory is down materially, as was the case in the
> last quarter.  We will see a modest increase in our residual position.  But it will be
> small relative to our overall retained interest piece.  And I think the majority of
> our exposure continues to be now in the highest credit segment of the market.

(Id. ¶ 278.)[12]  He later noted "an important transformation of the components of that asset base,

where the exposure that we retain is in the higher rated tranches of the exposure.  And what we

have done is reduce exposure in some of the broader lower rated categories."  Merrill Earnings

Call (2Q 2007), at 12 (Ex. FF).

## D.    Credit Markets Seize Up in the Third Quarter 2007 and the Market for Asset Backed Securities Abruptly Dries Up

In mid-August 2007, an unprecedented confluence of events caused a rapid and

widespread liquidity freeze in the credit markets worldwide.  Concern regarding subprime

mortgage-related securities drove investors to pull back from a wide range of structured finance

markets.  See CSI: Credit Crunch, Economist, Oct. 18, 2007 (Ex. B).  Overnight interbank rates

---

[12]    The "residual" interests are the unrated equity portions of MBSs and CDOs.  See William W. Bartlett, Mortgage-Backed Securities:  Products, Analysis, Trading at 396-98 (1989) (Ex. A).  Although Plaintiffs argue that Mr. Edwards' reference to residual interests was somehow misleading about Merrill's subprime exposure, Plaintiffs do not contend that the statement was inaccurate nor do they base their claims on any purported misrepresentation of Merrill's residual positions.

spiked and the commercial paper market seized up.  See id.; see also Alan Greenspan, The Roots of the Mortgage Crisis, Wall St. J., Dec. 12, 2007, at A19 (Ex. G).  As the IMF noted, "the markets for subprime mortgage-backed securities became illiquid at the very time that highly leveraged investors such as hedge funds needed to adjust positions or trade out of losing positions. . . .  As a result, hedge funds stopped trading, and the collateralized debt obligations market and related credit derivatives markets essentially ceased to exist."  Randall Dodd, Subprime:  Tentacles of a Crisis, Fin. & Development, (IMF quarterly magazine) Dec. 2007, at 15 (Ex. C).  It was not until late October 2007 that any significant number of AAA-rated CDOs were downgraded by the rating agencies.  See supra n.4.

## E.    Merrill Announces Third Quarter and Fourth Quarter 2007 Losses

Plaintiffs admit that the CDO market continued to be active in the first half of 2007 (Compl. ¶¶ 78, 106), and do not allege facts showing that market data was unavailable for Merrill to mark-to-market its CDO positions.  In the third quarter 2007, when liquidity in the MBS and CDO markets dried up, Merrill and other institutions suddenly could no longer look to market observables and were required to value their holdings using complex models.  Merrill 10-Q (3Q 2007), at 27 (Ex. Z); see also Inst. of Internat'l Fin., Final Report of the IIF Comm. on Market Best Practices (July 2008), at 16 ("[D]uring the recent stressed market conditions, illiquidity made valuation of many instruments much more challenging.") (hereinafter "IIF Report").

A few weeks after the credit crisis erupted, Merrill made additional disclosures regarding its subprime exposure in connection with the anticipated closing of Merrill's acquisition of First Republic Bank, which was scheduled for September 21, 2007.  In a Form 8-K filed with the SEC on September 14, 2007, Merrill repeated the warning it had included in its

second quarter Form 10-Q, regarding the risks associated with Merrill's subprime exposure, see supra, page 23, and further warned that it was already taking write-downs in the third quarter:

> Credit market conditions have continued to remain challenging in the third quarter, and the firm, as part of its regular accounting processes, has made requisite fair value valuation adjustments as appropriate to certain of these exposures, which are reflected in our third quarter to date results.

(Compl. ¶ 301.)

On October 5, 2007 – just days after the quarter ended and a month before its quarterly SEC report was otherwise due – Merrill pre-announced that it anticipated that it would write down "an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages." (Compl. ¶ 307; Merrill 8-K (Oct. 5, 2007) (Ex. CC).) Merrill explained that the additional losses "reflect[ed] in part significant dislocations in the highest-rated tranches of these securities which were affected by the unprecedented move in credit spreads and a lack of market liquidity in these securities, which intensified during the third quarter." (Id.) Merrill's stock price did not decline on these disclosures; *instead, it closed up $1.89 over the previous day's close.* (Merrill Stock Trading Data) (Ex. P). This increase is particularly noteworthy given that Merrill's stock price prior to that date had steadily declined by 20% from its Class Period high.

On October 24, 2007, Merrill reported its third quarter results, which included $7.9 billion in subprime-related write-downs. Merrill explained that "[i]n light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. . . . We expect market conditions for subprime mortgage-related assets to continue to be uncertain." (Compl. ¶ 310.) As Merrill detailed in its Business Segment Review:

> FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. sub-prime mortgages. These positions consist of

> CDO trading positions and warehouses, as well as U.S. sub-prime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. . . .
>
> Third quarter write-downs of $7.9 billion across CDOs and U.S. sub-prime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.

Merrill 8-K (Oct. 24, 2007), at 3 (Ex. DD). The $7.9 billion write-down included super-senior CDO losses of $5.6 billion; other "retained and warehouse" losses of $1.1 billion; and $1 billion of losses related to "U.S. subprime related exposures." Id. at 3-4 (Ex. DD). Of the super-senior positions, $1.9 billion of the write down was to high-grade CDOs, $3.1 billion was mezzanine, and $800 million was CDO-squared. See id. at 4.

On January 17, 2008, Merrill announced additional write-downs of "$11.5 billion related to U.S. ABS CDOs and subprime mortgages and $3.1 billion of credit valuations related to the firm's hedges with financial guarantors" in the fourth quarter of 2007. (Compl. ¶ 329.) Similar to Merrill, other financial institutions worldwide announced large losses beginning in October 2007, including Citigroup,[13] UBS,[14] Morgan Stanley and others.[15]

---

[13]  See Citigroup, Annual Report (Form 10-K), at 30, 48 (Feb. 22, 2008) (reporting 2007 mortgage-related losses of $20.4 billion, $14.2 billion of which related to super-senior ABS CDOs).

[14]  See UBS, Annual Report (form 20-F), at 28 (Mar. 18, 2008) (reporting 2007 sub-prime mortgage losses of $14.6 billion, $9.2 billion of which related to super-senior ABS CDOs, which UBS believed to have little impact on its VaR analysis due to their historically low volatility and AAA rating).

[15]  See Morgan Stanley, Annual Report (Form 10-K), at 34, 53 (Jan. 29, 2008) (noting that the majority of its 2007 mortgage related losses of $9.4 billion related to super-senior ABS CDOs); see also Bear Stearns Cos., Inc., Annual Report (Form 10-K), at 42 (Jan. 29, 2008) (noting that a "large component" of its $2.3 billion write-down related to CDO positions); Press Release, Deutsche Bank Reports Third Quarter 2007 Net Income of EUR 1.6 Billion, Up 31% (Oct. 31, 2007) (reporting $3.17 billion in subprime write-downs); Press Release, Credit Suisse Group Reports Net Income of CHF 1.3 Billion for the Third Quarter of 2007 (Nov. 1, 2007) (reporting $1.1 billion write-down of structured products, including CDOs.); Wachovia, Current Report (Form 8-K) (Nov. 9, 2007) ($1.1 billion write-down of *(cont'd)*

27

## ARGUMENT

## THE CONSOLIDATED AMENDED
## COMPLAINT SHOULD BE DISMISSED

**I.    PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5**

**A.    Standard of Review**

In Bell Atlantic v. Twombly, the Supreme Court held that to survive dismissal under Rule 12(b)(6), the plaintiff must allege facts that "raise a right to relief above the speculative level." 127 S. Ct. 1955, 1965 (2007); see also ATSI Comm'cns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ("Allegations that are conclusory or unsupported by factual assertions are insufficient."). Claims under Section 10(b) are also subject to the heightened pleading requirements of the PSLRA and Rule 9(b). The PSLRA "'insists that securities fraud complaints "specify" each misleading statement; that they set forth the facts "on which [a] belief" that a statement is misleading was "formed"; and that they "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."'" Dabit, 547 U.S. at 81-82 (alteration in original) (quoting Dura Pharms., 544 U.S. at 345); see also Lentell, 396 F.3d at 168 ("[R]ule [9(b)] is applied assiduously to securities fraud."); 15 U.S.C. § 78u-4(b)(1), (2).

**B.    Plaintiffs' Allegations Drawn from Press Clippings and Pleadings in Other Cases Are Insufficient Under Rule 9(b) and the PSLRA and Certain Allegations Should Be Stricken**

In the preamble to their Complaint, Plaintiffs confess that their allegations are based on no more than "a review of the public announcements made by defendants, [SEC] filings,

_____

*(cont'd from previous page)*
    CDOs.); Bank of America, Current Report (Form 8-K) (Nov. 13, 2007) (announcing an estimated
    fourth quarter subprime write-down of $3 billion).

press releases, analyst and media reports regarding Merrill, pleadings and other documents filed in other litigations involving Merrill, and certain other public filings." (Compl. at p.1.) As promised, the succeeding 686 paragraphs of the Complaint, which Plaintiffs had more than six months to investigate, are based almost exclusively on a collection of press clippings and public filings. This method of pleading securities fraud was considered improper under Rule 9(b) even before the PSLRA was enacted and surely is improper now. As Judge Mukasey observed in Hershfang v. Citicorp, 767 F. Supp. 1251 (S.D.N.Y. 1991) (a pre-PSLRA case), where the "[p]laintiffs have stitched together a patchwork of newspaper clippings and proclaimed the result a tale of securities fraud" their claims cannot survive dismissal under Rules 9(b) and 12(b)(6). Id. at 1259. Similarly, "conclusory allegations and opinions 'taken from a newspaper reporter's notebook' cannot satisfy the strictures of Rule 9(b) or the PSLRA and cannot be a predicate for [a fraud claim] under 10(b) and Rule 10b-5." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) (citation omitted).

Because Plaintiffs' allegations are based on information and belief, as opposed to personal knowledge, the Complaint must "'state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made.'" Rombach, 355 F.3d at 172 (alterations in original); see also 15 U.S.C. § 78u-4(b)(1). The alleged facts must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission" at issue. Novak v. Kasaks, 216 F.3d 300, 308, 314 n.1 (2d Cir. 2000). This requirement is considered "the PSLRA's single most important weapon against pleading fraud by hindsight because it forces plaintiffs to reveal whether they base their allegations on an inference of earlier knowledge drawn from later disclosures or from contemporaneous documents or other facts." In re Vantive Corp. Sec. Litig., 110 F. Supp. 2d 1209, 1216 (N.D. Cal. 2000), aff'd, 283

F.3d 1079 (9th Cir. 2002); see also Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th

Cir. 1999) ("Greater precomplaint investigation is warranted in fraud cases because public

charges of fraud can do great harm to the reputation of a business firm or other enterprise . . . .").

      The pervasive defects in Plaintiffs' pleading fall into three broad categories.  First,

Plaintiffs rely extensively on uncorroborated and unproven allegations from pleadings in other

cases involving Merrill.  (Compl. ¶¶ 104-07, 168-84).  Plaintiffs are not permitted to rely on

investigations conducted by counsel in other cases because their duty to investigate the factual

basis for their claims is "nondelegable."  Pavelic & LeFlore v. Marvel Entm't Group, 493 U.S.

120, 126 (1989); see also In re Connetics Corp. Sec. Litig., 542 F. Supp. 2d 996, 1005-06 (N.D.

Cal. 2008) (plaintiff's reliance on pleadings in separate case as basis for fraud claim violated

Rule 11).  All of the allegations drawn from other lawsuits should be ignored or stricken.  See

Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) ("[A]llegations about

[defendant] contained in pleadings from an unrelated lawsuit . . . are inadmissible.").[16]

      The danger of relying on unproven allegations in other cases is brought into stark

relief with respect to Paragraphs 179-184 of the Complaint.  In those paragraphs, Plaintiffs

contort allegations made by a monoline insurer, XL Capital Assurance ("XL"), that

unsuccessfully sought to repudiate insurance contracts on CDOs held by Merrill.  But less than

ninety days after the action was commenced, Judge Rakoff granted Merrill Lynch's motion for

summary judgment in all respects, declaring, among other things, that XL's purported

---

[16]   See also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 898 (2d Cir. 1976) (striking references to allegations in an SEC complaint that did not result in an adjudication on the merits); In re Merrill Lynch & Co. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("[R]eferences to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f) . . . ."); Geinko v. Padda, 00 C5070, 2002 U.S. Dist. LEXIS 3316, at *20-21 (N.D. Ill. Feb. 27, 2002) ("hearsay allegations" from other complaints improper).

"termination of all seven swaps was without legal basis." Merrill Lynch Int'l v. XL Capital Assurance Inc., 08 Civ. 2893, 2008 U.S. Dist. LEXIS 53467, at *25 (S.D.N.Y. July 15, 2008).

Second, many of Plaintiffs' critical factual allegations are based solely on media reports and are, again, uncorroborated by any investigation of counsel.  A number of the cited news articles purport to describe events occurring at Merrill well before the Class Period and are themselves based on hearsay reports of anonymous sources.  (E.g., Compl. ¶¶ 100-02, 109-14, 158-160.)  Plaintiffs' attempt to delegate their investigative responsibilities to newspaper reporters is improper.  Even if Plaintiffs had spoken directly to the anonymous sources, they would still need to allege sufficient facts to "support the probability that a person in the position occupied by the source would possess the information alleged." Novak, 216 F.3d at 314; see also CALPERS v. Chubb, 394 F.3d 126, 147 (3d Cir. 2004) (Novak "entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia").  Here, Plaintiffs do not allege any of these details and do not suggest they even know the identities of the sources for the articles.

To make matters worse, the Complaint takes liberties with the press reports.  For example, Plaintiffs draw upon an April 16, 2008 Wall Street Journal article for the bulk of their allegations concerning Merrill employee Jeffrey Kronthal.  (Compl. ¶¶ 100-01, 109-11.)  The article actually states that "some former Merrill executives say [that] Jeffrey Kronthal [had] imposed informal limits on the amount of CDO exposure the firm could keep on its books ($3 billion to $4 billion)."  Susan Pulliam et al., Merrill Upped Ante as Boom In Mortgage Bonds Fizzled, Wall St. J., Apr. 16, 2008, at A1 (Ex. M) (cited in Compl. ¶ 109).  Yet Plaintiffs elevate

31

these "informal limits" to "Merrill's risk management policies and guidelines," which purportedly were ignored. (Compl. ¶¶ 16(b), 38, 95, 98, 204(b), 211(c), 215(b), 221(b), 225, 232, 238(b), 259(b), 268(b), 280(c), 282, 297(b), 298, 302, 419.) They also omit the conflicting passage that, "[Merrill's] executives believed that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgages securities," Pulliam, supra.

Lastly, Plaintiffs offer no basis for many "facts" alleged in the Complaint. Examples are Plaintiffs' allegations that "[b]y the beginning of the Class Period, [defendants] knew of or received warnings that the market for CDOs was materially deteriorating" (Compl. ¶ 34); "Merrill was aware" that certain monoline insurers that insured its CDOs were not creditworthy (id. ¶ 103); and that "the Exchange Act Defendants were discussing at the time [September 14] the announcement of massive writedowns which would not be announced until after the First Republic Merger" (id. ¶ 302). Allegations such as these, "attributed to no source," are insufficient under the PSLRA. CALPERS, 394 F.3d at 155.

## C.    The Amended Complaint Fails To Plead Scienter

Under Tellabs, in analyzing whether a complaint adequately pleads a "'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." 127 S. Ct. at 2510. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Before Tellabs, courts in this Circuit recognized two principal methods for pleading scienter. First, scienter could be pleaded through allegations of "motive and opportunity" to commit fraud. Novak, 216 F.3d at 307. However, in Tellabs, the Supreme Court held that "motive" allegations may not be considered in isolation and instructed that "the

32

significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  127 S. Ct. at 2511.  Alternatively, scienter could be pleaded by alleging facts showing "strong circumstantial evidence of conscious misbehavior or recklessness."  Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001).  In this context, recklessness means "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id. at 142 (citation and internal quotation marks omitted).  Regardless of the pleading method used, the scienter allegations must now satisfy the Tellabs test.  See Dynex, 2008 U.S. App. LEXIS 13449, at *16-17.

> ### 1.    Any Inference of Scienter Is Not Cogent and Is Less Compelling than Nonfraudulent Inferences
>
> #### (a)    The Complaint Impermissibly Alleges "Fraud By Hindsight"

Plaintiffs' allegations fail the Tellabs test.  The more compelling and the only cogent inference to be drawn is that Merrill, like other financial institutions, the rating agencies, the IMF, the Federal Reserve and others, simply failed to predict the severity of the rapid and unexpected credit market developments that began to unfold in the third quarter 2007.

Courts in this Circuit have long been highly skeptical of claims alleging that losses suffered in the wake of market-wide downturns were supposedly caused by fraud.  These decisions date back, at least, to the seminal decision in Denny v. Barber, 576 F.2d 465 (2d Cir. 1978), where, in the midst of the economic problems of the 1970s, the Second Circuit rejected a remarkably similar claim of "fraud by hindsight" against The Chase Manhattan Bank.  The plaintiff, pointing to events that subsequently caused Chase losses, had accused Chase of engaging in unspecified "speculative and risky" loans and "risky and speculative" investments. Id. at 469-70.  The Second Circuit held that Chase could not be held liable for failing to predict

"that foreign governments and enterprises might encounter difficulties, particularly in consequence of the dramatic increase in petroleum prices; that REITS . . . would run into serious trouble . . . ; and that New York City would come to the verge of bankruptcy." Id. at 470; see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (rejecting claim that bank executives knew loan portfolio was "precarious" and understated reserves before commercial real estate market collapsed during late 1980s); In re Aegon N.V. Sec. Litig., 03 Civ. 0603, 2004 U.S. Dist. LEXIS 11466, at *5-7, *21-23 (S.D.N.Y. June 28, 2004) (rejecting claim that Aegon fraudulently understated its bond default reserve in the midst of precipitous decline in equity and credit markets in 2000). This same logic applies to the current market crisis. See In re 2007 Novastar Fin., Inc. Sec. Litig., 07-0139-CV-W-ODS, 2008 U.S. Dist. LEXIS 44166, at *9-10, *14-15 (W.D. Mo. June 4, 2008) (allegations that management concealed inadequate controls, weak underwriting standards, and inadequate loan loss reserves were "more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community").

Under this line of cases, courts will not "second guess the decisions made in the course of business operations, lest every strategy that goes awry becomes subject to a lawsuit, and corporations are inhibited from following all but the most conservative path." Fadem v. Ford Motor Co., 02 Civ. 0686, 2003 U.S. Dist. LEXIS 16898, at *11 (S.D.N.Y. Sept. 25, 2003). Thus, Plaintiffs' allegations regarding the supposedly risky decision Merrill made, over the alleged objection of some employees, to continue its CDO business and hold onto AAA-rated super-senior tranches do not plead scienter. Id. ("As a general matter, companies should not be barred from engaging in activities that are merely 'risk-increasing.'"); Lerner v. FNB Rochester

34

Corp., 841 F. Supp. 97, 101 (W.D.N.Y. 1993) ("Far from alleging fraudulent misstatements or omissions . . . plaintiff is more accurately expressing his displeasure with the judgment calls made by management, which turned out to have been poorly made, and with management's failure to anticipate that its portfolio would be particularly vulnerable in an economic slump.").

Similarly, Plaintiffs' hindsight allegations that risk management procedures and controls failed or were overridden and that Merrill's hedging strategies proved inadequate also must fail. See Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) (dismissing claim that Citicorp violated its risk management policies by entering into high-risk loans and holding that "the claim that the defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company"), aff'd mem., 956 F.2d 1161 (2d Cir. 1992).

Likewise, Plaintiffs' allegations that Merrill (alone among its peers) should have written down its CDOs in the first rather than the third quarter 2007 (Compl. ¶¶ 143, 150, 259(d)) are insufficient. See Stavros v. Exelon Corp., 266 F. Supp. 2d 833, 851-52 (N.D. Ill. 2003) (allegation that asset write-down should have occurred in first or second, rather than third quarter provided no basis to infer scienter). Courts recognize that highly judgmental decisions such as the setting of reserves or, as in this case, the valuation of complex securities, should not be second guessed. Where a plaintiff challenges the timing of a loss, for example, "[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim for securities fraud." Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995); DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) ("If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.").

Plaintiffs' failure to allege facts demonstrating that, in valuing the CDOs, the actual methods used and judgments made by Merrill's management were fraudulent is fatal to their claims. As Judge Lynch held in a case in which plaintiffs alleged that Allied Capital's valuation policies resulted in overvaluing of its investments:

> [T]he Complaint establishes nothing more than that the plaintiffs disagree with some of Allied's investment valuations – but given the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with some of Allied's valuations does not equate to alleging fraud. There is simply no basis on which to infer that Allied's valuation of its investments was in fact incorrect or inflated, and thus no basis to infer that Allied's accounting policies resulted in fraudulent overvaluation.

Allied Capital, 2003 U.S. Dist. LEXIS 6962, at *13 (citation omitted).

Ultimately, Plaintiffs' allegations amount to nothing more than inadequately pleaded claims of mismanagement, which would not give rise to a strong inference of scienter. See, e.g., Shields, 25 F.3d at 1129 ("The pleading strongly suggests that the defendants should have been more alert and more skeptical, but nothing indicates that management was promoting a fraud."). Mismanagement or the failure to disclose mismanagement is simply not actionable under the securities laws. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977) (securities laws do not regulate "'corporate mismanagement.'" (citation omitted)); Field v. Trump, 850 F.2d 938, 948 (2d Cir. 1988) (allegations requiring court "to distinguish between conduct that is 'reasonable' and 'unreasonable' or 'informed' and 'uninformed' . . . are the hallmark of state fiduciary law" and do not state a securities claim).

### (b) The More Compelling Inference Is That the Defendants Were Reacting Honestly To Unfolding Market Conditions

Several factors severely undercut any suggestion of fraudulent activity and support the inference that Merrill was simply reacting properly to market events as they unfolded. First, Plaintiffs cannot allege that Merrill has been required to restate its financial statements,

indicating at the least that "reasonable accountants could differ" on the accounting for the CDOs, which "defeats plaintiffs' claim of recklessness." In re JP Morgan Chase Sec. Litig., 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948, at *39-40 (S.D.N.Y. Mar. 29, 2007); see also 2007 Novastar, 2008 U.S. Dist. LEXIS 44166, at *12 (finding it "noteworthy that nobody – the SEC, Novastar's auditors, or anyone else – has suggested Novastar should or must restate its financial reports").

Second, Merrill made announcements on September 14, October 5 and October 24, 2007, alerting the market to its increasingly severe estimates of the impact of the credit crisis on its third quarter results, even though its Form 10-Q for that quarter was not due until November 9, 2007.  These announcements are consistent with management's making timely disclosures of their best assessment of the impact of the unfolding crisis.  The early disclosure of losses, before the company's financial statements are due, weakens any inference of scienter. See Rombach, 355 F.3d at 176 ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its [sic] financial statements."); see also In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) (disclosure of poor sales ten days before filing deadline for financial statements undercuts any inference that defendants knew but concealed problems earlier).

Third, Plaintiffs allege that Merrill committed fraud by failing to separately break out in its financial statements its subprime-related CDO exposures.  (E.g., Compl. ¶¶ 16(a), 204(a), 215(a).)  But, as explained below, Plaintiffs cannot allege that Merrill had a duty to disclose its proprietary trading positions.  See infra at I.E.1(a).  Where the complaint "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness." Kalnit, 264 F.3d at 143.  Plaintiffs

also acknowledge that Merrill advised investors of its practice not to "disclose our capital
allocations against any specific or even broader group," including CDOs (Compl. ¶ 279), which
undercuts any inference of fraudulent concealment.  Cf. Iron Workers Local 16 Pension Fund v.
Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 593 (E.D. Va. 2006) ("Defendants' attempt to
keep sensitive business information confidential does not support a strong inference of scienter.").

> **2.    Plaintiffs' Failure to Allege any Motive for the Defendants to Commit
> Fraud Undercuts any Inference of Scienter**

Plaintiffs have not alleged any compelling motive for Merrill or the Individual
Defendants to have committed the alleged fraud and the facts suggest the opposite, that the
Individual Defendants' interests were aligned with the shareholders.  Motive "entail[s] concrete
benefits that could be realized by one or more of the false statements and wrongful
nondisclosures alleged," while opportunity "entail[s] the means and likely prospect of achieving
concrete benefits by the means alleged."  Shields, 25 F.3d at 1130.  Under Tellabs, courts must
consider competing theories of motive to determine whether the allegations give rise to a strong
inference of scienter.  See 127 S. Ct. at 2511.

> **(a)    Plaintiff's Motive Allegations Are Economically Irrational**

The supposed fraud – involving management's decision to purchase billions in
high-rated CDOs, while they supposedly knew the positions were rapidly deteriorating in value,
all in order to increase fees on a business line that contributed, at best, 2% of Merrill's revenue –
would have been economically senseless and would not have gained the Individual Defendants
any concrete benefits.

The allegation that Merrill allegedly continued to invest billions in the super-
senior CDOs diminishes any inference that it was fraudulently constructing a "house of cards."
(Compl. ¶ 30.)  In Fadem, for example, the plaintiffs accused Ford Motor Company of making

38

massive, speculative purchases of forward contracts for palladium that it supposedly would not need for production and then covering up the purchases until after the price of palladium had crashed, requiring a $953 million write down.  See Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 525 (S.D.N.Y.), aff'd, 2005 U.S. App. LEXIS 26839 (2d Cir. Dec. 7, 2005).  Judge Haight held these facts undercut any inference of scienter:  "This is a recipe for economic disaster, which in fact came to pass, and is inconsistent with hopes for or expectations of increased bonuses."  Id.; see also In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 629 (S.D.N.Y. 2005) ("JPM Chase's continued provision of billions of dollars in fresh capital to Enron during the class period undermines plaintiffs' conclusory claim that JPM Chase knew or should have known Enron faced impending financial ruin." (emphasis added)); Davidoff v. Farina, 04 Civ. 7617, 2005 U.S. Dist. LEXIS 17638, at *35 & n.19 (S.D.N.Y. Aug. 22, 2005) ("[I]t would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail.").  The same reasoning applies here.

    The fact that the alleged fraud could not have been sustained further cuts against any inference of scienter.  The Second Circuit observed in Shields, in evaluating a claim that bank executives fraudulently understated the bank's loan reserves, that "the ordinary course of bank business would lead to the review of the loan portfolios, as it did," so the defendants did not have the opportunity to benefit from the alleged misstatements and nondisclosures.  25 F.3d at 1130.  Without allegations showing the defendants' motive to commit a short term fraud, the court held:  "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."  Id.; see also In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) (scienter allegations insufficient where "the alleged scheme could not possibly have succeeded" because truth inevitably would come out).  As in Shields, assuming (solely for

purposes of this motion) that Merrill knew of losses to its CDOs or that its hedge counterparties were not creditworthy before those matters were disclosed, it was inevitable that the truth would soon come to light and any fraud designed to conceal such risks would have made no sense. Among other things, as noted above, Merrill is a CSE and its risk management procedures and mark-to-market process were open to review by the SEC and Merrill's financial statements are subjected to a year-end audit by Merrill's independent auditors.

   The more compelling inference is that the Individual Defendants had every incentive to maintain Merrill's long-term health and profitability.  Plaintiffs allege the Individual Defendants were motivated to increase their yearly bonuses by some unstated amount.  (E.g., Compl. ¶¶ 23-25, 36, 70, 192-97.)  But Merrill pays its executive bonuses in January of each year, based on performance during the prior year, and sixty percent of the bonus is in the form of restricted stock, which vests over the course of four years.  Merrill Proxy (2007), at 37 (Ex. JJ). So, in order for the Individual Defendants to gain any benefit, the fraud would have to have been sustained for a period of years.  Any advantage they could have gained by a short term fraud would have been overwhelmed by the long-term damage to their personal holdings.  Cf. Rombach, 355 F.3d at 177 (finding "no personal interest sufficient to establish motive," where defendants, all major shareholders, "share[d] the pain when the company failed").

   In addition to their irrationality, Plaintiffs' allegations that the Individual Defendants were motivated to commit fraud to increase Merrill's CDO underwriting fees and to increase their bonuses (Compl. ¶¶ 23-24, 36, 192-94),[17] are the type of generic "[m]otives that

---

[17] The chart Plaintiffs reproduce in the Complaint showing Merrill's overall profits, CDO volume and executives pay only shows that executive pay increased with total profits, not CDO volume.  (Compl. ¶¶ 24, 193.)  Plaintiffs admit that CDO underwriting revenues were only 1-2% of Merrill's total revenues.  (Id. ¶ 18.)

are generally possessed by most corporate directors and officers" which are insufficient to plead scienter. <u>Kalnit</u>, 264 F.3d at 139-40 (alleged motive "to maintain or increase executive compensation is insufficient"); <u>see also</u> <u>Merrill Lynch Research Reports Sec. Litig.</u>, 289 F. Supp. 2d at 428 (motivation to receive fees for services insufficient); <u>In re JP Morgan Chase</u>, 363 F. Supp. 2d at 621 ("It would have been unreasonable to conceal Enron's financial weakness and put billions at risk in furtherance of a fraud that garnered tens of millions in fees.").

Similarly, the alleged motive to inflate Merrill's stock price in order to facilitate preferred stock offerings and to close the First Republic transaction using inflated common stock as consideration (<u>e.g.</u>, Compl. ¶ 188) cannot support an inference of scienter. <u>See</u> <u>Rombach</u>, 355 F.3d at 177; <u>see also</u> <u>Kalnit</u>, 264 F.3d at 140 (desire to close deal on favorable terms "does not demonstrate defendants' intent to benefit themselves at the expense of the shareholders because the shareholders themselves would benefit from a superior transaction"); <u>In re AstraZeneca Sec. Litig.</u>, 05 Civ. 2688, 2008 U.S. Dist. LEXIS 43680, at *40-41 (S.D.N.Y. June 3, 2008) (desire to conduct successful stock offering was generalized motive that did not support scienter). To the contrary, any inference of scienter from Merrill's stock issuance is undercut by Merrill's repurchase of $5.272 billion of its common stock during the first three quarters of 2007, which is greater than the $5.24 billion in common and preferred stock plaintiffs allege was issued at inflated prices. <u>Compare</u> Merrill 10-Q (3Q 2007), at 92 (Ex. Z) <u>with</u> Compl. ¶¶ 185-87; <u>see</u> <u>McNamara v. Pre-Paid Legal Servs., Inc.</u>, 189 F. App'x 702, 717 (10th Cir. 2006) (company's repurchase of its own stock at prices allegedly inflated by fraud presented compelling inference *against* scienter); <u>Mathews v. Centex Telemanagement, Inc.</u>, C-92-1837, 1994 U.S. Dist. LEXIS 7895, at *21 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated.").

**(b)      The Allegations Concerning Stock Sales by Some, but Not All of the Individual Defendants Are Insufficient To Raise a Strong Inference of Scienter**

Plaintiffs attempt to allege scienter based on stock sales by defendants O'Neal, Fleming and Fakahany.  There are no allegations regarding any stock sales by defendant Edwards, Merrill's Chief Financial Officer during the Class Period, even though he held beneficial ownership of more than 780,000 shares of stock and options during that time.  Merrill Proxy (2007), at 31 (Ex. JJ).  These allegations are insufficient to raise any inference of scienter.

First, the absence of any allegation of insider sales by Defendant Edwards – who as Merrill's CFO on analyst conference calls is alleged to have made many of the allegedly false statements at issue (e.g., Compl. ¶¶ 42, 43, 49, 169, 203, 219, 220, 245-47, 278-79, 281) – destroys Plaintiffs' theory that the alleged fraud was motivated by the Individual Defendants' desire to engage in insider trading.  See In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("fact that [CFO] did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud in order to profit from their own stock sales"); see also Acito, 47 F.3d at 54 (lack of sales by certain defendants "undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit'" (citation omitted)); Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 759 (7th Cir. 2007) (lack of stock sales by those "who would have been in the know . . . implies that nothing was thought to be out of the ordinary").

Second, insider sales must be "unusual" both in amount and timing to permit an inference of scienter.  Acito, 47 F.3d at 54.  Courts consider "'the amount of profit from the sales, the portion of the stockholdings sold, the change in volume of insider sales, and the number of insiders selling.'"  Borochoff v. GlaxoSmithkline, PLC, 07 Civ. 5574, 2008 U.S. Dist. LEXIS 38784, at *21 (S.D.N.Y. May 9, 2008) (citation omitted).  Courts also look to the timing of the

sales relative to the alleged misrepresentations.  See, e.g., AstraZeneca, 2008 U.S. Dist. LEXIS 43680, at *39 (insider selling that occurred before most of alleged misrepresentations were made effectively negates motive inference).

It is insufficient for Plaintiffs to allege only the number of shares sold and the gross profit earned; they must also allege the percentage of stock the individual sold during the Class Period and in prior years.  See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 151-52 (D. Conn. 2007); In re Glenayre Tech., Inc. Sec. Litig., 96 Civ. 8252, 1998 U.S. Dist. LEXIS 20344, at *11-12 (S.D.N.Y. Dec. 30, 1998) (no inference of scienter where defendant engaged in comparable cumulative sales both inside and outside of alleged class period), aff'd sub nom. Kwalbrun v. Glenayre Techs., Inc., 201 F.3d 431 (2d Cir. 1999).

The absence of such allegations is not surprising.  As discussed more fully in the Individual Defendants' memoranda of law in support of their motions to dismiss the Complaint, each of the Individual Defendants sold less than 10% of their holdings.  That they held onto the vast majority of their holdings undercuts any inference of scienter.  See In re Vantive Corp., 283 F.3d at 1092 (sales representing 38% of individual defendants' aggregate holdings did not establish scienter); Acito, 47 F.3d at 54 (low percentage of shares sold (11%) militates against an inference of scienter); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) (no inference of scienter from sales by individual defendants of less than 20% of holdings).

Third, Plaintiffs allege nothing suspicious about the timing of the alleged stock sales.  Merrill's executives are compensated largely in equity, so it is not surprising that some of them sold stock over the course of the 14-month Class Period.  Plaintiffs' attempt to "'[a]lleg[e] such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades,' and 'strengthens a competing inference that the plaintiffs filed their

complaint simply to embark on a fishing expedition with the hope of catching a valid claim.'"
Malin, 499 F. Supp. 2d at 151 (first alteration in original) (quoting Teachers' Ret. Sys. v. Hunter,
477 F.3d 162, 185 (4th Cir. 2007)); see also In re Vantive Corp., 283 F.3d at 1092 (same).

        Plaintiffs cite no sales by management after early February 2007 and they cannot
explain why Defendants would have continued to make misrepresentations for nearly another
year if they were motivated to sell stock in February 2007.  Where the bulk of the alleged
misrepresentations occur after the defendants sold stock, "the theory of insider selling as a
motive for misrepresentations is effectively negated."  AstraZeneca, 2008 U.S. Dist. LEXIS
43680, at *39; see City of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464, 475
(S.D.N.Y. 2008) (10-week gap between stock sales and disclosure of accounting problem did not
raise inference of scienter).

### 3.    The Complaint Fails To Identify Contemporaneous Facts Contradicting Merrill's Public Statements

        Because Plaintiffs have failed to allege any cogent motive for the alleged fraud,
any inference of scienter is weakened, so "'the strength of the circumstantial allegations [of
conscious misbehavior or recklessness] must be correspondingly greater,'" Kalnit, 264 F.3d at
142 (citation omitted), "'and the plaintiff must allege facts approaching a knowledgeable
participation in the fraud or a deliberate and conscious disregard of facts.'"  In re Bayou Hedge
Fund Litig., 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (citation omitted); see also AstraZeneca,
2008 U.S. Dist. LEXIS 43680, at *41.

        In Dynex, the Second Circuit just weeks ago reconfirmed that, in pleading
recklessness, "'[w]here plaintiffs contend defendants had access to contrary facts, they must
specifically identify the reports or statements containing this information.'"  2008 U.S. App.
LEXIS 13449, at *14 (alteration in original) (quoting Novak, 216 F.3d at 309).  The plaintiff

claimed that Dynex management had made misleading statements about problems with bonds securitized by mobile home loans. The court held that alleging senior management's access to data showing high default rates and "'failed or impaired repossessions'" was not enough to allege scienter. The plaintiff was required to allege that the default data "had been collected into reports that demonstrated loan origination practices were undermining the collateral's performance." Id. at *14-15. The allegations in Dynex did not give rise to a strong inference of scienter because the plaintiff failed to allege "information showing that the primary cause of the bonds' poor performance was *not* the general weakness in the mobile homes market." Id. at *16. Without allegations of contemporaneous documents contradicting Dynex's public statements, the Second Circuit held that any inference of scienter was not "'at least as compelling' as the competing inference," id. at *17 (quoting Tellabs, 127 S. Ct. at 2505), "i.e., that the statements either were not misleading or 'were the result of merely careless mistakes at the management level based on false information fed it from below.'" Dynex, 2008 U.S. App. LEXIS 13449, at *17 (citation omitted).

Under the heading "The Exchange Act Defendants Knowing or Recklessly Disregarded the Exposure that Merrill Faced" (Compl. p.37), the Complaint lays out 40 pages of "facts" that supposedly show that the Individual Defendants knew that Merrill had become overly exposed to subprime risks, had violated its risk management policies and had overvalued its CDO portfolio, which allegedly suffered undisclosed losses beginning as early as Q1-2007. None of these allegations satisfies the pleading requirements of Tellabs, as construed by Dynex.

### (a)    The Allegations Regarding Increasing Subprime Defaults and the Lowered Underwriting Standards by Mortgage Originators Do Not Give Rise to any Inference of Scienter

Plaintiffs allege that the Individual Defendants supposedly knew of the declining housing market and increasing defaults by subprime borrowers. (Compl. ¶¶ 116-23.) They also

45

allege that three mortgage originators, ResMAE, Ownit, and Mortgage Lenders Network, were forced into bankruptcy because they were being required to repurchase loans from Merrill and others after increased early payment defaults on the loans they originated.  (Id. ¶¶ 124-41.) These allegations are not sufficiently particularized because they do not specify who at Merrill was aware of these matters or when and do not point to any reports showing that the decline in subprime loan performance was so extreme it was undermining the market value of the AAA-rated super-senior CDO tranches.  See Dynex, 2008 U.S. App. LEXIS 13449, at *14-15.

Plaintiffs further allege that Merrill "essentially controlled" Ownit (Compl. ¶ 130), and supposedly directed Ownit to loosen its underwriting standards.  (Id. ¶¶ 132-33.)  The basis for this allegation is not specified, but even if it were credited, an allegation of an isolated instance of reduced underwriting standards would not demonstrate recklessness because it does not show that senior management was aware of this practice or that it undermined the entire portfolio of super-senior CDOs.[18]  Moreover, Plaintiffs also allege that Merrill was requiring Ownit to take back early defaulted loans which suggests, if anything, that Merrill was enforcing, not ignoring, underwriting standards.  (Compl. ¶¶ 127-28, 136, 139.)

**(b)    The Complaint Fails to Allege that Merrill "Recklessly Expanded" Its CDO Exposures**

Plaintiffs argue that Merrill "abandoned" its risk management procedures and "recklessly expanded" its CDO exposure.  (Compl. ¶¶ 92-107.)  First, Plaintiffs allege that, at the end of 2005, AIG ceased providing credit insurance for mortgage-backed securities because it

---

[18]    Plaintiffs have also failed to allege that Ownit was directed to lower its standards to an unacceptable level.  Ownit allegedly lowered its standards such that its credit (FICO) scores dropped from 670 to 646 and the percentage of full documentation loans dropped from 98% to 90%.  (Compl. ¶ 133.)  But, in 2006, the average FICO score for subprime mortgages was around 628, see Laurie S. Goodman, et al., Subprime Mortgage Credit Derivatives, at 10 (Frank J. Fabozzi, ed., 2008) (Ex. F), and the percentage of fully-documented loans issued to subprime borrowers was only 50.8%, see Economic Issues, at 74.

46

was concerned that lending standards had become too lax.  (Id. ¶ 100.)  But the Complaint is devoid of facts showing that anyone at Merrill was aware of this purported reason for AIG leaving the market.  Plaintiffs also allege that "at no time during the Class Period did Merrill ever disclose to investors this highly material fact."  (Id. ¶ 100.)  In fact, AIG's decision to exit this business was reported in the press in April 2006, long before the Class Period started.  Olivia Thetgyi, AIG Steps Back from ABS CDO Super-Seniors, Securitization News, Apr. 3, 2006 (Ex. O).  According to the press report, "[t]he step-back follows a big build-up in its book over a short period of time."  Contrary to Plaintiffs' suggestion that AIG's exit from the market foretold declining demand, the report also notes "[d]espite some market participant fears the move could throw a roadblock in selling ABS CDOs, monolines and European banks have stepped in recent weeks to take up the slack."  Id.; see also Higginbotham, 495 F.3d at 759 (scienter cannot be based on allegation that management knew but concealed information that was already public).

Moreover, Plaintiffs concede that Merrill was able to find alternatives to AIG by hedging its CDO exposure with monoline bond insurers such as ACA and XL.  To defuse this acknowledgement, Plaintiffs assert that "[d]ue to the poor capitalization or the overleveraged nature of these monolines – of which Merrill was aware – these insurers were unable to provide sufficient protection to hedge all of the exposure that Merrill had . . . ."  (Compl. ¶ 103 (emphasis added).)  Although Plaintiffs allege that Merrill took "credit valuation adjustments" relating to certain of its hedges in January and April 2008 (id. ¶ 107), there is not a single allegation suggesting that the monolines, which were also impacted by the unexpected credit crisis, had become uncreditworthy before the fourth quarter of 2007, let alone that anyone at Merrill knew it.  See Fabozzi, Handbook, at 115 (Ex. D) (historical experience creates high degree of confidence in monoline bond insurers).  Likewise, Plaintiffs point to the dispute between Merrill and XL as

47

evidence of Merrill's supposedly inadequate hedges (id. ¶ 104), but they offer no explanation why an alleged breach of contract, which was <u>rejected</u> by Judge Rakoff, shows that anyone at Merrill had knowledge contradicting any Class Period statement.

In a similar vein, Plaintiffs allege that Merrill sold CDOs, MBSs and related securities to customers who later complained about the investments after the market declined. (<u>Id.</u> ¶¶ 168-78.)  Plaintiffs do not allege who at Merrill was involved or that senior management knew of any issues with the transactions.  In any event, customer complaints made in the wake of a market downturn do not show scienter.  <u>In re Versant Object Tech. Corp. Sec. Litig.</u>, C 98-00299, 2001 U.S. Dist. LEXIS 25009, at *18-19 (N.D. Cal. Dec. 4, 2001) ("[C]ustomer complaints . . . which are received by every company, do not give rise to a strong inference of deliberate recklessness.").

### (c)    The Allegations Concerning "Warnings" By Employees Do Not Give Rise to any Inference of Scienter

Plaintiffs make a handful of allegations regarding reports by Merrill employees that supposedly alerted the Individual Defendants to problems in the CDO business.  (Compl. ¶¶ 101, 108-14.)  All of these allegations lack adequate bases.  Even if considered, they lack specificity and, at best, suggest a disagreement among Merrill employees regarding matters of business strategy, but not fraud.  Ultimately, these allegations fail because they do not show that any of the Individual Defendants learned information that contradicted Merrill's public statements.  These alleged warnings are "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached."  <u>In re Elan Corp. Sec. Litig.</u>, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008).

Plaintiffs place great weight on the allegation (based on a newspaper report relying on anonymous sources) that Jeffrey Kronthal supposedly warned "top Merrill executives"

that continuing to underwrite CDOs would require "that the firm assume tens of billions of dollars of market and credit risk" and that the "firm's balance sheet would assume open-ended risk *if these highly illiquid securities ran into credit trouble*." (Compl. ¶ 101 (emphasis added); see also id. ¶¶ 8, 36, 109.) These allegations lack particularity because the Complaint does not allege which executives received Kronthal's warnings or details about the warnings sufficient to evaluate their basis and severity. (Id.) There are no allegations that Kronthal knew that the super-senior tranches were likely to run into "credit trouble," or that their AAA-rating could not be relied upon. A vague reference attributed to Kronthal about the "risk" associated with Merrill's business strategy is insufficient to show that the Individual Defendants were alerted to information directly contradicting their statements. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 267-68 (S.D.N.Y. 2004) (report by senior vice president of "terrible" business conditions held "far too vague" and insufficient to show recklessness); Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) ("unsubstantiated beliefs and conclusionary statements" regarding executives who purportedly knew about business strategy "lack[ed] requisite specificity and indicia of reliability to satisfy the scienter requirement").

Plaintiffs also allege that Kronthal "imposed limits on the amount of CDO exposure Merrill could keep on its books to between $3-$4 billion," which Merrill supposedly disregarded. (Compl. ¶ 38; see also id. ¶¶ 101, 109, 204(b), 211(c), 215(b), 221(b), 238(b).) But, again, there are no details alleged regarding how Kronthal arrived at his purported "informal" limits, whether they were reasonable or necessary at the time, and to whom they were conveyed. It also is not alleged that Kronthal was in charge of risk management or that his informal opinions constituted Merrill's "risk management policies and guidelines."

Plaintiffs' other allegations concerning "warnings" from Merrill employees supposedly received by senior management fail to support any inference of scienter for the same reasons. There are no details regarding the reasons why Ranodeb Roy "initially objected" to taking CDOs onto the Company's books (id. ¶ 110), or why "a Merrill trader" did not "feel comfortable" about one CDO transaction, which is not even alleged to have been part of the ultimate write-downs (id. ¶ 111).

Even if the allegations regarding the reports by Kronthal and others were pleaded with sufficient particularity, they would suggest nothing more than a disagreement among managers about how much of the super-senior CDO tranches Merrill should hold. Scienter cannot be pleaded based on statements of former employees that merely reflect "that these employees and Defendants had different business judgments." Druskin, 299 F. Supp. 2d at 1334; In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) ("[T]he fact that other individuals within SSB may have had views different from [research analyst] Grubman's does not provide any basis for an inference that Grubman did not believe his own professed opinions on [the company's] value, or that the other valuation models, rather than Grubman's, constituted SSB's true institutional opinion (if such a concept is even meaningful).").

Lastly, Plaintiffs allege that, in the third quarter of 2007, Defendants Fleming and Fakahany warned Merrill's board of directors and Mr. O'Neal concerning "the mounting risk" from Merrill's CDO exposure (Compl. ¶¶ 71, 72, 113), and that Keishi Hotsuki, Co-Head of Risk Management, warned unnamed "superiors" that Merrill was too exposed to mortgage-related securities. (Id. ¶ 114.) Not only are these again mere recitations from a newspaper article but there is nothing alleged about these reports that gives rise to an inference that these individuals knew about problems earlier in the Class Period. Plaintiffs also do not identify with particularity

the nature of the risk these employees allegedly warned about, and they do not explain why these vaguely described "warnings" support an inference of scienter.  See CALPERS, 394 F.3d at 148 ("[B]arebones sketch of this internal memo utterly fails to meet this standard in any respect."); see also In re Federated Dep't Stores, Inc. Sec. Litig., 00-CV-6362, 2005 U.S. Dist. LEXIS 4743, at *12 (S.D.N.Y. Mar. 23, 2005) (allegations regarding internal reports that contained "unspecified information" were insufficient to allege recklessness).  But, more importantly, these alleged reports occurred in the third quarter when the events that ultimately led to the credit crisis were unfolding and the effect of the market conditions was disclosed within days of the quarter end, when Merrill pre-announced its estimated losses on October 5, 2007.  (Compl. ¶ 307.)

### (d)    The Complaint Does Not Allege Facts Showing Merrill Should Have Written Down Its CDO Portfolio Sooner Than It Did

Plaintiffs allege that Merrill should have known that its CDOs were overvalued as early as February 2007.  (Compl. ¶¶ 142-43.)  As support, they point to declines in the so-called ABX and TABX indices and to Merrill's attempt in June 2007 Merrill to sell certain CDOs that served as collateral for loans made to two Bear Stearns hedge funds.  (Id. ¶¶ 154-61.)  These facts do not in any way suggest that Merrill or the Individual Defendants did not honestly believe the valuations placed on the CDOs.

As a preliminary matter, Plaintiffs concede that valuation of CDOs can be highly judgmental and dependent on a wide range of factors.  (Id. ¶ 348.)  Indeed, Merrill warned investors that "complex instruments may have immature or limited markets.  As a result, the pricing models used for valuation often incorporate significant estimates and assumptions, which may impact the level of precision in the Consolidated Financial Statements."  Merrill 10-K (2006), at 25 (Ex. V).  "[V]aluation of complex and less-liquid products such as [CDOs] . . . are based on several elements:  available market information, assessment of the intrinsic value of

underlying assets, well-understood modeling and critical management judgment."  IIF Report at 89.

Courts recognize that valuation models are opinions, not hard facts.  See Salomon Analyst Level 3, 373 F. Supp. 2d at 251 (rejecting "plaintiffs' characterization of valuation models as 'fact' rather than 'opinion'").  Thus, allegations of recklessness are insufficient.  To allege that a statement of opinion, such as a valuation, is false, Plaintiffs "must allege with particularity 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false."  Bond Opportunity Fund v. Unilab Corp., 99 Civ. 11074, 2003 U.S. Dist. LEXIS 7838, at *8-9 (S.D.N.Y. May 9, 2003) (quoting Va. Bankshares v. Sandberg, 501 U.S. 1083, 1093-98 (1991)), aff'd, 03-7592, 2004 U.S. App. LEXIS 2217 (2d Cir. Feb. 10, 2004).  It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held."  In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).  Plaintiffs' disagreement with the assumptions or methodology is not sufficient to state a claim.  See Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 177-78 (S.D.N.Y. 1996) (allegation that defendants misrepresented prepayment assumptions on fixed income securities failed to state a claim absent allegations that defendants lacked good faith basis for assumptions).

With those principles in mind, Plaintiffs cannot allege that Merrill did not honestly believe in the values assigned to its super-senior CDOs.  There is no allegation, as required by Dynex, that any reports were prepared showing that the CDOs' market value had declined beyond what was reported.  See, e.g., Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105,

115 (D. Conn. 2005) (scienter not alleged where complaint did "not point to any specific source from which defendants received knowledge of flaws in [company's] accounting").  At best, Plaintiffs have alleged that they would have valued the CDOs differently, but they say nothing regarding what was knowingly improper or fraudulent about Merrill's methodology.  There are no allegations regarding the models Merrill used or the factors it considered to value its CDOs, so there is no basis for inferring that Plaintiffs' proposed valuation method was the only correct method, was any better than the method used by Merrill or that Merrill's senior executives did not honestly believe the values Merrill recorded.  "[G]iven the difficulty of valuing illiquid securities, and the multitude of factors that may appropriately be taken into account, alleging disagreement with some of [Merrill]'s valuations does not equate to alleging fraud."  Allied Capital, 2003 U.S. Dist. LEXIS 6962, at *13.

What little Plaintiffs say about their preferred valuation model is significantly flawed.  The ABX and TABX are indices that track a tiny fraction of the trillion dollar asset backed securities market.[19]  Plaintiffs' valuation theory assumes that these indices directly correlated to the value of Merrill's CDO holdings; they even purport to assign specific figures to the amount of write-downs Merrill should have taken based on declines in these indices.  (Compl. ¶¶ 40, 51-52, 142-43, 145-46, 153, 225, 440.)  But Plaintiffs do not allege that Merrill's CDOs were made up of the same handful of MBSs included in the indices, or that it would even have

---

[19]    As one treatise describes them:

> The ABX.HE indices consist of five separate subindices, one for each of the rating categories AAA, AA, A, BBB, and BBB-. . . . Each set of indices are backed by 20 cash subprime [MBS] deals, with each deal represented once in each subindex.  Thus, the BBB tranche of each of the 20 included subprime deals will be in the ABX.HE.BBB.  A new set of ABX indices is launched every six months on January 19 and July 19 of each year.

Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives, at 145 (2008) (Ex. F).  The TABX is essentially a sub-index of the BBB and BBB- tranches of the ABX indices.  See id. at 156-57.

been appropriate for Merrill to mark down its portfolio based solely on movements in these indices.[20]

Moreover, as quoted above, see supra, page 13, the company that created the ABX and TABX has stressed that the indices are "not designed to be uncritically extrapolated to the broader ABS market, and it was certainly not designed as a valuation tool for individual securities." Ben Logan, The ABX Index:  A Pricing Conundrum, Credit, May 1, 2008, at 48 (Ex. J); Don't mark to Markit, Economist, Mar. 6, 2008 (ABX indices have been "prone to distortion (mostly downward) by heavy speculation" and were too illiquid to "take the weight of short-selling heaped on them").  As one treatise recently noted, "there is no way to use TABX pricing as the benchmark for CDO pricing."  Goodman et al., Subprime Mortgage Credit Derivatives, at 160 (Ex. F).

Second, there are very good reasons for believing that Plaintiffs' proposed index-based valuation method would not have been reasonable.  Under Generally Accepted Accounting Principles ("GAAP"), specifically, SFAS No. 157, Fair Value Measurements, Merrill was

---

[20]    There are many differences between the ABX and TABX indices and a CDO that show that Plaintiffs are attempting to compare apples to oranges.  Each series of the ABX and TABX includes a fixed, rigidly defined basket of 20 (for the ABX) or 40 (for the TABX) MBSs all originated in a similar "vintage."  See Goodman et al., supra note 19, at 145-49, 156-60.  In contrast, CDOs may include a wide range of debt securities, not just subprime MBSs.  A CDO is also far more diversified than these indices.  For each CDO, a collateral manager is hired to judgmentally select a diverse set of underlying assets, so a typical CDO may have more than 100 underlying MBSs and other securities from varying vintages.  See id. at 269-70.  Thus, plaintiffs have alleged no cogent basis to believe that a portfolio of CDOs (with potentially thousands of underlying debt securities) would behave like the TABX (with forty MBSs containing no credit enhancements).  See id.

It is also apparent that Plaintiffs cherry picked the worst performing indices without regard for what might be included in Merrill's CDOs.  For example, Plaintiffs cite the decline in the ABX.HE.BBB index covering the second half of 2006 (Compl. ¶ 151), but they do not allege that Merrill's portfolio was built up of MBSs from that index or even from the same vintage.  Similarly, Plaintiffs point to the decline in the "BBB-" series of the TABX , which includes 40 BBB- rated MBSs.  But they do not allege Merrill's portfolio was made up of, or even bore similarity to, those 40 securities.  In fact, most of the super-senior CDOs in Merrill's portfolio were "high grade" CDOs, made up of "collateral having an average credit rating of Aa3/A1."  Merrill 10-K (2007), at 36 (Ex. W).

required to consider "observable" market data, if available, in valuing its CDO positions, such as price quotes for the same or similar assets, or "[i]nputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates)." SFAS 157 ¶ 28. Here, Plaintiffs do not allege – nor could they – that, prior to the third quarter 2007, price quotes or other observable market data were unavailable for the super-senior CDOs or that such data contradicted the valuations used by Merrill. To the contrary, Plaintiffs concede that the CDO market remained active into the first half of 2007 and that Merrill was able to purchase hedges on its CDOs even into the third quarter. (Compl. ¶¶ 78, 106.) Plaintiffs have also failed to allege facts showing that the AAA-rated tranches that Merrill owned were suffering credit defaults or that the likelihood of repayment had been diminished. Nor can they allege that any of Merrill's super-senior CDOs were downgraded by any of the ratings agencies at any time before the fourth quarter 2007. (See supra, n.4.)

Lastly, Plaintiffs cannot allege that other holders of super-senior CDOs were using the ABX or TABX as a proxy for the value of their CDO portfolios to take write-downs sooner than Merrill. If actual, sophisticated market participants had adopted Plaintiffs' proffered valuation methodology, the waves of write-downs that occurred beginning in the third quarter 2007 would, according to Plaintiffs, have commenced in March 2007. But that did not happen.

Plaintiffs' allegations regarding Merrill's sale of collateral from the Bear Stearns hedge funds are similarly flawed. (Compl. ¶¶ 154-61.) Apparently, Plaintiffs are seeking an inference that because Merrill could not obtain high enough prices on some of the hedge funds' collateral it must, therefore, have known that its own CDOs had lost value. Plaintiffs' allegations are, again, insufficiently particularized, since they do not explain whether and to what extent the

supposedly impaired CDOs seized from the Bear Stearns hedge funds were comparable to Merrill's portfolio of high-rated CDO tranches.[21]  Moreover, even assuming the Bear collateral was comparable to Merrill's super-senior holdings, Plaintiffs' contention disregards applicable accounting standards.  Under SFAS 157 and SEC guidance, distressed sales should *not* be considered in determining the fair value of assets, since the goal is to estimate the value that would be realized in an orderly sale.  SFAS 157 ¶ 7; <u>see</u> Sample Letter Sent to Public Companies on MD&A Disclosure Regarding the Application of SFAS 157 (Fair Value Measurements), SEC March 2007 ("Under SFAS 157, it is appropriate for you to consider actual market prices, or observable inputs, even when the market is less liquid than historical market volumes, <u>unless those prices are the result of a forced liquidation or distress sale</u>") (emphasis added).

### 4.    The Complaint Fails to Plead Scienter as to Alleged GAAP Violations

As discussed in more detail below <u>infra</u>, I.E.4, the Complaint fails to allege any violation of GAAP.  Even if Plaintiffs had alleged GAAP violations, such violations are alone insufficient to infer recklessness; rather, "[o]nly where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." <u>Novak</u>, 216 at 309 (citation omitted).  No such allegations have been made here.  The fact that Merrill's financial statements were audited and have not been restated precludes any inference of fraudulent intent. <u>In re JP Morgan Chase</u>, 2007 U.S. Dist. LEXIS 22948, at *39-40 (that issuer was never required to restate its financial statements suggests that "reasonable accountants could differ" on accounting standard applied, "an inference that defeats plaintiffs' claim of recklessness").

---

[21]    The press reports upon which Plaintiffs rely disclose that Merrill <u>was</u> able to sell higher-rated securities seized from the hedge funds.  <u>See</u> Roddy Boyd, <u>Merrill Blinks</u>, N.Y. Post June 22, 2007.

Moreover, Plaintiffs' failure to allege any cogent motive also precludes any inference of scienter based on GAAP violations. See Davidoff, 2005 U.S. Dist. LEXIS 17638, at *55.

## D.    The Complaint Fails to Plead Loss Causation

"Loss causation" "'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" Lentell, 396 F.3d at 172 (citation omitted). The purpose, "as with the foreseeability limitation in tort," is "'"to fix a legal limit on a person's responsibility, even for wrongful acts."'" Id. at 174 (citation omitted).  The Second Circuit and courts within it routinely dismiss securities fraud claims for failure to adequately allege loss causation.[22]  In light of Rule 9(b) and because the PSLRA explicitly requires proof of loss causation, see 15 U.S.C. § 78u-4(b)(4), a plaintiff must, at the very least, plead loss causation with "sufficient specificity to enable the court to evaluate whether the necessary causal link exists."  Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 186 (4th Cir. 2007) (citing Lentell, 396 F.3d at 172); see also Twombly, 127 S. Ct. 1960 (plaintiffs' allegations must at a minimum be "plausible").

### 1.    Plaintiffs Fail To Account for the Market Wide Collapse of the Credit Markets

Plaintiffs' failure to account for other factors including the worst credit crisis since World War II is fatal to their loss causation allegations.  As the Second Circuit held, where, as here, the alleged "'loss coincides with a marketwide phenomenon causing comparable losses to other investors' . . .  a plaintiff's claim fails when 'it has not adequately [pled] facts which if

---

[22]    See Lentell, 396 F.3d at 164, 175-78; see also, e.g., Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 151 (2d Cir. 2007); Joffee v. Lehman Bros., 410 F. Supp. 2d 187, 190 (S.D.N.Y. 2006), aff'd, 209 F. App'x 80 (2d Cir. 2006); In re Merrill Lynch & Co. Research Reports Sec. Litig., Nos. 02 MDL 1484, 07 CV 6677, 2008 U.S. Dist. LEXIS 37993, at *29 (S.D.N.Y. May 8, 2008); Garber v. Legg Mason, 537 F. Supp. 2d. 597 (S.D.N.Y. 2008); 60223 Trust v. Goldman Sachs, 540 F. Supp. 2d 449, 451 (S.D.N.Y. 2007); Davidoff, 2005 U.S. Dist. LEXIS 17638, at *50-53.

proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.'" Lentell, 396 F.3d at 174 (quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994)). "[P]laintiffs must distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price." In re Merrill Lynch & Co. Research Reports Sec. Litig., 02 MDL 1484, 02 Civ. 9690, 2008 U.S. Dist. LEXIS 44344, at *23 (S.D.N.Y. June 4, 2008) (alteration in original) (quoting Dura, 544 U.S. at 343). The financial crisis has caused declines in the stock of not only Merrill but also its peer financial institutions. (See Exs. P-U.) To allege loss causation, Plaintiffs must, at least, "'"ascribe some rough proportion of the whole loss to [the alleged] misstatements"'" and they "cannot plead loss causation where the complaint fails to 'allege[] facts to show that [defendant's] misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss.'" Id. (alterations in original) (citations omitted).

      Plaintiffs make no effort to explain the "rough proportion" of their losses attributable to fraud as opposed to other factors. Instead, Plaintiffs baselessly assert that the entire 49% decline in Merrill's stock price during the Class Period was "[a]s a direct and proximate result of . . . various corrective disclosures" that supposedly "revealed the truth." (Compl. ¶ 384.) This utterly ignores the onset of the still ongoing credit crisis and its impact on financial stocks as economic conditions continued to deteriorate. Plaintiffs' failure to explain these inconsistencies or to account for the long term gradual decline in Merrill's stock price during the Class Period requires dismissal. See Merrill Lynch & Co. Research Reports, 2008 U.S. Dist. LEXIS 37993, at *40 ("The Complaint fails to account, for example, for the 'crater[ing]' of the Internet market that occurred during the ten-month period when the reports were issued." (alteration in original)); 60223 Trust, 540 F. Supp. 2d at 461 (loss causation not

pleaded where "gradual loss of value" over class period "occur[red] during the time when alleged false and misleading comments of an optimistic nature were being issued").  As the Supreme Court recognized in <u>Dura</u>, a "lower price may reflect, not the earlier misrepresentation, but <u>changed economic circumstances</u>, changed investor expectations, <u>new industry-specific or firm-specific facts, conditions, or other events</u>, which taken together separately or together account for <u>some or all</u> of that lower price. . . .  Other things being equal, the longer the time between purchase and sale . . . the more likely that other factors caused the loss."  544 U.S. at 342-43.

> **2.    Plaintiffs' Loss Causation Allegations Are Not Plausible and Are Riddled with Inconsistencies**

Plaintiffs' attempt to allege a relationship between the alleged fraud and movements in Merrill's stock price is riddled with inconsistencies.  For example, on days where Plaintiffs allege Defendants supposedly issued misleading statements that "artificially inflated" Merrill's stock price, Merrill's stock price barely moved or actually declined.  (<u>Compare</u> Compl. ¶¶ 202-16, 218, 224-26, 228, 243, 245 250-52, 275 <u>with</u> Ex. P.)  In contrast, Plaintiffs allege that on October 5, 2007, Merrill "began to disclose the truth" by pre-announcing an estimated $4.5 billion in net, incremental write-downs on CDOs and subprime mortgages.  (Compl. ¶¶ 54, 198, 307.)  **But, on that date, Merrill's stock price actually rose by $1.89 (2.5%), a fact Plaintiffs evasively omit.**  (<u>Id.</u> ¶ 392.)  Instead, without explanation, Plaintiffs point to the following Monday (October 8, 2007) when the stock price declined – a day on which other financial stocks were down.  (<u>Id.</u> ¶ 393; <u>see also</u> Exs. Q, S & T (<u>e.g.</u>, Bear Stearns down 3.75%; Lehman Bros. down 1.88%; Morgan Stanley down 1.39%).)  Plaintiffs do not allege any corrective disclosure

occurred on October 8 nor do Plaintiffs offer any explanation why it would have taken two full business days for the October 5 press release to have been absorbed by the market.[23]

In the section of the Complaint entitled "Loss Causation/Economic Loss," Plaintiffs allege seven dates between June 20, 2007 and January 17, 2008 on which supposed "corrective disclosures" were made that dissipated the "artificial inflation" in Merrill's stock. (Compl. ¶¶ 384-99.) These allegations are all seriously flawed and actually undercut Plaintiffs' fraud theory. Plaintiffs must allege both that the purported corrective disclosure revealed the fraud and caused the stock to decline. See Lentell, 396 F.3d at 175 & n.4.[24]

Here, none of these seven alleged "corrective" disclosures even relates to the allegedly omitted matters. For example, there are no allegations of a corrective disclosure regarding Merrill's supposed lowering of loan underwriting guidelines, its "leveraging" of "risky subprime mortgages," its disregard of risk management "policies and guidelines" (Compl. ¶¶ 277-78) or its alleged understatement of its risk metrics like Value at Risk ("VaR") (id. ¶ 16). See, e.g., Garber v. Legg Mason, 537 F. Supp. 2d. 597, 617 (S.D.N.Y. 2008) (none of the public statements "correctively disclosed" alleged omissions"); Davidoff, 2005 U.S. Dist. LEXIS 17638, at *50-53 (same); In re Avista Sec. Litig., 415 F. Supp. 2d 1214, 1220-21 (E.D. Wash. 2005) (loss causation not pleaded where "corrective disclosure" did not mention issuer's risk

---

[23]    Plaintiffs have invoked the fraud-on-the-market theory to avoid pleading reliance, (Compl. ¶¶ 400-401), which rests on the assumption that in an open and well developed market, "'information important to reasonable investors . . . is immediately incorporated into the stock price.'" Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (citation omitted); (Compl. ¶ 400-01 ("[A]t all relevant times, the market for Merrill's securities was an efficient market" and that "market for Merrill's securities promptly digested current information.")).

[24]    See also In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 326 (D.N.J. 2007). Thus, "allegations of drops in stock price following an announcement of bad news that does not disclose the fraud" are inadequate. In re Tellium, Inc. Sec. Litig., 02 CV 5878, 2005 U.S. Dist. LEXIS 26332, at *14 (D.N.J. Aug. 26, 2005). Cf. Joffee, 410 F. Supp. 2d at 191 (dismissing, action where "each of the matters that Plaintiffs claim [Defendant] failed to disclose had, in fact, been disclosed to the market").

management policies). Similarly, there are no alleged corrective disclosures regarding the valuation of Merrill's CDOs, which as noted above is a matter of opinion. As Judge Sweet observed, "*to plead that such statements of opinion actually caused Plaintiffs' damages, it is critical for Plaintiffs to allege that the 'relevant truth,' i.e., the alleged dishonesty of the opinions, is revealed to the market.*" Joffe, 410 F. Supp. 2d at 193 (emphasis added); see also Lentell, 396 F.3d at 174-75 & n.4. Plaintiffs have not pleaded any disclosures in which it was revealed that Merrill did not honestly believe the valuations it had placed on its CDO portfolio.

Because Merrill's stock price did not decline on the October 5 announcement, the matters disclosed in Merrill's October 5 release – among other things, that Merrill would incur billions of dollars in write-downs due to CDOs and subprime mortgages; that its risk mitigation strategy had not prevented those losses; and its CEO's opinion that "We can do a better job in managing this risk" (Compl. ¶ 307) – cannot form the basis of Plaintiffs' fraud claim. See In re Verisign, Inc. Derivative Litig., 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) (plaintiffs failed to plead loss causation where stock rose after announcements relating to company's allegedly improper stock option practices).

As to the alleged corrective disclosures, three of them actually *precede* Merrill's October 5, 2007 announcement which Plaintiffs allege is when Merrill "began to disclose the truth." (Compl. ¶¶ 53-54, 385-86, 388, 391.) But a disclosure occurring before the revelation of the "truth" cannot support loss causation. See Lentell, 396 F.3d at 175 n.4; see also Dura, 544 U.S. at 342; Robbins v. Koger Props., Inc., 116 F.3d 1441, 1448-49 (11th Cir. 1997).

Moreover, none of these seven alleged "corrective" disclosures revealed any concealed fraud. (E.g., Compl. ¶ 385 (June 20 NY Times article reporting on Merrill's sale of certain Bear Stearns hedge fund collateral); ¶¶ 388, 391 (analyst reports which did not disclose

any alleged fraudulent statements)).  See also Teachers' Ret. Sys., 477 F.3d at 187 (plaintiffs

must allege market reacted to revelation of information); In re Merck & Co. Sec. Litig., 432 F.3d

261, 270-71 (3d Cir. 2005).  Similarly, the timely disclosure of quarter-end and year-end write

downs are not revelations that these losses should have been recognized earlier or were

attributable to anything other than the continued deterioration in the markets.  There is nothing in

these releases to indicate that the previous valuations were not honestly believed opinions.  See

Lentell, 396 F.3d at 175 n.4; Marsden v. Select Med. Corp., 04-4020, 2007 U.S. Dist. LEXIS

9893, at *18-19 (E.D. Pa. Feb. 6, 2007); Tellium, Inc., 2005 U.S. Dist. LEXIS 26332, at *12-13.

Lastly, Plaintiffs allege that on November 1, 2007, it was disclosed that the SEC

was investigating Merrill.  (Compl. ¶ 396.)  The disclosure of a regulatory inquiry, however, is

not a "corrective disclosure" where it does not reveal any previously concealed fraud.  See Avista,

415 F. Supp. at 1221.  Plaintiffs also disingenuously try to attribute the next day's decline to

alleged fraud, but omit that a negative Wall Street Journal article was issued that day but was

subsequently retracted on November 26, 2007 because the article "was based on incorrect

information."  Susan Pulliam, Deals with Hedge Funds May be Helping Merrill Delay Mortgage

Losses, Wall St. J., Nov. 2, 2007, at A1 (as corrected on Nov. 26, 2007) (Ex. L).[25]  Thus, any

decline on either of those days cannot support loss causation.

**E.     The Complaint Fails To Allege any Actionable Misleading Statement or Omission**

Plaintiffs purport to identify the supposedly false and misleading statements by

block-quoting large portions of press releases, investor conference call transcripts, and SEC

---

[25]   Plaintiffs' §10(b) claims are brought on behalf of not only purchasers of common stock, but also
purchasers of 13 different series of Merrill preferred stock.  (Compl. ¶ 13.)  Yet, Plaintiffs do not
include the details regarding the price movement of the preferred stock on any of the corrective
disclosure dates.

filings throughout the Class Period followed periodically by a statement that the preceding paragraphs "were materially false and misleading" due to a laundry list of matters the defendants supposedly "failed to disclose." (E.g., Compl. ¶¶ 204, 215, 221, 238, 248, 259, 268, 280, 290, 297.) This method of pleading is defective under Rule 9(b) and the PSLRA, which place the burden squarely on Plaintiffs to identify the specific statements claimed to be misleading and to explain why those statements are fraudulent. See, e.g., In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) ("Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.").

To the extent it can be discerned, Plaintiffs' allegations appear to fall into four categories: (1) Merrill's exposure to subprime-backed CDOs; (2) Merrill's risk management procedures and strategies; (3) underwriting standards for loans Merrill purchased from mortgage lenders; and (4) GAAP compliance. In each case, Plaintiffs have either mischaracterized the disclosure or failed to explain with sufficient particularity why the disclosure is misleading. The overriding defect with these allegations, however, is that they all depend on hindsight – Plaintiffs have not alleged facts showing that Merrill had reason to believe before the third quarter 2007 that the AAA-rated super-senior CDOs were unduly risky, or were marked inappropriately, or that its risk management strategies would not prevent losses in an historic market downturn.

### 1.    The Complaint Does Not Allege any Misleading Statement or Omission Regarding Merrill's Exposure to CDOs

Plaintiffs repeatedly allege that Merrill "fail[ed] to disclose that [it] was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period and over $40

billion of U.S. subprime ABS CDOs by June 29, 2007." (E.g., Compl. ¶¶ 16(a), 204(a), 215(a), 221(a), 238(a), 248(d), 259(a), 268(a), 280(a), 290(a), 297(a).)  This omission supposedly rendered misleading statements dating back to October 2006, regarding Merrill's net earnings, financial performance, risk management, hedging strategies, strategic acquisitions and GAAP compliance.  (E.g., id. ¶¶ 202-03, 206, 212, 222.)

### (a)    Merrill Had No Duty to Disclose Additional Information About its CDOs

The simple answer to Plaintiffs' claim is that Merrill disclosed what it was required to disclose regarding its holdings, based on information known at that time.  Plaintiffs allege that Merrill supposedly made "scant reference" to its subprime activities, (e.g., Compl. ¶¶ 227, 260), but they admit that Merrill's leadership position in the CDO securitization business was well known.  (Id. ¶ 219.)  And Merrill disclosed that it was securitizing tens of billions in assets each quarter, primarily mortgage loans, and that the volume of its securitization had roughly doubled in 2007.  See supra, page 21.

Merrill's disclosures were not rendered misleading by its supposed failure separately to break out a portion of its fixed income holdings, with underlying collateral consisting of subprime mortgages, and label them "ultra-risky," or to disclose that its "record profits were achieved at the expense" of exposing Merrill to these assets.  (E.g., Compl. ¶¶ 20, 22, 166, 244.)  Merrill was under no obligation to describe its investments using Plaintiffs' pejoratives.  See In re N.Y. Cmty. Bancorp, Inc. Sec. Litig., 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (no obligation for bank to describe mortgage backed securities "in pejorative terms"); In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) (no obligation to disclose that Citigroup's revenues were derived from "'unsustainable and illegitimate sources'"), aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc., 165 F. App'x 928 (2d Cir. 2006).  In any event, it is

not adequately alleged that Merrill actually knew the CDOs were ultra-risky.  See Fadem, 352 F.

Supp. 2d at 508 (Ford had no duty to disclose it had taken "large risk of loss" with commodities

contract where it did not know of alleged risk at time of disclosure).

               Plaintiffs also cannot fault Merrill for "lump[ing] the financial results of CDOs

and subprime MBSs together with other specialized debt products."  (Compl. ¶ 227.)  The

securities laws do not require corporations to "disaggregate" particular assets, line items of

revenue or costs, or other financial details simply because those items become problematic based

on subsequent events.[26]  The Fourth Circuit's decision in Nolte v. Capital One Financial Corp.,

390 F.3d 311 (4th Cir. 2004), illustrates this point.  At issue in Nolte was whether Capital One's

subprime credit-card portfolio had been adequately disclosed.  See id. at 316.  The court held that

as long as the bank met its regulatory obligations, disclosing its capital and loan loss reserves, no

more specificity regarding the size of its "subprime" portfolio was required.  Id. at 316-17; see

also In re AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006)

("As to any claim that AXIS was nonetheless required to identify contingent commissions as a

line item, plaintiffs point to no accounting or reporting requirements which would require the

disaggregation of acquisition costs."); In re N.Y. Cmty. Bancorp, 448 F. Supp. 2d 466, 479

(E.D.N.Y. 2006) (additional disclosure not required where "it is apparent from the quarterly

reports disclosed to the public that the company was heavily involved in investing in mortgage-

backed securities").  Plaintiffs cannot, without the benefit of hindsight, point to the more detailed

disclosures Merrill made in the third and fourth quarters of 2007 as evidence of what Merrill

---

[26]    As noted by the IMF, U.S. accounting rules focus on aggregate disclosures regarding classes of assets and liabilities and do not require disclosure of specific instruments held by a company.  Int'l Monetary Fund, Global Fin. Stability Report, at 67 (Apr. 2008).  See, e.g., Statement of Financial Accounting Standards Nos. 115 ¶ 19 (requiring disclosure of "aggregate fair value" of financial instruments for "major security types").

supposedly should have disclosed earlier.  Those disclosures were obviously made after the

losses to the super-senior CDOs had manifested themselves and the effects of the credit crisis on

Merrill's business had taken on added importance.  Plaintiffs cannot allege that these factors were

known earlier.

    Importantly, Plaintiffs do not point to any other large financial institution that,

before the third quarter 2007 credit crisis, separately reported its subprime related CDO

exposures.  It was certainly not industry practice.  If Merrill's competitors or its trading or

hedging counterparties had access to detailed information regarding the assets Merrill was

seeking to buy, sell or hedge, Merrill's ability to negotiate favorable pricing would have been

impacted.  See SEC Rel. No. 33-7386, 62 F.R. 6044, 6055 (Feb. 10, 1997) (SEC regulations for

market risk disclosures do not require disclosure of proprietary information regarding specific

investments).  Thus, not surprisingly, Merrill advised that it was not its practice to "disclose our

capital allocations against any specific or even broader group."  (Compl. ¶ 279.)  Requiring

Merrill to make disclosures that would harm its competitive position would have also harmed,

not benefited shareholders.  Thus, courts generally "have been sensitive about forcing a company

to damage its own interests as well as those of its shareholders by revealing competitive

information."  In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1211 (S.D.N.Y. 1996).

###    (b) Merrill Did Not Falsely Downplay its Subprime Exposure

    Plaintiffs also contend that Merrill misleadingly minimized its subprime exposure

beginning in April 2007 by stating that its "revenues from its subprime-related activities were

less than 1% of Merrill's net revenues."  (E.g., Compl. ¶¶ 6, 42-43, 244, 245.)  But Plaintiffs

acknowledge that this was an accurate description of Merrill's CDO underwriting fee income.

(Id. ¶ 18.)  Accurate statements of historical financial results are not actionable, even if future

results may not be as favorable.  See In re Sina Corp. Sec. Litig., 05 Civ. 2154, 2006 U.S. Dist.

LEXIS 71089, at *26 (S.D.N.Y. Sept. 26, 2006); In re Duane Reade Inc. Sec. Litig., 02 Civ.

6478, 2003 U.S. Dist. LEXIS 21319, at *22 (S.D.N.Y. Nov. 25, 2003), aff'd sub nom. Nadoff v.

Duane Reade, Inc., 107 F. App'x. 250, 252 (2d Cir. 2004).

        Plaintiffs seem to argue that Merrill's accurate statements about its revenues gave

a misleading impression because it failed to disclose the "exposure" to assets it was holding.

(Compl. ¶¶ 6, 244, 259(a).)  But investors were told it was Merrill's practice not to disclose

specific asset allocations (id. ¶ 279), and none of the cited statements purported to comment on

Merrill's exposure to asset write-downs.  Moreover, Merrill included in its financial statements

extensive disclosures regarding the risks of its proprietary trading positions.  Merrill 10-K (2006),

at 23 (Ex. V), quoted supra, page 17.  As conditions worsened in 2007, Merrill warned that it

was a "major participant" in the subprime mortgage market and that there was a "significant risk"

that its exposure to that market could lead to losses.  (Compl. ¶ 294 (quoting Merrill's Q2 2007

10-K).)  And, once again, there are simply no well pleaded allegations showing that Merrill had

reason to suspect that major write-downs were required before the third quarter 2007.  Plaintiffs'

contention that the statements regarding revenue gave "misleading impressions are insufficient,

particularly impressions made misleading only with the benefit of hindsight."  Fisher v. Ross, 93

Civ. 0275, 1996 U.S. Dist. LEXIS 15091, at *11 (S.D.N.Y. Oct. 11, 1996); see also In re Union

Carbide Class Action Sec. Litig., 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986) (vague allegations of

a misleading impression insufficient).[27]

---

[27] Plaintiffs also make vague allegations relating to Merrill's holdings of "residuals," which are the
unrated lowest tranches of MBSs and CDOs.  See supra, at Factual Background, B.1. (figure 1) and
n.12 (discussing residual interests).  For example, Plaintiffs allege that Edwards falsely represented in
April 2007 that "only a small part" of Merrill's retained interests in CDOs were "subprime residuals."
(Compl. ¶ 247; see also id. ¶ 260.)  But there is no allegation that this statement was false and
Plaintiffs concede that Merrill's largest exposures were to the senior-most, not the junior-most CDO
tranches.  (E.g., id. ¶ 91.)

Lastly, Plaintiffs point to Merrill's September 14, 2007 Form 8-K issued in anticipation of the closing of its exchange offer to purchase the outstanding shares of First Republic.  In that 8-K, Merrill provided an update regarding the challenging market conditions and the fact that it was taking valuation adjustments on its exposures.  (Compl. ¶ 301.)  Plaintiffs claim that the 8-K was false because "[i]n fact, the Exchange Act Defendants were discussing at that time the announcement of massive write-downs which would not be announced until after the First Republic merger closed."  (Id.)  Plaintiffs apparently invented this allegation, for there is no basis for it alleged in the Complaint and no other facts from which it could be inferred that Merrill had determined its third-quarter write-down nine days before the quarter had even ended.  See CALPERS, 394 F.3d at 154 (rejecting conclusory allegation that defendants must have known but concealed disappointing second quarter results even 19 days after quarter end).

## 2.    The Complaint Does Not Allege any Misleading Statement or Omission Regarding Merrill's Risk Management and Controls

Plaintiffs allege that Merrill's disclosures regarding its risk management were misleading because it supposedly "knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion."  (Compl. ¶¶ 8, 36, 38, 101, 109, 204(b), 211(c), 215(b), 221(b), 225, 238(b), 244, 259(b), 268(b), 280(c), 282, 297(b).)  Plaintiffs further allege that various statements were false because Merrill failed to disclose that it "did not adequately hedge" its exposures and that many of its hedges on CDOs "were with poorly capitalized or highly leveraged counterparties" such as XL and ACA.  (Id. ¶¶ 16(f), 238(d), 268(d), 280(d), 297(d).)  For example, Plaintiffs challenge defendant Edwards' statement on July 17, 2007 that Merrill's risk management had put it in a "good position" because it had "reduced its exposure to lower-rated segments of the market."  (Id. ¶ 278.)

68

Plaintiffs' allegations all fail because they have not alleged facts, with particularity or otherwise, demonstrating that the allegedly omitted information existed or was known by Merrill management at the time of the allegedly false statements. Plaintiffs have not alleged that Kronthal's "informal limits" represented Merrill's risk management policies. Nor do they allege facts showing that, by the second quarter 2007, Merrill had not reduced its exposure to lower rated segments of the market. (Id.) Plaintiffs also do not allege facts showing that Merrill was not actually hedging its exposures; in fact they admit that Merrill was insuring its CDOs in hedges with monolines. (Id. ¶¶ 102, 235, 323 n.2.) And they cannot allege facts showing that, as of July 2007, its hedging and other strategies had not "proven effective." (Id.) Again, that five months later credit adjustments were necessary with respect to some hedge counterparties does not mean the July statements were false when made. See Fadem, 352 F. Supp. 2d at 507 (allegations that disclosed hedging strategy ended up being "costly mistake" not actionable where facts undermining strategy were unknown at time statements were made).

Risk management does not mean risk elimination. In sum, all Plaintiffs have alleged is that, in hindsight, Merrill's risk management procedures, like the procedures used by a wide range of financial institutions, could not prevent losses in the wake of the credit crisis that erupted in the third quarter 2007.

There are a host of additional reasons why the risk management allegations do not plead any actionable misstatement. First, for the most part, Plaintiffs are challenging "generalizations regarding integrity, fiscal discipline and risk management" that courts have recognized are inactionable "puffery" because investors do not rely on such broad, general statements. In re JP Morgan Chase, 363 F. Supp. 2d at 633 (citing Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 59 (2d Cir. 1996)). For example, Plaintiffs allege that Merrill falsely

69

stated that its risk management units "work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch," (Compl. ¶¶ 205, 233); "[w]e monitor … risk levels on a daily basis to verify that they remain within corporate risk guidelines and tolerance levels," (id. ¶ 234); and "[o]ur risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets." (Id. ¶ 246.) Courts hold such statements to be non-actionable.[28] See In re JP Morgan Chase, 363 F. Supp. 2d at 612, 633 (statements that "'traders and others responsible for managing risk positions were accountable for identifying potential 'worst-case' losses and estimating the probability of loss'" and that bank was able to "'identify material risks and potential earnings vulnerabilities that might not be captured by statistical methodologies'" were mere "puffery"); In re JP Morgan Chase, 2007 U.S. Dist. LEXIS 22948 at *20, *35-36 (statement that "'[p]rocesses in place are intended to ensure credit risk instruments are accurately assessed, properly approved and continuously monitored'" was not actionable).[29]

Second, Plaintiffs fail to allege facts "showing that the descriptions of the [risk management] processes were false or misleading at the time they were included in the public statements, [or] facts showing that the processes were not followed." In re Citigroup, 330 F. Supp. 2d at 379; see also In re FBR Inc. Sec. Litig., 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2006) (that company's risk management program failed to root out alleged insider trading did not mean that statements regarding risk management were false when made). Plaintiffs' attempt to allege

---

[28]   Other examples of similar inactionable statements abound throughout the Complaint. (Compl. ¶ 52 (subprime exposure "contained"); id. ¶ 219 (Investment Banking and FICC had "best ever performances," Merrill was on its "strongest competitive footing" and GMI "had nothing short of an outstanding quarter"); see also id. ¶¶ 214, 222, 251.)

[29]   See also In re N.Y. Cmty. Bancorp, 448 F. Supp. 2d at 478-79 (statements such as that "risk-averse . . . strategy permeates every decision the company makes" were inactionable puffery, particularly given disclosures of investments in mortgage backed securities).

that procedures were not followed in the CDO business, which was only one slice of Merrill's wide-ranging businesses, even if adequately pleaded, would not render statements regarding Merrill's overall risk policies false.  See In re Citigroup, Inc., 330 F. Supp. 2d at 379 (allegations that "Citigroup extended increasingly more credit to an 'unstable borrower' [Enron]" did not show falsity of statements regarding Citigroup's risk management procedures) (alteration in original) (citation omitted).

Third, Merrill's disclosures relating to market risk, such as its "value at risk" or VaR calculation, and its statements regarding how it expects its hedging strategies to perform are predictions of future performance which are subject to the PSLRA's safe harbor for forward looking statements.[30]  Under the PSLRA, forward looking statements are not actionable if accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(A)(i).  If such cautionary language is missing, a forward looking statement is still inactionable unless made with "actual knowledge" that the statement was false or misleading.  Id. § 78u-5(c)(B), see also id. at (A).  Disclosures regarding market risk, including VaR disclosures, are subject to the SEC's Regulation S-K, Item 305, Quantitative and Qualitative Disclosures About Market Risk which specifically provides that the required disclosures, including VaR disclosures – which are statistical predictions of how much loss a portfolio of investments might suffer in the future based, in large part, on a historical data such as the credit ratings for the

---

[30]    The non-actionable allegations regarding VaR and other aspects of Merrill's market risk management appear throughout the Complaint.  (Compl. ¶¶ 43, 49, 169, 205, 208, 246, 275, 279, 281, 291, 293-95.)  Statements regarding Merrill's hedging strategy as a risk management practice, see, e.g., Compl. ¶¶ 232, 278, are also subject to the PSLRA's safe harbor protections.  Cf. Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5-6 (2d Cir. 1996) (statements regarding hedging strategy were protected by bespeaks caution doctrine (the predecessor to the PSLRA safe harbor) as the risks associated with hedging strategy were specifically disclosed).

investments (Compl. ¶162; Merrill 10-K (2006), at 52 (Ex. V)) – are deemed to be forward

looking statements under the PSLRA.  See 17 C.F.R. § 229.305(d) (2008); 15 U.S.C. § 78u-

5(i)(B), (C) (forward looking statements include "statement[s] of future economic performance"

or "statements of the plans and objectives of management for future operations").

        Merrill provided meaningful cautionary language regarding market risk, including

that "VaR is not intended to capture worst case scenario losses" and that "the calculation of VaR

requires numerous assumptions and thus VaR should not be viewed as a precise measure of

risk."  Merrill 10-K (2006), at 52 (Ex. V).[31]  Merrill also specifically disclosed the risk associated

with its hedging strategies.  See id. at 23 ("We are exposed to the potential for credit-related

losses that can occur as a result of [a] counterparty [] being unable or unwilling to honor its

contractual obligations.").  Given this cautionary language, the market risk disclosures are not

actionable.  See Sina, 2006 U.S. Dist. LEXIS 71089, at *30-33 (statements regarding risks of

operating in China were protected under safe harbor); Albert Fadem Trust v. Am. Elec. Power

Co., 334 F. Supp. 2d 985, 1021 (S.D. Ohio 2004) (statements regarding risk exposures and risk

management procedures were forward-looking and not actionable).

        In any event, Plaintiffs have failed to allege the reasons why Merrill's VaR

disclosures were false.  As with the valuation of complex securities, estimating VaR involves

management's judgment and amounts to an opinion about future events.  Plaintiffs do not say

anything about how Merrill calculated VaR or why its methods were unsound.  Cf. Salomon

Analyst Level 3, 373 F. Supp. 2d at 251 (valuation model was opinion, not fact).  And they say

---

[31]  Oral statements regarding market risk during investor conference calls, see, e.g., Compl. ¶ 246, are covered by the safe harbor because at the outset of each call Merrill referred investors to its SEC filings for additional information about risk factors, as required by the safe harbor provisions.  See, e.g., Merrill Earnings Call (2Q 2007) at 1 (Ex. FF)); 15 U.S.C. § 78u-5(c)(2); In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 268 (S.D.N.Y. 2004).

nothing that would suggest that Merrill considered inappropriate factors. To the contrary, Plaintiffs acknowledge that VaR calculations should consider the rating of the investments, (Compl. ¶ 162), and Merrill's super-senior positions were all AAA-rated.

### 3.  The Complaint Fails To Allege any Actionable False Statements or Omissions Regarding Loan Underwriting Standards

Plaintiffs allege that Merrill's purported failure to disclose that it "had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit," (Id. ¶¶ 131, 209(a)), rendered false and misleading Merrill's disclosures of its residential mortgage lending. (Id. ¶¶ 221(d), 231, 264(a).) Once again, Plaintiffs have failed to allege that the supposedly omitted information ever existed. As discussed above, their allegations that Merrill supposedly caused Ownit to lower its underwriting standards are inadequately pleaded and show nothing of the sort. See supra at I.C.3(a). Plaintiffs also allege that Merrill was requiring originators to take back early defaulted loans which suggests, if anything, that Merrill was enforcing, not ignoring underwriting standards. (Compl. ¶¶ 127, 128, 136, 139.)

Moreover, the allegedly false statements Plaintiffs cite concern Merrill's overall residential loan portfolio, not the subprime loans purchased for the securitization business. For example, Plaintiffs cite a disclosure in Merrill's 2006 10-K that for Residential Mortgage Lending "*Credit risk is closely monitored in order to confirm that reserves are sufficient and valuations are appropriate. These loans are predominantly extended to high credit quality borrowers.*" (Id. ¶¶ 208, 230, 262, 291 (emphasis in Complaint).) Plaintiffs do not dispute, however, that Merrill's portfolio of residential loans was predominantly extended to high credit quality borrowers. As of June 29, 2007, for example, Merrill allegedly held $18.9 billion in

mortgage loans and Plaintiffs do not allege that these loans were mostly sub-prime.  (Id. ¶¶ 16(h), 119, 209(a), 213, 221(d).)

### 4.    The Complaint Does Not Allege that Merrill's Financial Statements Violated GAAP or Disclosure Rules

Plaintiffs allege that, throughout the class period, Merrill's reporting of its assets and liabilities and its net earnings were false and misleading because, in violation of GAAP, it failed to account for the decline in value of its CDO exposures.  (E.g., id. ¶¶ 16(c), (d), (m), 238(i), 259(c), (d), (e), 290(b), (c), (e), 324(b), (c).)  In support of this assertion, Plaintiffs cite 22 pages worth of GAAP and other disclosure rules they claim were violated.  (Id. ¶¶ 337-82.)

As discussed above, the overriding defect in Plaintiffs' claim of accounting fraud is that they cannot point to contemporaneous facts known to Merrill that would have required a different accounting treatment for the CDOs.  The fact that independent auditors signed off on Merrill's 2006 and 2007 10-K, see supra at I.C.4, shows at the very least that Merrill's accounting was within the range reasonable accountants would consider appropriate.[32]

Plaintiffs first point to GAAP rules they allege required Merrill to carry its CDOs at "fair value" but they fail to allege facts showing that Merrill failed to do so.  As discussed above, before the third quarter, under SFAS 157, Merrill was required to look to observable data to mark its CDOs to market value.  Plaintiffs do not allege any facts demonstrating that Merrill failed to follow this requirement or that actual market data applicable to the super-senior CDOs showed the need for valuation adjustments before they were taken.[33]

---

[32]  GAAP, "far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions . . . tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management."  Thor Power Tool Co. v. Comm'r., 439 U.S. 522, 544 (1979).

[33]  Plaintiffs cite a number of GAAP provisions that do not apply here.  They cite paragraphs of SFAS 107 ¶¶ 20, 22, 27 (Compl. ¶ 348) regarding valuation of financial instruments that were repealed by SFAS 157.  See SFAS 157 Appendix E, ¶ E14(f).  They further claim Merrill failed to follow SFAS

*(cont'd)*

Next, Plaintiffs point to GAAP rules they assert required Merrill to make disclosures regarding the likelihood that it had incurred or would incur losses on its subprime securities. (Compl. ¶¶ 357-58.) Merrill disclosed that it was exposed to subprime losses in its July 17, 2007 earnings release and subsequent disclosures and Plaintiffs do not allege that Merrill knew it would suffer losses any sooner. Plaintiffs also allege that Merrill failed to disclose the "significant concentration" of risk from its subprime exposure. (Id. ¶¶ 95-97.) But Plaintiffs are again relying improperly on hindsight and have not adequately alleged that significant risk concentration or impending losses on these AAA-rated securities were apparent at the time of the earlier financial statements.

Plaintiffs further allege that Merrill violated various rules requiring corporations to maintain adequate internal controls over financial reporting. (Compl. ¶¶ 377-82.) Plaintiffs do not allege any facts concerning the supposed inadequacy of Merrill's internal controls, other than their hindsight assertion that the internal controls supposedly failed to prevent the overstatement of Merrill's assets and other accounting violations, which, for the reasons outlined above, have themselves not been alleged. Conclusory allegations regarding the purported lack of controls are insufficient to plead securities fraud. See Decker v. Massey-Ferguson, Ltd., 681

---

*(cont'd from previous page)*

No. 5, Accounting for Contingencies, by not taking valuation adjustments on the CDOs (Compl. ¶¶ 349, 357-59), but they do not identify facts that would require such an adjustment. Moreover SFAS No. 5 applies to "straightforward losses of earnings" and does not apply where more specific provisions apply. See Fadem, 352 F. Supp. 2d at 513-14. They also cite SOP 94-6 (Compl. ¶ 361), which does not apply to "financial instruments." (SOP 94-6 ¶ 23.) Lastly, SFAS 107 ¶ 15A, which Plaintiffs partially quote (Compl. ¶ 360), applies to "significant concentrations of *credit risk*" to "an individual counterparty or groups of counterparties." In contrast, under SFAS 107 ¶ 15C, "[a]n entity is encouraged, but not required, to disclose quantitative information about the *market risks* of financial instruments." There are no allegations that the CDOs posed a counterparty credit risk concentration. The value of the CDO positions may have been exposed to the underlying market risk in the subprime and housing market, but market risk is not a required disclosure under SFAS 107.

F.2d 111, 116 (2d Cir. 1982) (rejecting conclusory allegation that corporation lacked "'adequate operational, managerial and financial controls'" as defective under Rule 9(b).)

Lastly, Plaintiffs allege that Merrill violated its duty to disclose in its SEC filings information about "known trends" it "reasonably expects will have a material favorable or unfavorable impact on net sales or revenues" under Regulation SK, Item 303.  17 C.F.R. § 229.303 (2008) ("Item 303").  (Compl. ¶¶ 375-76.)  As a threshold matter, there is no private right of action under Item 303, see Oran, 226 F.3d at 287 (Alito, J.), and a violation of Item 303 does not amount to a violation of Section 10(b), see In re Flag Telecom, 308 F. Supp. 2d at 263. In any event, Merrill complied with Item 303 when it disclosed in its Q2-2007 10-Q that it had exposure to the problems emerging in the credit markets and that "significant risk remains that could adversely impact those exposures and results of operations," (Compl. ¶ 294), and when it made additional disclosures about its subprime exposures in its Q3-2007 10-Q, (id. ¶¶ 321-23). Plaintiffs have failed to allege that any decline in the value of the CDOs was a "known trend" before those disclosures.  See, e.g., In re Flag Telecom, 308 F. Supp. 2d at 265 (allegation that loss from a swap transaction should have been reported as a known trend was insufficient, where plaintiff failed to "identify the specific transactions . . . [or] specify when they occurred or the approximate value of the swaps").

## F.    Plaintiffs Have Not Alleged a Claim Under Rule 10b-5(a) and (c)

Count II of the Complaint, asserting a claim for manipulative and deceptive devices under SEC Rules 10b-5(a) and (c), simply incorporates all of the purported fraud allegations in the Complaint that form the basis of their claim under 10b-5(b).  (Compl. ¶¶ 417-24).  While Rule 10b-5(b) addresses misstatements and omissions, Rules 10b-5(a) and (c) apply to manipulative or deceptive devices or acts.  Count II should be dismissed because where the claim is based on alleged misstatements or omissions, a claim for market manipulation does not

76

lie.  See Lentell, 396 F.3d at 177-78 ("[W]here the sole basis for such claims is alleged

misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under

Rule 10b-5(a) and (c).") (citation omitted); accord ATSI Commc'ns, 493 F.3d at 101

(manipulation under 10b-5(a) and (c) is limited to conduct affecting market activity, such as

"'wash sales, matched orders or rigged prices'") (citation omitted).

### G.    Plaintiffs Have Failed to Allege that the Preferred Stock Traded on an Efficient Market and Therefore Cannot Rely on any Presumption of Reliance

The claims brought on behalf of all thirteen series of Preferred Stock also must

fail because Plaintiffs have predicated their claims on a fraud-on-the-market theory to avoid

pleading actual reliance, but have failed to include "specific allegations" that each series of stock

"traded in an efficient or 'open and developed market,'" Cammer v. Bloom, 711 F. Supp. 1264,

1278 (D.N.J. 1989).  Here, Plaintiffs simply lump the thinly-traded preferred stock with the

common stock (Compl. ¶ 400), which is insufficient.  See Cammer, 711 F. Supp. at 1278 & n.20.

### II.    PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT OR SECTION 14(A) OF THE EXCHANGE ACT

Plaintiffs attempt to weave the same tale of fraud into allegations that Merrill

violated Sections 11 and 12(a)(2) of the Securities Act (the "Securities Act Claims") in

connection with certain Merrill preferred stock offerings and Merrill's acquisition of First

Republic for cash and stock, and Section 14(a) of the Exchange Act (the "Proxy Claim") relating

to the proxy statement issued in connection with the First Republic transaction.[34]  These claims

---

[34]    Plaintiffs base their claims on registration statements and prospectuses, and documents incorporated by reference, related to the offerings of Merrill Lynch Capital Trust I Preferred Securities in December 2006 (Compl. ¶¶ 445-49); Merrill Lynch Floating Rate Non-Cumulative Preferred Stock, Series 5 in March 2007 (id. ¶¶ 450-53); Merrill Lynch Capital Trust II Preferred Securities in April 2007 (id. ¶¶ 454-58); Merrill Lynch Capital Trust III Preferred Securities in August 2007 (id. ¶¶ 459-63); and Merrill Lynch Series 6 Noncumulative Preferred Stock, Merrill Lynch Series 7

*(cont'd)*

are based on Merrill's SEC filings during the Class Period, to the extent incorporated by reference into the respective registration statements, prospectuses and proxy statement for the relevant offerings.  So the allegedly misleading statements are a subset of the purported misrepresentations alleged in the Section 10(b) claims.

In an apparent effort to sidestep the requirements for pleading fraud with particularity under Rule 9(b), Plaintiffs divided the Complaint into two parts and ask the Court to treat the Securities Act and Proxy Claims as "in effect a separate complaint" which does not incorporate the earlier Section 10(b) allegations.  (Compl. ¶¶ 432, 434.)  Plaintiffs repeat many of the same themes, but eliminate what little detail appeared in the first half of the Complaint. Thus, the flawed allegations regarding "warnings" from Merrill employees regarding the CDO business, Kronthal's purported "limits" on CDO exposure (e.g., id. ¶ 36-38), and the supposed lowering of underwriting standards at Ownit (e.g., id. ¶ 129-37), are not part of the Securities Act and Proxy claims.  The allegations regarding the decline in the ABX and TABX indices are carried over (id. ¶ 440), but not the flawed attempt to explain the relevance of these indices, (id. ¶ 142-53).  These allegations cannot state a claim under any standard.

## A.  Pleading Standards

### 1.  Plaintiffs' Claims Sound in Fraud and Are Therefore Subject to the Heightened Pleading Requirements of Rule 9(b)

Claims under Section 11 and 12(a)(2) of the Securities Act must comply with the heightened pleading requirements of Rule 9(b) if they "sound in fraud."  Rombach, 355 F.3d at 171.  The applicable test under Rombach is whether the complaint includes "wording and imputations . . . classically associated with fraud."  Id. at 172.  Here, as in Rombach, the

_____

*(cont'd from previous page)*

Noncumulative Perpetual Preferred Stock, and 11.6 million Merrill common stock issued in connection with the First Republic transaction (id. ¶¶ 464-69).

Complaint is replete with allegations of statements that were "materially false and misleading,"[35] and contain "untrue statements of material facts."[36] Id. (holding allegations that registration statement was "inaccurate and misleading;" that it contained "untrue statements of material facts;" and "materially false and misleading written statements" "sounded in fraud"); see also Miller v. Lazard, Ltd., 473 F. Supp. 2d 571, 585-86 (S.D.N.Y. 2007).

Because Plaintiffs' theory of why Merrill's SEC filings were misleading is based on the same course of conduct as their fraud claims, they cannot avoid Rule 9(b) by simply disavowing any reliance on "fraud, scienter or recklessness."  (E.g., Compl. ¶¶ 432, 434.) "'Plaintiffs cannot so facilely put the fraud genie back in the bottle.'"  Miller, 473 F. Supp. 2d at 585-86 (citation omitted); see also In re JPMorgan Chase, 363 F. Supp. 2d at 635 ("Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.").

Significantly, the test under Rombach "is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  355 F.3d at 171.  Thus, the attempt to divide the Complaint into separate parts has been tried and rejected as a means for avoiding Rule 9(b).  Even where the Securities Act claims are included as separate allegations, they will be subject to Rule 9(b) if facts supporting those claims are also repeated as support for the fraud claims, see NYFIX, Inc., 399 F. Supp. 2d at 122, or where they "do not allege that the Registration Statement or Prospectus contains any *additional* 'untrue statement or omission of a material fact' independent of [the fraud] allegations."  In re

---

[35]  Compl. ¶¶ 442, 488, 491, 493, 495, 497, 498, 501, 506, 511, 513, 515, 516, 518, 519, 527, 530, 534, 535, 537, 544, 546, 551, 552, 556, 559, 560, 660.

[36]  Compl. ¶¶ 498, 515, 519, 563, 575, 578, 583, 594, 600, 613, 621, 634, 642, 653, 669; see also id. ¶ 507 ("falsely represented").

AXIS Capital Holdings Ltd., 456 F. Supp. 2d at 598 (emphasis added; brackets in original removed).  Here, the same purported misrepresentations underlie the Securities Act and Proxy claims and Section 10(b) claims; the allegations used to support the Securities Act and Proxy claims, such as the purported GAAP violations, AIG's exit from the business of insuring mortgage securities and the supposed undercapitalization of the monoline insurers, (Compl. ¶¶ 438-39, 514, 527, 534, 544, 551, 559-560) are all included as purported bases for scienter in the Section 10(b) counts, (id. ¶¶ 92-99, 100-07, 337-82).

Given Plaintiffs' failure to allege scienter or falsity on their Section 10(b) claims relating to the same purported misstatements, their stripped down Securities Act and Proxy claims must similarly fail.  See In re JP Morgan Chase, 363 F. Supp. 2d at 635-36 (dismissing Section 11 and Section 14(a) claims for failure to allege scienter under Rule 9(b)).

## 2.    Plaintiffs' Claims Also Fail the Twombly Standard.

Even if Rule 9(b) did not apply, Plaintiffs' claims would fail under Rule 8(a).  Under Twombly, Rule 8(a) "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." 127 S. Ct. at 1965.  A complaint must plead "[f]actual allegations . . . to raise a right to relief above the speculative level."  Id.  As applied to Securities Act claims, "craftily drafted" fraud by hindsight allegations implying "that what only became clear due to subsequent events was somehow known . . . far earlier" do not meet this pleading standard.  Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669-70 (S.D.N.Y. 2008).  Indeed, even before Twombly, courts routinely dismissed Securities Act claims that pleaded fraud by hindsight.  See, e.g., Olkey, 98 F.3d at 8 ("To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted."); Schoenhaut v. Am. Sensors, Inc., 986 F. Supp. 785, 790  (S.D.N.Y. 1997) ("fraud by hindsight … is not actionable" under § 11 and § 12(2)); Zucker v. Quasha, 891

F. Supp. 1010, 1014, 1016-17 (D.N.J. 1995) (dismissing Securities Act claims where "Plaintiff's allegations [were] based entirely upon hindsight"), aff'd mem., 82 F.3d 408 (3d Cir. 1996).

Moreover, even without the heightened pleading standards, Plaintiffs may not second guess management's judgments regarding such matters as setting loan loss reserves or valuing complex securities. In re CIT Group, Inc., Sec. Litig., 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (holding that Securities Act plaintiffs failed "to plead any facts from which it could be inferred that defendant's belief in the adequacy of the [loan loss reserves] was beyond the pale of reason"). These are matters of opinion, and Plaintiffs must allege that the opinions are objectively and subjectively false. In re Salomon Analyst Level 3, 350 F. Supp. 2d at 489. As with Plaintiffs' section 10(b) claims, allegations of mismanagement will not support Plaintiffs' Securities Act and Proxy Claims. See Hinerfield v. United Auto Group, 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601, at *21 (S.D.N.Y. Jul. 15, 1998) ("There are no facts alleged to support an inference that [defendants' alleged] failure[s were] the result of anything but inaccurate forecasting or unforeseen circumstances."). See supra at I.C.1(a).

**B.     The Complaint Fails to Allege any Untrue Statement or Actionable Omission**

Section 11 of the Securities Act imposes liability for a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading." 15 U.S.C. § 77k. Section 12(a)(2) of the Securities Act imposes liability for "a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . ." 15 U.S.C. § 77l(a)(2); see Miller, 473 F. Supp. 2d at 578-79.

In their Securities Act claims, Plaintiffs rely on the same allegedly false disclosures in Merrill's earnings releases, 10-Qs and its 2006 10-K they relied on for their

Section 10(b) claims.  The "reasons" why the quoted statements are allegedly false and

misleading, however, are greatly truncated and do not even purport to be backed up by factual

allegations.  Even under the Rule 8(a) pleading standards, Plaintiffs are required to allege facts

"demonstrating the defendant possessed the omitted information at the time the registration

statement became effective and that the defendant had a duty to disclose that information."  In re

JPMorgan Chase, 363 F. Supp. 2d at 635; see also In re Flag Telecom, 308 F. Supp. 2d at 255.

Moreover, the allegations must be sufficiently specific for the court to determine whether the

matters omitted or allegedly misstated were material.  Garber, 537 F. Supp. 2d at 613 (dismissing

allegations of Section 11 and 12(a)(2) claims, inter alia, as "too conclusory, as they offer no

possibility at all of assessing materiality . . . .").  Plaintiffs do not allege any actionable statement

or omission for the same reasons set forth above.[37]

**C.    Plaintiffs Lack Standing Under Section 11 and Section 12(a)(2) With Respect to Certain of the Preferred Stock Offerings**

With respect to the Securities Act claims, neither Lead Plaintiff Ohio STRS nor

additional plaintiff Kosseff allege that they can trace their shares to any particular registration

statement (for the section 11 claims) or that they purchased in the public offering (for the section

12(a)(2) claims) with respect to the Merrill Lynch Capital Trust I (December 7, 2006 offering);

the Series 5 Preferred Stock (March 15, 2007 offering); the Series 6 Preferred Stock (First

Republic); or the Series 7 Preferred Stock (First Republic).  Accordingly, Plaintiffs also lack

standing to assert these claims.  See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189,

---

[37]    Plaintiffs allege that the registration statement for the First Republic merger was false because "it did not disclose material adverse events," referring to a contractual representation Merrill made in the merger agreement.  (Compl. ¶ 557.)  Plaintiffs do not allege any facts or even attempt to explain what material adverse event had occurred as of January 29, 2007, the date of the merger agreement.  Moreover, the prospectus disclosed that the contractual representations "were made for purposes of the merger agreement" were subject to qualifications and limitations and were therefore not intended to be relied upon by shareholders.  First Republic Prospectus at 65 (Ex. MM).

206-07 (S.D.N.Y. 2003) (dismissing section 11 claims); In re Flag Telecom, 308 F. Supp. 2d at

257 (dismissing section 12(a)(2) claims).

**D.    The Securities Act Claims Should Be Dismissed for Lack of Loss Causation**

As discussed above, Plaintiffs have utterly failed to explain how the alleged

misrepresentations caused their losses.  The same analysis is fatal to Plaintiffs' Securities Act

claims as well.  While loss causation is a defense to claims under both Sections 11 and 12(a)(2)

of the Securities Act, where it is shown that the plaintiff's losses were not the result of the alleged

false statement or omission upon which liability is predicated, such claims should be dismissed

where it is apparent that the losses are not attributable to the alleged untrue statement or omission.

See In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 253-54

(S.D.N.Y. 2003) ("[D]eclines in the price of . . . shares which occurred before public disclosure

of the allegedly concealed information . . . may not be charged to Defendants under Section 11 or

Section 12(a)(2)."); see also Azzolini v. CorTS Trust for Provident Fin. Trust I, 03 CV 1003,

2005 U.S. Dist. LEXIS 38454, at *18-23 (E.D. Tenn. Dec. 14, 2005) (declines in stock occurring

long after allegedly undisclosed facts were made public did not cause plaintiffs' losses); Stafford

v. Bakke, 02 CV 1132, 2005 U.S. Dist. LEXIS 40525, *15-16 (S.D. Ind. Jul. 7, 2005).

**E.    The Complaint Fails to State a Claim under Section 15 of the Securities Act**

In Count XIV, Plaintiffs allege a "control person" claim under Section 15 of the

Securities Act, 15 U.S.C. § 77o, against Merrill because Merrill supposedly controlled ML Trust

I, II and III, and Merrill Lynch Pierce Fenner & Smith Inc. in connection with the alleged direct

violations of Section 11 and Section 12(a)(2) of the Securities Act.  (Compl. ¶¶ 664-67.)  These

claims all fail because Plaintiffs have failed to allege a primary violation of the Securities Act.

See, e.g., Rombach, 355 F.3d at 177-78.

83

III.    **THE COMPLAINT FAILS TO STATE A CLAIM**
        **UNDER SECTION 14(A) OF THE EXCHANGE ACT**

Plaintiffs' claim under Section 14(a) of the Exchange Act is based on SEC Rule 14a-9, which states that "no solicitation . . . shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a) (2008); see 15 U.S.C. 78n(a).

The Section 14(a) claim is subject to Rule 9(b) because it sounds in fraud, as discussed above. In re JP Morgan Chase, 363 F. Supp. 2d at 636. The claim is also subject to the pleading standards of the PSLRA because Section 14(a) is part of the Exchange Act. 15 U.S.C. § 78u-4(b)(1), (2); Bond Opportunity Fund, 2003 U.S. Dist. LEXIS 7838, at *8-9. Accordingly, Plaintiffs are required, but have failed to (a) specify each statement alleged to be misleading, the reasons why the statement is misleading, and plead with particularity the facts showing the basis for their belief that the statements were misleading, 15 U.S.C. § 78u-4(b)(1); and (b) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2). The required state of mind for a section 14(a) claim is at least negligence. In re Elan Corp. Sec. Litig., 02 Civ. 865, 2004 U.S. Dist. LEXIS 9913, at *49 (S.D.N.Y. May 18, 2004) (dismissing Section 14(a) claim for failure to plead mental state of defendants); In re JP Morgan Chase, 363 F. Supp. 2d at 636 (same). Under the PSLRA, Plaintiffs are also required to plead and prove loss causation on the Section 14(a) claim. 15 U.S.C. § 78u-4(b)(4); see also Fisher v. Kanas, 467 F. Supp. 2d 275, 283 (E.D.N.Y. 2006). Given Plaintiffs' failure to state claims under Section 10(b), the less detailed § 14(a) claims must fail a fortiori.

**CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York
      July 21, 2008

                              _____/s/ Jay B. Kasner_____
                              Jay B. Kasner (jay.kasner@skadden.com)
                              Christopher P. Malloy (christopher.malloy@skadden.com)
                              Scott D. Musoff (scott.musoff@skadden.com)
                              Joanne Gaboriault (joanne.gaboriault@skadden.com)
                              SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                              Four Times Square
                              New York, New York  10036
                              (212) 735-3000

                              Attorneys for Defendants
                                Merrill Lynch & Co., Inc.,
                                Merrill Lynch Capital Trust I,
                                Merrill Lynch Capital Trust II,
                                Merrill Lynch Capital Trust III and
                                Merrill Lynch, Pierce, Fenner &
                              Smith Incorporated