# EXHIBIT E

**Statement of John Finnegan**
**before**
**The House Committee on Oversight and Government Reform**
**March 7, 2008**

Chairman Waxman, Ranking Minority Member Davis, and Members of the Committee on Oversight and Government Reform, I thank you for the opportunity to testify before you.  Today, I will address issues related to the compensation of Merrill Lynch's (the "Company") former Chairman and Chief Executive Officer, Mr. Stanley O'Neal, and issues related to his separation from the Company.

I am currently the Chairman of the Board and Chief Executive Officer of the Chubb Corporation.  Before joining Chubb in 2002, I was the Chairman and President of General Motors Acceptance Corporation, a financing subsidiary of General Motors Corporation.  I first became a member of the Company's Board of Directors (the "Board") in 2004, and I have been a member of the Board's Management Development and Compensation Committee (the "Compensation Committee") since that time.  I became Chairman of the Compensation Committee in April 2007.

<u>Mr. O'Neal's 2007 compensation and other amounts to which he was entitled upon his departure</u>

I would like to start by addressing three important factual matters that are key to the subject matter of this hearing: first, Mr. O'Neal's 2007 compensation; second, other compensation amounts, earned in prior years, to which Mr. O'Neal was entitled when he left the Company; and third, a brief outline of the reasons for his compensation for those prior years.  I will then provide the context for these matters.

<u>Mr. O'Neal's compensation for 2007</u>

The Board determined unanimously that Mr. O'Neal would receive no bonus of any kind for 2007 and no severance payment.  Mr. O'Neal's sole compensation for 2007

March 7, 2008
Page 2

was his base salary, which had been paid bi-weekly during the year until his termination on October 30, 2007.

## Other amounts, previously earned, to which Mr. O'Neal was entitled when he left the Company

Aside from his base salary, anything else retained by Mr. O'Neal at his departure had been earned and awarded to him in prior years. The amount disclosed in our public filings and highlighted by the media at the time of his departure relates entirely to compensation and benefits that he earned over the course of his career, and in all events, prior to his separation from the Company. Over 80% of the amount consists of Company stock he received as part of his annual bonuses for 2006 and prior years. Those bonuses were paid because of the Company's and Mr. O'Neal's strong performance during those earlier periods. These stock bonuses were made subject to our customary vesting and holding requirements, which are in place to align the executive's long-term financial interests with those of shareholders and to provide retention value. All of the compensation and benefits that make up the disclosed amount had been awarded to Mr. O'Neal through decisions of the Board that were taken before 2007, and before I became Chairman of the Compensation Committee. At the time of his departure, Mr. O'Neal was entitled under the terms of the Company's various plans and agreements to all of these items which previously had been reported in the Company's proxy statements.

## Mr. O'Neal's pre-2007 compensation

During Mr. O'Neal's tenure as first, President and Chief Operating Officer from 2001 to 2002 and, later as Chief Executive Officer from 2002 to 2006, the Company showed significant and measurable improvement in financial and other performance indicators, which was a direct result of the restructuring, diversification and growth strategy that Mr. O'Neal initiated and led. Mr. O'Neal was elected as President and COO in July of 2001. Immediately prior to Mr. O'Neal's appointment as president, the

March 7, 2008
Page 3

Company's results for the first six months of that year had declined by 30% from the same period in the prior year.  Subsequently, the events of September 11, 2001 displaced Merrill Lynch from its world headquarters for over two months.  The combination of September 11th and the already difficult market environment created uncertainty about, and challenges for, the securities business.  Against this backdrop, Mr. O'Neal acted quickly and decisively to restructure the Company.  Management was reshaped, operations were streamlined and a long-term recovery strategy was put in place.  Mr. O'Neal's leadership positioned the Company for what was to be a period of significant growth and profitability.  For example, return on equity increased from 7.5% in 2002 to 21.3% in 2006.  The Company's net revenues grew from $18.3 billion in 2002 to $32.7 billion in 2006 and net earnings grew from $1.7 billion to $7.6 billion over the same period, while the Company's pre-tax profit margin expanded from 12.6% to 31.9%.  Additionally, the Company diversified its global franchise, increasing the Company's non-US share of Company revenues from 25% in 2002 to 37% in 2006.  Over this period, Mr. O'Neal's leadership qualities and achievements were widely recognized by the markets, clients, analysts, competitors and the media.

In addition to these important considerations, as explained further below, the compensation awarded to Mr. O'Neal during this period was based in part on what the Board considered to have been in a range with that of Mr. O'Neal's peers.  In short, during the pre-2007 period, the Company wanted very much to keep Mr. O'Neal.

I will now try to put these matters in context by providing a review of the Company's executive compensation governance process and related compensation programs and describe why they are in the best interests of our shareholders.  I will then comment in detail on Mr. O'Neal's separation agreement, including a breakdown of the amount and a description of the historic stock grants and benefits that comprise the total reported amount retained by him.  I will address Mr. O'Neal's separation after his twenty-one years of service at the Company, then offer a brief conclusion.

March 7, 2008
Page 4

<u>The executive compensation process</u>

      The Board, in fulfilling its executive compensation responsibilities, adheres to the highest standards of corporate governance. The Board has delegated to the Compensation Committee the responsibility to oversee, in the best interest of shareholders, the use of corporate assets in compensating executives.  The members of the Compensation Committee and its Chairman are appointed by the Board on the recommendation of the Nominating and Corporate Governance Committee of the Board.  All members of the Compensation Committee have been determined by the Board to be independent and in compliance with the rules of the New York Stock Exchange, and also to meet the independence requirements of applicable SEC and IRS rules.

      Under the Compensation Committee charter adopted by the Board, the Committee is responsible for determining the compensation to be paid to individual members of executive management (including the chief executive officer).  The Compensation Committee's determinations for the chief executive officer and other officers identified in our annual proxy statement are submitted to the full Board for ratification.  As described in the Company's proxy statement, the Compensation Committee develops its annual compensation determinations with three primary objectives in mind:

- First, we pay for performance.  Our executives must produce tangible results measured against pre-established performance objectives.

- Second, we try to ensure that compensation for the Company's executives is competitive with that of key competitors in our industry after adjusting for performance.  In our industry, talented executives are in great demand and paying competitive compensation is essential to prevent our competitors from hiring them away.

- Third, we emphasize stock-based compensation to support alignment of our executives' long term financial interests with those of shareholders and to encourage retention.  In the case of Mr. O'Neal, more than 50% of his compensation as chief

March 7, 2008
Page 5

executive officer was delivered in stock awards subject to multi-year vesting and holding requirements.

With respect to measuring and rewarding tangible results against performance objectives, the Compensation Committee has established a formal process. This process starts at the beginning of each year. Management, in dialogue with the Compensation Committee, proposes a series of specific financial, strategic and leadership goals for the Company and individual business units. Examples of these objectives are:

(1) Financial (e.g., revenues, pre-tax profits, return on equity, balance sheet and capital management)

(2) Strategic Objectives (e.g., organic growth, acquisition targets, brand management)

(3) Leadership Objectives (e.g., strategic hires, leadership model)

(4) Specific Business Unit Objectives, (e.g., geographic expansion, new markets)

(5) Execution (e.g., realize targeted returns on investments made in prior years)

The Compensation Committee reviews and ultimately approves performance objectives for the year, and then shares these objectives with the full Board. Over the course of the year, management provides the Compensation Committee with regular updates on their progress and the Company's performance against these objectives.

At the end of the year, the Compensation Committee reviews the results for the Company, compares those results with the reported results of the peer group companies, and conducts a final review of management's performance against its financial, strategic and other objectives.

March 7, 2008
Page 6

   With respect to the Compensation Committee's goal of providing competitive pay for competitive performance, an independent compensation consultant comprehensively reviews competitive pay levels for executives. Since 2003, the Compensation Committee has directly retained Mr. John England, an independent compensation consultant from Towers Perrin, to ensure that it has access to an objective perspective and independent data. Mr. England attends all Compensation Committee meetings and is available individually to all its members. The Company does some other business with Towers Perrin – for example it purchases general compensation surveys, routine reports and business-related consulting assignments. To assure itself of the independence of Mr. England, the Company determined that Mr. England receives no compensation for any other services provided by Towers Perrin and reviews such services to ensure they are a statistically immaterial amount of Towers Perrin's annual revenues. The Compensation Committee is therefore satisfied with Mr. England's independence.

   The companies that comprise the peer group for performance and compensation comparison purposes include those companies who participate in the same core businesses as Merrill Lynch, have a similar business mix and compete directly for the same talent pool globally. The Compensation Committee is also mindful that other non-traditional competitors, such as hedge funds and private equity funds, also compete for the same talent and offer compelling compensation opportunities. However, these companies do not make their compensation information publicly available and so cannot be compared systematically.

   After assessing Company and individual performance and the compensation practices of industry peers, the Compensation Committee also considers the Company's historical compensation practices. On the basis of all this information, the Compensation Committee makes annual pay decisions with the objective of rewarding competitive performance with competitive pay. Most importantly, the Compensation Committee makes a decision regarding annual bonuses. These bonuses typically are

March 7, 2008
Page 7

by far the largest component of an executive's, and indeed most key employees', compensation.  By reserving the ability to vary the amount of our executives' year-end bonuses, which is the bulk of their pay, the Compensation Committee has great flexibility to meet its objectives regarding competitive pay for competitive performance.

Once the amount of annual compensation has been determined, the Compensation Committee considers the form in which it should be delivered.  The Compensation Committee has a long standing philosophy of delivering a significant portion of annual bonuses in Company stock.  Providing compensation in a combination of cash and stock, instead of all in cash, helps protect the interests of shareholders in a number of ways.  First, it promotes the retention of key employees because all or a portion of the stock will be forfeited if they leave the Company before they are eligible for retirement. Second, paying a meaningful portion of the annual bonus in stock aligns the financial interests of executives with those of shareholders over the long term.  Because the value of a stock bonus earned for one year increases or decreases based on stock price performance over the four-year vesting period (as well as over any subsequent holding period), executives are encouraged to take a long term view to business planning and decision making.

The Company's executive management team, including the chief executive officer, receives stock bonus grants with the same terms, conditions and forfeiture provisions as the other 10,000 annual stock bonus recipients.  However, in addition to the normal vesting restrictions, executive management is subject to stock ownership guidelines that require executives to hold a portion of their stock bonus even after the shares have vested, which serves to further align the long-term interests of executives with those of shareholders.

March 7, 2008
Page 8

<u>Mr. O'Neal's separation agreement</u>

In the fall of 2007, as Chairman of the Compensation Committee, I presided over the process that the Board used to determine the separation agreement for Mr. O'Neal. This agreement was reached after careful deliberation by the Board.  At the time, the Board was balancing the circumstances of Mr. O'Neal's departure and the performance of the Company in 2007 with the need for closure and a rapid transition to a new chief executive officer.  In reaching the agreement, the Board retained and was advised by an independent compensation consultant and independent legal counsel.

The press has reported the value of Mr. O'Neal's separation agreement as $161.6 million. There is no disputing the number; it comes directly from the Company Form 8-K filing at the time of his departure. The value was based on the Company's stock price on October 29, 2007, the day prior to Mr. O'Neal's departure.  To understand the reported value of the agreement, it is necessary to examine its specific components. However, before I do so, it is important to highlight that his separation agreement does <u>not</u> include <u>any</u> bonus compensation for 2007 or <u>any</u> severance payment.  Upon Mr. O'Neal's departure in October, the Board unanimously determined that no bonus would be paid to him for 2007 and no severance payment (in either cash or stock) could be given in light of the Company's performance in 2007.

At the time Mr. O'Neal left, the Board had determined that, while Mr. O'Neal, up until the mortgage crisis, had achieved outstanding results for the Company, he was not the right person to take the Company forward and that new leadership was required.  Based upon the Company's performance in 2007 and taking into consideration the amounts the Company paid Mr. O'Neal in prior years, the Board decided not to give Mr. O'Neal a bonus in 2007 or pay him severance.  In making these decisions, the Board recognized that Mr. O'Neal was entitled to retain the compensation and benefits that he earned in prior years and that he was eligible to receive under the Company's retirement provisions.  Consequently, the value disclosed and retained by him after his departure is entirely attributable to compensation and benefits earned by him from 1987 to 2006.

March 7, 2008
Page 9

These items include benefits payable to him under general employee plans, deferred compensation from 1997 and 1998, annual stock bonus awards made for performance in 2006 and prior years and a supplemental executive annuity plan.

In 2006 and earlier years, annual stock bonuses were awarded to Mr. O'Neal in lieu of paying his bonus entirely in cash to ensure that his long-term financial interests were aligned with those of shareholders. For the 2004 performance year, for example, Mr. O'Neal's entire bonus was paid in stock. If the Board had paid Mr. O'Neal all the prior annual bonuses in cash, instead of stock and cash, the amount reported as being retained by him at the time he left the Company would have been limited to $25 million (attributable to benefits) and $5 million (deferred compensation), and Mr. O'Neal would not have been adversely affected, as he in fact has been, by the decline in the Company's stock price since his departure.

Instead, the Compensation Committee paid a significant amount of Mr. O'Neal's annual bonus in stock with vesting over a four year period in order to align Mr. O'Neal's interests with those of the Merrill Lynch shareholders. This alignment can be seen in the effect of the decline in Merrill Lynch's stock price in 2007 on Mr. O'Neal's stockholdings. Mr. O'Neal had a beneficial ownership of 3,214,358 shares as of February 28, 2007, as reported in the Company's 2007 Proxy Statement. At Merrill Lynch's stock price as of year-end 2007 Mr. O'Neal's holdings declined by over 55%, or $117 million compared with their value in February 2007. I believe the Compensation Committee's approach of paying a significant portion of the annual bonus in stock with vesting and holding restrictions accomplished our goal of aligning Mr. O'Neal's interests with the long-term financial interests of shareholders.

In each of the years that Mr. O'Neal received a stock bonus award, the Compensation Committee and the Board followed the process I described at the beginning of my remarks. In each of those years, Mr. O'Neal's compensation reflected

March 7, 2008
Page 10

the Company's performance against pre-established goals, its results compared to key competitors, and the compensation of key industry peers.

<u>Mr. O'Neal's departure after 21 years with the Company</u>

In October of 2007, in accordance with the terms of our stock and benefit plans, Mr. O'Neal already was entitled to retirement treatment because of his age and length of service with the company. The benefit plans in which Mr. O'Neal participated are generally broad-based plans, and he participated on the same terms as all other employees. The terms of these plans were written to be fair to the broad Company employee population. Because the Board never entered into any type of employment contract with Mr. O'Neal, it retained the flexibility at the time he left to determine that he would not receive a bonus for 2007 and that no severance would be paid to him.

Mr. O'Neal joined the Company in 1986, 21 years ago. He met the eligibility requirements for retirement within the meaning of the Company's stock award plans before he ever became chief executive officer. Given his retirement rights, Mr. O'Neal's unvested stock and unexercised stock options continue to vest and are exercisable under the retirement provisions of the stock award plans. More specifically, the vesting of his stock grants was not accelerated in connection with his retirement, and they will continue to vest over time subject to the restrictive covenants that govern them, such as his agreements not to compete with the Company and not to solicit employees. Breach of these covenants will result in the forfeiture of the unvested stock awards. In addition, the Company did not provide Mr. O'Neal with a release of any claims that the Company may have against him.

Beyond these stock grants, the remainder of the reported amount is the $30 million attributable to the Executive Annuity Agreement, various benefits, and deferred compensation. Under the federal regulations that govern the status of the Company's 401(k) plan, the Employee Stock Ownership Plan and the Retirement Accumulation Plan, employee balances are protected from forfeiture by the Company for any reason.

March 7, 2008
Page 11

The deferred compensation plan, representing compensation Mr. O'Neal previously earned in 1997 and 1998 and irrevocably deferred by him to be received after retirement, is protected in a similar way by New York state law.

The only benefit plan in which Mr. O'Neal participated that was not broad-based is the Executive Annuity Agreement.  Since 1991, the Company has provided Executive Annuity Agreements to the Company's chief executive officers.  Messrs. Schreyer, Tully and Komansky, the three chief executive officers prior to Mr. O'Neal, all have similar agreements. These agreements were drafted as a retention device to reduce the possibility that the CEO would leave the Company prematurely without the approval of the Board.  The agreements provide for supplemental retirement payments to be made to the former chief executive officer after he retires based on pay levels in prior years, length of service at the Company and age at retirement.  The annuity payment is reduced by any other Company funded retirement benefits.  The agreement requires the Company to pay supplemental retirement payments to Mr. O'Neal if he retires after age 55, with the approval of the Board.  After consideration of the purpose and terms of the agreement and the immediate need to stabilize the Company and transition to new leadership, the Board concluded that it would not be in the Company's best interest to assert that Mr. O'Neal's departure was anything other than a retirement within the meaning of the agreement.

<u>Conclusions</u>

I would like to conclude by saying that I realize that many Americans have difficulty in understanding how compensation in the range of Mr. O'Neal's can be justified.  On the other hand, it is important to understand that the compensation he earned over his long career in an industry in which executives and top producers are well paid, stemmed from tangible results and the need for the Company's compensation to be competitive with that of comparable companies in its industry.  During Mr. O'Neal's first five years as CEO, he provided strong and decisive leadership during a phase of significant restructuring, repositioning and growth for the Company.  Although his legacy

March 7, 2008
Page 12

is marred by the deep losses in very specific parts of our business, the overall health and vitality of the rest of the Company's global franchise is due in large part to the strength of leadership and direction that he provided, and Mr. O'Neal's compensation from 2002 to 2006 reflected those results.  In 2007, when tangible results were not delivered, Mr. O'Neal lost his job and received no bonus and no severance.


     In developing separation arrangements for Mr. O'Neal the Board acted in the best interests of the Company's shareholders.  In all years, the Board followed an established process in compensating Mr. O'Neal.  It is a process that was designed to adhere to the best corporate governance practices.  The other members of the Board and I believe we met our responsibilities honorably and appropriately.


     Thank you for providing the Company with this opportunity to explain our process and decisions, and I will do my best to answer any questions you may have.