# EXHIBIT M

1 of 1 DOCUMENT

Copyright 2008 Factiva , from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2008, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.
The Wall Street Journal

April 16, 2008 Wednesday

**SECTION:** Pg. A1

**LENGTH:** 2205 words

**HEADLINE:** Merrill Upped Ante as Boom In Mortgage Bonds Fizzled --- Fresh $6 Billion Hit Is Expected as Toll Of CDO Push Rises

**BYLINE:** By Susan Pulliam, Serena Ng and Randall Smith

**BODY:**

Some 10 months after the mortgage hurricane made landfall, Merrill Lynch & Co. is still trying to dig out.

On Thursday Merrill will report $6 billion to $8 billion in new write-downs, according to a person familiar with the matter. The latest would bring its total since October to more than $30 billion and mean that Merrill reports a third straight quarterly net loss, the longest losing streak in its 94-year history.

Now the firm is readying a cost-saving plan that includes job cuts of 10% to 15% in some areas where business is off, such as bond finance, people familiar with the firm say.

While Merrill is far from alone in suffering, a look at how it got in so deep and its flawed efforts to recover sheds light on why the credit squeeze is proving so deep and persistent. Merrill aggressively continued to create new mortgage securities after doing so became riskier. Among those keenly interested in knowing what went wrong is the Securities and Exchange Commission, which is examining whether Merrill and other firms should have told investors sooner about the stumbling mortgage business last year.

When housing boomed earlier this decade, Merrill profited by turning mortgage-backed bonds into complex securities. Initially, it was well protected from credit risk in this underwriting. The protection frayed at the start of 2006. But Merrill kept playing the game.

By early 2007, as cracks in the housing and mortgage markets widened, Merrill again missed a chance to scale back. In fact, it revved up its production of complex debt securities -- despite a shortage of buyers for them -- in what turned out to be a misguided effort to limit its losses.

Its torrid underwriting loaded Merrill with exposure to mortgage securities, whose top credit rating provided scant protection when investors fled. Then Merrill made another fateful move: trying to hedge some of its massive mortgage risk through bond insurers whose strength was questionable.

Merrill, asked to respond to this account of its troubles, declined to offer a statement.

Merrill has made progress in getting its house in order. It has reduced its exposure to certain risky mortgage securities to $7.5 billion from $40.9 billion in June, mostly by writing down their value or paying another party to take on their credit risk.

Merrill Upped Ante as Boom In Mortgage Bonds Fizzled --- Fresh $6 Billion Hit Is Expected as Toll Of CDO Push Rises
The Wall Street Journal April 16, 2008 Wednesday

New chief executive John Thain has said that, having recently raised $12.8 billion in fresh capital, Merrill won't need to seek more in the foreseeable future. Mr. Thain has increased the importance of weekly risk-management meetings by requiring the heads of trading businesses to attend and by having the top risk managers report directly to him. Since taking over in December, he also has reduced executives' incentive to swing for the fences by tying more of their pay to the firm's overall results and less to how businesses do individually.

Yet as of year end, Merrill still appeared to be taking large risks. Its "leverage ratio" -- how many times assets exceed equity -- stood at 31.9 to 1, higher than most other Wall Street firms. Heavy borrowing like this magnifies both profits and losses.

The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005. As it repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc. An AIG unit bore the default risk of the CDOs' largest and highest-rated chunk, known as the "super-senior" tranche, normally sold to big investors such as foreign banks.

But AIG was keeping a close eye on the housing boom because it had another unit that made subprime loans, those to home buyers with weak credit. AIG did a review of the market. Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities.

Merrill was used to having to keep lots of mortgage bonds and pieces of CDOs on its books temporarily before selling them. But without a firm like AIG providing credit insurance, Merrill had to bear the risk of default itself.

Instead of scaling back its underwriting of CDOs, however, Merrill put the business in overdrive. It began holding on its own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload.

Merrill was able to hang onto the top spot in Wall Street's CDO-underwriting ranks. It generated $44 billion in CDOs in 2006 -- triple its 2004 output. Although not able to sell some of the CDOs, it collected about $700 million for underwriting and trading these and other structured products. And its top ranking was considered in the calculation of executives' bonuses.

Risk controls at the firm, then run by CEO Stan O'Neal, were beginning to loosen. A senior risk manager, John Breit, was ignored when he objected to certain risks taken in underwriting Canadian deals, according to people familiar with the matter. Mr. Breit, then head of market-risk management, told colleagues he had never been overruled like that before, say former Merrill executives.

Merrill lowered the status of Mr. Breit's job in its hierarchy. Mr. Breit sent a letter of resignation to Merrill's chief financial officer saying the job was too important to be diluted that much, says someone familiar with the matter. He was given a different job outside of the risk-management group and stayed at Merrill.

Some managers seen as impediments to the mortgage-securities strategy were pushed out. An example, some former Merrill executives say, is Jeffrey Kronthal, who had imposed informal limits on the amount of CDO exposure the firm could keep on its books ($3 billion to $4 billion) and on its risk of possible CDO losses (about $75 million a day). Merrill dismissed him and two other bond managers in mid-2006, a time when housing was still strong but was peaking.

To oversee the job of taking CDOs onto Merrill's own books, the firm tapped Ranodeb Roy, a senior trader but one without much experience in mortgage securities. CDO holdings on Merrill's books were soon piling up at a rate of $5 billion to $6 billion per quarter. This led to an inside joke at Merrill. Mr. Roy is known as Ronnie. Some employees took to saying that if they couldn't find a specialized bond insurer, known as a "monoline," to take Merrill's risk on the deal, they could resort to a "Ronoline."

Mr. Roy, whom Merrill asked to leave five months ago, says he was simply following orders in loading the books with mortgage securities and that he objected to the practice. He is now at Morgan Stanley.

In August 2006, one Merrill trader fought back when managers pushed to have the firm retain $975 million of a new $1.5 billion CDO named Octans. In a meeting in the office of a risk manager, the trader argued against keeping the securities on the books.

The result was a heated phone conversation with Merrill's CDO co-chief, Harin De Silva, who was out of the office. Mr. De Silva urged the trader to accept the securities, while the trader said he didn't know enough about the CDO to feel comfortable doing that, say people familiar with the meeting. Mr. De Silva reasoned that Merrill would bear less risk by

Page 3

Merrill Upped Ante as Boom In Mortgage Bonds Fizzled --- Fresh $6 Billion Hit Is Expected as Toll Of CDO Push Rises
The Wall Street Journal April 16, 2008 Wednesday

taking on the super-senior tranche because it had already found investors to take on the riskier slices. The alternative was to let the deal fall apart, which would leave Merrill holding the risk of all the securities that would have backed the CDO.

In the end, Mr. Roy's group took the $975 million of securities on the firm's books. That meant Merrill could complete the underwriting of the Octans CDO, a step that helped the firm hold its top rank in CDO underwriting and led to an estimated $15 million in fee revenue for the deal, according to people close to the situation. It's unclear whether Merrill took losses on the deal. The firm later paid Morgan Stanley to take on the credit risk of the securities through a swap transaction.

Pressures rose in early 2007 as the housing bubble lost air. Merrill set out to reduce its exposure, in an effort referred to innocuously as "de-risking."

It could have sold off billions of dollars' worth of mortgage-backed bonds that it had stockpiled with the intention of packaging them into more CDOs. But with the market for such bonds slipping, Merrill would have had to record losses of $1.5 billion to $3 billion on the bonds, says a person familiar with the matter.

Instead, Merrill tried a different strategy: quickly turn the bonds into more CDOs.

Doing so was no longer a profitable enterprise. Demand was weakening for the lower-rated CDO slices, normally sold to risk-tolerant investors such as hedge funds. Often, Merrill could move these only at discounted prices that all but eliminated its profit.

Still, executives believed that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgage securities. And they wouldn't have to sell off their mortgage bonds at a loss.

In the first seven months of 2007, Merrill created more than $30 billion in mortgage CDOs, according to Dealogic, keeping Merrill No. 1 in Wall Street underwriting for this type of security.

By June, the market for mortgage securities was weakening faster. Two Bear Stearns Cos. hedge funds that invested in them were being forced by creditors -- which included Merrill -- to sell securities. That set prices tumbling across the credit markets. One Merrill trader recalls Dale Lattanzio, then co-manager of Merrill's bond business, hustling around the firm's football-field-sized trading floor ordering his traders to "sell everything -- we're too long."

As the CDO business slid, Merrill's top managers embarked on a new plan, referred to as the "mitigation strategy." The aim was to find ways to hedge exposure through deals with bond insurers. This would reduce the size of write-downs Merrill would otherwise have to take.

Through August, Merrill insured $3.1 billion of CDOs against losses in a series of transactions with bond insurer XL Capital Assurance Inc.

In August, Merrill proposed that XL insure about $20 billion more of its CDO exposure, according to papers XL filed in court after their relationship deteriorated. "Pick your size. It's a very nice deal for XL and a big help for ML," a Merrill salesman told an XL employee, according to the papers XL filed in federal court in New York. XL declined the additional business.

Merrill turned to another bond insurer, MBIA Inc. MBIA agreed to insure around $5 billion of the securities. But it wouldn't cover interest payments; it would only cover principal payments when they come due in more than 40 years.

Continuing to scramble, Merrill got a tiny insurer called ACA Financial Guaranty Corp. to insure about $6.7 billion of its CDOs. The problem was that ACA was poorly capitalized. It was insuring more than $60 billion of debt securities -- a third of which were mortgage-related -- yet had only about $400 million of capital and few other resources to cover claims.

Some other firms, including Lehman Brothers Holdings Inc., had already set aside reserves against their hedges with ACA, concerned that ACA would be unable to cover losses on the bonds it insured. Lehman wrote down its exposure to ACA during the first half of 2007.

Merrill's deals with the insurers helped it to show a reduction of about $11 billion in its CDO exposure in last year's third quarter. Coupled with CDO-related write-downs of $6.9 billion in the quarter, this brought Merrill's CDO exposure down to $15.8 billion, from $33.9 billion in June. The bond-insurer deals thus helped reduce Merrill's third-quarter net loss, although it was a still-hefty $2.3 billion.

Page 4
Merrill Upped Ante as Boom In Mortgage Bonds Fizzled --- Fresh $6 Billion Hit Is Expected as Toll Of CDO Push Rises
The Wall Street Journal April 16, 2008 Wednesday

Even so, the numbers were worse than Merrill had previously indicated. In a late-October conference call with investors, Mr. O'Neal said that "we got it wrong by being overexposed to subprime" and that "both our assessment of the potential risk and mitigation strategies were inadequate." Within days, he resigned as CEO.

In December, Standard & Poor's cut its financial-strength rating of ACA to junk level. That forced Merrill to write down its CDO hedge with ACA by $1.9 billion in the fourth quarter, leaving questions about why it had turned to such a thinly capitalized partner.

XL Capital's agreement to insure Merrill CDOs is embroiled in litigation. XL sought to walk away from the deal, contending Merrill had violated the terms. Merrill sued last month to force XL to honor the agreement.

In a countersuit, XL said the purpose of the bond-insurance deal was simply to enable Merrill to report that its CDO exposure was lower. "Merrill Lynch undertook a rushed campaign to find parties willing to hedge or provide protection on its remaining CDO positions," the suit said. A spokesman for Merrill says XL "makes assumptions that are, very simply, wrong."

Merrill's new CEO, Mr. Thain, is seeking to regain investors' trust by upgrading the firm's risk controls. In one move, the firm in December rehired Mr. Kronthal, the risk-conscious bond executive Merrill had let go in 2006 when it was determined to increase its bet on CDOs. His new job: to help Merrill clean up its CDO mess.

---

Kate Kelly contributed to this article.





Merrill Upped Ante as Boom In Mortgage Bonds Fizzled --- Fresh $6 Billion Hit Is Expected as Toll Of CDO Push Rises The Wall Street Journal April 16, 2008 Wednesday





License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** April 17, 2008