# EXHIBIT Z

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-Q**

(Mark One)

X    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 28, 2007**

**OR**

__    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission file number 1-7182**

**MERRILL LYNCH & CO., INC.**

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **13-2740599** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **4 World Financial Center, New York, New York** | **10080** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(212) 449-1000**

Registrant's telephone number, including area code:

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

X    YES    __    NO

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large Accelerated Filer   X          Accelerated Filer   __          Non-Accelerated Filer   __

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

__    YES    X    NO

**APPLICABLE ONLY TO CORPORATE ISSUERS:**

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

853,434,567 shares of Common Stock and 2,596,282 Exchangeable Shares as of the close of business on October 31, 2007. The Exchangeable Shares, which were issued by Merrill Lynch & Co., Canada Ltd. in connection with the merger with Midland Walwyn Inc., are exchangeable at any time into Common Stock on a one-for-one basis and entitle holders to dividend, voting, and other rights equivalent to Common Stock.

(6) *The U.S. results for the three and nine months ended September 28, 2007 include $7.9 billion of losses related to U.S. sub-prime residential mortgage-related and asset-backed securities ("ABS") and collateralized debt obligations ("CDOs") in the third quarter of 2007.*

(7) *See Note 17 to the Condensed Consolidated Financial Statements for further information on discontinued operations.*

## Note 3.  Fair Value of Financial Instruments

Merrill Lynch early adopted the provisions of SFAS No. 157 and SFAS No. 159 in the first quarter of 2007.

### Fair Value Measurements

SFAS No. 157 defines fair value, establishes a framework for measuring fair value, establishes a fair value hierarchy based on the quality of inputs used to measure fair value, and enhances disclosure requirements for fair value measurements. Merrill Lynch accounts for a significant portion of its financial instruments at fair value or considers fair value in their measurement. Merrill Lynch accounts for certain financial assets and liabilities at fair value under various accounting literature, including SFAS No. 115, SFAS No. 133 and SFAS No. 159. Merrill Lynch also accounts for certain assets at fair value under applicable industry guidance, namely broker-dealer and investment company accounting guidance.

*Fair Value Hierarchy*

In accordance with SFAS No. 157, Merrill Lynch has categorized its financial instruments, based on the priority of the inputs to the valuation technique, into a three-level fair value hierarchy. The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). If the inputs used to measure the financial instruments fall within different levels of the hierarchy, the categorization is based on the lowest level input that is significant to the fair value measurement of the instrument.

Financial assets and liabilities recorded on the Condensed Consolidated Balance Sheets are categorized based on the inputs to the valuation techniques as follows:

*Level 1.* Financial assets and liabilities whose values are based on unadjusted quoted prices for identical assets or liabilities in an active market that Merrill Lynch has the ability to access (examples include active exchange-traded equity securities, listed derivatives, most U.S. Government and agency securities, and certain other sovereign government obligations).

*Level 2.* Financial assets and liabilities whose values are based on quoted prices in markets that are not active or model inputs that are observable either directly or indirectly for substantially the full term of the asset or liability. Level 2 inputs include the following:

    a) Quoted prices for similar assets or liabilities in active markets (for example, restricted stock);

    b) Quoted prices for identical or similar assets or liabilities in non-active markets (examples include corporate and municipal bonds, which trade infrequently);

     c) Pricing models whose inputs are observable for substantially the full term of the asset or liability (examples include most over-the-counter derivatives, including interest rate and currency swaps); and

     d) Pricing models whose inputs are derived principally from or corroborated by observable market data through correlation or other means for substantially the full term of the asset or liability (examples include certain residential and commercial mortgage related assets, including loans, securities and derivatives).

*Level 3.*   Financial assets and liabilities whose values are based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement. These inputs reflect management's own assumptions about the assumptions a market participant would use in pricing the asset or liability (examples include certain private equity investments, certain residential and commercial mortgage related assets (including loans, securities and derivatives), and long-dated or complex derivatives including certain foreign exchange options and long dated options on gas and power).

As required by SFAS No. 157, when the inputs used to measure fair value fall within different levels of the hierarchy, the level within which the fair value measurement is categorized is based on the lowest level input that is significant to the fair value measurement in its entirety. Thus, a Level 3 fair value measurement may include inputs that are observable (Levels 1 and 2) and unobservable (Level 3). Gains and losses for such assets and liabilities categorized within the Level 3 table below may include changes in fair value that are attributable to both observable inputs (Levels 1 and 2) and unobservable inputs (Level 3). Further, it should be noted that the following tables do not take into consideration the effect of offsetting Level 1 and 2 financial instruments entered into by Merrill Lynch that economically hedge certain exposures to the Level 3 positions.

A review of fair value hierarchy classifications is conducted on a quarterly basis. Changes in the observability of valuation inputs may result in a reclassification for certain financial assets or liabilities. Reclassifications impacting Level 3 of the fair value hierarchy are reported as transfers in/ out of the Level 3 category as of the beginning of the quarter in which the reclassifications occur. During the third quarter of 2007, a significant amount of assets and liabilities was reclassified from Level 2 to Level 3. This reclassification primarily relates to U.S. sub-prime residential mortgage-related assets and liabilities, including ABS CDOs, due to a significant decrease in the observability of market pricing for these assets and liabilities in the third quarter.

The following table presents Merrill Lynch's fair value hierarchy for those assets and liabilities measured at fair value on a recurring basis as of September 28, 2007.

*(dollars in millions)*

| | Fair Value Measurements on a Recurring Basis as of September 28, 2007 | | | | |
|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Netting Adj[1] | Total |
| **Assets:** | | | | | |
| Securities segregated for regulatory purposes or deposited with clearing organizations . . . . . . . . . | $   507 | $   5,303 | $      - | $      - | $   5,810 |
| Receivables under resale agreements . . . . . . . . . . . | - | 110,472 | - | - | 110,472 |
| Trading assets, excluding contractual agreements . . . | 89,351 | 102,653 | 9,733 | | 201,737 |
| Contractual agreements[2] . . . . . . . . . . . . . . . . . . . | 4,487 | 272,288 | 11,753 | (231,152) | 57,376 |
| Investment securities . . . . . . . . . . . . . . . . . . . . . . . | 5,342 | 60,327 | 5,653 | - | 71,322 |
| Loans, notes and mortgages . . . . . . . . . . . . . . . . . . | - | 980 | 7 | | 987 |
| Other assets[3] . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 | 923 | - | (99) | 832 |
| **Liabilities:** | | | | | |
| Payables under repurchase agreements . . . . . . . . . . | $      - | $117,536 | $      - | $      - | $117,536 |
| Trading liabilities, excluding contractual agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58,900 | 3,755 | - | - | 62,655 |
| Contractual agreements[2] . . . . . . . . . . . . . . . . . . . | 5,903 | 283,780 | 15,327 | (240,858) | 64,152 |
| Long-term borrowings[4] . . . . . . . . . . . . . . . . . . . . | - | 71,541 | 612 | | 72,153 |
| Other payables — interest and other[3] . . . . . . . . . . | 12 | 619 | - | (4) | 627 |

(1) *Represents counterparty and cash collateral netting.*
(2) *Includes $4.1 billion and $2.4 billion of derivative assets and liabilities, respectively, that are included in commodities and related contracts on the Condensed Consolidated Balance Sheet.*
(3) *Primarily represents certain derivatives used for non-trading purposes.*
(4) *Includes bifurcated embedded derivatives carried at fair value.*

## Level 3 Assets and Liabilities

Level 3 trading assets primarily include U.S. sub-prime residential mortgage-related and ABS CDO positions of $2.5 billion and corporate bonds and loans of $5.9 billion.

Level 3 contractual agreements (assets) primarily include long-dated equity derivatives of $4.6 billion and derivatives on U.S. sub-prime residential mortgage-related and ABS CDO positions, primarily in the form of credit default swaps of $3.8 billion.

Level 3 investment securities primarily relate to U.S. sub-prime residential mortgage-related and ABS CDO positions of $1.8 billion that are accounted for as trading securities under SFAS No. 115 as well as certain private equity and principal investment positions of $3.6 billion.

Level 3 contractual agreements (liabilities) primarily relate to long-dated equity derivatives of $5.5 billion and derivatives on U.S. sub-prime residential mortgage-related and ABS CDO positions, primarily in the form of total return swaps and credit default swaps of $8.5 billion.

Level 3 long-term borrowings primarily relate to structured notes with embedded long-dated currency derivatives of $544 million.

*U.S. sub-prime residential mortgage-related and ABS CDO activities*

During the third quarter of 2007, Merrill Lynch recorded a net loss of approximately $7.9 billion related to U.S. ABS CDO securities positions and warehouses, as well as U.S. sub-prime mortgage-related assets including whole loans, warehouse lending, residual positions and residential mortgage-backed securities. These losses primarily related to assets and liabilities recorded at fair value on a recurring basis and are included in principal transactions losses in the table below.

At September 28, 2007, the remaining net exposure for these positions was approximately $21.5 billion. This $21.5 billion net exposure includes:

• Assets and liabilities, including derivative positions, that are recorded at fair value on a recurring basis of $5.0 billion (includes Level 2 and Level 3);

• Assets that are recorded at fair value on a non-recurring basis of $2.3 billion (i.e., loans recorded at lower of cost or market);

• Additional off-balance sheet exposures on derivative positions (i.e., notional amounts) of $13.6 billion; and

• Additional off-balance sheet exposures on loan commitments of $0.6 billion.

In addition, Merrill Lynch through its U.S. bank subsidiaries has SFAS 115 investment securities and off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion at September 28, 2007.

Valuation of these exposures will continue to be impacted by external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur. Merrill Lynch's ability to mitigate its risk by selling or hedging its exposures is limited by the market environment. Merrill Lynch's future results may continue to be materially impacted by the valuation adjustments applied to these positions.

The following table provides a summary of changes in fair value of Merrill Lynch's Level 3 financial assets and liabilities for the three months ended September 28, 2007.

*(dollars in millions)*

| | | Level 3 Financial Assets and Liabilities Three months ended September 28, 2007 | | | | | | |
| | | Total Realized and Unrealized Gains or (Losses) included in Income | | | | | | |
| | Beginning Balance | Principal Transactions | Other Revenue | Interest | Total Realized and Unrealized Gains or (Losses) included in Income | Purchases, Issuances and Settlements | Transfers in (out) | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| **Assets:** | | | | | | | | |
| Trading assets. . . . . . . . . . . . | $3,648 | $(1,938) | $ - | $ 6 | $(1,932) | $1,608 | $6,409 | $ 9,733 |
| Contractual agreements, net . . . | 229 | (4,032) | (2) | 11 | (4,023) | 139 | 81 | (3,574) |
| Investment securities . . . . . . . | 5,784 | (974) | 4 | - | (970) | 938 | (99) | 5,653 |
| Loans, notes and mortgages. . . | 4 | - | (4) | - | (4) | (2) | 9 | 7 |
| **Liabilities:** | | | | | | | | |
| Long-term borrowings . . . . . . | $ 282 | $ 280 | $ - | $ - | $ 280 | $ 81 | $ 529 | $ 612 |

Net losses in principal transactions were due primarily to $7.9 billion of write-downs taken on U.S. sub-prime residential mortgage-related and ABS CDO positions that are classified as Level 3, partially offset by approximately $0.9 billion of gains in other fixed income and equity related products.

The increases attributable to purchases, issuances, and settlements of Level 3 assets and liabilities were primarily due to the exercise of certain purchase obligations that required Merrill Lynch to buy

underlying assets, primarily U.S. sub-prime residential mortgage-related and ABS CDO positions of $1.4 billion. These purchase obligations were previously included in contractual agreements and were primarily classified as Level 2 in prior periods.

The increases attributable to net transfers in of Level 3 assets and liabilities were due primarily to the decrease in observability of market pricing for instruments which had previously been classified as Level 2, primarily U.S. sub-prime residential mortgage-related and ABS CDO positions and related instruments of $1.2 billion and other notes and loans of $4.8 billion that are classified as trading assets.

The following table provides a summary of changes in fair value of Merrill Lynch's Level 3 financial assets and liabilities for the nine months ended September 28, 2007.

*(dollars in millions)*

| | | Level 3 Financial Assets and Liabilities Nine months ended September 28, 2007 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | **Total Realized and Unrealized Gains or (Losses) included in Income** | | | **Total Realized and Unrealized Gains or (Losses) included in Income** | **Purchases, Issuances and Settlements** | **Transfers in (out)** | **Ending Balance** |
| | **Beginning Balance** | **Principal Transactions** | **Other Revenue** | **Interest** | | | | |
| **Assets:** | | | | | | | | |
| Trading assets. . . . . . . . . . . . | $ 2,021 | $(1,685) | $ - | $34 | $(1,651) | $2,111 | $7,252 | $ 9,733 |
| Contractual agreements, net. . . . . . . . . . | (2,030) | (3,461) | 3 | 17 | (3,441) | 946 | 951 | (3,574) |
| Investment securities. . . . . . . . . . . . . . . | 5,117 | (1,404) | 484 | 5 | (915) | 2,142 | (691) | 5,653 |
| Loans, notes and mortgages. . . | 7 | - | (13) | - | (13) | (4) | 17 | 7 |
| **Liabilities:** | | | | | | | | |
| Long-term borrowings . . . . . . | $ - | $ 280 | $ - | $ - | $ 280 | $ 81 | $ 811 | $ 612 |

The significant items affecting the rollforward for the nine months ended September 28, 2007 generally occurred in the three months ended September 28, 2007 and are described above.

The following table provides the portion of gains or losses included in income for the three and nine months ended September 28, 2007 attributable to unrealized gains or losses relating to those Level 3 assets and liabilities still held at September 28, 2007.

*(dollars in millions)*

| | Unrealized Gains or (Losses) for Level 3 Assets and Liabilities Still Held at September 28, 2007 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Three Months Ended September 28, 2007** | | | | **Nine Months Ended September 28, 2007** | | | |
| | **Principal Transactions** | **Other Revenue** | **Interest** | **Total** | **Principal Transactions** | **Other Revenue** | **Interest** | **Total** |
| **Assets:** | | | | | | | | |
| Trading assets | $(1,956) | $ - | $ 6 | $(1,950) | $(1,719) | $ - | $34 | $(1,685) |
| Contractual agreements, net | (4,088) | (2) | 11 | (4,079) | (3,589) | (2) | 17 | (3,574) |
| Investment securities | (974) | (6) | - | (980) | (1,404) | 393 | 7 | (1,004) |
| Loans, notes and mortgages | - | 1 | - | 1 | - | 4 | - | 4 |
| **Liabilities:** | | | | | | | | |
| Long-term borrowings | $ 280 | $ - | $ - | $ 280 | $ 280 | $ - | $ - | $ 280 |

Total net unrealized losses were primarily due to $7.9 billion of write-downs of U.S. sub-prime residential mortgage-related and ABS CDO securities and related instruments that are classified as Level 3.

Certain assets and liabilities are measured at fair value on a non-recurring basis and, as such, are not included in the tables above. These assets and liabilities include loans and loan commitments classified

as held for sale and reported at lower of cost or market and assets that are measured at cost that have been written down to fair value during the period as a result of an impairment. The following table shows the fair value hierarchy for those assets and liabilities measured at fair value on a non-recurring basis as of September 28, 2007.

*(dollars in millions)*

| | | | | | Losses | |
| | Non-Recurring Basis as of September 28, 2007 | | | | Three Months Ended Sept. 28, 2007 | Nine Months Ended Sept. 28, 2007 |
| | Level 1 | Level 2 | Level 3 | Total | | |
|---|---|---|---|---|---|---|
| **Assets:** | | | | | | |
| Loans, notes, and mortgages | $- | $15,784 | $6,585 | $22,369 | $(633) | $(626) |
| Goodwill and other intangible assets | - | - | 53 | 53 | (107) | (107) |
| Other assets | - | 28 | - | 28 | (1) | (4) |
| **Liabilities:** | | | | | | |
| Other liabilities | $- | $    471 | $    - | $    471 | $(310) | $(355) |

Loans, notes, and mortgages include held for sale loans that are carried at the lower of cost or market and for which the fair value was below the cost basis at September 28, 2007. It also includes certain impaired held for investment loans where an allowance for loan losses has been calculated based upon the fair value of the loans. Level 3 assets primarily relate to residential and commercial real estate loans in the United Kingdom that are classified as held for sale of $4.8 billion. The losses on the Level 3 loans were calculated primarily by models incorporating internally derived credit spreads and discounted cash flow valuations of the collateral. Losses related to Level 2 loans were calculated by models incorporating significant observable market data.

Goodwill and other intangible assets measured at fair value on a non-recurring basis relate to intangible assets (mortgage broker relationships) that were acquired in connection with the First Franklin acquisition. Losses of $107 million represent an impairment charge related to these intangible assets recorded in the third quarter of 2007. The fair value of these intangible assets was calculated based upon discounted cash flow projections.

Other liabilities include amounts recorded for loan commitments in which the funded loan will be held for sale, particularly leveraged loan commitments in the United States. The losses were calculated by models incorporating significant observable market data.

**Fair Value Option**

SFAS No. 159 provides a fair value option election that allows companies to irrevocably elect fair value as the initial and subsequent measurement attribute for certain financial assets and liabilities. Changes in fair value for assets and liabilities for which the election is made will be recognized in earnings as they occur. SFAS No. 159 permits the fair value option election on an instrument by instrument basis at initial recognition of an asset or liability or upon an event that gives rise to a new basis of accounting for that instrument. As discussed above, certain of Merrill Lynch's financial instruments are required to be accounted for at fair value under SFAS No. 115 and SFAS No. 133 as well as industry level guidance. For certain financial instruments that are not accounted for at fair value under other applicable accounting guidance, the fair value option has been elected.

The following table presents a summary of eligible financial assets and financial liabilities for which the fair value option was elected on December 30, 2006 and the cumulative-effect adjustment to retained earnings recorded in connection with the initial adoption of SFAS No. 159.

*(dollars in millions)*

| | Carrying Value Prior to Adoption | Transition Adjustments to Retained Earnings Gain/(Loss) | Carrying Value After Adoption |
|---|---|---|---|
| **Assets:** | | | |
| Investment securities | $ 8,723 | $(268) | $ 8,732 |
| Loans, notes, and mortgages | 1,440 | 2 | 1,442 |
| **Liabilities:** | | | |
| Long-term borrowings | $10,308 | $ (29) | $10,337 |
| Pre-tax cumulative-effect of adoption | | $(295) | |
| Deferred tax benefit | | 110 | |
| Cumulative effect of adoption of the fair value option | | $(185) | |

The following table provides information about where in the Condensed Consolidated Statement of Earnings changes in fair values, for which the fair value option has been elected, are included for the three and nine month periods ended September 28, 2007.

*(dollars in millions)*

| | Changes in Fair Value for the Three Months Ended September 28, 2007, for Items Measured at Fair Value Pursuant to Fair Value Option | | | Changes in Fair Value for the Nine Months Ended September 28, 2007, for Items Measured at Fair Value Pursuant to Fair Value Option | | |
|---|---|---|---|---|---|---|
| | Gains/(losses) Principal Transactions | Gains/(losses) Other Revenues | Total Changes in Fair Value | Gains/(losses) Principal Transactions | Gains Other Revenues | Total Changes in Fair Value |
| **Assets:** | | | | | | |
| Receivables under resale agreements | $ 62 | $ - | $ 62 | $ 67 | $ - | $ 67 |
| Investment securities | (68) | (1) | (69) | 142 | 20 | 162 |
| Loans, notes and mortgages | (3) | 20 | 17 | (1) | 60 | 59 |
| **Liabilities:** | | | | | | |
| Payables under repurchase agreements | $(10) | $ - | $(10) | $ 7 | $ - | $ 7 |
| Long-term borrowings | 576 | - | 576 | 1,417 | - | 1,417 |

The following describes the rationale for electing to account for certain financial assets and liabilities at fair value, as well as the impact of instrument-specific credit risk on the fair value.


Resale and repurchase agreements:

Merrill Lynch elected the fair value option on a prospective basis for certain resale and repurchase agreements. The fair value option election was made based on the tenor of the resale and repurchase agreements, which reflects the magnitude of the interest rate risk. Resale and repurchase agreements collateralized by U.S. and Japanese government securities were excluded from the fair value option election as these contracts are generally short-dated and therefore the interest rate risk is not considered significant. Resale and repurchase agreements require collateral to be maintained with a market value equal to or in excess of the principal amount loaned resulting in immaterial credit risk for such transactions.

Investment securities:

Merrill Lynch elected the fair value option for certain fixed rate securities in its treasury liquidity portfolio previously classified as available-for-sale securities as management modified its investment strategy and economic exposure to interest rate risk by eliminating long-term fixed rate assets in its liquidity portfolio and replacing them with floating rate assets. These securities were carried at fair value in accordance with SFAS No. 115 prior to the adoption of SFAS No. 159. An unrealized loss of $172 million, net of tax, related to such securities was reclassified from accumulated other comprehensive loss to retained earnings.

Loans, notes, and mortgages:

Merrill Lynch elected the fair value option for automobile and certain corporate loans because the loans are risk managed on a fair value basis. The change in the fair value of loans, notes, and mortgages for which the fair value option was elected that was attributable to changes in borrower-specific credit risk was not material for all periods presented.

Long-term borrowings:

Merrill Lynch elected the fair value option for certain long-term borrowings that are risk managed on a fair value basis and for which hedge accounting under SFAS No. 133 had been difficult to obtain. The changes in the fair value of liabilities for which the fair value option was elected that was attributable to changes in Merrill Lynch credit spreads were $609 million and $656 million, respectively, for the three and nine months ended September 28, 2007. Changes in Merrill Lynch specific credit risk is derived by isolating fair value changes due to changes in Merrill Lynch's credit spreads as observed in the secondary cash market.

The following table presents the difference between fair values and the aggregate contractual principal amounts of loans, notes, and mortgages and long-term borrowings for which the fair value option has been elected.

*(dollars in millions)*

| | Fair Value at September 28, 2007 | Principal Amount Due Upon Maturity | Difference |
|---|---|---|---|
| **Assets** | | | |
| Loans, notes and mortgages[1] | $    987 | $ 1,205 | $   (218) |
| **Liabilities** | | | |
| Long-term borrowings[2] | $70,129 | $71,990 | $(1,861) |

*(1) The majority of the difference relates to loans purchased at a substantial discount from the principal amount.*
*(2) The majority of the difference relates to zero coupon notes issued at a substantial discount from the principal amount and the impact of the widening of Merrill Lynch's credit spreads.*

At September 28, 2007, the difference between the fair value and the aggregate contractual principal amount of receivables under resale agreements and payables under repurchase agreements for which the fair value option has been elected was not material to the Condensed Consolidated Financial Statements.

For those loans, notes and mortgages for which the fair value option has been elected, the aggregate fair value of loans that are 90 days or more past due and in non-accrual status is not material to the Condensed Consolidated Financial Statements.

**Hybrid Financial Instruments**

In February 2006, the FASB issued SFAS No. 155, which clarifies the bifurcation requirements for certain financial instruments and permits hybrid financial instruments that contain a bifurcatable embedded derivative to be accounted for as a single financial instrument at fair value with changes in fair value recognized in earnings. This election is permitted on an instrument-by-instrument basis for all hybrid financial instruments held, obtained, or issued as of the adoption date. At adoption, any difference between the total carrying amount of the individual components of the existing bifurcated hybrid financial instruments and the fair value of the combined hybrid financial instruments is recognized as a cumulative-effect adjustment to beginning retained earnings. Merrill Lynch adopted SFAS No. 155 on a prospective basis beginning in the first quarter of 2007. Since SFAS No. 159 incorporates accounting and disclosure requirements that are similar to SFAS No. 155, Merrill Lynch applies SFAS No. 159, rather than SFAS No. 155, to its fair value elections for hybrid financial instruments.

## Note 4.   Securities Financing Transactions

Merrill Lynch enters into secured borrowing and lending transactions in order to meet customers' needs and earn residual interest rate spreads, obtain securities for settlement and finance trading inventory positions.

Under these transactions, Merrill Lynch either receives or provides collateral, including U.S. Government and agencies, asset-backed, corporate debt, equity, and non-U.S. governments and agencies securities. Merrill Lynch receives collateral in connection with resale agreements, securities borrowed transactions, customer margin loans, and other loans. Under many agreements, Merrill Lynch is permitted to sell or repledge the securities received (e.g., use the securities to secure repurchase agreements, enter into securities lending transactions, or deliver to counterparties to cover short positions). At September 28, 2007 and December 29, 2006, the fair value of securities received as collateral where Merrill Lynch is permitted to sell or repledge the securities was $827 billion and $633 billion, respectively, and the fair value of the portion that has been sold or repledged was $656 billion and $498 billion, respectively. Merrill Lynch may use securities received as collateral for resale agreements to satisfy regulatory requirements such as Rule 15c3-3 of the SEC. At September 28, 2007 and December 29, 2006, the fair value of collateral used for this purpose was $11.7 billion, and $19.3 billion, respectively.

Merrill Lynch pledges firm-owned assets to collateralize repurchase agreements and other secured financings. Pledged securities that can be sold or repledged by the secured party are parenthetically disclosed in trading assets on the Condensed Consolidated Balance Sheets. The carrying value and classification of securities owned by Merrill Lynch that have been pledged to counterparties where

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of Merrill Lynch & Co., Inc.:

We have reviewed the accompanying condensed consolidated balance sheet of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of September 28, 2007, and the related condensed consolidated statements of earnings for the three-month and nine-month periods ended September 28, 2007 and September 29, 2006, and of cash flows for the nine-month periods ended September 28, 2007 and September 29, 2006. These interim financial statements are the responsibility of Merrill Lynch's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.

As discussed in Notes 1, 3 and 14 to the condensed consolidated interim financial statements, in 2007 Merrill Lynch adopted Statement of Financial Accounting Standards No. 157, "*Fair Value Measurement,*" Statement of Financial Accounting Standards No. 159, "*The Fair Value Option for Financial Assets and Financial Liabilities — Including an amendment of FASB Statement No. 115,*" and FASB Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109.*"

We have previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet of Merrill Lynch as of December 29, 2006, and the related consolidated statements of earnings, changes in stockholders' equity, comprehensive income and cash flows for the year then ended (not presented herein); and in our report dated February 26, 2007, we expressed an unqualified opinion on those financial statements and included an explanatory paragraph regarding the change in accounting method in 2006 for share-based payments to conform to Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment*. In our opinion, the information set forth in the accompanying condensed consolidated balance sheet as of December 29, 2006 is fairly stated, in all material respects, in relation to the consolidated balance sheet from which it has been derived.

/s/  Deloitte & Touche LLP

New York, New York
November 7, 2007

total, approximately $1.0 billion (net of federal benefit of state issues, competent authority and foreign tax credit offsets) represents the amount of unrecognized tax benefits that, if recognized, would favorably affect the effective tax rate in future periods. As indicated in Note 14, unrecognized tax benefits with respect to the U.S. Tax Court case and the Japanese assessment, while paid, have been included in the $1.5 billion and the $1.0 billion amounts above. Due to the uncertainty of the amounts to be ultimately paid as well as the timing of such payments, all FIN 48 liabilities which have not been paid have been excluded from the Contractual Obligations table.


**Commitments**

At September 28, 2007, our commitments had the following expirations:

*(dollars in millions)*

|  | | Expiration | | |
|---|---|---|---|---|
|  | **Total** | **Less than 1 Year** | **1 - 3 Years** | **3+ - 5 Years** | **Over 5 Years** |
| Commitments to extend credit[1] | $93,521 | $38,700 | $12,442 | $27,632 | $14,747 |
| Commitments to enter into resale agreements | 6,988 | 6,988 | - | - | - |

*(1) See Note 7 and Note 12 to the Condensed Consolidated Financial Statements.*


## CAPITAL AND FUNDING

The primary objectives of our capital management and funding strategies are as follows:

- Maintain sufficient long-term capital to support the execution of our business strategies and to achieve our financial performance objectives;
- Ensure liquidity across market cycles and through periods of financial stress; and
- Comply with regulatory capital requirements.


**Long-Term Capital**

Our long-term capital sources include equity capital, long-term borrowings and certain deposits in bank subsidiaries that we consider to be long-term or stable in nature.

At September 28, 2007 and December 29, 2006 total long-term capital consisted of the following:

*(dollars in millions)*

|  | **Sept. 28, 2007** | **Dec. 29, 2006** |
|---|---|---|
| Common equity | $ 33,872 | $ 35,893 |
| Preferred stock | 4,754 | 3,145 |
| Trust preferred securities[1] | 4,725 | 3,323 |
| Equity capital | 43,351 | 42,361 |
| Subordinated long-term debt obligations | 10,875 | 6,429 |
| Senior long-term debt obligations[2] | 162,128 | 120,122 |
| Deposits[3] | 77,552 | 71,204 |
| Total long-term capital | $293,906 | $240,116 |

(1) *Represents junior subordinated notes (related to trust preferred securities), net of related investments. The related investments are reported as investment securities and were $429 million at September 28, 2007 and $490 million at December 29, 2006.*
(2) *Excludes junior subordinated notes (related to trust preferred securities), the current portion of long-term borrowings and the long-term portion of other subsidiary financing that is non-recourse to or not guaranteed by ML & Co. Borrowings that mature in more than one year, but contain provisions whereby the holder has the option to redeem the obligations within one year, are reflected as the current portion of long-term borrowings and are not included in long-term capital.*
(3) *Includes $63,851 million and $13,701 million of deposits in U.S. and non-U.S. banking subsidiaries, respectively, at September 28, 2007, and $59,341 million and $11,863 million of deposits in U.S. and non-U.S. banking subsidiaries, respectively, at December 29, 2006 that we consider to be long-term based on our liquidity models.*

At September 28, 2007, our long-term capital sources of $293.9 billion exceeded our estimated long-term capital requirements. See Liquidity Risk in the Risk Management Section for additional information.


**Equity Capital**

At September 28, 2007, equity capital, as defined by Merrill Lynch, was $43.4 billion and comprised of $33.9 billion of common equity, $4.8 billion of preferred stock, and $4.7 billion of trust preferred securities. We define equity capital more broadly than stockholders' equity under U.S. generally accepted accounting principles, as we include other capital instruments with equity-like characteristics such as trust preferred securities. We view trust preferred securities as equity capital because they are either perpetual or have maturities of at least 50 years at issuance. These trust preferred securities represent junior subordinated notes, net of related investments. Junior subordinated notes (related to trust preferred securities) are reported on the Condensed Consolidated Balance Sheets as liabilities for accounting purposes. The related investments are reported as investment securities on the Condensed Consolidated Balance Sheets.

We regularly assess the adequacy of our equity capital base relative to the estimated risks and needs of our businesses, the regulatory and legal capital requirements of our subsidiaries, standards required by the SEC's consolidated supervised entity ("CSE") rules and considerations of rating agencies. At September 28, 2007, Merrill Lynch was in compliance with applicable CSE standards. Refer to Note 15 to the Condensed Consolidated Financial Statements for additional information on regulatory requirements. We also assess the impact of our capital structure on financial performance metrics.

We have developed economic capital models to determine the amount of equity capital we need to cover potential losses arising from market, credit and operational risks. We developed these statistical risk models in conjunction with our risk management practices, and they allow us to attribute an amount of equity to each of our businesses that reflects the risks of that business, both on- and off-balance sheet. We regularly review and periodically refine models and other tools used to estimate risks, as well as the assumptions used in those models and tools to provide a reasonable and conservative assessment of our risks across a stressed market cycle. We also assess the need for equity capital to support risks that may not be adequately measured through these risk models. When we deem prudent, we purchase protection against certain risks.

In addition, we consider how much equity capital we may need to support normal business growth and strategic initiatives. In the event that we generate common equity capital beyond our estimated needs, we seek to return that capital to shareholders through share repurchases and dividends, considering the impact on our financial performance metrics.

Major components of the changes in our equity capital for the first nine months of 2007 are as follows:

*(dollars in millions)*

| | |
|---|---:|
| Balance at December 29, 2006 | $42,361 |
| Net earnings | 2,056 |
| Issuance of preferred stock, net of repurchases and re-issuances | 1,609 |
| Issuance of trust preferred securities, net of redemptions and related investments | 1,402 |
| Common and preferred stock dividends | (1,124) |
| Common stock repurchases | (5,272) |
| Net effect of employee stock transactions and other[1] | 2,319 |
| Balance at Sept. 28, 2007 | $43,351 |

*(1) Includes effect of accumulated other comprehensive loss and other items.*

Our equity capital of $43.4 billion at September 28, 2007 increased $1.0 billion, or 2%, from December 29, 2006. Equity capital increased in the first nine months of 2007 primarily through net earnings, the net issuance of preferred stock and trust preferred securities and the net effect of employee stock transactions. The equity capital increase was offset by common stock repurchases and dividends.

In conjunction with the acquisition of First Republic Bank on September 21, 2007, Merrill Lynch issued $65 million of 6.70% non-cumulative perpetual preferred stock and $50 million of 6.25% non-cumulative preferred stock in exchange for First Republic Bank's preferred stock Series A and B, respectively. Upon closing the First Republic acquisition, Merrill Lynch also issued 11.6 million shares of common stock, par value $1.33⅓ per share, as consideration.

On August 22, 2007, Merrill Lynch Capital Trust III issued $750 million of 7.375% trust preferred securities and invested the proceeds in junior subordinated notes issued by ML & Co.

On May 2, 2007, Merrill Lynch Capital Trust II issued $950 million of 6.45% trust preferred securities and invested the proceeds in junior subordinated notes issued by ML & Co.

On March 30, 2007, Merrill Lynch Preferred Capital Trust II redeemed all of the outstanding $300 million of 8.00% trust preferred securities.

On March 20, 2007, Merrill Lynch issued $1.5 billion of floating rate, non-cumulative, perpetual preferred stock.

On January 18, 2007, the Board of Directors declared an additional 40% increase in the regular quarterly dividend to 35 cents per common share.

During the first nine months of 2007, we repurchased 62.1 million common shares at an average repurchase price of $84.88 per share. On April 30, 2007 the Board of Directors authorized the repurchase of an additional $6 billion of Merrill Lynch's outstanding common shares. At September 28, 2007, we had completed the $5 billion repurchase program authorized in October 2006 and had $4.0 billion of authorized repurchase capacity remaining under the repurchase program authorized in April 2007. For the near term, we do not anticipate additional repurchases of common shares.

**Balance Sheet Leverage**

Assets-to-equity leverage ratios are commonly used to assess a company's capital adequacy. We believe that a leverage ratio adjusted to exclude certain assets considered to have low risk profiles and assets in customer accounts financed primarily by customer liabilities provides a more meaningful measure of balance sheet leverage in the securities industry than an unadjusted ratio. We calculate adjusted assets by reducing total assets by (1) securities financing transactions and securities received as collateral less trading liabilities net of contractual agreements and (2) segregated cash and securities and separate accounts assets.

As leverage ratios are not risk sensitive, we do not rely on them to measure capital adequacy. When we assess our capital adequacy, we consider more sophisticated measures that capture the risk profiles of the assets, the impact of hedging, off-balance sheet exposures, operational risk and other considerations.

The following table provides calculations of our leverage ratios at September 28, 2007 and December 29, 2006:

*(dollars in millions)*

|  | Sept. 28, 2007 | Dec. 29, 2006 |
|---|---|---|
| Total assets | $1,097,188 | $841,299 |
| Less: | | |
| Receivables under resale agreements | 219,849 | 178,368 |
| Receivables under securities borrowed transactions | 172,479 | 118,610 |
| Securities received as collateral | 45,785 | 24,929 |
| Add: | | |
| Trading liabilities, at fair value, excluding contractual agreements | 65,133 | 60,428 |
| Sub-total | 724,208 | 579,820 |
| Less: | | |
| Segregated cash and securities balances | 20,032 | 13,449 |
| Separate account assets | 12,590 | 12,314 |
| Adjusted assets | 691,586 | 554,057 |
| Less: | | |
| Goodwill and other intangible assets | 4,891 | 2,457 |
| Tangible adjusted assets | $ 686,695 | $551,600 |
| Stockholders' equity | $ 38,626 | $ 39,038 |
| Add: | | |
| Trust preferred securities[1] | 4,725 | 3,323 |
| Equity capital | $ 43,351 | $ 42,361 |
| Tangible equity capital[2] | $ 38,460 | $ 39,904 |
| Leverage ratio[3] | 25.3x | 19.9x |
| Adjusted leverage ratio[4] | 16.0x | 13.1x |
| Tangible adjusted leverage ratio[5] | 17.9x | 13.8x |

(1) *Represents junior subordinated notes (related to trust preferred securities), net of related investments. The related investments are reported as investment securities and were $429 million and $490 million at September 28, 2007 and December 29, 2006, respectively.*
(2) *Equity capital less goodwill and other intangible assets.*
(3) *Total assets divided by equity capital.*
(4) *Adjusted assets divided by equity capital.*
(5) *Tangible adjusted assets divided by tangible equity capital.*

**Funding**

We fund our assets primarily with a mix of secured and unsecured liabilities through a globally coordinated funding strategy. We fund a portion of our trading assets with secured liabilities, including repurchase agreements, securities loaned and other short-term secured borrowings, which are less sensitive to our credit ratings due to the underlying collateral. A portion of our short-term borrowings are secured under a master note lending program. These notes are similar in nature to other collateralized financing sources such as securities sold under agreements to repurchase. Refer to Note 9 to the Condensed Consolidated Financial Statements for additional information regarding our borrowings.

We use unsecured liabilities to fund certain trading assets, as well as other long-dated assets not funded with equity. Our unsecured liabilities consist of the following:

*(dollars in millions)*

|  | Sept. 28, 2007 | December 29, 2006 |
|---|---|---|
| Commercial paper | $ 11,237 | $ 6,357 |
| Promissory notes | 3,450 | - |
| Other unsecured short-term borrowings[1] | 4,663 | 1,953 |
| Current portion of long-term borrowings[2] | 54,083 | 37,720 |
| Total unsecured short-term borrowings | 73,433 | 46,030 |
| Senior long-term borrowings[3] | 162,128 | 120,122 |
| Subordinated long-term borrowings | 10,875 | 6,429 |
| Total unsecured long-term borrowings | 173,003 | 126,551 |
| Deposits | $ 94,977 | $ 84,124 |

(1) *Excludes $7.7 billion and $9.8 billion of secured short-term borrowings at September 28, 2007 and December 29, 2006, respectively; these short-term borrowings are represented under a master note lending program.*

(2) *Excludes $2.5 billion and $460 million of the current portion of other subsidiary financing that is non-recourse or not guaranteed by ML & Co. at September 28, 2007 and December 29, 2006, respectively.*

(3) *Excludes junior subordinated notes (related to trust preferred securities), current portion of long-term borrowings, secured long-term borrowings, and the long-term portion of other subsidiary financing that is non-recourse or not guaranteed by ML & Co.*

Our primary funding objectives are maintaining sufficient funding sources to support our existing business activities and future growth while ensuring that we have liquidity across market cycles and through periods of financial stress. To achieve our objectives, we have established a set of funding strategies that are described below:

- Diversify funding sources;
- Maintain sufficient long-term borrowings;
- Concentrate unsecured funding at ML & Co.;
- Use deposits as a source of funding; and
- Adhere to prudent governance principles.

### *Diversification of Funding Sources*

We strive to diversify and expand our funding globally across programs, markets, currencies and investor bases. We issue debt through syndicated U.S. registered offerings, U.S. registered and unregistered medium-term note programs, non-U.S. medium-term note programs, non-U.S. private placements, U.S. and non-U.S. commercial paper and through other methods. We distribute a

significant portion of our debt offerings through our retail and institutional sales forces to a large, diversified global investor base. Maintaining relationships with our investors is an important aspect of our funding strategy. We also make markets in our debt instruments to provide liquidity for investors.

At September 28, 2007 our total short- and long-term borrowings were issued in the following currencies:

| (USD equivalent in millions) | | |
|---|---:|---:|
| USD | $171,662 | 58% |
| EUR | 72,151 | 25 |
| JPY | 16,719 | 6 |
| GBP | 9,653 | 3 |
| AUD | 5,871 | 2 |
| CAD | 5,869 | 2 |
| CHF | 2,283 | 1 |
| INR | 2,179 | 1 |
| Other[1] | 5,571 | 2 |
| Total | $291,958 | 100% |

Note: excludes junior subordinated notes (related to trust preferred securities).
(1) Includes various other foreign currencies, none of which individually exceed 1% of total issuances.

We also diversify our funding sources by issuing various types of debt instruments, including structured notes and extendible notes. Structured notes are debt obligations with returns that are linked to other debt or equity securities, indices, currencies or commodities. We typically hedge these notes with positions in derivatives and/or in the underlying instruments. We could be required to immediately settle certain structured note obligations for cash or other securities under certain circumstances, which we take into account for liquidity planning purposes. Structured notes outstanding were $62.3 billion and $33.8 billion at September 28, 2007 and December 29, 2006, respectively.

Extendible notes are debt obligations that provide the holder an option to extend the note monthly but not beyond the stated final maturity date. These notes are included in the long-term borrowings while the time to the stated final maturity is greater than one year. Total extendible notes outstanding were $7.5 billion and $11.4 billion at September 28, 2007 and December 29, 2006, respectively.

### Maintenance of Sufficient Long-Term Borrowings

An important objective of our asset-liability management is maintaining sufficient long-term borrowings to meet our long-term capital requirements. As such, we routinely issue debt in a variety of maturities and currencies to achieve cost efficient funding and an appropriate maturity profile. While the cost and availability of unsecured funding may be negatively impacted by general market conditions or by matters specific to the financial services industry or Merrill Lynch, we seek to mitigate this refinancing risk by actively managing the amount of our borrowings that we anticipate will mature within any one month or quarter.

At September 28, 2007, the weighted average maturity of our long-term borrowings exceeded five years. The following chart presents our long-term borrowings maturity profile as of September 28, 2007 (quarterly for two years and annually thereafter):

### Long-Term Debt Maturity Profile



Of the $17 billion in long-term debt maturing in the fourth quarter in 2007, approximately $6 billion represents contractual maturities. The remaining $11 billion in maturities represent structured notes that may potentially mature during the quarter, however the final maturity extends beyond the current quarter.

Major components of the change in long-term borrowings, excluding junior subordinated debt (related to trust preferred securities), during the first nine months of 2007 are as follows:

*(dollars in billions)*

| | |
|---|---:|
| Balance at December 29, 2006 | $181.4 |
| Issuance and resale | 136.7 |
| Settlement and repurchase | (60.3) |
| Other[1] | 7.1 |
| Balance at Sept. 28, 2007[2] | $264.9 |

*(1) Relates to foreign exchange and other movements.*
*(2) See Note 9 to the Condensed Consolidated Financial Statements for the long-term borrowings maturity schedule.*

Subordinated debt is an important part of our long-term borrowings. During the first nine months of 2007, ML & Co. issued $4.4 billion of subordinated debt in four currencies and with maturities ranging from 2017 to 2037. This subordinated debt was issued to satisfy certain anticipated CSE

capital requirements. All of ML & Co.'s subordinated debt is junior in right of payment to ML & Co.'s senior indebtedness.

At September 28, 2007, senior and subordinated debt issued by ML & Co. or by subsidiaries and guaranteed by ML & Co., including short-term borrowings, totaled $247.1 billion. Except for the $2.2 billion of zero-coupon contingent convertible debt (Liquid Yield Option Notes or "LYONs®") that were outstanding at September 28, 2007, senior and subordinated debt obligations issued by ML & Co. and senior debt issued by subsidiaries and guaranteed by ML & Co. do not contain provisions that could, upon an adverse change in ML & Co.'s credit rating, financial ratios, earnings, cash flows, or stock price, trigger a requirement for an early repayment, additional collateral support, changes in terms, acceleration of maturity, or the creation of an additional financial obligation. See Note 9 to the Condensed Consolidated Financial Statements for additional information.

We use derivative transactions to more closely match the duration of borrowings to the duration of the assets being funded, thereby enabling interest rate risk to be within limits set by our Market Risk Management Group. Interest rate swaps also serve to convert our interest expense and effective borrowing rate principally to floating rate. We also enter into currency swaps to hedge assets that are not financed through debt issuance in the same currency. We hedge investments in subsidiaries in non-U.S. dollar currencies in whole or in part to mitigate foreign exchange translation adjustments in accumulated other comprehensive loss. See Notes 1 and 6 to the 2006 Annual Report for further information.

### Concentration of Unsecured Funding at ML & Co.

ML & Co. is the primary issuer of all unsecured, non-deposit financing instruments that we use predominantly to fund assets in subsidiaries, some of which are regulated. The primary benefits of this strategy are greater control, reduced funding costs, wider name recognition by investors, and greater flexibility to meet variable funding requirements of subsidiaries. Where regulations, time zone differences, or other business considerations make this impractical, certain subsidiaries enter into their own financing arrangements.

### Deposit Funding

At September 28, 2007, our bank subsidiaries had $95.0 billion in customer deposits, which provide a diversified and stable base for funding assets within those entities. Our U.S. deposit base of $69.5 billion includes an estimated $53.8 billion of FDIC-insured deposits, which we believe are less sensitive to our credit ratings. We predominantly source deposit funding from our customer base in the form of our bank sweep programs and time deposits.

Deposits are not available as a source of funding to ML & Co. See Liquidity Risk in the Risk Management section for more information regarding our deposit liabilities.

### Prudent Governance

We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to regular senior management review and control through Asset/ Liability Committee meetings with treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

**Credit Ratings**

Our credit ratings affect the cost and availability of our unsecured funding, and it is our objective to maintain high quality credit ratings. In addition, credit ratings are important when we compete in certain markets and when we seek to engage in certain long-term transactions, including OTC derivatives. Factors that influence our credit ratings include the credit rating agencies' assessment of the general operating environment, our relative positions in the markets in which we compete, our reputation, level and volatility of our earnings, our corporate governance and risk management policies, and our capital management practices.

The following table sets forth ML & Co.'s unsecured credit ratings as of October 31, 2007. Rating agencies express outlooks from time to time on these credit ratings. Ratings from Fitch Ratings, Moody's Investor Service, Inc., and Standard & Poor's Ratings Services reflect one-notch downgrades from those agencies on October 24, 2007. Rating outlooks from those agencies remain Negative, where they were placed on October 5, 2007. Also, on October 24, 2007, Dominion Bond Rating Service Ltd. affirmed the Company's ratings and outlook as Stable. On October 25, 2007, Rating & Investment Information, Inc. (Japan) affirmed the Company's ratings and revised its outlook to Negative.

| Rating Agency | Senior Debt Ratings | Subordinated Debt Ratings | Preferred Stock Ratings | Commercial Paper Ratings | Rating Outlook |
|---|---|---|---|---|---|
| Dominion Bond Rating Service Ltd. | AA(low) | A(high) | A | R-1 (middle) | Stable |
| Fitch Ratings | A+ | A | A | F1 | Negative |
| Moody's Investors Service, Inc. | A1 | A2 | A3 | P-1 | Negative |
| Rating & Investment Information, Inc. (Japan) | AA | AA- | A+ | a-1+ | Negative |
| Standard & Poor's Ratings Services | A+ | A | A- | A-1 | Negative |

In connection with some OTC derivative transactions, we could be required to provide additional collateral to our counterparties in the event of a downgrade of the senior short-term and/or long-term debt ratings of ML & Co. from one or more credit rating agencies. The amount of the collateral required depends on the contract, but is usually based on a fixed incremental amount and/or the market value of the exposure, and will vary considerably based on the level of the new ratings. The contracts typically require us to deliver the collateral to the counterparty between one and thirty days after the change in ratings. As a result of the changes in our short and long-term ratings on October 24, 2007, we estimate that we are required to provide additional collateral of $4.9 billion to $5.3 billion subject to potential changes in the exposure based on trades and market conditions as well as contractual options. We estimate that a further one-notch downgrade of our long-term debt ratings could result in additional collateral requirements of approximately $300 million to $500 million. We consider additional collateral on derivative contracts along with other funding requirements that arise from changes in ML & Co.'s rating as part of our liquidity management scenario analysis and stress testing.

*Cash Flows*

Cash and cash equivalents of $46.9 billion at September 28, 2007 increased by $14.7 billion from December 29, 2006. Cash flows from financing activities provided $106.0 billion during the first nine months of 2007, primarily due to issuances and resales of long-term borrowings, net of settlements and repurchases, of $76.6 billion and cash from derivative financing transactions of $22.8 billion. Cash flows used for investing activities during the first nine months of 2007 were $11.4 billion and were primarily attributable to net purchases, sales, and maturities of available for sale securities. Cash flows used for operating activities during the first nine months of 2007 were $79.9 billion and were primarily

due to net cash used for resale agreements and securities borrowed transactions, partially offset by cash provided by repurchase agreements and securities loaned transactions.

## RISK MANAGEMENT

Risk-taking is integral to the core businesses in which we operate. In the course of conducting our business operations, we are exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of our business lines are primarily responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups monitor market risk, credit risk, liquidity risk and operational risk. The position of Chief Risk Officer was recently established with responsibility for both market and credit risk functions. This position, which reports jointly to the Co-Presidents and the Chief Financial Officer, was created in order to better integrate the two disciplines. The independent risk groups managing liquidity and operational risk continue to fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

The losses on U.S. Sub-prime Residential Mortgage-Related and ABS CDO activities in the third quarter reflect a significant concentration in securities that accumulated as a result of our activities as a leading underwriter of CDOs. Our stress tests and other risk measures significantly underestimated the magnitude of actual loss from the unprecedented credit market environment during the third quarter of 2007, in particular the extreme dislocation that affected U.S. sub-prime residential mortgage-related and ABS CDO positions. The firm has made and continues to make efforts to reduce our remaining exposure to these instruments. See additional disclosures on page 73.

Merrill Lynch will continue to take risk as appropriate and expand risk-taking judiciously where there are clear opportunities and where the business skill-set is in place to manage and understand the risk and its changing nature. Business lines will continue to have the primary responsibility and accountability for managing the risk, and we will continue to deepen capabilities in a number of areas. In addition, with the establishment of the Chief Risk Officer and the integration of the credit risk and market risk functions, we are enhancing our capacity to monitor the associated risk levels vigilantly on a daily basis to ensure that they remain within corporate risk guidelines and risk tolerance levels.

### *Market Risk*

We define market risk as the potential change in value of financial instruments caused by fluctuations in interest rates, exchange rates, equity and commodity prices, credit spreads, and/or other risks.

Our Market Risk Management Group and other independent risk and control groups are responsible for approving the products and markets in which our business units and functions will transact and take risk. Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.