# TAB 2

LEXSEE 2004 U.S. DIST. LEXIS 11466

IN RE AEGON N.V. SECURITIES LITIGATION

03 Civ. 0603 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2004 U.S. Dist. LEXIS 11466*; *Fed. Sec. L. Rep. (CCH) P92,853*

**June 23, 2004, Decided**
**June 28, 2004, Filed**

**DISPOSITION:** Defendants' motion to dismiss consolidated amended complaint granted.

**COUNSEL:** [*1] BERNSTEIN LIEBHARD & LIFSHITZ, Liaison Counsel for the Class, New York, NY, By : SANDY A. LIEBHARD, ESQ., JOSEPH R. SEIDMAN, JR., ESQ., Of Counsel.

SCHIFFRIN & BARROWAY, Lead Counsel for the Class, Bala Cynwyd, PA, By: DAVID KESSLER, ESQ., MICHAEL K. YARNOFF, ESQ., Of Counsel.

PIPER RUDNICK, Attorneys for Defendants AEGON N.V., Donald J. Shepard, Kess J. Storm and Jos B.M. Streppel, New York, NY, By: KEARA M. GORDON, ESQ.

PIPER RUDNICK, Washington, D.C., By: ROBERT J. MATHIAS, ESQ., DAVID CLARKE, JR., ESQ., SARA Z. MOGHADAM, ESQ., RACHEL TAUSEND, ESQ., Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.,**

Defendants Aegon N.V. ("Aegon"), Donald J. Shepard ("Shepard"), Kees Storm ("Storm") and Jos B.M. Streppel ("Streppel") (collectively the "Individual Defendants") (Aegon and the Individual Defendants collectively the "Defendants"), have moved pursuant to *Fed. R. Civ. P. Rules 9(b)* and *12(b)(6)* to dismiss the consolidated amended complaint ("CAC") filed on behalf of shareholders of Aegon during the period of August 9, 2001 to July 22, 2002 (the "Class [*2] Period"). For the reasons set forth below, the motion is granted.

*Prior Proceedings*

On January 24, 2003, a class action complaint was filed in this action, additional actions were filed and by stipulation and order of April 15, 2003, the actions were consolidated and lead plaintiffs and their counsel were selected. On July 14, 2004, the CAC was filed.

The CAC alleged violations of Sections 10(b) and 20(a) of the Exchange Act, *15 U.S.C. §§ 78j(b)* and *78t(a)*, and *Rule 10b-5* promulgated thereunder by the SEC, *17 C.F.R. § 240.10b-5*, arising out of Aegon's inadequate reserves for bond defaults (CAC PP 35- 40), its failure to accelerate deferred policy acquisition costs ("DPAC") (CAC P 41-46), its inadequate provisions for guaranteed minimum benefits (GMB) (CAC PP 47-48) which resulted in the making of materially false and misleading statements during the Class Period (CAC PP 49-78, 89-97), resulting in two claims, one against the Defendants for violation of *Section 10(b) of the Exchange Act* and *Rule 10b-5* and against the Individual Defendants for violation of *Section 20(a) of the Exchange Act*.

The instant motion to dismiss [*3] by the Defendants was heard and marked fully submitted on February 4, 2004.

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 3 of 16

Page 2
2004 U.S. Dist. LEXIS 11466, *3; Fed. Sec. L. Rep. (CCH) P92,853

*The Parties*

The Lead Plaintiffs and additional Plaintiffs (collectively, the "Plaintiffs") purchased stock of Aegon during the Class Period.

Aegon is a corporation organized under Dutch law that is domiciled in the Netherlands. It is managed by an executive board whose members are appointed and overseen by a supervisory board. Aegon is the holding company of one of the world's ten largest listed life insurance groups ranked by market capitalization and assets and is active in three major markets: the Americas, including the United States, Canada and, until year-end 2001, Mexico (collectively Aegon USA), the Netherlands and the United Kingdom. During the Class Period Aegon derived approximately two-thirds of its profits from its North American business. Aegon's common shares are listed and traded on Euronext Amsterdam, and the Frankfurt, London, Tokyo, Zurich and New York stock exchanges.

Shepard became chairman of the executive board of Aegon following Aegon's annual general meeting of shareholders on April 18, 2002. Shepard was previously a member of Aegon's executive board since 1992 and [*4] chairman, president and chief executive officer of Aegon USA.

Streppel was at all relevant times Aegon's chief financial officer and a member of the executive board.

Storm was chairman of Aegon's executive board until April 18, 2002. At the annual general meeting of shareholders on April 18, 2002, the appointment of defendant Shepard as chairman of the executive board and the appointment of defendant Storm to the supervisory board effective upon his retirement on July 1, 2002 were approved.

As members of the executive board, the Individual Defendants attended audit committee meetings.

According to the CAC, because of their senior executive positions with Aegon, the Individual Defendants had access to the adverse undisclosed information about Aegon's business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including Aegon's operating plans, budgets, forecasts and reports of actual operations), communications with other corporate officers and employees, attendance at management and executive board meetings and via reports and other information provided to them in connection [*5] with their positions.

*The Allegations of the CAC*

During the Class Period, Aegon, under the direction of the Individual Defendants, falsely represented that Aegon was on track to achieve earnings growth of 10% to 15% in 2001 and 2002. (PP 2, 33). When Defendants realized that this expected growth could not be obtained because of the sharp declines in equity markets, deteriorating credit markets and significant increases of default by issuers of corporate debt held, Aegon (i) inflated the carrying value of Aegon's investments in bonds and other fixed income securities; (ii) understated its liabilities for minimum benefit guarantees and provisions for bond defaults; and (iii) understated its amortization of deferred policy acquisition costs (DPAC) (P 15), resulting in materially overstating its reported net income and earnings per share throughout the Class Period. (PP 2, 5).

Prior to and during the Class Period, as the stock markets suffered substantial declines, increasing numbers of investors looked to invest in fixed products rather than variable products. Aegon claimed publicly that its balanced mix of fixed and variable rate products would allow it to prosper during [*6] these difficult economic times, (P 31), stating that it was less vulnerable to the vicissitudes of the equity and credit markets than competitors, because, *inter alia*, Aegon matched "high quality investment assets . . . in an optimal way to the corresponding insurance liability, taking into account currency, yield and maturity characteristics." (P 32.)

Throughout the Class Period, Aegon's bond portfolio contained a significant amount of low quality debt securities and its provisions for bond defaults were inadequate. (P 35.) By early 2000, well before the beginning of the Class Period, the risk of low quality debt securities was heightened as equity and credit markets began to decline precipitously. The Aegon bond portfolio contained a significant amount of low quality debt securities: 40% of Aegon's U.S. fixed income portfolio, which was 78% of Aegon's general account investments, was rated BBB or lower in 2001, (P 35). The bond portfolio also included substantial corporate bond holdings which were significantly impaired in value and

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 4 of 16

Page 3
2004 U.S. Dist. LEXIS 11466, *6; Fed. Sec. L. Rep. (CCH) P92,853

were at significant risk of default, including Adelphia, Enron, Global Crossing, Qwest and WorldCom. (P 38.) During the Class Period, Aegon had [*7] $ 300 million in exposure to Enron and $ 200 million in exposure to WorldCom. Aegon held bonds in default (net of write-downs) of $ 328 million (approximately EUR 368 million) at December 31, 2001, an amount that exceeded the provision for bond defaults by EUR 130 million. By failing to establish adequate provisions for these bond defaults and/or failing to write down the value of these impaired debt securities, Aegon's reported net income and earnings per share were materially overstated. (P 40.)

During the Class Period, in order to match income and expenses, deferred policy acquisition costs ("DPAC") such as commissions related to insurance contracts with fixed premiums were amortized as a percentage of premiums over the life of the contract. With respect to flexible insurance contracts, variable annuities, unit-linked products and fixed annuities, Aegon represented that the amortization of DPAC was generally in proportion to the expected gross profit stream over the entire life of the underlying contracts. (P 41.)

If the equity market performed worse than expected, the value of assets under management would decline and Aegon's actual and future earnings from these products would [*8] be less than estimated. (P 42.) Aegon falsely represented that in such an event, the DPAC amortization would be accelerated to maintain the matching principle and that the difference between the original DPAC amortization schedule and the revised schedule would be charged to the income statement, a process referred to as DPAC "unlocking." (*Id.*)

Guaranteed minimum benefits ("GMBs") were contained in certain products sold by Aegon in the U.S., Canada and the Netherlands. In the U.S., a common feature of variable annuities was a guaranteed minimum death benefit under which beneficiaries would receive the greater of the account balance or the guaranteed amount when the insured died. (P 47.) During the Class Period, Aegon purported to record a technical provision in the income statement to the extent that its products contained guaranteed minimum death benefits ("GMDB") or guaranteed minimum income benefits ("GMIB"). (*Id.*)

On May 3, 2001, Aegon issued a press release announcing its results for the first quarter of 2001 in which it reaffirmed its forecast of 10% to 15% growth in earnings and earnings per share for 2001, notwithstanding the negative impact of the overall stock market [*9] decline. (P 34.)

On August 9, 2001, Aegon announced in a press release a 25% increase in net income for the second quarter of 2001 and the fact that an increase in 2001 earnings and earnings per share of between 12% to 17% (formerly between 10% to 15%) was now expected. (P 49.) As a result of Aegon's positive second quarter earnings announcement, Aegon shares on the NYSE rose from $ 28.06 at the cost of trading the day before the announcement to $ 29.46 at the close of trading on August 9, 2001. (P 52.)

On November 8, 2001, Aegon issued another press release in which it announced a 14% increase in its net income for the third quarter ended September 30, 2001, and also reiterated its forecast for an increase in full-year net income and earnings per share of between 12% and 17% in 2001. (P 55.) The press release stated that the earnings per share increase was expected to be in the low end of this range due to the issuance of shares in connection with the acquisition of the direct marketing services operations of J.C. Penney just prior to the starting of the Class Period.

On March 7, 2002, Aegon issued a press release announcing its results for the fourth quarter and year ended December 31, 2001. The [*10] March 7, 2002 press release was included in a form 6-K dated the same day, which was filed with the SEC on April 4, 2002. (P 59.) For the full year 2001, the press release reported that net income and net income per share increased 16% and 12% respectively. (P 61.) In contrast, Aegon's direct competitors -- Skandia AB and ING Groep NV -- reported losses for the year 2001. (*Id.*) [1]

> 1   On March 29, 2002, Aegon filed its annual report, on Form 20-F with the SEC, which included the materially false and misleading results for 2001 announced on March 7, 2002.

On May 7, 2002, Aegon issued a press release announcing that its net income for the first quarter ended March 31, 2002 had increased by 15% per share in the same period a year earlier, (P72), and reiterated its outlook that 2002 net income and earnings per share would be "at least equal" to the previous year's level. (*Id.*)

Aegon did not record a DPAC unlocking amortization adjustment until the second quarter of 2002.

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 5 of 16

Page 4

2004 U.S. Dist. LEXIS 11466, *10; Fed. Sec. L. Rep. (CCH) P92,853

The S&P 500 decline, which began in [*11] April 2000 and continued throughout the Class Period, reached 45% by the second quarter. Aegon's calculations with respect to DPAC amortization during the Class Period assumed equity market returns in excess of 14% the near term (5 years) and 9.5% thereafter. (P 87.) By failing to accelerate DPAC amortization until the second quarter of 2002, Aegon avoided taking significant charges that would have significantly reduced its net income and earnings per share during the Class Period, thus allowing Aegon to report earnings and earnings per share which were materially overstated and consistent with its publicly stated projections for earnings growth. (P 46.) In 2002, Aegon belatedly took EUR 450 million in charges related to DPAC amortization unlocking that should have been taken in prior quarters. *Id.*

Notwithstanding the severe decline in the equity markets during the Class Period, Aegon failed to increase its technical provisions for minimum benefit guarantees until the second quarter of 2002, thereby understating liabilities and expenses and overstating net income throughout the Class Period. In 2002, Aegon belatedly took EUR 482 million in charges related to minimum benefit guarantees. [*12] (P 48.) Aegon's statements and financial numbers were false and misleading because Defendants failed to disclose that earnings growth of 12% could only be achieved by implementing the accounting described above and that the disclosed earnings and earnings per share were materially overstated as a result of these accounting manipulations. (P 71.)

The Defendants had actual knowledge of, or recklessly disregarded, the deteriorating financial markets, increasing incidents of default in the corporate bond market, and Aegon's inadequate provisions for bond defaults and guaranteed minimum benefits and failure to accelerate DPAC amortization. (P 111.)

On July 22, 2002, Aegon announced that it expected its full year 2002 earnings to be 30% to 35% lower than the previous year, as a result of (1) the deterioration of the stock markets which had lowered the fee revenue and, therefore, required Aegon to accelerate amortization of deferred policy acquisition costs and strengthen reserves for guarantee minimum benefits; and (2) the further deterioration in the U.S. credit markets and related continuing series of defaults, which had resulted in hundreds of millions of dollars in write-offs and required [*13] Aegon to strengthen its bond default provisions. (P 76.)

Upon these disclosures, the price of Aegon's shares declined 22% from a closing price of $ 16.99 on Friday, July 19, 2002 to a closing price of $ 13.25 on Monday, July 22, 2002, when trading resumed.

### *The Rule 12(b)(6) Standard*

In reviewing a 12(b)(6) motion, courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993)* (citing *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1052 (2d Cir. 1993)*. However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeene de Banque v. La Republica de Venezuela, 700 F. Supp. 114, 122 (S.D.N.Y. 1988)*. The complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1956)*; see also *Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)*. [*14]

The truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted. *See e.g., Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000)* ("If these documents contradict the allegations of the amended complaint, the documents control and this Court need not accept as true the allegations in the amended complaint.") (citation omitted). In addition, the following materials may be considered on a *Rule 12(b)(6)* motion:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under *Rule 201 of the Federal Rules of*

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 6 of 16

Page 5

2004 U.S. Dist. LEXIS 11466, *14; Fed. Sec. L. Rep. (CCH) P92,853

*Evidence.*

*In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003)* [*15] (footnotes omitted).

To state a claim under *Section 10(b) of the Act*, a plaintiff must allege that, "in connection with the purchase or sale of a security, the defendants, acting with scienter, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *Acito v. IMCERA Group, 47 F.3d 47, 52 (2d Cir. 1995)*. The complaint must also satisfy the heightened pleading requirements set forth by *Federal Rule of Civil Procedure 9(b)* and the PSLRA.

When a complaint alleges fraud or mistake, *Rule 9(b)* provides that the "circumstances constituting fraud or mistake shall be stated with particularity."

The Plaintiffs must also satisfy the heightened pleading requirements of the PSLRA. *See 15 U.S.C. § 78u-4(b)*. The PSLRA provides that in a private securities action such as the one here, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at *(b)(2)*. In addition, with respect to any fraud claim, the statute requires [*16] that the complaint:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

*Id.* at *(b)(1)*. Where a plaintiff fails to satisfy these stringent standards, the PSLRA mandates dismissal. *See id.* at *(b)(3)(A)* ("The court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met").

The PSLRA also creates a "safe harbor" for forward-looking statements, even those that, with the benefit of hindsight, turn out to be untrue. *15 U.S.C. § 78u-5(c)(1)*. "Congress created the PSLRA safe-harbor protection in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." *In re Columbia Labs., Inc. Sec. Litig., 144 F. Supp. 2d 1362, 1367 (S.D. Fla. 2001)* (quoting *Harris v. Ivax Corp., 182 F.3d 799, 802 (11th Cir. 1999))*; [*17] *see also In re QLT Inc. Sec. Litig., 312 F. Supp. 2d 526, 532 (S.D.N.Y. 2004)*.

### *The Causes of Action Based Upon the Statements Relating to the Bond Reserves are Dismissed*

The Plaintiffs alleged that Aegon's bond default provisions were materially understated throughout the Class Period. Among other things, the CAC alleges that:

> . Prior to and during the Class Period, the high yield (junk) bond market was experiencing significant credit defaults. (P 37.)
>
> . During the Class Period, the overall quality of Aegon's bond portfolio was low. (P 35.)
>
> . During the Class Period, Aegon's bond portfolio included substantial corporate bond holdings that were significantly impaired in value and at substantial risk of default, including Adelphia, Enron, Global Crossing, Qwest and WorldCom. (P38.) *See Bloomberg Financial Reports*. Aegon had $ 300 million in exposure to Enron alone and an additional $ 200 million in exposure to WorldCom. (PP 57, 74.)
>
> . Aegon held bonds in default (net of write-offs) of $ 328 million (approximately EUR 368 million) at December 31, 2001, an amount that exceeded the bond default provision by EUR 130 million. (P 39.)

[*18] Plaintiffs point to the size of the accounting charges that Aegon announced on July 22, 2002, and, based on that announcement, they allege that the Defendants must have known something nine months earlier that they failed to disclose. According to the Defendants, the CAC is a classic case of "fraud by hindsight," and is devoid of facts to demonstrate that the Defendants' earnings statements and projections were inconsistent with contemporaneous data. There are cases

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 7 of 16

Page 6

2004 U.S. Dist. LEXIS 11466, *18; Fed. Sec. L. Rep. (CCH) P92,853

for the proposition that the inference urged by the plaintiffs is not a reasonable inference that can support a claim for securities fraud. *See e.g., Acito, 47 F.3d at 53* ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud") (citations omitted); *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1126-29 (2d Cir. 1994)*; *Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)* (affirming dismissal of complaint which simply "seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones").

The Second Circuit's decision in *Shields* is controlling [*19] here. In *Shields*, a Citytrust shareholder filed suit against the defendant bank and two of its officers following Citytrust's announcement that it was going to take a $ 40 million charge against earnings to increase its loan loss reserves. *25 F.3d at 1125*. Similar to the Plaintiffs' allegations in the present case, the plaintiff alleged that representations regarding the company's earnings and growth (*e.g.*, that the company "expected to realize record earnings for the eleventh consecutive year") were misleading because the defendants concealed significant risks concerning the bank's loan portfolio and loan loss reserves (*e.g.*, that the bank was "critically vulnerable to drop in real estate values" because it had accepted a right to share in equity appreciation instead of typical collateral with respect to a number of its loans). *Id. at 1126*.

The district court dismissed the case for failure to satisfy the particularity requirements of *Rule 9(b)*. On appeal, the Second Circuit affirmed, criticizing a pleading technique which "recorded statements by defendants predicting a prosperous future and held them up against the backdrop of what actually [*20] transpired." *Id. at 1129*. Rejecting the plaintiff's pleading as "fraud by hindsight," the Court reasoned that her "technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." *Id.; see also In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 U.S. Dist. LEXIS 8061, 97 Civ. 1865, 1998 WL 283286, at *5 (S.D.N.Y. June 1, 1998)*.

Juxtaposing Aegon's future earning projections during the Class Period, on the one hand, with its subsequent announcement that it would be accelerating DPAC amortization and bolstering its reserves for bond defaults and GMBs, on the other hand, does not in itself establish the inference that Aegon's reserves must have been inadequate throughout the entire Class Period, that the Defendants' economic assumptions must have been unjustified throughout the entire Class Period and that the Defendants purposefully concealed this information from the public in order to defraud investors, as alleged in the CAC. (P 71).

The CAC alleges that Aegon's bond default reserve was "inadequate given the significant deterioration in the credit markets" and the composition of Aegon's [*21] bond portfolio. (CAC P 39). In this regard also, the present case is identical to *Shields* and other cases filed against banks that made substantial increases to their loan loss reserves when the commercial real estate market collapsed in the late 1980's. Even before the heightened standards of the PSLRA, courts dismissed complaints that contained conclusory allegations that reserves were inadequate, devoid of specific facts that supported that conclusion. *See, e.g., Shields, 25 F.3d at 1129* (dismissing claim that earnings statements were fraudulent because they failed to disclose risks inherent in bank's portfolio); *Grossman v. Texas Commerce Bankshares, 1995 U.S. Dist. LEXIS 13501, 87 Civ. 6295, 1995 WL 552744, at *12 (S.D.N.Y. Sept. 15, 1995)* (dismissing claim that earnings were overstated, that loan loss reserves were inadequate and that the quality of the company's loan portfolio had been misrepresented).

In essence, the plaintiffs in the loan loss cases were unsuccessful in their attempt "to penalize banking institutions 'for failing to show greater clairvoyance.'" *Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y. 1991)*, *aff'd*, *956 F.2d 1161 (2d Cir. 1992)* [*22] (quoting *Hershfang v. Citicorp, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991))*; *Stepak v. Aetna Life and Casualty Co., 1994 U.S. Dist. LEXIS 15559, Civ. No. H:90CV00886 (AVC), 1994 WL 858045, at *15 (D. Conn. Aug. 29, 1994), aff'd, 52 F.3d 311 (2d Cir. 1995)* (allegation that downturn in the real estate market rendered defendant's formula for calculating loan loss reserves "unrealistic" rejected as fraud by hindsight).

Although the Plaintiffs allege that the Defendants' reserves and DAC assumptions were unreasonable in light of the then current economic conditions, they do "not claim that [AEGON] misrepresented its data, but claim[] that the disclosures were inaccurate because of the method used to calculate the data. The latter claim does not support an action for violation of the securities

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 8 of 16

Page 7

2004 U.S. Dist. LEXIS 11466, *22; Fed. Sec. L. Rep. (CCH) P92,853

laws." *Stepak*, 1994 U.S. Dist. LEXIS 15559, 1994 WL 858045, at *22 n.28.

To satisfy *Rule 9(b)* and the PSLRA, the Plaintiffs must plead particular facts supporting their theory that the Defendants' failure to take the accounting charges earlier was due to something nefarious, rather than simply imperfect economic forecasting. The complaint lacks the requisite particularity. *See, e.g.*, [*23] *Lerner v. FNB Rochester Corp.*, 841 F. Supp. 97, 101 (W.D.N.Y. 1993); *Ruskin v. TIG Holdings, Inc., 1999 U.S. Dist. LEXIS 14860, 98 Civ. 1068, 1999 WL 756466 (S.D.N.Y. Sept. 24, 1999)*.

The *Ruskin* Court found the plaintiffs' pleading to be deficient because it "never alleged when and how, if at all, before [the first quarter disclosure], the defendants in fact learned of the reserves' inadequacy, and its magnitude -- without which allegations there remains no sufficient basis for the claim their statements, or omissions, were false when made." *Id. 1999 U.S. Dist. LEXIS 14860 [WL] at *3*. Accordingly, the Court granted the defendants' motion to dismiss for failure to plead with particularity, reasoning that,

> Since the complaint does not identify the accounts posing problems, nor the problems themselves, nor to whom and when they became known, nor when defendants recognized the need to increase the reserves, it does not "explain why the statements were fraudulent" and must be dismissed for failure to plead fraud with the particularity required in *Rule 9(b)*.

*Id. 1999 U.S. Dist. LEXIS 14860, [WL] at *4*. *AccordAig Global Secs. Lending Corp. v. Banc of Am. Secs. LLC, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003)* (plaintiffs' [*24] claim failed to satisfy *Rule 9(b)* because "although the plaintiffs have claimed in conclusory terms that the loss figures were materially false, they have provided no indication of the amount by which the figures were supposedly under or overstated"); *In re MSC Indus. Direct Co., 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003)* (dismissing *Section 10(b)* claim alleging reserve manipulation for lack of particularity where "the amended complaint did not allege what the inventory reserve for Enco or any other acquired company should have been") (citation omitted); *Pilarczyk v. Morrison Knudsen Corp., 965 F. Supp. 311, 320 (N.D.N.Y. 1997), aff'd, 162 F.3d 1148 (2d Cir. 1998)* (dismissing claims for failure to plead fraud claims with particularity).

The Plaintiffs have made two allegations to show that they are alleging something more than "fraud by hindsight." First, they point to a statement that Eric Goodman ("Goodman") made after the Class Period to the effect that bonds in default as of December 31, 2001 exceeded the provision for bond defaults. (CAC P 39.) Second, the Plaintiffs claim that the composition of Aegon's bond portfolio was somehow [*25] inappropriate or was the cause of the credit default losses that Aegon suffered in 2002. (CAC P 35.)

Goodman's statement concerned only the face value of bonds in default which, according to Plaintiffs, establishes that the amount of the reserve must equal the amount of the entirety of Aegon's holdings of securities in default. The Plaintiffs allege that Adelphia missed interest payments on its bonds (*i.e.*, was in default) on May 16, 2002. (CAC P 38(a).)

However, the Defendants point out even after that date Adelphia's bonds generally traded for 30-40 cents on the dollar, (Corporate Bonds Trading Report, http://www.investinginbonds.com, (showing trading price of 38 cents on the dollar on July 3, 2002).) and thus it may have been appropriate to have a smaller reserve. Similarly, WorldCom's, MCI's and Intermedia's bond holders are expected to receive between 93.5 and 35.9 percent of par value. (WorldCom, Inc. Form 8-K filed July 17, 2003). *See also In re Washington Public Power Supply Sys. Sec. Litig., 720 F. Supp. 1379, 1391 (D. Ariz. 1989)* (settlement fund, before accrued interest, estimated to approach 50 percent of losses).

The CAC, P 35, alleges that "a staggering [*26] 40% of the AEGON's U.S. fixed income portfolio, which was 78% of AEGON's general investments, was rated BBB or lower in 2001," as a fact to support the inference that this composition of the portfolio caused the defaults.

However, Aegon continuously disclosed the composition of its fixed income portfolio to the market and according to Exhibit 21, at p. 8, and Exhibit 22, at p. 32, Aegon's bond portfolio was in line with industry norms:

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 9 of 16

Page 8

2004 U.S. Dist. LEXIS 11466, *26; Fed. Sec. L. Rep. (CCH) P92,853

|  | 9/30/01 | 6/30/03 | 9/30/02 | Industry |
| --- | --- | --- | --- | --- |
| A and above | 61.9% | 61.8% | 62.6% | 59.4% |
| BBB | 31.3% | 30.8% | 29.6% | 32.6% |
| BB | 3.8% | 4.4% | 4.5% | 4.8% |
| B | 2.0% | 1.9% | 2.1% | 2.0% |
| Below B | 1.0% | 1.1% | 1.2% | 1.0% |

The allegation fails to allege a factual support for the inference because the corporate bond default in the relevant period were generally not junk bonds but investment grade "fallen angels," *e.g.*, Enron and WorldCom.

Moreover, the debate about an appropriate reserve level ultimately is immaterial, as the reserve is only applicable to the financial statements generated in accordance with Dutch Accounting Principles ("DAP"). Under DAP, Aegon shows its debt securities at amortized cost. When Aegon's financial [*27] results are reconciled to the U.S. GAAP in the Form 20-F, all of the publicly traded bonds in Aegon's portfolio are marked to market, thereby incorporating the market's assessment of the likelihood of defaults.

Even if Aegon's reserve for bond defaults had been inadequate, that would have generated a negative variance when the Dutch financial results were recast in accordance with GAAP, and the inadequacy would thereby have been revealed to the market. In fact, at the time of the Form 20-F, marking to market increased the valuation assigned to Aegon's bond portfolio under DAP. The market (which the Plaintiffs necessarily posit absorbs all available information) placed a higher overall value on the bonds in Aegon's portfolio than Aegon did.

The facts to which the Plaintiffs point in support of their contention that the Defendants engaged in fraud relative to the bond reserve are facts demonstrating that the bond market was experiencing significant risks of defaults. Indeed, Aegon added $ 565 million to the bond default reserve at year end 2001 (March 7, 2002 Press Release), and another $ 82 million in the first quarter of 2002 (May 7, 2002 Press Release) and during the Class Period [*28] Aegon disclosed that it had gross loan exposure to Enron Corporation of $ 300 million (November 30, 2001 Press Release), and warned that the volatility of the markets made a "wide range" of financial results possible (March 7, 2002 Press Release). Finally, in any event, it marked all publicly-traded debt securities to market.

*The Allegations Relating to DAC Unlocking and the Guaranteed Minimum Benefits Reserve*

The Plaintiffs have contended that Aegon should have unlocked DPAC earlier or increased its reserves for GMBs because of a "steady, long-term march downward" in the stock market that began in April 2000. (CAC P 43.) The Plaintiffs' characterization of what occurred in the stock market cannot withstand scrutiny, as the chart they supply contradicts that assertion. Rather, the market moved as follows:

| Second Quarter 01: | + | 5.5% (before the Class Period) |
| --- | --- | --- |
| Third Quarter 01: | - | 15.0% |
| Fourth Quarter 01: | + | 10.3% |
| First Quarter 02: | - | .1% |
| Second Quarter 02: | - | 13.7% |

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 10 of 16

Page 9
2004 U.S. Dist. LEXIS 11466, *28; Fed. Sec. L. Rep. (CCH) P92,853

| End of Class Period | | |
|---|---|---|
| (7/22/02) | - | 17.2% |

As the chart demonstrates, the market was up in the second quarter of 2001. The decline in the third [*29] quarter followed the events of September 11, 2001. The market then rebounded to finish the fourth quarter of 2001 up 10 percent. The first quarter of 2002 was essentially flat. (*Id.*) In the second quarter the market dropped 13.7% Thus, it is only with the benefit of hindsight that the Plaintiffs infer that April 2000 began what ended up being an historic fall in the stock market.

The Plaintiffs in opposing Defendants' motion argue that by the time Aegon took its charge for DPAC unlocking or added provisions for guaranteed minimum benefits, the S&P 500 had declined 45.6% since April 2000, that between April 2000 and the end of the first quarter of 2001, the S&P 500 had declined by 23%, and that the equity market return assumptions of 14.5% for five years and 9.5% thereafter were unreasonable in light of market conditions.

However, as the chart cited above demonstrates, the equity markets were up and down during the Class Period. DPAC unlocking is based upon Aegon's prediction as to the future performance of the markets. Past declines do not warrant an inference of fraud because there are no contemporaneous facts pled demonstrating that Aegon's expectations about the future changed [*30] before July 22, 2002.

The Plaintiffs have attacked assumptions that Aegon made about future market rates of return. As Aegon explained in its 2001 20-F, "the assumptions underlying the calculation of expected gross profits are determined from best estimates as to future experience" including an economic perspective on expectations about the future of the bond and equity markets. Whether or not management's business judgment in arriving upon those forward-looking assumptions was reasonable presents a question of appropriate management, not fraud.

Moreover, it is only with the benefit of hindsight that the Plaintiffs contend that the estimates were unreasonable. It must be remembered that these are nothing more than predictions about an inherently unknowable event: market movements in the future. The CAC fails because there is no contemporaneous report, memorandum or other document that demonstrates that Aegon's assumptions were not reasonable when made, or that it knew that to be the case.

### *Allegations Based on Forward-Looking Statements or Puffery*

Plaintiffs have based certain of their claims on statements regarding projections of future performance, (CAC PP 49, 50, [*31] 55, 62, 70, 72) or upon general optimistic statements about Aegon's future. (CAC P 50, 62, 63.)

Under the PSLRA, a safe harbor exists for forward-looking statements if (1) they are identified as forward-looking and are accompanied by meaningful cautionary language; (2) the statements are immaterial; or (3) the plaintiff fails to prove that the statements were made with actual knowledge of their falsity. *See* Section III(C), *supra. See also Fellman v. Electro Optical Sys. Corp., 2000 U.S. Dist. LEXIS 5324, 98 Civ. 6403, 2000 WL 489713, at *4 (S.D.N.Y. Apr. 25, 2000)* (characterizing it as a two part test consisting of (1) and (3), but noting that the prongs "operate independently"); *In re ATI Techs., Inc. Sec. Litig., 216 F. Supp. 2d 418, 429 (E.D. Pa. 2002)* ("a defendant will be immune from liability if *any one* of [the statute's] criteria is met") (emphasis in original).

"Under the Reform Act, a statement is forward-looking if, *inter alia*, it is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 536 (3d Cir. 1999)* [*32] (quoting *15 U.S.C. § 78u-5(i)(1)*).

Here, the Plaintiffs seek to base certain of their fraud claims on Aegon's earning forecasts. (CAC PP 49, 50, 55, 62 and 72.) As is explicitly delineated in the statute, however, such projections are "forward-looking statements" to which the safe harbor applies. *15 U.S.C. § 78u-5(i)(1). See, e.g., In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1091 (9th Cir. 2002)* ("forecasts are

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 11 of 16

Page 10
2004 U.S. Dist. LEXIS 11466, *32; Fed. Sec. L. Rep. (CCH) P92,853

unquestionably forward-looking statements"); *Advanta, 180 F.3d at 536* (projection of revenues a forward-looking statement); *ATI Techs., 216 F. Supp. 2d at 443-43* (same).

Forward-looking statements also include management's plans and objectives for future operations, statements of future economic performance and assumptions underlying either. *See 15 U.S.C. § 78u-5(i)(1)*; *see also Columbia Labs, 144 F. Supp. 2d at 1368* (statements reflecting "optimism and expectations about a future event," plans for a product and projected increased profits were forward-looking statements). "As a general rule, statements whose truth cannot be [*33] ascertained until some time after the time they are made are "forward-looking statements." *In re Ashanti Goldfields Secs. Litig., 184 F. Supp. 2d 247, 266 (E.D.N.Y. 2002)* (denying in part and granting in part motion to dismiss) (citations omitted). Accordingly, statements concerning Aegon's growth expectations qualify for the safe harbor.

Because the statements at issue are forward-looking, they are immunized unless the Plaintiffs plead that the statements were made with "actual knowledge by [the speaker] that the statement was false or misleading." *15 U.S.C. § 78u(c)(1)(B)(ii)*. To do so, the Plaintiffs must plead specific facts that support a strong inference that the Defendants had actual knowledge of the statements' falsity; in the absence of such facts, the claims must be dismissed. *See, e.g., Vantive, 283 F.3d at 1091-92* (dismissing claims that financial forecasts were false because the plaintiffs did not allege facts supporting a strong inference that the defendants had actual knowledge that the forecasts were false or misleading); *Advanta, 180 F.3d at 536-37* (same); *Columbia Labs, 144 F. Supp. 2d at 1369* [*34] (same).

For example, in *Fellman*, the plaintiffs alleged that the defendants violated *Section 10(b)* by, among other things, stating that "the company will break into profitability sometime early in 1999 and could achieve net income of $ 10.9 million or $ 0.52 per share by 2001" and that its "revenue and earnings potential is clearly huge." *2000 U.S. Dist. LEXIS 5324, 2000 WL 489713, at *5*. The court held that these statements were protected by the PSLRA's safe harbor because the plaintiffs only alleged "in a general way that [the defendants] had actual knowledge of the falsity" but set forth "no specific facts from which such actual knowledge can be inferred." *Id.* *2000 U.S. Dist. LEXIS 5324 [WL] at *5*.

Here, the Plaintiffs only generally allege that the Defendants had actual knowledge of the alleged falsity of their statements (CAC P 127) without alleging specific facts to support such an inference.

***The Statements are Protected by the Safe Harbor Because They Are Accompanied by Meaningful Cautionary Statements***

Even assuming actual knowledge was sufficiently pled, the statements were accompanied by "meaningful cautionary statements identifying important factors that could cause results to differ materially [*35] from those in the forward-looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i)*.

Aegon announced in March 2002 that it had added $ 565 million to its 2001 provision for bond defaults as a result of "increased bond default activity in the United States" (March 7, 2002 Press Release, CAC P 60), that it strengthened the reserve by another $ 82 million in the first quarter of 2002, (May 7, 2002 Press Release, CAC P 72), that it expected to "put aside about 200 million euros" to cover additional potential losses, (May 3, 2002 Bloomberg News Article), and that Aegon "remained cautious on our portfolio looking at the rest of the year." (April 18, 2002 Bloomberg News Article).

Moreover, Aegon advised its shareholders that the company's "shareholder equity is directly exposed to movements in the equity markets." (CAC P 65.) The 2001 Form 20-F stated that:

> . While the use of the Indirect Return Method makes net income less sensitive to movements in the equity markets than it would otherwise be, "as theallocation of investments held for the policy holderis for over 62% in equity securities, net income is sensitive to the fees earned on these assets." (2001 20-F, [*36] at 39.)
>
> . On the very first page of the text, risk factorsexisted and one of the "important factors that could cause actual outcomes and results to differ materially from forward-looking statements" is "changes in general economic conditions, particularly in the U.S., the Netherlands

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 12 of 16

Page 11

2004 U.S. Dist. LEXIS 11466, *36; Fed. Sec. L. Rep. (CCH) P92,853

and the United Kingdom." (*Id.* at 2.)

. "Changes in performance of financial markets" wereanother factor that could cause actual outcomes to differ from forward-looking statements. (*Id.*]

. "As an international life insurance company, Aegonis exposed to . . . changes in the fair value of its investments" (*Id.* at 6)

. "A decline in the securities markets may adversely affect sales of savings and investment products and assets under management" and that a "protracted orsteep decline in the stock or bond markets may significantly reduce the popularity of these products." (*Id.* at 6.)

. "The volatility in the markets in which we invest and the overall investment returns earned in those markets also affect profitability" and if the stock and bond markets do not appreciate or remain solid, then Aegon's "net income, revenues and assets may decline significantly." (*Id.* [*37] )

. Defaults in Aegon's fixed maturity and mortgage loan portfolios "may adversely affect profitability," and Aegon "is subject to the risk that the issuers of fixed maturity securities and mortgage loan borrowers may default on principal and interest payments ... particularly if a major economic downturn occurs" and an "increase in defaults on these securities could have a material adverse effect on [AEGON's] business, results of operations and financial condition." (*Id.* at 7.)

. "A host of challenges await AEGON's management team, notably in the form of margin pressures, increased regulatory burdens, risk management related issues, but also new opportunities. Maintaining and managing a high quality investment portfolio is more difficult in today's volatile economic environment as evidenced by the unexpected collapse of Enron, a highly rated company ranking among the ten largest US companies. Despite our high quality investment grade bond portfolio at AEGON USA, we are not immune from the market-wide increase in corporate default losses."(*Id.* at 40.)

. "As an international life insurance company, AEGONis exposed to currency fluctuations ... and to changes [*38] in the market value of its investments, credit risk and the impact of interest rate changes." (*Id.* at 37.)

These statements specifically warned investors of the risk that adverse developments in the equity market -- such as the historic drop in the second quarter of 2002 -- could cause actual earnings to differ from projections.

Finally, each press release that discussed Aegon's expectations for projected earnings included cautionary language such as the following:

> forward-looking statements are made based upon management's current expectations and beliefs concerning future developments and their potential effects upon the company. There can be no assurance that future developments affecting the company will be those anticipated by management. Actual results may differ materially from those included in the forward-looking statements.

(August 9, 2001 Press Release).

Each of the allegations based on Aegon's earning forecasts, including those in the 2001 Form 20-F and the press releases from 2001 and the first half of 2002, are dismissed as they are forward-looking statements protected by the PSLRA's safe harbor provision.

*The Allegation that* [*39] *Aegon Failed to Show its Investments at Fair Market Value Fails to State a Claim*

The allegation that Aegon failed to show its debt securities at fair market value (CAC P 54) is contradicted by Aegon's public filings. As stated therein, for GAAP balance sheet purposes, Aegon marked its available for

Case 1:07-cv-09633-LBS-DFE   Document 57-3   Filed 07/21/2008   Page 13 of 16

Page 12

2004 U.S. Dist. LEXIS 11466, *39; Fed. Sec. L. Rep. (CCH) P92,853

sale debt securities to market in its 20-F for the year ending December 31, 2001 and in its 6-K dated September 25, 2001 (2001 20-F at 132, September 25, 2001 6-K at 7) (under GAAP, "debt securities are classified as available for sale and valued at market value").) As a result, the argument in the complaint that Aegon should have increased its bond default reserve because of the deteriorating performance of various borrowers (*see* CAC PP 35-39) is beside the point. Because for purposes of the reconciliation in its 20-F, Aegon marked these securities to market, all available negative information about those companies was already reflected in the reconciliation.

*The Allegation Concerning Aegon's Accounting Policies Statement*

In their complaint Plaintiffs note Aegon's Form 20-F which stated that the company's "accounting policy of deferring and amortizing capital [*40] gains on equity and real estate investments in the general account portfolio makes net income less sensitive to the effects of volatile equity markets than it would otherwise be." (CAC P 65). The Plaintiffs infer that this statement was fraudulent because -- as evidenced by Aegon's July 2002 reduction in forecasted earnings -- Aegon was not immune to the volatility of the market.

However, the sentence at issue states only that Aegon's accounting policy makes the company "less sensitive" to market volatility; it does not promise that Aegon was immune to market forces and explicitly states that Aegon was "not immune to these influences." (2001 20-F at 14, CAC P 63.) Further, in the sentence directly preceding the one at issue, Aegon specifically warns that its "shareholders' equity is directly exposed to movements in the equity markets." (*Id.*, CAC P 65.)

In addition, the Plaintiffs have not proffered any fact from which the Court could infer that the statement was even incorrect, much less fraudulent. *See Lerner, 841 F. Supp. 97 supra.* This sentence pertains to a specific accounting policy that Aegon uses in its DAP filings called the Indirect Return Method. Using this methodology, all [*41] realized and unrealized gains (net of losses) on shares and real estate are not taken into earnings immediately; rather, they are credited to Aegon's revaluation account and are partially released quarterly into the income statement as indirect income. (Aegon Indirect Return Method, described at www.aegon.com, Form 20-F, at 82). No facts have been alleged to demonstrate that the statement at issue -- that this practice makes net income less sensitive to market movements than it would otherwise be (*i.e.*, if Aegon took gains and losses into income immediately) -- is false. The allegation thus fails to state a claim of securities fraud.

*Any Attempt by the Plaintiffs to State a Claim Based on Analyst Statements Must Fail*

In their pleading, the Plaintiffs refer to various analyst reports. To the extent that the Plaintiffs purport to state a claim based on any such reports, their effort must fail because the statements: (1) are not properly attributable to the Defendants; (2) fail to satisfy the particularity requirements of *Rule 9(b)*; and (3) are inactionable expressions of optimism.

An analyst report is not attributable to a corporation or corporate officials, and [*42] they have no duty to correct or update any statements therein, unless they (1) "adopted or placed their 'imprimatur' on the reports" or (2) "intentionally fostered a mistaken belief concerning a material fact that was incorporated into the reports." *Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)* (quoting *Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163-64 (2d Cir. 1980)*); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, 2003 U.S. Dist. LEXIS 11108, 02 Civ. 0767, 2003 WL 21507294, at *7 (S.D.N.Y. June 30, 2003)* (same). Here, however, the Plaintiffs have not even alleged any such involvement by Defendants. *See In re Northern Telecom Ltd. Sec. Litig., 42 F. Supp. 2d 234, 249 (S.D. N.Y. 1998)* ("The allegation that the challenged analyst statement was based on information provided by [company] management does not suggest the kind of control or cooperation in the issuance of the report necessary to render defendants liable for its contents"). Moreover, the complaint states only that "as defendants intended, Aegon's second quarter earnings announcement generated favorable analyst commentary." (CAC P 51). This vague and conclusory statement fails adequately to plead that any defendant [*43] "intentionally fostered a mistaken belief concerning a material fact." *See*, *e.g., Elkind, 635 F.2d at 164* (affirming dismissal).

Any claim based on an analyst report fails to meet the particularity requirements of *Rule 9(b)* because the Plaintiffs "have neither identified the [Aegon] executive responsible for any particular communication to an analyst nor stated where and when a particular communication to an analyst took place." *In re Revlon,*

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 14 of 16

Page 13

2004 U.S. Dist. LEXIS 11466, *43; Fed. Sec. L. Rep. (CCH) P92,853

*Inc. Sec. Litig.*, 2001 U.S. Dist. LEXIS 3265, 99 Civ. 10192, 2001 WL 293820, at *10 (S.D.N.Y. Mar. 27, 2001) (dismissing the majority of plaintiffs' claims regarding misrepresentations to analysts). *See also Northern Telecom, 42 F. Supp. 2d at 237* (dismissing claims); *In re Gaming Lottery Sec. Litig.*, 1998 U.S. Dist. LEXIS 7926, 96 Civ. 7936, 1998 WL 276177, at *6 (S.D.N.Y. May 29, 1998) (same).

Finally the earnings predictions and other statements quoted from the analyst reports are not actionable because they are merely "vague expressions of optimism for the future." *Northern Telecom, 42 F. Supp. 2d at 237* (finding that such statements "added little to the other allegations of the complaint" and did not [*44] constitute actionable fraud). For all of the reasons set forth in Section IV(B), *supra*, above, any claims based on such statements should be dismissed.

### *The Plaintiffs Fail to Plead Scienter Adequately*

The Plaintiffs contend that scienter is generally inappropriate for resolution on a motion to dismiss. However, under the PSLRA where the facts pled do not support a strong inference of scienter, a fraud claim not only should, but must, be dismissed at the threshold. *See 15 U.S.C. § 78u-4(b)(3)(A)* (stating that, upon a defendants' motion, a court "shall" dismiss the complaint if the plaintiff fails to plead particular facts giving rise to a strong inference of scienter); *see also Chill v. General Electric Co., 101 F.3d 263 (2d Cir. 1996)* (affirming dismissal for failure to adequately plead scienter); *Acito, 47 F.3d at 54-55* (same).

Where the plaintiffs have failed to plead evidence of motive, "the strength of the circumstantial allegations must be correspondingly greater[]" to plead recklessness. *Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)* (citation omitted).

The Plaintiffs [*45] argue that they have done so based solely upon the receipt of bonuses by the Individual Defendants. Significantly, however, the Plaintiffs fail to cite even one Second Circuit case to support this contention. To the extent the Plaintiffs seek to combine the Defendants' receipt of a bonus in conjunction with an attempt to plead recklessness, the Second Circuit has rejected such an attempt to plead scienter. *See Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001)* ("Here, plaintiff seeks to combine inadequate allegations of motive with inadequate allegations of recklessness, as described *infra*, to demonstrate scienter. Plaintiff offers no support for his approach, and we decline to accept it").

The Plaintiffs concede that in order to prove recklessness, they must allege that the Defendants "had knowledge of facts or access to information contradicting their public statements." *Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)*. They contend that they have satisfied this standard by alleging that: (1) the Defendants had knowledge of information "demonstrating that the bond default provision was obviously inadequate"; (2) the assumptions underlying [*46] Aegon's DPAC amortization calculation "lacked any reasonable basis during the Class Period"; and (3) the assumptions underlying Aegon's "calculation of provisions for GMBs assumed a growth rate devoid of any reasonable basis in fact[.]" These allegations, however, fail to meet the pleading standard set forth in *Novak*.

This case differs from those that the Plaintiffs relied upon in the opposition in a significant way. *See, e.g., Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357 (1st Cir. 1994); Reliance, 91 F. Supp. 2d 706*. In *Serabian*, for example, the only section of the plaintiffs' complaint which the First Circuit found to be "sufficiently particular and pertinent to survive the defendants' motion to dismiss" was the one in which the "plaintiffs specifically cited reports and documents presented to defendants at relevant times that were inconsistent with defendants' public statements." *Id. at 363, 368*. Based on these internal reports, the court concluded that the plaintiffs had presented "a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their [allowance [*47] for loan losses], and what the company was telling the public *at the same time*." *Id. at 365* (emphasis in original).

*Reliance* can also be distinguished from the present case. In *Reliance*, the plaintiffs alleged that the defendants received two different reports which specifically advised them of the deficiencies in their loan loss reserves. *91 F. Supp. 2d at 724*. There the court found that the company's loan loss reserves were declining as a percentage of income at the same time the loan loss rate was increasing, thus leading the court to conclude that "the individual defendants' conduct may amount to more than failure to assess risks or to recognize a negative trend in the industry." *91 F. Supp.*

Case 1:07-cv-09633-LBS-DFE    Document 57-3    Filed 07/21/2008    Page 15 of 16

Page 14

2004 U.S. Dist. LEXIS 11466, *47; Fed. Sec. L. Rep. (CCH) P92,853

*2d at 724-25*. In addition, the court also found that timing of the disclosure gave rise to an inference of fraud because the defendants had delayed release of their financial disclosure statements until after they had completed a spin-off transaction and then, two days after that transaction was complete, they announced that the company would be taking an $ 18 million charge against earnings. *Id.*

The Plaintiffs have not set forth any evidence [*48] of reports or data to establish that the Defendants knew that their reserves were inadequate or that their economic assumptions were improper. Thus, this is not a case where the Plaintiffs have presented a contrast between what the Defendants were "hearing internally about [the problematic area], and what the company was telling the public at the same time." *Serabian, 24 F.3d at 365*. Here, the Plaintiffs ask this Court to accept their conclusions about the reserves and the economic assessments of the Defendants, and to speculate that the Defendants must have known that the Plaintiffs' conclusions were correct during the Class Period.

The Plaintiffs also argue that they have pled scienter in other ways. The Plaintiffs allege that the Defendants had access to adverse undisclosed information because of their senior positions with the company. Such allegations are insufficient to establish scienter. *See, e.g., In re Interpublic Sec. Litig., 2003 U.S. Dist. LEXIS 8844, 02 Civ. 6527, 2003 WL 21250682, at *14 (S.D.N.Y. May 29, 2003)* ("Generalized allegations about their role in the corporation or the length of time that the accounting problems lasted are not a substitute for the [*49] particularized pleading required by the law"); *In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 U.S. Dist. LEXIS 8061, 97 Civ. 1865, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998)* ("Courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook") (citations omitted).

The Plaintiffs also claim that "the significance of [the allegedly undisclosed] facts to AEGON's core business are enough to" support a strong inference of scienter. However, there are no facts pled which relate to Aegon's "core business" -- only conclusions (*i.e.*, that the reserves were "inadequate" or the assumptions "improper").

Even assuming the Plaintiffs had pled particular facts (*i.e.*, contemporaneous data), however, the Plaintiffs oversimplify the matters at issue here. For example, the process of determining when DPAC should be unlocked is a complicated one which requires that the company make certain economic assumptions about the fees it will earn in the future based on estimates of future bond and equity returns, mortality [*50] and disability assumptions and future inflation rates. None of these factors are static; for example, the stock market was moving up and down during the Class Period and its future was obviously unknowable. This case differs from instances in which particular and concrete information had a readily quantifiable impact on the issuer's "core operations," which was contrary to public statements. *See Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989)* (finding that defendants' admission that sales to the People's Republic of China constituted a significant new source of revenue for the company gave rise to a strong inference that the directors of the company knew of that country's import restrictions since they "eliminated a potentially significant source of income for the company"); *In re Xerox Corp. Secs. Litig., 165 F. Supp. 2d 208, 223 (D. Conn. 2001)* (noting that the allegedly undisclosed operational problems "jeopardized the success of the company's most significant initiative at that time").

The Plaintiffs allege that the assumptions and forecasts inherent in this ongoing process resulted from conscious misbehavior, rather than merely "overly optimistic [*51] projections, which are also insufficient for *section 10(b)* liability." *Funke v. Life Financial Corp., 237 F. Supp. 2d 458, 470 (S.D.N.Y. 2002)* (citing *Stevelman v. Alias Research Inc., 174 F.3d 79, 84-85 (2d Cir. 1999))*. In the two post-PSLRA cases cited by Plaintiffs for this proposition, the court specifically found that the plaintiffs had pled particular facts demonstrating that the defendants had actually received non-public information which contradicted their public statements. *See Novak, 216 F.3d at 311* (plaintiffs alleged that the defendants discussed the need to mark down inventory and approved inventory management practices that violated the company's markdown policy); *Xerox, 165 F. Supp. 2d at 222* (finding recklessness adequately pled based on allegations that "members of the company's sales force personally communicated to the individual defendants" information that contradicted their public representations); *see also id.* (also finding that the plaintiffs had "sufficiently pled scienter under the 'motive and opportunity' approach" based on allegations that the individual defendants had engaged in unusual [*52]

Case 1:07-cv-09633-LBS-DFE Document 57-3 Filed 07/21/2008 Page 16 of 16

Page 15

2004 U.S. Dist. LEXIS 11466, *52; Fed. Sec. L. Rep. (CCH) P92,853

insider sales).

Finally, the opposition relies upon the fact that the Defendants' earnings projections were reduced by 30% to 35% and, from that, argues that the "amount of the miss is probative of Defendants' state of mind." The cases cited for this proposition do not suggest, however, that the amount of the "miss" alone can satisfy scienter. To the contrary, in those cases, the plaintiffs pled substantial facts demonstrating scienter. Moreover, in each of those cases, the amount of the "miss" was substantially greater than that at issue here. *See Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000)* (company announced that "$ 73.8 million of $ 87.5 million in royalty advances, *i.e., over 84 percent* of the total ]]royalty advances it had capitalized by the end of the third quarter of 1997 needed to be expenses") (emphasis in original); *In re Complete Mgmt. Sec. Litig., 153 F. Supp. 2d 314 (S.D.N.Y. 2001)* (company took bad debt charge constituting more than 75% of its revenue; company filed for bankruptcy soon thereafter).

In summary, regardless of whether the "motive and opportunity" or "conscious misbehavior and recklessness" approach is used, [*53] the Plaintiffs are required to set forth facts giving rise to a strong inference that the Defendants acted with the "required state of mind, which has been described as an intent to 'deceive, manipulate or defraud.'" *In re Duane Reade Inc. Sec. Litig., 2003 U.S. Dist. LEXIS 21319, 02 Civ. 6478, 2003 WL 22801416, at *8 (S.D.N.Y. Nov. 25, 2003)* (citation omitted). Because they failed to do so, the Plaintiffs' claims are dismissed.

### *Conclusion*

For the reasons stated above, Aegon's motion to dismiss the Plaintiffs' Consolidated Amended Complaint is granted.

It is so ordered.

**New York, NY**

**June 23, 2004**

**ROBERT W. SWEET**

    **U.S.D.J.**