# TAB 6

FOCUS - 7 of 20 DOCUMENTS


Caution
As of: May 23, 2008

**BOND OPPORTUNITY FUND and STEVEN GIDUMAL, suing on their own behalf individually, and on behalf of shareholders of UNILAB CORPORATION, Plaintiffs, -v.- UNILAB CORPORATION, DAVID C. WEAVIL, HAYWOOD COCHRANE, Jr., KIRBY L. CRAMER, WILLIAM J. GEDALE, RICHARD A. MICHAELSON, GABRIEL B. THOMAS, and BT ALEX.BROWN, Defendants.**

99 Civ. 11074 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 7838*; *Fed. Sec. L. Rep. (CCH) P92,418*

**May 9, 2003, Decided
May 12, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Bond Opportunity Fund v. Unilab Corp., 2004 U.S. App. LEXIS 2217 (2d Cir. N.Y., Feb. 10, 2004)*

**DISPOSITION:** Defendants' motion to dismiss complaint granted.

**COUNSEL:** [*1] For Bond Opportunity Fund, PLAINTIFF: Joel P Laitman, Samuel P Sporn, Schoengold & Sporn, PC, New York, NY USA. Howard I Rhine, Coleman, Rhine & Goodwin LLP, New York, NY USA. Howard I Rhine, Bruce S Coleman, Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, New York, NY USA.

For Steven Gidumal, PLAINTIFF: Joel P Laitman, Samuel P Sporn, Schoengold & Sporn, PC, New York, NY USA. Howard I Rhine, Bruce S Coleman, Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP, New York, NY USA.

For Unilab Corporation, DEFENDANT: Jay B Kasner, Skadden, Arps, Slate, Meagher & Flom, New York, NY USA.

For David C. Weavil, Haywood Cochrane, Kirby L Cramer, William J Gedale, Richard A Michaelson, Gabriel B Thomas, DEFENDANTS: John R Oller, Willkie, Farr & Gallagher, New York, NY USA.

**JUDGES:** JOHN S. MARTIN, Jr., United States District Judge.

**OPINION BY:** JOHN S. MARTIN, Jr.

**OPINION**

**OPINION AND ORDER**

JOHN S. MARTIN, Jr., United States District Judge:

This purported class action, filed by former shareholders of Unilab Corporation, arises out of a buyout of virtually all of the public shareholders of Unilab in a merger of Unilab into UC Acquisition Sub, Inc., a subsidiary of Kelso [*2] & Co., which was created for that purpose. Plaintiffs allege that the proxy statement dated October 26, 1999, and a supplemental proxy statement dated November 15, 1999, [1] contained false and misleading statements in violation of 14(a) and 20(a) of the Securities Exchange Act, *15 U.S.C. 78n(a), 78t(a)*. In addition, Plaintiffs assert state law claims of breach of fiduciary duty, common law fraud and deceit, and negligent misrepresentation.

Case 1:07-cv-09633-LBS-DFE    Document 57-7    Filed 07/21/2008    Page 3 of 12

Page 2
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

1 The Plaintiffs filed their original Complaint in this action, seeking to enjoin the merger, on November 4, 1999. The supplemental proxy was prepared with the participation of Plaintiffs' counsel, and published pursuant to a preliminary settlement, subject to confirmatory discovery. The shareholder vote, in which the merger was approved, took place on November 23, 1999.

Plaintiffs claim that the allegedly misleading proxy materials were issued in furtherance of a scheme to induce shareholders to sell their Unilab shares at an unfairly low price. [*3] They contend that this scheme was intended to benefit the director defendants, BT Alex.Brown (the investment banker), Kelso, and three institutional shareholders, two of which remained shareholders after the merger. Plaintiffs claim that the extent to which Unilab stock was undervalued in the merger is demonstrated by the fact that 18 months after the buyout at $ 5.85 per share, Kelso took the successor company public at $ 16 per share, and it closed its first day of trading at $ 23 per share. This increase took place despite the fact that Unilab's results over that period of time were not as good as had been expected, and the stock market declined generally.

All Defendants have moved to dismiss the Third Amended Complaint pursuant to *Fed. R. Civ. P. Rules 12(b)(6) and 9(b)*, and 21D(b) of the Securities Exchange Act, *15 U.S.C. 78u, 4 (b)*, for failure to state a cause of action. In addition, BT Alex.Brown has moved to dismiss the securities law claims asserted against it as barred by the statute of limitations.

The Proxy Materials

Plaintiffs charge that the original proxy statement contained a number of misstatements and omissions, and that the supplemental [*4] proxy that was sent to shareholders after the Plaintiffs filed the original Complaint in this action, and before the vote approving the merger, did not remedy a number of deficiencies in the disclosure with respect to the merger. Plaintiffs allege that the following statements constituted material misstatements and omissions.

1. The statement in both the proxy and the supplemental proxy that two institutional investors, Pequot Scott Fund, LP and EOS Partners, LP, were retaining a portion of their shares in the merger and that this was a benefit to other shareholders, who would be able to receive cash for all of their shares, and would allow their merger to be accounted for as a recapitalization, was untrue because Pequot and EOS Partners actually were permitted to retain their shares primarily because they had expressed disappointment in the proposed $ 5.85 buy out price.

2. The proxy and supplemental proxy did not disclose that prior to the announcement of the merger, the Unilab Board had elected not to exercise a prepayment option on a $ 14 million note held by Oaktree, which was convertible into Unilab stock, allegedly giving Oaktree a windfall and gaining Oaktree's support [*5] for the buyout as a result.

3. The proxy stated that the $ 5.85 buy out price was supported by earnings estimates of research analysts, when, in fact, there was only one research analyst who covered Unilab, and it was not disclosed that Unilab had urged that analyst to reduce her earnings estimates.

4. The proxy did not disclose that the financial projections that were included in the proxy were not the ones used by BT Alex.Brown in rendering its fairness opinion to the Board, and that using the same projections would have yielded an implied range of values that were $ 1.95 higher than the range of values presented to the Board.

5. The proxy stated that the company had engaged in an extensive auction process, which ensured that the buyout price was fair. Plaintiffs allege that this statement was false and misleading because it failed to state that in addition to its role as financial advisor to Unilab, BT Alex.Brown had agreed to provide financing to six of the nine parties that initially indicated interest in purchasing Unilab, to two of the final three bidders, and to Kelso, with whom Unilab negotiated exclusively in May 1999. Kelso, the ultimate purchaser, also agreed [*6] to permit BT Alex.Brown to purchase a 1% interest in the new company Consequently, according to Plaintiffs, BT Alex.Brown was on both sides of the negotiations. In addition, while the proxy stated that the Board had created a special committee to oversee the negotiations, the negotiations were actually left to BT Alex.Brown, which allegedly had motivation to keep the price as low as possible and to ensure that Kelso was the winning bidder.

6. The proxy statement included a fairness opinion prepared by BT Alex.Brown, and stated that in reaching its opinion, BT Alex.Brown relied upon data prepared by management *and* publicly available research analysts' estimates, when the estimated financial data upon which BT Alex.Brown relied actually was prepared by Unilab alone and did not include projections of benefits from Unilab's recent Meris and Bio-Cypher acquisitions.

7. The Unilab net income figure for the last twelve months that was included in the proxy allegedly was understated because it did not include the benefit of Unilab's net operating loss carry forwards.

8. BT Alex.Brown allegedly did not use appropriate discount rates in the proxy, making the "discounted [*7] cash flow analysis" materially false and misleading. Moreover, the inclusion of "Projections" and the descrip-

Case 1:07-cv-09633-LBS-DFE    Document 57-7    Filed 07/21/2008    Page 4 of 12

Page 3

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

tion of a discounted cash flow analysis made it appear that BT Alex.Brown had discounted the projections in arriving at its range of fairness, when, it is alleged, it had not.

The supplemental proxy disclosed BT Alex.Brown's compensation from Unilab and Kelso, BT Alex.Brown's intent to make an equity investment in UC Acquisition Sub, and the failure to include net operating loss carry-forwards in BT Alex.Brown's discounted cash flow analysis, but it did not correct the alleged misrepresentations and omissions regarding the auction process, the fairness opinion, the failure to use appropriate discount rates, the failure to include the benefits of the Meris and BioCypher acquisitions in the cash flow figures, the true reason why EOS and Pequot would retain their shares after the merger, the fact that only one analyst followed Unilab and that Unilab employees had urged her to reduce her price projections for the company, and the benefit realized by Oakland due to Unilab's failure to prepay its note.

*Section 14(a)* Claims

A motion to dismiss is directed to the sufficiency [*8] of the Complaint, and, for purposes of the motion, all of the material allegations of the Complaint are assumed to be true, and are viewed in the light most favorable to the plaintiff. *Jenkins v. McKeithen, 395 U.S. 411, 423, 89 S. Ct. 1843, 1849, 23 L. Ed. 2d 404 (1969)*; *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999)*. The motion may be granted only if it appears beyond doubt that plaintiffs can prove no set of facts that would entitle them to relief. *Minzer v. Keegan, 218 F.3d 144, 148 (2d Cir. 2000)*, cert. denied, *531 U.S. 1192, 149 L. Ed. 2d 106, 121 S. Ct. 1190 (2001)*.

*The Private Securities Litigation Reform Act of 1995* ("PSLRA") dictates the pleading standards for Plaintiffs' claim under 14(a) of the Securities Exchange Act and Rule 14a-9. The PSLRA requires that the complaint specify each statement that is alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made upon information and belief, all facts with particularity upon which that belief is formed. *15 U.S.C. 78u-4* [*9] *(b)(1)*. In addition, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. 78u-4(b)(2)*. The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." *In re: Champion, 145 F. Supp. 2d 871, 877 (E.D. Mich. 2001)*(citing *Helwig v. Vencor, 251 F.3d 540, 553 (6th Cir. 2001)*, cert. denied, *536 U.S. 935, 153 L. Ed. 2d 800, 122 S. Ct. 2616 (2002)*). However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. *Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.)*, cert. denied, *531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000)*.

*Rule 14a-9* provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits [*10] to state any material fact necessary in order to make the statements therein not false or misleading.

*17 C.F.R. 240.14a-9(a)*.

Thus, plaintiffs must show that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384-85, 90 S. Ct. 616, 621-22, 24 L. Ed. 2d 593 (1970)*.

Materiality

A plaintiff who charges that a statement or omission is materially false must show:

> a substantial likelihood that, under the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact [or correction of the misstated fact] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)*. [*11]

In the context of a merger, an omitted or misstated fact "is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."*Id.*

On a motion to dismiss pursuant to *Rule 12(b)*, the Court may dismiss for lack of materiality only if the facts

Case 1:07-cv-09633-LBS-DFE   Document 57-7   Filed 07/21/2008   Page 5 of 12

Page 4

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

that are alleged to have been omitted or misleading are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *In re: MCI World Com, Inc. Securities Litigation, 93 F. Supp. 2d 276, 282 (E.D.N.Y. 2000)*. On the other hand, proxy materials need not be perfect. They need only convey a sufficiently accurate picture so as not to mislead.*Id.*; *Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 (2d Cir. 1978)*("Nit-picking should not become the name of the game.").

State of Mind

Although the Supreme Court has reserved decision on whether **scienter** is necessary for liability under *14(a)*, *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1091 n.5, 111 S. Ct. 2749, 2757 n. 5, 115 L. Ed. 2d 929*, the lower courts generally [*12] have held that the plaintiffs need prove only negligence when seeking to impose liability under that section and *Rule 14a-9*. In *Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1298-1301 (2d Cir. 1973)*, the Second Circuit held that with respect to a corporate defendant, plaintiffs who "represent the very class who were asked to approve a merger on the basis of a misleading proxy statement and are seeking compensation from the beneficiary who is responsible for the preparation of the statement . . . are not required to establish any evil motive or even reckless disregard of the facts." *Id., 478 F.2d at 1300*. [2] Numerous other courts have held that the negligence standard also applies to 14(a) claims against individual defendants. See, e.g., *Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 778 (3rd Cir. 1976)*; *In re: Trump Hotels Shareholder Derivative Litigation, 2000 U.S. Dist. LEXIS 13550, Nos. 96 Civ. 7820, 96 Civ. 8527, 2000 WL 1371317, *12 (S.D.N.Y. Sept. 21, 2000)*; *In re: Reliance Securities Litigation, 135 F. Supp. 2d 480, 511 (D. Del. 2001)*("In enforcing that standard, courts should apply the standard of due [*13] diligence rather than the standard of actual knowledge or gross negligence."); *In re: McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1263 (N.D. Cal. 2000)*; *Lichtenberg v. Besicorp Group, Inc., 43 F. Supp. 2d 376, 384-85 (S.D.N.Y. 1999)*, app. dism., *204 F.3d 397 (2d Cir. 2000)*; *Katz v. Pels, 774 F. Supp. 121, 126 (S.D.N.Y. 1991)*("In order to establish liability under the proxy laws, it is sufficient to show that the corporate officers and directors who authorized the proxy statement negligently failed to adhere to the rules requiring full disclosure.").

   2   In that case, the Second Circuit did "not pass on the principles that govern liability of directors and other individuals having some responsibility for the statement, as distinguished from a controlling corporation which has been the beneficiary of the action that was induced." *Gerstle v. Gamble-Skogmo, 478 F.2d at 1298*.

Therefore, under the standards imposed [*14] by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence on the part of all Defendants. For this purpose, the corporation is assumed to know all that any of its agents know. *Gerstle v. Gamble-Skogmo, 478 F.2d at 1299*. However, with respect to the individual directors, the PSLRA has eliminated the "group pleading" doctrine. Therefore, Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held. *In re: Reliance, 135 F. Supp. 2d at 507*; *In re: Digital Island Securities Litigation, 223 F. Supp. 2d 546, 555 (D. Del. 2002)* (That insiders "must have known" true facts does not satisfy the relevant pleading requirements.); *In re: NAHC, Inc. Securities Litigation, No. 004020, 2001 U.S. Dist. LEXIS 16754, *64 (E.D. Pa. Oct. 17, 2001)*(Under the PSLRA pleading requirements, general statements that a defendant must have been aware that statements were false by virtue of his position within the company are inadequate.). Moreover, where plaintiffs contend that the defendants had access to facts contrary to those stated in the [*15] proxy materials, they must specifically identify the reports or statements containing this information. *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)*, cert. denied, *531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000)*.

Statements of Opinion

Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege "with particularity" "provable facts" to demonstrate that the statement of opinion is both objectively and subjectively false. *Virginia Bankshares v. Sandberg, 501 U.S. 1083, 1093-98, 111 S. Ct. 2749, 2758-60, 115 L. Ed. 2d 929 (1991)*. Thus, the plaintiff must show both that the directors did not actually hold the belief or opinion stated, *and* that the opinion stated was in fact incorrect. *Id. at 2760* ("To recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize 14(a) litigation confined solely to what one skeptical court spoke of as the 'impurities' of a director's 'unclean heart.'"); *In re: Reliance Securities Litigation, 135 F. Supp. 2d 480, 514-15 (D. Del. 2001)* [*16] ("Disbelief or undisclosed motivation alone does not satisfy the element of fact that must be established under 14(a)")(quoting *Freedman v. Value Health, Inc., 958 F. Supp. 745, 752 (D. Conn. 1997)*); *In re: McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1260, 1265 (N.D. Cal. 2000)*("While material statements of fact are false if they are contradicted by true facts, material statements of opinion are false only if the opinion

Case 1:07-cv-09633-LBS-DFE    Document 57-7    Filed 07/21/2008    Page 6 of 12

Page 5
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

was not sincerely held."; "Plaintiff must plead with particularity why the statement of opinion was objectively and subjectively false.").

The Motions to Dismiss

Plaintiffs' claims fail to meet the demanding pleading standards set out by the PSLRA and in the cases. An examination of the proxy and supplemental proxy reveals that although the disclosure with respect to the merger may not have been perfect, the "total mix" of information provided was complete and accurate enough to allow a shareholder to make an informed decision. Moreover, absent impermissible speculation and extensive extrapolation as to defendants' purposes and motives, plaintiffs have not set out sufficient facts to support the conclusion [*17] that the proxy and supplemental proxy contained statements that were false and misleading.

For example, Plaintiffs allege that it was not disclosed that the real reason why the Pequot Scott Fund and EOS Partners were allowed to retain 25% and 43% of their shares, respectively, in the merger, was to buy their votes in favor of the merger after they expressed dissatisfaction with the price. However, in the proxy statement, it is stated that:

> although they would continue to have the opportunity to participate in any potential improvements of Unilab's business following the merger, the institutional stockholders of Unilab and members of Unilab's management in either case designated by UC Acquisition Sub and who agree to retain shares in the merger would, by that agreement, enable all other common stockholders to receive cash for all of their shares and ensure that the merger be accounted for as a recapitalization.

The supplemental proxy elaborated further, identifying EOS Partners and Pequot Scott as the two institutional investors that would retain shares after the merger, stated the number of shares that each would retain, and stated that Mr. Weavil would retain a small [*18] percentage of his shares. Thus, the proxy does acknowledge that retaining Unilab shares would allow the institutional investors to participate in future improvements in the business. In fact, the proxy makes no other statement regarding the funds' reasons or motivation for retaining a portion of their shares. It simply does not say, or imply, that the funds agreed to retain shares in the company *in order to* benefit the other shareholders. Furthermore, Plaintiffs have done no more than speculate as to the "real motive" that they allege, and they do not explain why the Funds would agree to sell the majority of their shares at an inadequate price in return for the "opportunity" to keep fewer than half of their shares as compensation, given that the significant number of shares that they owned would have given them a fair chance of defeating the merger, had they sought to oppose it. [3] Nor have Plaintiffs shown that the statement that the institutional shareholders' willingness to retain some of their shares would allow the company to purchase all of the public shareholders' tendered shares and account for the transaction as a recapitalization was, in fact, false.

   3  There was testimony during discovery that Pequot was "disappointed" by the merger price, but no evidence has been cited to support the claim that EOS Partners held the same view.

[*19] Plaintiffs also allege that the statement that the $ 5.85 buyout price was supported by the earnings estimates of independent research analysts (plural) was false and misleading because there was, in fact, only one analyst who covered Unilab stock, and Unilab employees had urged that analyst to reduce her estimates. Assuming it is true that there was only one analyst, [4] this distinction is *de minimus* - and not a fact that would so alter the total mix of available information that it might change the vote of a reasonable shareholder. Plaintiffs also have not pled facts to support the conclusion that simply because Unilab employees suggested to the analyst that she reduce her earnings estimates, either that her original estimates were not overly optimistic or that her judgment was so overborne that her estimates could no longer be considered independent.

   4  Defendants argue that it was true that there were at least two analysts covering Unilab because the Stephens report on Unilab was signed by two individuals.

[*20] Plaintiffs allege that the net income figures for the last twelve months that were included in the proxy statement were understated because they did not include Unilab's net operating loss carry forwards. However, the supplemental proxy did state that net operating loss carry forwards were not factored into the discounted cash flow analysis performed by BT Alex.Brown in connection with its fairness opinion. Even if this statement addresses a slightly different issue, it would put a reasonable investor at least on inquiry notice as to the inclusion of such figures in Unilab's cash flow analyses and income figures.

Plaintiffs assert that the directors' recommendation that the shareholders vote to approve the merger was misleading because the financial projections that were included in the proxy were not the same as those used by BT Alex.Brown in rendering its fairness opinion to the Board, and using the same projections would have yielded

Case 1:07-cv-09633-LBS-DFE   Document 57-7   Filed 07/21/2008   Page 7 of 12

Page 6
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

an implied range of values $ 1.95 higher than the range of values presented to the Board. However, the fairness opinion does not set out or otherwise state what financial projections BT Alex.Brown relied on in preparing its opinion. [5] In addition, [*21] the proxy contained a "Cautionary Statement Regarding Forward-Looking Statements" that was more than a full page long. As the Court stated in *Rodman v. Grant Foundation, 608 F.2d 64, 72 (2d Cir. 1979)*, a company has no duty to include "speculative financial predictions" in a proxy.

> 5   The Fairness Opinion stated that BT Alex.Brown had "(i) reviewed the reported prices and trading activity for Unilab Common Stock, (ii) compared certain financial and stock market information for Unilab with similar information for certain other companies whose securities are publicly traded, (iii) reviewed the financial terms of certain recent business combinations which it deemed comparable in whole or in part, (iv) reviewed the terms of a draft of the Merger Agreement dated May 24, 1999, and (v) performed such other studies and analyses and considered such other factors as it deemed appropriate."

Therefore, if anything, Plaintiffs' allegations regarding BT Alex.Brown's financial analyses would tend to support [*22] a claim that the Board was misled by BT Alex.Brown, not that the Board misled the public shareholders. Furthermore, if it is true that the proxy statement contained projections that yielded a higher range of values than those presented to the Board, the shareholders were, in fact, given the information from which they could have concluded for themselves that the merger price was not adequate. That is all that 14(a) requires.

The plaintiffs allege that BT Alex.Brown did not use appropriate discount rates, making the discounted cash flow analysis contained in the "Projections" section of the proxy materially false and misleading. It is clearly stated, however, in that section, that the projections were prepared for the company's internal purposes, and are included in the proxy only because they were furnished to UC Acquisition Sub and Kelso in connection with the negotiation of the Merger Agreement. [6] It stated further that

> It is not possible to predict whether the assumptions made in preparing the projected financial information will be valid, and actual results may prove to be materially higher or lower than those contained in the projections. The inclusion of this information [*23] should not be regarded as an indication that the Company, UC Acquisition Sub or anyone else who received this information considered it a reliable predictor of future events, and this information should not be relied on as such. None of the Company, UC Acquisition Sub or any of their respective representatives assumes any responsibility for the validity, reasonableness, or completeness of the projected financial information, and the Company has made no representation to UC Acquisition Sub regarding such information.

Thus, absent a showing that BT Alex.Brown knowingly used

inappropriate rates in order to mislead the shareholders, or incompetently did so, and that the Board was negligent in its failure to discover this lack of care, this allegation cannot support a claim under 14(a).

> 6   There is no allegation that this statement is untrue.

Plaintiffs allege that the fairness opinion prepared by BT Alex.Brown and attached to the proxy statement falsely stated that BT Alex.Brown had relied on estimated [*24] financial data from management and publicly available research analysts' estimates, when, in fact, the data was prepared by Unilab alone, and did not include benefits from the recent acquisitions of Meris and Bio-Cypher. However, the fairness opinion states that:

> in arriving at its opinion, BT Alex.Brown has reviewed certain publicly available financial and other information concerning Unilab and certain internal analyses and other information furnished to or discussed with it by Unilab and its advisors. BT Alex.Brown has also held discussions with members of the senior management of Unilab and Kelso regarding the business and prospects of Unilab.

Proxy at B-1.

Nowhere in this statement, nor in the rest of the paragraph detailing analyses and reviews conducted by BT Alex.Brown, is there mention of research analysts' estimates. The statements to which Plaintiffs object are located on page 22 of the proxy in the sections titled, "Analysis of Selected Public Companies" and "Analysis of Selected Precedent Transactions." Plaintiffs do not state on what information they base the allegation that BT Alex.Brown did not look at analysts' reports, but assuming that to be [*25] true, it is a *de minimus* misstatement,

Case 1:07-cv-09633-LBS-DFE   Document 57-7   Filed 07/21/2008   Page 8 of 12

Page 7
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

which would not have affected a reasonable shareholder's vote with respect to the merger, especially in light of the statement that

> The above summary is not a complete description of the opinion of BT Alex.Brown to the Board of Directors or the financial analyses performed and factors considered by BT Alex.Brown in connection with its opinion. The preparation of a fairness opinion is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analyses and the application of those methods to the particular circumstances and, therefore, a fairness opinion is not readily susceptible to summary description. BT Alex.Brown did not form a conclusion as to whether any single factor or analysis, considered in isolation, supported or did not support an opinion as to fairness from a financial point of view. Rather, BT Alex.Brown believed that the totality of the factors considered and analyses performed by it in connection with its opinion operated collectively to support its determination as to the fairness of the Common Stock Merger Consideration from a financial point of view. [*26] Accordingly, BT Alex.Brown believes that its analyses and the summary above must be considered as a whole and that selecting portions of its analyses and factors or focusing on information presented in tabular format, without considering all analyses and factors or the narrative description of the analyses, could create a misleading or incomplete view of the processes underlying BT Alex.Brown's analyses and opinion.

Proxy at 24. [7]

[7] If Plaintiffs' complaint is that there was only one analyst who covered Unilab, that misstatement (if it actually is a misstatement, given that the Stephens report is signed by two analysts), it cannot be found, as stated previously, that such a discrepancy would affect the vote of a reasonable shareholder with respect to the merger. To allow this action to continue on the basis of discrepancies of this type would violate the direction that "nitpicking should not become the name of the game." *Kennecott Copper Corp. v. Curtiss Wright Corp., 584 F.2d 1195, 1200 (2d Cir. 1978)*.

[*27] Furthermore, Plaintiffs present no reason to doubt that BT Alex.Brown "reviewed certain publicly available financial and other information concerning Unilab," including Unilab's public SEC filings, which are themselves incorporated by reference into the proxy statement. In addition, the proxy stated that the "Company's management believed that the Meris acquisition offered a strong opportunity for the Company." (Proxy at 15). The proxy also referenced both the Meris and the Bio-Cypher transactions in the Note on page 11, which stated that the variation in year-to-year financial results were primarily due to the acquisition of Bio-Cypher Laboratories on May 6, 1999, and of Meris on November 5, 1998.

Some of Plaintiffs' other claims of failure to disclose cannot support a cause of action pursuant to 14(a) because they are actually claims of breach of fiduciary duty or corporate waste. [8] For example, Plaintiffs claim that the Board failed to disclose that it had declined to exercise a prepayment option on a $ 14 million note held by Oaktree, which was convertible into Unilab stock, in order to give Oaktree additional consideration for its shares and gain Oaktree's support for the [*28] buyout. While apparently pled in order to demonstrate that Oaktree realized that the merger price was unsatisfactory and that the Defendants had to use such a device to secure Oaktree's vote in favor of the merger, there is nothing in the Complaint to support Plaintiffs' conclusion that the failure to prepay the note was a way of giving Oaktree additional consideration for its shares and thereby buying Oaktree's vote. Absent that speculative and conclusory extrapolation, all that is alleged is that the Unilab Board's treatment of the Oaktree note violated the duty to protect corporate assets for the benefit of all of the shareholders.

[8] Since the waste of corporate assets affects all shareholders equally, it is a derivative claim, which is extinguished upon completion of a merger. *Behrens v. Aerial Communications, Inc., Civil Action No. 17436, 2001 Del. Ch. LEXIS 80, *19 (Del. Ch. May 18, 2001)*, revised, *2001 Del. Ch. LEXIS 80 (Del. Ch. May 22, 2001)*.

The breach of such a fiduciary [*29] duty does not give rise to a securities law claim, however. *Section 14(a)* and *Rule 14a-9* relate only to disclosure obligations. They do not give rise to a cause of action for breach of fiduciary duty, and do not give Plaintiffs a right to an advantageous price, or even a fair price for their shares. *Minzer v. Keegan, 218 F.3d 144, 151 (2d Cir. 2000)*, cert. denied, *531 U.S. 1192, 149 L. Ed. 2d 106, 121 S. Ct. 1190 (2001)*(There is no 14(a) violation for merely failing to

Case 1:07-cv-09633-LBS-DFE    Document 57-7    Filed 07/21/2008    Page 9 of 12

Page 8
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders.); *Mendell v. Greenberg, 938 F.2d 1528, 1529 (2d Cir. 1991)*("Securities laws do not guarantee sound business practices and do not protect investors against reverses."); see *In re: PHLCORP Securities Tender Offer Litigation, 700 F. Supp. 1265, 1269 (S.D.N.Y. 1988)*(stating, in the context of a 14(e) case, that as long as the relevant underlying facts are disclosed, the securities laws do not require insiders to characterize conflict of interest transactions with pejorative nouns or adjectives)(citing *Goldberg v. Meridor, 567 F.2d 209, 218 n. 8 (2d Cir. 1977)*, [*30] cert. denied, *434 U.S. 1069, 55 L. Ed. 2d 771, 98 S. Ct. 1249 (1978))*.

Furthermore, claims based on Defendants' failure to disclose past acts that may have negatively impacted the value of Plaintiffs' shares do not state a cause of action pursuant to 14(a) because knowledge of those facts, which would tend to support a conclusion that the corporation was worth *less* than the value attributed to it by the market, would not have influenced a reasonable shareholder to decline to sell his or her shares and reject the merger. *Minzer v. Keegan, 218 F.3d at 149*; *In re: McKesson HBOC, Inc. Securities Litigation, 126 F. Supp. 2d 1248, 1260 (N.D. Cal. 2000)*.

Plaintiffs' claims relating to the statements regarding the auction process through which Unilab found a buyer for the company are somewhat similar in that they have more weight as complaints about the way the Board conducted the process, than about the disclosure related to that process. Plaintiffs allege that the statement that the auction process ensured that the buyout price was fair was false and misleading because it did not reveal either the full extent of BT Alex.Brown's [*31] role throughout that process or BT Alex.Brown's alleged motivation to keep the price low and to ensure that Kelso was the ultimate purchaser, and did not reveal that the special committee appointed to supervise the final negotiations with Kelso allegedly abdicated its responsibilities and left those negotiations entirely in BT Alex.Brown's hands.

However, an examination of the proxy statement and supplemental proxy reveals that the disclosure on these subjects was at least adequate to place a reasonable shareholder on inquiry notice as to the relevant facts. The original proxy stated that BT Alex.Brown had acted as a financial advisor to Unilab in connection with the merger and would receive a fee for its services, "a significant portion of which is contingent upon the consummation of the merger," that BT Alex.Brown would be participating in the financing of the merger, and that it had provided financial services to both Unilab and Kelso in the past. The supplemental proxy added more specific information about BT Alex.Brown's role in the financing of the merger, and stated that an affiliate of BT Alex.Brown would act as "lead arranger, book manager, administrative agent and a lender [*32] under Unilab's new credit facility," and as a deal manager for Unilab's repurchase of its outstanding notes, and it set forth the fees that BT Alex.Brown would receive for those services. It also stated that BT Alex.Brown and Kelso anticipated that an affiliate of BT Alex.Brown would make an approximately $ 2 to $ 3 million investment in UC Acquisition Sub. Plaintiffs have presented no facts beyond those set forth in the proxy and supplemental proxy with respect to BT Alex.Brown's role to support their contention that BT Alex.Brown was motivated to keep the price to be paid for the shares as low as possible, [9] and to ensure that Kelso was the ultimate purchaser.

> 9   The proxy states that upon completion of the merger, BT Alex.Brown would receive an aggregate financial advisory fee equal to 1% of the aggregate consideration paid, a fact that would make it in BT Alex.Brown's interest to negotiate a higher share price. On the other hand, BT Alex.Brown's role as an equity investor in the new company, which is disclosed in the supplemental proxy, creates an interest in a lower price. Regardless of what BT Alex.Brown's motivations may have been in this regard, its multiple roles were disclosed to the Unilab shareholders.

[*33] According to Plaintiffs, the strongest evidence that the disclosure in the proxy materials was misleading is the fact that eighteen months later, UC Acquisition Sub shares sold for as much as $ 17.15 (or 300%) more than the price paid in the merger, even though the stock market fell generally over that period of time. Defendants respond that this argument constitutes an impermissible attempt to plead fraud by hindsight. "Allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.)*, cert. denied, *531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000)*. See also *In re: NAHC, Inc. Securities Litigation, No. 00-4020, 2001 U.S. Dist. LEXIS 16754, *34 (E.D. Pa. Oct. 17, 2001)*, aff'd, *306 F.3d 1314 (3rd Cir. 2002)*("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events."). The mere fact that the shares increased in value over the eighteen months subsequent [*34] to the merger does not, in itself, constitute any evidence of a securities law violation.

Furthermore, Defendants indicated in the proxy statement that they believed that Unilab stock was worth more than its current market price. The proxy stated, "Notwithstanding the significantly improved financial

Case 1:07-cv-09633-LBS-DFE    Document 57-7    Filed 07/21/2008    Page 10 of 12

Page 9

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

performance, the Company's stock price was essentially flat. As a result, the Company believes its historical stock market price has not fully reflected the Company's true value." (Proxy at 15). In fact, it is stated that this was a major reason for seeking a purchaser for the company. In addition, the section titled "Historical and Recent Market Prices Compared to Consideration to be Received by Holders of Common Stock" showed that over the 2-1/2 to 3 months prior to the issuance of the proxy statement, the price of Unilab shares had risen markedly (Proxy at 18), and the "Premiums Analysis" in the proxy showed that the premium implied in the merger had decreased from 122.9% in March 1999, to 53.4% in April, to 18.5% on the day prior to the public announcement of the merger. (Proxy at 23). For the reasons stated, none of the misstatements or omissions alleged by Plaintiffs can pass the [*35] materiality test of 14(a). Moreover, even if one or more of the alleged misstatements or omissions were actually false and misleading, and could, in fact, have altered the "total mix" of available information in a way that might have caused a reasonable shareholder to withhold his or her vote for the merger, Plaintiffs have not shown that the directors were negligent in their failure to disclose that information in the proxy materials. Given that knowledge cannot be attributed to directors simply by virtue of their positions, it is difficult to imagine that the directors knew or should have known of the alleged flaws in the financial analyses, which allegedly were so hidden that Plaintiffs' counsel, who engaged in exacting scrutiny and began confirmatory discovery prior to the approval of the merger, and who are experts in this field, were satisfied with the supplemental proxy. In fact, Plaintiffs allege that due to BT Alex.Brown's overreaching, the directors were affirmatively misled by BT Alex.Brown. In addition, they claim that despite diligent inquiry, they themselves were not able to discover the true facts until November 1, 2000. Thus, Plaintiffs present no support either [*36] for the proposition that the directors did not believe that the price paid for the shares in the merger was fair from a financial point of view, and that it was in the best interests of the shareholders generally, or that they were negligent in not discovering that their belief was incorrect.

In this regard, it is extremely significant that all of the defendant directors sold all or most of their Unilab shares for the same $ 5.85 buyout price that was paid to the public shareholders. The one exception was defendant Weavil, who retained less than 6% of his shares (85,000 out of total holdings of 1,487,428 shares). As the Second Circuit stated in *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)*, we must "assume the [director] defendant[s are] acting in [their] informed economic self-interest." See also *Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001)*("Where plaintiff's view of the facts defies economic reason, . . . it does not yield a reasonable inference of fraudulent intent."; achieving a superior merger would have benefitted all shareholders, including defendants). Thus, achieving a higher price for the shares would [*37] have benefitted the directors, and particularly defendant Weavil, whose holdings were substantial.

Plaintiffs attempt to overcome this presumption by arguing that because the outside directors were allowed to purchase their shares cheaply, they could make a profit even at a low price, and therefore they had no motivation to ensure that the shareholders receive the highest price possible. This, however, does not negate these directors' self-interest in achieving a higher price for their shares. Since it is very common for directors and officers of a company to be given the opportunity to purchase shares at below market prices, acceptance of Plaintiffs' theory in this regard, without a further factual showing, would raise suspicion about directors' and officers' "conflicts" in any case where directors and officers have been given such opportunities. Furthermore, the proxy contains full disclosure as to the exercise prices of the directors' options. (Proxy at 47). *Section 20(a)* Control Person Liability

In order to maintain a cause of action for control person liability under 20(a), *15 U.S.C. 78t(a)*, plaintiffs must establish: (1) an underlying violation [*38] by a control person or entity; (2) that the defendants are controlling persons; and (3) that the defendants were in some meaningful sense culpable participants in the fraud. *In re: Digital Island Secs. Litigation, 223 F. Supp. 2d 546, 560 (D. Del. 2002)*. Since the Complaint fails to state an underlying violation of 14(a), plaintiffs' claims pursuant to 20(a) must be dismissed as well. *Feasby v. Industri-Matematik Int'l Corp., 2000 U.S. Dist. LEXIS 9792, No. 99 Civ. 8761, 2000 WL 977673, *7 (S.D.N.Y. July 17, 2000)*; *Ellison v. American Image Motor Co., 36 F. Supp. 2d 628, 641 (S.D.N.Y. 1999)*. This being the case, there is no need to determine whether the defendant directors were controlling persons within the meaning of the securities laws and whether they were culpable participants in an underlying securities violation.

State law claims

Plaintiffs have alleged state law claims of breach of fiduciary duty against the directors, and of fraud and deceit against the directors and Unilab. Since jurisdiction over these claims is asserted solely on the basis of the Court's supplemental jurisdiction pursuant to *28 U.S.C. 1367*, [*39] and the court has found that the securities law claims over which it has original jurisdiction should be dismissed, there is no reason or basis upon which to retain supplemental jurisdiction over the state law claims. *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)*; *Leyh v. Property Clerk of City of New York Police Dep't, 774 F. Supp. 742,*

Case 1:07-cv-09633-LBS-DFE   Document 57-7   Filed 07/21/2008   Page 11 of 12

Page 10

2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

747 (E.D.N.Y. 1991). Therefore, Plaintiffs' state law claims shall be dismissed as well.

Claims Against BT Alex.Brown

Plaintiffs added BT Alex.Brown as a defendant in this action in an Amended Complaint filed in September 2001. They asserted claims against BT Alex.Brown under 14(a), for aiding and abetting the directors' breach of their fiduciary duties, fraud and deceit, and negligent misrepresentation. BT Alex.Brown contends that the 14(a) claim should be dismissed because it did not participate in the solicitation of proxies and there was no substantial connection between the use of BT Alex.Brown's name and the solicitation effort, see *Lazzaro v. Manber, 701 F. Supp. 353, 367 (E.D.N.Y. 1988)*, and because the claims are time-barred. [*40] The statute of limitations applicable to the 14(a) claims is one year from discovery or three years from the occurrence that gives rise to the Complaint, whichever is less. *Ceres Partners v. GEL Associates, 918 F.2d 349, 362-63 (2d Cir. 1990)*. Although the original Complaint was filed in this action in November 1999, Plaintiffs did not name BT Alex.Brown as a defendant until nearly two years later. BT Alex.Brown contends that Plaintiffs were on inquiry notice as to its role in the merger as of November 1999, causing the one year limitations period to begin to run. Plaintiffs argue that they did not learn the true facts of BT Alex.Brown's involvement until they took BT Alex.Brown's deposition in November 2000, and that therefore the limitations period should not expire until November 2001.

In *LC Capital Partners v. Frontier Ins. Group, 318 F.3d 148 (2d Cir. 2003)*, the Second Circuit stated:

> The one-year limitations period applicable to discovery of the violation begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action *or notice of the facts, which in the exercise of reasonable diligence, would* [*41] *have led to actual knowledge*."

*318 F.3d at 154* (citing *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir.)*, cert. denied, *506 U.S. 986, 121 L. Ed. 2d 432, 113 S. Ct. 494 (1992))*(emphasis in original).

In LC Capital Partners, the Court elaborated:
> As we have explained, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." "Such circumstances are often analogized to 'storm warnings.'"
>
> The duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the investor undertakes some inquiry. If the investor makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose. However, if the investor makes some inquiry once the duty arises, we will impute knowledge of what an investor "in the exercise of reasonable diligence, should have discovered" concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud.

*Id.* (citations omitted).

In [*42] this case, Plaintiffs claim that because they began to make inquiry immediately upon issuance of the proxy, in late October/early November 1999, knowledge of BT Alex.Brown's role should not be imputed until they actually learned all the facts in November 2000. This argument is unconvincing, however. *LC Capital Partners* holds that the running of the statute of limitations against a plaintiff who has attempted to make an inquiry and learn the facts will be delayed as compared to the application of the statute in a situation to a plaintiff who simply sat back and made no such attempt. However, this does not mean that a plaintiff can move that inquiry along slowly, limited only by the otherwise applicable three year maximum limitations period. Thus, the Second Circuit clearly referred to the point at which, "in the exercise of reasonable diligence, [the plaintiff] should have discovered" the facts of the alleged fraud as the point at which the statute of limitations begins to run against a plaintiff who makes an inquiry. A minimal or lackadaisical investigation will not serve to extend the statute of limitations until the plaintiff actually learns facts that could have been discovered [*43] much earlier had a diligent investigation taken place.

In this case, given that at least the basics of BT Alex.Brown's role as a key player on both sides of the merger was disclosed in the October 26, 1999 proxy statement, and elaborated in the supplemental proxy dated November 15, 1999, it is incomprehensible how Plaintiffs can claim that they were not sufficiently aware of BT Alex.Brown's involvement in this transaction to name it as a defendant in this action prior to its deposition in No-

Case 1:07-cv-09633-LBS-DFE   Document 57-7   Filed 07/21/2008   Page 12 of 12

Page 11
2003 U.S. Dist. LEXIS 7838, *; Fed. Sec. L. Rep. (CCH) P92,418

vember 2000. Nor is it understandable how Plaintiffs can claim that they engaged in a diligent inquiry yet did not obtain the testimony of a BT Alex.Brown representative until a full year after the merger took place. Accordingly, the statute of limitations has run on Plaintiffs' 14(a) claims against BT Alex.Brown, and those claims will be dismissed.

State Law Claims Against BT Alex.Brown

Since jurisdiction over the state law claims against BT Alex.Brown is founded on the Court's supplemental jurisdiction pursuant to *28 U.S.C. 1367*, and the securities law claims against BT Alex.Brown are being dismissed, the state law claims against BT Alex.Brown shall be [*44] dismissed as well. See *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966)*.

Conclusion

For the foregoing reasons, the securities claims asserted against Unilab and the director defendants in the Third Amended Complaint are dismissed pursuant to *Fed. R. Civ. P. Rules 12(b)(6) and 9(b)*, and 21D(b) of the *Securities Exchange Act for* failure to state a cause of action. The securities claims against BT Alex.Brown are dismissed as time-barred. Upon dismissal of all of the federal claims asserted in the Third Amended Complaint, the state law claims are dismissed as well.

**SO ORDERED.**

Dated: New York, New York

May 9, 2003

JOHN S. MARTIN, JR.

U. S. D. J.