# TAB 9

LEXSEE 2003 U.S. DIST. LEXIS 21319

IN RE DUANE READE INC SECURITIES LITIGATION

02 Civ. 6478(NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2003 U.S. Dist. LEXIS 21319

November 24, 2003, Decided
November 25, 2003, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint granted in its entirety.

**COUNSEL:** For Plaintiffs: Jacob A. Goldberg, Schiffrin & Barroway, LLP.

For Plaintiffs: Andrew L. Zivitz, Bernstein Liebhard & Lifshitz, LLP, Bala Cynwyd, Pennsylvania.

For Plaintiffs: Mel E. Lifshitz, Gregory Egleston, New York, NY.

For Defendants: Kenneth M. Kramer, Shearman & Sterling.

For Defendants: Tai H. Park, Adam S. Hakki, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

   **MEMORANDUM AND ORDER**

   **NAOMI REICE BUCHWALD**

   **UNITED STATES DISTRICT JUDGE**

   This is a class action against Duane Reade, Inc. ("Duane Reade" or the "Company") and three of its executives: (1) Chairman of the Board of Directors and Chief Executive Officer, Anthony Cuti ("Cuti"); (2) Senior Vice President of Sales and Marketing, Gary Charboneau ("Charboneau"); and (3) Senior Vice President and Chief Financial Officer, John Henry ("Henry") (collectively, "defendants"). The class, represented by Capstone Asset Management Company, consists of parties who purchased Duane Reade's common stock between April 1, 2002 and July 24, 2002 (the [*2] "Class Period"). See Plaintiffs' Consolidated Amended Complaint ("CAC") PP 1, 6.

   Presently before this Court is defendants' motion to dismiss plaintiffs' CAC for failure to state a claim on which relief can be granted and failure to comply with applicable pleading requirements. For the reasons stated below, defendants' motion is granted in its entirety.

**THE COMPLAINT**

   1

   1   To reference the following facts, see Plaintiffs' Consolidated Amended Complaint ("CAC").

   Defendant Duane Reade, a Delaware corporation, is the largest drug store chain in the metropolitan New York City area. With over 200 stores, it offers a variety of prescription and over-the-counter drugs, as well as other health and beauty care and related items. Duane Reade is a publicly-held company whose common stock is registered with the Securities and Exchange Commission ("SEC") pursuant to the *Securities Exchange Act of 1934* (the "Exchange Act") and traded on the New York Stock Exchange ("NYSE").

   In its Earnings Conference Call [*3] for the first

quarter of fiscal 2002 (the "Conference Call"), which was held on April 25, 2002, Duane Reade released information regarding its performance in the first quarter of 2002 and made projections concerning its anticipated performance for the second quarter of the year. On the same day, defendant Cuti also participated in a televised interview regarding the information the Company had released. Thereafter, and throughout the second quarter of 2002, many of the Company's statements were republished or discussed by financial analysts and trade publications. [2]

> [2] The statements that were reiterated throughout the quarter were fundamentally consistent with those the Company released on April 25, 2002.

Plaintiffs' CAC alleges that defendants were aware during the April 2002 Conference Call of various factors which would negatively impact on their second quarter results, but that in contravention of applicable securities laws, defendants failed to disclose this information to investors. The statements and [*4] alleged omissions relevant to this lawsuit concerned revenue generated from front-end sales, costs associated with the opening of new stores and costs incurred through loss of inventory. Plaintiffs also complain about statements defendants made regarding the state of the overall New York economy.

**Front-end Sales** [3]

> [3] Duane Reade uses the term "front-end sales" to refer to sales of its non-prescription products. Duane Reade's Form 10-K, dated March 28, 2002, stated that front-end sales accounted for 60.8% of its total sales in 2001.

Plaintiffs complain about several statements and alleged omissions defendants made relating to front-end sales during the Conference Call and throughout the Class Period. They also allege that several statements defendants made regarding New York's economy misled investors with respect to Duane Reade's anticipated performance. In the April 25, 2002 Conference Call, defendant Cuti announced that the first quarter of 2002 saw an improvement in front-end sales over the final [*5] quarter of 2001, and defendant Henry predicted that for the second quarter of 2002, front-end sales would be "flat." See Memorandum in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") Ex. E. Thereafter, in a television interview on CNBC also on April 25, 2002, defendant Cuti stated, "I explained in our conference call that our front-end sales, our non-prescription sales were strengthening from January to March in a very predictable trend." CAC P 113.

Defendants also made several optimistic statements during and after the Conference Call concerning Duane Reade's operations and the New York economy in general. For example, defendant Cuti was quoted in an article published by the *Drug Store News* on April 29, 2002 as stating that, "urban expertise is clearly one of our most distinguishing features ..."). Id. at P 123. Similarly, Cuti also stated during his April 25, 2002 appearance on CNBC, "we see Manhattan and the outer boroughs getting better and better with each passing month." See id. at P 113. [4]

> [4] Similar generalized optimistic statements can be found at CAC PP 99-100 (an April 1, 2002 *Chain Drug Review* article quoting Cuti (from an address he made in February 2002) as stating that Duane Reade's "in-depth knowledge of the metro New York market enabled [it] to accurately project revenues for the [first] quarter ... and to operate [its] business by appropriately controlling costs" and that "although front-end sales have not returned to pre-disaster growth levels, we are witnessing a consistent improvement in general market conditions as the city and surrounding areas adapt to the many changes induced by the disaster"); CAC P 106 (citing Cuti's statement in the Company's April 25, 2002 press release that "we are particularly pleased with the record-breaking improvement in the rate of generic prescriptions filled during the first quarter ..."); CAC P 113 (Cuti stating on CNBC, "we believe the $ .15 a share impact for this year, which is built into our guidance, is still prudent to continue to project at that level."); CAC P 119 (an article published by the *Chain Drug Review* on April 29, 2002 quoting Cuti as stating, "we're very, very hopeful that the recession will be temporary and that the pendulum will swing even more here than elsewhere," and stating "our belief is solidifying with every passing week."); CAC P 120 (another statement taken from the *Chain Drug Review* April 29, 2002 article wherein Cuti explains the in-depth tools Duane Reade is using to try to adjust to post-September 11 changes in New York City demographics by, for example,

Case 1:07-cv-09633-LBS-DFE   Document 57-10   Filed 07/21/2008   Page 4 of 12

Page 3
2003 U.S. Dist. LEXIS 21319, *5

"stud[ying] changes in Manhattan's pedestrian and bus and subway traffic, and opening new outlets accordingly."); CAC P 127 (a *Drug Store News Article* published on May 20, 2002 quoting Cuti as stating, "the New Yorko market continues to improve steadily ... which should in turn have a positive impact on sales trends in our business."); and CAC P 130 (a *Chain Drug Review* article published June 10, 2002, stating that the recently completed $ 218 million convertible note offering will allow the Company "to significantly improve our capital structure and allow us to more readily achieve-and potentially surpass our earnings growth objectives.").

[*6] In addition to conveying Duane Reade's general sense of optimism, defendants also indicated during the April 25, 2002 Conference Call that this was still a time for caution. In the Conference Call, John Henry stated:

> If there is one area in sales that we are being somewhat conservative on, it's on front-end same store sales growth. We are looking at the economy. We are looking at what's going on in the city, and we just think it's prudent to be- continue to be somewhat cautious with regard to our guidance on the front-end comps ... We think it's in the best interest of everyone just to plan for them to be somewhat more-continue some restraint in those projections.

Def.'s Ex. E at 11. [5]

> 5      Other cautionary statements made by defendants on the topic of front-end sales include the following: (1) Also during the April 25, 2002 call, defendants stated with respect to front-end sales that there would be a "dampening in April, which will, you know, be seen if you analyze the March to April figure" and "I think it's prudent to consider the city as a slow comeback market." Def.'s Ex. E at 5, 10; (2) In a Form S-3 dated June 21, 2002, defendants stated, "we operate in a concentrated region and as a result, are highly dependent on the economic conditions of the metropolitan New York area.;" "We can make no prediction as to economic conditions in this region;" "During a downturn in New York's economic conditions, such as the current one, our revenues and profitability could be adversely affected ...." Def.'s Ex. I at 17.

[*7] Defendants released their second quarter results on July 25, 2002, reporting that front-end sales had declined 1.2% for the quarter. See id. Ex. D. Plaintiffs' CAC asserts that defendants were aware that sales of non-prescription products were trending downward at the time of the April Conference Call. See CAC P 8. They allege that Duane Reade's predictions regarding both its own upcoming performance, and that of the overall economy, were overstated and dishonest, and thus, in violation of federal securities laws. See id.

**New Store Openings**

During the Conference Call, defendants stated that the Company would continue to pursue a strategy of expansion. See Defs.' Mem. Ex. E. Specifically, they announced that they opened ten new stores during the first quarter and planned to open at least nine more during the second quarter in order to progress toward their goal of opening thirty-five new stores in 2002. See id. Defendant Cuti stated during the Conference Call that the Company was expecting to spend $ 400,000 on new store opening costs during the second quarter. However, defendants had previously advised investors in their Form 10-K dated March 15, 2002, that, [*8] "[a] number of factors could cause our actual results performance, achievements or industry results to be materially different from any future results expressed or implied in forward-looking statements [including] changes in our acquisition and capital expenditure plans ...." Defs.' Mem. Ex. A at 10. They further explained, "our capital requirements primarily result from opening and stocking new stores." Id. at 19.

The second quarter saw more openings than predicted and at a greater cost for fewer openings than predicted. On July 25, 2002, the Company reported that it had received $ 9.4 million during the second quarter in connection with a business interruption insurance claim relating to September 11, 2001. It further announced that in May and June, it implemented a "business building program," devoting over half the funds it had received to the program. This business building program included vendor promotions and the opening of additional stores during the second quarter. See id. Ex. O at 2, 3. The Company reported that the insurance proceeds allowed it

to open five more stores in the second quarter than originally anticipated and that the Company spent $ 1.5 million [*9] on new store opening costs rather than the $ 400,000 originally projected in April. See id.

Plaintiffs claim that defendants were aware in April 2002 that new store opening costs would be higher than the amount predicted in the Conference Call and that they should have disclosed this information, but knowingly failed to do so in contravention of applicable securities laws. See CAC P 9.

**Shrink**

The term "shrink" refers to theft and vendor errors that result in reduced inventory. Defendant Henry updated the public on Duane Reade's shrink statistics during the April 2002 Conference Call, stating that shrink results for the first quarter were as the Company had anticipated and that the programs Duane Reade had implemented to reduce shrink were beginning to appear fruitful. See Defs.' Mem. Ex. E. Nonetheless, despite these observations regarding shrink levels in the second half of the year, Henry stated that he was not yet prepared to make any specific predictions with respect to shrink. See id. Additionally, defendants' warned investors that an error of even one percent in Duane Reade's estimate concerning shrink could significantly impact the accuracy of its [*10] predictions for its over all earnings. [6] See id.

> 6   Duane Reade's Form 10-K dated March 15, 2002 states that "we take front-end physical inventories in each of our stores and the distribution center twice per year ... shrink estimates are based on the latest chain-wide trends. At December 29, 2001, and understatement of this shrink estimate by 1.0% of front-end sales would result in a reduction of current year pre-tax earnings of approximately $ 2.0 million." Def.'s Ex. A at 22. In the April 25, 2002 conference call, defendants also stated with respect to shrink, ""I think that there is some upside in the second half of the year. However, at this stage of the game, I'm not about to reflect any of that in my guidance." Def.'s Ex. E at 8.

Plaintiffs allege that within the Class Period, defendants learned that increased shrink was reducing Company earnings and had a duty to disclose this information but that, in violation of applicable securities laws, defendants failed to do so. See CAC P 11.

[*11] **Second Quarter Results**

On July 25, 2002, Duane Reade announced its second quarter results. For the quarter, net sales increased 11.1%, due primarily to low margin pharmacy sales, but front-end sales declined 1.2% as compared to the same quarter in 2001. Additionally, Duane Reade revealed that it had incurred greater expenses than originally forecast because of increased shrink and new store opening costs. Plaintiff asserts that Duane Reade's receipt of $ 9.4 million in September 11th-related insurance proceeds was the only reason defendants were not forced to report a loss for the quarter.

After the July 25, 2002 press release, stock prices fell from $ 23.55 to $ 14.60 on a dramatically high trading volume of 5.4 million shares, as compared with an average trading volume of 321,000 shares. Plaintiffs rely on statements of former Duane Reade employees and the information that was released by defendants in July 2002 to allege that defendants failed to make disclosures in order to intentionally inflate their stock price throughout the second quarter of 2002.

**DISCUSSION**

**A. Motion to Dismiss Standard**

In considering a motion to dismiss, we accept as true all material [*12] factual allegations in the complaint. *Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001)*. We may grant the motion only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. In addition to the facts set forth in the complaint, we may also consider documents attached thereto and incorporated by reference therein, *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d. Cir. 1998)*, as well as matters of public record, *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d. Cir. 1998)*.

**B. *Section 10(b)* and *Rule 10b-5***

Defendants move to dismiss plaintiffs' claims for failure to state a claim under *Section 10(b) of the Exchange Act* or *Rule 10b-5* promulgated thereunder. Defendants assert that because the CAC neither identifies a false or misleading statement nor adequately alleges

scienter, it must be dismissed. We concur.

The [*13] broad outline of the relevant securities laws may be briefly state *Section 10(b) of the Exchange Act*, 15 U.S.C. § 78j(b), and *Rule 10b-5* promulgated thereunder, *17 C.F.R. § 240.10b-5*, prohibit fraudulent activities in connection with securities transactions. In relevant part, *§ 10(b)* provides that it is unlawful to:

> use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulation as the Commission [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j(b)* . To implement this statute, the SEC has promulgated *Rule 10b-5*, which specifies what behavior the statute forbids. That rule makes it unlawful:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ....

*17 C.F.R. § 240.10b-5*. The Second Circuit has established that to state [*14] a claim for relief under *§ 10(b)* and *Rule 10b-5*, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re IBM Corp. Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)*.

The statements that plaintiffs characterize as false and misleading are listed in plaintiffs' CAC, PP 99-137. In alleging material misstatements and omissions, plaintiffs look not only to the Conference Call, but to the entire Class Period. Plaintiffs' primary argument is that defendants were aware during the April 25, 2002 Conference Call that front-end sales were trending downward and that they thus, had a duty to disclose this information. Plaintiffs argue in the alternative that even if defendants statements were not misleading when made, they became misleading and created a duty to update when circumstances began unfolding differently than predicted. Contrary to plaintiffs' assertions, the statements they point to constitute either protected statements of opinion or [*15] accurate statements of historical fact, and as such, they are not actionable.

**1.** *Material Omissions or Misstatements*

Not all statements which in retrospect are inaccurate constitute material misstatements. A company's statements of hope, opinion, or belief about its future performance or general market conditions are not actionable under the securities laws. See *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996)*. Predictive statements of opinion and belief are not considered material for purposes of the securities laws. See *Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55, 58 (2d Cir. 1996)*. "An opinion may ... be actionable ... if it is without a basis in fact ... [or if] the speakers were aware of any facts undermining the accuracy of these statements." *In re International Business Machines Corporate Securities Litig., 163 F.3d 102, 107 (2d Cir. 1998)*. However, "to be actionable, the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention." *Greenberg v. Chrust, 282 F. Supp. 2d 112, No. 01 Civ. 10080, 2003 WL 22097883 (S.D.N.Y. Sept. 10 2003)* [*16] (quoting *Smith v. Meyers, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991)*.

Plaintiffs' claims with respect to the statements listed below are dismissible on the grounds that such statements constitute protected forward-looking opinions and inactionable puffery. An example representative of many of these statements is a remark Mr. Cuti made in the April 25, 2002 Conference Call:

> Looking to the balance of the year, we have a positive outlook and remain confident in our ability to achieve our sales and earnings targets. With respect to the second quarter, we anticipate achieving sales of approximately $ 355 million and expect diluted earnings per share will range from $ . 40-$ .44.

CAC P 106. [7] Such statements are not actionable, as "future earnings, sales goals, and [the Company's] desire to achieve continued prosperity are 'just the sort of predictive statements of opinion and belief that courts have found immaterial.'" *Lasker, 85 F.3d at 58* (citations

omitted).

> 7   Other similar statements that fall into the category of non-actionable statements of opinion can be found at CAC PP 113, 119, 120, 123, 127, 130.

[*17] Plaintiffs' argument that defendants' statements in the Conference Call were not optimistic hopes, but rather misleading statements replete with material omissions is flawed. While statements "regarding projections of future performance may be actionable under *Section 10(b)* or *Rule 10b-5* if they are worded as guarantees or are supported by specific statements of fact" *In re International Bus. Mach. Corporate Sec. Litig., 163 F.3d at 107* (citations omitted), defendants gave no guarantees when making the complained of statements. Moreover, as described more fully below, despite plaintiffs' urging to the contrary, there is no obligation to release interim sales data prior to a quarter's end. See *Fecht v. Northern Telecom Ltd. (In re Northern Telecom Ltd. Sec. Litig.), 116 F. Supp.2d 446, 459 (S.D.N.Y. 2000)* (stating that "the rule that there is no obligation to preannounce results has long been embraced by courts.") (citations omitted).

### a. *Cautionary Language*

Duane Reade's statements about its prospective performance were accompanied by cautionary language. Such [*18] language brings into play the "bespeaks caution" doctrine. Under the "bespeaks caution" doctrine, "courts have held that meaningful cautionary language can render omissions or misrepresentations immaterial." *In re Donald Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)). The Private Securities Litigation Reform Act of 1995* ("PSLRA") also provides a safe harbor exception for situations where statements have been accompanied by adequate cautionary language. See *5 U.S.C. § 77z-2(c)(1)(A)(i) (1997)* (stating that there is no liability for statements "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forwards-looking statement ..."). The only exception to this rule is that there may be liability where (1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts. See *In re Oxford Health Plans, Inc., 187 F.R.D. 133, 141 (S.D.N.Y. 1999).* [8]

> 8   Plaintiffs assert in their Reply Brief that the second exception applies here because at the time Duane Reade made certain of its alleged misstatements, "the problems investors were warned of had already come to pass." Pl.'s Reply at 20. However, the CAC does not allege any facts showing that changes in front-end sales or new store opening costs were materially impacting earnings at the time defendants made their second quarter earnings projections. Accordingly, the exception does not apply. Additionally, at the time of the Conference Call of which Plaintiffs complain, only three weeks of the quarter had yet elapsed. There is no reason to assume that Duane Reade would have had any indication that the results of the first few weeks would be indicative of the entire quarter.

[*19] The "SEC has encouraged, without requiring, registered companies to supply forward-looking information." *In re Boesky Sec. Litig., 825 F. Supp. 623, 636 (S.D.N.Y. 1993)*. A company that releases such forward-looking information will accordingly be protected from liability if the statements it makes are accompanied by cautionary language that "[is] 'too prominent and specific to be disregarded' and ... 'warns investors of exactly the risk that plaintiffs claim was not disclosed.'" *Milman v. Box Hill Sys. Corp., 72 F. Supp.2d 220, 230 (S.D.N.Y. 1999)* (citing *Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996))*.

For each of the issues about which plaintiffs complain, Duane Reade did, in fact, couch its statements with specific cautionary language. As stated above, defendants released specific cautionary statements regarding front-end sales, [9] new store opening costs [10] and inventory shrink. [11] For example, with respect to shrink, Duane Reade made clear that company-wide shrink information was gathered only twice per year and emphasized in the April 25, 2002 Conference Call that the Company was not prepared to offer [*20] guidance with respect to shrink. See Defs.' Mem. Ex. A at 22.

> 9   To reference these statements, see note 5 and accompanying text, *supra.*
> 10  To reference these statements, see Defs.' Mem. Ex. A, Duane Reade's Form 10-K for the Fiscal Year Ended December 29, 2001 at 10, 19.
> 11  To reference these statements, see note 6, *supra.*

As has been explained by the Second Circuit, "extensive and cautionary language" that "fully disclosed the risk of the investment" cannot be considered boilerplate and will satisfy the bespeaks caution doctrine. *Olkey, 98 F.3d at 9*. Thus, even if Duane Reade's forward-looking statements constitute more than merely optimistic predictions, the cautionary language it used in connection with those statements rendered them inactionable. [12] "The securities laws 'do not require that investors be treated like children ... investors know that the stock market is a risky business and that when a company's officer makes predictions ... they are not [*21] issuing guarantees.'" *Elliott Assocs., L.P. v. Covance, Inc., 2000 U.S. Dist. LEXIS 17099, No. 00 Civ. 4155, 2000 WL 1752848 at *9 n.12 (S.D.N.Y. Nov. 28, 2000)* (citations omitted). Accordingly, plaintiffs' claims with respect to the statements listed in the CAC at PP 113, 119, 120, 123, 127, and 130 are dismissed. [13]

> 12   Finally, defendants assert that even if the Court concludes that (1) the statements were more than mere puffery and historical fact and thus are actionable and (2) that the statements were not accompanied by sufficient warnings to investors, the CAC still fails to adequately state a claim because it does not meet the pleading requirement of stating *why* the alleged misstatements were misleading. Def.'s Mem. at 17. Because the claims relating to defendants statements have already been disposed of on multiple other theories, this memorandum will not address defendants' alternative argument.
>
> 13   To reference these statements, see note 4, *supra.*

**b.** *Accurate Statements of Historical Fact*

[*22] In addition to statements of corporate optimism, plaintiffs also label as misleading defendants' recitation of accurate statements of historical fact. Plaintiffs complain about several self-laudatory statements in which defendants emphasize that they accurately predicted past results. See CAC PP99-100, 106, 113, and 120. An example of one such statement is the excerpt of Cuti's April 25, 2002 appearance on CNBC, quoted *supra* page 4, where he stated that "front-end sales, our non-prescription sales were strengthening from January to March in a very predictable trend." CAC P 113.

Plaintiffs assert that by this statement, Duane Reade is holding itself out as a reliable prognosticator. We believe that the statement is ambiguous both as to the source of the "predictable trend" and as to whether the statement includes an future directed implications. However, even under the reading posited by plaintiffs, the statement is not actionable. The fact that defendants correctly predicted results in the past is not misleading if it is true. See *In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999)* (stating that accurate recitations of past earnings do not create [*23] liability under *Section 10(b)*). "Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." Id. Plaintiffs do not allege, nor is there any evidence that the statements are false, and contrary to plaintiffs' suggestions, "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401, n.3 (6th Cir. 1997)*. Plaintiffs claims as to the statements cited in the CAC at PP 99-100, 106, 113, and 120 are accordingly dismissed. [14]

> 14   To reference these statements, see note 4, *supra.*

**c.** *Duty to Update*

Contrary to plaintiffs' assertions, there is no requirement that a company update or correct statements that were not material in the first place. See *In re Int'l Bus. Machs. Corporate Sec. Litig., 163 F.3d 102, 110 (2d Cir. 1998)* (finding no duty [*24] to update where the statements at issue were not material). As forward-looking predictions for the next quarter, the statements of which plaintiffs complain constitute immaterial opinions and thus, cannot form the basis of a duty to update. See id. (citing *San Leandro, 75 F.3d at 811*) (stating that there is no duty to update expressions of opinion or vague statements of corporate optimism). Even though defendants may have learned before the close of the second quarter that their prior predictions would prove incorrect, "the federal securities laws do not obligate companies to disclose their internal forecasts." *In re N. Telecom Ltd. Sec. Litig., 116 F.3d Supp.2d 446, 458 (S.D.N.Y. 2000)* (citations omitted). "A company has no duty to update forward-looking statements merely because changing circumstances have proven them wrong." *Stransky v. Cummins Engine Co., 51 F.3d 1329 (7th Cir. 1995)*. [15]

15   Moreover, even when facts are material, a business need not disclose them immediately; rather, "the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC." *SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 n. 12 (2d Cir. 1968)*. We note that the timing of Duane Reade's announcements for the first and second quarter were parallel, namely approximately three and a half weeks after the close of the quarter.

[*25] Plaintiffs assert that Duane Reade had a duty to update its prior statements because those statements were being used as the basis for press articles and analyst reports and consequently, were being reiterated and perpetuated throughout the second quarter. See CAC P 10. [16] While a court may attribute an analyst's report to a corporate defendant, such attribution, according to the Second Circuit requires particularized allegations that the defendant either "(1) intentionally fostered a mistaken belief concerning a material fact" that was incorporated in the report; or (2) "adopted or placed their 'imprimatur' on the report[]." *Novak v. Kasaks, 216 F.3d 300 at 314* (quoting *Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163-64 (2d Cir. 1980))*. Defendants maintain that plaintiffs made no such particularized allegations. See Def.'s Mem. 23 n. 10.

16   Plaintiffs have cited to trade articles from May and June in order to create the false impression that Duane Reade was touting their second quarter prospects throughout the entire Class Period.

[*26] Plaintiff's assertion that defendants' alleged misstatements and omissions "swayed stock market analysts" hardly reaches the level of the required particularized allegations. Nor do plaintiffs allege that Duane Reade adopted or put their imprimatur on the reports at issue. Because plaintiffs have not satisfied the pleading requirements with respect to the statements of analysts and periodicals, the claims as to the statements quoted in the CAC PP 116, 124, 133 and 135 are dismissed. [17]

17   To reference these statements, see note 17, *infra.*

Moreover, even if these third-party statements could be attributed to Duane Reade, each of them also falls into the categories of either protected forward-looking statements or accurate statements of historical fact and accordingly, they are not actionable. For example, on April 25, 2002, Sun Trust Robinson Humphrey Conference a report in which it responded to Duane Reade's public Conference Call of that day. Plaintiffs complain, *inter alia,* about the following [*27] statement in the report: "front-end business improved sequentially throughout the [first] quarter, and we expect that trend to continue." See CAC P 116.

The first part of the statement is accurate historical fact, and as such, is not actionable. [18]See *In re Sofamor, 123 F.3d 394*. The second half of the statement is a prediction regarding future results, and as stated above, these kinds of statements are "just the sort of predictive statements of opinion and belief that courts have found immaterial." *Lasker, 85 F.3d 55 at 58* (citations omitted). [19]

18   Other third-party statements plaintiffs list constitute accurate historical fact as well. See CAC P 116(a) ("Business is improving;" "management reiterated earnings guidance").

19   Additional third-party statements cited by plaintiffs that constitute inactionable predictions can be found at CAC P 116 (a) ("front-end [sales] appear[] to be rebounding as traffic and the economy improve;" "we reiterate our BUY rating on the shares due to improving visibility on a number of different fronts"); CAC P 116(b) (citing *J.P.* Morgan's statements that: management's guidance was "realistic and possibly conservative;" that management "factored in assumptions for a 'flattish' economy;" that the Company's "expansion strategy is on track to meet its target for 35 store openings by year-end;" that "the company believes that New York is well-poised to outpace the national economy" and that "the company expects a slight sequential up-tick from current sales trends as the front-end continues to recover."); CAC P 116(c) (Deutsche Bank Securities' statement that "though we expect a tough retail environment in 1H02, we believe Duane Reade's strong positioning in the market cushions it relative to its competitors from a slowdown"); CAC P 124 (statements in an MMR article that "Duane Reade remains confident that their chain "can continue to grow

and flourish" that it "expects to open another 35 stores" in 2002; and that Duane Reade sees the economy improving "with every passing week."); CAC P 133 (statements made by Sun Trust Robinson Humphrey on May 31, 2002 that "business seemed to be solid for ... drug retail;" that Duane Reade was the "best combination of quality/growth/PEG valuation;" that "DRD's earnings are expected to grow 38% this year and 20% next year;" and reiterating its BUY rating because, *inter alia,* "we estimate the [sic] DRD front-end comps have recovered to more flattish territory versus the significant declines in the wake of September 11."); CAC P 135(a) (a report issued by Sun Trust Robinson Humphrey in which it lowered its second quarter estimates for Duane Reade, citing lower front-end sales, but stating that "management had not updated its guidance"); P 135(b) (a report issued by JP Morgan in which it also lowered its guidance citing the possibility of lower front-end sales and stating its opinion that "if risk to the quarter was material, management would have pre-announced earnings at an earlier date"); and CAC P 138 (stating that Sun Trust Robinson Humphrey reiterated its BUY rating on July 22, 2002 and stated "we remain comfortable with our recently-revised ... estimate.")

[*28] Finally, it should be noted that almost all of the statements in the articles of which plaintiffs complain were made in the context of the April 25, 2002 earnings release and related communications. It is disingenuous of plaintiffs to take these statements out of context in an attempt to attribute them to later time periods throughout the quarter.

## 2. Scienter

Even if the Court were to find (1) that Duane Reade's statements were material and misleading and (2) that those statements were not rendered immaterial by adequate warnings, the CAC must still be dismissed because of plaintiffs' failure to adequately plead scienter.

Defendants object to the CAC on the grounds that plaintiffs fail to plead the state of mind required by *Fed. R. Civ. P. 9(b)* and the PSLRA. *Rule 9(b) of the Federal Rules of Civil Procedure* sets forth heightened pleading requirements for fraud actions. It provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred [*29] generally.

*Fed. R. Civ. P. 9(b)*. Additionally, in order to "curtail the filing of meritless lawsuits," the PSLRA imposes new and more stringent requirements on plaintiffs alleging securities fraud. *Novak, 216 F.3d at 306* (quoting H.R. Conf. Rep. No. 104-369, at 41 (1995)). In relevant part, the PSLRA provides:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading ....

*15 U.S.C. 78u-4(b)(1)*. In addition,. "in any action where plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind," the complaint shall "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant [*30] acted with the requisite state of mind." *15 U.S.C. § 78u-4(b)(2)*. The required state of mind, which has been described as an intent to "deceive, manipulate or defraud," *Ganino v. Citizens Utils. Co., 228 F.3d 154, 168 (2d Cir. 2000)* (citations omitted) can be pled by either (1) "alleging facts to show that defendants had both motive and opportunity to commit fraud" or by (2) "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id. at 168-9.* [20] Plaintiffs have not alleged facts sufficient to support allegations of either motive or conscious misbehavior or recklessness.

> 20 The Second Circuit has concluded that through the PSLRA's amendments to the securities laws, Congress "effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the

exception of the 'with particularity' requirement.). *Novak, 216 F.3d at 310*. Thus, the Court of Appeals has directed district courts to employ the modes of analysis established in existing precedents in determining if a plaintiff has met his burden of pleading a "strong inference" of scienter. See *id. at 311* ("We hold that the PSLRA adopted our 'strong inference' standard .... Therefore, in applying this standard, district courts should look to the cases and factors ... [already established by this Circuit.]")(citations omitted).

[*31] **a. *Motive***

With respect to motive, plaintiffs' allegations must include concrete benefits that could be attained through the alleged misstatements or omissions. See *Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)* (stating that allegations must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."). The benefit alleged must be one that will accrue to the individual defendants; general corporate benefits to the Company will not suffice. See *id. at 139* (citing *Novak, 216 F.3d at 307-308*). The Second Circuit has specifically held that the motive of keeping the corporation's stock price high (even if the point is to increase executive compensation) is not sufficient to sustain a plaintiffs' pleading burden. *Novak, 216 F.3d at 307* (citing *Acito v. IMCERA Group, 47 F.3d 47 at 54*).

Plaintiffs' assertions that defendants wanted to maintain a higher stock price in order to pay down debt are insufficient to sustain its claims. The desire to maintain a higher stock price does not qualify as motive under the Second Circuit's pleading standards [*32] for scienter. See *Kalnit, 264 F.3d at 139*. Nor does a company's desire to reduce the cost of debt meet the requirements. See *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996)* (holding that a company's desire to maintain a high bond or credit rating to minimize the interest rate on its debt securities does not qualify as sufficient motive for fraud). Plaintiffs' allegations that defendants were motivated by a desire to inflate stock prices in order to replace existing debt with lower cost debt are thus insufficient to sustain its burden with respect to the pleading requirements for motive. [21]

21   It is also worth noting that while plaintiffs aver that Duane Reade inflated its stock price throughout the Class Period, the note offering at issue was completed in full by April 16, 2002. This fact belies the logic of plaintiffs' argument, as the note offering was completed very early in the Class Period.

Plaintiffs' allegation [*33] that defendants were motivated to inflate their stock price in order to acquire pharmacies also fails. Duane Reade spent $ 17.3 million on new store acquisitions in the first half of 2002, but made only $ 4.7 million of those acquisitions during the second quarter, meaning that the remaining $ 12.6 million was spent during the first quarter, prior to defendants alleged misdeeds. See Def.'s Ex. S at 9. Defendants make a compelling argument that the $ 4.7 million spent during the second quarter was too small an amount to be the impetus for fraud given that the Company expected to spend close to $ 50 million during 2002 on capital expenditures. See Def.'s Mem. at 29; Def.'s Ex. S. [22]

22   Additionally, Duane Reade had access to $ 79.3 million under its revolving credit facility during this time, see Def.'s Ex. S, and contends that it would have been illogical to commit fraud to save money on acquisitions totaling $ 4.7 million. Where a plaintiff"s theory of motive is "belied by logic," it must be rejected. *Faulkner v. Verizon Communications, Inc., 189 F. Supp.2d 161 (S.D.N.Y. 2002)* (citations omitted); see also *Coates v. Heartland Wireless Communications, Inc., 55 F. Supp.2d 628, 643 (N.D. Tex. 1999)* (dismissing complaint where "alleged motive to commit fraud is not plausible as pleaded").

[*34] Based on the above analysis, even "taking all reasonable inferences in the plaintiffs' favor" there is not "sufficient reasonable possibility ... of developing proof that a motive in fact existed." *In re Complete Mgmt. Sec. Litig., 153 F. Supp.2d 314, 328 (S.D.N.Y. 2001)* (citing *In re Time Warner Sec. Litig., 9 F.3d 259, 270 (2d Cir. 1993)*.

**b. *Conscious Misbehavior or Recklessness***

Although a plaintiff may circumvent the motive requirement by showing that the defendants engaged in conscious misbehavior or recklessness, plaintiffs' allegations do not support such an inference. The Second Circuit has held that even where motive has not been pleaded, a plaintiff may still plead scienter by alleging

circumstances showing conscious misbehavior on the part of defendants. See *Kalnit, 264 F.3d at 142*. The Court is to consider the allegations in the CAC in their totality in making this determination. See *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001)*. However, "the strength of the circumstantial allegations must be correspondingly greater" than those necessary to properly plead motive. See [*35] *Kalnit, 264 F.3d at 142*. Plaintiffs must allege that defendants' behavior constituted "an extreme departure from standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Nortel Networks Corp. Sec. Litig., 238 F. Supp.2d 613, 631 (S.D.N.Y. 2003)* (citations omitted).

Plaintiffs' argument that because sales were down at the end of the first quarter, the impending final results for the second quarter must have been apparent throughout the quarter (including after the first three weeks) mimics the typical type of "fraud by hindsight" theory that courts have been unwilling to entertain. See *Stevelman v. Alias Reseach Inc., 174 F.3d 79, 85 (2d Cir. 1999)*; *Faulkner, 189 F. Supp. 2d at 172* ("mere speculation" is inadequate to plead knowledge of allegedly omitted facts). Accordingly, plaintiffs' unsupported claims that Duane Reade was aware of facts or had access to information suggesting that their public statements were inaccurate are insufficient to support allegations of conscious misbehavior or recklessness.

Although plaintiffs [*36] rely on statements of anonymous former employees to show that defendants' were aware that its predictions were inaccurate, plaintiffs' allegations in this regard are insufficient. The former employees on whom plaintiffs rely revealed only that management had access to and generally reviewed interim sales data. See CAC PP 33-64. These facts do not mean that defendants would be aware, based on a maximum of three weeks of data, that their predictions for the entire quarter would prove false.

Because plaintiffs have shown neither motive nor conscious misbehavior or recklessness that can be attributed defendants, they has failed to adequately plead scienter, and their claims under *Section 10(b)* and *Rule 10b-5* must be dismissed.[23] See *Kalnit, 264 F.3d at 142*.

> 23   We note that plaintiffs have not sought leave to replead nor would such leave be appropriate given the particular deficiencies and the fact that the complaint is both amended and consolidated.

### 3. Claims Against Individual Defendants

[*37] Plaintiffs also seek to hold Mr. Cuti, Mr. Henry and Mr. Charboneau liable as "controlling persons" under *Section 20(a) of the Exchange Act*. See CAC P 173-75. Because plaintiffs have not adequately alleged a primary violation under *Rule 10-b(5)*, however, there can be no liability for any of the individual defendants. *Boguslavsky v. Kaplan, 159 F.3d 715, 721 (2d Cir.1996)*.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint is granted.

### IT IS SO ORDERED.

DATED: November 24, 2003

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE