# TAB 10

FOCUS - 4 of 20 DOCUMENTS



Analysis
As of: May 23, 2008

**In re ELAN CORPORATION SECURITIES LITIGATION; This Document Relates to: All Actions**

**02 Civ. 865 (RMB)(FM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 9913*

**May 18, 2004, Decided**

**SUBSEQUENT HISTORY:** Settled by, Costs and fees proceeding at *In re Elan Sec. Litig., 2005 U.S. Dist. LEXIS 6782 (S.D.N.Y., Apr. 19, 2005)*

**PRIOR HISTORY:** *In re Elan Corp. Sec. Litig., 2004 U.S. Dist. LEXIS 9837 (S.D.N.Y., May 18, 2004)*

**DISPOSITION:** Magistrate Judge's recommendation to grant in part and deny in part defendants' motion to dismiss.

**COUNSEL:** [*1] For Barry Pinkowitz, on behalf of himself and all others similarly situated, Plaintiff: Daniel R. Karon, Weinstein, Kitchenoff, Scarlato, Karon & Goldman, Ltd., Cleveland, OH. Frederick Taylor Isquith, Sr, Gregory M. Nespole, Gustavo Bruckner, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

For Jerry Krim, Plaintiff: Laura M. Perrone, Law Offices of Laura M. Perrone, P.L.L.C., New York, NY.

For Gan Israel, Mercaz Chabad, Consol Plaintiff: Stephen D. Oestreich, Entwistle & Cappucci, L.L.P., New York, NY.

For Jerry Krim, Consol Plaintiff: Laura M. Perrone, Law Offices of Laura M. Perrone, P.L.L.C., New York, NY.

For KPMG LLP, Consol Plaintiff: Mitchell Alan Karlan, Gibson, Dunn and Crutcher (DC), Washington, DC.

For William Browning, Christopher Tighe, Movants: Neil L. Selinger, Richard Bemporad, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY.

For Gregory Van Kipnis, S & T Investment Company, City of Monroe Employees' Retirement System, Norman Lefkowitz, Movants: Frederic Scott Fox, Kaplan, Fox & Kilsheimer, LLP, New York, NY.

For The Schutt, Movant: Jules Brody, Stull Stull & Brody, New York, NY.

For Fox Asset Management, [*2] Movant: Frederick Taylor Isquith, Sr, Gregory Mark Nespole, Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York, NY.

**JUDGES:** FRANK MAAS, United States Magistrate Judge.

**OPINION BY:** FRANK MAAS

**OPINION**

**REPORT AND RECOMMENDATION TO THE HONORABLE *RICHARD M. BERMAN***

**FRANK MAAS**, United States Magistrate Judge.

*I. Introduction*

This putative class action arises out of more than thirty securities class actions which have been consolidated before Your Honor. The plaintiffs ("Plaintiffs") are

persons who acquired shares of Elan Corporation ("Elan"), an Irish pharmaceutical company, either in the open market or as the result of a merger. The defendants are Elan; four of its executives, Donal L. Geaney ("Geaney"), Thomas G. Lynch ("Lynch"), Shane M. Cooke ("Cooke"), and William F. Daniel ("Daniel") (collectively, the "Individual Defendants" and, together with Elan, the "Elan Defendants"); and Elan's outside auditor, KPMG, Chartered Accountants ("KPMG-Ireland"), and a related United States entity, KPMG LLP ("KPMG-US") (together, the "KPMG Defendants"). (*See* Docket No. 37). On January 24, 2003, after the appointment of lead plaintiffs and lead counsel, the Plaintiffs filed [*3] an 85-page consolidated complaint ("Complaint" or "Compl.") alleging violations of *Sections 11, 12(a)(2), and 15* of the Securities Act of 1933, as amended ("Securities Act"), and *Sections 10(b), 14(a), and 20a(a)* of the Securities Exchange Act of 1934, as amended ("Exchange Act"), as well as several rules promulgated thereunder. (Docket No. 45). The Elan and KPMG Defendants have now moved to dismiss the Complaint, pursuant to *Rules 12(b)(6) and 9(b)* of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C.     78u-4(b)*, for failure to state a claim or plead with the requisite particularity. (Docket Nos. 54, 56, 60). For the reasons set forth below, I recommend that these motions be granted in part and denied in part. Additionally, except where otherwise noted, the Plaintiffs should be given leave to replead within thirty days. [1]

1    The Plaintiffs have filed two cross-motions. First, the Plaintiffs seek to strike from the record several exhibits proffered by the Elan and KPMG-Ireland Defendants, (*see* Decl. of Jaculin Aaron, Esq., dated Mar. 25, 2003 ("Aaron Decl."), Exs. 5-10; Aff. of Michael R. Young, Esq., sworn to on Mar. 25, 2003, Exs. 8, 11-12), in an effort to show (a) that the Securities and Exchange Commission ("SEC" or "Commission") undertook a "lengthy and detailed review" of Elan's accounting practices in 1999, but took issue only with its accounting for two of Elan's joint ventures; and (b) that market analysts understood some of the facts that the Plaintiffs allege were concealed. (*See* [[Docket No. 67]. Because those exhibits plainly raise ]]matters not appropriate for consideration at this pre-discovery stage, I have not considered them, thereby rendering the Plaintiffs' motion moot.

The Plaintiffs' second cross-motion (Docket No. 80) asks the Court to take judicial notice of Elan's 2002 Annual Report and Form 20-F, in which Elan restated its earnings for 2001, reducing its reported income by $ 73 million and its cash

flow from investments by more than $ 500 million. In their opposition papers, the Elan Defendants concede that "the request for judicial notice is not objectionable," although they assert that the Plaintiffs' "suggestion that this document supports a finding of scienter is." (Elan Defs.' Mem. of L. in Opp. to Pls.' Mot. for Judicial Notice at 1). Inasmuch as the exhibit is a proper subject of judicial notice, this motion should be granted.

The Plaintiffs also have submitted a letter-request to lift the automatic stay of discovery imposed by the PSLRA. That application is addressed in a separate Discovery Order bearing today's date.

[*4] II. *Background*

A. *Relevant Facts*

For present purposes, the following facts alleged in the Complaint must be taken as true.

1. *Parties*

Elan is an Irish pharmaceutical company, with headquarters in New York and San Diego, that specializes in the discovery, development, and marketing of therapeutic products and services in the areas of neurology, pain management, and auto-immune diseases. (Compl. P 13). Elan's securities are traded on the Irish Stock Exchange as common stock, and on the New York Stock Exchange as American Depository Receipts ("ADRs"). [2] (*Id.* P 13(f)).

2    An ADR is a receipt issued by a U.S. depositary bank "which represents shares of a foreign corporation held by the bank." (*See* [[http://www.nyse.com/glossary/ ]]1042235995800.html) (last visited May 11, 2004). ADRs are quoted in dollars and trade in the same manner as the shares of a domestic corporation. (*Id.*).

Defendant Geaney served as Chief Executive Officer and Chairman of Elan until July 2002, when he [*5] was fired due to the financial improprieties alleged in the Complaint. (*Id.* P 14). Defendant Cooke was an officer of Elan and served as its Chief Financial Officer from July 5, 2001, through July 2002, when he met the same fate as Geaney. (*Id.* P 15). Defendant Lynch was an officer and director of Elan and served as its Chief Financial Officer prior to July 5, 2001. (*Id.* P 16). Defendant Daniel was an officer of Elan who signed its filings with the SEC. (*Id.* P 17).

Defendant KPMG-Ireland is an accounting firm based in the United Kingdom with offices in Dublin. (*Id.* P 19). KPMG-Ireland certified Elan's Financial State-

2004 U.S. Dist. LEXIS 9913, *

ments for the years 1999 through 2001 as conforming to Generally Accepted Accounting Principles ("GAAP") both in the United States and Ireland. (*Id.*). Defendant KPMG-US is an accounting firm based in the United States with its principal offices in New York. (*Id.* P 20). KPMG-US is alleged to have audited Elan's financial statements and to have provided opinions to KPMG-Ireland regarding Elan's compliance with U.S. GAAP. (*Id.*].

The Plaintiff Class consists of all persons who purchased Elan ADRs between February 7, 2000, and July 1, 2002 (the [*6] "Class Period"). (*Id.* P 226). The Plaintiff Class contains two subclasses consisting of: (a) all persons who acquired Elan ADRs as a result of Elan's merger with the Liposome Corporation ("Liposome") (hereinafter, "Liposome Subclass"), and (b) all persons who acquired Elan ADRs as a result of Elan's merger with Dura Pharmaceuticals, Inc. ("Dura") (hereinafter, "Dura Subclass"). (*Id.*).

2. *Alleged Securities Law Violations*

The Plaintiffs contend that the Elan Defendants engaged in various improper practices during the Class Period which materially inflated Elan's reported financial results. The Plaintiffs further contend that the KPMG Defendants improperly certified Elan's inflated financial statements.

The common feature of many of Elan's alleged accounting schemes was "round tripping," a process by which Elan provided third parties with funding that was later returned to Elan. (*Id.* P 26). At the same time that Elan booked its payments to the third parties as either capital investments or loans, it also recorded the returning funds as revenue. (*Id.*). Elan allegedly inflated its financial results through four different round-tripping schemes involving (a) joint [*7] business ventures ("JBVs"), (b) a product rationalization program, (c) risk sharing arrangements, and (d) special purpose entities. Elan also allegedly engaged in a scheme to generate tax-free compensation for its executives.

a. *Joint Business Venture Scheme*

From 1998 through mid-2001, Elan entered into more than fifty JBVs with other firms ("Business Partners"). (*Id.* PP 31, 35). Although Elan touted the JBVs as vehicles to spread the risks associated with the development of new products, they actually were created to enable Elan to report substantial sales income.

In a typical transaction, Elan would fund the JBV by making direct and indirect contributions, which the JBV, in turn, used to purchase a license from Elan for its medical technology. As a result of this round tripping of funds, the JBV typically would be "penniless" following

the purchase of the license. (*See id.*) PP 34-35). Thereafter, however, from time to time Elan would inject operating funds into the JBV. (*See id.* P 35). Elan also had the right to appoint one of the JBV's directors whose attendance was required for there to be a quorum at a JBV board meeting. (*Id.* P 40(b)).

Under the equity [*8] method of accounting, a company that exercises "significant influence" over another entity must include a proportionate share of the gains or losses of that entity in its own financial results to conform to GAAP. (*See id.* P 39). Pursuant to GAAP, there is a presumption that a company exerts the requisite degree of influence over another entity when it owns twenty percent or more of the voting stock of that entity. (*Id.*). Although Elan sought to avoid that presumption by purchasing only 19.9 percent of the securities issued by the JBVs, the company nevertheless exerted "significant influence" over the JBVs because it had "veto power" over the actions taken by the JBV boards. (*Id.* PP 40, 40(b)).

According to the Plaintiffs, Elan therefore should have used equity accounting principles to record the results of its JBV investments. Instead, Elan included all of the money that it received from the JBVs for the sale of licenses in its reported revenues and net income. In doing so, Elan failed to include its proportionate share of the losses sustained by the JBVs or to exclude its proportionate share of the amounts that the JBVs spent to purchase the licenses. (*Id.* P 38). [*9] These practices violated GAAP. (*See id.* P 39).

The JBVs also enabled Elan to remove certain research and development costs from its profit and loss statements. (*Id.* P 45). Under GAAP, such costs ordinarily must be expensed as incurred. (*Id.*) Because Elan had many products under development, this would have had an adverse impact on its earnings. (*Id.*) Through the use of the JBVs Elan was able to shift many of these costs to other entities. (*Id.* PP 45-46).

In 2000, the SEC issued Staff Accounting Bulletin 101 ("SAB 101"), which required that license fees be amortized rather than being recognized up front. (*Id.* P 47). As a result, Elan took a noncash charge of $ 344 million "for the cumulative effect of this accounting change" relating to revenue recognized in periods up to December 31, 1999. (Pls.' Mot. for Judicial Notice, Ex. A (2002 Annual Report and Form 20-F) at 150).

b. *Product Rationalization Program*

In an effort to mitigate the consequences of SAB 101, Elan developed a Product Rationalization Program, pursuant to which it began selling to other companies the royalty and distribution rights for certain products for periods of as long as ten years. [*10] (*Id.* P 48). These

2004 U.S. Dist. LEXIS 9913, *

purchases were made with funds that Elan provided to the purchasers. (*Id.*). Elan failed to disclose its role in the financing of these transactions. In addition, Elan improperly accounted for the transactions by (i) classifying them as ordinary sales, when, in fact, they were sales of assets which should have been reported after net earnings as "non-recurring" or "other" income, and (ii) recognizing the earnings resulting from these "sales" during the year in which they were received, rather than allocating them over the term of the contracts. (*Id.* PP 48, 54-55).

### c. *Risk Sharing Arrangement*

Under its "Risk Sharing Arrangement," Elan "sold" to third parties the future royalty rights to certain products that it had under development, in return for substantial payments to reimburse Elan for its research and development costs related to those products. (*Id.* P 60). Elan accounted for the payments as "sales" revenues even though they reflected the reimbursement of costs that Elan had incurred. (*Id.* P 61).

One such risk sharing arrangement involved the sale of Elan's royalty rights for five key products to Pharma Marketing, Inc. ("Pharma"), a Bermuda-based [*11] entity. (*Id.* P 60). During the Class Period, Elan continuously emphasized the importance of these drug products to its business plan, without disclosing (i) the risk sharing arrangement, (ii) that much of the revenue it was reporting as income actually related to the sale of Elan's royalty rights or the reimbursement of its research and development and costs, or (iii) that as part of the arrangement, Elan had given up a significant portion of its future royalty revenues. (*Id.* P 62). According to the Plaintiffs, the fact that Elan had to inject $ 60 million into Pharma when it ran out of cash only eighteen months after the initial sale is further evidence of the sham nature of the original Pharma transaction. (*Id.* P 64). Elan recorded this expenditure of cash on its books as "being for an 'intangible asset,' and made no disclosure of the additional funding to investors." (*Id.*). Elan's justification for this accounting treatment was that the payment allegedly was made to reacquire the royalty rights to Myobloc, one of the five drugs whose future royalty streams had been conveyed to Pharma. (*Id.*). The Plaintiffs contend that this was a sham because Elan (i) paid substantially [*12] more for the repurchase than it initially had received for the Myobloc rights and (ii) also conveyed a sixth product to Pharma as a swap for Myobloc. [3] (*Id.*).

> [3] In December 2001, Elan entered into a second risk-sharing arrangement with a Bermuda-based entity known as Autoimmune Research and Development, Ltd. (*Id.* P 65).

### d. *Special Purpose Entities Scheme*

Elan also entered into transactions with three special purpose entities, known as Elan Pharmaceutical Investments, Ltd. ("EPIL"), EPIL II, and EPIL III, in order to remove substantial amounts of debt from its balance sheet and create the illusion of profits. (*Id.* PP 66-67). As part of this scheme, Elan conveyed the securities it had received from the JBVs and its Business Partners and sold them to the EPILs. (*Id.* P 67). The sales amounts exceeded Elan's "book value" of the securities, thereby enabling Elan to record extraordinary gains of approximately $ 40 million in both 2000 and 2001. (*Id.*). The EPILs had no incentive to bargain [*13] for a lower price for the securities because Elan had guaranteed all of the debt issued by the EPILs. (*Id.*).

Elan allegedly violated GAAP in connection with these transactions both by recognizing gains from its transactions with the EPILs and by failing to consolidate the EPILs' substantial losses in its own financial reports as required by U.S. GAAP. (*Id.* P 68). Pursuant to GAAP, financial statements must disclose material related-party transactions. (*Id.* P 68). The Plaintiffs contend that the transactions with the EPILs should have been treated in this fashion because Elan exercised significant control over the JBVs, the securities of which were the sole assets of the EPILs. (*Id.* P 69). Instead, Elan failed to disclose the liquidity problems that the EPILs were experiencing until after the close of the Class Period. (*Id.* P 70).

### e. *Executive Compensation Scheme*

Finally, the Plaintiffs contend that Elan failed to disclose certain compensation that the Individual Defendants and other Elan executives received through an entity known as "Monksland" that the executives owned. (*Id.* P 72). Over the years, Elan paid "royalties" to Monksland, which redistributed [*14] the funds to its "shareholders" in the form of undisclosed - and untaxed - income. In total, Elan paid more than $ 20 million to its executives through this mechanism, including $ 3 million in 2001 alone. (*Id.* P 73).

### 3. *False and Misleading Statements*

As a result of these accounting practices and schemes, Elan's financial reports during the Class Period overstated the company's revenues and earnings and failed to disclose material adverse information. The Plaintiffs estimate Elan's net profit to have been inflated by a total of $ 648.8 million, consisting of $ 266.7 million attributable to the JBV scheme, $ 215.8 million attributable to the product rationalization program, $ 86.6 million attributable to the risk sharing arrangement scheme, and $ 79.7 million attributable to the EPIL scheme. (*Id.* PP 74-205).

### 4. *Merger Acquisitions*

2004 U.S. Dist. LEXIS 9913, *

The Plaintiffs contend that the misstatements by the Elan and KPMG Defendants enabled Elan to make two acquisitions during the Class Period using its inflated stock. (*Id.* PP 79, 81).

The first acquisition involved Liposome. On March 6, 2000, Elan announced that it had agreed to acquire Liposome in a stock-for-stock transaction, valued [*15] at approximately $ 575 million, pursuant to which Liposome shareholders were to receive 0.385 of an Elan ADR for each share of Liposome that they owned. (*Id.* P 81). In connection with the proposed merger, Elan issued a Form F-4 Registration Statement ("Liposome Registration Statement") and a Proxy Prospectus (together, the "Liposome Merger Offering Materials"), that incorporated, among other things, Elan's financial results for the last nine months of 1999. (Id. P 82). The merger was approved by the Liposome shareholders and, thereafter, was completed on May 12, 2000. (*Id.* P 85).

The second acquisition involved Dura. On September 11, 2000, Elan announced a proposed stock-for-stock merger, valued at approximately $ 1.8 billion, pursuant to which Dura shareholders were to receive 0.6175 of an Elan ADR for each share of Dura common stock that they owned. (*Id.* P 112). As required by the SEC, Elan filed a Form F-4 Registration Statement ("Dura Registration Statement") along with a Proxy Prospectus (together, the "Dura Merger Offering Materials"). (*Id.* P 113). These filings incorporated Elan's Annual Report for 1999, as well its quarterly reports for the periods ending March [*16] 31 and June 30, 2000. (*Id.*). The Dura merger was completed on November 9, 2000. (*Id.* P 116).

5. *Claims for Relief*

Counts I through IV of the Complaint allege violations of the Securities Act. In Count I, the Liposome and Dura Subclasses claim that the Elan Defendants (other than Cooke) violated *Section 11 of the Act* by making false or misleading statements in the Liposome and Dura Registration Statements. (*Id.* PP 232-40). In Count II, the Dura Subclass alleges that the KPMG Defendants violated *Section 11* in connection with Elan's financial statements for Fiscal Year 2000, which were incorporated by reference into the Dura Registration Statement. (*Id.* PP 241-50). Count III alleges that the Elan Defendants (other than Cooke) violated *Section 12(a)(2) of the Securities Act* by soliciting members of the Liposome and Dura Subclasses to acquire Elan ADRs through the use of false and misleading statements in the proxies/prospectuses issued in connection with the Liposome and Dura mergers. (*Id.* PP 251-60). Count IV seeks to hold each of the Individual Defendants liable under *Section 15 of the Securities Act for Elan's* false and misleading statements in the Liposome [*17] and Dura Registration Statements and prospectuses. (*Id.* PP 261-63).

Counts V through VII allege violations of the Exchange Act. In Count V, the Elan Defendants are alleged to have violated *Section 14(a)* of the Act, and *Rule 14a-9* promulgated thereunder, by soliciting proxies from members of the Dura and Liposome Subclasses by means of a proxy/prospectus which was materially false and misleading. (*Id.* PP 264-67). Count VI alleges that all of the defendants violated *Section 10(b) of the Act, and Rule 10b-5* promulgated thereunder, by engaging in a scheme to inflate the revenues, assets, net income, and net income per share of Elan. (*Id.* 268-79). Finally, Count VII alleges that the Individual Defendants also are liable under *Section 20(a)* for the violations alleged in Count VI. (*Id.* PP 280-84).

III. *Standard of Review*

The Elan and KPMG Defendants have moved to dismiss the Complaint pursuant to *Rules 9(b)and 12(b)(6)* of the Federal Rules of Civil Procedure and the PSLRA.

"Any *Rule 12(b)(6)* movant for dismissal faces a difficult (though not insurmountable) hurdle." *In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003)* [*18] (Berman, J.) (quoting *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999)*). In reviewing a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993)*; *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)*. The Court may grant the motion only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. In deciding a motion to dismiss, the Court may deem a complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)* [*19] (internal citations omitted).

*Rule 9(b)* requires that allegations of fraud, including securities fraud, be stated with particularity. Under *Rule 9(b)*, "malice, intent, knowledge, and other conditions of mind of a person may be averred generally." *Fed. R. Civ. P. 9(b)*. Nevertheless, an allegation of fraud must specify: (1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements fraudulent. *Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995)*.

Finally, the PSLRA is applicable to the Plaintiffs' Exchange Act claims. *See 15 U.S.C. 78u-4(a)(1)*. PSLRA requires that in any action brought by a private plaintiff under the Exchange Act the complaint must specify each statement alleged to have been misleading and why the statement is misleading. *Id. 78u-4(b)(1)*. Additionally, if an allegation regarding a statement or omission is made on information and belief, the complaint must state with particularity the facts on which that belief is formed. *Id.* While the Exchange Act requires a defendant to [*20] have acted with a particular state of mind before a private plaintiff may recover money damages, the PSLRA further requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id. 78u-4(b)(2)*. As Judge Martin noted:

> The "strong inference" requirement has been held to mean that plaintiffs are entitled to only the "most plausible of competing inferences." *Miller v. Champion Enters., Inc. (In re Champion Enters., Inc. Secs. Litig.), 145 F. Supp. 2d 871, 877 (E.D. Mich. 2001)* (citing *Helwig v. Vencor, 251 F.3d 540, 553 (6th Cir. 2001), cert. denied, 536 U.S. 935, 153 L. Ed. 2d 800, 122 S. Ct. 2616 (2002))*. However, plaintiffs must plead with particularity only sufficient facts to support their beliefs, and not every fact necessary to prove their claim. *Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.), cert. denied, 531 U.S. 1012, 148 L. Ed. 2d 486, 121 S. Ct. 567 (2000)*.

*Bond Opportunity Fund v. Unilab Corp., 2003 U.S. Dist. LEXIS 7838, No. 99 11074 (JSM), 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003)*.

IV. *Discussion*

A. *Securities Act*

1. *Section 11* Claims

Pursuant to *Section 11 of* [*21] *the Securities Act*, every person who signs a registration statement or who was a director (or person performing similar functions) or partner of the issuer at the time the registration statement was filed, and every accountant who has with his consent been named as having prepared or certified any report or valuation which is used in connection with the registration statement shall be liable to the extent that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted

to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *15 U.S.C. 77k(a)*. Accountants, however, are liable only with respect to their own statements. *Id. 77k(a)(4)*.

As the Supreme Court noted in *Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)*:

> This section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant [*22] to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case.

A *Section 11* violation is established when "material facts have been omitted or presented in such a way as to obscure or distort their significance." *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 761 (2d Cir. 1991)* (citation, internal quotation marks, and alterations omitted). "Material facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968)*.

Until recently, the Second Circuit had not resolved whether a claim under *Sections 11 or 12(a)(2)* of the Securities Act was required to meet the particularity requirements of *Rule 9(b)*. Moreover, the district courts in the Circuit were divided as to the applicability of the rule to such claims. *Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)*. Earlier this year, the Second Circuit [*23] finally reached this question, stating that "the heightened pleading standard of *Rule 9(b)* applies to *Section 11* and *Section 12(a)(2)* claims insofar as the claims are premised on allegations of fraud." *Id.* In that case, as here, the plaintiffs asserted in their complaint that their *Section 11* claims did not "sound in fraud," but the court found that language suggesting that the registration statements were "inaccurate and misleading" and contained "untrue statements of material facts" was "classically associated with fraud." *Id. at 171-72*. Notwithstanding the Plaintiffs' fraud disclaimer, the *Section 11* claims in this case are peppered with similar words. (*See* Compl. PP 234, 241).

Accordingly, as in *Rombach*, those claims must meet the pleading requirements of *Rule 9(b)*.

a. *Elan Defendants*

The first statements that the Plaintiffs allege violated *Section 11* relate to the JBVs. The Elan Defendants (other than Cooke) are alleged to have incorporated into the Liposome and Dura Merger Offering Materials financial results for the JBVs which were false and misleading because they did not employ equity accounting principles and failed to make adequate disclosure [*24] regarding the round tripping of the JBVs' revenues.

The Accounting Principles Board ("APB" or "Board") is one of three successors to the American Institute of Certified Public Accounts authorized to promulgate GAAP standards. *Ganino v. Citizens Utils. Co., 228 F.3d 154, 159 n.4 (2d Cir. 2000)*. In 1971, in APB Opinion 18, the Board concluded that "the equity [accounting] method best enables investors in corporate joint ventures to reflect the underlying nature of their investment in those ventures." (Aaron Decl. Ex. 23 (APB Op. 18) P 16). The Board therefore indicated that an investor whose voting stock gives it the ability to exercise "significant influence" over an investee should use the equity method to account for its investment. (*Id.* P 17). Under equity accounting, an investor recognizes its share of the investee's earning and losses after the acquisition date. (*Id.* P 6(b)).

Recognizing that the "substantial influence" test would often prove difficult to apply, the Board concluded that

> an investment (direct or indirect) of 20% or more of the voting stock of the investee should lead to a presumption that *in the absence of evidence to the contrary* [*25] an investor has the ability to exercise significant influence over an investee. Conversely, an investment of less than 20% of the voting stock . . . should lead to a presumption that an investor does not have the ability to exercise significant influence *unless such ability can be demonstrated.*

(*Id.* P 17) (emphasis added).

In this case, from the face of the Complaint, it might appear that Elan was seeking to skirt APB Opinion 18 by limiting its ownership of stock in each JBV to 19.9 percent. However, Elan's ownership interest in those JBVs consisted of *nonvoting* stock. The Plaintiffs consequently are not entitled to a presumption under APB Opinion 18 that Elan's accounting treatment of its JBV investments in its registration statements was materially misleading simply because Elan failed to employ equity accounting.

Similarly, although Elan's contractual arrangement with each JBV evidently gave it the right both to appoint a director whose attendance was necessary for a quorum and to approve the venture's "business plan," the Plaintiffs have not set forth any basis on which a finder of fact could reasonably conclude that the failure to use equity accounting because [*26] of these aspects of Elan's interest in the JBVs constituted fraud. In that regard, it is, of course, settled law that a mere violation of GAAP, standing alone, does not suffice to state a securities fraud claim. *Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)* (citing *Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999)*).

Quite apart from the accounting method employed, the Plaintiffs allege that the Liposome and Dura Registration Statements failed to make adequate disclosure of the round tripping of JBV revenues. The Liposome Registration Statement incorporated by reference Elan's Annual Report for 1998, as amended by its Form 20-F/A1. [4] (*See* Aaron Decl. Ex. 21 at 68). The Dura registration statement similarly incorporated by reference Elan's Annual Report for 1999, on Form 20-F. (*Id.* Ex. 22 at 80).

> 4   Foreign issuers submit their annual reports to the SEC on a Form 20-F. *See* 1 Harold S. Bloomenthal, *Securities Law Handbook,* ("Handbook")   3:17:40 (2004). The A1 suffix regarding the 1998 report indicates that Elan had amended its original Form 20-F for 1998. (Aaron Decl. Ex. 21 at 68). Unlike domestic corporations, foreign issuers are not required to file quarterly reports on Form 10-Q, but must file on Form 6K information which is made available to stockholders pursuant to foreign law or stock exchange regulations, or otherwise distributed to stockholders. Handbook   22:11.

[*27]   Both of the annual reports incorporated by reference into the Registration Statements detailed information about the amounts that Elan invested in the JBVs and its Business Partners, as well as the license fees that Elan received from the JBVs. For example, the 1999 report shows that Elan invested $ 30 million in ISIS Pharmaceuticals, Inc., a genomics-based drug discovery and development company, receiving, in return, a $ 15 million license fee to develop oral oligonucleotide delivery technologies and commercialize certain "antisense" targets. (*See id.* Ex. 3 at 11). Similar details concerning the amounts invested and the license fees received are furnished for more than one dozen additional JBVs. (*Id.* at 11-12). The annual report also discloses that many of the agreements governing the JBVs provide for Elan to conduct research and development at the JBV's request, for which Elan may recover its expenses at a predetermined rate. (*Id.* at 11). Elan further disclosed that the majority of

its Business Partners would likely require additional funding before or during 2001, and that the JBVs would have to fund their research and development through their own cash resources, "which [*28] may have arisen in part from Elan's original investment," additional funding from public and private capital markets, or additional infusions of cash by Elan. (*Id.* at 13). There consequently is no basis for the Plaintiffs' contention that Elan failed to disclose its partial round tripping of funds.

The Plaintiffs also assert that Elan failed to disclose that the JBVs were penniless after they paid Elan their licensing fees. (*See* Compl. P 35). The Plaintiffs base this allegation on Elan's annual report for Fiscal Year 2001, which states that the JBVs typically have no funds after paying the initial licensing fees to Elan. (Pl.'s Mem. of L. in Opp. to Elan Defs.' Mot. at 14; *see* Aaron Decl. Ex. 1 at 13). While this disclosure was not made in prior years, the JBVs were start up operations created by Elan and its Business Partners. The Plaintiffs have not set forth any reason why an investor would believe that the JBVs, at their inception, would have substantial amounts of cash on hand. In any event, in its Form 20-F annual reports for prior years, Elan did disclose the amounts that it had invested in its Business Partners and JBVs and the amount of the license fees that it [*29] received. [5] (Aaron Decl. Exs. 2 at 109, 3 at 11-12) The Plaintiffs have not shown, as they must, that Elan's disclosures in 1999 and 2000 regarding the finances of the JBVs were so misleading or incomplete that they were fraudulent.

> 5  In its Form 20-F for 2000, Elan did not break out these amounts by JBV. Nevertheless, Elan reported the aggregate amounts that it had invested in the JBVs and its Business Partners and the total amount of license revenue it received. (Aaron Decl. Ex. 2 at 109).

The next branch of the Plaintiffs' *Section 11* claim relates to EPIL I. The Complaint alleges that the Liposome Merger Offering Materials "failed to account for or disclose the losses sustained by EPIL I." (Compl. P 83). The Complaint further alleges that the Dura Merger Offering Materials were misleading because the Elan financial results for the second quarter of 2000 included an illusory gain of $ 39.2 million in connection with EPIL I which Elan achieved by inflating the book value of the securities that it had conveyed [*30] to that entity. (*Id.* P 114(c)). In their opposition papers, however, rather than setting forth a basis for these contentions, the Plaintiffs focus on EPILs II and III. The only facts that they muster with respect to EPIL I are that it "needed to be restructured in January 2001"; that many of the securities it held were not publicly traded, "making their valuation entirely arbitrary"; and that, because Elan had guaranteed that the EPIL investors would not lose their investments, there

was little incentive for them to secure accurate appraisals of the securities underlying their investments. (Pls.' Mem. of L. in Opp. to Elan Defs.' Mot. at 7-8). However, none of these factual allegations, even if established, suggests that Elan's disclosures in the Liposome and Dura Registration Statements related to EPIL I were untrue or omitted relevant facts at the time that the statements became effective. Accordingly, the Plaintiffs allegations with respect to EPIL I fail to state a *Section 11* fraud claim. [6]

> 6  In their papers opposing KPMG-Ireland's motion to dismiss, the Plaintiffs also note that Elan's FY 2000 Annual Report did not disclose the profits of EPIL I in a separate "line item or footnote." (Pls. Mem. of L. in Opp. to KPMG-Ireland's Mot. at 8). The Plaintiffs have not set forth any reason why such an accounting treatment was necessary.

[*31] The Plaintiffs next allege that the Dura Registration Statement was materially misleading because it highlighted the development of several new drug products, but failed to disclose (i) that Elan had sold the royalty rights to these products to Pharma in June 2000 and (ii) that certain "revenues" received from Pharma actually constituted reimbursements for research and development costs that Elan had incurred. (*See* Compl. PP 29, 60-64, 114(d)). [7]

> 7  Because the Pharma transaction took place after the Liposome merger was completed, this aspect of the Plaintiffs' *Section 11* claim relates solely to the Dura Merger Offering Materials.

In their motion papers, the Elan Defendants argue that no disclosure regarding the Pharma risk sharing arrangement was required in *2000* when the Dura registration became effective because (i) by 2001 only one of the five products which were the subject of the royalty rights transfer "had reached a stage at which any royalties even became due," and (ii) the $ 5.6 million in [*32] royalties attributable to that product (Zanaflax) was not material in light of Elan's $ 1.7 billion in revenues that year. (Elan Mem. of L. at 29 (citing Aaron Decl. Ex. 1 (Elan 2001 Form 20-F) at 42, 68, 106)).

To accept this argument, the Court would first have to infer from the disclosures for 2001 that Zanaflax had generated no royalties during 2000 and that none of the other products whose royalty rights were assigned had been approved for distribution by then. While that is likely correct, a court may not engage in such fact finding at this preliminary stage.

More importantly, even if the direct financial consequences of the Pharma risk sharing arrangement were not material to Elan's financial situation in 2000, this alone is not dispositive of the materiality issue. The

question instead is whether the alleged omissions in the Dura Registration Statement would have misled a reasonable investor. Here, the Complaint alleges that the five products that were the subject of the arrangement with Pharma were key to Elan's business plan, and that the written risk sharing agreements required Elan to pay Pharma ever increasing royalties, "averaging 24% by the mid-point of the agreements. [*33] " (Compl. PP 60-63). At this preliminary stage, the Court cannot say, as a matter of law, that the failure to identify the specific products subject to risk sharing would not have been material to a reasonable investor.

Another element of the risk sharing arrangement was that, subject to certain limitations, Pharma would make regular payments to Elan corresponding to the amounts that Elan expended to develop and commercialize the five products. (*See* id. P 114(d)). As the Elan Defendants correctly observe, by incorporating its 1999 Form 20-F into the Dura Registration Statement, Elan disclosed that its revenues consisted of, *inter alia*, "(i) product sales derived from pharmaceutical products . . . and (iv) research revenues for performing research and development activities on behalf of pharmaceutical industry clients." (Aaron Decl. Ex. 3 at 25). Elan further disclosed that its product sales included "revenue arising from product co-promotion and similar activities." (*Id.*). These generic descriptions of its revenue sources did not disclose, however, that Elan was treating the reimbursements that it received from Pharma as revenues. Indeed, Pharma was not even named in the [*34] disclosures incorporated by reference into the Dura Registration Statement.

The failure to disclose this information in the Dura Merger Offering Materials, or the documents incorporated by reference therein, might give rise to a *Section 11* claim based on negligent misrepresentations. In this case, however, the allegations in Count I of the Complaint concerning Pharma sound in fraud. Accordingly, it is incumbent upon the Plaintiffs to plead the circumstances allegedly constituting the fraud with particularity. Whatever the merits of the Plaintiffs' *Section 11* claim regarding Pharma might be were it couched as a negligence claim, the Plaintiffs plainly have not adequately alleged that Elan engaged in fraud in connection with Pharma. Accordingly, this aspect of the Plaintiffs' *Section 11* claim against the Elan Defendants must be dismissed.

The last aspect of the Plaintiffs' *Section 11* claim against the Elan Defendants (other than Cooke) relates to the Monksland tax savings "scheme." (Compl. PP 84, 206-07). The Plaintiffs allege that money was channeled to the Individual Defendants and other senior Elan executives "in a manner designed to evade income taxes in Ireland." (*Id.* P 72). [*35] The Plaintiffs also allege that this diversion of funds was material and undisclosed. (*Id.* PP 72-73). Finally, in their opposition papers, the Plain-

tiffs contend that the Monksland arrangement constituted a "bonus plan" which had to be disclosed pursuant to SEC regulations. (Pls.' Mem. of L. in Opp. to Elan Defs.' Mot. at 15).

Despite the use of such value-laden terms as "scheme" and "evade," the Plaintiffs have not alleged in their Complaint that the tax-free payments to the Individual Defendants and others violated any laws. In fact, they apparently base their contentions regarding the Monksland tax-free compensation arrangement on an article which appeared in the *Sunday Independent*, an Irish newspaper, on August 4, 2002. (*See* Compl. PP 206-07). That article stated that "the tax-free dividends paid under the device are likely to cause further concern over Elan's aggressive accounting practices, although *the scheme is permissible* through a Revenue loophole and was authorised in the mid-Eighties." (Aaron Decl. Ex. 20) (emphasis added). In the absence of any allegation that the scheme was unlawful, the mere decision to use it to ease the tax burden of certain Elan executives [*36] is no more objectionable than the use of Section 401-K plans for corporate employees seeking to defer taxes in the United States. Consequently, as presently pleaded, this aspect of the Plaintiffs' *Section 11* claim against the Elan Defendants does not give rise to any inference of fraud.

More troubling is the allegation that the compensation paid to the Elan executives through Monksland remained undisclosed until 2002. (*See* Compl. PP 84, 206-07). In their opposing papers, the Elan Defendants claim that this contention on the part of the Plaintiffs is flat wrong. (Elan Defs.' Mem. of L. at 19 & n.12). From the face of Elan's financial statements, which list only the aggregate compensation paid to Elan's senior officers, it is impossible to tell whether the Monksland compensation was disclosed. On the other hand, as noted above, the Plaintiffs bear the burden of pleading fraud with particularity. In the absence of any explanation for the Plaintiffs' belief that the tax-free compensation was undisclosed, the Plaintiffs clearly have not met that burden. The Irish newspaper article is silent as to the accounting treatment of the Monksland royalty payments and therefore cannot suffice [*37] to bridge this pleading gap.

Finally, the Plaintiffs' allegation that the Monksland payments amounted to an executive "bonus plan" does not appear anywhere in their Complaint. While the Plaintiffs should be given leave to amend their existing allegations, the Complaint cannot be amended by means of statements made in opposition to a motion to dismiss. *See Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower, 2003 U.S. Dist. LEXIS 5145, No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *13 (S.D.N.Y. Apr. 2, 2003).*

b. *KPMG Defendants*

In Count II of the Complaint, the Plaintiffs seek to hold the KPMG Defendants liable to the members of the Dura Subclass under *Section 11* on the basis of the Dura Registration Statement. (Compl. PP 241-50). That registration statement incorporated by reference Elan's annual report for 1999 on Form 20-F, which included Elan's consolidated financial statements for the years 1998 and 1999. (*See* Aaron Decl. Ex. 22). In those financial statements, KPMG-Ireland opined (without qualification) that Elan's financial statements conformed to U.S. GAAP. (*Id.* Ex. 3 at 44).

KPMG-US's name is nowhere to be found in the Dura Registration Statement or the financial [*38] statements section of the Elan annual report. Accordingly, KPMG-US seeks dismissal of the Plaintiffs' *Section 11* claim because KPMG-US never authorized the making of any statement on its behalf and was not identified as the firm that prepared the Elan financial statement in the Form 20-F which was incorporated by reference into the Dura registration statement. (*See* KPMG-US Mem. of L. at 19-20).

The Plaintiffs' rejoinder is that at this early stage the Court must "accept the factual allegations of the complaint as true and must draw all reasonable inferences in [their] favor." (Pls.' Mem. of L. in Opp. to KPMG-US Mot. at 16). While this general precept is, of course, correct, it is equally well settled that the Court need not accept any averments of a complaint which are contradicted by documents incorporated by reference therein. *In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 2004 U.S. Dist. LEXIS 5876, 02 Civ. 2251 (LAP), 2004 WL 72046, at *2 (S.D.N.Y. April 1, 2004).* Accordingly, because KPMG-US's name is not mentioned in the Dura Registration Statement, or any of the documents incorporated by reference, the Plaintiffs' *Section 11* claim against that firm must be dismissed with prejudice. [*39] *See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 n.13, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)* ("A *Section 11* claim can be brought only against the issuer, its directors or partners, underwriters, and accountants who are named as having prepared or certified the registration statement."); *Adair v. Kaye Kotts Assocs., 1998 U.S. Dist. LEXIS 3900, No. 97 Civ. 3375 (SS), 1998 WL 142353, at *4 (S.D.N.Y. March 27, 1998)* ("In order to state a claim against an accountant under *[Section 11]*, the accountant must have prepared or certified a statement that was false or misleading.").

On the other hand, KPMG-Ireland was Elan's independent auditor and it did certify the financial statements incorporated by reference into the Dura registration statement. The firm is alleged to have violated *Section 11* by making false and misleading statements and failing to disclose other facts necessary to make its statements not misleading. (Compl. PP 241-45). More specifically, the Dura Subclass alleges that the financial statements prepared by KPMG-Ireland failed to account properly for the JBVs, inaccurately reported an "illusory" $ 39.2 million gain "fabricated" from the EPIL I transaction, failed to [*40] disclose the conveyance to Pharma of the royalty rights for five key Elan products, and improperly recorded as "revenues" monies received from Pharma which in fact were reimbursements of Elan's research and development costs. (*Id.* P 241)(incorporating by reference PP 112-16)).

Turning to the first of these allegations, the Plaintiffs contend that KPMG-Ireland failed to disclose the "round trip" nature of Elan's JBV revenues and earnings and also misled investors by not using equity accounting, which would have required Elan to exclude 19.9 percent of its JBV revenues from, and include 19.9 percent of the JBV losses in, its own results. (*Id.* PP 114(a)-(b)).

As noted earlier, Elan's annual financial report for 1999, of which the KPMG-Ireland statement was a part, disclosed with respect to each of the JBVs the amounts that Elan invested and the license fees that it received. The report also disclosed that in the aggregate "Elan invested approximately $ 285.0 million" in the JBVs and their parent companies in 1999, receiving "gross license revenues of $ 193.6 million" in return. (Aaron Decl. Ex. 3 at 11-12). While the report did not expressly note that the JBVs were paying for [*41] their licenses with Elan funds, it did state that Elan expected that most of its Business Partners ("strategic collaborators") would require additional funding in or before 2001. (*Id.* at 13). The report also indicated that the JBVs could fund their research and development from "existing cash resources, which may have arisen in part from Elan's initial investment," could look for funding in the capital markets, or could seek additional funding from Elan or, with Elan's consent, from its JBV partner. (*Id.*). Given these disclosures, there does not seem to be any basis on which a finder of fact could reasonably conclude that the Dura Subclass was misled as to the attributes of Elan's JBV program.

Turning to the equity accounting issue, the Plaintiffs contend that "'fraud is not an element in *Section 11*'" and that a showing of scienter is also unnecessary. (Pls.' Mem. of L. in Opp. to KPMG-Ireland Mot. at 13-14). The Second Circuit's recent decision in *Rombach*, which was issued after the parties briefed the issues in this case, has substantially changed the pleading terrain. *See Rombach, 355 F.3d at 171*. Accordingly, because the Plaintiffs' present *Section* [*42] *11* claim against KPMG-Ireland sounds in fraud, it is insufficient to allege simply that the accounting treatment that Elan employed did not conform to GAAP. This aspect of Count II consequently must be dismissed.

The remaining allegations in Count II of the Complaint relating to EPIL I and Pharma are substantially the

same as those set forth in Count I. Accordingly, because Count II sounds in fraud, it fails to state a claim for relief with respect to Pharma or the valuation of EPIL I for the reasons previously set forth.

### 2. *Section 12(a)(2)*

*Section 12(a)(2) of the Securities Act* imposes liability on "any person who offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading . . . ." *15 U.S.C.    77l(a)(2).* To prevail on a *Section 12(a)(2)* claim, the purchaser of the securities must make a showing that the prospectus or communication was "intended or perceived as instrumental in effecting the sale." *Jackson v. Oppenheim, 533 F.2d 826, 830 n.8 (2d Cir. 1976).* [*43] Additionally, while a plaintiff may bring a *Section 12(a)(2)* claim on the basis of an issuer's negligence, where the claim sounds in fraud, it must be pleaded with particularity. *Rombach, 355 F.3d at 171.* Proof of actual reliance is not required; rather, a plaintiff need only show "some causal connection between the alleged communication and the sale, even if not decisive." *Metromedia Co. v. Fugazy[[, 983 F.2d 350, 361 (2d Cir. 1992)* (citation and internal ]]quotation marks omitted).

Count III of the Complaint alleges that the Elan Defendants (other than Cooke) violated *Section 12(a)(2)* by making false and misleading statements in the proxies/prospectuses issued in connection with the Liposome and Dura mergers. (Compl. PP 251-56). The Liposome and Dura Subclasses incorporate into this claim by reference the entire catalog of alleged misconduct discussed previously and, once again, disclaim any reliance on a fraud theory, stating that "this claim does not sound in fraud, and neither fraud nor scienter is an element of this claim." (*Id.* P 251 (incorporating PP 81-85, 112-16)). Notwithstanding this disclaimer, elsewhere in Count III, the Plaintiffs [*44] have used the sort of language that triggered a finding in *Rombach* that the claim sounded in fraud, stating that the proxies/prospectuses "contained *untrue* statements of material facts," "omitted other facts necessary to make the statements not *misleading*," and "*concealed* and *failed to disclose* material facts." (*Id.* P 255) (emphasis added). Given these allegations, Count III of the Complaint cannot be construed as merely a negligence claim and therefore must meet the particularity requirement of *Rule 9(b).* When the claim is evaluated in that manner, it, too, fails to meet the pleading requirements of the rule. Count III of the Complaint therefore also should be dismissed.

### 3. *Section 15*

Section 15 of the Securities Act provides that:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Sections 11 or 12 of the Securities Act], shall also be liable jointly and severally with and to the same extent as such controlled person to any person to [*45] whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

*15 U.S.C.    77o.* Thus, to establish a *prima facie Section 15* claim, a plaintiff need only establish (a) that a defendant has control of a person upon whom liability may be imposed, and (b) that the person controlled by the defendant committed a violation of *Sections 11 or 12(a)(2).* [8] *See In re Independent Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 769-70 (S.D.N.Y. 2001).*

> 8   A few courts in this Circuit have also required a third element, "culpable participation," but most do not. *See In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 352 n.82 (S.D.N.Y. 2003)* (citing *Dorchester Investors v. Peak TrENDS Trust, 2003 U.S. Dist. LEXIS 1446, No. 99 Civ. 4696 (LMM), 2003 WL 223466, at *3 (S.D.N.Y. Feb. 3, 2003)*) (collecting cases)).

[*46] Count IV of the Complaint alleges that "each of the Individual Defendants, by virtue of their executive and/or directorial positions and stock ownership had and exercised the power to control the representatives and actions of Elan." (Compl. PP 261-63). Additionally, this count incorporates by reference paragraphs 81 through 85 and 112 through 116 of the Complaint, which relate to the Dura and Liposome mergers. (*Id.* P 261). Because these allegations meet the limited pleading requirements of *Rule 8(a) of the Federal Rules of Civil Procedure, see Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)*, the individual defendants may properly be held liable for misstatements in Elan's prospectuses and registration statements, but only to the extent that Elan itself is potentially liable. Consequently, because Counts I through III of the Complaint are subject to dismissal for failure to state a claim, Count IV does not entitle the Liposome and Dura Subclasses to any additional relief.

2004 U.S. Dist. LEXIS 9913, *

B. *Exchange Act*

1. *Section 14(a)*

Count V of the Complaint alleges that the Elan Defendants violated *Section 14(a) of* [*47] *the Exchange Act, and Rule 14a-9* promulgated thereunder, by soliciting proxies for the Liposome and Dura mergers through the use of false and misleading statements in the proxies/prospectuses. (Compl. PP 264-67). Those false and misleading statements, detailed in paragraphs 81 through 85 and 112 through 116 of the Complaint, are incorporated by reference in Count V. (*Id.* P 264).

Section 14(a) makes it unlawful to solicit any proxy "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *15 U.S.C. 78n(a)*. Rule 14a-9, in turn, prohibits proxy solicitation "by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." *17 C.F.R. 240.14a-9(a)*. The elements of a claim under *Section 14(a)* and *Rule 14a-9* are therefore:

> ([a]) that the proxy materials contain [*48] a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; ([b]) that the misstatement or omission of a material fact was the result of knowing, reckless or negligent conduct; and ([c]) that the proxy solicitation was an essential link in effecting the proposed corporate action.

*Vides v. Amelio*, 265 F. Supp. 2d 273, 276 (S.D.N.Y. 2003) (citing *Halpern v. Armstrong, 491 F. Supp. 365, 378 (S.D.N.Y. 1980))*. "In the context of a proxy statement, a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Resnik v. Swartz, 303 F.3d 147, 151 (2d Cir. 2002)* (citations and internal quotation marks omitted). "There must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)*. "It is not sufficient to allege that the investor [*49] might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted

differently if an accurate disclosure was made." *Ganino, 228 F.3d at 162*.

Although the Plaintiffs have not hesitated to accuse the Elan Defendants of wrongdoing throughout their Complaint, their **Section 14(a)**/Rule 14a-9 claim expressly excludes any allegations of **scienter**, stating that "none of the paragraphs regarding defendants' **scienter** are incorporated therein." (Compl. P 264). The difficulty is that, following this exclusion, neither the paragraphs of this specific claim, (*id.* PP 264-67), nor those that are incorporated by reference, (*id.* PP 81-85, 112-16), say anything at all about the Elan Defendants' mental state. Accordingly, pursuant to the PSLRA, Count V of the Complaint must be dismissed for failing to set forth any facts giving rise to a strong inference that the defendants acted at least negligently in misrepresenting or failing to set forth the material facts in the Dura and Liposome proxy materials.

2. *Section 10(b) and Rule 10b-5*

Count VI of the Complaint alleges that all of the defendants [*50] violated *Section 10(b) of the Exchange Act, and Rule 10b-5* thereunder, by engaging in a course of conduct intended to induce the members of the Class to purchase Elan ADRs at prices which were artificially inflated as a consequence of the defendants false and misleading statements of material fact. (*Id.* PP 268-79). This count relies upon each of the alleged schemes considered in relation to the prior counts of the Complaint. This claim differs from the prior counts of the Complaint in that it incorporates by reference (for the first time) all of the preceding paragraphs of the Complaint, including the Product Rationalization Program that allegedly came into existence after SAB 101 precluded Elan from recognizing all of the income from a JBV license in the year that the license was issued. (*Id.* PP 47-59, 268).

*Section 10(b)* is a "catchall provision" which entitles a plaintiff to recover damages for manipulative practices undertaken by defendants acting in bad faith. *See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 205-06, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*. The statute provides, in relevant part, that:

> It shall be unlawful for any person, directly or indirectly, [*51] by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --
>
> . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . .

any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C.    78j(b)*. Rule 10b-5, the parallel regulation, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or [*52] deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R.    240.10b-5*.

To state a claim for relief under *Section 10(b)* and *Rule 10b-5*, a plaintiff must allege that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino, 228 F.3d at 161*; *accord Suez Equity Investors, L.P. v. Toronto Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001)*. A plaintiff alleging that a defendant engaged in securities fraud in violation of these provisions must satisfy the pleading requirements of both *Rule 9(b)* and PSLRA. *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69-70 (2d Cir. 2001)*. In this case, because the Elan and KPMG Defendants do not question the causation element of the claim, my Report and Recommendation focuses on whether the Plaintiffs have adequately pleaded a material misstatement or omission and that the defendants acted with the requisite mental state.

a. *Statements and omissions*

[*53] At the pleading stage, a plaintiff satisfies the materiality requirement of *Section 10(b)* and *Rule 10b-5* by "alleging a statement or omission that a reasonable

investor would have considered significant in making investment decisions." *Ganino, 228 F.3d at 161*. For each such statement or omission, a court must determine whether "defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002)* (citing *McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576, 579 (2d Cir. 1990)*); *see also Basic v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)* (the materiality requirement for *Section 10(b)* and *Rule 10b-5* violations is met when there is a "substantial likelihood" that the statement or the disclosure of an omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available") (quoting *TSC Indus., 426 U.S. at 449*). [*54]

While "it is not sufficient to allege that the investor might have considered the misrepresentation or omission important" when considering statements or omissions, "it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made." *Ganino, 228 F.3d at 162*. Materiality is a mixed question of law and fact. *Id.* A complaint fails to state a claim only if "*no reasonable investor* could have been misled about the nature of the risk when he invested." *Halperin, 295 F.3d at 359* (emphasis in original); *see also Ganino, 228 F.3d at 162* ("a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance") (quoting *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*).

In their Complaint, the Plaintiffs seek to rely on each of the schemes previously discussed as the source of material misrepresentations or omissions giving rise to liability under *Section 10(b)* and *Rule 10b-5*. [*55] With respect to three of these alleged bases for liability - concerning the JBVs, EPIL I and Monksland - the Plaintiffs have not adequately alleged a materially false statement or omission for the reasons previously set forth. On the other hand, the alleged failure to make adequate disclosure concerning Pharma is potentially material and is alleged with sufficient specificity.

Because Count VI of the Complaint incorporates *all* of the prior paragraphs of the Complaint, (Compl. P 268), it adds several allegations concerning the EPILs which were not part of any of the prior claims for relief. First, Count VI alleges with respect to the EPILs that Elan violated U.S. GAAP by not including the losses incurred by these entities in its own financial results. (*See id.* (incorporating PP 68-69 by reference)). Ironically, although

2004 U.S. Dist. LEXIS 9913, *

Elan and its auditors concluded that the EPILs should be separately reported under U.S. GAAP, they also determined that Irish GAAP mandated consolidation. Accordingly, Elan reported the EPIL financial results on both a consolidated and an unconsolidated basis in its Annual Reports on Form 20-F for 1999 and 2000. (*See* Aaron Decl. Exs. 2 at 110, 113, 4 at [*56] 71-72).

Thus, while the performance results of the EPILs may not have been incorporated into Elan's financial results for purposes of U.S. GAAP, they were plainly disclosed to investors who took the time to read the entire report. The Plaintiffs consequently have not alleged a materially false statement or omission of material fact with respect to this aspect of Elan's disclosures concerning the EPILs.

Second, the Plaintiffs allege as part of Count VI that Elan extended the payment period for the EPIL I notes in March 2001 by conveying all of them to EPIL III in exchange for $ 350 million in EPIL III notes guaranteed by Elan. (Compl. P 143). The Plaintiffs further allege that this restructuring of EPIL I was not disclosed during the Class Period, and that it would have been a "red flag" for investors had it been disclosed. (*Id.* P 144). The difficulty with this branch of the Plaintiffs' 10(b)/10b-5 claim is that no facts have been set forth to support the allegation that EPIL I was in extremis at the time that the payment terms were restructured.

The Plaintiffs further contend that Elan created a fictitious $ 40.5 million capital gain by transferring the JBV securities to EPIL [*57] III at prices above book value. (*Id.* P 141). Unfortunately, here again, the Complaint fails to set forth any facts to support the Plaintiffs' supposition that the securities were not appropriately valued at the time of the transfer. [9]

> 9 The Plaintiffs note that when a portion of the EPIL I debt transferred to EPIL III became due in July 2002, EPIL III was unable to make payment. (*Id.* P 145). This, however, does not establish that the securities were overvalued at an earlier time.

The other alleged scheme incorporated by reference into Count VI of the Complaint relates to the Product Rationalization Program. According to Elan's Annual Report on Form 20-F for 2001, Elan disposed of certain product lines pursuant to this program through outright sales or distribution and royalty arrangements. (Aaron Decl. Ex. 1 at 35). The Report contains a table listing each product that was rationalized, the company that acquired the product or rights, and the net revenues received. (*Id.*). The Report also contains [*58] a narrative description of each of the transactions. (*Id.* at 35-37).

In the Complaint, the Plaintiffs allege that the advent of SAB 101 - which required Elan to spread the revenues received from the JBVs over the life of the license -

"substantially impaired" Elan's ability to inflate its JBV earnings. (Compl. PP 47-48). According to the Plaintiffs, Elan thereafter developed the Product Rationalization Program, pursuant to which it "sold" to third parties the royalty and distribution rights to certain products for periods as long as ten years. (*Id.* P 48). The Complaint alleges that this was yet another form of undisclosed round tripping because "many of these transactions were financed entirely by Elan's investments in, and loans to, the purchasers." (*Id.* PP 48, 52-54). The Complaint further alleges that Elan engaged in deceptive accounting by treating the revenue received through such transactions as "ordinary sales," rather than reporting it "*after* net earnings" as "non-recurring" or "other" income, and by failing to spread the revenues received over the term of the contracts. (*Id.* P 49) (emphasis in original). Finally, the Complaint alleges that the impact [*59] of these transactions was material because they accounted for 31 percent of Elan's net profit for the year. (*Id.* P 50).

In their opposition papers, the Elan Defendants contend that the Plaintiffs are mistaken insofar as they characterize the product rationalization transactions as the granting of licenses. (Elan Defs.' Reply Mem. of L. at 9-11). Citing Elan's annual report for 2001, the Elan Defendants contend that all but one of the transactions involved an outright sale, even though Elan retained a royalty right as part of most such sales. (*Id.* at 10 (citing Aaron Decl. Ex. 1 at 35-37)). The Elan Defendants also maintain that SAB 101 did not require Elan to spread the revenues received as a result of the product rationalizations over time. (*Id.*). Finally, the Elan Defendants assert that as a foreign issuer, Elan had no duty to make disclosures concerning the Product Rationalization Program until its Form 20-F for 2001 was due because it was not required to file interim reports. (*Id.* at 11).

At the outset, the Plaintiffs have not adequately pleaded facts which would warrant the conclusion that the product rationalization transactions involved licenses. In the 2001 Form 20-F, [*60] Elan characterizes the transactions as "outright sales" or "distribution and royalty arrangements." (Aaron Decl. Ex. 1 at 35). The Plaintiffs have not set forth any basis for their apparent belief that the outright sales were actually licenses. Moreover, the Plaintiffs have not indicated why the "distribution and royalty" arrangements should be considered licenses for which Elan improperly accounted.

Indeed, in the one product rationalization clearly described in Elan's annual report as involving a "distribution and option agreement," which related to a product known as "Permax," Elan disclosed that Amarin, a United Kingdom public limited company, had agreed to market and distribute Permax in the United States, receiving in exchange an option to acquire rights to the product line

2004 U.S. Dist. LEXIS 9913, *

from Elan. [10] (*Id.* at 36). In terms of its accounting treatment of this arrangement, Elan's Form 20-F stated that

> *Elan recorded consideration of $ 45.0 million under the terms of the amended distribution and option agreement* and retained a royalty right of 3.5% on net sales of Permax by Amarin from 1 January 2002 through the date on which Amarin exercises or terminates its option to acquire [*61] Permax. In 2001, Elan also recorded a net amount of $ 6.2 million from Amarin for distribution fees and royalties on sales of Permax. After reducing the carrying value of the Permax intangible and *equity accounting*, Elan recorded net revenue from Amarin of $ 16.9 million in 2001,which includes the distribution revenue. Amarin's option to purchase Permax was exercisable between September 2001 and May 2002 for an exercise price of $ 37.5 million, payable $ 7.5 million on exercise of the option and $ 2.5 million in quarterly installments thereafter, and a royalty of between 7% and 10% on future net sales of Permax by Amarin. The royalty on future net sales may be reduced by up to $ 8.0 million if Permax revenues in 2003 and 2004 are less than $ 26.0 million and $ 16.0 million, respectively. If Permax revenues in 2003 and 2004 are greater than $ 26.0 million and $ 16.0 million, respectively, Amarin will make additional royalty payments to Elan of up to $ 8.0 million. Amarin exercised its option to purchase Permax in March 2002 and paid Elan the first installment of the exercise price of $ 7.5 million.

In connection with the amended distribution and option agreement, Elan *provided* [*62] *a loan of $ 45.0 million* to Amarin. The loan bears interest at a rate equal to the London Interbank Offered Rate ("LIBOR") plus a margin of 2%. The loan matures on 28 September 2002. At 31 December 2001, Elan held approximately 7% of the outstanding ordinary shares of Amarin and also held preferred shares convertible into an additional 34% of Amarin's equity on a fully diluted basis. In March 2002, Elan converted a portion of the Amarin preferred shares into Amarin ordinary shares. Following this conversion, Elan owned approximately 27% of Amarin's outstanding ordinary shares.

(*Id.* at 36-37) (emphasis added).

> 10   A subsequent amendment to the agreement gave Amarin an exclusive Permax distributorship until August 2002. (*Id.* at 36).

To the extent that the Permax product rationalization involved the round tripping of revenues, the salient financial aspects of the transaction were disclosed. Additionally, although Elan evidently recorded the distribution revenue during the period it was received, [*63] it appears that the company employed equity accounting for at least certain aspects of its dealings with Amarin. Finally, Elan's disclosures apparently indicated that the company would record any future royalty income derived from Permax or its other rationalized product lines as it was received. (*See id.* at 35) ("Elan may receive future revenues from Entex, Midrin, Mysoline, Nasorel, Nasalide, and Permax in the form of royalties or option payments."). In the absence of any allegation that Elan had a duty to provide continuing services to its product rationalization counterparties, the Plaintiffs have not adequately pleaded any reasons why Elan's accounting treatment of these transactions was generally improper.

There is one narrow respect in which the Complaint does allege that Elan's disclosures regarding the Product Rationalization Program were inadequate. In their motion papers, the Elan Defendants make the point that foreign issuers do not have quarterly disclosure duties and need not file interim reports for material events. (*See* Elan Defs.' Mem. of L. at 14 n.7). Nevertheless, as they themselves concede, the securities laws require Elan to disclose in a Form 6-K material [*64] information which it makes public or is required to make public in Ireland, or which it distributes or is required to distribute to its securities holders. (*See id.* (citing *17 C.F.R. 240.13a-11(b), 240.13a-13(b)(2), 240.13a-16*)).

In a press release issued on April 23, 2001, Elan indicated that its "operating income in the first quarter of 2001 increased 94% to $ 116.2 million compared to 59.8 million in 2000, reflecting strong revenue growth, the improved gross margin on product revenue and lower research and development expenses." (Compl. PP 146-47) (emphasis deleted). That disclosure arguably gave rise to a duty to make a further timely disclosure regarding the extent to which those increases were attributable to one-time events or funded by Elan itself. Although Elan notes that its Form 20-F for 1999 stated that Elan recorded its sales of inventory and related product rights as product revenues, (*see* Elan Defs.' Reply Mem. of L. at 11 (citing Aaron Decl. Ex. 3 at 25)), the Court cannot say as a matter of law that this disclosure was adequate to alert investors prior to the filing of Elan's 2001 Form 20-F that Elan's

quarterly revenues included [*65] the proceeds of substantial sales of product lines and the round tripping of funds.

In sum, Plaintiffs have adequately pleaded that the defendants made a material misstatement or omission of fact in relation to the Pharma and Product Rationalization schemes.

### b. *Scienter*

To prevail in an action brought under *Section 10(b)* or *Rule 10b-5*, a plaintiff must allege that the defendants acted with "an intent to deceive, manipulate or defraud." *Ganino, 228 F.3d at 168* (quoting *Hochfelder, 425 U.S. at 193 n.12*). Under the PSLRA, with respect to each act or omission alleged to have violated the Exchange Act, the complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *15 U.S.C.       78u-4(b)(2)* (emphasis added). In this Circuit, this requirement is satisfied by alleging either (a) "facts to show that defendants had both motive and opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito, 47 F.3d at 52. Accord Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001);* [*66] *Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000)* (indicating that the PSLRA "did not change the basic pleading standard for scienter in this Circuit").

### i. Motive and opportunity

To establish motive, a plaintiff must allege "concrete benefits that could be realized by one or more false statements and wrongful nondisclosures alleged." *Novak, 216 F.3d at 307* (quoting *Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)*). To establish opportunity, the plaintiff must allege that the defendants had the "means and likely prospect of achieving concrete benefits by the means alleged." *Id.* Motives that are "generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit, 264 F.3d at 139.* Among the motives that are insufficient to meet this test are a desire for the corporation to appear profitable or to keep the stock price high to increase officer compensation. *Id.; see also San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris, 75 F.3d 801, 814 (2d Cir. 1996)* [*67] (corporation's desire to maintain a high credit rating is not a sufficient motive).

In this case, the Plaintiffs allege that the Elan Defendants "were motivated to participate in the fraud to raise the price of Elan's ADRs and thereby provide currency to acquire other pharmaceuticals in an effort to build a global empire." (Compl. P 212). They further suggest that the Individual Defendants were "direct

beneficiaries" of the Monksland royalty scheme. (*Id.* P 211). Finally, they allege that Geaney's "fraudulent mind-set" is evidenced by his continued insistence that Elan had made "full and fair disclosure" even after financial analysts began to question Elan's bookkeeping practices in 2002. (*Id.* P 213).

In *Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000)*, the Second Circuit noted that while "virtually every company may have the desire to maintain a high bond or credit rating, . . . not every company has the desire to use its stock to acquire another company." Accordingly, the Plaintiffs may rely on the Elan Defendants' desire to complete the Liposome and Dura mergers as the requisite motive, but only to the extent that the allegedly fraudulent conduct preceded [*68] the merger. As the Elan Defendants evidently concede, (*see* Elan Defs.' Mem. of L. at 34 n.18), the Dura merger was completed *after* the Pharma sale. Consequently, the Plaintiffs' allegation that the Elan Defendants engaged in fraud in order to increase their ability to acquire other companies adequately pleads motive and opportunity with respect to alleged material misstatements and omissions concerning Pharma made in connection with the Dura merger.

In their Complaint, the Plaintiffs allege that the Product Rationalization Program was developed in response to SAB 101, which sounded the death knell for Elan's JBV accounting. That accounting bulletin, however, first became effective in 2001, by which time both the Dura and the Liposome mergers had been completed. It follows that a desire to complete a corporate merger using fraudulently-inflated Elan ADRs could not have provided the motive to engage in any fraud with regard to the Product Rationalization Program, which first came into existence after the mergers took place. Inasmuch as no other specific motive is ascribed to the Elan or KPMG Defendants, the Plaintiffs have not adequately alleged scienter on the basis of motive [*69] and opportunity in relation to the purported Product Rationalization fraud.

In a section of the Complaint captioned "Scienter of the Individual Defendants and Elan," the Plaintiffs also allege that the Individual Defendants participated in the Monksland scheme to enhance their incomes. (Compl. P 211). As noted earlier, however, the Plaintiffs have failed to allege adequately that the Monksland scheme was improper in any respect. Insofar as the payments through Monksland served as a legal tax avoidance mechanism for the Individual Defendants, their involvement in it fails, as a matter of law, to furnish a motive for them to have defrauded investors through either the Pharma or Product Rationalization schemes. *See, e.g., Kalnit, 264 F.3d at 140* ("As we made clear in *Acito*[,*43 F.3d at 54*], an allegation that defendants were motivated by a desire to maintain or increase executive compensation is insuffi-

cient because such a desire can be imputed to all corporate officers.").

Finally, the fact that Geaney may have denied any wrongdoing in 2002, after the relevant facts became known, does not establish that he had a motive to act in a fraudulent manner [*70] at an earlier time, nor does it constitute a motive not generally attributable to all corporate officers. Indeed, if the mere denial of a class action plaintiff's accusations were sufficient to establish a defendant's scienter, the requirement of pleading the requisite mental state with particularity would frequently become a mere formality.

### ii. *Conscious misbehavior or recklessness*

A plaintiff may also satisfy the pleading standard by alleging facts showing conduct on the part of the defendant which was "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id. at 142* (quoting *Honeyman v. Hoyt (In re Carter-Wallace Sec. Litig.), 220 F.3d 36, 39 (2d Cir. 2000))*. This requirement is satisfied when a plaintiff has "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements . . . [and] defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* [*71]  (quoting *Novak, 216 F.3d at 308*).

Because the Plaintiffs have adequately alleged motive with respect to the Pharma risk sharing arrangement, it is not necessary to consider whether any of the Elan Defendants' conduct in relation to Pharma meets the alternative method by which scienter may be established. Turning to the Product Rationalization Program, it is undisputed that the Elan Defendants did not disclose any details of the program during 2001, despite Elan's issuance of an optimistic press release concerning its first quarter income. The Plaintiffs further allege that the Product Rationalization Program had a material effect on Elan's revenues, accounting for 31 percent of its reported net profit that year. (Compl. P 50). In these circumstances, the Court cannot say as a matter of law that the Elan Defendants' failure to make timely disclosure regarding the details of its Product Rationalization Program was not, at a minimum, reckless.

Accordingly, the Plaintiffs have adequately alleged scienter on the part of the Elan Defendants with respect to both the Pharma risk sharing arrangement and the Product Rationalization Program.

### c. *KPMG Defendants*

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164, 191, 128 L. Ed. 2d 119,* *114 S. Ct. 1439 (1994),* [*72] the Supreme Court held that a private plaintiff may not bring an action under *Section 10(b)* against a defendant on the theory that the defendant aided and abetted a primary violator. Predictably, plaintiffs responded to *Central Bank* by seeking to charge lawyers, accountants and others as primary, rather than as secondary, violators. *Cf.* Bart Schwartz and Jonathan Friedman, *Aiding and Abetting Liability and Enron,* N.Y. Law Journal, Jan. 23, 2003, at 5, col. 1. Courts have reached varying conclusions regarding the level of involvement that a plaintiff must show to name an indirect participant in a securities fraud as a primary violator. Some courts deem it sufficient that the defendant had "substantial participation" in the steps leading to the publication of the allegedly fraudulent statements. *See, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n.5 (9th Cir. 2000); In re Enron Corp. Secs., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 583-93 (S.D. Tex. 2002).* Other courts, including the Second Circuit, have adopted a "bright line" test. *See, e.g., Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998).* [*73]  Under the latter formulation, a defendant must actually make a false or misleading statement in order to be held liable under *Section 10(b). Id.* The defendant itself need not have communicated the statement to investors so long as it knew or had reason to know that its representation would be communicated to investors and the statement is attributed to the defendant. *Id.* (citing *Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997)).* "Anything short of such conduct is merely aiding and abetting and no matter how substantial that aid may be, it is not enough to trigger liability." *Id.* (quoting *Shapiro, 123 F.3d at 720*).

Although the Second Circuit adheres to the "bright line" rule, it also has stated that the definition of a primary violator is broad enough to include anyone "who participated in the fraudulent scheme" or other activities proscribed by the securities laws. *SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998)* (quoting *SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1471 (2d Cir. 1996)); see In re Scholastic Corp., 252 F.3d at 75-76* (vice president for finance [*74]  and investor relations who was allegedly involved in drafting and disseminating false and misleading statements may be liable as a primary violator even though the statements were not specifically attributed to him); *see also 17 C.F.R.      240.10b-5(a), (c)* (making it unlawful to employ "any device, scheme or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security"); *Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972)* (noting that subsections *(a)* and *(c)* of Rule 10b-5 do not require a plaintiff to allege that the defendant made a false or misleading statement or omission).

In *In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 2004 U.S. Dist. LEXIS 5040, No. 02 Civ. 910 (GEL), 2004 WL 763890, at *7-*8 (S.D.N.Y. March 23, 2004)*, Judge Lynch recently sought to reconcile some of the case law under *Section 10(b)*. Judge Lynch found the decision in *In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152 (D. Mass. 2002)*, particularly persuasive. In that case, the corporation's [*75] principal auditor was KPMG Belgium, but it was assisted by other KPMG affiliates that did not sign the audit reports. The Court held that the auditor's Singapore affiliate could not be held liable under *Section 10(b)* where its role was limited to communicating its "clean" audit opinion to the Belgian affiliate responsible for issuing the public company's audit reports. *Lernout & Hauspie, 230 F. Supp. 2d at 171.* On the other hand, because the role of the United States affiliate had been widely made known in the company's annual reports, the court found that "it was appropriate to infer that . . . investors reasonably attributed the statements contained in the quarterly and annual reports to [the United States affiliate]." *Id. at 166-67.* Judge Lynch concluded that

> the rule espoused in *Lernout & Hauspie* is that a plaintiff may state a claim for primary liability under *section 10(b)* for a false statement (or omission), even where the statement is not publicly attributed to the defendant, where the defendant's participation is substantial enough that s/he may be deemed to have *made* the statement, and where investors are sufficiently aware [*76] of defendant's participation that they may be found to have *relied* on it as if the statement had been attributed to the defendant.

*In re Global Crossing, 2004 U.S. Dist. LEXIS 5040, 2004 WL 763890, at *8* (emphasis in original).

Here, the Plaintiffs allege that KPMG-Ireland's representation that Elan's financial statements for 1999 and 2000 conformed to U.S. GAAP constituted an "implicit" representation that KPMG-US agreed. (Compl. P 273). The Plaintiffs further allege that analysts in the United States in turn relied upon that implied representation in making their recommendations regarding Elan ADRs. (*Id.*). Under the bright line rule applicable in this Circuit, these allegations are insufficient to establish KPMG-US's involvement because Elan's disclosures are utterly silent as to any role that KPMG-US may have played in the Elan audits. *See Wright, 152 F.3d at 176* (defendant accounting firm not liable under *Section 10(b)* where corporate press release contained unaudited financial statement "without a whisper" of firm's involvement); *see also Ziemba v.*

*Cascade Int'l, Inc., 256 F.3d 1194, 1205 (11th Cir. 2001)* (for an accounting or law firm [*77] to be "primarily" liable under *Section 10(b)* and *Rule 10b-5*, "the alleged misstatement or omission must have been publicly attributed to the defendant"). Indeed, even if this Court were to conclude that *Lernout & Hauspie* correctly states the applicable law, the *Section 10(b)* and *Rule 10b-5* claim against KPMG-US would have to be dismissed because there is no suggestion in the Complaint that KPMG-US's role in the audit process, rather than being surmised by investors, was in fact disclosed to them in some fashion by Elan.

The Plaintiffs further contend that KPMG-US should be held liable for Elan's fraudulently misleading statements because KPMG-US may be deemed to have "directly or indirectly issued such statements, or participated in their issuance under the group pleading doctrine." (Compl. P 274). The "group pleading doctrine" permits plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Vivendi Universal, S.A., Sec. Litig., 2003 U.S. Dist. LEXIS 19431, No. 02 Civ. 5571 (HB), 2003 WL 22489764, [*78] at *25 (S.D.N.Y. Nov. 3, 2003)* (quoting *Polar Int'l Brokerage Corp. v. Reeve, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000)*). Here, however, the Complaint does not allege that KPMG had the requisite level of involvement with Elan. It follows that KMPG-US cannot be held liable under the group pleading doctrine pursuant to *Section 10(b)* or *Rule 10b-5* on the theory that it was a direct participant in fraudulent misrepresentations or omissions made by Elan. *See Goldin Assocs., L.L.C. ex rel. Smar-Talk Teleservices, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp., 2003 U.S. Dist. LEXIS 16798, No. 00 Civ. 8688 (WHP), 2003 WL 22218643 (S.D.N.Y. Sept. 25, 2003)* (group pleading doctrine is limited in scope and does not extend to "every outside contributor" to a document published by a group); *Degulis v. LXR Biotechnology, Inc., 928 F. Supp. 1301, 1311-12 (S.D.N.Y. 1996)* (group pleading doctrine only applies where the officers or directors of the company participated in preparation and dissemination of the group-published document).

### 3. *Section 20(a)*

In their final claim for relief, the Plaintiffs allege that the Individual Defendants are liable as control persons for the *Section 10(b)* violations pursuant [*79] to *Section 20(a)* of the Exchange Act. (Compl. PP 280-84). Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any pro-

vision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C.    78t(a)*. Controlling person liability under *Section 20(a)* is "a form of secondary liability, under which a plaintiff may allege a primary *[Section] 10(b)* violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." *Suez Equity Investors, L.P., v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001)* (citing *First Jersey, 101 F.3d at 1472*).

To state a claim under *Section 20(a)*, a plaintiff must allege at least two elements: (a) a primary violation by a controlled person and (b) direct or indirect control of the primary violator by the defendant. Control [*80] may be established by showing that the defendant possessed, either directly or indirectly, "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *17 C.F.R.     240.12b-2*; *see In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003)* (noting that the court in *First Jersey* adopted the definition of control in *17 C.F.R. 240.12b-2* as the standard for a *Section 20(a)* claim).

Courts disagree as to whether a *Section 20(a)* claim also requires a showing of scienter. *See In re Initial Pub. Offering, 241 F. Supp. 2d at 392-93* & n.179 (observing that six circuits have held that there is no scienter requirement, two have held that there is such a requirement, and the Second Circuit "has yet to definitively answer this question"); *Neubauer v. Eva-Health USA, Inc., 158 F.R.D. 281, 284 (S.D.N.Y. 1994)* (collecting cases). In this Circuit, the courts are divided as to whether a securities plaintiff must at least allege that "that the controlling person was in some meaningful sense a culpable [*81] participant in the primary violation." *Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)* (quoting *First Jersey, 101 F.3d at 1472*). Some judges have concluded that this state of mind requirement is a necessary element of the claim, that it necessitates compliance with the PSLRA, and that a plaintiff must therefore "plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Burstyn v. Worldwide Xceed Group, Inc., 2002 U.S. Dist. LEXIS 18555, 01 Civ. 1125 (GEL), 2002 WL 31191741, at *7 (S.D.N.Y. Sept. 30, 2002)*

(noting that the "debate continues" even though recent Second Circuit opinions such as *Ganino* and *Boguslavsky* "appear to treat culpable participation as an element of the *prima facie* case . . . since the pleading standard of *Section 20(a)* was not at stake in any of those cases and the split was not explicitly addressed") (citation and internal quotation marks omitted); *see also* [*In re Loral ]]Space & Communications Ltd. Sec. Litig., 2004 U.S. Dist. LEXIS 3059, No. 01 Civ. 4388 (JGK), 2004 WL 376442, [*82] at *19 (S.D.N.Y. Feb. 27, 2004)* (adopting culpable participation requirement). Other judges have opined that "*Section 20(a)* requires the plaintiff to allege only control, not scienter or culpable conduct." *Duncan v. Pencer, 1996 U.S. Dist. LEXIS 401, 94 Civ. 321 (LAP), 1996 WL 19043, at *17 (S.D.N.Y. Jan. 18, 1996)* (collecting cases and noting that Judge Pollack has adopted this view); *Food & Allied Servs. Trades Dep't v. Millfeld Trading Co., 841 F. Supp. 1386, 1390 (S.D.N.Y. 1994)* (Sand, J.) ("We agree . . . that all that is required to make out a *prima facie* case of controlling person liability at the pleading stage is an allegation of control status."). Your Honor has previously weighed in on this issue, siding with those judges who have concluded that a particularized showing of culpable participation is necessary. *See In re Solv-Ex Corp. Sec. Litig., 210 F. Supp. 2d 276, 284 (S.D.N.Y. 2000)*. Accordingly, I have assumed for purposes of this Report and Recommendation that culpable participation is a necessary element of a *Section 20(a)* claim.

The Complaint adequately alleges that each of the Individual Defendants was an Elan control person [*83] during at least some of the Class Period. (*See* Compl. PP 209-14). Nevertheless, the Complaint does not set forth a particularized showing of culpable participation on the part of any of the Individual Defendants. Perhaps the closest that the Plaintiffs come to meeting this requirement is their allegation that in 2002, after financial analysts began to question Elan's disclosures, "Geaney continued to insist that there had been 'full and fair disclosure.'" (*Id.* P 213). As noted earlier, if a denial of wrongdoing could serve as the factual predicate for a showing of scienter (or culpable participation), this element of a securities law claim would become a mere formality in any action in which the individual defendants (or control persons) did not concede liability. While the exact boundaries of what must be alleged may be unclear under existing Second Circuit law, Geaney's mere denial of wrongdoing plainly is not enough to meet the Plaintiffs' pleading burden under *Section 20(a)* if a plaintiff must make a particularized showing of culpable participation. Count VI of the Complaint therefore fails to state a claim against any of the Individual Defendants.

## V. *Conclusion*

[*84] For the reasons set forth above, the defendants' motion to dismiss should be granted in part and

2004 U.S. Dist. LEXIS 9913, *

denied in part. The Plaintiffs' cross-motion to strike certain exhibits proffered by the Elan and KPMG-Ireland Defendants is rendered moot, because I have not considered those exhibits, which raise matters not appropriate for consideration at this pre-discovery stage. Finally, the Plaintiffs' cross-motion asking the Court to take judicial notice of Elan's 2002 Annual Report and Form 20-F should be granted.

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Richard M. Berman, at the United State Courthouse, 40 Centre Street, New York, New York, 10007, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See 28 U.S.C.     636(b)(1)*; *Fed. R. Civ. P. 6(a)* [*85] *, 6(e), 72(b)*. Any requests for an extension of time for filing objections must be directed to Judge Berman. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985)*; *28 U.S.C.     636(b)(1)*; *Fed. R. Civ. P. 6(a), 6(e), 72(b)*.

Dated: New York, New York

May 18, 2004

FRANK MAAS

United States Magistrate Judge