# TAB 11

Case 1:07-cv-09633-LBS-DFE    Document 57-12    Filed 07/21/2008    Page 1 of 9

LEXSEE 2003 U.S. DIST. LEXIS 16898

**ZACHARY R. FADEM, RICHARD JASTREMSKI, GORDON KAISER, JOHN H. ARTRIP, JOHN M. CALLAHAN, RICHARD and ELLEN MILLER, and SEYMOUR SHAPIRO, on behalf of themselves and all others similarly situated, Plaintiffs, -against- FORD MOTOR CO., JACQUES NASSER, and HENRY D.G. WALLACE, Defendants.**

02 Civ. 0686 (CSH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 16898*; *Fed. Sec. L. Rep. (CCH) P92,523*

September 24, 2003, Decided
September 25, 2003, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at *Fadem v. Ford Motor Co., 2005 U.S. Dist. LEXIS 793 (S.D.N.Y., Jan. 19, 2005)*

**DISPOSITION:** [*1] Defendants' motion to dismiss complaint under *Rules 12(b)(6) and 9(b)* granted.

**COUNSEL:** For Zachery R Fadem, PLAINTIFF: Christopher Lovell, Lovell, Stewart, Halebian, LLP, New York, NY USA.

For Robert H Blailock, Richard Jastremski, Gordon Kaiser, Bennett A Porter, Jr, PLAINTIFFS: Aaron Lee Brody, Stull, Stull & Brody, Christopher J Gray, Lovell, Stewart, Halebian, LLP, New York, NY USA.

**JUDGES:** CHARLES S. HAIGHT, JR., SENIOR UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge:

Plaintiffs are a purported class of shareholders in Ford Motor Company ("Ford") who brought this action against Ford and two of its officers, former President and CEO Jacques Nasser ("Nasser") and former Group Vice President and CFO Henry D. G. Wallace ("Wallace"), alleging that Ford and its officers made fraudulent or misleading statements with respect to commodities futures activity by the company, in violation of *§ 10(b) of the Securities Exchange Act of 1934* (the "1934 Act"), *Rule 10b-5* promulgated thereunder, and *§ 20(a)* of the 1934 Act. [1] Pursuant to *Rules 9(b)* and *12(b)(6)* of the Federal Rules of Civil Procedure [*2], defendants move this Court to dismiss the complaint. For reasons set forth below, defendants' motion to dismiss is granted, with leave to plaintiffs to replead.

> 1 The class is described as purchasers of Ford common stock from March 21, 2001 through January 10, 2002. No class has as yet been certified.

I. BACKGROUND

Ford is the world's second-largest automobile producer. Pursuant to the Clean Air Act, *42 U.S.C. § 7401, et seq*, the company makes use of autocatalysts to limit emissions from the internal combustion engines in its automobiles. In order for these autocatalysts to function properly, they are coated with a solution of chemicals and non-ferrous metals, typically including platinum group metals. It is the purchase of one of these metals, palladium, that is at issue in this case.

Between July 31, 2000 and February 9, 2001, Ford

Case 1:07-cv-09633-LBS-DFE    Document 57-12    Filed 07/21/2008    Page 3 of 9

Page 2
2003 U.S. Dist. LEXIS 16898, *2; Fed. Sec. L. Rep. (CCH) P92,523

entered into a series of forward contracts to purchase palladium at fixed prices. The market for this commodity was highly volatile at the time--due [*3] in part to factors such as periodic interruptions in supplies from Russia, as well as increased demand stemming from tighter controls on engine emissions. As a result, Ford's contracts were purchased at historically high prices.

By the fourth quarter of 2001, Ford engineers validated an improved catalyst design technology that sharply reduced the company's need for palladium. As a result, Ford no longer needed the large supply of palladium it had either purchased or promised to purchase. After several unsuccessful attempts to dispose of this excess supply, Ford eventually entered into cash settling contracts in lieu of taking physical delivery of the metals. As required by Financial Accounting Standards ("FAS") 133, it marked to market its forward purchase contracts as of December 31, 2001, resulting in a non-cash charge to earnings in the amount of $ 953 million. *See* Ford's 2001 Form 10-K Annual Report, p. FS-17 n.16.

Ostensibly, the metals covered by the forward purchase contracts were intended for normal use in production. The plaintiffs allege, however, that Ford's actual purpose was to engage in a speculative bet that the price of palladium would continue to rise, so that [*4] Ford and its officials could resell the commodity for a profit. Compl. P 29. Moreover, the plaintiffs allege that Ford and its officers knew or should have known that it was purchasing a far greater supply of palladium than it needed, as demonstrated by the allegation that Ford and its officers knew the company was in the midst of implementing the new palladium-reducing technology at the time it entered into the contracts. As a result, the shareholders allege that Ford and its officers made several misrepresentations and omissions with regard to the forward contracts. Specifically, they allege that the defendants claimed the forward contracts were purchased as a hedge, thereby concealing the true speculative purpose of the contracts and the extent of the risks the company faced.

## II. *RULE 12(b)(6) AND 9(b)* STANDARDS OF REVIEW

On a motion to dismiss a complaint under *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)*; [*5] *see Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 124 (2d Cir. 1991)*. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. The district court should grant a *Rule 12(b)(6)* motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)* (*citing Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*. In the case at bar, the motion to dismiss for failure to state a claim must be judged in accordance with the substantive law of civil suits based on violations of *§ 10(b)* and *Rule 10b-5*.

Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 118 L. Ed. 2d 208, 112 S. Ct. 1561 (1992)*; [*6] *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*. On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain, 478 U.S. 265, 283, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986)*, and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991)*. "[A] *Rule 12(b)(6)* motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982)*.

The Court may take judicial notice of public disclosure documents filed with the SEC when considering a *Rule 12(b)(6)* motion. *See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)*; *In re MetLife Demutualization Litig., 156 F. Supp.2d 254, 259 n.1 (E.D.N.Y. 2001)*. Similarly, the full text of any document quoted or referred to in a complaint, including news articles, may be considered by the Court on a motion to dismiss. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 809 (2d Cir. 1996)*; [*7] *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991)*.

*Federal Rule of Civil Procedure 9(b)* provides "in all

Case 1:07-cv-09633-LBS-DFE    Document 57-12    Filed 07/21/2008    Page 4 of 9

Page 3
2003 U.S. Dist. LEXIS 16898, *7; Fed. Sec. L. Rep. (CCH) P92,523

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Accordingly, a complaint alleging fraud must (1) specify the statements, oral, or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent. *Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995)*.

### III. DISCUSSION

**A. Failure to State a Claim that Defendants Made Fraudulent Statements or Omissions**

To state a claim under *§ 10(b)* and the corresponding *Rule 10b-5*, a plaintiff must "plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's [*8] reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co., 228 F.3d 154, 161 (2d Cir. 2000)*.

The plaintiffs' primary allegation is that by entering into forward purchase contracts for palladium, defendants engaged in speculative activity that subjected the company--and consequently its shareholders--to risk of enormous loss. By failing to disclose to its shareholders that they were speculating, defendants violated *§ 10(b) of the Securities and Exchange Act and Rule 10b-5* promulgated thereunder. *See* Compl. PP 74, 88-95. Defendants counter that Ford was not "speculating" but rather hedging its bets in an uncertain market. It is conceded that defendants disclosed to its shareholders that it would make use of forward contracts to hedge commodity price risk. [2] Thus it is necessary to determine whether defendants' activity constituted the virtue of hedging (as defendants contend) or the vice of speculating (as plaintiffs contend).

   2   In its Form 10-K Annual Report for the year ended December 31, 2000, Ford disclosed its use of forward contracts to hedge commodity price risk as follows:

   Commodity Price Risk

   We enter into commodity forward and option contracts. Such contracts are executed to offset our exposure to the potential change in prices mainly for various non-ferrous metals ... used in the manufacturing of automotive components.

[*9] The distinctions between hedgers and speculators are "often quite blurred." *Leist v. Simplot, 638 F.2d 283, 287 (2d Cir. 1980)*. However, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 72 L. Ed. 2d 182, 102 S. Ct. 1825 (1982)*, the Supreme Court described hedgers as "those who actually are interested in selling or buying the commodity," and whose "primary financial interest is in the profit to be earned from the production or processing of the commodity." *Id. at 359*. By contrast, the Court defined speculators as "those who seek financial gain by taking positions in the futures market." *Id.*

Guided by these distinctions, defendants' activities appear at first blush to be those of a hedger. It is undisputed that Ford used palladium in the course of its production process. The plaintiffs, on the other hand, charge that the defendants purchased much more palladium than Ford needed, and that the defendants failed to minimize their risk of exposure by, for example, purchases of palladium put options, or other transactions that would ensure financial stability, in case the price of palladium should fall. Compl. [*10] PP 43, 44. Furthermore, plaintiffs allege that when rumors circulated on the New York Mercantile Exchange ("NYMEX") to the effect that Ford was experiencing a shortage of supply, defendants did not deny the false accusations, leading indirectly to a further increase in the purchase price of the metal. Compl. PP 62, 63. Moreover, plaintiffs aver, defendants entered into forward contracts for palladium at a time when it making plans to introduce new technology that would dramatically reduce its palladium needs. Compl. PP 36, 37.

In hindsight, there is little doubt that Ford purchased future contracts for palladium at record high prices. By December 31, 2001, Ford marked to market its forward purchase contracts for palladium, resulting in a non-cash charge to earnings in the amount of $ 953 million dollars. Compl. PP 48, 86, 87. In addition, the market price of

Case 1:07-cv-09633-LBS-DFE   Document 57-12   Filed 07/21/2008   Page 5 of 9

Page 4
2003 U.S. Dist. LEXIS 16898, *10; Fed. Sec. L. Rep. (CCH) P92,523

Ford stock fell to a four-year low. [3] Comp. P 86. However, the plaintiffs' allegations fail to demonstrate that the defendants' actions represented fraudulent behavior rather than mere mismanagement. Indeed, it is entirely plausible that the defendants were making what they thought to be a reasonable business judgment at the [*11] time, since by entering the forward contracts, they were protecting Ford from the distinct possibility that the price of palladium would increase.

> 3  The palladium related loss, less than $ 1 billion, was not the sole or even the principal cause of the depressed stock price. The total pre-tax charge to earnings announced by Ford for the fourth quarter of 2001 was $ 5.7 billion. The after tax loss was $ 4.1 billion. *See* 2001 Form 10-K, p. FS-17 n.16 Ford's 2001 year-end total assets were $ 277 billion. *Id.*

As a general matter, companies should not be barred from engaging in activities that are merely "risk-increasing." Compl. P 42. It is not the role of the courts to second guess the decisions made in the course of business operations, lest every strategy that goes awry becomes subject to a lawsuit, and corporations are inhibited from following all but the most conservative path. *See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)* ("While greater clairvoyance ... might have led to a [*12] realization that foreign governments and enterprises might encounter difficulties, ... failure to make such perceptions does not constitute fraud."); *Acito, 47 F.3d at 53* ("Defendants' lack of clairvoyance simply does not constitute securities fraud."). In this case, plaintiff's proffered evidence establishes only that the defendants made the decision to stockpile an ingredient necessary to their production process. They did so at high prices, but also in an uncertain and volatile marketplace. Nothing in the plaintiff's allegations gives rise to a belief that the defendants' actions represent speculation rather than poor management.

Plaintiffs rely upon *In re Ashanti Goldfields Secs. Litig., 184 F. Supp.2d 247 (E.D.N.Y. 2002)*, where shareholders of a gold mining company brought *Rule 10(b)and 10b-5* actions against the company and two officers, charging that the company's alleged hedging activity with respect to future gold prices was in actuality risky speculation. Finding for the plaintiffs, the District Court noted, "if hedging functions as a variety of insurance, as numerous courts have explained, changes in the price of the commodity normally [*13] should not lead to losses for parties engaged in it." *Id. at 256*. The plaintiffs at bar assert that Ford's $ 953 million loss shows that the company was actually engaging in speculation rather than hedging.

However, *Ashanti* is distinguishable from the present case. The Court in *Ashanti* went on to add, "the increase in the cash price for the commodity producer's reserves should offset any lost profit in futures sales." *Id.* In other words, because Ashanti was a commodity *producer,* a loss of profit due to rising gold prices should have been offset by the fact that they could then sell their own supply of gold at the higher price. The fact that they did not have any gold to sell clearly indicated that they were a gold seller in name only, and that rather than acting as an insurance against volatility, their options contracts were actually speculative in purpose. By contrast, the defendants are not palladium producers but *consumers.* Their primary goal was locking in a fixed price for a necessary supply. Since the defendants entered into their commodities contracts for a decidedly different purpose than a commodity producer, *Ashanti* does not necessarily [*14] apply.

*Ashanti* is distinguishable for further reasons. First, as the Court noted, "Ashanti had become more dependent for its profits on the futures market than a producer that was merely hedging would be." *Id. at 257*. This is not the case for the defendants, nor have the plaintiffs demonstrated as such. [4] Second, Ashanti's CEO stated he was "prepared to concede that we were reckless. We took a bet on the price of gold. We thought it would go down and we took a position." *Id.* No Ford officer or employee has made a similar statement.

> 4  All of Ashanti's profits for 1997 and 1998, and two-thirds of its profits in 1996 were a product of its hedging operations. *Ashanti, 184 F. Supp.2d at 257*. By contrast, both Ford's profits and losses far surpassed the magnitude of its palladium loss. In 2000, the company's profits stood at $ 8.2 billion, and in 2001 its losses were $ 7.6 billion.

The plaintiffs also assert that the defendants entered into palladium future contracts at [*15] a time when they knew they would be implementing a new technology that would drastically reduce their palladium needs. In *Merrill Lynch,* the Supreme Court noted that "when a hedger takes a long or a short position that is greater than its interest in the commodity itself, it is to that extent no

Case 1:07-cv-09633-LBS-DFE   Document 57-12   Filed 07/21/2008   Page 6 of 9

Page 5
2003 U.S. Dist. LEXIS 16898, *15; Fed. Sec. L. Rep. (CCH) P92,523

longer a hedger, but a speculator." *456 U.S. at 360 n.10.* Building upon that proposition, plaintiffs say that even conceding that after implementing the new technology the defendants would still need a limited supply of palladium, if the defendants willfully purchased a quantity of palladium that they knew would far exceed their future palladium needs, then Ford was no longer acting as a hedger but a speculator with respect to the palladium commodity.

For this theory to succeed, plaintiffs would need to establish that the defendants knew or should have known, *at the time they purchased the palladium contracts,* that the new technology would be implemented at a certain time in the future, so that the defendants' need for the metal was far less than what they actually purchased.

The plaintiffs attempt to establish the defendants' knowledge in that regard is based almost [*16] exclusively on news articles. [5] However, these articles do not indicate that defendants knew with any reasonable degree of certainty, at the time they purchased the forward contracts, that their palladium-reducing technology would be implemented at a known date in the future.

> 5   Beyond the news articles, plaintiffs make two further arguments in support of the new technology claim. First, plaintiffs state in conclusory fashion without reference to specific facts or sources, that "the history of autocatalyst conversion in automobiles has been one of repeated improvements in technology," including a decrease in the amount of platinum group metals used. Compl. P 35. Second, the plaintiffs refer, again without reference, to future anticipated breakthroughs by Ford and others in palladium reduction. Compl. P 36. These assertions, even if true, are not probative on the issue of whether defendants knew they were over purchasing palladium, at the time the purchases were made.

Three of the news articles cited by the plaintiffs [*17] do not refer to the Ford at all, but to other companies. The gist of these articles is that these companies planned on reducing their palladium usage in the near future. *See Automakers Steering Away From Palladium in Catalytic Converters,* American Metal Market, May 29, 2000, at 7 (noting that South Korean automakers were developing catalytic converters using less palladium); *Honda Motor to Unveil New Minivan That Uses a New Catalytic Converter from Catalytic Solutions, Inc.,* Santa Barbara News-Press, Mar. 22, 2001 (reporting that Honda unveiled a new minivan that reduced the amount of palladium used); Johnson Matthey's *The Platinum Metals Report,* Jan. 2001, at 2 ("GM planned to reduce its palladium consumption by 40-50 per cent by 2003 ...."). While these articles may convey news of technological advances in the industry generally, they do not establish that Ford or its officers specifically were aware of the company's own implementation of palladium saving devices.

Other articles cited by the plaintiffs do allude to Ford but do not refer to the palladium decreasing technology in question. *See Pet Project Carmakers Are Green With Innovation in Coming Up With Environmentally* [*18] *Friendly Vehicles,* Chicago Trib., June 18, 1998, at 1 (reporting new emissions reducing catalysts used by Ford that actually required *more* palladium than had been previously used.); Jim Suhr, *Honda to Pare Use of Precious Metals in Auto Exhaust Systems.* Associated Press Newswires, Mar. 22, 2001 (quoting Ford Chairman William Clay Ford, Jr.'s promise that fuel cells would "finally end the 100-year reign of the internal combustion engine"). [6] In addition, the plaintiffs cite a report that Ford was "considering" licensing an ultra-low palladium catalyst from a third party. See Brian Corbett, *Not So Precious Anymore; Automakers Cutting Palladium Use,* Ward's Auto World, June 1, 2001, at 47. However, this event took place well *after* Ford had already purchased palladium forward contracts. Again, these articles do not establish that the defendants had knowledge, at the time of palladium purchase, that it would be using palladium reducing technology.

> 6   Current fuel cell technology requires twice the amount of precious metal usage as typical catalysts. See Brian Corbett, *Not So Precious Anymore: Automakers Cutting Palladium Use,* Ward's Auto World, June 1, 2001, at 47.

[*19] Finally, the plaintiffs reference quoted statements by top Ford officials that allude to a near term transition into palladium-reducing catalysts. In an August 2000 article, Ford vice president Martin Inglis stated that "within the next 12 months" Ford would make the switch "from palladium to platinum ... *on nine vehicles." Auto Companies Vow to Reduce Palladium Use,* Platt's Metals Week, Aug. 28, 2000, at 1, 1 (emphasis added). Ford Motor Company has 25 vehicles in its Ford fleet alone. [7]

Case 1:07-cv-09633-LBS-DFE   Document 57-12   Filed 07/21/2008   Page 7 of 9

Page 6
2003 U.S. Dist. LEXIS 16898, *19; Fed. Sec. L. Rep. (CCH) P92,523

To say that the company was planning on making the switch on nine of its vehicles does not represent a drastic anticipated reduction in palladium demand. In the same article, Dr. Harendra Gandhi, Director of Chemical Engineering at Ford's Scientific Research Laboratories, stated, "We are taking very aggressive actions to quickly move away from palladium ..." in the "very short term." *Id.* Even these optimistic statements by Dr. Gandhi, presumably expressed in hopes of obtaining favorable publicity, are vague and do not necessarily lead to the conclusion that the defendants knew they would no longer need a large supply of palladium when they purchased the forward contracts. The uncertainty [*20] of the switch is evidenced by analyst Ellen Zadoff's matter-of-fact statement, in the same article, "You are not going to see anything revolutionary over the short term." *Id. See also* Adam Aljewicz, *Auto Industry Considers Alternative Metals to Palladium,* Dow Jones Int'l News, Feb. 23, 1999 (reporting that "any switch from palladium to other metals will take time").

> 7   It also owns or has a vested interest in Lincoln, Mercury, Mazda, Volvo, Jaguar, Land Rover, and Aston Martin. See Ford Motor Company Home Page, *at* http://www.ford.com (last visited Sept. 10, 2003).

At best, these articles provide hopeful and optimistic reports that the defendants would soon convert to a new palladium-reducing technology. But they do not establish that either Ford or its officers knew or should have known that the technology would be guaranteed for use at a *specific* time. The plaintiffs allege that the defendants knew at sometime in the year 2000 that "the only remaining issue was 'when', not 'if'" their technology [*21] would reduce their palladium needs. Compl. P 51. Perhaps that is true; however, the question of "when" is critical to establishing the plaintiffs' claim. The answer could have been (and indeed was) the fall quarter of 2001, but it just as reasonably could have been 2002, 2003, or beyond. Even the articles that the plaintiffs cite demonstrates the presence of uncertainty.

Finally, plaintiffs' complaint alleges the following:

> According to plaintiffs' investigations (including statements made by Ford purchasing employees located in Detroit Michigan and Ontario Canada to other persons, and statements made by an unnamed Ford employee who has personal knowledge of the facts to a reporter), the true reason that Ford, and Ford alone among U.S. automakers, suffered this anomalous, $ 1,000,000,000 loss is that Ford knowingly and purposely speculated on and did not adequately hedge its speculative exposure to palladium prices.

Compl. P 40.

This paragraph does not attribute to Ford officers or employees the view that the defendants were speculating on the price of palladium. Rather, the plaintiffs are careful to attribute that conclusion to "plaintiffs' investigation." In any event, [*22] plaintiffs do not even make an attempt to provide any particular information about those Ford individuals. And while the Second Circuit has rejected "any notion that confidential sources must be named as a general matter," the Court has also stated that sources such as former employees must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000). See In re Smith-Gardner Sec.Litig., 214 F. Supp.2d 1291, 1301 (S.D. Fla. 2002)* ("A bare-bones claim that this former employee was 'involved with the installation' without another adequate basis for believing Plaintiffs' allegations is insufficient."). The plaintiffs have not pleaded their claims with particularity sufficient to satisfy *Federal Rule of Civil Procedure 9(b)*.

### B. Failure to Establish Scienter

Under the Private Securities Litigation Reform Act ("PSLRA"), "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Acito, 47 F.3d at 52.* [*23] *See also Ganino, 228 F.3d at 168*, providing that "the requisite state of mind in a *Rule 10b-5* action is 'an intent to deceive, manipulate or defraud'" (quoting *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976))*. Such intent can be established "either by (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)*. The plaintiffs have failed to plead facts sufficient to justify an inference of fraudulent

Case 1:07-cv-09633-LBS-DFE    Document 57-12    Filed 07/21/2008    Page 8 of 9

Page 7
2003 U.S. Dist. LEXIS 16898, *23; Fed. Sec. L. Rep. (CCH) P92,523

intent, based on either prong

**1. Motive and Opportunity**

The motive element of fraudulent intent "entails concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields, 25 F.3d at 1130*. "General allegations that the defendants acted in their economic self-interest are not enough." *Ganino, 228 F.3d at 170*.

Plaintiffs' motive and opportunity scienter claims focus on the two individual [*24] defendants, Nasser and Wallace. Plaintiffs assert that they "were under intense pressure and subject to intense criticism of their job performance from approximately March through October 2001." Compl. P 56(a). Furthermore, plaintiffs assert both that their executive positions and compensation were at risk between March and October 2000 (Compl. P 56(b)) and that they were eventually fired or otherwise let go from the company by fall of 2001. The plaintiffs do not further specify what specific factors led to criticism or risk of job loss. *Ganino* teaches that undefined or unspecific references to employee pressure are not enough to establish motive.

**2. Conscious Misbehavior or Recklessness**

Conscious misbehavior is "easily identified since it encompasses deliberate illegal behavior." *Novak, 216 F.3d at 308*. The plaintiffs have not attempted to establish conscious misbehavior in this case.

Recklessness, on the other hand, is "harder to identify with ... precision and consistency." *Id.* The Second Circuit has defined reckless conduct as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... [*25] to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rolf v. Blyth, Eastman Dillon & Co.,570 F.2d 38, 47 (2d Cir. 1978)* (quoting *Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1997))*. See *Goldman v. McMahan, Brafman, Morgan & Co., 706 F. Supp. 256, 259 (S.D.N.Y. 1989)* (defining reckless conduct as "an egregious refusal to see the obvious, or to investigate the doubtful").

The plaintiffs fail to establish that Ford or its officials acted with a reckless conduct that would lead toward a strong inference of fraud. Allegations of "fraud by hindsight" are not enough. *Stevelman v. Alias Research Inc., 174 F.3d 79, 85 (2d Cir. 1999)*. Corporate officers need not be clairvoyant. Thus, "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak, 216 F.3d at 309*. For reasons noted above, plaintiffs' complaint does not give rise to a strong inference that Ford and its officers knew or should [*26] have known that they were over purchasing palladium.

In order to meet the pleading standards, a complaint must contain more specific allegations of defendants' knowledge of facts or access to information contradicting their public statements than the plaintiffs have alleged. For example, the pleading standard was met when defendants made or authorized statements that sales to China would be "an important new source of revenue," while at the same time the People's Republic of China announced new import restrictions that would restrict defendant's sales to Chinese customers. *Cosmas v. Hassett, 886 F.2d 8, 12 (2d Cir. 1989)*. The differences between *Cosmas* and the case at bar are instructive. While the plaintiffs in *Cosmas* pointed towards Chinese regulations that were concrete and fixed to specific dates, the claims of the present plaintiffs depend on tenuous prognostications by Ford officials that were not date specific and only hopeful at best. Conclusory allegations gleaned from vague statements in news articles do not rise to the level of particularity required of *Rule 9(b)*.

The Court does not improperly undertake the role of the jury when it evaluates competing [*27] inferences and concludes that defendants' alleged actions constituted mismanagement rather than recklessness or fraud. The Court does no more than regard plaintiffs' factual allegations as insufficient to support an inference of fraudulent intent. *See Chill v. GE, 101 F.3d 263, 268 n.7*.

**C. Control Person Liability**

The plaintiffs assert a claim under *§ 20(a) of the Exchange Act* against defendants Nasser and Wallace. To establish a claim under *§ 20(a)*, a plaintiff must establish "(1) a primary violation of the 1934 Act, (2) scienter, and (3) control of the primary violator by the defendants." *In re 1993 Corning Sec. Litig., 93 Civ. 7015, 1996 U.S. Dist. LEXIS 6601, at *26 (S.D.N.Y. May 15, 1996)*. For reasons set forth above, the plaintiffs have failed to plead facts from which an inference of scienter can be drawn

Case 1:07-cv-09633-LBS-DFE   Document 57-12   Filed 07/21/2008   Page 9 of 9

Page 8

2003 U.S. Dist. LEXIS 16898, *27; Fed. Sec. L. Rep. (CCH) P92,523

against any defendant.

**IV CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss the Complaint under *Rules 12(b)(6) and 9(b)* is granted.

The Court grants plaintiffs leave, if so advised, to file and serve an amended complaint on or before October 27, 2003, if plaintiffs are able to do so in a manner consistent with the [*28] provisions of *Rule 11, Fed. R. Civ. P.*

Defendants are directed to answer an amended complaint, if one is served and filed, in the form and within the time specified by the Rules.

It is SO ORDERED.

Dated: September 24, 2003

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE