# TAB 13

LEXSEE 1996 U.S. DIST. LEXIS 15091

DEBORAH ANN FISHER, Individually and on behalf of those similarly situated, Plaintiffs, -against- JERRY ROSS, JEFFREY KREINDEL, ANDREW KRAMER, JOSEPH PASCAL, ALEX EHRLICH, ANDREW JASSIN, and RONALD A. RESNICK, Defendants.

93 Civ. 0275 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*1996 U.S. Dist. LEXIS 15091*; *Fed. Sec. L. Rep. (CCH) P99,348*

September 30, 1996, Decided
October 11, 1996, FILED

**DISPOSITION:** [*1] Defendants' motions for summary judgment granted and claims under § 11 of the Securities Act against all of the defendants and claims under § 10(b) of the Exchange Act and *Rule 10b-5* promulgated against defendant Ross dismissed.

**COUNSEL:** APPEARANCES:

For plaintiff: Curtis V. Trinko, Timothy J. MacFall, and Lori E. Colangelo, Esqs., Law Offices of Curtis V. Trinko, New York, New York.

For defendants: Martin S. Siegel, John P. Biedermann, Esqs., Berlack, Israels & Liberman LLP, New York, New York.

**JUDGES:** John G. Koeltl, United States District Judge

**OPINION BY:** John G. Koeltl

**OPINION**

*OPINION AND ORDER*

**JOHN G. KOELTL, District Judge:**

This is a class action alleging securities fraud against the former directors of Ilio, Inc. ("Ilio") arising out of a debenture offering followed by a bankruptcy filing. The plaintiff asserts claims based on § 11 of the Securities Act of 1933 (the "Securities Act"), *15 U.S.C. § 77k*, against all of the defendants, and a claim based on § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *15 U.S.C. §§ 78j(b)*, and *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, promulgated thereunder, only against defendant Jerry Ross, Ilio's chairman, chief executive [*2] officer and chief financial officer.[1] The § 11 claims are based on several alleged misrepresentations or omissions in the Prospectus for the debenture offering. The class consists of those persons and entities who purchased the Ilio debentures during the Offering Period pursuant to the Prospectus. The § 10(b) and *Rule 10b-5* claims are based on allegedly fraudulent misrepresentations and omissions allegedly made by Ross in a press release made public during the Offering Period. The defendants now move for summary judgment dismissing the complaint.

> 1   The plaintiff also asserts a claim against defendant Ross as a controlling person under § 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)*.

I.

There is no genuine dispute with respect to the following facts. Ilio, a company founded in 1985, was a New York corporation with its principal place of business in New York City. Its product line consisted primarily of ladies' cotton woven shirts that it designs, manufactures overseas, and imports for sale in the [*3] United States. Ilio went public in 1989 after experiencing rapid growth. In 1991, Ilio formed three new divisions dedicated to new

Case 1:07-cv-09633-LBS-DFE    Document 57-14    Filed 07/21/2008    Page 3 of 11

Page 2

1996 U.S. Dist. LEXIS 15091, *3; Fed. Sec. L. Rep. (CCH) P99,348

product lines including knitwear, bottoms, and basketball sportswear.

Ilio's operations depended on several forms of credit including letters of credit on overseas shipments and bank lines of credit to support those letters of credit. In October 1991, Ilio established a $16 million line of credit with Barclays Commercial Credit Corp. ("Barclays") and Chase Manhattan Bank ("Chase"), a $2 million increase over Ilio's prior line of credit with Marine Midland Bank. In mid-1991, Ilio engaged Offerman & Co., Inc. ("Offerman & Co.") to explore a possible public debt offering. The issue would consist of convertible senior subordinated debentures (the "Debentures") with a face value of $5.5 million with a possible overallotment of additional debentures with $2 million in face value. The Debentures were to bear interest at 11% per year, payable monthly and were to mature on January 1, 2002.

In connection with preparations for the Offering, Offerman & Co. performed due diligence. Ilio's independent auditors reviewed its financial records, and Ilio's board of [*4] directors reviewed drafts of the Securities and Exchange Commission ("SEC") disclosure filings. [2] Ilio then filed a Form S-1 Registration Statement and Prospectus with the SEC and the SEC declared the registration statement effective on January 24, 1992. From that time until April 15, 1992 (the "Offering Period") the Debentures were offered for sale and sold. [3] Staggered closings were conducted at various points during the Offering Period at which time net proceeds from the completed Debenture sales were transferred to Ilio's bank, Chase. At the conclusion of the Offering Period, the entire Debenture issue including the overallotment had been sold, netting Ilio proceeds of about $6.6 million.

> [2] The plaintiff disputes the intensity and effectiveness of the due diligence performed by Offerman & Co. and the review by Ilio's auditors. The plaintiff also disputes the thoroughness of the review performed by Ilio's board of directors. These disputed facts are not germane to the issues on this motion which relate solely to the materiality of the alleged misstatements and omissions in the Prospectus and whether the alleged omissions were required to make the representations in the Prospectus not misleading. The defendants have not argued that they are entitled to summary judgment based on a "due diligence" defense under § 11(b). *See* 15 U.S.C. § 77k(b).

[*5]

> [3] The plaintiff disputes the duration of the Offering Period in spite of having conceded the April 15, 1992 ending date in its Rule 3(g) statement. The only evidence the plaintiff cites is the testimony of Ilio's controller, Jay Sosonko, that he was not sure that the last Debenture sales were complete by April 15 and that he thought there may have been an additional sale in May 1992. But after reviewing some documents, Sosonko testified that "Again, I'm not sure of the actual date when the final proceeds were transferred. I thought there might have been one in May, but apparently it may have been end of [sic] April." (Deposition of Jay Sosonko, dated April 21, 1995, at 187.) Therefore, there is no genuine issue of material fact with respect to the April 15, 1992 ending date of the Offering Period. The plaintiff has offered no evidence to dispute the documents, testimony, and her own admissions that the Offering Period ended on April 5, 1992. (See, e.g., Aff. of Joseph Pascal at P19, attached as Exhibit 50 to Aff. of John Biedermann; Ilio Form 10-K for Fiscal year ending April 30, 1992, at 3, attached as Exhibit 29 to Aff. of John Biedermann).

[*6] The Prospectus plainly indicated that the Debentures involved a high risk investment. The prospectus stated: "The Debentures involve a high degree of risk. In analyzing this offering, prospective investors should carefully consider the following risk factors, together with all other information in the Prospectus." (Prospectus at 7). The Prospectus then detailed nineteen specific risk factors including recent declines in sales, increases in losses and new operations, possible termination of credit facility, and dependence on proceeds of the Offering to comply with debt covenants of Ilio's credit facility.

On March 13, 1992, during the Offering Period, Ilio signed a letter of intent with National Football League Properties, Inc. ("NFL Properties") in connection with Ilio's effort to obtain exclusive manufacturing and distribution rights for a line of mens and boys sportswear through the newly formed N.F.L. Quarterback Club, Inc. ("QBC") division of Ilio. A formal agreement was

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 4 of 11

Page 3

1996 U.S. Dist. LEXIS 15091, *6; Fed. Sec. L. Rep. (CCH) P99,348

executed several months later.

Also in March 1992, Ilio began negotiations with Heller Financial, Inc. ("Heller") to arrange a $ 22 to $ 23 million line of credit. Ilio formally executed the line of credit with [*7] Heller for $ 23 million on July 22, 1992.

In September 1992, after the Offering Period, Ilio publicly announced a $ 3.3 million loss for the first quarter of its 1993 fiscal year, the three months ending July 31, 1992. On October 9, 1992, Jerry Ross, Ilio's chairman, chief executive officer and chief financial officer left Ilio on an extended sick leave. On December 30, 1992 Ilio filed for bankruptcy and monthly interest payments on the Debentures ceased.

## II.

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)*. "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend [*8] to issue-resolution." *Id., 22 F.3d at 1224*.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323*. The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962))*; *see also Gallo, 22 F.3d at 1223*.

If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for [*9] trial." *Fed. R. Civ. P. 56(e)*. With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper. *See Chambers v. TRM Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)*.

A plaintiff must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993)*; *see Wyler v. United States, 725 F.2d 156, 160 (2d Cir. 1983)*; *Cornett v. Sheldon, 894 F. Supp. 715, 724 (S.D.N.Y. 1995)*.

On a motion for summary judgment, once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must come forward with specific facts to show there is a factual question that must be resolved at trial. *See Fed. R. Civ. P. 56(e)*; *see also Cornett, 894 F. Supp. at 724* ("The plaintiff, to avoid summary judgment, must show a genuine issue by presenting evidence that would be sufficient, if all reasonable inferences [*10] were drawn in his favor, to establish the existence of that element at trial." (citing *Celotex, 477 U.S. at 322-23*)).

## III.

Under § 11 of the Securities Act, a purchaser of a security may sue if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . .." *15 U.S.C. § 77k(a)*. In this case, the plaintiff identifies four allegedly material omissions. The plaintiff argues that three of these omissions, while not required to be disclosed, should have been disclosed in order to prevent the representations included in the Prospectus from being misleading. The plaintiff argues that the fourth omission was required to be disclosed in any event.

To evaluate properly whether any of the omissions is a violation of § 11, the Court must consider the "affirmative statement that is made misleading by the material omission." *In re Union Carbide Class Action*

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 5 of 11

Page 4

1996 U.S. Dist. LEXIS 15091, *10; Fed. Sec. L. Rep. (CCH) P99,348

*Sec. Litig., 648 F. Supp. 1322, 1326 (S.D.N.Y. 1986)*. The perspective from which the evaluation must be made is controlled by the date [*11] the registration statement containing the prospectus became effective. *Nelson v. Paramount Communications Corp., 872 F. Supp. 1242, 1246 (S.D.N.Y. 1994)*; *see also Finkel v. Stratton Corp., 962 F.2d 169, 173-74 (2d Cir. 1992)*. The plaintiff must identify the assertion made misleading by omission--misleading impressions are insufficient, particularly impressions made misleading only with the benefit of hindsight. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir. 1996)*; *Denny v. Barber, 576 F.2d 465*. 470 (2d Cir. 1978); *In re Bank of Boston Corp. Sec. Litig., 762 F. Supp. 1525, 1538 (D. Mass 1991)*; *In re Union Carbide Class Action Securities Litigation, 648 F. Supp. at 1326*; *Ross v. A.H. Robins Co.*, [1978]*CCH Fed. Sec. L. Rep. P 96,388 at P 93,353 (S.D.N.Y. 1978)*.

The three alleged material omissions identified by the plaintiff that allegedly made representations in the Prospectus misleading are (1) Ilio's alleged use of the proceeds from the Debenture Offering for purposes different from those identified in the Prospectus; (2) Ilio's lenders allegedly having become inflexible with credit; [*12] and (3) Ilio's alleged difficulties securing letters of credit in a timely fashion resulting in cancellations, returns, late deliveries and narrowed gross profit margins.

The plaintiff identifies the fourth alleged material omission as the failure to disclose in the Prospectus the fact that certain Ilio directors had been employed previously by Magic Group, Inc., an importer of ladies apparel that had filed for bankruptcy in December 1985. The plaintiff argues that disclosure of this information was required pursuant to SEC regulations governing registration statements and failure to disclose the Ilio directors' prior affiliation with a defunct prior employer was a material omission.

The defendants argue that none of the four alleged omissions are either material or misleading and, even if they were, that the cautionary language also included in the Prospectus is sufficient to warn investors of the possibility of future problems and insulate the defendants from liability under the "bespeaks caution" doctrine.

A.

The plaintiff argues that the proceeds from the Debenture offering were not used for the purposes identified in the Prospectus. The Prospectus provides that:

> It [*13] is anticipated that such net proceeds will be utilized first as indicated in the next paragraph.
>
> Approximately $ 1,400,000 of the proceeds of this offering will be applied to finance the Company's [Ilio's] recently formed knitwear division, bottoms division, and NBA division. . . .
>
> . . .
>
> The balance of the net proceeds, if any, will be applied to working capital and general corporate purposes.

(Prospectus at 11.)

The plaintiff argues that none of the proceeds were used to finance the new divisions and instead the funds were used to pay down Ilio's bank debt. The plaintiff argues that at the time the registration statement became effective the defendants did not intend the proceeds would be used to finance the new divisions in accordance with the disclosure in the Prospectus.

The defendants argue that there is no evidence that they did not intend to use the offering proceeds as disclosed at the time the registration statement became effective. The defendants also argue that paying down bank debt was in fact a method of financing the new divisions by freeing up additional credit to draw letters of credit against and that financing the new divisions in this manner was contemplated [*14] by the disclosure in the Prospectus. Finally, the defendants argue that the representations concerning the use of the proceeds were never a firm commitment or guarantee and cannot form the basis of a securities fraud claim.

The Prospectus does include additional explanations regarding the use of the proceeds. The Prospectus provided:

> In lieu of or pending application of the net proceeds for the above purposes, the Company may apply a portion of the proceeds to reduce the amount outstanding

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 6 of 11

Page 5

1996 U.S. Dist. LEXIS 15091, *14; Fed. Sec. L. Rep. (CCH) P99,348

under its credit facility. A reduction of the balance due under the Company's credit facility should allow subsequent utilization of the credit facility for the purposes described above.

. . .

In the event the Underwriter [Offerman & Co.] exercises its over-allotment option, the net proceeds from the sale of Debentures sold pursuant to such overallotment will be allocated to working capital and/or to reducing the amount outstanding on the credit facility.

(Prospectus at 11-12.)

The Prospectus also disclaims that any of the representations regarding the use of the proceeds are assured:

None of the proposed uses described above constitutes a firm commitment by the Company. [*15] Projected expenditures are estimates only. Future events, including changes in the economic climate or the Company's business operations, may make shifts in the allocation of funds necessary or desirable.

(Prospectus at 12.)

Considered in light of the foregoing disclosures, the plaintiff's first "omission" is not an omission at all. The plaintiff merely disagrees with the proposition that applying the proceeds of the offering to reduce outstanding bank debt and free additional borrowing capacity to support letters of credit was a reasonable method of "financing" the new divisions. But the plaintiff has come forward with no evidence to support its view which stands in direct contradiction to the Prospectus and the evidence in the record.

The Prospectus plainly discloses that proceeds from the Debenture offering might be used to reduce Ilio's bank debt and that such a reduction would "allow subsequent utilization of the credit facility" for the identified purposes, namely financing the new divisions. Moreover, the testimony from Ilio's directors and officers uniformly supports the view that financing the new divisions consisted of providing inventory for sale purchased through [*16] letters of credit drawn against Ilio's credit line. By using the offering proceeds to pay down outstanding bank debt, Ilio was able to free additional borrowing capacity against which such letters of credit could be drawn. (*See*, *e.g.*, Deposition of Jerry Ross, dated March 21, 1995, at 529-30, 583-84; Deposition of Jay Sosonko, dated April 21, 1995, at 60, 102, 126, 175-76, 188.)

The plaintiff has not brought forward any evidence to suggest that use of the proceeds directly was a more preferred or more likely mechanism for financing the new divisions than the indirect method of reducing bank debt to increase borrowing capacity. And the indirect method is plainly disclosed in the Prospectus. The Prospectus also warns that the disclosure of the intended uses of the offering proceeds did not constitute a firm commitment. Moreover, the Prospectus indicated that the proceeds from the overallotment would be used to reduce bank debt, illustrating that there was nothing unusual about using at least some portion of the proceeds in that manner.

The plaintiff argues that the fact that the proceeds from the Debenture offering were wired directly to Ilio's account at Chase following each [*17] staggered closing raises an inference that the defendants never contemplated applying the proceeds directly to the new divisions. But the plaintiff has identified nothing unusual about this practice in light of the undisputed evidence that all of Ilio's operations, including those of the new divisions, were supported from that account. (*See* Ross Dep. at 528-29.)

The plaintiff also argues that Ilio's banks, Barclays and Chase, were anxious to have the offering proceeds applied to reduce outstanding debt and that the true purpose of applying the funds in that way was to avoid violating the company's debt covenants. The plaintiff relies on the testimony of Jay Sosonko, Ilio's controller, who recalled that the company was close to its peak borrowing capacity during the Offering Period. (*See* Sosonko Dep. at 136.) Sosonko also testified, however, that he did not believe the proceeds were required to avoid being out of compliance with the company's debt covenants and that the banks were motivated by a desire for Ilio to reduce outstanding debt to create additional borrowing capacity. (*See* Sosonko Dep. at 135-36.)

The plaintiff also points to the testimony of director

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 7 of 11

Page 6
1996 U.S. Dist. LEXIS 15091, *17; Fed. Sec. L. Rep. (CCH) P99,348

Ronald [*18] A. Resnick that at the beginning of the Offering Period the Ilio directors discussed the possibility of using the proceeds to comply with the company's debt covenants. (*See* Deposition of Ronald A. Resnick, dated Jan. 17, 1995, at 111-12.) Nothing about the existence of such discussions suggests that the Prospectus was misleading, however. First, the Prospectus indicates that only $ 1.4 million of the proceeds would be used to finance the new divisions. The remaining proceeds would be applied to working capital and general corporate purposes. Second, the Prospectus indicates that all of the proceeds from the overallotment option of an additional $ 2 million Debentures would be applied to reduce outstanding bank debt. Nothing about Resnick's recollection is inconsistent with these disclosures in the Prospectus--in fact, they are entirely compatible. Finally, the Prospectus expressly discloses that "the Company may be dependent upon the net proceeds of this offering to comply with minimum debt covenants imposed by its Lenders [Barclays and Chase] . . . . The Company believes, although no assurances can be given, that the net proceeds from this offering . . . will enable the Company [*19] to comply with its debt covenants." (Prospectus at 7-8.) This disclosure reveals the possibility discussed by the Ilio directors prior to the Offering Period and it was this disclosure in the Prospectus that Resnick was actually referring to in his deposition. Therefore the plaintiff cannot argue that this possibility was an omission of a material fact.

The plaintiff has failed to come forward with any evidence that the representations made in the Prospectus were misleading in any way. Nor has the plaintiff identified how the alleged omission of the "fact" that the proceeds could be applied to reduce outstanding bank debt made any of those representations materially misleading. The plaintiff merely asserts in a conclusory manner that use of the proceeds to reduce bank debt was not a method of financing the new divisions. But more than $ 1.4 million of the Offering proceeds were used in precisely that manner. (See Ross Dep. at 617-19.) And the Prospectus makes it clear how use of the proceeds in that way would finance the new divisions by making additional credit available. Moreover, the Prospectus was explicit that there was no assurance that the proceeds would be used at all in the [*20] manner proposed in the Prospectus.

Accordingly, the plaintiff's first alleged omission cannot form the basis of a securities fraud claim under § 11.

**B.**

The second and third alleged material omissions are both related to Ilio's credit position before and during the Offering Period. The plaintiff argues that the defendants failed to disclose that Ilio's lenders had become inflexible with credit and restricted Ilio's borrowing. The plaintiff also argues that Ilio was experiencing delays in obtaining letters of credit prior to, during, and after the Offering Period and that the delays had adversely affected Ilio's financial performance. The plaintiff supports her position that these omitted facts were violations of § 11 by citing a number of facts. The undisputed evidence demonstrates, however, that the facts as they existed at the time of Prospectus were disclosed in the Prospectus, that the adverse impact of the delayed letters of credit was not recognized until well after the Offering Period, and that the risks of loss of credit were in fact disclosed in the Prospectus. The plaintiff's claim is classic fraud by hindsight and cannot survive.

The plaintiff's argument with [*21] respect to Ilio's alleged undisclosed liquidity and letter of credit problems relies on an analysis of Ilio's financial performance after the Offering Period. In late June 1992 the company's financial auditors reported a substantial loss of over $ 1.4 million for the fiscal year ended April 30, 1992. In September 1992 Ilio management, including the defendants, were advised that the loss for the first quarter of the 1993 fiscal year, ending July 31, 1992, would exceed $ 3.3 million. The mounting losses were attributed to difficulties in obtaining letters of credit, and the failure of sales to develop as anticipated, particularly at the new QBC division. Ilio's chairman, Jerry Ross, announced publicly the first quarter 1993 loss on September 25, 1992.

The plaintiff does not dispute the underlying causes of Ilio's financial collapse. The failure to secure letters of credit resulted in cancelled orders, returns, and deep discounts designed to repair frayed customer relations. These difficulties combined with lackluster sales created an acute financial crisis leading ultimately to Ilio's demise. There is no evidence, however, that any of the information about either the causes or effects [*22] of Ilio's difficulties in securing letters of credit on time was available prior to late June 1992. Prior to that time, when the 1992 fiscal year results were reported to management by Ilio's auditors, the undisputed evidence in the record

1996 U.S. Dist. LEXIS 15091, *22; Fed. Sec. L. Rep. (CCH) P99,348

demonstrates that Ilio was enjoying healthy sales and had been successful in expanding its credit. In October 1991 Ilio replaced a smaller line of credit with Marine Midland with a larger $ 16 million line from Barclays and Chase. Shortly after the Debenture offering was completed, Ilio secured a $ 23 million line with Heller. Nothing about Ilio's ability to arrange successively higher lines of credit suggests that either the defendants or the lenders were aware of any symptoms of the impending losses. [4]

> 4   The plaintiff disputes the intensity with which Ilio's lenders or auditors reviewed the company's financial records. But beyond the conclusory denial, the plaintiff has come forward with no evidence that either the lenders or the auditors were aware of information suggesting the future losses or that the defendants were concealing such information from them.

[*23] In fact, while the testimony on which the plaintiff relies identifies the problem, it also demonstrates that the impact of the late letters of credit did not become apparent until May or June 1992. Sosonko explained:

> So [the late letters of credit] ran through the period February, March, April. We were constantly fighting with Chase, literally, to get these letters of credit open so we could get merchandise in and generate the sales on a timely basis.
>
> What happened is starting in May and June when these bills for the shipments that we made February, March, April came due, our customers came to us and said one of two things, "Look, you shipped us late, We can't pay you full price for this merchandise. We need a 25 percent discount" or "We need a 30 percent discount." Or the other option was, "We can't keep the merchandise at all, you shipped us late and we want to return it."
>
> . . . However, we didn't learn of this problem until May and June of '92, but it affected the April quarter. And that was the basic reason for that loss.

(Sosonko Dep. at 210-11.) There is no evidence that the plaintiff has produced to indicate that Sosonko's testimony is inaccurate or that [*24] there was other information available to the defendants that would have alerted them earlier to the problems associated with the late letters of credit. The plaintiff has failed to identify any assertions in the Prospectus that were inaccurate when made or that were made misleading by the omission of this information that only came to light after the Offering Period. [5]

> 5   The plaintiff points to Resnick's testimony that a loss of $ 3 million should not have come as a shock to Ilio's management. (*See* Resnick Dep. at 221-22.) That testimony is speculative at best, however, and refers to the losses sustained between the end of the fiscal 1992 year on April 30, 1992 and the end of the subsequent quarter on July 31, 1992. That period does not fall within the Offering Period. The plaintiff points to no testimony or other evidence that management was aware of these future loses during the Offering Period.

Furthermore, the plaintiff does not dispute that Ilio's financial results including the level of sales during [*25] the Offering Period were in line with expectations. (*See* Deposition of Nicholas DiMaio, dated April 12, 1995, at 28, 74-75; Sosonko Dep. at 142-43, 146; Affidavit of John Biederman, dated August 25, 1995, Exs. 21, 34.) Nor does the plaintiff dispute that the terms governing Ilio's line of credit with Barclays and Chase were fully disclosed in the Prospectus, including the fact that at times Ilio maintained outstanding debt approaching the limit on the credit line.

The plaintiff argues that Ilio believed its lenders had become inflexible and that this fact should have been disclosed. But the Prospectus indicates that "the Lenders may terminate [the] credit facility if, in their sole discretion, they become dissatisfied with the Company's financial condition, economic prospects or maintenance of satisfactory relationship with each of the Lenders. . . . If the Company's losses continued, there can be no assurance that the Lenders will continue or renew or not reduce the Company's credit facility." (Prospectus at 7.) And the plaintiff's argument is unsubstantiated and wholly at odds with the fact that neither Barclays or Chase ever terminated or reduced the line of credit. Indeed, [*26] during the Offering Period, the line of credit was temporarily increased in March 1992 to account in part for seasonal financing needs (Sosonko Dep. at 212-13). Moreover, Ilio was able to replace the

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 9 of 11

Page 8

1996 U.S. Dist. LEXIS 15091, *26; Fed. Sec. L. Rep. (CCH) P99,348

Barclays and Chase line with a significantly higher line of credit from Heller after the Offering was completed.

Ultimately, the plaintiff has failed to meet her burden of coming forward with evidence beyond conclusory assertions to support her argument that any undisclosed facts about Ilio's lenders or its credit made any assertion in the Prospectus materially misleading. The risks in Ilio's relations with its lenders were disclosed, and the plaintiff has failed to identify any evidence that the defendants were aware of additional material facts that ultimately led to Ilio's financial demise. *See In re Keegan Management Sec. Litig., 794 F. Supp. 939, 946 (N.D. Cal. 1992)* ("Section 11 . . . does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants"). Therefore, the second and third omissions cannot form the basis of a § 11 claim.

**C.**

The fourth and final allegedly fraudulent omission relates [*27] to the former employment of defendants Ross, Pascal, Kramer, and Kreindel with a company called Magic Group, Inc. ("Magic Group"), a company that filed voluntarily for bankruptcy in December 1985. The plaintiff recognizes that there are specific provisions of SEC Regulation S-K requiring disclosure of directors' former employment and business experience and that the regulation expressly limits the disclosure to the past five years. *See 17 C.F.R. § 229.401(e)*. The plaintiff also recognizes that the SEC regulation requiring disclosure of prior legal proceedings, including bankruptcy proceedings, is also limited expressly to the previous five years. *See 17 C.F.R. § 229.401(f)*. 6 Nonetheless, the plaintiff maintains that the Ilio directors' prior affiliation with Magic Group and the fact that Magic Group was the subject of a bankruptcy proceeding more than six years before were material omissions that should have been disclosed pursuant to the catch-all provision of SEC Regulation C, Rule 408, *17 C.F.R. § 230.408*, which provides that:

> In addition to the information expressly required to be included in a registration statement, there shall be added such further material [*28] information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

6   Rule 401(f)(1) requires disclosure of a bankruptcy petition filed against a company "of which [the director] was an executive officer at or within two years before the time of such filing." *17 C.F.R. § 229.401(f)(1)*. "Executive officer" includes the "any vice president of the registrant in charge of a principal business unit, division or function (such as sales, administration or finance) . . ." *17 C.F.R. § 230.405* (Regulation C). A bankruptcy petition filed by Magic Group would appear to fall squarely within Rule 401(f)(1) because of the defendants' positions as Vice Presidents of Sales (Kramer and Kreindel), Vice President and Controller (Ross), and head of production (Pascal). However, Rule 401(f) is limited to legal proceedings that occurred in the last five years.

The plaintiff does not dispute that the information regarding Magic Group was not required [*29] to be disclosed under Regulation S-K. Therefore, the question is whether that information was material notwithstanding its apparent exclusion from the SEC disclosure regulations. 7

7   Counsel for the defendants indicated during oral argument that the omitted information about Magic Group was already disclosed. (*See* Trans. at 21.) It is true that the fact that Ilio's directors had been employed by Magic Group was fully disclosed in the prospectus issued when Ilio went public in 1989. (*See* Affidavit of Lori E. Colangelo, dated Sept. 22, 1995, Ex. O, at 17.) But that prospectus does not disclose Magic Group's bankruptcy filing.

An omission is material if there is a substantial likelihood that a reasonably prudent investor would consider it important in making a decision. *Basic Inc. v. Levinson, 485 U.S. 224, 231, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)*; *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)* ("There must be a substantial likelihood that the [*30] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."); *Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir.*

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 10 of 11

Page 9
1996 U.S. Dist. LEXIS 15091, *30; Fed. Sec. L. Rep. (CCH) P99,348

*1996).* Generally, as the plaintiff urges, materiality is a mixed question of law and fact ordinarily left to the finder of fact to determine. *TSC, 426 U.S. at 450.* The question of materiality may be decided as a matter of law if the alleged omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] importance." *Feinman, 84 F.3d at 541* (quoting *Goldman, 754 F.2d 1059, 1067).*

The conceded absence of any regulation requiring disclosure of the bankruptcy proceeding concerning Magic is some evidence of the SEC's expert view that such disclosure is not required. *See GAF Corp. v. Heyman, 724 F.2d 727, 739 (2d Cir. 1983)* (finding that certain litigation was not required to be disclosed because, among other reasons, the "regulation does provide us with the Commission's expert view of the types of involvement in legal proceedings that are most likely to be matters of concern to [*31] shareholders in a proxy contest."); *General Elec. Co., v. Cathcart, 980 F.2d 927, 937 (3rd Cir. 1992)* (SEC regulations are not determinative but are "persuasive authority as to the required scope of disclosure" of litigation); *Geiger v. The Solomon-Page Group Ltd., 933 F. Supp. 1180, 1996 WL 391981 at *7 (S.D.N.Y. 1996)* (absence of regulation requiring disclosure, in the presence of detailed requirements for disclosure about selling shareholders is some evidence that the undisclosed information is not material).

In this case, the plaintiff has alleged that the prior employment of four directors and executive officers at Magic, more than six years before the Offering, is material. But the conclusory allegation is unsupported by any specific facts. The bankruptcy at issue occurred more than six years before. There is no evidence proffered to indicate that there was anything about the bankruptcy of Magic that was related to the financial condition or prospects of Ilio at the time of this offering. There is no evidence presented that the individual defendants committed any wrongdoing at Magic, and there is no statement in the Prospectus about the specific directors that [*32] is in any way false or misleading. [8] The SEC regulations reflect an understandable judgment that some employment history and litigation is too old to be material. Debenture holders had a record of performance at Ilio on which to judge the defendants and a Prospectus that detailed the financial performance and the substantial risks of the company. Any reasonable investor would have judged the directors and officers of the company on the results which they had achieved over six years with the company whose securities they were buying.

> [8] This is not a case like *Alexander v. Evans, 1993 U.S. Dist. LEXIS 14560, 1993 WL 427409 (S.D.N.Y. 1993)* where there was evidence of a positive misstatement that the company president had never been an officer or director of a company that filed for bankruptcy protection, and where there was evidence that disclosure of the misstatement caused a drop in the affected company's stock price. Id at *2, *16, *18 n.5.

Accordingly, the omitted information regarding the six-year-old bankruptcy of Magic Group, a [*33] prior employer of four Ilio directors, is not information that is material and, particularly in light of the fact that disclosure of this particular piece of information was not required under applicable SEC regulations precisely because it concerns a legal proceeding more than five years old, the omitted information is so unimportant that reasonable investors would not disagree about its unimportance. Therefore, the omission of that fact from the Debenture Prospectus cannot form the basis of a § 11 claim.

**D.**

Having held that none of the four alleged omissions was material or made the representations made in the Prospectus misleading, the plaintiff's claim under § 11 of the Securities Act cannot be maintained. Accordingly, the defendants' motion for summary judgment dismissing that claim is granted. [9]

> [9] Because of the result here, there is no need to address the defendants' argument that the § 11 claim is also defeated under the "bespeaks caution" doctrine because of the numerous cautions contained in the Prospectus.

[*34] **IV.**

Defendant Ross also moves for summary judgment on the § 10(b) and *Rule 10b-5* claims against him based on certain alleged misrepresentations and omissions made by Ross in a press announcement released on March 13, 1992, during the Offering Period. [10] The plaintiff alleges that the March 13th press release was misleading because it failed to disclose the same four omissions that formed the basis of the plaintiff's § 11 claim, as described above.

Case 1:07-cv-09633-LBS-DFE   Document 57-14   Filed 07/21/2008   Page 11 of 11

Page 10

1996 U.S. Dist. LEXIS 15091, *34; Fed. Sec. L. Rep. (CCH) P99,348

[11] None of those omissions provide a basis for a securities fraud claim under § 11 of the Securities Act, as explained above. Moreover, the omission relating to the Magic Group bankruptcy is not material. Therefore the question is whether the press release contains any additional representations that would make disclosure of any of the omitted information necessary to prevent the statements in the press release from being misleading.

> 10   During oral argument, plaintiff's counsel explained that only the press release dated March 13, 1992 is at issue in this case. (*See* Trans. at 39-42); (See Colangelo Aff., Exh. P).
>
> 11   At oral argument, the plaintiff's counsel also asserted that the March 13th press release contained an affirmative misrepresentation regarding the prior quarter's net earnings. (*See* Trans. at 42.) There is no representation in the March 13th press release relating to earnings at all. Moreover, as plaintiff's counsel conceded, Ilio's financial statements for the quarter ended January 31, 1992 fully disclosed net earnings. (Id.); (See Exh. L to Aff. of Lori Colangelo.)

[*35] The press release consists of an announcement that Ilio had signed a letter of intent with NFL Properties relating to the exclusive manufacturing and distribution rights for certain sportswear. The press release also refers to the Quarterback Club label. There is no information provided about the Debenture Offering, the use of the proceeds from that Offering, Ilio's bank financing or letter of credit arrangements, or any other matter relating to the company's operations. The sole import of the press release is the announcement of the NFL Properties agreement.

None of the omissions the plaintiff alleged as bases for her § 11 claim would be required with or after the March 13th press release. Those omissions are wholly unrelated to the subject matter of the press release, and the plaintiff has not identified anything about the omission of those facts from the press release that makes the press release misleading in any way. Nor has the plaintiff identified any other statement in the press release that is allegedly false or misleading.

Accordingly, defendant Ross's motion for summary judgment dismissing the § 10(b) claim against him based on the March 13th press release is granted.

[*36] **CONCLUSION**

For the foregoing reasons, the defendants' motions for summary judgment are **granted** and the claims under § 11 of the Securities Act against all of the defendants and the claims under § 10(b) of the Exchange Act and *Rule 10b-5* promulgated thereunder against defendant Ross are dismissed. The Clerk is directed to enter judgment dismissing this case.

**SO ORDERED.**

**Dated: New York, New York**

**September *30*, 1996**

**John G. Koeltl**

**United States District Judge**