# TAB 15

Case 1:07-cv-09633-LBS-DFE   Document 57-16   Filed 07/21/2008   Page 1 of 6

LEXSEE 1998 U.S. DIST. LEXIS 20344

IN RE GLENAYRE TECHNOLOGIES, INC. SECURITIES LITIGATION.

Master File No. 96 Civ. 8252 (HB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1998 U.S. Dist. LEXIS 20344; Fed. Sec. L. Rep. (CCH) P90,419

**December 29, 1998, Decided**
**December 30, 1998, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss Second Amended Complaint GRANTED.

**COUNSEL:** For ROBIN KWALBRUN, LLM, plaintiffs: Jerome M. Congress, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

**JUDGES:** Harold Baer, Jr., United States District Judge.

**OPINION BY:** Harold Baer, Jr.

**OPINION**

**OPINION AND ORDER**

**HAROLD BAER, JR., District Judge:**

Defendant Glenayre Technologies, Inc. ("Glenayre") and several individual defendants move to dismiss the plaintiffs second amended and consolidated Complaint. [1] For the reasons discussed below, the motions to dismiss are GRANTED.

> 1 Glenayre is a leading manufacturer of paging technology.

**I. Background**

Plaintiffs commenced this securities fraud class action on November 1, 1996 pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Thereafter, Glenayre and corporate officers Ramon D. Ardizzone, Clarke H. Bailey, John J. Hurley, Billy C. Layton, Stanley Ciepcielinski and Gary B. Smith moved to dismiss the action. [2] Defendants Gerald [*2] B. Cramer, Thomas C. Israel, Edward J. Rosenthal, Barry W. Gray, Alma McConnell, A.C. Israel Enterprises, Inc. and Cramer Rosenthal McGlynn, Inc. also moved for dismissal. On November 4, 1997 I granted the motions to dismiss given the failure to plead fraud with particularity and establish the requisite scienter pursuant to the Private Securities Litigation Reform Act ("PSLRA"), but permitted the plaintiffs leave to replead. *See In re Glenayre Technologies Inc. Sec. Litig., 982 F. Supp. 294, 297, 299 (S.D.N.Y. 1997)* [hereinafter *Glenayre I*].

> 2 Bailey and Hurley contend that they held no managerial positions during the class period.

A detailed description of the facts can be found in *Glenayre I. Id. at 296*. The plaintiffs' claims are rooted in two assertions. First, the plaintiffs allege that the defendants committed securities fraud by misrepresenting the firmness of Glenayre's $ 102 million backlog reported for the last quarter of 1995. Second, the defendants allegedly failed to disclose the adverse [*3] impact of a Federal Communication Commission ("FCC") freeze on licenses for new paging channels. On March 28, 1996 the Company issued its 1995 Form 10-K that touted the allegedly "firm" backlog, noted the FCC action and warned that the freeze might adversely impact sales. Approximately six months later, on September 13, 1996, the Company issued a statement that indicated third quarter income would fall between 40% - 45% below the same quarter in the previous year.

In the Second Consolidated Amended Class Action Complaint ("Second Amended Compl.") the plaintiffs

Case 1:07-cv-09633-LBS-DFE   Document 57-16   Filed 07/21/2008   Page 3 of 6

Page 2

1998 U.S. Dist. LEXIS 20344, *3; Fed. Sec. L. Rep. (CCH) P90,419

new allegations include that the defendants, through a program entitled Build Up Big Backlog Again ("BUBBA"), "exhorted their sales force to build the backlog number at almost any cost, making the increase in the backlog number by the end of 1995 a top priority." Second Amended Compl. PP 44-45. Pursuant to the BUBBA program, employees were allegedly encouraged to offer extremely generous terms, deep discounts, provide extended delivery time and allow purchasers to cancel orders without penalty. Second Amended Compl. P 45. The plaintiffs assert that these attendant terms weakened the backlog's firmness. Second Amended Compl. [*4] P 51. According to the plaintiffs, the defendants sought to increase the backlog in the last quarter of 1995 "because of their awareness of the likelihood of the FCC freeze on new paging licenses in the first quarter of 1996." Second Amended Compl. P 47. The plaintiffs contend that one of the defendants, Ramon D. Ardizzone, learned of the impending freeze in late 1995 given his "extensive political and FCC contacts." Second Amended Compl. P 47. In December 1995 and January 1996 the plaintiffs allege that several defendants, including Ardizzone, Smith and Ciepcielinski, "informed their sales force of the impending freeze" and encouraged employees to work extra hard to obtain immediate sales since the FCC freeze would hamper the flow of orders. Second Amended Compl. P 48.

On February 6, 1996 Glenayre issued a press release that announced favorable financial results for the fourth quarter of 1995 and the twelve months ending on December 31, 1995. Second Amended Compl. P 58. This press release and subsequent statements made to investment analysts, the plaintiffs note, failed to mention the alleged prospective deterioration of the new backlog. Second Amended Compl. P 60. In addition, the [*5] plaintiffs allege that the press release was false and misleading since Glenayre omitted any reference to the impending FCC freeze. Second Amended Compl. PP 66-67. The plaintiffs also allege that the defendants disseminated false and misleading information when considering that they knew that the BUBBA program "would depress the level of customer orders in 1996" and rendered the backlog "hollow" given the contingent nature of the orders. Second Amended Compl. P 63.

Between February 12, 1996 and February 29, 1996 Cramer, Gray, Hurley, Israel, Rosenthal, Smith and McConnell sold approximately $ 36 million of their Glenayre stock holdings. Second Amended Compl. P 69. The plaintiffs allege that this trading was subsequently labeled suspicious by an investment analyst and gave rise to an investigation by the Securities and Exchange Commission. Second Amended Compl. P 69. According to the plaintiffs, when this insider trading occurred Glenayre's market price did not yet reflect the adverse impact of the impending FCC freeze on the Company's business, since it failed to publicly disseminate this information. Second Amended Compl. P 69. Predictably, the plaintiffs contend, when the FCC freeze [*6] became public knowledge several of the defendants major customers -- including ProNet, Inc., Paging Network, Inc., Arch Communications Group, Inc. and Mobile Telecommunications Technology Corp. -- delayed shipment of existing orders indefinitely and reduced the number of new orders requested. Second Amended Compl. P 72(c).

## II. Discussion

Defendants move to dismiss on the ground that plaintiffs fail to state a claim upon which relief can be granted. *See Fed. R. Civ. P. 12(b)(6)*. A court will only grant a 12(b)(6) motion when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 63 (2d Cir. 1997)* (citation and internal quotations omitted). When deciding a 12(b)(6) motion, a court "must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Id.*

### A. Section 10(b)

In order to state a § 10(b) claim for securities fraud that satisfies the heightened pleading requirements of the PSLRA, a plaintiff must allege facts that give rise to a [*7] strong inference of either reckless behavior or conscious misconduct. *See Novak v. Kasaks, 997 F. Supp. 425, 430 (S.D.N.Y. 1998)* ("joining the emerging consensus in this district that either conscious recklessness or actual intent [to misrepresent] satisfy the PSLRA's scienter requirement"); *In re Baesa Sec. Litig., 969 F. Supp. 238, 241-42 (S.D.N.Y. 1997)* (plaintiff must allege facts supporting strong inference of conscious or reckless behavior by the defendants in order to satisfy the reform act). [3] Again, the plaintiffs' allegations fail to establish the requisite scienter. [4]

   3   The plaintiffs also contend that statements

Case 1:07-cv-09633-LBS-DFE   Document 57-16   Filed 07/21/2008   Page 4 of 6

Page 3

1998 U.S. Dist. LEXIS 20344, *7; Fed. Sec. L. Rep. (CCH) P90,419

made during the enactment of the Securities Litigation Uniform Standards Act of 1998 conclusively establish that motive and opportunity are sufficient to establish scienter. This contention is without merit since post-enactment legislative history plays no role in statutory interpretation. *See Regional Rail Reorganization Act Cases v. Connecticut Gen. Ins. Corp., 419 U.S. 102, 132, 42 L. Ed. 2d 320, 95 S. Ct. 335 (1974)* ("post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress"); *see also Petry v. Block, 225 U.S. App. D.C. 279, 697 F.2d 1169, 1171 (D.C. Cir. 1983)* (district court reversed where it "relied improperly on the post-enactment statements of legislators involved in the enactment process").

[*8]

4   Since the plaintiffs fail to adequately plead scienter, I need not address the other grounds for dismissal articulated by the defendants.

The plaintiffs contend that the defendants actual knowledge of the impending FCC freeze and the insider sales by seven defendants during the class period are sufficient. According to the plaintiffs, the defendants engaged in fraudulent conduct by inflating 1995 financial figures through the BUBBA program, when it was known that the impending FCC Freeze would adversely impact Glenayre's business given the contingent nature of the BUBBA orders. I disagree.

In *San Leandro*, the plaintiffs advanced a general claim that the defendants withheld unspecified confidential company reports that revealed a larger decline in sales than previously reported. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 812 (2d Cir. 1996)*. The Second Circuit affirmed the district court dismissal with respect to the non-disclosure, since the plaintiffs failed to allege "circumstances [that] show [] the defendants [*9] lacked a reasonable basis for their optimistic, but qualified, predictions as to the company's future performance." *Id. at 813, 815*. Likewise, the plaintiffs in the instant case fail to provide a factual basis upon which to conclude that the defendants did not reasonably expect the BUBBA orders to be shipped. Indeed, there is no allegation that the defendants falsely claimed that the $ 102 million in purchase orders were irrevocable. Consequently, the plaintiffs have failed to adequately allege scienter. *See San Leandro, 75 F.3d at 812-813*; *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994)* (no inference of fraud where company's disclosures were not inconsistent with current reports since "misguided optimism is not a cause of action"); *see also Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993)* (where company accurately reported past financial results no obligation existed to speculate on the impact of future events).

In addition, the plaintiffs allegations are insufficiently conclusory. The plaintiffs advance the conclusory allegation that one of the defendants, Ramon D. Ardizzone, learned of the impending freeze in late 1995 [*10] given his "extensive political and FCC contacts." Without more, this allegation is insufficient. What is needed and missing here is some specificity with respect to either the individuals from whom Ardizzone allegedly received information about the impending FCC freeze or the nature of the relationship with these individuals and the positions of authority they held.

Moreover, the allegation that several defendants, including Ardizzone, Smith and Ciepcielinski, "informed their sales force of the impending freeze" in December 1995 or January 1996 is unavailing. Again, the plaintiffs provide no specificity in terms of date, location or method by which the defendants allegedly communicated this information. The plaintiffs also make no reference to any office memorandum, e-mail or telephone conversation on this subject. Further, the plaintiffs neglected to provide in their allegations even one staff member to whom the defendants mentioned the FCC freeze. Given the conclusory nature of the plaintiffs contentions, the alleged facts do not give rise to the requisite strong inference of actual knowledge. *See 15 U.S.C. § 78u-4(b)(2)* (PSLRA requires plaintiffs to "state with particularity [*11] facts giving rise to a strong inference" of scienter); *San Leandro, 75 F.3d at 813* (no "license to base" § 10(b) claims "on speculation and conclusory allegations") (citation and internal quotations omitted).

The plaintiffs allegations with respect to the insider sales by seven defendants during the class period presents a closer question. Between February 12, 1996 and February 29, 1996 these defendants sold approximately $ 36 million of their Glenayre stock holdings. To bolster the assertion that this trading gives rise to a strong inference of fraudulent intent, the plaintiffs newly allege that the sales were subsequently labeled suspicious by an

Case 1:07-cv-09633-LBS-DFE    Document 57-16    Filed 07/21/2008    Page 5 of 6

Page 4

1998 U.S. Dist. LEXIS 20344, *11; Fed. Sec. L. Rep. (CCH) P90,419

investment analyst and gave rise to an investigation by the Securities and Exchange Commission.

It is beyond peradventure that "unusual insider trading activity during the class period may permit an inference of bad faith and scienter." *Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995)*. Insider stock sales are unusual where "the trading was in amounts dramatically out of line with prior trading practices [and] at times calculated to maximize personal benefit from undisclosed inside information." *Marksman Partners,* [*12] *L.P. v. Chantal Pharmaceutical Corp., 927 F. Supp. 1297, 1312 (C.D. Cal. 1996)* (citation and internal quotations omitted). Here, the sales do not give rise to an inference of scienter.

To begin with, the individual defendants engaged in comparable cumulative sales in 1994, and in fact sold more stock in 1995. *See In re Silicon Graphics, Inc. Sec. Litig., 970 F. Supp. 746, 768 (N.D. Cal. 1997)* (no inference of scienter where individual sales by defendants were consistent with those made in previous quarters) [hereinafter *Silicon Graphics*]. Second, the February sales totaled only five percent of the defendants cumulative stock holdings. This low percentage militates against an inference of scienter. *See Acito, 47 F.3d at 54* (sale that represented approximately 11% of defendant's holdings suggests that trading was not unusual); *see also Silicon Graphics, 970 F. Supp. at 768* (no inference of scienter where sales represented 2.6%, 4.1%, 6.9% and 7.1% of stock holdings); *In re Comshare Inc. Sec. Litig., 1997 U.S. Dist. LEXIS 17262, at *28 (E.D. Mich. Sept. 18, 1997)* (no strong inference of scienter where some executives retained significant portions of their [*13] stock) [hereinafter *Comshare*].

Third, and perhaps most importantly, the inference of scienter is undermined by the fact that Glenayre's Chief Executive Officer ("CEO") and Chairman, Vice Chairman, Chief Financial Officer ("CFO") and Comptroller did not sell any stock before the Company publically disclosed the impact of the FCC freeze. Certainly, one can assume that these high-ranking corporate officers, arguably the most knowledgeable of all Board members, would be part of any fraudulent scheme to benefit from insider information through pre-emptive stock sales. The absence of sales from these individuals, then, suggests that the February trading by the seven defendants does not give rise to a strong inference of scienter. *See Acito, 47 F.3d at 54* ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public so that they could sell their stock at a huge profit.") (citation and internal quotations omitted); *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1423 (3d Cir. 1997)* (strong inference of fraudulent intent absent where no allegation that the CEO [*14] or general merchandise manager traded stock); *Comshare, 1997 U.S. Dist. LEXIS 17262*, at *28-29 (suggestion of knowledge undermined where plaintiffs did not allege that CEO or CFO, who the court deemed probable "essential participants," sold any stock during the class period).

Lastly, the additional allegations advanced by the plaintiffs that the February trading was labeled suspicious by an investment analyst and gave rise to an investigation by the Securities and Exchange Commission are unhelpful. At best, these allegations simply confirm my observation in *Glenayre I* that the plaintiffs "articulated a troubling factual scenario." *Glenayre I, 982 F. Supp. at 299*. Nonetheless, as I concluded there, the plaintiffs have not demonstrated that the sales undergirding this factual scenario are unusual -- given the consistent past trading history of the defendants, low percentage of stocks traded relative to the amount owned and absence of participation in the alleged trading scheme by high-ranking corporate officers. Accordingly, at least for now the PSLRA must be read so as to find that the plaintiffs have failed to establish the requisite scienter. Understanding such, the motions [*15] to dismiss claim one are granted. *See 15 U.S.C. § 78u-4(b)(3)(A)* (PSLRA mandates dismissal of the complaint where the scienter requirement is not satisfied).

B. Controlling Person Liability

In claim two, the plaintiffs seek to hold individual defendants liable under § 20 of the Exchange Act. Pursuant to this provision, any individual that directly or indirectly controls another person that is primarily liable for a securities violation may also be held jointly and severally liable. *See* 15 U.S.C. § 78(t)(a). Given the dismissal of the § 10(b) claim, there can be no liability under § 20(a) because the plaintiffs are unable to establish a primary violation of the Exchange Act. Accordingly, the motions to dismiss claim two are granted.

III. Conclusion

1998 U.S. Dist. LEXIS 20344, *15; Fed. Sec. L. Rep. (CCH) P90,419

For the reasons discussed above, the motions to dismiss the Second Amended Complaint are GRANTED. The Clerk is instructed to close this case.

**SO ORDERED.**

Dated: December 29, 1998

New York, New York

Harold Baer, Jr.

United States District Judge