# TAB 16

LEXSEE 1998 U.S. DIST. LEXIS 10601

ALAN HINERFELD, et al., Plaintiffs, -v- UNITED AUTO GROUP, et al., Defendants.

CONSOLIDATED AS 97 Civ. 3533 (RPP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1998 U.S. Dist. LEXIS 10601; Fed. Sec. L. Rep. (CCH) P90,264

July 15, 1998, Decided
July 15, 1998, Filed

**DISPOSITION:** [*1] Defendants' motions to dismiss for failure to state claim granted in their entirety. Consolidated Amended Class Action Complaint dismissed in its entirety as to all defendants.

**COUNSEL:** For Plaintiffs: Kenneth J. Vianale, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For Plaintiffs: David Kessler, Schiffrin Craig & Barroway, LLP, Bala Cynwyd, PA.

For Plaintiffs: Eduard Korsinsky, Stull, Stull & Brody, New York, NY.

For United Auto Group, Inc., Carl Spielvogel, Marshall S. Cogan, Defendants: Jeanne M. Luboja, James H. Bicks, Willkie Farr & Gallagher, New York, NY.

For J.P. Morgan Securities, Inc., Montgomery Securities, Inc., Smith Barney, Inc., Defendants: Dennis E. Glazer, Jason Block, Davis Polk & Wardwell, New York, NY.

**JUDGES:** Robert P. Patterson, Jr., U.S.D.J.

**OPINION BY:** Robert P. Patterson, Jr.

**OPINION**

**OPINION AND ORDER**

**Robert P. Patterson, Jr., U.S.D.J.**

Defendants J.P. Morgan Securities, Inc. ("J.P. Morgan"), Montgomery Securities, Inc., and Smith Barney, Inc. (Smith Barney) (collectively the "Underwriter Defendants") move to dismiss the Consolidated Amended Class Action Complaint dated October 3, 1997 (the "Complaint"), against all defendants, pursuant [*2] to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). Defendants United Auto Group, Inc. ("UAG"), Carl Spielvogel, and Marshall S. Cogan (collectively the "UAG Defendants") also move for an order dismissing the Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)*.

**THE COMPLAINT**

Plaintiffs bring this action as a class action on behalf of all persons, other than defendants, who purchased or otherwise acquired the common stock of UAG issued in connection with and/or traceable to UAG's initial public offering ("IPO") on or about October 23, 1996, at any time between the time of the IPO and February 26, 1997 (the "Class Period") (Compl. P 1). Plaintiffs allege that the prospectus issued in connection with the IPO contained materially false statements and omissions (id.). Plaintiffs' claims are brought pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") (*15 U.S.C. 77k, 77l(a)(2) and 77o*) (id. P 2). In the context of these motions the factual allegations contained in the Complaint are accepted as true. See *Gant v. Wallingford Bd. Of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*.

Defendant UAG owns and operates new and used [*3] automobile and light truck dealership franchises in seven states throughout the United States (Compl. P 9). UAG also owns and operates Atlantic Auto Finance Company ("Atlantic Finance"), an automobile finance company (id.). At all material times Spielvogel was Chairman of the Board and Chief Executive Officer ("CEO") of UAG, and Cogan was Vice Chairman of the Board and Chairman of the Executive and Compensation Committees (id. P 10). [1] The Underwriter Defendants were the lead underwriters for the IPO. They are alleged to have conducted a due diligence investigation prior to the IPO through which, if

Case 1:07-cv-09633-LBS-DFE    Document 57-17    Filed 07/21/2008    Page 3 of 7

Page 2

1998 U.S. Dist. LEXIS 10601, *; Fed. Sec. L. Rep. (CCH) P90,264

they acted with reasonable care, they would have obtained knowledge of the facts alleged in the Complaint (Id. P 12).

> 1  Shortly after the relevant time period Spielvogel resigned as Chairman and CEO and Cogan assumed his former responsibilities. Spielvogel continues to work for UAG as a consultant. (Compl. P 11.)

On or about August 2, 1996, UAG filed a registration statement with the Securities and Exchange [*4] Commission ("SEC") in connection with UAG's IPO (id. P 16). On or about October 23, 1996, the prospectus for the offering became effective and UAG subsequently sold, through the Underwriter Defendants, 6,250,000 shares of its common stock to the public in an IPO at a price of $ 30.00 per share (id. PP 9, 16).

The financial statements contained in the prospectus reflect a strong pattern of revenue growth commencing in 1994 (id. P 18). The gravamen of the Complaint is that the prospectus "was silent as to the Company's highly material risk of losing substantial growth momentum ... [which] would materially impair the Company's purported highly-touted growth strategy" based on stock-for-stock acquisitions of dealerships, and that "these undisclosed and material risks further exposed UAG's stock to unusually high downside volatility" (id. P 19). Plaintiffs concede that the prospectus stated that "unforeseen expenses, difficulties, complications and delays frequently encountered in connection with the rapid expansion of operations could inhibit the Company's growth," but allege that this "generalized boilerplate disclaimer" was insufficient to alert investors to various [*5] material factors that were already impairing UAG's growth potential at the time of the IPO (id. P 20).

Specifically plaintiffs allege that the prospectus failed to disclose at the time of the IPO that: (1) UAG was experiencing lengthy delays in obtaining approvals from car manufacturers for its acquisitions of dealerships (id. PP 21-24) [2]; (2) sales, general and administrative expenses would necessarily increase dramatically once UAG went public (id. PP 25-27); (3) defaults on automobile purchase loans at Atlantic Finance were rising sharply ultimately causing the Atlantic Finance unit to increase its reserves in connection with its fiscal fourth quarter financial results, and UAG had failed adequately to reserve for this increased risk of loss at the time the prospectus was issued, October 2, 1996 (id. PP 28-30) [3]; and (4) UAG's base business was experiencing weaker than expected sales and margin pressure, and that further decreases in sales and revenues would result from the fact that some manufacturers were discontinuing sales incentives and rebates (id. PP 31-32). Despite these problems, about which the Complaint alleges defendants were or should have been [*6] aware, defendants are alleged to have taken various actions to boost UAG's falling stock prices (id. PP 33-35). Specifically, defendants J.P. Morgan and Smith Barney are alleged to have given UAG stock "Buy" ratings in November, 1996, with price targets of $ 38-40 (id. P 34), and Spielvogel is alleged to have told Bloomberg Business Radio on November 20, 1996, that "we expect to be on target with forecasts that have been put out there" and that "there will be no surprises" (id. P 35).

> 2  The Complaint also allege that these delays were likely to increase once UAG went public because some auto manufacturers require additional information from public companies before approving dealership acquisitions (id. P 24).
>
> 3  The Complaint alleges that the increase in loan defaults required UAG to take a charge against earnings of between $ 400,000 and $ 500,000 a few months after completing the IPO (id. PP 29-30).

On or about February 24, 1997, during a telephone conference with several analysts [*7] hosted by Spielvogel, UAG announced that it expected earning for the first quarter of 1997 to be in the range of 17 to 21 cents per share, well below the 25 cents per share which had been expected by analysts based on guidance provided from the company and individual defendants as to purported growth and the strength of the company's operations (id. P 36). After the conference call trading in UAG stock was halted for four hours at the request of the company (id. P 38). On or about February 25, 1997 UAG issued a press release in which it attributed its anticipated first quarter earnings shortfall to increased general, administrative and sales expenses, but the company subsequently revealed that the shortfall was also due to significant delays in obtaining approvals for planned acquisitions (id. PP 38-39). It was also reported that UAG would take a $ 400,000 to $ 500,000 reserve against loan losses in the fourth quarter of fiscal 1996. Thereafter, Atlantic Finance reported a loss of $ 764,000 for fiscal 1996, approximately double original loss estimates (id. P 40). The price of UAG stock, which had closed at $ 31.375 per share on February 24, 1997, suffered a single day [*8] decline of $ 6.625 per share on February 25, 1997 (id. P 41).

The Complaint alleges generally that defendants knew, or in the exercise of reasonable care should have known, that the prospectus contained material misstatements and omissions (id. PP 43-46), and specifically that defendants knew, or should have known, that the length of the manufacturers' dealership approval process had an impact on when closings occurred on dealerships to be acquired and on when revenues from those dealerships could be properly reported, and that the non-disclosure of the effect of such delays was material (id. P 44). Secondly,

Case 1:07-cv-09633-LBS-DFE     Document 57-17     Filed 07/21/2008     Page 4 of 7

Page 3
1998 U.S. Dist. LEXIS 10601, *; Fed. Sec. L. Rep. (CCH) P90,264

it alleges that defendants knew or should have known that general administrative and sales expenses would increase once UAG went public and that this would materially affect company earnings, but, nonetheless, the prospectus gave the overall impression that the company was efficient and would benefit from economies as a result of expansion (id.). Thirdly, it alleges that the defendants should have acknowledged the dramatically rising credit risks and loan losses at Atlantic Finance (id. P 45). The problems reported during the conference call, on February 24, [*9] 1997, and thereafter, are alleged to have been "ongoing, deeply rooted and material," and operative throughout the relevant time period, and to contradict and discredit defendants' false statements of optimism (id. P 46).

The Complaint's First Cause of Action alleges that both the UAG Defendants and the Underwriter Defendants, none of whom possessed reasonable grounds for the belief that the statements contained in the registration statement and prospectus were true, are strictly liable under Section 11 of the Securities Act (*15 U.S.C. 77k*) for the material misstatements in, and omissions from, the registration statement and prospectus (id. PP 47-54). Plaintiffs and other members of the class are alleged to have acquired UAG shares on, or traceable to, the IPO and issued pursuant to the registration statement and prospectus, and to have sustained damages as a result (id. PP 55-56). It is further alleged that plaintiffs had no knowledge of the facts concerning the alleged wrongful conduct, and could not reasonable have discovered these facts prior to February 26, 1997 (id. P 57).

The Second Cause of Action, brought pursuant to *Section 12(a)(2)* of the Securities [*10] Act (*15 U.S.C. 77l(a)(2)*) alleges that defendants are liable as sellers, offerors and/or solicitors of the shares offered pursuant to the August 2, 1996 prospectus, because the prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose other material facts (id. PP 58-66).

The Third Cause of Action alleges that the individual defendants are liable as control persons of UAG pursuant to *Section 15* of the Securities Act (*15 U.S.C. 77o*) for the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in the first two causes of action (id. PP 67-71).

**DISCUSSION**

**Motion to Dismiss Under *Rule 12(b)(6)***

On a motion to dismiss the factual allegations of a complaint are to be accepted as true and all reasonable inferences are construed in the plaintiffs favor. See *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995)*. A court should not dismiss a complaint under *Fed. R. Civ. P. 12(b)(6)* unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] [*11] to relief." *Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994)* (internal quotation marks omitted).

On a motion to dismiss a complaint brought under the securities laws the Court may consider documents, such as the prospectus at issue, which are incorporated by reference into a complaint. See *Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)*; *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d. Cir. 1991)*. A district court deciding a motion to dismiss a complaint alleging securities law violations may also review and consider "public disclosure documents required by law to be and which actually were filed with the SEC..." *Cortec at 47*.

**Elements of Section 11 and 12(2) Causes Of Action**

Section 11 of the Securities Act provides that any signer of a registration statement, director of the issuer, or underwriter, may be held liable to purchasers of registered securities if any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *15 U.S.C.* [*12] *77k(a)*. Section 11 imposes stringent standards of liability on parties who play a direct role in a registered offering. See *Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82, 74 L. Ed. 2d 548, 103 S. Ct. 683 (1983)*. To establish a prima facie case a plaintiff must demonstrate that the registration statement or prospectus contains false or misleading statements concerning a material fact.

Id. *Section 12(a)(2)* imposes liability for using a prospectus or registration statement which includes an untrue statement of material fact or omits to state a material fact necessary in order to make statements, in light of the circumstances in which they are made, not misleading. See *15 U.S.C. 77l(a)(2)*; *Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 58 (2d Cir. 1996)*.[4]

> 4   *Section 15* imposes derivative liability upon persons who control persons liable under Sections 11 or 12. See *15 U.S.C. 77o*.

Under these sections an omitted fact is material if there is a substantial likelihood that [*13] the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. See *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)*; *Kronfeld v. Trans World Airlines, Inc.,*

Case 1:07-cv-09633-LBS-DFE   Document 57-17   Filed 07/21/2008   Page 5 of 7

Page 4

1998 U.S. Dist. LEXIS 10601, *; Fed. Sec. L. Rep. (CCH) P90,264

*832 F.2d 726, 731 n.11 (2d Cir. 1987)*; *Geiger v. The Solomon-Page Group, Ltd., 933 F. Supp. 1180, 1184 (S.D.N.Y. 1996)*. The statements in a prospectus are judged as of the effective date of the offering. See *15 U.S.C. 77k(a)*. Courts will dismiss claims under these sections if they charge omissions of what was in fact disclosed. See *Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 9 (2d Cir. 1996)*, cert. denied, *138 L. Ed. 2d 194, 117 S. Ct. 2433 (1997)* (affirming dismissal where claims were contradicted by the disclosure of risk contained in each prospectus). If the plaintiffs' claims of misleading disclosures are contradicted by disclosures made on the face of the prospectus, then no additional facts can prove the claims and dismissal is proper. See *Olkey at 9*; *Finkel v. Putnam Convertible Opportunities and Income Trust, 1997 U.S. Dist. LEXIS 1401, 1997 WL 60847* (S.D.N.Y. February [*14] 11, 1997). "The complaint must offer more than allegations that the portfolios failed to perform as predicted." *Olkey at 8*.

**The Sufficiency of the Allegations**

Despite claims to the contrary, the Complaint points to no actual misrepresentations contained within the prospectus. Rather, the Complaint alleges that the prospectus failed to disclose facts, of which the defendants were, or should have been, aware, which created a "highly material risk of [UAG] losing substantial growth momentum" (Compl. P 19). The Complaint also alleges that the discussion of risks included in the prospectus amounts to mere boilerplate which was insufficient to alert investors to this material risk (*id. P 20*). However, contrary to plaintiffs' assertions, the section of the prospectus entitled "Risk Factors" is more than mere boilerplate. Rather, this section, which is six pages long, and is referenced on the first page of the prospectus, contains a detailed discussion of risk factors specific to businesses involved in the acquisition of automobile dealerships, and to UAG specifically.

The Complaint alleges that the prospectus failed to disclose that UAG was experiencing lengthy [*15] delays in obtaining manufacturer approval for its acquisitions, and that such delays were likely to increase as a result of UAG going public (*id. PP 21-24*). The Complaint alleges that the timing of the completion of acquisitions was material "because UAG was dependent for its growth on acquiring new dealerships and hence their revenue stream" (*id. P 24*). These allegations amount to claims that defendants should have disclosed that, as a general matter, the process of obtaining manufacturer approval can be a lengthy one, and that the process takes longer when proposed acquisitions are by publicly traded corporations.[5] However, the prospectus states "manufacturers exercise a great degree of control over dealerships" and goes on to state that "prior manufacturer approval is required with respect to acquisitions of automobile dealerships, and a Manufacturer may deny the Company's application to make an acquisition or seek to impose further restrictions on the Company as a condition of granting approval of an acquisition" (Prospectus, Posen Aff. Ex. B, at 8). In addition, the subsection entitled "Risks Associated with Acquisitions" states that "unforseen expenses, difficulties, [*16] complications and *delays frequently encountered in connection with rapid expansion of operations could inhibit the Company's growth*" and adds "the Company's future growth via acquisition of automobile dealerships will depend on its ability to obtain requisite Manufacturer approvals," and that "one or more manufacturers may seek to impose further restrictions on the Company in connection with their approval of an acquisition" (*id. at 9*) (emphasis added). While the prospectus does not explicitly state that the approval process might take longer once UAG went public, the prospectus does make numerous references to the special requirements which some car and light truck manufacturers impose on publicly owned corporations desiring to own and operate franchises (Prospectus at 8). Finally, the prospectus acknowledged that UAG's "principal source of growth has come, and is expected to continue to come, from acquisitions" and that, therefore, its "period to period results of operations vary depending on the dates of such acquisitions" (Prospectus at 27). Thus, plaintiffs were on notice that there was a significant risk of delay in connection with UAG obtaining requisite approvals for [*17] the acquisition of new dealerships, and that such delays could affect the company's revenue stream from "period to period."

5   While the Complaint alleges that UAG "was experiencing lengthy delays in obtaining approvals from car manufacturers for its then-impending acquisitions" (Compl. P 21), the factual allegations that follow involve unspecified future acquisitions and claims that defendants omitted from the prospectus general information about the possibility of delays affecting such acquisitions, and that such delays would negatively affect earnings (*id. PP 21-24*). The prospectus disclosed that $ 62.1 million of the proceeds of the IPO would be used to acquire three dealerships, with these purchases to be consummated contemporaneously with the completion of the offering (Prospectus, Posen Aff. Ex. B, at 6). It is undisputed that these purchases were completed on schedule. (See UAG's 1996 Form 10-K at F-14, attached to Posen Aff. As Ex. C.) Further, while UAG clearly planned a growth strategy contingent on additional acquisitions, at the time of the IPO the prospectus did not state that any other specific acquisitions were planned (Prospectus at 16).

Case 1:07-cv-09633-LBS-DFE    Document 57-17    Filed 07/21/2008    Page 6 of 7

Page 5
1998 U.S. Dist. LEXIS 10601, *; Fed. Sec. L. Rep. (CCH) P90,264

[*18] The Complaint next alleges that the prospectus failed to disclose that sales, general and administrative expenses would inevitably increase once UAG went public (Compl. PP 25-27). Rather, the Complaint alleges, the prospectus gave the impression that overall savings would result as the company grew through acquiring new dealerships (*id. P 25*). While the prospectus does suggest that some savings would result from economies of scale, [6] it also states that "[UAG's] growth will depend in large part on its ability to manage expansion, control costs in its operations and consolidate dealership acquisitions... into existing operations" (Prospectus at 9). Further, as stated above, the prospectus states that "unforeseen expenses, difficulties, complications and delays frequently encountered in connection with rapid expansion of operations could inhibit the Company's growth" (id.). Also, while the prospectus does not explicitly state that there were likely to be additional expenses incurred by UAG once it became a publicly traded corporation, something which is true for any company which goes public, [7] the prospectus did make numerous references to the special requirements which [*19] some car and light truck manufacturers impose on publicly owned franchises. [8] The Complaint fails to allege facts from which it can be inferred that the statements about economies of scale involved misrepresentations. As the warning contained in the prospectus made clear, it was possible that any savings resulting from economies of scale would be offset by additional unrelated expenses (Prospectus at 9). No facts have been alleged which would allow an inference that the prospectus contained any misrepresentations or material omissions in connection with sales, general and administrative expenses.

6 The prospectus states that UAG's "large size allows it to centralize certain administrative functions and negotiate favorable pricing on certain automotive parts, aftermarket products, supplies and advertising" as well as "superior access to capital as compared to smaller dealerships" (Prospectus, Posen Aff. Ex. B, at 4).

7 To demonstrate the materiality of the alleged omissions regarding the likelihood of increased expenses, the Complaint alleges that UAG share prices dropped after UAG reported earnings per share significantly below the earnings per share expected "by analysts covering the Company, which estimates were based on guidance from the Company and the Individual Defendants as to the purported growth and strength of the Company's operations" (Compl. P 36). Insofar as the Complaint alleges a failure to disclose expenses routinely connected with publicly traded corporations, e.g., expenses associated with SEC filings, due diligence reviews of planned acquisitions, increased liability insurance, etc. (*id. P 26*), these are expenses which analysts would have been well aware of and are likely to have considered in reaching their original estimates of earnings. At no place does the Complaint elaborate on the nature of the "guidance" by the company or the individual defendants.

[*20]
8 See e.g., the subsection of the section on Risk Factors entitled "Stock Ownership/Issuance Limits (Prospectus at 8).

The Complaint also alleges that the prospectus failed to disclose that loan defaults at Atlantic Finance were rising sharply and that UAG had failed to set aside adequate reserves to cover the increased risk of loss (Compl. P P 28-30). The Complaint alleges that this increased risk of loss was due to "substantial credit risks resulting from the Company's rapid expansion into this field" (*id. P 29*). Plaintiffs allege that the warning contained in the prospectus that "payments by consumers on a number of the retail installment contracts purchased by Atlantic Finance become delinquent from time to time and some end up in default" is "vague and conditional" (*id. P 30*). However, the prospectus, which contains a subsection entitled "Risks Associated with Automobile Finance Subsidiary" also warns prospective investors that there "can be no assurance that the credit performance of Atlantic Finance's customers will be maintained or that general economic conditions will not worsen [*21] and lead to higher rates of delinquency and default" and, after pointing out that Atlantic Finance had only commenced operations during the previous year, goes on to warn that "there can be no assurance that the rate of future delinquency and defaults will be consistent with prior experience or at levels that will allow Atlantic Finance to maintain overall profitability" (Prospectus at 11). Further, financial notes to the prospectus do disclose that default rates had been increasing prior to the IPO (*id. at 44*).

The Complaint alleges that if UAG had adequately reserved against future losses the prospectus would have shown materially lower growth and profitability (Compl. P 29). The Complaint's allegations that the defendants knew or should have known about the inadequacy of the reserves (*id. P 43*) are conclusory and unsupported by additional factual allegations. There are no facts alleged to support an inference that this failure was the result of anything but inaccurate forecasting or unforeseen circumstances, especially in light of the fact that Atlantic Finance was a new unit that had only been in operation since 1995. The failure to anticipate the extent of necessary reserves, [*22] even if it amounts to mismanagement, is not actionable under federal securities laws. See *Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 (3d Cir. 1992)* ("it is not a violation of securities laws to simply

Case 1:07-cv-09633-LBS-DFE   Document 57-17   Filed 07/21/2008   Page 7 of 7

Page 6
1998 U.S. Dist. LEXIS 10601, *; Fed. Sec. L. Rep. (CCH) P90,264

fail to provide adequate loan loss reserves"); *Ciresi v. Citicorp, 782 F. Supp. 819, 821-23 (S.D.N.Y. 1991)*, aff'd without opinion, *956 F.2d 1161 (2d Cir. 1992)*. [9]

> [9] While failure to take an adequate accounting reserve *may* constitute an actionable omission when there is an affirmative and intentional misrepresentation about the adequacy of the reserves in question, see *In re Wells Fargo Sec. Litig., 12 F.3d 922 (9th Cir. 1993)*, the Complaint does not allege that the adequacy of Atlantic Finances reserves were affirmatively and intentionally misrepresented.

The Complaint's final allegation is that UAG failed to disclose that some manufacturers were discontinuing sales incentives and rebates which would exacerbate what were already "weaker-than-expected sales and margin pressure" (id. PP [*23] 31-32). The Complaint alleges no specific facts in support of this claim, and does not make it clear why, in an industry in which sales incentives from manufacturer come and go, this amounted to a material omission. Further, the prospectus does warn about the "cyclicality" of motor vehicle sales (Prospectus at 10), and in discussing factors affecting competition within the industry makes specific reference to the role of pricing "including Manufacturer rebates and other special offers" (*id. at 44-45*). The prospectus also warned investors that the success of UAG was linked, among other things, to the marketing and distribution capabilities of the manufacturers" (*id. at 8*). The facts alleged, even if taken as true, are insufficient to state a viable claim for violation of the Securities Act.

The warnings contained in the prospectus for the UAG IPO are explicit and lengthy. As in Olkey, "the prospectus[] when read in [its] entirety [is] not overly sanguine but instead bespeaks caution." *Olkey at 5* (internal citations omitted). See also *I. Meyer Pincus & Assocs. V. Oppenheimer & Co., Inc., 936 F.2d 759, 763 (2d Cir. 1991)*; *Sheppard v. TCW/DW Term Trust 2000,* [*24] *938 F. Supp. 171, 179 (S.D.N.Y. 1996)* (dismissing claims under sections 11, 12(a)(2) and 15 where "the various risks inherent in purchasing shares in the Trusts were adequately disclosed."). The Complaint fails to allege specific facts sufficient, even if true, to entitle plaintiffs to relief. Plaintiffs' have pointed to no specific misrepresentations, and their claims of material omissions are contradicted by disclosures made on the face of the prospectus. See *Olkey. at 9*; *Finkel v. Putnam Convertible Opportunities and Income Trust, 1997 U.S. Dist. LEXIS 1401, 1997 WL 60847* (S.D.N.Y. February 11, 1997).

For the foregoing reasons the first two causes of actions are dismissed, as to all defendants, for failure to state a claim. [10] Because the causes of action under Sections 11 and 12(a)(2) of the Securities Act are dismissed, there can be no control person liability under *Section 15*. Therefore, the third cause of action is also dismissed.

> [10] Defendants contend that plaintiffs lack standing because it is not clearly alleged in the Complaint that they purchased their shares in the IPO. The Complaint states that plaintiffs and other members of the class purchased shares "on or traceable to the IPO and issued pursuant to the Registration Statement and Prospectus" (Compl. PP 55, 63). Plaintiffs argue that this formulation is sufficient and cite authority in support of their position. Defendants have also cited authority in support of their position. In light of the Court's findings, detailed above, it is not necessary to reach this issue.

[*25] Leave to submit a Second Amended Complaint is denied. While leave to amend a complaint "shall be freely given when justice so requires," *Fed. R. Civ. P. 15(a)*, it is within the sound discretion of the court whether to grant leave to amend. See *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*. Insofar as all of the claims contained in the Amended Complaint are belied by the plain language of the prospectus, it would be an exercise in futility as well as a waste of judicial resources to allow further amendment. See *Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)*; *John Hancock Mutual Life Insurance Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994)*.

**CONCLUSION**

The motions to dismiss for failure to state a claim are granted in their entirety. The Consolidated Amended Class Action Complaint is dismissed in its entirety as to all defendants.

IT IS SO ORDERED.

Dated: New York, New York

July 15, 1998

Robert P. Patterson, Jr.

U.S.D.J.