# TAB 17

LEXSEE 2007 U.S. DIST. LEXIS 22948

IN RE: JP MORGAN CHASE SECURITIES LITIGATION

02 Civ. 1282 (SHS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 22948*

**March 28, 2007, Decided**
**March 29, 2007, Filed**

**PRIOR HISTORY:** *In re JPMorgan Chase Sec. Litig., 363 F. Supp. 2d 595, 2005 U.S. Dist. LEXIS 4932 (S.D.N.Y., 2005)*

**COUNSEL:** [*1] For ECA and Local 134 IBEW Joint Pension Trust of Chicago, Penn Security Bank & Trust Co., Empire Life Insurance Co., Lead Plaintiffs: Steve W. Berman, LEAD ATTORNEY, Hagens, Berman, Sobol, Shapiro, LLP, Seattle, WA.

For Brian Barry, on behalf of the Barry Family LP, individually, and on behalf of all others similarly situated, Plaintiff: Ira M. Press, Pamela Elizabeth Kulsrud, LEAD ATTORNEYS, Kirby McInerney & Squire, LLP, New York, NY; Lionel Z. Glancy, Michael Goldberg, LEAD ATTORNEYS, Los Angeles, CA; Neal A. Dublinsky, LEAD ATTORNEY, Glancy & Binkow, L.L.P., Los Angeles, CA.

For JP Morgan Chase, Defendant: Bruce Domenick Angiolillo, LEAD ATTORNEY, Simpson Thacher & Bartlett LLP, Palo Alto, CA; Thomas C. Rice, LEAD ATTORNEY, Simpson Thacher & Bartlett LLP, New York, NY.

For ECA & Local 134 IBEW Joint Pension Trust of Chicago, Movant: Christopher J. Gray, LEAD ATTORNEY, Law Office of Christopher J. Gray, P.C, New York, NY; Christopher Lovell, LEAD ATTORNEY, Lovell & Stewart, L.L.P., New York, NY; Steve W. Berman, LEAD ATTORNEY, Hagens, Berman, Sobol, Shapiro, LLP, Seattle, WA; Steven C. Mitchell, LEAD ATTORNEY, Hagens Berman & Mitchell, PLLC, Phoenix, AZ.

For [*2] Joseph Gregory, Movant: Ira M. Press, LEAD ATTORNEY, Kirby McInerney & Squire, LLP, New York, NY.

**JUDGES:** Sidney H. Stein, U.S.D.J.

**OPINION BY:** Sidney H. Stein

**OPINION**

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs in this action are shareholders of J.P. Morgan Chase & Co. and its predecessor, Chase Manhattan Corp., (collectively, "JPM Chase") who claim they were defrauded by the bank's complicity in Enron Corp.'s financial scandals. In essence, plaintiffs allege that that they invested in JPM Chase stock based on the company's reputation for integrity and financial discipline and ostensibly aboveboard bookkeeping whereas in reality, according to plaintiffs, JPM Chase was illegally and secretly aiding and abetting Enron's attempts to hide its massive financial liabilities.

In March 2005, the Court dismissed without prejudice plaintiffs' first amended complaint for failure to state a claim for relief pursuant to *Fed. R. Civ. P. 12(b)(6)* and for failure to comply with the heightened pleading standard required by *Fed. R. Civ. P. 9(b)* and the Private Securities Litigation Reform Act, *15 U.S.C. § 78u-4* [*3] . See *In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005)*. Plaintiffs have now

filed a 322-page second amended complaint, which includes "volumes of new material from the Senate, SEC, Enron bankruptcy examiner investigations into JPMC's [allegedly] illicit conduct and evidence and opinions from the Worldcom litigation." (Pl.'s Opp. to Def.'s Motion to Dismiss at 1.) This version of the complaint, however, suffers from the same flaws as the first: If plaintiffs' allegations are borne out, it would be not they but the shareholders of Enron -- the real victims of the energy giant's collapse -- who would have been defrauded. The allegations in the second amended complaint fail to show, in a particularized fashion, that JPM Chase or its officers intended to deceive its own shareholders or in fact did deceive them in a material way. Accordingly, plaintiffs have again failed to state a claim for securities fraud. Defendants' motion to dismiss the second amended complaint is therefore granted with prejudice.

## I. BACKGROUND

### A. The First Amended Complaint

The Court presumes familiarity with its decision dismissing plaintiffs' First Amended [*4] and Consolidated Class Action Complaint for Violations of Federal Securities Laws ("FAC"), *In re JP Morgan Chase, 363 F. Supp. 2d 595*. Nonetheless, a brief recitation of the allegations in the FAC and the Court's findings as to those allegations is necessary to understand plaintiffs' second amended complaint.

The FAC alleged that during the class period -- from November 1999 through July 2002 -- JPM Chase defrauded its shareholders by concealing its complicity in the financial frauds perpetrated by Enron, which was one of JPM Chase's most lucrative clients. The FAC's principle allegation was that JPM Chase hid from its shareholders its creation of two shell corporations, Mahonia Ltd. and Mahonia Natural Gas Ltd., through which the bank provided Enron with billions of dollars in credit disguised as revenue from prepaid commodity trades ("prepays"). These "Mahonia transactions," according to the FAC, enabled Enron to conceal debt that otherwise would have appeared on its balance sheet; in exchange, JPM Chase charged Enron exorbitant "advisory" fees. The FAC also alleged that JPM Chase invested millions of dollars in one of Enron's money-spinning partnerships, LJM2, [*5] which allegedly was beneficial for the investors and utilized by Enron to consummate various sham transactions that hid the ownership risks of many of Enron's assets from its shareholders.

JPM Chase took these actions, according to the FAC, in order to (a) receive underwriting, consulting and commitment fees from Enron, as well as interest and other payments; (b) market its prepay services to other companies; (c) artificially inflate the price of JPM Chase stock, which the company could then use in stock-for-stock acquisitions of other financial institutions; (d) prevent Enron from defaulting on the hundreds of millions of dollars worth of credit default put options JPM Chase had written on Enron's publicly-traded debt; and (e) receive "kickbacks" in the form of opportunities to invest in LJM2. In addition, the two named individual defendants -- William Harrison, Jr., who was President and Chief Executive Officer of Chase Manhattan Corp. before the merger with J.P. Morgan & Co. and of J.P. Morgan Chase & Co. after the merger, and Marc. J. Shapiro, who was Vice Chairman of Chase before the merger -- allegedly benefited personally from the artificial stock price inflation by receiving [*6] large performance-based bonuses.

The FAC asserted that JPM Chase's conduct constituted violations of federal securities laws because the company hid from its shareholders, among other things, the risks inherent in the Mahonia transactions and JPM Chase's involvement in LJM2 through a series of misstatements on and omissions from its financial reports and other public disclosures. In particular, the FAC alleged that JPM Chase:

1) downplayed its Enron-related exposure by issuing deceptive press releases;

2) failed to disclose alleged violations of law in connection with the Mahonia and LJM2 transactions;

3) falsely portrayed itself as a low-risk company with a reputation for fiscal discipline and integrity;

4) permitted its analysts to issue misleading positive reports designating Enron's stock as a "buy"; and

5) improperly accounted for the Mahonia prepays as viable trades rather than impaired loans on its financial statements.

The FAC alleged that as a result of these misstatements and omissions, the price of JPM Chase stock became inflated above its inherent value, thereby

defrauding the members of the proposed class. After JPM Chase's role in the Enron affair came to light [*7] in July 2002, its share price plummeted and the company, according to the FAC, lost part of its "reputation premium" for integrity that it had previously enjoyed.

**B. The Court's Dismissal of the FAC**

The Court evaluated the FAC in light of the heightened pleading standard mandated by *Rule 9(b) of the Federal Rules of Civil Procedure*, which provides that "circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. Accordingly, a plaintiff asserting a claim for securities fraud pursuant to section 10(b) of the Securities Exchange Act, *15 U.S.C. § 78j*, and *Rule 10b-5*, *17 C.F.R. § 240.10b-5*, must plead with particularity "that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000)*.

The Court found that the FAC failed to comply with these standards [*8] because it did not sufficiently allege scienter for all but the allegations involving JPM Chase's improper characterization of the Mahonia prepay transactions as trades, and for that allegation, plaintiffs did not properly plead materiality. See *In re JP Morgan, 363 F. Supp. 2d at 619-634*.

Specifically, in regard to scienter, the Court first found that plaintiffs failed to plead legally sufficient motive for any of the five categories of alleged misstatements and omissions. *Id. at 619-20*. For each category, plaintiffs alleged the kinds of motives that can be imputed to all corporations and their officers -- such as the incentive to increase shareholder profit and officer compensation -- as opposed to the type of concrete and personal benefit that suffices to plead a strong inference of scienter. *Id. at 621* (citing *Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001))*. The Court also pointed out that plaintiffs did not provide a rational incentive for the alleged fraud: why would JPM Chase continue to extend billions of dollars in credit to Enron (through the Mahonia prepays) if it was aware that Enron was on the verge [*9] of collapse? Id.

Second, the Court analyzed whether plaintiffs properly pleaded recklessness in regard to any of the categories of alleged misstatements because even in the absence of motive, "strong circumstantial evidence of conscious behavior or recklessness" can suffice to establish scienter pursuant to the securities laws. *Id. at 619* (quoting *Novak v. Kasaks, 216 F.3d 300, 310 (2d Cir. 2000)* (internal quotation marks omitted)). The Court concluded as follows.

*1. Alleged Downplaying of Enron-related Exposure*

Plaintiffs asserted that JPM Chase acted recklessly in issuing a November 2001 press release that did not divulge the existence of significant insured liabilities connected to the Mahonia transactions. *Id. at 634*. The Court found, however, that because the Mahonia transactions were insured, the November press release did not contain a material falsehood. Id. Plaintiffs offered only "conclusory allegations that JPM Chase should have known that the insurers would challenge those contracts or that those challenges might be successful." Id. Plaintiffs also failed to set forth any particularized allegations indicating that JPM Chase's [*10] other statements allegedly downplaying its Enron-related exposure "were false when made or that they constituted more than immaterial puffery." Id.

*2. Alleged Failure to Disclose Violations of Law*

The FAC alleged that JPM Chase made material omissions in failing to disclose legal violations in connection with the Mahonia transactions and the company's investment in LJM2. *Id. at 624, 632*. These allegations failed, however, because they were strictly conclusory: plaintiffs offered no specific allegations supporting the conclusion that investment opportunities in LJM2 or other Enron special purpose entities constituted illicit "kickbacks" in exchange for loans to Enron or that these opportunities were otherwise illegal. Id. Plaintiffs also proffered no allegations showing that defendants knowingly made material misstatements or omissions to government regulators or financial institutions. *Id. at 632*.

*3. Alleged Falsities in Portraying Itself as a Low-Risk Company*

Plaintiffs alleged that JPM Chase repeatedly misrepresented itself as a low-risk company with adequate financial discipline to manage risks. *Id. at 612*. The Court found, however, that JPM's statements [*11] regarding corporate integrity, fiscal discipline and risk

management amounted to "no more than puffery" and thus were inactionable under the securities laws. *Id. at 632-33* (citing *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (per curiam)).

*4. Allegedly Permitting Its Analysts to Issue Misleading Reports*

Plaintiffs claimed that in an attempt to inflate Enron's stock prices, JPM Chase analysts rated Enron stock a "buy" despite JPM Chase's knowledge that Enron's earnings were unsustainable. *Id. at 633*. These allegations failed because plaintiffs did not allege particular facts "suggesting that JPM Chase or the individual analysts believed these 'buy' ratings to be false at the time they were issued." *Id. at 633*. The Court also found that even if the analysts knew their reports were false, "more accurate reports would not necessarily have provided JPM Chase shareholders material information about how Enron's vulnerability would impact the price of JPM Chase stock." *Id. at 633-34*.

*5. Allegedly Improper Accounting for the Mahonia Transactions as Viable Trades Rather Than as Impaired Loans*

Plaintiffs alleged that JPM [*12] Chase's accounting of the Mahonia transactions was problematic in two ways: (1) JPM Chase characterized the transactions as viable assets when in fact, according to plaintiffs, those assets were impaired; and (2) JPM accounted for the transactions as trades instead of as loans. As to the first allegation, the Court found that the FAC did not allege sufficient facts to suggest that defendants knew or should have known that the Mahonia transactions constituted impaired, rather than viable, assets. *Id. at 629*. Plaintiffs claimed that JPM Chase should have realized that Enron might default on the Mahonia prepays and that the companies who insured the transactions would refuse to perform pursuant to their surety contracts. *Id. at 628*. Plaintiffs, however, failed to allege any specific facts indicating that JPM Chase conducted its due diligence on Enron improperly and pled only conclusorily that JPM Chase should have been aware that Enron's financial misdeeds might force the company to default on the prepays. *Id. at 628-29*. The Court noted that the FAC alleged that Enron successfully kept the extent of its off-balance sheet debt secret from JPM Chase and other banks by using [*13] "approximately 3,500 affiliates to effectuate off-balance sheet deals." *Id. at 629*. The Court added: "JPM Chase's continued provision of billions of dollars in fresh capital to Enron during the class period undermines plaintiffs' conclusory claim that JPM Chase knew or should have known Enron faced impending financial ruin." Id.

However, the Court found that plaintiffs did properly plead recklessness with regard to JPM Chase's accounting of the Mahonia transactions as trades rather than loans. *Id. at 626*. Plaintiffs alleged numerous facts that gave rise to the "strong inference that JPM Chase knew or should have known that the [Mahonia] transactions were not bona fide trades" but rather were loans. Id. Specifically, the FAC alleged that JPM Chase "set up the triangular trading structure between itself, an entity it controlled and Enron"; that the transactions "eliminated price risk and entailed no actual commodity exchange"; that internal JPM Chase documents indicated that its employees considered the Mahonia prepays financing mechanisms, not trades; and that JPM Chase took the position in other litigation that "its insurers had to know that the Mahonia transactions [*14] constituted financing rather than trades." Id.

The Court concluded that JPM Chase, as a corporate defendant, could potentially be held liable for this alleged improper accounting because plaintiffs alleged "the existence of specific JPM Chase communications that indicate that JPM Chase officers, including the Vice Chairman, a Vice President and a Managing Director, had knowledge that the Mahonia transactions were not bona fide trades." *Id. at 627*. The Court also found that defendant Shapiro could potentially be held liable for the Mahonia accounting because plaintiffs alleged that he "'was the Chase executive responsible for the bank's dealings with Enron'" (id. (quoting FAC P 36)) and the FAC referenced a specific meeting in August 1999 in which Shapiro allegedly reviewed JPM Chase's trading with energy companies, including Enron. *Id. at 627-28*. On the other hand, the Court found that defendant Harrison could not be held liable for the Mahonia accounting because plaintiffs offered no basis to infer that Harrison had specific knowledge of that accounting, nor did plaintiffs allege facts suggesting that treating the Mahonia transactions as trades rather than loans was [*15] "at the core of JPM Chase's business," which is the requisite standard for ascribing knowledge of company information to a high-level corporate officer. *Id. at 628* (citing *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004)).

Thus, plaintiffs sufficiently alleged scienter for only a single allegation - the characterization of the Mahonia prepay transactions as trades as opposed to loans on JPM Chase's balances sheets - and for that allegation, only defendants JPM Chase and Shapiro could potentially face liability. The Court found, however, that even this allegation failed because labeling the Mahonia transactions as trades rather than loans was not a material misrepresentation. *Id. at 630-31*.

The alleged misrepresentation was not quantitatively material because:

> Treating the prepays as viable loans rather than as viable trades would not have [had] a material impact on JPM Chase's overall financial situation. It would not have involved diminishing the bank's total assets, but rather would have involved shifting a minute fraction of assets from one line - trading assets - to another - loan assets - in the asset [*16] column of JPM Chase's balance sheet. . . . Changing the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors.

*Id. at 630*. The alleged misrepresentation also was not qualitatively material because "[a]ccounting for the prepays as [loans] [1] would not have communicated the risks inherent in those transactions." *Id. at 631*. The Court noted that the FAC did not contain allegations suggesting that "had JPM Chase represented the prepays as loans it would have been more thorough in its due diligence of Enron and thereby more likely to discover Enron's financial distress." Id.

> 1   The Court's Opinion and Order mistakenly used the word "trades" here instead of "loans," an error that is apparent given the context of the sentence. See *In re JP Morgan, 363 F. Supp. 2d at 631*.

Because the FAC adequately pled scienter only with respect to the characterization of the Mahonia transactions as trades rather [*17] than loans - "a distinction that would not have been material to reasonable investors" - the Court held that the FAC failed to state a claim pursuant to *section 10(b) of the Securities Exchange Act*. *Id. at 634*.

The Court also dismissed the remainder of plaintiffs' claims for relief. Plaintiffs' claims for "controlling person" liability pursuant to section 15 of the Securities Act of 1933, *15 U.S.C. § 77o*, failed because the FAC did not properly allege an underlying violation of the Securities Act. *Id. at 635-36*. Their claims pursuant to section 11 of the Securities Act, *15 U.S.C. § 77k*, failed because the FAC's allegations sounded in fraud and thus failed for the same reasons as did plaintiffs' section 10(b) claim. *Id. at 635*. And finally, plaintiffs' claims pursuant to section 14(a) of the Exchange Act, *15 U.S.C. § 78n(a)*, failed because they, too, sounded in fraud and yet did not comply with the heightened pleading standard required by *Fed. R. Civ. P. 9(b)* and also because plaintiffs did not properly plead facts suggesting [*18] that any of the assertions in defendants' proxy statement were material misrepresentations or omissions when that statement was issued. *Id. at 636*.

**C. The Allegations of the Second Amended Complaint**

Many of the allegations in plaintiffs' "Second Amended and Consolidated Class Action Complaint for Violations of Federal Securities Laws" ("SAC") are identical to or close facsimiles of the allegations in the FAC. [2] The Court will therefore focus only on plaintiffs' pertinent new allegations. These allegations fall generally into three categories: (1) JPM Chase's alleged downplaying of its Enron-related exposure; (2) the alleged misrepresentation of JPM Chase's reputation for integrity and risk management; and (3) the allegedly faulty reporting of the Mahonia transactions.

> 2   Compare SAC PP 71-73 with FAC PP 49-51; SAC PP 102-16 with FAC PP 77-92; SAC PP 532-43 with FAC PP 317-27; SAC PP 577-86 with FAC PP 546-55; SAC PP 672-75 with FAC PP 455-58; SAC PP 696-701 with FAC PP 463-68; SAC PP 702-16 with FAC PP 469-83; SAC PP 720-24 with FAC PP 484-88; SAC PP 757-71 with FAC PP 489-503; and SAC PP 801-22 with FAC PP 524-45.

[*19]  *1. Alleged Downplaying of Enron-Related Exposure*

As explained above, the Court found that the FAC failed to sufficiently plead that JPM Chase acted recklessly in issuing a press release in November 2001

downplaying the bank's liabilities connected to the Mahonia transactions. That press release confirmed "only $ 900 million in combined exposure to Enron," and left out JPM Chase's $ 1.1 billion in insured interests in the Mahonia transactions. (SAC P 762.) The Court found that because those interests were insured, the press release did not contain a material falsehood. *In re JP Morgan Chase, 363 F. Supp. 2d at 634*. Plaintiffs now allege that JPM Chase could not have reasonably relied on the insurance contracts when it issued the press release because New York Insurance Law prohibits insurance companies from guaranteeing the performance of debt instruments. (SAC P 442 (citing *N.Y. Ins. Law § 1113(a)(16)*).) Plaintiffs allege that because the Mahonia transactions were not bona fide trades but were in fact debt instruments, JPM Chase obtained its insurance contracts "fraudulently" and "should have become aware of this fact in doing its due [*20] diligence on coverage." (Id. PP 371, 442, 656.)

   *2. Alleged Misrepresentation of JPM Chase's Reputation for Integrity*

   Like the FAC, the SAC alleges that during the class period, among other statements touting JPM Chase's reputation for risk management and fiscal integrity, JPM Chase represented that it "set the standard for best practices in risk management," that "[p]rocesses in place are intended to ensure credit risk instruments are accurately assessed, properly approved and continuously monitored" and that the company would continue to "focus on fiscal discipline." (See, e.g., FAC PP 154-57, 168-73; SAC PP 3, 336-37, 354, 380, 400, 472, 474, 479, 481, 551, 556.)

   The SAC goes further than the FAC, however, in alleging why, according to plaintiffs, these representations were materially misleading. First, the SAC quotes extensively from the Securities and Exchange Commission's charges in its civil lawsuit against JPM Chase. (SAC PP 636-39.) Those charges including that JPM Chase "aided and abetted Enron Corp.'s . . . manipulation of its reported financial results" through complex structured transactions that "had no business purpose aside from masking the fact that, [*21] in substance, [the transactions] were loans from [JPM Chase] to Enron" and that the Mahonia prepays "allowed Enron to hide the true extent of its borrowings from investors and rating agencies because sums borrowed in prepay transactions appeared as 'price risk management liabilities' rather than 'debt' on Enron's balance sheet." (SAC P 636.) The SAC notes that JPM Chase "agreed to a final judgment" with the SEC that involved a payment to the SEC of $ 135 million. (SAC P 639.)

   Second, plaintiffs quote testimony from the hearings of the United States Senate Permanent Subcommittee on Investigations on "The Role of the Financial Institutions in Enron's Collapse." (SAC PP 587-604.) Senator Carl Levin's opening statement accused JPM Chase of "actively assist[ing] Enron in its deceptions" and lambasted the bank for "pitch[ing] Enron-style, phony prepays to other companies, further spreading into the U.S. business community the poisonous practice of misleading accounting." (SAC P 600.)

   Third, the SAC includes a section entitled "[JPM Chase's] Involvement in WorldCom Expose[d] It to Billions in Contingent Liabilities and Material Reputational Risk." (SAC PP 188-240.) That section [*22] alleges that JPM Chase served as a co-lead underwriter on two multi-billion dollar WorldCom offerings - and that its due diligence on these offerings was "astonishingly reckless." (SAC PP 188-203.) In 2000, JPM Chase helped underwrite a $ 5 billion bond offering for WorldCom despite mounting problems in the telecommunications industry; the SAC alleges that the due diligence on the offering "essentially consisted of one cursory phone call with [Scott Sullivan, then the Chief Financial Officer of WorldCom]." (SAC PP 192-93.) In 2001, JPM Chase was the co-lead manager on "what would become the largest public debt offering in United States history" -- WorldCom's issuance of $ 11.9 billion worth of notes - even though WorldCom's share price had declined 70% in the prior five months, the telecommunications industry was on the brink of "collapse" and WorldCom had missed financial estimates in the fourth quarter of 2000. (SAC PP 204-06, 209.) The SAC alleges that the due diligence on this massive offering "consisted of two phone calls with WorldCom's management," including one that lasted only ten minutes, and that the underwriters did not review "any budgets" or "any reports on such critical [*23] financial metrics as line costs, capital expenditures or revenues" and "did not attempt to verify anything management told them." (SAC PP 208-10.) According to plaintiffs, had JPM Chase conducted proper due diligence, it would have discovered WorldCom's fraudulent capitalization of line costs. (SAC PP 215-235.)

   The SAC alleges that JPM Chase failed to

adequately perform its due diligence obligations on the WorldCom offerings "in order to garner extraordinary fees." (SAC P 748.) Plaintiffs identify several emails that purportedly show "how important Worldcom and [its CEO, Bernard Ebbers] were as clients." (SAC PP 748-55.) Given this importance, according to the SAC, "it is reasonable to infer that all defendants were either aware of the true financial condition of WorldCom or consciously disregarded those facts." (SAC P 756.)

*3. The Allegedly Faulty Reporting of the Mahonia Transactions*

The SAC includes several new allegations regarding JPM Chase's reporting of the Mahonia transactions as viable trading assets in its financial statements. First, the SAC alleges additional facts in support of plaintiffs' theory that JPM Chase recklessly disregarded the fact that the Mahonia [*24] prepays were impaired, rather than viable, assets. (SAC PP 289-304.) The SAC alleges that JPM Chase, as the "primary lender" to Enron, "was required to undertake extensive analysis that would ultimately take into consideration all aspects of the financial operations of Enron, including significant off balance sheet and/or affiliated enterprises." (SAC PP 784-88.) Plaintiffs list a series of activities showing JPM Chase's "heavy entanglement with many of Enron's financings." (SAC PP 51-52, 789.) These activities, according to plaintiffs, put JPM Chase "in a position to have knowledge of Enron's true financial condition." (SAC PP 53, 789.) Plaintiffs quote the Enron Bankruptcy Examiner, who noted:

> As a result of its Tier 1 status, its long-standing Enron relationship, and the frequency of its interaction with Enron in multiple transaction capacities, [JPM Chase] developed an in-depth understanding of the intricacies of Enron's financial condition (including its off-balance sheet obligations), as well as Enron's desire for bank-generated cash that could be treated as something other than debt.

(SAC P 53.)

Second, the SAC alleges that in addition to misreporting the [*25] Mahonia transactions as viable trades rather than impaired loans, JPM Chase failed to comply with Statement of Financial Accounting Standards No. 57 ("SFAS 57"), which plaintiffs allege required the company to report the Mahonia transactions as related-party transactions on its financial statements. (SAC PP 242-54.)

According to SFAS 57, a "related party" is one that "can significantly influence the management or operating policies of the transacting parties" or that "has an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests." (SAC P 242.) Plaintiffs allege that JPM Chase and "its shell corporation, Mahonia, were 'related parties'" pursuant to this definition because, among other reasons, JPM Chase "controlled" Mahonia, reviewed documents and made decisions on Mahonia's behalf and was granted power of attorney by Mahonia. (SAC P 243.)

SFAS 57 provides that when a company engages in "material related party transactions," it "shall" disclose in its financial statements the following:

> a. The nature of the relationship(s) [*26] involved
>
> b. A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements
>
> c. The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period [and]
>
> d. Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

(SAC P 245; SFAS 57 P 2, available at www.fasb.org.) The SAC alleges that JPM Chase failed to make these allegedly requisite disclosures with regard to the Mahonia

transactions. (SAC P 250-51.) Had JPM Chase done so, according to plaintiffs, "the duplicitous nature of the elaborate Mahonia accounting charade" would have been exposed and "the public markets would have punished" the company accordingly. (SAC P 251.) Plaintiffs explain that the "related party" disclosures "would [*27] have revealed the essential irregularity that assets classified as 'trading' on JPMC's statement of financial position were subject to negligible price risk, but were rife with the type of credit risk characteristic of loan receivable assets." (SAC P 250.) As a result, according to plaintiffs, proper accounting for the Mahonia transactions "would have set off a chain of material implications for [JPM Chase], including significant loan loss provision charges against periodic net income, material increases in reported non-performing and non-accrual status loans, and the 'domino effect' collapse of a major borrower, Enron, as the capital markets were made aware of the extent of Enron's off-balance sheet debt and the true nature of its reported cash flows." (Id.)

Finally, the SAC includes new allegations to support plaintiffs' contention that defendant Harrison possessed the requisite scienter to be held responsible for JPM Chase's allegedly faulty accounting of the Mahonia transactions because those transactions were at the "core" of JPM Chase's business. The SAC alleges that until its bankruptcy "Enron was one of [JPM Chase's] most important clients"; that JPM Chase designated [*28] Enron as a "highest priority" "blue" client; that Enron was JPM Chase's "largest client in oil and gas"; that JPM Chase "received an estimated 11% of Enron's lucrative merger and acquisition advisory assignments since 1999"; and that JPM Chase was one of Enron's "top two agents," along with Citibank. (SAC PP 54, 56, 705.) Plaintiffs also allege that JPM Chase "was aware exactly why Enron wanted to use" structured finance vehicles. (SAC P 13.) The SAC cites an internal JPM Chase email stating:

> Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev[enue] or (better yet) bury it in their trading liabilities.

(Id.) In addition, the Enron bankruptcy examiner found that "JP Morgan Chase had an in-depth appreciation of Enron's reported and actual earnings, and its pattern of engaging in cash-generating transactions as a 'year-end management tool.'" (SAC P 14.)

## II. ANALYSIS

### A. Legal Standard

As it did in reviewing defendants' motion to dismiss the FAC, the Court treats all factual allegations in the SAC as true and draws all reasonable inferences in plaintiffs' [*29] favor. See *Ganino, 228 F.3d at 161*; *Lee v. Bankers Trust Co., 166 F.3d 540 (2d Cir. 1999)*. "Dismissal is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir. 2001)* (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984))*.

Because the SAC charges securities fraud, plaintiffs must satisfy the heightened pleading requirements of *Fed. R. Civ. P. 9(b)* and the PSLRA, *15 U.S.C. § 78u-4*. See *Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001)*. Thus, "[t]he complaint must identify the statements plaintiff[s] assert[] were fraudulent and why, in plaintiff[s]' view they were fraudulent, specifying who made them, and where and when they were made." *In re Scholastic Corp., 252 F.3d at 69-70*.

### B. Plaintiffs' Claims Pursuant to Section 10(b) of the Securities Exchange Act

Plaintiffs' principal claims are brought pursuant to *section 10(b)* [*30] of the Securities Exchange Act and *Rule 10b-5* promulgated thereunder. To bring a cause of action pursuant to these provisions, plaintiffs must allege with particularity that JPM Chase "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005)*. Accordingly, plaintiffs must convey through factual allegations that defendants made materially false statements, and that they did so with scienter. See *In re Globalstar Sec. Litig., No. 01 Civ. 1748, 2003 U.S. Dist. LEXIS 22496, 2003 WL 2295163, at *5 (S.D.N.Y. Dec. 15, 2003)*; *In re Revlon Sec. Litig., No. 99 Civ. 10192, 2001 U.S. Dist. LEXIS 3265, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001)* (citing *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 812-13 (2d Cir.*

1996))).

A misstatement or omission is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [*31] [act].'" *Basic, Inc. v. Levinson, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* (quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976))*. "Material facts include those that affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001)*. "At the pleading stage, a plaintiff satisfies the materiality requirement of *Rule 10b-5* by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino, 228 F.3d at 162* (citing *Basic, 485 U.S. at 231*).

The requisite scienter plaintiffs must allege is "an intent to deceive, manipulate or defraud." *Kalnit, 264 F.3d at 138* (internal quotation marks and citations omitted). In evaluating whether plaintiffs have satisfied this requirement, "the Court must read the complaint in toto and most favorably to plaintiff." *In re Regeneron Pharms., Inc. Sec. Litig., No. 03 Civ. 3111, 2005 U.S. Dist. LEXIS 1350, 2005 WL 225288, at \*24 (S.D.N.Y. 2005)* [*32] (internal quotation marks and citations omitted). However, plaintiffs must allege facts that give rise "to a strong inference that [defendants] acted with the required state of mind," *15 U.S.C. § 78u-4(b)(2)*; "a weak yet reasonable inference of scienter" will not suffice. *In re JP Morgan Chase, 363 F. Supp. 2d at 618*.

Plaintiffs can establish scienter in either of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks, 216 F.3d at 307* (quoting *Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995))*.

As explained above, the Court dismissed the FAC because it failed to establish scienter for all but the allegation that JPM Chase mischaracterized the Mahonia transactions as trades rather than loans, and for that allegation, plaintiffs did not properly plead materiality. See *In re JP Morgan Chase, 363 F. Supp. 2d at 619-634*. Defendants assert that none of the new factual allegations in the [*33] SAC - regarding JPM Chase's alleged downplaying of its Enron-related exposure, misrepresentation of its reputation for integrity and faulty reporting of the Mahonia transactions -- remedies the deficiencies that led the Court to dismiss the FAC. The Court agrees.

*1. New York Insurance Law Does Not Save Plaintiffs' Claims Regarding JPM Chase's Downplaying of Its Enron-Related Liability*

Plaintiffs assert that JPM Chase's November 2001 press release acknowledging only $ 900 million in Enron-related explosure -- and leaving out more than $ 1 billion in insured liabilities -- was reckless because JPM Chase "should have become aware" of the "fact" that the insurance contracts were fraudulently obtained, as New York law prohibits insurance companies from guaranteeing the performance of debt instruments. (SAC PP 371, 442, 656, 762.) The reality, however, is that New York insurance law does not -- on its face or otherwise -- clearly prohibit or render unenforceable the kinds of surety arrangements JPM Chase had made with its insurers to cover the Mahonia transactions. Plaintiffs cite no cases or administrative opinions applying *N.Y. Ins. Law § 1113(a)(16)* to the [*34] types of insurance contracts at issue here, nor does the SAC allege any other facts suggesting defendants knew or should have known that these contracts would be challenged. It was not, therefore, unreasonable for defendants to have assumed that those contracts were valid. As the Court noted in dismissing the FAC, "[r]ecklessness in the scienter context cannot merely be enhanced negligence"; "reckless conduct is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re JP Morgan Chase, 363 F. Supp. 2d at 624-25* (internal citations and quotation marks omitted). Plaintiffs plainly do not allege sufficient facts to suggest that defendants' reliance on the surety contracts was "an extreme departure from the standards of ordinary care."

*2. Defendants' Representations Regarding Risk Management Were Not Materially Misleading*

Plaintiffs attempt to resurrect their allegations regarding JPM Chase's repeated representation of itself as an institution with sound risk management [*35] procedures by identifying new ways that these representations were allegedly misleading. But plaintiffs still do not show how any of these alleged

misrepresentations amount to more than puffery. As the Court explained in dismissing the FAC, "generalizations regarding integrity, fiscal discipline and risk management" constitute "'precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable.'" *In re JP Morgan Chase, 363 F. Supp. 2d at 633* (quoting *Lasker, 85 F.3d at 59*).

Plaintiffs assert that Lasker does not apply here because investment banking is an industry in which integrity and risk management are "matters of great importance to investors." In Lasker, however, it was not disputed that the "financial integrity" of the defendant public utility was important to its investors; rather, the United States Court of Appeals for the Second Circuit found that "broad, general" statements about financial integrity could not be relied upon by reasonable investors as representations that "the company's actions would in no way impact [its] finances." *Lasker, 85 F.3d at 59*. Likewise, JPM Chase's [*36] generalized boast that it "set the standard for best practices in risk management" could not have been relied upon by reasonable investors as a specific representation that the company would not take certain actions, such as the structuring of prepay transactions, that might adversely impact its reputation.

In dismissing the FAC, the Court stated that "[e]ven if defendants' statements were more than puffery, plaintiffs have failed to allege adequately that the assertions were materially misleading." *In re JP Morgan Chase, 363 F. Supp. 2d at 633*. This conclusion, too, is not altered by plaintiffs' new allegations. As explained below, the one inaccuracy for which plaintiffs have adequately pled scienter -- the characterization of the Mahonia transactions as trades rather than loans -- is itself immaterial and thus does not render JPM Chase's representations of its risk management practices materially misleading. See id.

Finally, the SAC's kitchen sink-style allegations concerning JPM Chase's less-than-thorough due diligence in underwriting WorldCom's note offerings and its "aiding and abetting" of Enron's "manipulation of its reported financial results" are irrelevant [*37] to this action because they concern the potential misleading of WorldCom and Enron shareholders and not the misleading of JPM Chase's own shareholders. See *Kalnit, 264 F.3d at 141*.

*3. Plaintiffs Fail to Allege How the Improper Accounting of the Mahonia Transactions Was Material*

Plaintiffs contend that the new facts alleged in the SAC establish that (a) JPM Chase recklessly disregarded the fact that the Mahonia prepays were impaired, rather than viable, assets; (b) the improper accounting for the Mahonia transactions was material; and (c) defendant Harrison possessed the requisite scienter to be held liable for the Mahonia accounting. Each of these contentions fails to withstand scrutiny.

First, the SAC's new allegations suggesting that JPM Chase "developed an in-depth understanding of the intricacies of Enron's financial condition (including its off-balance sheet obligations)" and thus knew or should have known that Enron would default on the prepays do not remedy the fundamental flaw the Court identified in the FAC: that "JPM Chase's continued provision of billions of dollars in fresh capital to Enron during the class period undermines plaintiffs' conclusory [*38] claim that JPM Chase knew or should have known Enron faced impending financial ruin." *In re JP Morgan Chase, 363 F. Supp. 2d at 629*. Plaintiffs still have not alleged any specific facts indicating that JPM Chase conducted its due diligence toward Enron improperly or that JPM Chase "would have conducted due diligence in a materially different manner had it accounted for the Mahonia prepays as loans rather than as trades." *Id. at 628*.

Moreover, plaintiffs' conclusory allegation that JPM Chase knew of Enron's "true financial condition" is contradicted by other allegations in the SAC. For example, plaintiffs allege that various financial institutions "complied with Enron requests to restrict disclosure of the nature and extent of its prepay activities" and that "by design," the prepays "made it impossible for . . . financial institutions to uncover the true level of Enron's indebtedness." (SAC P 592.) The SAC even specifies that JPM Chase was "surprise[d]" to learn that Enron had $ 5 billion in prepays outstanding -- "an amount that was much greater than [JPM Chase] had expected." (Id.) Given these allegations, it would be unreasonable to infer [*39] that JPM Chase knew or should have known that Enron would default on the prepays and thus that those transactions were not viable but impaired.

Second, plaintiffs assert that JPM Chase's "reckless" failure to comply with SFAS 57 renders defendants' improper accounting of the Mahonia transactions material. Plaintiffs are correct that the SAC properly

pleads that Mahonia was a "related party" pursuant to SFAS 57 through its allegations that JPM Chase created, controlled and made decisions on behalf of Mahonia. Thus, defendants' failure to disclose the Mahonia prepays as related party transactions may have constituted a violation of Generally Accepted Accounting Principles.

However, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. . . . Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Novak, 216 F.3d at 309* (internal citations and quotation marks omitted). That corresponding evidence is missing here: plaintiffs allege no facts suggesting that JPM Chase possessed fraudulent intent in its failure to adhere to SFAS 57. Significantly, [*40] the SAC does not plead that the Securities and Exchange Commission has alleged that JPM Chase's SEC filings improperly omitted related party disclosures or that JPM Chase has had to restate its financial statements due to its failure to comply with SFAS 57. These omissions suggest that reasonable accountants could differ as to whether SFAS 57 applied to the Mahonia transactions -- an inference that defeats plaintiffs' claim of recklessness. See *S.E.C. v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)* (GAAP violations not reckless unless "no reasonable accountant would have made the same decisions if confronted with the same facts" or the violations constitute "an egregious refusal to see the obvious, or to investigate the doubtful") (internal citations and quotation marks omitted).

Even if plaintiffs had adequately pleaded scienter with regard to JPM Chase's failure to comply with SFAS 57, that failure would not have been material to reasonable investors. Compliance with SFAS 57 would have meant that JPM Chase would have disclosed (a) the nature of the relationship between JPM Chase and Mahonia; (b) that JPM Chase engaged in prepay transactions with Mahonia; [*41] (c) the dollar amount of the transactions with Mahonia; and (d) the amount of outstanding obligations. (See SAC P 245.). Because the Mahonia transactions were already fully disclosed as assets on JPM Chase's balance sheet, the only new information revealed by compliance with SFAS 57 would have been details about the nature of the relationship between JPM Chase and Mahonia.

This information would not have materially altered the "total mix" of information available to investors. *Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*. With regard to quantitative materiality, the Court already determined that the Mahonia transactions comprised such a small percentage of JPM Chase's total assets that accounting for the transactions as trades as opposed to loans was quantitatively immaterial, *In re JP Morgan Chase, 363 F. Supp. 2d at 631*, and plaintiffs' allegations regarding SFAS 57 do not change that analysis. Plaintiffs urge, however, that the SFAS disclosures were qualitatively material because they would have revealed how assets that were characterized as trades were in fact "loan receivable assets" -- and that this [*42] revelation "would have set off a chain of material implications for [JPM Chase]," including the "'domino effect' collapse" of Enron. (SAC P 250.)

Plaintiffs' sweeping and conclusory allegation finds no support in the facts alleged in the SAC. Plaintiffs fail to explain how information about JPM Chase's influence over Mahonia would have exposed Enron's frauds or, in fact, exposed any pertinent new information as to whether Enron might default on the prepays. At most, plaintiffs' allegations support the inference that compliance with SFAS 57 would have led shareholders to question whether the Mahonia transactions should have been accounted for as loan assets as opposed to trading assets -- and the Court has already found that such a reclassification would have been both quantitatively and qualitatively immaterial. Thus, plaintiffs have properly pled neither scienter nor materiality with respect to JPM Chase's noncompliance with SFAS 57.

Plaintiffs' effort to establish defendant Harrison's scienter also fails. Regardless of whether Enron was one of JPM Chase's crucial "blue" clients, the SAC does not plead sufficient facts suggesting that the accounting treatment of the Mahonia prepays [*43] was such a core part of JPM Chase's business that Harrison, as CEO, would have undertaken to understand whether those transactions were properly reported as loan assets or trading assets. Plaintiffs contend that because Enron was such an important client, keeping it satisfied was a core concern -- and one of the ways to keep it satisfied was to shield its off-balance sheet transactions from public exposure. This assertion, however, is belied by the fact that JPM Chase's various deals with Enron generated a total of only $ 86 million for JPM Chase over five years -- which amounts to no more than a minute fraction of the

bank's overall revenues during that time period. (SAC PP 51, 54.) By themselves, the Mahonia transactions generated only $ 30 million in fees from Enron (SAC P 708); this figure is far too small to suggest that the accounting treatment of these transactions was at the core of JPM Chase's business.

Thus, the SAC, like the FAC, does not sufficiently allege that defendants acted with scienter in making any material representations or omissions in connection with the purchase or sale of JPM Chase securities. Accordingly, plaintiffs have failed to state a claim pursuant [*44] to *section 10(b) of the Securities Exchange Act*.

### C. Plaintiffs' Remaining Claims

The SAC offers no new allegations pertaining to plaintiffs' claims pursuant to *sections 11* and *15 of the Securities Act* and *section 14(a) of the Securities Exchange Act*; these claims are therefore dismissed for the reasons set forth in the Court's opinion and order dismissing the FAC. See *In re JP Morgan Chase, 363 F. Supp. 2d at 635-36*.

### III. CONCLUSION

Having been given the opportunity to amend their pleadings, plaintiffs still have pled scienter with particularity only in connection with the fact that JPM Chase's prepay transactions with Enron were characterized improperly as trading assets rather than as loan assets -- and that distinction alone would not have been material to investors. Plaintiffs have thus failed to state a claim for securities fraud. Defendants' motion to dismiss the SAC is therefore granted with prejudice.

Dated: New York, New York

March 28, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.