# TAB 18

LEXSEE 2007 U.S. DIST. LEXIS 9893

CLIFFORD C. MARSDEN and MING XU, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. SELECT MEDICAL CORP., MARTIN JACKSON, ROBERT A. ORTENZIO, ROCCO ORTENZIO, and PATRICIA RICE, Defendants.

CIVIL ACTION 04-4020

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2007 U.S. Dist. LEXIS 9893

**February 6, 2007, Decided**

**SUBSEQUENT HISTORY:** Motion denied by *Marsden v. Select Med. Corp., 2007 U.S. Dist. LEXIS 42924 (E.D. Pa., June 12, 2007)*

**PRIOR HISTORY:** *Marsden v. Select Med. Corp., 2006 U.S. Dist. LEXIS 16795 (E.D. Pa., Apr. 6, 2006)*

**COUNSEL:** [*1] For CLIFFORD C. MARSDEN, DIE KAPITALANLAGEGESELLSCH AFT DER BANK AUSTRIA CREDITANSTALT GRUPPE GMBH FOR ACCOUNT OF ITS FUNDS C 43 AND GF 5, Plaintiffs: BRIAN P. KENNEY, ERIC L. YOUNG, LEAD ATTORNEYS, KENNEY LENNON & EGAN, PLYMOUTH, PA; KRISTIE STAHNKE MCGREGOR, LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, LEAD ATTORNEYS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY.

For MING XU, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff: BRIAN P. KENNEY, ERIC L. YOUNG, LEAD ATTORNEYS, KENNEY LENNON & EGAN, PLYMOUTH, PA; KRISTIE STAHNKE MCGREGOR, LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, LEAD ATTORNEYS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY; STUART T. STEINBERG, LEAD ATTORNEY, DECHERT PRICE AND RHOADS, PHILA, PA.

For CAPITAL INVEST, Plaintiff: ANN E. GITTLEMAN, LEAD ATTORNEY, NEW YORK, NY; BRIAN P. KENNEY, ERIC L. YOUNG, LEAD ATTORNEYS, KENNEY LENNON & EGAN, PLYMOUTH, PA; JOSHUA H. VINIK, LEAD ATTORNEY, MILBERT WEISS BERSHAD, HYNES & LERACH LLP., NEW YORK, NY; KRISTIE STAHNKE MCGREGOR, LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, LEAD ATTORNEYS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY; STUART J. GUBER, [*2] LEAD ATTORNEY, MOTLEY RICE LLC, ATLANTA, GA.

For JAMES SHAVER, FRANK C. BAGATTA, Plaintiffs: ANN E. GITTLEMAN, LEAD ATTORNEY, NEW YORK, NY; BRIAN P. KENNEY, ERIC L. YOUNG, LEAD ATTORNEYS, KENNEY LENNON & EGAN, PLYMOUTH, PA; JOSHUA H. VINIK, LEAD ATTORNEY, MILBERT WEISS BERSHAD, HYNES & LERACH LLP., NEW YORK, NY; KRISTIE STAHNKE MCGREGOR, LORI G. FELDMAN, PETER E. SEIDMAN, SANFORD P. DUMAIN, LEAD ATTORNEYS, MILBERG WEISS BERSHAD & SCHULMAN LLP, NEW YORK, NY.

For SELECT MEDICAL CORP., MARTIN JACKSON, ROBERT A. ORTENZIO, ROCCO ORTENZIO, PATRICIA RICE, Defendants: DAVID M. HOWARD, LEAD ATTORNEY, JOHN V. DONNELLY, III, DECHERT LLP, PHILADELPHIA, PA; MICHAEL L. KICHLINE, STUART T. STEINBERG, LEAD ATTORNEYS, DECHERT, PRICE & RHOADS, PHILA, PA.

2007 U.S. Dist. LEXIS 9893, *2

**JUDGES:** J. CURTIS JOYNER, J.

**OPINION BY:** J. CURTIS JOYNER

**OPINION**

**MEMORANDUM AND ORDER**

Joyner, J.

Presently before the Court is Defendants' Motion for Certification of Interlocutory Appeal Pursuant to *28 U.S.C. § 1292(b)* (Doc. No. 44), Plaintiffs' Opposition (Doc. No. 51) and Defendants' reply (Doc. No. 54) thereto. After considering the parties' submissions, the Court concludes that its earlier analysis of loss causation [*3] under *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, was erroneous with respect to Plaintiffs' theory of liability for securities fraud based on Defendants' allegedly improper revenue practices. For the reasons below, the Court now holds that Plaintiffs have failed to allege the necessary loss causation to advance this theory of liability. The Court therefore VACATES in PART its previous decision, GRANTS Defendants' Motion to Dismiss Plaintiffs' security fraud claims premised on alleged improper revenue practices, and DENIES as MOOT Defendants' Motion.

**Discussion** [1]

> 1 The Court assumes the reader's familiarity with the underlying facts and allegations. For a detailed summary of the factual allegations in this case, see this Court's earlier opinion, *Marsden v. Select Medical Corp., 04-4020, 2006 U.S. Dist. LEXIS 16795 (E.D. Pa. Apr. 6, 2006)*.

*I. The Court may reconsider its April 6, 2006 decision sua sponte.*

Defendants did not file a motion for reconsideration, [*4] [2] but "so long as [this Court] has jurisdiction over [a] case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1977)*. This Court's April 6, 2006 decision denying in part Defendants' motion to dismiss is an interlocutory order. See, e.g., *Cabirac v. Comm'r, 02-8057, 2003 U.S. Dist. LEXIS 14588, at *1 (E.D. Pa.*

June 23, 2003). And it is surely the case that rectifying a clear error of law is "consonant with justice." After all, were this a formal motion for reconsideration, the Court could grant it (among other reasons) "to correct a clear error of law or to prevent manifest injustice." *General Instrument Corp. of Delaware v. Nu-Tek Elecs. & Mfg., Inc., 3 F. Supp. 2d 602, 606 (E.D. Pa. 1998)*, aff'd., *197 F.3d 83 (3d Cir. 1999)*; see also *Jilin Pharm. USA, Inc. v. Chertoff, 447 F.3d 196, 199 (3d Cir. 2006)* (citing *Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)*). Moreover, as this Court's April 6, 2006 Memorandum Opinion and [*5] Order did not dispose of every claim, it is "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties." *Fed. R. Civ. P. 54(d)*; see also *Mohammad v. Kelchner, 03-1134, 2005 U.S. Dist. LEXIS 40762, at *6 (W.D. Pa. Apr. 27, 2005)*. It is therefore clearly proper for the Court to reconsider its earlier decision *sua sponte*. [3]

> 2 Under the Eastern District of Pennsylvania's local rules, a party must file a motion for reconsideration "within ten (10) days of entry of the judgment, order, or decree concerned." *Loc. R. Civ. P. 7.1(g)*.
>
> 3 Because the parties have thoroughly briefed the issue of loss causation both for this motion and the earlier motion to dismiss, the Court did not request any further briefing on the issue. It therefore views its decision to reconsider the loss causation issue *sua sponte* without further briefing as being unfair to neither party.

*II. Plaintiffs do not adequately plead loss causation* [*6] *under Dura Pharmaceuticals with respect to their theory of liability premised on improper revenue practices.*

Section 10(b) of the Securities and Exchange Act of 1934 proscribes (1) the "use or employ[ment]" of any "deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of Securities and Exchange Commission rules and regulations." *15 U.S.C. § 78j(b)*. Under this statute, the SEC promulgated *Rule 10b-5*, which forbids the making of any "untrue statement or material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." *17 C.F.R. § 240.10b-5(b)*. The statute and rule together permit

individuals to bring private damages actions that resemble common law tort actions for deceit and misrepresentation. See, e.g., *Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 730, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)*. And so the elements of 10b-5 claim are well-established. [4] But unlike its common law predecessors, federal private securities actions are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). At issue here [*7] is the requirement that private plaintiffs must prove loss causation under *Section 78u-4(b)(4) of PSLRA*. [5] In relevant part, it provides:

> Loss Causation. In any private action arising under this chapter, the plaintiff shall have the burden of providing that the acts or omissions of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

*15 U.S.C. § 78u-4(b)(4)*. A plaintiff therefore shows loss causation by alleging and ultimately proving that the defendant's fraud caused her to suffer actual economic loss. See, e.g., *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 198-99 (2d Cir. 2003)*.

> [4] The basic elements of a federal securities fraud claim involving purchases or sales of securities publically traded securities are: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation;" (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. See, e.g., *Dura, 544 U.S. at 340*.

[*8]
> [5] The heightened pleading requirements also require a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why statement is misleading [and allege] facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(1) - (2)*. Not to be forgotten, of course, is the basic requirement under *Rule 9(b) of the Federal Rules of Civil Procedure* that "all averments of fraud . . . shall be stated with particularity."

In *Dura Pharmaceuticals*, the Supreme Court resolved a circuit split by unanimously holding that a securities plaintiff does not plead loss causation by merely alleging (and later establishing) that the price of the security on the date of the purchase was inflated because of the defendant's misrepresentation(s). See *544 U.S. at 342*. Justice Breyer's opinion began by observing that at the moment the initial transaction takes place, a plaintiff has suffered no loss because "as a matter of pure logic . . . the inflated purchase payment is offset [*9] by ownership of a share that at that instant possesses equivalent value." Id. And if a purchaser were to sell these shares "before the *relevant truth* [about the seller's misrepresentation] . . . leaks out," that misrepresentation will not have caused any loss. Id (emphasis added). Indeed, it is only after "the truth makes its way into the market place [that] an initially inflated purchase price *might* mean a later loss." Id. (emphasis in original). In other words, to successfully plead loss causation requires a plaintiff to allege that the stock price fell after the truth about the misrepresentation was made known to the market. [6] See id.; see also *Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 477 (4th Cir. 2006)*; *D.E. & J. Ltd. P'ship v. Conaway, 133 Fed. Appx. 994, 1000 (6th Cir. 2005)* (unpublished); *Semerenko v. Cendant Corp., 223 F.3d 165, 185 (3d Cir. 2000)* ("Where the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation. In the absence of a correction in the [*10] market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price."). [7]

> [6] In the Court's previous opinion, it opined that loss causation requires the value of the shares must drop "significantly" after the truth became known. See *Marsden, 2006 U.S. Dist. LEXIS 16795, at *39*. The Court acknowledges that this language tracks that used by the Supreme Court in *Dura*. See *544 U.S. at 347*. ("The complaint's failure to claim that Dura's share price fell significantly after the truth became known suggests that the plaintiffs considered the

allegation of purchase price inflation alone sufficient."). But it believes that this language - that the drop in stock price be "significant" - is dicta for at least two reasons. First, the Supreme Court did not hold that a securities plaintiff fails to plead loss causation, as a matter of law, by failing to allege that a defendant's share price fell by some specified percentage. Second, this language was ultimately unnecessary to the Supreme Court's holding because the *Dura* plaintiffs attempted to establish loss causation by simply alleging that they had paid inflated amounts for their shares. The Supreme Court did not address the issue of what drop in stock price is sufficient to establish loss causation when the relevant truth became known to the market.

[*11]

7   *Dura* cited approvingly *Semerenko*'s analysis of loss causation. See *544 U.S. at 345*.

In *Dura,* plaintiffs had alleged two theories of liability: (1) that Dura (or its officials) made false statements concerning its drug profits and sales; and (2) that Dura falsely claimed (or overstated) the company's prospects of gaining approval from the Food and Drug Administration ("FDA") for its new asthmatic spray device. See *Dura, 544 U.S. at 339*. It was this second theory of liability that was before the Supreme Court. 8 The Court concluded that the *Dura* plaintiffs did not adequately plead loss causation with respect to the spray device claim because Dura's share price fell significantly on news that its earnings would be lower than expected because of slow drug sales, rather than any news about the spray device. *Id. at 346*. Plaintiffs therefore did not plead loss causation for the spray device claim because there were no allegations "that Dura's share price fell significantly after the truth [that the FDA would not [*12] approve the device] became known." *Id. at 347*. Because Dura's earnings announcement was silent with respect to the spray device, the drop in share price could not have been caused because of any action (or inaction) by the FDA.

8   The District Court had dismissed the drug-profitability claim because the plaintiffs did not adequately "allege the appropriate state of mind, i.e., that the defendants had acted knowingly, or the like." *Dura, 544 U.S. at 340*. The Supreme Court did not review the correctness of this decision.

Like the *Dura* plaintiffs, Plaintiffs in this action allege two theories of liability: (1) Select Medical Corporation's ("Select") concealed its poor financial condition by employing improper revenue practices 9 ("improper revenue practices theory") and (2) Select knew of likely changes to federal Medicare/Medicaid regulations that could negatively affect its business model but did not publicly alert investors of these changes ("regulatory changes theory"). [*13] 10 This Court's earlier decision concluded that Plaintiffs had adequately pled loss causation with respect to each of these theories of liability. See *Marsden, 2006 U.S. Dist. LEXIS 16795, at *41*. Upon careful reconsideration, the Court now recognizes that this was not entirely correct.

9   Plaintiffs allege that Select's improper patient referral practices allowed it to artificially (and misleadingly) inflate revenue figures. See, e.g., Amended Complaint ("Am. Compl.") at P 132. These allegedly improper patient referral practices included: (1) payment of improper kickbacks for patient referrals; (2) payment of bribes for premature patient transfers; and (3) improper patient churning, which would create multiple reimbursable discharges for the same medical condition. See id. at P 132 (c), (d), (e). Plaintiffs further allege that these improper revenue practices continued unabated because Select failed to institute appropriate internal controls. See, e.g., id. at PP 50, 51, 128, 131. The Court treats the allegations of improper revenue practices and inadequate controls as interrelated and not separate theories of liability. But even if these were separate theories of liability, the Court concludes that Plaintiffs fail to plead loss causation on either because the May 10, 2004 Press Release did not reveal any "truths" that Select maintained either inadequate internal controls or improperly recognized revenue. See Slip Op., *post* at 11-14.

[*14]

10   Plaintiffs contend that Defendants knew or should have known that the Centers for Medicare and Medicaid Services ("CMS") was planning to issue a new rule that could negatively impact Select's revenue model by limiting certain types of patient referrals. See, e.g., Am. Compl. at PP 132(f), 150(g), 169(g), 176.

This Court did not make the same mistake as the

2007 U.S. Dist. LEXIS 9893, *14

Ninth Circuit had in *Dura* - namely, it did not hold that Plaintiffs in this action successfully pled loss causation by merely alleging that they had paid inflated amounts for their shares in reliance of Select's misrepresentations. And, indeed, Defendants concede that with respect to the regulatory changes theory, Plaintiffs have adequately pled loss causation. See Memorandum of Law in Support of Motion of Defendants for Certification Pursuant to *28 U.S.C. § 1292(b)* ("D. Memo.") at 15-16 n.5. Rather, the Court did not consider carefully enough whether the "truth" that Plaintiffs allege was adequate to establish loss causation for *both* theories of liability. [11]

> [11] Plaintiffs argue that they are not pursuing two separate theories of liability but rather one "inherently intertwined" claim. Plaintiff's Memorandum in Opposition to Defendants Motion for Certification ("P. Memo.") at 2. The Court disagrees with the view that Plaintiffs have one grand theory of liability. Plaintiffs' argument is as follows: (1) Defendants engaged in improper Medicare practices that resulted in improper revenue, (2) this led to greater government scrutiny, which (3) resulted in regulatory changes that had substantially adverse effects on Select's revenue, earnings and entire business model. See id. The first problem with this argument is Plaintiffs make no allegations that government regulators were specifically scrutinizing Select's revenue practices. Rather, Plaintiffs' allegations are of a general nature - that the growth of long-term care hospitals ("LTCHs") had raised concerns about abuses in Medicare billing. See, e.g., Am. Compl. at PP 65-69. There are no allegations in Plaintiffs' Amended Complaint linking the changes in federal regulations to any *specific* abuses by Defendants. Second, Plaintiffs' allegations of improper revenue practices are far broader in scope than the resultant regulatory changes. For example, Plaintiffs allege that Defendants engaged in garden-variety fraud by obtaining patient referrals through bribes and kickbacks. And they allege that this was only possible because Defendants failed to put into place adequate internal controls. Yet, the proposed regulatory changes mentioned in the May 11, 2004 Press Release refer only to placing a cap on the percentage of "hospital within a hospital" referrals. It makes no mention of other regulatory changes or any specific investigations into Select's revenue practices. And there is nothing to suggest that Defendants' alleged practices of bribing, offering kickbacks and patient churning could not continue even after the new regulations went into place. Accordingly, the Court treats Plaintiffs' allegations as encompassing two discrete theories of liability of securities fraud.

[*15] Plaintiffs allege that the truth about Select's improper revenue practices and the likelihood of changes in federal regulations came to light on May 11, 2004. See Am. Compl. PP 186-190. That day, Select issued a press release which, in relevant part, stated:

> This afternoon, the Centers for Medicare and Medicaid Services ("CMS") issued a press release announcing among other things, proposed regulatory changes applicable to long-term acute care hospitals that are operated as a "hospital within a hospital." The proposed rule would change the requirements necessary for a "hospital within a hospital" to qualify for reimbursement as a long-term acute care hospital. Under the proposed rule, to receive reimbursement as a long-term acute care hospital, no more than 25 percent of any "hospital within a hospital's" admissions may be from its host hospital. Most of Select's long-term acute care hospitals currently would not meet this proposed requirement, and therefore would be subject to lower levels of reimbursement. . . . Select believes that, if adopted, the proposed rule would have a material adverse effect on Select's results of operations for periods after the rule becomes [*16] effective.

D. Memo., Exhibit A ("May 11, 2004 Press Release"). Plaintiffs argue that this press release indicates that the "proposed regulatory change . . . would have a substantial adverse effect on Select's revenue, earnings and entire business model." Am. Compl. at P 187. And more importantly, this announcement revealed that Select's earlier statements were "materially false and misleading." Id. at P 195.

The Court's previous decision reasoned that the May

11, 2004 Press Release was sufficient to establish loss causation for both theories of liability because:

> That other factors may contribute to a price drop should not, however, preclude plaintiffs from pursuing claims based on those factors. Rather, allegations that the other factors contributing to the loss are themselves actionable seem to be the missing link in cases addressing loss causation.

*Marsden, 2006 U.S. Dist. LEXIS 16795, at *41*. The Court acknowledges that this analysis was incomplete, if not a bit perfunctory. Having re-examined those cases addressing loss causation since the Supreme Court's decision in *Dura,* as well as those that anticipated it, the Court concludes [*17] that the "missing link" is typically the failure by securities plaintiffs to adequately allege that the market ever learned about the "truth" of a defendant's misrepresentation. And that's exactly the deficiency in Plaintiffs' theory premised on improper revenue practices.

The May 10, 2004 Press Release mentions only the expected effect that CMS' proposed rule capping the number of "hospital within hospital" referrals to 25% would have on Select's future operations (i.e. revenues). There is not a single reference in the press release to either Select's *past* revenue practices or the adequacy of its internal controls. Moreover, the press release makes no mention that Select's then-revenue practices constituted improper Medicare practices. The scope of information contained in the May 10, 2004 Press Release is limited; it indicates only that Select's business model would be adversely affected by the new regulation. And this type of public declaration - that a proposed regulatory change could negatively impact a company's future performance - is not an admission to past improprieties in its business practices. Indeed, the Court concludes that this type of admission is no different [*18] than a company filing for bankruptcy. In this latter case, the filing of a bankruptcy petition does not amount to an admission that a company had previously misrepresented its financial condition. See *D.E. & J Limited Partnership, 133 Fed. Appx. at 1000* (that a stock price dropped after a bankruptcy announcement is not necessarily an acknowledgment of prior misrepresentations, absent any public disclosure of these misrepresentations); cf *Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005)* (Merrill Lynch's downgrades of its stock recommendations does not amount to a "corrective disclosure . . . because they do not reveal to the market the falsity of the prior recommendation"); see also In re Tellium, Inc. Sec. Litig., 02-5878, 2005 U.S. Dist. LEXIS 26332, at *12 (D.N.J. Aug. 26, 2005) (disclosure that quarterly revenues will be lower than expected is not the type of announcement that alone is sufficient to "demonstrate a market correction of an earlier artificial inflation caused by defendants' misrepresentations").

In short, Select's press release merely acknowledges the impact of a future regulatory change. [*19] This was not a corrective public disclosure about its past revenue practices. In fact, Plaintiffs' Amended Complaint makes not a single allegation that Select ever publicly disclosed that it maintained improper revenue practices or misrepresented its revenues. Simply put, while it might be true that Select's revenue practices were improper, and while it might be true that it misrepresented its revenues, none of that information was ever disclosed to the market. And absent any such disclosures, the price of Select's stock could not possibly have reflected this information. The market cannot react to information of which it is unaware. And to proceed on a fraud-on-the-market theory, it must be assumed that the price of a company's stock reflects all publicly available information. See, e.g., *Basic v. Levinson, 485 U.S. 224, 248-49, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*.

Plaintiffs' Amended Complaint includes no allegations that Select's share price fell after the market became aware of its allegedly improper revenue practices. The May 10, 2004 Press Release establishes loss causation only with respect to theory of liability that Select misrepresented (or failed to disclose) information about the likelihood [*20] of certain regulatory changes. But it includes no disclosures about Select's past revenue practices. And Plaintiffs may not rely upon it to proceed on a theory of liability premised on Select's allegedly improper revenue practices.

**Conclusion**

Justice Frankfurter once remarked that, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co., 335 U.S. 595, 600, 69 S. Ct. 290, 93 L. Ed. 259, 1949-1 C.B. 223 (1949)* (Frankfurter, J., dissenting). This is one of those moments. But by correcting its error now, the Court is hopefully saving the parties (and itself) from potentially time-consuming,

unnecessary and costly discovery into a theory of liability not properly before this Court. For the foregoing reasons, the Court concludes that Plaintiffs have failed to plead loss causation with respect to their security fraud claims premised on Select's allegedly improper revenue practices. An appropriate Order follows.

**ORDER**

AND NOW, this    day of February, 2007, it is hereby ORDERED that:

1. Defendants' Motion for Certification of Interlocutory Appeal Pursuant to *28 U.S.C. § 1292(b)* (Doc. [*21] No. 44) is DENIED as MOOT.

2. This Court's April 6, 2006 Memorandum and Order is VACATED IN PART, and Defendants' Motion to Dismiss Plaintiffs' security fraud claims arising from alleged improper revenue practices is GRANTED.

3. The parties may each file a motion seeking clarification or modification (including any suggested modifications to its language) of this Memorandum and Order by February 14, 2007. [12]

   12  The Court offers the parties this opportunity to seek clarification, *if necessary,* of this Memorandum and Order with the hope that it may stave off any future discovery disputes.

BY THE COURT:

J. CURTIS JOYNER, J.