# TAB 19

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

LEXSEE


Positive
As of: Jun 23, 2008

CAROL MATHEWS, on behalf of herself and all others similarly situated, Plaintiffs, v. CENTEX TELEMANAGEMENT, INC., PETER A. HOWLEY and HENRY P. HUFF, III, Defendants.

No. C-92-1837-CAL

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

1994 U.S. Dist. LEXIS 7895; Fed. Sec. L. Rep. (CCH) P98,440

June 8, 1994, Decided
June 8, 1994, Filed; June 9, 1994, Entered

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs filed a securities action against defendant corporation that included claims under Rule 10b-5 of the Securities and Exchange Act of 1934 and state common law fraud claims. Defendant filed a motion for summary judgment.

**OVERVIEW:** Plaintiffs brought a securities action against defendant alleging that the corporation failed to account for uncollectible receivables in its financial statements and failed to maintain adequate loss reserves for bad debts. The court awarded summary judgment to defendant. The court held that the issues raised by plaintiffs were claims about what defendant should have done and did not establish anything more than differences in judgment and criticism by hindsight. Plaintiffs' contentions did not show misstatements or material omissions and did not demonstrate knowingly false statements. The evidence was not sufficient to create a genuine issue of fact as to materiality, scienter, fraud, or loss causation, and without proof of reliance, the fraud claims under state common law were also inadequate.

**OUTCOME:** The court granted defendant's motion for summary judgment in plaintiffs' securities fraud action.

**CORE TERMS:** accounts receivable, summary judgment, stock, collection, scienter, bad debts, receivable, uncollectible, earnings, debt reserves, write-off, misstatement, materiality, misleading, announced, omission, discovery, billing, per share, fraudulent, national economy, genuine, aging, financial statements, good faith, accounting, causation, investor, material fact, material omissions

**LexisNexis(R) Headnotes**

*Securities Law > Liability > Remedies > Actual Damages*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN1]To establish a claim under Rule 10b-5 of the Securities and Exchange Act of 1934, plaintiffs must prove (1) a false statement or an omission that rendered another statement misleading; (2) materiality; (3) scienter; and (4) loss causation.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Materiality > Predictions of Future Performance*

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 3 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

[HN2]Inadequate loss reserves can be the basis for a Rule 10b-5 suit if the necessary elements of such a cause of action are present. Reserves for bad debts are essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made. Because reserves are meant to be estimates or predictions of collectibility, they are fraudulent only if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices.

*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Definitions > General Overview*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Proxies > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*

[HN3]Materiality in the context of a false proxy statement under the Securities and Exchange Act of 1934 is defined by the U.S. Supreme Court as a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. Courts can and do grant summary judgment on the grounds that a given statement or omission was not material. Courts also find that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Deceptive & Manipulative Devices*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > Recklessness*

[HN4]Scienter is a necessary element in any 10b-5 claim. Scienter is a mental state embracing intent to deceive, manipulate, or defraud. To prove scienter, plaintiffs must show, at the least, that defendants acted recklessly, as defined by the Ninth Circuit Court of Appeals: a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actors must have been aware of it. A defendant may not be found liable under 10b-5 unless he acted other than in good faith. Although scienter often is a fact specific issue to be determined by the trier of fact, in appropriate cases it can be decided on summary judgment.

*Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > Fraudulent Interstate Transactions > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Reliance > Fraud on the Market*
*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > General Overview*

[HN5]The "fraud on the market" theory does not apply to common law fraud claims. Plaintiffs must prove actual reliance on the allegedly misleading statement.

**JUDGES:** [*1] LEGGE

**OPINION BY:** CHARLES A. LEGGE

**OPINION**

*ORDER FOR SUMMARY JUDGMENT*

The case is now before this court on defendants' motion for summary judgment. The motion was opposed, briefed, argued and submitted for decision. The court has reviewed the moving and opposing papers, the arguments of counsel, the voluminous record of the motion and opposition, and the applicable authorities. For the reasons stated below, the court concludes that there are no genuine issues of material fact and that defendants' summary judgment motion should be granted.

I.

A brief recitation of the history of the case, leading to this motion and decision, is appropriate in order to define the present record.

The action was filed May 19, 1992. In September 1992, there was a hearing on defendants' motion to dismiss, which raised many of the same issues which defendants urge in this summary judgment motion. The motion to dismiss was denied without prejudice. At the same time, the court attempted to identify the key issues in the case and direct discovery on those issues.

Following that discovery, defendants made this summary judgment motion, which was opposed and set for hearing in July 1993. After reviewing the moving and opposing [*2] papers at that time, this court continued defendants' motion. The court was concerned that its earlier attempt to manage the discovery might have had the result of precluding plaintiffs from obtaining

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 4 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

discovery which might be necessary for them to resist the summary judgment motion. The court therefore set another date for the completion of discovery, the filing of supplemental material in connection with this motion, and the hearing of the motion. The parties then completed that discovery, filed supplemental material, and the motion was argued and submitted for decision. All other proceedings in the case have been stayed pending the court's resolution of this motion.

II.

This is a securities action brought under Rule 10b-5 of the Securities and Exchange Act of 1934, and state common law fraud claims. The allegations are that Centex failed to adequately account for uncollectible receivables in its financial statements.

Plaintiffs also allege that defendants made false and misleading statements in a press release on October 21, 1991, commenting on Centex's third quarter results, and in its annual report for 1991, issued on March 30, 1992. Plaintiffs allege generally that defendants [*3] painted a falsely optimistic picture by indicating that Centex was a growth company which could withstand recession. However, that claim is too general and amorphous to base a cause of action upon, and is answered by the actual statements which Centex made in its releases and filings.

The real claim is that Centex had increasing difficulty in collecting its accounts receivable during the period October 31, 1991 to May 1, 1992, and that Centex did not record adequate reserves for its bad debts during the third and fourth quarters of 1991. Plaintiffs claim that this had the effect of artificially inflating the company's income and net worth until a May 1, 1992 press release. At that time, Centex announced that it would write off $ 850,000 of its earnings to a reserve for bad debts. Centex also announced relatively flat earnings for the first quarter of 1992. Centex's stock prices fell from $ 13.75 on May 1 to $ 12 on May 2, on trading of over two million shares.

It is obvious from Centex's public filings during late 1991 and early 1992 that there were disclosures made to the public of collection and bad debt problems, and that increases were made by Centex to its reserves for bad debts. [*4] The central issues are therefore the adequacy of the bad debt reserves -- a subject on which reasonable business, accounting and legal minds differ constantly -- and the adequacy of Centex's disclosures about its collection and bad debt problems.

III.

Defendants' summary judgment motion is based upon the following assertions from the record: Defendants disclosed the material information. Any statements that were allegedly misstatements were not material. There is insufficient evidence to show that defendants' setting of Centex's reserves for bad debts was fraudulent or was with scienter, but rather the reserves were good faith efforts by management to maintain adequate reserves based on Centex's prior collection experience. There is no other evidence of scienter, because defendants relied in good faith on their accountants in setting the reserves and they purchased more stock than they sold during the relevant time period. There is no showing of loss causation. And plaintiffs' state law claims do not show the reliance and *scienter* required by the recent California Supreme Court case *Mirkin v. Wasserman, 5 Cal. 4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993)*. [*5]

IV.

Having reviewed the extensive record and briefs, the court concludes that there are no genuine issues about the material facts. Those facts, together with the applicable law, compel that judgment be entered in favor of defendants.

In summary, the major points are: Debt collection problems and the increases of bad debt reserves were disclosed in Centex's 10Q report for the third quarter of 1991 and in its 1991 year end reports. The necessity for an even larger increase in the bad debt reserves was not known until April 1992, in response to 1992 events. There is not evidence sufficient to create a genuine issue of fact on misrepresentation, omission, materiality, scienter, fraud or loss causation.

The record of what was done and what was not done is not really in dispute. The issues raised by plaintiffs are claims about what defendants *should* have done. They do not establish anything more than differences in judgment and criticism by hindsight. The court does not believe that plaintiffs' contentions are enough to create genuine issues of material fact, particularly in the face of the record of the undisputed facts.

V.

Because of the nature of plaintiffs' claims, the defenses, [*6] and this court's conclusions, it is necessary to recite the record in some detail:

Defendant Centex offers telecommunications management and services to other companies. It is a service business and it bills its customers for its services.

As stated, plaintiffs allege that defendants touted Centex as a growth company which would continue to grow despite a bad economy. The complaint cites statements dated August 1, 1991, February 7, 1991, and

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 5 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

October 31, 1991 in which defendant Howley proclaimed that the company was doing well "particularly in light of the weakness in the national economy" or "despite the poor national economy." However, these statements made no commitments for the future, and were in any event before the debt collection problems of 1992. While such statements may form a general background for plaintiffs' specific claims, they are not themselves actionable as misstatements or omissions of material facts. Plaintiffs' real claims are based upon Centex's receivables and reserves for bad debts.

The declaration of defendant Huff, the former Chief Financial Officer of Centex, defined Centex's billing and collection procedures: Centex generally billed customers 15-20 days [*7] after the end of each month. Billings were recognized as revenue in the month in which Centex had a non-contingent right to receive the money. Because Centex knew that not all bills would be paid, each month Centex provided for possible bad debts with a monthly bad debt expense (an addition to its doubtful accounts reserve), which was an estimate of the amount that would turn out to be uncollectible. When a particular receivable was determined to be uncollectible, it was written off against the reserve, and that write-off did not itself affect net income during that month.

Huff stated that the monthly bad debt reserve was an estimate of future uncollectible invoices, which was based on business judgment and was necessarily subjective. He based his reserve decisions on Centex's past collection history, the aging of the accounts receivable, and general business conditions. An important factor was the "days outstanding;" that is, the ratio of total accounts receivable to average billings per day.

The declaration of defendant Howley explained how bad debts were written off. When a collector believed that a receivable was uncollectible, he proposed the write-off. Various management levels [*8] had to review the proposed write-off; and Howley himself had to approve amounts over $ 5000.

In the third quarter of 1991, a sluggish economy made collections more difficult. Huff therefore decided to increase the bad debt reserve for Centex's third quarter to $ 516,000 -- a 249% increase over the third quarter of 1990, and a 145% increase over the second quarter of 1991. This information was disclosed in the 10-Q report filed with the Securities and Exchange Commission on November 14, 1991. The report specifically stated that, "The Company increased its bad debt expenses to $ 516 as compared to $ 148 for the corresponding period of 1990. These increases are due to increased write-offs of doubtful receivables reflecting the current recessionary forces in the national economy." The report also stated that "The national economy has resulted in increases in the Company's receivables days outstanding."

KPMG Peat Marwick served as Centex's independent auditor. Huff and KPMG decided together that the reserve balance at the end of the third quarter of 1991 was adequate. KPMG did not advise him that reserves needed to be greater to comply with Generally Accepted Accounting Principles, even [*9] if KPMG might have initially believed that some higher reserve was warranted. Huff decided not to increase reserves further because Centex's aging of accounts receivable over 90 days had improved, from 8.02% in the second quarter to 6.89% in the third quarter. Although Huff knew that as a percentage of accounts receivable the reserve had decreased from 1.35% during the second quarter of 1991 to 1.01% in the third quarter, he considered that adequate because Centex normally had higher reserves than necessary and usually had uncollectibles of only .6% to .7%. Huff also believed that unpaid receivables on September 30, 1991 were higher than normal because Centex's bills had gone out late in the past two months as a result of technical problems.

At year end, the level of accounts receivable over 90 days increased from 6.89% in the third quarter to 7.22% in the fourth quarter. Huff then increased bad debt expenses to $ 688,000, 33% more than in the third quarter. This was disclosed in the 10-K report filed with the SEC on March 30, 1992. Centex also set up a new reserve of $ 225,000 for disputed billings, so the total addition to the company's reserves was $ 913,000.

In February 1992, [*10] KPMG conducted its year end audit of Centex's financial statements. Although KPMG did some original test work which suggested that the reserve levels might be higher, it later agreed with Huff that the company's reserves were adequate. KPMG's original tests were conservative, because it recommended reserves between 3 and 4% of accounts receivable (rather than Centex's historical 1-2%), and because Huff had already increased reserves to 2.43% of accounts receivable.

KPMG finally recommended that the reserve should be increased by $ 100,180 pre-tax. The KPMG representative stated in his deposition that the $ 100,000 change was not material, because it was such a small percentage of billings (less than one percent), and also less than one percent of after-tax income. Huff relied on KPMG's opinion that the financial statements were fair and accurate, and if KPMG had concluded that the reserves were inadequate Huff would have raised them.

In the first quarter of 1992, there was a substantial increase in bankruptcies and delinquencies among Centex's clients. The company was adversely impacted

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 6 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

because many of its clients were in California, which had a particularly bad economy. The aging [*11] of its accounts receivable deteriorated rapidly. By the end of the first quarter, March 1992, the percentage of accounts receivable over 90 days old was 11.54% compared to an average in the prior quarter of 7.22%.

In response to those events, a finance group within Centex performed a detailed review of each of Centex's accounts receivable, to decide if the doubtful accounts reserve was adequate. As a result of that research and in consultation with KPMG, the reserve was increased by $ 853,000. That more than doubled the then existing reserve of $ 779,000. The increase was necessary because of events of which Centex became aware in the first quarter of 1992, and there is not sufficient evidence to create a genuine issue of fact that such an increase was necessary earlier. The increased reserve was announced in a press release dated May 1, 1992. The release also announced that earnings were reduced by over $ 500,000 and that earnings per share were 14 cents, a two cent decrease from the previous quarter.

VI.

Plaintiffs contend that Centex's collections did not suddenly deteriorate in first quarter of 1992, but that the large increase then was due to the failure to maintain adequate reserves [*12] in the last two quarters of 1991. But plaintiffs' contentions only show a difference in judgment, and not misstatements or material omissions. Plaintiffs point to certain evidence in the record, and to certain discussions within the company and with KPMG, which could lead to a conclusion that the reserves might have been higher. And plaintiffs point to certain write-off requests that were not acted upon immediately and to changes in the aging of certain of the receivables. While plaintiffs may be correct as a matter of hindsight -- that is, that the receivable reserve might have been increased earlier -- those differences of opinion do not rise to the level of misstatements or material omissions, for the reasons discussed in Section VII below.

Plaintiffs' expert, Mr. Gavron, explained how he arrived at a higher calculation of reserve requirements. First, he stated that defendants should have written off certain accounts receivable as uncollectible much earlier. Because the write-offs would have been against the reserve, the reserve would have had to correspondingly increase. He based his determination of which accounts should have been written off sooner on certain accounts which [*13] were disconnected. He assumed in his analysis that these bills were probably already 30 days old on the date of disconnection. Second, he also stated that Centex did not adequately account for "credits in the pipeline;" that is, amounts which defendants improperly charged to customers and which would have to be credited to them. He also stated that management delayed writing off bad debts which had been approved by regional directors. Defendants contend that Mr. Gavron relied on faulty assumptions. Specifically (1) not all disconnected lines are disconnected for failure to pay (e.g., a customer may go out of business or switch to a competitor), and even as to those lines, not all accounts were uncollectible; (2) the decision to issue business credits also takes a long time, and might not have been determined at the end of 1991, even if it resulted from a 1991 transaction. And two documents on which Mr. Gavron relied (Exhibits F and H), were prepared in April 1992 and contained information not known earlier to Centex. This court need not reconcile those differences of opinion, because they are just that; that is, differences of opinion. They are not evidence of misstatements or material [*14] omissions.

VII.

[HN1]To establish a Rule 10b-5 claim, plaintiffs must prove (1) a false statement or an omission that rendered another statement misleading; (2) materiality; (3) scienter; and (4) loss causation. *In re Apple Computer Security Litigation,* 886 F.2d 1109, 1113 (9th Cir. 1989); *McGonigle v. Combs,* 968 F.2d 810, 817, 819 (9th Cir. 1992).

A.

The company's collection problems, and the necessity for increases to its reserves, were publicly disclosed as they became apparent. Defendants did increase Centex's bad debt reserves in late 1991, and stated in public filings that the company was having increasing difficulty in collections. The 10-Q for the third quarter, filed with the SEC on November 14, 1991 and quoted above, stated that the company had increased its bad debt expenses and that the increases were due to increased write-offs because of the current state of the national economy and to increased aging of receivables. Additionally, a table in the allegedly misleading year end reports disclosed that the provision for bad debts had increased from $ 951,000 in 1990 to $ 1,678,000 for 1991. The necessity for larger [*15] reserves and write offs of accounts did not become known to defendants until 1992.

Plaintiffs' arguments about what should have been known or done in 1991 are only differences in business judgment viewed from hindsight, and do not demonstrate knowingly false statements or [HN2]omissions. Inadequate loss reserves *can* be the basis for a Rule 10b-5 suit if the necessary elements of such a cause of action are present. See *In re Wells Fargo Securities Litigation,* 12 F.3d 922, 926 (9th Cir. 1993) (reviewing dismissal under F.R.C.P. 12 (b)(6), and not a summary judgment

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 7 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

based on a fact record). But the necessary elements are not present here.

Reserves for bad debts are essentially predictions about the future. The fact that a future prediction turns out to be wrong does not mean it was fraudulent when made. *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 489, 490 (9th Cir. 1974). Because reserves are meant to be estimates or predictions of collectibility, they are fraudulent only "if, when they were established, the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting [*16] practices." *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir. 1983); *see also DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir. 1990) and *In re Convergent Technologies Second Half 1984 Securities Litigation,* No. C-85-20130-SW, 1988 U.S. Dist. Lexis 18658, AT *5(N.D.Cal. May 23, 1988). In *In re Adobe Systems, Inc. Securities Litigation,* 787 F. Supp. 912, 919 (N.D.Cal. 1992), the court held that if the defendants' method of projection was reasonable, summary judgment is appropriate. The jury need not be given the task of deciding whose proffered method is more reasonable. *Adobe* at 920.

It is also obvious that a dramatic change occurred in the first quarter of 1992. The number of accounts receivable over 90 days old went up from the 7-8% range to 11.54% at the end of the first quarter of 1992. In that same quarter, California bankruptcies were up 37%. This lends credence to defendants' contention that the 1992 increase in reserves was due to newly changed circumstances, not to prior fraudulent understatements.

There is simply not sufficient [*17] evidence of any misstatement or material omission.

B.

Plaintiffs' 10b-5 claim also fails for lack of materiality and lack of loss causation. Even if the company had increased its reserves as contended by plaintiffs, such increases would not have had a material impact on Centex's financial statements, and are therefore not actionable.

Revenues, as defined by billings in accrual accounting, would not have changed at all had the reserves been increased. If the reserves had been increased by $ 382,000 in the third quarter, net income would have been $ 2,647,000 rather than $ 2,888,000, resulting in earnings per share of 14 rather than 15 cents. If the reserves had been increased by $ 277,000 in the fourth quarter, net income would have been $ 2,514,000 rather than $ 2,682,000, and earnings per share would have been 13 rather than 14 cents. If the reserves had been increased by $ 100,180 (the final difference between defendants' reserves and those recommended by KPMG), the difference in income would have been only $ 60,642. Net income figures fluctuated in 1990 and 1991 from $ 2,055,000 in the first quarter of 1990 to a high of 2,944,000 in the second quarter of 1991.

[HN3]Materiality in the [*18] context of a false proxy statement under the 1934 Act has been defined by the U.S. Supreme Court as "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976). Courts can and do grant summary judgment on the grounds that a given statement or omission was not material. *E.g. Apple,* 886 F.2d at 1116.

Courts have also found that allegedly fraudulent transactions which are under one or two percent of net operating revenues are immaterial. *See In re Convergent Technologies Second Half 1984 Sec. Litig.,* No. C-85-20130-SW, slip op. at 22-23 (N.D.Cal. Jan. 10, 1990). In *Convergent,* the court held that "in this context of meeting net current operations well above market [*19] expectations and then recognizing a huge one time loss, a difference of a cent or two per share is not material." Thus, transactions amounting to $ 1.2 million, but which accounted for one and one half percent of revenue, were not material. In considering whether a proxy statement was false or misleading, another district court held that a failure to disclose an increase in revenue of less than 1% was immaterial. *Pavlidis v. New England Patriots Football Club,* 675 F. Supp. 688, 692 (D.Mass. 1986).

Plaintiffs argue that the drop in stock price on May 2, 1991 indicates materiality. When defendants announced flat earnings for the first quarter of 1992 and the $ 853,000 increase in the bad debt reserve, the stock price fell $ 1.75, from $ 13.75 to $ 12. Stock prices may sometimes indicate materiality, depending on the circumstances of a particular case. *Apple,* 886 F.2d at 1116. However, three days later the price of the stock rebounded to $ 13.75, suggesting that investors did not believe the change was really material. And investors were also reacting to the first quarter 1992 addition of $ 853,000 to reserves; not to the proposed [*20] addition of $ 100,000 to $ 300,000 for the fourth quarter of 1991.

Looking at the total mix of information available to investors, the increase in reserves would not have been material. Earnings per share and net income was basically flat through 1990-91, so that one cent would not have made a material difference.

Case 1:07-cv-09633-LBS-DFE   Document 57-20   Filed 07/21/2008   Page 8 of 8

1994 U.S. Dist. LEXIS 7895, *; Fed. Sec. L. Rep. (CCH) P98,440

C.

Plaintiffs have also failed to show [HN4]*scienter,* which is a necessary element in any 10b-5 claim. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). *Scienter* is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst,* 425 U.S. at 1993-94 n. 12. To prove *scienter,* plaintiffs must show, at the least, that defendants acted recklessly, as defined by the Ninth Circuit: "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actors must have been aware of it. [citations omitted]." *Hollinger v. Titan Capital,* 914 F.2d 1564 (9th Cir. 1990). [*21] A defendant may not be found liable under 10b-5 unless he acted other than in good faith. *Ernst,* 425 U.S. at 206. Although *scienter* often is a fact specific issue to be determined by the trier of fact, in appropriate cases it can be decided on summary judgment. *Apple,* 886 F.2d at 1113. Here, plaintiffs have shown no more than a difference in the business judgment exercised by the defendants. Defendants also conferred with and relied in good faith on their outside auditor.

Further, Centex bought 209,500 shares of its own stock in the open market, at a total price of almost four million dollars. It would have made no sense to purchase that stock if defendants knew the prices to be inflated.

Defendants' overall conduct shows no intent to defraud. In late 1991 Centex's reserves were increased and the company disclosed its collection problems. In the first quarter of 1992, voluntarily and on its own initiative, Centex began reviewing all of its accounts receivable to insure that its reserves were adequate. When it discovered that the accounts were inadequate it immediately raised reserves and [*22] announced this in a press release.

Plaintiffs appear to have abandoned their claim of scienter based on the individual defendants' selling Centex stock. This is because defendants had a consistent pattern of selling stock for several years: Since the company went public in 1987, Huff had a practice of selling Centex stock to diversify his stock into cash. He sold about 20,000 shares each in 1989 and 1990. In the second quarter of 1991 he sold 135,888 shares; in the third quarter 1991 sold 5,600 shares, and in the fourth quarter 1991 9,400 shares. Howley sold some stock each quarter, depending on the amount of money he needed. He sold about 73,000 shares held by himself and his children in 1989 and 115,600 shares in 1990. In 1991 he sold 16,000 shares the first quarter, 6,000 the second, 8,000 the third, and 19,175 shares the fourth quarter. In the first quarter of 1992 he sold 18,333 shares.

VIII.

Plaintiffs' claims under California law also fail for two reasons. First is the absence of *scienter,* as discussed above. Second, the California Supreme Court has recently held that [HN5]the "fraud on the market" theory does not apply to common law fraud claims. *Mirkin,* 23 Cal.Rptr.2d at 101. [*23] Plaintiffs must prove actual reliance on the allegedly misleading statement. In this case, the class representative has not submitted a declaration or other showing that she read the allegedly false materials and relied upon them. And under *Mirkin* even her reliance would not establish reliance by the class.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment is granted.

Dated: June 8, 1994.

CHARLES A. LEGGE

UNITED STATES DISTRICT JUDGE

*JUDGMENT*

For the reasons set forth in the Order for Summary Judgment signed and filed this date, judgment is hereby entered in favor of defendants Centex Telemanagement, Inc., Peter A. Howley, and Henry P. Huff III, and against Carol Mathews, on behalf of herself and all others similarly situated.

Dated: June 8, 1994.

CHARLES A. LEGGE

UNITED STATES DISTRICT JUDGE