UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
IN RE MERRILL LYNCH & CO., INC.                    :
SECURITIES, DERIVATIVE AND ERISA          :
LITIGATION                                                          :
                                                                            :
                                                                            :   Master File No.:
                                                                            :   07 cv 9633 (LBS) (AJP) (DFE)
                                                                            :
                                                                            :
                                                                            :
This Document Relates To:                                  :
Securities Action, 07 cv 9633 (LBS) (AJP) (DFE)  :
-----------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF
E. STANLEY O'NEAL'S MOTION TO DISMISS THE
<u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>**


SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone:  (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Defendant E. Stanley O'Neal*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS..............................................................................................................2

ARGUMENT...................................................................................................................................4

I.  THE COMPLAINT FAILS TO ALLEGE ANY FALSE OR MISLEADING STATEMENTS BY MR. O'NEAL .........................................................................................4

II. THE COMPLAINT FAILS TO ALLEGE THAT MR. O'NEAL'S SALE WAS "SUSPICIOUS" OR "UNUSUAL" ......................................................................................9

    A.  The Sale Occurred in the Exact Same Time Frame as Mr. O'Neal's Two Prior Sales................................................................................................................9

    B.  Mr. O'Neal Sold a Small Percentage of His Holdings, Just as He Had Done in Prior Years.............................................................................................12

    C.  The Complaint Does Not Allege Facts Constituting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness .........................................14

III. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 15 OF THE SECURITIES ACT AND SECTIONS 14(A) AND 20(A) OF THE EXCHANGE ACT ............................................................................................................15

CONCLUSION..............................................................................................................................15

i

# TABLE OF AUTHORITIES

## Cases

*Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995) ....................................................................13

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..............................................................................................................................5

*City of Brockton Retirement System v. Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) ..............................................................................................10

*In re Astea International Inc. Securities Litigation*, No. 06 Civ. 1467, 2007 U.S. Dist. LEXIS 58238 (E.D. Pa. Aug. 8, 2007) .............................................................13

*In re AstraZeneca Securities Litigation*, --- F. Supp. 2d ---, No. 05 Civ. 2688 (TPG), 2008 U.S. Dist. LEXIS 43680 (S.D.N.Y. June 3, 2008) ...............................................................................................................................9, 11

*In re Bayou Hedge Fund Litigation*, 534 F. Supp. 2d 405 (S.D.N.Y. 2007) ...............................14

*In re BISYS Securities Litigation*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................................14

*In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ........................................................................................................9, 10

*In re Citigroup, Inc. Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) ......................................................................................................................11, 15

*In re Credit Acceptance Corp. Securities Litigation*, 50 F. Supp. 2d 662 (E.D. Mich. 1999) ............................................................................................................12

*In re Dura Pharmaceuticals, Inc. Securities Litigation*, No. 99CV0151-L(NLLS), 2000 WL 33176043 (S.D. Cal. July 11, 2000) .................................................13

*In re JP Morgan Chase Securities Litigation*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ...........................................................................................................................6

*In re KeySpan Corp. Securities Litigation*, 383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................................................................................passim

*In re Vantive Corp. Securities Litigation*, 283 F.3d 1079 (9th Cir. 2002) ...................................13

*Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45 (2d Cir. 1999) ..............................................................................................................................16

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ............................................................................14

*Lasker v. N.Y. State Electric & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) .........................................6

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007) .................................................10

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993) ......................................................11

*Ressler v. Liz Claiborne*, 75 F. Supp. 2d 43 (E.D.N.Y. 1998) ..............................................passim

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ...........................................................................9

*Tellabs v. Merkor Issues and Rights*, 127 S. Ct. 2499 (2007)..................................................9, 11

Case 1:07-cv-09633-LBS-DFE    Document 59    Filed 07/21/2008    Page 4 of 20

E. Stanley O'Neal respectfully moves to dismiss the complaint against him in its entirety. To avoid burdening the Court with duplicative briefing, Mr. O'Neal limits this brief to certain arguments relating solely to him, and expressly adopts and joins in the motions to dismiss filed by defendants Merrill Lynch & Co., Inc. ("Merrill"), Jeffrey N. Edwards, Gregory J. Fleming and Ahmass L. Fakahany.

## PRELIMINARY STATEMENT

The complaint is an impermissible exercise in hindsight pleading following a worldwide financial crisis of unanticipated extent and depth. The complaint does not plead facts showing that Mr. O'Neal, or any other defendant, had any information that contradicted his public statements. It does not state a claim for securities fraud.

Instead of offering well-pled facts, Plaintiffs speculate that Defendants knew two years ago what is known today. This argument ignores the undisputed facts: that the financial world was stunned by an unprecedented liquidity crisis, that government officials and regulators were equally taken by surprise, that Defendants voluntarily pre-announced an enormous estimated write down, and that the exact same type of "fraud" that is alleged here has been alleged against numerous major American financial institutions and their senior officers.

As to Mr. O'Neal, the complaint does not contain one factual allegation that gives rise to a strong inference that he intended to defraud anyone or made any material misstatement. The complaint does not plead that Mr. O'Neal made any statement that was knowingly or recklessly false, or that he uttered any opinion that he did not believe was true. The complaint tries to show that a small number of statements attributed to Mr. O'Neal over the course of a 15-month class period were misleading by resorting to unfair misreadings, selective redactions and argument. But these tactics do not satisfy the pleading standards Plaintiffs must meet. The only

meaningful allegation against Mr. O'Neal that is purportedly predicated on *fact* is that he acted with scienter because he sold stock at the beginning of the class period. But this claim also fails.

The complaint itself and publicly-available filings regarding Mr. O'Neal's stock holdings show that nothing about his sale was "suspicious" or "unusual". The sale replicated, in timing and amount, the only other two sales Mr. O'Neal made in the last six years. In each of these three sales, he sold less than 6% of his Merrill holdings. Each of the three sales occurred in the month of February, a few weeks after Merrill announced its earnings for the prior year. Moreover, Mr. O'Neal's beneficial holdings of Merrill, totaling more than 3 million shares, actually *increased* during the class period. These undisputed facts demonstrate that there was nothing suspicious or unusual about Mr. O'Neal's stock sale. In addition, the sale on which Plaintiffs focus took place a full *eight months* before Merrill voluntarily pre-announced an estimate of its subprime-related write-down. The utter illogic of any defendant continuing to make allegedly misleading statements for eight months *after* his one supposedly suspicious stock sale further demonstrates the complaint's lack of merit.

## STATEMENT OF FACTS

Mr. O'Neal is the former Chairman and Chief Executive Officer of Merrill. Compl. ¶ 70.[1] The complaint does not allege that Mr. O'Neal engaged in insider trading, but argues that he (and two other individual defendants) were "motivated to artificially inflate the price of Merrill common stock in order to maximize the price received on sales of their personal holdings of Merrill common stock." *Id*. ¶ 194.

According to the complaint, Mr. O'Neal sold 199,887 shares of Merrill stock on February 5 and 6, 2007. *Id.* ¶ 195. The sale consisted of a single sell order executed over two

---

[1] Mr. O'Neal was not an officer or director of Merrill during the entire class period. He retired from Merrill on October 30, 2007, Compl. ¶ 70, and cannot be liable for anything that occurred after that date.

2

days. *See* Declaration of Jay B. Kasner in Support of the Merrill Defendants' Motion to Dismiss, dated July 21, 2008 ("Kasner Decl."), Ex. RR.[2] The sale comprised just 5.9% of Mr. O'Neal's beneficial holdings of Merrill stock and options,[3] and he did not sell any other Merrill stock during the class period. *See* Compl. ¶ 195. According to Merrill's proxy statements, Mr. O'Neal beneficially held more Merrill stock and options at the end of the class period (3,248,763) than at the beginning (3,011,957). *Compare* Kasner Decl., Ex. II at 35 *with* Ex. KK at 24.[4]

Mr. O'Neal sold Merrill stock twice before the start of the class period, once in 2005 and once in 2006. *See id.*, Ex. RR. Both sales occurred in February. *Id.* Both comprised a modest percentage of his Merrill holdings. On February 28, 2005, Mr. O'Neal sold 98,709 shares, or 3.1% of his Merrill beneficial holdings. *See id.*, Exs. HH, RR. On February 23, 2006, Mr. O'Neal sold 146,438 shares, or 4.6% of his Merrill beneficial holdings. *Id.*, Exs. II, RR.

As CEO, Mr. O'Neal received the majority of his compensation in the form of restricted shares and stock options. *See, e.g., id.*, Ex. HH at 38-39; Ex. JJ at 35-36. Mr. O'Neal sold a small percentage of his Merrill stock in February of 2005, 2006 and 2007 in order to diversify his assets. The restricted shares and options he received vested over a number of years according to a schedule specified in the grant documents, typically vesting in quarterly installments on the anniversary date of each award. *See, e.g., id.*, Ex. JJ at 37-38. Because Merrill paid its annual incentive compensation in January, one-quarter of each grant of restricted shares and options would vest every January. *See, e.g., id.* Moreover, Merrill typically releases year end results for the prior year in January. *See* Merrill Press Release, *Merrill Lynch Reports*

---

[2]   "Ex." refers to exhibits attached to the Kasner Decl.

[3]   Prior to the sale, Mr. O'Neal beneficially held 3,414,245 shares and options. *See* Kasner Decl., Exs. JJ, RR. Thus, the sale of 199,887 shares represented 5.9% of his total beneficial holdings.

[4]   Mr. O'Neal received an incentive grant of 279,677 restricted shares during the class period. *See* Kasner Decl., Ex. JJ at 50.

3

*Record Net Revenues, Net Earnings and Diluted EPS for Full Year 2006*, issued on Jan. 18, 2007, *available at* http://files.shareholder.com/downloads/MER/340660175x0x67849/cb41f3af-e616-44c0-9f43-dfdcda7df146/4Q06%20Earnings%20Release-Final_attach.pdf.

## ARGUMENT

### I.   THE COMPLAINT FAILS TO ALLEGE ANY FALSE OR MISLEADING STATEMENTS BY MR. O'NEAL

The complaint attacks a handful of statements attributed personally to Mr. O'Neal. *See* Compl. ¶¶ 214, 218, 224, 243, 275, 277, 307, and 310.[5] All are allegedly misleading by omission, chiefly because they failed to disclose that Merrill (1) was "increasingly leveraging risky subprime mortgages" and (2) "knowingly or recklessly ignored its risk management policies and guidelines." *Id*. ¶ 215; *see also id*. ¶¶ 221, 225, 244, 276, 280. Two statements – Merrill's initial announcements regarding its subprime-related write-down in October 2007 – are alleged to be misleading because the initial estimate of the write-down was eclipsed by subsequent events and because Merrill failed to disclose that "many" of its hedging transactions "were with poorly capitalized or highly leveraged counterparties." *Id*. ¶¶ 308, 311. All of these alleged misstatements constitute fraud by hindsight pleading. They take what ultimately became apparent (subprime mortgage securities were riskier than believed and Merrill's subprime write off grew larger over time) and assert that Defendants must have known these facts at an earlier time. Such pleading fails to state a claim as a matter of law.[6]

---

[5]   The complaint attributes to the "Exchange Act Defendants" generally, a group which includes Mr. O'Neal, additional allegedly misleading statements from numerous Merrill press release and public filing during the class period. *See*, *e.g.*, Compl. ¶¶ 233, 234, 243, 252-58, 278. These statements are not actionable for the reasons set forth in the briefs submitted by Merrill ("Merrill Br.") and Mr. Edwards ("Edwards Br.").

[6]   The heightened pleading standards that apply to Plaintiffs' claims have been fully briefed elsewhere. *See* Merrill Br. at 28-29. In addition to the reasons set out herein, each of the statements attributed to Mr. O'Neal personally fails to state a claim for the reasons set forth in Merrill's brief, including that Defendants had no duty to disclose the allegedly omitted details regarding Merrill's CDO holdings. *Id*. at 65-68. Nor did Mr. O'Neal minimize Merrill's subprime exposures, *see* Compl. ¶ 244, by stating that Merrill's subprime-related activities comprised less than 1% of Merrill's total net revenue over the prior five

4

- The first statement the complaint addresses is from a November 14, 2006 investor conference at which Mr. O'Neal spoke:

> *Before we begin I need to call your attention to this slide regarding forward-looking information . . . .*
>
> *I'll also take a moment to comment on what we see happening in the global market place and how these trends, we believe, translates into an attractive set of opportunities for Merrill Lynch over the longer term. . . .*
>
> So is it all blue sky from here? – Well, obviously not. There will be bumps in the road and cyclical corrections from these longer-term secular trends, which means that we have to continue to ensure proper controls, good risk management and adequate liquidity. We have to continue to invest in the people and systems necessary to manage the risks that are inherent in our capital market business. And we're doing that . . . .
>
> In mortgages we've announced three transactions on three continents this year, most notably the acquisition of the First Franklin origination and servicing businesses here in the U.S. Together, these acquisitions will help provide an additional attractive source of origination for our mortgage-backed securitization and trading platform, enhancing revenue velocity relative to assets and thereby increasing our returns.[7]

The complaint asserts that this statement is misleading because it omits to state that "Merrill was increasingly leveraging risky subprime mortgages." Compl. ¶ 215. But this claim makes no sense since Mr. O'Neal specifically noted that the First Franklin acquisition was intended to increase Merrill's stake in mortgage-backed securities. The complaint further fails to plead any facts suggesting that Mr. O'Neal did not, as of November 14, 2006, honestly hold the opinion

---

quarters. The revenue figures cited in the complaint establish that in fact subprime-related activities did comprise less than 1% of Merrill's net revenue over that period. *See id.* ¶¶ 18-19; Merrill Br. at 68-70.

[7] Italics denote portions of Mr. O'Neal's remarks that Plaintiffs omitted from the complaint, but which can be reviewed by the Court on this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (on motion to dismiss, the court may consider the complaint, "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to plaintiff and upon which it relied in bringing suit").

that the First Franklin acquisition and the prospect of more mortgage originations was "attractive." Moreover, the italicized portion of Mr. O'Neal's statement – which Plaintiffs redacted – makes clear that it is a protected forward-looking statement, and that it was Mr. O'Neal's cautious opinion that the then-current market conditions provided some attractive opportunities for Merrill over the long term, but that the outlook was not "all blue sky." Indeed, Mr. O'Neal stressed the inevitability of cyclical corrections and stated that Merrill had to invest *more* in "the people and systems necessary to manage the risks inherent in our capital market business."[8]

- The complaint criticizes Mr. O'Neal's January 18 and February 22, 2007 statements in which he opined that "[b]y virtually any measure, [Merrill Lynch] completed the most successful year in its history" in 2006. Compl. ¶ 224; *see also* ¶ 218. This is plainly inactionable corporate puffery, *see JP Morgan Chase*, 363 F. Supp. 2d at 633, and a statement of opinion. Plaintiffs fail to plead any facts showing that Mr. O'Neal did not honestly believe this opinion at the time or that the reported financial results on which he in part predicated his opinion – Merrill's 2006 "[r]evenues, earnings per share and return on equity" – were false. Plaintiffs also use an ellipsis to alter the overall tenor of Mr. O'Neal's remarks, cutting out, for example, his comments that "to me, our success is about more than just financial performance, it's about the company's strategic progress. . . . [p]erhaps the most significant achievement for the company last year was our successful combination of Merrill Lynch Investment Managers (MLIM) with Black Rock, Inc." Kasner Decl., Ex. LL. A fair reading of Mr. O'Neal's full

---

[8] Plaintiffs repeated assertion that Merrill failed to disclose it was violating its own supposed "risk management policies and guidelines" is addressed in Merrill's brief. *See* Merrill Br. at 70-74. Mr. O'Neal's statements concerning Merrill's risk management also are inactionable because such "generalizations regarding integrity, fiscal discipline and risk management" are "puffery" that courts routinely reject as the basis for a securities fraud claim. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (citing *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 1996)).

6

remarks makes plain that he was offering an honestly-held opinion about the "success" (as he defined that term) of Merrill as an overall firm.

- The complaint alleges that Mr. O'Neal's April 19, 2007 comment that the first quarter of 2007 "was a terrific quarter" was misleading because, in Plaintiffs' view "it was not a terrific quarter." Compl. ¶ 244. This is not a securities fraud allegation, only a competing opinion. Plaintiffs base their argument on a supposed "steep drop in the ABX and TABX indices" and a decline in the housing market. *Id.* But Mr. O'Neal's statement is plainly opinion and puffery and the complaint pleads no facts to show that he was even aware of any movement in the ABX or TABX indices at the time of his statement, or that even if he was, that such knowledge would have changed his opinion as to whether the quarter was "terrific" for Merrill overall. And far from concealing mortgage-related risk, as Plaintiffs argue, Mr. O'Neal went on to emphasize that "[r]evenues from mortgage-related activities declined, resulting from a difficult environment for the origination securitization and trading of non-prime mortgage loans and securities in the U.S." *Id.* ¶ 243.

- Based on a second hand media report, the complaint takes issue with statements purportedly made by Mr. O'Neal at a June 27, 2007 conference. Compl. ¶ 275. Plaintiffs claim that Mr. O'Neal stated that Merrill's exposure to subprime debt is "reasonably well contained." *Id.* In fact, however, the media report on which Plaintiffs rely on actually states that Mr. O'Neal said that risks "in the subprime mortgage market" were reasonably well contained *but does not mention Merrill*. According to the news report, Mr. O'Neal elaborated that "[t]here have been no clear signs" that the subprime issues "were spilling over into other subsets of the bond market" and also noted that "[t]here's risks in some of the structures, in some of the complexities of CDOs, mortgage-backed securities and particularly prime brokerage. . . ." *Id.* Clearly Mr.

7

O'Neal's view of the market – not Merrill – is opinion and even assuming it has any relevance at all to this case (which is unclear), the complaint once again pleads no facts suggesting he did not hold that opinion in good faith. *See* Testimony of Ben S. Bernanke, Chairman, Federal Reserve Board before Joint Economic Committee, U.S. Congress (Mar. 28, 2007) ("At this juncture, however, the impact on the broader economy and financial markets of the problems in the sub-prime market seems likely to be *contained*.") (emphasis added).

- The complaint cites a July 17, 2007 press release in which Mr. O'Neal stated that "[Merrill] delivered another strong quarter in a volatile and, at times, hostile market environment." Compl. ¶ 277. Once again, this is plainly a statement of opinion, and Plaintiffs do not explain, as they are required to do, which part of Mr. O'Neal's statement is supposedly misleading or why. The complaint also pleads no facts to show that Mr. O'Neal did not honestly believe that Merrill had a "strong" quarter. *Id*. And, once again, Mr. O'Neal, who Plaintiffs accuse of concealing the truth about the state of Merrill's sub-prime exposure goes out of his way to characterize the market as "volatile, and, at times, hostile."

- Lastly, the complaint takes issue with Merrill's October 5, 2007 pre-announcement of the initial $4.5 billion write-down estimate and the October 24, 2007 report of a $7.9 billion write-down. Compl. ¶¶ 307-311. Both statements are alleged to be misleading because, according to Plaintiffs, Merrill "should have actually written down" a much larger number on each date. *Id*. ¶¶ 308, 311. This is pure second-guessing. Not a single fact is pled to suggest that Mr. O'Neal or any other defendant was aware of any facts on either October 5 or October 24 that suggested at that time that Merrill should "actually" write-down a larger number. And, of course, the idea that anyone would voluntarily pre-announce a multi-billion dollar

8

estimated write down or take a $7.9 billion write down as a way of "concealing" bad news is self-evidently foolish.[9]

None of these statements, particularly when not unfairly misread or excised out of context, support any suggestion of fraud, much less a cogent and compelling inference. *See Tellabs v. Merkor Issues and Rights*, 127 S. Ct. 2499, 2510 (2007).

## II. THE COMPLAINT FAILS TO ALLEGE THAT MR. O'NEAL'S SALE WAS "SUSPICIOUS" OR "UNUSUAL"

It is well-settled that "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). "For insider sales to raise an inference of improper motive, they must be 'suspicious or unusual.'" *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 381 (E.D.N.Y. 2003). To determine whether particular sales are "suspicious or unusual," courts examine a number of factors, including the amount and percentage of stockholdings sold the timing of the sales, and any pattern of prior sales. *See In re AstraZeneca Sec. Litig.*, --- F. Supp. 2d ---, No. 05 Civ. 2688 (TPG), 2008 U.S. Dist. LEXIS 43680, at *38 (S.D.N.Y. June 3, 2008) (citing *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000)).

### A. The Sale Occurred in the Exact Same Time Frame as Mr. O'Neal's Two Prior Sales

The timing of a stock sale is considered suspicious or unusual only when it is "calculated to maximize personal benefit from inside information." *Ressler v. Liz Claiborne*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (internal quotations omitted). The timing of Mr. O'Neal's only stock sale during the class period – over the course of a two-day period in February 2007 –

---

[9] Merrill's October 5 and 24 press releases also make clear that they are protected forward-looking statements, which are "inherently uncertain." Kasner Decl., Exs. CC, DD. Mr. O'Neal also stressed that "market conditions for subprime mortgage-related assets to continue to be uncertain." Compl. ¶ 310.

was consistent with the timing of his sales in each of the two prior years. Mr. O'Neal's 2005 sale occurred on February 28, and his 2006 sale took place on February 23. In all three years, Mr. O'Neal's sales occurred within a few weeks after (1) Merrill announced its earnings for the prior year, and (2) a portion of his prior equity awards vested. *See* Kasner Decl. Exs. HH, II, JJ, RR; *see also, e.g.*, *Bristol-Myers*, 312 F. Supp. 2d at 561 (rejecting stock sales as the basis for a motive allegation where the evidence showed "a consistent pattern of trading"); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007) ("Plaintiffs fail to provide evidence of Defendants' prior sales of XL stock, which, if similar to the pattern of sales during the class period, could undermine any inference of fraud arising from them.").

Mr. O'Neal's 2007 sale also occurred *eight months* before the complaint asserts that Defendants' alleged "scheme" began to unravel, when Merrill voluntarily pre-announced an estimated write down on October 5, 2007, and almost one year before the end of the class period. *See* Compl. ¶ 198; Kasner Decl., Ex. RR. This timing refutes any inference of scienter. *See Keyspan*, 383 F. Supp. at 385 (no inference of fraud where "nothing explains why these sales took place after a year of allegedly fraudulent statements . . . and seven months before any negative public disclosures"); *Ressler*, 75 F. Supp. 2d at 60 ("[T]he stock sales at issue took place, for the most part, over six months prior to the release of the negative disclosure by [defendant.] Such timing does not suggest that the defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price."); *City of Brockton Retirement System v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (finding that a "10-plus week gap" between defendants' sales and the company's disclosure of negative information was "not strongly suspicious").

The fact that Mr. O'Neal only sold stock *once* during the entire class period also undermines any suggestion that he was motivated to participate in multiple material misstatements over a 15-month class period "to artificially inflate the price of Merrill common stock in order to maximize the price received on sales of [his] personal holdings of Merrill common stock." Compl. ¶ 194. Just last month, Judge Griesa held that a plaintiff's "entire insider trading motive theory must be disregarded" when the plaintiff alleged at least fifteen misrepresentations over a one-year class period, but just one instance of insider trading each by two of the four defendants. *AstraZeneca*, 2008 U.S. Dist. LEXIS 43680, at *40. Judge Griesa found that "[t]here is *obviously no possible basis* for saying that any of these four persons had insider sales as a motive for the fifteen or so alleged misrepresentations." *Id.* at *39 (emphasis added).

The complaint nevertheless argues that Mr. O'Neal's sale was "unusual and suspicious in timing as [it] i) occurred the day after MLN filed for bankruptcy and a few days before ResMAE filed for bankruptcy, ii) occurred just prior to the February crash of the ABX, and iii) were near the Class Period high for Merrill common stock of $97.53 per share." Compl. ¶ 197. But there can be nothing suspicious about the timing of a stock sale that occurs *after* a public bankruptcy filing and Plaintiffs do not and cannot allege that Mr. O'Neal had prior knowledge of the ResMAE or ABX events.[10] In short, none of Plaintiffs' farfetched arguments is as "cogent" and "compelling" as the indisputable fact that Mr. O'Neal had a pattern of selling a modest percentage of his overall holdings in February after Merrill announced year-end earnings and after his holdings vested. *See Tellabs*, 127 S. Ct. at 2510.

---

[10]   *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("In order to satisfy the pleading requirements of Rule 9(b) and the PSLRA, a plaintiff must allege that an officer or director '*personally* knew of, or participated in, the fraud'.") (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (emphasis in original)).

11

Also, while Plaintiffs allege that Mr. O'Neal and Defendants Fleming and Fakahany sold stock during the class period, they do not allege any insider sales by Defendant Edwards, Merrill's Chief Financial Officer. *See* Compl. ¶ 194; Edwards Br. at 5. The absence of any stock sales by Merrill's CFO undermines Plaintiffs' claim that Mr. O'Neal's stock sales shows intent to defraud. *See, e.g.*, *In re Credit Acceptance Corp. Sec. Litig.*, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) (since "the CFO would have been an essential participant in any fraudulent scheme to defraud the company . . . The fact that he did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud in order to profit from their own stock sales"). Plaintiffs' claim is further undercut by the fact that fourteen of Merrill's nineteen other senior managers and directors who filed public records regarding their stock holdings also did not sell any stock during the class period. *See Keyspan*, 383 F. Supp. 2d at 384 (citations omitted) ("Additional factors weigh against an inference of scienter …. [E]ight other … officers who were required to file public records of their stock holdings – and who are not named as defendants – did not sell any stock. . . .").[11]

### B.  Mr. O'Neal Sold a Small Percentage of His Holdings, Just as He Had Done in Prior Years

With respect to size, "[l]arge dollar amounts alone typically do not suffice to establish motive." *Keyspan*, 383 F. Supp. 2d at 382. Rather, courts must look to the percentage of holdings sold. *Ressler*, 75 F. Supp. 2d at 59-60. Mr. O'Neal's 2007 sale represented less than 6% of his total holdings. *See* Kasner Decl., Ex. JJ at 31. This percentage is far too small to raise strong inference of scienter:

---

[11]  *See* Form 4s filed with the SEC on behalf of the officers and directors of Merrill pursuant to Section 16(a) of the Exchange Act, available at http://www.sec.gov/cgi-bin/browse-edgar?company=&CIK=mer&filenum=&State=&SIC=&owner=only&action=getcompany

| Case Name | Percentage of Holdings Sold Found Insufficient to Infer Scienter |
|---|---|
| *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995) | 11% |
| *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 382-83 (E.D.N.Y. 2003) | less than 20% |
| *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) | 38% |
| *In re Dura Pharmaceuticals, Inc. Sec. Litig.*, No. 99CV0151-L(NLLS), 2000 WL 33176043, at *10 (S.D. Cal. July 11, 2000) | between 34% and 61% |
| *In re Astea Int'l Inc. Sec. Litig.*, No. 06 Civ. 1467, 2007 U.S. Dist. LEXIS 58238, at *42-44 (E.D. Pa. Aug. 8, 2007) | between 18.9% and 66% |

Nor can the complaint overcome the fact that Mr. O'Neal beneficially held *more* Merrill stock at the end of the class period than he did at the beginning. *See* Kasner Decl., Ex. II at 35; Ex. KK at 24. This fact undercuts any theory of scienter. *See Keyspan*, 383 F. Supp. 2d at 383 ("The net acquisition of shares cuts against the notion that defendants sought to unload their holdings of [company] stock before their likely diminution in value following the disclosure of negative insider information."); *Ressler*, 75 F. Supp. 2d at 60 ("In this case, the Court finds it significant that by the end of the class period, these defendants held 23,306 more shares than they did prior to the beginning of the class period. Inferences of scienter can be undermined when an insiders' sales of stock are offset by even larger stock acquisitions during the relevant time period.").

The complaint quibbles that the 2007 stock sale was "unusual and suspicious" because Mr. O'Neal "had sold much smaller amounts of stock in previous years: $11.2 million of his stock in 2006, $5.8 million in 2005, and reportedly no sales in 2003 and 2004." Compl.

13

¶ 195. This is baseless nitpicking. In February 2005, Mr. O'Neal sold 3.1% of his beneficial holdings. In February 2006, he sold 4.6% of his beneficial holdings. In 2007, he sold 5.9%. The complaint's argument, then, is that Mr. O'Neal acted with scienter because over three years the percentage of his overall holdings that he sold rose from 3.1% to 4.6% to 5.9%. The consistent, modest, incremental rise from 3.1 to 4.6 to 5.9 actually shows that the three sales are in close alignment and that the 2007 sale is hardly suspicious.

Nor is there anything unusual or suspicious about the fact that the 2007 sale generated greater proceeds than the earlier sales. It is well-settled that "gross proceeds, standing alone, tell us very little" about intent to defraud. *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 445 (S.D.N.Y. 2005); *see also Ressler*, 75 F. Supp. 2d at 59-60. Moreover, the difference in proceeds was due in large measure to the increase in Merrill's stock price, from $59 when Mr. O'Neal sold his shares in 2005, to $76 in 2006, to $94 in 2007. *See Keyspan*, 383 F. Supp. 2d at 382 ("[P]laintiffs do not adequately plead that defendants, individually or collectively, sold a large percentage of their total shares; large dollar amounts, standing alone, typically do not suffice to establish motive.").

  **C.** **The Complaint Does Not Allege Facts Constituting Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

The complaint fails to allege any plausible motive for Mr. O'Neal to commit fraud. Therefore, the burden on Plaintiffs to plead strong circumstantial evidence that Mr. O'Neal engaged in conscious misbehavior or acted recklessly "must be correspondingly great," *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted), and "approach[] a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007) (citations and quotations

14

omitted). For all of the reasons set forth in Merrill's brief, the Complaint cannot meet this requirement. *See* Merrill Br. at 33-35.

Nor, of course, can Plaintiffs infer scienter simply by alleging that Mr. O'Neal was CEO of Merrill and therefore must have had access to non-public information. *See, e.g.*, Compl. ¶¶ 70, 430; *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004) (dismissing securities fraud claims for which plaintiffs alleged that "scienter can . . . be inferred . . . by virtue of their high ranking positions," finding that a defendant's "position as an officer alone . . . is insufficient to support an inference of scienter"). In this case, given the breadth of Merrill's global operations (at the end of 2007, Merrill employed over 64,000 people in 40 countries and territories around the world, *see* Form 10K Annual Report, 2007, at 19-20, *available at* http://ir.ml.com/secfiling.cfm?filingID=950123-08-2050) and because subprime-related activities comprised just 1-2% of Merrill's overall revenues during the class period, *see supra* note 6, there is no sound basis to infer that Mr. O'Neal was aware of or ignored information that contradicted his public statements.

### III. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTIONS 11 AND 15 OF THE SECURITIES ACT AND SECTIONS 14(A) AND 20(A) OF THE EXCHANGE ACT

For the reasons set forth in Merrill's brief at 80-87 and Mr. Edwards' brief at 19-20, Plaintiffs also have failed to allege valid claims under Sections 11 and 15 of the Securities Act and Sections 14(A) and 20(A) of the Exchange Act.

### CONCLUSION

For the foregoing reasons, as well as those set forth in the briefs submitted by Merrill and the other Individual Defendants, Mr. O'Neal respectfully requests that the Court dismiss the Complaint in its entirety and with prejudice. Because the Complaint has already been amended and because it rests on a non-actionable premise, it should be dismissed without

further leave to amend.  *See Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) ("[A] district court may properly deny leave when amendment would be futile.").

Dated: New York, New York
       July 21, 2008

                        SIMPSON THACHER & BARTLETT LLP

By:   s/ Michael J. Chepiga
      Michael J. Chepiga (mchepiga@stblaw.com)
      Paul C. Curnin (pcurnin@stblaw.com)
      Jason S. Stone (jstone@stblaw.com)
      Sarah L. Dunn (sdunn@stblaw.com)

      425 Lexington Avenue
      New York, New York 10017
      Telephone:  (212) 455-2000
      Facsimile:  (212) 455-2502

      *Attorneys for Defendant E. Stanley O'Neal*