**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. | : | Master File No.: |
| SECURITIES, DERIVATIVE AND ERISA | : | 07-CV-9633(LBS)(AJP)(DFE) |
| LITIGATION | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This Document Relates to:                          :
Securities Action, 07cv9633(LBS)(AJP)(DFE) :
                                                                 :
                                                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANT**
**JEFFREY N. EDWARDS TO DISMISS THE CONSOLIDATED AMENDED CLASS**
**ACTION COMPLAINT**


WILLKIE FARR & GALLAGHER LLP
Richard D. Bernstein
Michael R. Young
Mei Lin Kwan-Gett
Frank M. Scaduto
787 Seventh Avenue
New York, New York  10019
(212) 728-8000

Attorneys for Defendant Jeffrey N. Edwards

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS .................................................................................. 2

ARGUMENT ...................................................................................................... 4

I.  THREE COMPELLING INFERENCES DEMONSTRATE THAT MR. EDWARDS
    BEHAVED HONESTLY ............................................................................. 4

    A.  Mr. Edwards's Absence Of Stock Sales Supports A Strong Inference Of
        Innocent Intent ..................................................................................... 4

    B.  The Industry-Wide Subprime Crisis Creates A Strong Inference That
        Scienter Was Absent ............................................................................ 5

    C.  Merrill's Early Writedowns Support A Strong Inference Of Innocent
        Intent For Mr. Edwards ....................................................................... 7

II. IN CONTRAST, PLAINTIFFS FAIL TO ALLEGE FACTS CREATING ANY
    INFERENCE THAT MR. EDWARDS HAD SCIENTER ............................. 8

    A.  Mr. Edwards's Former Position As CFO Does Not Support An Inference Of
        Scienter ................................................................................................. 9

    B.  The Fact That Mr. Edwards Made Statements As CFO Does Not Support An
        Inference of Scienter ........................................................................... 10

        1.  Plaintiffs Have Not Even Adequately Alleged That The Factual
            Statements By Mr. Edwards Were Inaccurate ............................. 10

        2.  Plaintiffs Allege No Basis To Infer That Mr. Edwards Did Not
            Believe The Opinions At Issue ..................................................... 12

III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER §§ 11 AND 15 OF THE
     SECURITIES ACT AND §§ 14(A) AND 20(A) OF THE EXCHANGE ACT ............. 19

CONCLUSION ................................................................................................. 20

## TABLE OF AUTHORITIES

**CASES**                                                                                    Page

In re 2007 Novastar Fin., Inc., Sec. Litig., No. 07-0139, 2008 U.S. Dist.
      LEXIS 44166 (W.D. Mo. June 4, 2008) ................................................................... *passim*

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) ......................................................... 4

In re AstraZeneca Sec. Litig., No. 05-2688, 2008 U.S. Dist. LEXIS 43680
      (S.D.N.Y. June 3, 2008) ............................................................................................ 4

In re BearingPoint, Inc. Sec. Litig., 525 F. Supp. 759 (E.D. Va. 2007) ................................... 8

In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549 (S.D.N.Y. 2004) ............ 3, 5, 16, 17

Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...................................... 19

Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546 (5th Cir. 2007) ...... 9

Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y. 1991),
      aff'd 956 F.2d 1161 (2d Cir. 1992) ............................................................................. 5

In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004), aff'd sub nom.
      Albert Fadem Trust v. Citigroup Inc., 165 F. App'x. 928 (2d Cir. 2006) .................. 9, 10

In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187 (N.D. Ga. 2007) ........................ 9

In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662 (E.D. Mich. 1999) ...................... 4

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) ......................................................................... 5

Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...................................... 19

Dura Pharm., Inc. v. Broudo, 544 U.S. 336 (2005) ................................................................. 10

In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187 (S.D.N.Y. 2008) ........................................... 9

In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ......................................... 4

In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249 (S.D.N.Y. 2004) ............... 9

Garfield v. NDC Health Corp., 466 F.3d 1255 (11th Cir. 2006) ................................................ 9

Glickman v. Alexander & Alexander Servs., Inc., No. 93-7594, 1996 U.S. Dist.
      LEXIS 2325 (S.D.N.Y. Feb. 29, 1996) .................................................................... 9-10

In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189 (S.D.N.Y. 2003) .................... 19-20

Hampshire Equity Partners II, L.P. v. Teradyne, Inc., No. 04-3318, 2005 U.S. Dist. LEXIS 5261 (S.D.N.Y. Mar. 30, 2005), aff'd 159 F. App'x. 317 (2d Cir. 2005) ............ 9

In re Health Mgmt., Inc., Sec. Litig., 970 F. Supp. 192 (E.D.N.Y. 1997) .................................... 9

Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753 (7th Cir. 2007) .................................................. 4

In re JPMorgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................ 15-16

In re JPMorgan Chase Sec. Litig., No. 02-1282, 2007 U.S. Dist. LEXIS 22948 (S.D.N.Y. Mar. 28, 2007) ......................................................................................... 13-14

Joffee v. Lehman Bros., 410 F. Supp. 2d 187 (S.D.N.Y. 2006), aff'd, 209 Fed. Appx. 80 (2d Cir. 2006) ....................................................................... 12

Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006) ............................ 20

Lilley v. Charren, 17 F. App'x 603 (9th Cir. 2001) ..................................................................... 19

In re Nokia Corp. Sec. Litig., No. 96-3752, 1998 U.S. Dist. LEXIS 4100 (S.D.N.Y. Apr. 1, 1998) .............................................................................................. 8

Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146 (S.D.N.Y 2004) ........................ passim

In re Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181 (N.D. Cal. 2000), aff'd 335 F.3d 843 (9th Cir. 2003) ............................................................................... 10

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) .................................................................... 7, 20

In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................ 12

In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248 (S.D.N.Y. 2005) ..................... passim

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996) ................................................... 20

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) .......................................... 5, 12

In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159 (S.D. Fla. 2004) ..................................... 3

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., No. 06-2902, 2008 U.S. App. LEXIS 13449 (2d Cir. June 26, 2008) ................................................ 5-6

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ......................................... 1

In re USF&G Corp. Sec. Litig., No. B-90-2928, 1993 U.S. Dist. LEXIS 10064 (D. Md. Feb. 11, 1993) ................................................................................................ 16

Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991) ................................................... 19

**STATUTES**

15 U.S.C. §78u-4(b)(1) .................................................................................................10-11

**OTHER AUTHORITIES**

Ben Logan, The ABX Index:  A Pricing Conundrum, Credit, May 1, 2008, at 48
      (Kasner Decl. Ex. J) ..........................................................................................15

Doug Alexander, Greenspan Says Worst of U.S. Housing Slowdown Is Over, Bloomberg.com,
      Feb. 14, 2007, available at http://www.bloomberg.com/apps/news?pid=20601082&sid
      =aYmkpWpqx91s&refer=canada ...................................................................7

Edmund L. Andrews, Treasury Chief Moves to Stabilize Markets, N.Y. Times, Oct. 16, 2007,
      at C1, available at http://query.nytimes.com/gst/fullpage.html?res=9902E4DE173A
      F935A25753C1A9619C8B63&fta=y ..............................................................7

Floyd Norris, It's a Crisis, and Ideas Are Scarce, N.Y. Times, Apr. 11, 2008, at C1, available
      at http://www.nytimes.com/2008/04/11/business/11norris.html?_r=1&oref=slogin ......7

Jennifer E. Bethel et al., Legal Issues in the Subprime Lending Market (Harvard John M. Olin
      Ctr. for Law, Econ., and Bus., Discussion Paper 612, Feb. 2008), available at
      http://www.law.harvard.edu/programs/olin_center/papers/.............................14

Joellen Perry, Subprime Index is Overstating Losses, BIS Says, Wall St. J., June 9, 2008,
      at C2, available at http://wsj.com/article/SB121295844265255355.html?mod=
      CommercialRealEstateMain_1 ......................................................................15

Krishna Guha and Gillian Tett, Last Year's Model:  Stricken US Homeowners Confound
      Predictions, Fin. Times, Feb. 1, 2008, available at http://us.ft.com/ftgateway/
      superpage.ft?news_id=fto013120081417445946&page=2 ...........................18

Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives
      (Frank J. Fabozzi ed., 2008) (Kasner Decl. Ex. F) .......................................14

Meg Fletcher, Trends:  Subprime Fallout Could Cost Billions, Bus. Ins., Apr. 21, 2008,
      available at http://www.businessinsurance.com/cgi-bin/article.pl?article_id=24617......6

Merrill Lynch, Biography of Jeffrey N. Edwards, available at
      http://www.ml.com/index.asp?id=7695_8134_8302_7551.............................2

Press Release, Merrill Lynch Names Nelson Chai as Chief Financial Officer (Dec. 3, 2007),
      available at http://www.ml.com/index.asp?id=7695_7696_8149_
      74412_86378_86379.........................................................................................2

Reuters, Housing Woes Not Affecting Economy:  Paulson, Mar. 13, 2007, available at
      http://www.reuters.com/article/businessNews/idUSN1319587920070313 ....................7

Defendant Jeffrey N. Edwards respectfully joins the motion of Defendant Merrill Lynch & Co., Inc. ("Merrill" or the "Company") to dismiss the Consolidated Amended Class Action Complaint (the "Complaint"), and submits this memorandum of law in support of his own motion to dismiss.

## PRELIMINARY STATEMENT

Plaintiffs fail to state a §10(b) claim against Mr. Edwards because "the inference of scienter" is not "at least as compelling as" the inference that Mr. Edwards acted honestly. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510 (2007).

First, three undisputed facts support compelling inferences that Mr. Edwards acted honestly. The first is that Mr. Edwards did not sell any of his Merrill shares when he was CFO. As courts have recognized, the absence of insider sales by a CFO creates a strong inference that a CFO honestly believed the company was a good investment. The second undisputed fact is that Mr. Edwards and Merrill have been swept up in the unprecedented industry-wide subprime crisis that has caused more than 130 companies to announce writedowns. Industry-wide downturns suggest that honest executives of the impacted companies were overwhelmed by unexpected events. The third undisputed fact is that without any pressure, Merrill disclosed large CDO writedowns in early October 2007, before nearly all of the other companies that have disclosed similar losses, and one month before Merrill's next SEC reporting deadline. Plaintiffs offer no basis to infer why Mr. Edwards would have been willing to disclose large losses in October 2007 but reticent to disclose losses earlier. The compelling inference is that, like our most senior, well-informed government officials, Mr. Edwards could not foresee the unparalleled changes in economic conditions that began in the third quarter of 2007. For similar reasons, a court recently dismissed for lack of scienter claims against the CFO of a

company impacted by large subprime-related losses. In re 2007 Novastar Fin., Inc., Sec. Litig., No. 07-0139, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008).

Second, there is no paragraph in the Complaint that sets forth straightforwardly why scienter should be inferred against Mr. Edwards. Plaintiffs appear to propose two inferences. The first is that scienter can be inferred from Mr. Edwards's position as CFO. Courts routinely reject this boilerplate allegation. The second is that scienter can be inferred because, as with any CFO, Mr. Edwards spoke for Merrill on analyst conference calls. This proposed inference improperly conflates the separate and distinct elements of making a statement and scienter. Mr. Edwards's factual statements were accurate and the Complaint fails to allege any basis to infer that he did not believe the statements of opinions at issue concerning Merrill's CDO valuations and risk management.

For the reasons described herein, Plaintiffs also fail to state a claim under §§ 11 and 15 of the Securities Act and §§ 14(a) and 20(a) of the Exchange Act. There is thus no basis for Plaintiffs to drag Mr. Edwards into this lawsuit.

## STATEMENT OF FACTS

Mr. Edwards was the CFO of Merrill until December 2007.[1] (Compl. ¶ 73.) As CFO, Mr. Edwards signed certifications concerning Merrill's financial statements, including its

---

[1]    The Complaint mistakenly alleges that Mr. Edwards "is" the CFO. (Compl. ¶ 73.) Mr. Edwards was CFO from March 2005 until December 2007. As was publicly announced, Mr. Edwards was replaced as CFO when John Thain became CEO and brought over the CFO from the NYSE to be Merrill's new CFO. See Press Release, Merrill Lynch Names Nelson Chai as Chief Financial Officer (Dec. 3, 2007). Mr. Edwards continues his twenty-year Merrill career as one of fourteen vice chairmen of Merrill's Executive Client Coverage Group. See Merrill Lynch, Biography of Jeffrey N. Edwards, available at http://www.ml.com. Plaintiffs also incorrectly assert that as CFO, Mr. Edwards was a member of the Executive Committee. (Compl. ¶ 94.) In fact, Mr. Edwards was never a member of that Committee, although as CFO he was often invited to its meetings by Merrill's more senior management.

10-Q and 10-K reports.  As with any CFO, he hosted quarterly conference calls with analysts following Merrill's earnings announcements.  (Id. ¶ 73.)

Plaintiffs allege that as CFO, Mr. Edwards made misleading statements about the value of Merrill's CDOs and risk management.  (Id. ¶¶ 41-45, 48-50, 73, 207, 221, 248, 289, 403-24.)  Outside of these conclusory allegations, the Complaint is essentially silent about Mr. Edwards.  Although the Complaint alleges that vague information and warnings relating to the subprime market and CDOs were provided to unnamed members of "senior management" (Id. ¶¶ 108-09), it does not specifically allege that any particular information or warning was given to Mr. Edwards.  The Complaint similarly does not allege any instance in which Mr. Edwards made any private statement that was inconsistent with his or Merrill's public statements.  Finally, Mr. Edwards beneficially owned more than 780,000 shares of stock and options during the class period, including approximately 170,000 shares and options acquired during the class period.[2] The Complaint does not allege that Mr. Edwards sold any Merrill stock or was protecting any large compensation package.[3]  (See id. ¶¶ 10, 25.)

---

[2]  See Decl. of Jay B. Kasner in Support of the Merrill Defs.' Mots. to Dismiss the Con. Am. Compls. [hereinafter "Kasner Decl."], Exs. JJ & OO.  All materials referred to in this memorandum are either exhibits to the Kasner Declaration or readily available on the Internet.  The Table of Authorities provides cross-references to the Kasner Declaration exhibit number or to an URL where the item is found on the Internet.

[3]  The Amended Class Action Complaint, in contrast to the Amended Shareholders' Derivative Complaint, properly does not allege that Mr. Edwards "sold" 30,963 shares of Merrill stock on January 31, 2007. (Compare Verified Consol. & Am. Shareholders' Derivative Compl. ¶ 266.)  As reflected in publicly available SEC filings, the January 31, 2007 transaction was merely Merrill's automatic forfeiture of certain shares for tax withholding purposes based on the vesting of shares granted in prior years.  See Kasner Decl. Ex. OO.  The forfeiture of shares "for tax withholding purposes" does not support "a strong inference of scienter."  In re Sportsline.com Sec. Litig., 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004); see also In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (trades "to pay taxes" do not support scienter).

**ARGUMENT**

I.    **THREE COMPELLING INFERENCES DEMONSTRATE THAT MR. EDWARDS BEHAVED HONESTLY.**

A.    **<u>Mr. Edwards's Absence Of Stock Sales Supports A Strong Inference Of Innocent Intent.</u>**

A CFO's lack of stock sales during the class period suggests he or she acted honestly.  <u>See, e.g.</u>, <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 54 (2d Cir. 1995) ("The fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'"); <u>accord</u> <u>Higginbotham v. Baxter Int'l, Inc.</u>, 495 F.3d 753, 759 (7th Cir. 2007) (lack of stock sales by those "who would have been in the know . . . implies that nothing was thought to be out of the ordinary"); <u>In re Credit Acceptance Corp. Sec. Litig.</u>, 50 F. Supp. 2d 662, 677 (E.D. Mich. 1999) ("The fact that [the CFO] did not sell any shares during the class period undermines the suggestion that the Defendants engaged in securities fraud in order to profit from their own stock sales.").

In <u>In re eSpeed, Inc. Securities Litigation</u>, 457 F. Supp. 2d 266 (S.D.N.Y. 2006), neither the CEO nor CFO sold stock during the class period.  The court dismissed the complaint for lack of scienter even though other executives had sold some of their stock:

> [T]he dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period.  Given this, it is difficult to conclude that sales by two of the four defendants of less than twenty percent of their individual holdings represent such unusual selling activity as to give rise to an inference that either defendant intended to defraud investors.

<u>Id.</u> at 291-92; <u>see also</u> <u>In re AstraZeneca Sec. Litig.</u>, No. 05-2688, 2008 U.S. Dist. LEXIS 43680, at *37-39 (S.D.N.Y. June 3, 2008) (paucity of sales near time of misrepresentations "effectively negated" an inference of scienter).

Here, Plaintiffs do not allege that Mr. Edwards sold any of his 780,000 shares of Merrill stock and options. Plaintiffs thus ask the Court to infer that Mr. Edwards quixotically believed that Merrill's ship was sinking, but did not use his inside information to any personal advantage by selling any Merrill shares. Mr. Edwards's lack of stock sales – while his Merrill shares were significantly increasing – supports a much stronger inference that he believed that Merrill was sound and a good investment. See In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (dismissing where individual defendants "increased [their stock] holdings during the Class Period – a fact wholly inconsistent with fraudulent intent") (emphasis in original).

**B.    The Industry-Wide Subprime Crisis Creates A Strong Inference That Scienter Was Absent.**

For decades, courts in this Circuit have held that scienter was lacking in securities fraud cases against executives of companies that suffered losses during industry-wide downturns. See, e.g., Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.) (rejecting attempt to plead "fraud by hindsight" because Chase Manhattan's officers failed to have "clairvoyance" to predict losses stemming from worldwide economic shocks and New York City's near-bankruptcy).[4] Indeed, the Second Circuit recently held that a plaintiff had not pleaded scienter against defendants where the plaintiff failed to allege that management had been given "information showing that the primary cause of the bonds' poor performance was not the general

---

[4]    Accord Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of claims brought after the commercial real estate collapse of the 1980s that executives concealed the inadequacy of reserves for bad loans because plaintiff had failed to allege a strong inference that defendants recklessly ignored that "continuing erosion of the real estate market would render the loan portfolio precarious"); Ciresi v. Citicorp, 782 F. Supp. 819, 821 (S.D.N.Y. 1991) ("As sometimes happens when an industry encounters financial problems, this is not the only case of its kind pending against a major bank, and it also is not the only case of its kind that Citicorp/Citibank is now defending. A number of these complaints have been dismissed for a reason common to them all: the claims in essence try to penalize banking institutions 'for failing to show 'greater clairvoyance.'"), aff'd, 956 F.2d 1161 (2d Cir. 1992).

weakness in the mobile homes market." <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, No. 06-2902, 2008 U.S. App. LEXIS 13449, at *16 (2d Cir. June 26, 2008) (emphasis in original).

   Consistent with this established general authority, a court recently dismissed the § 10(b) claim brought against a CFO of a company impacted by the industry-wide subprime crisis.  In <u>Novastar</u>, plaintiffs alleged that a subprime lender and its executives, including its CFO, fraudulently concealed the company's true exposure to the subprime housing crisis.  The plaintiffs made nearly identical allegations to those made here about defective projections, improper accounting for loan losses in violation of GAAP, "deviation from underwriting standards," and "the deterioration and volatility of the subprime mortgage market."  2008 U.S. Dist. LEXIS 44166, at *9-13.  In dismissing on scienter grounds, the court held: "Plaintiff's allegations are more consistent with a company and executives confronting a deterioration in the business and finding itself unable to prevent it than they are with a company and executives recklessly deceiving the investing community." <u>Id.</u> at *15.

   This precedent supports dismissing the claim against Mr. Edwards.  Merrill and Mr. Edwards have been swept up in a severe industry-wide downturn.  As of April 2008, more than 130 companies had announced writedowns relating to the subprime crisis.  Meg Fletcher, <u>Trends:  Subprime Fallout Could Cost Billions</u>, Bus. Ins., Apr. 21, 2008.  There is no basis to conclude that the CFOs of all of these companies had scienter because their companies did not announce writedowns earlier.  CFOs like Mr. Edwards behaved honestly before and after economic circumstances dramatically changed in the third quarter of 2007.

   These CFOs were not alone in their inability to foresee the severity of the subprime crisis earlier.  During most of 2007, the nation's leading government officials publicly

declared that the subprime crisis was contained and would not affect the wider financial markets, including the market for the highest-rated, least-risky CDOs.  For example, in February 2007, former Federal Reserve Chairman Alan Greenspan, speaking of the subprime crisis, said, "I think the worst is behind us."  Doug Alexander, <u>Greenspan Says Worst of U.S. Housing Slowdown Is Over</u>, Bloomberg.com, Feb. 14, 2007.  In March 2007, Federal Reserve Chairman Ben Bernanke told Congress, "At this juncture, however, the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  Testimony of Ben S. Bernanke before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007).  Also in March, Treasury Secretary Henry Paulson said subprime-related problems were "largely contained."  Reuters, <u>Housing Woes Not Affecting Economy:  Paulson</u>, Mar. 13, 2007.  And later, in August 2007, Secretary Paulson reiterated, "We're going to work through this problem just fine."  Edmund L. Andrews, <u>Treasury Chief Moves to Stabilize Markets</u>, N.Y. Times, Oct. 16, 2007, at C1.  No one could seriously argue that these well-informed government officials acted with scienter.  Rather, like Mr. Edwards, they behaved honestly but failed to foresee the severity of a credit crisis that precious few were clairvoyant enough to predict.  <u>See</u> Floyd Norris, <u>It's a Crisis, and Ideas Are Scarce</u>, N.Y. Times, Apr. 11, 2008, at C1 ("Most of the critics – myself included – did not anticipate the severity of the credit collapse, and we should not act is if the <u>executives and regulators</u> who failed to prevent it were blind or stupid." (emphasis added)).

### C.    Merrill's Early Writedowns Support A Strong Inference Of Innocent Intent For Mr. Edwards.

The Second Circuit has held that voluntary disclosure of problems prior to a standard reporting deadline undermines an inference of scienter.  <u>See, e.g.</u>, <u>Rombach v. Chang</u>, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file [the

company's] financial statements."); see also In re Nokia Corp. Sec. Litig., No. 96-3752, 1998

U.S. Dist. LEXIS 4100, at *38 (S.D.N.Y. Apr. 1, 1998) ("If anything, the fact that [defendant]

voluntarily chose to issue a press release earlier than its standard year-end reporting in February

undercuts the allegation that defendants were acting recklessly.").

        For example, In re BearingPoint, Inc. Securities Litigation, 525 F. Supp. 2d 759

(E.D. Va. 2007), held that plaintiffs had not adequately pleaded scienter against a company and

its executives, including its former CFO, when the company announced a $397 million

writedown for goodwill impairment.  To the contrary, the court held that "truthful disclosures of

negative information 'militate[] against a finding that [defendants] acted with a culpable state of

mind.'"  Id. at 769.  "It simply defies common sense to suppose that a public company withheld

bad news to entice investment, while knowing it soon would release even worse news and

thereby drive away all of the investment it had just garnered."  Id. at 771.

        Accordingly, Merrill's disclosure of large writedowns on October 5, 2007 – one

month before the next quarterly SEC filing was due – supports an inference that Merrill and Mr.

Edwards acted honestly.  Plaintiffs do not allege that the October 5 writedowns were pressured

by Merrill's auditors, regulators, or anyone else.  Moreover, by taking writedowns substantially

before the year-end for 2007, Mr. Edwards and other Merrill executives took action that would

inevitably lower their bonuses.  Those early writedowns therefore support an additional strong

inference that Mr. Edwards acted without scienter.

## II.    IN CONTRAST, PLAINTIFFS FAIL TO ALLEGE FACTS CREATING ANY INFERENCE THAT MR. EDWARDS HAD SCIENTER.

        Plaintiffs do not allege any purported basis for inferring Mr. Edwards's scienter

other than that he was CFO and, as CFOs regularly do, he made statements on behalf of the

Company in analyst conference calls. (See Compl. ¶¶ 73, 414, 430.) The courts have repeatedly rejected similar scienter inferences.

### A.   Mr. Edwards's Former Position As CFO Does Not Support An Inference Of Scienter.

A defendant's position as CFO, or responsibilities concerning risk management, provide no basis to infer scienter. See, e.g., In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004), aff'd, Albert Fadem Trust v. Citigroup Inc., 165 F. App'x 928 (2d Cir. 2006); In re Health Mgmt., Inc., Sec. Litig., 970 F. Supp. 192, 204-05 (E.D.N.Y. 1997). A CFO's certifications of financial statements are also insufficient to infer scienter. Citigroup, 330 F. Supp. 2d at 382; accord Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 555 (5th Cir. 2007); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006).

The Complaint's boilerplate allegation that, as CFO, Mr. Edwards had "access" (Compl. ¶ 430) to corporate information is similarly insufficient to infer scienter. See Novastar, 2008 U.S. Dist. LEXIS 44166, at *15 (dismissing where complaint did not allege with specificity CFO's "prior receipt of information demonstrating that the statement would be false or misleading").[5] Particularly for a sprawling, diversified company such as Merrill, an allegation of "'unfettered access'" to corporate information "is an inadequate basis for scienter" because it "would expose virtually any [senior corporate official], by virtue of his or her position alone, to

---

[5]    Accord, e.g., In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (alleged warnings to "senior management" were "far too vague with respect to what information was actually communicated and what conclusions any defendant actually reached"); Hampshire Equity Partners II, L.P. v. Teradyne, Inc., No. 04-3318, 2005 U.S. Dist. LEXIS 5261, at *10-11 (S.D.N.Y. Mar. 30, 2005) ("Vague and conclusory allegations that a defendant allegedly had access to non-public information, including matters discussed at internal meetings or contained in unspecified internal reports and documents, do not suffice."), aff'd, 159 F. App'x 317 (2d Cir. 2005); In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 267-68 (S.D.N.Y. 2004) (report provided by senior vice president of "terrible" business conditions was "far too vague" to establish scienter); In re Coca-Cola Enters. Inc. Sec. Litig., 510 F. Supp. 2d 1187, 1201 (N.D. Ga. 2007) ("[I]t is not enough to make conclusory allegations that the Defendants had access to the 'true facts' in order to demonstrate scienter, particularly where the complaint fails to allege 'which defendant knew what, how they knew it, or when.'").

liability." Glickman v. Alexander & Alexander Servs., Inc., No. 93-7594, 1996 U.S. Dist. LEXIS 2325, at *43 (S.D.N.Y. Feb. 29, 1996). The Complaint fails to contain a single allegation specifically naming Mr. Edwards as receiving information that was contrary to Merrill's or his statements. Although Plaintiffs refer to vague, after-the-fact newspaper accounts of differing views or reports of problems within Merrill's ranks, *Mr. Edwards's name does not even appear in the paragraphs of the Complaint that reference these alleged concerns*. (See, e.g., Compl. ¶¶ 108-15.)

**B.    The Fact That Mr. Edwards Made Statements As CFO Does Not Support An Inference of Scienter.**

A defendant's alleged false statement and his or her scienter are two separate and distinct elements of a securities fraud claim under § 10(b). See, e.g., Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Proof of falsity does not support an inference of scienter. See, e.g., In re Read-Rite Corp. Sec. Litig., 115 F. Supp. 2d 1181, 1184 (N.D. Cal. 2000) ("falsity of the statement by itself does not strongly imply the speaker's knowledge of falsity"), aff'd, 335 F.3d 843 (9th Cir. 2003); Citigroup, 330 F. Supp. 2d at 381; see also Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (evidence that opinion was unreasonable "is not sufficient to allege scienter"). Accordingly, the fact that, as with any CFO, Mr. Edwards made statements in analyst conference calls provides no basis to infer his scienter. To the contrary, as we next show, the contents of Mr. Edwards's specific statements contradict Plaintiffs' general and conclusory allegations of his scienter.

**1.    Plaintiffs Have Not Even Adequately Alleged That The Factual Statements By Mr. Edwards Were Inaccurate.**

Plaintiffs cannot rest on conclusory allegations that a statement was false or misleading. Rule 9(b) required the Complaint to "explain why the statements were fraudulent," and the PSLRA requires the Complaint to "specify . . . the reason or reasons why the statement is

misleading." 15 U.S.C. §78u-4(b)(1). The Complaint fails to satisfy these requirements. <u>First</u>, Plaintiffs make the conclusory allegation that Mr. Edwards's statement on April 19, 2007 that net revenues from "subprime-related activities" (including First Franklin) were no more than 2% of the Company's net revenues was false and misleading. (Compl. ¶¶ 245, 248.) Plaintiffs do not allege what the correct percentage was, they only vaguely refer to "approximately" $700 million in subprime-related revenues, and they cite no source for this number. (<u>Id.</u> ¶ 18). Because Merrill's total company revenues were approximately $35 billion, (<u>see</u> Merrill 10-K (2006), at 21-22 (Kasner Decl. Ex. V)), a conclusory and vague allegation of "approximately" $700 million in subprime-related revenues does not adequately allege that Mr. Edwards's reference to 2% was false or misleading.

    <u>Second</u>, Mr. Edwards correctly stated on the April 19, 2007 analyst call that "retained interests will be up" because the retention of "investment grade rated" securities was increasing. (Id. ¶ 247.) As Mr. Edwards accurately stated in addressing the "retained interests" held by Merrill, "there is only a small part that reflects the subprime residuals," <u>i.e.</u>, the lowest-rated equity portions. (<u>Id.</u>) The residuals were "a small part" because the vast majority was, as Mr. Edwards said, the higher-rated "investment grade rated securities." (<u>Id.</u>).

    <u>Third</u>, Plaintiffs cite Mr. Edwards' statement on July 17, 2007 that Merrill had reduced "our exposure to lower-rated segments of the market" for CDOs and mortgage-backed securities ("MBS"). (<u>Id.</u> ¶ 278.) However, Plaintiffs do <u>not</u> allege that this was false. Mr. Edwards accurately stated in the July 17, 2007 call that "I think the majority of our exposures continues to be now in the highest credit segment of the market." (<u>Id.</u> ¶ 278). The Complaint effectively admits that Merrill had reduced its exposure to lower-rated segments by alleging that

Merrill's losses almost entirely arose from the super senior AAA CDOs. (See id. ¶¶ 31-32, 55, 57, 92.)

### 2.    Plaintiffs Allege No Basis To Infer That Mr. Edwards Did Not Believe The Opinions At Issue.

The core allegations against Mr. Edwards improperly attack honest opinions. Courts are particularly reluctant to allow securities fraud claims based on statements of opinion. This is because opinions are subjective, predictive, and often subject to honest disagreement.

"The sine qua non of a securities fraud claim based on false opinion is that defendants deliberately misrepresented a truly held opinion." Podany, 318 F. Supp. 2d at 153-54 (emphasis added); Shields, 25 F.3d at 1131 ("A statement of reasons, opinion or belief . . . can be actionable under the securities laws if the speaker knows the statement to be false.") (emphasis added). "In other words, plaintiffs must allege with particularity that defendants did not sincerely believe the opinion they purported to hold." Podany, 318 F. Supp. 2d at 154; Joffee v. Lehman Bros., 410 F. Supp. 2d 187, 193 (S.D.N.Y.) ("statements of opinion are actionable only to the extent that they are not honestly held"), aff'd, 209 F. App'x 80 (2d Cir. 2006). "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held." In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004). Moreover, a statement of opinion "does not omit a material fact by failing to note that others [within or outside the company] may have different opinions or analytical approaches." In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005).

a.     **CDO Valuation Opinions**

A statement about value that involves judgment is an opinion. See Podany, 318 F.

Supp. 2d at 154.  In In re Salomon Analyst Level 3 Litigation, plaintiffs alleged that an

individual defendant investment bank official made false and misleading statements about the

value of a company.  Plaintiffs alleged that the official had scienter because his valuation

differed from valuations generated by other models used at his firm.  In granting dismissal, Judge

Lynch explained that "financial valuation models depend so heavily on the discretionary choice

of the modeler – including choice of method . . . , choice of assumption . . . , and choice of

'comparables' – that the resulting models and their predictions can only fairly be characterized as

subjective opinions." 373 F. Supp. 2d at 251-52.  "Like other opinions, some valuation models

may be more or less reliable than other models, have more or less predictive power, or hew more

or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and

not objective facts." Id. at 252.

Here, the central allegation of the Complaint is that Merrill's "financial statements

materially overstated the fair value of its ABS CDO positions." (Compl. ¶ 350 (emphasis

added); see also id. ¶¶ 16(c)-(d), 52, 99, 143, 351-52, 355, 358.)  Likewise, the Complaint alleges

that Mr. Edwards misstated that, when two Bear Stearns hedge funds did not repay their loans

from Merrill, the CDOs Merrill received as collateral were "appropriately marked." (Id. ¶ 281.)

The Complaint simply does not allege any basis to infer that Mr. Edwards did not

believe the valuation opinions at issue.  In particular, Plaintiffs do not allege that Mr. Edwards

made any inconsistent private statements. See Podany, 318 F. Supp. 2d at 155.  Nor do Plaintiffs

allege that any auditor or anyone else ever suggested to Mr. Edwards that Merrill should adopt

different valuations. See In re JPMorgan Chase Sec. Litig., No. 02-1282, 2007 U.S. Dist. LEXIS

22948, at *39-40 (S.D.N.Y. Mar. 28, 2007) (lack of restatement "defeats" inference of scienter); Novastar, 2008 U.S. Dist. LEXIS 44166, at *12 (same).

Instead, Plaintiffs incorrectly attempt to infer scienter by arguing that Mr. Edwards (and Merrill) should have mechanically valued Merrill's CDOs by mimicking the declines of two indices of MBS, the ABX and TABX. (Compl. ¶¶ 142-43.) This argument fails for four reasons.

First, Plaintiffs contradict their own mechanical approach by quoting accounting rules for valuing a CDO portfolio that refer to the use of "[j]udgments about . . . methods and assumptions." (See Compl. ¶ 348 (quoting FAS 107).)

Second, Plaintiffs do not allege that anyone –industry analysts, government regulators, or other financial institutions – actually valued any CDO portfolio to mimic the ABX or TABX.

Third, the ABX and TABX measure MBS, which are different from CDOs. CDOs also contain interests in other assets, including interests in other CDOs, collateralized loan obligations, and commercial real estate. See Jennifer E. Bethel et al., Legal Issues in the Subprime Lending Market 12 (Harvard John M. Olin Ctr. for Law, Econ., and Bus., Discussion Paper 612, Feb. 2008). In addition, CDOs include enhanced credit protections that MBS lack, such as overcollateralization and reserve funds that are designed to protect against losses on the kinds of more senior AAA tranches of CDOs that Merrill held. Laurie S. Goodman et al., Subprime Mortgage Credit Derivatives 145 (Frank J. Fabozzi ed., 2008).

Fourth, even the creator of the ABX and TABX, a company called Markit Group Limited, has warned against using those indices to value CDOs. As Ben Logan, the head of structured finance at Markit, explained:

- 14 -

> The ABX . . . was not designed to be uncritically extrapolated to
> the broader ABS market, and it <u>was certainly not designed as a
> valuation tool for individual securities</u>.
>
> Compare the ABX to equity indices.  While movements in the
> Dow Jones Industrial Average, for example, may provide a
> snapshot of market performance, the index performance will not
> give an equity investor information on the performance or value of
> a specific stock . . . .
>
> <u>Nor is the ABX a similar animal to the benchmark equity indices</u>.
> Unlike traditional indices which are built by summing up the price
> or total return on their constituents, the ABX . . . is composed of
> synthetic securities and is designed to be traded.  Its constituents,
> by contrast, trade only thinly and have no officially published
> prices.

Ben Logan, <u>The ABX Index:  A Pricing Conundrum</u>, Credit, May 1, 2008, at 48 (emphasis

added).  Indeed, the <u>Wall Street Journal</u> recently reported a study suggesting that using the ABX

to value subprime assets may overstate losses by 60%.  <u>See</u> Joellen Perry, <u>Subprime Index is

Overstating Losses, BIS Says</u>, Wall St. J., June 9, 2008, at C2.

 In sum, alleging that a person could produce a different valuation by placing more

reliance on the ABX or TABX is exactly the kind of 20-20 hindsight argument that <u>In re

Salomon Analyst Level 3 Litigation</u>, 373 F. Supp. 2d at 252, and <u>Podany</u>, 318 F. Supp. 2d at 154,

155-56, dismissed as a basis to infer scienter.

 **b. Risk Management Opinions**

 The Complaint also challenges Mr. Edwards's statements in April and July 2007

about the likely effectiveness of Merrill's risk management.  (<u>See, e.g.</u>, Compl. ¶¶ 43, 49, 234,

246, 278, 281-82.)  As demonstrated by Merrill's motion, "generalizations regarding integrity,

fiscal discipline and <u>risk management</u>" cannot furnish a basis for securities fraud because

- 15 -

investors do not rely on such broad, general statements.  In re JPMorgan Chase Sec. Litig., 363 F. Supp. 2d 595, 633 (S.D.N.Y. 2005) (emphasis added).[6]

Even assuming such statements are not inactionable under the so-called "puffery" doctrine, they constitute opinions.  In particular, statements that express optimism about risk are opinions.  See, e.g., In re USF&G Corp. Sec. Litig., No. B-90-2928, 1993 U.S. Dist. LEXIS 10064, at *16 (D. Md. Feb. 11, 1993) ("[P]laintiffs' related allegation, that defendants misled investors by describing the investment strategy as conservative, is also defective. Not only is such a characterization a matter of opinion, but this Court has recognized that 'the fact that [investments] fail does not itself demonstrate that they constituted unacceptable risks when they were made.'"); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d at 557-58 (statements about the risk of FDA disapproval).

In this case, statements about risk management were inherently statements of opinion because they involve judgments about potential future valuations.  The Complaint states that Merrill disclosed that its "main method" for evaluating Merrill's "exposure to risks" from CDOs was "Value at Risk" or "VaR." (Compl. ¶ 162.)  The Complaint further admits that VaR was the "industry standard" used by "all major investment banks and global banks" as a "measure of the potential loss in the fair value of a portfolio due to adverse movements in underlying risk factors." (Id.) (emphasis added)  Thus, "VaR is a risk management methodology that provides an estimate of what losses might be and the probability of those losses occurring," taking into consideration "numerous factors." (Id.) (emphases added)  Accordingly, in this

---

[6]    As Merrill's motion demonstrates, statements about risk management are also shielded from liability under the PSLRA's "safe harbor" provision for forward-looking statements.

context, a statement about risk management is necessarily an opinion because it involves estimates, probabilities, and subjective assessments of future events.

The words used by Mr. Edwards and quoted by the Complaint confirm that his statements about risk management were statements of opinion. For example, Mr. Edwards said on the April 19, 2007 earnings conference call: "[R]isk management . . . is a crucial aspect of our business and I think we've done a very good job in negotiating these markets as a result of that. . . . So I think we're approaching it in a prudent way, given the environment." (Compl. ¶¶ 43, 246; see also id. ¶¶ 49, 278, 281-82.) Moreover, Mr. Edwards gave warnings that his opinions might prove wrong, such as this warning on the July 17, 2007 conference call: "Obviously the market has gone through a period of flux. We think that remains the case." (Id. ¶¶ 49, 278; see also id. ¶ 220 (January 18, 2007: "as a general matter, our risk profile has increased over time").)

Bristol-Myers Squibb, 312 F. Supp. 2d at 557-58, is particularly instructive. There, the CFO said he was "very positive about the approval prospects for" a new drug and that "I don't think it's likely at all that this drug won't get approved." Id. (emphasis added). The FDA declined to approve the drug. The court concluded that the CFO's statements were inactionable opinions because they expressed "optimism about regulatory events not under the Company's control." Id. at 558.

Mr. Edwards's statements about the likely effectiveness of risk management are analytically indistinguishable from the Bristol-Myers CFO's statements. Like the Bristol-Myers CFO, Mr. Edwards stated a belief (as indicated by "I think" or "We think") about the risk of an uncertain future event that was "not under the Company's control." As Merrill later explained, the value of Merrill's highest-rated AAA pieces of CDOs was subsequently "impacted by

external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur." (Compl. ¶ 322; see id. ¶¶ 31, 32, 92.) For example, one report indicated that AAA CDOs unexpectedly sustained large losses because of "a striking recent change" that reversed decades of American homeowner behavior. Krishna Guha and Gillian Tett, Last Year's Model: Stricken US Homeowners Confound Predictions, Fin. Times, Feb. 1, 2008.[7] In prior financial crises, American households "default[ed] on unsecured loans such as credit cards and car loans first – and stopped paying their mortgage only as a last resort." Id. In this crisis, they have "stopped paying mortgages before they halt payments on their credit or automotive loans – turning the traditional delinquency pattern on its head." Id. (emphasis in original). Scienter cannot be inferred simply because Mr. Edwards's cautiously phrased risk management opinions did not foresee this and other unprecedented developments. See Podany, 318 F. Supp. 2d at 156 ("The securities laws are not intended as investor insurance every time an investment strategy turns out to have been mistaken.").

Plaintiffs admit: "Merrill knew how to manage risk. Merrill had a well-structured risk control process and sophisticated risk management capabilities. At all times during the Class Period, the Company had state-of-the-art models and systems." (Compl. ¶ 93.) Plaintiffs do not allege any specific facts showing that Mr. Edwards was told that Merrill's risk management systems were being misused. Nor do Plaintiffs allege that those systems predicted anything close to the magnitude of the subsequent losses. Indeed, Plaintiffs do not allege that any information provided to Mr. Edwards before October 2007 showed that the subprime risk was so severe it was likely to impact Merrill's AAA CDOs substantially.

---

[7]    Mr. Guha is the lead editorial writer for the Financial Times, and Ms. Tett won the 2007 Wincott Prize, the premier British award for financial journalism.

Moreover, even if it was specifically alleged that Mr. Edwards knew of differing views, that would still provide no basis to infer scienter because "in any large corporation there will be differences of opinion expressed." Lilley v. Charren, 17 F. App'x 603, 607 (9th Cir. 2001). In In re Salomon Analyst Level 3 Litigation, the plaintiff alleged that the defendant investment banker publicly expressed a valuation opinion that was contrary to valuations done by other bank employees. Judge Lynch dismissed the complaint because "the fact that other individuals within [the investment bank] may have had views different from [the defendant] does not provide any basis for an inference that [defendant] did not believe his own professed opinions." Salomon Analyst Level 3 Litig., 373 F. Supp. 2d at 252.[8]

## III. PLAINTIFFS FAIL TO STATE A CLAIM UNDER §§ 11 AND 15 OF THE SECURITIES ACT AND §§ 14(A) AND 20(A) OF THE EXCHANGE ACT.

A.     As demonstrated in Merrill's motion to dismiss, Plaintiffs' § 11 and § 14(a) claims "sound in fraud" and should be dismissed for the same reasons as the § 10(b) claims. Moreover, in order to plead that a defendant's opinions were false, a § 11 and § 14(a) plaintiff must adequately allege that the speaker knowingly misstated the fact that he truly believed the opinions. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1095-96 (1991) (§ 14(a) claim premised on opinion requires that the speaker misstated "the psychological fact of the speaker's belief in what he says"); In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 210-11 (S.D.N.Y. 2003) (dismissing § 11 claim in pertinent part because plaintiff did not allege

---

[8]    See also Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) ("unsubstantiated beliefs and conclusory statements" regarding warnings given to individual defendants "simply reflect[ed] a difference of opinion as to how to operate a business" and "lack[ed] requisite specificity and indicia of reliability to satisfy the scienter requirement"). Plaintiffs allege that after the class period, Merrill's new CEO, John Thain, "has admitted that Merrill's risk controls and its risk control committee did not function." (Compl. ¶ 436.) Mr. Thain's subsequent opinion does not support an inference that Mr. Edwards knowingly misstated his own much earlier opinions about risk management. See Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 414 (S.D.N.Y. 2007) (statements by new "CEO, after the Class Period" about company's prior problems could not establish individual defendants' scienter).

adequately that "the opinion or belief [was] not truly held"). For the reasons discussed, <u>supra</u> at II.B, the Complaint fails to allege any basis to infer that Mr. Edwards did not believe the valuation and risk management opinions at issue.

B.      Plaintiffs' "control person" claims against Mr. Edwards under § 15 of the Securities Act and § 20(a) of the Exchange Act should be dismissed for failure to allege a primary violation by a controlled person. <u>See</u> <u>Rombach</u>, 355 F.3d at 177-78 (§ 15); <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472 (2d Cir. 1996) (§ 20(a)). Plaintiffs' § 20(a) claim should be dismissed for the additional reason that Plaintiffs failed to allege facts supporting a strong inference of the necessary scienter. <u>See</u> <u>Lapin v. Goldman Sachs Group, Inc.</u>, 506 F. Supp. 2d 221, 244-46 (S.D.N.Y. 2006).

## CONCLUSION

For the foregoing reasons and the reasons stated in Merrill's motion to dismiss, the Court should dismiss the Complaint against Mr. Edwards.

Dated:  July 21, 2008
         New York, New York

                                        Respectfully submitted,

                                        WILLKIE FARR & GALLAGHER LLP


                                        _____
                                        Richard D. Bernstein
                                        Michael R. Young
                                        Mei Lin Kwan-Gett
                                        Frank M. Scaduto
                                        787 Seventh Avenue
                                        New York, New York  10019
                                        (212) 728-8000

                                        Attorneys for Defendant Jeffrey N. Edwards