"The total number of job cuts amounts to a 10% reduction of Merrill Lynch's workforce excluding financial advisers and investment associates."

Merrill Lynch reported revenue of $2.9 billion, down 69% from the prior-year period, primarily due to net writedowns of $2.7 billion in mortgage-related securities and $3 billion in downward revisions of the value of faltering bond insurers' guarantees. It is also writing down $925 million of the value of its leveraged loan portfolio.

Analysts had projected a $1.99 per share loss on a net loss of $1.4 billion and revenue of $3.7 billion. Calling it "as difficult a quarter as I've seen in my 30 years on Wall Street," Chief Executive Officer John Thain said the bank is preparing for slower and tougher times ahead.

"...Merrill Lynch's results show that the industry is still suffering from the mortgage meltdown that began when the subprime sector crumbled last year."

"Merrill Lynch's and other investment banks' writedowns are a stark reminder that we are not out of the woods yet in terms of the credit crisis," said Octavio Marenzi, head of Celent, a Boston-based financial research and consulting firm. "There is more pain to come and the pressure on earnings is going to continue."

"At the start of 2008, analysts expected a profit of $1.52 per share and even a month ago, they were still predicting earnings of 48 cents per share."

Like its peers, the bank is still plagued by declines in the value of assets such as mortgages and leveraged loans and from its exposure to crumbling bond insurers. Merrill Lynch played big in the mortgage market and lost. It continued to issue mortgage-backed securities in 2007, even as the market was faltering.

"To compensate for roughly $24 billion in write downs in the second half of last year, Merrill Lynch raised $12.8 billion in capital during the past two quarters and Chief Executive John Thain said he doesn't plan to raise any more."

A year ago, the picture was much different. Merrill Lynch was basking in a 31% increase in quarterly profit, as trading revenue and investment banking fees soared. The bank turned in a record performance of $9.9 billion in revenue and $2.2 billion, or $2.26 per share, in net income.

"Executives knew the subprime sector was weakening but did not fathom what it would do the [sic]storied institution. Jeff Edwards, Merrill Lynch's chief financial officer at the time, sought to assure investors on the April 2007 conference call."

"At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors," [Jeff] Edwards said."

This year, after three straight quarterly losses, Merrill Lynch highlighted some of the strengths in its other businesses. It garnered record quarterly net revenue in its global wealth management division and had "significant" revenue growth from its stake in BlackRock, an investment management company. It also said it had a "healthy" investment banking fee pipeline, down only 5% overall from the end of 2007.

"The company has $82 billion in liquidity, more than its funding obligations, executives said on a conference call. Still, Merrill Lynch is looking to lower its capital needs by reducing its balance sheet and trimming back illiquid assets."

"The staff reductions will save the investment bank $800 million a year, though it will record a $350million restructuring charge in the second quarter. Merrill Lynch has 63,000 full-time employees, including 16,600 financial advisers."

""They are writing off everything they possibly can, but I think we have more to go," Grant said."

210. An April 17, 2008 Forbes article entitled *Merrill Trips Up Street* stated, in part, the following:

"Merrill said it lost $2 billion in the first quarter after another $1.5 billion in write-downs, and reported it still had exposure to U.S. asset-backed security collateralized debt obligations of $6.7 billion, up from $5.1 billion at the end of 2007."

"Merrill also announced it will cut about 4,000 jobs to save about $600.0 million in 2008 and $800 million a year moving forward."

211. An April 17, 2008 Financial Planning article entitled *The Bright Spot in Merrill's Results* stated, in part, the following:

Merrill Lynch reported a net loss from continuing operation of $1.97 billion for the first quarter of 2008. Meanwhile, the wealth management division increased record net revenues 7% to $3.6 billion from the same time period last year. But the division's pre-tax profit decreased 8% to $720 million as the firm prepared a loss reserve for an $80 million client receivable. Merrill attracted $4 billion of net new money over the quarter but this was largely offset by the downturn in the market and total client assets of $1.6 trillion were virtually unchanged from the year before.

212. An April 17, 2008 Investors Business Daily article entitled *Merrill Lynch Misses Views, But Shares Rise On* stated, in part, the following:

"Merrill Lynch (MER) said Thursday it lost money for a third consecutive quarter, wrote down risky assets by a further $6.6 billion and will cut more jobs."

"But its shares rose 4% on hints that profits will return."

"Merrill lost $2.20 a share in the first quarter, or about $2 billion. That was worse than Wall Street expected and nearly as much as the brokerage made a year earlier."

"Net revenue plunged 69% to $2.93 billion, also below views."

Wall Street has viewed Merrill as one of the most vulnerable big financials after Bear Stearns' (BSC) near-collapse. The brokerage lost $2.85 a share in the third quarter of 2007, followed by a huge $12.57-a-share loss in the fourth. It has written down about $30 billion in mortgage debt and other risky assets since the credit crunch began.

"Merrill plans to ax 4,000 jobs, or 10% of total staff this year. It already cut 1,100 in the first quarter."

"The wealth management unit's revenue rose 8%, a rare bright spot. "
"But investment banking revenue and proprietary trading fell sharply from the prior quarter."

"[John Thain] said the firm's $82 billion in excess liquidity should help protect it against choppy market conditions. It has raised about $12 billion in capital since late last year."

"[John Thain] had said Merrill was finished raising new equity money, but told analysts Thursday he was open to issuing preferred shares."

"[John Thain] said results were "actually much worse" than they appeared on the surface due to a $3.1 billion pretax write-down on its U.S. Banks' investment securities portfolio. It was recognized in "other comprehensive income" rather than on the income statement."

"Some observers said Merrill was not transparent about future write-downs."There's not enough information to opine on it," said Janet Tavakoli, a structured finance specialist. "It's up to them to open the kimono a bit.""

"We were surprised to see the firm's direct exposure to ABS CDOs increase to $6.7 billion in the first quarter of 2008 from $5.1 billion last quarter even after taking a $1.5 billion write-down in the quarter," [John Thain] wrote."

213.   An April 18, 2008 CNBC article entitled *Market 360: A Weekly Wrap of US Equity Markets, Commodities, Currencies, and More* stated, in part, the following:

> Merrill Lynch reported a worse than expected first quarter net loss of $2.19 / share driven by write-downs in mortgage-related securities; it also plans to cut a total of 4,000 jobs. Nonetheless, CEO John Thain sees brighter business conditions in April, and shares rallied 8.40% for the week.

214.   An April 18, 2008 Daily Times article entitled *UK's FTSE 100 Slumps 0.3 Percent* stated, in part, the following:

> "The FTSE 100 slipped out of positive territory after first-quarter earnings from Merrill Lynch. The world's largest brokerage reported a first quarter loss, after taking several billion dollars of writedowns for subprime mortgages and other risky assets."

215.   An April 18, 2008 Washington Post article entitled *Merrill Posts Wide Loss, Plans to Cut 3,000 Jobs* stated, in part, the following:

> In reporting its third straight quarterly loss, the bank said its exposure to collateralized debt obligations, responsible for much of the meltdown in credit markets, actually increased in the first three months of the year. This is partly because the steps Merrill had taken to hedge, or reduce the risk of falling prices, had failed.

> Despite Merrill's results, which were worse than most analysts' expectations, its shares rose more than 4 percent Thursday. This is an indication of how low the bar had been set for a beleaguered financial sector that has repeatedly reported disastrous earnings, analysts said.

216.   An April 18, 2008 Reuters article entitled *Financial Stocks Rally As 1st Wave of Earnings are Reported* stated, in part, the following:

> Merrill Lynch took $6.5 billion in write-downs during the first quarter tied to mortgage and credit related problems. Overall, the investment bank lost $2.14 billion in the period. But those losses did not stop the bank's shares from rising 4 percent Thursday, the day it announced the losses. Since the middle of 2007, Merrill Lynch has taken about $29 billion in write-downs. Shares rose 8.4 percent for the week, to $47.35.

217.    An April 23, 2008 Bloomberg article entitled *Most U.S. Stocks Fall on Earnings Reports, Manufacturing Slump* stated, in part, the following:

> "Merrill Lynch & Co. advanced even after posting its third straight quarterly loss and writing down at least $6.5 billion of debt. Merrill, the third-biggest U.S. securities firm, climbed $1.82 to $46.71, paring its decline over the past year to 48 percent."

218.    Merrill Lynch released its March 2008 10-Q on May 6, 2008, which was signed by Nelson Chai, Executive Vice President and Chief Financial Officer. The company disclosed that its Level 3 assets rose 69 percent during the first quarter from $48.6 billion on Dec. 28, 2007 to $82.4 billion on Mar. 28, 2008. *See* Merrill Lynch Quarterly Report (Form 10-Q) (Sep. 28, 2007). Merrill added $7 billion worth of mortgage-laden collateralized debt obligations to the Level 3 category in the first quarter, along with $2 billion more of derivatives on subprime securities, $18 billion of credit derivatives not related to mortgages, and $7.6 billion in derivatives tied to equities, currencies and commodities.

219.    Both stock analysts and the financial press have expressed concern about the 69% increase in Level 3 assets in just one quarter[76] because "Level 3 assets are those whose valuation is essentially a best guess by the investor, because there is virtually no active trading market for the product to use as a pricing guide."[77]

---

[76] It is also important to note that this increase comes after Merrill Lynch's previous reclassification of a significant amount of CDO and subprime securities in the third quarter 2007.

[77] *See Merrill Lynch Level 3 Assets Increase Through March,* CNNMoney.com, May 6, 2008 *available at* http://money.cnn.com/news/newsfeeds/articles/apwire/c278ee62746c916ea9e0f9913fd59fcf.htm. *See* Liz Moyer, *Level 3: Merrill Keeps Feeling The Crunch*, Forbes, May 6, 2008.

220.    The increase in Level 3 represents an incrementally higher probability--but not a certainty--that more write-downs are coming," said Fox Pitt Kelton analyst David Trone, in a research note about Merrill dated May 6, 2008.[78]

221.    Moody's Investors Service said that it has placed Merrill Lynch on review for a possible downgrade after the earnings report, citing "continued deteriorating conditions in the mortgage market and the increased expected losses on MER's portfolio of super-senior CDOs [sic] as measured in Moody's stress test."[79]

## DEMAND FUTILITY

222.    Plaintiffs bring this action derivatively in the right and for the benefit of Merrill Lynch to redress damage suffered and to be suffered by Merrill Lynch as a direct result of the Individual Defendants' breaches of fiduciary duty, corporate mismanagement, and abuse of control.  This is not a collusive action to confer jurisdiction in this Court which it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of Merrill Lynch and its shareholders in enforcing and prosecuting their rights.

223.    Merrill Lynch's Board at the time this case was commenced was made up of the following 10 directors: Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese and Rossotti.   Plaintiffs did not make a demand on that Board of Directors of Merrill Lynch to institute this action because such demand would be a futile and useless act for the foregoing and following reasons:

---

[78]    *See* Liz Moyer, *For Merrill's Thain, A Tough Road Ahead,* Forbes, May 6, 2008.

[79]    Paul Jackson, *Merrill Posts Quarterly Loss, $4.3 Billion in Mortgage-Related Writedowns,"* HousingWire.com, April 17, 2008, *available at* www.housingwire.com/2008/04/17/merrill-posts-quarterly-loss.

**The Audit and Finance Committees Completely Failed in**
**Their Oversight Role of Managing the Company's Risk**

224. The Board's Finance Committee is responsible for reviewing the Company's "policies and procedures for managing exposure to market and credit risk." Further, the Finance Committee is required to review "significant risk exposures and trends in these categories of risk." Defendants Cribiore, Finnegan, Reese and Rossotti are on Merrill Lynch's finance committee. Until recently, Defendant Finnegan was the committee's chair. The charter of the Finance Committee states that committee members have the responsibility to assist the Board in fulfilling its oversight responsibilities relating to:

    A.    Financial commitments and investments;

    B.    The Corporation's financial and operating plan;

    C.    The Corporation's financing plan, including funding, liquidity and insurance programs;

    D.    Balance sheet and capital management; and

    E.    Credit and market risk management.

225. The Finance Committee was required to meet no less than three times per year. The Committee is required to "report regularly to the Board with respect to such matters that are within the Committee's responsibilities."

226. The Finance Committee members – Defendants Cribiore, Finnegan, Reese and Rossotti – had the following additional specific responsibilities:

    A.    Financial Commitments and Investments

        1.    The Committee shall review and approve the Corporation's policies governing the use of funds to acquire, create or dispose of an asset of long term value, including technology and real estate commitments and acquisitions and divestitures of businesses.

        2.    The Committee shall review and approve the Corporation's policies governing acquisition of ownership stakes in entities, funds or assets other than through a liquid or publicly traded

security, where the investment is intended to be monetized or is not intended to be operated as a core business ("principal investments").

3. The Committee shall review and approve specific financial commitments and principal investments to the extent required by such policies.

4. The Committee shall periodically review financial commitments and principal investments effected pursuant to such policies.

B.    Financial and Operating Plan

1. The Committee shall review the annual financial and operating plan.

C.    Financing Plan/Insurance

1. The Committee shall review the Corporation's financing plan, including funding and liquidity policies and programs.

2. The Committee shall have the authority to authorize and, where appropriate, establish limits for the incurrence of debt by the Corporation and its subsidiaries.

3. The Committee shall periodically review the Corporation's insurance programs(other than Directors' & Officers' Insurance, which is reviewed by the Nominating and Corporate Governance Committee).

4.

D.    Balance Sheet and Capital Management

1. The Committee shall review management's framework for balance sheet management, including categories of assets and liabilities and levels of commitment. The Committee shall also periodically review capital allocation methodologies.

2. The Committee shall review regulatory capital, leverage ratios and similar measures of capital adequacy.

3. The Committee shall review and recommend the Corporation's capital management policies and programs relating to common stock, including dividend policy, repurchase programs, and stock splits.

4. The Committee shall have the authority (i) to approve the issuance and sale of, and fix all the designations and any of the preferences of, preferred stock of the Corporation to the extent and within the limits authorized by the Board, (ii) to declare and pay dividends and designate record and payable dates on the Corporation's preferred stock, (iii) to authorize the repurchase of any or all of the Corporation's preferred stock and (iv) to take any other related actions with respect to the Corporation's preferred stock.

E.   Risk Management

1.   The Committee shall review the Corporation's policies and procedures for managing exposure to market and credit risk, including the framework for counterparty credit risk management, trading limits and VAR or other relevant models.

2.   The Committee shall, as appropriate, review significant risk exposures and trends in each of these categories of risk.

227.   To comply with these substantial duties, the Finance Committee members were explicitly granted by the Finance Committee charter "full, free and unrestricted access to the Corporation's senior management and employees."

228.   The Finance Committee members – Defendants Cribiore, Finnegan, Reese and Rossotti – are not independent and objective because they face a substantial likelihood of liability for their failure to manage the Company's credit risk, including their failure to properly review significant risk exposures and trends in the relevant categories of risk faced by Merrill Lynch.   The Finance Committee members also breached their duties in authorizing the Company's stock repurchase plan.

229.   The Board's Audit Committee is also responsible for reviewing "the framework established by management to assess and manage the major categories of risk."   The audit committee is also in charge of reviewing Merrill Lynch's "policies and processes for managing operational, legal and reputation risk."   Defendants Jonas, Prueher, Reese, and Rossotti, were on Merrill Lynch's Audit Committee during the Relevant Period.

230.   The Company's Audit Committee charter states that the role of the Audit Committee is to assist the Board in fulfilling its oversight responsibility relating to the:

A.   Preparation and integrity of the Corporation's financial statements and oversight of related disclosure matters;

B.   Qualifications, independence and performance of, and the Corporation's relationship with, its registered public accounting firm (the "independent auditor");

C.   Performance of the Corporation's internal audit function and internal controls; and

D.  Compliance by the Corporation with legal and regulatory requirements.

E.  Provide the report required by the rules of the Securities Exchange Commission (the "Commission") to be included in the Corporation's annual proxy statement.

231.  The Audit Committee was required to meet at least six times per year and had the following additional specific requirements:

The Committee shall meet as frequently as it determines, but not less frequently than six times per year. The Chair of the Committee, or any two members of the Committee, (in consultation with the Chair where possible) may call meetings of the Committee. Meetings of the Committee may be held telephonically.

The Chair shall preside at all sessions of the Committee at which he or she is present and shall set the agendas for Committee meetings. All members of the Board of Directors are free to suggest to the Chair items for inclusion in the agenda for the Committee's meetings. The agenda and information concerning the business to be conducted at each Committee meeting shall, to the extent practical, be communicated to the members of the Committee sufficiently in advance of each meeting to permit meaningful review.

The Committee shall meet periodically in separate private sessions with management, the internal auditors, the independent auditor and the General Counsel. The Committee may request any officer or employee of the Corporation or the Corporation's outside counsel or independent auditor to attend a meeting of the Committee or to meet with any member of, or advisers to, the Committee.

The Committee shall report regularly to the Board with respect to such matters that are within the Committee's responsibilities and with respect to such recommendations as the Committee may deem appropriate. The report to the Board may take the form of an oral report by the Chair or by any other member designated by the Committee to make such report. The Committee shall maintain minutes or other records of meetings and activities of the Committee. The Committee shall provide the report of the Committee to be contained in the Corporation's annual proxy statement, as required by the rules of the Commission.

232.  The Audit Committee also has the following significant duties:

Financial Statements and Disclosure Matters

1.  The Committee shall meet to review and discuss with management and the independent auditor the Corporation's annual audited and quarterly

consolidated financial statements, including the disclosures contained in the Corporation's Annual Report on Form 10-K ("Form 10-K") and its Quarterly Reports on Form 10-Q ("Form 10-Q"), under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations." After review of the annual audited consolidated financial statements and the reports and discussions required by Sections IV.A.7. and IV.B.5. of this Charter, the Committee shall determine whether to recommend to the Board of Directors that such financial statements be included in the Corporation's Form 10-K.

2.   The Committee shall be advised of (i) the execution by the Corporation's Chief Executive Officer and Chief Financial Officer of the certifications required to accompany the filing of the Form 10-K and the Forms 10-Q, and (ii) any other information required to be disclosed to it in connection with the filing of such certifications.

3.   The Committee shall discuss with management and the independent auditor any significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles, and any major issues as to the adequacy and clarity of the Corporation's disclosure procedures.

4.   The Committee shall review and discuss the quarterly reports from the independent auditor on:

   a.   All critical accounting policies and practices to be used.

   b.   All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment recommended by the independent auditor.

   c.   Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

5.   The Committee shall discuss with management the Corporation's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, and financial information and earnings guidance, if any, provided to analysts and rating agencies. Such discussion may be conducted generally (i.e., by discussing the types of information to be disclosed and the types of presentations to be made). The Committee may delegate responsibility for the review of the quarterly earnings press release to a member of the Committee.

6. The Committee shall discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Corporation's financial statements.

7. The Committee shall discuss with the independent auditor the matters required to be discussed by Public Company Accounting Oversight Board Interim Auditing Standard AU Section 380, "Communications with Audit Committees" relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

233. To carry out its substantial duties, the Audit Committee members (Defendants Jonas, Prueher, Reese, and Rossotti) were given absolute and unrestricted access to all senior management and the auditor:

> The Committee shall have full, free and unrestricted access to the Corporation's senior management and employees, and to the Corporation's internal and independent auditors.

234. The Audit Committee members also had the power to retain their own advisors at the Company's expense and without obtaining approval of any executive officer:

> The Committee has the authority to retain legal counsel, consultants, or other outside advisers, with respect to any issue or to assist it in fulfilling its responsibilities, without consulting or obtaining the approval of any officer of the Corporation.

> The Corporation shall provide for appropriate funding, as determined by the Committee, for payment (i) of compensation to the independent auditor, (ii) to any advisers retained by the Committee, and (iii) of any ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out the Committee's duties.

235. By allowing Merrill Lynch to take on billions of dollars in CDO and subprime debt — $30.8 billion of which has already been written down — the Finance and Audit Committees completely failed to fulfill their oversight responsibilities. As detailed by Forbes.com:

Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for not catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion at the end of June [2007] just before the market started to crater.

236.    The Director Defendants sitting on Merrill's Audit and Finance Committees consciously disregarded unacceptable and huge financial risks. The extent of the damage they have caused Merrill is massive. After the recent implosion of Bear Stearns, analysts at Wachovia recently called Merrill "the riskiest of the remaining monoline banks" with subprime CDO exposure of *$30.4 billion – 3.3x the group average*. Merrill also has the worst liquidity ratio of major banks, at 52% and the highest leverage ratio in the industry of 31.9%. These factors vastly increase the expense of any additional capital that Merrill needs to raise.[80]

237.    The Director Defendants who sat on Merrill's Audit and Finance Committees also failed miserably in disclosing Merrill's addiction to the subprime market. Merrill's 2006 Form 10-K Annual Report mentions the word "subprime" only twice. But by then Merrill was already addicted to subprime loans, using them to collateralize debt obligations it could package and sell for rich fees. To feed this improvident appetite, as discussed below, the director defendants caused Merrill to pay $1.3 billion to purchase subprime originator First Franklin at the peak of

---

[80]    Merrill sold stock to two "rescuers" on Christmas Eve 2007 – Temasek (an arm of the Singapore government) and Davis Selected Advisors – for $48 a share. At the time, the price was an 11% discount to Merrill's stock price and 43% less than Merrill had spent earlier in the year to buy back $5.3 billion in stock. Wachovia senior analyst Douglas Sipkin noted that Merrill ended 2007 with $79 billion in its excess liquidity pool and that the broker had $22.3 billion available to it through a number of credit facilities at the end of the fourth quarter. "In the event of a ratings downgrade," Sipkin said, "Merrill Lynch must post additional collateral and make termination payments of $4 billion, highest among the group." Another issue of note, Wachovia contends, is Merrill's agreement on its $6.2 billion capital raise with Temasek Holdings and Davis Select Advisors. The firm said a **price reset agreement** is in place with the two parties in that if Merrill raises additional common stock or convertible securities with a price or reference below $48 a share within one year of closing, Merrill must pay both Temasek and Davis the aggregate excess amount.

the market in December 2006. Merrill had to close First Franklin just fifteen months later, incurring $200 million in charges and firing 650 people.

238.    Defendants Jonas, Prueher, Reese, and Rossotti, as members of the Audit Committee, and Defendants Defendants Cribiore, Finnegan, Reese and Rossotti, as members of the Finance Committee, consciously ignored significant red flags which demonstrated that the Company's risk management and financial investment policies were inadequate and overly risky. For example, in 2006 Defendant O'Neal fired Jeff Kronthal, one of the Company's top traders, because Kronthal objected to the Company's wildly excessive increased exposure to the subprime market which was being orchestrated by O'Neal and by Christopher Ricciardi, Managing Director and head of Global Structured Credit Products. Kronthal urged O'Neal and others at the Company to curb the Company's exposure to the subprime market in light of increasing public indications of credit deterioration and lax underwriting standards in the origination of mortgages. When Kronthal continued to object to the policies of O'Neal and Ricciardi, O'Neal fired Kronthal. Kronthal's firing was big news at Merrill and the director defendants on the Audit Committee and Finance Committee were aware of the firing and the reasons for it. Nonetheless, despite their duties as members of the Audit and Finance Committees, Defendants Jonas, Prueher, Reese, Cribiore, Finnegan, and Rossotti did not take adequate steps in 2006 and 2007 to curb Merrill's unreasonable risk in subprime investments.

239.    Ironically, in December 2007 Merrill's new CEO Thain hired Kronthal back. When he returned, Kronthal received a standing ovation from Merrill employees, who recognized that Kronthal's very public exhortations to O'Neal and other top executives at Merrill had gone unheeded in 2006 and 2007. Thain hired Kronthal to direct the very areas that the Audit and Finance Committee members had ignored – risk management.

240. Moreover, Defendants Reese and Rossotti are labeled as "Audit Committee Financial Experts" by Merrill Lynch and thus had a particular ability to detect and prevent the inappropriate exposure to the subprime market and the false financial statements that the Individual Defendants caused the Company to issue. Moreover, the rest of the members of the Audit Committee were "financially literate" according to Merrill's 2008 Proxy Statement: "In addition, all members of the Audit Committee meet the financial literacy requirements of the NYSE and at least one member has accounting or related financial management expertise, as required by the applicable SEC and NYSE rules."

241. By mid-2007, Merrill had $150 billion in illiquid investments – four times its equity. Nonetheless, the Director Defendants ignored these known risks which sat on Merrill's balance sheet like a ticking time bomb. As noted above, the members of the Audit and Finance Committees were required to meet at least six and three times, respectively, per year with the Company's senior executives and review all issues concerning the Company's risk management. Thus, the Audit and Committee members became aware of the increased risks to Merrill Lynch's subprime investments (which were not only know within the Company, but which were public knowledge by early 2007) and consciously disregarded these risks and failed to carry out their fiduciary duties to manage such risks.

242. Indeed, according to the *New York Times*, Merrill Lynch's Board had been informed of its subprime exposure and CDO obligations as early as April and July 2007, respectfully.[81] Despite the Company's vast exposure to CDOs and subprime, the Board failed to take any action to decrease the risks faced by the Company.

---

[81] Graham Bowley and Jenny Anderson, *Where Did the Buck Stop at Merrill?*, N.Y. Times, Nov. 4, 2007.

243.     Moreover, the members of the Audit Committee and Finance Committee face a particularly high substantial likelihood of liability because they were the ones directly responsible for ensuring adequate risk management. "According to some analysts, the billion-dollar size of [fixed-income CDO] profits – and the soaring return on equity – should have caused directors to ask whether the risks being taken to generate higher profits warranted better controls."[82]    Or, as stated by one corporate and securities law professor, "[There are] no free lunches in the capital markets …If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't."[83]

244.     As summarized by Brian Foley, an executive compensation expert, the Merrill Lynch situation "looks like a systemic problem in terms of risk management and risk control – the whole nine yards…. There seems to be some blame to go around."[84]

245.     Based on the director defendants' conscious disregard and failure to limit the Company's aggressive exposure to risk, one of Merrill Lynch's largest institutional investors has recommended that shareholders vote against re-electing the members of the finance committee to the Board, absent a compelling explanation or immediate changes to the composition to the finance committee.  Specifically, in January 2008, the CTW Investment Group ("CtW"), a coalition of union pension funds with about $1.4 trillion in assets, sent a letter to the members of Merrill Lynch's finance committee expressing its concern that the finance committee failed to control the Company's "exposure to mortgage-related risk in general and its investments in

---

[82]  *Id.*

[83]  *Id.*

[84]  *Id.*

complex, mortgage-backed derivatives in particular." CTW noted several factors that likely caused the finance committee to completely fail in its oversight role, including:

> The Finance Committee's chairman during 2007, Defendant Finnegan, has a "long personal and business relationship with Defendant O'Neal. As discussed below, that relationship compromised his willingness to reign in O'Neal's aggressive risk and outsized compensation.

> In addition, Defendant Finnegan is the Chairman, CEO and President of The Chubb Corporation. As such, he did not have the time to effectively monitor Merrill Lynch's exposure to mortgage risk and fully understand its investments in complex derivatives. For this very reason, many institutional investors have proxy voting policies that dictate that CEOs should restrict their service on outside boards.

> Further, the Board's decision to split responsibility for risk oversight between the audit and finance committees "may have had the effect of diffusing responsibility to the detriment of the corporation and its shareholders."

246. Based on the above, each member of the Company's Audit and Finance committees cannot independently analyze or investigate the claims asserted in this action because each face a real and substantial danger of personal liability in this action.

### The Audit Committee Allowed Merrill Lynch to Issue False and Misleading Financial Statements

247. In addition to its role in managing risk, the Audit Committee is also responsible for ensuring the integrity of Merrill Lynch's financial statements. The Audit Committee completely failed to fulfill its oversight role by allowing Merrill Lynch to file financial statements with the SEC that, as discussed above, did not accurately describe the risks the Company faced as a result of its unreasonable and outsized exposure to CDOs and subprime loans. As such, no member of the Audit Committee can independently analyze or investigate the claims asserted in this action because each faces a real and substantial danger of personal liability in this action.

### In A Unanimous Vote, The Director Defendants Gave O'Neal
### An Undeserved $161 Million "Golden Goodbye"

248.   As discussed above, Merrill Lynch's Board allowed O'Neal to retire rather than terminating him with cause.  Even worse, the Board **unanimously** voted to give O'Neal a retirement package worth $161 million.  Not surprisingly, Wall Street was disturbed by the Board's decision.  So were members of the United States Congress.  In March 2008, the House Committee on Oversight and Government Reform called O'Neal before it as part of its investigation into "CEO Pay and the Mortgage Crisis."  The day before the hearing, the majority staff released a memorandum detailing the findings of its investigation.  Based on its review of Merrill Lynch's Board minutes, emails and SEC filings, as well as its consultations with leading experts in executive compensation, the majority staff raised the following concerns about O'Neal's retirement package:

> By far the largest component of O'Neal's retirement package was $131 million in unvested stock and options.  If the board had terminated O'Neal for cause, he would have been required to forfeit these unvested stock and options.  "No documents were provided to the Committee that indicated that the board ever debated terminating Mr. O'Neal for cause or considered withholding all or part of Mr. O'Neal's $131 million in unvested stock and options.  From a shareholder perspective, there appears to be no justification for precluding the board from recouping unvested stock and options in cases of poor performance."

> O'Neal signed a non-compete agreement in 2004 prohibiting him from working for any Merrill Lynch competitor (defined broadly) for three to four years from the time of his retirement.  As part of his retirement package, the board agreed to modify O'Neal's noncompetition agreement to apply to only nine specific companies for a period of 18 months.  These changes in the competition agreement were approved at a special meeting of the compensation committee on October 29, 2007 and at a meeting of the full board the next day.  Only one board member, defendant Peters, raised any objection to loosening O'Neal's noncompetition restrictions.  "The documents the Committee received provide no explanation why the narrowing of Mr. O'Neal's noncompetition agreement was determined to be in the best interests of Merrill Lynch and its shareholders."

> Because O'Neal did not have an employment agreement with Merrill Lynch, he was not entitled to continued perquisites after he departed.  Nonetheless, the board

agreed to provide O'Neal with office space in New York for his personal use and the services of full-time executive assistant for a period of three years. "The documents do not reflect what shareholder value the board hoped to obtain by providing these perquisites to Mr. O'Neal."

249.   In sum, each of the Director Defendants wasted the Company's assets in that O'Neal's retirement package was exorbitant given the circumstances and because the retirement package was given without consideration since the Company could have, and should have, terminated O'Neal's employment for cause.   As such, each Director Defendant faces a substantial threat of personal liability for such conduct.

### Defendants Face a Substantial Likelihood of Liability

250.   Several of the Company's current and former executives and directors, as well as the Company itself, have been named as defendants in the securities fraud class action cases pending before this Court.   Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jones, Peters, Prueher, Reese and Rossotti will not authorize the maintenance of this suit because discovery in this case and/or in the securities fraud suit will likely reveal wrongdoing by such directors of the Company and thus expose them to a significant likelihood of liability.

251.   The SEC, which previously announced an informal inquiry into Merrill Lynch due to the conduct alleged in this complaint, transformed its inquiry into a "formal" inquiry in February 2008.   The United States Attorney's Office for the Southern District of New York announced an investigation of Merrill Lynch in early 2008.   The New York Attorney General has issued a subpoena to Merrill Lynch related to the conduct alleged herein.   As indicated above, the Massachusetts Attorney General sued Merrill Lynch for securities fraud a day after Merrill agreed to buy back CDO securities sold to Massachusetts at their original value.   All these governmental investigations involve factual issues that also serve as a central focus of the wrongdoing alleged in this Complaint.   Thus, the Director Defendants cannot be expected to

remain independent and objective concerning conduct that occurred under their watch and for which they could ultimately face responsibility and/or culpability.

### Given Their Close Ties to O'Neal, a Majority of the Board Would Not Vote to Approve This Lawsuit

252.    With exception of Defendants Peters and Prueher, every person who was on Merrill Lynch's Board when O'Neal was named chief executive has since retired.  O'Neal personally handpicked their successors.  As such, Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Reese and Rossotti are so beholden to O'Neal that they would not pursue an action against him or those who acted in concert with him during the Relevant Time Period.

253.    In addition, O'Neal has close personal ties with many of the Director Defendants such that they would not vote to pursue an action against him or those who acted in concert with him during the Relevant Time Period.  For example, Forbes.com reports that Defendant Finnegan and O'Neal are long time friends.  And as mentioned above, CtW questioned Finnegan's willingness to reign-in O'Neal's aggressive risk and outsized compensation given their long personal and business relationship dating back "to the time they worked together in General Motors treasury department."  Likewise, press reports have described Defendant Cribiore as close to O'Neal, and the New York Times has reported that in the late 1990s, Cribiore came close to recruiting O'Neal away from Merrill Lynch to work at Brera Capital.

### Several of the Director Defendants have Already Been Named as Defendants in the ERISA Litigation

254.    In addition to this derivative action, several "ERISA" lawsuits have been filed by Merrill Lynch employees.  Among others, Defendants Cribiore, Codina, Colbert, Finnegan and Peters are named as defendants in these lawsuits.  As members of the committees in charge of the Company-sponsored-employee-retirement plans, these defendants had a heightened fiduciary

duty to know all important details that affected the value of Merrill Lynch's stock and its appropriateness as an investment vehicle for Merrill's retirement plan. These defendants breached that duty by allowing the retirement plans to invest heavily in Merrill Lynch' stock at the same time the Company had become disastrously overexposed to CDO and subprime loans. As a result, they face a substantial threat of liability in the ERISA case. Thus, these defendants are unlikely to authorize this derivative action as it will only further uncover their gross negligence in allowing the Company to become heavily overexposed to the CDO and subprime market.

**All the Director Defendants Authorized the Purchases of First Franklin and First Republic, and Then Authorized a Massive Stock Repurchase Program to Keep Merrill Lynch's Stock Inflated Until the Exchange Ratio for the First Republic Merger Was Fixed**

255. As discussed above, while most investment banks sought to get out of the subprime market, Merrill Lynch dove even deeper into it by purchasing First Franklin in December 2006. Specifically, on December 30, 2006, the Board authorized the purchase of First Franklin for $1.3 billion. By this time, the heightened risks in the subprime market were already well known. Notwithstanding their knowledge or reckless disregard of Merrill's over-exposure to these risks, the director defendants caused Merrill to increase its exposure to the subprime market by authorizing the purchase of First Franklin. As a result, the Company has suffered even further losses. Indeed, in March 2008 the Board caused the Company to close down First Franklin all together. As such, all the directors face a substantial threat of liability and, thus none will authorize this suit.

256. On January 29, 2007, Merrill Lynch announced that it would acquire another bank – First Republic – for $1.8 billion.

257.    By February 2007, the stock market was already questioning why Merrill chose to significantly increase its exposure to the subprime market at a time when defaults were increasing and many players were exiting the subprime market.  Merrill Lynch's acquisition of First Franklin threatened Merrill's ability to make other strategic acquisitions.[85]  Market analysts noted that "First Franklin is going to be more of an integration and absorption issue" and that "trying to navigate the subprime mortgage market at a time when delinquent borrowers are defaulting on loans in droves could slow down the company's acquisition plans."[86]

258.    With full knowledge of these significant problems in February 2007, the Finance and Audit Committee members not only did nothing to decrease Merrill's substantial risk to the subprime market, they took steps to perpetuate the problem and delay the inevitable.  Merrill Lynch needed to keep its stock price inflated in order to facilitate the First Republic transaction, which was set to close in September 2007, and in fact closed on September 21, 2007.  Based on the merger agreement, the aggregate consideration would be paid with 50% Merrill Lynch common stock and 50% cash.  The exchange rate used to calculate the number of Merrill Lynch shares paid to First Republic shareholders was based on Merrill Lynch's average closing price over the five trading days preceding Sept. 21, 2007, which was $75.02 per share.  Merrill Lynch wanted and needed to keep its stock inflated so that it could issue as few shares of Merrill stock as possible to First Republic shareholders.  If Merrill's stock price declined in the February to September 2007 time period, then Merrill would have to issue more shares of its stock to First Republic shareholders, which would cause dilution and impair Merrill's acquisition strategy.

259.    To avoid this, the members of the Finance Committee authorized and the full

---

[85]  *See* Shaheen Pasha, "Merrill Strategy Threatened by Bad Loan Market," CNN Money.com, Feb. 21, 2007.

[86]  *Id.*

Board approved a massive $6 billion stock repurchase program, which was publicly announced on April 30, 2007. This repurchase plan was intended and designed to keep Merrill's stock artificially inflated at least through the completion of the First Republic acquisition. Indeed, the stock repurchase plan was needed because analysts had begun to actively question Merrill's huge risk to the subprime market near this time. Reacting to the increasing tide of publicly-available information about increased risks in the subprime market, some analysts questioned the risk posed by Merrill Lynch's exposure to the subprime mortgage market in April 2007. Defendant O'Neal unequivocally dismissed those concerns in an effort to keep Merrill's stock inflated as long as possible. As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses could make bonds that it issues riskier than rivals such as Bear Stearns Cos., the biggest issuer of mortgage-backed securities on Wall Street.

> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive Stanley O'Neal told Dow Jones that reports have "exaggerated and misunderstood the nature of the business and how it's managed … and it's not consistent with what I would assess the state of the business to be."[87]

260. The timing of Merrill's eventual belated disclosure of its massive write-downs related to its subprime investments on October 5, 2007 – just weeks after completion of the First Republic transaction – was highly suspect, and analysts at the time questioned why Merrill had waited so long to take write-downs. Analysts and the market were also shocked at the magnitude of the write-downs.

261. As discussed above, First Republic shareholders sued Merrill Lynch for securities fraud. Had Merrill Lynch disclosed the truth about its financial and business prospects, the Company's stock would have dropped in value and Merrill Lynch would have had to issue a greater number of shares to purchase First Republic. As a consequence, the merger may not

---

[87] David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12, 2007

have been approved by First Republic's Board of Directors or its shareholders. Merrill therefore failed to disclose the truth about its exposure and losses to CDO and subprime securities until three weeks after the merger closed and therefore was able to purchase First Republic with inflated stock.

### The Insider Selling Defendants' Illicit Insider Sales

262. Defendants caused or allowed Merrill Lynch to issue false and misleading press releases and financial reports during the Relevant Period, and failed to disclose material, nonpublic information necessary to make such press releases and financial reports not false and misleading. As a result of these false and misleading statements and omissions, the price of the Company's stock was artificially inflated.

263. Defendants were motivated to engage in the wrongdoing herein, resulting in the artificial inflation of the Company's stock, in order to allow certain of the Individual Defendants to profit from their sales of Merrill Lynch common stock during the Relevant Period.

264. As detailed above, the Individual Defendants, as officers of the Company, were privy to confidential financial information concerning the Company's business, financial condition, future business prospects and outlook. In this capacity, the Individual Defendants had access to material, nonpublic information concerning the Company's true financial condition and the precarious position the Company was in as a result of its improper and unsound business and investment practices.

265. Notwithstanding the duty not to sell Merrill Lynch common stock under these circumstances, or to disclose the material, nonpublic information prior to selling the stock, the Insider Selling Defendants sold Merrill Lynch stock at prices that were artificially inflated by Defendants' materially false and misleading statements and omissions.

266. Specifically, at the commencement of the Relevant Period during the week of February 1, 2007 through February 7, 2007, the Insider Selling Defendants, while in possession of material, nonpublic information regarding the Company's true business prospects, improperly sold 748,007 shares of their Merrill Lynch stock for total proceeds of $70,128,522.05:

| Merrill Lynch Insider Sales | | |
|---|---|---|
| Relevant Period (2/1/07- 2/7/07) | | |
| **Named Defendant** | **# of shares** | **Proceeds** |
| Jeffrey Edwards | 30,963 | $2,867,173.80 |
| Ahmass Fakahany | 162,580 | $15,235,050.10 |
| Gregory Fleming | 80,109 | $7,485,026.84 |
| E. Stanley O'Neal | 474,355 | $44,541,271.31 |
| Totals | 748,007 | $70,128,522.05 |

267. These Defendants entered into these illicit insider transactions at a time when Merrill Lynch's stock price was trading near its Relevant Period-high, as shown in the chart below:



268. Based on the foregoing, it would be futile for Plaintiffs to make a demand on Merrill Lynch's Board to initiate this, or a similar, legal action. Demand is therefore excused.

<u>COUNT I</u>
**(Breach of Fiduciary Duties of Care, Loyalty and Good Faith)**

269. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

270. As alleged in detail herein, O'Neal, and each of the Director Defendants, had a duty to Merrill Lynch and its shareholders to, amongst other things, ensure that the Company was operated in a diligent, honest and prudent manner.

271. Plaintiffs assert this claim derivatively on behalf of Merrill Lynch against O'Neal and all of the Director Defendants.

272. O'Neal and the Director Defendants have breached their fiduciary duties of care, loyalty and good faith owed to Merrill Lynch and its stockholders by allowing the Company to assume over $32 million in risky CDOs, $7.8 billion of which has already had to be written down, with more write downs anticipated in the near future.

273. Further, each of the Director Defendants, as well as the Officer Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

274. By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

275. Plaintiffs and Merrill Lynch have no adequate remedy of law.

## COUNT II
### (Corporate Waste)

276.     Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

277.     Plaintiffs allege this cause of action on behalf of Merrill Lynch against O'Neal and the Director Defendants.

278.     O'Neal and each of the Director Defendants owes and owed to Merrill Lynch the obligation to protect Merrill Lynch's assets from loss or waste.

279.     O'Neal and the Director Defendants' failure to adequately evaluate and monitor Merrill Lynch's risk in the CDO market constituted a waste of Merrill Lynch's corporate assets and was grossly unfair to Merrill Lynch.  No person of ordinary, sound business judgment could conclude that O'Neal and the Director Defendants' decision to become so overextended in the risky CDO market was a sound exercise of business judgment.

280.     Further, the Director Defendants committed corporate waste by authorizing and approving O'Neal's exorbitant severance package.  There was no consideration for O'Neal's $160 million severance given that O'Neal was subject to termination for cause.

281.     By reason of the foregoing, Merrill Lynch has sustained and will continue to sustain serious damage and irreparable injury, for which relief is sought herein.

282.     Plaintiffs and Merrill Lynch have no adequate remedy at law for the wasteful and wrongful conduct engaged in by the Director Defendants.

283.     Plaintiffs and Merrill Lynch are therefore entitled to judgment against the Director Defendants as specified below.

138

## COUNT III
### (Against All Defendants for Abuse of Control)

284. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

285. Defendant O'Neil's and the Director Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Merrill Lynch, for which they are legally responsible.

286. As a direct and proximate result of these defendants' abuse of control, Merrill Lynch has sustained significant damages.

287. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

## COUNT IV
### (Against All Defendants for Gross Mismanagement)

288. Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

289. By their allegations alleged herein, Defendant O'Neal and the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Merrill Lynch in a manner consistent with the operations of a publicly held corporation.

290. As a direct and proximate result of these defendants' gross mismanagement and breaches of duty alleged herein, Merrill Lynch has sustained significant damages in excess of $8 billion dollars.

291. As a result of the misconduct and breaches of duty alleged herein, these defendants are liable to the Company.

## COUNT V
**(Against all Defendants for Contribution, Indemnification and Declaratory Relief)**

292.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

293.    Merrill Lynch is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Merrill Lynch.

294.    Merrill Lynch's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and Merrill Lynch is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Merrill Lynch by virtue of the Defendants' misconduct.

295.    Further, Plaintiffs seek a declaration that Merrill Lynch has no duty to advance any legal fees to the Individual Defendants because they did not act in good faith or in any manner they believed to be in the best interest of the Company.

## COUNT VI
**(Against All Defendants for Aiding and Abetting Breach of Fiduciary Duty)**

296.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

297.    In addition to directly breaching their fiduciary duty to the Company, the Individual Defendants aided and abetted the other Defendants' breaches of fiduciary duty in a grossly negligent, willful and reckless manner, as described above.

298. These Defendants knowingly gave substantial assistance and encouragement to the other Defendants and each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

299. As a result of the misconduct alleged herein, Defendants are liable to the Company.

300. By reason of the foregoing, Merrill Lynch was damaged.

301. Plaintiffs, on behalf of Merrill Lynch, have no adequate remedy at law.

## COUNT VII
**(Against All Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information)**

302. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

303. At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Merrill Lynch common stock on the basis of such information.

304. The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Merrill Lynch common stock.

305. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Merrill Lynch common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

306. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**Count VIII**
**(Against All Defendants For Unjust Enrichment)**

307. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

308. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Merrill Lynch.

309. Plaintiffs, as shareholders and representatives of Merrill Lynch, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging their profits, benefits and other compensation by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and in favor of Merrill Lynch against all of the Defendants as follows:

A. Against all the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, and waste of corporate assets;

B. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Merrill Lynch and its shareholders from

142

a repeat of the damaging events described in this Complaint, including but not limited to, adopting the following remedial measures:

        a.    strengthening the board's supervision and oversight responsibilities and developing a system to ensure the Board accurately manages the Company's risk potential;

        b.    prohibiting and individual from concurrently serving as the Chief Executive Officer and the Chairman of the Board;

        c.    allowing the Company's shareholders to nominate at least one candidate for election to the Board; and

        d.    a policy of ensuring the accuracy of the qualifications of Merrill Lynch's directors, executives and other employees;

    C.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts fees, costs and expenses; and

    D.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

    Plaintiffs demand a trial by jury.

Dated: May 21, 2008                Respectfully submitted,

                                    **BROWER PIVEN**
                                    A Professional Corporation

By:                                       
                                    David A.P. Brower
                                    488 Madison Avenue
                                    Eighth Floor
                                    New York, New York 10022
                                    Telephone: (212) 501-9000
                                    Facsimile: (212) 501-0300

                                    *Liaison Counsel and Executive Committee*
                                    *Counsel for Derivative Plaintiffs*

**SAXENA WHITE P.A.**
Joseph E. White, III
Christopher S. Jones
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Telephone: (561) 394-3399
Facsimile: (561) 394-3382

*Executive Committee Counsel for
Derivative Plaintiffs*

**JOHNSON BOTTINI, LLP**
Francis A. Bottini
655 W. Broadway
Suite 1400
San Diego, CA 92101

Telephone: (619) 230-0063
Facsimile: (619) 233-5535

*Executive Committee Counsel for
Derivative Plaintiffs*

# VERIFICATION

I, Miriam Loveman, verify:

I am the Plaintiff in the above-entitled action; I hereby verify that I was a shareholder of Merrill Lynch at the times the misconduct complained of in the Verified Shareholder's Consolidated Amended Derivative Complaint ("Complaint") occurred. Additionally, I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 17th day of May 2008 at Baltimore, Maryland.

Miriam Loveman

## VERIFICATION

I, Carmen Barrasso, verify that,

Plaintiff Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds is a Plaintiff in the above-entitled action. I hereby verify that Plaintiff Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds has been a shareholder of Merrill Lynch both before and during the times the misconduct complained of in the Verified Consolidated Amended Derivative Complaint for Breach of Fiduciary Duties ("Consolidated Amended Complaint") occurred, has continuously held its Merrill Lynch common stock since such time, and continues to hold such shares.

Additionally, I have reviewed the allegations made in the Consolidated Amended Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of May, 2008 at _Bronx_, New York.

Carmen Barrasso
Fund Administrator

JOANN KARAKATSANES
Notary Public - State of New York
No. 01KA6104818
Qualified in Bronx County
My Commission Expires 2012

Joann Karakatsanes

## **VERIFICATION**

I, Patricia Arthur, verify that:

I am a Plaintiff in the above-entitled action. I hereby verify that I have been a shareholder of Merrill Lynch both before and during the times the misconduct complained of in the Verified Consolidated Amended Derivative Complaint for Breach of Fiduciary Duties ("Consolidated Amended Complaint") occurred, and have continuously held my Merrill Lynch common stock since such time, and continue to hold such shares. Additionally, I have reviewed the allegations made in the Consolidated Amended Complaint, and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19 day of May, 2008 at Atherton, California.

_____
Patricia Arthur

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (LBS)(AJP)(DFE) |
| This Document Relates To: Derivative Action, 07cv9696 (LBS)(AJP)(DFE) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 21, 2008, I caused to be electronically mailed and on May 22, 2008, I will mail, first class postage pre-paid with the United States Postal Service, true and correct copies of Plaintiffs' Verified Shareholder's Consolidated Amended Derivative Complaint filed May 21, 2008 in the United States District Court for the Southern District of New York to the following Defendants' counsel:

Jay B. Kasner
Scott D. Musoff
Christopher P. Malloy
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
christopher.malloy@skadden.com

Dennis J. Block
Jason M. Halper
**CADWALADER, WICKERSHAM & TAFT LLP**
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
dennis.block@cwt.com
jason.halper@cwt.com

Executed: May 21, 2008
      New York, New York

Eric C. Love
Legal Assistant/Not Admitted

**BROWER PIVEN**
A Professional Corporation
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300