UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE MERRILL LYNCH & CO., INC.  : Master File No.:
SECURITIES, DERIVATIVE AND ERISA  : 07-CV-9633 (LBS)(AJP)(DFE)
LITIGATION  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x  **ECF Case**

This Document Relates to:  :
Derivative Action, 07cv9696 (LBS)(AJP)(DFE)  : **Electronically Filed**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' VERIFIED CONSOLIDATED AND AMENDED SHAREHOLDERS' DERIVATIVE COMPLAINT

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Jay B. Kasner
Scott D. Musoff
Four Times Square
New York, New York 10036
(212) 735-3000


Attorneys for Nominal Defendant
Merrill Lynch & Co., Inc.


SIMPSON THACHER & BARTLETT LLP
Michael J. Chepiga
Paul C. Curnin
425 Lexington Avenue
New York, New York 10017
(212) 455-2000

Attorneys for Defendant E. Stanley O'Neal


WILLKIE FARR & GALLAGHER LLP
Richard D. Bernstein
Michael R. Young
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

Attorneys for Defendant Jeffrey N. Edwards

CADWALADER, WICKERSHAM
  & TAFT LLP
Dennis J. Block
Gregory A. Markel
Jason M. Halper
One World Financial Center
New York, New York 10281
(212) 504-6000

Attorneys for Defendants Carol T. Christ, Armando
M. Codina, Virgis W. Colbert, Alberto Cribiore,
John D. Finnegan, Judith Mayhew Jonas, Joseph
W. Prueher, Ann N. Reese and Charles O. Rossotti


MILBANK, TWEED, HADLEY
  & MCCLOY LLP
James N. Benedict
George Canellos
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Attorneys for Defendant Ahmass L. Fakahany


WEIL, GOTSHAL & MANGES LLP
Joseph S. Allerhand
Jonathan D. Polkes
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Defendant Gregory J. Fleming

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES......................................................................................iv

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ........................................................................................4

      A.    The Parties ..................................................................................4

      B.    The Alleged Wrongdoing ...........................................................6

      C.    The Role Of The Board ..............................................................8

          1.    Merrill's Monitoring Systems And Controls ....................................8

          2.    The Challenged Transactions Approved By The Board...................10

ARGUMENT ........................................................................................................11

POINT I    THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS DEMONSTRATING THAT DEMAND IS EXCUSED.........................................11

      A.    The Demand Requirement Serves Important Corporate Governance Purposes And Requires The Pleading Of Particularized Facts Beyond Those Ordinarily Required In Order To State A Claim ...............................12

      B.    Plaintiffs Have Not Pleaded The Particularized Facts Required By Delaware Law To Excuse Their Failure To Make A Demand On Merrill's Board.........................................................................14

      C.    Demand Is Not Excused With Respect To Plaintiffs' Oversight Claims.......................................................................................15

          1.    The Directors Would Be Disinterested In A Demand ......................15

              a.    The Directors Are Rendered Disinterested By Article XIII, Section 1 Of Merrill's Certificate Of Incorporation...................................................................15

              b.    The Amended Complaint Does Not Allege With Particularity That The Director Defendants Confront A "Substantial Likelihood" Of Liability With Respect To The Failure Of Oversight Claims.........................................16

        i.     Mere Membership On The Audit Or Finance Committees Does Not Establish A Substantial Likelihood Of Liability ............................................. 22

        ii.    Allegations That Merrill Assumed Business Risk Do Not Excuse Demand ................................... 24

    c.    Conclusory Allegations Of The Directors' Purported Motive To Avoid A Suit That Would Reveal Additional Wrongdoing Do Not Render Them Interested .............................................................. 26

  2.    The Complaint Does Not Raise A Reasonable Doubt Regarding The Independence Of A Majority Of The Board ............ 27

D.    Demand Is Not Excused With Respect To Plaintiffs' Claims Challenging The Decisions Of The Board ...................................................... 29

  1.    The Complaint Does Not Plead That Any Of The Director Defendants Is Interested In Or Lacks Independence With Respect To The Challenged Transactions ......................................... 29

  2.    The Complaint Does Not Plead Particularized Facts Creating A Reasonable Doubt That The Director Defendants Acted In Good Faith And On An Informed Basis In Approving The Challenged Transactions ................................................................. 30

    a.    The Complaint Fails To Plead Particularized Facts Showing That The First Franklin Acquisition Falls Outside The Protection Of The Business Judgment Rule .................................................................... 32

    b.    The Complaint Fails To Plead Particularized Facts Showing That The Repurchase Program Falls Outside The Protection Of The Business Judgment Rule .................. 33

    c.    The Complaint Fails To Plead Particularized Facts Creating A Reasonable Doubt That The Approval Of Mr. O'Neal's Retirement Agreement Was A Valid Exercise Of The Board's Business Judgment ....................... 34

E.    Demand Is Required For The Insider Trading Claims .................................. 37

POINT II    THE DUE CARE CLAIMS AGAINST MERRILL'S PRESENT AND FORMER DIRECTORS SHOULD BE DISMISSED PURSUANT TO MERRILL'S CERTIFICATE OF INCORPORATION ............................................ 38

POINT III    THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6)
             FOR FAILURE TO STATE A CLAIM ..................................................................41

          A.    The Complaint Does Not State A Claim For Breach Of The Duty Of
                Oversight ............................................................................................42

          B.    The Complaint Does Not State A Claim For Breach Of Fiduciary
                Duty Based On Alleged Misappropriation Of Information And Insider
                Stock Sales..........................................................................................42

          C.    The Complaint Does Not State A Claim For Aiding And Abetting A
                Breach Of Fiduciary Duty By The Individual Defendants...........................45

          D.    The Complaint Does Not State A Claim For Gross Mismanagement
                Or Abuse Of Control.............................................................................46

          E.    The Complaint Does Not State A Claim For Corporate Waste....................47

          F.    The Complaint Does Not State A Claim For Unjust Enrichment.................48

          G.    Plaintiffs' Contribution And Indemnification Claims Are Not Ripe.............49

CONCLUSION ...........................................................................................................51

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

Albert v. Alex. Brown Mgmt. Servs., Inc.,
  Nos. Civ. A. 762-N, 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005) ...............................45

Andreae v. Andreae,
  Civ. A. No. 11905, 1992 WL 43924 (Del. Ch. Mar. 3, 1992).....................................................34

Aronson v. Lewis,
  473 A.2d 805 (Del. 1984)...................................................................................................passim

Ash v. McCall,
  No. Civ. A. 17132, 2000 WL 1370341 (Del. Ch. Sept. 15, 2000) ......................................24, 32

Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,
  845 A.2d 1040 (Del. 2004)................................................................................................28, 20

Bell Atl. Corp. v. Twombly,
  127 S. Ct. 1955 (2007) ...........................................................................................................41

Brehm v. Eisner,
  746 A.2d 244 (Del. 2000)..................................................................................................passim

Brophy v. Cities Serv. Co.,
  70 A.2d 5 (Del. Ch. 1949) ..................................................................................................42-43

Canadian Comm'l Workers Indus. Pension Plan v. Alden,
  No. Civ. A. 1184-N, 2006 WL 456786 (Del. Ch. Feb. 22, 2006) .............................................23

Cantor v. Perelman,
  235 F. Supp. 2d 377 (D. Del. 2002), aff'd in part, rev'd in part on other grounds,
  414 F.3d 430 (3d Cir. 2005) ....................................................................................................24

Caviness v. Evans,
  229 F.R.D. 354 (D. Mass. 2005).............................................................................................23

Certainteed Corp. v. Celotex Corp.,
  No. Civ. A. 471, 2005 WL 217032 (Del. Ch. Jan. 24, 2005)....................................................50

Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb,
  385 F. Supp. 2d 449, (D. Del. 2004) ........................................................................................46

Daily Income Fund, Inc. v. Fox,
  464 U.S. 523 (1984)................................................................................................................13

David B. Shaev Profit Sharing Acct. v. Armstrong,
  No. Civ. A. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13), aff'd,
  911 A.2d 802 (Del. 2006) .............................................................................. 17, 21

Debussy LLC v. Deutsche Bank AG,
  No. 05 Civ. 5550, 2006 WL 800956 (S.D.N.Y. Mar. 29, 2006), aff'd,
  242 Fed. Appx. 735 (2d Cir. 2007) ................................................................ 41, 42

Desimone v. Barrows,
  924 A.2d 908 (Del Ch. 2007) ............................................................................... 26

Egelhof v. Szulik,
  No. 04 CVS 11746, 2006 WL 663410 (N.C. Super. Ct. Mar. 13, 2006) ................................... 23

Emerald Partners v. Berlin,
  787 A.2d 85 (Del. 2001) ...................................................................................... 39

Fadem v. Ford Motor Co.,
  No. 02 Civ. 0680, 2003 WL 22227961 (S.D.N.Y. Sept. 25, 2003) ............................................ 11

Ferre v. McGrath,
  No. 06 Civ. 1684 CM, 2007 WL 1180650 (S.D.N.Y. Feb. 16, 2007) ........................................ 23

Fink v. Komansky,
  No. 03CV0388, 2004 WL 2813166 (S.D.N.Y. Dec. 8, 2004) ................................. 11-12, 17, 21

Fink v. Weill,
  No. 02 Civ. 10250, 2005 WL 2298224 (S.D.N.Y. Sept. 18, 2005) .................................... 15, 21

Funke v. Life Fin. Corp.,
  237 F. Supp. 2d 458 (S.D.N.Y. 2002) ................................................................... 41

Gagliardi v. TriFoods Int'l, Inc.,
  683 A.2d 1049 (Del. Ch. 1996) ............................................................................. 25

Globis Partners, L.P. v. Plumtree Software, Inc.,
  C.A. No. 1577-VCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007) .......................................... 46

Greenwald v. Batterson,
  No. 16475, 1999 WL 596276 (Del. Ch. July 26, 1999) ............................................... 31

Grimes v. Donald,
  673 A.2d 1207 (Del. 1996) ................................................................... 13, 15, 29-30

Grobow v. Perot,
  539 A.2d 180 (Del. 1988) ................................................................................ passim

Guttman v. Huang,
　　823 A.2d 492 (Del. Ch. 2003) ........................................................................passim

Halpert Enters., Inc. v. Harrison,
　　362 F. Supp. 2d 426 (S.D.N.Y. 2005)...........................................................21

Highland Legacy Ltd. v. Singer,
　　No. Civ. A. 1566-N, 2006 WL 741939 (Del. Ch. Mar. 17, 2006)........................31, 35

In re Baxter Int'l, Inc. S'holders Litig.,
　　654 A.2d 1268 (Del. Ch. 1995) ...............................................................15-16, 17

In re Bristol-Myers Squibb Sec. Litig.,
　　312 F. Supp. 2d 549 (S.D.N.Y. 2004)...........................................................42

In re Caremark Int'l Inc. Deriv. Litig.,
　　698 A.2d 959 (Del. Ch. 1996) ........................................................................passim

In re Cendant Corp. Deriv. Action Litig.,
　　96 F. Supp. 2d 394 (D.N.J. 2000) ...............................................................49

In re Citigroup Inc. S'holders Litig.,
　　No. 19827, 2003 WL 21384599 (Del. Ch. June 5), aff'd sub nom.
　　Rabinovitz v. Shapiro, 839 A.2d 666 (Del. 2003) ...........................................20, 21

In re Coca-Cola Enters., Inc. Deriv. Litig.,
　　478 F. Supp. 2d 1369, 1378 (N.D. Ga. 2007)...............................................23

In re Countrywide Fin. Deriv. Litig.,
　　No. CV-07-06923-MRP, 2008 WL 2064977 (C.D. Cal. May 14, 2008)..................22

In re Evergreen Mut. Funds Fee Litig.,
　　423 F. Supp. 2d 249, 255 (S.D.N.Y. 2006) ...................................................41

In re Forest Labs., Inc. Deriv. Litig.,
　　450 F. Supp. 2d 379 (S.D.N.Y. 2006)...........................................................22

In re IAC/InterActiveCorp. Sec. Litig.,
　　478 F. Supp. 2d 547 (S.D.N.Y. 2007)...........................................................29

In re infoUSA, Inc. S'holders Litig.,
　　No. Civ. A. 1956-CC, 2007 WL 2419611 (Del. Ch. Aug. 13, 2007) ......................31

In re J.P. Morgan Chase & Co. S'holder Litig.,
　　906 A.2d 808 (Del. Ch. 2005), aff'd,
　　906 A.2d 766 (Del. 2006)...........................................................................30

In re Lukens Inc. S'holders Litig.,
757 A.2d 720 (Del. Ch. 1999), aff'd sub nom.
Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000).................................................40

In re Morgan Stanley Deriv. Litig.,
542 F. Supp. 2d 317 (S.D.N.Y. 2008)...............................................................29, 30

In re Oracle Corp. Deriv. Litig.,
867 A.2d 904 (Del. Ch. 2004),
aff'd, 872 A.2d 960 (Del. 2005) ......................................................................42-43

In re Pfizer Inc. Deriv. Sec. Litig.,
503 F. Supp. 2d 680 (S.D.N.Y. 2007)...................................................................28

In re Pozen S'holders Litig.,
Nos. 04 CVS 1540, 1541, 2005 WL 3035783 (N.C. Super. Ct. Nov. 10, 2005) .................26-27

In re Sagent Tech., Inc., Deriv. Litig.,
278 F. Supp. 2d 1079 (N.D. Cal. 2003) ..................................................................45

In re Sportsline.com Sec. Litig.,
366 F. Supp. 2d 1159 (S.D. Fla. 2004) ..................................................................44

In re United Telecommc'ns, Inc., Sec. Litig.,
No. 90-2251-EEO, 1993 WL 100202 (D. Kan. Mar. 4, 1993)...........................................49-50

In re Zoran Corp. Deriv. Litig.,
511 F. Supp. 2d 986, 1018 (N.D. Cal. 2007)........................................................45-46

Kahn ex rel. DeKalb Genetics Corp. v. Roberts,
679 A.2d 460 (Del. 1996 ..................................................................................34

Kamen v. Kemper Fin. Servs., Inc.,
500 U.S. 90 (1991)...........................................................................2, 12, 13

Kenney v. Koenig,
426 F. Supp. 2d 1175 (D. Colo. 2006) ...................................................................23

Khoury Factory Outlets, Inc. v. Snyder,
No. 11568, 1996 WL 74725 (Del. Ch. Jan. 8, 1996) ..................................................48

Kramer v. Time Warner Inc.,
937 F.2d 767 (2d Cir. 1991) ................................................................................3

Langner v. Brown,
913 F. Supp. 260 (S.D.N.Y. 1996) (Sand, J.)...........................................................2

Laties v. Wise,
  No. Civ. A. 1280-N, 2005 WL 3501709 (Del. Ch. Dec. 14, 2005)............................................40

Leung v. Schuler,
  No. C.A. 17089, 2000 WL 1478538 (Del. Ch. Oct. 2, 2000),
  aff'd, 783 A.2d 124 (Del. 2001) ...............................................................................................31

Levine v. Smith,
  Civ. A. No. 8833, 1989 WL 150784 (Del. Ch. Nov. 27, 1989), aff'd,
  591 A.2d 194 (Del. 1991).........................................................................................................13

Levine v. Smith,
  591 A.2d 194 (Del. 1991)...................................................................................................passim

Lewis v. Graves,
  701 F.2d 245 (2d Cir. 1983) .......................................................................................................2

Lewis v. Vogelstein,
  699 A.2d 327, 336 (Del. Ch. 1997).............................................................................................47

Litt v. Wycoff,
  No. Civ. A. 19083-NC, 2003 WL 1794724 (Del. Ch. Mar. 28, 2003) ...........................28, 30-31

Logicom Inclusive, Inc. v. W.P. Stewart & Co.,
  No. 04 Civ. 0604, 2004 WL 1781009 (S.D.N.Y. Aug. 10, 2004)................................................4

Loveman v. Lauder,
  484 F. Supp. 2d 259 (S.D.N.Y. 2007)..................................................................................29, 33

Malpiede v. Townson,
  780 A.2d 1075 (Del. 2001).........................................................................................................40

McGowan v. Ferro,
  No. Civ. A. 18672-NC, 2002 WL 77712 (Del. Ch. Jan. 11, 2002) ............................................45

Midland Grange No. 27 Patrons of Husbandry v. Walls,
  C.A. No. 2155-VCN, 2008 WL 616239 (Del. Ch. Feb. 28, 2008)..............................................46

Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins,
  No. Civ. A. 20228-NC, 2004 WL 1949290 (Del. Ch. Aug. 24, 2004)............................35, 48-49

Pall v. KPMG, LLP,
  No. 3:03CV00842, 2006 WL 2800064 (D. Conn. Sept. 26, 2006) ............................................49

Pogostin v. Rice,
  480 A.2d 619 (Del. 1984)...........................................................................................................17

Positorivo v. AG Paintball Holdings, Inc.,
  C.A. Nos. 2991-VCP, 3111-VCP, 2008 WL 553205 (Del. Ch. Feb. 29, 2008)........................31

Quereguan v. New Castle Cty.,
  C.A. No. 20298-NC, 2006 WL 2522214 (Del. Ch. Aug. 18, 2006)...........................................50

Rales v. Blasband,
  634 A.2d 927 (Del. 1993)...................................................................................................passim

Rattner v. Bidzos,
  No. Civ. A. 19700, 2003 WL 22284323 (Del. Ch. Sept. 30, 2003) ...................................passim

Richardson v. Graves,
  C. A. No. 6617, 1983 WL 21109 (Del. Ch. Mar. 7, 1983) ......................................................14

Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.),
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)......................................................................................41

Ross v. Bernhard,
  396 U.S. 531 (1970)..................................................................................................................12

Sachs v. Sprague,
  401 F. Supp. 2d 159 (D. Mass. 2005) ......................................................................................38

Seminaris v. Landa,
  662 A.2d 1350 (Del. Ch. 1995) ................................................................................................26

Silverzweig v. Unocal Corp.,
  Civ. A. No. 9078, 1989 WL 3231 (Del. Ch. Jan. 19), aff'd,
  561 A.2d 993 (Del. 1989)..........................................................................................................48

Sinclair Oil Corp. v. Levien,
  280 A.2d 717 (Del. 1971)...........................................................................................31-32, 32-33

Stepak v. Ross,
  No. Civ. A. 7047, 1985 WL 21137 (Del. Ch. Sept. 5, 1985)...................................................43

Stone ex rel. AmSouth Bancorp. v. Ritter,
  911 A.2d 362 (Del. 2006).............................................................................................18-19, 21, 42

Total Care Physicians, P.A. v. O'Hara,
  No. Civ. A. 99C-11-201-JRS, 2002 WL 31667901 (Del. Super. Ct. Oct. 29, 2002) .................48

Wagner v. Selinger,
  No. 16740, 2000 WL 85318 (Del. Ch. Jan. 18, 2000) .............................................................47

White v. Panic,
  783 A.2d 543 (Del. 2001)...................................................................................................passim

Wilson v. Tully,
    676 N.Y.S.2d 531 (1st Dep't 1998) ....................................................................25

Wood v. Baum,
    No. 621, 2007, 2008 WL 2600981 (Del. July 1, 2008) ....................................passim

Xethanol Corp. Deriv. Litig.,
    No. 06 Civ. 15536, 2007 WL 2331975 (S.D.N.Y. Aug. 16, 2007)...........................21

## STATUTES & OTHER AUTHORITIES:

Fed. R. Civ. P.:
    12(b)(6).........................................................................................................41
    23.1(b)(3).......................................................................................................11

Del. Code Ann. tit. 8:
    § 102(b)(7).....................................................................................................39
    § 141(e).........................................................................................................24
    § 145(e).........................................................................................................50

Jennifer E. Bethel et al.,
    Law & Economic Issues in Subprime Litigation (John M. Olin Ctr. for Law, Econ. &
    Bus., Harv. Univ. Mar. 2008), available at http://www.law.harvard.edu/programs/
    olin_center/papers/pdf/Ferrell_et_al_612.pdf ...........................................................6

John C. Dugan, Comptroller of the Currency,
    Remarks before the Global Ass'n of Risk Professionals (Feb. 27, 2008), available at
    http://www.occ.treas.gov/ftp/release/2008-22a.pdf...................................................7

Defendants Carol T. Christ, Armando M. Codina, Virgis W. Colbert, Alberto Cribiore, John D. Finnegan, Judith Mayhew Jonas, Joseph W. Prueher, Ann N. Reese, and Charles O. Rossotti (collectively, the "Director Defendants"), E. Stanley O'Neal, Ahmass L. Fakahany, Gregory J. Fleming, and Jeffrey N. Edwards (collectively, the "Officer Defendants," and together with the Director Defendants, the "Individual Defendants"), and nominal defendant Merrill Lynch & Co., Inc. ("Merrill" or the "Company," and together with the Individual Defendants, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Verified Consolidated and Amended Shareholders' Derivative Complaint (the "Complaint" or "Compl.").[1]

## PRELIMINARY STATEMENT

In this shareholder derivative action, Plaintiffs seek to turn the directors of Merrill – each of whom was an outside, non-employee director when this suit was commenced – into guarantors of the financial performance of the Company during troubled economic times. Since August 2007, Merrill (like numerous other financial institutions in the U.S. and abroad) has been forced to write down assets that had received the highest ratings from credit rating agencies and has been the subject of several lawsuits and investigations related to events in the subprime mortgage market. When such adverse events occur, derivative lawsuits alleging lack of

---

[1] Beginning on November 1, 2007, two shareholder derivative actions purportedly brought on behalf of nominal defendant Merrill and asserting similar causes of action as in the Complaint were commenced against certain present and former Merrill directors and officers in this Court (the "Arthur Action" and the "Loveman Action," respectively). On December 7, 2007, a substantially similar derivative action, which was commenced in the Supreme Court of the State of New York, New York County (the "Operative Plasterers Action"), was removed to this Court. On March 12, 2008, the Court consolidated these three derivative actions and appointed lead counsel, and on May 21, 2008, Plaintiffs filed the Complaint. A fourth similar derivative lawsuit, Eidman v. O'Neal, 08-CV-3392 (LBS), was originally filed in New Jersey Superior Court, but was removed by defendants and transferred to this Court. By order dated June 16, 2008, the Court will defer Eidman's motion to remand the action to state court until it decides this motion to dismiss.

"oversight" by a corporation's board of directors inevitably follow, but those suits are almost always dismissed because Delaware law – the state of Merrill's incorporation and the law governing the derivative claims asserted in this case – rightly sets an extremely high standard for bringing such claims.  The conclusory allegations in the Complaint do not approach this high standard, and the Complaint should be dismissed for three independent reasons.

First, Plaintiffs failed to make a pre-suit demand on Merrill's Board of Directors (the "Board"), or to plead particularized facts demonstrating that demand is excused as futile, as required by Rule 23.1 of the Federal Rules of Civil Procedure and Delaware substantive law. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991); Lewis v. Graves, 701 F.2d 245, 247 (2d Cir. 1983).[2]  "Unlike a claim brought by a plaintiff on his own behalf to enforce a right he personally possesses, a derivative claim is brought on behalf of a corporation to remedy an injury suffered by the corporation.  It is, therefore, the corporation and not the shareholder plaintiff who is the real plaintiff."  Langner v. Brown, 913 F. Supp. 260, 264 (S.D.N.Y. 1996) (Sand, J.) (applying Delaware law); see also Levine v. Smith, 591 A.2d 194, 200 (Del. 1991).

Because derivative claims belong to the corporation, a shareholder must either demand that the board of directors commence the litigation, or plead with particularity the reasons why a pre-suit demand would have been futile.  See Rales v. Blasband, 634 A.2d 927, 932 (Del. 1993).  Where, as here, a plaintiff primarily asserts claims based on an alleged lack of oversight by the Board, the requirement to make a demand is excused under Delaware law only in the exceptional case in which a shareholder plaintiff pleads "particularized facts" – not mere conclusory assertions or characterizations – creating a reasonable doubt that a majority of the corporation's directors at the time the suit was commenced are "interested" in the subject matter

---

[2]    Delaware law governs whether shareholders are required to make a pre-suit demand because Merrill is a Delaware corporation.  Kamen, 500 U.S. at 98-99.

of the action or lack "independence" from an interested director.  Wood v. Baum, No. 621, 2007, 2008 WL 2600981, at *2 (Del. July 1, 2008).  No such particularized facts appear anywhere in the Complaint with respect to any (much less a majority) of the ten individuals who were members of Merrill's Board of Directors when the pre-consolidated derivative actions were commenced.  Rather, when these actions were commenced, all ten members of the Board were non-management, non-employee directors whose interest and independence are not fairly called into question by any of the allegations in the Complaint.[3]

In addition to alleged oversight failures, Plaintiffs also challenge as breaches of the directors' fiduciary duties three transactions that were approved by the Board:  (i) Merrill's acquisition of First Franklin Financial Corporation ("First Franklin") in December 2006; (ii) a stock repurchase plan announced on April 30, 2007; and (iii) Mr. O'Neal's retirement agreement. In order to demonstrate that demand is excused for these Board decisions, a shareholder plaintiff must allege "particularized facts" which, as to a majority of the Board, "raise a reasonable doubt as to (i) director disinterest or independence, or (ii) whether the directors exercised proper business judgment in approving the challenged transaction."  Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988) (emphasis added).  Far from pleading such facts, the Complaint offers boilerplate, conclusory allegations that courts time and again have rejected as insufficient to excuse demand and should be rejected here.

---

[3]    In November 2007, when these actions were commenced, the Board had ten members:  nine Director Defendants, Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Prueher, Reese, Rossotti, and non-party Aulana L. Peters.  None of these individuals is alleged to have been or in fact was an officer or employee of Merrill.  See Declaration of Jay B. Kasner in Support of the Merrill Defendants' Motions to Dismiss the Consolidated Amended Complaints, dated July 21, 2008 (the "Kasner Declaration" or "Kasner Decl."), Ex. KK (Merrill's Definitive Proxy Statement for 2008, filed with the Securities & Exchange Commission (the "SEC") on Form 14A on Mar. 14, 2008 ("Merrill's 2008 Proxy Statement")) at 6-9. This Court may take judicial notice of Merrill's 2008 Proxy Statement and other publicly available documents filed with the SEC.  See, e.g., Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("court may take judicial notice of the contents of relevant public disclosure documents").

Second, the claims against Merrill's present and former directors are barred by Article XIII, Section 1 of Merrill's Restated Certificate of Incorporation. Specifically, Merrill's shareholders, acting pursuant to Section 102(b)(7) of the Delaware General Corporation Law, voted to amend Merrill's corporate charter in 1987 to eliminate the liability of the Company's directors to the Company or its shareholders to the fullest extent permitted by Delaware law. See Kasner Decl., Ex. SS (Merrill Restated Certificate of Incorporation, dated May 3, 2001), Art. XIII, Section 1.[4] As a result, the shareholders eliminated the liability of Merrill's directors for any claims that sound in negligence and gross negligence – which, at best, describe the claims asserted in the Complaint. See Point II.

Third, the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The allegations in the Complaint simply do not adequately plead claims for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, gross mismanagement, abuse of control, corporate waste and unjust enrichment. In addition, the cause of action for indemnification and contribution is not ripe because Merrill has not incurred any liability arising out of the conduct alleged in the Complaint. See Point III.

## STATEMENT OF FACTS[5]

### A.    The Parties

Plaintiffs Miriam Loveman, Patricia Arthur, and Operative Plasterers & Cement Masons Local 262 and Annuity Fund purport to bring these consolidated shareholder derivative actions on behalf of Merrill. (Compl. ¶ 6.)

---

[4]    The Court may take judicial notice of a certificate of incorporation, which is a publicly filed document. See Logicom Inclusive, Inc. v. W.P. Stewart & Co., No. 04 Civ. 0604, 2004 WL 1781009, at **1, 3-4 (S.D.N.Y. Aug. 10, 2004).

[5]    The statement of facts is derived from the allegations of facts in the Complaint. These allegations are accepted as true solely for purposes of this motion. See infra at 41.

The nine Director Defendants – Carol T. Christ, Armando M. Codina, Virgis W. Colbert, Alberto Cribiore, John D. Finnegan, Judith Mayhew Jonas, Joseph W. Prueher, Ann N. Reese and Charles O. Rossotti – are current members of Merrill's Board of Directors, and were Merrill directors when these actions were commenced. (Compl. ¶¶ 19-27.) Defendant E. Stanley O'Neal is a former director and officer of Merrill, who was not a member of the Board when these actions were commenced. (Id. ¶ 13.) Defendants Ahmass L. Fakahany, Gregory J. Fleming, and Jeffrey N. Edwards have never served on the Merrill Board; during the events in dispute in this case, they were officers of the Company. (Id. ¶¶ 14-16.)

When these actions were filed, the Merrill Board consisted of ten "outside" non-management directors. In addition to the nine Director Defendants, non-defendant Aulana L. Peters was the tenth member of the Board. Not only do none of the directors work for Merrill, but each has impressive credentials independent of Merrill: Ms. Christ is the President of Smith College; Mr. Codina is the President and CEO of Flagler Development Group; Mr. Colbert is a Senior Advisor to the Miller Brewing Company; Mr. Cribiore is the Founder and Managing Principal of Brera Capital Partners LLC; Mr. Finnegan is the Chairman and CEO of Chubb Corporation; Ms. Jonas is a well-regarded British solicitor; Mr. Prueher is a Consulting Professor at Stanford University and a former U.S. Ambassador to China; Ms. Reese is the Co-Founder and Co-Executive Director of the Center for Adoption Policy; Mr. Rossotti is a Senior Advisor to the Carlyle Group and a former Commissioner of Internal Revenue at the Internal Revenue Service; and Ms. Peters is a retired partner of Gibson, Dunn & Crutcher LLP and a member of the International Public Interest Oversight Board. See Kasner Decl., Ex. KK (Merrill Lynch's 2008 Proxy Statement) at 6-9; Compl. ¶¶ 19-27.

Nominal defendant Merrill is a corporation organized under the laws of the State of Delaware, with its principal place of business in New York. (Compl. ¶ 12.) Merrill is one of

the world's leading capital markets, advisory and wealth management companies engaged in diverse business activities within the financial services industry, with offices in 40 countries and territories and total client assets of almost $2 trillion as of December 28, 2007. See Kasner Decl., Ex. W (Merrill Annual Report on Form 10-K for the year ending December 28, 2007, filed with the SEC on February 25, 2008 ("Merrill's 2007 10-K")) at 20; Compl. ¶ 48. Merrill's investment bank subsidiary is a leading global trader and underwriter of securities and derivatives across a broad range of asset classes, and serves as a strategic advisor to corporations, governments, institutions, and individuals worldwide. See Kasner Decl., Ex. W (Merrill's 2007 10-K) at 20; Compl. ¶ 50.

**B.    The Alleged Wrongdoing**

At the heart of Plaintiffs' claims lies their hindsight-based disagreement with Merrill having become a leading underwriter of collateralized debt obligations ("CDOs"). (Compl. ¶ 2.) As a result of drastic changes in the housing and credit markets, Merrill's involvement in the CDO business now has turned out to be unprofitable, and Plaintiffs seek to hold officers and directors of Merrill personally liable for those business losses. (Id. ¶¶ 2-3, 44-45.)

CDOs are complex securities supported by other assets, such as mortgage-backed securities, which in turn are securities whose cash flows are supported by the payment of principal and interest on a pool of mortgages (including subprime mortgages). See Jennifer E. Bethel et al., Law & Economic Issues in Subprime Litigation 12 (John M. Olin Ctr. for Law, Econ. & Bus., Harv. Univ. Mar. 2008), available at http://www.law.harvard.edu/programs/olin_center/papers/pdf/Ferrell_et_al_612.pdf. CDOs are divided into tranches with senior tranches having priority in terms of repayment. (Compl. ¶ 57.) Each tranche is rated by the three major rating agencies, with those receiving AAA ratings from

Standard & Poor's Ratings Services ("S&P") or Fitch Ratings ("Fitch") (or its equivalent Aaa from Moody's Investors Service ("Moody's")) considered low-risk, low-yield securities.  See John C. Dugan, Comptroller of the Currency, Remarks before the Global Ass'n of Risk Professionals 4 (Feb. 27, 2008), available at http://www.occ.treas.gov/ftp/release/2008-22a.pdf; Compl. ¶ 100.

The Complaint acknowledges that Merrill's transactions in CDOs were extremely profitable for several years.   (Compl. ¶¶ 32, 59.)   Through pursuit of these business opportunities, the Company went "from [a] bit player to powerhouse in the lucrative business of bundling loans into salable securities."  (Id. ¶ 59.)  Prior to August 2007, the CDO business was "very profitable for investment banks . . ." and "a very lucrative business for this industry."  (Id. ¶ 80.)

While Plaintiffs label Merrill's underwriting of and investments in CDOs as "tremendously risky," there are no particularized allegations indicating that any of the Individual Defendants had any knowledge concerning any purported "excessive risk" associated with Merrill's exposure to such securities, or that Merrill's risk management policies supposedly were inadequate.  To the contrary, Plaintiffs allege that when the demand for CDOs started to slow, Merrill sold the high-risk, high return portions of CDOs, but continued to hold for itself the safer, super-senior tranches of the CDOs, which had priority in terms of repayment and AAA ratings from S&P and Fitch (or an equivalent Aaa rating from Moody's).  (Compl. ¶¶ 70-71.)  As conceded in the Complaint, "executives believed that so long as all they retained on their books were super-senior tranches, they would be shielded from falls in the prices of mortgage securities."  (Id. ¶ 191.)  The Complaint also acknowledges that Merrill's business strategy of retaining the AAA rated super-senior securities was a strategy followed by many of its competitors.  (Id. ¶ 184: "Many investment banks with CDO businesses – Citigroup, Inc.,

Morgan Stanley and UBS – frequently kept or bought these super-senior pieces, whose lower returns interested few investors.")

However, starting in August 2007, "[a]mid a steep decline in house prices and rising defaults on mortgage loans, the value of subprime-backed securities went into a free fall." (Compl. ¶ 184.)  Merrill was far from the only company surprised by the drastic change in the markets.  Independent rating agencies "called the subprime deterioration unprecedented and unexpectedly rapid."  (Id.)

On October 5, 2007, in a pre-release estimate of third-quarter earnings, Merrill announced that, as a result of the downturn in the subprime mortgage market, it expected its third quarter results to include write-downs of an estimated incremental $4.5 billion related to CDOs and subprime mortgages.  (Compl. ¶ 147.)  On October 24, 2007, Merrill announced that its earnings for the third quarter would include write-downs of $7.9 billion across CDOs and U.S. subprime mortgages.  (Id. ¶ 156.)  As market conditions continued to worsen, on January 17, 2008, Merrill released its year-end 2007 financial statements, which included $23.2 billion in write-downs from CDO and subprime exposure.  (Id. ¶ 185.)

## C.    The Role Of The Board

Notably absent from the Complaint are anything more than conclusory allegations regarding the participation or even knowledge of the Board of Directors in the transactions challenged by the Plaintiffs in this action.  The few specific facts alleged in the Complaint actually demonstrate that the Board was discharging its duties appropriately.

### 1.    Merrill's Monitoring Systems And Controls

Although Plaintiffs primarily assert claims against the Director Defendants for alleged failures of risk management and financial reporting, the Complaint acknowledges the extensive monitoring systems and controls in place at Merrill in both of these areas.  The Board

carries out its oversight of the Company's exposure to market and credit risk through a four member Finance Committee, which, among other things, oversees the Company's financial commitments and investments, financial and operating plan, balance sheet and capital management, and credit and market risk.  (Compl. ¶ 224.)  The Finance Committee is required to meet at least three (3) times per year, and met twelve (12) times in 2007.  See id. ¶ 225; see also Kasner Decl., Ex. KK (Merrill's 2008 Proxy Statement) at 18.

        The Board's Audit Committee exercises oversight related to, among other things, the preparation of the Company's financial statements.  (Compl. ¶ 230.)  The four member Audit Committee is required to meet at least six (6) times per year, and met eleven (11) times in 2007.  See id. ¶ 231; see also Kasner Decl., Ex. KK (Merrill's 2008 Proxy Statement) at 17.   In performing its oversight function, the Audit Committee regularly communicates with internal auditors and the Company's independent auditors at Deloitte & Touche, LLP ("Deloitte"), both with and without management present, on the results of their audits and the overall quality of the Company's financial reporting and internal controls.  See Compl. ¶¶ 130, 140, 230-33; Kasner Decl., Ex. KK (Merrill's 2008 Proxy Statement) at 17, 21.  With respect to each of the financial reports approved by the Audit Committee that is challenged in the Complaint, the Audit Committee received a report from management certifying that the financial statements contained no material errors, and a written report from Deloitte setting forth either an unqualified audit opinion, in the case of a Form 10-K, or an unqualified review report, in the case of Form 10-Qs. See Compl ¶¶ 122, 130, 140; Kasner Decl., Ex. V (Merrill Annual Report on Form 10-K for the year ending Dec. 29, 2006, filed with the SEC on Feb. 26, 2007, Exs. 99.2 and 99.3); Ex. X (Merrill Quarterly Report on Form 10-Q for the quarter ending Mar. 30, 2007, filed with the SEC on May 7, 2007) at 49; Ex. Y (Merrill Quarterly Report on Form 10-Q for the quarter ending June 29, 2007, filed with the SEC on Aug. 3, 2007) at 51; Ex. Z (Merrill Quarterly Report on

Form 10-Q for the quarter ending Sept. 28, 2007, filed with the SEC on Nov. 7, 2007) at 60; Ex. AA (Merrill Quarterly Report on Form 10-Q for the quarter ending on Mar. 28, 2008, filed with the SEC on May 6, 2008) at 64.

2.    **The Challenged Transactions Approved By The Board**

The Complaint also alleges that the Director Defendants breached fiduciary duties to the Company and its shareholders when they: (i) authorized the acquisition, on Merrill's behalf, of mortgage originator First Franklin in December 2006 (Compl. ¶¶ 82-83, 255); (ii) authorized the buyback of approximately $6 billion of Merrill stock in April 2007 (id. ¶¶ 108-12); and (iii) "voted to give O'Neal a retirement package worth $161 million" (id. ¶¶ 164, 248-49). However, the Complaint fails to plead any particularized facts creating a reasonable doubt that these decisions were a valid exercise of the Board's business judgment.

To the contrary, Plaintiffs merely assert, with perfect 20/20 hindsight, that the directors made a poor business decision in approving the First Franklin acquisition because, nearly a year and a half later, Merrill chose to phase out First Franklin's business due to poor performance. (Compl. ¶ 255.) But the Complaint itself recognizes the valid business judgment exercised by the Company in connection with this decision: Merrill pursued this acquisition in order to "vertically integrate" its creation of CDOs, such that Merrill would directly control a mortgage originator. (Id. ¶ 120.) The Complaint likewise acknowledges that Merrill's competitors, such as Lehman Brothers, Deutsche Bank, Morgan Stanley and Barclays, were similarly acquiring mortgage originators. (Id. ¶¶ 80, 83.)

Equally deficient are Plaintiffs' allegations regarding the Board's decision to approve a stock repurchase program and a retirement agreement for Mr. O'Neal. Far from pleading facts creating a reasonable doubt that these decisions were valid exercises of business judgment, the Complaint acknowledges, for instance, Merrill's explanation at the time that the

stock repurchase plan "will enable us to continue to be active and flexible in managing our equity capital." (Compl. ¶ 109.) Likewise, Plaintiffs offer the wholly conclusory assertion that the Board should have fired O'Neal for "cause" instead of allowing him to retire with the benefits of his severance package, which consisted of compensation already earned by Mr. O'Neal during his tenure at Merrill.[6]

## ARGUMENT

### POINT I

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE FAILED TO PLEAD PARTICULARIZED FACTS DEMONSTRATING THAT DEMAND IS EXCUSED[7]

Rule 23.1 of the Federal Rules of Civil Procedure requires that in any derivative action brought by one or more shareholders to enforce a right of the corporation, the complaint must allege "with particularity: (A) any effort made by the plaintiff to obtain the desired action from the directors or comparable authority; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). "Rule 23.1 is an exception to the traditional

---

[6]    Contrary to the allegation in the Complaint, the Board did not "vote[] to give Mr. O'Neal a retirement package worth $161 million." (Compl. ¶ 248.) Rather, the actual decision made by the Board was to treat Mr. O'Neal's departure as a retirement. See Kasner Decl., Ex. EE (Merrill Current Report, dated and filed with the SEC on Form 8-K on Oct. 30, 2007). At hearings conducted before the United States House of Representatives' Committee on Oversight and Government Reform (the "Committee"), John Finnegan (the Chairman of the Merrill Board's Compensation Committee since April 2007) stated: "[a]side from his base salary, anything else retained by Mr. O'Neal at his departure had been earned and awarded to him in prior years. The amount disclosed in our public filings and highlighted by the media at the time of his departure relates entirely to compensation and benefits that he earned over the course of his career, and in all events, prior to his separation from the Company." See Kasner Decl., Ex. E (Statement of John Finnegan before the House Committee on Oversight and Government Reform, Mar. 7, 2008, available at http://oversight.house.gov/documents/20080307121706.pdf). The Court may take judicial notice of this testimony because the hearing before the Committee, at which Mr. Finnegan provided this testimony, and the Committee's Memorandum are referred to in the Complaint. See Compl. ¶ 248; Fadem v. Ford Motor Co., No. 02 Civ. 0680, 2003 WL 22227961, at *2 (S.D.N.Y. Sept. 25, 2003).

[7]    Nominal Defendant Merrill has moved to dismiss pursuant to Rule 23.1, and therefore joins in the arguments in Point I. Merrill has not moved to dismiss pursuant to Rule 12(b)(6) and therefore does not join in Points II and III, which are argued by all other Defendants.

and less stringent requirement of notice pleadings." <u>Fink v. Komansky</u>, No. 03CV0388, 2004 WL 2813166, at *3 (S.D.N.Y. Dec. 8, 2004) ("<u>Komansky</u>"). "The standard of pleading 'with particularity' means with specificity." <u>Id.</u> at *6. "[C]onclusory allegations of fact or law not substantiated with specific facts are insufficient" to excuse demand. <u>Id.</u> at *4.

While Rule 23.1 addresses the "adequacy of the shareholder representative's pleadings" by requiring the pleading of facts with particularity, state law governs the substance of the demand requirement, and thus state law determines whether the justifications offered by a plaintiff for failing to make demand are acceptable such that demand on a corporation's board of directors is excused as futile. <u>Kamen</u>, 500 U.S. at 96-99; <u>see also Komansky</u>, 2004 WL 2813166, at *3 ("Although Rule 23.1 creates a procedural and federal standard as to the specificity of pleading the futility of demand, 'the adequacy of those efforts is to be determined by state [substantive] law'") (citation omitted).

As noted above, Merrill is incorporated under the laws of the State of Delaware. (Compl. ¶ 12.) The Complaint must be dismissed under governing Delaware law because Plaintiffs neither made demand, nor does the Complaint plead particularized facts demonstrating that demand is excused.

## A.    The Demand Requirement Serves Important Corporate Governance Purposes And Requires The Pleading Of Particularized Facts Beyond Those Ordinarily Required In Order To State A Claim

Unlike an action a plaintiff brings on his or her own behalf to enforce a claim he or she personally possesses, a shareholder derivative claim is brought "'to enforce a <u>corporate</u> cause of action.'" <u>Kamen</u>, 500 U.S. at 95 (<u>quoting Ross v. Bernhard</u>, 396 U.S. 531, 534 (1970)) (emphasis in original). Derivative claims thus belong not to the shareholder bringing the action, but to the corporation. <u>See White v. Panic</u>, 783 A.2d 543, 546-47 (Del. 2001); <u>Levine</u>, 591 A.2d at 200.

Because of this unique and fundamental aspect of shareholder derivative actions, a shareholder must demand that the corporation's directors cause the corporation to pursue the claim before obtaining standing to commence the action. This demand requirement reflects the universally recognized "'basic principle of corporate governance that the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors or the majority of shareholders.'" Kamen, 500 U.S. at 101 (quoting Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 530 (1984)). As the Delaware Supreme Court explained in White, the pre-suit demand is "designed to implement the principle that the cause of action belongs to the corporation" and the board that must decide whether to pursue the claim. 783 A.2d at 546-47.

The demand requirement serves other purposes as well. It constitutes "a 'form of alternate dispute resolution,' that requires the stockholder to exhaust 'his intracorporate remedies'" rather than seek "immediate recourse to litigation." Rales, 634 A.2d at 935 (quoting Aronson v. Lewis, 473 A.2d 805, 811-12 (Del. 1984)). The demand requirement also serves to "deter costly, baseless suits by creating a screening mechanism to eliminate claims where there is only a suspicion expressed solely in conclusory terms . . . ." Grimes v. Donald, 673 A.2d 1207, 1217 (Del. 1996). For all of these reasons, a motion to dismiss for failure to make demand "is not intended to test the legal sufficiency of the plaintiff's substantive claim. Rather, its purpose is to determine who is entitled, as between the corporation and its shareholders, to assert the plaintiff's underlying substantive claim on the corporation's behalf." Levine v. Smith, Civ. A. No. 8833, 1989 WL 150784, at *5 (Del. Ch. Nov. 27, 1989), aff'd, 591 A.2d 194 (Del. 1991).

As a result, and as the Delaware Supreme Court described in Brehm v. Eisner, 746 A.2d 244 (Del. 2000):

> [T]here is a very large – though not insurmountable – burden on stockholders who believe they should pursue the remedy of a derivative

suit instead of selling their stock or seeking to reform or oust these directors from office.

Delaware has pleading rules and an extensive judicial gloss on those rules that must be met in order for a stockholder to pursue the derivative remedy.  Sound policy supports these rules. . . .

Id. at 267.  "Generalities, artistically ambiguous, all-encompassing conclusory allegations are not enough.  What is required are pleadings that are specific and, if conclusory, supported by sufficient factual allegations that corroborate the conclusion and support the proposition that demand is futile."  Richardson v. Graves, C. A. No. 6617, 1983 WL 21109, at *2 (Del. Ch. Mar. 7, 1983).

**B.    Plaintiffs Have Not Pleaded The Particularized Facts Required By Delaware Law To Excuse Their Failure To Make A Demand On Merrill's Board**

Plaintiffs concede that they did not make a pre-litigation demand prior to commencing this action, contending instead that demand is excused because it would have been "futile."  (Compl. ¶ 223.)

Delaware courts have set forth two tests for determining demand futility:  the "Aronson" test and the "Rales" test.  In cases where board decisions are at issue, whether demand is excused is governed by the Aronson test, pursuant to which "particularized facts" must be alleged that "raise a reasonable doubt as to (i) director disinterest or independence, or (ii) whether the directors exercised proper business judgment in approving the challenged transaction."  Grobow, 539 A.2d at 186 (citing Aronson, 473 A.2d at 814) (emphasis added).  In cases "where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates)," a different test – the Rales test – applies, because no business judgment has been made, and thus the second prong of the Aronson test is inapplicable.  Rales, 634 A.2d at 934 n.9; see also Wood, 2008 WL 2600981, at *2 (the Rales test "applies where the subject of a derivative suit is not a business decision of the Board but rather a violation of the

14

Board's oversight duties").   Under both the <u>Aronson</u> and the <u>Rales</u> tests, the disqualifying interest or lack of independence must afflict a <u>majority</u> of the corporation's directors.   <u>See</u> <u>Grimes</u>, 673 A.2d at 1216; <u>Rales</u>, 634 A.2d at 930, 936-37; <u>Levine</u> 591 A.2d at 205.   As explained below, the Complaint fails to satisfy the <u>Rales</u> test for the oversight claims and the <u>Aronson</u> test where it challenges actual decisions of the Board.

## C.   Demand Is Not Excused With Respect To Plaintiffs' Oversight Claims

In order to excuse demand under <u>Rales</u>, Plaintiffs must allege with particularity facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."   634 A.2d at 933; <u>see also</u> <u>Fink v. Weill</u>, No. 02 Civ. 10250, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 18, 2005) ("<u>Weill</u>").   As explained below, the Complaint does not satisfy this exacting standard.

### 1.   The Directors Would Be Disinterested In A Demand

#### a.   The Directors Are Rendered Disinterested By Article XIII, Section 1 Of Merrill's Certificate Of Incorporation

As discussed in detail in Point II below, Merrill's shareholders, acting pursuant to Delaware law, have adopted a provision in Merrill's Certificate of Incorporation that exempts Merrill's directors from personal liability for monetary damages in cases such as this one that are based on allegations of negligence or gross negligence.   <u>See</u> Kasner Decl., Ex. SS (Merrill Restated Certificate of Incorporation, dated May 3, 2001) Art. XIII, Section 1.   This provision is dispositive of the disinterest of Merrill's directors because Plaintiffs' contention is that the directors are interested because they purportedly "face a real and substantial danger of liability in this action."   (Compl. ¶¶ 246, 249, 255.)

Under Delaware law, "[w]hen the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless

particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." In re Baxter Int'l, Inc. S'holders Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995); see also Wood, 2008 WL 2600981, at *3 ("Where directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts'") (quoting Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003)) (emphasis in original).  As explained in Point II, the alleged wrongdoing in this case does not "fall[] outside the exemption" created by Merrill's Certificate of Incorporation.  In short, there is no allegation in the Complaint that any – much less a majority – of the Director Defendants engaged in any self-dealing or otherwise violated the duty of loyalty, and the Complaint similarly fails to plead that any of the Director Defendants acted in bad faith.  The Director Defendants accordingly are "not disable[d] . . . from considering a demand fairly." In re Baxter, 654 A.2d at 1270.

> **b.    The Amended Complaint Does Not Allege With Particularity That The Director Defendants Confront A "Substantial Likelihood" Of Liability With Respect To The Failure Of Oversight Claims**

Even without reference to the provision in Merrill's Certificate of Incorporation eliminating director liability in cases such as this one, the Complaint is insufficient to excuse demand under Rales because it lacks particularized facts that could establish that a majority of the Director Defendants are interested or lack independence.  Under Delaware law, a "mere threat" of personal liability does not render a director interested.  See Aronson, 473 A.2d at 815. Rather, "[d]irectors who are sued for failure to oversee subordinates have a disabling interest when 'the potential for liability is not "a mere threat" but instead may rise to "a substantial likelihood.'"" In re Baxter, 654 A.2d at 1269 (citation omitted).

It follows, then, that demand is not excused merely because the Complaint names nine of ten directors as defendants.  "It is settled law that demand is not excused because plaintiff pleads that directors would have to sue themselves thereby 'placing the litigation in hostile hands.'"  <u>Komansky</u>, 2004 WL 2813166, at *7 (citation omitted); <u>accord</u> <u>Aronson</u>, 473 A.2d at 818; <u>Pogostin v. Rice</u>, 480 A.2d 619, 625 (Del. 1984) ("[W]e note that the plaintiffs' bootstrap allegations of futility, based on claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue themselves, were laid to rest in <u>Aronson</u> . . .").

Rather, Plaintiffs confront an extremely difficult burden to plead a "substantial likelihood" of liability in connection with oversight claims.  Such claims are governed by the standard set forth in <u>Caremark</u>, where the Delaware Court of Chancery stated:

> Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exits – will establish the lack of good faith that is a necessary condition to liability.  Such a test of liability – lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight – is quite high.

<u>In re Caremark Int'l Inc. Deriv. Litig.</u>, 698 A.2d 959, 971 (Del. Ch. 1996).

<u>Caremark</u> establishes "a standard for liability for failures of oversight that requires a showing that the directors breached their duty of loyalty by failing to attend to their duties in good faith.  Put otherwise, the decision premises liability on a showing that the directors were conscious of the fact that they were not doing their jobs."  <u>Guttman</u>, 823 A.2d at 506.  Thus, in order to plead an oversight claim, a complaint must contain "well-pleaded facts to suggest a reasonable inference that a majority of the directors consciously disregarded their duties over an extended period of time."  <u>David B. Shaev Profit Sharing Acct. v. Armstrong</u>, No. Civ. A. 1449-N, 2006 WL 391931, at *1 (Del. Ch. Feb. 13), <u>aff'd</u>, 911 A.2d 802 (Del. 2006).

The stringent pleading standard established in <u>Caremark</u> was recently adopted by the Delaware Supreme Court in <u>Stone ex rel. AmSouth Bancorp. v. Ritter</u>, 911 A.2d 362 (Del. 2006) ("<u>AmSouth</u>").  In that case, plaintiffs brought shareholder derivative claims on behalf of AmSouth claiming that the company's directors breached fiduciary duties by failing to prevent AmSouth from violating various anti-money laundering regulations, which resulted in AmSouth paying $40 million in fines and $10 million in civil penalties.  The complaint alleged that demand was excused under <u>Rales</u> because a majority of the AmSouth board "face[d] a substantial likelihood of liability" in connection with failing to prevent the conduct that led to fines and penalties.  <u>Id.</u> at 367.

In rejecting that argument, the Delaware Supreme Court first observed that "[c]ritical to this demand excused argument is the fact that the directors' potential personal liability depends upon whether or not their conduct can be exculpated by the section 102(b)(7) provision contained in the AmSouth certification of incorporation.  Such a provision can exculpate directors from monetary liability for a breach of the duty of care, but not for conduct that is not in good faith or a breach of the duty of loyalty."  <u>Id.</u>  Because AmSouth shareholders had adopted such a provision, the directors could only be rendered "interested" due to the likelihood of liability if the complaint pled a failure to act in good faith or breach of the duty of loyalty.  <u>Id.</u>

The court then found that the type of allegations required to plead a <u>Caremark</u> claim "draws heavily upon the concept of director failure to act in good faith."  <u>Id.</u> at 369.  The <u>Stone</u> opinion held that in order to plead such a <u>Caremark</u> claim – and likewise to excuse demand based upon director interest due to a "substantial likelihood of liability" in connection with such a claim – a complaint must plead that:

> (a) the directors <u>utterly failed</u> to implement any reporting or information system or controls; or (b) having implemented such a system or controls,

<u>consciously failed to monitor</u> or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention.  In either case, imposition of liability requires a showing that <u>the directors knew that they were not discharging their fiduciary obligations</u>.  Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

<u>Id.</u> at 370 (emphasis added; original emphasis omitted).

Here, the Complaint contains no allegations, particularized or otherwise, that could satisfy either method of pleading a <u>Caremark</u> claim.  First, the Complaint does not allege "an utter failure to attempt" to put a monitoring system in place.  Instead, the Complaint describes rigorous monitoring functions implemented by Merrill's Board.  The Complaint pleads, for instance, that the Board tasked its audit committee with ensuring the integrity of Merrill's financial statements (<u>see</u> Compl. ¶¶ 230-32), and its finance committee with overseeing Merrill's credit and market risk management policies and procedures.  (<u>Id.</u> ¶¶ 224-26.) Moreover, the Complaint concedes that the Audit Committee was required to meet at least six (6) times per year and met eleven (11) times in 2007 (<u>see id.</u> ¶ 231; <u>see also</u> Kasner Decl., Ex. KK (Merrill 2008 Proxy Statement) at 17), and that the Finance Committee was required to meet at least three (3) times per year and met twelve (12) times in 2007 (<u>see</u> Compl. ¶ 225; <u>see also</u> Kasner Decl., Ex. KK (Merrill 2008 Proxy Statement) at 18).  The Complaint thus pleads that Merrill had monitoring systems in place, and Delaware law does not allow shareholder plaintiffs to second guess the directors' business judgment about the type of systems and controls needed. <u>See</u> <u>In re Caremark</u>, 698 A.2d at 970 ("Obviously the level of detail that is appropriate for [a corporate reporting and] information system is a question of business judgment" not subject to second guessing by shareholder plaintiffs); <u>Guttman</u>, 823 A.2d at 506-07 (complaint failed to

plead oversight claim where it did not plead particularized facts regarding board's monitoring systems).

Second, Plaintiffs have not alleged particularized facts demonstrating that a majority of the Director Defendants knowingly failed to monitor the information generated by Merrill's systems and controls or otherwise consciously ignored "red flags" of wrongdoing. Indeed, even where a board is sued for having failed to prevent conduct that was criminal or fraudulent, courts repeatedly have refused to excuse demand based on conclusory allegations that directors ignored "red flags."

The Delaware Court of Chancery's decision in Guttman is instructive. In Guttman, a company had issued false financial statements that were later corrected through a restatement, and the plaintiffs sought to hold the board responsible for alleged lack of oversight of company accounting systems. 823 A.2d at 505-06. In dismissing the complaint on demand grounds, the court held that the allegations in the complaint did not suggest that the directors faced a substantial likelihood of liability. Id. at 507. The court reasoned that the complaint was:

> empty of the kind of fact pleading that is critical to a Caremark claim, such as contentions that the company lacked an audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.

Id. (emphasis added). The court noted that "the complaint [did] not plead a single fact suggesting specific red – or even yellow – flags were waved at the outside directors." Id. Delaware courts have emphasized that "red flags" "'are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer.'" Wood, 2008 WL 2600981, at *4 (quoting In re Citigroup Inc. S'holders Litig., No. 19827, 2003 WL 21384599, at *2 (Del. Ch. June 5), aff'd sub nom. Rabinovitz v. Shapiro, 839 A.2d 666 (Del. 2003)); Rattner v. Bidzos, No. Civ. A. 19700, 2003 WL 22284323, at *13 (Del. Ch. Sept. 30, 2003) (same); see

also Halpert Enters., Inc. v. Harrison, 362 F. Supp. 2d 426, 432-33 (S.D.N.Y. 2005) (dismissing complaint asserting oversight claims for failure to adequately plead that demand was excused where the complaint "never, except with conclusory allegations, conveys that the [alleged] scheme occurred with the Board's knowledge or systemic failure to engage in proper oversight," and the plaintiff "offered no specific allegations suggesting that the directors knew of the nature of JPM Chase's dealings with Enron, or that they disregarded 'red flags'"); Weill, 2005 WL 2298224, at **1, 4 (allegation that "Citigroup engaged in an extensive series of unlawful and fraudulent transactions, principally with Enron" insufficient to plead a substantial likelihood of liability because "Plaintiff fail[ed] entirely to proffer particularized allegations of any of the Defendants' knowledge of or involvement in any of these transactions").[8]

  Here, at most, the Complaint pleads that Merrill has suffered certain adverse business developments, not that the directors knowingly failed to discharge their fiduciary obligations.  The Delaware Supreme Court emphasized this distinction in AmSouth:

> [W]ith the benefit of hindsight, the plaintiffs' complaint seeks to equate a bad outcome with bad faith.  The lacuna in the plaintiffs argument is a failure to recognize that the directors' good faith exercise of oversight responsibility may not invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both.

911 A.2d at 373.  Thus, the allegations in the Complaint fall far short of excusing demand.

---

[8] See also Komansky, 2004 WL 2813166, at *4 (applying Delaware law, dismissing, on demand grounds, oversight claims against Merrill board based on allegedly wrongful transactions with Enron "[w]here plaintiff has 'not pled with particularity that directors ignored obvious danger signs of employee wrongdoing' but instead base his claim 'on a presumption that employee wrongdoing would not occur if directors performed their duty properly . . .'") (citations omitted); Xethanol Corp. Deriv. Litig., No. 06 Civ. 15536, 2007 WL 2331975, at *4 (S.D.N.Y. Aug. 16, 2007) (same); In re Citigroup, 2003 WL 21384599, at *2 (same); David B. Shaev Profit Sharing Acct., 2006 WL 391931, at *5 (same).

### i. Mere Membership On The Board's Audit Or Finance Committees Does Not Establish A Substantial Likelihood Of Liability

The central thrust of Plaintiffs' Caremark claim is that the directors who served on the Board's audit and finance committees "must have known" about alleged problems concerning Merrill's risk management or financial reporting solely based on their membership on such committees. (Compl. ¶¶ 224-46.) Earlier this month, the Delaware Supreme Court rejected this same argument as "contrary to well-settled Delaware law." Wood, 2008 WL 2600981, at *4.[9] In Wood, the plaintiffs asserted that the members of the audit committee faced a substantial likelihood of liability because the company engaged in numerous violations of federal securities and tax laws. Id. The Delaware Supreme Court rejected as insufficient the mere assertion that the audit committee "should have been aware" of these problems, and

---

[9] In support of their contention that mere committee membership can excuse demand, Plaintiffs will likely cite a recent decision from the United States District Court for the Central District of California, In re Countrywide Financial Derivative Litigation, No. CV-07-06923-MRP, 2008 WL 2064977 (C.D. Cal. May 14, 2008). In that case, shareholders of Countrywide Financial Corp. ("Countrywide") sued its directors and officers challenging various aspects of Countrywide's lending practices. The court denied a Rule 23.1 motion to dismiss on the ground that the directors who served on the board committees responsible for overseeing the disputed practices, who constituted a majority of the board, faced a substantial likelihood of liability in the suit by virtue of their committee membership. Id. at *32. Defendants respectfully submit that the Countrywide decision cannot be reconciled with the Delaware Supreme Court's subsequent decision in Wood or the numerous other decisions construing Delaware law that have rejected this same allegation as insufficient to excuse demand. See infra, at 23 n.10.

Alternatively, a more narrow reading of Countrywide is that it represents that rare and extreme case in which detailed allegations from confidential witnesses describe with particularity widespread and flagrant violations of corporate policies "at all levels." 2008 WL 2064977, at *11. There are no such allegations in the Complaint in this action. Moreover, in Countrywide, the court inferred knowledge by the committee members of alleged red flags because the allegations concerned the company's core business functions. See id. at *14 ("Loan origination is at the core of all of Countrywide's business operations, and risks related to loan performance and delinquency are central to the Company's overall risk position"). Here, in contrast, CDOs and subprime mortgages represented just a small fraction of Merrill's overall business, and generated just 2% of Merrill's annual revenues. (Compl. ¶ 125). In any event, even in this respect, the dubious reasoning of the Countrywide opinion has been rejected by other courts. See In re Forest Labs., Inc. Deriv. Litig., 450 F. Supp. 2d 379, 390-91 (S.D.N.Y. 2006) (refusing, on a Rule 23.1 motion, to assume that non-management directors must have known about misrepresentations regarding core business products constituting 82% of corporate revenues).

22

dismissed the suit because "the plaintiff failed to allege with particularity any facts from which it can be inferred that particular directors knew or should have been on notice of alleged accounting improprieties." Id.[10]

Similarly, allegations that audit committee members allowed dissemination of improper public statements, without more, do not create a reasonable doubt as to their disinterest. See, e.g., Wood, 2008 WL 2600981, at *3 ("The Board's execution of [the company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality"); Rattner, 2003 WL 22284323, at *12 (same); In re Coca-Cola, 478 F. Supp. 2d at 1377 (demand not excused under Delaware law where the complaint failed to plead "particularized facts demonstrating the Board's involvement in the preparation of [the company's] allegedly false" statements and lacked "any facts as to what the Board knew or should have known and [was] void of any degree of particularity on steps the Board could have taken but did not take to prevent these allegedly false statements").[11]

---

[10]    See also Ferre v. McGrath, No. 06 Civ. 1684 CM, 2007 WL 1180650, at *8 (S.D.N.Y. Feb. 16, 2007) (applying Delaware law and holding that plaintiff failed to allege "specific facts showing that the members of the Audit Committee 'had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation'") (citation omitted); Kenney v. Koenig, 426 F. Supp. 2d 1175, 1183 (D. Colo. 2006) (same); In re Coca-Cola Enters., Inc. Deriv. Litig., 478 F. Supp. 2d 1369, 1378 (N.D. Ga. 2007) (same); Caviness v. Evans, 229 F.R.D. 354, 359-60 (D. Mass. 2005) (same).

[11]    The Complaint asserts that since Ms. Reese and Mr. Rossotti are labeled "Audit Committee Financial Experts," they "had a particular ability to detect and prevent the inappropriate exposure to the subprime market and the false financial statements that the Individual Defendants caused the Company to issue." (Compl. ¶ 240.) However, it is well-settled under Delaware law that directors are not held to a higher standard of care merely because they have professional qualifications. See Canadian Comm'l Workers Indus. Pension Plan v. Alden, No. Civ. A. 1184-N, 2006 WL 456786, at *7 n.54 (Del. Ch. Feb. 22, 2006); In re Coca-Cola, 478 F. Supp. 2d at 1379 ("'No Delaware case has held that directors with professional qualifications are held to a higher standard of care'") (citation omitted); Egelhof v. Szulik, No. 04 CVS 11746, 2006 WL 663410, at *10 (N.C. Super. Ct. Mar. 13, 2006) (applying Delaware law and holding that allegations that two directors owed a heightened duty of care because they possessed "unique" expertise were insufficient to excuse demand).

Indeed, the few facts alleged in the Complaint about the audit committee process show that the Director Defendants face no risk of liability.  Under Delaware law, directors are "fully protected" when they rely in good faith on the reports of officers or experts.  Del. Code. Ann. tit. 8, § 141(e); see also Ash v. McCall, No. Civ. A. 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000).  As the Delaware court explained in Ash, an expert's favorable advice to the board serves as a prominent "green flag" assuring the directors that things are in order.  2000 WL 1370341, at*9; see also Cantor v. Perelman, 235 F. Supp. 2d 377, 387-88 (D. Del. 2002) (section 141(e) protected directors from liability for "allegations of accounting abuses" because directors relied on clean audit opinions provided by outside auditors), aff'd in part, rev'd in part on other grounds, 414 F.3d 430 (3d Cir. 2005).  Here, the Complaint itself alleges that senior management certified that the financial statements were free from material error, and that Deloitte, the Company's outside auditor, provided the directors with opinions (for annual reports) or review reports (for quarterly reports) confirming that financial statements were free of material errors. See Compl. ¶¶ 122, 130, 140; see also Ash, 2000 WL 1370341, at *9 (demand required where directors relied on expert accountants and financial advisors).

### ii.     Allegations That Merrill Assumed Business Risk Do Not Excuse Demand

Plaintiffs also suggest that the finance committee should have known that Merrill's risk management systems were purportedly inadequate because these directors presumably were 'aware' that "Defendant O'Neal fired Jeff Kronthal, one of the Company's top traders, because Kronthal . . . urged O'Neal and others at the Company to curb the Company's exposure to the subprime market in light of increasing public indications of credit deterioration and lax underwriting standards in the origination of mortgages." (Compl. ¶ 238.)  According to the Complaint, Kronthal resisted taking on more subprime risk "in mid-2006, a time when

housing was still strong but was peaking." (Id. ¶ 191.) Even accepting this unfounded allegation as true, it is far from a "red flag" warning that Mr. O'Neal was acting wrongfully. It merely suggests that Messrs. O'Neal and Kronthal had a business disagreement about the relative risks and rewards presented by investments in subprime related securities. Moreover, the Complaint concedes that this disagreement took place in "mid-2006", when the housing market was "still strong." (Id.) Delaware law allows directors and officers to make aggressive or even ill advised decisions regarding risk. See Gagliardi v. TriFoods Int'l, Inc., 683 A.2d 1049, 1053 (Del. Ch. 1996); In re Caremark, 698 A.2d at 967. The fact that the plaintiff, or the court, "regards a decision as unwise, foolish, or even stupid in the circumstances is not legally significant; indeed that others may look back on it and agree that it was stupid is legally unimportant . . . ." Gagliardi, 683 A.2d at 1053.

Another case challenging Merrill's business strategies (albeit in different circumstances), Wilson v. Tully, 676 N.Y.S.2d 531 (1st Dep't 1998), is on point. In Wilson, the court dismissed a derivative suit on grounds of failure to have made a demand where a shareholder sought to hold the Merrill board of directors liable for allowing the Company to be exposed to liability based on the sale of highly leveraged derivative securities to Orange County, California, which resulted in a $2 billion loss to the County. Id. at 533-34. In finding that the complaint did not allege a substantial likelihood of liability based on the directors allegedly having failed to prevent Merrill from assuming excessive risk, the court noted that "risk is at the heart of Merrill's business, or for that matter any business, and it seems as if the risk entailed resulted, for a substantial period of time, in what plaintiffs describe as 'huge fees and commissions to the company.'" Id. at 538 (citation omitted). The same reasoning applies in this case – even if the Board was aware of the fact that Mr. O'Neal was willing to take on a higher

level of subprime risk than Mr. Kronthal, that would hardly suffice to plead a "red flag" of corporate misconduct.

In any event, even if this disagreement were somehow a "red flag", which it is not, the Complaint does not allege with specificity that this alleged difference of opinion between Mr. O'Neal and a trader came to the attention of the directors on the audit and finance committees. See Desimone v. Barrows, 924 A.2d 908, 940 (Del Ch. 2007) (declining to infer that because "it was 'widely known' within the company that stock options were backdated, the directors must also have known about that and thus abdicated their oversight responsibilities by failing to take remedial action") (emphasis in original). Nowhere does the Complaint plead when or how the Director Defendants became aware of this information, or even if they did, that the Director Defendants consciously chose to ignore this event. In short, there is not a single factual allegation relating to Mr. Kronthal's departure from Merrill suggesting that the Board was aware of or consciously chose to ignore it. As a result, this allegation plainly does not excuse demand.

### c.    Conclusory Allegations Of The Directors' Purported Motive To Avoid A Suit That Would Reveal Additional Wrongdoing Do Not Render Them Interested

Plaintiffs assert that the Director Defendants "will not authorize the maintenance of this suit because discovery in this case and/or in the securities fraud suit will likely reveal wrongdoing by such directors of the Company and thus expose them to a significant likelihood of liability." (Compl. ¶ 250.) Courts have consistently rejected such allegations as "a slightly altered version of the discredited refrain - 'you can't expect directors to sue themselves.'" Seminaris v. Landa, 662 A.2d 1350, 1355 (Del. Ch. 1995) (citation omitted); see also In re Pozen S'holders Litig., Nos. 04 CVS 1540, 1541, 2005 WL 3035783, at *11 (N.C. Super. Ct. Nov. 10, 2005) (demand not excused under Delaware law by allegation that directors would not authorize

suit because it "would open the directors up to future civil litigation for securities laws violations and would harm them in the class actions currently pending in federal district court").

Moreover, Plaintiffs' allegation that some or all of the Director Defendants are named as defendants in related actions pending before this Court asserting claims under the federal securities laws and ERISA is inaccurate. (Compl. ¶¶ 250, 254.) None of the Director Defendants is named as a defendant in the consolidated amended class action complaints filed in the related securities and ERISA actions on May 21, 2008. See Consolidated Amended Class Action Complaint in the action captioned In re Merrill Lynch & Co., Inc. Securities Litigation, 07cv9633 (Docket Entry No. 42); Consolidated Amended Complaint for Violations of the Employee Retirement Security Act in the action captioned In re Merrill Lynch & Co., Inc. ERISA Litigation, 07cv10268 (Docket Entry No. 41). As a result, they hardly face a substantial likelihood of liability in those cases.

**2.    The Complaint Does Not Raise A Reasonable Doubt Regarding The Independence Of A Majority Of The Board**

Plaintiffs assert that the Board lacked independence to consider a demand due to alleged personal and business ties between certain of the Director Defendants and Mr. O'Neal, Merrill's former Chief Executive Officer. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." Aronson, 473 A.2d at 816. To establish a lack of independence, the plaintiff "must show that the directors are 'beholden' to [an interested director] or so under their influence that their discretion would be sterilized." Rales, 634 A.2d at 936.

The Complaint in this case alleges that "many of the Director Defendants" have "close personal ties" with Mr. O'Neal such that "they would not vote to pursue an action against him or those who acted in concert with him." (Compl. ¶¶ 253.) However, the Complaint only

contains allegations of such "close personal ties" between Mr. O'Neal and two of the ten directors, Messrs. Finnegan and Cribiore, not the majority of directors required to excuse demand under Delaware law. Thus, the Court's analysis of the independence of the Board can stop here – Plaintiffs have not satisfied the Rales test.

Setting aside that the independence of a majority of the directors is beyond question, Plaintiffs' allegations regarding Mr. O'Neal's relationship with two of the directors does not call into question their independence. First, Mr. O'Neal was neither an officer nor a director of Merrill when these actions were commenced. Thus, Messrs. Finnegan and Cribiore could not have been beholden to Mr. O'Neal for purposes of their independence in considering a demand. Second, conclusory allegations that a director has close personal or business ties to an interested individual are insufficient to raise a reasonable doubt about a director's independence. See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1050 (Del. 2004) ("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence"); Litt v. Wycoff, No. Civ. A. 19083-NC, 2003 WL 1794724, at *4 (Del. Ch. Mar. 28, 2003) ("Neither mere personal friendship alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence"); In re Pfizer Inc. Deriv. Sec. Litig., 503 F. Supp. 2d 680, 686 (S.D.N.Y. 2007) (same).

Here, the allegations of "personal and business relationships" between Mr. O'Neal and Messrs. Finnegan and Cribiore are plainly insufficient to establish that Mr. O'Neal controls or dominates any members of the Board. Plaintiffs assert that Mr. O'Neal and Mr. Finnegan are "long time friends" dating back to "the time they worked together in General Motors' treasury department" and that Mr. Cribiore is "close to O'Neal." (Compl. ¶ 253.) These allegations could not establish that either man "would be more willing to risk his . . . reputation

28

than risk the relationship" with Mr. O'Neal, which would be required to call into question their independence under Delaware law.  See Beam, 845 A.2d at 1052.[12]

### D.    Demand Is Not Excused With Respect To Plaintiffs' Claims Challenging The Decisions Of The Board

The Complaint also challenges three transactions allegedly approved by the Director Defendants: (i) Merrill's acquisition of First Franklin in December 2006; (ii) the April 20, 2007 stock repurchase program; and (iii) Mr. O'Neal's retirement agreement.  Since these allegations relate to board action, demand is excused under Aronson only if Plaintiffs plead "particularized facts" that "raise a reasonable doubt as to (i) director disinterest or independence, or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." Grobow, 539 A.2d at 186 (citing Aronson, 473 A.2d at 814).  As explained below, the Complaint fails to plead particularized facts that satisfy either prong of Aronson, and therefore Plaintiffs have failed to adequately plead that demand is excused.

### 1.    The Complaint Does Not Plead That Any Of The Director Defendants Is Interested In Or Lacks Independence With Respect To The Challenged Transactions

As under the Rales standard, in order to plead that demand is excused under Aronson because of director interest or lack of independence, the disqualifying interest or lack of independence must afflict a majority of the corporation's directors.  See Grimes, 673 A.2d at

---

[12]    Plaintiffs' conclusory allegation that Defendants Christ, Codina, Colbert, Cribiore Finnegan, Jonas, Reese, and Rossotti are beholden to Mr. O'Neal because he "personally handpicked" them to serve on Merrill's Board (Compl. ¶ 252) also fails to create a reasonable doubt as to these individuals' independence.  See In re IAC/InterActiveCorp. Sec. Litig., 478 F. Supp. 547, 602 (S.D.N.Y. 2007) ("Any argument that the directors were 'nominated by or elected at the behest' of the controlling person adds nothing" to the demand excusal analysis, since "'[t]hat is the usual way a person becomes a corporate director'") (quoting Aronson, 473 A.2d at 816); Loveman v. Lauder, 484 F. Supp. 2d 259, 269 (S.D.N.Y. 2007) (same); In re Morgan Stanley Deriv. Litig., 542 F. Supp. 2d 317, 325-26 (S.D.N.Y. 2008) (rejecting allegation that certain directors were recruited to the Morgan Stanley board of directors by defendant Purcells (Morgan Stanley's former CEO) as insufficient to demonstrate that these directors were beholden to Purcells and therefore lacked independence).

1216; <u>Rales</u>, 634 A.2d at 930, 936-37; <u>In re Morgan Stanley</u>, 542 F. Supp. 2d at 322.  Here,

Plaintiffs do not even attempt to plead that any, let alone a majority, of the Director Defendants

is interested or lacks independence with respect to any of the three challenged transactions.

Significantly, the Complaint does not plead that any of the Director Defendants had a material

financial interest in or expected to derive any personal benefit from the First Franklin

acquisition, the stock repurchase program, or Mr. O'Neal's retirement agreement, nor does the

Complaint plead that any of these transactions will have a "materially detrimental impact on a

[Director Defendant], but not on the corporation or and the stockholders."  <u>Rales</u>, 634 A.2d at

936; <u>see</u> <u>also</u> <u>In re J.P. Morgan Chase & Co. S'holder Litig.</u>, 906 A.2d 808, 821 (Del. Ch. 2005)

(shareholder plaintiffs failed to adequately plead director interest under <u>Aronson</u> where "none of

the outside directors stood on both sides of the transaction nor are they alleged to have received

any personal financial benefit from it other than one that devolved on all JPMC stockholders

alike"), <u>aff'd</u>, 906 A.2d 766 (Del. 2006).  As a result, demand is not excused under the first

prong of <u>Aronson</u>.

> **2.    The Complaint Does Not Plead Particularized Facts Creating A Reasonable Doubt That The Director Defendants Acted In Good Faith And On An Informed Basis In Approving The Challenged Transactions**

In order to establish that demand is excused under the second prong of <u>Aronson</u>, a

complaint must "carry the 'heavy burden'" of pleading <u>particularized facts</u> that raise a reasonable

doubt about whether the challenged transaction is entitled to the protection of the business

judgment rule.  <u>White</u>, 783 A.2d at 551; <u>see</u> <u>also</u> <u>Litt</u>, 2003 WL 1794724, at *6; <u>In re J.P.</u>

<u>Morgan Chase</u>, 906 A.2d at 824.[13]  As the Delaware Court of Chancery explained in <u>Litt</u>:

---

[13]    The business judgment rule is "a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest."  <u>Grobow</u>, 539 A.2d at 187.  That presumption is heightened where, as here,

*(cont'd)*

> A plaintiff may rebut the presumption that the board's decision is entitled to deference by raising a reasonable doubt whether the action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation. Thus, in order to excuse demand when a majority of the board at the time of demand is found to be disinterested and independent, the plaintiff must plead particularized facts sufficient to raise a reasonable doubt that the action was taken in good faith or reasonable doubt that the board was adequately informed in making the decision.

2003 WL 1794724, at *6; White, 783 A.2d at 554 ("absent some reasonable doubt that the [company's] board proceeded based on a good faith assessment of the corporation's best interests, the board's decisions are entitled to deference under the business judgment rule").

"'The plaintiff faces a heavy burden, as the second prong of the Aronson test is "directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review."'" Highland Legacy Ltd. v. Singer, No. Civ. A. 1566-N, 2006 WL 741939, at *7 (Del. Ch. Mar. 17, 2006) (quoting Greenwald v. Batterson, No. 16475, 1999 WL 596276, at *7 (Del. Ch. July 26, 1999)) (other citations omitted; emphasis added); see also Positorivo v. AG Paintball Holdings, Inc., C.A. Nos. 2991-VCP, 3111-VCP, 2008 WL 553205, at *8 (Del. Ch. Feb. 29, 2008) (a plaintiff seeking to establish demand futility under the second prong of Aronson faces "a high standard to satisfy" which is "'closely akin to proving the underlying transaction could not have been a good faith exercise of business judgment'") (quoting In re infoUSA, Inc. S'holders Litig., No. Civ. A. 1956-CC, 2007 WL 2419611, at *1 (Del. Ch. Aug. 13, 2007)) (emphasis in original). In fact, "[i]f a board's decision can be 'attributed to any rational business purpose' . . . a court will not substitute its judgment for that of a board."

---

(cont'd from previous page)

the decision is approved by a board, the majority of whom are outside, nonmanagement directors. See Levine, 591 A.2d at 207; Leung v. Schuler, No. C.A. 17089, 2000 WL 1478538, at *6 (Del. Ch. Oct. 2, 2000), aff'd, 783 A.2d 124 (Del. 2001).

Levine, 591 A.2d at 207 (quoting Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)) (emphasis added).

Plaintiffs have not met their heavy pleading burden with respect to any of the three board decisions challenged in the Complaint.

> **a.    The Complaint Fails To Plead Particularized Facts Showing That The First Franklin Acquisition Falls Outside The Protection Of The Business Judgment Rule**

Plaintiffs second-guess the Board's approval of the acquisition of First Franklin in December 2006, which gave Merrill control of a mortgage originator to supply the creation of CDOs.   Plaintiffs challenge this business decision because First Franklin allegedly became worthless fifteen months after the transaction was consummated.   (Compl. ¶ 255.)   The Complaint, however, does not come close to meeting the "heavy burden" of pleading particularized facts sufficient to create a reasonable doubt that the transaction was the product of a valid business judgment.

While, in hindsight, Plaintiffs allege that the decision to purchase First Franklin appears to have been a poor one, Plaintiffs cannot cast reasonable doubt on the directors' business judgment in approving this transaction in December 2006 by "examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for [the company], so horribly that it must be a waste of corporate assets . . . .  [T]he relevant time to measure whether the . . . [defendants] committed 'waste' is at the time they entered into and approved the transaction." Ash, 2000 WL 1370341, at *8 (emphasis added); see also Wood, 2008 WL 2600981, at *3 ("Delaware law on this point is clear:  board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors").   "If a board's decision can be 'attributed to any rational business purpose,' a court will not substitute its judgment for that of a

board." <u>Levine</u>, 591 A.2d at 207 (<u>quoting</u> <u>Sinclair Oil</u>, 280 A.2d at 720) (emphasis added). Here, the Complaint concedes a rational business purpose for the transaction – Merrill wanted to own a loan originator so that it could assure continued access to loans needed for the creation of CDOs. <u>See</u> <u>supra</u> at 10. Far from showing that no person of sound business judgment would pursue such a policy, the Complaint concedes that many of Merrill's competitors were pursuing similar transactions at the time. <u>See</u> <u>supra</u> at 10; Compl. ¶¶ 80, 83.

In addition, the Complaint is silent regarding the Board's deliberations and conduct in connection with the First Franklin acquisition.[14] Instead of pleading the type of particularized facts required to excuse demand, the Complaint does not plead any facts, particularized or otherwise, regarding: (i) the process by which the Board approved this transaction; (ii) what information the Board received or considered in connection with approving this transaction; (iii) whether the Board received advice from experts on the propriety of this transaction; (iv) how long the Board deliberated before approving this transaction; or (v) the valuation methodologies considered by the Board in approving this transaction. In the absence of any such allegations, demand cannot be excused.

b.     **The Complaint Fails To Plead Particularized Facts Showing That The Repurchase Program Falls Outside The Protection Of The Business Judgment Rule**

Plaintiffs' challenge to the Board's decision to authorize a stock repurchase program in April 2007 fails for the same reasons as their attack on the First Franklin acquisition. The Complaint contains no allegations whatsoever challenging the Board's process in making

---

[14]     As explained in <u>Loveman</u>, "[i]t is plaintiff's burden to allege particularized facts raising a reasonable doubt that the [transaction] was a valid exercise of business judgment, not – at least in the context of evaluating a derivative plaintiff's failure to make pre-suit demand – defendants' burden to file a Form 8-K that details the steps taken by the board in determining whether to approve the transaction." 484 F. Supp. 2d at 270.

that decision, and relies solely on the hindsight observation that more than eight months later, Merrill sought additional capital due to changed market conditions. (Compl. ¶ 111.) Moreover, Plaintiffs' allegation that the Director Defendants authorized a $6 billion stock repurchase program to "protect" a $1.3 billion investment in First Republic defies economic reason, and therefore certainly is not a basis to excuse demand.

In addition, as with the First Franklin acquisition, the Complaint concedes a rational business purpose for the repurchase program: Merrill sought a flexible tool to manage its equity capital. (Compl. ¶ 109.) Significantly, Delaware courts repeatedly have applied the protection of the business judgment rule to decisions to repurchase company stock. See Kahn ex rel. DeKalb Genetics Corp. v. Roberts, 679 A.2d 460, 466 (Del. 1996) (stock repurchase protected by the business judgment rule); Grobow, 539 A.2d at 187-88 (dismissing claim challenging stock repurchase due to the business judgment rule); Andreae v. Andreae, Civ. A. No. 11905, 1992 WL 43924, at *8 (Del. Ch. Mar. 3, 1992) (same).

**c.    The Complaint Fails To Plead Particularized Facts Creating A Reasonable Doubt That The Approval Of Mr. O'Neal's Retirement Agreement Was A Valid Exercise Of The Board's Business Judgment**

The Complaint also alleges that "each of the Director Defendants wasted the Company's assets" by "unanimously vot[ing] to give O'Neal a retirement package worth $161 million." (Compl. ¶¶ 248-49.) Plaintiffs assert in wholly conclusory fashion that "the retirement package was given without consideration since the Company could have, and should have, terminated O'Neal's employment for cause." (Id. ¶ 249.)

The Delaware Supreme Court has defined corporate "waste" to mean "'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" White, 783 A.2d at 554

(citation omitted).    To excuse demand on grounds of waste, "the complaint must allege particularized facts sufficient to create a reasonable doubt that the board authorized action on the corporation's behalf that no person of ordinary, sound business judgment could conclude represents a fair exchange." Highland Legacy, 2006 WL 741939, at *7. "'Th[is] extreme test is rarely satisfied.'" Id. (citation omitted).    In particular, with respect to claims of waste related to executive compensation, the Delaware Supreme Court has stated that "the size and structure of executive compensation are inherently matters of judgment . . . . To be sure, there are outer limits, but they are confined to the unconscionable cases where directors irrationally squander or give away corporate assets." Brehm, 746 A.2d at 263; see also Official Comm. of Unsecured Creditors of Integrated Health Servs., Inc. v. Elkins, No. Civ. A. 20228-NC, 2004 WL 1949290, at *17 (Del. Ch. Aug. 24, 2004) ("when dealing with a board's decision on executive compensation, its substantive decision is entitled to great deference").

Brehm is instructive.    In that case, shareholders of The Walt Disney Company ("Disney") brought a derivative suit against Disney's current and former directors, alleging, among other things, that the directors had breached their fiduciary duties to the company and its shareholders in connection with agreeing to terminate former Disney president Michael Ovitz on a non-fault basis.    746 A.2d at 248-49.    Having been terminated on a non-fault basis, Ovitz became entitled to a severance package valued at over $140 million, even though he had only worked for Disney for approximately one year.    Id. at 253.    The complaint alleged that it was "waste for the Board to pay Ovitz essentially the full amount he was due on the non-fault termination basis because he should have been fired for cause." Id. at 265.

In analyzing whether plaintiffs had met their pleading burden under the second prong of Aronson, the court acknowledged that the Board had "arguable grounds to fire Ovitz for cause," but noted that a rational person could have chosen not to do so because:    (i) "Disney

35

would have had to persuade a trier of fact and law of this argument in any litigated dispute with Ovitz"; and (ii) "the process of persuasion could involve expensive litigation, distraction of executive time and company resources, lost opportunity costs, more bad publicity and an outcome that was uncertain at best and, at worst, could have resulted in damages against the Company."  Id. (emphasis in original).  In holding that plaintiffs failed to create a reasonable doubt that the board's decision was protected by the business judgment rule, the court stated:

> [c]onstrued most favorably to plaintiffs, the Complaint contends that, by reason of the New Board's available arguments of resignation and good cause, it had leverage to negotiate Ovitz down to a more reasonable payout than that guaranteed in his Employment Agreement.  But the Complaint fails on its face to meet the waste test because it does not allege with particularity facts tending to show that no reasonable business person would have made the decision that the New Board made under the circumstances.

Id. at 265-66.

Just as in Brehm, Plaintiffs' conclusory assertion that Mr. O'Neal could have been terminated for "cause" does not create a reasonable doubt that the Board's decision to treat his departure as a retirement was a valid exercise of business judgment.  Indeed, had it terminated Mr. O'Neal for cause, the Board still would have had to persuade a trier of fact of the merits of such a decision, and that process could have been both time-consuming and expensive, subjected Merrill to unwanted and negative publicity, and distracted Merrill management from its primary responsibilities.  Thus, Plaintiffs' conclusion that Mr. O'Neal should have and could have been fired for cause is both devoid of any factual support, and, as in Brehm, is not in and of itself grounds for excusing demand under the second prong of Aronson.

In addition, Mr. O'Neal did not receive a "retirement package" or "golden parachute" when he left Merrill in 2007.  See supra at 11 n.6.  Rather, "[a]side from his base salary, anything else retained by Mr. O'Neal at his departure had been earned and awarded to him in prior years."  Id.  In connection with his retirement agreement, the Complaint alleges that

Mr. O'Neal received only two "new" benefits:  (i) a reduction in the length of his existing non-compete agreement; and (ii) the use of office space and an executive assistant for a period of three years.  (Compl. ¶ 248.)  While Plaintiffs assert that Merrill did not receive consideration in exchange for awarding these benefits, Merrill's Form 8-K, filed with the Securities and Exchange Commission on October 30, 2007, states that Merrill received the following concessions from Mr. O'Neal in connection with his retirement:  (i) an agreement not to seek any bonus compensation for the 2007 fiscal year (Mr. O'Neal received an $18.5 million cash bonus for fiscal 2006, as well as over $26 million in Merrill stock (see Kasner Decl., Ex. JJ (Merrill Definitive Proxy Statement for 2007, filed with the SEC on Form 14A on Mar. 16, 2007) at 46); and (ii) waiver of the right to six months of base compensation under Article 1(A) of his existing non-compete agreement (Mr. O'Neal's base compensation for 2006 was $700,000).  See id.; see also Kasner Decl., Ex. EE (Merrill Current Report, dated and filed with the SEC on Form 8-K on Oct. 30, 2007).[15]  Because Merrill received such consideration, Plaintiffs have not pled that the Director Defendants committed waste.[16]

## E.    Demand Is Required For The Insider Trading Claims

Plaintiffs seek to bring claims for alleged insider trading against a former officer-director, Mr. O'Neal, and three officers, Messrs. Fakahany, Edwards and Fleming.  (Compl.

---

[15]    On or about September 17, 2004, Mr. O'Neal entered into an agreement with Merrill that, among other things, required Mr. O'Neal to give six months advance written notice prior to terminating his employment (the "Non-Compete Agreement").  See Kasner Decl., Ex. BB (Merrill Current Report, dated and filed with the SEC on Form 8-K on Sept. 17, 2004).  Pursuant to the Non-Compete Agreement, Merrill was required to pay Mr. O'Neal his base salary and certain other benefits during the six month period after receiving such notice.

[16]    In addition, as with the acquisition of First Franklin and the Company's stock repurchase program, the Complaint does not contain a single allegation regarding: (i) the process by which the Board approved Mr. O'Neal's retirement agreement; (ii) what information the Board received in connection with approving this agreement; (iii) whether the Board received advice from experts; or (iv) how long the Board deliberated before approving the agreement.  Thus, the Complaint does not plead the particularized facts necessary to demonstrate that the Board acted in bad faith or failed to act on an informed basis.

¶¶ 262-68.)    Because none of the individuals who sold stock was on the Board when the Complaint was filed, and Plaintiffs have not pled facts showing that any (much less a majority) of the Director Defendants lacked independence from these individuals (see supra at 27-29), Plaintiffs were plainly required to make a demand on the Board with respect to these claims.  To reiterate, the Complaint does not allege that any of the ten Merrill directors constituting the Merrill Board at the time these actions were commenced sold any Merrill stock during the relevant period.  Thus, Plaintiffs' conclusory allegations of "illicit insider trading" are irrelevant to the demand inquiry: "the fact that three non-director-defendants, who each engaged in very substantial trades during the Contested Period, are named in the case has little bearing on the demand excusal analysis for an obvious reason:  they are not on the board."  Guttman, 823 A.2d at 503 n.22; see also Sachs v. Sprague, 401 F. Supp. 2d 159, 166 n.5 (D. Mass. 2005) (same).

## POINT II

### THE DUE CARE CLAIMS AGAINST MERRILL'S PRESENT AND FORMER DIRECTORS SHOULD BE DISMISSED PURSUANT TO MERRILL'S CERTIFICATE OF INCORPORATION

The claims in the Complaint for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, gross mismanagement, and abuse of control also are subject to dismissal as to Merrill's present and former directors on a second ground – the adoption by Merrill's shareholders, acting pursuant to Section 102(b)(7) of the Delaware General Corporation Law, of a provision in Merrill's Restated Certificate of Incorporation eliminating the possibility of director personal liability in cases such as this one.

Section 102(b)(7), enacted in 1986, permits shareholders to adopt Certificate of Incorporation provisions "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director,"

with the exception of liability (i) for breach of the director's "duty of loyalty to the corporation or its stockholders," (ii) for "acts or omissions not in good faith," or that "involve intentional misconduct or a knowing violation of law," (iii) under Del. Gen. Corp. Law § 174, which prohibits unlawful payments of dividends and unlawful stock purchases and redemptions, and (iv) for "any transaction from which the director derived an improper personal benefit." Del. Code Ann. tit. 8, § 102(b)(7); see also Emerald Partners v. Berlin, 787 A.2d 85, 90 (Del. 2001) ("[f]ollowing the enactment of Section 102(b)(7), the shareholders of many Delaware corporations approved charter amendments containing these exculpatory amendments with full knowledge of their import").

Acting pursuant to Section 102(b)(7), Merrill's shareholders voted to amend Merrill's Restated Certificate of Incorporation in 1987 to add Article XIII, thereby providing Merrill's directors the full protection allowed by the statute. See Kasner Decl., Ex. SS (Merrill Restated Certificate of Incorporation, dated May 3, 2001) Art. XIII, Section 1. As stated in Merrill's 1987 Proxy Statement, pursuant to which Merrill's shareholders voted for this Certificate of Incorporation provision:

> Because of the increasing unavailability of acceptable directors' and officers' liability insurance, the Delaware legislature recently amended the Delaware General Corporation Law (the "Corporation Law") under which ML & Co. is organized, to authorize a corporation, with stockholder approval, to limit the personal liability of directors for monetary damages for certain breaches of fiduciary duties. Pursuant to such amendment to the Corporation Law, the proposed Amendment (the "Amendment") to ML & Co.'s Restated Certificate of Incorporation (the "Certificate") contains a provision (the "Limitation of Liability Provision") that would effectively eliminate personal liability of ML & Co.'s directors for breach of their duty of care, but not for, among other things, breach of their duty of loyalty or intentional misconduct. . . .

> Stockholders are being asked to give up their right to bring a claim against directors for monetary damages for breach of their fiduciary duty of care, even if the directors exercise their business judgment in a grossly negligent manner when considering, for example, acquisition proposals or similar transactions. Adoption of the Limitation of Liability Provision

39

> may reduce the likelihood of derivative litigation against directors and may discourage or deter stockholders or management from bringing a lawsuit against directors for breach of their duty, even though such an action, if successful, might otherwise have benefited ML & Co.

See Kasner Decl., Ex. GG (Merrill Definitive Proxy Statement for 1987, filed with the SEC on Form 14A on Mar. 23, 1987) at 16-19.

Delaware courts repeatedly have held that where a certificate of incorporation provision eliminates director liability for breaches of fiduciary duty pursuant to Section 102(b)(7), a complaint alleging a breach of fiduciary duty that does not implicate any of the four exceptions in Section 102(b)(7) must be dismissed as a matter of law.  See, e.g., Malpiede v. Townson, 780 A.2d 1075, 1092-93 (Del. 2001) (affirming dismissal of plaintiffs' due care claim pursuant to Section 102(b)(7)); Laties v. Wise, No. Civ. A. 1280-N, 2005 WL 3501709, at *2 (Del. Ch. Dec. 14, 2005) (dismissing complaint pursuant to Section 102(b)(7) provision in the company's charter where complaint did not assert bad faith, intentional misconduct, or knowing violation of law); In re Lukens Inc. S'holders Litig., 757 A.2d 720, 734 (Del. Ch. 1999) (same), aff'd sub nom. Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000).

Here, a breach of the duty of good faith is pled only in the most conclusory terms, with no facts alleged demonstrating that Merrill's present and former directors breached such a duty.  While the Complaint vaguely pleads that certain of the Director Defendants were "aware of the increased risks to Merrill Lynch's subprime investments (which were not only known within the Company, but which were public knowledge by early 2007) and consciously disregarded these risks and failed to carry out their fiduciary duties to manage such risks" (Compl. ¶ 241), it is devoid of any specific facts supporting these allegations.  Rather, the Complaint merely speculates that the members of the Board's Audit and Finance Committees "must have known" of these risks and ignored them.  (Id.)  Because such allegations are

40

insufficient to plead a breach of the duty of loyalty or good faith, the claims against Merrill's present and former directors for breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, gross mismanagement, and abuse of control must be dismissed as a matter of law pursuant to Article XIII, Section 1(a) of Merrill's Restated Certificate of Incorporation.

**POINT III**

**THE COMPLAINT SHOULD BE DISMISSED UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM**

Rule 12(b)(6) provides that a complaint must be dismissed where it fails to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). Following the United States Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), a plaintiff does not adequately plead a claim for relief by merely alleging a "conceivable" basis for that claim. Id. at 1974. Rather, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss pursuant to Rule 12(b)(6). Id. When deciding such a motion to dismiss, the Court must accept as true all well-pled allegations in the Complaint. See Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 465 (S.D.N.Y. 2002); Debussy LLC v. Deutsche Bank AG, No. 05 Civ. 5550, 2006 WL 800956, at *2 (S.D.N.Y. Mar. 29, 2006), aff'd, 242 Fed. Appx. 735 (2d Cir. 2007). However, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.), 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001); see also In re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249, 255 (S.D.N.Y. 2006) ("the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss need not be accepted"). Furthermore, the Court need

41

not assume the truth of legal conclusions or unsupported factual inferences.  See Debussy, 2006 WL 800956, at *2; In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("In order to avoid dismissal, plaintiffs must do more than plead mere 'conclusory allegations or legal conclusions masquerading as factual conclusions'") (citation omitted).

## A.    The Complaint Does Not State A Claim For Breach Of The Duty Of Oversight

As set forth above, see Point I(C)(1)(b), supra, in order to plead a claim under Delaware law for breach of fiduciary duty based on an alleged failure of oversight, a plaintiff must allege that "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system of controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  AmSouth, 911 A.2d at 370 (emphasis in original).  Since Plaintiffs concede (and Merrill's proxy statements make clear) that Merrill had reporting systems and controls, and fail to plead that the Individual Defendants received warnings requiring their attention and consciously ignored such warnings, they have failed to state a claim for breach of the duty of oversight – "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."  In re Caremark, 698 A.2d at 967.

## B.    The Complaint Does Not State A Claim For Breach Of Fiduciary Duty Based On Alleged Misappropriation Of Information And Insider Stock Sales

To properly plead a breach of fiduciary duty claim based on allegations of insider trading, a complaint must allege facts demonstrating that a defendant traded company stock when he or she possessed material, non-public information.  See Brophy v. Cities Serv. Co., 70 A.2d 5, 8 (Del. Ch. 1949) ("When, therefore, a person 'in a confidential or fiduciary position, in breach of his duty, uses his knowledge to make a profit for himself, he is accountable for such profit'") (citation omitted); In re Oracle Corp. Deriv. Litig., 867 A.2d 904, 934 (Del. Ch. 2004)

(a plaintiff seeking to prevail on a <u>Brophy</u> claim ultimately must show that the corporate fiduciary possessed material, nonpublic company information and used that information improperly by making trades in company stock), <u>aff'd</u>, 872 A.2d 960 (Del. 2005).  In addition, "'it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse, material non-public information.'"  <u>Rattner</u>, 2003 WL 22284323, at *11 (<u>quoting</u> <u>Stepak v. Ross</u>, No. Civ. A. 7047, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985)).  Where a complaint fails to plead particularized facts demonstrating that the trades in question were "unusual" in comparison to prior trading periods, courts repeatedly have held that plaintiff failed to plead a breach of fiduciary duty.  <u>See</u> <u>Rattner</u>, 2003 WL 22284323, at *12 (rejecting allegations of insider trading where the complaint "does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices"); <u>Guttman</u>, 823 A.2d at 498 (rejecting allegations of insider trading where the complaint lacked allegations as to "[t]he relationship of the defendants' trades . . . to permitted trading periods," as well as "[t]he actual trading patterns of the defendants . . . during the periods preceding the Contested Period . . .").

As a threshold matter, while Count VII of the Complaint purports to assert a claim for breach of fiduciary duty based on misappropriation of information and insider stock sales "against <u>all</u> defendants," the Complaint only alleges that four Individual Defendants (O'Neal, Fakahany, Edwards, and Fleming) sold Merrill stock during the Relevant Period.  (Compl. ¶ 266.)  As a result, the Complaint plainly does not plead a claim based on sales of Merrill stock against any other Individual Defendants.

With respect to Messrs. O'Neal, Fakahany, Edwards, and Fleming, the Complaint merely lists purported sales of Merrill stock between February 1 and 7, 2007, and then alleges in

wholly conclusory fashion that these sales were executed while these defendants were in possession of "material, nonpublic information regarding the Company's true business prospects." (Compl. ¶ 266.)  First, Plaintiffs have erroneously asserted that Mr. Edwards sold Merrill stock during this time period, and materially overstated the number of shares sold by Messrs. O'Neal, Fakahany and Fleming.  Mr. Edwards did not sell <u>any</u> Merrill stock in 2006 or 2007.[17]  Thus, Plaintiffs have plainly failed to state a claim against Mr. Edwards for breach of fiduciary duty based on insider sales.  In addition, Mr. O'Neal sold 199,887 shares of Merrill stock between February 1 and February 7, 2007 (not the 474,335 shares alleged by Plaintiffs), Mr. Fakahany sold 77,998 shares of Merrill stock during that time period (not the 162,580 shares alleged by Plaintiffs), and Mr. Fleming sold 45,020 shares of Merrill stock in that time period (not the 80,109 shares alleged by Plaintiffs).  <u>See</u> Kasner Decl., Ex. RR (E. Stanley O'Neal Statements of Changes in Beneficial Ownership, filed with the SEC on Form 4 on Feb. 6, 2007); Ex. PP (Ahmass L. Fakahany Statements of Changes in Beneficial Ownership, filed with the SEC on Form 4 on Feb. 6, 2007); Ex. QQ (Gregory J. Fleming Statement of Changes in Beneficial Ownership, filed with the SEC on Form 4 on Feb. 8, 2007).  These sales constituted less than ten percent (10%) of Messrs. O'Neal, Fakahany, and Fleming's holdings of Merrill stock and vested options.  <u>See</u> Kasner Decl., Ex. JJ (Merrill 2007 Proxy Statement) at 31 (showing overall holdings of 3,214,358 shares and options for Mr. O'Neal, 937,197 shares and options for Mr. Fakahany, and 912,904 shares and options for Mr. Fleming).

---

[17]   Plaintiffs assert that Mr. Edwards sold 30,963 shares of Merrill stock between February 1 and 7, 2007.  (Compl. ¶ 266.)  However, the Report on Form 4 filed by Mr. Edwards on February 2, 2007 indicates that these shares, which vested in January 2007, were automatically forfeited for tax withholding purposes.  <u>See</u> Kasner Decl., Ex. OO (Jeffrey N. Edwards Statement of Changes in Beneficial Ownership, filed with the SEC on Form 4 on Feb. 2, 2007).  Such forfeiture of shares for tax withholding purposes does not constitute insider trading.  <u>See</u> <u>In re Sportsline.com Sec. Litig.</u>, 366 F. Supp. 2d 1159, 1173 (S.D. Fla. 2004).

With respect to these sales, absent from the Complaint are particularized facts demonstrating that any defendant "possessed any <u>specific</u> material, nonpublic information at the time of each of those transactions" or that defendants "traded on the basis of such information." <u>In re Sagent Tech., Inc., Deriv. Litig.</u>, 278 F. Supp. 2d 1079, 1092 (N.D. Cal. 2003).  Moreover, the Complaint does not contain allegations indicating that these sales were "unusual" in light of prior trading practices.  <u>See</u> <u>Rattner</u>, 2003 WL 22284323, at *12; <u>see also</u> Merrill Lynch & Co., Inc.'s Memorandum of Law in Support of its Motion to Dismiss in the action captioned <u>In re Merrill Lynch & Co., Inc. Securities Litigation</u>, 07cv9633, dated July 21, 2008 (Docket No. 54), at 42-44.  Since the Complaint fails to identify specific, material, nonpublic information that was in Defendants' possession when the trades in question occurred, it fails to state a <u>Brophy</u> claim for insider trading as a matter of law.

## C.     The Complaint Does Not State A Claim For Aiding And Abetting A Breach Of Fiduciary Duty By The Individual Defendants

Under Delaware law, in order to adequately plead a claim for aiding and abetting a breach of fiduciary duty, a complaint must allege: "(i) the existence of a fiduciary relationship[;] (ii) a breach of a fiduciary duty[;] (iii) knowing participation in th[at] breach by a defendant who is <u>not a fiduciary</u>[;] and (iv) damages proximately caused by the breach." <u>McGowan v. Ferro</u>, No. Civ. A. 18672-NC, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002) (emphasis added).  Aiding and abetting liability is a form of vicarious liability.  <u>See</u> <u>Albert v. Alex. Brown Mgmt. Servs., Inc.</u>, Nos. Civ. A. 762-N, 763-N, 2005 WL 2130607, at **10-11 (Del. Ch. Aug. 26, 2005).  "It holds a third party, <u>not a fiduciary</u>, responsible for a violation of fiduciary duty."  <u>Id.</u> at *11 (emphasis added); <u>see also</u> <u>In re Zoran Corp. Deriv. Litig.</u>, 511 F. Supp. 2d 986, 1018 (N.D. Cal. 2007) (dismissing aiding and abetting breach of fiduciary duty

claim under Delaware law where "Plaintiff has not pled the existence of a defendant who is not already a fiduciary").

Here, the Complaint asserts that all Individual Defendants owe fiduciary duties to Merrill's shareholders. (Compl. ¶¶ 6, 222, 273, 297.) Since the Individual Defendants are alleged to owe such fiduciary duties, they cannot be liable under an aiding and abetting theory. See In re Zoran, 511 F. Supp. 2d at 1018. In addition, Plaintiffs' aiding and abetting claim must be dismissed because, as demonstrated above (see Point III(A), (B), supra), there is no underlying breach of fiduciary duty. See Midland Grange No. 27 Patrons of Husbandry v. Walls, C.A. No. 2155-VCN, 2008 WL 616239, at *12 (Del. Ch. Feb. 28, 2008) ("Because the Court has concluded that the Officer Respondents did not breach their fiduciary duties, [plaintiff] cannot, as a matter of law, prevail on its aiding and abetting claim"); Globis Partners, L.P. v. Plumtree Software, Inc., C.A. No. 1577-VCP, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007) (same).

**D.    The Complaint Does Not State A Claim For Gross Mismanagement Or Abuse Of Control**

Delaware law does not recognize an independent cause of action for gross mismanagement or abuse of control separate and apart from a breach of fiduciary duty claim. See In re Zoran, 511 F. Supp. 2d at 1019 (dismissing claims for gross mismanagement and abuse of control under Delaware law because "these claims are often considered a repackaging of claims for breach of fiduciary duties instead of being a separate tort"); Continuing Creditors' Comm. of Star Telecommc'ns, Inc. v. Edgecomb, 385 F. Supp. 2d 449, 464 (D. Del. 2004) ("'claim that a corporate manager [or director] acted with gross negligence is the same as a claim that she breached her fiduciary duty of care'") (citation omitted). Thus, Plaintiffs' purported claims for "gross mismanagement" and "abuse of control" must be dismissed.

**E.    The Complaint Does Not State A Claim For Corporate Waste**

As set forth above, see Point I(D)(2)(c), supra, in order to state a claim for corporate waste, a complaint must plead that there was an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.  See Brehm, 746 A.2d at 263.  As explained by the Delaware Court of Chancery:

> Most often the claim [for waste] is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received.  Such a transfer is in effect a gift.  If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky.  Any other rule would deter corporate boards from the optimal rational acceptance of risk.

Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997) (emphasis omitted).

Here, the Complaint alleges that "O'Neal and the Director Defendants' failure to adequately evaluate and monitor Merrill Lynch's risk in the CDO market constituted a waste of Merrill Lynch's corporate assets."  (Compl. ¶ 279.)  These allegations fail to state a waste claim under the stringent standard established by Delaware law.  Plaintiffs do not assert that the CDOs and other subprime related securities purchased by Merrill had no value at the time they were purchased.  Rather, the Complaint merely asserts that there were risks associated with these investments, and that the value of these assets declined over time as borrowers defaulted on their mortgages.  Such allegations plainly fail to plead that these transactions were "bereft of consideration," and Plaintiffs' waste claim therefore should be dismissed.  See Wagner v. Selinger, No. 16740, 2000 WL 85318, at *3 (Del. Ch. Jan. 18, 2000).

The Complaint also asserts that "the Director Defendants committed corporate waste by authorizing and approving O'Neal's exorbitant severance package" because "there was

47

no consideration" for that package.  (Compl. ¶ 280.)  As set forth above, see Point I(D)(2)(c), supra, (i) all of the compensation that Mr. O'Neal received in connection with his retirement "had been earned and awarded in prior years," so Mr. O'Neal plainly did not receive a "golden parachute" or "exorbitant severance package", and (ii) Merrill received consideration in exchange for reducing Mr. O'Neal non-compete agreement and providing Mr. O'Neal with a secretary and an office after his retirement.  Thus, these conclusory allegations fail to meet the stringent Delaware standard for pleading a claim of corporate waste.

## F.    The Complaint Does Not State A Claim For Unjust Enrichment

To plead a cause of action for unjust enrichment under Delaware law, a complaint must allege: (i) "an enrichment"; (ii) "an impoverishment"; (iii) "a relation between the enrichment and the impoverishment"; (iv) "the absence of justification"; and (v) "the absence of a remedy at law."  Total Care Physicians, P.A. v. O'Hara, No. Civ. A. 99C-11-201-JRS, 2002 WL 31667901, at *10 (Del. Super. Ct. Oct. 29, 2002); see Khoury Factory Outlets, Inc. v. Snyder, No. 11568, 1996 WL 74725, at *11 (Del. Ch. Jan. 8, 1996).

Here, the Complaint alleges in conclusory fashion that "[b]y their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Merrill Lynch."  (Compl. ¶ 308.)  However, the Complaint does not allege that the Individual Defendants received any enrichment at all in connection with the challenged conduct.  Rather, the only compensation allegedly received by the Individual Defendants relates to their services as officers or directors, and Delaware law does not regard ordinary officer or director compensation with suspicion.  See Silverzweig v. Unocal Corp., Civ. A. No. 9078, 1989 WL 3231, at *2 (Del. Ch. Jan. 19) ("the receipt of directors' fees does not constitute a disqualifying interest for purposes of the demand requirement"), aff'd, 561 A.2d 993 (Del. 1989); Elkins, 2004

48

WL 1949290, at *17 (board's decision on executive compensation is "entitled to great deference"). Thus, Plaintiffs' unjust enrichment claim should be dismissed.

**G.**    **Plaintiffs' Contribution And Indemnification Claims Are Not Ripe**

The Complaint vaguely asserts that "Merrill Lynch is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Merrill Lynch." (Compl. ¶ 293.) As a result, Plaintiffs claim that "Merrill is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Merrill Lynch by virtue of the Defendants' misconduct." (Id. ¶ 294.) While the Complaint does not articulate whether Plaintiffs' indemnification and contribution claims are asserted under state or federal law, it appears that these claims are brought under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 21D of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78j(b) (the "PSLRA").

The Complaint, however, fails to allege that Merrill has actually incurred any liability to any plaintiff arising from Defendants' alleged misconduct. Thus, Plaintiffs' speculative claim for indemnification or contribution is not ripe and should be dismissed as a matter of law. See In re Cendant Corp. Deriv. Action Litig., 96 F. Supp. 2d 394, 397 (D.N.J. 2000) (derivative plaintiff's claim for contribution against the directors of Cendant Corporation under Section 11(f) of the Securities Act of 1933 was not ripe where there was no final judgment or settlement against Cendant); Pall v. KPMG, LLP, No. 3:03CV00842, 2006 WL 2800064, at *3 (D. Conn. Sept. 26, 2006) (dismissing shareholder derivative claim for contribution under Section 21D of the Exchange Act and common law as not ripe where that claim was "contingent upon a finding of liability in related actions"); In re United Telecommc'ns, Inc., Sec. Litig., No. 90-2251-EEO, 1993 WL 100202, at *3 (D. Kan. Mar. 4, 1993) (dismissing shareholder

derivative action as not ripe where the plaintiff only sought to recover speculative damages that the corporation "might be ordered to pay" in a related class action).

To the extent Plaintiffs seek contribution or indemnification under Delaware law, that claim also is not ripe. See Quereguan v. New Castle Cty., C.A. No. 20298-NC, 2006 WL 2522214, at *5 (Del. Ch. Aug. 18, 2006) ("a cause of action for common law indemnification does not accrue until after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded"); Certainteed Corp. v. Celotex Corp., No. Civ. A. 471, 2005 WL 217032, at *3 (Del. Ch. Jan. 24, 2005) (cause of action for common law indemnification "accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded").[18]

---

[18]    Plaintiffs also seek "a declaration that Merrill Lynch has no duty to advance any legal fees to the Individual Defendants because they did not act in good faith or in any manner they believed to be in the best interest of the Company." (Compl. ¶ 295.) However, Merrill's Restated Certificate of Incorporation expressly provides that: "Directors and officers of the Corporation shall have the right to be paid by the Corporation expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition." Kasner Decl., Ex. SS (Merrill Restated Certificate of Incorporation, dated May 3, 2001) Art. XIII, Section 2(b); Del. Code Ann. tit. 8, § 145(e). Thus, Plaintiffs are not entitled to such a declaration as a matter of law.

## CONCLUSION

For all of the reasons set forth above, Defendants' motion to dismiss the Complaint and each and every claim stated in the Complaint should be granted.

Dated:    New York, New York
          July 21, 2008


                                        Respectfully submitted,


SKADDEN, ARPS, SLATE, MEAGHER          CADWALADER, WICKERSHAM
     & FLOM LLP                             & TAFT LLP


By: _____/s/ Jay B. Kasner_____    By: _____/s/ Dennis J. Block_____
Jay B. Kasner                          Dennis J. Block
Scott D. Musoff                        Gregory A. Markel
Four Times Square                      Jason M. Halper
New York, New York 10036               One World Financial Center
(212) 735-3000                         New York, New York 10281
                                       (212) 504-6000


Attorneys for Nominal Defendant        Attorneys for Defendants Carol T. Christ,
Merrill Lynch & Co., Inc.              Armando M. Codina, Virgis W. Colbert,
                                       Alberto Cribiore, John D. Finnegan,
                                       Judith Mayhew Jonas, Joseph W. Prueher,
                                       Ann N. Reese and Charles O. Rossotti


SIMPSON THACHER & BARTLETT LLP         MILBANK, TWEED, HADLEY
                                            & MCCLOY LLP


By: _____/s/ Michael J. Chepiga_____    By: _____/s/ James N. Benedict_____
Michael J. Chepiga                     James N. Benedict
Paul C. Curnin                         George Canellos
425 Lexington Avenue                   One Chase Manhattan Plaza
New York, New York 10017               New York, New York 10005
(212) 455-2000                         (212) 530-5000


Attorneys for Defendant E. Stanley O'Neal     Attorneys for Defendant Ahmass L. Fakahany

WILLKIE FARR & GALLAGHER LLP          WEIL, GOTSHAL & MANGES LLP


By: _____/s/ Michael R. Young_____          By: _____/s/ Joseph S. Allerhand_____
Richard D. Bernstein          Joseph S. Allerhand
Michael R. Young          Jonathan D. Polkes
787 Seventh Avenue          767 Fifth Avenue
New York, New York 10019          New York, New York 10153
(212) 728-8000          (212) 310-8000

Attorneys for Defendant Jeffrey N. Edwards          Attorneys for Defendant Gregory J. Fleming

52