**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | : : : : : : : : | Master File No.: 07cv9633 (LBS)(AJP)(DFE) **CLASS ACTION** |
| This Document Relates To: ERISA ACTION | : : : : | Case No.: 07-CV-10268 (LBS)(AJP)(DFE) |

------------------------------------

**CONSOLIDATED AMENDED COMPLAINT FOR**
**VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

375471.2 2

## I.    INTRODUCTION

1.    Plaintiffs Carl Esposito, Barbara Boland, Alan Maltzman and Mary Gidaro ("Plaintiffs") allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company"), including Merrill Lynch's proxy statements (Form DEF 14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of the Merrill Lynch 401(k) Savings and Investment Plan (the "SIP"), a review of the Forms 5500 filed by the SIP, the Merrill Lynch Retirement Accumulation Plan (the "RAP"), and the Merrill Lynch Employee Stock Ownership Plan (the "Traditional ESOP") (collectively the "Plans") with the U.S. Department of Labor ("DOL"), interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.    NATURE OF THE ACTION

2.    This is a class action brought on behalf of the Plans pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plans for violations of ERISA.

3.    The Plans are retirement plans sponsored by Merrill Lynch.

4.    Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets from September 25, 2006 to May 6, 2008 (the "Class Period").

375471.2 2

5.    Defendants allowed the imprudent investment of the Plans' assets in Merrill

Lynch common stock throughout the Class Period even though they knew or should have known

that such investment was unduly risky and imprudent due to the fact that, by June 29, 2007, the

Company had accumulated at least $43 billion of net exposure to risky and illiquid collateralized

debt obligation securities ("CDO securities")[1][2] and subprime mortgages,[3] which was greater

than the Company's total equity value of $42 billion at that time (also referred to as "book

value"). Merrill Lynch not only withheld information about the true extent of its net exposure to

CDO securities and subprime mortgages (collectively "CDO and subprime exposure"),[4] but the

Company repeatedly made false and misleading statements about its exposure to these risky and

illiquid securities, thereby artificially inflating the value of shares of Merrill Lynch stock and the

Merrill Lynch Stock Fund in the Plans ("Merrill Lynch Stock Fund" or "Company Stock Fund").

---

[1]    According to the Company's 2007 10-K, "collateralized debt obligations" or "CDOs" are securities "collateralized by a pool of asset-backed securities ('ABS'), for which the underlying collateral is primarily subprime residential mortgage loans." *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 28, 2007), at 36 (hereinafter, "2007 10-K"). Because the press often refers to "CDOs" as the investment vehicles or entities that purchase the underlying assets that are repackaged and securitized as new debt securities (i.e., the issuer of the new securities), to avoid confusion, we hereinafter refer to the entire investment vehicle as the CDO and the securities issued as "CDO securities."

[2]    In its third quarter 2007 10-Q, Merrill Lynch restated its net exposure related to CDO securities as $33.9 billion (as of June 29, 2007, see footnote 4, *infra*), which primarily consisted of the Company's "CDO portfolio" (CDO securities held "on balance sheet") as well as "retained and warehouse exposures related to our CDO business." *See* Merrill Lynch Quarterly Report (Form 10-Q) (Sep. 28, 2007) (hereinafter, "Third Quarter 2007 10-Q"), at 76.

[3]    In its Third Quarter 2007 10-Q, Merrill Lynch disclosed that, as of June 29, 2007, it had net exposures related to subprime mortgages of $8.8 billion, which consisted of U.S. subprime whole loans, residual positions, residential mortgage backed securities (RMBS) and warehouse lending. *Id,* at 74 -5.

[4]    No CDO net exposure value was disclosed in the Company's Second Quarter 2007 10-Q; the term CDO appeared only once in a generic statement. *See* Merrill Lynch's Quarterly Report (Form 10-Q) (June 29, 2007) (hereinafter, "Second Quarter 2007 10-Q"). The first disclosure was in an October 24, 2007 8-K that stated, as of June 29, 2007, it had $40.1 billion of CDO and subprime related net exposure. *See* Merrill Lynch Current Report 8-K (Oct. 24, 2007). However, in its Third Quarter 2007 10-Q, the Company restated the value of its Second Quarter CDO and subprime net exposure as $42.7 billion, which was comprised of $33.9 billion of CDO related exposure and $8.8 billion of subprime mortgage related exposure. *See* footnotes 2 and 3, *supra.* Hereinafter, we use this updated value of $43 billion as the Company's disclosed value of its exposure to CDO and subprime securities (as of (September 28, 2007). *See* Third Quarter 2007 10-Q.

6.    Meanwhile, the Company and the Plans' other fiduciaries took no steps to protect the Plan participants and beneficiaries from the risk posed by the Plans' investment in Merrill Lynch stock, and caused or allowed the Plans to continue to purchase this stock at inflated prices.

7.    For example, on July 17, 2007 after the failure of two Bear Stearns subprime related hedge funds, concerned stock analysts asked Merrill Lynch's Chief Financial Officer, Jeffrey Edwards, pointed questions about how much capital Merrill Lynch had at risk related to subprime mortgages, CDO securities, and warehouse lines. *See Merrill Lynch Second Quarter 2007 Analyst Conference Call*, July 17, 2007, at 5 (hereinafter, "Second Quarter 2007 Conference Call").  In response, Merrill Lynch did not disclose the $43 billion in CDO and subprime exposure that it had at that time; rather the Company reassured the analysts and investors at large that its "aggressive risk management has put it in [an] exceptionally good position." *Id.*  At the same time Merrill Lynch's CEO directed similar reassurances at the participants in the Plans. Just three months later, however, the Company began taking billions of dollars in write-downs (i.e., losses).  Within six months the Company disclosed $23.2 billion in write-downs related to CDO and subprime related securities.[5]  2007 10-K, at 22.  Since then the Company has disclosed additional write-downs totaling $31 billion[6] (including the previously

---

[5]    According to its 2007 10-K, the write-down of $23.2 billion was comprised of $16.7 billion related to CDO exposure, $3.2 billion related to U.S. subprime residential mortgage exposure, $2.6 billion related to credit valuation adjustments from hedges on CDO securities with financial guarantors and approximately $700 million related to subprime related securities in Merrill Lynch's U.S. banks investment securities portfolio. 2007 10-K, at 22.

[6]    For 2007, Merrill Lynch reported $23.2 billion in write-downs related to CDO and subprime exposure. *See* footnote 5, *supra.* On April 17, 2008, the Company reported an additional $4.5 billion in write-downs and $3.1 billion in "comprehensive losses" related to its CDO and subprime exposure, which totals $30.8 billion (rounded to $31 billion). *See* Merrill Lynch Current Report 8-K (Apr. 17, 2008), at Ex. 99.1. Under applicable accounting rules, Merrill Lynch can elect not to classify the $3.1 billion in "comprehensive losses" from CDO and subprime securities as "write-downs" by stating that the securities that have lost value are available-for-sale rather than held to maturity. 2007 10-K, at 24, 64. The effect is that Merrill Lynch can elect to account for the $3.1 billion in losses from these securities as "other comprehensive losses" to shareholder equity rather than as write-downs that are accounted for on the Company's income statement. Because the only difference between write-downs and "other comprehensive losses" is whether the securities are held as available-for-sale or held to maturity, for clarity and simplicity we collectively refer to Merrill Lynch's disclosed write-downs and comprehensive losses as "write-downs" related to subprime and CDO exposure, which totaled $31 billion as of March 28, 2008. *See* Merrill Lynch Current Report 8-

disclosed $23.2 billion) and has acknowledged that it may continue to take additional write-downs based on its remaining exposure to CDO and subprime securities.[7] The $31 billion in write-downs that Merrill Lynch has suffered is the predictable result of Merrill Lynch's decision to wager its *own* capital on increasingly risky and illiquid CDO and subprime related securities, a process the Company started in 2006.

8.    Merrill Lynch withheld information about the true condition of the Company as long as it could while employees purchased and held Company stock at inflated prices. Eventually, the inevitable day of reckoning came when Merrill Lynch could no longer hide the losses it had suffered from its CDOs and subprime exposure. Starting on October 5, 2007, the Company began to announce its write-downs increments (as described in detail below). As Merrill Lynch continues to increase the value of its write-downs -- currently $31 billion (which is more than six times its initial estimate of $4.5 million on October 5, 2007), the price of its stock has fallen to almost half its value since the beginning of the Class Period. On September 25, 2006, the stock closed at $78.49, but as of May 6, 2008, it closed at $51.35, a loss of over one-third of its value.

9.    Even now the full extent of Merrill Lynch's CDO and subprime exposure remains unknown. Some analysts predict that additional write-downs are imminent because the Company's actual CDO and supbrime net exposure have not been fully disclosed.[8] For example,

---

K (Apr. 17, 2008), at Ex. 99.1; 2007 10-K, at 117. *See also*, David Reilly, *A Way for Charges to Stay Off the Bottom Line*, Wall St. J., Apr. 21, 2008.

[7]    The Company acknowledged that, "We may incur additional material losses in future periods due to write-downs in the value of financial instruments" and that the "markets for U.S. ABS CDOs and other sub-prime residential mortgage exposures remain extremely illiquid in early 2008 and, as a result, valuation of these exposures is complex and involves a comprehensive process including the use of quantitative modeling and management judgment." 2007 10-K, at .25.

[8]    Moreover, the fact that current value of disclosed write-downs equals 70% of the Company's initial disclosure of its CDO and subprime exposure (i.e., $31 billion / $43 billion) leads to one of two conclusions: (1) the CDO and subprime related securities that Merrill Lynch has on its balance sheet are currently only worth about 30%

Brad Hintz, an analyst at Sanford Bernstein, has estimated that Merrill Lynch in fact had $150 billion in CDO and subprime exposure in July 2007 (versus the disclosed value of $43 billion). Daniel Fisher, *No Thain, No Gain: Can the Man Who Saved the NYSE Revive a Badly Mauled Merrill Lynch,* Forbes, Apr. 7, 2008. Accordingly, further disclosures of previously withheld information may necessitate revising the Class Period.

10. Merrill Lynch's Company stock was not a suitable investment for the retirement accounts of its employees due to Merrill Lynch's reckless business practices, including wagering the entire book value of the franchise on securities that were risky, illiquid and highly correlated. Merrill Lynch's rush into the uncharted waters of purchasing and holding CDO and subprime related securities exposed the Company to unacceptable levels of risk, which resulted in $31 billion of write-downs to date.

11. Moreover, unrelated to its CDO and subprime exposure, Merrill Lynch also has "significant" off-balance sheet exposure. The Company has disclosed $90 billion as of December 2007, which was an increase of 65% from December 2006 and, in fact, the majority of that increase was in just one quarter (off-balance sheet exposure rose 52% from September to December of 2007).[9] In addition the Company had $70 billion dollars in "total return swaps" that were not consolidated into its financial statements (i.e., derivative contracts that may require Merrill Lynch to repurchase certain assets) as of December 2007.[10]

---

of their initial value (or $12.9 billion) or (2) Merrill Lynch continues to withhold the true extent of its CDO and subprime exposure and indeed the remaining exposure is much greater than the $12.9 billion not yet written down.

[9]     Merrill Lynch acknowledges in both its 2006 and 2007 10-Ks that, "As a part of our normal operations, we enter into various off-balance sheet arrangements that may require future payments." The total value of the Company's "significant" off-balance exposure was $54.5 billion on December 29, 2006, $59.3 billion on September 28, 2007, and $89.8 billion on December 28, 2007. See *Merrill Lynch Annual Report* (Form 10-K) (Dec. 29, 2006) (hereinafter, "2006 10-K"), at 43; 2007 10-K, at 50. *See also* Third Quarter 2007 10-Q.

[10]     The Company disclosed in its 2007 10-K, "We also fund selected assets, including CDOs and CLOs [collateralized loan obligations, which are securities where the payments are backed with receivables from loans] via derivative contracts with third party structures that are not consolidated on our balance sheets. Of the total notional amount of these total return swaps, approximately $24 billion is term financed through facilities provided by

12.    Finally, Merrill Lynch has taken on even greater risk through other derivative contracts in the form of guarantees.[11] The Company disclosed that its "maximum payout/notional [value]" was $4.6 *trillion* as of December 28, 2007, which was $2.7 trillion, or 157% greater than the Company's "maximum payout" value a year before.[12]

13.    In short, during the Class Period, Merrill Lynch's stock was an artificially inflated, unduly risky, and inappropriate investment option for participants' retirement savings. Because the Plans' fiduciaries knew or should have known of these circumstances, they breached their fiduciary duties by failing to take action to protect the Plans from the massive losses that occurred.

14.    Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the Plans' assets breached their fiduciary duties to the Plans' participants and beneficiaries in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Merrill Lynch stock. In Count II, Plaintiffs allege that the Defendants, who were responsible for the selection, monitoring and removal of the Plans' other fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate. In Count III, Plaintiffs allege that the Defendants, with knowledge of the risks associated with Merrill Lynch stock, breached their duty to disclose

---

commercial banks, $35 billion of long term funding is provided by third party special purpose vehicles and $11 billion is financed with asset backed commercial paper conduits. In certain circumstances, we may be required to purchase these assets which would not result in additional gain or loss to us as such exposure is already reflected in the fair value of our derivative contracts." 2007 10-K, at 137.

[11]    The Company disclosed that "Merrill Lynch enters into certain derivative contracts that meet the accounting definition of a guarantee under FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indebtedness of Others ("FIN 45"), [which] defines guarantees to include derivative contracts that contingently require a guarantor to make payment to a guaranteed party based on changes in an underlying (such as changes in the value of interest rates, security prices, currency rates, commodity prices, indices, etc.), that relate to an asset, liability or equity security of a guaranteed party. Derivatives that meet the FIN 45 definition of guarantees include certain written options and credit default swaps (contracts that require Merrill Lynch to pay the counterparty the par value of a referenced security if that referenced security defaults)." *Id* at 137.

[12]    The maximum payout for its derivative contracts was $1.8 trillion as of December 2006.

6

necessary information to co-fiduciaries.  In Count IV, Plaintiffs allege that the Defendants responsible for providing information to participants and beneficiaries breached their duty to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness of Merrill Lynch stock and the prudence of investing and holding retirement contributions in Merrill Lynch equity.  In Count V, Plaintiffs allege that various Defendants breached their duties and responsibilities as co-fiduciaries, among other things, failing to remedy breaches by other fiduciaries of their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

15.    As more fully explained below, during the Class Period, Defendants with responsibility for the plan investments imprudently permitted the Plans to hold and acquire billions of dollars in Merrill Lynch stock despite the Company's undisclosed $43 billion in exposure to risky and illiquid assets, namely its CDO and subprime related securities.  Based on publicly available information for the Plans, it appears that Defendants' breaches have caused the Plans to lose nearly *$1.5 billion dollars* of retirement savings.

16.    This action is brought on behalf of the Plans and seeks to recover losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

17.    ERISA §§ 409(a) and 502(a)(2) authorizes participants such as the Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duties.  Pursuant to that authority, Plaintiffs bring this action as a class action under

Fed. R. Civ. P. 23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Merrill Lynch common stock during the Class Period.

18.     In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

## III.     JURISDICTION AND VENUE

19.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

20.     **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

21.     **Venue.** Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Merrill Lynch has its principal place of business in this district.

## IV.    PARTIES

**A.    Plaintiffs**[13]

22.    **Plaintiff Carl Esposito** is a resident of Suffolk, New York.  He worked for Merrill Lynch beginning in December, 1989, and left the Company in July, 2002.  He is a participant in the SIP, the Traditional ESOP, and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

23.    **Plaintiff Barbara Boland** is a resident of Metuchen, New Jersey.  She worked for Merrill Lynch beginning in 1980 and left the Company in 2007.  She is a participant in the SIP, the Traditional ESOP, and the RAP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1102(7) and 1132(a), and held Merrill Lynch shares in the Plans during the Class Period.

24.    **Plaintiff Alan Maltzman** is a resident of Monroe Township, New Jersey.  He worked for Merrill Lynch beginning in 1956, and left the Company in 1996.  He is a participant in the SIP, the Traditional ESOP and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

25.    **Plaintiff Mary Gidaro** is a resident of Princeton, New Jersey.  She began working for Merrill Lynch in 1987, and is a current employee.  She is a participant in the SIP, the Traditional ESOP and the RAP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Merrill Lynch shares in the Plans during the Class Period.

**B.    Defendants**

26.    **Defendant Merrill Lynch & Co., Inc.**  Merrill Lynch, a Delaware corporation, is a holding company with its principal place of business at 4 World Financial Center, 250 Vesey

---

[13/]    Plaintiffs may propose additional class representatives when they move for certification of the proposed Class.

Street, New York, New York. Merrill Lynch is one of the world's largest wealth management, capital markets, and advisory companies with approximately $1.8 trillion in assets under management. Prior to the fourth quarter of 2006, Merrill Lynch reported its business activities in three business segments: Global Markets and Investment Banking ("GMI"), Global Private Client ("GPC"), and Merrill Lynch Investment Managers ("MLIM"). Effective with the merger with BlackRock, Inc. ("BlackRock"), on September 29, 2006, MLIM ceased to exist as a separate business segment. As a result, a new business segment, Global Wealth Management ("GWM") was created, which consists of GPC and Global Investment Management ("GIM"). GWM and GMI are now the Company's two major business segments. Merrill Lynch has over 64,000 employees in these two business segments. The Company owns a 45 percent voting interest and approximately half of the economic interest of BlackRock. Merrill Lynch common stock is listed on the New York Stock Exchange and trades under the ticker symbol "MER."

27.    **Defendant E. Stanley O'Neal.** The Merrill Lynch Board of Directors (hereinafter the "Board") is the governing body of Merrill Lynch under its charter, its bylaws, and applicable Delaware law, and, pursuant to the Plans' documents, was charged with responsibility for appointing the Plans' Trustees. The Board is composed of outside directors and one inside director, E. Stanley O'Neal. Defendant O'Neal served as a member of the Board of Merrill Lynch from 2001 until his retirement effective October 30, 2007. Defendant O'Neal also served as the Company's Chief Executive Officer from December 2002 until his retirement.

28.    The Board had and exercised responsibility for appointing the Trustee of the Plans, which is a fiduciary function under ERISA. Accordingly, Plaintiffs name Defendant O'Neal as a member of the Board who exercised appointment authority with respect to the

Trustee.[14] In addition, Defendant O'Neal engaged in acts of Plan administration by communicating extensively with employees regarding the Company and Company stock, the single largest asset of the Plans.

29. **Senior Vice President, Human Resources Defendants.** As explained in more detail below, the Senior Vice President, Human Resources (a.k.a. Senior Vice President, Leadership and Talent Management) Defendants, and their functional successors, had certain fiduciary responsibilities with respect to the Plans, including appointment and oversight responsibilities. On information and belief, the following served as Senior Vice President, Human Resources during the Class Period:

       **Defendant Peter Stingi.**

30. The identity(ies) of the remaining Senior Vice President, Human Resources Defendant(s) is currently unknown to Plaintiffs and is therefore named fictitiously as John and Jane Doe 1. Once the identity(ies) of the remaining Senior Vice President, Human Resources Defendant(s) is ascertained, Plaintiffs will seek leave to join him/her under his/her true name.

31. Defendant Stingi and John and Jane Doe 1, as well as their functional successors, are referred to as the "Senior Vice President, Human Resources Defendants."

32. **Administrative Committee Defendants.**[15] As explained in more detail below, the Plans assigned certain fiduciary responsibilities and duties to the Administrative Committee. The Administrative Committee members have certain responsibilities over the assets in the SIP

---

[14] Plaintiffs reserve the right to amend the Complaint, or seek leave to do so if necessary, to add additional Director Defendants as necessary and appropriate under the circumstances.

[15] As of the date of the filing of this Consolidated Amended Complaint, Plaintiffs have not been provided the identities of persons who served on the Administrative and Investment Committees. While it appears from the Plan Documents that there was one Administrative Committee and one Investment Committee for each of the three Plans, Plaintiffs do not know if the same persons served on the Administrative Committees for all three Plans, nor do they know if the same persons served on the Investment Committees for all three Plans. For the sake of convenience, Plaintiffs shall refer to the three Administrative Committees as the "Administrative Committee" and the three Investment Committees as the "Investment Committee" unless otherwise noted.

and RAP, and have full authority and power to administer and construe the SIP, RAP and Traditional ESOP.  On information and belief, the individual Administrative Committee Defendants are as follows:

> **Defendant Louis DiMaria** has served as a member of the SIP Administrative Committee.

33.    The identities of the remaining members of the Administrative Committee are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 2-10. Once the identities of additional Administrative Committee members are ascertained, Plaintiffs will seek leave to join them under their true names.

34.    Defendant DiMaria and John and Jane Does 2-10 are referred to as the "Administrative Committee Defendants."

35.    **Investment Committee Defendants.**[16]  As explained in more detail below, the Investment Committee Defendants have the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds.  The Investment Committee consists of a group of senior executives, but does not include directors or executive officers.  SIP 2006 11-K.  The identities of the Investment Committee Defendants are currently unknown to Plaintiffs and are therefore named fictitiously as John and Jane Does 11-20.  Once the identities of the Investment Committee Defendants are ascertained, Plaintiffs will seek leave to join them under their true names.

36.    John and Jane Does 11-20 are referred to as the "Investment Committee Defendants."

---

[16]    *See* footnote immediately preceding.

12

## V.     DEFENDANTS' FIDUCIARY STATUS

### A.     The Nature of Fiduciary Status.

37.     **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

38.     *De Facto* **Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

39.     Each of the Defendants was a fiduciary with respect to one or all of the Plans and owed fiduciary duties to one or all of the Plans and the participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

40.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

41.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

42.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, Merrill Lynch chose to assign the appointment and removal of the Administrative and Investment Committee Defendants to the Senior Vice President, Human Resources Defendants, who, in turn, selected Merrill Lynch employees, officers and agents to perform most fiduciary functions.

43.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.    Merrill Lynch's Fiduciary Status.**

44.    Pursuant to the SIP, RAP and Traditional ESOP Plan documents, the Company was the "administrator" and "plan administrator" with respect to the Plans, as those terms are defined in ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and in the Internal Revenue Code of 1986 § 414(g), respectively. SIP Plan Document § 8.1.2; RAP Plan Document § 8.1; Traditional ESOP Plan Document § 10.1.

45.    On information and belief, in order to comply with ERISA, the Company and the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA. *See, e.g.,* ERISA § 101(a)(1), 29 U.S.C. §

14

1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). In this regard, the Company and the Administrative Committee disseminated the Plans' documents and related materials which, among other things, incorporated by reference Merrill Lynch's misleading SEC filings, thus converting such materials into fiduciary communications.

46.    Further, on information and belief, the Company exercised *de facto* authority and control with respect to the *de jure* responsibilities of the Administrative Committee, the Investment Committee, and Senior Vice President, Human Resources Defendants, making itself fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing plan documents to the those Defendants, without relieving them of any such responsibility.

47.    Additionally, through its authority to amend the Plans and separately through its authority to name and remove the Senior Vice President, Human Resources Defendants, Merrill Lynch was responsible for appointing and monitoring the Senior Vice President, Human Resources. Thus, according to DOL regulations, the Company exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

48.    Moreover, by exercising control over the conduct of the Senior Vice President, Human Resources Defendants, Merrill Lynch became responsible for appointing and monitoring the Investment Committee Defendants and the Administrative Committee Defendants with respect to each of the Plans.

49.    Further, Merrill Lynch, at all applicable times, on information and belief, has exercised control over the activities of its employees in connection with their performance of fiduciary functions with respect to the Plans, including the Investment Committee Defendants

15

375471.2 2

and Administrative Committee Defendants, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Merrill Lynch is, thus, responsible for the activities of its employees as fiduciaries with respect to the Plans through traditional principles of agency and *respondeat superior* liability.

50.     Finally, under basic tenets of corporate law, Merrill Lynch is imputed with the knowledge that its officers and employees (including other Defendants) had regarding the misconduct alleged herein, even if such knowledge is not communicated to Merrill Lynch.

51.     Consequently, in light of the foregoing duties, responsibilities, and actions, Merrill Lynch was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**C.    Defendant O'Neal's Fiduciary Status.**

52.     The Board is charged with the appointment, monitoring and removal of the Trustees and execution of the Trust documents with the Trustee to provide for the investment, management and control of the assets of the Plans and exercised this responsibility. SIP Plan Document § 9.1.1; RAP Plan Document § 9.1; Traditional ESOP Plan Document § 11.1. Thus, as a member of the Board who exercised responsibility for appointing the Trustee, Defendant O'Neal is an appointing fiduciary under ERISA.

53.     In addition, throughout the Class Period, Defendant O'Neal made numerous statements, many of which were incomplete and inaccurate, to employees, and thus to Plan participants, regarding the Company, and future prospects of the Company specifically with

16

regard to the risk, or purported lack thereof, faced by the Company as a result of its subprime and

CDO exposure. These statements, which were made in, among other places, Company memos

and newsletters sent to all employees, were made in an ERISA fiduciary capacity because they

contained information about the likely future of the Plans' benefits, in particular the value and

prudence of the Plans' largest single investment, Merrill Lynch stock, and, thus were acts of Plan

administration under controlling legal precedent.

54.    Consequently, in light of the foregoing duties, responsibilities, and actions, as a

member of the Board (the sole insider Director), and as a result of his communications with the

Plans' participants which constitute acts of Plan administration, Defendant O'Neal was a *de facto*

fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the

Class Period in that he exercised discretionary authority or discretionary control respecting

management of the Plans, exercised authority or control respecting management or disposition of

the Plans' assets, and/or had discretionary authority or discretionary responsibility in the

administration of the Plans.

**D.    Senior Vice President, Human Resources Defendants' Fiduciary Status.**

55.    Pursuant to the SIP, RAP and Traditional ESOP Plan Documents, the

Administrative Committee Defendants and the Investment Committee Defendants were

appointed by the Senior Vice President, Human Resources. SIP Plan Document § 10.1.1 and §

10.2.1; RAP Plan Document § 8.2 and § 8.3; Traditional ESOP Plan Document §10.2 and § 10.3.

Accordingly, the Senior Vice President, Human Resources Defendants had the duty to monitor,

and to remove, the members Administrative Committee and the Investment Committee. Thus,

according to DOL regulations, the Senior Vice President, Human Resources Defendants

exercised a fiduciary function under ERISA. 29 C.F.R. § 2509.75-8 (D-4).

56.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Senior Vice President, Human Resources Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**E.    Administrative Committee Defendants' Fiduciary Status.**

57.    Pursuant to the SIP and the RAP Plan Documents, "[i]f Designated Investment Alternatives are established [by the Investment Committee]", then the Administrative Committee "may, in its sole discretion, permit Participants and Beneficiaries to determine the portion of their Accounts that shall be invested in each Designated Investment Alternative and shall determine what transfers between Designated Investment Alternatives and other Trust assets shall be permissible." SIP Plan Document 2005 Amendment § 11.1.2; RAP Plan § 5.1.

58.    Additionally, according to the SIP, RAP and Traditional ESOP Plan documents, the Administrative Committee is the "named fiduciary" of the Plans, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plans. SIP Plan Document § 8.1.1; RAP Plan Document § 8.1; Traditional ESOP Plan Document § 10.1.

59.    Pursuant to the SIP, RAP and Traditional ESOP Plan documents, the Administrative Committee had the "exclusive authority and right to interpret the Plan provisions and to exercise discretion where necessary or appropriate in the interpretation and administration of the Plan and to decide any and all matters arising thereunder or in connection with the administration of the Plan…". SIP Plan Document § 10.1.3; RAP Plan Document § 8.2; Traditional ESOP Plan Document § 10.2. At all relevant times, the "decisions, actions and

records of the Administrative Committee [are] conclusive and binding….".  SIP Plan Document § 10.1.3; RAP Plan Document § 8.2; Traditional ESOP Plan Document § 10.2.

60.    In addition, the Administrative Committee has the following powers and duties:

(a)    The Administrative Committee shall have the power to promulgate such rules and procedures, to maintain or cause to be maintained such records and to issue such forms as it shall deem necessary or desirable for the administration of the Plan.

(b)    Subject to the terms of the Plan and applicable law, the Administrative Committee shall determine the time and manner in which all elections authorized by the Plan shall be made or revoked.

(c)    The Administrative Committee may direct that such amounts be withheld from any payment due under this Plan as required to comply with applicable income tax law.

(d)    The Administrative Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e)    The Administrative Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f)    The Administrative Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Administrative Committee and shall not be liable for any act or omission of a person so designated.

SIP Plan Document § 10.1.3; RAP Plan Document § 8.2; Traditional ESOP Plan Document § 10.2.

61.    On information and belief, in order to comply with ERISA, the Company and the Administrative Committee exercised responsibility for communicating with participants regarding the Plans in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA.  *See, e.g.,* ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  In this regard, the Company and the Administrative Committee disseminated the Plans' documents

and related materials which, among other things, incorporated by reference Merrill Lynch's misleading SEC filings, thus converting such materials into fiduciary communications.

62.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Administrative Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**F.    Investment Committee Defendants' Fiduciary Status.**

63.     Pursuant to the SIP, RAP and Traditional ESOP Plan Documents, the Investment Committee is the "named fiduciary" with authority to establish Designated Investment Alternatives (in the SIP and the RAP), manage and control all Trust assets, and appoint one or more Investment Managers.  SIP Plan Document § 8.1.1; RAP Plan Document § 8.1; Traditional ESOP Plan Document § 10.1.

64.     In addition, the Investment Committee has the following powers and duties:

(a)     The Investment Committee shall establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.

(b)     The Investment Committee shall have the power to direct the assets of the Trust be held in a master trust consisting of assets of qualified plans maintained by the Company or an Affiliate.

(c)     The Investment Committee shall have the authority to establish Designated Investment Alternatives and permit the investment of Accounts in Company Stock

(d)     The Investment Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e)    The Investment Committee shall exercise all of its powers and responsibilities in a nondiscriminatory manner.

(f)    The Investment Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Investment Committee and shall not be liable for any act or omission of a person so designated.

**NEEDS TO BE DOUBLE SPACED.** SIP Plan Document § 10.2.3; RAP Plan Document § 8.3; ESOP Plan Document § 10.3 (establishing Designated Investment Alternatives -- section (c) above -- is not included in the Investment Committee's duties in regard to the Traditional ESOP).

65.    Additionally, the Investment Committee established investment objectives for the Designated Investment Alternatives in the SIP. SIP Plan Document § 11.1.1.

66.    Further, prior to or after investment in one or more Designated Investment Alternatives in the RAP, the Investment Committee had the authority to invest all or a portion of the Trust Fund in short-term securities. RAP Plan Document § 5.1.

67.    Moreover, pursuant to the ESOP Plan Document, the Investment Committee was required to "establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA." Traditional ESOP § 10.3.

68.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Investment Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## VI.    THE PLANS

69.    The Plans, sponsored by Merrill Lynch, are "employee pension benefit plans," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The Plans are legal entities that can

sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are neither defendants nor Plaintiffs. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

70.     The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, State Street Bank and Trust Company ("State Street") was co-trustee of the Plans, with certain authority and duties as described in the Trust Agreements with respect to the Company stock held in trust pursuant to the terms of the Trust Agreements. Merrill Lynch Trust Company was the other co-trustee of the Plans, with the authority to hold, manage and control, subject to the authority and duties allocated to State Street, the assets of the Plans held in trust pursuant to the terms of the Trust Agreements. SIP Trust Agreement; RAP Trust Agreement Effective October 1, 1989; Traditional ESOP Trust Agreement Effective July 1, 1989. All contributions made to the Plans constitute a form of deferred compensation.

**A.     Merrill Lynch & Co., Inc. 401(k) Savings& Investment Plan.**

71.     The SIP became effective on October 1, 1987. The purpose of the Plan is to provide eligible employees with a supplemental source of retirement income. *See* Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, As restated, including amendments adopted through January 1, 2007 (hereinafter the "SIP Plan Document") at i.

72.     Effective July 1, 2000, employees became eligible to participate in the SIP at commencement of their employment and upon compliance with the enrollment procedures under the Plan. *Id.* § 2.1(d).

73.    Individual notional accounts are maintained for each SIP participant.[17]  SIP Plan Document § 3.5; SIP Plan Document, 2007 SIP Plan Amendment at No. 3.

74.    Throughout the Class Period, participants in the SIP were permitted to defer a percentage of their base compensation for investment in the Plan.  SIP participants were allowed to contribute between 1% and 25% of their base compensation, up to an annual maximum of $15,000.  SIP Plan Document § 3.2.2.

75.    Prior to January 1, 2007, the Company matched 50% of the first 6% of a participant's contributions, up to an annual maximum Company contribution of $2,000, after one year of service.  *Id.* § 3.3.1.  Effective January 1, 2007, the Company matches 100% of the first 4% of a participant's contributions, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  2007 SIP Plan Amendment at No. 2.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution is $2,000.  *Id.*

76.    Participants become fully vested in the Employer Contributions made to their Employer Contributions Subaccount upon the completion of five years of service.  SIP Plan Document § 4.1.3.

77.    Throughout the Class Period, the Investment Committee selected the investment options (a.k.a. "Designated Investment Alternatives") that were made available to participants in the SIP for investment of their retirement savings.  SIP Plan Document § 11.1.1.

---

[17]    Participants' accounts may be comprised of various subaccounts such as:  an Employer Contributions Subaccount; a 401(k) Subaccount; a Rollover Contributions Subaccount; a Deferred Profit Sharing Account; a Vocon Account; a Transferred Employer Contributions Subaccount; and a Roth Elective Deferral Subaccount, which are credited with contributions, plus any investment earnings and minus any losses.  *Id.*

78.     Participants direct the investment of their contributions and Company contributions into the various Designated Investment Alternatives.  SIP 2006 11-K at 5; 401(k) Plan Chapter: Investing Your 401(k) Balance.

79.     The Designated Investment Alternatives consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund.  SIP Plan Document § 11.1.1; Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan, Annual Report (Form 11-K) at 7 (Dec. 31, 2006) (hereinafter the "2006 Form 11-K").

80.     The Merrill Lynch Stock Fund was not a required feature of the SIP.  Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision assigned by the governing Plan documents to the Investment Committee (SIP Plan Document §§ 10.2.3(c) & 11.1.1), and, to the extent that the Investment Committee chose to offer the Merrill Lynch Stock Fund, the amount of money that could be allocated to the Merrill Lynch Stock Fund was a discretionary decision assigned by the governing Plan documents to the Administrative Committee.  *Id.* § 11.1.2.

81.     While certain provisions of the SIP purported to eliminate the right of either Committee to dispose of investments in a Designated Investment Alternative, the Investment Committee and the Administrative Committee each separately had the discretionary authority under the terms of the SIP to preclude any new investments by Plan Participants in the Merrill Lynch Stock Fund.  *Id.* §§ 10.2.3(c); 11.1.1-2; 11.1.1(i).

82.     Additionally, nothing in the SIP could limit the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as a consequence of ERISA's mandate to follow plan documents only to the extent

consistent with ERISA, and the obligation under ERISA to prudently manage the Plans' investments.

83.    Accordingly, the Investment Committee and the Administrative Committee each had the authority and responsibility to require that Plan participants transfer their investments in the Merrill Lynch Stock Fund to another Designated Investment Alternative, or in the case of the Investment Committee had the authority and responsibility to liquidate those investments, once it became imprudent to remain invested in Merrill Lynch stock or in the Merrill Lynch Stock Fund to the extent that it was comprised of Merrill Lynch stock.

84.    Because the Company exercised *de facto* control over the decisions of the Investment Committee and the Administrative Committee, including the decision not to inquire into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to protect the SIP participants from the risks of investing in Merrill Lynch stock, the decision to permit continued investment in the Merrill Lynch Stock Fund during the Class Period (both as to new money and money already invested) was a decision made by the members of the Investment Committee and the Administrative Committee, each acting under the effective direction and control of the Company.

**B.    Merrill Lynch Retirement Program.**

85.    Effective January 1, 1997, all U.S. employees of Merrill Lynch are eligible to participate in the Retirement Program after completing one year of service. *See* Merrill Lynch & Co., Inc. Retirement Accumulation Plan, As restated, including amendments adopted through January 1, 2007 (hereinafter the "RAP Plan Document") § 2.1(b); Merrill Lynch & Co., Inc. Employee Stock Ownership Plan, As restated, including amendments adopted through January 1, 2007 (hereinafter the "Traditional ESOP Plan Document") § 2.1(b).

86.    Once an employee is eligible for the Retirement Program, two accounts are set up: the RAP and the Traditional ESOP. *See* Retirement Chapter: Retirement Program Contributions.

87.    Merrill Lynch makes all contributions to the RAP and ESOP accounts; participants may not contribute their own funds to these accounts. *See* Retirement Chapter: Facts First.

88.    The Company's contributions to the RAP accounts are made in cash. The Company's contributions to the Traditional ESOP are made in stock, except as may be necessary to repay ESOP debt. During the Class Period, the Company's contributions to the Traditional ESOP were made substantially in cash to service and repay ESOP acquisition debt. These contributions resulted in the allocation of Merrill Lynch stock to the accounts of participants..

89.    Contributions to a participant's RAP and Traditional ESOP account are based, in part, on their years of service and their eligible compensation. Retirement Chapter: Retirement Program Contributions. The maximum annual eligible compensation used to determine contributions is set by the Internal Revenue Service ("IRS"). *Id.* This amount was $225,000 in 2007. *Id.* Contributions range from 2% to 8% of a participant's eligible compensation for the year, depending on a participant's years of service. *Id.*

90.    The following is a summary of the steps taken by Merrill Lynch to determine if the Retirement Program contributions are made in the form of Company stock, cash, or both:

**Step 1: Annual Contributions**
Merrill Lynch looks at each participant's length of service as of each January 4 and his or her eligible compensation to determine the amount of annual contributions to each participant's Retirement Program accounts. Then, all of these contributions are added together to determine the total amount of annual contributions required.

**Step 2: Amount of Merrill Lynch Common Stock to Be Contributed**
Merrill Lynch determines the number of shares of Merrill Lynch common stock that will be contributed to [or allocated to] participants' accounts for that year.

**Step 3: Market Value of Shares of Merrill Lynch Common Stock**
Merrill Lynch calculates the market value of the shares that will be contributed to [or allocated to] participants' accounts (from Step Two). The market value of Merrill Lynch common stock is determined using the New York Stock Exchange closing price on the last business day of the year.

**Step 4: Determining the Percentage of Merrill Lynch Common Stock and/or Cash**
The market value of these shares is then divided by the total annual contribution amount (from Step One). The outcome of this calculation is a percentage – that percentage determines the split of cash and Merrill Lynch common stock that will be contributed to [or allocated to] participants' accounts. For example, if the percentage is 7%, this means that 7% of that annual contribution will be made in Merrill Lynch common stock to ESOP accounts and 93% will be made in cash to RAP accounts.

*See* Retirement Chapter: Retirement Program Contributions.  See also RAP Plan Document § 3.5.

91.     Effective January 1, 2007, participants in the Retirement Program become 100% vested in their Company Retirement Contribution Account after three years of service.  RAP Plan Document, 2007 RAP Plan Amendment at No. 2; Traditional ESOP Plan Document, 2007 Plan Amendment at 2.  Previously, participants became fully vested upon the completion of five years of service.  RAP Plan Document § 4.1; Traditional ESOP Plan Document § 5.1.

1.     **Merrill Lynch & Co., Inc. Retirement Accumulation Plan ("RAP").**

92.     The RAP became effective on January 1, 1989.  The purpose of the Plan is to provide employees with a supplemental source of retirement income.  RAP Plan Document at i.

93.     Merrill Lynch makes annual Retirement Contributions to the RAP utilizing the method described above.  The Retirement Contributions to the RAP are in the form of Basic Credits.  *Id.* § 3.2.  Basic Credits are varied based on a participant's years of service and are allocated in an amount equal to a percentage of a participant's eligible compensation for the year in which they were a qualified participant.  *Id.*  For those who were participants in the RAP as of January 4, 1989, and met certain age and service requirements, the Company also makes

Supplemental Credits and Additional Supplemental Credits to their accounts. *Id.* § 3.3. The Company's contributions to the RAP are reduced by the value of Merrill Lynch shares allocated to the participant's Traditional ESOP account. *Id.* § 3.5.

94.     Throughout the Class Period, the Plan fiduciaries, by and through the Investment Committee, selected the investment options that were made available to RAP participants for investment of their retirement savings. *Id.* §§ 5.1 & 8.3(c). The options consisted of various mutual funds, and, in addition, the Merrill Lynch Stock Fund. Merrill Lynch 2007 Annual Report, *available at http://files.shareholder.com/downloads/MER/197622170x0x174107 /f9fd43ab-b71b-4da0-b78b-17bb96ad7b8d/annual_report_2007_complete.pdf,* at 140.

95.     Plan participants direct how they want their RAP contributions invested. RAP Plan Document § 5.1; Retirement Chapter: Investing Your RAP Account Balance.

96.     RAP participants may not elect to have their contributions invested directly into Merrill Lynch stock, but may invest any portion of their account balance into Merrill Lynch stock by processing a fund transfer. Retirement Chapter: Investing Your RAP Account Balance.

97.     In order for RAP participants to withdraw the Merrill Lynch stock held in their RAP accounts, participants must be vested and at least 59½ years old at the time of withdrawal if the ESOP shares in their RAP account were acquired as a result of Merrill Lynch contributions to the RAP and/or fund transfers to Merrill Lynch stock. Retirement Chapter: ESOP Diversification. There are no withdrawal restrictions if a participant transfers the Merrill Lynch stock held in their Traditional ESOP account to their RAP account. *Id.* § 3.6.

98.     The Merrill Lynch Stock Fund was not a required feature of the RAP. Rather, whether to offer the Merrill Lynch Stock Fund as a Plan investment option was a discretionary decision assigned by the governing Plan documents to the Investment Committee (RAP Plan

Document §§ 5.1 & 8.3(c)), and, to the extent that the Investment Committee chose to offer the Merrill Lynch Stock Fund, the amount of money that could be allocated to the Merrill Lynch Stock Fund was a discretionary decision assigned by the governing Plan documents to the Administrative Committee. *Id.* § 5.1.

99.    While certain provisions of the RAP purported to eliminate the right of either the Investment Committee or the Administrative Committee to dispose of investments in a Designated Investment Alternative, the Investment Committee and the Administrative Committee each separately had the discretionary authority under the terms of the RAP to preclude any new investments by Plan participants in the Merrill Lynch Stock Fund. *Id.* §§ 5.1 & 8.3(c).

100.    Additionally, the Investment Committee has the discretion, prior to or after investment in one or more investment alternatives, to invest "all or a portion of the Trust Fund" in "short-term securities issued on an interim basis or guaranteed by the United States of America or any agency or instrumentality thereof or any other prudent investments of a short-term nature that earn income." *Id.* § 5.1.

101.    Further, nothing in the RAP limits the ability of the Plan fiduciaries to remove the Merrill Lynch Stock Fund as an investment alternative or divest assets invested in the option as a consequence of ERISA's mandate to follow plan documents only to the extent consistent with ERISA, and the obligation under ERISA to prudently manage the Plans' investments.

102.    Accordingly, the Investment Committee and the Administrative Committee each had the authority and responsibility to require that Plan participants transfer their investments in the Merrill Lynch Stock Fund to another Designated Investment Alternative, or in the case of the Investment Committee had the authority and responsibility to liquidate those investments, once it

became imprudent to remain invested in Merrill Lynch stock or in the Merrill Lynch Stock Fund to the extent that it was comprised of Merrill Lynch stock.

103.    Because the Company exercised *de facto* control over the decisions of the Investment Committee and the Administrative Committee, including the decision not to inquire into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to protect the RAP participants from the risks of investing in Merrill Lynch stock, the decision to permit continued investment in the Merrill Lynch Stock Fund during the Class Period (both as to new money and money already invested) was a decision made by the members of the Investment Committee and the Administrative Committee, each acting under the effective direction and control of the Company.

### 2.    Merrill Lynch & Co., Inc. Employee Stock Ownership Plan.

104.    The Traditional ESOP became effective on July 1, 1989. The purpose of the Plan is to provide employees with a supplemental source of retirement income. *See* Merrill Lynch & Co., Inc. Employee Stock Ownership Plan, as restated, including amendments adopted through January 1, 2007 (hereinafter the "Traditional ESOP Plan Document") at i.

105.    The Traditional ESOP is a stock bonus plan under § 401(a) of the Internal Revenue Code and is subject to the applicable provisions of ERISA. *Id.*

106.    Merrill Lynch makes annual contributions to the Traditional ESOP as described above. Contributions to the Traditional ESOP are made in Merrill Lynch stock or cash as required to service and repay debt owed by the Traditional ESOP, resulting in the allocation of Merrill Lynch shares to the accounts of participants in the Traditional ESOP. Merrill Lynch 2007 Annual Report at 140. Participants do not exercise any authority or control over this investment decision.

107.    Upon completion of five years of service, participants in the Traditional ESOP are able to diversify their account by: transferring their shares to their RAP account; rolling over to an IRA or other tax-qualified retirement plan; transferring to a Merrill Lynch Brokerage Account; or by taking a cash distribution. *See* Retirement Chapter: ESOP Diversification.

108.    Further, nothing in the Traditional ESOP limits the ability of the Investment Committee to liquidate all or a portion of the Plan's investment in Merrill Lynch stock as prudence dictates.

109.    Indeed, the Investment Committee is granted responsibility for "the investment of Trust assets" and is required to "establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA." Traditional ESOP § 10.3.

110.    Because the Company exercised *de facto* control over the decisions of the Investment Committee, including the decision not to inquire into the prudence of investments in the Merrill Lynch Stock Fund or otherwise take any action to protect the Traditional ESOP participants from the risks of investments in Merrill Lynch stock, the decision to permit continued investment in the Merrill Lynch Stock Fund during the Class Period (both as to new money and money already invested) was a decision made by the members of the Investment Committee, acting under the effective direction and control of the Company.

**C.    ESOP Fiduciaries are Bound by Core ERISA Fiduciary Duties.**

111.    In addition to the designation of the Traditional ESOP as a purported ESOP, the portions of the SIP and the RAP that are invested in Merrill Lynch stock are also designated as purported ESOPs. SIP Plan Document § 1.40; RAP Plan Document § 1.34.

112.    An ESOP is an ERISA plan that is designed to invest primarily in "qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). On information and belief, the SIP and the RAP did not satisfy all of the statutory and regulatory mandates with respect to ESOP design

and/or operation. For example, the SIP and RAP are not designed to invest primarily in qualifying employer securities in violation of 29 C.F.R. § 2550.4073-6(b).

113.    Even if the portions of the SIP and the RAP designated as ESOPs satisfy all of the applicable regulatory requirements for this designation, just like 401(k) plan fiduciaries generally, fiduciaries of an ESOP remain bound by core ERISA fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

114.    Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the purported ESOP components of the SIP and RAP as well as for the Traditional ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments.

**D.    The Plans Incurred Significant Losses during the Class Period.**

115.    During the Class Period, Merrill Lynch stock represented significant portions of the Plans' assets.

116.    As of December 31, 2006, the SIP held approximately 16.4 million shares of Merrill Lynch stock, then having a market value of approximately $1.5 billion, and representing 28% of the net assets of the Plan. 2006 Form 11-K at 11.

117.    As of December 31, 2006, the RAP held approximately 12 million shares of Merrill Lynch stock, then having a market value of approximately $1.1 billion, and representing 38% of the net assets of the Plan. RAP Form 5500 for year end Dec. 31, 2006, *available at* http://www.freeerisa.com/5500/InstantView.asp?mainID=18994202.

118.    As of December 31, 2006, the ESOP held approximately 22 million shares of Merrill Lynch stock, then having a market value of approximately $2.09 billion, and representing

99% of the net assets of the Plan.  Traditional ESOP Form 5500 for year end Dec. 31, 2006.

*available at* http://www.freeerisa.com/5500/InstantView.asp?mainID=18994211.

119.    Despite the Plans' massive investment in Merrill Lynch stock, Defendants took no

action to protect the Plans from the risks that the Company's reckless and improper conduct

created.  Defendants continued to hold the Plans' shares of Merrill Lynch stock and compounded

the problem (and the losses) by purchasing additional shares during the Class Period.  Plaintiffs

estimate a principle loss of over $1.5 billion dollars.

## VII.    FACTS BEARING ON FIDUCIARY BREACH

**A.    Merrill Lynch Stock Was an Imprudent Investment for the Plans during the Class Period Because the Company Amassed Unprecedented and Undisclosed Levels of CDO & Subprime Exposure Resulting in $31 Billion in Write-downs and the Precipitous Decline in the Company's Stock Price.**

120.    During the Class Period, Merrill Lynch accumulated exposure to risky and illiquid

CDO and subprime related securities that exceeded the total book value of the Company and

made it imprudent for the Plans' fiduciaries to continue to cause or allow the Plans to purchase

Merrill Lynch stock, to offer Merrill Lynch stock as an investment option for the Plans, to accept

the match of employee contributions in inflated Merrill Lynch stock, and to maintain the Plans'

significant investment in the stock.  Third Quarter 2007 10-Q; *See also Fisher, supra* at 9.

121.    As a result of Merrill Lynch's CDO and subprime exposure, its off-balance sheet

exposure of at least $90 billion, its highly-leveraged and illiquid balance sheet,[18] its

mismanagement of risk, and its persistent refusal to disclose all material information about its

true financial condition, the Company's stock posed an unduly large risk of significant loss,

---

[18]    Merrill Lynch's leverage ratio (total assets / equity capital) was 25.5x as of June 29, 2007 (*See* Third Quarter 2007 10-Q), which was the most leverage the Company carried on its balance sheet up to that date.  The Company's year end leverage ratio steadily increased from 15.2x in 2003 to 19.9x in 2006 and then steeply increased to 27.8x in 2007 as a result of the $23.2 billion write-down (loss of capital) the Company suffered due to its CDO and subprime exposure.  *See* Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2003), Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2004), Merrill Lynch Annual Report (Form 10-K) (Dec. 31, 2005), 2006 10-K, 2007 10-K; *See also* discussion of growing amounts of illiquid Level 3 assets, *infra*.

which could not be prudently borne by Merrill Lynch's employee retirement plans. This risk was separate and distinct from the risk inherently posed by concentration of investment in the stock of a single issuer (here Merrill Lynch); the level of risk posed by the Plans' investment in Merrill Lynch stock would have been inappropriate even if diversified across multiple issuers in various disparate industries and geographic areas, each posing a similar level of risk to that presented by Merrill Lynch Stock.

122.    While a fiduciary's duty of prudence does not include a general duty to diversify with respect to company stock in an ERISA-governed retirement plan, a fiduciary may not ignore circumstances, such as those here, which increase the risk of loss to participants and beneficiaries and the overall magnitude of that potential loss to an imprudent and unacceptable level.

123.    These risks were exacerbated by false and misleading statements issued by Merrill Lynch that caused the price of Company stock to be artificially inflated. As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated. Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *Phelps v. Calpine Corp., et al.*, (9th Cir. 2006) (No. 06-15013).

124.    A variety of circumstances contributed to the unacceptable level of risk borne by Plan participants as a result of the Plans' massive investment in Merrill Lynch stock, including, but not limited to:

- The Company aggressively grew its CDO business, even as credit markets deteriorated, subprime mortgage defaults increased, and housing prices fell;

- After the subprime mortgage debacle was well under way (by late 2005), Merrill Lynch decided to use its own capital to purchase CDO securities that its

customers were rejecting in order to continue collecting additional underwriting fees;

- Merrill Lynch increased its CDO underwriting volume in 2006 and 2007 in the face of a stagnating CDO market, which forced the Company to take large amounts of CDO securities onto its own balance sheet;

- As a result, by June 29, 2007, Merrill Lynch accumulated $43 billion in exposure to CDOs and subprime related securities, which was greater than the entire equity value of the Company;

- The Company failed to acknowledge, manage and accurately disclose the risks associated with owning such risky and illiquid securities;

- The Company repeatedly made false, misleading and incomplete statements to its employees and the investing public regarding the true level of its exposure to CDO securities and subprime mortgages, which caused the price of Merrill Lynch stock to be artificially inflated;

- Merrill Lynch continued to mis-mark its subprime and CDO related investments throughout 2006 and 2007 based on assumptions that disregarded the actual housing market, credit market, and liquidity conditions;

- The Company lacked a Chief Risk Officer until September 10, 2007;

- Merrill Lynch's desperation to reduce its CDO and subprime exposure led the Company to: (a) underwrite and sell these securities without disclosing the true risk and illiquidity of these securities to its customers; and (b) purchase costly hedges for its CDO and subprime exposure from counterparties with doubtful ability to make good on their obligations in order to create the appearance that risk had been removed from the Company's balance sheet when in fact the risk persisted in the form of credit risk posed by financially weak counterparties;[19]

- Even following its write-downs, the Company's off-balance sheet exposure continued to grow, and was at least $90 billion as of December 2007;

- Merrill Lynch's "maximum payout/notional [value]" for other derivative contracts in the form of guarantees rose from $1.8 trillion as of December 2006 to $4.6 trillion as of December 2007;

- The Company had $70 billion dollars in "total return swaps" that may require Merrill Lynch to repurchase certain assets, which was not consolidated into its financial statements (as of December 2007);

---

[19]    Merrill Lynch acknowledges in its 2007 10-K that its estimate of its CDO and subprime exposure is contingent on, *inter alia*, "the financial strength of counterparties, such as financial guarantors, with whom we have economically hedged some of our exposure to these assets . . . [and that its] ability to mitigate our risk by selling or hedging our exposures is also limited by the market environment." 2007 10-K, at 19.

- The Company's increasingly leveraged balance sheet grew steadily from 15.2x in 2003 to 19.9x. Then in 2006 it increased steeply to 27.8x in 2007 as a result of the $23.2 billion write-down (loss of equity) the Company suffered due to its CDO and subprime exposure; and

- Finally, even Merrill Lynch's on-balance sheet assets became increasingly illiquid and difficult to value, as evidenced by the fact that the Company continued to shift greater assets from Level 2 to Level 3 (as discussed in detail below).

125.    The risk of significant loss to the Plans was exacerbated by the fact that Merrill Lynch stock constituted a significant portion of the Plans' total assets, as illustrated above in Section VI(D). Astonishingly, given the purpose of the Plans – to allow employees to save for retirement – the Plans' fiduciaries did not undertake any meaningful action to protect the Plans from the losses that have been caused by the Plans' holding billions of dollars of Merrill Lynch stock and acquiring even more Merrill Lynch stock while exigent circumstances have beset Merrill Lynch during the Class Period. For example, the Plans' fiduciaries continued to offer Merrill Lynch stock as an investment option and purchased additional shares even while the stock was plunging in value as a result of the collapse of the CDO and subprime markets. A prudent fiduciary facing similar circumstances would not have stood idly by as the Plans lost approximately $1.5 billion.

126.    Defendants Merrill Lynch and O'Neal allowed employees to pay inflated prices for Merrill Lynch stock during the Class Period and took no action, as senior management bet the Company's entire franchise value on risky and illiquid securities, many of which have been downgraded to junk rated securities[20] or are in default[21] and which have led to write-downs of $31 billion.

---

[20]    For example, "Norma" is a CDO underwritten by Merrill Lynch. In March 2007, all three rating agencies initially rated 75% of its securities as AAA securities (the remaining 25% were rated as investment grade). Within less than a year, Moody's downgraded seven of the nine tranches to junk and Fitch downgraded all nine tranches to junk. Carrick Mollenkamp and Serena Ng, *Wall Street Wizardry Amplified Credit Crisis --- A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, Wall St. J., Dec. 27, 2007. Similarly, in May 2008, Fitch downgraded to junk three classes of a CDO underwritten by Merrill Lynch ("TORO I"), where the underlying

1.      **Background:  The Rise and Fall of Subprime Mortgage Lending.**

127.    The term " subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics:  weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios." *See* Sandra F. Braunstein, Dir., Div. of Consumer and Cmty. Affairs, Fed. Reserve Bd., *Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit, Committee on Financial Services,* Mar. 27, 2007, *available at* http://www.federalreserve.gov/newsevents/testimony/Braunstein20070327a.htm.

128.    Between 2003 and 2005, the prevalence of subprime loans among all mortgage originations more than doubled.  Ruth Simon and James Hagerty, *More Borrowers With Risky Loans Are Falling Behind – Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount,* Wall St. J., Dec. 5, 2006.

129.    In order to take advantage of this new market, some lenders began weakening their underwriting standards, including reducing the minimum credit score borrowers need to qualify for certain loans and allowing borrowers to finance a greater percentage of a home's value or to carry a higher debt load (e.g., "no money down").  *See* Ruth Simon, *Mortgage Lenders Loosen Standards - Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules,* Wall St. J., July 26, 2005; *See also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down,* USA Today, Jan. 17, 2006.

---

portfolio consists of subprime residential mortgage backed securities (46%), CDO securities (25%), and other non-subprime mortgage related securities (29%).  The three tranches that were downgraded to junk were initially rated AAA, AA and BBB (all investment grade).

[21]    According to the *Financial Times,* "Merrill Lynch, [stet] has underwritten 26 CDO deals in default according to Total Securitization."  Michael Mackenzie, *Credit Vehicle Defaults Continue to Climb,* Financial Times, Apr. 23, 2008, *available at* http://www.totalsecuritization.com.

375471.2 2

130.    In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers.  Examples of typical subprime mortgages are:  interest-only mortgages, which allow borrowers to pay only interest for a period of time (typically 5–10 years); "pick a payment" loans, for which borrowers choose their monthly payment (full payment, interest only, or a minimum payment which may be lower than the payment required to reduce the balance of the loan); and initial fixed rate mortgages that quickly convert to variable rates. *See* Liz Moyer, *Beware the Interest-Only Mortgage,* Forbes, July 6, 2005; *See also* Ruth Simon, *New Type of Mortgage Surges in Popularity,* Wall St. J., Apr. 19, 2006, and Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks,* Sept. 29, 2006, *available at* http://www.federalreserve.gov/BoardDocs/SRLetters/2006/SR0615a2.pdf.  These novel terms combined with the lowered lending standards contributed to the likelihood that many borrowers would default.

131.    As a result of these various incentives for subprime mortgages, subprime mortgage originations grew from $120 billion in 2001 to $625 billion in 2005.  Simon & Hagerty, *supra.*  Meanwhile, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased risks for borrowers and lenders in the overheated housing markets.  Simon, *supra.*

132.    The housing troubles emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes which caused the interest rates on variable rate loans, including mortgage loans, to rise.  In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, issued new guidelines for mortgage lenders.  *Id.*; *See also* Testimony of Sandra L. Thompson,

*supra.* The proposed "Interagency Guidance on Nontraditional Mortgage Product Risks" sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of subprime lenders. *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *supra.*

133.    However, most subprime lenders failed to heed these and other warnings. "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards. Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005." Simon & Hagerty, *supra.* Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate expired. However, because housing prices were falling, borrowers could not readily re-sell the property for a profit when they could not pay their increased monthly payments, causing mortgage defaults to increase significantly.

134.    In 2006, subprime mortgage exposure grew even riskier as lenders originated a large number of "liar loans" (no-documentation and low-documentation loans). This practice constituted as much as 40% of subprime mortgages issued in 2006, up from 25% in 2001. Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007. Mortgage industry research reported in April 2006 revealed that 90% of borrowers had overstated their incomes by 5% or more and had inflated their incomes by more than half in 60% of the cases. *Id.*

### 2.    Merrill Lynch Becomes Global Leader in CDO Underwriting.

135.    Merrill Lynch undertook a dramatic transformation of its Fixed-Income, Currencies and Commodities ("FICC") business between 2003 and 2006. Merrill Lynch rapidly increased its CDO underwriting business, which resulted in the Company's ascent "from bit

39

player to powerhouse in the lucrative business of bundling loans into salable securities." Serena Ng and Carrick Mollenkamp, *Merrill Takes $8.4 Billion Credit Hit --- It Plunged Into CDOs In '03, Hiring Pioneer Of the Debt Securities,* Wall St. J., Oct. 25, 2007.

136.    Merrill Lynch's CDO business was spearheaded by a young banker, Christopher Ricciardi, who joined the Company in 2003.  As Managing Director and Head of Global Structured Credit Products for the Company, he was responsible for the origination and structuring of all CDOs, Structured Funds and Structured Credit Derivatives.  As a result of Ricciardi's aggressive expansion of the CDO business, Merrill Lynch leapt from 15th place among CDO underwriting ranks in 2002, when it arranged just $2.2 billion of deals, to the top global underwriter of CDOs in 2004, 2005, and 2006.  CDO underwriting became an increasingly important profit center for Merrill Lynch, which earned $400 million in CDO underwriting profits in 2005.  Serena Ng and Carrick Mollenkamp, *Pioneer Helped Merrill Move Into CDOs,* Wall St. J., Oct. 25, 2007.

137.    CDOs are usually constructed from a portfolio of fixed-income assets and are used to spread the risk of the underlying assets. These assets are divided into different tranches of debt securities:  senior tranches, mezzanine tranches, and equity tranches.  Losses are applied in reverse order of seniority so junior tranches offer higher coupons (interest rates) to compensate for the added default risk.  But the system only works if the underlying asset backed securities held by the CDO are uncorrelated -- that is, if they are unlikely to go bad all at once.  Mollenkamp & Ng, *supra.*

138.     To the contrary, CDOs holding only subprime related investments, such as residential mortgage backed securities (RMBS), credit default swaps,[22] and other instruments dependent on mortgages for their value, were highly correlated because they held only subprime securities and were therefore vulnerable to a rise in defaults on subprime mortgage loans.[23] Nonetheless, because of the high yields associated with subprime mortgages, these mortgages became very attractive for investment banks securitizing CDOs. *See* David E. Vallee, *FDIC Outlook, A New Plateau for the U.S. Securitization Market, available at* http://www.fdic.gov/bank/analytical/regional/ro20063q/na/2006_fall01.html.

### 3.     The Deterioration of the Subprime Mortgage and CDO Market.

139.     Because all subprime loans were vulnerable to falling home prices; all of Merrill Lynch's subprime related securities (e.g., RMBS, CDOs and CDO squared or CDO cubed securities)[24] had the same vulnerabilities. *See* footnote 13, *supra.*

140.     The sharp increase in defaults and falling home prices that started in 2005 eroded the value of all tranches of the RMBS and CDO securities that Merrill Lynch underwrote. In turn, because RMBS yields were falling, the yields on the CDO bonds sank as well. *See* Shawn Tully, *Wall Street's Money Machine Breaks Down: The Subprime Mortgage Crisis Keeps Getting Worse - and Claiming More Victims,* Fortune, Nov. 12, 2007.

141.     The ABX index was launched in January of 2006. Because securities backed by subprime mortgages trade privately and infrequently, their values are hard to determine. The

---

[22]     These swaps, in essence, are insurance contracts that pay out if the securities backed by subprime mortgages decline in value. Such swaps trade more actively, with their values rising and falling based on market sentiments about subprime default risk.

[23]     Merrill Lynch acknowledged that the valuation of its CDO and subprime related securities "continue to be impacted by external market factors including default rates [and] a decline in the value of the underlying property." 2007 10-K.

[24]     CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared" and CDOs that add another layer of securitization are referred to as "CDO cubed." Mollenkamp & Ng, *supra.*

ABX family of indexes (including the ABX 06-2 sub index) was designed to reflect their values based on instruments called credit-default swaps. These swaps, in essence, are insurance contracts that pay out if the securities backed by subprime mortgages decline in value. *See* Kate Kelly, *How Goldman Won Big On Mortgage Meltdown: A Team's Bearish Bets Netted Firm Billions*, Wall St. J., Dec. 14, 2007. *See also CDS IndexCo and Markit Launch Synthetic ABS Index; ABX.HE, an Asset-Backed Credit Derivative Index, Allows Investors to Go Long or Short U.S. Sub-Prime Residential Mortgages*, Business Wire, Jan. 17, 2006.

### 4.    The Fatal Error:  Underwriting Fees Leads Merrill Lynch to Expose its Own Balance Sheet to Risky and Illiquid CDO Securities.

142.    As the *Wall Street Journal* reported: "For much of the mortgage boom, Merrill was able to sell the bulk of the CDOs it underwrote to investors all over the world. But from late 2005 onwards, it became harder for the investment bank to find buyers for the growing volume of mortgage CDOs it was arranging. Many investors felt they had invested enough money in this asset class, and financial guaranty companies, which wrote credit insurance on many CDOs, were getting skittish about their growing exposures to mortgage securities in a slowing housing market." Randal Smith & Jed Horowitz, *Merrill Takes $8.4 Billion Credit Hit*, Wall St. J., Oct. 25, 2007.

143.    When demand for CDO securities waned in late 2005, Merrill Lynch was unwilling to give up the underwriting fees so it began purchasing the AAA tranches of the CDO securities with its own capital. *Id.* As reported in the financial press, Defendant O'Neal pushed this strategy of buying CDO securities with Merrill Lynch's own capital. Executives that resisted, such as fixed income adviser Jeff Kronthal, were fired. *See* Gary Weiss, *The Taming of Merrill Lynch*, May 2008, *available at* http://www.portfolio.com/executives/features/2008/04/14/Thain-Heading-Up-Merrill-Lynch#page3; *See also* Fisher, *supra*.

144.    "Merrill took the top tranches onto its own balance sheet," said Scott Sprinzen, an analyst with S&P. "The amounts were staggering." Tully, *supra*.

145.    "That decision turned out to be one of the worst miscalculations in the annals of risk management."[25] *Id.* "It's like me buying all those buildings out there just to get a little fee. It wouldn't make sense," a Merrill official stated in the financial press. Weiss, *supra*. Ultimately, when credit markets tightened, the Company could not borrow sufficient cash to keep the CDOs afloat.[26] *See* Peter Eavis, *CDOs explained:  How These Debt Vehicles Led to Big Losses at Big Banks -- and Why There May Be More to Come*, Fortune, Nov. 26, 2007.

146.    In response to the decreased demand for CDOs, Mr. Ricciardi (then head of Merrill Lynch's CDO business) had budgeted for no growth in 2006 in mortgage CDOs before he left the Company in February 2006.

147.    But following Mr. Ricciardi's departure, Dow Kim (then head of markets and investment banking) sought to reassure the CDO group that Merrill Lynch remained committed to the business, saying it would do "whatever it takes" to remain No. 1 in CDOs. Ng & Mollenkamp, *supra*.

148.    In 2006, Merrill Lynch sharply boosted its issuance of CDO securities to $44 billion, compared to $14 billion in 2005.  Its fees from CDOs jumped to more than $700 million in 2006.  *Id.*  But to earn these fees Merrill Lynch had to continue purchasing CDO securities.

---

[25]    The underwriter of a CDO issuance typically acts as a middleman by underwriting the CDO issuance for a fee, but does not retain a proprietary interest in the issued securities.  Fisher, *supra*.

[26]    As described in detail below, Merrill Lynch's inability to liquidate the CDO securities it held on its balance sheet during the credit crisis, may also have led Merrill Lynch to engage in various activities.  The Company has been sued for fraud and misrepresentation as underwriter for not disclosing the true nature of the underlying securities.  In addition, Merrill Lynch has been accused of selling CDO securities to investors by hiding the fact that they were actually CDOs or other subprime related securities.

149.    Indeed, throughout 2006 Merrill Lynch continued purchasing the CDO securities that its customers were rejecting, despite the deterioration of the subprime and CDO markets and warnings from its own analyst that a subprime meltdown was imminent.  Tully, *supra*.

### 5.    Published Warnings Place Plan Fiduciaries on Notice of Need To Investigate Risks at Merrill Lynch.

150.    On September 25, 2006, Kenneth Bruce, Merrill Lynch's own analyst, warned his clients that demand for subprime bonds "could dissipate quickly," exposing their holders to losses.  Bruce specifically warned that rising chances of an "asset fire-sale" could cause prices to fall.  Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Market*, Reuters, Sept. 25, 2006.

151.    On September 25, 2006, *Reuters* reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against subprime-related securities since late 2005."  *Reuters* also reported warnings that worsening credit quality in housing would soon sting holders of subprime mortgage bonds and there was plenty data to support their views.  *Id.*

152.    In mid-November 2006, Ownit Mortgage Solutions, Inc. (one of the mortgage lenders from which Merrill Lynch bought loans to repackage into mortgage backed securities) defaulted on its credit line and Merrill Lynch seized the company's assets and demanded that Ownit buy back the poorly performing loans.  Because it did not have the cash to buy back all its defaulting loans, Ownit declared bankruptcy in December 2006.  Bradley Keoun, *Ownit Mortgage, Part-Owned by Merrill, Shuts Down This Week*, Bloomberg, Dec. 7, 2006.

153.    On December 5, 2006, a Merrill Lynch analyst reported that losses on recent subprime deals could be 6% to 8% if home prices were flat in 2007 and in double digits if home prices fell by 5%.  The analyst's report further stated that falling home prices could trigger losses

not only in riskier classes of mortgage-backed securities, but also in investment grade bonds. Simon & Hagerty, *supra*.

154.    On December 15, 2006, the *Wall Street Journal* reported that: ". . . investors are watching to see if the effects [of subprime crisis] will be felt in CDOs.  That's because the mortgage-lending money trail ends at the asset-backed CDOs, which are backed largely by subprime mortgage bonds." *See* Danielle Reed, *Eyeing CDOs for Signs of Trouble – To Gauge Subprime Fallout, Bond Investors Scrutinize Esoteric Concerns of Market*, Wall St. J., Dec. 15, 2006.

155.    On December 20, 2006, the *Center for Responsible Lending* issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006.  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings.  *Id.*

156.    In January 2007, as concerns about subprime mortgages grew, the ABX 06-2 dropped from about 95 to below 90.  Traders using the ABX index to bet against subprime mortgages were booking large profits.  Kate Kelly, *How Goldman Won Big On Mortgage Meltdown: A Team's Bearish Bets Netted Firm Billions*, Wall St. J., Dec.14, 2007.

157.    Nonetheless, on January 1, 2007, to gain access to a larger number of subprime mortgages, Merrill Lynch paid $1.3 billion for First Franklin, a mortgage company that catered to subprime borrowers.  As *Reuters* reported: "The First Franklin deal puzzled analysts because the market for subprime loans was souring in a hurry when the deal was announced.  Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt." Yoon, *supra*.

158.    On January 3, 2007, *Consumer Affairs* published an article that warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a result." Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing*, Consumer Affairs, Jan. 3, 2007.

159.    Indeed, by early 2007, the collapse of the subprime lending industry was well underway. By late February 2007, the ABX 06-2 index fell close to 60. *See* Kate Kelly, *supra*.

160.    On March 11, 2007, the *New York Times* reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy. Morgenson, *Crisis Looms In Market for Mortgages, supra*.

161.    On March 14, 2007, *Bloomberg News* reported that "[b]ond investors rattled by mounting losses in subprime U.S. mortgages say that trouble is brewing in collateralized debt obligations, or CDOs." Caroline Salas and Darrell Hassler, *Around the Markets: Investors Worry That a Bust Awaits the CDO Market*, Bloomberg News, Mar. 14, 2007. Investors "need to worry a good bit" about subprime delinquencies spilling over into the CDO market, said Mark Adelson, head of structured finance research at Nomura Securities in New York. *Id.*

162.    Lehman Brothers reported that, as of March 2007, CDOs backed by asset-backed securities had already lost about $20 billion in value as delinquencies increased. *Id.*

163.    On March 29, 2007, the *Wall Street Journal* reported that New Century Financial Corp., the largest U.S. subprime lender ,was at the "brink of bankruptcy" because it could not pay back loans it took from Wall Street banks:

> Increased defaults were hammering [subprime] loans . . . and its lenders were preparing to declare it in default.
>
> ***

By extending generous credit to subprime lenders, Wall Street firms financed the borrowing binge that helped fuel the housing boom. Those firms now are turning off the money spigot. They see more borrowers having trouble paying off those mortgages in a slowing economy, which has made investors less willing to pour money into the sector.

*\*\**

Wall Street isn't yet free of risk from the mess. If it drags down the economy or weighs too much on the housing market, the banks will feel pain like everybody else. The firms also could see losses if the value of mortgages they accepted as collateral falls too far or if their risk-hedging strategies weren't up to snuff.

*\*\**

And burned investors and borrowers could sue the Wall Street banks, arguing that they shouldn't have allowed things to get out of hand. A lawsuit seeking class-action status, filed on March 19 in federal court in California, includes Morgan Stanley and Bear Stearns as defendants, alleging that they included false statements in documents describing New Century's plans to sell new preferred shares of itself to the public.

Gregory Zuckerman, *How Street Hit Lender -- 'Subprime' King New Century Was Down but Not Quite Out; Then, Banks Shut Cash Spigot*, Wall St. J., Mar. 29, 2007.

164.    On March 30, 2007, *Reuters* reported that the subprime mortgage crises was making investors wary of CDOs, or bonds secured by other bonds:

Wall Street is cooking up even riskier deals offering bigger returns to lure hedge fund investors…called CDO squared. Many buyers have been skeptical of CDO squareds,[27] however. A flurry of CDO squared deals could make any deeper fallout from the subprime mortgage crises even worse. Prices on some risky subprime mortgage securities have sunk even lower than junk bonds, although they retain high-grade ratings from credit agencies. Many CDOs are supported by subprime loans, and have so far lost about $20 billion in market value, Lehman Brothers said. Meanwhile, CDO managers have sold billions of dollars' worth of credit insurance on CDOs in recent months, throwing these derivatives into 'synthetic' CDO squared deals. One scenario is that subprime CDOs will be especially vulnerable to further subprime turmoil because of their appetite for derivatives. That, Nomura's Adelson says, could potentially lead to an "absolute bloodbath."

Neil Shah, *Subprime Mortgage Scare Spurs even Fancier CDOs,* Reuters, Mar. 30, 2007.

---

[27]    CDOs that securitized assets comprised of CDO securities are referred to as "CDO squared.

165.    On April 2, 2007, New Century filed for Chapter 11 bankruptcy.  Julie

Creswell, *New Century Files for Bankruptcy*, N.Y. Times, April 2, 2007.

166.    On April 12, 2007, some analysts questioned the risk posed by Merrill Lynch's

exposure to the subprime mortgage market, given the depressed market.  Defendant O'Neal

unequivocally dismissed those concerns.  Defendant O'Neal's statements were highly

misleading.  As *MarketWatch* reported:

> Analysts at Banc of America Securities said Merrill's subprime losses
> could make bonds that it issues riskier than rivals such as Bear Stearns
> Cos., the biggest issuer of mortgage-backed securities on Wall Street.

> But speaking Thursday [April 12, 2007] in Philadelphia, Chief Executive
> Stanley O'Neal told Dow Jones that reports have "exaggerated and
> misunderstood the nature of the business and how it's managed ... and it's
> not consistent with what I would assess the state of the business to be."

David Weidner, *Merrill Results Could Shed Light On Exposure,* MarketWatch, Apr. 12,
2007.

167.    On April 19, 2007, responding to questions  during an earnings call with Wall

Street analysts, Edwards commented on the First Franklin acquisition stating that it may not add

to earnings by the end of 2007, as was expected, due to a "difficult environment for the

origination, securitization and trading of nonprime mortgage loans and securities in the U.S."

*See* Jed Horowitz and Randall Smith, *Merrill Shrugs Off Stock, Subprime Woes as Profit*

*Skyrockets,* Wall St. J., Apr. 20, 2007.   Edwards stated that, in the face of the subprime crisis,

Merrill Lynch "just powered on through." *Id.*

168.    On April 24, 2007, the *Wall Street Journal* reported that S&P and Moody's, the

agencies that had rated subprime related securities, "have a reputation dilemma . . . Now, some

critics are asking why they did not spot the mess in subprime mortgages -- which cater to

especially risky homeowners."  The companies are "implicitly admitting that [their] initial

375471.2 2

48