UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

IN RE MERRILL LYNCH & CO., INC. **:**
SECURITIES, DERIVATIVE AND ERISA **:** Master File No. 07 CV 9633 (LBS)(AJP)(DFE)
LITIGATION **:** ECF CASE
**:**
**:**
This document relates to: **:**
**:**
ERISA ACTION **:** No. 07 CV 10268 (LBS)(AJP)(DFE)
**:**
**:**
**:**

----------------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jay B. Kasner
Scott D. Musoff
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jay.kasner@skadden.com


Attorneys for Defendant
Merrill Lynch & Co., Inc.

SHEARMAN & STERLING LLP
Stuart J. Baskin
Brian H. Polovoy
Adam S. Hakki
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
sbaskin@shearman.com


Attorneys for Investment Committee
Defendants, Administrative Committee
Defendants, and Senior Vice President,
Human Resources Defendants

SIMPSON THACHER & BARTLETT LLP
Michael J. Chepiga
Paul C. Curnin
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
mchepiga@stblaw.com

Attorneys for Defendant E. Stanley O'Neal

**Table of Contents**

Page

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

    A.   The Merrill Retirement Plans.................................................................. 3

        1.   Employees' Retirement Accounts.................................................. 3

        2.   The Role of Defendants ................................................................ 5

    B.   The Events of the Class Period ............................................................. 7

        1.   Merrill's CDO and Mortgage Business and Efforts to Disclose
            and Contain Risk........................................................................... 8

        2.   Turmoil Hits the Credit Markets, Causing Merrill To Write Down
            the Value of its CDO and MBS Positions...................................... 11

        3.   Merrill's Stock Price Performance During the Class Period .......... 13

ARGUMENT.................................................................................................... 15

I.      PLAINTIFFS FAIL TO STATE A CLAIM FOR FAILURE TO
        PRUDENTLY AND LOYALLY MANAGE THE PLANS (COUNT I) ............ 15

        A.    The Decision To Offer Plan Participants The Ability To Invest
              In Merrill Stock Was Not Fiduciary Conduct On The Part Of The
              Prudence Defendants, And There Can Be No Liability For Failing
              To Diversify The Plans In Any Event......................................... 15

        B.    The <u>Moench</u> Presumption Requires Dismissal of Count I........................ 19

        C.    The Prudence Defendants Did Not Breach Any Duty To Investigate ...... 23

        D.    Count I Fails Against The Administrative Committee Defendants
              For The Additional Reason That The Administrative Committee
              Had No Discretion Over The Investment Of Plan Assets....................... 27

        E.    Merrill's Limited Role As Settlor And Plan Administrator Does Not
              Create Fiduciary Duties Regarding The Management Of Plan Assets..... 30

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF DUTY
        TO MONITOR (COUNT II) ................................................................. 33

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF
        FIDUCIARY DUTY TO DISCLOSE NECESSARY INFORMATION
        TO CO-FIDUCIARIES (COUNT III) ................................................... 36

        A.    Mr. O'Neal And Merrill Had No Fiduciary Discretion Or Authority ...... 36

        B.    Plaintiffs' Liability Theory Would Require Plan Fiduciaries To
              Violate Insider Trading Laws ................................................... 37

        C.    Plaintiffs Have Failed To Meet The Pleading Requirements Of
              Rule 9(b) ................................................................................. 38

D. Plaintiffs Have Failed To Allege A Causal Link Between The Alleged Omissions And Any Breach By The Administrative Committee Or The Investment Committee.................................................. 39

IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY TO DISCLOSE MATERIAL, NON-PUBLIC INFORMATION TO PLAN PARTICIPANTS (COUNT IV) .................................................. 39

A. The Court Should Dismiss Count IV Against Mr. O'Neal ...................... 39

B. The Court Should Dismiss Count IV Against The Administrative Committee Defendants............................................................................. 41

C. The Court Should Dismiss Count IV Against Merrill .............................. 43

V. PLAINTIFFS FAIL TO STATE A CLAIM FOR CO-FIDUCIARY LIABILITY (COUNT V) ...................................................................................... 44

VI. THE COMPLAINT SOUNDS IN FRAUD AND ALL COUNTS MUST BE DISMISSED BECAUSE IT FAILS TO SATISFY RULE 9(b)..................... 46

VII. ERISA § 404(c) REQUIRES DISMISSAL OF ALL COUNTS WITH RESPECT TO THE 401(k) AND RAP .................................................................. 48

CONCLUSION............................................................................................................. 50

# TABLE OF AUTHORITIES

## CASES

Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson, No. 03 Civ. 1060,
2006 U.S. Dist. LEXIS 74670 (N.D.N.Y. July 13, 2006)..................................28

Akers v. Palmer, 71 F.3d 226 (6th Cir. 1995)...............................................................30

In re Alstom S.A. Sec. Litig., 406 F. Supp. 2d 402 (S.D.N.Y. 2005)..............................3

In re Astrazeneca Sec. Litig., No. 05 Civ. 2688, 2008 U.S. Dist. LEXIS 43680
(S.D.N.Y. June 3, 2008)..................................................................................48

ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ..........................3

Baker v. Kingsley, 387 F.3d 649 (7th Cir. 2004) .........................................................42

Beauchem v. Rockford Prods. Corp., No. 01 Civ. 50134, 2003 U.S. Dist. LEXIS
5546 (N.D. Ill. Mar. 24, 2003).......................................................................34

Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007)...................................... passim

Benzman v. Whitman, 523 F.3d 119 (2d Cir. 2008)......................................................49

Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139
(2d Cir. 1997)..................................................................................................42

Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d
164 (3d Cir. 2002)...........................................................................................30

In re Calpine Corp. ERISA Litig., No. 03 Civ. 1685, 2005 U.S. Dist. LEXIS
34452 (N.D. Cal. Dec. 5, 2005) .................................................................40, 47

In re Calpine Corp. ERISA Litig., No. 03 Civ. 1685, 2005 U.S. Dist. LEXIS
9719 (N.D. Cal. Mar. 30, 2005)............................................................... passim

Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704 (2d Cir. 2002).............................10, 24

In re CF&I Fabricators of Utah, Inc., 150 F.3d 1293 (10th Cir. 1998) ...................27, 43

In re Coca-Cola Enters. ERISA Litig., No. 06 Civ. 953, 2007 U.S. Dist. LEXIS
44991 (N.D. Ga. June 19, 2007) ...............................................................22, 47

Coleman v. Nationwide, 969 F.2d 54 (4th Cir. 1992) .......................................29, 31, 37

Conn. Nat'l Bank v. Fluor Corp., 808 F.2d 957 (2d Cir. 1987) ...................................48

Coyne & Delany Co. v. Selman, 98 F.3d 1457 (4th Cir. 1996)................................33, 34

Crowley v. Corning, Inc., 234 F. Supp. 2d 222 (W.D.N.Y. 2002) ............................32, 34, 40, 41

Crowley v. Corning, Inc., No. 02 Civ. 6172, 2004 U.S. Dist. LEXIS 758
    (W.D.N.Y. Jan. 14, 2004) ...................................................................................17

In re Dell, Inc. ERISA Litig., No. 06 Civ. 758, 2008 U.S. Dist. LEXIS 50296
    (W.D. Tex. June 23, 2008)...................................................................................22

Donovan v. Cunningham, 716 F.2d 1455 (5th Cir. 1983) ............................................45

In re Duke Energy ERISA Litig., 281 F. Supp. 2d 786 (W.D.N.C. 2003) ....................22

In re Dynegy, Inc. ERISA Litig., 309 F. Supp. 2d 861 (S.D. Tex. 2004)........................28, 30, 35

Eckelkamp v. Beste, 201 F. Supp. 2d 1012 (E.D. Mo. 2002)........................................34

Eckelkamp v. Beste, 315 F.3d 863 (8th Cir. 2002)........................................................34

Edgar v. Avaya, Inc., No. 05 Civ. 3598, 2006 U.S. Dist. LEXIS 23151
    (D.N.J. Apr. 24, 2006) ........................................................................................44

Edgar v. Avaya, 503 F.3d 340 (3d Cir. 2007)...................................................... passim

Everson v. Blue Cross & Blue Shield, 898 F. Supp. 532 (N.D. Ohio 1994) ...................3

F.H. Krear & Co. v. Nineteen Named Trs., 810 F.2d 1250 (2d Cir. 1987) ...................29

Faircloth v. Lundy Packing Co., 91 F.3d 648 (4th Cir. 1996) ......................................43

Fink v. Nat'l. Sav. & Trust Co., 772 F.2d 951 (D.C. Cir. 1985) ...................................24

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994)...................3

Flanigan v. Gen. Elec. Co., 242 F.3d 78 (2d Cir. 2001) ........................................27, 37

Foltz v. U.S. News & World Report, Inc., 865 F.2d 364, 373-74 (D.C. Cir. 1989).....................18

Gelardi v. Pertec Computer Corp., 761 F.2d 1323 (9th Cir. 1985) ...............................32

Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18
    (2d Cir. 2002).....................................................................................................15

<u>Hecker v. Deere & Co.</u>, No. 06 Civ. 719, 2007 U.S. Dist. LEXIS 78959
    (W.D. Wis. Oct. 19, 2007) ................................................................................49

<u>Henneberry v. Sumitomo Corp. of Am.</u>, 532 F. Supp. 2d 523 (S.D.N.Y. 2007)..........................38

<u>Hooven v. Exxon Mobil Corp.</u>, 465 F.3d 566 (3d Cir. 2006).......................................................44

<u>Howell v. Motorola, Inc.</u>, 337 F. Supp. 2d 1079 (N.D. Ill. 2004) ................................................41

<u>Hughes Aircraft Co. v. Jacobson</u>, 525 U.S. 432 (1999)...............................................................30

<u>Hull v. Policy Mgmt. Sys. Corp.</u>, No. 00 Civ. 778, 2001 U.S. Dist. LEXIS
    22343 (D.S.C. Feb. 9, 2001) ..........................................................................32, 33, 34, 38

<u>Hunt v. Hawthorne Assocs., Inc.</u>, 119 F.3d 888 (11th Cir. 1997) ................................................31

<u>Hunter v. Caliber Sys., Inc.</u>, 220 F.3d 702 (6th Cir. 2000)...........................................................30

<u>Husvar v. Rapoport</u>, 430 F.3d 777 (6th Cir. 2005) ......................................................................32

<u>Izzarelli v. Rexene Prods. Co.</u>, 24 F.3d 1506 (5th Cir. 1994).......................................................45

<u>Kalnit v. Eichler</u>, 264 F.3d 131 (2d Cir. 2001) ...........................................................................48

<u>Kirschbaum v. Reliant Energy, Inc.</u>, 526 F.3d 243 (5th Cir. 2008)...................................... *passim*

<u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767 (2d Cir. 1991).............................................................3

<u>Kuper v. Iovenko</u>, 66 F.3d 1447 (6th Cir. 1995) .................................................................. *passim*

<u>LaRue v. DeWolff, Boberg & Assocs.</u>, 128 S. Ct. 1020 (2008)....................................................48

<u>LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.</u>, No. 01 Civ. 4389, 2002
    U.S. Dist. LEXIS 23323 (S.D.N.Y. Dec. 4, 2002) .........................................................10

<u>Lee v. Burkhart</u>, 991 F.2d 1004 (2d Cir. 1993) ...........................................................................45

<u>Leigh v. Engle</u>, 727 F.2d 113 (7th Cir. 1984)..............................................................................32

<u>Lockheed Corp. v. Spink</u>, 517 U.S. 882 (1996)...........................................................................30

<u>In re Luxottica Group S.p.A., Sec. Litig.</u>, 293 F. Supp. 2d 224 (E.D.N.Y. 2003)........................39

<u>Marks v. Newcourt Credit Group</u>, 342 F.3d 444 (6th Cir. 2003) .................................................41

<u>In re McKesson HBOC, Inc. ERISA Litig.</u>, 391 F. Supp. 2d 812 (N.D. Cal. 2005) .............. *passim*

In re McKesson HBOC, Inc. ERISA Litig., No. 00 Civ. 20030, 2002 U.S. Dist.
        LEXIS 19473 (N.D. Cal. Sept. 30, 2002) .............................................................31, 38, 49

Mellot v. Choicepoint, No. 05 Civ. 1340, 2007 U.S. Dist. LEXIS 97117
        (N.D. Ga. 2007) ........................................................................................................43

In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243
        (S.D.N.Y. 2003) ..........................................................................................................3

In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351
        (S.D.N.Y. 2003) ..........................................................................................................3

In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 416
        (S.D.N.Y. 2003) ..........................................................................................................3

Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995) ................................................... passim

Pedraza v. Coca-Cola Co., 456 F. Supp. 2d 1262 (N.D. Ga. 2006)............................17, 19, 34, 43

Pegram v. Herdrich, 530 U.S. 211 (2000) .......................................................15, 27, 37

Plumb v. Fluid Pump Servs., Inc., 124 F.3d 849 (7th Cir. 1997) ............................................31, 37

Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126 (7th Cir. 1992).........................................32

In re Polaroid ERISA Litig., 362 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................20, 30, 34

Pugh v. Tribune Co., 521 F.3d 686 (7th Cir. 2008)................................................... passim

Qualey v. Jackson, No. 07 Civ. 10910, 2007 U.S. Dist. LEXIS 45620
        (E.D. Mich. June 25, 2007).......................................................................................32

In re Radioshack Corp. ERISA Litig., No. 08 MD 1875, 2008 U.S. Dist. LEXIS
        53668 (N.D. Tex. Mar. 31, 2008) ............................................................................22, 44

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).........................................................47

Sazerac Co., Inc. v. Falk, 861 F. Supp. 253 (S.D.N.Y. 1994) .................................10, 50

Silverman v. Mut. Ben. Life Ins. Co., 941 F. Supp. 1327 (E.D.N.Y. 1996)..................................45

Silverman v. Mut. Ben. Life Ins. Co., 138 F.3d 98 (2d Cir. 1998)................................................45

In re Sina Corp. Sec. Litig., No. 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089
        (S.D.N.Y. Sept. 25, 2006)...........................................................................................3

Smith v. Delta Air Lines, Inc., 422 F. Supp. 2d 1310 (N.D. Ga. 2006) ..................................28, 46

Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters. Inc.,
    793 F.2d 1456 (5th Cir. 1986) ....................................................................................31, 37

Sprague v. Gen. Motors Corp., 133 F.3d 388 (6th Cir. 1998) .......................................................42

Stein v. Smith, 270 F. Supp. 2d 157 (D. Mass. 2003) ...........................................................41, 45

Summers v. State St. Bank & Trust Co., 453 F.3d 404 (7th Cir. 2006) ......................................26

Teagardener v. Republic-Franklin, Inc. Pension Plan, 909 F.2d 947
    (6th Cir. 1990)...............................................................................................................3

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ............................................3

Thompson v. Avondale Indus., Inc., No. 99 Civ. 3439, 2003 U.S. Dist. LEXIS
    2318 (E.D. La. Feb. 14, 2003) ..........................................................................................38

Toussaint v. JJ Weiser & Co., No. 04 Civ. 2592, 2005 U.S. Dist. LEXIS 2133
    (S.D.N.Y. Feb. 9, 2005) ...................................................................................................48

In re Tyco Int'l, Ltd. MDL, No. 02 MD 1357, 2004 U.S. Dist. LEXIS 24272
    (D.N.H. Dec. 2, 2004).......................................................................................................49

Unaka Co. v. Newman, No. 99 Civ. 267, 2005 U.S. Dist. LEXIS 43660
    (E.D. Tenn. Apr. 26, 2005) ...............................................................................................31

In re Unisys Sav. Plan Litig., No. 91 Civ. 3067, 1997 U.S. Dist. LEXIS 19198
    (E.D. Pa. Nov. 24, 1997)............................................................................................24, 35

Varity Corp. v. Howe, 516 U.S. 489 (1996)..................................................................27, 37, 41

Virtual Countries, Inc. v. Republic of South Africa, 148 F. Supp. 2d 256
    (S.D.N.Y. 2001) ..............................................................................................................3

Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230 (2d Cir. 2002) .......................3

In re Williams Cos. ERISA Litig., 271 F. Supp. 2d 1328 (N.D. Okla. 2003) .........................34, 46

In re WorldCom, Inc. ERISA Litig., 263 F. Supp. 2d 745 (S.D.N.Y. 2003)........................ passim

Wright v. Or. Metallurgical Corp., 360 F.3d 1090 (9th Cir. 2004) ....................................... passim

# STATUTES

29 U.S.C. § 1002(16) ..........................................................................................6, 29

29 U.S.C. § 1002(21)(A) ............................................................................16, 27, 29, 36

29 U.S.C. § 1021(b) .............................................................................................6

29 U.S.C. § 1104(a)(1)(B) .....................................................................................14

29 U.S.C. § 1104(a)(2) .........................................................................................18

29 U.S.C. § 1104(c) ........................................................................................48, 49

29 U.S.C. § 1105(a) .............................................................................................44

29 U.S.C. § 404(a) ..............................................................................................26

ERISA § 402(a)(2) ....................................................................................17, 18, 23

ERISA § 404(a)(1)(B) ..........................................................................................14

ERISA § 404(c) ...........................................................................................48, 49, 50

ERISA § 405(a) ..................................................................................................44

ERISA § 405(a)(1) ..........................................................................................45, 46

ERISA § 405(a)(3) ..........................................................................................45, 46

# OTHER AUTHORITIES

House Conference Report No. 93-1280 (1974) ..............................................................50

Defendants respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' Consolidated Amended Complaint (the "Complaint") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This purported class action under the Employee Retirement Income Security Act ("ERISA") is a tag-along to the securities fraud case against Merrill Lynch & Co., Inc. ("Merrill" or the "Company") pending before this Court.  In this case, plaintiffs seek to hold Merrill's alleged "ERISA fiduciaries" responsible for failing to predict an unprecedented credit and liquidity crisis that blindsided the United States government, the credit rating agencies, and the most prestigious firms on Wall Street.  According to plaintiffs, on some unspecified date between September 2006 and May 2008, certain defendants should have shut down Merrill's employee stock ownership program and sold off the billions of dollars of Merrill stock in which participants had chosen to invest.  It is not overstatement to say that if plaintiffs' contorted view of ERISA duties were correct, almost every major financial institution should have cancelled its employee stock ownership program in the last year.  Plaintiffs' theory contravenes unanimous Court of Appeals precedent, the express terms of Merrill's retirement plans, and the plain language of ERISA itself.

Merrill's retirement plans each contains an employee stock ownership plan.  This is known as an "ESOP" in the ERISA world.  When the plans were established years before the class period, Merrill – like many other companies – required that Company stock be a plan investment option for employees.  That choice was fully consistent with Congress's strong policy in favor of workers sharing in the ownership of their companies.  ERISA not only encourages this, but also affirmatively prohibits lawsuits claiming that such plans should have been more

diversified.  Plaintiffs' Complaint runs headlong into this prohibition.  Their core contention is

that the plans were comprised of an "undue percentage" of Merrill stock.  That is the first reason

the Complaint must be dismissed.  A second, related reason for dismissal is that defendants had

neither the right nor the power to remove Merrill stock as an investment option.  The plans

guarantee its availability to participants, and multiple decisions recognize that such choices must

be enforced.

Plaintiffs' case is also barred under the so-called <u>Moench</u> presumption.  <u>See</u>

<u>Moench v. Robertson</u>, 62 F.3d 553 (3d Cir. 1995).  This presumption sets forth an imposing

standard for determining whether alleged ERISA fiduciaries were obligated to cease offering

company stock.  <u>Moench</u>, and the many cases applying it, hold that there can be no liability for

continuing an employee stock ownership program unless a company's fortunes appear

unsalvageable, and its stock price has plummeted toward zero.  Said differently, there can only

be ERISA liability where company stock is no longer a viable long-term savings option, and the

salutary purposes of employee stock ownership have thus been rendered moot.  That is not

alleged here.  Nor could it be.  Merrill's core franchise and diversified businesses remain sound.

This alone requires dismissal.

ERISA does not require fiduciaries to actively manage employee stock ownership

programs, constantly seeking to avert short-term losses and realize short-term gains.  These are

<u>retirement</u> plans, and they require no more than a sober, long-term view of value.  And even

putting that aside, the Complaint assumes the impossible:  that the defendants should have

predicted a credit panic so severe in scope and effect that it stunned most, if not all, of the

world's most sophisticated market participants.  ERISA, and the many cases interpreting it,

categorically reject such "hindsight" claims.

That is the essence of this case and this motion.  Plaintiffs' lengthy Complaint packages their theory in various causes of action, but they all suffer from these basic flaws (in addition to many others explained throughout this memorandum), and they all must be dismissed.

## STATEMENT OF FACTS[1]

### A.    The Merrill Retirement Plans

#### 1.    Employees' Retirement Accounts

Merrill is one of the world's leading capital markets, advisory, and wealth management companies.  (CAC ¶ 26.)[2]  Plaintiffs are purported present or former Merrill employees who allegedly held Merrill stock in their retirement accounts during the putative class period (September 25, 2006 through May 6, 2008) (the "Class Period").  Like most public

---

[1]    For purposes of a motion to dismiss, "courts must consider . . . sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); see also ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.") (citation omitted); Teagardener v. Republic-Franklin, Inc. Pension Plan, 909 F.2d 947, 949 (6th Cir. 1990) (ERISA plan documents were incorporated by reference into the complaint and therefore part of the pleadings); Everson v. Blue Cross & Blue Shield, 898 F. Supp. 532, 536 n.1 (N.D. Ohio 1994) (ERISA plan documents were part of the pleadings and could be considered on motion to dismiss).  Newspaper articles and press releases are appropriate subjects for judicial notice, see, e.g., In re Alstom S.A. Securities Litigation, 406 F. Supp. 2d 402, 408-09 (S.D.N.Y. 2005) (newspaper articles); as are speeches by government officials, see, e.g., In re Merrill Lynch & Co. Research Reports Securities Litigation, 273 F. Supp. 2d 351, 383-88 (S.D.N.Y. 2003) (speeches by SEC chairman and newspaper and journal articles showed widespread reporting of potential conflicts of interests of securities analysts); stock quotations, see, e.g., In re Merrill Lynch & Co. Research Reports Securities Litigation, 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003); analyst reports, see, e.g., In re Sina Corp. Securities Litigation, No. 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089, at *22 (S.D.N.Y. Sept. 25, 2006); and indisputable market phenomena, see, e.g., In re Merrill Lynch & Co. Research Reports Securities Litigation, 289 F. Supp. 2d 416, 421 (S.D.N.Y. 2003) (judicial notice of "the crash of the internet bubble"); Virtual Countries, Inc. v. Republic of South Africa, 148 F. Supp. 2d 256, 266-67 & n.12 (S.D.N.Y. 2001) (same), aff'd, 300 F.3d 230, 241-42 (2d Cir. 2002); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 770 (2d Cir. 1994) (real estate market downturn); Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991) (junk bond market collapse and related litigation).

[2]    All references in citations to "CAC" refer to the Complaint.  All other material cited herein either has been appended as an exhibit to the July 21, 2008 Declaration of Stuart J. Baskin ("Baskin Decl."), filed herewith, or to the July 18, 2008 Declaration of Jay B. Kasner ("Kasner Decl.") filed in support of defendants' motion to dismiss in the related securities fraud action.

companies today, Merrill does not have a pension plan in the traditional sense of providing fixed payments to employees upon retirement.  Merrill's employees have individual retirement savings accounts that they manage and invest themselves.

Merrill offers three types of retirement accounts.  The first is an account in a standard 401(k) plan, which allows each employee (known as a plan "participant") to invest a percentage of his or her compensation in a tax-deferred retirement account (the "401(k)").  (CAC ¶¶ 74-75.)  Each participant decides how the account will be invested.  (Id. ¶ 78.)  They choose among a variety of mutual funds, and they also can invest a percentage of their accounts in Company stock.  (Id. ¶ 79; 401(k) § 11.1.1 (Baskin Decl., Ex. A).)  There is no requirement that 401(k) participants invest in Company stock, and they can change their investments at any time. (401(k) Summary Plan Description ("401(k)-SPD"), "Investing Your 401(k) Account Balance" Chapter (Baskin Decl., Ex. B).)[3]

The second retirement account is an account in Merrill's Retirement Accumulation Plan (or the "RAP").  The RAP works the same way the 401(k) does, except that Merrill contributes all of the cash in participants' accounts.  (CAC ¶¶ 86-88; RAP § 5.1 (Baskin Decl., Ex. C); see also Retirement Program Summary Plan Description ("RP-SPD"), "Investing Your RAP Account Balance" Chapter (Baskin Decl., Ex. D).)  Participants invest their RAP accounts as they see fit, with the same choices and freedom provided to 401(k) participants. (CAC ¶ 95.)  Participants in the 401(k) and RAP are advised that:

> You also have the ability to change your investments daily, both
> for amounts already invested in your . . . account and for future
> contributions to your . . .  account.  *You – not Merrill Lynch or*

---

[3]  Participants who choose to invest their accounts in Company stock are not actually registered shareholders of Merrill stock; rather, their accounts hold unit interests in the Merrill Lynch & Co., Inc. Stock Fund, a fund comprised entirely of Merrill common stock.  For the sake of simplicity, we refer to such unit interests as investments in Merrill stock.

> *anyone else – are responsible for your investment choices.  Plan*
> *fiduciaries are not responsible for any losses that are the direct*
> *and necessary result of your investment decisions.*

(RP-SPD, "Investing Your RAP Account Balance" Chapter (emphasis added) (Baskin Decl., Ex.

D); see also 401(k)-SPD, "Investing Your 401(k) Account Balance" Chapter (Baskin Decl., Ex.

B) (providing same).)  Participants are also provided with a written "Description[] of Investment

Choices" that sets forth extensive and repeated warnings about the importance of diversification

and the fact that holding Merrill stock provides no "degree of diversification," and participants'

unfettered right not to hold Merrill stock in their accounts.  (Descriptions of Investment Choices,

401(k) Savings & Investment Plan and Retirement Program at 5, 15-16 (Baskin Decl., Ex. E.)

The third retirement account is an account in a traditional employee stock

ownership plan (the "Traditional ESOP").  Merrill contributes Company stock to employees'

accounts; employees make no contributions to their Traditional ESOP accounts.  (CAC ¶¶ 86-

88.)  After five years of service, employees can, among other things, transfer their Traditional

ESOP holdings to their RAP account, where they are free to convert all Merrill stock into any

other investment alternative, or receive the cash value of their Merrill stock holdings.  (RP-SPD,

"ESOP Diversification" Chapter (Baskin Decl., Ex. D); CAC ¶ 107.)

The 401(k), RAP and Traditional ESOP are referred to collectively herein as the

"Plans."

## 2.    The Role of Defendants

The Plans assign functions and duties to various parties, which we summarize

briefly below.  This "division of labor" is fully consistent with ERISA and standard among

public company retirement plans.

Merrill established the Plans and is Plan Administrator.  (CAC ¶ 44; 401(k)

§ 8.1.2 (Baskin Decl., Ex. A); RAP § 8.1 (Baskin Decl., Ex. C); Traditional ESOP § 10.1

(Baskin Decl., Ex. F).)  Under ERISA, a "Plan Administrator" is responsible for certain

statutorily prescribed tasks, such as filing the plan's annual report.  29 U.S.C. §§ 1002(16),

1021(b).  Merrill's responsibilities as Plan Administrator do <u>not</u> include the authority to manage

and control the operation and administration of the Plans, establish investment options for the

Plans, or control Plan assets.  (401(k) § 8.1.1 (Baskin Decl., Ex. A); RAP § 8.1 (Baskin Decl.,

Ex. C); Traditional ESOP § 10.1 (Baskin Decl., Ex. F).)  Because Merrill established the Plans, it

is known in ERISA law as the plan or trust "settlor."  It selected Company stock as a mandatory

option under all three Plans long before the Class Period began.

       The Investment Committee for the Plans is appointed by Merrill's Senior Vice

President, Human Resources (the "SVP-HR").  (CAC ¶ 55.)  Their duties are carefully delineated

and extremely limited as set forth in the Plans.  (401(k) § 10.2 (Baskin Decl., Ex. A); RAP § 8.3

(Baskin Decl., Ex. C); Traditional ESOP § 10.3 (Baskin Decl., Ex. F).)  Apart from Company

stock, which was pre-selected by the Plan settlor, the Investment Committee establishes the

"Designated Investment Alternatives" for the Plans.  (401(k) § 10.2.3 (Baskin Decl., Ex. A);

RAP § 8.3 (Baskin Decl., Ex. C).)  The Plans are structured so that participants (not the

Investment Committee) "determine how to invest [their 401(k)/RAP] account balance."  (401(k)-

SPD, "Investing Your 401(k) Account Balance" Chapter (Baskin Decl., Ex. B); RP-SPD,

"Investing Your RAP Account Balance" Chapter (Baskin Decl., Ex. D).)  The 401(k) and RAP

both provide that the Investment Committee shall not:

- make any investments or dispose of any investments . . . in a Designated Investment Alternative without the direction of the Participant or Beneficiary for whom an Account is maintained;

- be responsible for reviewing investment directions given by a Participant or Beneficiary with regard to assets held in a Participant or Beneficiary's Accounts invested in a Designated Investment Alternative or for making recommendations on acquiring, retaining or disposing of any assets or otherwise regarding any assets; or

- be liable for any losses incurred therein as a consequence of investments selected by any Participant or Beneficiary . . . .

(401(k) § 11.1.4 (Baskin Decl., Ex. A); RAP § 5.1 (Baskin Decl., Ex. C).)[4]

The Administrative Committee for the Plans is also appointed by the SVP-HR. (CAC ¶ 55; 401(k) § 10.1.1 (Baskin Decl., Ex. A); RAP § 8.2 (Baskin Decl., Ex. C); Traditional ESOP § 10.2 (Baskin Decl., Ex. F).)  As its name suggests, the Administrative Committee's powers and duties are entirely administrative:  promulgating rules and procedures, keeping books and records, setting dates and procedures for participant elections of plan options, monitoring income tax withholdings and the like.  (401(k) § 10.1.3 (Baskin Decl., Ex. A); RAP § 8.2 (Baskin Decl., Ex. C); Traditional ESOP § 10.2 (Baskin Decl., Ex. F).)

The SVP-HR has the power to appoint or remove members of the Investment Committee and the Administrative Committee.  (CAC ¶ 55.)  The Complaint does not allege that the SVP-HR Defendants have any other duties or responsibilities with respect to the Plans.

E. Stanley O'Neal was the Chief Executive Officer and Chairman of Merrill until his retirement effective October 30, 2007.  (Id. ¶ 27.)  The Chief Executive Officer has no role whatsoever with respect to the Plans.  Merrill's Board of Directors (of which Mr. O'Neal was a member) has the authority to appoint a Trustee for each of the Plans.  (Id. ¶¶ 27-28.)  But the Complaint does not allege that the Trustees did anything wrongful or breached any duties, or that the Chief Executive Officer (or any other Board member) failed to do anything required in appointing or monitoring the Trustees.

## B.    The Events of the Class Period

As in the related securities case filed against Merrill, plaintiffs here fundamentally base their case on the subprime mortgage and credit crises that began in 2007.  (Id. ¶ 5.)

---

[4]    There is no analogous provision in the Traditional ESOP because the Plan can only hold Merrill stock.

Plaintiffs' core allegation is that defendants violated ERISA by "allow[ing] the imprudent investment of the Plans' assets in Merrill Lynch common stock throughout the Class Period even though they knew or should have known that such investment was unduly risky and imprudent due to the fact that, by June 29, 2007, the Company had accumulated at least $43 billion of net exposure to risky and illiquid collateralized debt obligation securities . . . and subprime mortgages . . . ." (Id.)

Plaintiffs devote 58 pages of their Complaint to re-telling the securities plaintiffs' story of supposed fraud and mismanagement by Merrill in connection with its exposure to collateralized debt obligations ("CDOs") and mortgage-backed securities ("MBSs"). (See id. ¶¶ 120-303.) This memorandum will not rehash or respond to that story in detail. Merrill's motion to dismiss the securities case comprehensively addresses those allegations. In the end, all that is alleged is a broad credit crisis that adversely impacted most of the financial world. To be sure, Merrill experienced stock price declines during the Class Period, and most of its competitors suffered comparable or even greater declines over the same period. But this is an ERISA case and nothing alleged suggests that Merrill ceased being a responsible long-term investment choice, or that the defendants breached a fiduciary duty by failing to treat Merrill's prospects as so utterly hopeless that its employees should be prohibited from participating in an employee stock ownership program.

### 1.    Merrill's CDO and Mortgage Business and Efforts to Disclose and Contain Risk

CDOs are complex securities backed by pools of assets that may include a wide variety of debt obligations, including MBSs and other CDOs. (Jennifer E. Bethel et al., Law and Economic Issues in Subprime Litigation, The Harvard John M. Olin Center for Law, Econ., and Bus., Discussion Paper 03/2008, at 12 (Baskin Decl., Ex. G); see also CAC ¶ 137.) Although

they comprised only a small portion of Merrill's broad mix of businesses, Merrill had become a

leader in the CDO and MBS arena by 2006.  (CAC ¶ 135.)[5]

        Merrill achieved near record revenues for the first quarter 2007 but disclosed that

"[r]evenues from mortgage-related activities" were suffering "from a difficult environment for

the origination, securitization and trading of non-prime mortgage loans and securities . . . ."

(Merrill, Current Report (Form 8-K), Ex. 99.1 at 7 (Apr. 19, 2007) (Baskin Decl., Ex. H).)

Similarly, although Merrill experienced very strong second-quarter 2007 results, it cautioned that

it had suffered a "decline in net revenues from the structured finance and investment business,

which includes mortgage-related activities."  (Merrill, Current Report (Form 8-K), Ex. 99.1 at 3

(July 17, 2007) (Baskin Decl., Ex. I).)  Its quarterly filing for the second quarter of 2007 stated

that its "outlook for growth in most global businesses" remained "strong" but explicitly warned

of a "significant risk" of losses as a result of subprime and CDO exposure.  (Merrill, Quarterly

Report (Form 10-Q), at 58 (Aug. 3, 2007) (Kasner Decl., Ex. Y).)

        Coupled with these disclosures throughout the Class Period were statements

noting that Merrill's broad mix of businesses stood on sound financial footing for the long term,

and that the firm was implementing strategies to contain its subprime exposure over the short

term.  (See, e.g., CAC ¶¶ 214 (record results reported for 2006); 219-222 (noting that subprime

mortgage sector was suffering but that environment for other business lines was "quite

favorable," and that sector downturns were "nothing new" and to be "expected" in the industry);

230 (business unit that included CDOs achieved second best second-quarter results ever despite

dislocation in subprime market); 232 (discussing "aggressive risk management" efforts,

including, among other things, an effort to concentrate majority of CDO exposure in the "highest

---

[5]    In the interest of brevity, this memorandum does not include a detailed explanation of the subprime, CDO and MBS markets.  These matters are well explained in Merrill's motion to dismiss the securities case.

credit segment of the market").)  No well pleaded allegations in the Complaint aver that any of these descriptions of market conditions, Merrill's strategies for responding to those conditions or Merrill's highly diversified businesses were untrue.[6]

Of course Merrill was not alone:  most independent market observers and regulators shared its perspective that the problems in the subprime mortgage area would be contained.  Consider Federal Reserve Chairman Bernanke's assessment in May 2007:  "the effect of the troubles in the subprime sector on the broader housing market will likely be limited, and we do not expect significant spillovers from the subprime market to the rest of the economy or to the financial system."[7]  Similarly, the International Monetary Fund opined that the "deterioration in the credit quality of subprime mortgages" was "not likely to pose a serious systemic threat" to "[CDO] tranches rated A and higher" (International Monetary Fund, April 2007 Global Financial Stability Report at 6-7 (Baskin Decl., Ex. J)) – precisely the securities to which Merrill was shifting its exposures to mitigate its subprime risk.

As late as the third quarter 2007, the Federal Reserve and Treasury Department believed that the subprime problems were contained.  In early July, Treasury Secretary Paulson stated that he believed that the housing market correction was "at or near the bottom" and markets, on the whole, remained healthy.  (Emily Kaiser, Paulson Sees U.S. Housing Downturn Near End, Reuters, July 2, 2007 (Baskin Decl., Ex. K).)  On July 18, 2007, Chairman Bernanke

---

[6]    "[C]onclusory allegations" are given "no credence" on a motion to dismiss.  Cantor Fitzgerald Inc. v. Lutnick, 313 F.3d 704, 709 (2d Cir. 2002) (citation omitted); LaSalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc., No. 01 Civ. 4389, 2002 U.S. Dist. LEXIS 23323, at *7 (S.D.N.Y. Dec. 4, 2002).  In addition, where, as here, "the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint."  Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994).

[7]    Ben S. Bernanke, Address at the Federal Reserve Bank of Chicago's Forty-Third Annual Conference on Bank Structure and Competition:  The Subprime Mortgage Market (May 17, 2007), available at http://www.federalreserve.gov/newsevents/speech/bernanke20070517a.htm.

expressed the view that the problems in the subprime mortgage market had not spilled over into other markets.[8]

Nowhere in their Complaint do plaintiffs explain how the Plan fiduciaries could have abused their discretion in believing that Merrill's stock constituted a viable long-term retirement option in view of the reassuring statements from neutral market sources that were in harmony with the Company's stated outlook on the markets and risk management strategies.

### 2. Turmoil Hits the Credit Markets, Causing Merrill To Write Down the Value of its CDO and MBS Positions

In mid-August 2007, a rapid, widespread, and unanticipated liquidity freeze hit the credit markets worldwide. As the rating agencies began to downgrade subprime mortgage-related securities, investors pulled back from a wide range of structured finance markets. (CSI: Credit Crunch, Economist, Oct. 18, 2007 (Kasner Decl., Ex. B).) "[H]edge funds stopped trading, and the collateralized debt obligation market and related credit derivatives markets essentially ceased to exist." (Randall Dodd, Subprime: Tentacles of a Crisis, Fin. & Dev., Vol. 44, No. 4, Dec. 2007, at 18 (Kasner Decl., Ex. C).) Even then, the downgrades were contained at the lowest tranches of CDO debt and did not reach Merrill's high-grade holdings. It was not until late October 2007 that AAA-rated CDOs were widely downgraded. (Jian Hu, Structured Finance CDO Ratings Surveillance Brief – September 2007, Moody's Investors Service, Oct. 23, 2007, at 2 (Kasner Decl., Ex. I).)

In light of the increasingly negative developments, on October 5, 2007, Merrill pre-announced that it expected to write down "an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages."

---

[8]    Semiannual Monetary Policy Report to the Congress: Hearing Before the Comm. on Fin. Servs., 110th Cong. (July 18, 2007), (statement of Ben S. Bernanke, Federal Reserve Chairman) at 2, available at http://www.federalreserve.gov/newsevents/testimony/bernanke20070718a.htm.

(Merrill Press Release, Oct. 5, 2007 (Kasner Decl., Ex. CC).)  Merrill explained that the

additional losses it expected to incur related to the super senior CDO tranches it predominantly

held and that the losses "reflect[ed] in part significant dislocations in the highest-rated tranches

of these securities which were affected by an unprecedented move in credit spreads and a lack of

market liquidity in these securities, which intensified during the third quarter."  (Id.)

On October 24, 2007, Merrill reported its third quarter results, disclosing write-

downs of $7.9 billion.  (Merrill Press Release, Oct. 24, 2007) (Kasner Decl., Ex. DD).)  The

Company increased its estimates of declining value because, "[i]n light of difficult credit markets

and additional analysis by management during our quarter-end closing process, we re-examined

our remaining CDO positions with more conservative assumptions . . . .  We expect market

conditions for subprime mortgage-related assets to continue to be uncertain . . . ."  (Id. at 2)[9]

Much of the financial industry was dealing with the same rapidly deteriorating

environment.  For example, on October 1, 2007, Citigroup announced third quarter subprime-

related losses of $1.3 billion, (Citigroup Inc., Current Report (Form 8-K), Ex. 99.1 at 2 (Oct. 1,

2007)),[10] and on January 15, 2008 announced an additional $17.4 billion of subprime write-

downs for the fourth quarter, (Citigroup Inc., Current Report (Form 8-K), Ex. 99.1 at 2 (Jan. 15,

2008)).  Like Merrill, Citigroup had retained a significant portion of super senior CDOs and

mistakenly believed they were protected from significant losses due to their triple-A ratings.

---

[9]    On January 17, 2008, Merrill announced additional writedowns of "$11.5 billion related to U.S. ABS CDOs and
sub-prime residential mortgages and $3.1 billion of credit valuation adjustments related to the firm's hedges
with financial guarantors" in the fourth quarter of 2007.  (Merrill, Current Report (Form 8-K), Ex. 99.1 at 5 (Jan.
17, 2008) (Baskin Decl., Ex. L).)

[10]    Citigroup's SEC filings cited in this section can be accessed at http://www.citigroup.com/citigroup/fin/sec.htm.

(Citigroup Inc., Annual Report (Form 10-K), at 91 (Feb. 22, 2008).)  UBS,[11] Morgan Stanley[12] and others[13] announced similar losses.

### 3.     Merrill's Stock Price Performance During the Class Period

Merrill's stock price closed at $78.49 on the first day of the Class Period and $51.35 on the last day, a 35% decline.  (CAC ¶ 8)  That decline obviously was an unwelcome development to all concerned.  But it is a far cry from the "dire" and "viability"- threatening free fall that courts have required before finding that a claim has been stated that ERISA fiduciaries may have abused their discretion by continuing to allow plan participants the option to invest in employer stock.  Not surprisingly, the stock of many of Merrill's competitors experienced similar, or even greater, declines over the same period:[14]

---

[11]    On December 10, UBS announced that it had taken write-downs of $10 billion on subprime assets and expected to record a loss for the fourth quarter.  (Press Release, UBS Strengthens Capital Base and Adjusts Valuations (Dec. 10, 2007), available at http://www.ubs.com/1/e/investors/releases?newsId=133686.)  When it pre-announced its fourth quarter earnings on January 30, 2008, UBS disclosed an additional $2.0 billion in subprime write-downs.  (Press Release, UBS Pre-announces Full-year and Fourth Quarter 2007 Results (Jan. 30, 2008), available at http://www.ubs.com/1/e/investors/releases?newsId=135568.)  Half of its 2007 subprime losses related to its holdings of super senior tranches of CDOs.  (UBS AG, Annual Review (2007), Section 1 at 28 (Mar. 25, 2008), available at http://www.ubs.com/1/e/investors/annual_reporting2007.html.)  UBS had relied on the historically low volatility of these instruments and their triple-A rating to conclude that its super senior positions had little impact on UBS's value at risk (VaR) analysis.  (Id. at 20-21.)

[12]    See Press Release, Morgan Stanley Provides Information Regarding Subprime Exposure (Nov. 7, 2007) (disclosing that revenues for the two months ended October 31, 2007 were reduced by $3.7 billion as a result of decline in subprime assets), available at http://www.morganstanley.com/about/press/articles/5779.html; Morgan Stanley, Annual Report (Form 10-K), at 34 (Jan. 28, 2008) (noting majority of its mortgage-related losses (including $7.8 billion write down in the fourth quarter) principally related to its super senior positions in CDOs), available at http://www.morganstanley.com/about/ir/shareholder/10k2007/Form10-K.htm.

[13]    See Press Release, Deutsche Bank Reports Third Quarter 2007 Net Income of EUR 1.6 Billion, Up 31% (Oct. 31, 2007), at 5 (EUR 1.6 billion (approx. $2.3 billion) in write-downs of structured products, including CDOs), available at http://www.db.com/presse/en/content/press_releases_2007_3687.htm?month=3; Press Release, Credit Suisse Group Reports Net Income of CHF 1.3 Billion for the Third Quarter of 2007 (Nov. 1, 2007) (CHF 1.1 billion (approx. $1.0 billion) write-down of structured products, including CDOs), available at http://www.credit-suisse.com/news/en/media_release.jsp?ns=40555; Wachovia, Current Report (Form 8-K), Ex. 99 at 15 (Nov. 9, 2007) ($1.1 billion write down of CDOs), available at http://ccbn.10kwizard.com/xml/download.php?format=PDF&ipage=5267146; Bank of America, Current Report (Form 8-K) (Nov. 13, 2007), Ex. 99.1 at 11 (estimated Q4 subprime write-down of $3.0 billion), available at http://ccbn.10kwizard.com/xml/download.php?format=PDF&ipage=5272615; Bear Stearns, Current Report (Form 8-K), at 1 (Nov. 14, 2007) (write-down of $1.2 billion on subprime positions), available at http://www.secinfo.com/dRSm6.u2ed.htm.

[14]    Stock tables with the data cited in this section are attached as Exhibit M to the Baskin Declaration.

| Citigroup | -48% |
|-----------|------|
| UBS | -43% |
| Lehman Brothers | -36% |
| Merrill | -35% |
| Morgan Stanley | -32% |
| Bank of America | -26% |

Plaintiffs do not (and could not) contend that each of these world-class financial institutions ceased to be viable.  Nor do plaintiffs allege that even one of these institutions disallowed its own stock as a retirement option or shuttered its ESOPs.  Had Merrill done so, it would have been a radical departure from the informed decisions of ERISA committees across the same industry.  ERISA § 404(a)(1)(B) requires that fiduciaries act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity" would employ.  29 U.S.C. § 1104(a)(1)(B) (emphasis added).  It is an unusual ERISA case where the conduct of other similarly-situated fiduciaries is available for contemporaneous and direct comparison.[15]

Merrill's decline in stock price not only was comparable to its peers, but also fell within historical volatility ranges for financial sector stocks during market dislocations.  Consider the summer of 1998:  a "perfect storm" hit the markets, starting in Russia and Asia, and triggering a liquidity crisis in the United States.  (Peter Coy, Failed Wizards of Wall Street, BusinessWeek, Sept. 21, 1998 (Baskin Decl., Ex. N).)  Merrill's stock price tumbled 51% in the third quarter of 1998.  Morgan Stanley fell 52% in the same quarter.  (See Baskin Decl., Ex. M at 50-53.)  Both recovered to all time highs within a few years thereafter.

Merrill (and its peers) have weathered market dislocations before and almost certainly will again.  This is demonstrably different from meltdowns like Enron or Worldcom.

---

[15]   Predictably, nearly identical ERISA cases have been filed in this district against other financial institutions, including Citigroup, Morgan Stanley, Lehman Brothers and Wachovia.

Merrill is not alleged to be on the brink of collapse, or riddled with fraud such that continuing

employee stock ownership could be viewed as an abuse of discretion.  Its diverse businesses are

in no way permanently broken or impaired, and plaintiffs do not contend otherwise.  As will be

seen, the law effectively requires systemic and permanent impairment before ERISA fiduciaries

can be deemed to have abused their discretion by failing to take the dire (and largely

unprecedented step) of impounding their company's stock and declaring it is unsuitable for long-

term investment.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO STATE A CLAIM FOR FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS (COUNT I)

Count I alleges a breach of the duty of prudence by the Investment Committee

and Merrill in connection with all three Plans, and the Administrative Committee in connection

with the 401(k) and the RAP, referring to these parties as the "Prudence Defendants."  Plaintiffs

claim that these defendants acted imprudently by continuing (on some unspecified date) to offer

Merrill stock as an investment option under the 401(k) and RAP, failing (on some unspecified

date) to liquidate the portions of all Plans that held company shares, and continuing (over

unspecified time periods) to invest dividends within the Traditional ESOP.  (CAC ¶¶ 364-74.)

### A.    The Decision To Offer Plan Participants The Ability To Invest In Merrill Stock Was Not Fiduciary Conduct On The Part Of The Prudence Defendants, And There Can Be No Liability For Failing To Diversify The Plans In Any Event

Although the so-called "Prudence Defendants" each had duties specified in the

Plans, the decision to allow the Plans to invest in Merrill common stock was not among those

duties.  "In every case charging breach of ERISA fiduciary duty . . . the threshold question is . . .

whether [the defendant] was acting as a fiduciary . . . <u>when taking the action subject to the</u>

<u>complaint</u>."  <u>Pegram v. Herdrich</u>, 530 U.S. 211, 226 (2000) (emphasis added); <u>Harris Trust &</u>

Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 28 (2d Cir. 2002).  To be an ERISA fiduciary with respect to a challenged act, an individual must have "discretionary authority" or "discretionary responsibility."  29 U.S.C. § 1002(21)(A).  Thus, to state a claim, plaintiffs must properly allege that the Prudence Defendants had the "discretionary authority" to prohibit 401(k) and RAP participants from investing in Merrill company stock, to liquidate all of the Plans' Merrill stock holdings, and to prohibit the Traditional ESOP from reinvesting dividends in Merrill stock.

Each of the Plans Merrill established (or "settled") required inclusion of Merrill stock as an investment option.  The Traditional ESOP states that all contributions "shall" be invested in Merrill common stock.  (Traditional ESOP § 6.1(a) (Baskin Decl., Ex. F).)  It further provides that, absent a contrary direction from participants, dividends "shall" be reinvested in Merrill common stock.  (Id. § 6.1(c).)  The RAP similarly requires that participants be given the option to invest in Merrill stock.  Its fundamental design is that "the Plan shall consist of two portions.  The first portion is that part of the Plan that is invested in assets other than Company Stock . . . .  The second portion is that part of the Plan that is invested in Company Stock and is intended to qualify both as a stock bonus plan and an employee stock ownership plan . . . ."  (RAP § 1.34 (emphasis added) (Baskin Decl., Ex. C).)[16]

---

[16]    The Complaint does not mention these sections of the RAP that explicitly state that the RAP "shall" permit investment in Merrill stock, but instead cites to one phrase in Section 5.1 to create the impression that the Investment Committee could direct that "all or a portion of the Trust Fund may be invested . . . in short-term securities" issued by the United States.  (CAC ¶ 100.) (quoting RAP § 5.1 (Baskin Decl., Ex. C)).  The very next sentence of Section 5.1 makes plain that such short-term investments are for the purpose of paying reasonable expenses.  Indeed, the following sentence – again omitted from the Complaint – states plainly that "except for the investment of trust assets pending their investment in Designated Investment Alternatives, . . . [neither the Administrative Committee nor the Investment Committee shall] make any investments or dispose of any investments . . . without the direction of the Participant . . . for whom an Account is maintained."  (RAP § 5.1(i) (Baskin Decl., Ex. C).)

The 401(k) also required that plan participants be permitted to invest in Merrill stock. The 401(k) states: "that portion of the Plan invested in Company Stock . . . is both a stock bonus plan and an employee stock ownership plan . . . . The remainder of the Plan is a profit sharing plan . . . ." (401(k) § 1.40 (emphasis added) (Baskin Decl., Ex. A); id. § 5.6.)

The settlor's decree that the Plans offer Merrill stock requires dismissal for two related reasons. First, where, as here, a plan mandates employee stock ownership as a fundamental plan feature, there can be no fiduciary liability in complying with that stipulation. See Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 249-53 (5th Cir. 2008) ("Because the Plan's requirements to invest in [company] stock are mandatory and were treated as such by [the company and alleged ERISA fiduciaries], we agree with the district court that no fiduciary duties are inherent in the Plan other than to follow its terms."); Crowley v. Corning, Inc., No. 02 Civ. 6172, 2004 U.S. Dist. LEXIS 758, at *30-31 (W.D.N.Y. Jan. 14, 2004) ("[I]n the case at bar, the Plan does not give the fiduciaries any discretion with regard to investments in company stock. Consequently, the Plan creates no potential for fiduciary liability with regard to investments in [company] stock.").[17]

Second, plaintiffs' prudence claim is barred by Section 402(a)(2) of ERISA. That provision specifically exempts fiduciaries of "eligible individual account plans" (commonly

---

[17] By contrast, in WorldCom, the plan at issue did not require company stock as an option, and thus the "settlor doctrine" did not apply. In re WorldCom, Inc. ERISA Litig., 263 F. Supp. 2d 745, 764 (S.D.N.Y. 2003). This distinction was emphasized in Crowley, where the court pointed out that "nothing in the [WorldCom] Plan committed WorldCom" to offer its own stock to plan participants. 2004 U.S. Dist. LEXIS 758, at *18. (The plan in Crowley, like Merrill's Plans, directed that company stock be an investment option, and the court accordingly applied the settlor doctrine to bar plaintiffs' claims.) Similarly, in Moench v. Robertson, 62 F.3d 553 (3d Cir. 1995), the Third Circuit found that ERISA fiduciaries had discretion to discontinue company stock under certain extreme circumstances, but was careful to state that "we are not concerned with a situation in which an ESOP plan in absolutely unmistakable terms requires that the fiduciary invest the assets in the employer's securities regardless of the surrounding circumstances." 62 F.3d at 567 n.4.; see also Kirschbaum, 526 F.3d at 255 n.9 (noting that plan in Moench "was only 'biased' toward" employer stock and did not require it as a plan option); Pedraza v. Coca-Cola Co., 456 F. Supp. 2d 1262, 1276 n.21 (N.D. Ga. 2006) (applying settlor rule to dismiss claim and observing that "[p]art of Moench's rationale was that the fiduciary had some discretion to swap employer stock for other investments. That is not the situation in this case.").

referred to as "EIAPs") and ESOPs from the duty to diversify plan assets, as well as from any

duty of prudence to the extent that prudence would otherwise require diversification.  29 U.S.C.

§ 1104(a)(2); <u>see also</u> <u>Wright v. Or. Metallurgical Corp.</u>, 360 F.3d 1090, 1097 (9th Cir. 2004);

<u>Kirschbaum</u>, 526 F.3d at 249; <u>Kuper v. Iovenko</u>, 66 F.3d 1447, 1458 (6th Cir. 1995).[18]

       Plaintiffs admit that the Merrill Plans are EIAPs and thus are "excused from the

duty to diversify."  (CAC ¶ 361.)[19]  Plaintiffs nevertheless argue that a plan "with an <u>undue</u>

<u>percentage</u> of very risky investments, no matter how well diversified, is not a prudent retirement

investment."  (<u>Id.</u> (emphasis added).)  But that is mere wordplay.  Saying that the Plans held an

"undue percentage" of Merrill stock is just another way of saying they were not adequately

diversified.[20]  ERISA § 402(a)(2)'s statutory exemption requires dismissal of Count I.  <u>See</u> <u>In re</u>

<u>Calpine Corp. ERISA Litig.</u>, No. 03 Civ. 1685, 2005 U.S. Dist. LEXIS 9719, at *14 (N.D. Cal.

Mar. 30, 2005) (claim that "defendants were liable for failing to 'deselect'" company stock as a

plan option "<u>is substantively the same as a claim based on failure to diversify</u> . . .") (emphasis

added) (granting motion to dismiss); <u>In re McKesson HBOC, Inc. ERISA Litg.</u>, 391 F. Supp. 2d

812, 828-29 (N.D. Cal. 2005) (granting motion to dismiss); <u>accord</u> <u>Wright</u>, 360 F.3d at 1097

("Interpreting ERISA's prudence requirement" to include a duty to discontinue or divest

company stock from plan "arguably threatens to eviscerate congressional intent and the guiding

---

[18]   This broad exemption from liability exists to promote Congress's strong policy in favor of employee stock ownership.  <u>Kuper</u>, 66 F.3d at 1458 ("In drafting the ESOP provisions of ERISA, Congress intended to encourage employees' ownership of their employer company.  In order to promote this goal, Congress carved out specific exceptions to certain fiduciary duties," including the diversification exception.); <u>Moench</u>, 62 F.3d at 568 (observing that diversification exemption exists to promote "the concept of employee ownership."); <u>Wright</u>, 360 F.3d at 1097 ("EIAPs are exempt from certain ERISA provisions because of the 'strong policy and preference in favor of investment in employer stock.'") (internal quotation omitted).

[19]   ESOPs and EIAPs "are treated the same for the purpose of fiduciary duty analysis."  <u>Wright</u>, 360 F.3d at 1098 n.3 (citing <u>Foltz v. U.S. News & World Report, Inc.</u>, 865 F.2d 364, 373-74 (D.C. Cir. 1989)).

[20]   Throughout the Complaint, plaintiffs complain about the "percentages" of Merrill stock the Plans held.  (<u>See</u> CAC ¶¶ 361, 404.)

rational behind EIAPs themselves.") (affirming grant of motion to dismiss); <u>Pedraza</u>, 456 F.

Supp. 2d at 1275-76 (granting motion to dismiss).

  **B.**  **The <u>Moench</u> Presumption Requires Dismissal of Count I**

    Even assuming that there were no settlor rule and no resulting exemption from

diversifying EIAPs and ESOPs, plaintiffs have not and could not plead a breach of the duty of

prudence.  Plan fiduciaries have limited ERISA roles.  They are not investment advisors.  They

do not decide whether company stock is overvalued.  They do not trade stocks.  They do not time

markets.  They do not seek short term profits.  They make no recommendations.  Their task –

and their only task – is to designate a suitable mix of investment options for 401(k) and RAP

participants to choose from for their retirement accounts.  Under the Plans, "participants," not

defendants:  (1) choose among the investments, (2) retain the right to change their investments at

any time, and (3) decide whether to invest in Merrill stock.  (<u>See</u> <u>supra</u> at 4-6.)

    This limited role for EIAP and ESOP fiduciaries animated the seminal decision in

<u>Moench v. Robertson</u>, 62 F.3d 553 (3d Cir. 1995), where the Third Circuit considered the legal

standard governing plan fiduciaries (when the settlor did not foreclose their discretion) in

considering the suitability of employer stock as a retirement investment.  The <u>Moench</u> court

adopted an abuse of discretion standard in assessing the conduct of plan fiduciaries, and held that

this presumption could only be rebutted if unforeseen circumstances would defeat or

substantially impair the accomplishment of the plan's purpose.  <u>Id.</u> at 571.  This requirement,

referred to as the "<u>Moench</u> presumption," has been widely applied among the Circuits and by

district courts in this Circuit.  <u>See, e.g.</u>, <u>Kirschbaum v. Reliant Energy, Inc.</u>, 526 F.3d 243 (5th

Cir. 2008); <u>Pugh v. Tribune Co.</u>, 521 F.3d 686 (7th Cir. 2008); <u>Edgar v. Avaya</u>, 503 F.3d 340 (3d

Cir. 2007); <u>Wright v. Or. Metallurgical Corp.</u>, 360 F.3d 1090 (9th Cir. 2004); <u>Kuper v. Iovenko</u>,

19

66 F.3d 1447 (6th Cir. 1995); In re Polaroid ERISA Litig., 362 F. Supp. 2d 461 (S.D.N.Y. 2005);

WorldCom, 263 F. Supp. 2d 745 (S.D.N.Y. 2003).

Moench sets an exceedingly high bar for pleading and proving a breach of

fiduciary duty out of deference to the strong ERISA policy in favor of employee stock ownership

programs and other related policy considerations.  62 F.3d at 571; see also Kirschbaum, 526 F.3d

at 256 (Moench presumption is a "substantial shield").  For an ERISA stock-drop case such as

this, the decisions qualitatively require that the company must be fundamentally and permanently

impaired, such as a company on the brink of bankruptcy or riddled with systemic fraud.

Similarly, quantitatively, courts overwhelmingly have required a crippling stock price decline,

with many courts dismissing cases involving 75% or 80% stock drops as insufficiently severe to

overcome the Moench presumption.

It is only in such undeniably dire circumstances that ERISA fiduciaries can

determine with confidence that terminating employee ownership is the prudent thing to do.  It is

only then that plan fiduciaries can appropriately determine that company stock is beyond

recovery and no longer a viable, long-term investment.  Indeed, in the real world, if a company

(such as Merrill here) still has a substantial market capitalization, a decision to vitiate employee

ownership would almost certainly trigger a broader sell-off and free fall of company share prices.

That scenario would be the worst of all worlds for plan participants:  both the value of their

existing retirement accounts, as well as their source of employment, could face ruin.[21]

Moench itself involved the "demise" of Statewide Bancorp, whose shares fell

from $18.25 to 25 cents per share over a prolonged spiral into bankruptcy during which the

---

[21]  "[C]ourts must be aware of the risks that 'if the fiduciary, in what it regards as an exercise of caution, does not maintain the investment in the employer's securities, it may face liability for that caution, particularly if the employer's securities thrive.'"  Kirschbaum, 526 F.3d at 256 n.13 (quoting Moench, 62 F.3d at 572).

alleged ERISA fiduciaries never halted plan investments in the company's stock notwithstanding evidence that they knew of the company's impending collapse. 62 F.3d at 557. It was only under those extreme circumstances that the Third Circuit concluded that there might have been an abuse of discretion in continuing to allow investments in company stock. Id.

Numerous decisions have held that only truly dire circumstances – akin to those presented in Moench – can state a claim of abuse of discretion. For example, in Kirschbaum, the Fifth Circuit recently held that a stock drop of "approximately forty percent" (compared to 35% here over the Class Period) was insufficient and stated that a threat to the company's "viability as a going concern" and a "danger of [the stock] becoming essentially worthless" are needed to establish an abuse of discretion in continuing the employee stock ownership program. 526 F.3d at 255 (describing facts as a "far cry from the downward spiral in Moench"). The court also observed that the facts before it were "much less grave than facts other courts routinely conclude are insufficient to rebut the Moench presumption." Id. The Fifth Circuit cited cases where companies suffered 75% and 80% stock drops, and those were still held insufficient to overcome Moench on a motion to dismiss. Id. at 256; accord Kuper, 66 F.3d at 1460 (80% stock drop insufficient to overcome Moench).

Similarly, in Wright, the Ninth Circuit granted a motion to dismiss, finding no abuse of discretion in continuing the employee stock ownership program even where the company's stock price plummeted from $28.94 to $7.94 per share. Even then, the Ninth Circuit held that the facts in Wright were "far from the sort of deteriorating financial circumstances involved in Moench," and disposed of the claim on a motion to dismiss. 360 F.3d at 1098-99.[22]

---

[22] In Bell Atlantic Corp. v. Twombly, the Supreme Court held that to satisfy Rule 8 pleading requirements, a complaint must allege facts that "raise a right to relief above the speculative level." 127 S. Ct. 1955, 1965 (2007). Even before Bell Atlantic, most courts applied Moench on a motion to dismiss. After Bell Atlantic, virtually all courts that have analyzed the issue have applied Moench at the motion to dismiss stage. See Edgar,

Qualitatively, there is no allegation that Merrill's core businesses are permanently impaired. And quantitatively, Merrill's 35% Class Period stock drop (or even a substantially greater stock drop) could not come close to sustaining a claim of abuse of discretion. See Edgar, 503 F.3d at 349 (citing Wright and holding that there is "no reason to allow this case to proceed to discovery" when public stock and financial performance records incorporated in the complaint, including a large stock drop, "cannot establish that defendants abused their discretion"); In re Duke Energy ERISA Litig., 281 F. Supp. 2d 786, 793-94 (W.D.N.C. 2003) (granting motion to dismiss where stock price fell 55% and concluding that the absence of allegations of "impending collapse," a threat to the company's status as a "viable concern," and truly "dire" circumstances were not shown); Calpine, 2005 U.S. Dist. LEXIS 9719, at *16 (granting motion to dismiss in absence of allegations and public facts calling company's "viability as an ongoing concern" into question) (citation omitted); McKesson, 391 F. Supp. 2d at 838-39 (granting motion to dismiss where company's stock price dropped 75% and massive accounting irregularities led to the restatement of financial statements, finding that "neither Kuper nor Moench holds that a 75% decline in value is sufficient to rebut the Moench presumption"); In re Coca-Cola Enters. Inc. ERISA Litig., No. 06 Civ. 953, 2007 U.S. Dist. LEXIS 44991, at *32-33 (N.D. Ga. June 19, 2007) (granting motion to dismiss where stock drop did not satisfy Moench, observing that Moench is rebutted only where a "company is on the verge of financial collapse").

---

503 F.3d at 349; Pugh, 521 F.3d at 701; In re Radioshack Corp. ERISA Litig., No. 08 MD 1875, 2008 U.S. Dist. LEXIS 53668, at *21-23 (N.D. Tex. Mar. 31, 2008); In re Dell, Inc. ERISA Litig., No. 06 Civ. 758, 2008 U.S. Dist. LEXIS 50296, at *31-32 (W.D. Tex. June 23, 2008); Kirschbaum, 526 F.3d at 254, 256 n.12 (in dicta, "[t]he Moench presumption logically applies to any allegations of fiduciary duty breach for failure to divest" (emphasis added) (citing two cases that dismissed ERISA duty of prudence claims on a motion to dismiss when describing facts that were held to be insufficient to rebut the Moench presumption: Wright, 360 F.3d at 1096, 1098; McKesson, 391 F. Supp. 2d at 830-33)).

In fact, this case, involving an industry-wide credit crisis that impacted almost all of Merrill's competitors, is a stronger case for dismissal than the cases cited above. As discussed at pages 9 through 11 above, the Company and key financial regulators all were predicting that difficulties in the subprime market would be limited, and that the risk management strategies – such as those attempted by Merrill – could be effective in containing losses. Plaintiffs offer no reason why the Prudence Defendants were required to second guess these judgments, particularly when their counterparts at the other affected financial institutions did not discontinue their ESOPs under similar or worse circumstances. These indisputable facts (which plaintiffs themselves plead) should preclude liability under any standard, let alone the exceedingly protective <u>Moench</u> standard.

This Court should follow the wave of authorities applying <u>Moench</u> cited above and grant dismissal under Rule 12(b)(6). After the Supreme Court's decision in <u>Bell Atlantic</u>, it is clearer than ever that class actions proceeding on implausible theories barred by settled precedent should not proceed to expensive and burdensome discovery.

### C.    The Prudence Defendants Did Not Breach Any Duty To Investigate

Plaintiffs allege that the Prudence Defendants violated the duty of prudence because they "knew or should have known that Merrill Lynch stock was an imprudent investment" and failed to conduct an adequate investigation to ensure the prudence of the investment. The Court need not reach this question.

For the reasons stated above, plaintiffs have failed to plead that Merrill stock was an imprudent investment because (1) the Plans required that Merrill stock be included as an investment option, and, under the settlor rule, the Prudence Defendants had no discretion to remove it, (2) the prudence claim is, in substance, a complaint that the Prudence Defendants failed to diversify the Plans' holdings and is thus barred by ERISA § 404(a)(2), and (3) plaintiffs

have failed to plead facts to overcome the <u>Moench</u> presumption.  <u>See</u> <u>Wright</u>, 360 F.3d at 1099

("[A] plaintiff must show a <u>causal link</u> between the failure to investigate and the harm suffered

by the plan.") (emphasis in original) (quoting <u>Kuper</u>, 66 F.3d at 1459); <u>see also</u> <u>In re Unisys Sav.</u>

<u>Plan Litig.</u>, No. 91 Civ. 3067, 1997 U.S. Dist. LEXIS 19198, at *70 (E.D. Pa. Nov. 24, 1997)

("Even if a fiduciary fails to make an adequate investigation, that fiduciary is not liable if a

hypothetically prudent fiduciary would have made the same decision after making an adequate

investigation.") (citation omitted).[23]

       But even if all of these defenses somehow failed, the Court still should dismiss

Count I because there are no well pleaded allegations establishing that the Prudence Defendants

knew, or should have known, that Merrill stock was an imprudent investment.  To begin with,

plaintiffs do not genuinely contend that the Prudence Defendants actually knew that Merrill

stock was an imprudent investment.  In fact, they plead the opposite.  Plaintiffs allege that the

committee members – who were not officers or executive directors (CAC ¶ 35) – "should have

sought information concerning the risks posed by an investment in Company stock . . . but <u>failed</u>

<u>to do so</u>."  (<u>Id.</u> ¶ 395 (emphasis added).)

       Plaintiffs' "should have known, but failed to investigate" allegations fail as well.

<u>First</u>, they plead no facts whatsoever in support of their claim that the Prudence Defendants did

not actually investigate Merrill's financial condition.  The Complaint merely speculates that

there was no investigation.  (<u>See, e.g.</u>, <u>id.</u> ¶ 306.)  Speculation does not state a claim.  <u>Bell</u>

<u>Atlantic</u>, 127 S. Ct. at 1965 (Rule 12(b)(6) dismissal is appropriate where complaint does not

demonstrate "a right to relief above the speculative level."); <u>Cantor Fitzgerald Inc. v. Lutnick</u>,

---

[23]   <u>McKesson</u>, 391 F. Supp. 2d at 833-34 (plaintiff "must show that an investment actually was imprudent before
he can state a claim for failing to investigate") (citing <u>Fink v. Nat'l. Sav. & Trust Co.</u>, 772 F.2d 951, 962 (D.C.
Cir. 1985)).

313 F.3d 704, 709 (2d Cir. 2002) ("[C]onclusory allegations" are given "no credence" on a motion to dismiss.).

Second, plaintiffs allege no facts that would have justified an investigation by the Prudence Defendants. They cite a litany of supposed "red flags," but even a cursory review of these items shows that none of them plausibly should have triggered investigation. Most of the "flags" are nonsensical. For example: the fact that the Wall Street Journal reported that "demand for CDOs was decreasing" in 2006. (CAC ¶ 307.) Demand for all of Merrill's product offerings and services is either decreasing or increasing most of the time. That is hardly a basis to launch an investigation, particularly during a period when the Company was still reporting record profits and CDOs reportedly represented only about 1-2% of revenue. (See supra at 9-11.) The same can be said of the various mortgage company bankruptcies cited by plaintiffs. (See CAC ¶ 307.) Merrill is not a mortgage company; it is a large and diverse financial institution with myriad businesses and products. Nowhere do plaintiffs explain how such bankruptcies should have prompted an investigation of Merrill by the Prudence Defendants. Pugh, 521 F.3d at 700 ("With nothing but pure speculation to support them, the plaintiffs' alleged red flags fail as a matter of law.") (affirming order granting motion to dismiss ERISA case).

More importantly, the fact that there were difficulties in the subprime mortgage market was common knowledge and widely reported for most of the Class Period.[24] As discussed in detail at pages 9 through 11 above, these difficulties, their potential impact on Merrill, and the Company's strategies for reducing its exposure in the area (e.g., shifting asset

---

[24] This information of course, was equally available to Plan participants. Under the Plans, it was their responsibility to make investment decisions, and there is nothing in the Plans or disclosures that would suggest to them that the Prudence Defendants would be conducting investigations of developments in the market and their impact on Merrill.

allocation to higher tranches of CDOs) were extensively addressed by the Company in public statements.  Nowhere do plaintiffs explain why the Prudence Defendants abused their discretion by relying on these statements rather than launching an internal investigation of Merrill.  The fact that changed market conditions later led Merrill to write down the value of its CDO portfolio "says nothing about whether the defendants were on notice of potential problems beforehand." Pugh, 521 F.3d at 700.

          The suggestion that an investigation was warranted becomes particularly strained when one considers that the most sophisticated market observers – rating agencies, the Federal Reserve, the Treasury Department and the International Monetary Fund – all were making public statements consistent with Merrill's public market assessments throughout the Class Period. (See supra at 10-11.)  ERISA's "prudent man acting in a like capacity" standard does not require plan fiduciaries to predict an unprecedentedly severe liquidity and credit crisis (let alone its impact on the value of highly complex securities) when the world's leading market authorities could not.  29 U.S.C. § 404(a); see Summers v. State St. Bank & Trust Co., 453 F.3d 404, 408 (7th Cir. 2006) (Posner, J.) (ERISA fiduciaries are not "required to act on the assumption that the market [is] overvaluing" the investment.).  Furthermore, in addition to being a public company with independently audited financial statements, Merrill is subject to extensive oversight of its securities holdings and their valuation by the Securities and Exchange Commission ("SEC").[25] As the Court of Appeals held in Pugh, "especially because [the company was] being audited by a third party," "there is no reason to infer" that ERISA fiduciaries would be on notice of the need

---

[25]    It is a matter of public record that, since January 1, 2005, Merrill has been a so-called consolidated supervised entity ("CSE") subject to extensive oversight by the SEC, specifically with respect to its risk management practices.  (Merrill, 2006 Annual Report (Form 10-K), at 22, 128 (Feb. 26, 2007) (Kasner Decl., Ex. V).)  To qualify as a CSE, Merrill was required to consent to ongoing, firm-wide SEC supervision of its capital adequacy, liquidity and risk exposures, including on-site inspections by the SEC to test Merrill's implementation and procedures with respect to valuing, or "marking-to-market," complex and less-liquid positions.  (See CSE Program Overview, available at http://www.sec.gov/divisions/marketreg/cseoverview.htm.)

to investigate technical matters of accounting or valuation.  Pugh, 521 F.3d at 700.[26]

    **D.**    **Count I Fails Against The Administrative Committee Defendants For The Additional Reason That The Administrative Committee Had No Discretion Over The Investment Of Plan Assets**

        The Court need look no further than plaintiffs' own allegations to confirm that the Administrative Committee Defendants did not have the requisite discretion to be held liable for the conduct alleged in Count I.  As discussed above, an ERISA plaintiff must plead not only that each defendant was a fiduciary, but also that he was acting in a fiduciary capacity with respect to the particular conduct alleged in the complaint.[27]  See Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000); see also Flanigan v. Gen. Elec. Co., 242 F.3d 78, 87 (2d Cir. 2001).  Fiduciary status under ERISA is not an all or nothing concept, but rather extends only as far as an individual's actual discretionary authority or discretionary control.  See 29 U.S.C. § 1002(21)(A); see also Varity Corp. v. Howe, 516 U.S. 489, 498 (1996).  Accordingly, a fiduciary's liability for breach of ERISA duties cannot extend to matters beyond his discretionary authority or control.  WorldCom, 263 F. Supp. 2d at 760 ("ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations."); see also Pegram, 530 U.S. at 225-26.

        Here, although the Administrative Committee Defendants are lumped in as "Prudence Defendants" in Count I (CAC ¶ 365), Count I is explicitly limited to "the Defendants who were responsible for the investment of the Plans' assets."  (Id. ¶ 14.)  But the Administrative

---

[26]    Even assuming arguendo that an investigation by the Prudence Defendants yielded non-public information that would have led them to liquidate the Plans' Company stock holdings, doing so likely would have violated the federal securities laws' prohibition against insider trading.  ERISA duties do not require plan fiduciaries to engage in unlawful conduct.  See Wright, 360 F.3d at 1098 n.4 (plan liquidation would be "problematic to the extent that it inadvertently encourages corporate officers to utilize inside information for the exclusive benefit of the corporation and its employees.  Such activities could potentially run afoul of the federal securities laws."); see also In re CF&I Fabricators of Utah, Inc., 150 F.3d 1293, 1301 (10th Cir. 1998) ("Congress has made clear when ERISA conflicts with another provision of federal law, ERISA must be subordinated.").

[27]    An individual or entity can become an ERISA fiduciary either by being so named in the plan document, or by exercising discretionary authority or control with respect to plan administration or the disposition of plan assets.  29 U.S.C. § 1002(21)(A).

Committee has no discretion whatsoever over the investment of the Plans' assets, and thus did not have a fiduciary function as to that activity. Its responsibilities and duties are expressly limited to "the operation and administration of the Plans." (Id. ¶ 58; citing 401(k) § 8.1.1 (Baskin Decl., Ex. A); RAP § 8.1 (Baskin Decl., Ex. C); Traditional ESOP § 10.1 (Baskin Decl., Ex. F).)[28]

These types of administrative tasks do not confer discretionary authority or control with respect to plan assets and cannot sustain claims for breach of the duty of prudence and loyalty. Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson, No. 03 Civ. 1060, 2006 U.S. Dist. LEXIS 74670, at *46-47 (N.D.N.Y. July 13, 2006) (dismissing claims against Administrative Committee because it lacked the requisite discretion over investment of plan assets); see also Smith v. Delta Air Lines, Inc., 422 F. Supp. 2d 1310, 1326-27 (N.D. Ga. 2006) (dismissing claims and holding that the Administrative Committee was a fiduciary only with respect to plan administration, not plan investments); In re Dynegy, Inc. ERISA Litig., 309 F. Supp. 2d 861, 892 (S.D. Tex. 2004) (dismissing prudence and loyalty claims against committee defendants where plan documents did not confer discretion over plan investments).

Plaintiffs' claim hinges on a misreading of a clause in the RAP and 401(k) Plans. The clause states:

> If Designated Investment Alternatives are established [by the Investment Committee], the Administrative Committee may, in its sole discretion, permit Participants and Beneficiaries to determine the portion of their accounts that shall be invested in each Designated Investment Account and shall determine what transfers

---

[28]    The Complaint and the Plans set forth the specific duties and responsibilities of the Administrative Committee, all of which are limited to administrative tasks such as promulgating rules, issuing forms, maintaining records and determining the time and manner of elections. (CAC ¶ 60, citing 401(k) § 10.1.3 (Baskin Decl., Ex. A); RAP § 8.2 (Baskin Decl., Ex. C); Traditional ESOP § 10.2 (Baskin Decl., Ex. F).)

> between Designated Investment Alternatives and other Trust assets
> shall be permissible.[29]

(CAC ¶ 57, citing 401(k) 2005 Amendment § 11.1.2 (Baskin Decl., Ex. A); RAP § 5.1 (Baskin Decl., Ex. C).)  Relying on this provision, plaintiffs insist that the Administrative Committee Defendants had sweeping fiduciary duties related to Plan investments.  But the quoted clause grants no discretion as to the selection of Merrill stock or other Designated Investment Alternatives, nor does it authorize the Administrative Committee to divest participants' accounts of Merrill stock.[30]

Under plaintiffs' theory, the Administrative Committee effectively approves or vetoes the Designated Investment Alternatives selected by the Investment Committee.  This cannot be squared with the Administrative Committee's overall list of functions (see supra at 7), and nothing in the Plans or the Complaint suggests that the Administrative Committee was intended substantively to supersede the Investment Committee in selecting investment alternatives.  There is a clear division of labor:  the Investment Committee selects the investment alternatives (other than Company stock, which is mandatory), and the Administrative Committee handles matters of procedure.  The only reasonable construction of the quoted passage is that it was intended to grant the Administrative Committee authority to establish rules and procedures for participation in the Plans:  forms, signatures, deadlines, and the like.  See Coleman v. Nationwide, 969 F.2d 54, 60-61 (4th Cir. 1992); F.H. Krear & Co. v. Nineteen Named Trs., 810

---

[29]  Plaintiffs conspicuously omit the next sentence, which reads "[t]he Plan is then intended to comply with section 404(c) of ERISA, under which Participants and Beneficiaries are responsible for, and bear the consequences of, such investment determinations."  (401(k) § 11.1.2 (Baskin Decl., Ex. A); RAP § 5.1 (Baskin Decl., Ex. C).)  When read together, these two sentences merely reflect the ability of the participants – not the Administrative Committee – to make their own investment choices.

[30]  Notably, Plaintiffs do not allege that the Administrative Committee Defendants acted as de facto fiduciaries by actually exercising discretionary authority or control with respect to the disposition of plan assets.  See 29 U.S.C. § 1002(21)(A).  On the contrary, the gravamen of Count I against the Administrative Committee Defendants is that they failed to exercise their purported discretionary authority or control with respect to investments in Merrill stock.

F.2d 1250, 1259 (2d Cir. 1987) (ERISA contemplates a division of discretion and duties among

plan fiduciaries.).[31]

### E.    Merrill's Limited Role As Settlor And Plan Administrator Does Not Create Fiduciary Duties Regarding The Management Of Plan Assets

As discussed above, the Plans themselves require that Plan participants be

permitted to invest in Company stock.  While Merrill originally established those Plans, under

the "settlor doctrine," Merrill cannot be held liable for an alleged breach of fiduciary duty based

on its role in establishing the terms of a retirement plan because such acts are those of a "settlor"

of a trust and not those of a fiduciary.  Akers v. Palmer, 71 F.3d 226, 231 (6th Cir. 1995).  See

also Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999) (noting that the role of a plan

sponsor is analogous to that of the settlor of a trust); Lockheed Corp. v. Spink, 517 U.S. 882, 890

(1996); Hunter v. Caliber Sys., Inc., 220 F.3d 702, 718 (6th Cir. 2000).

In addition, while Merrill is denoted as "Plan Administrator" under the Plans, that

designation does not make Merrill a fiduciary for all purposes.  See Bd. of Trs. of Teamsters

Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 174 (3d Cir. 2002) (holding that even

when "employers themselves serve as plan administrators they assume fiduciary status only

when and to the extent that they function in their capacity as plan administrators.") (internal

citation omitted).  "Whether an employer who is also an ERISA plan administrator is a fiduciary

---

[31]    Plaintiffs' makeweight claim that the "Prudence Defendants" breached their duty of loyalty also goes nowhere.
First, the allegation that a conflict of interest arose because the Prudence Defendants' "compensation and
tenure" were tied to the performance of the Plans (CAC ¶ 375) is facially insufficient to state a claim.  See In re
Polaroid ERISA Litig., 362 F. Supp. 2d 461, 479 (S.D.N.Y. 2005) (conflict-of-interest claim based on fact that
"[d]efendants' compensation was stock-based . . . fails to state a claim for breach of fiduciary duty"); see also
WorldCom, 263 F. Supp. 2d at 768.  Second, plaintiffs' characterization of the interaction between the RAP and
Traditional ESOP simply does not suggest that the fiduciaries were acting in self-interest at the expense of the
Plans or Plan participants.  Indeed, among other things, there is no causal link alleged between the supposed
conflict and the harm to the Plans, nor any facts to show that the Prudence Defendants' actions were motivated
by their alleged self-interest.  See McKesson, 391 F. Supp. 2d at 835 (breach of loyalty claim must allege a
specific conflict and resulting harm to the plan, an act or omission taken by a fiduciary while acting as a
fiduciary and as a result of the conflict, and the specific benefit to the fiduciary from the conflict); Dynegy, 309
F. Supp. 2d at 897-98 (same).

of the plan generally requires a detailed analysis of the employer's actions and whether those actions were performed in the employer's fiduciary capacity." Unaka Co. v. Newman, No. 99 Civ. 267, 2005 U.S. Dist. LEXIS 43660, at *69 (E.D. Tenn. Apr. 26, 2005).

Here, even if the terms of the Plans gave discretionary authority to remove Company stock as an investment option for Plan participants – and they do not – Merrill still could not be liable because it had no discretion or authority over any of the assets of the Plans; any such authority was granted to others under the terms of the Plans. (See 401(k) § 8.1.1 (Baskin Decl., Ex. A); RAP § 8.1 (Baskin Decl., Ex. C); Traditional ESOP § 10.1 (Baskin Decl., Ex. F).) See also In re McKesson HBOC, Inc. ERISA Litig., No. 00 Civ. 20030, 2002 U.S. Dist. LEXIS 19473, at *49-50 (N.D. Cal. Sept. 30, 2002) (holding that claims based on prudence of investment in employer stock could not be asserted against the company where plan delegated to others the authority to select investment options). The Company's lack of ERISA liability in the absence of expressly designated authority and discretion is well illustrated in Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc., 793 F.2d 1456, 1459-60 (5th Cir. 1986). In Sommers, the Fifth Circuit held that because "the trustees had exclusive authority under the terms of the Trust to 'manage, control, sell, exchange or lease' the Trust's assets," the employer and its major shareholder could not be liable as fiduciaries. Id.; see also Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 911 (11th Cir. 1997) (criticizing district court for reading ERISA plan to give named fiduciary more authority than was conferred by plan documents); see also Plumb v. Fluid Pump Servs., Inc., 124 F.3d 849, 854 (7th Cir. 1997) (noting ERISA fiduciary "will not be held to be a fiduciary with respect to an activity unless the plan documents show that the [fiduciary] was responsible for that activity"); Coleman, 969 F.2d at 61.

Similarly, in Leigh v. Engle, 727 F.2d 113 (7th Cir. 1984), the Seventh Circuit held that an employer who was a fiduciary for certain tasks was not responsible for the plan trustee's investment decisions. Id. at 133-36. ("ERISA recognizes that a person may be a fiduciary for some purposes and not others," and "ties fiduciary responsibilities to a person's actual authority."); see also Pohl v. Nat'l Benefits Consultants, Inc., 956 F.2d 126, 129 (7th Cir. 1992) ("ERISA makes the existence of discretion a sine qua non of fiduciary duty."); Crowley v. Corning, Inc., 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (granting motion to dismiss and finding that imprudent investment claim against company must fail, "since it is clear from the amended complaint that Corning could not control investment options").[32]

Thus, the law is clear – a corporate employer cannot breach fiduciary duties under ERISA with respect to investment decisions where it had no investment authority under the terms of the plan. See, e.g., Hull v. Policy Mgmt. Sys. Corp., No. 00 Civ. 778, 2001 U.S. Dist. LEXIS 22343, at *16-24 (D.S.C. Feb. 9, 2001). In Hull, the ERISA claims against the company were dismissed due to lack of investment authority even though the company had other responsibilities as the plan sponsor, plan administrator and named fiduciary. Id. at *7, *23. Here, the Complaint fails to plead a claim against Merrill because it fails to allege that Merrill had control or authority over any Plan assets or the selection of any investment alternatives, much less the discretion to remove Company stock as an investment alternative.[33]

---

[32]    That employees serve on benefits committees, (see CAC ¶ 49), does not make the employer a fiduciary with respect to the acts of the committee members. Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1324 (9th Cir. 1985).

[33]    Instead of pointing to actions taken by the Company in its capacity as Plan Administrator, the Complaint contains lengthy criticism of the Company's business decision to invest in CDOs. (See, e.g., CAC ¶ 120.) ("During the Class Period, Merrill Lynch accumulated exposure to risky and illiquid CDO and subprime related securities that exceeded the total book value of the Company . . . ."). Such allegations of purported mismanagement cannot state a claim under ERISA. See Husvar v. Rapoport, 430 F.3d 777, 782 (6th Cir. 2005) (allegations of mismanagement of the employer's business, even where it reduces the value of plan assets, does not "implicate the protections afforded by ERISA"); Qualey v. Jackson, No. 07 Civ. 10910, 2007 U.S. Dist. LEXIS 45620, at *13-14 (E.D. Mich. June 25, 2007) (holding that directors' approval of merger agreement was

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF DUTY TO MONITOR (COUNT II)

Plaintiffs allege that Merrill and the two Senior Vice Presidents of Human Resources – collectively the "Monitoring Defendants" – breached their fiduciary duties by failing to monitor and remove members of the Administrative Committee and Investment Committee.  (CAC ¶ 387.)  Plaintiffs also accuse the Monitoring Defendants of failing to ensure that the members of the Administrative Committee and Investment Committee were adequately informed as to "the true extent of Merrill Lynch's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Merrill Lynch stock."  (Id.)  These boilerplate, conclusory allegations do not come close to raising "a right to relief above the speculative level."  Bell Atlantic, 127 S. Ct. at 1965.

As an initial matter, the failure to monitor claims fail because, as explained throughout this memorandum, there was no underlying breach of fiduciary duty on the part of Investment Committee or Administrative Committee Defendants.  See Pugh, 521 F.3d at 702 (affirming dismissal of duty to monitor claim because "it is premised on the first two rejected claims that the appointed fiduciaries breached their duties"); Edgar v. Avaya, Inc., 503 F.3d 340, 349 n.15 (3d Cir. 2007) (same); see also Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1103 (9th Cir. 2004).

Separately, courts recognize that the duty to monitor appointed fiduciaries is appropriately narrow.  Coyne & Delany Co. v. Selman, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996) (noting that "courts have properly taken a restrictive view of the scope of this duty [to monitor]

---

"business decision that is not subject to ERISA"); Eckelkamp v. Beste, 201 F. Supp. 2d 1012, 1023 (E.D. Mo. 2002) (holding corporate compensation decisions do not implicate ERISA's fiduciary duties and noting "[b]usiness decisions can still be made for business reasons, notwithstanding their collateral effect on prospective, contingent employee benefits"), aff'd, 315 F.3d 863 (8th Cir. 2002); see also Hull, 2001 U.S. Dist. LEXIS 22343, at *12 (noting that "absent very limited and unusual circumstances, [employers] are not held to a fiduciary standard in regard to their general business decisions").

and its attendant potential for liability"); In re Calpine Corp. ERISA Litig., No. 03 Civ. 1685,

2005 U.S. Dist. LEXIS 9719, at *19 (N.D. Cal. Mar. 30, 2005) ("[t]he duty of an ERISA

fiduciary to review the performance of its appointees is a limited one").

       Generally, an appointing fiduciary will not be held liable unless there was

something to put them on notice "of possible misadventure by their appointees."  Coyne &

Delany Co., 98 F.3d at 1466 n.10 (citation omitted); see also Pedraza v. Coca-Cola Co., 456 F.

Supp. 2d 1262, 1278 (N.D. Ga. 2006).  "ERISA does not attach liability for investment decisions

to fiduciaries whose roles were limited to appointing, retaining and removing other fiduciaries."

In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005); see, e.g., Beauchem v.

Rockford Prods. Corp., No. 01 Civ. 50134, 2003 U.S. Dist. LEXIS 5546, at *10 (N.D. Ill. Mar.

24, 2003) (dismissing claim that employer failed to monitor other fiduciaries because "[n]othing

requires or allows [the employer] control over the Plan Committee beyond appointing its

members"); WorldCom, 263 F. Supp. 2d at 760-61 (dismissing failure to monitor claim against

board premised on its ability to appoint fiduciaries); Crowley, 234 F. Supp. 2d at 229; In re

Williams Cos. ERISA Litig., 271 F. Supp. 2d 1328, 1339 (N.D. Okla. 2003) (same); Hull, 2001

U.S. Dist. LEXIS 22343, at *21 (same).

       Plaintiffs do not allege any facts (as distinguished from legal conclusions and

speculation) supporting their conclusion that the Monitoring Defendants breached their narrow

duties.  Plaintiffs allege that the Monitoring Defendants should have removed the Plan

fiduciaries for continuing to invest in Merrill stock when they knew it was imprudent to do so.

(CAC ¶ 387(d).)  But plaintiffs do not allege that the Monitoring Defendants knew that Merrill

stock was an unsuitable investment, or had cause to second-guess the decisions of the Investment

Committee (much less to remove its members).[34]  (See supra at Point I(C)); see also Dynegy, 309

F. Supp. 2d at 904 (dismissing claims against appointing fiduciaries where nothing put them on

notice of possible breach by their appointees).  To the contrary, the Complaint sets forth

numerous public statements by Merrill, sophisticated market observers, and regulators that the

Company's core businesses overall were performing well, that Merrill was employing aggressive

risk management strategies to contain subprime losses, and that dislocation in subprime market

was not expected to significantly affect other sectors.  (See supra at 9-11.)

　　　　　Furthermore, plaintiffs allege no facts to support their speculation that the

Monitoring Defendants did not in fact monitor or evaluate the performance of their appointees.

See Calpine, 2005 U.S. Dist. LEXIS 9719, at *19-20 (granting dismissal where no factual

allegations supported claim that defendants failed to review performance of appointees).

　　　　　Finally, the Complaint does not allege facts suggesting that any information came

to the attention of the Monitoring Defendants suggesting improper activities by the Investment

Committee, or that the Monitoring Defendants would have uncovered or prevented any breach

had they monitored their appointees or evaluated their performance.  Therefore, plaintiffs have

failed to allege the requisite "causal link" between the failure to monitor and the losses to the

plan.  Wright, 360 F.3d at 1099, quoting Kuper, 66 F.3d at 1459 ("[A] plaintiff must show a

causal link between the failure to investigate and the harm suffered by the plan."); see also In re

Unisys Sav. Plan Litig., No. 91 Civ. 3067, 1997 U.S. Dist. LEXIS 19198, at *70 (E.D. Pa. Nov.

24, 1997).

---

[34]   Plaintiffs' claim for failure to remove the Administrative Committee fiduciaries is equally weak.  There are
simply no facts alleged explaining why the Monitoring Defendants would have had reason to remove the
members of the Administrative Committee, who, as explained supra in Point I(D), had no control over the
investment of Plan assets in Merrill stock.

III.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY TO DISCLOSE NECESSARY INFORMATION TO CO-FIDUCIARIES (COUNT III)**

Count III alleges that Mr. O'Neal and Merrill breached fiduciary duties by failing to disclose material, non-public information to the Investment Committee and Administrative Committee, thereby allegedly preventing the committee members from disclosing or otherwise acting upon the information for the benefit of Plan participants. (CAC ¶¶ 392-395.) This Count fails on multiple, independent grounds.

A.    **Mr. O'Neal And Merrill Had No Fiduciary Discretion Or Authority**

Mr. O'Neal and Merrill have no liability as a matter of law because they did not have fiduciary discretion or authority with respect to any issue in this case. ERISA expressly provides that a person is a plan fiduciary <u>only</u> to the extent that:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A); <u>see also</u> <u>Kirschbaum v. Reliant Energy, Inc.</u>, 526 F.3d 243, 251 (5th Cir. 2008) ("[A] person is a fiduciary only 'to the extent' he has or exercises specified authority, discretion, or control over a plan or its assets."). The undisputed facts here show that the Plans did <u>not</u> confer on Mr. O'Neal the right or power to do <u>anything</u> with respect to the Plans, and Merrill's obligations were strictly limited to those imposed on it as Plan Administrator. Nothing in the Plans gives Mr. O'Neal or Merrill the obligation or even the power to inform the committee members of anything. Because ERISA is unequivocal that a person's fiduciary

liability is coextensive with his discretionary authority, Count III must be dismissed as a matter of law. See Varity, 516 U.S. at 498; Pegram, 530 U.S. at 225-226; Flanigan, 242 F.3d at 87; Sommers, 793 F.2d at 1459-60 (fiduciary liability coextensive with authority allocated by plan); Plumb, 124 F.3d at 854 (ERISA fiduciary "will not be held to be a fiduciary with respect to an activity unless the plan documents show that [the fiduciary] was responsible for that activity"); Coleman, 969 F.2d at 61 (same).

Plaintiffs also allege that, "as a member of the Board who exercised responsibility for appointing the Trustee, Defendant O'Neal is an appointing fiduciary under ERISA." (CAC ¶ 52.)[35] But board members are not liable under ERISA simply because they appoint ERISA fiduciaries. See WorldCom, 263 F. Supp. 2d at 760-61 (dismissing claims against director defendants because allegation that they merely appointed other ERISA fiduciaries "does not sufficiently allege that the Director Defendants functioned as ERISA fiduciaries"). Moreover, a mere appointing fiduciary, by definition, is not liable unless his appointee breached a fiduciary duty. The Complaint contains no allegations whatsoever that the appointed Trustees did anything wrongful. Absent a breach by the Trustees, any ERISA claim based on Mr. O'Neal's alleged status as an appointing fiduciary must fail. See Pugh, 521 F.3d at 702; Edgar, 503 F.3d at 349 n.15; see also Wright, 360 F.3d at 1103.

### B.    Plaintiffs' Liability Theory Would Require Plan Fiduciaries To Violate Insider Trading Laws

Even assuming, arguendo, that Mr. O'Neal or Merrill were fiduciaries for purposes of communicating with members of the Investment or Administrative Committees, Count III must be dismissed because ERISA does not require plan fiduciaries to obtain or

---

[35]    As alleged in the Complaint, State Street Bank and Trust Company is the trustee principally responsible for the relevant portions of the Plans. (CAC ¶ 70.) It performs purely ministerial, custodial functions.

disclose unfavorable non-public information to other fiduciaries so that the plans can sell or

cease purchasing company stock. Plaintiffs would have Mr. O'Neal and others at Merrill

become "tippers" of material, non-public information to permit the Plans to trade on that

information for the exclusive benefit of Plan participants. Of course, ERISA requires no such

thing because "[f]iduciaries are not obligated to violate the securities laws in order to satisfy their

fiduciary duties." McKesson, 2002 U.S. Dist. LEXIS 19473, at *21; see also Kirschbaum, 526

F.3d at 256 ("[I]n some cases, requiring a fiduciary to override the terms of a company stock

purchase plan could suggest the necessity of trading on insider information. Such a course is

prohibited by the securities laws."); Hull, 2001 U.S. Dist. LEXIS 22343, at *22 (finding no duty

"to keep the Committee informed of what can only be characterized as 'inside information' for

use in the making of its investment decisions"); Thompson v. Avondale Indus., Inc., No. 99 Civ.

3439, 2003 U.S. Dist. LEXIS 2318, at *70-71 (E.D. La. Feb. 14, 2003) (rejecting claim that the

management defendants withheld material non-public information that prevented other

fiduciaries from making well-informed decisions).

      **C.**      **Plaintiffs Have Failed To Meet The Pleading Requirements Of Rule 9(b)**

        Count III also must be dismissed as against Mr. O'Neal and Merrill because, as

discussed infra in Point VI, plaintiffs' claims sound in fraud and plaintiffs have not pleaded any

particulars or elements of fraud associated with the purported intentional failure of Mr. O'Neal

and Merrill to inform the committee members of adverse developments at the Company as

required by Rule 9(b). See, e.g., Henneberry v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523,

555 (S.D.N.Y. 2007) ("Rule 9(b)'s heightened pleading standards apply to breach of fiduciary

duty claims where the breach is premised on the defendant's fraudulent conduct, such as an

attempt 'to induce action or inaction on the part of the investors by means of falsehoods or

material omissions'") (quoting <u>In re Luxottica Group S.p.A., Sec. Litig.</u>, 293 F. Supp. 2d 224, 238 (E.D.N.Y. 2003) (internal citation omitted).

### D.    Plaintiffs Have Failed To Allege A Causal Link Between The Alleged Omissions And Any Breach By The Administrative Committee Or The Investment Committee

Finally, plaintiffs have not alleged, and could not allege, a "causal link" between the alleged failure of Mr. O'Neal and Merrill to inform the committee members and any breach of fiduciary duty by those defendants.  That is because, as demonstrated above, plaintiffs have failed adequately to allege that Merrill stock became an imprudent investment option even assuming the committee members knew everything Mr. O'Neal and the Company allegedly knew.  (<u>See</u> Points I(C) and II, <u>supra</u>, explaining causal link argument and citing authority.)

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY TO DISCLOSE MATERIAL, NON-PUBLIC INFORMATION TO PLAN PARTICIPANTS (COUNT IV)

Count IV alleges that Merrill, Mr. O'Neal and the Administrative Committee Defendants breached fiduciary duties by failing to disclose completely and accurately material, non-public information to Plan participants.  (CAC ¶ 404.)  This Count suffers from the same defects as discussed above with respect to Count III and also fails for several additional reasons.

### A.    The Court Should Dismiss Count IV Against Mr. O'Neal

To recover under ERISA, as opposed to the securities laws, plaintiffs must demonstrate that any alleged misrepresentations or omissions by Mr. O'Neal were made while he was acting in an ERISA fiduciary capacity.  As discussed in Point III, <u>supra</u>, plaintiffs allege that Mr. O'Neal is an ERISA fiduciary because he was a member of Merrill's Board of Directors and was charged with appointing the Plans' Trustees, but none of plaintiffs' claims has anything to do with appointing the Trustees or even the Trustees themselves.  As a result, Mr. O'Neal was not a fiduciary with respect to any issue in this case.  That fact alone is dispositive of the claims

against him.  (See supra Point III.)  In addition, as explained in Point VI, infra, because all claims

against Mr. O'Neal sound in fraud, Count IV must be dismissed for failure to plead with

particularity as required by Rule 9(b).

Count IV also fails as against Mr. O'Neal because plaintiffs do not allege that he

engaged in any ERISA communications.  All plaintiffs allege is that he made public statements

about the Company's performance in public settings and in Company memoranda "sent to all

employees."  (CAC ¶ 53.)  This is hardly remarkable given that Mr. O'Neal was the CEO of the

Company, and it is black letter law that ordinary course business communications, such as

making SEC disclosures or communicating with markets or employees, are not actionable under

ERISA.  See Kirschbaum, 526 F.3d at 257 (dismissing claim where defendant did not show that

"defendants were acting in anything other than a corporate capacity in making these statements");

Crowley, 234 F. Supp. 2d at 228 (public statements and omissions concerning financial

performance fail to state a claim under ERISA "regardless of [their] truth or falsity"); Calpine,

2005 U.S. Dist. LEXIS 34452, at *27 (granting motion to dismiss ERISA disclosure claim where

plaintiff could not allege that statements in question were not made in a fiduciary capacity and

were not directed to plan participants even where alleged misrepresentation "turned out to have

an adverse impact on the plan") (citation omitted).

It is a bedrock principle that "ERISA liability arises only from actions taken or

duties breached in the performance of ERISA obligations."  WorldCom, 263 F. Supp. 2d at 760.

Plaintiffs do not allege that Mr. O'Neal was performing a duty under the Plans or the ERISA

statute when communicating with the media or Company employees as CEO.  Nor do plaintiffs

allege that any of those statements addressed Plan matters or were labeled in any way as efforts

to communicate with Plan participants.  Accordingly, Count IV fails as a matter of law as against

Mr. O'Neal.  See Stein v. Smith, 270 F. Supp. 2d 157, 173 (D. Mass. 2003) (statements by

defendant in releases and SEC filings not actionable because they were not made in the context

of discussing plan benefits); Marks v. Newcourt Credit Group, 342 F.3d 444, 454 n.2 (6th Cir.

2003) (challenged statements must be specifically directed to plan participants or relate to plan

benefits); see also Varity, 516 U.S. at 504-05 (statement must be intentionally and directly

connected to a plan to be actionable under ERISA).[36]

### B.    The Court Should Dismiss Count IV Against The Administrative Committee Defendants

Plaintiffs' disclosure claim fails against the Administrative Committee

Defendants on two threshold grounds:  The Administrative Committee (1) is not alleged to have

made any misleading statements, and (2) cannot have failed to disclose what it did not know.

Count III of the Complaint avers that the Administrative Committee did not know – and should

have been told – about the risks to Merrill's CDO and MBS portfolio.  See Crowley, 234 F.

Supp. 2d at 230 (dismissing claim where plaintiff failed to allege that fiduciaries "actually

possessed the adverse information"); Howell v. Motorola, Inc., 337 F. Supp. 2d 1079, 1089-92

(N.D. Ill. 2004) (same).[37]  These points alone require dismissal, but there are additional grounds.

First, the underlying theory of the case is that the alleged misrepresentations and

omissions on which plaintiffs base Count IV were fraudulent.  As such, Rule 9(b) applies, and

for the reasons discussed in Point VI, infra, plaintiffs have failed to satisfy the rule.

---

[36]  Plaintiffs' disclosure claims fail against all defendants for the additional reasons explained in detail in defendants' motions to dismiss the parallel securities fraud action.

[37]  Even if, contrary to Crowley, Howell, and common sense, the Administrative Committee Defendants could be held liable for failing to disclose information that they "should have known" (and which plaintiffs allege was fraudulently concealed from them by others), that theory would fail.  As explained in Point I, supra, plaintiffs have failed adequately to allege that the Prudence Defendants (which include the Administrative Committee Defendants) were under a duty to investigate under the circumstances pleaded and reflected in documents as to which the Court can take judicial notice.  See also Pugh, 521 F.3d at 702 (rejecting ERISA disclosure claim where, as here, "the facts alleged [did] not support that the defendants should have been aware of the [alleged] fraud").

Second, nothing in the Plans places the Administrative Committee under a duty to communicate with participants concerning the Company's financial condition or performance. Indeed, there is nothing in the Plans – or any other document – suggesting that the Administrative Committee was in a position to know such information, let alone convey it to others. The duties of the Administrative Committee are carefully delineated in the Plans (see supra at 7), and even the Complaint's recitation of the Administrative Committee's duties does not include a duty to unearth and disclose non-public information concerning Merrill's financial performance. (See CAC ¶¶ 57-62.) This was not an area of discretionary authority for the committee, and, as such, it cannot serve as the basis of a breach of fiduciary duty claim against them. (See authorities limiting fiduciary obligations to areas of discretionary authority at pages 27-33, supra.)

Third, and finally, even assuming that the Administrative Committee Defendants possessed, or should have possessed, material, non-public information concerning the Company's financial condition, its non-disclosure does not give rise to an ERISA claim. ERISA includes detailed and itemized affirmative disclosure requirements, none of which encompasses the information concerning the financial condition of an employer. Multiple circuit court opinions have rejected the argument that the general ERISA fiduciary duty includes an obligation to disclose information not provided for in the statute's required disclosures. See Baker v. Kingsley, 387 F.3d 649, 662 (7th Cir. 2004); Sprague v. Gen. Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998) (en banc) ("It would be strange indeed if ERISA's fiduciary standards could be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed."); Bd. of Trs. of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 147 (2d Cir. 1997) ("it [is] inappropriate to infer an unlimited

disclosure obligation on the basis of general [ERISA fiduciary duty] provisions that say nothing

about disclosure"); <u>Faircloth v. Lundy Packing Co.</u>, 91 F.3d 648, 657 (4th Cir. 1996) ("To accept

the argument . . . we would have to hold that ERISA's general fiduciary duty provision . . .

requires plan fiduciaries to furnish documents to participants and beneficiaries in addition to the

documents that ERISA's specific disclosure provision . . . requires the plan administrator to

furnish."); <u>see also</u> <u>Mellot v. Choicepoint</u>, No. 05 Civ. 1340, 2007 U.S. Dist. LEXIS 97117, at

*29-36 (N.D. Ga. 2007) (addressing issue in detail and granting motion to dismiss ERISA

disclosure claim).[38]

### C.    The Court Should Dismiss Count IV Against Merrill

Plaintiffs allege that Merrill failed to make adequate disclosures to Plan

participants, but as discussed above with respect to Mr. O'Neal, none of the allegedly misleading

disclosures cited in the Complaint concerns the Plans or their operation; rather, they all concern

Merrill's business operations.  (CAC ¶¶ 321-22.)  Plaintiffs suggest that because allegedly

misleading SEC filings concerning Merrill stock were disseminated to shareholders, some of

whom were also Plan participants, Merrill breached its duty as Plan Administrator to disclose

facts to shareholders.  However, "SEC filings are made for the purpose of complying with the

federal securities laws.  The creation of SEC filings is not regulated by ERISA, and in creating

the filings, [an employer is] not acting as a fiduciary of the Plan."  <u>Pedraza</u>, 456 F. Supp. 2d at

1279.  Moreover, even assuming that Merrill had been able to make the negative disclosures at

the times suggested by plaintiffs, "such a disclosure would have resulted in a swift market

adjustment, and the Plans would not have been able to sell their [employer] stock holdings at the

---

[38]    Numerous courts have also held that disclosure of material, non-public information not specifically required to
be disclosed under ERISA would conflict with the federal securities laws.  <u>See, e.g.</u>, <u>McKesson</u>, 391 F. Supp.
2d at 836-37; <u>Wright</u>, 360 F.3d at 1098 n.4; <u>In re CF&I Fabricators of Utah, Inc.</u>, 150 F.3d 1293, 1301 (10th Cir.
1998).  <u>See also</u> Point III(B), <u>supra</u>.

higher, pre-announcement price, and the Plans would have sustained the same losses they incurred when the Company [subsequently made negative disclosures]."  Edgar v. Avaya, Inc., No. 05 Civ. 3598, 2006 U.S. Dist. LEXIS 23151, at *29 (D.N.J. Apr. 24, 2006); see also McKesson, 391 F. Supp. 2d at 837.[39]

## V. PLAINTIFFS FAIL TO STATE A CLAIM FOR CO-FIDUCIARY LIABILITY (COUNT V)

As a means to hold every defendant in the case liable, regardless of role, plaintiffs claim that each defendant is liable for a supposed breach of fiduciary duty by every other defendant.  This fails as a matter of law because ERISA imposes "co-fiduciary" liability only in extremely limited circumstances not applicable here.

Section 405(a) of ERISA provides that a fiduciary shall be liable for a co-fiduciary's breach only:

> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a) (emphasis added).  Here, plaintiffs' "co-fiduciary" claim is that the Investment Committee Defendants, the Administrative Committee Defendants, and the SVP-HR Defendants were "aware of each other's failure to conduct an independent investigation of the

---

[39]    Plaintiffs have also failed to allege adequately that they relied on the allegedly misleading disclosures, which is fatal to their claim for breach of the duty to disclose.  See Hooven v. Exxon Mobil Corp., 465 F.3d 566, 571 (3d Cir. 2006) ("Detrimental reliance on a material misrepresentation made by the defendant is a necessary element of an ERISA breach of fiduciary duty claim."); see also In re Radioshack Corp. ERISA Litig., No. 08 MD 1875, 2008 U.S. Dist. LEXIS 53668, at *28 (N.D. Tex. Mar. 31, 2008).

merits of the Plans' investments in Company stock." (CAC ¶¶ 415-416.) This is conclusory, group-pleaded boilerplate that literally could be asserted in any ERISA stock-drop complaint. It falls far short of alleging "enough facts to state a claim to relief that is plausible on its face" or "rais[ing] a right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1974, 1965.

First, as a threshold matter, plaintiffs' "co-fiduciary" claim must be dismissed because plaintiffs have not stated a claim for an underlying breach of fiduciary duty. Izzarelli v. Rexene Prods. Co., 24 F.3d 1506, 1525 n.34 (5th Cir. 1994) ("Because there was no breach of fiduciary duty on the part of the Rexene defendants, it goes without saying that the Bank cannot be liable as a co-fiduciary for the same conduct"); Calpine, 2005 U.S. Dist. LEXIS 9719, at *25-26.

Second, to state a claim of co-fiduciary liability under Sections 405(a)(1) and (3), plaintiffs must plead that a defendant possessed actual knowledge of the breach by another and failed to make reasonable efforts to remedy it. Lee v. Burkhart, 991 F.2d 1004, 1010-11 (2d Cir. 1993) (dismissing claim under Section 405 where complaint failed to allege actual knowledge of co-fiduciary's breach); Donovan v. Cunningham, 716 F.2d 1455, 1475 (5th Cir. 1983) ("Section 405 does not impose vicarious liability – it requires actual knowledge by the co-fiduciary. Under this rule, the fiduciary must know the other person is a fiduciary with respect to the plan, and must know that he participated in the act that constituted a breach, and must know that it was a breach.") (internal quotation omitted); Stein, 270 F. Supp. 2d at 175 (dismissing co-fiduciary claim because the general allegation that defendants knew or should have known of another's breach was insufficient to allege the requisite knowledge and participation); Silverman v. Mut. Ben. Life Ins. Co., 941 F. Supp. 1327, 1335 (E.D.N.Y. 1996), aff'd, 138 F.3d 98 (2d Cir. 1998). Here, there is no well pleaded factual allegation that these individuals had knowledge that the

supposed "failure" on the part of someone else to conduct an independent investigation of the merits of the Plans' investments in Company stock was a breach of fiduciary duty; indeed, to the contrary, the Complaint alleges "[o]n information and belief, . . . even those Defendants who did not have actual knowledge or who had only partial knowledge, failed to fulfill their fiduciary obligation to investigate risks posed by Merrill Lynch stock."  (CAC ¶ 308.)  Especially after Bell Atlantic, this sort of boilerplate pleading fails to state a claim.

Third, even if any of the defendants had knowledge of a breach of fiduciary duty – and such knowledge is not adequately alleged – they could not have knowingly participated in a breach of duty, nor been in a position to remedy any alleged breach, as required by Sections 405(a)(1) and 405(a)(3), respectively, because the defendants had no authority over the investment decisions of Plan participants.  See Smith v. Delta Air Lines, Inc., 422 F. Supp. 2d 1310, 1326 (N.D. Ga. 2006) (noting that defendants who were not a "Named Fiduciary with respect to investment decisions . . . cannot be co-fiduciaries with respect to such decisions"); Williams, 271 F. Supp. 2d at 1338 (granting Williams' motion to dismiss co-fiduciary claim because it "did not control investment decisions").

## VI.    THE COMPLAINT SOUNDS IN FRAUD AND ALL COUNTS MUST BE DISMISSED BECAUSE IT FAILS TO SATISFY RULE 9(b)

According to plaintiffs, defendant Merrill "knew all" of the "truth" about the Company's true financial condition (CAC ¶ 329), but "aggressively and falsely downplayed the risks" of the Company's CDO and subprime exposure in its communications to the markets and plan participants.  (Id. ¶ 328.)  Furthermore, they allege that Merrill and defendant O'Neal intentionally "took advantage of the inflated value of the Company to reduce the Company's obligation to the RAP, when disclosure of the truth . . . would have . . . increased the Company's contribution obligation."  (Id. ¶ 333.)  They also allege that O'Neal "fail[ed] to make

46

disclosures" to "facilitate" the sale of his own shares at "inflated" prices.  (Id. ¶ 334)  It is difficult to imagine more blatant allegations of fraud.  More broadly, as evidenced by pages 54 through 83 of the Complaint, plaintiffs essentially adopt the theory of the companion securities fraud case, including several pages devoted to listing "fraud" cases against the Company related to subprime and CDOs.  (Id. ¶¶ 267-278.)  And the Complaint is replete with allegations of misleading statements, material omissions, incomplete disclosures, and intentionally concealed facts, all of which allegedly contributed to plaintiffs' losses.  (See, e.g., id. ¶¶ 53, 124, 238, 266, 269, 304, 313, 352, 359, 360, 368, 404-06.)[40]

Plaintiffs had no choice but to attempt to plead fraud.  If they acknowledged that defendants were blindsided by a widespread crisis in the credit markets that no one could predict, they would have no one to blame or sue.  They would have no fraud that defendants Merrill or O'Neal allegedly committed, and they would have no fraud that the remaining defendants failed to investigate, knew about, or should have known about.

In this Circuit, claims that sound in fraud must be pleaded with a particularity that satisfies Rule 9(b) to survive dismissal.  Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004).  Courts have specifically recognized that where, as here, a complaint that claims a breach of ERISA fiduciary duties "presupposes the existence of a fraud," it is subject to Rule 9(b).  In re Coca-Cola Enters. ERISA Litig., No. 06 Civ. 953, 2007 U.S. Dist. LEXIS 44991, at *19 (N.D. Ga. June 19, 2007) (dismissing ERISA claims under Rule 9(b) and noting that "[n]one of the Plaintiffs' claims can succeed if this fraudulent scheme cannot be proven"); see also Calpine, 2005 U.S. Dist. LEXIS 34452, at *18 (granting motion to dismiss and finding that Rule 9(b)

---

[40]    Not surprisingly, many of these allegations merely parrot those in the parallel securities fraud action and are insufficient for the reasons stated in Merrill's motion to dismiss in that case.  In the interest of brevity, those arguments are not repeated here.  Furthermore, paragraphs 269 through 276 of the Complaint improperly include allegations concerning other proceedings and matters not before this Court.  Such allegations should be disregarded and/or stricken for the same reasons explained in Merrill's motion to dismiss the securities action.

applies to "all averments of fraud regardless of whether fraud is an essential element of the underlying cause of action.") (emphasis in original).

In Toussaint v. JJ Weiser & Co., No. 04 Civ. 2592, 2005 U.S. Dist. LEXIS 2133 (S.D.N.Y. Feb. 9, 2005), Judge Mukasey explained that, where ERISA allegations sound in fraud, the pleaded facts must give rise to a "to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth," just as is required in federal securities fraud cases. Id. at *28-29 (quoting Conn. Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987)). Merrill's motion to dismiss the coordinated securities fraud case demonstrates conclusively that not even the securities fraud plaintiffs have come close to pleading the "strong inference" required to state a claim, and we refer the Court to those arguments.[41]

Because the Complaint hinges entirely on an alleged fraud, but fails to plead facts that would satisfy Rule 9(b), it should be dismissed in its entirety.

## VII.    ERISA § 404(c) REQUIRES DISMISSAL OF ALL COUNTS WITH RESPECT TO THE 401(k) AND RAP

Plaintiffs acknowledge that Section 404(c) of ERISA creates an "exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions."  (CAC ¶ 348); see also 29 U.S.C. § 1104(c); LaRue v. DeWolff, Boberg & Assocs., 128 S. Ct. 1020, 1025 (2008) (Section 404(c) "exempts fiduciaries from liability for losses

---

[41]    Plaintiffs' allegation that Merrill and Mr. O'Neal intentionally "took advantage of the inflated value of Company stock to reduce the Company's obligation to the RAP, when disclosure of the truth . . . would have . . . increased the Company's contribution obligation" (CAC ¶ 333) is but one example of plaintiffs' failure to satisfy Rule 9(b).  Apart from the fact that none of the person, place, and other particulars required under Rule 9(b) are pled, the allegation fails to plead a "strong inference" of an intent to defraud as required in Toussaint. A "generalized desire" to have higher corporate profits (here, by avoiding a pension funding expense) does not give rise to an inference of an intent to defraud.  Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001); see also In re Astrazeneca Sec. Litig., No. 05 Civ. 2688, 2008 U.S. Dist. LEXIS 43680, at *40-41 (S.D.N.Y. June 3, 2008) ("Any potential motive to keep the share price high in order to have a more successful [stock] placement is just an example of a generalized motive that any officer or director who desires to operate a successful company will have.")

caused by participants' exercise of control over assets in their individual accounts.").  The RAP

and the 401(k) were invested in Merrill stock only to the extent that participants affirmatively

selected Merrill stock as an investment option.  (CAC ¶¶ 78, 95; see also supra at 4-6.)  See also

McKesson, 2002 U.S. Dist. LEXIS 19473, at *51 (noting that duty to monitor other fiduciary

"does not necessarily entail a duty to monitor the investments of the plan participants, each of

whom is given responsibility for their investment decisions").  And the Complaint also fails to

take heed of plaintiffs' unhindered ability to sell or otherwise convert their holdings of Merrill

stock at any time.

          Section 404(c) applies if four elements exist:  "(1) the plan at issue must provide

for individual accounts; (2) the plan must permit a participant to exercise control over the assets

in his account; (3) the participant must actually exercise control over the assets, and (4) the loss

or fiduciary breach on which the claim is based must result from the participant's exercise of

control."  In re Tyco Int'l, Ltd. MDL, No. 02 MD 1357, 2004 U.S. Dist. LEXIS 24272, at *27

(D.N.H. Dec. 2, 2004); see also 29 U.S.C. § 1104(c).  Plaintiffs' own allegations and the Plans

themselves conclusively establish these elements.  Plaintiffs do not dispute that the 401(k) and

the RAP provide individual accounts for each participant.  (CAC ¶ 361; see also 401(k) § 1.1

(Baskin Decl., Ex. A); RAP § 1.1 (Baskin Decl., Ex. C).)  Nor do they contest that they had and

exercised control over their investments in the 401(k) and RAP.  (See CAC ¶¶ 78, 95; see also

supra at 4-6.)[42]

---

[42]    To the extent that Section 404(c) is considered an affirmative defense (see CAC ¶ 348), it can properly be raised on a motion to dismiss "as long as the defense is based on facts appearing on the face of the complaint" and the documents incorporated therein.  Benzman v. Whitman, 523 F.3d 119, 125 (2d Cir. 2008) (citation omitted).  Furthermore, in light of Bell Atlantic, ERISA claims that are foreclosed by 404(c) may be dismissed on the pleadings where "satisfaction of the requirements for [404(c)] is largely discernable from the documents."  Hecker v. Deere & Co., No. 06 Civ. 719, 2007 U.S. Dist. LEXIS 78959, at *8-12 (W.D. Wis. Oct. 19, 2007) (applying Bell Atlantic and affirming dismissal of ERISA claims on the basis 404(c)).

Finally, given that the decision to invest in Merrill stock exclusively belongs to

Plan participants, it necessarily follows that any alleged losses attributable to the drop in

Merrill's stock price were a result of the participants' decision to invest in Company stock.

Indeed, the legislative history of Section 404(c) confirms this point:

> [I]f the participant instructs the plan trustee to invest the full balance of his account
> in, e.g., a single stock, the trustee is not to be liable for any loss because of a failure
> to diversify or because the investment does not meet the prudent man standards.

H. C. Rep. No. 93-1280, as reprinted in 1974 U.S.C.C.A.N. 5085-86.[43]

Accordingly, ERISA § 404(c) bars all of plaintiffs' claims related to the 401(k)

and the RAP.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[43]    Plaintiffs do not dispute that the "RAP and the SIP were intended to comply with 404(c)."  (CAC ¶ 349.)  This
is confirmed by the Plans themselves.  (401(k) § 11.1.2 (Baskin Decl., Ex. A); RAP § 5.1 (Baskin Decl., Ex. C).)

Dated: New York, New York
        July 21, 2008

Respectfully submitted,

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:  /s/ Jay B. Kasner
     Jay B. Kasner
     Scott D. Musoff
Four Times Square
New York, NY  10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
jay.kasner@skadden.com


Attorneys for Defendant
Merrill Lynch & Co., Inc.

SHEARMAN & STERLING LLP

By:  /s/ Stuart J. Baskin
     Stuart J. Baskin
     Brian H. Polovoy
     Adam S. Hakki
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
sbaskin@shearman.com


Attorneys for Investment Committee
Defendants, Administrative Committee
Defendants, and Senior Vice President,
Human Resources Defendants


SIMPSON THACHER & BARTLETT LLP

By:  /s/ Michael J. Chepiga
     Michael J. Chepiga
     Paul C. Curnin
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
mchepiga@stblaw.com


Attorneys for Defendant E. Stanley O'Neal