6.8   Valuation of Accounts:

Subject to the next paragraph, for each Valuation Date the Administrative Committee shall cause each Participant's Accounts to be adjusted upward to reflect any earnings, and downward to reflect any losses attributable to such Accounts since the preceding Valuation Date. Each distribution, withdrawal, investment reallocation or other payment under the Plan shall be made as of the Valuation Date immediately preceding or coincident with such distribution, withdrawal, reallocation or payment.

If as of any Valuation Date, other than the last day of the Plan Year, only a Participant's Account is affected by a contribution, distribution, withdrawal, investment reallocation, or other payment, only the Account so affected shall be valued by the Administrative Committee and the preceding provisions of this Section 6.8 shall be applied separately to such Accounts.

6.9   Investment Managers:

The Investment Committee may, by an instrument in writing, appoint one or more persons as an Investment Manager. Each person so appointed shall be: (i) an investment adviser registered under the Investment Advisers Act of 1940, (ii) a bank as defined in that Act, or (iii) an insurance company qualified to manage, acquire or dispose of any asset of the Plan under the laws of more than one state.

Each Investment Manager shall acknowledge in writing that it is a fiduciary with respect to the Plan. The Investment Committee shall enter into an agreement with each Investment Manager that it appoints specifying the duties and compensation of such Investment Manager and the other terms and conditions under which such Investment Manager shall be retained. The Investment Committee shall not be liable for any act or omission of any Investment Manager that it appoints and shall not be liable for following the advice of any Investment Manager with respect to any duties delegated to any Investment Manager.

The Investment Committee shall have the power to determine the Trust assets to be invested pursuant to the direction of a designated Investment Manager and to set investment objectives and guidelines for the Investment Manager.

6.10   Compensation:

Each Investment Manager and Trustee shall be paid such reasonable compensation, in addition to their expenses, as shall from time to time be agreed to by the Company or other person making such appointment; provided, however, that no such compensation shall be paid to any Investment Manager or Trustee who is an Employee.

WDC99 534295-2.047750.0011

ARTICLE VII

WITHDRAWALS

7.1    Diversification of Investments:

    (a)    Notwithstanding any other provision of this Plan, and consistent with the requirements of Code sections 4975(e)(7) and 4980(c)(3) and the regulations thereunder, during Employment each Qualified Participant (as hereinafter defined) may direct, within the ninety-day period following the close of each Plan Year, or such other ninety-day period as designated by the Administrative Committee in compliance with Section 401(a)(28) of the Code, during the Participant's "Qualified Election Period" (as hereinafter defined), the treatment of up to:  (i) 25% of the sum of the Participant's Accounts (determined as of the last preceding Valuation Date) plus the amounts previously distributed or transferred from the Plan pursuant to this paragraph (a), less (ii) the amounts previously diversified (whether by transfer, distribution or otherwise) to meet the requirements of this paragraph (a), within the time determined under paragraph (b) below.  For purposes of this paragraph (a), the Qualified Participant may elect to receive the amount described in the preceding sentence in a single payment in cash or in Company Stock.

            With respect to the 25% limitation described in the preceding paragraph, a Qualified Participant may, within ninety days after the close of the last Plan Year or such other ninety-day period as designated by the Administrative Committee in compliance with Section 401(a)(28) of the Code in the Participant's Qualified Election Period, direct the application of a percentage of up to 50% rather than 25%.

            Effective September 1, 2003, any reference to the ninety-day period in the above paragraphs shall be disregarded, and any Qualified Participant may diversify his or her Account Balances as provided in this Section 7.1 at any time.

    (b)    Within one hundred and eighty days after the close of each Plan Year during the Qualified Election Period, the portion of a Qualified Participant's Accounts subject to the election described in subsection (a) above shall be distributed to such Qualified Participant, as directed by such Participant.  Effective September 1, 2003, this subsection (b) shall cease to apply.

    (c)    For purposes of this Section 7.1, the terms "Qualified Participant" and "Qualified Election Period" shall have the following meanings:  "Qualified Participant" means any Participant who has attained age 55 and has completed at least ten "years of participation."  "Years of participation" shall include: (i) years of participation under this Plan; (ii) effective as such time as the Administrative

Committee may establish as administratively feasible following receipt of the approval of the Internal Revenue Service of this clause (ii), with respect to a Participant on whose behalf PAYSOP Shares are or at any time were held in the Transferred Contribution Account of the Participant, each such year of participation under the Payroll-Based Stock Ownership Plan for Employees of Merrill Lynch & Co., Inc.; and (iii) effective January 1, 2002, years of participation under the Herzog Heine Geduld Employee Stock Ownership Plan (including predecessor plans). "Qualified Election Period" means the six-Plan Year period beginning with the first Plan Year in which the individual first became a Qualified Participant.   Effective December 1, 2003, "Qualified Participant" means any Participant who has completed at least five years of Service.  Effective December 1, 2003, the foregoing definition of, and any reference to, "Qualified Election Period," and all references under this Section 7.1 to "years of participation" shall be disregarded and be of no further force or effect.

(d)     Effective at such time as the Administrative Committee may establish as administratively feasible following the receipt of the approval of the Internal Revenue Service of this paragraph (d): (i) the 25% limitation described in paragraph (a) shall be replaced by a 100% limitation, (ii) the second paragraph of paragraph (a) shall be disregarded, and (iii) "five years of participation" shall be substituted for "ten years of participation" in paragraph (c).

(e)     To the extent necessary to comply with Section 602 (Requirements and Interpretations Relating to Independence) of the Securities and Exchange Commission Codification of Financial Reporting Policies or any similar applicable requirements, a Participant may elect, at any time, to diversify the entire amount held under all of his or her Accounts through the direct transfer of such amount to the RAP.  A Participant may be required to submit evidence of the need for such diversification.  A Participant who makes an election under this subsection (e) shall discontinue participation under the Plan and shall no longer be eligible to receive allocations under the Plan, including allocations of forfeitures under Section 5.2.

7.2     <u>Withdrawals With Respect to PAYSOP Shares:</u>

(a) <u>Prior to December 1, 1996</u>

During Employment, a Participant shall be permitted to withdraw all, and not less than all, of the Company Stock that had been allocated on his or her behalf to the Payroll-Based Stock Ownership Plan for Employees of Merrill Lynch & Co., Inc. and Affiliates at least eighty-four months prior to the withdrawal.  The withdrawal shall be processed with contributions and distributions in the December valuation cycle and such other dates as the Administrative Committee prescribes.

Notwithstanding the provisions of the first paragraph of this Section 7.2, a Participant whose employment is considered as continuing due to Disability may elect to withdraw all, and not less than all, of the PAYSOP Shares held on the Participant's behalf, and any dividends accruing thereon, as soon as practicable following such Participant's election.

Each Participant electing a withdrawal under any of the preceding paragraphs of this Section 7.2 shall be entitled to elect to have his or her withdrawal paid in one of the following forms:

    (i)      a single sum distribution in cash; or

    (ii)     a single sum distribution in Company Stock.

(b)  <u>On or after December 1, 1996</u>

Effective December 1, 1996, during Employment a Participant may elect to withdraw all, but not less than all, of the PAYSOP Shares held on the Participant's behalf, and any dividends accruing thereon, in accordance with procedures approved by the Administrative Committee. Any such withdrawal shall be paid, at the Participant's election, in a single sum distribution in cash or in Company Stock.

7.3    <u>1994-97 Withdrawals</u>:

  (a)    <u>Withdrawal Periods and Eligibility</u>.

        Each Participant who has participated in the Plan for at least five years and is employed by the Company or an Affiliate as of each September 30, beginning with September 30, 1994 and ending on September 30, 1997, and who has neither Retired nor had a Termination of Employment shall be eligible to elect a withdrawal of shares of Company Stock held in the Participant's Accounts in the amounts described in paragraph (b) below, provided that no Participant may elect to receive more than two withdrawals under this Section 7.3, and provided further that any such withdrawal election may only be made after the date this Section is effective with respect to the Participant and prior to October 1, 1997. Withdrawals shall be processed with contributions and distributions in the September valuation cycle.

  (b)    <u>Amounts Which May be Withdrawn</u>.

        An eligible Participant described in paragraph (a) who has attained age 55 on or prior to the relevant September 30 may elect to receive a single sum in kind withdrawal of up to 50% of the number of shares of Company Stock held in the Participant's Accounts on the date the withdrawal is processed. All other eligible Participants described in paragraph (a) may elect to receive a single sum in kind withdrawal of up to 25% of the number of such shares of Company Stock.

WDC99 534295-2.047750.0011

(c)    <u>Suspension of Plan Allocations</u>.

If a Participant elects a withdrawal in any form other than a direct rollover to the RAP, allocations of Leveraged Shares and Reversion Shares pursuant to Section 4.3 that would otherwise have been allocated to the Participant's Leveraged Share Account and Reversion Share Account shall be suspended during the one-year period commencing on the October 1 immediately following the Administrative Committee's acceptance of the Participant's withdrawal election under this Section 7.3.

7.4    <u>Direct Rollover Distributions</u>:

A Participant who is eligible to receive a withdrawal from the Plan pursuant to the provisions of this Article VII which constitutes an "eligible rollover distribution," as defined in Code section 402(c)(4) (Code section 402(f)(2)(A), effective January 1, 2002), may direct the Administrative Committee to transfer all or any part of such withdrawal to an "eligible retirement plan," as defined in Code section 402(c)(8)(B) (including tax-qualified retirement plans and individual retirement accounts). Effective for distributions made after December 31, 2001, "eligible retirement plan" shall also include an annuity contract described in Code section 403(b) and an eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan. Effective for distributions made after December 31, 2001, the definition of "eligible retirement plan" shall also apply in the case of a distribution to a surviving spouse, or to a spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code section 414(p). The Administrative Committee shall cause the portion of the withdrawal which the Participant has elected to so transfer to be transferred directly to the designated "eligible retirement plan." Subject to such limitations as may apply under procedures established to administer the Plan, the portion of a Participant's withdrawal to be transferred to an eligible retirement plan, if any, may be paid in a form as permitted in the foregoing provisions of this Article which may be different from the form of the portion of the withdrawal that is paid directly to the Participant, if any, which form shall also be as permitted in the foregoing provisions of this Article.

7.5    <u>Withdrawals after Age 70½</u>:

A Participant who remains in employment with an Employer following his or her attainment of age 70½, may elect to make one withdrawal from his or her Accounts during each 12-month period of such employment, in accordance with procedures approved by the Administrative Committee.

WDC99 534295-2.047750.0011

ARTICLE VIII

DISTRIBUTION UPON RETIREMENT OR TERMINATION OF EMPLOYMENT

8.1    Amount of Distribution:

Upon a Participant's Retirement or Termination of Employment, the Participant shall be entitled to a distribution of the Participant's Plan Benefit, subject to the provisions of this Article VIII.

8.2    Forms of Distribution:

Subject to such limitations as may apply under procedures established to administer the Plan, a Participant who either Retires or has a Termination of Employment with a Plan Benefit shall be entitled to elect to have his or her Plan Benefit paid in one or more of the following forms:

(a)    a single sum distribution in cash;

(b)    a single sum distribution in Company Stock;

(c)    the application of the Plan Benefit to the purchase from an insurance company of any one of the following forms of annuities for the Participant or the Participant and his or her survivor annuitant:

    (i)    a single life annuity,

    (ii)    a 100% joint and survivor annuity,

    (iii)    a 50% joint and survivor annuity,

    (iv)    a ten-year term certain annuity, or

    (v)    such other annuity form or forms as may be made available by the Administrative Committee,

provided that the Participant shall be permitted to elect that a specific dollar amount of his or her Plan Benefit be distributed under Section 8.2(a), with the remainder to be transferred to an insurance company for the purchase of an available annuity; and further provided that, if the Participant elects to receive all or a portion of his or her Plan Benefit in the form of an annuity, such Participant shall be subject to the qualified Joint and Survivor Annuity rules described in Appendix II. Notwithstanding this paragraph (c), a Participant's election of an annuity form of distribution shall be subject to any minimum dollar requirements

as may be established by an independent insurance company (for Plan Year 2005, $10,000; or

(d)     deferral by the Participant until the Participant attains age 70½ in the case of Retirement, or until attainment of Normal Retirement Age, in the case of the Participant's Termination of Employment with a Plan Benefit. If the Participant defers distribution under the provisions of this Section 8.2(d), he or she may elect to have his or her Plan Benefit paid in any form described in paragraphs (a) through (c) above at any time on or before attainment of age 70½ or Normal Retirement Age, as applicable.

(i)     If the Participant has attained age 70½ or Normal Retirement Age, as applicable, and has failed to request distribution of his or her Plan Benefit, his or her Plan Benefit shall be paid in a single sum distribution in cash. Effective January 1, 2005, this subparagraph 8.2(d)(i) shall cease to apply.

(ii)    Notwithstanding the foregoing, if the Participant who has a Termination of Employment has elected deferral of his or her Plan Benefit and his or her Plan Benefit is $3,500 ($5,000, effective July 1, 1999) or less on the applicable Valuation Date, distribution of such amount shall not be deferred and shall be paid in a single distribution in cash. Notwithstanding anything to the contrary in this Plan, effective March 28, 2005, this subparagraph 8.2(d)(ii) shall cease to apply.

Notwithstanding the foregoing in this Section 8.2 or anything to the contrary in this Plan, effective January 1, 2005, in the case of Retirement or Termination of Employment a Participant may defer distribution until the maximum time permitted under Section 8.5.

8.3     <u>Timing of Distribution</u>

The Participant shall be entitled to elect to have his or her Plan Benefit paid in any form of distribution provided under Section 8.2 within the period ending six months following the date of his or her Retirement or Termination of Employment.

(a)     In the absence of a distribution election within six months following the date of the Participant's Retirement or Termination of Employment, the Participant's Plan Benefit shall be paid upon attainment of Normal Retirement Age (or in the case of Retirement, if later, upon the expiration of the six-month distribution election period provided above), in a single sum distribution in cash; provided, however, that at any time prior to the Participant's attaining Normal Retirement Age, the Participant may request a distribution pursuant to an option described Sections 8.2(a) through 8.2(d) ; and, provided, further, that notwithstanding the foregoing or anything to the contrary in this Plan, effective January 1, 2005, all reference in this Section 8.3 to a six-month distribution election period in connection to the

Participant's Retirement or Termination of Employment shall be disregarded and the Participant's Benefit Commencement Date shall be no earlier than as soon as practicable after the Participant requests a distribution pursuant to an option described in Sections 8.2(a) through 8.2(d). Where no such election is received by the Administrative Committee, a Participant is deemed to have elected to commence such distribution at the maximum time permitted under Section 8.5.

(b)     Notwithstanding any other provision of this Plan, in the case of a Participant who has a Termination of Employment and whose Plan Benefit as of the applicable Valuation Date is $3,500 ($5,000, effective July 1, 1999) or less, the Participant's Plan Benefit shall be paid as soon as practicable in a single sum distribution in cash in the absence of an election by the Participant. Effective March 28, 2005, this paragraph 8.3(b) shall cease to apply.

(c)     The value of the Participant's Plan Benefit shall be determined, and distribution of such Plan Benefit pursuant to this Section 8.3 shall be paid, as soon as practicable following such Participant's election pursuant to this Section 8.3 or as soon as practicable following the time otherwise prescribed by this Section 8.3 for distribution of such Participant's Plan Benefit.

8.4    <u>Direct Rollover Distributions</u>:

A Participant who is eligible to receive a distribution from the Plan pursuant to the provisions of this Article VIII which constitutes an "eligible rollover distribution," as defined in Code section 402(c)(4), (Code section 402(f)(2)(A), effective January 1, 2002), may direct the Administrative Committee to transfer all or any part of such distribution to an "eligible retirement plan," as defined in Code section 402(c)(8)(B) (including tax-qualified retirement plans and individual retirement accounts) (or, effective for distributions after December 31, 2001, to an "eligible retirement plan" as defined under Section 7.4 of the Plan). The Administrative Committee shall cause the portion of the distribution which the Participant has elected to so transfer to be transferred directly to the designated "eligible retirement plan."

Subject to such limitations as may apply under procedures established to administer the Plan, the Participant may elect to receive the portion of the eligible rollover distribution to be transferred to an eligible retirement plan in either of the forms described in Sections 8.2(a)- (b), which may be different from the form of the portion for the Plan Benefit that is to be paid directly to the Participant, if any.

8.5    <u>Minimum Required Distributions</u>:

Notwithstanding any other provision of this Plan, distribution of a Participant's Plan Benefit shall commence no later than required beginning date. The "required beginning date" means the end of the calendar year in which the Participant attains age 70½ or, if later, April 1 of the calendar year following the calendar year in which the Participant

ceases Employment; provided, however, that in the case of a Participant who is a 5% owner (as defined in Code section 416(i)(1)), such distribution shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70½. The distribution of the Plan Benefit of the Participant's designated beneficiary shall commence in accordance with Article IX. All distributions required under this article will be determined and made in accordance with the Treasury regulations under section 401(a)(9) of the Internal Revenue Code.

Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the required beginning date, as of the first distribution calendar year distributions will be made in accordance with Section 6.4(c). If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Code section 401(a)(9) and the Treasury regulations.

During the Participant's lifetime, the minimum amount that will be distributed for each distribution calendar year is the lesser of:

(i) the quotient obtained by dividing the Participant's Account Balance by the distribution period in the Uniform Lifetime Table set forth in section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's age as of the Participant's birthday in the distribution calendar year; or

(ii) if the Participant's sole designated beneficiary for the distribution calendar year is the Participant's Spouse, the quotient obtained by dividing the Participant's Account Balance by the number in the Joint and Last Survivor Table set forth in section 1.401(a)(9)-9 of the Treasury regulations, using the Participant's and Spouse's attained ages as of the Participant's and Spouse's birthdays in the distribution calendar year.

Required minimum distributions during the Participant's lifetime will be determined under this Section 8.5 beginning with the first distribution calendar year and up to and including the distribution calendar year that includes the Participant's date of death.

Definitions: (i) "Designated beneficiary" means the individual who is designated as the Beneficiary under Article VII of the Plan and is the designated beneficiary under section 401(a)(9) of the Internal Revenue Code and section 1.401(a)(9)-1, Q&A-4, of the Treasury regulations. (ii) "Distribution calendar year" means a calendar year for which a minimum distribution is required. The first distribution calendar year is the calendar year immediately preceding the calendar year which contains the Participant's required beginning date. The required minimum distribution for the Participant's first distribution calendar year will be made on or before the Participant's required beginning date. The required minimum distribution for other distribution calendar years, including the required minimum distribution for the distribution calendar year in which the Participant's required beginning date occurs, will be made on or before December 31 of that

distribution calendar year. (iii) "Life expectancy" means such expectancy as computed by use of the Single Life Table in section 1.401(a)(9)-9 of the Treasury regulations.

Any amounts payable over a life expectancy or life expectancies pursuant to this Section 8.5 shall be paid in cash, except that the Participant may annually elect to have any cash distributions payable to him or her paid in Company Stock.

Distributions under this Article VIII of the Participant's Plan Benefit and any annuity contract purchased therewith shall be paid in accordance with the requirements of Code section 401(a)(9) and the final and proposed regulations thereunder, including the minimum distribution incidental benefit requirement of Treasury Regulation section 1.401(a)(9)-2.

8.6    Special Rule on Commencement of Benefits:

Unless a Participant otherwise elects pursuant to this Article VIII, a Participant shall in no event begin to receive his or her Plan Benefit later than the sixtieth day after the close of the Plan Year in which the latest of the following events occur: (i) the Participant attains age 65; (ii) the tenth anniversary of the date the Participant commenced participation; or (iii) the Participant's Termination of Employment or Retirement.

WDC99 534295-2.047750.0011

ARTICLE IX

## DISTRIBUTION UPON DEATH

9.1    Amount of Distribution:

Upon a Participant's death, his or her Beneficiary shall be entitled to a distribution of the Participant's Plan Benefit, subject to the provisions of this Article IX.

9.2    Form of Distribution:

Subject to such limitations as may apply under procedures established to administer the Plan, upon the death of a Participant, his or her Beneficiary shall be entitled to elect to have the Participant's Plan Benefit paid in one or more of the following forms:

(a)    a single sum distribution in cash;

(b)    a single sum distribution in Company Stock;

(c)    the application of the Plan Benefit to the purchase from an insurance company of any one of the following forms of annuities for the Beneficiary:

(i)    a single life annuity,

(ii)    a ten-year term certain annuity, or

(iii)    such other annuity form or forms as may be made available by the Administrative Committee;

provided that the Beneficiary shall be permitted to elect that a specific dollar amount of the Participant's Plan Benefit be paid under Section 9.2(a), with the remainder to be transferred to the insurance company for the purchase of an available annuity for the Beneficiary.  Notwithstanding this paragraph (c), a Beneficiary's election of an annuity form of distribution shall be subject to any minimum dollar requirements as may be established by an independent insurance company (for 2005, $10,000).

9.3    Timing of Distribution:

The Beneficiary shall be entitled to elect to have the Participant's Plan Benefit paid in any form of distribution provided under Section 9.2 within six months following the date of the Participant's death.

41

WDC99 534295-2.047750.0011

(a)    In the absence of a distribution election within six months following the date of the Participant's death, the Participant's Plan Benefit shall be paid in a single sum distribution in cash.

(b)    The value of a Participant's Plan Benefit shall be determined, and distribution of such Plan Benefit to the Beneficiary pursuant to this Section 9.3 shall be paid, as soon as practicable following such Beneficiary's election pursuant to this Section 9.3 or as soon as practicable following the time otherwise prescribed by this Section 9.3 for distribution of such Participant's Plan Benefit.

9.4    <u>Direct Rollover Distributions</u>:

A Beneficiary who is the Participant's spouse (or an alternate payee under a "qualified domestic relations order" as defined in Code section 414(p) who is treated as the Participant's spouse) who is eligible to receive a distribution from the Plan pursuant to the provisions of this Article IX which constitutes an "eligible rollover distribution," as defined in Code section 402(c)(4) (Code section 402(f)(2)(A), effective January 1, 2002), may direct the Administrative Committee to transfer all or any part of such distribution to an individual retirement account or an individual retirement annuity. The Administrative Committee shall cause the portion of the distribution which such spouse (or alternate payee under a "qualified domestic relations order" as defined in Code section 414(p) who is treated as the Participant's spouse) has elected to so transfer to be transferred directly to the designated individual retirement account or individual retirement annuity (or, effective for distributions made after December 31, 2001, to an "eligible retirement plan" as defined under Section 7.4 of the Plan). The Beneficiary (or alternate payee) may elect to receive the portion of the eligible rollover distribution to be transferred to an eligible retirement plan in either of the forms described in Sections 8.2(a)-(b), which may be different from the form for the portion of the Plan Benefit that is to be paid directly to the Beneficiary (or alternate payee), if any.

9.5    <u>Distributions Shall be Paid in Accordance With the Requirements of Code Section 401(a)(9)</u>:

Distribution under this Article VIII of the Participant's Plan Benefit and any annuity contract purchased therewith shall be paid in accordance with the requirements of Code section 401(a)(9) and the final and proposed regulations thereunder, including the minimum distribution incidental benefit requirement of Proposed Treasury Regulation section 1.401(a)(9)-2.

WDC99 534295-2.047750.0011

ARTICLE X

ADMINISTRATION OF THE PLAN

10.1    Named Fiduciaries:

Except as otherwise provided in Section 6.2, the Administrative Committee shall be the "named fiduciary" of the Plan, as that term is defined in ERISA section 402(a)(2) with authority to manage and control the operation and administration of the Plan, and the Investment Committee shall be the "named fiduciary" of the Plan with authority to manage and control all Trust assets, and appoint one or more investment managers pursuant to Section 6.9.

The Company shall be the "administrator" and "plan administrator" with respect to the Plan, as those terms are defined in ERISA section 3(16)(A) and in Code section 414(g) respectively.

Any person or persons may serve in more than one named fiduciary capacity with respect to the Plan, including, without limitation, service as a Trustee, as a member of the Administrative Committee and as a member of the Investment Committee.

10.2    The Administrative Committee:

The Administrative Committee shall consist of not less than one person appointed from time to time by the Senior Vice President, Human Resources (or such officer's functional successor). The members of the Administrative Committee shall serve at the pleasure of the Senior Vice President, Human Resources (or such officer's functional successor) without compensation and, except as required by applicable law, without bond or other security. Any member of the Administrative Committee may resign by delivering his or her written resignation to the Senior Vice President, Human Resources (or such officer's functional successor) and to the Secretary of the Administrative Committee. Unless the Senior Vice President, Human Resources (or such officer's functional successor) otherwise provides, any member of the Administrative Committee who is an Employee of the Company or an Affiliate and who reports, directly or indirectly, to the Senior Vice President, Human Resources (or such officer's functional successor) at the time of his or her appointment, will be considered to have resigned from the Investment Committee when he or she ceases to be an Employee or no longer reports, directly or indirectly, to the Senior Vice President, Human Resources (or such officer's functional successor).

The members of the Administrative Committee shall elect a chairperson from their number and a Secretary who may, but need not, be one of the members of the Administrative Committee; may appoint from their number such committees with such powers as they shall determine; may authorize one or more of their number or any agent to execute or deliver any instrument or make any payment on behalf of the Administrative

Committee; and may retain counsel, employ agents and obtain clerical, medical, actuarial and accounting services as the Administrative Committee may require or deem advisable from time to time. All action by the Administrative Committee shall be taken at a meeting or via telephone conference. The Administrative Committee shall hold meetings upon notice, at such place or places, or via telephone conference, and at such time or times as it may from time to time determine. Any action required or permitted to be taken at any meeting of the Administrative Committee may be taken without a meeting, if all the members of the Administrative Committee consent thereto in writing.

If more than one member is appointed, 50% of the members of the Administrative Committee then in office shall constitute a quorum for the transaction of business at any meeting of the Administrative Committee. The vote of a majority of the members present at the time of the vote, if a quorum is present at such time, shall be the act of the Administrative Committee. However, if less than three members are appointed, the Administrative Committee shall act only upon the unanimous consent of its members. A member of the Administrative Committee who is also a Participant shall not vote or act upon any matter relating to himself or herself unless such person is the sole member of the Administrative Committee.

Subject to Section 10.1, the Administrative Committee shall be responsible for the administration, operation and interpretation of the Plan. It shall have the exclusive authority and right to interpret the Plan provisions and to exercise discretion where necessary or appropriate in the interpretation and administration of the Plan and to decide any and all matters arising thereunder or in connection with the administration of the Plan (including correction of errors and the determination of the eligibility of Participants and Beneficiaries for benefits under the Plan), and it shall endeavor to act, whether by general rules or by particular decisions, so as not to discriminate in favor of any person or class of persons. Such decisions, actions and records of the Administrative Committee shall be conclusive and binding upon the Company, any Employer and all persons having or claiming to have any right or interest in or under the Plan.

The Administrative Committee shall maintain or cause to be maintained accounts to the extent it deems necessary or appropriate showing the fiscal transactions of the Plan.

In addition to the foregoing, the Administrative Committee shall have the following powers and responsibilities:

(a)     The Administrative Committee shall have the power to promulgate such rules and procedures, to maintain or cause to be maintained such records and to issue such forms as it shall deem necessary or desirable for the administration of the Plan.

(b)     Subject to the terms of the Plan and applicable law, the Administrative Committee shall determine the time and manner in which all elections authorized by the Plan shall be made or revoked.

WDC99 534295-2.047750.0011

(c)     The Administrative Committee may direct that such amounts be withheld from any payment due under this Plan as required to comply with applicable income tax law.

(d)     The Administrative Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(e)     The Administrative Committee shall exercise all of its powers and responsibilities in a uniform and nondiscriminatory manner.

(f)     The Administrative Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Administrative Committee and shall not be liable for any act or omission of a person so designated.

Notwithstanding any other provisions of the Plan, appropriate personnel in the Global Benefits and/or Employee Services departments of the Company (or functionally similar departments of any Affiliate of the Company) are authorized to take action with respect to routine ministerial matters in connection with the Plan and to take action with respect to the transfer and disposition of assets, including those held under the Plan, in connection with acquisitions, divestitures and other corporate transactions.

10.3    Investment Committee:

The Investment Committee shall consist of not less than one person appointed from time to time by the Senior Vice President, Human Resources (or such officer's functional successor).  The members of the Investment Committee shall serve at the pleasure of the Senior Vice President, Human Resources (or such officer's functional successor) without compensation and, except as required by applicable law, without bond or other security. Any member of the Investment Committee may resign by delivering his or her written resignation to the Senior Vice President, Human Resources (or such officer's functional successor) and to the Secretary of the Investment Committee.  Unless the Senior Vice President, Human Resources (or such officer's functional successor) otherwise provides, any member of the Investment Committee who is an Employee of the Company or an Affiliate at the time of his or her appointment will be considered to have resigned from the Investment Committee when he or she ceases to be an Employee.

The operation and procedures of the Investment Committee shall be the same as the operation and procedures of the Administrative Committee as set forth in the second and third paragraphs of Section 10.2 above.

Subject to Section 10.1, the Investment Committee shall be responsible for the investment of Trust assets and shall have the following powers and responsibilities:

(a) The Investment Committee shall establish and carry out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA.

(b) The Investment Committee shall have the power to direct that assets of the Trust be held in a master trust consisting of assets of qualified plans maintained by the Company or an Affiliate.

(c) The Investment Committee shall have such other rights, powers, duties and obligations as may be granted or imposed upon it elsewhere in the Plan.

(d) The Investment Committee shall exercise all of its powers and responsibilities in a uniform and nondiscriminatory manner.

(e) The Investment Committee may designate persons, including persons other than "named fiduciaries" (as defined in ERISA section 402(a)(2)), to carry out the specified responsibilities of the Investment Committee and shall not be liable for any act or omission of a person so designated.

10.4    <u>Claim Procedures</u>:

The Administrative Committee shall establish a claims procedure.

10.5    <u>Indemnification</u>:

To the extent permitted by applicable law, no member of the Administrative Committee or the Investment Committee shall be liable for any act or omission of any other member of the Administrative Committee or the Investment Committee nor for any act or omission on his or her own part, other than those acts or omissions attributable to his or her own willful misconduct or gross negligence. To the extent permitted by applicable law, the Company and each other Employer jointly and severally shall indemnify and save harmless the members of the Administrative Committee, the Investment Committee and other Employees, officers or directors of the Company or an affiliate who are fiduciaries against any and all demands, suits, proceedings or claims for liability, loss, damage, or expense (including payment of reasonable expenses in connection with defense against any such demands, suits, proceedings or claims) in connection with the Plan and Trust that may be brought by Participants or their Beneficiaries, Employees of participating Employers, or by any other person, corporation, entity, government or agency thereof; provided, however, that such indemnification shall not apply with respect to acts or omissions of willful misconduct or gross negligence. The Board of Directors, at the Company's or any Employer's expense, may settle any such claim or demand asserted, or suit or proceeding brought, against any member of the Administrative Committee or the Investment Committee when such settlement appears to be in the best interest of the Company.

10.6     Payment of Expenses:

All Plan expenses, including expenses of the Administrative Committee, the Investment Committee, the Trustee and any Investment Manager may be payable from the Trust and to the extent not paid by the Trust shall be paid by the Employer.

Notwithstanding the foregoing, if any expenses to be paid from the Trust are allocable to one or more but not all Accounts, such obligations shall be paid from and charged solely to the Account or Accounts involved, either on a specific or proportionate basis as determined by the Administrative Committee in its sole discretion.

WDC99 534295-2.047750.0011

ARTICLE XI

OPERATION OF THE TRUST

11.1    Trust; Trustee:

All the funds of the Plan shall be held by a Trustee or Trustees, appointed from time to time pursuant to this Section 11.1, in trust under a Trust Agreement adopted, or as amended, by the Board of Directors for use in providing the benefits of the Plan and paying its expenses not paid directly by any Employer.

The Board of Directors shall appoint one or more individuals (or entities) as Trustee(s) who shall serve as trustee(s) of all or a portion of the Trust pursuant to the Trust Agreement.

Each Trustee shall accept its appointment by executing the Trust Agreement. No other Plan fiduciary shall be liable for any act or omission of any Trustee with respect to any duties delegated to any Trustee.

If individuals are acting as Trustees, the Trustees shall act by a majority of the Trustees at the time in office and such action may be taken either by a vote at a meeting or in writing without a meeting. If less than three individual Trustees are appointed, however, the Trustees shall act only upon the unanimous consent of all of the Trustees. The Trustee(s) may authorize in writing any person to execute any document or documents on the Trustee's (or Trustees') behalf, and any interested person, upon receipt of notice of such authorization directed to it, may thereafter accept and rely upon any document executed by such authorized person until the Trustee(s) shall deliver to such interested person a written revocation of such authorization.

WDC99 534295-2.047750.0011

ARTICLE XII

PLAN ADOPTION, AMENDMENT, TERMINATION AND MERGER

12.1    Plan Amendment:

The Company shall have the right at any time to amend the Plan through action of the Company's Board of Directors (or the Board's delegatee) by an instrument in writing, effective retroactively or otherwise. The Board or its delegatee hereby delegates to the Administrative Committee the right at any time, by an instrument in writing, to amend the Plan to provide for the grant of additional "past service" allocations under the Plan to "international employees" (i.e. U.S. citizens and U.S. permanent residents employed outside of the U.S.). No amendment pursuant to this Section 12.1 shall have any of the effects specified in Section 12.2.

12.2    Limitations on Plan Amendments:

No amendment (except for amendments to Section 13.5) may:

(a)    be made at any time prior to the satisfaction of all liabilities under the Plan with respect to Participants and their Beneficiaries which would permit any part of the corpus or income of the Trust to be used for or diverted to purposes other than for the exclusive benefit of such persons under the Plan and the payment of the expenses of the Plan;

(b)    decrease the Account Balance of any Participant or his or her Beneficiary under the Plan;

(c)    reduce the vested percentage of any Participant;

(d)    eliminate an optional form of benefit distribution (unless such elimination conforms with any applicable requirements under the Code); or

(e)    change the vesting schedule, either directly or indirectly, unless each Participant having not less than three years of Service is permitted to elect, within a reasonable period specified by the Administrative Committee after the adoption of such amendment, to have his or her vested percentage computed without regard to such amendment. The period during which the election may be made shall commence with the date the amendment is adopted and shall end as of the later of:

(i)    sixty days after the amendment is adopted;

(ii)    sixty days after the amendment becomes effective; or

WDC99 534295-2.047750.0011

(iii)  sixty days after the Participant is issued written notice by the Administrative Committee.

12.3  <u>Termination of Plan or Discontinuance of Allocations and Contributions</u>:

(a)  The Plan may be terminated at any time by the Board of Directors, but only upon the condition that, except as provided for in subsection (d), such action is taken as shall render it impossible for any part of the corpus or income of the Trust be used for or diverted to purposes other than for the exclusive benefit of the Participants and their Beneficiaries under the Plan and for the payment of the expenses of the Plan.

(b)  If the Plan is terminated under paragraph (a) above or in the event the Plan is terminated by operation of law and the Board of Directors determines that the Trust shall be terminated, the Trust shall be revalued as if the termination date were a Valuation Date, and the current value of all Accounts shall be paid as soon as practicable in accordance with Articles VIII and IX to the extent permissible under applicable law and regulations.

(c)  If the Plan is terminated by the Board of Directors but the Board of Directors determines that the Trust shall be continued pursuant to its terms, no further contributions shall be made by any Employer, but the Trust shall be administered as though the Plan were otherwise in full force and effect. If the Trust is subsequently terminated, the provisions of paragraph (b) above shall then apply.

(d)  Upon the termination of the Plan, shares of Company Stock held in the Leveraged Share Suspense Account and the Revision Share Suspense Account shall be applied as follows:

(i)  any Leveraged Shares (other than those required to be allocated pursuant to Article IV for the calendar year in which the termination of the Plan occurs) then held in the Leveraged Shares Suspense Account shall first be applied to repay the outstanding balance on any Acquisition Loan, and to the extent permitted by and consistent with the provisions of Code section 415, any remaining shares of Company Stock shall be allocated to Participants' Leveraged Share Accounts in a nondiscriminatory manner, and

(ii)  any Reversion Shares (other than those required to be allocated pursuant to Article IV for the calendar year in which the termination of the Plan occurs) then held in the Reversion Share Suspense Account following the satisfaction of all liabilities under the Plan shall revert to the Company.

(e)  In addition to the right to amend or terminate the Plan, the Board of Directors or the board of directors of any Employer with respect to that Employer may at any

time permanently and completely discontinue contributions under the Plan. If the Company or any Employer completely discontinues contributions under the Plan, either by resolution of the Board of Directors or the board of directors of any Employer, respectively, or for any other reason, the Company or the Employer, as applicable, and the Trustee shall proceed under paragraphs (b) or (c) depending upon whether in connection with such complete discontinuance of contributions the Employer has terminated the Plan and Trust or has terminated the Plan and continued the Trust in effect. If no action has been taken by the Board of Directors or the board of directors of the Employer in connection with a complete discontinuance of contributions to the Plan, it shall be deemed that paragraph (c) is applicable.

(f)    As of the date of a termination of the Plan, or the complete discontinuance of contributions under the Plan:

  (i)    if not then fully vested, each affected Participant who is then an Employee shall become 100% vested in his or her Account Balances;

  (ii)    no further allocations shall be made after such date; and

  (iii)    no Eligible Employee shall become a Participant after such date.

(g)    As of the date of a "partial termination" of the Plan:

  (i)    if not then fully vested, each affected Participant who is then an Employee shall become 100% vested in his or her Account Balances; and

  (ii)    no further contributions or allocations of forfeitures shall be made after such date with respect to each affected Participant.

(h)    All other provisions of the Plan shall remain in effect unless otherwise amended.

(i).    Notwithstanding any other provision of this Plan, an individual who has a Termination of Employment or Retires and takes a distribution of his or her Account Balances or who has a Termination of Employment with no vested percentage in the Account Balance of his or her Reversion Share Account or Leveraged Share Account shall have no right to any additional benefit in the event of a complete or partial termination of the Plan.

12.4    <u>Merger, Consolidation or Transfer:</u>

The merger or consolidation of the Company with any other person, or the transfer of the assets of the Company to any other person, shall not constitute a termination of the Plan, if provision is made for the continuation of the Plan.

51

WDC99 534295-2.047750.0011

The Plan may not merge or consolidate with, or transfer any assets or liabilities to, any other plan, unless each Participant would (if the Plan then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit he or she would have been entitled to receive immediately before the merger, consolidation or transfer (if the Plan had then terminated).

In the event: (i) the Administrative Committee designates that an Employer shall after a specified date become an Affiliate that is not participating in the Plan, (ii) an Employer ceases to be an Affiliate, or (iii) all or a portion of an Employer's business is sold or otherwise disposed of, the Administrative Committee may in accordance with such rules and procedures as it may prescribe direct that the balances held in the Accounts of Participants affected by such event be transferred in a trust-to-trust basis to the trust under another plan that satisfies the requirements of Code section 401(a) in which such Participants continue to participate.

12.5    Bankruptcy:

In the event that the Company shall at any time be judicially declared bankrupt or insolvent without any provisions being made for the continuation of this Plan, the Plan shall be completely terminated in accordance with Section 12.3.

WDC99 534295-2.047750.0011

# ARTICLE XIII

## MISCELLANEOUS

**13.1    Exclusive Benefit of Participants:**

The Trust shall be held for the benefit of all persons who shall be entitled to receive payments under the Plan and for payment of Plan expenses. Subject to Sections 3.5 and 13.5, it shall be prohibited at any time for any part of the Trust (other than such part as is required to pay expenses) to be used for, or diverted to, purposes other than for the exclusive benefit of Participants or their Beneficiaries.

**13.2    Plan Not a Contract of Employment:**

The Plan is not a contract of Employment, and the terms of Employment of any Employee shall not be affected in any way by the Plan or related instruments except as specifically provided therein.

**13.3    Source of Benefits:**

Benefits under the Plan shall be paid or provided for solely from the Trust, and neither the Employer, the Administrative Committee, Trustee, Investment Manager or any insurance company shall assume any liability therefor.

**13.4    Benefits Not Assignable:**

Benefits provided under the Plan may not be assigned or alienated, either voluntarily or involuntarily. The preceding sentence shall also apply to the creation, assignment or recognition of a right to any benefit payable with respect to a Participant pursuant to a "domestic relations order" (as defined in Code section 414(p)) unless such order is determined by the Administrative Committee to be a "qualified domestic relations order" (as defined in Code section 414(p)).

**13.5    Domestic Relations Orders:**

Notwithstanding any other provision of this Plan, the Administrative Committee shall have all powers necessary with respect to the Plan for the proper operation of Code section 414(p) with respect to "qualified domestic relations orders" (or "domestic relations orders" treated as such) referred to in Section 13.4, including, but not limited to, the power to establish all necessary or appropriate procedures, to authorize the establishment of new accounts with respect to such assets and subject to such investment control by the Administrative Committee as the Administrative Committee may deem appropriate, and the Administrative Committee may decide upon and make appropriate distributions therefrom.

WDC99 534295-2.047750.0011

To the extent provided by the applicable qualified domestic relations order, benefits to which the alternate payee is entitled shall be distributed prior to the date such benefits would otherwise become payable in accordance with the applicable provisions of the Plan. Such early distribution may only be payable in the form of a single sum distribution in cash, or if elected by the alternate payee, in Company Stock.

An alternate payee who is the Participant's former spouse under a "qualified domestic relations order" as defined in Code section 414(p) who is eligible to receive a distribution from the Plan pursuant to the provisions of this Section 13.5 which constitutes an "eligible rollover distribution," as defined in Code section 402(c)(4) (Code section 402(f)(2)(A), effective January 1, 2002), may direct the Administrative Committee to transfer all or any part of such distribution to an "eligible retirement plan," as defined in Code section 402(c)(8)(B) (including tax-qualified retirement plans and individual retirement accounts) (or, effective for distributions made after December 31, 2001, to an "eligible retirement plan" as defined under Section 7.4 of the Plan). The Administrative Committee shall cause the portion of the distribution which the alternate payee has elected to so transfer to be transferred directly to the designated "eligible retirement plan." The alternate payee may elect to receive the portion of the eligible rollover distribution to be transferred to an eligible retirement plan in the form of a single sum distribution of cash or Company Stock, which may be different from the form for the portion of the Plan Benefit that is to be paid directly to the alternate payee, if any.

13.6    Benefits Payable to Minors, Incompetents and Others:

In the event any benefit is payable to a minor or an incompetent or to a person otherwise under a legal disability, or who, in the sole discretion of the Administrative Committee, is by reason of advanced age, illness or other physical or mental incapacity incapable of handling and disposing of his or her property, or otherwise is in such position or condition that the Administrative Committee believes that he or she could not utilize the benefit for his or her support or welfare, the Administrative Committee shall have discretion to apply the whole or any part of such benefit directly to the care, comfort, maintenance, support, education or use of such person, or pay the whole or any part of such benefit to the parent of such person, the guardian, committee, conservator or other legal representative, wherever appointed, of such person, the person with whom such person is residing, or to any other person having the care and control of such person. The receipt by any such person to whom any such benefit on behalf of any Participant or Beneficiary is paid shall be a sufficient discharge therefor.

13.7    Missing Payees:

If a payment sent by the Trustee to the last known address of a Participant, Beneficiary or alternate payee (as defined in Section 13.5), is returned by the United States Postal Service because the addressee cannot be located at such address and if such addressee does not provide a current address to the Trustee or the Employer within 180 days

following the date the check was issued (or if payment is not returned but remains uncashed for at least 180 days following the date the check was issued), then the amount payable under the Plan (or, if applicable, qualified domestic relations order) shall be treated as a forfeiture under the Plan as of the date which is 180 days following the date the check was issued; provided, however, that if any such addressee subsequently submits a claim, such amount shall be paid to him or her.

13.8    Action by Employer:

Any action required to be taken by an Employer pursuant to the terms of the Plan shall be taken by the board of directors of the Employer or a committee thereof or any person duly empowered to exercise the powers of the Employer with respect to the Plan.

13.9    Provision of Information:

For purposes of the Plan, each Employee shall execute such forms and provide such information in such manner as may be reasonably required by the Administrative Committee.

13.10    Controlling Law:

The Plan is intended to qualify under Code section 401(a) and to comply with ERISA, and its terms shall be interpreted accordingly. Otherwise, to the extent not preempted by ERISA, the laws of the State of New York shall control the interpretation and performance of the terms of the Plan.

13.11    Singular and Plural and Article and Section References:

As used in the Plan, the singular includes the plural, and the plural includes the singular, unless qualified by the context. Titles of Articles and Sections of the Plan are for convenience of reference only and are to be disregarded in applying the provisions of the Plan. Any reference in this Plan to an Article or Section is to the Article or Section so specified of the Plan.

13.12    Trust-to-Trust Transfers:

The administrative Committee may, under such circumstances it considers appropriate, permit a trust-to-trust transfer to this Plan under such terms as the Administrative Committee may prescribe. Any such transferred amounts shall be allocated to Transferred Contribution Accounts of Participants as determined by the Administrative Committee.

WDC99 534295-2.047750.0011

ARTICLE XIV

IN THE EVENT THE PLAN BECOMES TOP-HEAVY

14.1    Purpose and Limited Application of this Article:

The purpose of this Article XIV is to conform to the requirements of Code sections 401(a)(10)(B) and 416. This Article shall in no way affect the amount of eligibility for any benefits provided under the Plan unless and until the Plan becomes a Top-Heavy or a Super Top-Heavy Plan.

14.2    Definitions:

As used in this Article XIV each of the following terms shall have the meaning for that term set forth in this Section 14.2.

(a)    Determination Date means, for any Plan Year subsequent to the first Plan Year, the last day of the preceding Plan Year. For the first Plan Year, Determination Date means the last day of that year.

(b)    Determination Period means the Plan Year containing the Determination Date (and, for Plan Years ending before January 1, 2002, the four preceding Plan Years).

(c)    Key Employee means an Employee or former Employee (and the Beneficiaries of such Employee) who at any time during the Determination Period was:

(i)    an officer of an Employer having an annual Testing Compensation greater than 50% of the dollar limitation under Code section 415(b)(1)(A) for any Plan Year ending before January 1, 2002 (or, for Plan Years beginning after December 31 2001, greater than $130,000, as adjusted pursuant to Code section 416(i) to reflect changes in the cost of living);

(ii)    for Plan Years ending before January 1, 2002, an owner (or a person considered an owner under Code section 318) of one of the ten largest interests in an Employer if such person owns at least a 1/2% interest in the Employer and such person's Testing Compensation exceeds 100% of the dollar limitation, referred to in clause (i);

(iii)    a "5% owner" (as defined in Code section 416(i)) of an Employer; or

(iv)    a "1% owner" (as defined in Code section 416(i)) of an Employer who has a Testing Compensation of more than $150,000.

(d)     Limitation Compensation means an amount determined in accordance with Section 3.3(b)(ii).

(e)     Non-Key Employee means any Employee who is not a Key Employee.

(f)     Permissive Aggregation Group means the Required Aggregation Group of Qualified Plans plus any other Qualified Plans of the Company or an Affiliate which, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Code sections 401(a)(4) and 410.

(g)     Required Aggregation Group means:  (i) each Qualified Plan of the Company or its Affiliates in which at least one Key Employee participates, and (ii) any other Qualified Plan of the Company or its Affiliates which enables a plan described in (i) to meet the requirements of Code sections 401(a)(4) and 410.

(h)     Super Top-Heavy Plan means the Plan, if the Top-Heavy Ratio, determined pursuant to the definition of a Top-Heavy Plan, exceeds 90%.

(i)     Top-Heavy Plan means the Plan, if any of the following conditions exists:

    (i)     if the Top-Heavy Ratio for the Plan exceeds 60% and the Plan is not part of any Required Aggregation Group or Permissive Aggregation Group of plans;

    (ii)     if the Plan is a part of a Required Aggregation Group of plans but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group exceeds 60%; or

    (iii)     if the Plan is a part of a Required Aggregation Group and part of a Permissive Aggregation Group of plans and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds 60%.

(j)     Top-Heavy Ratio means:

    (i)     If the Company or an Affiliate maintains one or more Defined Contribution Plans (including any "simplified employee pension" within the meaning of Code section 408(k)) and the Company or an Affiliate has never maintained any Defined Benefit Plan which during the five-year period ending on the Determination Date has or has had accrued benefits, the Top-Heavy Ratio for this Plan alone or for the Required or Permissive Aggregation Group as appropriate is a fraction, the numerator of which is the sum of the account balances of all Key Employees as of the Determination Date (including any part of any account balance distributed in the five-year period ending on the Determination Date), and the denominator of which is the sum of all account balances (including any

part of any account balance distributed in the five-year period ending on the Determination Date) both computed in accordance with Code section 416. Both the numerator and denominator of the Top-Heavy Ratio are adjusted to reflect any contribution not actually made as of the Determination Date, but which is required to be taken into account on that date under Code section 416.

(ii)     If the Company or an Affiliate maintains one or more Defined Contribution Plans (including any "simplified employee pension" within the meaning of Code section 408(k)) and the Company or an Affiliate maintains or has maintained one or more Defined Benefit Plans which during the five-year period ending on the Determination Date has or has had any accrued benefits, the Top-Heavy Ratio for any Required or Permissive Aggregation Group, as appropriate, is a fraction, the numerator of which is the sum of the present value of accrued benefits under the aggregated Defined Benefit Plans for all Key Employees plus the sum of account balances under the aggregated Defined Contribution Plans for all Key Employees, in each case as of the respective Determination Date for each plan (including any part of any accrued benefit or account balance distributed in the five-year period ending on the Determination Date), and the denominator of which is the sum of the present value of all accrued benefits under the aggregated Defined Benefit Plans plus the sum of all account balances under the aggregated Defined Contribution Plans for all Participants, in each case as of the respective Determination Date for each plan (including any part of any accrued benefit or account balance distributed in the five-year period ending on the Determination Date), all determined in accordance with Code section 416.

(iii)    For purposes of (i) and (ii) above, the value of account balances and the present value of accrued benefits will be determined as of the most recent Valuation Date that falls within or ends with the twelve-month period ending on the Determination Date, except as provided in Code section 416 for the first and second Plan Years of a Defined Benefit Plan. The account balances and accrued benefits of a Participant: (1) who is not a Key Employee but who was a Key Employee in a prior year, or (2) who has not been credited with at least one Hour of Service with any Employer at any time during the five-year period (one-year period with respect to Plan Years beginning after December 31, 2001) ending on the Determination Date, will be disregarded. The calculation of the Top-Heavy Ratio, and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Code section 416. Deductible employee contributions will not be taken into account for purposes of computing the Top-Heavy Ratio. When aggregating plans the value of account balances and accrued benefits will be calculated with reference to

the Determination Dates for the respective aggregated plans that fall within the same calendar year.

(iv)    Solely for the purpose of determining if the Plan, or any other plan included in a Required Aggregation Group of which this Plan is a part, is Top-Heavy (within the meaning of Code section 416(g)) such determination shall be made under (A) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Employer, or (B) if there is no such method, as if such benefit accrued not more rapidly than the slowest accrual rate permitted under the fractional accrual rate of Code section 411(b)(1)(C).

(v)    Notwithstanding any other provision of the Plan, with respect to Plan Years beginning after December 31, 2001, the present values of accrued benefits and the amounts of account balances of an Employee as of the determination date shall be increased by the distributions made with respect to the Employee under the Plan and any plan aggregated with the Plan under Code section 416(g)(2) during the one-year period ending on the Determination Date. The preceding sentence shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with the Plan under Code section 416(g)(2)(A)(i). In the case of a distribution made for a reason other than separation from service, death or disability, this provision shall be applied by substituting "five-year period" for "one-year period."

(k)    <u>Valuation Date</u> means the date as of which account balances, or accrued benefits, are valued for purposes of calculating the Top-Heavy Ratio.

14.3    <u>Allocation of Contributions for a Top-Heavy Plan</u>:

If the Plan is determined to be a Top-Heavy Plan as of any Determination Date, then it shall be subject to the rules set forth in the balance of this Article XIV, beginning with the first Plan Year commencing after such Determination Date.

(a)    Except as provided in Section 14.3, and except if any other Defined Contribution Plan or Defined Benefit Plan provides such minimum benefit to the Participant, for any Plan Year in which the Plan is a Top-Heavy Plan, contributions allocated to the Accounts of any Participant who is not a Key Employee, whether or not such Participant has elected to participate in the Plan, in respect of that Plan Year shall not be less than the smaller of:

(i)    3% of such Participant's Limitation Compensation, or

       (ii)   the largest percentage of contributions and forfeitures, as a percentage of the Key Employee's Limitation Compensation, allocated in the aggregate to the Accounts of any Key Employee for that year.

(b)    A Participant who has completed three years of service with an Employer shall be 100% in his or her Accounts.

(c)    The provision in (a) above shall not apply to any Participant who was not employed by the Company or an Affiliate on the last day of the Plan Year.

(d)    If the Plan is a Top-Heavy Plan, in determining whether the Plan meets the requirements of Section 3.3, the Participant's defined benefit fraction described in Code section 415(e)(2) and defined contribution fraction described in Code section 415(e)(3) shall be determined by substituting "1.0" for "1.25" unless the Plan is a not Super Top-Heavy Plan, and the Administrative Committee increases the minimum benefit provided in Section 14.3(a) by 1%.

WDC99 534295-2.047750.0011

14.4    <u>Invalidation of Top-Heavy Provisions</u>:

In the event that any provision of this Article XIV is no longer required to qualify the Plan under the Code, then such provision shall thereupon be void without the necessity of further amendment of the Plan.

61

APPENDIX I

<u>Excluded Foreign and International Employees</u>

<u>Excluded "Foreign Employees":</u>

Pursuant to the definition of "Eligible Employee" in Article I, the Administrative Committee has designated as ineligible to participate in the Plan the following groups of Employees:

| Classification (Plan) | Effective Date |
|---|---|
| Members of the Merrill Lynch Europe Limited Retirement Benefits Plan (Temporary Assignee) | January 1, 1993 |
| Members of the Third Country National Pension Plan for Merrill Lynch International Incorporated and Affiliates (Temporary Assignee) | January 1, 1993 |
| Singapore Nationals who are Members of the Singapore Central Provident Fund (All) | July 1, 1993 |
| Australian Nationals who are Members of the Merrill Lynch Australia Superannuation Fund (Temporary Assignee) | January 1, 1994 |

<u>Excluded "International Employees":</u>

Pursuant to the definition of "Eligible Employee" in Article I, the Administrative Committee has designated as ineligible to participate in the Plan the following groups of Employees:

| Classification (Status) | Effective Date |
|---|---|
| Employed in Germany (Permanent Assignee or Local Hire) | January 1, 1993 |
| Employed in Dubai (Permanent Assignee or Local Hire) | January 1, 1993 |
| Members of the Merrill Lynch Europe Limited Retirement Benefits Plan (Local Hire) | July 1, 1993 |

WDC99 534295-2.047750.0011

2

APPENDIX II

Form of Benefit Distributions
(See Article VIII)

A-1  Presumptive Form of Benefit Applicable to Sections 8.2(d):

The benefit payable to Participant who has elected an annuity under 8.2(d) shall be paid in the form of a Qualified Joint and Survivor Annuity (as defined in Section A-4). The preceding sentence shall not apply to a Participant who has declined the Qualified Joint and Survivor Annuity (pursuant to Section A-3), in which case benefits shall be paid as provided in Section A-5.

A-2  Explanation of Qualified Joint and Survivor Annuity:

Within a reasonable period, but in any event no less than thirty days and no more than ninety days prior to a Participant's Benefit Commencement Date, the Administrative Committee shall provide to the Participant who becomes subject to this Appendix II, a written explanation of the terms and conditions of a Qualified Joint and Survivor Annuity. Such written explanation shall consist of:

(a)  the terms and conditions of the Qualified Joint and Survivor Annuity;

(b)  the Participant's right to make, and the effect of, an election to waive the Qualified Joint and Survivor Annuity;

(c)  the rights of the Participant's spouse under Section A-3;

(d)  the Participant's right to make, and the effect of, a revocation of a previous election to waive the Qualified Joint and Survivor Annuity, which revocation shall only be effective if made prior to the Participant's Benefit Commencement Date; and

(e)  the material features and relative values of the various optional forms of distribution under the Plan.

The Administrative Committee may provide for such other notices, information or election periods or take such other action as the Administrative Committee considers necessary or appropriate so that this Section A-2 is implemented in such a manner as to comply with Code sections 401(a)(11) and 417.

A-3  Declining the Qualified Joint and Survivor Annuity; Qualified Elections:

Qualified Elections.  A "qualified election" for purposes of this Section A-3 shall be a waiver of the Qualified Joint and Survivor Annuity and the election of another optional form

of benefit permitted under Section 8.2(c).  If the Participant is married at his or her Benefit Commencement Date, this waiver shall not be effective unless his or her spouse:

(i)  consents in writing;

(ii)  the consent is witnessed by a notary public; and

(iii) the consent acknowledges the effect of the election.

Additionally, a Participant's waiver of the Qualified Joint and Survivor Annuity will not be effective unless the election designates another form of benefit distribution available under Section 8.2(d), which may not be changed without spousal consent.

Notwithstanding this consent requirement, if the Participant establishes to the satisfaction of the Administrative Committee that such written consent may not be obtained because there is no spouse or the spouse cannot be located, or because such other circumstances exist as the Administrative Committee may provide in accordance with regulations promulgated by the Internal Revenue Service, a waiver will be deemed a "qualified election."  Any "qualified election" under this provision shall not be effective with respect to any other spouse.  No consent obtained under this provision shall be valid unless the Participant has received notice as provided in this Section A-3.  A spouse shall have no right to revoke his or her consent to a waiver with respect to any distribution.

A revocation of a prior waiver may be made by a Participant without the consent of the spouse any time before the Participant's Benefit Commencement Date.  After such revocation, the Participant may again make (with his or her spouse's consent, if the Participant is married) another "qualified election" at any time prior to the Participant's Benefit Commencement Date.  The number of revocations shall not be limited.

A-4  Qualified Joint And Survivor Annuity Defined:

A Qualified Joint and Survivor Annuity shall have the following meaning:

In the case of a married Participant, an annuity for the life of the Participant with a survivor annuity for the life of the Participant's spouse which is 50% of the amount of the annuity payable during the joint lives of the Participant and his or her spouse.  If the Participant is unmarried, Qualified Joint and Survivor Annuity shall mean an annuity for the life of the Participant.  In either case, the annuity shall be the amount of benefit which can be purchased with the Participant's Account Balance, or any portion thereof to which this form of benefit is applicable.

A-5  <u>Alternate Forms of Benefits</u>:

Each Participant electing to decline the Qualified Joint and Survivor form of benefit, pursuant to Section A-3, shall be entitled to receive his or her Plan Benefit under the annuity options described in Section 8.2(d), whichever is applicable to the Participant.

A-6  <u>Establishment of Benefit Commencement Date</u>:

The Benefit Commencement Date means the first day of the first period for which an amount is paid to a Participant as an annuity or in any other form of distribution.

## APPENDIX III

### Additional Company Contribution

Pursuant to a compliance letter issued by the Internal Revenue Service on April 16, 2004, in connection with a filing under the Employee Plans Compliance Resolution System, as described in Revenue Ruling 2003-44, 2003-25 I.R.B. 1051, the Company shall make an additional contribution, as provided in Section 3.6 of the Plan. The additional contribution described in this Appendix III shall be allocated in the form of Company Stock (with cash for fractional shares) in an amount determined by the Plan Administrator, but not less than $14,949.42, which contribution will be allocated as described below to the Accounts of certain Employees designated by the Plan Administrator. The remaining terms of the Plan shall apply to the additional Company contribution described in this Appendix III for all other purposes.

The additional Company contribution described above shall be allocated hereunder to each specific Participant designated by the Plan Administrator, in accordance with the following steps, which allocation shall be determined in a manner necessary to satisfy the "general test" requirements of Treas. Reg. Section 1.401(a)(4)-2(c) for the Plan Year ended June 30, 2001:

(a)     An "Allocation Percentage" shall be computed for each Participant, which shall be the value of the allocation otherwise made to such Participant pursuant to Article IV of the Plan for the Plan Year ended June 30, 2001, expressed as a percentage of the Participant's Compensation.

(b)     Two "Rate Groups" shall be established for Participants based on the range of Allocation Percentages for each individual Rate Group for the Plan Year ended June 30, 2001. One Rate Group shall be established with a midpoint Allocation Percentage of .25% and a second Rate Group shall be established with a midpoint Allocation Percentage of .75%. Each Rate Group will include all Participants who have Allocation Percentages that exceed or fall into a specified range of the midpoint Allocation Percentage, in accordance with Treas. Reg. Section 1.401(a)(4)-2(c)(v).

(c)     A "Ratio Percentage" shall be computed for each Rate Group. The Ratio Percentage shall be a fraction, the numerator of which is the ratio of non-Highly Compensated Employees in the Rate Group divided by the total number of non-Highly Compensated Employees, and the denominator of which is the ratio of Highly Compensated Employees in the Rate Group divided by the total number of Highly Compensated Employees. Only persons who have satisfied the eligibility requirements of Section 2.1 of the Plan and who were active Participants on June 30, 2001 shall be considered in this computation.

(d)     Each Rate Group whose Ratio Percentage is less than 34.5% shall be deemed a "Failing Rate Group." For purposes of this Appendix III, the Rate Group with a midpoint Allocation Percentage of .75% for the Plan Year ended June 30, 2001 shall be the Failing Rate Group.

(e)     The allocation made pursuant to Article IV of the Plan for the Plan Year ended June 30, 2001 shall be increased for any Participant described in (f) below who is not in the Failing Rate Group and who requires the lowest additional allocation of a portion of the additional Company contribution, described above, in order to increase such Participant's Allocation Percentage to the point where the Allocation Percentage for such Participant for the Plan Year ended June 30, 2001 falls within the specified range of the midpoint of the Failing Rate Group, such that the Participant shall be added to the Failing Rate Group. If more than one eligible Participant who is not in the Failing Rate Group shall require an identical additional allocation in order to add such Participants to the Failing Rate Group, as described above, then the eligible Participant who is not in the Failing Rate Group who requires the lowest additional allocation in order to be added to the Failing Rate Group and has the lowest Compensation will be selected for this purpose. The allocation of the additional Company contribution described above shall be determined on this basis. This adjustment shall be repeated for the Failing Rate Group as many times as is necessary to increase the Ratio Percentage of the Failing Rate Group to as close as possible to 36.5%, and the final allocation of the additional Company contribution for the Plan Year ended June 30, 2001 shall reflect such cumulative adjustments.

(f)     Notwithstanding anything herein contained to the contrary, only those Participants who were active Participants on both June 30, 2001 and December 23, 2002, or who were terminated Participants who were fully vested in their Plan benefits as of December 23, 2002, shall be eligible for an allocation of the additional Company contribution described above.

(g)     Once the allocation amount as of June 30, 2001 is determined under (e) above, the total amount to be contributed by the Company and allocated to all affected Participants under this Appendix III shall be a number of shares of Company Stock (with cash for fractional shares) equal to the greater of: 1) the number of shares equal in value to the amount determined under (e) above, based on the Company Stock share price determined on the date of contribution, or 2) a number of shares equal to the amount determined under (e) above, based on the share price on June 29, 2001, increased by the amount of dividends that would have been paid on those shares from June 29, 2001 through the date of contribution. Any amount contributed under this Appendix III in excess of the amount initially determined under (e) above will be allocated to Participants on the basis of the amounts to which they are otherwise entitled under (e) above.