# HARVARD

JOHN M. OLIN CENTER FOR LAW, ECONOMICS, AND BUSINESS

LAW AND ECONOMIC ISSUES
IN SUBPRIME LITIGATION

Jennifer E. Bethel
Allen Ferrell
Gang Hu

Discussion Paper

03/2008

Harvard Law School
Cambridge, MA 02138

This paper can be downloaded without charge from:

The Harvard John M. Olin Discussion Paper Series:
http://www.law.harvard.edu/programs/olin_center/

The Social Science Research Network Electronic Paper Collection:
http://papers.ssrn.com/

This paper is also a discussion paper of the
John M. Olin Center's Program on Corporate Governance.

rose from a low of 50.4 percent in 2001 to 81 percent in 2006.[7] Much of the MBS volume transferred from agency to non-agency sponsors, with agency-sponsored MBS representing less than half of the MBS market in 2005 and 2006.[8] Using data from Securities Data Corporation, Figure 3 indicates that agency-sponsored mortgage-backed securitization peaked in 2003, and virtually all was registered and publicly traded. In contrast, private-label (i.e. non-agency) sponsored mortgage-backed securitization peaked in 2005, and private-label equity-line-of-credit securitization peaked in 2006. Although the private-label 144A market was much smaller than the private-label registered market, it too was robust throughout the period, with private-label sponsored 144A mortgage-backed securitization peaking in 2005 and private-label 144A equity-line-of-credit securitization peaking in 2006.

The biggest sponsors of private-label MBS tend to be investment banks. As shown in Table 2, the MBS industry is relatively concentrated with most deals being structured by one of the top 20 sponsors. Each of the top five sponsors structured at least seven percent of market.

Loans that do not conform to MBS requirements are often packaged into CDOs.[9] Like an MBS, a CDO has a sponsoring organization, such as an investment bank, that establishes an SPV that issues securities, typically multiple tranches differentiated by maturity and credit risk, to raise money to invest in financial assets. Most CDO debt is floating rate off LIBOR and can include short-term debt, such as commercial paper (often called asset backed commercial paper or ABCP). ABCP is also issued against a conduit that holds various CDO tranches, often the senior CDO tranche. ABCP's maturity is quite short, running anywhere from one to 270 days,

---

[7] *The Subprime Lending Crisis: The Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, U.S. Congress Joint Economic Committee, October 27, 2007; Data from Inside Mortgage Finance, The 2007 Mortgage Market Statistical Annual, Top Subprime Mortgage Market Players & Key Data, 2006.
[8] Data from Inside Mortgage Finance, Mortgage and Asset Securities Issuance, 2007.
[9] According to the Securities Industry and Financial Markets Association, aggregate global CDO issuance totaled $157 billion in 2004, $272 billion in 2005, and $549 billion in 2006. Available at www.sifma.org/research/pdf/SIFMA_CDOIssuanceData2007q2.pdf.

and is thus generally much shorter than the maturity of the CDO's underlying assets. This difference can create a problem if a CDO or conduit holding CDO tranches has troubled refinancing or rolling the paper. Consequently, CDOs and conduits typically contract with a standby liquidity provider that guarantees liquidity for a fee. Usually either the asset seller or the CDO sponsor retains the most subordinate equity tranche. In addition, CDO sponsors retain many of the most senior tranches for investment purposes. Like the market for RMBS, the market for CDOs has grown dramatically over the past 10 years as has the ABCP market.[10] The growth slowed significantly in 2007, however, as housing prices fell, loan delinquencies rose, foreclosures increased, and the performance of recent-vintage RMBS declined.[11]

The collateral of CDOs can be home loans, RMBS, or even other CDOs (the so-called CDO^2). Many CDOs, although not all, are actively managed, which entails buying and selling CDO assets. For instance, many CDOs merely outline the type of assets that they will purchase and various restrictions on when they will not buy or continue to hold particular assets when raising capital from investors. The party that is entrusted with managing the CDO's assets, subject to these limitations, is the "collateral manager." These limitations are often a function of the conditions under which the CDO must operate to maintain a favorable credit rating from the rating agencies for various CDO tranches. Even if the collateral manager does not have the authority to trade the CDO assets on an on-going basis, many CDOs raise funds prior to the purchase of some of the CDOs assets (the so-called "ramp-up" period). With respect to the CDOs uninvested funds, the collateral manager will have the obligation to invest these funds consistent with the asset strategy of the CDO. In some ways, actively managed CDOs can

---

[10] Douglas J. Lucas, Laurie S. Goodman, and Frank J. Fabozzi, *Collateralized Debt Obligations*, John Wiley & Sons, Hoboken, NJ, 2006.
[11] Brant Maller and Rick Antonoff, "Spillover effect from subprime collapse; News; As legislation and liability get sorted out, modern real estate lending process faces a big test," *New York Law Journal*, January 14, 2008, 239 (9), p. S6, col. 1.

resemble hedge funds (including the fact that the purchasers of CDO interests are not retail investors).

CDOs are often designed to meet specific investor needs. Investors can specify the desired maturity and credit risk characteristics of securities, which results in more highly-tailored, but less liquid securities than might otherwise be available. The information exchange and time necessary to confer with investors in many instances precludes them from being publicly-tradable on registered exchanges or markets. Investors must therefore rely on dealers to execute trades.

C. Collateral appraisers

MBS and CDO sponsors typically hire firms, known as collateral appraisers or "due-diligence firms," to review and verify the quality of loans sold to SPVs. These reviews evaluate the credit and collateral risks of the loans in the pool and verify the information provided by loan originators to MBS sponsors. Reviews include verifying a borrower's identity, place of residence, and employment status. They typically review note, mortgage riders, title, and mortgage insurance details and may include a property appraisal, as well as a review of the loan originators' property and closing procedures. The information gathered by these firms, as the legal discussion will emphasize, will likely play an important role in much of the subprime litigation. Collateral appraisers in 2007 included Clayton Holdings, First American, LandAmerica Financial Group, and Stewart Information Services Corporation.

D. Sources of credit enhancement

The creditworthiness of MBS and CDOs are typically credit enhanced, meaning that their credit risk is reduced below the credit risk of the asset pool. Credit enhancement is designed to

13