LEXSEE 1998 U.S. DIST. LEXIS 4100

IN RE NOKIA CORPORATION SECURITIES LITIGATION

96 Civ. 3752 (DC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1998 U.S. Dist. LEXIS 4100; Fed. Sec. L. Rep. (CCH) P90,195

March 31, 1998, Decided
April 1, 1998, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss granted and the amended complaint dismissed. Leave to replead granted only as to certain of plaintiffs' claims.

**COUNSEL:** Sanford P. Dumain, Esq., Daniel J. Dolcetti, Esq., MILBERG WEISS BERSHAD HYNES & LERACH LLP - and - Jill S. Abrams, Esq., James S. Notis, Esq., ABBEY & ELLIS, New York, New York, for Plaintiffs.

Kenneth M. Kramer, Esq., Jerome S. Fortinsky, Esq., SHEARMAN & STERLING, New York, New York, for Defendants.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINION BY:** DENNY CHIN

**OPINION**

*OPINION*

CHIN, D.J.

Plaintiffs bring these consolidated actions on behalf of themselves and a purported class of similarly situated shareholders who purchased Nokia Corporation ("Nokia") American Depository Receipts ("ADRs") during the class period ("Class Period") from June 16, 1995 to December 13, 1995. Plaintiffs have alleged that defendants, Nokia and certain of its officers, violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), *15 U.S.C. §§ 78j(b), 78t(a) (1988)*, and *Rule 10b-5, 17 C.F.R. § 240.10b-5 (1994)*. Plaintiffs contend that during the Class Period, Nokia made positive statements about its prospects, business, and [*2] profits that were misleading. Specifically, plaintiffs allege that defendants misrepresented or failed to disclose material facts relating to Nokia's mobile phone and television businesses.

Defendants move to dismiss the amended complaint for failure to state a claim upon which relief may be granted, pursuant to *Fed. R. Civ. P. 12(b)(6)*, and for failure to plead fraud with sufficient particularity as required by *Fed. R. Civ. P. 9(b)*. For the reasons set forth below, defendants' motion to dismiss is granted and the amended complaint is dismissed. Leave to replead is granted only as to certain of plaintiffs' claims.

*BACKGROUND*

A. *Nokia's Financial History*

Nokia, a Finnish corporation, manufactures advanced telecommunication systems, computer monitors, and cellular telephones. At the time of the events in question, Nokia also sold color televisions. Defendant Jorma Ollila ("Ollila") is chairman of the Board, President and Chief Executive Officer of Nokia, defendant Olli-Pekka Kallasvuo ("Kallasvuo") is the Chief Financial Officer of Nokia, and defendant K. P. Wilska ("Wilska") is President of Nokia's United States operations.

In 1994, Nokia reported approximately [*3] 30.2 billion markka in net sales for its mobile phone, telecommunications, consumer electronic, and cables and machinery businesses, with 95 percent of the total operating income being generated by its telecommunications and mobile phones businesses.

From 1993 to 1994, Nokia's revenues increased 27 percent, its operating profits increased 145 percent, and its operating margin increased from 6.2 percent to 11.9 percent. (Compl. P 20). [1] Nokia's mobile phone and telecommunications businesses experienced revenue gains of 69 percent and 50 percent, respectively, and increases in operating profit of 83 percent and 72 percent, respectively. The operating profit margins of the telecommunications

Case 1:07-cv-09633-LBS-DFE  Document 84-5  Filed 07/21/2008  Page 2 of 10

Page 2
1998 U.S. Dist. LEXIS 4100, \*; Fed. Sec. L. Rep. (CCH) P90,195

business increased from 21.4 percent to 24.6 percent and the margin of the mobile phone business increased from 15 percent to 16.3 percent.

> 1  References to Compl. are to the amended consolidated complaint filed herein.

Nokia continued to perform well for the first two "tertials" (four month periods) of 1995. In a June 16, [\*4] 1995 press release, Nokia reported a 109 percent increase in profits from $ 201 million to $ 422 million for the first tertial of 1995 (from January-April) over the same fiscal period in 1994. (Compl. P 23). The report also stated that there was an increase in profit margins from 10 percent to 15.7 percent for that same period. On October 19, 1995, Nokia issued a press release reporting that for the eight-month period ending August 31, 1995, Nokia's profits increased 58 percent over the same period in 1994. (Compl. P 33).

By mid-1995, however, things apparently took a turn for the worse. Nokia's mobile phone profit margins fell more than 60 percent from 1994 to 6.3 percent in July-August 1995 and 5.7 percent in September 1995 from 16.4 percent in 1994. (Pl. Opp. at 5). According to plaintiffs, this decline caused Nokia profit margins "to plummet from 17.2 percent in the first half of 1995 to 11.2 percent in July-August 1995 and 10.1 percent in September-December 1995." (Pl. Opp. at 5). This "evaporation" of Nokia's mobile phone profits allegedly occurred when mobile phone sales were increasing and Nokia was reporting that its share of the cellular telephone market was increasing. [\*5] (Compl. PP 45, 55).

Although Nokia routinely reported its financial results six to eight weeks after the end of the reporting period, it chose to issue a press release on December 14, 1995 -- before the end of the tertial. (Compl. PP 23, 33, 52). In that release, Nokia disclosed that it expected its operating profits for the third tertial (September-December) to be lower than in 1994. (Compl. P 46). The release also stated that growth and profitability in Nokia Mobile Phones "have developed somewhat below plan" (*id.*) in part because Nokia was experiencing problems with shortages of key components. It also stated that European color-TV markets in the final months of 1995 "have continued to deteriorate." (Compl. P 47). As a result, it was predicted that Nokia Consumer Electronics would incur a "significant loss" for 1995. (*Id.*). The price of Nokia's ADR's on the New York Stock Exchange fell 24 percent that same day. (Compl. P 48).

### B. *Prior Procedural History*

The same day that the December 14, 1995 press release was issued, three complaints were filed against Nokia and K.P. Wilska -- two in this Court and one in the Northern District of Texas. The next day, four [\*6] more complaints were filed -- two in the Northern District of Texas and two in the Eastern District of Pennsylvania. On December 18, 1995 and December 20, 1995, two more complaints were filed in the Northern District of Texas. The cases in the Texas and Pennsylvania actions were transferred to this Court and all nine actions were consolidated on July 18, 1996.

On August 2, 1996, plaintiffs served the consolidated and amended complaint (the "Complaint") brought on behalf of a putative class of people who purchased Nokia ADR's between June 16, 1995 and December 13, 1995. (Compl. P 10). No class has been certified to date.

### C. *The Amended Complaint*

The Complaint alleges that plaintiffs purchased Nokia ADRs on the open market during the period from June 16, 1995 through December 13, 1995 at artificially inflated prices and sustained damages as a result. The Complaint alleges that Nokia officials made approximately fifteen allegedly misleading statements as follows:

1. On June 2, 1995, Smith Barney published a statement allegedly made by Nokia that it could recover up to three-quarters of the anticipated annual price decline in mobile (cellular) phone prices for 1995 through [\*7] the substitution of components used in the handsets and through ongoing efficiency improvements. (Compl. P 26).

2. On June 16, 1995, Nokia issued a press release reporting its financial results for the first tertial of 1995 and statements by defendant Ollila that Nokia's profit margins grew from 10 percent to 15.7 percent for that period and that "*this positive trend in profit development is projected to continue throughout the rest of 1995* although not necessarily as strongly as during the first tertial due to increasingly competitive market conditions." (Compl. P 23),

3. On June 16, 1995, *Reuters European Business Report* reported that Nokia stated that its results for the period were better than expected and provided ample reason for satisfaction. (Compl. P 23).

4. On June 17, 1995, the *Financial Times* reported that in response to concern of possible lower profit margins, defendant Ollila stated that Nokia had seen "very little of that happening." (Compl. P 24).

5. On July 11, 1995, *Reuters European Business Report* reported that Ollila stated, "As long as we can keep that (tightly focused) mentality, we can look at the next couple of years with a lot of optimism." [\*8] (Compl. P 28). Ollila also stated that Nokia's consumer electronic business (primarily televisions) was providing Nokia with crucial know how about digital compression of video transmission and "'in that sense consumer electronics is a

Case 1:07-cv-09633-LBS-DFE    Document 84-5    Filed 07/21/2008    Page 3 of 10

Page 3
1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

big positive and we are not looking at it as a burden.'" (*Id.*).

6. On October 10, 1995, the *Dow Jones Newswire* reported that Ollila denied seeing any pricing pressure pattern for mobile (cellular) telephones in 1995, compared with 1994. (Compl. P 32).

7. On October 19, 1995, Nokia issued a press release reporting that its financial results for the eight months ending August 31, 1995 indicated the continuation of a trend of moderately increasing profit margins and reported profit increases that were more than twice as great as sales increases. (Compl. P 33). It also stated that the "strong growth in Group operating profit is attributable to the good results of Nokia Telecommunications and Nokia Mobile Phones." (Compl. P 34). A press release in *Business Wire* on the same day stated that "Nokia Mobile Phones continued its strong growth, although the pace slowed somewhat from the first tertial of the year." (*Id.*). The seasonality of the [*9] United States mobile phone market was cited as one reason for the slowing.

8. Also on October 19, 1995, the *Dow Jones Newswire*, reported the following:

> "Nokia's market position in its main businesses has continued to improve" said the Company's President, Jorma Ollila in a release. "Our confidence in the long-term market growth potential has further strengthened."
>
> "New Product areas such as cellular data have opened new, important opportunities for growth beyond existing markets," he said. "We are well prepared to further improve our market position and to effectively utilize the new opportunities for growth."
>
> In the first eight months of the year, the business group Nokia Mobile Phones continued its strong growth, although the pace slowed somewhat from the first four months of the year following stronger seasonality and slower growth of the U.S. cellular phone segment, he said.
>
> The Mobile Phones unit market share has continued to increase and the shift to digital phones is expected to continue in Europe and the Asia-Pacific region toward the end of the year, giving Nokia a good opportunity to further improve its market position, Ollila said.
>
> Mobile [*10] phones sales growth were particularly strong in Europe and Asia, the Company said, adding that about two-thirds of the global market in 1995 is expected to be covered by advanced mobile phone system (AMPS) or global system for mobile communications (GSM).

(Compl. P 35). In addition, Nokia estimated that growth in its main markets would continue throughout the year. (*Id.*).

9. In *Reuters European Business Report*, Ollila stated, "We have seen continued strengthening and we're very happy. We have reason to be pleased because we've strengthening our market position in telecommunications and mobile [phones]." (Compl. P 36).

10. The *Reuters European Business Report* also reported that Ollila distinguished Nokia from Motorola, which had recently reported mobile phone sales below the market's expectations, by stating the higher-margin digital phones would soon account for half of Nokia's U.S. sales, whereas Motorola would continue to be exposed to the "lower margins" of analog phones. (Compl. P 37).

11. On October 20, 1995, *The Guardian* reported that defendant Ollila stated that "Nokia's market position in its main business continued to improve and long term market [*11] potential had strengthened." (Compl. P 38).

12. On November 3, 1995, Wilska stated on CNBC-TV that he was "*confident about profit margins.*" (Compl. P 39).

13. On November 7, 1995, *Bloomberg Business News* reported that defendant Wilska, the president of Nokia's United States operations, stated that the increased price for Nokia shares "has much to do with the fact that cellular phone sales outside the U.S. are booming." (Compl. P 40).

14. On November 27, 1995, *Dow Jones Newswire* reported that "Company officials" stated that "Finland's fast-growing telecommunications group Nokia Oy expects its global market share of the mobile telephone handset market to reach above 20% in 1995." (Compl. P 43). The article also quoted Lauri Kivinen, a vice president of Nokia Mobile Phones, as saying that "our market share reached 20% already last year and we believe that we have gained some market share this year." (*Id.*). The article also reported that "the group forecasts that the total number of global mobile phone subscribers will grow to around 80 million by end of 1995 from 54 million at the end of 1994." (*Id.*) According to Dow Jones, Kivinen indicated that "Nokia is likely [*12] to sell a bit more than 9 million phones in 1995." (*Id.*). The article also stated that "Nokia expects mobile phone handset sales to double

Case 1:07-cv-09633-LBS-DFE    Document 84-5    Filed 07/21/2008    Page 4 of 10

Page 4

1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

to 7.0 million units in 1995 from 3.5 million units last year." (*Id.*).

15. AFX News and *Reuters European Business Report* reported on December 13, 1995 that Ollila stated that the United States mobile phone market had proved stronger than expected and that the mobile phone handset market "has been better since the last [eight-month] report." (Compl. P 44). [2]

> 2 These 15 statements are hereafter referred to by number as Statement One, Statement Two, etc.

According to plaintiffs, all of these statements were false and misleading in violation of the securities laws.

This motion followed.

## DISCUSSION

### A. *Motion to Dismiss*

In analyzing Nokia's motion to dismiss for failure to state a claim, I must view the Complaint in the light most favorable to plaintiffs and accept all allegations contained therein as true. *See Scheuer v. Rhodes, 416 U.S.* [*13] *232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); Annis v. County of Westchester, 36 F.3d 251, 253 (2d Cir. 1994), aff'd in part rev'd in part, 136 F.3d 239, 1998 WL 49317 (2d Cir. 1998)*. Dismissal of the Complaint is inappropriate unless it appears beyond a reasonable doubt that plaintiffs can prove no set of facts that would entitle them to relief. *See Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth., 23 F.3d 636, 639 (2d Cir. 1994)*.

### B. *Section 10(b)*

Section 10(b) prohibits the use of "any manipulative or deceptive" practice in connection with the purchase or sale of a security. 1934 Act § 10(b). To state a cause of action under section 10(b) and *Rule 10b-5*, the plaintiff must allege that in connection with a purchase or sale of a security, the defendant made a false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused the plaintiff injury. *San Leandro Emergency Med. Plan v. Philip Morris, Co., 75 F.3d 801, 808 (2d. Cir. 1996); see also In re Time Warner Inc. Sec. Litig., 9 F.3d* [*14] *259, 264 (2d Cir. 1993)*.

Here, plaintiffs' security fraud allegations are premised on their assertion that defendants knowingly made misstatements about Nokia's business by failing to provide material information to the public. This material information included: (1) Nokia's hiring of 6,000 additional employees in 1995, including 4,267 in the mobile phone business, increasing the company's expenses (Compl. PP 45, 58); (2) Nokia's addition of manufacturing and distribution facilities, increasing the company's fixed costs (*id.*); (3) problems posed by the unavailability of a digital cellular network in U.S. in 1995 (*id.*); (4) inventory shortages that forced Nokia to purchase microprocessors on the "spot market," paying higher prices than would otherwise be required (*id.*); (5) inventory build-up in certain of Nokia's mobile phone models that were rendered obsolete by its own introduction of new models (*id.*); (6) increasing losses in the television business (Compl. PP 30, 45, 58); (7) continued growth in market share in mobile phones and Nokia's increased fixed and variable costs associated with those phones hurt Nokia's profit margins (Compl. PP 45, 58); and (8) declining [*15] prices for mobile phones that were not being covered by declining component prices and manufacturing efficiencies. (Compl. P 40).

Defendants raise a number of defenses, including: (1) the statements at issue either were general statements of optimism or "bespoke caution"; (2) the statements were not false when made; (3) defendants did not omit material information because the information either was available to plaintiffs at the time of the statements or was not material; and (4) plaintiffs failed to adequately plead scienter.

#### 1. *Optimism and Bespeaks Caution Doctrine*

##### a. *General Statements of Optimism*

Plaintiffs allege that a number of statements were materially misleading because they were overly optimistic at a time when Nokia's financial prospects were less positive. In other words, these statements purportedly gave rise to a duty to disclose less favorable information about Nokia's mobile phone and television businesses. As defendants have pointed out, however, a number of these statements are not actionable as they were simply statements of general optimism.

In determining whether a defendant has a duty to disclose, the Second Circuit has held that courts must [*16] consider the "total mix of information." *San Leandro, 75 F.3d at 811*. Courts must also bear in mind that disclosure requirements "are not intended to 'attribute to investors a child-like simplicity.'" *In re Philip Morris Sec. Litig., 872 F. Supp. 97, 101 (S.D.N.Y. 1995), aff'd in part rev'd in part, 75 F.3d 801 (1996)* (citation omitted). Rather, investors are presumed to have the ability to be able to digest varying reports and data. *Id.*

"Forward-looking statements" that "reflect hope, adequately tinged with caution," when considered in the context of the "total mix of information" available to the market, are not misleading. *San Leandro, 75 F.3d at 811*. Specifically, the Second Circuit has ruled that general announcements that a company is "optimistic" about its

Case 1:07-cv-09633-LBS-DFE    Document 84-5    Filed 07/21/2008    Page 5 of 10

Page 5
1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

earnings and that it expects a product to perform well do not require disclosure of possible policies that might contradict those predictions. *Id.* As the court noted,

> Such puffery cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws.

*Id.*

[*17] Under this standard, a number of statements referred to in the Complaint cannot be considered actionable. For example, Statement Two to the effect that "this positive trend in profit development is projected to continue throughout the rest of 1995" is not actionable because it is a general statement of optimism. (Compl. P 23). This is the type of "subdued general comment[]" about earnings that "lack[s] the sort of definite positive projections that might require later correction." *San Leandro, 75 F.3d at 811* (quoting *Time Warner, 9 F.3d at 267*) (finding comments such as the company "should deliver income growth consistent with its historically superior performance" and "we are optimistic about 1993" to be "relatively subdued comments" that were not actionable)); *see also Lasker v. New York State Elec. & Gas Corp., 85 F.3d 55, 58 (2d Cir. 1996)* (statements about future earnings and the desire to achieve continued prosperity were "just the sort of predictive statements of opinion and belief that courts have found immaterial"). Moreover, this statement is accompanied by the more cautionary language "although not necessarily as strongly as during the first tertial due [*18] to increasingly competitive market conditions." (Compl. P 23). Thus, considering the "total mix of information," these "forward looking statements" were "tinged with caution" and thus are not actionable.[3]

> 3 Other statements of general optimism that are not actionable are: (1) "We are well prepared to further improve our market position and to effectively utilize the new opportunities for growth" (Statement Eight, Compl. P 35); (2) "the shift to digital phones is expected to continue in Europe and the Asia-Pacific region toward the end of the year, giving Nokia a good opportunity to further improve its market position" (*id.*); (3) "We have seen continued strengthening and we're very happy. We have reason to be pleased because we've strengthened our market position in telecommunications and mobile [phones]." (Statement Nine, Compl. P 36); (4) "Nokia's market position in its main businesses continued to improve and long term market potential had strengthened" (Compl. Statement Eleven, P 38); and (5) defendant Wilska's statement that he was "confident about profit margins" (Compl. P 39, Statement Twelve).

[*19] In responding to concerns about possible lowering of profit margins, defendant Ollila stated in a June 17, 1995 *Financial Times* article that he had "very little of that happening." (Statement Four, Compl. P 24). Plaintiffs omitted the fact that the statement was preceded by the phrase "so far,"[4] as well as the cautionary comment that "one has to be cautious because . . . there will be increased competition."[5] (Kramer Decl., Ex. F). Looking at the total mix of information, Ollila's statement is part of a forward looking statement, cautioning that profit margins may indeed fall in the future.

> 4 The Second Circuit has held that courts may consider the full contents of documents partially quoted in the complaint where the documents are integral to the complaint. *San Leandro, 75 F.3d at 809*; *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960 (1992)*. Here, the documents are integral to the complaint as I must consider the context in which the statements were made. Plaintiffs also had notice of these documents and did not object to consideration of the full text of the documents.

[*20]
> 5 The June 17, 1995 *Financial Times* article states more fully:
>
> > Mr. Jorma Ollila, chief executive, said he expected profits to continue growing, although possibly not as fast as in the first four months. "One has to be cautious because even if the market growth in our sectors seems to continue to be positive, there will be increased competition."
> >
> > . . .
> >
> > As competition increases, some analysts see Nokia and its competitors being squeezed by lower profit margins. But Mr. Ollila said Nokia had so far seen "very little of that happening."
>
> (Kramer Decl., Ex. F).

The statements plaintiffs cite in the October 19, 1995 articles, including, "Nokia's market position in its main

Case 1:07-cv-09633-LBS-DFE     Document 84-5     Filed 07/21/2008     Page 6 of 10

Page 6

1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

business has continued to improve," and "our confidence in the long-term market growth potential has further strengthened," are also general statements of optimism that are not actionable. (Statement Eight, Compl. P 35; *see also* Statement Seven, Compl. PP 33, 34). Moreover, the total mix of information presented to the public on October 19, 1995 is more cautionary. For example, in the October 19th [*21] press release, Ollila stated that

> the last tertial of the year will bring new challenges for the development of the Group. The competitive situation is expected to grow more difficult in some markets. Especially uncertain is the outlook of the US cellular phone market and of Europe's television market.

(Kramer Decl. Ex. C. at 5). Taking the totality of the statements, these statements would not mislead an investor. This is precisely the kind of hopeful statement, "tinged with caution," that cannot reasonably be found to be misleading. *See San Leandro*, 75 F.3d at 811.

Thus, considering the total mix of information, the information released on October 19, 1995 does not reflect either misleading optimism or fraud. The totality of this information merely indicates that Nokia was experiencing mixed results, with some positive trends and other less positive trends. *See, e.g., In re Philip Morris, 872 F. Supp. at 101* (finding totality of statements indicating a company that was looking at "troublesomely mixed results in an increasingly competitive industry" to reflect neither "misleading optimism nor fraud"). Considering these statements in the contexts in which they [*22] were made, I find as a matter of law that none of these statements would mislead a reasonable investor.

Accordingly, Statements Two, Three, Four, Seven, Eight, Nine, Eleven, and Twelve (corresponding to Compl. PP 23, 24, 33, 34, 35, 36, 38, 39) are not actionable.

### b. *Bespeaks Caution Doctrine*

Nokia also argues that plaintiffs' Complaint fails to state a claim as a matter of law with respect to a number of statements because, even taking plaintiffs' allegations as true, the alleged misstatements are not material under the "bespeaks caution" doctrine. Specifically, Nokia asserts that the warnings contained in the press releases "bespoke caution" as to the precise negative investment results that gave rise to this action.

Under the "bespeaks caution" doctrine, "where the totality of statements is generally cautious, projections therein which are however qualified by assorted variables outside the control of the speakers, may not be looked to for a cause of action." *In re Philip Morris, 872 F. Supp. 97 at 101; Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).* This doctrine, however, only applies to forward looking statements, *Carlisle Ventures, Inc. v. Banco Espanol* [*23] *De Credito, S.A., 1996 U.S. Dist. LEXIS 17447*, No. 94 Civ. 5835, 1996 WL 680265, at *8 (S.D.N.Y. Nov. 25, 1996), and the language cited "must precisely address the substance of the specific statement or omission that is challenged." *Id.* (citing *In re Prudential Sec. Ltd. Partnerships Litigation, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)*). In other words, courts will not find liability where alleged misstatements are simply future projections or predictive statements. *See, e.g., T. Rowe Price Small-Cap Value Fund, Inc. v. Oppenheimer & Co., 1995 U.S. Dist. LEXIS 18486*, No. 95 Civ. 1925, 1995 WL 739525, at *2 (S.D.N.Y. Dec. 14, 1995); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig., 850 F. Supp. 1105, 1141 (S.D.N.Y. 1993)*.

Merely inserting warnings into offering material, however, does not insulate a party from all liability for alleged material misstatements in those materials. *T. Rowe Price, 1995 U.S. Dist. LEXIS 18486*, No. 95 Civ. 1925, 1995 WL 739525, at *3; *see also Rohland v. Syn-Fuel Assocs. - 1982 Ltd. Partnership, 879 F. Supp. 322, 333 (S.D.N.Y. 1995)* (motion to dismiss denied where plaintiff alleged that defendant knew statement was false at the time it was made); *In re First American Center Sec. Litig., 807 F.* [*24] *Supp. 326, 333 (S.D.N.Y. 1992)* (warnings are "insufficient to sustain a motion to dismiss, if plaintiffs allege particular facts demonstrating the defendant knew that such statements were false at the time they were made"); *Griffin v. McNiff, 744 F. Supp. 1237, 1254 (S.D.N.Y. 1990)* (motion to dismiss denied where "allegations go to the misleading nature of the statement when made"), *aff'd, 996 F.2d 303 (2d Cir. 1993)*.

The bespeaks caution doctrine is applicable to two statements in this case. First, the statement that "As long as we can keep that (tightly focused) mentality, we can look at the next couple of years with a lot of optimism" was part of a more cautious statement. (Statement Five, Compl. P 28). The July 11, 1996 article in which that quote was contained also included the following statements:

> Fast-growing Finnish mobile phone major Nokia Oy can stay optimistic as long as it remains focused to ease the sharp "growing pains" of explosive expansion, chief executive officer Jorma Ollila said Tuesday.
>
> . . . .
>
> We have been extremely concerned about the fast pace of growth -- every management book could tell you that when

1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

> you grow 40 to 70 percent as [*25] we have done . . . you get growing pains. And yes, we are having them every day," he said.

(Kramer Decl. Ex. G). Once again, the totality of the statements is generally cautious and thus they are not actionable. *See Furman v. Sherwood, 833 F. Supp. 408, 415 (S.D.N.Y. 1993)* ("Predictive statements may not serve as the basis for a securities fraud claim when defendants season their forecast with words that bespeak caution.").

Several of the quotes from the October 19, 1995 press release also omitted cautionary language included in that release:

> the last tertial of the year will bring new challenges for the development of the [Nokia] Group. The competitive situation is expected to grow more difficult in some markets. Especially uncertain is the outlook of the U.S. cellular phone market and of Europe's television market.
>
> . . .
>
> Nokia Mobile Phones continued its strong growth, although the pace slowed somewhat from the first tertial of the year. The primary reason for this are the stronger seasonality and the slower growth for the US cellular phone segment.

(Kramer Decl. Ex. C. at 5). Thus, other predictive statements contained in that release, such [*26] as "we are well prepared to further improve our market position and to effectively utilize the new opportunities for growth," are counterbalanced by this language that bespeaks caution. (Statement Eight, Compl. P 35).

Hence, Statements Five and Eight (corresponding to Compl. PP 28, 35) are not actionable.

### 2. *Falsity*

The Complaint also lacks sufficient allegations as to the falsity of a number of statements made by Nokia. Plaintiffs simply fail to allege how these statements are false. For example, plaintiffs allege no circumstances to support their assertion that the statement that the consumer electronics business was providing Nokia with "crucial knowhow" about digital compression and "in that sense" Nokia was considering consumer electronics to be "a big positive" and not "a burden" was false at the time made. [6] (Statement Five, Compl. P 28).

---

6 Other statements that were not false when made include: (1) Ollila's statement that he did not see any pricing pressure pattern for mobile phones in 1995 compared to 1994 (Statement Six, Compl. P 32); (2) that the "'results for the period were better than expected'" (Statement Three, Compl. P 23); (3) "New Product areas such as cellular data have opened new, important opportunities for growth beyond existing markets" (Statement Eight, Compl. P 35); (4) "The Mobile Phones unit market share has continued to increase and the shift to digital phones is expected to continue in Europe and the Asia-Pacific region toward the end of the year" (*Id.*); (5) "Mobile phones sales growth were particularly strong in Europe and Asia" and that "about two-thirds of the global market in 1995 is expected to be covered by advanced mobile phone system (AMPS) or global system for mobile communication" (*Id.*); (6) "cellular phone sales outside the U.S. are booming" (Statement Thirteen, Compl. P 40); (7) that the mobile phone handset market "has been better since the last [eight-month] report" (Statement Fifteen, Compl. P 44); and (8) that business in Asia was "doing very well." (*Id.*).

[*27] Nor do plaintiffs allege circumstances to support the idea that Ollila's statement that "higher margin digital phones would soon account for half of Nokia's U.S. sales," as opposed to sales of analog phones, was false when made. [7] (Statement Ten, Compl. P 37).

---

7 The complaint faults Nokia for failing to disclose that Nokia's analog mobile telephones had significantly lower profit margins than its digital mobile phones. (Compl. P 45(c)). According to paragraph 37 of the complaint, however, Nokia made statements to the effect that analog phones had lower profit margins than digital phones.

Finally, nothing in the November 27, 1995 *Dow Jones Newswire* is alleged to be false, and, as previously discussed, a number of statements in that report are general statements of optimism. (Statement Fourteen, Compl. P 43).

Although I find that plaintiffs have failed to sufficiently allege falsity, I cannot hold that these claims are not actionable on that basis alone at this stage. Some of these allegations, however, [*28] are not actionable based on the general optimism and bespeaks caution doctrines, namely Statements Two, Three, and Eight (corresponding to Compl. PP 23, 35). The remaining allegations, Statements Six, Ten, Thirteen, Fourteen, and Fifteen (corresponding to Compl. PP 32, 37, 40, 43, 44) are dismissed without prejudice to replead.

Case 1:07-cv-09633-LBS-DFE    Document 84-5    Filed 07/21/2008    Page 8 of 10

Page 8
1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

### 3. *Non-Omissions*

Although plaintiffs fault defendants for failing to disclose information that they allege rendered the defendants' statements false, plaintiffs concede in their briefs that a number of these facts were actually disclosed.

First, plaintiffs allege that defendants failed to disclose that Nokia was planning "substantial expenditures for plants and employees." (Compl. P 27). In response to defendants' motion, however, plaintiffs concede that "upon further reflection," defendants disclosed that Nokia was constructing additional manufacturing and distribution facilities and that these facilities related to the mobile phone business. (Pl. Opp. at 41).

Second, plaintiffs allege that defendants failed to disclose that Nokia's profit margins in mobile phones were being "heavily squeezed" by increased fixed and variable costs, and by declining [*29] prices for mobile phones that, "contrary to the Company's representations, were not being covered by declining component prices and manufacturing efficiencies." (Compl. P 41). To the extent these profit margins were being "squeezed" by costs such as the construction of manufacturing and distribution facilities, plaintiffs again concede these facts were disclosed.

Third, plaintiffs allege that Nokia failed to disclose that its television business was experiencing "increasing losses," and that Nokia had "concentrated its television business on the lower priced, lower profits margin models, which were the most susceptible to price erosion." (Compl. P 30). Plaintiffs concede, however, that "there were statements made by defendants indicating some weakness being experienced in the television business." (Pl. Opp. at 42). Moreover, the fact that defendants chose to concentrate on "lower price, lower margin" television models was disclosed in Nokia's 1994 annual report with the SEC. (Kramer Decl. Ex. O at 13).

Fourth, although plaintiffs initially alleged that defendants failed to disclose that Nokia planned to hire 6,000 employees, including 4,267 in the mobile phone business, plaintiffs [*30] now concede that information about the hiring of 6,000 employees was revealed. (Pl. Opp. at 40).

Accordingly, plaintiffs cannot rely upon any of these alleged non-omissions to make out a claim in this case. To the extent plaintiffs have relied on these non-omissions in any of the allegations of the Complaint, those allegations are dismissed.

### 4. *Rule 9(b)*

While plaintiffs' claims as to a number of statements in the Complaint are simply not actionable under the general optimism and bespeaks caution doctrines, [8] *all* of plaintiffs' claims must also be dismissed for failing to meet the requirements of *Rule 9(b)*, either because the statements: (1) lack specificity as to the circumstances under which they were made; or (2) fail to properly plead scienter.

> 8  This applies to Statements Two, Three, Four, Five, Seven, Eight, Nine, Eleven, and Twelve (corresponding to Compl. PP 23, 24, 28, 33, 34, 35, 36, 38, 39). The allegations based on these statements are dismissed with prejudice.

#### a. *Specificity* [*31] *As to Circumstances*

Securities fraud allegations under § 10(b) and *Rule 10b-5* are subject to the pleading requirements of *Fed. R. Civ. P. 9(b)* that "the circumstances constituting fraud . . . be stated with particularity." *Rule 9(b)* is designed "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)* (citations omitted). Thus, the Complaint must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995)* (citing *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993))*.

Given this standard, the statements of "Nokia" to Smith Barney (Statement One, Compl. P 26), are not actionable because they fail to meet the *Rule 9(b)* requirement that the plaintiff identify the speaker of allegedly false statements. *In re Time Warner,* [*32] *9 F.3d at 265.* Here, the statement is not attributed to any specific Nokia official. Nor did the statement involve an official press release, *see In re AnnTaylor Stores Sec. Litig., 807 F. Supp. 990, 1004 (S.D.N.Y. 1992)*, or the defendants placing its "imprimatur" on an analyst's report. *See Alfus v. Pyramid Tech. Corp., 764 F. Supp. 598, 603 (N.D. Cal. 1991).* The statement merely alleges that this statement was reported by a Smith Barney analyst. Unlike in *San Leandro*, this statement was not in the context of an article containing numerous quotes from named company officials. *75 F.3d at 810.* Therefore, a reasonable factfinder could not infer that the statement was attributable to a named official. Thus, the Complaint must be dismissed as to this statement for failure to meet the particularity requirements of *Rule 9(b)*.

#### b. *Scienter*

The remaining allegations of the Complaint must also be dismissed because they fail to properly and adequately plead scienter.

Case 1:07-cv-09633-LBS-DFE   Document 84-5   Filed 07/21/2008   Page 9 of 10

Page 9
1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

While *Rule 9(b)* provides that "malice, intent, knowledge, and other condition of mind may be averred generally," the Second Circuit has held that to serve the purposes of *Rule 9(b)*, plaintiffs must "allege [*33] facts that give rise to a strong inference of fraudulent intent." *Acito, 47 F.3d at 52*; *Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)*. This "strong inference" of fraud may be established either by (1) identifying circumstances indicating conscious or reckless behavior by the defendants, or (2) alleging facts showing a motive for committing fraud and a clear opportunity for doing so. *San Leandro, 75 F.3d at 813* (citing *Shields, 25 F.3d at 1128*).  9

> 9 Plaintiffs have not alleged motive and opportunity in this case. (*See* Pl. Opp. at 46). Plaintiffs allege that the allegations in the Complaint give rise to a strong inference of recklessness. (*Id.*).

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill v. General Electric Co., 101 F.3d 263, 269 [*34] (2d Cir. 1996)* (citation omitted). The facts that are alleged to support recklessness, therefore, must be "*strong* circumstantial evidence of that recklessness." *Id., 101 F.3d at 269* (citation omitted and emphasis added). The Second Circuit has held that there is no requirement "that whenever a corporation speaks, it must disclose every piece of information in its possession that could affect the price of its stock." *In re Time Warner, 9 F.3d at 268*.

Here, plaintiffs argue that defendants were reckless because they withheld information that contradicted their public statements. (Pl. Opp. at 46-50). Plaintiffs claim that defendants made statements about Nokia's business and its prospects for greater growth in 1995 that "were wholly at odds with information the Company had learned." (*Id. at 48-49*). Plaintiffs claim that defendants' "conscious disregard" of material facts can be inferred from the allegation that at the "very time defendants were making positive statements about Nokia's [phone] business, those profits were evaporating." (*Id. at 49*). In addition, plaintiffs allege that the factors leading up to defendants' December 14, 1995 announcement "raise a strong [*35] inference that these were not problems that surprised defendants at the last minute." (*Id.*).

These allegations are insufficient to create a "strong inference" of fraud. Nor do they adequately plead conduct so "highly unreasonable" and departing so extremely from the standards of ordinary care that a reasonable factfinder could find recklessness.

First, plaintiffs allege that defendants failed to disclose that the cost of construction dramatically increased in 1995, over 1994. As defendants point out, however, this information would not become apparent until sometime after 1995 was over, and hence after the Class Period had ended. Thus, on the facts alleged in the Complain, Nokia had no duty to reveal the percentage of increasing construction costs until sometime after the end of the Class Period.

Second, plaintiffs also allege that defendants failed to disclose "key facts" such as the fact that Nokia's officers and directors "appointed new management for the television business" and had "considered either selling or shutting down its television operations." (Compl. PP 45(f), 58(g)). Nokia has no duty, however, to "disclose all marginally-related material information" any time [*36] it chooses to issue a comment. *In re Canandaigua Sec. Litig. v. Sands, 944 F. Supp. 1202, 1209 (S.D.N.Y. 1996)*. Recklessness cannot be inferred from any purported failure to reveal this information in light of the fact that plaintiffs acknowledge that defendants had indicated the company was experiencing trouble with its television business. Moreover, plaintiffs fail to allege that any of the information regarding its television business should have been revealed prior to the December 14, 1995 press release. Hence, they are effectively seeking to plead fraud by hindsight. *Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)* (plaintiffs may not plead "fraud by hindsight").

Third, plaintiffs do not properly allege that the defendants' failed to disclose that "continued growth in market share in mobile phones" would be at "the expense of profit margins." (Compl. P 41). Not only do plaintiffs fail to allege any facts to support this allegation, they utterly fail to allege facts supporting the allegation that defendants were "highly unreasonable" in not disclosing this information earlier. Indeed, plaintiffs have failed to allege circumstances showing that defendants knew of lower [*37] profit margins at the time of these statements in mid-June. To the extent plaintiffs rely on information published after the end of the Class Period, such as the August 8, 1996 press release citing financial information about 1995 (Pl. Opp. at 7 n.6), plaintiffs' reliance is misplaced, as that press release is not cited in the Complaint.

Fourth, plaintiffs allege that defendants failed to reveal a number of facts about their mobile phone inventories, including that there were component shortages, inventory buildups in obsolete phone models, and that there were "declining prices for mobile phones" that "were not being covered by declining component prices and manufacturing efficiencies." (Compl. P 41). Once again, plaintiffs are pleading fraud by hindsight. Plaintiffs fail to allege when defendants knew this information (other than the general assertion that it was during the Class Period) and thus should have revealed it, hence failing to satisfy

Case 1:07-cv-09633-LBS-DFE   Document 84-5   Filed 07/21/2008   Page 10 of 10

Page 10

1998 U.S. Dist. LEXIS 4100, *; Fed. Sec. L. Rep. (CCH) P90,195

the particularity requirement of *Rule 9(b)*. *San Leandro, 75 F.3d at 812* (unsupported general claims of the existence of information that should have been revealed is insufficient to survive a motion to dismiss). "'References to unreleased [*38] or internal information that allegedly contradict[s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them.'" *Id.* (citing *Arazie v. Mullane, 2 F.3d 1456, 1467 (7th Cir. 1993))*. There is no explanation or allegation as to why this should have been revealed earlier.

Indeed, as with all of the information revealed in the December 14, 1995 press release, plaintiffs fail to explain why any of this information should have been previously disclosed. If anything, the fact that Nokia voluntarily chose to issue a press release earlier than its standard year-end reporting in February undercuts the allegation that defendants were acting recklessly.

Fifth, plaintiffs do not allege how Nokia was "reckless" in failing to disclose the marginally-related information that 4,267 of the 6,000 employees it was hiring would be in the mobile phone business. The more important fact, that 6,000 employees were to become an additional expense for Nokia, was indisputably disclosed.

Finally, to the extent the allegedly misleading statements were general [*39] statements of optimism, statements that bespeak caution, or statements that were not false when made, plaintiffs were not reckless in making them without disclosing additional information. These statements hardly constitute "highly unreasonable" statements, nor present a "danger" Nokia would or should have been aware of, and thus disclosed.

Plaintiffs have failed as a matter of law to plead scienter with requisite specificity. Accordingly, the Complaint is dismissed for failure to comply with the requirements of *Rule 9(b)*.

### C. Leave to Amend

Plaintiffs request leave to amend the Complaint to include facts "admitted" by defendants in an August 8, 1996 press release about financial information for 1995. (Pl. Opp. at 7 n.6; Dumain Decl. Ex. B). Plaintiffs allege that deducting the data about Nokia's financial performance in the first half of 1995 (reported in the August 8th press release) from the January-August period (previously published) reveals Nokia's financial results for July-August 1995 -- indicating the sharp decline in Nokia's profit margins in that period. According to plaintiffs, Nokia's 1996 disclosures "leave no doubt that this dramatic deterioration of [*40] Nokia's profit margins was caused by the Mobile Phone business, whose 16.4% operating profit margin in 1994 evaporated by the first quarter of 1996, when Nokia's Mobile Phone business was unprofitable." (Pl. Opp. at 9). Defendants argue that plaintiffs incorrectly compare these two numbers. The August 1996 release only reflects Nokia's 1995 profits from continuing operations, while the earlier release reflect both Nokia's profits from continuing operations and the losses from areas that have since been discontinued.

Leave to amend should be freely granted, especially where dismissal of the complaint was based on *Rule 9(b)*. *Fed. R. Civ. P. 15(a)*; *Luce, 802 F.2d at 56*. Although plaintiffs have already been granted an opportunity to replead once before, plaintiffs are granted leave to amend the Complaint within 30 days hereof to address the claims found to be deficient under *Rule 9(b)*. Plaintiffs are cautioned, however, that they may not rehash the conclusory allegations of their first Complaint. *See Hershfang v. Citicorp, 767 F. Supp. 1251, 1259 (S.D.N.Y. 1991)*. Rather, the intention is to allow plaintiffs, if it is possible, to meet the deficiencies of their Complaint as noted [*41] above.

Plaintiffs may not replead based on the information in the August 8th press release, unless that information reasonably supports plaintiffs' allegations that statements made by defendants during the Class Period were false and misleading. In addition, plaintiffs may not replead any of the allegations that are based on statements I hold are not actionable as a matter of law. Plaintiffs are only entitled to replead allegations set forth in Statements One, Six, Ten, Thirteen, Fourteen, and Fifteen (corresponding to Compl. PP 26, 32, 37, 40, 43, 44).

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted and the Complaint is dismissed. Plaintiffs are hereby granted leave, to the extent set forth above, to file a consolidated and second amended complaint within 30 days hereof.

SO ORDERED.

Dated: New York, New York

March 31, 1998

DENNY CHIN

United States District Judge