# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (LBS)(AJP)(DFE) |
| This Document Relates To: Securities Action, 07cv9633 (LBS) (AJP) (DFE) | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | JURY TRIAL DEMANDED |

RECEIVED 08 MAY 21 PM 7:57 U.S. DISTRICT COURT S.D.N.Y.

# TABLE OF CONTENTS

**PAGE**

I.  NATURE AND GENERAL OVERVIEW OF THE CLAIMS.................... 1

II.  JURISDICTION AND VENUE ................................................. 1

III.  CLAIMS AGAINST DEFENDANTS MERRILL, O'NEAL,
      FAKAHANY, FLEMING AND EDWARDS UNDER
      SECTION 10(b) AND RULE 10b-5 AND UNDER SECTION 20(a)
      OF THE EXCHANGE ACT.......................................................... 2

  A. Overview of the Exchange Act Claims............................................. 2

    1.  *The Exchange Act Defendants Fundamentally Altered
        Merrill's Risk Exposure by Secretly Accumulating Over
        $40 Billion of U.S. Subprime ABS CDOs Exposures* ................................ 9

    2.  *Prior to and During the Class Period the Exchange Act
        Defendants Knowingly or Recklessly Disregarded the
        Rapidly Deteriorating Market for U.S. Subprime ABS
        CDOs and Failed to Timely and Adequately Fully
        Disclose the True Extent of Merrill's Exposure* ....................... 16

  B. The Exchange Act Parties.......................................................... 26

  C. The Exchange Act Defendants' Role in the Subprime and
     CDO Industry.......................................................................... 29

    1.  *MBSs, CDOs and U.S. Subprime ABS CDOs* .......................................... 31

      a.  Residential Mortgages ..................................................... 31

      b.  Individual Mortgages are "Pooled" and Securitized.......................... 32

      c.  CDOs Acquire Assets Such as RMBs, Derivatives
          or Other CDOs .............................................................. 33

    2.  *The Exchange Act Defendants Knowingly or Recklessly
        Disregarded the Exposure that Merrill Faced*........................................ 37

      a.  The Exchange Act Defendants Abandoned Merrill's
          Risk Management Practices and Controls and its
          Risk Measurement Profiles and Exposures......................................... 37

      b.  Defendants Recklessly Expanded Merrill's CDO
          Exposure and Hid It From Merrill Shareholders ................................ 40

i

c.   High Level Employees Warn Merrill Executives Including Defendants That They Are Over Exposed to CDO and Other Subprime Debt ....................................... 44

d.   Merrill Was Aware of a Material Decline in the Housing Market and a Material Increase in Defaults by Subprime Borrowers ..................................................... 47

e.   Subprime Loan Originators Filed For Bankruptcy ........................... 49

     i.    ResMAE ................................................................................. 50

     ii.   Ownit Mortgage Solutions, Inc. ("Ownit") ................................. 52

     iii.  Mortgage Lenders Network USA, Inc. ("MLN") ........................ 54

     iv.   Other Subprime Originators ........................................................ 55

f.   Two Key MBS and CDO Indices Suffer Significant Declines Requiring Merrill to Writedown CDO and Subprime-Related Debt ........................................................ 55

g.   Bear Stearns Hedge Funds Collapse and Merrill Is Unable to Sell Its Assets .................................................... 61

h.   Merrill's Misleading and Manipulated Value at Risk Disclosures ....................................................................... 64

i.   Unauthorized Sale of CDOs to Broker Customers ........................... 66

j.   Simultaneously Committing the Same Control Rights on CDOs to More Than One Counterparty ..................... 72

3.   Stock Offerings and Compensation ......................................................... 75

4.   Defendants' CDO Scheme Crashes ......................................................... 78

IV.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT CONDUCT DURING THE CLASS PERIOD ....... 79

A.   Financial Results for the Fiscal Quarter Ended September 29, 2006 .......................................................................... 79

B.   Registration Statement Amendment No. 1 (December 7, 2006 Offering) ................................................................ 87

C.   Financial Results for the Fiscal Year Ended December 29, 2006 ........................................................................... 88

D. Series 5 Preferred Stock Prospectus
(March 15, 2007 Offering)........................................................... 106

E. Registration Statement Amendment No. 2
(April 25, 2007 Offering)............................................................ 107

F. Financial Results for the Fiscal Quarter
Ended March 30, 2007................................................................ 107

G. First Republic Acquisition ......................................................... 124

H. Financial Results for the Fiscal Quarter Ended
June 29, 2007 ............................................................................. 124

I. Registration Statement Amendment No. 3
(August 15, 2007 Offering)......................................................... 141

J. September 14, 2007 Form 8-K.................................................... 141

K. Financial Results for the Fiscal Quarter
Ended September 28, 2007 .......................................................... 143

V. THE CLASS PERIOD ENDS ..................................................... 157

VI. THE EXCHANGE ACT DEFENDANTS'
VIOLATIONS OF GAAP ........................................................... 162

VII. LOSS CAUSATION/ECONOMIC LOSS ................................... 184

VIII. FRAUD-ON-THE-MARKET DOCTRINE ................................. 190

IX. NO SAFE HARBOR ................................................................... 191

COUNT I (For Violation of Section 10(b) of the Exchange
Act and Rule 10b-5(b) Against Defendants Merrill,
O'Neal, Fakahany, Fleming and Edwards)................................. 191

COUNT II (For Violation of Section 10(b) of the Exchange
Act and SEC Rules 10b-5(a) and (c) Against
Defendants Merrill, MLPFS and O'Neal, Fakahany,
Fleming and Edwards) ............................................................... 195

COUNT III (For Violation of Section 20(a) of the 1934 Act
Against Defendants O'Neal, Fakahany,
Fleming and Edwards)................................................................ 197

X. CLAIMS AGAINST DEFENDANTS UNDER
SECTIONS 11, 12, AND 15 OF THE SECURITIES
ACT AND SECTION 14(a) OF THE EXCHANGE ACT...................... 199

A. Overview of Securities Act and Proxy Claims .............................................. 199

    *1. December 7, 2006 Offering* ................................................................. 203

    *2. March 15, 2007 Offering* .................................................................... 203

    *3. April 25, 2007 Offering* ..................................................................... 204

    *4. August 15, 2007 Offering* .................................................................. 205

    *5. First Republic Acquisition* ................................................................. 205

B. Securities Act and Proxy Claim Plaintiffs ................................................... 207

C. Securities Act and Proxy Claim Defendants................................................. 207

D. Registration Statement Amendment No. 1
(December 7, 2006 Offering)........................................................................ 210

    *1. October 17, 2006 Form 8-K*.............................................................. 211

    *2. False Financial Results for the Fiscal Quarter
    Ended September 29, 2006* ................................................................. 211

E. Series 5 Preferred Stock Prospectus
(March 15, 2007 Offering)........................................................................... 216

    *1. Merrill's January 18, 2007 8-K*.......................................................... 217

    *2. False Financial Results for the Year Ended
    December 29, 2006* ............................................................................ 218

F. Registration Statement Amendment No. 2
(April 25, 2007 Offering)............................................................................. 226

    *1. Merrill'ss April 19, 2007 Form 8-K* .................................................... 226

G. Registration Statement Amendment No. 3
(August 15, 2007 Offering)......................................................................... 227

    *1. False Financial Results for the Quarter
    Ended March 30, 2007*....................................................................... 228

    *2. Merrill's July 17, 2007 Form 8-K*....................................................... 233

    *3. False Financial Results for the Quarter
    Ended June 29, 2007* ......................................................................... 235

H. First Republic Registration Statement ......................................................... 241

I.  GAAP Violations ........................................................................................ 242

COUNT IV  (Against Defendants Merrill, ML Trust I, O'Neal,
Edwards, MLPFS, Citigroup, Morgan Stanley, UBS
and Wachovia for Violations of Section 11 of the
Securities Act in Connection with the December 7,
2006 Offering) ...................................................................... 245

COUNT V  (Against Defendants ML Trust I, Merrill, MLPFS,
Citigroup, Morgan Stanley, UBS and Wachovia for
Violations of Section 12(a)(2) of the Securities Act
in Connection with the December 7, 2006 Offering) ............... 247

COUNT VI  (Against Defendants Merrill, O'Neal, Edwards, MLPFS
and Deloitte for Violations of Section 11 of the Securities
Act in Connection with the March 15, 2007 Offering)............. 248

COUNT VII (Against Defendants Merrill and MLPFS for Violations
of Section 12(a)(2) of the Securities Act in Connection
with the March 15, 2007 Offering)............................................ 250

COUNT VIII (Against Defendants Merrill, ML Trust II,
O'Neal, Edwards, MLPFS, Citigroup, Morgan
Stanley, UBS, Wachovia and Deloitte for
Violations of Section 11 of the Securities Act
in Connection with the April 25, 2007 Offering) ...................... 251

COUNT IX  (Against Defendants ML Trust II, Merrill, MLPFS,
Citigroup, Morgan Stanley, UBS and Wachovia for
Violations of Section 12(a)(2) of the Securities Act
in Connection with the April 25, 2007 Offering) ...................... 253

COUNT X  (Against Defendants Merrill, ML Trust III, O'Neal,
Edwards, MLPFS, Citigroup, Morgan Stanley, UBS,
Wachovia and Deloitte for Violations of Section 11
of the Securities Act in Connection with the August
15, 2007 Offering) .................................................................... 254

COUNT XI  (Against Defendants ML Trust III, Merrill, MLPFS,
Citigroup, Morgan Stanley, UBS and Wachovia for
Violations of Section 12(a)(2) of the Securities Act
in Connection with the August 15, 2007 Offering) ................... 256

COUNT XII  (Against Defendants Merrill, O'Neal, Edwards and
Deloitte for Violations of Section 11 of the Securities
Act in Connection with the First Republic Registration
Statement) ................................................................................ 257

COUNT XIII (Against Defendant Merrill for Violations of
   Section 12(a)(2) of the Securities Act in Connection
   with the First Republic Registration Statement)......................................... 259

COUNT XIV (Against Defendants O'Neal, Edwards and Merrill
   for Violations of Section 15 of the Securities Act)................................... 260

COUNT XV (Against Defendants Merrill, O'Neal, Edwards and
   Deloitte for Violations of Section 14(a) of the Exchange
   Act and Rule 14a-9 in Connection with the First Republic
   Registration Statement)............................................................................ 262

IX.   FRAUD-ON-THE-MARKET DOCTRINE ............................................. 264

XI.   CLASS ACTION ALLEGATIONS ........................................................ 264

PRAYER FOR RELIEF ................................................................................................. 266

Lead Plaintiff State Teachers' Retirement System of Ohio ("Ohio STRS" or "Lead Plaintiff"), by its undersigned counsel, and Plaintiff Gary Kosseff, by his undersigned counsel, individually and on behalf of all other persons who purchased or acquired Merrill Lynch & Co., Inc. ("Merrill" or the "Company") common stock and certain preferred stock during the class period set forth hereafter or securities issued pursuant to the registration statements set forth hereafter, make the following allegations, which are based upon the investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review of the public announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, press releases, analyst and media reports regarding Merrill, pleadings and other documents filed in other litigations involving Merrill, and certain other public filings.

## I.    NATURE AND GENERAL OVERVIEW OF THE CLAIMS

1.    This is a securities class action brought under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o; Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) 78n(a) and 78t(a); and SEC Rules 10b-5 and 14a-9, 17 C.F.R. § 240.10b-5, 17 C.F.R. § 240.14a-9(a).

## II.    JURISDICTION AND VENUE

2.    This court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331, 1337, and 1367.

3.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C.

1

§§ 1391(b) and (c). Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Merrill maintains its principal office in New York, New York.

4.      In connection with the acts and omissions alleged in this Consolidated Amended Class Action Complaint, all of the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    CLAIMS AGAINST DEFENDANTS MERRILL, O'NEAL, FAKAHANY, FLEMING AND EDWARDS UNDER SECTION 10(b) AND RULE 10b-5 AND UNDER SECTION 20(a) OF THE EXCHANGE ACT

**A.    Overview of the Exchange Act Claims**

5.      During the class period, the Exchange Act Defendants (as hereafter defined) built up a huge exposure to U.S. subprime residential mortgage-related and asset backed securities ("ABS"), collateralized debt obligations ("CDOs"), and related exposures and activities (hereinafter referred to "U.S. subprime ABS CDOs" or "U.S. subprime ABS CDO exposures") which reached $40 billion by the end of June 2007.[1]  However, they did not disclose Merrill's huge exposure to these securities, until October 5, 2007, when Merrill first began to disclose its tens of billions of dollars of exposure and began to initiate write-downs. Moreover, even the October 5 disclosure was materially false and misleading.  By January 17, 2008, Merrill had written down over $24 billion in U.S. subprime ABS CDO exposures.

6.      When questions began to arise in April 2007 regarding Merrill's exposure to U.S. subprime ABS CDOs, the Exchange Act Defendants sought to minimize, hide and obscure Merrill's exposure by falsely representing that Merrill's risk controls and hedging

---

[1] Annexed hereto as Appendix A is an appendix containing definitions of many of the terms used herein.  The terms "ABS" and "CDO" are defined in Appendix A.

techniques were effectively mitigating and minimizing any impact that subprime issues would have on Merrill. Moreover, the Exchange Act Defendants falsely led investors to believe that the impact of subprime issues would be minimal on Merrill by repeatedly representing that Merrill's revenues from its subprime-related activities were less than 1% of Merrill's net revenues, without disclosing that Merrill had tens of billions of dollars of U.S. subprime ABS CDO exposures, which greatly exceeded its reported earnings. By February 2007, Merrill's U.S. subprime ABS CDO exposures had become substantially impaired and should have been materially written down by Merrill.

7.     By the beginning of the Class Period, the Exchange Act Defendants were well aware of materially declining trends in the U.S. housing market, rising default rates among subprime borrowers and that Merrill had required Ownit, an originator of subprime mortgages (in which Merrill had made a substantial investment, which gave a Merrill executive a seat on Ownit's board), to materially lower its underwriting standards for loans that Merrill was to purchase from Ownit, which provided Merrill more subprime product for its securitization and CDO activities. Of course, materially lowering underwriting standards virtually guaranteed materially greater defaults which, as set forth herein, did occur.

8.     Moreover, top Merrill executives were warned in the summer of 2006 by Jeffrey Kronthal, also a top Merrill executive, that Merrill's U.S. subprime ABS CDO exposures were ballooning, very risky, and should be curtailed. Shortly after these warnings, Kronthal and members of his team were fired by O'Neal and Merrill's CDO business was further ramped up by, among other things, in late 2006, acquiring First Franklin, a subprime mortgage originator.

9. However, the reduction of mortgage underwriting standards which resulted in a substantial increase to Merrill of subprime mortgages did not satisfy Merrill's increasing need for subprime mortgage product to securitize and create mortgage backed securities ("MBSs"), which Merrill needed to feed its CDO machine. Therefore, Merrill leveraged these subprime mortgages by creating derivative securities such as credit default and total return swaps, which were based upon and mimicked the underlying subprime MBSs. This multiplied Merrill's revenues and profits in the short term, but also magnified its risks exponentially since these tens of billions of dollars of supposed assets were built on a shaky foundation of subprime mortgages.

10. Because Merrill was reporting so much revenue from the issuance of U.S. subprime ABS CDOs and because top Merrill management also profited handsomely from the issuance of these CDO products, the Exchange Act Defendants refused to shut down Merrill's CDO machine. Further, at the very time the market for subprime-related debt was deteriorating, defendants Stanley O'Neal ("O'Neal"), Gregory J. Fleming ("Fleming"), and Ahmass L. Fakahany ("Fakahany") sold millions of dollars worth of Merrill stock and profited handsomely.

11. Additionally, in July and August 2007 defendants Fleming and Fakahany warned Merrill's Board of Directors about Merrill's exploding U.S. subprime ABS CDO exposures by sending a detailed letter to the Merrill board describing the extensive nature of Merrill's U.S. subprime ABS CDO exposures.

12. Defendant O'Neal resigned in October 2007 in the wake of Merrill's disclosures beginning that month regarding Merrill's exposure to U.S. subprime ABS CDOs, but exited with a pay package of more than $160 million. Merrill is now the subject of an

investigation by the SEC, and other regulators and governmental authorities are investigating Merrill's subprime-related issues.

13.    The Exchange Act claims are brought on behalf of a class of purchasers or acquirers of Merrill common stock and the following preferred securities purchased during the period October 17, 2006 through January 16, 2008 (the "Class Period"):

   (a) Merrill Lynch Preferred Capital Trust III – 7% Cumulative Trust Originated Preferred Securities ("TOPRS");

   (b) Merrill Lynch Preferred Capital Trust IV – 7.12% Cumulative TOPRS;

   (c) Merrill Lynch Preferred Capital Trust V – 7.28% Cumulative TOPRS;

   (d) Merrill Lynch Series 1 Preferred;

   (e) Merrill Lynch Series 2 Preferred;

   (f) Merrill Lynch Series 3 Preferred;

   (g) Merrill Lynch Series 4 Preferred;

   (h) Merrill Lynch Series 5 Preferred;

   (i) Merrill Lynch Series 6 Preferred;

   (j) Merrill Lynch Series 7 Preferred;

   (k) Merrill Lynch Capital Trust I Preferred 6.45% Securities;

   (l) Merrill Lynch Capital Trust II Preferred 6.45% Securities; and

   (m) Merrill Lynch Capital Trust III Preferred 7.375% Securities.

14.    The Exchange Act defendants are Merrill, O'Neal, Fakahany, Fleming, and Edwards (collectively, the "Exchange Act Defendants").

15.    The Class Period begins on October 17, 2006, the day that Merrill announced its third quarter results. On that day, Merrill's common stock closed at $84.54 per share. On

October 5, 2007, Merrill announced a partial write-down of $4.5 billion related to U.S. subprime ABS CDOs exposures. On October 24, 2007, Merrill announced that the write-down increased to $7.9 billion, more than the $3.0 billion higher than the Company had said on October 5, 2007. On the news of the October 24, 2007 announcement, Merrill's stock declined from $67.12 per share on October 23, 2007 to $63.22 on October 24, 2007 on volume of more than 52 million shares. The Class Period ends on January 16, 2008, the day before Merrill announced that it would write down another $16.7 billion related to U.S. subprime ABS CDOs. On this news, Merrill's stock price declined from $55.09 per share on January 16, 2008 to $49.45 per share on January 17, 2008 on volume of more than 73 million shares.

16.     Lead Plaintiff alleges that the Exchange Act Defendants engaged in manipulative practices and made materially false and misleading statements in Merrill's press releases, conference calls, at Merrill's annual shareholder meeting on April 27, 2007 and in SEC filings, including without limitation, its Registration Statements and reports on Forms 10-K and 10-Q. As explained in more detail herein, the Exchange Act Defendants made false and misleading statements and omissions by, among other things:

       a.  Failing to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period and over $40 billion of U.S. subprime ABS CDOs by June 29, 2007 (see ¶¶17-33; 74-91);

       b.  Failing to disclose that in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk

management policies and guidelines, including those established by
Kronthal and other executives who refused to increase Merrill's exposure
to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-66; 92-115);

c.  Violating generally accepted accounting principles ("GAAP") by falsely
representing Merrill's trading assets and liabilities as reported in its 10-Qs
for the periods ending March 30, June 29 and September 28, 2007 based
on the failure to properly mark to market the true value of its U.S.
subprime ABS CDO exposures (see ¶¶142-161; 337-382);

d.  Violating GAAP by falsely representing Merrill's net earnings and
earnings per share as reported in its earnings releases and 10-Qs for the
periods ending March 30, June 29 and September 28, 2007 based on the
failure to properly mark to market the true value of its U.S. subprime ABS
CDO exposures (see ¶¶142-161; 337-382);

e.  Representing that it mitigated market and credit risk on trading assets and
liabilities by being adequately hedged and that these hedging techniques
were supplemented by adequate corporate risk management policies and
procedures, when in fact the Exchange Act Defendants had knowingly or
recklessly ignored Merrill's risk policies and guidelines and did not
adequately hedge these exposures (see ¶¶92-115);

f.  Failing to disclose that many of Merrill's hedges on U.S. subprime ABS
CDO exposures were with poorly capitalized or highly leveraged
counterparties, including companies such as XL Capital Assurance Inc.

("XL") and ACA Capital Holdings Inc. ("ACA"), and thus materially

increasing Merrill's counterparty risk (see ¶¶100-107; 179-184);

g.  Understating Merrill's reported VaR by not adequately considering that

Merrill's risky U.S. subprime ABS CDOs were backed by subprime-

related assets many of which were rated BBB or below and thus falsely

convincing analysts and the market that Merrill was a less risky company

than its peers (see ¶¶162-167);

h.   Failing to disclose that the Merrill had significantly lowered the

underwriting guidelines for subprime loans that were originated and

purchased from other subprime originators, such as ResMAE, Mortgage

Lenders Network USA, Inc. ("MLN") and Ownit (see ¶¶116-141).  With

respect to Ownit, Michael Blum, a Managing Director and Head of Global

Structure Finance & Investment Group at Merrill and Merrill's

representative on Ownit's board of directors, in January, 2006, instructed

Bill Dallas, the founder of Ownit, to materially lower its underwriting

standards which provided Merrill access to a greater number of subprime

mortgages (see ¶¶129-137);

i.  Failing to disclose that as a result of the lowered underwriting guidelines,

Merrill, by the beginning of the Class Period, had experienced at least

$400 million of early payment defaults on loans purchased from subprime

originators and thus began exercising "put" options forcing the subprime

originator to take back the defaulting loans (see ¶¶116-141);

8

j.  Failing to disclose that by at least April 13, 2007 Merrill informed National City Bank that as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006 the value of First Franklin mortgages held for sale were materially overvalued at the time of the First Franklin closing on December 30, 2006 (see ¶¶121-123);

k.  Falsely representing that because of Merrill's hedging techniques and risk management policies, it would not be materially affected by issues related to the subprime market (see ¶¶41-52; 92-107; 179-184);

l.  Obscuring and concealing Merrill's U.S. subprime ABS CDO exposure by falsely representing that Merrill's subprime-related revenue from this exposure was less than 1% of net revenues company-wide (see ¶¶41-45; 168-178); and

m.  Violating GAAP by failing to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶92-99, 142-153; 335-380).

**1.    *The Exchange Act Defendants Fundamentally Altered Merrill's Risk Exposure by Secretly Accumulating Over $40 Billion of U.S. Subprime ABS CDO Exposures***

17.    Defendant O'Neal was named to the Company's top executive position near the end of 2002 and set out to expand Merrill's role as a creator, underwriter and trader of U.S. subprime ABS CDOs in order to increase Merrill's reported revenues and profits and thereby increase his own compensation. He moved Merrill away from its traditional role as stockbroker to the average main street investor and refocused its business. According to an article in *USA Today* on October 31, 2007, "[u]nder O'Neal's watch, people skills didn't

matter anymore. Within months of his ascension to the top job, he fired an array of senior executives, some of whom had been his rivals and some of whom had been his biggest supporters. The message: Making it at the new Merrill would be all about performance and whether you followed O'Neal in lockstep. . . . [A]fter watching other Wall Street banks turbocharge their earnings with investments in CDOs based on subprime mortgages, O'Neal invested heavily in the area."

18.    In 2002, Merrill underwrote approximately $2.2 billion in CDOs and was not a major player in the CDO market, ranking 15th among CDO underwriters. Subsequently, Merrill ramped up its underwriting of CDOs and by 2004 was the biggest underwriter of CDOs, underwriting $19 billion. In 2005, Merrill's total underwriting increased to approximately $35 billion, of which $14 billion were backed by securities tied to subprime mortgages. By 2006, Merrill underwrote $53.7 billion of CDOs, of which more than two-thirds were backed by subprime mortgages. The reason for Merrill's increased interest in CDOs was clear: fees on such deals are typically 1.25% to 1.5% of the face value of the debt issued. For 2005 and 2006, Merrill's fees were approximately $400 million and $700 million, respectively, in underwriting fees alone. Merrill further profited from securitizing mortgages and trading and investing in U.S. subprime ABS CDOs.

19.    By all public accounts, until October 2007, it appeared that O'Neal's strategy for Merrill was succeeding. For 2006, Merrill reported total net revenues of $34 billion resulting in reported net earnings of $7.5 billion. Merrill reported total net revenues of $9.9 billion resulting in net earnings of $2.2 billion for the quarter ending March 30, 2007 and net revenues of $9.7 billion resulting in reported net earnings of $2.1 billion for the quarter ending June 29, 2007.

20.     However, what these results did not disclose to investors was that the reported record profits were achieved at the expense of adding tens of billions of dollars of risky U.S. subprime ABS CDO exposures to Merrill's balance sheet, and additional exposure in off-balance sheet arrangements. The record profits for 2006 and the first two quarters of 2007 would later be more than wiped out by the over $30 billion of write-downs that Merrill would take in the third and fourth quarters of 2007 and the first quarter of 2008. These write-downs were a direct result of Merrill's exposures to, and activities in, risky U.S. subprime ABS CDOs, as detailed more fully below.

21.     It was not Merrill's role as an underwriter alone that resulted in its write-down of approximately $30 billion of U.S. subprime ABS CDOs. In 2006, Merrill, through a shift in its CDO and subprime-related activities directed in part by O'Neal, became not only an underwriter of CDOs, but also began to be a major purchaser and holder of U.S. subprime ABS CDOs. In fact, it was Merrill's move away from its limited role as an underwriter that resulted in it becoming exposed to over $40 billion worth of risky U.S. subprime ABS CDOs by June 29, 2007. Merrill hid this exposure from its shareholders until it belatedly started to write down these instruments in the third quarter of 2007.

22.     The Exchange Act Defendants' strategy was based on a simple proposition: the more CDOs Merrill sold and the larger those CDOs were, the greater the Company's profits. But as the number and size of deals increased, the risk retained by Merrill also increased exponentially. As the business grew, the risk related to U.S. subprime ABS CDO exposures on (and off) Merrill's balance sheet was growing at an undisclosed, but increasing rate. Beginning in mid-2006 it began to accumulate $5 billion to $6 billion of exposure per quarter on its balance sheet in very risky U.S. subprime ABS CDOs. Unbeknownst to

Merrill shareholders, the Exchange Act Defendants were excessively and unreasonably leveraging Merrill's balance sheet in an effort to generate reportedly increased revenues and thereby increase the compensation of a few Merrill executives. Such compensation was tied to revenues generated without regard to risk retained (or hidden).

23.     For example, the executives of Merrill's Fixed Income Currencies and Commodities ("FICC"), responsible for underwriting CDOs, were compensated based upon revenues generated. Therefore, this group was motivated to increase the number and size of deals to achieve higher compensation. In a typical deal, the underwriter was paid a 1.25% underwriting fee on the total size of the deal. Prior to the Class Period, for transactions with heavy concentrations of subprime debt, the "usual" size topped out around $500 million, which would generate about $6.25 million in fees for Merrill.

24.     As the chart below clearly demonstrates, there was a direct link between CDO volume, annual profit and O'Neal's and other senior executives' pay.



The *Wall Street Journal*, April 16, 2008 at A14.

25.     Moreover, during the Class Period, defendants O'Neal, Fakahany and Fleming received significant compensation packages and sold Merrill stock at inflated prices. For example:

(a) Defendant O'Neal (Merrill's Chief Executive Officer ("CEO")) sold in excess of $18 million in Merrill stock during the Class Period and received a benefits package of over $160 million of cash and stock at the time of his resignation;

(b) Defendant Fakahany (Merrill's Co-President and Chief Operating Officer ("COO") during the Class Period) sold more than $13 million in Merrill stock and also received significant other compensation; and

(c) Defendant Fleming (Merrill's President and COO during the Class Period) sold more than $4 million in Merrill stock during the Class Period and received other significant compensation.

26.    Traditionally, CDOs were backed by cash assets in the form of MBS created from subprime mortgages.  However, the increased appetite for CDOs related to subprime mortgages created a shortage of subprime mortgages for use in CDOs.  At first, Merrill tried to fill this shortage by relaxing the underwriting guidelines of mortgages used in MBS. However, in 2006, even the relaxed standards for mortgages were not enough to feed Merrill's U.S. subprime ABS CDO machine.  So, it began to create a variety of derivative contracts to include as assets in CDOs to supplement the short supply of subprime residential mortgages.

27.    During the Class Period, the Exchange Act Defendants caused Merrill to be exposed to great risk by heavily leveraging their investments in risky subprime mortgages. Merrill did so by materially lowering the underwriting guidelines for subprime mortgages in order to create more loans that served as the basis for MBSs and CDOs underwritten by Merrill.  At the same time, Merrill invested little equity into its CDOs and instead used leverage to significantly increase the value of its CDOs.

28.     Such heavily leveraged CDOs were called "Synthetic CDOs" because approximately 10% of their assets were actual MBSs and the remaining 90% was comprised of highly speculative derivative contracts. During the Class Period, by using derivative contracts instead of actual MBSs, the size of Merrill CDOs increased from approximately $500 million to approximately $1.5 billion. This allowed Merrill to reap greater underwriting fees.

29.     In a typical Synthetic CDO with a face value of $1.5 billion, the CDO would purchase approximately $150 million of MBSs or cash assets that generated income streams. Merrill would then enter into derivative contracts with the CDO for the remaining face value of the CDO, or $1.35 billion. In effect, Merrill was making a side bet of $1.35 billion that the underlying $150 million of MBSs would perform as required by the CDO. This greatly multiplied the risk associated with subprime MBSs.

30.     In effect, the Exchange Act Defendants created a house of cards founded upon risky subprime mortgages. This "house-of-cards" later collapsed when the value of the underlying subprime assets declined. As a result of Merrill's extensive use of leverage, its losses were greatly magnified. These losses caused Merrill to write down the value of its U.S. subprime ABS CDOs by approximately $30 billion.

31.     Moreover, Merrill began to purchase, or commit to purchase, large portions of the debt being issued by the CDO. In most of the CDOs it underwrote in 2006 and 2007, Merrill retained the super senior portions of the debt. The super senior debt was rated AAA resulting in a very low rate of return for the investors who held such debt. As a result, Merrill was often unable to sell those portions of the debt to investors. The super senior debt retained by Merrill was often as much as 50-75% of the debt issued by the CDO. In a CDO

of $1.5 billion, Merrill would purchase, or commit to purchase, up to $1 billion of super senior debt. Even though the super senior debt was rated AAA, it was often backed by assets that were on average only rated BBB.

32.    Because of Merrill's ability to leverage the subprime MBS through CDOs, the CDOs took relatively small amounts of Merrill's capital and, therefore, the CDO line of business was a highly profitable one. With the potential for high profits, however, came the potential for high losses, as the increased leverage meant that if the underlying subprime collateral defaulted, the consequences would be magnified. By June 29, 2007, Merrill accumulated over $40 billion worth of U.S. subprime ABS CDO exposures. The Exchange Act Defendants hid this fact from investors and did not begin to disclose Merrill's exposure to such risky and artificially inflated and leveraged investments until beginning in October 2007, when it wrote down over $7.9 billion of U.S. subprime ABS CDOs and, for the first time, informed shareholders not only of the amount of exposure but also that super senior debt while rated AAA was backed by assets having much lower ratings and greater risk. The October 2007 write-down and the subsequent write-down in January 2008 of $16.7 billion were a direct result of Merrill taking positions in highly leveraged and risky debt and derivative contracts in U.S. subprime ABS CDO exposures.

33.    Investors in Merrill stock did not know of Merrill's huge CDO exposure or its concentration in the subprime mortgage market. Merrill's financials were so opaque that it was impossible for even a sophisticated reader to decipher the extent of Merrill's exposure to CDOs or subprime debt. Indeed, despite the fact that Merrill was exposed to billions of dollars of CDOs by the end of 2006, the word "CDO" does not appear in Merrill's annual report on Form 10-K for the period ending December 29, 2006.

    **2.**    *Prior to and During the Class Period the Exchange Act Defendants Knowingly or Recklessly Disregarded the Rapidly Deteriorating Market for U.S. Subprime ABS CDOs and Failed to Timely and Adequately Fully Disclose the True Extent of Merrill's Exposure*

34.    While the billions of dollars Merrill accumulated in U.S. subprime ABS CDOs were hidden from investors, the Exchange Act Defendants were well aware of Merrill's increasing exposure to such risky instruments.  By the beginning of the Class Period, they knew of or received warnings that the market for CDOs was materially deteriorating.  The Exchange Act Defendants chose to knowingly or recklessly ignore these warning signs and instead further ramped up Merrill's exposure to U.S. subprime ABS CDOs.  These warnings continued and intensified throughout the Class Period.  However, despite Merrill's accumulating over $40 billion of exposure to U.S. subprime ABS CDOs, the Exchange Act Defendants never informed shareholders of Merrill's U.S. subprime ABS CDO exposure until Merrill belatedly took its first write-down in October 2007.

35.    In late 2005, American International Group, Inc. ("AIG") advised Merrill that AIG would no longer underwrite insurance to protect Merrill's growing CDO exposure. Merrill had been relying on insurance purchased from AIG to transfer significant portions of the residual risks created through Merrill's underwriting of CDOs.  Without the backing of a company like AIG, Merrill was forced to turn to other less significant insurers to attempt to protect itself, or in some cases bear the risk of default itself.

36.    In the summer of 2006, Kronthal (head of Merrill's Global Credit Real Estate and Structured Products, Global Markets and Investment Banking), who ran Merrill's fixed income business, including its CDO business, warned top Merrill executives that Merrill was taking too much risk on to its balance sheet and was too exposed to U.S. subprime ABS CDOs.  At or around this time, Merrill's U.S. subprime ABS CDOs were approximately $1

billion.  Nonetheless, top management disregarded this advice and O'Neal fired Kronthal and the members of his group because O'Neal wanted to report allegedly improved results for Merrill, which would enable O'Neal to receive higher compensation through bonuses or otherwise.  According to William D. Dallas ("Dallas") the founder and former chief executive of Ownit, Kronthal was fired because he "couldn't pull the trigger" and defendant O'Neal "wanted to get bigger in this space."  Despite this warning by Kronthal, the Exchange Act Defendants, driven by their revenue addiction, ramped up, rather than pulled back, Merrill's U.S. subprime ABS CDO exposure.  For example, even after the Kronthal warning, Merrill acquired First Franklin, a subprime mortgage originator, precisely to have more subprime product that could be used in creating and underwriting more CDOs.

37.    Additionally, prior to the beginning of the Class Period, the U.S. housing market was materially deteriorating and default rates on home mortgages had begun to materially increase.  For example, Merrill began to exercise "put" rights - *i.e.* rights to return to the originator - certain mortgages that Merrill had purchased from subprime mortgage originators, such as ResMAE, MLN and Ownit, because such mortgages were rapidly defaulting soon after they had been purchased.  Throughout 2006, Merrill exercised more than $400 million in "put rights."

38.    Kronthal had imposed limits on the amount of CDO exposure the firm could keep on its books to approximately $3 - $4 billion.  However, after Kronthal was fired, the Exchange Act Defendants dramatically increased the amount of U.S. subprime ABS CDO exposure on Merrill's books - increasing the exposure to approximately $40 billion in June 2007. In fact, throughout the Class Period, the Exchange Act Defendants continued to

knowingly or recklessly ignore Merrill's risk policies in an attempt to increase short term profits.

39.    Beginning as early as January 2007, in order to help mask the true risk in these CDO investments, Merrill also entered into billions of dollars of credit default swaps ("CDSs") with monoline insurers.  CDSs are essentially insurance contracts.  Although consummated via separate contracts, the economic bottom line of these transactions was that those insurers were supposedly insuring Merrill, or the Merrill-sponsored CDO issuing-entity, against any risk of loss, to either or both principal and interest on CDOs.  Sometimes these insurance policies also purported to insure Merrill or Merrill's CDO issuing-entity on the total return the particular CDO tranche was supposed to yield.  The monoline insurers included entities like ACA, a single A rated insurance company (which insured AAA-rated debt) with severely limited capital, as well as XL, an over leveraged insurer.  These entities were themselves exposed to tens of billions in subprime debt.  However, even as Merrill attempted to obtain insurance from the monolines in an attempt to hedge or reduce its risk, Merrill further exposed itself to the risk of subprime debt by selling billions of dollars in credit protection to hedge funds.

40.    In February 2007, the ABX and the TABX indices (discussed in more detail below in ¶¶142-153), which track prices of certain CDOs and CDO tranches, both start to show signs of material weakening due to rising defaults in subprime mortgages and their impact on MBSs and CDOs.  By the end of the first quarter of 2007, the ABX and TABX had declined significantly by up to 40% at the BBB level, and by at least 15% at the super senior AAA level.  However, the Exchange Act Defendants did not begin to write down Merrill's actual exposure to U.S. subprime ABS CDOs until October 2007.

41.     In April 2007, market analysts began asking questions about the effect the above warning signs would have on Merrill and how much exposure Merrill had to U.S. subprime ABS CDOs.  In response, the Exchange Act Defendants made materially false and misleading statements intended to mislead investors about the impact any such exposure would have on Merrill.  For example, in the April 19, 2007 press release announcing first quarter results, Merrill represented: "Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters."

42.     Defendant Edwards, in a conference call with analysts that same day, added:

> As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that *revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters.*  And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%.

(Emphasis added).

43.     These comments were designed to minimize any concerns relating to Merrill's exposure to U.S. subprime ABS CDOs.  In that same conference call, the following exchange took place between William Tanona, an analyst for Goldman Sachs, and defendant Edwards:

> WILLIAM TANONA, ANALYST, GOLDMAN SACHS: Good morning, Jeff. Obviously, *the environment became a little bit more tricky this first quarter and there were concerns with subprime which you guys seem to have squashed any concerns regarding your exposure there.* But I'm wondering if you guys have kind of changed your appetite in this environment or kind of rethinking what you put on your balance sheet or what type of risks you might take or if it has changed how you're approaching the business right now. . . .

Defendant EDWARDS: *risk management, as I said, in the prepared remarks, is a crucial aspect of our business and I think we've done very good job in negotiating these markets as a result of that.* So how are we approaching that? We're certainly looking at new ways to do business where there are opportunities for us to either share risk or presell some of the risk and still do good business. *So I think we're approaching it in a prudent way,* given the environment . . . .

(Emphasis added).

44.     Analyst reports issued following the April 19, 2007 conference call reinforced the idea that Merrill had little risk and exposure related to U.S. subprime ABS CDOs.  For example, in an April 19, 2007 report concerning Merrill, CIBC stated "[t]he quarter was highlighted by record-setting growth in each of its capital markets businesses and strong contribution from its wealth management business…CFO Edwards believes that the subprime mortgage downturn is contained and MER's exposure is small as subprime-related revenue was <1% of firm revs. in the past 5 quarters." According to the April 19, 2007 Wachovia report: "[o]verall sub-prime related revenues for the last five quarters contributed less than 1% to MER's total revenues."  Similarly, in its report dated April 20, 2007, Buckingham Research Group stated "within MBS trading (a source of investor concern) management noted that subprime mortgages represented only 1% of total revenues (and 2% proforma for the recent acquisition of First Franklin)."

45.     The statements made by Edwards were materially false.  First, by the end of the first fiscal quarter of 2007 (March 30, 2007), Merrill was required by GAAP to write down at least 15% of its U.S. subprime ABS CDOs.  By this time, there was a steep decline of at least 40% in the underlying value of mezzanine-related debt securities, which consisted of tranches of CDOs rated below AAA but above the CDOs equity (unrated) tranche and by

at least 15% at the super senior level. However, Merrill did not timely or properly write down these assets.

46.    As early as April 2007, unable to sell certain debt issued by the CDOs it underwrote, Merrill foisted hundreds of millions of dollars of its less attractive CDOs into the accounts of its large customers without client consent, and contrary to the clients' own requirements that Merrill invest only in liquid, low-risk securities. This scheme purported to support the Company's claim that it was reducing its concentration in CDOs, but inevitably led to massive customer losses, regulatory investigations, litigation and repayments by Merrill.

47.    In or around April 2007, it began to be disclosed that two hedge funds run by Bear Stearns containing significant subprime holdings including CDOs (some of which were underwritten by Merrill), had become significantly impaired. Merrill loaned approximately $850 million to the Bear Stearns hedge funds. In June 2007, Merrill quickly moved to seize the assets that were collateral for its loans. However, as set forth more fully below, Merrill was unable to sell all of these subprime assets or sold only a small portion of them at a steep discount, further indicating that these assets, and other similar assets on Merrill's balance sheet, had severely deteriorated in value.

48.    Still, in its press releases and in statements during conference calls, Merrill and defendants O'Neal and Edwards continued to falsely and repeatedly assure that all was well and that Merrill's financial condition was strong. Nothing could have been further from the truth.

49.    On July 17, 2007, in connection with its second quarter 2007 earnings conference call, defendant Edwards stated the following:

21

While we have seen some positive signals, such as improving first-payment default levels for First Franklin, the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize. ***Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results.***

\*     \*     \*

[T]his is another example where ***I think proactive, aggressive risk management has put us in an exceptionally good position.*** Obviously the market has gone through a period of flux. We think that remains the case.

***But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We have seen significant reductions in our exposure to lower-rated segments of the market.*** Our warehouse lines are down materially, our whole-loan inventory is down materially.

\*     \*     \*

[Edwards] Well, just to remind everybody, we made the comment[s] in the first quarter that over the previous 5 quarters, all of that activity as broadly as we could define it, represented less than 2% [of net revenues] . . . .

(Emphasis and alteration added).

50.     The above statements concerning Merrill's risk management and hedging were again intended to falsely represent to the market that Merrill's exposure to U.S. subprime ABS CDOs was limited. As with the first quarter 2007 statements, these statements convinced analysts that Merrill had limited exposure, even though Merrill would later disclose in October 2007 that it had over $40 billion of U.S. subprime ABS CDO exposure as of June 29, 2007. A Wachovia report concerning Merrill, dated July 17, 2007, stated "[t]his is the second quarter in a row that fears of sub-prime losses have been unfounded." A Fox-Pitt, Kelton report dated the same day stated "[a]s for CDO/MBS/leveraged loan risk, mgmt was sanguine about Merrill's exposure and implied successful hedging outcomes, although specifics were limited."

22

51. By the end of June 2007, the ABX and the TABX had continued to decline and the Senior TABX Tranche had dropped in price to the mid 60s losing close to 40% of its value.

52. Nevertheless, in its June 29, 2007 financials, Merrill took no write-downs on Merrill's subprime debt and continued to assure investors that Merrill's financial position was strong and its exposure to subprime was "contained." However, the truth was that the value of U.S. subprime ABS CDOs owned by Merrill continued to decline steeply throughout this period. By June 29, 2007, Merrill's CDOs and MBS were impaired by at least 40%. Thus, by June 29, 2007, Merrill was required by GAAP to write down at least $16 billion of its U.S. subprime ABS CDO exposure. Once again, Merrill did not timely or properly effectuate the required write-down.

53. Beginning in October 2007, Merrill belatedly began to disclose the truth and to take write-downs in connection with its U.S. subprime ABS CDOs. In fact, the write-downs Merrill ultimately has taken thus far (through the date of this complaint) were over $30 billion which are among the largest taken in the history of U.S. corporate finance.

54. In early October 2007, Merrill acknowledged it would have to take a $4.5 billion charge in the third quarter of 2007 relating to the value of its U.S. subprime ABS CDOs.

55. Then, on October 24, 2007, before the market opened, Merrill issued a press release, announcing that the third quarter charge related to U.S. subprime ABS CDOs would be $7.9 billion instead of $4.5 billion. Merrill's write-down for the quarter ended September 28, 2007 is set forth in the following chart:

**Net Write-downs For the Three Months Ended September 28, 2007 of U.S. ABS CDO and Other Subprime-Related Instruments (in billions)**

AAA-rated super senior exposures:

| | |
|---|---|
| High-grade | ($1.9) |
| Mezzanine | (3.1) |
| CDO-squared | (0.8) |
| Total ABS CDO superior senior exposures | (5.8) |
| Other retained and warehouse exposures | (1.1) |
| **Total ABS CDO-related exposures** | **($6.9)** |
| Total U.S. subprime mortgage-related exposures | (1.0) |
| **Total Net Write-downs** | **($7.9)** |

56.     On this news, Merrill's common stock declined from $67.12 per share on October 23, 2007, to $63.22 per share on October 24, 2007, a decline of $3.90 per share or 5.8% on unusually heavy trading volume of over 52 million shares.

57.     On January 17, 2008, before the market opened, Merrill disclosed it would write down another $16.7 billion related to its U.S. subprime ABS CDO exposure.  Merrill's write down for the quarter ended December 28, 2007 was:

**Net Write-downs For the Three Months Ended Dec. 28, 2007 of U.S. ABS CDOs and Other Subprime-Related Instruments (in billions)**

AAA-rated superior senior exposures:

| | |
|---|---|
| High-grade | ($5.5) |
| Mezzanine | (2.9) |
| CDO-squared | (0.28) |
| Total ABS CDO super senior exposures | (8.7) |
| Other retained and warehouse exposures | (1.1) |
| **Total ABS CDO-related exposures** | **($9.8)** |
| Total U.S. subprime mortgage-related exposures | (1.6) |
| Financial Guarantors | (3.1) |
| U.S. Banks Investment Securities | (2.2) |
| **Total Net Write-downs** | **($16.7)** |

58.    On this news, Merrill's common stock declined from $55.09 per share on January 16, 2008, to $49.45 per share on January 17, 2008, a drop of $5.64 per share or more than 10% on unusually heavy trading volume of more than 73 million shares.

59.    However, this was not the end.  On April 17, 2008, Merrill disclosed it would write down another $4.5 billion related to U.S. subprime ABS CDOs.

60.    As Merrill has acknowledged in its SEC filings, government regulators, including the SEC, have been investigating the Company's subprime-related activities.  In its third quarter 2007 10-Q for the period ended September 28, 2007, Merrill reported that on October 24, 2007 the SEC staff had "initiated an inquiry into matters related to Merrill Lynch's subprime mortgage portfolio."  Also, in its Annual Report for the year ended December 28, 2007 filed with the SEC on Form 10-K on February 25, 2008 ("2007 10-K"),  Merrill disclosed the following: "*Regulatory Investigations:*  Merrill Lynch is cooperating with the SEC and other regulators investigating sub-prime-related activities."

61.    On December 6, 2007, the *Washington Post* reported that the FBI had launched a "mortgage fraud task force" and that New York Attorney General Andrew Cuomo had served subpoenas to half a dozen investment banks, including Merrill.  The subpoenas sought "information on how billions of dollars in complex securities backed by mortgages were packaged and sold to yield-hungry investors all over the world."

62.    On December 18, 2007, the *Wall Street Journal* reported that Merrill "will bring back former bond executive Jeffery Kronthal as a consultant on its portfolio of subprime mortgage assets."  Further, the article noted that "Kronthal will advise on the firm's fixed income business and risk management."

63.     On February 2, 2008, the *Wall Street Journal* reported that Massachusetts state authorities had accused Merrill of fraud and misrepresentation related to the Company's sale of debt securities that collapsed during the credit crisis.

64.     On March 22, 2008, the *New York Times* reported that the Justice Department was gathering evidence to determine whether to create a task force to investigate wrongdoing in the mortgage lending industry.

65.     On May 5, 2008, the *Associated Press* reported that prosecutors in the Eastern District of New York were heading a task force to determine, among other things, if Wall Street firms participated in fraud in connection with the mortgage industry.

66.     As of May 20, 2008 Merrill's stock closed at $46.31 per share down over $51.22 per share or approximately 53% from its Class Period high of $97.53 per share on January 24, 2007.

**B.**     **The Exchange Act Parties**

67.     Lead Plaintiff purchased shares of Merrill common stock during the Class Period and acquired Merrill common stock in exchange for First Republic stock and was injured thereby as reflected in its attached supplemental certification.

68.     Defendant Merrill is a Delaware corporation with its principal executive office in New York, New York. The Company purports to offer a broad range of services to private clients, small businesses, institutions and corporations, organizing its activities into two interrelated business segments - Global Markets and Investment Banking Group ("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management. FICC is within the Global Markets & Investment Banking Group.

26

69.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill.  MLPFS provides investment, financing, advisory, insurance, banking, and related products and services.

70.    Defendant O'Neal joined Merrill in 1986 and became head of its junk-bond department in 1989.  O'Neal was appointed Chief Financial Officer ("CFO") in 1998. O'Neal served as Chairman of the Board since July 2002 and CEO since December 2002, positions he held until October 30, 2007, when Merrill announced that O'Neal had resigned from his positions at the Company.  O'Neal sold in excess of $18 million in Merrill stock during the Class Period.  He received a benefit package of over $160 million of cash and stock at the time of his resignation.  During the Class Period, O'Neal signed certain Merrill registration statements or caused such documents to be signed on his behalf.  O'Neal signed (1) Merrill's 2006 10-K; (2) the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 in the quarterly reports filed with the SEC on Form 10-Q for the quarters ended September 29, 2006, March 30 and June 29, 2007 and in Merrill's 2006 10-K.  In addition, throughout the Class Period, O'Neal knew the risks associated with the Company's increased U.S. subprime ABS CDO exposure.  O'Neal knowingly or recklessly ignored these warnings and fired executives who issued warnings about Merrill's increasing exposure to subprime debt because he wanted to report purportedly improved results for Merrill which would enable him to receive higher compensation through bonuses or otherwise.

71.    Defendant Fakahany was Co-President and COO of Merrill from May 2007 until the end of the Class Period.  From 2005 until May 2007, Fakahany served as Vice Chairman and Chief Administrative Officer.  During the Class Period, Fakahany sold more than $13 million in Merrill stock.  Fakahany signed the certification pursuant

to Section 302 of Sarbanes Oxley Act of 2002 ("Sarbanes Oxley"), submitted with Merrill's 10-Q for the quarter ended September 28, 2007. As Co-President of the Company, Fakahany knew the risks associated with increasing U.S. subprime ABS CDO exposure during the Class Period. In fact, in the summer of 2007, on at least two occasions, Fakahany warned Merrill's board of directors and defendant O'Neal of the mounting risk Merrill faced from such exposure. Fakahany, along with Edwards, was responsible for and managed the control groups that managed credit and market risks. On January 28, 2008, Merrill announced that Fakahany would retire from the Company as of February 1, 2008.

72.     Defendant Fleming is, and at all relevant times was, President and COO of Merrill. During the Class Period, Fleming sold more than $4 million in Merrill stock. Fleming signed the certification pursuant to Section 302 of Sarbanes Oxley Act in the 10-Q for the quarter ended September 28, 2007. Fleming knew of the mounting risk facing Merrill through its U.S subprime ABS CDO exposure. In fact, in August 2007, Fleming sent a letter to Merrill's directors, and defendant O'Neal discussing this increasing exposure.

73.     Defendant Edwards is, and at all relevant times was, Senior Vice President and CFO of Merrill. During the Class Period, Edwards signed certain Merrill registration statements or caused such documents to be signed on his behalf. Edwards also signed the following documents: (1) Merrill's 10-Q for the quarter ended September 29, 2006, March 30, June 29 and September 28, 2007; (2) Merrill's Report on Form 10-K for the fiscal year ended December 29, 2006 (the "2006 10-K"); and (3) Merrill's 10-Qs for the quarters ended March 30, June 29 and September 29, 2007. As the top financial officer at Merrill, Edwards knew that throughout the Class Period, Merrill was increasingly exposed to risky subprime-

related securities.  As CFO, Edwards was responsible for and managed the control groups

that managed credit and market risks.  Despite such knowledge, Edwards falsely maintained

that Merrill's exposure to U.S. subprime ABS CDOs was limited.

**C.    The Exchange Act Defendants' Role in the Subprime and CDO Industry**

74.    The Exchange Act Defendants' scheme was based upon their creation of

highly complex CDOs which are highly complex debt securities collateralized by other debt

instruments.  The foundation of these structures consisted of ABS - i.e., securitized bundles

of debt, which were based on underlying assets.  During the Class Period, the underlying

assets consisted, in significant part, of subprime residential mortgages.  ABSs typically

represented only a small portion, often 10% to 20% of the securitized debt obligations that

served as the collateral for the CDOs.  The remainder were typically derivatives such as

CDSs, which are contractual obligations relating to the performance of other assets, such as

ABSs that may or may not be owned by the CDO.  By using large amounts of leverage,

Merrill multiplied the income it could generate from its risky subprime mortgage assets,

while greatly multiplying the risks to its stockholders.  The centerpiece of the scheme,

however, was these defendants' concealment from investors in Merrill stock of the risks

caused by these activities.

75.    The Exchange Act Defendants received huge increases in their compensation

as they pressed forward with the CDO scheme. However, their greed, as set forth in detail

herein, left Merrill and its shareholders exposed to tens of billions of dollars in undisclosed

risk and has, to date, caused Merrill to write down almost $30 billion in losses in U.S.

subprime ABS CDO exposure. Merrill may even be forced to take additional write-downs of

these assets.

76.     The Exchange Act Defendants took great care to hide the CDO scheme and the risks they were creating from persons who purchased or acquired Merrill securities. Indeed, in their public statements throughout the Class Period, as set forth herein, the Exchange Act Defendants consistently and falsely portrayed that Merrill's exposure was limited, contained, and under control; that its net revenues from subprime-related activities were less than 1% of net revenues; and that it was better positioned and less risky than its competitors in the industry.  The Exchange Act Defendants' statements were recklessly or knowingly false and misleading.

77.     The Exchange Act Defendants' CDO scheme took advantage of, and also helped fuel, the unprecedented growth of mortgage lending to unsophisticated, and/or poor credit borrowers.  The Exchange Act Defendants' limitless appetite to increase revenues, and therefore their compensation of O'Neal and other top Merrill executives, required Merrill to purchase tens of billions of dollars of underlying mortgages and MBSs, which were then repackaged into CDOs.  However, a great majority of the loans that Merrill purchased from loan originators such as Ownit, MLN and ResMAE, as well as those originated by its First Franklin unit, were made to borrowers with poor credit history, no income verification, and/or loans with high loan to value ratios, such as 100% financing (typically referred to as subprime loans). These loans bore a higher degree of risk for the lender as the likelihood of default by the borrower was extremely high. As set forth herein, when the U.S. housing market began to show signs of deterioration in 2006, instead of scaling back their risk, the Exchange Act Defendants increased Merrill's risk dramatically by purchasing subprime lender First Franklin, and by putting their CDO scheme into overdrive.

78.     During 2005, Merrill underwrote approximately $35 billion of CDOs. In 2006, Merrill ramped up its CDO scheme, underwriting approximately $53 billion worth of CDOs. In the first half of 2007, that number was over $30 billion, even though the CDO market was materially declining from lack of investor interest. Further, Merrill played a pivotal role in constructing and facilitating the creation of CDOs from the very most basic ingredient, a subprime residential home loan, to the very end - the design, sale and marketing of interests in the very complex CDOs.

### 1.     MBSs, CDOs and U.S. Subprime ABS CDOs

#### a.     Residential Mortgages

79.     For all the complexity of the structure of a CDO, it starts with simple consumer debt, such as home mortgages. As home prices materially increased, the need for more home loans also materially increased. To meet this need, loan originators, at Merrill's discretion, started to relax their credit underwriting standards for individuals who had previously been unable to obtain home loans, and make loans to subprime borrowers. These loans were given to individuals who had poor credit histories or provided no proof of income. Many of these loans required little or no down payment, relied on low "teaser" interest rates that would adjust after one or more years, and would typically have higher coupon or interest rates than prime borrowers.

80.     Merrill served as an originator of subprime mortgages and purchased such mortgages or pools of mortgages from brokers and lenders throughout the U.S. In September 2006, Merrill agreed to acquire First Franklin, a subprime loan originator, so that it could further feed its need for subprime home loan mortgages. The transaction closed on December 30, 2006.

      **b.**     **Individual Mortgages are "Pooled" and Securitized**

81.     As depicted below, the next step in the construction of a CDO is to take the individual subprime home loans and wrap them into a MBS, often referred to as a Residential Mortgage Backed Security ("RMBS"). A RMBS pools together thousands of individual subprime home loans into a single entity which, in turn, issues debt that can then be sold to investors, or in most cases CDOs. The debt from the RMBS is paid from the revenue stream of principal and interest payments created by the pool of subprime mortgages. Merrill issued billions of dollars of RMBS through its subsidiaries Merrill Lynch Mortgage Investors Inc., Merrill Lynch First Franklin Mortgage Loan Trust, and other entities.



Charts in ¶¶81-83 have been adapted from *Wall Street Wizardry Amplified Credit Crisis; A CDO Called Norma Left 'Hairball of Risk'; Tailored by Merrill Lynch*, THE WALL STREET JOURNAL, By Carrick Mollenkamp and Serena Ng, December 27, 2007, Page 1.

82.     As depicted below, RMBSs created by Merrill were then "bought" by asset managers whose sole purpose was to collect assets in order to form CDOs. Merrill's role at this stage was to finance the asset manager's acquisition of assets through a line of credit or loan, known as a "warehouse." A warehouse is an industry term used to denote the gathering of assets to form a CDO. The assets are said to be in a "warehouse" until they are transferred to the CDO. Merrill supported this "warehousing"

of assets by recruiting asset managers, providing the financial backing, usually hundreds of millions of dollars, and, often, providing the RMBS being sold into the warehouse. Where Merrill provided the financing, the assets remained on Merrill's balance sheet until the CDO was formed, the assets sold to the CDO, and the CDO notes sold to investors.



### c.    CDOs Acquire Assets Such as RMBS, Derivatives or Other CDOs

83.    Each CDO is set up as a new entity, typically an offshore limited liability entity, with its own assets and liabilities.  As set forth below, the CDOs assets are either a collection of ABSs, such as RMBSs, derivatives like credit default swaps (also known as "CDS" which term is defined in Appendix A), or portions of other CDOs.  The CDOs liabilities include debt in the form of promises to pay noteholders from the cash flow generated by the asset side of the CDO.  The liability side of the CDO is most often subdivided into layers or "tranches" of debt.  The lowest tranche of the CDO bears the initial losses, up to a fixed percent of the value of the CDO, but receives the highest rate of interest.  The next lowest tranche is assigned the next level of losses and receives the next highest rate of interest, and so on.  Thus, the highest tranche of the CDO will not

experience losses unless and until all lower tranches have recorded the full amount of losses allocated to them. The tranches are typically rated by major debt rating agencies (i.e., Moody's, Standard & Poor's, and Fitch), and the higher tranches are typically rated higher, signifying lower credit risk. The chart below depicts the structure of such a CDO issuer in its most basic form.



84.     CDOs structured solely with RMBSs are called "cash CDOs". Virtually all of the CDOs Merrill structured during the Class Period, however, were backed, in addition to RMBSs, by derivatives or "synthetic securities," which were, in effect, insurance contracts where the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS which it was mimicking, and the counterparty insured against a decline or default in the underlying RMBS security. In short, a synthetic security is akin to a "side bet" on the performance of certain assets. Such CDOs are called "Synthetic CDOs". A CDO that consists of assets that are other CDO notes are called "CDO Squared."

85.     A Synthetic CDO, which may only have 10-20% of cash assets, such as RMBS, needed some form of assets to make up the remaining 80-90% of the CDO.

Merrill generally provided this asset to the CDO in the form of derivative contracts, most likely a CDS. For example, in addition to the $100 million - $200 million in RMBSs referenced above, Merrill entered into a CDS under which Merrill paid premiums to the CDO and in exchange, the CDO would compensate Merrill if the asset referenced by the CDS lost value or some other triggering event occurred. These CDSs would be used by Merrill to hedge derivative contracts, generally in the form of CDSs or total return swaps ("TRS") it had entered into with hedge funds or other sophisticated investors. Through the agreements with such hedge funds or other counterparties, Merrill took on additional risk that if subprime debt referenced in the agreement did not perform, Merrill would be required to make substantial payments to the hedge funds or other counterparties if there were defaults or other "credit events" in the underlying subprime debt which backed the CDS. Merrill also entered into another contract with the CDO, a TRS, for the remaining collateral in the CDO and guaranteed a rate of return to the CDO while Merrill took on the risk of the collateral.

86.    Additionally, Merrill frequently entered into TRSs with the CDO whereby the CDO, at Merrill's direction, would use cash generated by the sale of notes to investors to invest in assets offering a high rate of return, such as other CDOs. The CDO would "swap" the cash flow paid by these assets, including both gains and losses, to Merrill in exchange for Merrill paying the CDO a LIBOR-based interest stream. By using these TRS, Merrill was able to effectively invest in CDOs, including taking on both the risks and the rewards of those investments, by effectively borrowing at LIBOR-based rates the capital belonging to the CDOs that Merrill had created.

87.     One of the primary functions that Merrill, as underwriter, played was determining the marketable size of each CDO. This determination was based on three things: the supply of collateral that would make up the assets of the CDO, the market demand for the securities issued by the CDO and the risk-taking ability of Merrill (i.e., ability to retain unsold CDO securities and to insure the CDO against losses).

88.     Merrill was able to increase the volume and size of the CDOs it underwrote in order to generate more revenues and profits by including an ever greater percentage of "synthetic assets" that referenced an actual cash asset. These synthetic assets in the form of CDSs replicated the performance of a single cash bond many times. Thus, Merrill solved the limited supply of assets and fed its ever growing CDO machine by creating derivative contracts.

89.     Once the cash and synthetic assets were pooled, Merrill started the underwriting process and most importantly tried to pre-sell the debt and equity to be issued by the CDO. As discussed above, the CDO issued different tranches of debt that paid different return rates based on the risk of loss and the priority of payment. Generally, Merrill had difficulty selling the super senior or top AAA portion of the CDO, which often was up to 90% of the entire capital structure and which paid a low rate of interest. When the AAA portion of a CDO could not be sold, Merrill was forced to retain it.

90.     Greater supply and the larger deal sizes caused Merrill to retain unsold notes in the CDO deals. Merrill retained much of the super senior portion of the CDO for at least two reasons: (1) there were no buyers in the market at a price that would allow

Merrill to book any revenues; and (2) Merrill increased the size of the CDO issuance which resulted in tens of millions of dollars more for Merrill as underwriter.

91.     However, despite the fact that large chunks of the debt retained by Merrill was so-called AAA super senior debt, Merrill was still exposed to significant risk with these positions.  This is true because, as discussed above, the assets in the CDO generally had a weighted average rating of BBB, or below investment grade, even though the debt issued by the CDO had certain highly rated tranches, including the AAA super senior tranche.  So, while Merrill was retaining the super senior AAA rated tranches it was issued by a CDO, the assets underlying the CDO were, at best, BBB rated assets.

**2.      *The Exchange Act Defendants Knowingly or Recklessly Disregarded the Exposure that Merrill Faced***

**a.      The Exchange Act Defendants Abandoned Merrill's Risk Management Practices and Controls and its Risk Measurement Profiles and Exposures**

92.     Throughout the Class Period, Merrill systematically misstated its risk management policies and controls and did not disclose its overexposure to and concentration of risk in CDOs and subprime-related debt.  As stated above, Merrill often retained an interest in the CDOs it facilitated and underwrote, or entered into swap agreements with the CDO or other parties such as hedge funds.  The exposure that Merrill retained, while often rated AAA, was in almost all cases derived from a CDO that had assets with an average weighted rating of BBB or lower.  Additionally, the swap agreements it entered into, referenced a similarly rated RMBS.  In fact, of the $16 billion Merrill wrote down relating to CDOs alone, nearly half of such CDOs were comprised of assets rated BBB or lower.

93.    Merrill knew how to manage risk.  Merrill had a well-structured risk control process and sophisticated risk measurement capabilities.  At all times during the Class Period, the Company had state-of-the-art risk measurement models and systems.  However, the Exchange Act Defendants chose to override and/or ignore those risk controls, to skew Merrill's risk controls and analyses, and to hide its risk exposure.

94.    Merrill micro-managed its risks on the basis of day-by-day global exposures.  Merrill stated that its earnings came from two core activities: fee income and risk-based income.  As set forth in detail below, the Exchange Act Defendants represented throughout the Class Period that Merrill's Risk Oversight Committee ("ROC") was aware of and appropriately managed Merrill's risk, and that "[t]he Executive Committee pays particular attention to risk concentrations and liquidity concerns."  Defendants O'Neal, Fakahany, Edwards and Fleming were members of the Executive Committee.

95.    However, the Exchange Act Defendants overrode and/or ignored these risk controls for a purported short-term profit.  However, it was risk concentration in CDOs and undisclosed massive credit risks that ultimately required Merrill to write down over $30 billion (thus far) from its exposure to CDOs and related securities.

96.    For all of its risk controls, limits and procedures, the Exchange Act Defendants took hidden risks beyond any reasonable tolerance level in U.S. subprime ABS CDOs and assumed concentrations beyond the limits of any reasonable risk management regimen.

97.    For the first time in Merrill's third quarter 2007 10-Q filing, Merrill began to disclose the truth concerning its risk concentration, as follows:

> The losses on U.S. Sub-prime Residential Mortgage-Related and ABS CDO activities in the third quarter reflect a significant concentration in securities that accumulated as a result of our activities as a leading underwriter of CDOs.
>
> To complement VaR and in recognition of its inherent limitations, we use a number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that may result in material losses for Merrill Lynch. VaR, stress tests and other risk measures significantly underestimated the magnitude of actual loss from the unprecedented credit market environment during the third quarter of 2007, in particular the extreme dislocation that affected U.S. sub-prime residential mortgage-related and ABS CDO positions. In the past, these AAA ABS CDO securities had never experienced a significant loss of value.

98.     In fact, Merrill's third quarter 2007 10-Q also purported to blame Merrill's losses on the allegedly "unprecedented credit market environment during the third quarter of 2007, in particular the extreme dislocation that affected U.S. sub-prime residential mortgage-related and ABS CDO positions." However, this statement was itself materially misleading because it was not the allegedly unprecedented credit market environment which caused Merrill's losses, but instead the Exchange Act Defendants' disregard for Merrill's risk management policies and Merrill's huge losses in CDOs and related U.S. subprime ABS CDOs. Indeed, the Exchange Act Defendants knew what those risks were and chose to knowingly or recklessly ignore Merrill's systems and hide the truth from Merrill's shareholders.

99.     Moreover, it was untrue that AAA ABS CDO securities had never experienced a significant loss of value (until the third quarter of 2007). As set forth in detail herein, Merrill's U.S. subprime ABS CDO exposures had lost 15% of their value by the end of the first quarter of 2007 and 40% of their value by the end of the second

quarter of 2007.  Merrill had chosen to hide the losses in its CDO portfolios and

knowingly or recklessly ignore the "dislocation" in U.S. subprime ABS CDO exposures

until after the end of the third quarter of 2007.

> **b.     Defendants Recklessly Expanded Merrill's CDO Exposure and Hid It From Merrill Shareholders**

100.     At the end of 2005, Merrill encountered a material hurdle in its quest to

churn out more CDOs.  At that time, insurance giant AIG reportedly stopped insuring the

AAA rated slice of Merrill CDO deals known as AAA rated "super-senior" pieces of

Merrill's CDOs.  Nevertheless, at no time during the Class Period did Merrill ever

disclose to investors this highly material fact, which was reported after the end of the

Class Period:

> The first tremor that rattled Merrill's profitable business of underwriting mortgage securities came at the end of 2005.  As it repackaged mortgage bonds into securities called collateralized debt obligations, or CDOs, Merrill had a key partner in insurer American International Group Inc.  An AIG unit bore the default risk of the CDOs largest and highest-rated chunk, known as the "super-senior" tranche, normally sold to big investors such as foreign banks.
>
> But AIG was keeping a close eye on the housing boom because it had another unit that made subprime loans, those to home buyers with weak credit.  AIG did a review of the market.  Concerned that home-lending standards were getting too lax, AIG at the end of 2005 stopped insuring mortgage securities.
>
> Merrill was used to having to keep mortgage bonds and pieces of CDOs on its books temporarily before selling them.  But without a firm like AIG providing credit insurance, Merrill had to bear the risk of default itself.
>
> Instead of scaling back its underwriting of CDOs, however, Merrill put the business in overdrive.  It began holding on its own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload.

The *Wall Street Journal*, April 16, 2008 at A1.

101.    With AIG no longer willing to underwrite this insurance, Kronthal (who was in charge of Merrill's CDO business), internally warned top Merrill executives that to continue underwriting these deals would require that the firm assume tens of billions of dollars of market and credit risk.  Kronthal had set limits on the amount of CDO exposure Merrill could keep on its books to between $3-$4 billion.  At one point in the discussions, Kronthal told management that the firm's balance sheet would assume an open-ended risk if these highly illiquid securities ran into credit trouble.  These arguments were reportedly met with skepticism by both then-bond chief Dow Kim and defendant O'Neal because Merrill's CDO business was so lucrative.  Instead of reducing Merrill's CDO exposure, O'Neal fired Kronthal in July 2006.  Again, however, at no time during the Class Period did the Exchange Act Defendants disclose to investors the increasing CDO risks which Kronthal had been warning Merrill executives about internally.

102.    With AIG no longer insuring CDOs, in late 2006 and 2007, Merrill's top managers reportedly embarked on a new plan, internally referred to as the "mitigation strategy."  Knowing that Merrill's CDO exposure had ballooned out of control and fearful of disclosing this to the market, the Exchange Act Defendants attempted to hedge Merrill's exposure through financial guarantee deals with bond insurers.  Further, financial guarantees allowed Merrill to book the present value of interest income from CDOs sooner than it otherwise could have without such protection.  As a result, in order to continue churning out CDOs, Merrill turned to certain monolines or financial guarantors to "hedge" the Company's investment in CDOs.  However, unbeknownst to the market Merrill's hedges were ineffective.

103.    The core business of monolines, such as ACA and XL, was traditionally guaranteeing the debt issued by governmental entities, such as municipal bonds, which have materially different risk profiles than the CDOs Merrill was underwriting.  Due to the poor capitalization or the over leveraged nature of these monolines - of which Merrill was aware – these insurers were unable to provide sufficient protection to hedge all of the exposure that Merrill had, or even the more limited exposure many such monolines undertook to guarantee.  In other words, Merrill convinced investors that risk was being managed, when in fact, it was not and Merrill remained exposed to the risk of billions of dollars in clearly foreseeable losses.

104.    For example, according to allegations in a complaint filed in *Merrill Lynch International v. XL Capital Assurance Inc.* (1:08-cv-02893-JSR)(S.D.N.Y.), starting in January 2007, Merrill insured $3.1 billion of CDOs against losses in a series of transactions with bond insurer XL.  XL, a division of Security Capital Assurance ("SCA"), is a highly leveraged monoline.  The Exchange Act Defendants knew this because, among other things, Merrill was an underwriter of SCA's initial public offering in June 2006.  On February 22, 2008, XL told Merrill that because Merrill allegedly violated the terms of its contract with XL, XL was no longer responsible for its financial obligations under seven credit default swaps worth approximately $3.1 billion.  Merrill filed suit seeking to enforce its contracts with XL.  XL's counterclaim asserted that, in August 2007, Merrill had "launched a desperate campaign . . . to offload or hedge its super senior CDO position in order to remove these risks from its balance sheet and improve the appearance of its financial condition before the quarter close."  According to the counterclaim, Merrill reportedly was aggressively "marketing its super senior CDO

42

positions up and down Wall Street looking for any counterparties willing to take on additional CDO risk" and "Merrill was desperate to get these CDO liabilities off its books during the third quarter."

105.    According to the counterclaim, around the beginning of August 2007, Merrill approached XL with a list of two dozen super senior CDO positions with more than $20 billion in CDO exposure. The Merrill salesperson "implored" that XL could "[p]ick as many trades from the . . . attached spreadsheet that you'd like. We put them all in a basket . . . and you write me the protection . . . Pick your size, it's a very nice deal for XL and a *big help for ML*." (Emphasis in original).

106.    Merrill also sought to have another bond insurer, MBIA Inc., insure about $5 billion of the securities. However, MBIA reportedly would not cover interest payments. Rather, it would only cover principal payments when they came due, which in some cases was more than 40 years. When MBIA passed on the deal, Merrill used ACA to insure about $6.7 billion of Merrill's CDO securities. However, ACA was poorly capitalized and like XL, was heavily leveraged. By July 2007, ACA was insuring more than $60 billion of debt securities, a third of which were mortgage-related, yet had a capital base of $236 million (a leverage ratio of over 180-to-1) and few other resources to cover claims. Deals with these financial guarantors helped Merrill to report a supposed material reduction of about $11 billion in its CDO exposure for the quarter ended September 29, 2007. Coupled with CDO-related write-downs of $6.9 billion in the quarter, Merrill purportedly reduced its CDO exposure to $15.2 billion by September 29, 2007, from $32.8 billion reported as of June 29, 2007. Thus, it appeared that financial guarantor deals helped materially reduce Merrill's reported third-quarter net loss.

107.    Although Merrill relied on these purported guarantees to avoid timely and properly recording impairment charges for its CDO assets, Merrill's deals with these financial guarantors did not materially reduce the Company's exposure to CDOs. Because of the inability of these insurers to pay, since October 2007 Merrill has written down approximately $6.1 billion in financial guarantees from monolines.  In particular, according to Merrill's January 17, 2008 press release, during the fourth quarter of 2007, Merrill reported a "credit valuation adjustment" relating to the firm's hedges with "financial guarantors" of negative $3.1 billion, including negative $2.6 billion related to U.S. super senior ABS CDOs.  Specifically, Merrill wrote down approximately $1.9 billion from its exposure to ACA.  XL is seeking to avoid paying Merrill under its agreements with Merrill because, according to XL, Merrill violated the terms of their agreements.  Further, on April 17, 2008, Merrill reported that during the quarter ended March 28, 2008, it recorded "credit valuation adjustments related to the firm's hedges with financial guarantors [of] negative $3 billion, including negative $2.2 billion related to U.S. super senior ABS CDOs."

c.    **High Level Employees Warn Merrill Executives Including the Exchange Act Defendants That They Are Over Exposed to CDO and Other Subprime Debt**

108.    Throughout the Class Period, senior executives at Merrill knew and warned their superiors, including the Exchange Act Defendants of the risks associated with Merrill's CDO business, specifically regarding Merrill's exposure to subprime debt.

109.    As set forth above, in July 2006, Kronthal warned senior management at Merrill that its CDO business model would expose the Company's balance sheet to potentially massive credit risk.  According to the *Wall Street Journal*, and as noted above,

44

Kronthal had imposed limits on the total amount of CDO exposure Merrill could keep on its books ($3 billion to $4 billion).  In July 2006, O'Neal fired Kronthal and five other veteran bond executives, including Douglas DeMartin and Harry Lengsfield, who were part of his team, as part of a supposed broader shake-up that was ostensibly designed to bring more international orientation to the firm's bond division.  In reality, as reported in the *Wall Street Journal* on April 16, 2008, according to current and former Merrill executives, Kronthal and his team were dismissed in the summer of 2006 because they expressed concern to the firm's top management that Merrill's CDO business model was broken and its exposure was too great.

110.    Shortly thereafter, senior Merrill executives asked Ranodeb Roy, a senior trader who had little experience in mortgage securities, to oversee the job of taking CDOs that Merrill could not sell onto its books.  Roy initially objected to the practice of loading up Merrill's balance sheet with mortgage securities and CDOs, but ultimately relented, stating that he was simply "following orders."  Roy was dismissed from his position at Merrill in or around December 2007.

111.    In August 2006, a Merrill trader warned his superior, Harin De Silva ("De Silva"), one of the heads of Merrill's CDO origination business in the U.S., about the risks associated with retaining on Merrill's balance sheet $975 million of a $1.5 billion CDO named Octans.  Nevertheless, De Silva urged the trader to accept the securities despite the fact that the trader stated that he did not know enough about the CDO to feel comfortable committing to the deal.  As reported in the *Wall Street Journal* on April 16, 2008, according to individuals familiar with this matter, De Silva believed that Merrill would keep the super-senior tranches and sell the lower tranches to other investors.

45

Despite the trader's opposition, Merrill ultimately took the $975 million of securities onto the Company's balance sheet which enabled Merrill to book at least $15 million in revenues from the transaction.

112.    It was also recently reported that at the end of July 2007, defendant Fakahany, who had assumed broad responsibility over Merrill's risk exposure, warned Merrill's board of directors and others, including specifically defendant O'Neal, Charles Rossotti (a director in charge of Merrill's Risk Committee), and Rosemary Berkery (General Counsel), of the mounting risk Merrill faced from CDOs and subprime MBS.

113.    On August 9, 2007, Defendants Fakahany and Fleming sent a three-page letter entitled "Board Market Update End July Results: Note from Fakahany and Fleming", to Merrill's directors, O'Neal and Rosemary Berkery, discussing the mounting losses and troubles facing the Company's CDO exposure and explaining that significant deterioration in this business had taken place in July.

114.    In August 2007, Keishi Hotsuki, Merrill's Co-Head of Risk Management, warned his superiors that the Company's exposure to mortgage-related securities was too big.  In November 2007, Hotsuki left Merrill in part due to the position he had taken with respect to the Company's CDO and subprime exposure.

115.    Nevertheless, despite these repeated internal warnings, at no time during the Class Period did the Exchange Act Defendants timely or properly disclose to investors the complete truth concerning Merrill's increasing exposure to U.S. subprime ABS CDOs.

    **d.**    **The Exchange Act Defendants Were Aware of a Material Decline in the Housing Market and a Material Increase in Defaults by Subprime Borrowers**

116.    Near the end of 2005 as home price appreciation was materially declining, the quality of subprime mortgage loans that were securitized was steadily declining. Starting in late 2005 and extending into 2007, the quality of subprime mortgage loans that underpinned MBS deals deteriorated with each successive quarter. In a Standard & Poor's ("S&P") report for the third quarter of 2006, S&P noted that issuers claimed to be tightening their underwriting standards in response to rising delinquencies and early payment defaults.

117.    Moody's Investors Service ("Moody's") observed that there had not merely been a one-time shift in the quality of loans, but that there appeared to be a trend of weakening loan quality. In the first quarter of 2007, Moody's noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters." In June 2007, Moody's noted that "within the 2006 vintage... the performance of late-2006 pools is generally worse than that of early-2006 pools," and that "following the pattern of serious delinquencies... cumulative losses for late 2006 pools have trended higher than those for early 2006 pools at the same points of seasoning."

118.    By the beginning of the Class Period, many subprime loan originators were asked by Merrill to buy back loans that experienced early payment defaults. Many mortgage originators could not satisfy margin calls as a result of early payment defaults ("EPD"). This resulted in an increasing number of mortgage originators filing for bankruptcy.

119.    Throughout this period, Merrill continued to buy and originate subprime loans and increase its production, yet it falsely represented in its 2006 10-K, and continued to state in subsequent 10-Qs, that it primarily dealt with "high quality borrowers."

120.    By the start of the Class Period, the Exchange Act Defendants knew that the subprime market had materially declined.  Indeed, by the first quarter of 2007, Merrill was aware that a significantly increasing number of borrowers were unable to timely make payments on their mortgages.  In connection with the acquisition of First Franklin on December 30, 2006, Merrill also acquired subprime mortgage loans and originated a significant volume of subprime mortgage loans during the first half of 2007.  As 2007 developed, delinquencies and defaults in the subprime mortgage loan market materially increased.

121.    In April 2007, Merrill privately admitted knowing that the market for subprime debt had been deteriorating.  This information recently became public on April 10, 2008 in a verified petition filed in New York State Supreme Court by Merrill Lynch Bank & Trust Co. against National City Bank.  The admissions arose from a dispute between Merrill and National City Bank concerning Merrill's acquisition of First Franklin.  Under the terms of National City Bank's sale of First Franklin to Merrill, National City Bank agreed that if First Franklin's estimated final pro forma net asset statement as of December 30, 2006 was lower than the pro forma net asset statement as of June 30, 2006, National City Bank would pay Merrill the difference.  According to the verified petition, on March 16, 2007 National City Bank wrote a letter to Merrill in which it indicated that it would adjust the purchase price down by $30 million.

122.    On April 13, 2007, Merrill responded in a letter to National City Bank asserting that a further adjustment of approximately $67 million, for a total of $97 million was required to be paid by National City Bank to Merrill.  In the April 13, 2007 letter, Merrill advised National City Bank of thirteen disputed items requiring adjustments.

123.    According to Merrill, the largest disputed item related to mortgage loans held for sale by First Franklin were acquired by Merrill.  "Merrill Lynch is entitled to an adjustment of $43.65 million because of Nat. City's failure to value these loans appropriately . . . Nat City calculated the value of mortgages held by First Franklin for sale by looking at the historical average of sale prices for comparable mortgage loans during the prior six months . . . This method of valuing First Franklin's mortgage loans held for sale *failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, and resulted in an overstatement of such loans held for sale of approximately $43.65 million.*"  (Emphasis added).

e.    **Subprime Loan Originators Filed For Bankruptcy**

124.    With its voracious appetite to underwrite more and more securities with subprime loans as the primary underlying collateral, by at least 2006, Merrill began extending credit to many subprime loan originators that used Merrill's money to underwrite subprime loans.  These loan originators sold the subprime loans to Merrill that bundled them and issued securities for which the subprime loans served as the underlying collateral.  However, by late 2006, Merrill knew that it was facing an increasing early default rate (*i.e.*, borrowers no longer making loan payments within one, two or three months of Merrill acquiring the loan) on hundreds of millions of dollars of subprime loans it purchased, thus calling into serious doubt the value of the collateral underlying

the securities Merrill was issuing.  Moreover, Merrill knew that it was essentially forcing

into bankruptcy subprime loan originators it had been funding.  Merrill attempted to "put

back" the loans it purchased from certain such originators as a result of the borrowers'

early payment defaults on the loans.  However, the "put back" rights were of little value

because these mortgage originators had limited assets and would be unable to buy back

the loans.  In fact, as described below, between December 2006 and March 2007 several

of the loan originators from whom Merrill was buying subprime loans filed for

bankruptcy protection due, in large part, to increasing demands that such originators buy

back from Merrill such defaulting loans.

### i.    ResMAE

125.    ResMAE was a nationwide mortgage banking company which, among

other products, originated, sold and serviced subprime mortgages. By early 2006,

ResMAE claimed to be one of the leading and fastest growing subprime lenders in the

United States.

126.    In order to finance the origination of mortgage loans, ResMAE entered

into agreements with financial institutions (often referred to as a "warehouse lender")

such as Merrill to provide a line of credit to ResMAE.  As a general matter, ResMAE

owned the mortgages for a short period of time during which it was responsible for

collecting payments and otherwise discharging the duties of the lender, which is known

in the industry as "servicing" the mortgage loans.  However, shortly after originating the

loan (usually within 45 to 60 days), ResMAE sold the loans and repaid the warehouse

lender's line of credit.

127.    ResMAE sold substantially all the mortgages it originated to securitizers and other financial institutions such as Merrill, which then bundled the purchased loans and used them as collateral in connection with the issuance of securities.  When the mortgages were sold, the servicing obligations were generally also sold to the loan purchaser or its designee.  However, the agreements pursuant to which loan purchasers such as Merrill purchased the loans gave the loan purchaser the right to "put back" loans to ResMAE and require that it repurchase the loans.  Of particular relevance were provisions which provided that if a borrower failed to make its first, second or sometimes even third mortgage payment after the loan purchaser such as Merrill bought the loan from ResMAE (referred to as an "Early Payment Default" or "EPD"), then the loan purchaser could put back the loan to ResMAE or, in other words, demand that ResMAE repurchase the loan.

128.    During calendar year 2006, Merrill was ResMAE's largest loan purchaser by volume, purchasing mortgage loans worth approximately $3.51 billion in unpaid principal balance.  However, Merrill knew throughout the Class Period that it was facing a high early default payment rate on the billions of dollars of loans it purchased from ResMAE.  By at least as early as October 2006 Merrill sent notification to ResMAE that it would be making a large EPD claim.  Further, by about December 12, 2006, Merrill made EPD demands on ResMAE totaling approximately $308 million.  It was this EPD-based demand that Merrill made to ResMAE which was a significant factor in ResMAE's filing for Chapter 11 bankruptcy protection on or about February 12, 2007.

###### ii.    Ownit Mortgage Solutions, Inc. ("Ownit")

129.    By 2006, Ownit had become one of the nation's larger originators of subprime loans and, like ResMAE, became a significant source of subprime loans that Merrill bought and used as collateral for the RMBSs it was creating.  In September 2005, Merrill Lynch L.P. Holdings Inc. acquired a 20% stake in Ownit for approximately $100 million, and appointed a Merrill executive to Ownit's board of directors.  According to William D. Dallas ("Dallas"), the founder and chief executive of Ownit, for the period between September 2005 and December 2006, Ownit orginiated approximately $6 billion dollars of loans that were sold to Merrill.

130.    Merrill essentially controlled Ownit for the following reasons: i) Merrill held a 20% ownership interest in Ownit, ii) Merrill extended to Ownit a line of credit of $3.5 billion, and iii) two-thirds of Ownit's originations were sold to Merrill.  Michael Blum ("Blum"), managing director and head of Merrill Lynch's Global Structured Finance & Investments (GSFI) Group, was Merrill's representative on Ownit's board of directors.  Matt Whalen ("Whalen"), a Merrill managing director and a mortgage specialist assisted Blum.  Ketan Parekh ("Parekh"), a Merrill representative, worked out of Ownit's offices to oversee the origination of Ownit's loans for Merrill.

131.    According to Dallas, soon after Merrill acquired its ownership interest, Merrill instructed Dallas to loosen lending standards and originate more stated income loans, which are loans for which lenders do not verify a borrower's source of income. According to Dallas, Blum, Parekh and Whalen were the Merrill representatives who asked that Ownit lower its underwriting guidelines.  Dallas stated that this was discussed in connection with Ownit's January 2006 preboard meeting in Arizona.