132.    According to Dallas, Merrill wanted more loans with coupon or interest rates of 8% to 8.5%, which were higher than the prevailing rates for prime borrowers. Dallas explained to Blum that the only way this can be achieved is to either (i) raise interest rates for prime loans (which could not be done because prime borrowers would go elsewhere for a lower rate loan), or (ii) by loosening underwriting guidelines and taking more risk.

133.    Specifically, Dallas indicated that the following steps were taken to "loosen" underwriting guidelines: (i) Ownit originated more stated income loans, and (ii) Ownit lowered the acceptable FICO scores for borrowers.  According to Dallas, prior to Merrill's investment in Ownit, 98% of Ownit's loans were fully documented.  After Blum asked for more stated income loans, the number of full-document loans declined to 90%.  In addition, Ownit materially lowered the FICO scores from approximately 669 to 670 at the time Merrill acquired its stake in Ownit, to approximately 646 by the time Ownit filed for bankruptcy in December 2006.  According to Dallas, Merrill "wanted us to be more like New Century or more like First Franklin" and originate loans with higher coupon rates; Merrill was "not concerned with the performance of the loan at all." According to Dallas, the loans originated as a result of these lowered guidelines was approximately $300 million to $400 million in originations per month.

134.    As a direct result of this change in guidelines, in January 2006 through March 2006, Ownit began to experience EPDs and first payment defaults of 1% to 3%. According to Dallas, prior to Merrill's involvement with Ownit, it had never experienced such defaults. In response to Dallas' concerns about the EPDs, Blum told him to "produce your way out of it."

135.    After approximately five months of loosened underwriting guidelines and increased defaults, Dallas tightened underwriting guidelines.  Merrill was not happy with this and, according to Dallas, because of his decision to cut out the higher coupon originations, Merrill sought another source of subprime loans through its acquisition of First Franklin.

136.    On December 28, 2006, Ownit filed for Chapter 11 bankruptcy protection. In connection with such filing, Ownit listed Merrill as its single largest unsecured creditor, with claims of approximately $93 million.  Merrill's claim related to "Repurchase Requests" by Merrill to Ownit to repurchase loans Merrill acquired from Ownit in 2006 that were the subject of EPDs and/or other delinquencies.

137.    However, even after Ownit declared bankruptcy, Merrill continued to pool Ownit originated mortgages for sale to RMBS. For example, in or around May 16, 2007, Merrill underwrote a securitization of subprime loans in which a majority of the loans were originated by Ownit.  At this point, Merrill's "put" rights were worthless because of Ownit's bankruptcy and thereby caused Merrill to bear the risk of any defaults on the subprime loans.

### iii.    Mortgage Lenders Network USA, Inc. ("MLN")

138.    By the third quarter of 2006, MLN was the nation's fifteenth largest subprime loan originator, with $3.3 billion in loan originations.  Merrill Lynch Bank USA and Merrill Lynch Mortgage Capital, Inc. (both wholly owned subsidiaries of Merrill) were together among MLN's four largest warehouse lenders.  In 2006, Merrill's credit line to MLN was approximately $1.7 billion.  As was the case with ResMAE, shortly after originating subprime loans, MLN sold substantially all such loans to its warehouse lenders, including Merrill.  Merrill used MLN as yet another source to fill

Merrill's growing appetite for subprime mortgage loans to serve as collateral for the MBS and CDOs it was creating.

139.    Similar to its agreements with ResMAE and Ownit, Merrill was able to put back (or demand that MLN buy back) loans which had EPDs.  Starting in June 2006, Merrill began demanding that MLN buy back loans that it had purchased from MLN.

140.    On or about February 4, 2007, MLN filed for Chapter 11 bankruptcy protection.  In filings made in connection therewith, MLN noted that an increase in EPD and the resulting loan buy back demands made by loan purchasers such as Merrill were among the primary factors leading to MLN's bankruptcy filing.  Indeed, at the time of its bankruptcy petition, MLN listed Merrill Bank USA as its largest unsecured creditor, the nature of which were, *inter alia*, loan repurchase requests.

### iv.    Other Subprime Originators

141.    Other subprime loan originators from which Merrill purchased subprime loans were also filing for bankruptcy at around the same time ResMAE, Ownit and MLN declared their bankruptcies.  For example, on March 20, 2007 subprime loan originator Peoples Choice Home Loan, Inc. ("Peoples Choice") filed for Chapter 11 protection.  In its bankruptcy filings, Peoples Choice listed Merrill as one of its top unsecured creditors.

### f.    Two Key MBS and CDO Indices Suffer Significant Declines Requiring Merrill to Write Down CDO and Subprime-Related Debt

142.    During February 2007, in response to the reported rise of default rates on subprime mortgages and the announced bankruptcy of several subprime mortgage originators, the ABX and TABX indices, two key indices for MBSs and CDOs, declined 15-40% on the very type of debt that Merrill belatedly wrote down in the third and fourth

quarters of 2007. Further, by June 2007, the ABX and TABX had declined further and traded at discounts between 40%-55%. By September 29, 2007, the ABX and TABX had declined further and traded at discounts of at least 65%.

143.    The ABX and TABX in general tracked the values of MBS and CDOs as explained more fully below. As alleged below, the material declines of the ABX and the TABX during the first half of 2007, in conjunction with: (i) the reported bankruptcy of several subprime originators; (ii) Merrill's knowledge of the actual defaulted loans it was trying to put back to subprime originators such as MLN, Ownit and ResMAE; and (iii) Merrill's inability to sell CDO asset collateral seized from the Bear Stearns hedge funds, required that Merrill timely take material write-downs to its CDO and subprime-related debt for the periods ended March 30, June 29, and September 29, 2007. Merrill knowingly or recklessly failed to write down at least 15% of the value on Merrill's books of the CDOs and MBSs as of March 30, 2007, at least 40% (or $16 billion) of the value of such CDOs and MBSs as of June 29, 2007 and at least 65%, or another $11.5 billion, as of September 29, 2007.

144.    The ABX (also known as ABX.HE) consists of several different credit derivative indices which reference ABSs. The ABX.HE indices track the value of CDS, which are derivatives that provide insurance against default, on MBS. Each ABX.HE index tracks the price of CDS based on different ABS, broken down by rating and vintage/year: AAA, AA, A and BBB. The ABX is reported by Markit Group of London. As the price of credit protection increases, the ABX index declines.

145.    In February 2007, as certain ABX indices were falling precipitously, Wall Street dealers launched a new product that essentially broke the ABX into pieces or

56

tranches much like a CDO. That product, known as TABX, divided the BBB- ABX

index into a capital structure of six tranches that ranged from the first dollar of loss (those

assets with ratings of BBB or lower) to a tranche that looked very much like the AAA

tranches of CDOs to which Merrill was, in significant part, exposed.

146.    That AAA tranche was at risk for all losses in excess of the first 40% of

losses in the ABX index (the "Senior TABX Tranche"). This was similar to the structure

of a CDO since the lower rated tranches had the first risk of loss and the senior tranches

had the last risk of loss. However, while the super senior tranches retained by Merrill

were the most senior in the CDO, theses tranches would begin to suffer a risk of loss as

early as the 35% level. In effect, the TABX recreated the risk levels that were contained

within the CDOs that Merrill was both underwriting and exposed to through the

Company's accumulation of CDOs on its balance sheet.

147.    According to one analysis, by December 2006, subprime MBS had shown

substantial distress:

> Defaults on the riskiest residential loans, known as subprime mortgage
> securities, already have pushed the main index of those securities to record
> lows.
>
> The lowest rated "BBB-" index of subprime mortgages fell to 95.26 this
> week, while spreads widened to about 400 basis points, increasing the
> costs for investors to buy protection against default, according to
> Markit.com data. The index traded at 242 basis points in July.
>
> Downgrades on subprime mortgage securities are expected to climb to a
> record 300 by the end of the year, twice as much as last year, and rise even
> more in 2007, Fitch Ratings said on Thursday.

*Reuters*, *Housing, Car Markets May Spark Credit Crunch*, December 15, 2006.

148.    As early as the beginning of 2007, as more and more subprime mortgage

lenders filed for bankruptcy and/or announced disappointing results and the residential

real estate and subprime loan markets were materially declining, the ABX materially declined to record lows as investors sought insurance against defaults. For example, in February 2007, the ABX index that tracks CDSs on certain risky subprime loans (those rated BBB) materially declined. According to *Market Watch,* in early February, the index was above 90. Then, the index had declined from 72.71 on February 22, 2007, to 69.39 on February 23, 2007. An ABS strategist at RBS Greenwich Capital commented in a *Market Watch* article dated February 23, 2007 that "ABX needs protection sellers badly . . . Real (not perceived) problems in select mortgage pools and in the subprime mortgage lending industry do not make for an ideal fundamental opportunity at this time."

149. Further, immediately upon launch TABX tranches materially declined, indicating that the value of CDOs materially declined. Merrill was aware of this decline because it was one of the 16 licensed market makers in ABX and TABX. As depicted in the chart below, the Senior TABX Tranche dropped from a price of nearly 100 in mid-February 2007, to around 85 by the end February 2007. Indeed, the TABX continued to fall significantly in the months after February 2007, also as shown in the chart below reflecting historical TABX data from Markit Group of London. Nevertheless, at no time during the Class Period did Merrill timely disclose the deteriorating state of its U.S. subprime ABS CDO exposures or timely and properly write down the value of its CDOs.



150.     By the end of the first fiscal quarter of 2007, for the period ending March

30, 2007, given that Merrill was aware of increasing defaults from subprime mortgages

(as reported in mortgage remittance reports), materially declining housing prices, and the

material decline in certain ABX indices, the Exchange Act Defendants knew that

Merrill's total net CDO and MBS exposures were impaired by at least 15%.  By this time

there was a steep decline in the underlying value of mezzanine-related debt of at least

30%.  Nevertheless, Merrill did not write down its exposure at this time.

151.     By July 2007, the ABX.HE index tracking BBB ABS plunged even

further and the indices tracking higher quality securities also declined.  A *Los Angeles*

*Times* article dated July 17, 2007 stated that on July 16, 2007 the ABX.HE index tracking

BBB ABS tumbled 7.5% to record low of 45.28.  The article further indicated that this

index lost more than half of its value in 2007.  In addition, the ABX indices tied to higher

quality mortgage bonds – those rated AAA and AA – also fell in the days preceding this

article.  The chart below from Markit Group of London, illustrates the precipitous fall of

the BBB-ABX.



152.    By the end of the second fiscal quarter of 2007 (ended June 29, 2007), the

Senior TABX Tranche had declined to the mid-60s.  However, the Exchange Act

Defendants knowingly or recklessly disregarded or ignored this market information, and

did not reduce the value of Merrill's holdings.  Defendants also failed to timely disclose

to investors that the MBS total net exposures were impaired by at least 40%.  Thus, by

June 29, 2007, Merrill was required by GAAP to write down at least $16 billion of its

U.S. subprime ABS CDO exposure.  Even though the Exchange Act Defendants were

aware of increasing defaults from subprime mortgages (as reported in mortgage

remittance reports), materially declining housing prices, the material decline in certain

ABX indices, and the material difficulty Merrill had in selling assets seized from certain Bear Stearns hedge funds (as alleged below) it did not write down its true exposure in the second quarter of 2007.

153.    It was not until the end of the third quarter of 2007 that Merrill first began to make some disclosures to investors concerning purportedly limited losses in certain of its U.S. subprime ABS CDOs.  But even these disclosures were misleading.  By that time, the TABX Senior Tranche had dropped an additional 20% or into the 40 dollar range, indicating CDO losses exceeded 60% of the value.  Of course, at that time, Merrill only had written down the value of its U.S. subprime ABS CDOs by $7.9 billion.  However, given the continued decline in the ABX and TABX, the rise in subprime defaults and the declining housing prices, Merrill should have taken an additional write-down of $11.5 billion.

   **g.**  **Bear Stearns Hedge Funds Collapse and Merrill Is Unable to Sell Its Assets**

154.    In 2003, the Bear Stearns Companies, Inc. ("BSC") created a hedge fund named the High Grade Structured Credit Strategies Fund and in August 2006, BSC created a second hedge fund with a similar strategy named the High Grade Structured Credit Strategies Enhanced Leverage Fund (collectively, the "Hedge Funds").  At one point, these Hedge Funds reportedly controlled assets of approximately $20 billion.  The Hedge Funds primarily invested in subprime-related assets, including, among other things, CDOs (90% of the Hedge Funds assets were CDOs).

155.    BSC raised approximately $600 million from investors and borrowed additional capital of at least $6 billion from various Wall Street banks, including a loan of $850 million provided by Merrill so that the Hedge Funds could purchase Merrill CDOs.

Merrill's loans to the Hedge Funds was collateralized by the Hedge Funds' CDO assets. Merrill was one of the Hedge Funds' biggest creditors and underwrote a majority of the CDOs that at least one of the Hedge Funds purchased.

156.    In April 2007, both Hedge Funds began to report to their investors material losses principally as a result of the Hedge Funds' investments in CDOs. Certain of the Hedge Funds' assets had materially declined in value and reportedly were worth substantially less than the values stated on the Hedge Funds' balance sheets. The losses triggered margin calls from lenders, including Merrill, and demands from investors for the return of capital invested in the Hedge Funds. By June 2007, the Hedge Funds could no longer satisfy the margin calls.

157.    On June 14, 2007, the Hedge Funds' creditors gathered at a meeting at BSC's offices in New York where attendees discussed the Hedge Funds' financial condition. The next day, Merrill seized at least $850 million worth of collateral assets and indicated that the assets would be auctioned off. As reported in the *New York Post* on June 21, 2007, according to data from its auction list, Merrill was lead manager on eight of the 11 separate CDO deals the Hedge Funds purchased, or, put another way, $674 million of the $857 million Merrill sought to auction.

158.    On June 15, 2007, Merrill's bond traders began circulating a list of subprime-related securities which served as collateral for the credit it had extended to the Hedge Funds. Bids for the subprime-related securities were scheduled to be negotiated starting at 12:00 p.m. on June 18, 2007. As reported by the *New York Post* on June 22, 2007, one trader who bid on the bonds reportedly stated that had Merrill sold the bonds,

"[the Company] would have locked in a lot of losses for themselves and a large slug of their client base by jamming bonds into the market."

159.    On June 18, 2007, creditors, including Merrill, met at BSC's offices for a further discussion of the Hedge Funds' financial condition.  The manager of the Hedge Funds, Ralph Cioffi, asked Merrill and other creditors to cancel their collateral auctions and their default notices, and accept a 12 month freeze on new margin calls.  According to the *Wall Street Journal* in an article dated June 23, 2007, representatives from Merrill were "taken aback" and the following day, Merrill pursued its plan to auction off the collateral.

160.    On June 20, 2007, the Exchange Act Defendants offered Merrill's $850 million in CDO collateral for sale, seeking bids from investors.  When the bids came in late on June 20, 2007, many of them were materially below prices at which Merrill was willing to sell the securities.  Reportedly, certain bids were as low as 30% of par value and for others there were no bids.  As a result, Merrill only sold a fraction of the assets.

161.    The sale of certain CDOs at materially depressed prices, and the failure to sell other CDO assets seized by Merrill, raised yet another red flag internally within the Company.  This confirmed what the Exchange Act Defendants knew all along, namely that:  (i) the CDO market was increasingly illiquid and had materially declined; and (ii) many CDOs (including CDOs that Merrill underwrote) could be sold only, if at all, for prices materially below par value.  Based on their knowledge of these facts, the Exchange Act Defendants knew or recklessly disregarded that the value of CDOs and other subprime-related assets reported on Merrill's balance sheet had materially declined in

value, were impaired and should have been written down by at least $16 billion by

June 29, 2007.

### h.    Merrill's Misleading and Manipulated Value at Risk Disclosures

162.    During the Class Period, Merrill's main method for reporting to investors

a quantification of the Company's exposure to risk, including, among other exposures,

Merrill's U.S. subprime ABS CDO exposure, was "Value at Risk."  According to its SEC

filings, Merrill defines Value at Risk ("VaR") as "a statistical measure of the potential

loss in the fair value of a portfolio due to adverse movements in underlying risk factors."

VaR is a risk-management methodology that provides an estimate of what losses might

be and the probability of those losses occurring.  A VaR analysis considers numerous

factors, including whether certain assets are investment grade or AAA or are more risky

assets, such as BBB or mezzanine or even lower rated assets.  It is the industry standard

and all major investment banks and global banks use it to tell investors their respective

levels of risk.

163.    During the Class Period, Merrill's actual VaR was materially greater than

reported and Merrill's reported VaR therefore materially understated Merrill's exposure

to risk.  Merrill's reported VaR conveyed to investors and analysts that the Company's

risk profile was materially lower than its peers.  For example, on November 15, 2006,

Credit Suisse issued a research report after a meeting with defendant Edwards. The report

stated, in part, that as of the third quarter of 2006 "[a]s a gauge of risk taking, we look at

Merrill's trading VaR . . . VaR as a percentage of tangible equity is low relative to peers.

[Bear Stearns, Goldman Sachs, Lehman Brothers and Morgan Stanley] . . . ."  On January

19, 2007, Bernstein Research issued a research report stating, in part, that Merrill's VaR

was lower than the industry average. After a meeting with defendant Fleming and Dow Kim, on February 2, 2007 Credit Suisse stated that while Merrill was taking more risk in many of its businesses, VaR as a percentage of tangible equity was low relative to Merrill's peers.

164.    On May 17, 2007, after a meeting with defendant Edwards, The Buckingham Research Group issued a research report stating that Merrill's "average daily trading VaR as a % of tangible equity [was] 30% below the peer group . . . based on our discussion with management, we believe the representation vs. the peer group is fairly accurate." On May 21, 2007, after a meeting with defendant O'Neal, Credit Suisse repeated its opinion that while Merrill was taking more risk in many of its businesses, Merrill's VaR as a percentage of tangible equity was low relative to its peers.

165.    Merrill's 2007 10-K on February 25, 2008 disclosed for the first time some of the truth concerning Merrill's U.S. subprime ABS CDO exposures: "If U.S. subprime residential ABS CDO and residual securities positions were included under traditional VaR treatment, the daily average VaR for 2007 would have been $83 million and the 2007 year-end VaR would have been $157 million due to the increase in volatility of the sub-prime residential indices used to model the excluded positions." Merrill's daily average and year end 2007 VaR for its U.S. subprime ABS CDOs were materially higher than its daily average and year end 2007 VaR excluding this exposure – which was $65 million for both. This had never been disclosed previously.

166.    Merrill's earlier reported VaR during the Class Period was materially false and misleading because, among other things, Merrill either recklessly or intentionally ignored that while its U.S. ABS CDO exposure was purportedly AAA rated debt, such

debt was comprised of assets that had BBB or lower ratings. Indeed, in Merrill's quarterly report for the period ended September 29, 2007, Merrill for the first time told investors that its "AAA-rated super senior CDO" exposures were materially comprised of Mezzanine (BBB) assets or highly risky CDO Squareds.

167.    Had Merrill properly disclosed its U.S. subprime ABS CDO exposure, Merrill's reported VaR for the quarter ended September 26, 2006, the year ended December 29, 2006, and the quarters ended March 30 and June 29, 2007 would have been materially higher than the VaR reported by Merrill for those periods.

### i.    Unauthorized Sale of CDOs to Broker Customers

168.    During the Class Period, defendants Merrill and MLPFS also foisted CDOs, MBS and related securities upon certain of their brokerage clients without such clients' authorization. Defendants Merrill and MLPFS undertook such conduct in an effort to reduce artificially the amount of CDOs on Merrill's own balance sheet. These actions are further evidence that the Exchange Act Defendants were aware that CDOs were overvalued and needed to be transferred off Merrill's balance sheet before losses would be recognized, among other things.

169.    For example, the unauthorized sale of CDOs helped enable defendant Edwards to claim during Merrill's second quarter 2007 earnings conference call held on July 17, 2007 that Merrill's allegedly "proactive aggressive risk management has put us in an exceptionally good position"; that "aggressive risk management I think has certainly transformed our risk profile since the end of the year"; and that "[w]e have seen significant reductions in our exposure to lower rated segments of the market." In truth, however, Merrill's and MLPFS's practices of engaging in unauthorized trading of CDOs in MLPFS client accounts contributed directly to Merrill's alleged "significant

reductions" in inventory of lower-rated CDO tranches. Further, these unauthorized sales also contributed to creating the appearance of greater secondary market activity in the trading of CDO tranches than actually would have existed absent such unauthorized transactions.

170.    In fact, at least two separate proceedings have been commenced publicly against MLPFS relating to such practices. The first action is captioned *MetroPCS Communications, Inc. and MetroPCS Wireless, Inc. v. Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Incorporated*, Cause No. 07-12430 (District Court of Dallas County, Texas, complaint dated Oct. 18, 2007) (the "MetroPCS litigation"). The second action is an administrative enforcement proceeding filed by the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts, captioned *In the Matter of Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Carl Kipper and Manuel Choy*, Docket No. 2008-001 (administrative complaint dated Feb. 1, 2008) (the "Massachusetts litigation").

171.    According to the complaint filed in the MetroPCS litigation, Merrill and MLPFS began in May of 2007 to unilaterally invest millions of dollars MetroPCS had entrusted to Merrill, in highly risky and illiquid tranches of several CDOs. MetroPCS alleges that certain of these CDOs were purchased through Merrill's auction rate market program, which was a list of commercial paper and other short-term debt instruments circulated periodically within Merrill that identified certain securities for its brokers to sell. In particular, MetroPCS Communications, Inc. ("MetroPCS") and MetroPCS Wireless, Inc. ("Metro Wireless") allege that Merrill improperly caused MetroPCS and

Metro Wireless to acquire second priority senior tranches of securities from the following

nine specific CDOs and in the following specific amounts:

- Alesco I Preferred Funding I, Ltd.          $ 5,950,000
- Broderick CDO Ltd.                          $18,500,000
- Reservoir Funding Ltd.                      $10,000,000
- Jupiter High-Grade CDO III, Ltd.            $10,000,000
- Lakeside CDO I, Ltd.                        $20,000,000
- Lakeside CDO II, Ltd.                       $20,000,000
- Mantoloking 2006-1, Ltd.                    $19,950,000
- Mercury CDO 2004-1, Ltd.                    $ 9,500,000
- TABS 2004-1, Ltd.                           $10,000,000.

In addition, MetroPCS and Metro Wireless allege that Merrill and MLPFS caused them

to also purchase an additional security for $10 million that was issued by Athilon Capital

Corporation whose value was backed by derivative instruments, which, in turn, were

obligated to insure other CDOs. Moreover, these allegedly unauthorized sales by Merrill

and MLPFS reportedly occurred during the Class Period – coinciding precisely with the

time that Merrill was increasingly desperate to increase its CDO sales and thereby reduce

its own inventory.

172.   In total, according to the MetroPCS complaint, defendants Merrill and

MLPFS caused MetroPCS and Metro Wireless to improperly invest some $133.9 million

in highly risky CDOs. Further, the MetroPCS plaintiffs allege that Merrill and MLPFS

engaged in such practices in direct violation of the specific terms of the parties'

investment advisory contract which, among other things, provided that the cash assets

were to be invested in a manner that was to preserve capital, provide liquidity and minimize risk.

173.    MetroPCS and Metro Wireless also allege, among other things, that Merrill and MLPFS failed to timely or properly deliver any of the offering memoranda for these CDOs, that Merrill and MLPFS failed to disclose that the collateral backing many of these CDOs had wide-ranging exposure to the subprime mortgage market, making them highly risky, that Merrill had a conflict of interest in marketing and selling these CDOs to MetroPCS and Metro Wireless because Merrill held significant investments of its own in CDOs and related instruments with subprime exposure, and thus stood to lose significantly if the market for such instruments weakened, and that Merrill and MLPFS falsely represented that these CDOs were safe and liquid.  In addition to breach of the parties' investment advisory contract, MetroPCS and Metro Wireless also assert, among other claims, that defendants Merrill and MLPFS breached their fiduciary duties and defrauded MetroPCS and Metro Wireless in connection with the unlawful purchase of these CDOs for MetroPCS and Metro Wireless.

174.    Similarly, the complaint filed by the Massachusetts Securities Division alleges that in April and June of 2007, MLPFS improperly sold the City of Springfield, Massachusetts approximately $14 million in three CDOs.  The three CDOs and the amounts the City of Springfield expended included specifically:

- Centre Square CDO                    $12,625,000
- South Coast Funding V CDO            $   700,000
- Tabs CDO                             $   625,000.

175.    As with MetroPCS and Metro Wireless, Massachusetts alleges that MLPFS sold these CDOs to the City of Springfield from MLPFS's auction rate market listings, and that these securities were purchased directly from MLPFS's own inventory. Also as with MetroPCS and Metro Wireless, Massachusetts alleges that the City of Springfield did not authorize these CDO purchases.  Further, Massachusetts filed its complaint after receiving certain documents from MLPFS which it obtained privately by subpoena, and also alleges that MLPFS received undisclosed underwriting fees in connection with underwriting these CDOs and additional undisclosed "remarketing fees" in connection with selling pieces of these CDOs; that MLPFS failed to perform any due diligence with respect to the suitability of the CDOs for the City of Springfield's portfolio, or timely or properly disclose to the City of Springfield the risks of transacting in, or even owning, CDOs; and that MLPFS improperly qualified the City of Springfield under SEC Rule 144A as a Qualified Institutional Buyer, reportedly merely to facilitate the sales of these CDOs to the City of Springfield.

176.    By August 2007, MLPFS reported to the City of Springfield that these CDOs had lost between 7-16% of their "estimated market value", according to the Massachusetts complaint.  Consequently, representatives of the City of Springfield approached MLPFS in September 2007 to request that these securities be sold and/or to explore other available options.  The City of Springfield was allegedly then advised by MLPFS that there were few, if any, buyers for these securities, and that these securities could not be sold at any price close to their par value.  However, MLPFS also then flatly denied that it was responsible in any respect to the City of Springfield for these investments.  In fact, in response to additional questions raised by the City of Springfield

concerning these CDOs in conferences on November 15-16, 2007, V. James Mann, First

Vice President and Assistant General Counsel of Merrill Lynch, sent a letter dated

November 29, 2007 to Salvatore Calvanese, Treasurer of the City of Springfield,

disclaiming any such responsibility on the part of Merrill.

177.    However, in direct contrast to its prior disclaimers of any responsibility,

by February 1, 2008, Merrill acknowledged that it had, in fact, improperly sold the City

of Springfield these CDOs.  According to a February 1, 2008 report by the Associated

Press:

> The City of Springfield and the Springfield Financial Control Board have
> said that neither body approved the purchases of these investments,
> Merrill Lynch spokesman William Halldin said in a statement.  *After
> carefully reviewing the facts, we have determined the purchases of these
> securities were made without the express permission of the City*.

> As a result, we are making the City whole and we have taken appropriate
> steps internally to ensure this conduct is not repeated, the company
> statement said. *Merrill Lynch had previously said Springfield officials
> reviewed, approved and authorized all of the investments*.

(Emphasis added).

Further, according to that same *Associated Press* report, Merrill Lynch had also agreed to

"reimburse" the City of Springfield the entire $13.9 million principal the City had

"invested" in these three CDOs.

178.    The specific unauthorized purchases of CDOs alleged in both the

MetroPCS litigation and the Massachusetts litigation occurred largely during the second

quarter of 2007.

**j.    Simultaneously Committing the Same Control Rights on CDOs to More Than One Counterparty**

179.    Allegedly in order to sell some CDOs that were reportedly otherwise unmarketable, Merrill and certain of its operating subsidiaries also improperly committed the same control rights over certain tranches of CDOs simultaneously to more than one counterparty, according to allegations recently filed by XL in its litigation with Merrill, as described more fully below.  Control rights include such things as whether and when the CDO may liquidate collateral, accelerate maturities, or remove a trustee or collateral manager.  Control rights also typically include the power to direct the CDO trustee to institute proceedings to protect the CDOs' underlying assets, and to approve agreements the CDO issuer proposes entering into with the collateral manager, administrator or bank.  Control rights comprise a fundamental part of each CDO.  Some CDOs Merrill issued provided that a single senior tranche of notes would be the "Controlling Class" over certain of the CDOs' control rights.

180.    Desperate to offload or at least try to hedge its massive inventory of CDOs backed by subprime mortgages particularly beginning in late 2006 and through 2007, Merrill and certain of its operating units entered into transactions with third parties pursuant to which the third party would guarantee, via a CDS or other agreement similar in substance to an insurance policy, the payments on certain tranches of CDO notes.  In exchange, Merrill paid the counterparty a fee.  However, to protect the financial guarantee it was obligated to provide, the counterparty guarantor typically required that it be entitled to exercise certain of the voting rights controlling the CDO notes that were the subject of the guarantee.

181.    Merrill entered into a number of these transactions during the Class Period with different third party guarantors.  These third parties purported to provide Merrill with guarantees against shortfalls in interest or principal payments due to investors in the CDOs.  Consequently, these guarantees were extremely attractive to Merrill as they helped enable Merrill to market and sell to investors billions of dollars of CDOs under the guise that these CDOs were financially guaranteed via an enforceable contract.

182.    Unbeknownst to at least certain counterparties, however, Merrill allegedly committed the same voting and control rights over specific CDO tranches simultaneously to two or more third party guarantors.  By doing so, Merrill was able to obtain from these counterparties financial guarantees on certain tranches of CDOs Merrill would otherwise be unable to obtain, and thereby market and sell to investors more CDOs and, thus, purportedly reduce its own inventory and generate reportedly increased revenues and profits.  Meanwhile, the third party guarantor believed that Merrill had committed the particular CDOs' voting and control rights exclusively to that third party.  However, there was no such guarantee.  Therefore, Merrill knew or recklessly disregarded that at least in certain instances these guarantees were worthless since Merrill was breaching the contractual provisions.

183.    Merrill reportedly undertook this scheme with respect to billions of dollars of CDOs during the Class Period.  For example, the counterclaim filed by financial guarantor XL alleges that a subsidiary of Merrill, Merrill Lynch International ("MLI"), undertook such illicit control right practices with respect to seven transactions covering $3.1 billion in CDO securities between January and August 2007 alone, specifically as follows:

(a) on or about January 25, 2007, $375 million on Class A-2 Notes issued by West Trade Funding CDO II, Ltd. and West Trade Funding CDO II, LLC;

(b) on or about April 11, 2007, $437.5 million on Class A-2 Notes issued by Silver Marlin CDO I, Ltd. and Silver Marlin CDO I, LLC;

(c) on or about May 25, 2007, $625 million in Class A-2 Notes issued by West Trade Funding CDO III, Ltd. and West Trade Funding CDO III, LLC;

(d) on or about June 4, 2007, $450 million in Class A-2 Notes issued by Tazlina Funding CDO II, Ltd. and Tazlina Funding CDO II, LLC;

(e) on or about June 15, 2007, $525 million in Class A-2 Notes issued by Jupiter High-Grade CDO VI, Ltd. and Jupiter High-Grade CDO VI, LLC;

(f) on or about June 29, 2007, $385 million in Class A-2 Notes issued by Robeco High Grade CDO I, Ltd. and Robeco High Grade CDO I, LLC; and

(g) on or about August 10, 2007, $350 million in Class A-2 Notes issued by Biltmore CDO 2007-1, Ltd. and Biltmore CDO 2007-1, LLC.

184.     XL alleges, among other things, that Merrill schemed to improperly commit voting and control rights in the same manner as to these seven CDOs; that bond insurer MBIA was reportedly one of the other specific financial guarantors to which Merrill had improperly committed the same CDO voting and control rights Merrill had previously committed exclusively to XL; and that Merrill's scheme entitled XL to be relieved of any obligation to pay any financial guarantee on these CDOs.  In fact, XL alleges that Merrill's scheme "was in blatant and knowing derogation of MLI's prior

contractual agreements" with XL, and that Merrill "has taken affirmative steps to" conceal from XL this scheme. Merrill denies the allegations generally, has moved for summary judgment, and seeks to hold XL responsible under the parties' agreements.

### 3. *Stock Offerings and Compensation*

185. The Exchange Act Defendants were also motivated to keep Merrill's stock price artificially inflated and its credit rating inflated throughout the Class Period so that Merrill could issue over $5 billion of Preferred Securities and common stock at artificially inflated prices. Merrill's proceeds from its securities issuances during the Class Period included:

| Security | Date | Proceeds |
|---|---|---|
| Merrill Lynch Capital Trust I Preferred | December 14, 2006 | $1.05 billion |
| Merrill Series 5 Preferred | March 20, 2007 | $1.5 billion |
| Merrill Lynch Capital Trust II Preferred | May 2, 2007 | $950 million |
| Merrill Lynch Capital Trust III Preferred | August 22, 2007 | $750 million |

186. Each of these securities was a direct or indirect obligation of Merrill and each was valued in material part on the basis of Merrill's financial statements, perceived financial strength, and perceived ability to manage risks. Moreover, these shares all traded at prices closely correlated to the price of Merrill's common stock.

187. In addition, Merrill issued the following securities to former holders of First Republic securities on September 21, 2007:

| Security | Value |
|---|---|
| Merrill Lynch Common Stock | $870 million |
| Merrill Lynch & Co. Series 6 Preferred | $65 million |
| Merrill Lynch & Co. Series 7 Preferred | $50 million |

188.    Had Merrill's common stock traded at lower prices, the First Republic acquisition would have been more costly to Merrill, Merrill would have had to issue additional shares, or would not have occurred.  Moreover, the First Republic acquisition was first announced in January 2007 and did not close until September 21, 2007.  The Exchange Act Defendants wanted desperately to have this acquisition close and purposefully delayed any disclosures of subprime problems or write-downs until after the First Republic acquisition closed.  Indeed, Merrill made their initial disclosures of write-downs in a matter of days after the closing of the First Republic acquisition.

189.    On December 24, 2007, near the end of the Class Period, and after the first round of write-downs, Merrill reached agreements with two investors to sell 116.7 million shares of common stock at $48 per share, on purchase dates between December 27, 2007 and January 15, 2008.

190.    On January 15, 2008, Merrill issued a press release titled "Merrill Lynch Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to Long-Term Investors" that stated, in part, that Merrill "enhanced its capital position by reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in private placements to long-term investors, primarily from Korea Investment Corporation, Kuwait Investment Authority and Mizuho Corporate Bank."

191.    These transactions would not have been consummated at the price set had Merrill fully disclosed its true financial condition.

192.    The Exchange Act Defendants were also motivated to provide materially misleading disclosures in order to conceal Merrill's true financial condition and to maximize their own compensation, particularly during the fiscal year 2006.  As the chart

76

from *The Wall Street Journal* below demonstrates, there was a direct link between CDO

volume, annual profit and these Defendants' pay.



193.    Absent misrepresentations of Merrill's true performance and risk

management practices, the Exchange Act Defendants would have received materially

smaller cash bonuses, as well as materially smaller total compensation.

194.    Finally, three of the individual Exchange Act Defendants were motivated

to artificially inflate the price of Merrill common stock in order to maximize the price

received on sales of their personal holdings of Merrill common stock.

195.    Defendant O'Neal sold 199,887 shares of his personal holdings of Merrill

common stock on February 5 and 6, 2007, at prices between $93.90 per share and $94.60

per share, reaping proceeds of $18.4 million.  This was an unusual and suspicious series

of transactions for O'Neal, as he had sold much smaller amounts of stock in previous

years: $11.2 million of his stock in 2006, $5.8 million in 2005, and reportedly no sales in

2003 and 2004.

196.    Defendant Fleming sold 45,020 shares of his personal holdings of Merrill

common stock on February 6, 2007, at prices between $94.00 per share and $94.29 per

share, realizing $4.2 million. This was also an unusual and suspicious series of transactions for Fleming, as he had reported sales of less than $500,000 in 2006.

197.    Defendant Fakahany sold 66,488 shares of his personal holdings of Merrill on October 24 and 25, 2006 at prices between $85.65 and $86.10 per share, and an additional 77,998 shares between February 5 and 6, 2007, at prices between $94.00 per share and $94.60 per share, reaping proceeds of more than $13 million. These sales were unusual and suspicious for Fakahany, as he had reported no other stock sales since 2003. These three individual defendants' February 5-6 sales are also unusual and suspicious in timing as they i) occurred the day after MLN filed for bankruptcy and a few days before ResMAE filed for bankruptcy, ii) occurred just prior to the February crash of the ABX, and iii) were near the Class Period high for Merrill common stock of $97.53 per share. These defendants did not buy shares of Merrill on the open market during the Class Period.

### 4.    *Defendants' CDO Scheme Crashes*

198.    On October 4, 2007, the *Wall Street Journal* reported that Merrill fired three executives who were involved in Merrill's investments in subprime debt. Specifically, Merrill fired Osman Semerci, global head of fixed income, Dale Lattanzio, co-head of fixed income for the Americas and Kim, who had overseen the acquisition of First Franklin Corp. On October 5, 2007, Merrill acknowledged it would have to take a $4.5 billion charge in the third quarter of 2007 due to mortgage and credit problems.

199.    Then, on October 24, 2007, before the market opened, Merrill issued a press release, announcing that the third quarter charge related to CDOs and U.S. subprime mortgages would be $7.9 billion instead of $4.5 billion. On October 30, 2007,

Merrill disclosed that defendant O'Neal "has decided to retire from the company effective immediately."

200.    On November 1, 2007 it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages. On January 17, 2008, before the market opened, Merrill disclosed it would write down another $16.7 billion related to its CDO and subprime exposure.  On April 17, 2008, Merrill disclosed its financial results for the period ended March 28, 2008 and further write-downs of approximately $9 billion, including the write-down of $1.5 billion of CDOs, and disclosed "credit valuation adjustments related to hedges with financial guarantors" of negative $3.4 billion.

201.    As of May 20, 2008, Merrill's stock closed at $46.31 per share.

### IV. THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND FRAUDULENT CONDUCT DURING THE CLASS PERIOD

A.    <u>Financial Results for the Fiscal Quarter Ended September 29, 2006</u>

202.    On October 17, 2006, in Merrill's press release for the quarter ended September 29, 2006, the Exchange Act Defendants represented:

> Net earnings for the third quarter of 2006 were $3.0 billion, or $3.17 per diluted share, as total net revenues increased significantly from both the third quarter of 2005 and the second quarter of 2006, to $9.9 billion.

*       *       *

> ■    GMI's third-quarter 2006 net revenues were $4.4 billion, up 21 percent from the year-ago quarter.  Compared with the third quarter of 2005, net revenues increased in all three major business lines:

> ■    Fixed Income, Currencies and Commodities (formerly Debt Markets) net revenues increased 26 percent, and were a quarterly record, driven primarily by record results in commodities and an

increase from trading credit products, which more than offset declines from principal investing and trading interest rate products.

203.    On October 17, 2006, in Merrill's conference call for the quarter ended September 29, 2006, Defendant Edwards represented the following:

Our CDO business continues to be extremely strong. Overall, it was our second-best quarter there.

204.    The statements above in paragraphs 202-203 were materially false and misleading because the Exchange Act Defendants failed to disclose the following:

(a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period (see ¶¶17-33; 74-91);

(b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-100; 108-115); and

(c) That increases in Merrill's reported net revenues and earnings for Merrill's fixed income division were achieved, in part, only by exposing Merrill to billions of dollars in highly risky U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91).

205.    On November 3, 2006, Merrill filed with the SEC on Form 10-Q its quarterly report for the quarter ended September 29, 2006 ("November 3, 2006 10-Q"). In the November 3, 2006 10-Q, the Exchange Act Defendants represented the following, *inter alia*, concerning Merrill's risk management policies and practices:

80

The strategy of maintaining long-term client relationships, ***closely monitoring costs and risks, diversifying revenue sources***, and growing fee-based and recurring revenues all continue as objectives to mitigate the effects of a volatile market environment on Merrill Lynch's business as a whole . . . .

\*     \*     \*

Risk-taking is integral to many of the core businesses in which Merrill Lynch operates. In the course of conducting its business operations, Merrill Lynch is exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of Merrill Lynch's core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, there are independent control groups that manage market risk, credit risk, liquidity risk and operational risk, among other functions, which fall under the management responsibility of the Chief Financial Officer. ***Along with other control units these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.***

(Emphasis added).

206.　In the November 3, 2006 10-Q, the Exchange Act Defendants made various representations concerning Merrill's market risk management, including *inter alia*:

(a) That Merrill's Market Risk Management Group, who had responsibility for approving the markets and products that Merrill's business units would transact and take risk, used the following methods to assess the risk of Merrill's portfolios and positions:

> Market Risk Management quantifies the sensitivities of Merrill Lynch's current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that Merrill Lynch's current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $43 million and:

> To calculate VaR, Market Risk Management aggregates sensitivities to market risk factors and combines them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options . . . .

(c) That in addition to VaR, Merrill also used other risk measurement methods to assess the Company's risk such as:

> These [additional risk measurement methods and tools] include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(d) That risk levels were monitored on a "daily basis to ensure they remain within corporate risk guidelines and tolerance levels."

207.    The statements in paragraphs 205-206 above were materially false and misleading for the reasons set forth above in paragraph 204 as well as because Merrill understated its reported VaR by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below, thereby falsely convincing analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167).

208.    In the November 3, 2006 10-Q, the Exchange Act Defendants represented the following concerning Merrill's credit risk:

*Residential Mortgage Lending*

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when

82