compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

209.    The statement above in paragraph 208 concerning credit risk was materially false and misleading because the Exchange Act Defendants failed to disclose that:

    (a) Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶129-141).  With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages (see ¶¶129-137); and

    (b) As a result of the lowered underwriting guidelines Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141).

210.    In the November 3, 2006 10-Q, with respect to derivative transactions, the Exchange Act Defendants represented, *inter alia*, that:

    . . . to reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agency securities, on certain derivative transactions. From an economic standpoint, Merrill Lynch ***evaluates risk exposures net of related collateral*** . . . .

> In addition to obtaining collateral, Merrill Lynch ***attempts to mitigate its default risk on derivatives whenever possible*** by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of its derivative contracts.

(Emphasis added).

211.    The statements above in paragraph 210 were materially false and misleading with respect to Merrill's derivatives related to CDOs and CDO-related assets because the Exchange Act Defendants failed to disclose that it was becoming increasingly difficult to satisfactorily mitigate Merrill's risk with respect to derivatives based on U.S. subprime ABS CDO exposures.  In particular, the Exchange Act Defendants failed to disclose that:

(a) By 2005, at least one top-tier insurer, AIG, had refused to sell insurance to Merrill to protect the Company's growing exposure to U.S. subprime ABS CDOs (see ¶¶100-102);

(b) Merrill was having extreme difficulty selling to investors AAA rated tranches of CDOs and resorted to purchasing these AAA rated tranches itself (see ¶¶74-91);

(c) In increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-61; 92-100; 108-115).

212.    The November 3, 2006 10-Q contained certifications, signed by defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made the following certifications:

84

1. I have reviewed this quarterly report on Form 10-Q of Merrill Lynch & Co., Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrants most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

213. The statements above in paragraph 212 were materially false and misleading because Merrill failed to disclose the information set forth in paragraphs 204, 209 and 211 herein, including that Merrill had reduced underwriting standards for mortgages which underlay its CDO house of cards while at the same time ramping up the size and number of CDOs by creating derivative contracts which were based upon and mimicked the subprime mortgages which were defaulting in ever greater quantities.

214. On November 14, 2006, defendant O'Neal spoke at the 2006 Merrill Lynch Banking and Financial Services Investor Conference and stated in part that Merrill would weather any trends in the market as it had "proper controls", "good risk management" and that the First Franklin acquisition would increase returns:

So is it all blue sky from here? — Well, obviously not. There will be bumps in the road and cyclical corrections from these longer-term secular trends, which means that *we have to continue to ensure proper controls, good risk management and adequate liquidity. We have to continue to invest in the people and systems necessary to manage the risks that are inherent in our capital market business. And we're doing that* . . . .

Diversification across products and asset classes is also important to our success. Over the last few years, we have reinvented our fixed income business, *adding scale and balance* . . . .

Results continue to be good. In the third quarter, FICC net revenues set a new record, of $2.1 billion, up 26 percent year-over-year, and were continuing to gain scale and share within a number of business lines. A couple of examples: . . . . In mortgages we've announced three transactions on three continents this year, most notably the acquisition of the First Franklin origination and servicing businesses here in the U.S. Together, ***these acquisitions will help provide an additional attractive source of origination for our mortgage-backed securitization and trading platform, enhancing revenue velocity relative to assets and thereby increasing our returns.***

Additionally, we continue to make progress in both rate and credit derivatives. . .

(Emphasis added).

215.    The statements above in paragraph 214 were materially false and misleading because Merrill failed to disclose the following:

    (a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures by the beginning of the Class Period (see ¶¶17-33; 74-91); and

    (b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115).

**B.**    **Registration Statement Amendment No. 1 (December 7, 2006 Offering)**

216.    On December 6, 2006, Merrill and Merrill Lynch Capital Trust I ("ML Trust I") filed with the SEC a Post-effective Amendment to a March 31, 2006 automatic shelf registration ("Registration Statement Amendment No. 1").

217.    Registration Statement Amendment No. 1 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, which, as set forth above in paragraphs 205-213, contained misrepresentations and omissions of material fact.

**C.    Financial Results for the Fiscal Year Ended December 29, 2006**

218.    In Merrill's January 18, 2007 press release for the fourth quarter and year ended 2006, the Exchange Act Defendants represented that Merrill had completed its most successful year ever and that it was "positioned better than ever to capitalize on the array of opportunities still emerging around the world":

> "We are extremely pleased with Merrill Lynch's performance for the year and the fourth quarter," said Stan O'Neal, chairman and chief executive officer. "By virtually any measure, our company completed the most successful year in its history. Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we can offer clients, expanding our geographic footprint, diversifying our business mix, managing and deploying our capital more effectively, and investing in top talent. We finished the year positioned better than ever to capitalize on the array of opportunities still emerging around the world as a result of what we believe are fundamental and long-term changes in how the global economy and capital markets are developing."

> *        *        *

> ■    GMI generated $18.9 billion in net revenues for the full year 2006, up 37 percent from 2005, driven by record revenues in both Global Markets and Investment Banking. Pretax earnings were $7.1 billion, up 43 percent from the prior-year period. The pretax profit margin was 37.6 percent, up from 36.0 percent in 2005, demonstrating operating leverage even as substantial investments were made across the business.

> ■    GMI's fourth-quarter 2006 net revenues were $5.4 billion, up 55 percent from the year-ago quarter. Compared with the fourth quarter of 2005, net revenues increased in all three major business lines:

■ Fixed Income, Currencies and Commodities net revenues of $2.3 billion increased 70 percent, setting a quarterly record, driven by every major business line, in particular record revenues from credit products, commodities and foreign exchange, as well as strong growth from trading interest rate products.

219.   Moreover, on January 18, 2007, in Merrill's conference call for the quarter and year ended December 29, 2006, defendant Edwards made the following statements highlighting "record revenues [and] earnings," "best ever performances in Investment Banking and Fixed Income [C]urrency [and] Commodities," Merrill's status as "Number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space":

This morning, I'm delighted to report the strongest quarter and year ever for Merrill Lynch. Highlights for both the Fourth Quarter and full year include record revenues, earnings and earnings per share, significant - [INAUDIBLE] return on equity while continuing to grow book value per share, record results in Global Markets and Investment Banking or GMI driven by best ever performances in Investment Banking and Fixed Income [C]urrency [and] Commodities and the full year record inequity Markets as well.

*      *      *

All these results demonstrate the breadth and depth we continue to add to our capabilities and positioning across business segments and regions, putting Merrill Lynch on its strongest competitive footing ever as we enter 2007. In the Fourth Quarter, we generated our highest ever quarterly operating revenues at $8.6 billion, up 27% from the Fourth Quarter of 2005 and 8% from the third quarter of 2006. With strong expense control particularly over compensation costs, pre-tax earnings of $3.4 billion were up 65% year on year and 42% sequentially. Record net earnings of $2.3 billion were up 68% year on year and 21% sequentially and earnings per share increased 71% and 21% over the comparable periods to a new high of $2.41.

*      *      *

89

GMI had nothing short of an outstanding quarter across nearly all businesses and regions, with $5.4 billion in revenues, GMI set a new quarterly record up 21% sequentially and 55% year on year. Pre-tax earnings for the quarter of $2.6 billion up 76% sequentially and 73% from the year ago quarter. GMI's pre-tax margin of 48.4% was an all-time high driven both by strong revenue growth and operating leverage achieved through disciplined overcompensation costs. This record Fourth Quarter completed a record full year for GMI. Net revenues of $18.9 billion were the highest ever, up 37% from 2005 with double digit percentage increases coming from each division and each region. Pre-tax earnings growth was even stronger at 43% to $7.11 billion as GMI achieved solid operating leverage even as significant investments continued to be made across the business. The full year pre-tax margin was 37.6%.

*     *     *

Since the Fourth Quarter began, we've closed two previously announced acquisitions. . . on the first day of the new fiscal year, ***First Franklin***, a non-prime mortgage origination and servicing franchise, so both these operations ***will contribute to our business in 2007***. Second, our Investment Banking business continues to make great strides, ranking Number one for the quarter in global equity and Equity-Linked underwriting lead tables and ***Number one in 2006 in CDO issuance for the third year in a row as we continue to be an innovator in that space***.

(Emphasis added).

220.    Moreover, defendant Edwards represented that Merrill's growth would not materially alter Merrill's risk profile:

[responding to a question]  Well, as a general matter, I think we've been very explicit in our strategy on risk. Our goal has been to add resources both people and technology to allow us to take more risk and as a general matter, our risk profile has increased over time and that certainly has contributed to growth in revenues. For this quarter itself, we'll publish our VAR statistics as part of our K, but I don't think you'll see a dramatic move in the VAR statistics one way or another particularly. On the leverage front, we have seen, ***we have been growing our assets and that has been a contributor as well to our growth and you'll see the continuation of that trend in the Fourth Quarter***.

(Emphasis added).

221.    The statements above in paragraphs 218-220 were materially false and

misleading.  The statement in Merrill's press release concerning "record revenues from

credit products" omitted to disclose that these "record revenues" were the result of

Merrill's decision to materially increase its concentration of assets in highly risky U.S.

subprime ABS CDO exposures.  The statement that "by virtually any measure our

company completed the most successful year in its history" was materially false and

misleading because Merrill failed to disclose that revenue derived from Merrill's U,S,

subprime ABS CDO exposures was at the expense of exposing the Company to

unprecedented risk.  As stated herein, this risk was in the form of Merrill's ballooning

exposure to the subprime market in the form of U.S. subprime ABS CDOs, synthetic

CDOs, CDO squared, TRS, and CDS.  While defendant Edwards extolled the virtues of

Merrill's GMI division (the division which generated the CDO business) stating that it

had "nothing short of an outstanding quarter across nearly all business and regions with

$5.4 billion in revenues", Edwards omitted to state that those revenues were earned by

exposing Merrill to huge risks that were not disclosed to investors.  Moreover, these

statements did not disclose other material negative trends affecting Merrill's business

including:

> (a) That Merrill was increasingly leveraging risky subprime mortgages, which
>
>     resulted in Merrill having billions of dollars of U.S. subprime ABS CDO
>
>     exposures (see ¶¶17-33; 74-91);
>
> (b) That in increasing its holdings of risky U.S. subprime ABS CDO
>
>     exposures, Merrill knowingly or recklessly ignored its risk management
>
>     policies and guidelines, including those established by Kronthal and other

executives who refused to increase Merrill's exposure to U.S. subprime

ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-100; 108-

115);

(c) That Merrill falsely represented that it mitigated market and credit risk on

trading assets and liabilities by being adequately hedged and that these

hedging techniques were supplemented by adequate corporate risk

management policies and procedures, when, in fact, the Exchange Act

Defendants had knowingly or recklessly ignored Merrill's risk policies

and guidelines and did not adequately hedge these exposures (see ¶¶34-66;

92-99; 108-115);

(d) That Merrill had significantly lowered the underwriting guidelines for

subprime loans that were originated and purchased from other subprime

originators, such as ResMAE, MLN and Ownit (see ¶¶ 124-141).  With

respect to Ownit, Michael Blum, a Managing Director and Head of Global

Structure Finance & Investment Group at Merrill and Merrill's representative

on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the

founder of Ownit, to materially lower its underwriting standards, which

provided Merrill access to a greater number of subprime mortgages; (see

¶¶129-137); and

(e) That as a result of the lowered underwriting guidelines Merrill had

experienced at least $400 million of early payment defaults on loans

purchased from subprime originators and thus began exercising "put" options

forcing the subprime originator to take back the defaulting loans and a major

originator of subprime loans – Ownit – had declared bankruptcy because of Merrill's exercising its put rights, but that Merrill would continue to package such loans into MBSs (see ¶¶124-141).

222.    On January 29, 2007, the Company announced it would acquire First Republic Bank for $1.8 billion.  In a press release, the Company represented:

> "We are very pleased that First Republic will join Merrill Lynch as a separately run business that will enable us to enhance the growth of our private client organization by leveraging First Republic's very successful business model and strategy," said Robert J. McCann, president of Merrill Lynch's Global Private Client business.  "First Republic will enable Merrill Lynch to accelerate its strategic objective of growing its high net worth business.  Our goal is to provide First Republic with the resources and support to replicate the firm's success in key markets across the country and to benefit from its deep banking expertise.  We look forward to supporting First Republic's further expansion with additional capital and a greater range of investment products, advice and services.  While First Republic will operate as a separate division with its own brand identity and strategic goals, we expect our entire private client organization to benefit from its outstanding history, excellent credit and lending capabilities, and its experienced management team.  First Republic's strong culture of client focus and service sets the standard for excellence in the private banking industry and is consistent with Merrill Lynch's mission and principles."

> *        *        *

> First Republic shareholders will receive $55.00 per share at closing.  Shareholders will have the ability to elect cash or stock, subject to proration, such that the aggregate consideration will be paid with 50 percent cash and 50 percent Merrill Lynch common stock.  Merrill Lynch plans to repurchase in the open market the number of shares equivalent to those it will issue in the transaction.  The firm expects to realize synergies by eliminating certain of First Republic's costs related to being a listed, publicly traded company.  Merrill Lynch also expects to realize benefits from the optimization of funding costs.  First Republic and Merrill Lynch expect to enhance revenue and earnings growth by accelerating First Republic's office expansion and by cross-offering products and services between the two organizations.  Such enhancements will initially be partially offset by integration costs and retention expenses.  Merrill Lynch expects the transaction to be modestly accretive to its earnings and EPS and neutral to its ROE by the end of 2008.  First Republic's financial

results will be included in Merrill Lynch's Global Private Client portion of its Global Wealth Management (GWM) segment.

223.    The above statements were materially false and misleading because Merrill failed to disclose that one of the reasons it sought to acquire a high-end net-worth business such as First Republic was because the Exchange Act Defendants knew of the rapid deterioration of the subprime market and Merrill's exploding risks to this market through its U.S. subprime ABS CDO exposures.  Thus, in addition to not disclosing its true exposure to U.S. subprime ABS CDOs, Merrill attempted to further obscure its true exposure by acquiring First Republic.

224.    On February 22, 2007, in a "Letter to Fellow Shareholders and Clients", defendant O'Neal made the following representations:

> I am pleased to report that, by virtually any measure, Merrill Lynch completed the most successful year in its history — financially, operationally, and strategically. After several years of restructuring and investing in our business, all of the components came together to reflect a company capable of strong, disciplined performance with tremendous potential for future success.

> Revenues, earnings, earnings per share and return on equity all grew strongly as a result of our continued emphasis on broadening the asset classes and capabilities we offer clients, expanding our geographic footprint, diversifying our revenues, managing and deploying our capital more effectively and investing in top talent from within and outside the company.

> *       *       *

> We also took a number of steps to further round out our capabilities. We acquired First Franklin, one of the nation's leading originators of residential mortgage loans, adding scale to our mortgage platform and providing a robust source of origination for our securitization and trading operations . . . We reorganized our institutional fixed income division to better manage risks, improve efficient use of the firm's balance sheet and enhance growth prospects . . .

94

225.    The statements in the paragraph above were materially false and misleading because even though O'Neal stated that Merrill had "completed the most successful year in its history," O'Neal omitted to disclose the material fact that in so doing, Merrill exposed itself to enormous risk in the form of billions of dollars in U.S. subprime ABS CDO exposure.  O'Neal also failed to disclose that as set forth in paragraphs 34-66, 74-99 and 108-115, the Exchange Act Defendants knowingly or recklessly ignored Merrill's risk management models and knowingly or recklessly ignored warnings concerning this ballooning exposure, including those of Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion and were fired because of their views.  Furthermore, O'Neal failed to disclose that Merrill's financials were materially exposed to the mounting risks associated with the declining housing market and increasing default rates of subprime borrowers.  (*See* ¶¶116-141).  Indeed, as set forth herein at paragraphs 142-153, by this time, the ABX and TABX indices had materially declined, which indicated to the Exchange Act Defendants that Merrill's U.S. subprime ABS CDOs were impaired.

226.    On February 27, 2007, Merrill caused to be filed with the SEC, Merrill's 2006 10-K.  The 2006 10-K represented that for fiscal 2006, Merrill reported: (i) net earnings of $7.5 billion, an increase of 47% from fiscal year 2005, and (ii) net earnings per diluted share of $7.59 per share, an increase of 47% from $5.16 per share in fiscal year 2005.

227.    The 2006 10-K makes scant reference to Merrill's involvement with subprime mortgages and contains no disclosures of the nature and extent of Merrill's CDO involvement or its use of subprime mortgage debt in structuring these financial

instruments.  Unlike the 2007 10-K, which  contains four full pages describing "U.S.

ABS CDO and Other Mortgage-Related Activities," neither the 2006 10-K nor any of the

10-Qs during the Class Period before the third quarter of 2007 contain any comparable

disclosures.  Merrill's 2006 10-K describes the business segment that was responsible for

its CDO business using vague generalities that did not give investors any glimpse of what

these securities involved or the risks attendant to them:

> *Fixed Income, Currencies and Commodities*
> FICC includes the following groups:
>
> *Global Credit* – responsible on a global basis for credit trading of money
> market instruments, investment grade debt, credit derivatives, structured
> credit products, syndicated loans, high-yield debt, distressed and emerging
> markets debt, as well as collateralized mortgage obligations, asset-backed
> securities trading, and pass-through mortgage obligations trading;

The 2006 10-K lumps the financial results from CDOs and subprime MBSs together with

other specialized debt products and reports that: "In 2006, FICC net revenues of

$8.1 billion increased 31% from 2005, as net revenues increased for all major products.

The increases in net revenues were primarily driven by record year-over-year results in

commodities, credit trading, foreign exchange, and structured finance."  Unlike in the

2007 10-K, the Exchange Act Defendants did not describe the extent of Merrill's

holdings in CDOs as of the date of the balance sheet or the risk that those holdings would

decline in value.

228.    By the time Merrill filed its 2006 10-K, there was a sharp decline in the

ABX and TABX.  Merrill did not disclose that it had billions of dollars of exposure to

these U.S. subprime ABS CDOs and that there was a substantial likelihood that the

decline in their value would materially negatively impact upon its financials.

229.    With respect to Non-Trading Related Assets and Liabilities, the 2006 10-K represented that Merrill "economically hedge[s]" risk by purchasing credit default swaps:

**Loans, Notes, and Mortgages, Net**

Our portfolio of loans, notes, and mortgages includes corporate and institutional loans, residential and commercial mortgages, asset-based loans and other loans to individuals and other businesses. We maintain collateral to mitigate risk of loss in the event of default on some of these extensions of credit in the form of securities, liens on real estate, perfected security interests in other assets of the borrower or other loan parties, and guarantees. We also ***economically hedge portions of the credit risk in certain commercial loans by purchasing credit default swaps***. Loans, notes, and mortgages were $73.0 billion at year-end 2006, up 11% from 2005 as a result of strong market demand driven by favorable borrower fundamentals and business growth.

(Emphasis added).

230.    The 2006 10-K further represented, *inter alia*, concerning Residential Mortgage Lending that any additional credit risk resulting from certain mortgage loans it addressed through "adherence to underwriting guidelines," that credit risk was "closely monitored" and that loans were "predominantly extended to high credit quality borrowers":

We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through ***adherence to underwriting guidelines*** as described below. ***Credit risk is closely monitored in order to confirm that reserves are sufficient and valuations are appropriate. These loans are predominantly extended to high credit quality borrowers***.

\*         \*         \*

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform which is focused on originating non-prime residential

mortgage loans through a wholesale network. As a result of this acquisition which was completed in the fiscal first quarter of 2007, *the credit profile of our mortgage lending portfolio may be impacted* in future periods.

(Emphasis added).

231.    The statements above in paragraphs 227-230 were materially false and misleading because during 2006, prior to the First Franklin acquisition, Merrill had greatly expanded its origination and purchasing of subprime mortgages and had reduced its credit standards both as to loans originated and loans purchased, which loans had begun to default in large numbers by the end of the year.  These statements were also materially false and misleading because by the beginning of the Class Period, Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options, forcing the subprime originator to take back the defaulting loans (see ¶¶124-141).  Thus, contrary to Merrill's statements, the credit profile of Merrill's mortgage lending portfolio *had already been* adversely impacted.  Moreover, rather than adhering to underwriting guidelines, Merrill ordered its originators, including Ownit, to lower underwriting guidelines, virtually insuring materially high default rates (see ¶¶124-141).

232.    As set forth below, the Exchange Act Defendants caused Merrill to falsely represent, in great detail, that Merrill had adequate risk policies in place to minimize the exposures of Merrill's portfolio.  However, the Exchange Act Defendants knowingly or recklessly ignored these policies and hid Merrill's true exposure to U.S. subprime ABS CDOs from plaintiffs and the class.  (*See* ¶¶34-66; 92-115).  Indeed, in the 2006 10-K, the Exchange Act Defendants represented that any risk associated with Trading-Related Assets and Liabilities were "mitigated" through "hedging strategies":

Although trading-related balances comprise a significant portion of the Consolidated Balance Sheets, *the magnitude of these balances does not necessarily result in an increase in risk*. The *market and credit risks associated with trading-related balances are mitigated through various hedging strategies*, as discussed in the following section. . . .

Trading Assets and Liabilities . . .

We use both "cash instruments" (e.g., securities) and derivatives to manage trading inventory market risks. As a result of these economic hedging techniques, a significant portion of our trading assets and liabilities represents hedges of other trading positions. We may use long positions in U.S. Government securities, for example, to hedge our short positions in interest rate futures contracts. *These hedging techniques, which are generally initiated at the trading unit level, are supplemented by corporate risk management policies and procedures* . . .

(Emphasis added).

233.    Further, in Merrill's 2006 10-K, the Exchange Act Defendants represented that Merrill's risk management policies and practices were, *inter alia*, subject to "regular senior management review and control," "clearly defined," and that "[r]isk framework exceptions and violations [were] reported and investigated at predefined and appropriate levels of management."  The Exchange Act Defendants represented the following:

Prudent Governance
We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to regular *senior management review and control* through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

\*       \*       \*

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with

other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, *these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.* To accomplish this, we have established a risk management process which includes:

☐        A formal risk governance structure that defines the oversight process and its components;

☐        A *regular review of the risk management process by the Audit Committee* of the Board of Directors (the "Audit Committee") as well as a *regular review of credit, market and liquidity risks and processes by the Finance Committee* of the Board of Directors ("the Finance Committee");

☐        *Clearly defined risk management policies and procedures* supported by a rigorous analytical framework;

☐        Communication and coordination among the businesses, executive management, and risk functions while maintaining *strict segregation of responsibilities, controls, and oversight*; and

☐        Clearly articulated risk tolerance levels, defined and *regularly reviewed by the ROC*, that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process. While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to mitigate risk-related losses so that they fall within acceptable, predefined levels, under foreseeable scenarios.

\*        \*        \*

Market and credit risk tolerance levels are represented in part by framework limits, which are established by the ROC and *reviewed and approved annually by the Executive Committee*, which must also approve certain intra-year changes. Substantive market and credit risk framework limit changes are reported to the Audit and Finance Committees. The

frameworks are reviewed by the Finance Committee in the context of its evaluation of market and credit risk exposures. ***Risk framework exceptions and violations are reported and investigated at predefined and appropriate levels of management***.

Both the Audit Committee and the Finance Committee are provided with ***regular risk updates,*** and significant issues and transactions are reported to the Executive Committee, the Audit Committee and the Finance Committee. Various governance committees exist to create policy, review activity, ***and verify that new and existing business initiatives remain within established risk tolerance levels***. Representatives of the independent risk and control groups participate as voting members of these committees. The activities of these committees are monitored by the ROC.

(Emphasis added).

234.    In the 2006 10-K, the Exchange Act Defendants represented the following concerning Merrill's management of market risk:

(a)  That the groups responsible for approving the products and

markets in which Merrill transacts and takes risk include Merrill's

Market Risk Management Group as well as other independent risk

and control groups and that:

. . . this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b)  That Merrill's overall VaR was only $52 million and:

101

To calculate VaR, we aggregate sensitivities to market risk factors and combine them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options.

\*     \*     \*

Trading VaR increased during 2006 due to increased levels of equity, commodity and credit trading. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels.***

To complement VaR and in recognition of its inherent limitations, we use a 'number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(c) That in addition to VaR, Merrill used other risk measurement

methods to assess the Company's risk including stress testing and

event risk analysis.

235.    In the 2006 10-K, in statements concerning Merrill's management of

credit risk, the Exchange Act Defendants made representations concerning the

creditworthiness of Merrill's counterparties, including that these parties could satisfy

their contractual obligations to Merrill and that their risks were monitored by "senior

management." However, these statements were materially false and misleading because

these counterparties were undercapitalized and/or highly leveraged. Therefore,

102

Defendants failed to disclose that there was a heightened risk of non-performance by

these counterparties (see ¶¶100-107) and falsely understated Merrill's VaR (see ¶¶162-

167). Thus, the Exchange Act Defendants represented:

> The Global Credit and Commitments Group uses a variety of methodologies to set limits on exposure and potential loss resulting from an individual, counterparty or issuer failing to fulfill its contractual obligations. The group performs analyses in the context of industrial, regional, and global economic trends and incorporates portfolio and concentration effects when determining tolerance levels. Credit risk limits take into account measures of *both current and potential exposure as well as potential loss and are set and monitored by broad risk type, product type, and maturity*. Credit risk mitigation techniques include, where appropriate, the right to require initial collateral or margin, the *right to terminate transactions or to obtain collateral should unfavorable events occur, the right to call for collateral when certain exposure thresholds are exceeded, the right to call for third party guarantees and the purchase of credit default protection. With senior management involvement, we conduct regular portfolio reviews, monitor counterparty creditworthiness, and evaluate potential transaction risks with a view toward early problem identification and protection against unacceptable credit-related losses.* We continue to invest additional resources to enhance Merrill Lynch's methods and policies to assist in managing our credit risk and to address evolving regulatory requirements.
>
> Senior members of the Global Credit and Commitments Group chair various commitment committees with membership across business, control and support units. These committees review and approve commitments, underwritings and syndication strategies related to debt, syndicated loans, equity, real estate and asset-based finance, among other products and activities . . .
>
> Further, to protect against declines in the value of the assets held by SPEs, for which Merrill Lynch provides either liquidity facilities or default protection, *Merrill Lynch economically hedges its exposure through derivative positions that principally offset the risk of loss arising from these guarantees.*

(Emphasis added).

236.    In the 2006 10-K, the Exchange Act Defendants represented, *inter alia*,

the following concerning the Company's liquidity and that it had risk management

systems in place to ensure that the Company had sufficient liquidity and that it would not

need to raise additional capital:

> Scenario analysis and stress testing is an important part of our liquidity
> management process. Our Liquidity Risk Management Group performs
> regular scenario-based stress tests covering credit rating downgrades and
> stressed market conditions both market-wide and in specific market
> segments. . .
>
> In our scenario analysis, we assume loss of access to unsecured funding
> markets during periods of financial stress. Various levels of severity are
> assessed through sensitivity analysis around key liquidity risk drivers and
> assumptions. Key assumptions that are stressed include diminished access
> to the secured financing markets, run-off in deposits, draws on liquidity
> facilities, and derivative collateral outflows. We assess the liquidity
> sources that can be accessed during the crisis and the residual positions.
>
> . . . The Liquidity Risk Management Group works with our Credit and
> Market Risk Management groups to incorporate the results of their
> judgment and analytics where credit or market risk implications exist. We
> assess the cash flow exposures under the various scenarios and use the
> results to refine liquidity assumptions, size our excess liquidity pools
> and/or adjust the asset-liability profiles.

237.    The 2006 10-K contained certifications, signed by defendants O'Neal and

Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made

substantially the same certifications as set forth above in paragraph 212.

238.    The statements above in paragraphs 232-237 were materially false and

misleading because the Exchange Act Defendants:

> a.  Failed to disclose that Merrill was increasingly leveraging risky subprime
>
>     mortgages that resulted in Merrill having billions of dollars of U.S.
>
>     subprime ABS CDO exposures (see ¶¶17-33; 74-91);
>
> b.  Failed to disclose that in increasing its holdings of risky U.S. subprime
>
>     ABS CDO exposures, Merrill knowingly or recklessly ignored its risk
>
>     management policies and guidelines, including those established by

104

Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

c. Misrepresented that Merrill mitigated market and credit risk on trading assets and liabilities by being adequately hedged and that these hedging techniques were supplemented by adequate corporate risk management policies and procedures, when in fact the Exchange Act Defendants had knowingly or recklessly ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶34-66; 92-99; 108-115);

d. Failed to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including companies such as XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107);

e. Materially understated Merrill's reported VaR by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167);

f. Failed to disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶124-141). With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and

Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages; (see ¶¶129-132);

g.  Failed to disclose that as a result of the lowered underwriting guidelines Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141);

h.  Misrepresented that because of Merrill's hedging techniques and risk management policies, Merrill would not be materially affected by issues related to the subprime market (see ¶¶41-52); and

i.  Misrepresented that Merrill's financial statements conformed to GAAP and failed to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶92-99, 142-153; 337-382).

**D.    Series 5 Preferred Stock Prospectus (March 15, 2007 Offering)**

239.   On March 12, 2007, Merrill filed with the SEC a product supplement related to the March 31, 2006 shelf registration statement and on March 16, 2007, Merrill filed with the SEC a term sheet/prospectus (collectively referred to as "Series 5 Preferred Stock Prospectus") under which it issued 60 million depository shares each representing a 1/1200th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series 5 at $25 per depository share.

240.    The Series 5 Preferred Stock Prospectus incorporated by reference
Merrill's November 3, 2006 10-Q and Merrill's 2006 10-K, which, as set forth above in
paragraphs 205-213 and 226-238, contained misrepresentations and omissions of material
fact.

**E.    Registration Statement Amendment No. 2 (April 25, 2007 Offering)**

241.    On April 23, 2007, Merrill and Merrill Lynch Capital Trust II ("ML Trust
II") filed with the SEC a Post-effective Amendment No. 2 to the shelf registration dated
March 31, 2006 ("Registration Statement Amendment No. 2").

242.    Registration Statement Amendment No. 2 incorporated by reference
Merrill's 2006 10-K, which, as set forth above in paragraphs 226-238, contained
misrepresentations and omissions of material fact.

**F.    Financial Results for the Fiscal Quarter Ended March 30, 2007**

243.    On April 19, 2007, in its press release for the quarter ended March 30,
2007, the Exchange Act Defendants represented:

> "This was a terrific quarter.  In an environment which was volatile at
> times, we took full advantage of market opportunities and delivered value
> to our clients and our customers," said Stan O'Neal, Chairman and Chief
> Executive Officer.

> \*        \*        \*

> Revenues from mortgage-related activities declined, resulting from a
> difficult environment for the origination securitization and trading of non-
> prime mortgage loans and securities in the U.S. ***Revenues from activities
> related to U.S. non-prime mortgages, in aggregate, comprised less than
> 1 percent of Merrill Lynch's total net revenues over the past five
> quarters.***

244.    Defendant O'Neal's statement in paragraph 243 above regarding Merrill's
first quarter earnings was materially false and misleading because it failed to disclose that

Merrill's U.S. subprime ABS CDOs had exposed the Company to extreme risk and created exposures to Merrill in the tens of billions of dollars. While O'Neal stated "this was a terrific quarter…" in fact it was not a terrific quarter for Merrill.  During this period, there was a steep drop in the ABX and TABX indices (see paragraphs 142-153), which was yet another fire alarm for Merrill that its U.S. subprime ABS CDO assets were materially overvalued. Moreover, while the housing market was continuing to decline, and defaults were continuing to rise, Kronthal had warned top Merrill executives of the danger of Merrill's exploding exposure to these risky assets (see paragraphs 108-115) and Merrill was having extreme difficulty selling U.S. subprime ABS CDOs it had packaged (see paragraphs 89-91).  Moreover, defendant O'Neal's statement that revenues from activities related to U.S. non-prime mortgages comprised less than 1% of Merrill's total net revenue over the past five quarters was materially false and misleading because the statement obscured the Company's U.S. subprime ABS CDO exposures, was intended to minimize the perceived risk of Merrill's U.S. subprime ABS CDO exposures, and misled Merrill shareholders and analysts.  Indeed, as stated below, the statement convinced analysts that Merrill's exposure was limited.  Thus, even assuming *arguendo* that revenues from activities related to mortgages comprised less than 1% of Merrill's net revenues over the past five quarters, O'Neal failed to disclose that the Exchange Act Defendants fraudulent CDO scheme exposed the Company to billions of dollars of ultra-risky assets in order to generate the 1% of overall revenue.  The Exchange Act Defendants, including defendant O'Neal, were aware of this and concealed this fact from investors.

245.   On April 19, 2007, in its conference call for the quarter ended March 30, 2007, defendant Edwards continued to assert that any problems in the markets related to subprime generally would not "impede the overall momentum" of Merrill, because revenues from subprime activities were less than 1% of net revenues for the past five quarters.  Defendant Edwards represented:

> In key businesses, in both GMI and global wealth management or GWM, we continue to successfully execute our strategy to broaden and deepen our platform.   The benefits of this diversification become especially evident in quarters such as this one, where *a clear dislocation in an individual market, the subprime mortgage space in the U.S., did not impede the overall momentum of our franchise.*
>
> *      *      *
>
> I want to pause here to make a few comments about our U.S. subprime mortgage business, since I know it has been a topic of much discussion and speculation.  Let me put this business into context.  As we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that *revenues from subprime mortgage-related activities comprise less that 1% of our net revenues for those five quarters.*  And even if you were to incorporate, pro forma, the revenues of First Franklin as if they were a part of our firm for all of 2006, the aggregate contribution would still be less than 2%. That said, this is an asset class that will continue to be significant both in the U.S. and worldwide. And the strategic importance of the First Franklin acquisition was clearly evident this quarter. *As having both origination and servicing capabilities, enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly.*

246.   Moreover, in the April 19, 2007 conference call, defendant Edwards falsely represented that Merrill's risk management capabilities were "better than ever" and that Merrill was "enhancing" its "already strong underwriting standards."  Edwards represented:

I would also point out that *our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets. In fact, we've been capitalizing on the market dislocation by recruiting the best talent from competitors, and we fully expect to emerge from this cyclical downturn even better positioned. At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors.*

*     *     *

WILLIAM TANONA, ANALYST, GOLDMAN SACHS: Good morning, Jeff. Obviously, the environment became a little bit more tricky this first quarter and there were concerns with subprime which you guys seem to have squashed any concerns regarding your exposure there. But I'm wondering if you guys have kind of changed your appetite in this environment or kind of rethinking what you put on your balance sheet or what type of risks you might take or if it has changed how you're approaching the business right now. . . .

EDWARDS: *[R]isk management, as I said, in the prepared remarks, is a crucial aspect of our business and I think we've done very good job in negotiating these markets as a result of that.* So how are we approaching that? We're certainly looking at new ways to do business where there are opportunities for us to either share risk or presell some of the risk and still do good business. *So I think we're approaching it in a prudent way,* given the environment . . . .

WILLIAM TANONA: In terms of sharing risk, obviously I think there is a lot of concern out there because you guys are pretty active on the CDO side and the warehouse side of that business. Can you kind of share your thought process as it relates to that and kind of what the trends you're seeing there in the overall business as well as possibly in the subprime space there?

EDWARDS: Okay. Well, it is a very active quarter for securitizations both in the ABS space directly and in the CDO space broadly. In CDOs, in addition to having a very active ABS calendar, we saw attention in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter. 19 of them were ABS/CDOs, and more than ten of those deals were in the first couple of weeks of March. So while it was certainly a more difficult environment, we continued to see an ability to transact and to move volume.

110

And on the subprime business, maybe just a couple more comments there. While it was a difficult environment, we were able to actually increase origination volumes at First Franklin in the quarter. And in fact, we had record volumes in both January and February. *And we did that in the background where we were enhancing our already strong underwriting standards*. We rationalized our array of products, eliminating certain products that were performing less well. And we successfully raised coupon rates. And we also saw during the quarter the first payment defaults at First Franklin and First Franklin originated paper, fall steadily throughout the quarter and they started out and remain at a level far below the industry. So I think the trends there show some signs of positiveness . . . .

\*     \*     \*

ROGER FREEMAN: Okay. That's helpful. Thanks. I guess lastly, can you talk at all to the VAR during the quarter or at least directionally from the fourth quarter?

EDWARDS: Yes. You'll see it in our Q, of course but directionally, it won't surprise you, I don't think, that it will be up consistent with the performance in our trading businesses. We've talked for some time now about our strategy of adding capabilities both people and technology to support growth and risk taking. That risk taking is evident in the results and you'll see the VAR reflect that as well.

247.     Finally, with respect to Merrill's retained interests in CDO deals, which were dramatically increasing, Edwards falsely represented there was "only a small part that reflects the subprime residuals". Edwards represented:

MICHAEL HECHT: . . . Is it possible for you to touch on the level of your overall retained interest for mortgage securitization noninvestment grade in particular and whether you've seen any big shifts since the beginning of the year?

JEFF EDWARDS: If you look at our retained interest in general, one important point to make there is that the majority of them clearly are investment grade rated securities that are either part of our CDO warehouse or that are the result of securitizations that are effectively in inventory that we intend to sell on to investors. *So, there is only a small part that reflects the subprime residuals.* And in general, given the level of activity and securitization that I described earlier, you would expect and you'll see retained interests will be up. The residual amount will be up at a much lower rate.

111

(Emphasis added).

248.    Defendant Edwards' statements in the April 19, 2007 conference call were materially false and misleading. Edwards stated that because of Merrill's diversification, subprime mortgage issues did not impede the overall momentum of Merrill's franchise. In other words, Edwards falsely represented that while there were issues in the subprime market, these issues would not materially affect Merrill's overall business.  In fact, the overall momentum at Merrill was impeded substantially because Merrill faced increasing difficulty in selling CDOs and, therefore, the Exchange Act Defendants had instructed Merrill employees to simply place those CDOs on Merrill's balance sheet at inflated values.  These statements by Edwards were also materially false and misleading for the following reasons:

(a)    Edwards' statement that "[t]he benefits of … diversification become especially evident in quarters such as this one, where a clear dislocation in … the subprime mortgage space in the U.S., did not impede the overall momentum of our franchise" implied that Merrill did not concentrate its assets in any high-risk asset category, and in particular, had not increased its concentration in the subprime mortgage-related area; whereas, in fact, during 2006 and the first quarter of 2007 Merrill had materially increased its concentration of and exposure to U.S. subprime ABS CDOs and related derivatives and greatly increased its risk of loss due to mortgage defaults and the decline in market value of subprime MBSs (see ¶¶17-33; 74-91; 124-141);

112