(b) Edwards' statement that "[a]s we noted in our earnings release, if you looked at both last year and the first quarter of this year and added up all of the origination, securitization, warehouse lending, trading and servicing revenues, both directly in our subprime business as well as our CDO activity involving subprime, including all of the retained interests, you would see that revenues from subprime mortgage-related activities comprise less than 1% of our net revenues for those five quarters" was materially false and misleading because, first, it suggested that Merrill's subprime business was directly discussed in the January 18, 2007 earnings release, which it was not.  Second, the statement suggested that the subprime business was a minor part of Merrill's business.  In fact, subprime MBSs were the principal cash asset backing virtually all of the CDOs and related derivative instruments underwritten, sold, swapped, traded, and held by Merrill, and without this foundation of securitized subprime mortgages, virtually none of the CDOs underwritten and traded by Merrill would have existed (see ¶¶17-33; 74-91);

(c) Edwards' statement concerning First Franklin that "having both origination and servicing capabilities, enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly" was materially false and misleading because he failed to disclose that Merrill lowered underwriting guidelines to increase subprime loans and as a result Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising

"put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141);

(d) Edwards did not disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91);

(e) Edwards did not disclose that Merrill's assets and liabilities were materially false because they did not account for impairment in the U.S subprime ABS CDO portfolio by at least 15% (see ¶¶142-153; 337-382); and

(f) Edwards' statement concerning VaR was materially misleading because Merrill's reported VaR did not adequately consider that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets many of which were rated BBB or below and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167).

249.    The Exchange Act Defendants' false statements had convinced the market that Merrill's exposure to U.S. subprime ABS CDOs was minimal. For example, on April 19, 2007, CIBC issued a report concerning Merrill that stated "[t]he quarter was highlighted by record-setting growth in each of its capital markets businesses and strong contribution from its wealth management business…CFO Edwards believes that the subprime mortgage downturn is contained and MERs exposure is small as subprime-related revenue was <1% of firm revs. in the past 5 quarters."

250.    Other analyst reports, including Wachovia and Buckingham Research Group repeated this theme. According to an April 19, 2007 Wachovia report: "[o]verall sub-prime related revenues for the last five quarters contributed less than 1% to MERs total revenues." Moreover, in its report dated April 20, 2007, Buckingham Research Group stated "within MBS trading (a source of investor concern) management noted that subprime mortgages represented only 1% of total revenues (and 2% proforma for the recent acquisition of First Franklin)."

251.    On April 27, 2007, Merrill held its 2007 Annual Meeting of Shareholders at the Merrill Lynch Hopewell Campus, 1550 Merrill Lynch Drive, Hopewell, New Jersey. At the meeting, defendant O'Neal discussed Merrill's purchase of First Franklin. O'Neal stated that he remained "very confident" that First Franklin "will be a more valuable franchise over time" partly because so many competitors had "gone bankrupt" or halted making new loans.

252.    On May 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended March 30, 2007 (the "May 7, 2007 10-Q"). In the May 7, 2007 10-Q, the Exchange Act Defendants represented, *inter alia*, that Merrill reported i) net earnings of $2.2 billion, an increase of 24% from the 2006 first quarter year results, and ii) net earnings per share of $2.50 per share and $2.26 per diluted share.

253.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $7.3 billion at March 30, 2007.

254.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that Merrill had mortgage loans of $21.0 billion and commitments to make mortgage loans of $7.995 billion as of March 30, 2007 and allowance for loan losses of $492 million.

255.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that as of March 30, 2007 Merrill had assets of mortgages, mortgage-backed and asset backed assets of $42.8 billion, contractual agreements of $36.3 billion and investment securities of $80.3 billion.

256.    In the May 7, 2007 10-Q, the Exchange Act Defendants categorized Merrill's assets into three types:  levels 1, 2 and 3.  Level 1 purported to represent those assets whose values were based on "unadjusted quoted prices for identical assets in an active market."  Level 2 purported to represent those assets whose values were based on "quoted prices for similar assets in active markets . . . non-active markets  . . . [p]ricing models whose inputs are observable for substantially the full term of the asset  . . . [and] pricing models whose inputs are derived principally from or corroborated by observable market data."  Level 3 assets purported to represent those assets whose values were "based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement."  Merrill represented that its Level 2 and Level 3 assets were the following amounts:

> (a) Level 2: (i) Trading assets, excluding contractual agreements were $79.408 billion; (ii) Contractual agreements were $184.552 billion, minus a net adjustment of approximately $153 billion, resulting in approximately $31 billion; and (iii) Investment securities were $52.360 billion;

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.830 billion; (ii) Contractual agreements were $5.341 billion; and (iii) Investment securities were $5.922 billion.

257.    The May 7, 2007 10-Q represented, *inter alia*, that Merrill's maximum exposure to loan and real estate Variable Interest Entities ("VIEs") was $196 million and $6.425 billion in guaranteed and other funds.

258.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented that "The Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

259.    The statements above in paragraphs 251-258 were materially false and misleading and omitted material facts for the following reasons:

(a) The Exchange Act Defendants failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having tens of billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 79-91);

(b) The Exchange Act Defendants failed to disclose that in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDOs beyond $3-$4 billion (see ¶¶34-66; 92-115);

(c) The Exchange Act Defendants violated GAAP by falsely representing Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q

based on the failure to properly mark-to-market the true value of the U.S. subprime ABS CDO exposures by at least 15% (see ¶¶142-153; 337-382);

(d) The Exchange Act Defendants violated GAAP by falsely representing Merrill's net earnings and earnings per share as reported in its May 7, 2007 10-Q based on the failure to properly mark-to-market the true value of the U.S. subprime ABS CDO exposures (see ¶¶142-153; 337-382); and

(e) The Exchange Act Defendants violated GAAP by failing to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶337-382).

260.    The May 7, 2007 10-Q barely mentions Merrill's subprime mortgage-related activity and is silent as to Merrill's use of subprime MBS in structuring CDOs. The May 7, 2007 10-Q contained a passing reference to subprime mortgage securitizations as follows:

> Retained interests in securitized assets were approximately $8.7 billion and $6.8 billion at March 30, 2007 and December 29, 2006, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have quoted market prices. The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and *only a small portion of the retained interests represent residual interests from subprime mortgage securitizations.*

(Emphasis added.)

261.    The statement above was materially misleading because it omitted any reference to retained interests in CDOs for which subprime mortgage securitizations were the underlying collateral, and thereby created a materially false and misleading

impression that Merrill's exposure to subprime mortgage-related assets was extremely limited.

262.    In the May 7, 2007 10-Q, the Exchange Act Defendants made the following representations concerning residential mortgage lending:

> We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through **_adherence to underwriting guidelines._** Credit risk is **_closely monitored in order to ensure that reserves are sufficient and valuations are appropriate_**. For additional information on residential mortgage lending, see the 2006 Annual Report.

(Emphasis added).

263.    Included in a section in the 2006 10-K, which the May 7, 2007 10-Q incorporates by reference, is the statement that Merrill's residential mortgage loans, including such non-traditional features, "are predominantly extended to high credit quality borrowers."

264.    The statements above in paragraphs 262-263 were materially false and misleading because the Exchange Act Defendants:

(a) Failed to disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶124-141). With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill, and Merrill's representative on Ownit's board of directors, in January 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards,

which provided Merrill access to a greater number of subprime mortgages for its CDOs; (see ¶¶129-135);

(b) Failed to disclose that as a result of the lowered underwriting guidelines, Merrill had experienced at least $400 million of early payment defaults on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141); and

(c) Failed to disclose that Merrill knew no later than April 13, 2007 that, as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, the value of First Franklin mortgages for sale were materially overvalued at the time of the First Franklin closing (see ¶¶121-123).

265. In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning derivatives:

Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

*         *         *

Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

266. In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning Merrill's risk management:

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In

addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

267.    In the May 7, 2007 10-Q, the Exchange Act Defendants represented the following concerning Merrill's management of market risk:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $65 million and:

At March 30, 2007, trading VaR was higher than at year-end 2006 primarily due to increased interest rate exposures along with modest increases to commodity exposures. This increase was offset by reduced equity exposures. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. *We monitor these risk levels on*

*a daily basis to verify they remain within corporate risk guidelines and tolerance levels* . . . .

(Emphasis added).

   (c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

268.   The statements above in paragraphs 266-267 concerning Merrill's derivatives and risk management were materially false and misleading because the Exchange Act Defendants did not disclose the following:

   (a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having tens of billions of dollars of U.S. subprime ABS CDO exposures (see ¶¶17-33; 74-91);

   (b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

   (c) That Merrill did not properly mitigate market and credit risk on trading assets and liabilities by being adequately hedged and that these hedging techniques were supplemented by corporate risk management policies and procedures, when in fact, the Exchange Act Defendants had knowingly or recklessly

ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶100-107; 179-184);

(d) That many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107);

(e) That Merrill materially understated its reported VaR because it did not adequately consider that Merrill's risky exposure to U.S. subprime ABS CDOs were backed by subprime-related assets, many of which were rated BBB or below, and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167);

(f) That Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated and purchased from other subprime originators, such as ResMAE, MLN and Ownit (see ¶¶124-141).  With respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards so Merrill had access to a greater number of subprime mortgages (see ¶¶129-135); and

(g) That Merrill disregarded or ignored its hedging techniques and risk management policies and affirmatively misled investors into believing that Merrill would not be materially affected by issues related to the subprime market(see ¶¶34-66; 92-115).

123

269.    The May 7, 2007 10-Q contained certifications, signed by defendants

O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley which made the same

certifications as set forth above in paragraphs 212 and 237.

270.    The statements above in paragraph 269 were materially false and

misleading for the reasons set forth above in paragraph 268.

## G.    First Republic Acquisition

271.    On or about May 8, 2007, Merrill filed with the SEC a Registration

Statement on Form S-4 (the "May 8, 2007 S-4"), as amended on June 8, 2007 and June

21, 2007 (the "June 21, 2007 S-4/A"), which became effective on June 22, 2007 and the

Proxy Statement and Prospectus dated June 22, 2007 (the "June 22, 2007

Proxy/Prospectus"). The May 8, 2007 S-4, June 21, 2007 S-4/A and the June 22, 2007

Proxy/Prospectus are collectively referred to as the "First Republic Registration

Statement."

272.    The First Republic Registration Statement incorporated by reference the

following documents: the 2006 10-K; the November 3, 2006 10-Q; the May 7, 2007 10-

Q; and the July 19, 2007 Joint First Republic and Merrill Lynch Notice to shareholders of

Extension of Cash/Stock election deadline in connection with the pending merger filed

pursuant to Rule 425, each of which contained false statements of material fact as

elaborated above at paragraphs 205-213, 226-238 and 252-270.

## H.    Financial Results for the Fiscal Quarter Ended June 29, 2007

273.    In June 2007, there was another dramatic drop in the ABX index. See

paragraphs 151-152. Moreover, in June 2007 the Bear Stearns Hedge Funds had

collapsed. See paragraphs 154-161. Merrill was a large lender to these funds and had

financed the funds' purchases of Merrill CDO assets and seized $850 million in collateral. On June 20, 2007, *The New York Times* reported that "an effort to save a troubled hedge fund at Bear Stearns hit a major hurdle yesterday when Merrill signaled that it would move forward with its plan to auction $850 million in subprime securities that had been held as collateral . . . if the assets – securities and bonds backed by subprime mortgages that can be difficult to value – are sold at prices well below where they are currently valued, the reverberations across Wall Street would be strong. Not only would Merrill be forced to post losses on its holdings, but other banks, hedge funds and investors owning similar securities would have to mark down the value of those holdings to new, lower prices."

274.    Further, the Exchange Act Defendants difficulties selling CDO tranches substantially increased during this period causing Merrill's balance sheet to pile up with $40 billion of U.S. subprime ABS CDO exposures that could not be sold and had become impaired due to a decline in value of at least 40 percent. Despite these clear and negative trends and events, the Exchange Act Defendants did not disclose Merrill's true exposure and represented that Merrill's exposure to subprime debt was "reasonably well contained". Similarly, the Exchange Act Defendants issued a press release falsely trumpeting "another strong quarter."

275.    On June 27, 2007, *Bloomberg News* reported that at a conference organized by Euromoney Institutional Investors Plc defendant O'Neal stated the following: (i) "rising foreclosures on subprime mortgages in the U.S. aren't affecting other parts of the bond market"; (ii) that Merrill's exposure to subprime debt is "reasonably well contained"; (iii) "There have been no clear signs its spilling over into

other subsets of the bond market, the fixed-income market and the credit market", and (iv) that "[t]here are risks in some of the structures, in some of the complexities of CDOs, mortgage-backed securities and particularly prime brokerage, but there's no clear sign that there's contagion developing."

276.     The statements above in paragraph 275 were materially false and misleading because defendant O'Neal obscured Merrill's true exposure to U.S. subprime ABS CDOs and misled investors into believing that Merrill's U.S. subprime ABS CDO exposures were minimal and contained.     Further, the Exchange Act Defendants knew, but did not disclose, that Merrill was materially exposed to U.S. subprime ABS CDOs and that those assets were impaired by at least 40 percent or at least $16 billion.

277.     On July 17, 2007, in a press release, Merrill announced its financial results for the quarter ended June 29, 2007.  Despite the continuation of negative trends in housing, subprime and the implosion of the Bear Sterns Hedge Funds, defendant O'Neal touted Merrill's results as the product of "diversification" and "the earnings power of [Merrill's] franchise."  In truth, because of a decline of at least 40 percent in Merrill's U.S. subprime ABS CDO exposures, Merrill's earnings had in fact deteriorated and it should have written down at least $16 billion in U.S. ABS CDO exposures.  The Exchange Act defendants represented the following:

> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

*          *          *

126

- GMI's second-quarter 2007 net revenues were $6.2 billion, up 36 percent from the second quarter of 2006, as net revenues increased in all three major business lines:

  - Fixed Income, Currencies and Commodities (FICC) net revenues increased 55 percent to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45 percent from 2006, reflecting increased diversity and depth across asset classes.

278.    As analysts became concerned about Merrill's exposure to subprime-related debt, the Exchange Act Defendants falsely assured the market that Merrill's "management, hedging, and cost controls" had "proven to be effective in mitigating the impact of [Merrill's] results" and as a result, Merrill was in an "exceptionally good position." On July 17, 2007, in connection with its second quarter 2007 earnings conference call, defendant Edwards represented the following concerning risk management, hedging controls, CDOs and Merrill's U.S. subprime ABS CDO exposures:

> [T]he sequential decline in FICC revenues was driven primarily by credit, commercial real estate, and currencies, which has all set revenue records in the first quarter, as well as commodities. Partially offsetting these declines was a substantial increase from structured finance and investments, which primarily reflects a better performance from ou[r] U.S. subprime mortgage activities and to a lesser extent the continues growth in global rates.

> While we have seen some positive signals, such as improving first-payment default levels for First Franklin, the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize. *Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results.*

*     *     *

127

Glenn Schorr - *UBS - Analyst*
[I]n terms of both subprime and CDO exposure . . . You are the largest underwriter of CDOs, and maybe try to give some color around myth versus reality, and how people should think about, A) What is on your books in terms of residuals and exposure, and B) maybe even comment related to some of the Bear hedge funds, what collateral you have taken on your books or have not? And just overall comfort there, as well.

Jeff Edwards - *Merrill Lynch - CFO*
Okay. Well, look, again I want to make two points. The first is, that this is another example where ***I think proactive, aggressive risk management has put us in an exceptionally good position.*** Obviously the market has gone through a period of flux. We think that remains the case.

***But aggressive risk management I think has certainly helped transform our risk profile since the end of the year. We've seen significant reductions in our exposure to lower-rated segments of the market.*** Our warehouse lines are down materially, our whole-loan inventory is down materially. As was the case in the last quarter, we will see a modest increase in our residual position. But it will be small relative to our overall retained interest piece. And I think the majority of our exposure continues to be now in the highest credit segment of the market . . . .

[T]his is obviously an area that has received a lot of attention, and it receives a lot of attention as we work to risk manage it. But it is only a part of our business, our broader business. It is a part of our structured finance and investment business, which has many other pistons around the world, other asset classes. And in turn, structured finance is only a part of our broader FICC business, which is obviously only a part of GMI, and a part of the firm. I think the importance of diversification came through yet again this quarter in these results . . . .

Obviously we have a very robust process around marking these [CDO and subprime] assets. And we are confident in how they were marked, how they are marked.

(Emphasis added).

279.   Moreover, when questioned regarding what percent of Merrill's earnings were subprime-related, Edwards once again minimized the impact of subprime on Merrill, even though it had an undisclosed exposure of at least $40 billion which was itself more than 40% impaired by this time.  Defendant Edwards represented:

**Mike Mayo** - *Deutsche Bank – Analyst*
[W]hat percent of your earnings are related to mortgage or subprime mortgage? And if you could include in that CDOs, warehouse lines, or anything else.

**Jeff Edwards** - *Merrill Lynch – CFO*
Well, just to remind everybody, we made the comment in the first quarter that over the previous 5 quarters, all of that activity as broadly as we could define it, represented less than 2%. As I said, the business overall was down compared to last year, it was up compared to the first quarter. *I don't think there is anything that would change that comment that I made in the first quarter* . . . .

**Mike Mayo** - *Deutsche Bank - Analyst*
How much of your capital is at risk? How much in total assets do you have that is somehow related to that same category?

**Jeff Edwards** - *Merrill Lynch - CFO*
Well, we obviously have a robust economic capital model that we employ, to address risk around all of our different assets. From an overall asset standpoint, again the point I would make there, *is that there has been we think an important transformation of the components of that asset base, where the exposure that we retain is in the higher rated tranches of the exposure. And what we have done is reduce exposure in some of the broader lower rated categories.*

**Mike Mayo** - *Deutsche Bank - Analyst*
Okay. Do you have an overall number though, for how much capital you have at risk related to subprime mortgage, CDOs, warehouse lines?

**Jeff Edwards** - *Merrill Lynch - CFO*
We don't disclose our capital allocations against any specific or even broader group.

**Richard Bove** - *Punk, Ziegel & Company - Analyst*
And I guess finally, just overall in the broad high-yield market, it appears that yield on high yield bonds has gone up 65 basis points in the last 5 to 6 weeks. And the ABX index which I guess has a lot of relevance or no relevance, depending upon how you use it, has dropped about 40% over the year. What has that done to the valuation of the overall assets of Merrill Lynch . . . .

**Jeff Edwards** - *Merrill Lynch - CFO*
At any point in time, we have got assets and hedges in place that are directly affected by all of these items. ***And in the course of the quarter,***

*we seek to mark all of those things. And again, it highlights, I think the importance of having effective risk management, which we believe thus far we have demonstrated has been very effective.*

\*        \*        \*

**Meredith Whitney** - *CIBC World Markets – Analyst*
I need a little extra help on the values you are describing to the mortgage piece and the CDO piece. I appreciate your comments earlier that you are comfortable how you are valuing them, but for an outsider that doesn't have the benefit of what you see. Can you give a little bit more of a qualitative overview, in terms of what methods you are using to value these securities? How the methods have changed? At what point have you decided the market deserves a revaluation of these securities? Did you revalue and write down these securities during the second quarter? Any extra color you can give that would help me, and a bunch of others so it would be appreciated.

**Jeff Edwards** - *Merrill Lynch - CFO*
Okay. Well, of course **we are constantly reevaluating these assets and related hedges on a constant basis.** So in some cases, they get marked down, in some cases they get marked up. The offsets sometimes move in other directions. The broad answer to your question is, yes, we absolutely marked all of that, all of those assets and related hedges during the quarter. **In general when there is an active observable market, we have mark to market.** When there are related markets that we can use to interpolate, we also can mark effectively to market. There are some parts, such as the residuals which are more on a mark to model basis, based on inputs that we can observe, such as cumulative default curves, for example. And then there are loans that we also make judgments on, using lower-cost markets. So, that is a broad explanation as to how we look at those assets . . . . Everything will affect our valuations and the related hedges. And we will constantly be updating for all the new input that comes into the market.

**Meredith Whitney** - *CIBC World Markets - Analyst*
Okay. Just one last follow-up in terms of the severity of these marks, would you qualify the second quarter severity to be greater than the first quarter?

**Jeff Edwards** - *Merrill Lynch - CFO*
Well, overall, as I pointed out the business performed better in the second quarter than it did in the first quarter. Still did not perform as well as it did in the second quarter last year. And I think that appropriately gives you a benchmark.

**Meredith Whitney** - *CIBC World Markets - Analyst*

130

Okay. But the indexes are down dramatically from the first quarter this year and the second quarter of last year. So that is really speaking about valuations.

**Jeff Edwards** - *Merrill Lynch - CFO*
**All of which is reflected in those results.**

(Emphasis added).

280.   The statements above in paragraphs 277-279 were materially false and misleading because:

(a)   Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

(b)   Merrill did not adequately account for the impairment of its U.S. subprime ABS CDO exposures of at least 40% or $16 billion during this quarter (see ¶¶142-153);

(c)   Edwards failed to disclose that in increasing Merrill's holdings of risky U.S. subprime ABS CDOs, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶33-66; 92-99; 108-115); and

(d)   Edwards failed to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including companies, such as XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107; 179-184).

281.  On July 17, 2007, defendant Edwards represented that Merrill's exposure to the Bear Sterns Hedge Funds was "both limited and well under control," "contained" and "appropriately marked:"

> **Richard Bove** - *Punk, Ziegel & Company - Analyst*
> I was wondering if you could go further into the Bear Stearns transaction. I don't know if the press reports are anywhere near correct, but they are suggesting that you loaned $800 million to this fund that Bear Stearns put together. And at the present time most of the collateral was still held by Merrill Lynch, and that most of the assets in that fund are not worth $0.10 on the dollar. So I am just wondering, #1) Why would Merrill Lynch lend $800 million if that number is at all correct to a fund which had not been in existence for a year? And secondly, whether the valuations stated in the press are anywhere near correct, and if they are, how you are valuing the collateral that you now hold in that fund . . . .

> **Jeff Edwards** - *Merrill Lynch - CFO*
> Let me just say that we think ***our net exposure in the situation is both limited and well under control.*** We obviously have acted in ways that we think are ***prudent in managing our risk***. I think again, as a demonstration of our pro-activity here. At this point, we remain in active dialogue with Bear Stearns Asset Management, but I think our exposure here is limited. It is contained. And it is appropriately marked . . . .

> We look at all of our hedge fund clients on a individual basis. Obviously providing financing to hedge funds is what the financing and services business is all about. ***When we undertake to make such loans, we do so in ways that we believe are structured prudently from a credit perspective.*** And we expect to resolve this in a reasonable way and a reasonable amount of time.

(Emphasis added).

282.  Defendant Edwards' statements concerning the Bear Sterns Hedge Funds were materially false and misleading because Edwards falsely stated that Merrill's exposures to the Bear Sterns Hedge Funds were "both limited and well under control."  In addition, Edwards' statements provided the materially false impression that Merrill's risk management controls were effectively managing the risks associated with Merrill's exposure to these funds.  However, Edwards did not disclose that Merrill had knowingly

132

or recklessly ignored its risk management policies and guidelines, including those of Kronthal and other executives who refused to increase Merrill's exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion. See ¶¶ 34-66; 92-99; 108-115. Moreover, Edwards failed to disclose that the problems relating to the Bear Sterns Hedge Funds also existed, on an even larger scale, on Merrill's own balance sheet since Merrill had more than $40 billion in U.S subprime ABS CDO exposures which itself was overvalued by more than 40% or $16 billion (see ¶¶142-161).  Moreover, Edwards did not disclose that Merrill's "loan" to the Bear Stearns hedge fund was in reality a financing by Merrill so that the hedge fund would purchase Merrill CDO assets.

283.    On July 26, 2007, several days after the July 17 press release and conference call, the First Republic shareholders voted to approve the merger between First Republic and Merrill.  If the Exchange Act Defendants had issued correct financials and had not made false and misleading statements during the July 17 conference call, the First Republic stockholders most likely would not have approved the merger on the terms they did.

284.    On August 3, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended June 29, 2007 (the "August 3, 2007 10-Q").  The August 3, 2007 10-Q, represented *inter alia*, that Merrill reported i) net earnings of $2.1 billion, and ii) earnings per common share of $2.48 per share and $2.24 per diluted share, up 39% and 37%.

285.    The August 3, 2007 10-Q represented that as of June 29, 2007, Merrill had assets of mortgages, mortgage-backed assets of $34.5 billion, contractual agreements of $42.9 billion and investment securities of $86.4 billion.

286.    The August 3, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $8.6 billion at June 29, 2007.

287.    The August 3, 2007 10-Q reported mortgage loans of $18.9 billion and commitments to make mortgage loans of $8.1 billion as of June 29, 2007 and allowance for loan losses of $435 million.

288.    The August 3, 2007 10-Q categorized Merrill's assets into three levels: levels 1, 2 and 3.  The categories were described in a substantially similar way in the August 3, 2007 10-Q as they were described in Merrill's May 7, 2007 10-Q.  Merrill represented that its Level 2 and Level 3 assets were the following amounts:

(a) Level 2: (i) Trading assets, excluding contractual agreements were $86.611 billion; (ii) Contractual agreements were $216.321 billion minus a net adjustment of approximately $180 billion for a total of approximately $36 billion; and (iii) Investment securities were $58.519 billion;

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.648 billion; (ii) Contractual agreements were $6.601 billion; and (iii) Investment securities were $5.784 billion.

289.    The August 3, 2007 10-Q represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

290.    The statements above in paragraphs 284-289 were materially false and misleading and omitted material facts because the Exchange Act Defendants:

(a) Failed to disclose that Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having billions of dollars of U.S. subprime ABS CDO exposures of over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

(b) Violated GAAP by falsely representing Merrill's trading assets and liabilities as reported in its 10-Qs for the period ending June 29, 2007 based on the failure to properly mark-to-market the true value of its U.S. subprime ABS CDO exposures (see ¶¶142-153; 337-382);

(c) Violated GAAP by falsely representing Merrill's net earnings and earnings per share as reported in its 10-Q for the periods ending June 29, 2007 based on the failure to properly mark-to-market the true value of its U.S. subprime ABS CDO exposures. Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion, and its earnings per diluted share would have declined from a reported profit of $2.24 per share to a loss of $10.30 per share (see ¶¶142-153; 337-382);

(d) Failed to disclose that by at least April 13, 2007, Merrill informed National City Bank that as a result of adverse conditions in the secondary market for mortgage loans that existed at the end of 2006, the value of First Franklin mortgages held for sale were materially overvalued at the time of the First Franklin closing (see ¶¶121-123);

(e) Violated GAAP by failing to disclose Merrill's significant concentration of credit risk to U.S. subprime ABS CDOs (see ¶¶337-382); and

(f) That Merrill was continuing to securitize loans originated by Ownit, which by this time had gone bankrupt (see ¶141).

291.    The August 3, 2007 10-Q represented the following concerning residential mortgage lending:

> Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

292.    The statements above in paragraph 291 were materially false and misleading because Merrill did not disclose that Merrill had significantly lowered the underwriting guidelines for subprime loans that were originated by and purchased from other subprime originators, such as ResMAE, MLN and Ownit, in order to obtain more subprime mortgages for Merrill's CDOs.  As a result of the lowered underwriting guidelines, Merrill had experienced at least $400 million of EPD on loans purchased from subprime originators and thus began exercising "put" options forcing the subprime originator to take back the defaulting loans (see ¶¶124-141).  In addition, Merrill did not disclose the material fact that with respect to Ownit, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's representative on Ownit's board of directors, in January, 2006, instructed Bill Dallas, the founder of Ownit, to materially lower its underwriting standards, which provided Merrill access to a greater number of subprime mortgages (see ¶¶129-135).

293.     In the August 3, 2007 10-Q, the Exchange Act Defendants represented the following concerning derivatives:

Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

*          *          *

Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

294.     In the August 3, 2007 10-Q, the Exchange Act Defendants represented that Merrill "continue[d] [its] disciplined risk management" and "manage[d] [its] overall portfolio of positions and exposures" even though in reality, the Exchange Act Defendants knew that Merrill's exposure to U.S. subprime ABS CDOs had spiraled out of control. In so doing, the Exchange Act Defendants were assuring investors that even though there were "challenging market conditions," Merrill's risk was under control:

While the outlook for growth in most global businesses in which we operate remains strong, the challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. Merrill Lynch continues to be a major participant in these markets with risk exposures through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. *We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks.*

*          *          *

137

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

(Emphasis added).

295.    In the August 3, 2007 10-Q, the Exchange Act Defendants represented that they monitored risk levels on a daily basis "to verify they remain which corporate risk guidelines" and represented the following:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $71 million and:

The average trading VaR was higher in the second quarter than in the first quarter due primarily to higher equity exposures and higher interest and credit spread exposures earlier in the period. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading

activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. *We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels*.

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis "which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for Merrill Lynch."

296.    In the August 3, 2007 10-Q, the Exchange Act Defendants represented that Merrill's maximum exposure to loan and real estate VIEs was $220 million and $6.65 billion in guaranteed and other funds.

297.    The statements above in paragraphs 293-296 concerning Merrill's derivatives and risk management were materially false and misleading because the Exchange Act Defendants misrepresented and/or did not disclose the following:

(a) That Merrill was increasingly leveraging risky subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33);

(b) That in increasing its holdings of risky U.S. subprime ABS CDO exposures, Merrill knowingly or recklessly ignored its risk management policies and guidelines, including those established by Kronthal and other executives who refused to increase  exposure to U.S. subprime ABS CDO exposures beyond $3-$4 billion (see ¶¶34-66; 92-99; 108-115);

(c) That Merrill did not properly mitigate market and credit risk on trading assets and liabilities by being adequately hedged and misrepresented that these hedging techniques were supplemented by corporate risk management policies and procedures when in fact, the Exchange Act Defendants had knowingly or recklessly ignored Merrill's risk policies and guidelines and did not adequately hedge these exposures (see ¶¶100-107; 179-196);

(d) That many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107);

(e) That Merrill's reported VaR was materially understated by not adequately considering that Merrill's risky exposure to U.S. subprime ABS CDO exposures was backed by subprime-related assets many of which were rated BBB or below and thereby falsely convinced analysts and the market that Merrill was a less risky company than its peers (see ¶¶162-167); and

(f) That defendants Merrill and MLPFS had foisted CDOs and related securities upon certain of their brokerage clients without such clients' authorization (see ¶¶168-178).

298.    The August 3, 2007 10-Q contained substantially the same Section 302 statements as those set forth in Merrill's November 3, 2006 10-Q, which are set forth above in paragraphs 212, 237 and 269.  The certifications were materially false and misleading because they failed to disclose that Merrill had overridden its risk control systems.  In addition, the statement that "the financial statements, and other financial

information included in this report, fairly present in all material respects the financial condition" of the Company, was materially false and misleading because Merrill's statements of assets and liabilities did not take into consideration an impairment of at least 40%, or $16 billion, in Merrill's U.S. subprime ABS CDO exposures.

**I.     Registration Statement Amendment No. 3 (August 15, 2007 Offering)**

299.    On August 13, 2007, Merrill and Merrill Lynch Capital Trust III ("ML Trust III") filed with the SEC a Post-effective Amendment No. 3 to the shelf registration dated March 31, 2006 ("Registration Statement Amendment No. 3").

300.    Registration Statement Amendment No. 3 incorporated by reference Merrill's 2006 10-K, as well as Merrill's May 7, 2007 10-Q and August 3, 2007 10-Q, which, as set forth above in paragraphs 226-238, 252-270 and 284-298, contained misrepresentations and omissions of material fact.

**J.     September 14, 2007 Form 8-K**

301.    On September 14, 2007, Merrill filed a Form 8-K updating the First Republic Registration Statement, which stated:

> We are making the following disclosure in anticipation of the closing of Merrill Lynch's acquisition of First Republic Bank, which is scheduled for September 21, 2007.
>
> As we stated in our Quarterly Report on Form 10-Q for the quarterly period ended June 29, 2007: "While the outlook for growth in most global businesses in which we operate remains strong, the challenging market conditions in certain credit markets that existed during the first half of 2007 have intensified in the beginning of the third quarter. Characteristics of this environment include increased volatility, wider credit spreads, reduced price transparency, lower levels of liquidity, and rating agency downgrades. These factors have impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products and components of the leveraged finance origination market. Merrill Lynch continues to be a major participant in these markets with risk exposures

through cash positions, loans, derivatives and commitments. Given current market conditions, significant risk remains that could adversely impact these exposures and results of operations. We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks."

Credit market conditions have continued to remain challenging in the third quarter, and the firm, as part of its regular accounting processes, has made requisite fair value valuation adjustments as appropriate to certain of these exposures, which are reflected in our third quarter to date results.

302.    Merrill's statements above in paragraph 301 were materially misleading because Merrill had not in fact made the appropriate "valuation adjustments" to account for its U.S. subprime ABS CDO exposures.  In addition, Merrill continued to hide its true exposure to the U.S. subprime ABS CDOs because its risk management systems had been overridden.  In addition, although the Exchange Act Defendants represented that Merrill's exposure to the "sub-prime mortgage market" could be adversely impacted, in fact the Exchange Act Defendants still did not disclose the level of that exposure (at least $40 billion as of June 29, 2007) or that its exposure had already been adversely impacted. In fact, the Exchange Act Defendants were discussing at that time the announcement of massive write-downs which would not be announced until after the First Republic merger closed.

303.    On September 21, 2007, Merrill filed a Form 8-A with the SEC that registered the Merrill Lynch Series 6 Preferred and the Merrill Lynch Series 7 Preferred pursuant to Section 12(b) of the Exchange Act in connection with the First Republic Acquisition.

304.    The statements above in paragraph 303 was materially false and misleading because Merrill failed to disclose that it was increasingly leveraging risky

subprime mortgages that resulted in Merrill having over $40 billion of U.S. subprime ABS CDO exposures by June 29, 2007 (see ¶¶17-33).

305.    On September 21, 2007, Merrill's acquisition of First Republic closed.

306.    On September 26, 2007, a Goldman Sachs analyst reported that Merrill might record losses of as much as $4 billion in the third quarter on its fixed-income assets.  The price of Merrill's common stock declined that day by $0.37 per share, from a closing price of $72.12 per share on September 25, 2007, to close at $71.75 per share on exceptionally high trading volume of over 26 million shares, and Merrill stock declined an additional $0.47 per share over the next two trading days.

**K.**    **Financial Results for the Fiscal Quarter Ended September 28, 2007**

307.    On October 5, 2007, approximately two weeks after the First Republic merger closed, in a press release, the Company announced:

> **NEW YORK, October 5, 2007** – Merrill Lynch & Co., Inc. **(NYSE:MER)** today announced that challenging credit market conditions will have an adverse impact on its net earnings for the third quarter.  The company expects to report a net loss per diluted share of up to 50 cents, resulting from significant negative mark-to-market adjustments to its positions in two specific asset classes: collateralized debt obligations (CDOs) and subprime mortgages; and leveraged finance commitments.  These mark-to-market adjustments primarily affect Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business.  The company expects to report revenue growth in excess of 20 percent over the 2006 third quarter in each of its other major business lines:  Equity Markets (excluding the firm's private equity business), Investment Banking and Global Wealth Management.  Merrill Lynch expects to report a solid revenue performance from the rest of its FICC business, considering market conditions, and expects strong performance from its operations outside the U.S., led by the Pacific Rim region.
>
> "Despite solid underlying performances in most of our businesses in the third quarter, the impact of this difficult market was much more severe in certain of our FICC businesses than we expected earlier in the quarter," said Stan O'Neal, chairman and chief executive officer of Merrill Lynch.  "While market conditions were extremely difficult and the degree of

sustained dislocation unprecedented, we are disappointed in our performance in structured finance and mortgages. **We can do a better job in managing this risk, as we have done with other asset classes,** including leveraged finance, interest rate and foreign exchange trading, equity trading, principal investments and commodities."

\*       \*       \*

The primary drivers of the FICC net losses in the third quarter were as follows:

- *Write-downs of an estimated $4.5 billion, net of hedges, related to incremental third quarter market impact on the value of CDOs and subprime mortgages.* These valuation adjustments reflect in part significant dislocations in the highest-rated tranches of these securities which were affected by unprecedented move in credit spreads and a lack of market liquidity in these securities, which intensified during the third quarter. During the quarter, the company significantly reduced its overall exposure to these asset classes.

- Write-downs of an estimated $967 million on a gross basis, and $463 million net of related underwriting fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

"Although the outlook for the fourth-quarter revenues remains difficult to predict, we continue to see evidence of strong long-term growth trends in each of our global businesses. While it is very early in the current quarter and despite continued challenges in structured finance, we are beginning to see signs of a return to more normal activity levels in a number of markets. *Given our strong core operating performance and solid market, liquidity and capital positions, we are confident in our ability to deliver superior returns to shareholders over the long-term,*" Mr. O'Neal concluded.

(Emphasis added).

144

308.   The statements above in paragraph 307 were materially false and misleading because while the Exchange Act Defendants began to disclose their exposure to U.S. subprime ABS CDOs and announced a write-down of approximately $4.5 billion, Merrill should have actually written down an additional $14.9 billion.  Merrill's U.S. subprime ABS CDO exposures were then impaired by approximately 65% and Merrill continued to conceal its true exposure at this time.  In addition, the Exchange Act Defendants failed to disclose the material fact that many of Merrill's hedges on U.S. subprime ABS CDOs were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107).

309.   On October 8, 2007, the trading day following Merrill's October 5, 2007 press release, Merrill's common stock declined $2.55 per share or approximately 3%, from a close on October 5, 2007 of $76.67 per share, to close at $74.12 per share on volume of over 10 million shares.

310.   On October 24, 2007, Merrill issued a press release titled "Merrill Lynch Merrill Lynch Reports Third-Quarter 2007 Net Loss From Continuing Operations Of $2.85 Per Diluted Share" that stated, in part, the following:

> **NEW YORK, October 24, 2007** — Merrill Lynch (**NYSE: MER**) today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006 . . . .  Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release . . .

Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion . . . .

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said Stan O'Neal, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued . . . .

**Business Segment Review . . .**

**Global Markets & Investment Banking (GMI)**
GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively . . . . Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

> ▪ FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. See below for details.

**Net Exposures at Period End:**

| ($ billions) | Sept. 28, 2007 | June 29, 2007 | Percent Inc / Dec |
|---|---|---|---|
| Total ABS CDO-related exposures | $15.2 | $32.1 | (53) |
| Total U.S. subprime mortgage-related exposures | 5.7 | 8.8 | (35) |

| | Net Exposures at Sept. 28, 2007 | Net Write-downs For the Three Months Ended Sept. 28, 2007 |
|---|---|---|
| AAA-rated super senior exposures: | | |
| High-grade | $8.3 | ($1.9) |
| Mezzanine | 5.3 | (3.1) |
| CDO-squared | 0.6 | (0.8) |
| Total ABS CDO super senior exposures | 14.2 | (5.8) |
| Other retained and warehouse exposures | 1.0 | (1.1) |
| **Total ABS CDO-related exposures** | **$15.2** | **($6.9)** |
| Total U.S. subprime mortgage-related | 5.7 | (1.0) |

146

exposures

**Total Net Write-downs**                                          **($7.9) . . . .**

> ▪ FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings . . . .

> ▪ The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period . . . .

**Non-Compensation Expenses** . . . .

> ▪ Other expenses were $341 million, an increase of 71 percent, due primarily to the write-off of approximately $100 million of identifiable intangible assets related to First Franklin.

311.    The statements above in paragraph 310 were materially false and misleading because while the Exchange Act Defendants began to disclose Merrill's exposure to U.S. subprime ABS CDOs and announced a write-down of approximately $7.9 billion, the Company should have actually written down an additional $11.5 billion. Merrill's U.S. subprime ABS CDO exposures were impaired by approximately 65% and Merrill continued to conceal its true exposure at this time.  In addition, the Exchange Act Defendants failed to disclose the material fact that many of Merrill's hedges on U.S. subprime ABS CDOs were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107).

147

312.    On October 24, 2007, Merrill common stock declined from a closing price on October 23, 2007 of $67.12 per share, to close at $63.22 per share, a decline of $3.90 per share or approximately 6% on volume of approximately 52 million shares and on October 25, 2007 Merrill common stock declined an additional $2.32 per share or approximately 4% to close at $60.90 per share, on volume approximately 41 million shares.

313.    On October 30, 2007, Merrill issued a press release titled "Stan O'Neal Retires From Merrill Lynch; Alberto Cribiore To Serve As Interim Non-Executive Chairman And Chair Search Committee" that stated, in part,

> **NEW YORK, October 30, 2007** — Stan O'Neal, chairman and chief executive officer of Merrill Lynch & Co., Inc. (**NYSE: MER**), has decided to retire from the company effective immediately, the company announced today . . . .
>
> The company said Mr. O'Neal and the board of directors both agreed that a change in leadership would best enable Merrill Lynch to move forward and focus on maintaining the strong operating performance of its businesses, which the company last week reported were performing well, apart from sub-prime mortgages and CDOs . . . .
>
> Ahmass Fakahany and Gregory Fleming will continue as Merrill Lynch co-presidents and chief operating officers.

314.    On November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages.  On November 1, 2007, Merrill common stock declined from a closing price on October 31, 2007 of $66.02 per share to close at $62.19 per share, a decline of $3.83 per share or approximately 6% on volume of approximately 20 million shares and on November 2, 2007 Merrill stock declined an additional $4.91 per share or

approximately 8% to close at $57.28 per share on volume of approximately 77 million shares.

315.    On November 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for its fiscal quarter ended September 28, 2007 (the "November 7, 2007 10-Q"). The November 7, 2007 10-Q stated that Merrill reported: i) net losses from continuing operation of $2.3 billion; and ii) losses per diluted share of $2.85 per share earnings.

316.    The November 7, 2007 10-Q stated that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

317.    The statements above in paragraphs 309-310 and 313-316 were materially false and misleading because while these statements regarding third quarter earnings began to disclose the truth regarding Merrill's exposure to subprime-related debt, Merrill did not fully disclose the extent of its true exposure to U.S. subprime ABS CDOs. Merrill represented that it had significantly reduced its overall exposure to U.S subprime ABS CDOs. However, the Exchange Act Defendants knew at this time that their subprime exposure needed to be written down much more than $7.9 billion. As discussed above at paragraphs 100-107, the Exchange Act Defendants failed to disclose that in order to attempt to hedge some of Merrill's subprime exposure, Merrill had entered into credit default swaps and other types of insurance contracts with companies such as ACA and XL, which the Exchange Act Defendants knew were not well capitalized or highly leveraged and whose ability to pay on defaults was highly questionable.

318.    The November 7, 2007 10-Q represented that as of September 28, 2007 Merrill's reported assets of mortgages, mortgage-backed and asset backed assets of $56.3 billion, contractual agreements of $53.3 billion and investment securities of $92.8 billion.

319.    The November 7, 2007 10-Q represented that Merrill retained interests in securitized assets relating to residential mortgage loans were $5.946 billion at September 28, 2007.

320.    The November 7, 2007 10-Q represented that Merrill's maximum exposure to loan and real estate VIEs was $216 million and $2.997 billion in guaranteed and other funds as of September 28, 2007.

321.    The November 7, 2007 10-Q represented the following concerning its mortgage related assets:

### U.S. sub-prime residential mortgage-related and ABS CDO activities

During the third quarter of 2007, **Merrill Lynch recorded a net loss of approximately $7.9 billion related to U.S. ABS CDO securities positions and warehouses, as well as U.S. sub-prime mortgage-related assets including whole loans, warehouse lending, residual positions and residential mortgage-backed securities**. These losses primarily related to assets and liabilities recorded at fair value on a recurring basis and are included in principal transactions losses in the table below.

**At September 28, 2007, the remaining net exposure for these positions was approximately $21.5 billion**. This $21.5 billion net exposure includes:

- Assets and liabilities, including derivative positions, that are recorded at fair value on a recurring basis of $5.0 billion (includes Level 2 and Level 3);

- Assets that are recorded at fair value on a non-recurring basis of $2.3 billion (i.e., loans recorded at lower of cost or market);

- Additional off-balance sheet exposures on derivative positions (i.e., notional amounts) of $13.6 billion; and

- Additional off-balance sheet exposures on loan commitments of $0.6 billion.

In addition, Merrill Lynch through its U.S. bank subsidiaries has SFAS 115 investment securities and *off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion at September 28, 2007*.

Valuation of these exposures will continue to be impacted by external market factors including default rates, rating agency actions, and the prices at which observable market transactions occur. Merrill Lynch's ability to mitigate its risk by selling or hedging its exposures is limited by the market environment. Merrill Lynch's future results may continue to be materially impacted by the valuation adjustments applied to these positions . . . .

(Emphasis added).

322. As alleged herein, Merrill had material exposure to U.S. subprime ABS CDOs throughout the Class Period. Indeed, the Exchange Act Defendants had secretly accumulated more than $40 billion in U.S. subprime ABS CDOs by June 29, 2007. Nevertheless, as set forth herein, none of Merrill's 10-Qs during the Class Period before this one described Merrill's exposure to this business. It was not until the November 7, 2007 10-Q that the Exchange Act Defendants provided detail about Merrill's activities related to U.S. subprime ABS CDOs. The Exchange Act Defendants represented the following concerning these activities:

At the end of the third quarter, we maintained exposures to these markets through cash positions, loans, derivatives and commitments. During the third quarter, FICC revenues were adversely affected by the substantial deterioration in the value of many of these exposures, particularly towards quarter end. See *U.S. Sub-prime Residential Mortgage-Related and ABS CDO Activities* on page 73 for further detail.

The markets for U.S. ABS CDO exposures remain extremely illiquid and as a result, valuation of these exposures is complex and involves a comprehensive process including the use of quantitative modeling and management judgment. Valuation of these exposures will also continue to be impacted by external market factors including default rates, rating

agency actions, and the prices at which observable market transactions occur. Our ability to mitigate our risk by selling or hedging our exposures is also limited by the market environment. Our future results may continue to be materially impacted by the valuation adjustments applied to these positions.

*        *        *

*U.S. Sub-prime Residential Mortgage-Related Activities*

As part of our U.S. sub-prime residential mortgage-related activities, sub-prime mortgage loans are originated through First Franklin or purchased in pools from third-party originators for subsequent sale or securitization. Mortgage-backed securities are structured based on the characteristics of the underlying mortgage collateral, sold to investors and subsequently traded in the secondary capital markets.

Our U.S. sub-prime residential mortgage net exposure (excluding Merrill Lynch's Bank sub-prime residential mortgage portfolio held for investment purposes which is described *in Sub-prime Mortgage-Related Securities in Merrill Lynch Bank Investment Portfolio*) consists of the following:

• <u>Sub-prime whole loans</u>: We purchase pools of whole loans from third-party mortgage originators. In addition, First Franklin originates mortgage loans through its retail and wholesale channels. Prior to their sale or securitization, whole loans are predominantly reported on the balance sheet in Loans, notes and mortgages and are accounted for as held for sale.

Securitizable whole loans are valued on an "as-if" securitized basis based on estimated performance of the underlying mortgage pool collateral, rating agency credit structure assumptions and market pricing for similar securitizations. Key characteristics include underlying borrower credit quality and collateral performance, mortgage terms and conditions, assumptions on prepayments, delinquencies and defaults. Non-securitizable loans are valued using a combination of discounted liquidation value and re-performing value.

• <u>Residuals</u>: We retain certain mortgage residuals, which represent the subordinated classes and equity/first-loss tranche from our residential mortgage-backed securitization activity. Residuals have been retained from the securitizations of third-party whole loans we have purchased as well as from our First Franklin loan originations.

152

Residuals are valued by modeling the present value of projected cash flows that will accrue to the residual holder, based on actual and projected performance of the mortgages underlying a particular securitization. Key determinants include estimates for borrower prepayments, delinquencies, defaults and loss severities. Modeled performance and loan level loss projections are adjusted monthly as actual borrower performance information is released from trustees and loan servicers.

- Residential mortgage-backed securities ("RMBS"): We retain and purchase securities from the securitizations of loans, including sub-prime residential mortgages. Valuation of RMBS securities is based on observable prices and securitization cash flow model analysis.

- Warehouse lending: Warehouse loans represent collateralized revolving loan facilities to originators of financial assets, such as sub-prime residential mortgages. These mortgages typically serve as collateral for the facility. Loans are generally carried at amortized cost with an allowance for loan losses established for credit losses estimated to exist in the portfolio unless deemed to be permanently impaired. In the case of an impairment, the loan receivable value is adjusted to reflect the valuation of the whole loan collateral underlying the facility if the value is less than amortized cost.

The following table provides a summary of changes in our U.S. sub-prime residential mortgage-related net exposures, excluding net exposures to residential mortgage-backed securities held in our U.S. banks for investment purposes, from June 29, 2007 to September 28, 2007.

\*     \*     \*

*U.S. ABS CDO Activities*

An ABS CDO is a security collateralized by a pool of asset-backed securities. The underlying collateral for these asset-backed securities is primarily residential mortgage loans.

We are engaged in the underwriting and sale of ABS CDOs. There are a number of steps involved in the underwriting process beginning with determining investor interest or responding to inquiries or mandates received. We also engage a CDO collateral manager who is responsible for selection of the ABS securities that will become the underlying collateral for the CDO securities subject to our approval. All CDO securities are rated by one or more rating agencies. The various tranches of the CDO are securitized, priced at representative market rates and distributed to investors, or in some cases, retained by Merrill Lynch.

Our U.S. ABS CDO net exposure primarily consists of our AAA-rated super senior CDO portfolio, as well as retained and warehouse exposures related to our CDO business.

<u>Super senior CDO portfolio</u>

Super senior positions represent our exposure to the senior most tranche in a CDOs capital structure. In bankruptcy, this tranches claims have priority to the proceeds from liquidated cash CDO assets. Our exposure to AAA-rated super senior CDOs includes the following securities, which are primarily held as derivative positions in the form of total return swaps:

- High-grade super senior positions, which are CDOs with underlying collateral having an average credit rating of Aa3/A1 by Moody's Investor Services;
- Mezzanine super senior positions, which are CDOs with underlying collateral having an average credit rating of Baa2/Baa3 by Moody's Investor Services; and
- CDO-squared super senior positions, which are CDOs with underlying collateral consisting of other CDO securities which have collateral attributes typically similar to high grade and mezzanine super senior positions.

Despite the high credit rating of these CDO securities (typically AAA), their fair value at September 28, 2007 reflects unprecedented market illiquidity and the deterioration of underlying sub-prime collateral.

<u>Other Retained and Warehouse Exposures Related to the CDO Business</u>

We have other retained and warehouse exposures related to our CDO business, which consists of RMBS and CDO positions previously held in CDO warehouses awaiting securitization, retained securities from CDO securitizations, and related hedges.

323.    In the November 7, 2007 10-Q, the Exchange Act Defendants revealed the components of Merrill's U.S. subprime ABS CDO exposures, which continued to be a false and misleading representation of Merrill's actual exposure to these activities.  The Exchange Act Defendants represented the following concerning these exposures:

154

*(dollars in millions)*

| | Net Exposures as of June 29, 2007 | Gain/(Loss) Included in Income (1) | Other Net Changes in Net Exposures (2) | Net Exposures as of Sept. 28, 2007 |
|---|---|---|---|---|
| **Super senior CDO net exposures:** | | | | |
| High-grade | $ 22,648 | $ (1,841) | $ (11,882) | $ 8,925 |
| Mezzanine | 8,022 | (3,084) | 299 | 5,237 |
| CDO-squared | 1,454 | (826) | 2 | 630 |
| Total super senior CDO net exposures | 32,124 | (5,751) | (11,581) | 14,792 |
| Other retained and warehouse net exposures | 1,740 | (1,104) | 390 | 1,026 |
| Total CDO-related net exposures | $ 33,864 | $ (6,855) | $ (11,191) | $ 15,818 |

*(1) Primarily represents unrealized losses on net exposures.*
*(2) Primarily consists of hedging activity such as entering into credit default swaps that are matched to specific CDO securities. This activity is conducted with various third parties, including monoline financial guarantors, insurers and other market participants.*

324.    The statements above in paragraph 318-323 were materially false and misleading because:

(a) Merrill should have actually written down an additional $11.5 billion as a results of the impairment of Merrill's U.S. subprime ABS CDO exposures by at least 65% (see ¶¶142-153);

155

(b) The Exchange Act Defendants violated GAAP by falsely representing Merrill's trading assets and liabilities as reported in its November 7, 2007 10-Q based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures (see ¶¶142-153; 337-382);

(c) The Exchange Act Defendants violated GAAP by falsely representing losses for net earnings and earnings per share of $2.3 billion and $2.85 per share, respectively. Had Merrill's financial statements for the quarterly period ended September 28, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported loss of $2.3 billion to a loss of $9.8 billion and its loss per diluted share would had declined from a reported loss of $2.85 per share to a loss of $12.03 per share. (see ¶¶337-382); and

(d) The Exchange Act Defendants failed to disclose that many of Merrill's hedges on U.S. subprime ABS CDO exposures were with poorly capitalized or highly leveraged counterparties, including XL and ACA, and thus materially increased Merrill's counterparty risk (see ¶¶100-107).

325.    The November 7, 2007 10-Q contained certifications, signed by defendants Fleming, Fakahany and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made the same certifications as set forth above in paragraphs 212, 237, 269 and 298 and were materially false and misleading for the reasons set forth in paragraph 324.

326.    On December 6, 2007, the *Washington Post* reported that the Federal Bureau of Investigation had launched a "mortgage fraud task force" and that the New York Attorney

156

General had served subpoenas to half a dozen investment banks, including Merrill. The

subpoenas sought "information on how billions of dollars in complex securities backed by

mortgages were packaged and sold to yield-hungry investors all over the world."

327.    On December 24, 2007, Merrill issued a press release titled "Merrill

Lynch Enhances Its Capital Position By Raising Up To $6.2 Billion From Investors,

Temasek Holdings And Davis Selected Advisors" that stated, in part, the following:

> **NEW YORK, December 24, 2007** — Merrill Lynch (**NYSE: MER**)
> today announced it has enhanced its capital position by reaching
> agreements to raise up to $6.2 billion of newly issued common stock in a
> private placement with Temasek Holdings and Davis Selected Advisors.
> Merrill Lynch expects these transactions to close by mid-January 2008.

328.    On January 15, 2008, Merrill issued a press release titled "Merrill Lynch

Enhances Its Capital Position With Agreement to Issue $6.6 Billion in Preferred Stock to

Long-Term Investors" that stated, in part, that Merrill "enhanced its capital position by

reaching agreements to issue $6.6 billion of mandatory convertible preferred stock in private

placements to long-term investors, primarily from Korea Investment Corporation, Kuwait

Investment Authority and Mizuho Corporate Bank."

## V.    THE CLASS PERIOD ENDS

329.    On January 17, 2008, before the market opened, the Company issued a

press release titled "Merrill Lynch Reports Full-Year 2007 Net Loss From Continuing

Operations of $8.6 Billion" that stated, in part, the following:

> **NEW YORK, January 17, 2008** — Merrill Lynch (**NYSE: MER**) today
> reported a net loss from continuing operations for the full year 2007 of
> $8.6 billion, or $10.73 per diluted share, significantly below net earnings
> from continuing operations of $7.1 billion, or $7.17 per diluted share for
> 2006. Merrill Lynch's net loss for the full year 2007 was $7.8 billion, or
> $9.69 per diluted share, significantly below net earnings of $7.5 billion, or
> $7.59 per diluted share for 2006. Net revenues for 2007 were $11.3
> billion, down 67 percent from $33.8 billion in 2006, while the 2007 pretax

loss from continuing operations was $12.8 billion compared to pretax earnings from continuing operations of $9.8 billion for 2006.

The firm's substantially reduced performance in 2007 was primarily driven by significant declines in Fixed Income, Currencies & Commodities (FICC) net revenues for the second half of the year . . . . During the second half of 2007, FICC net revenues were materially impacted by a weaker business environment and net write-downs that included $7.9 billion in the third quarter and $11.5 billion in the fourth quarter related to U.S. ABS CDOs [collateralized debt obligations comprised of asset-backed securities] and U.S. subprime residential mortgages outside of the firm's U.S. bank-related investment securities portfolio. In addition, credit valuation adjustments of $2.6 billion related to hedges with financial guarantors on U.S. ABS CDOs were recorded in the fourth quarter of 2007 . . . .

**Business Segment Review** . . . .

**Global Markets and Investment Banking (GMI)** . . . .

FICC net revenues were negative $15.2 billion for the quarter, impacted primarily by net losses of $11.5 billion related to U.S. ABS CDOs and subprime residential mortgages and $3.1 billion of credit valuation adjustments related to the firm's hedges with financial guarantors . . . .

U.S. ABS CDOs:
At the end of the fourth quarter 2007, net exposures to U.S. ABS CDOs, including both super-senior ABS CDOs and secondary trading, totaled $4.8 billion, down from $15.8 billion at the end of the third quarter 2007. Net write-downs related to these exposures were $9.9 billion in the fourth quarter. The majority of these write-downs were related to the high-grade super-senior ABS CDO exposures, the collateral for which is primarily comprised of 2006 vintage mortgages. The valuation for these securities is based on cash-flow analysis including cumulative loss assumptions. These assumptions are derived from multiple inputs including mortgage remittance reports, housing prices and other market data. Relevant ABX indices are also analyzed as part of the overall valuation process. The value of these positions remains subject to mark-to-market volatility. Please see [the chart below] for details of related exposures. . . .

| (Unaudited) | | | | (dollars in millions) |
|---|---|---|---|---|
| | Net Exposures as of Sept. 28, 2007 | Gain/(Loss) Reported in Income (1) | Other Net Changes in Net Exposures (2) | Net Exposures as of Dec. 28, 2007 (5) |
| **U.S. ABS CDO net exposures:** | | | | |
| U.S. Super senior ABS CDO net exposures: | | | | |
| High-grade | 8,925$ | (5,531) | $ 986$ | 4,380$ |
| Mezzanine | 5,237 | (2,912) | (141) | 2,184 |

| | | | |
|---|---|---|---|
| CDO-squared | 630 | (280) | (79) | 271 |
| Total super senior ABS CDO net exposures(3) | 14,792 | (8,723) | 766 | 6,835 |
| Secondary trading (4) | 1,026 | (1,141) | (1,882) | (1,997) |
| **Total U.S. ABS CDO-related net exposures** | **$15,818** | **$(9,864)** | **$(1,116)** | **$4,838** |

[Footnotes omitted] . . . .

Financial Guarantors:
During the fourth quarter, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.1 billion, including negative $2.6 billion related to U.S. super-senior ABS CDOs. These amounts reflect the write-down of the firm's current exposure to a non-investment-grade counterparty from which the firm had purchased hedges covering a range of asset classes including U.S. super-senior ABS CDOs . . . .

U.S. Subprime and Other Residential Mortgages:
At the end of the fourth quarter of 2007, net exposures related to U.S. subprime residential mortgages totaled $2.7 billion, down from approximately $5.7 billion at the end of the third quarter. Net write-downs related to these exposures were $1.6 billion during the quarter . . . .

U.S. Banks Investment Securities Portfolio:
Within the investment securities portfolio of Merrill Lynch's U.S. banks, net pretax write-downs of $1.3 billion were recognized through other comprehensive income/(loss) (OCI) and $869 million through the income statement during the fourth quarter of 2007. As of year-end, the pretax OCI balance related to this portfolio was approximately negative $2.2 billion. These write-downs primarily relate to U.S. subprime residential mortgage-related securities and Alt-A residential mortgage-backed securities, and, to a lesser extent, prime residential and commercial mortgage exposures . . . .

**Non-Compensation Expenses** . . . .
▪ Other expenses were $467 million, up 24 percent, due primarily to a $53 million impairment charge on identifiable intangible assets related to First Franklin and increased costs related to consolidated investments.

330. On January 17, 2008, Merrill common stock declined from a closing price on January 16, 2008 of $55.09 per share, to close at $49.45 per share, a decline of $5.64 per share or approximately 10%, on exceptional volume of over 70 million shares.

331.    On January 28, 2008, Merrill disclosed that Fakahany informed Merrill of his decision to retire effective February 1, 2008.

332.    On February 2, 2008, the *Wall Street Journal* reported that Massachusetts state authorities had accused Merrill of fraud and misrepresentation related to the Company's sale of debt securities that collapsed during the credit crisis.

333.    On March 5, 2008, Merrill issued a press release titled "Merrill Lynch Discontinues First Franklin Mortgage Origination; Will Explore Sale of Home Loan Services; Global Wealth Management Mortgage Origination to Continue Through Merrill Lynch Credit Corporation" that stated, in part, the following:

> New York, March 5, 2008 — Merrill Lynch (NYSE: MER) said today that it is discontinuing mortgage origination at its First Franklin subsidiary in the United States and will explore the sale of Home Loan Services, a mortgage loan servicing unit for First Franklin.
>
> The company said it made the decision to discontinue lending by First Franklin because of the deterioration of the subprime lending market . . . .
>
> "Since July, we have reduced staffing at First Franklin by nearly 70 percent, but after evaluating a number of strategies, we believe it is appropriate to discontinue mortgage origination," said David Sobotka, head of Fixed Income, Currencies & Commodities at Merrill Lynch.

334.    On March 22, 2008, the *New York Times* reported that the Justice Department was gathering evidence to determine whether to create a task force to investigate wrongdoing in the mortgage lending industry.

335.    On April 17, 2008, Merrill issued a press release titled "Merrill Lynch Reports First-Quarter 2008 Net Loss From Continuing Operations Of $1.97 Billion" that stated, in part, the following:

> **NEW YORK, April 17, 2008** — Merrill Lynch (**NYSE: MER**) today reported a net loss from continuing operations for the first quarter of 2008 of $1.97 billion, or $2.20 per diluted share, compared to net earnings from

continuing operations of $2.03 billion, or $2.12 per diluted share for the first quarter of 2007. Merrill Lynch's net loss for the first quarter of 2008 was $1.96 billion, or $2.19 per diluted share, compared to net earnings of $2.16 billion, or $2.26 per diluted share for the year-ago quarter.

In this challenging market environment, which continued to deteriorate during the quarter, first-quarter 2008 net revenues were $2.9 billion, down 69 percent from the prior-year period, primarily due to net write-downs totaling $1.5 billion related to U.S. ABS CDOs and credit valuation adjustments of negative $3.0 billion related to hedges with financial guarantors, most of which related to U.S. super-senior ABS CDOs . . . .

**Business Segment Review:**

**Global Markets and Investment Banking (GMI)**
GMI recorded net revenues of negative $690 million and a pretax loss of $4.0 billion for the first quarter of 2008, as the challenging market conditions resulted in net losses in Fixed Income, Currencies and Commodities (FICC) . . . .

Net revenues from GMI's three major business lines were as follows:

▪ FICC net revenues were negative $3.4 billion for the quarter, impacted primarily by net losses related to U.S. ABS CDOs and credit valuation adjustments related to hedges with financial guarantors . . . .

U.S. ABS CDOs:
At the end of the first quarter of 2008, net exposures to U.S. ABS CDOs were $6.7 billion, up from $5.1 billion at the end of 2007 as a reduction of hedges more than offset $1.5 billion of net write-downs . . . .
Financial Guarantors:
During the first quarter of 2008, credit valuation adjustments related to the firm's hedges with financial guarantors were negative $3.0 billion, including negative $2.2 billion related to U.S. super-senior ABS CDOs.

The hedges with financial guarantors related to U.S. super-senior ABS CDOs declined to $10.9 billion, due to net gains on these hedges and the firm's decision to consider $1.1 billion notional amount of certain hedges with a highly rated financial guarantor as ineffective, which resulted in a write-off of $45 million. The net gains, coupled with the deteriorating environment for financial guarantors, resulted in credit valuation adjustments of negative $2.2 billion during the 2008 first quarter. As a result, the carrying value of these hedges related to U.S. super-senior ABS CDOs was $3.0 billion at quarter end . . . .

Residential Mortgages:

161

Net exposures related to U.S. subprime residential mortgages declined during the first quarter of 2008 to $1.4 billion, primarily due to additional hedging, asset sales and net write-downs of $306 million during the quarter . . .

336.    On May 5, 2008, the *Associated Press* reported that prosecutors in the Eastern District of New York were heading a task force to determine, among other things, if Wall Street firms participated in fraud in connection with the mortgage industry.

## VI.    THE EXCHANGE ACT DEFENDANTS' VIOLATIONS OF GAAP

337.    The Exchange Act Defendants caused the Company to falsely report its financial position and results of operations as of and for the quarterly periods ended, March 30, 2007; June 29, 2007 and September 28, 2007 (the "relevant timeframe") by, among other things, overstating net earnings and misrepresenting the Company's true financial position. The Company's financial statements for the year ended December 29, 2006 (the "2006 annual financial statements"), and interim financial statements for the quarterly periods ended March 30, 2007, June 29, 2007 and September 28, 2007 (the "relevant 2007 interim financial statements", and collectively, the "relevant financial statements") did not present fairly the Company's financial position and results of operations, and/or were not presented in conformity with GAAP and SEC rules.

338.    Generally Accepted Accounting Principles ("GAAP") are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). GAAP consists of a hierarchy of authoritative literature. The highest priority is comprised of Financial Accounting Standards Board ("FASB") Statements of Financial Accounting Standards ("FAS"),

162

followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), and AICPA Statements of Position ("SOP"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

339.    As a publicly traded company, the Company is responsible and required to maintain books and records in sufficient detail to reflect the transactions of the Company and therefore prepare financial statements in accordance with GAAP.  Specifically, the Securities and Exchange Act of 1934, 15 U.S.C. § 78m (b) (2) ("the Exchange Act"), requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.    transactions are executed in accordance with management's general or specific authorization;

ii.    transactions are recorded as necessary (i) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (ii) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

340.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.

Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a))

341.    The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing Standards ("AU"), in relevant part:

> The financial statements are management's responsibility... Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. (Footnote omitted.)

(AU 110.03)

342.    As alleged elsewhere herein, prior to and throughout the relevant timeframe, the Exchange Act Defendants caused the Company to recklessly originate, purchase, create, invest, and trade inherently risky loans, primarily mortgages, and related securities (collectively, the "subprime-related securities"). The Company defines subprime mortgages and subprime mortgage-related securities as follows:

> We view sub-prime mortgages as single-family residential mortgages displaying more than one high risk characteristic, such as: (i) the borrower has a low FICO score (generally below 660); (ii) a high loan-to-value ("LTV") ratio (LTV greater than 80% without borrower paid mortgage insurance); (iii) the borrower has a high debt-to-income ratio (greater than 45%); or (iv) stated/limited income documentation. Sub-prime mortgage-related securities are those securities that derive more than 50% of their value from sub-prime mortgages. (Form 10-K 2007 p. 34)

The Company's practices regarding subprime-related securities exposed the Company to a significant and excessive concentration of subprime-related securities. That concentration, in combination with certain prevailing market conditions, such as declining home values and increasing credit delinquencies and defaults (discussed in greater detail elsewhere herein), impaired the Company's financial position and caused significant declines in the Company's results of operations by at least February 26, 2007. The Company's relevant 2007 interim financial statements, however, not only failed to recognize known losses (i.e., impairments) related to the significant declines in the value of its subprime-related securities, but the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 failed to even disclose its exposure to such a significant, let alone excessive, concentration of highly risky securities and related losses.

343.    The Company's assets with exposure to subprime-related securities were materially overstated (or liabilities were materially understated, as applicable), and thereby the Company's net earnings was materially overstated (or net losses were materially understated, as applicable) as reported in the Company's relevant 2007 interim financial statements. Additionally, the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 lacked required (under GAAP) disclosures, omitting material facts regarding the Company's exposure to and losses from subprime-related securities. Additionally, throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and internal control over financial reporting, despite repeated certifications signed by certain Defendants and other statements to the contrary.

344. Further, the Company's relevant financial statements presented the Company's financial position and results of operations in a manner which, among other things, also violated the following fundamental accounting principles:

(a) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

(b) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

(c) The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶42);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶50);

(e) The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

(f) The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

(g)  The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81); and

(h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97).

345.  Each of the improper accounting practices, misrepresentations and omissions engaged in by the Exchange Act Defendants, and discussed further herein, standing alone, was a material breach of GAAP and/or SEC regulations.

*Overstatement of U.S. ABS CDOs and Other Subprime-related Securities*

346.  The Exchange Act Defendants caused the Company's relevant 2007 interim financial statements to materially overstate the reported values (under GAAP) of U.S. Asset-Backed Securities ("ABS") Collateralized Debt Obligations ("CDOs") and other subprime-related securities. U.S. ABS CDOs are securities collateralized by a pool of asset-backed securities. The underlying collateral of the Company's U.S. ABS CDOs is primarily subprime residential mortgage loans. (Form 10-K 2007 p. 36).

347.  The Company's positions in U.S. ABS CDOs were primarily held as trading assets (or liabilities, as applicable) in the form of mortgages, mortgage-backed, and asset-backed securities; investment securities classified as trading; and derivative instruments (collectively the "U.S. ABS CDO positions"). Trading securities are securities that are held principally for the purpose of selling them in the near term. (FAS No. 115, *Accounting for Investments in Certain Debt and Equity Securities* ("FAS 115"), ¶12a). Derivative instruments, generally, are financial instruments or other contracts that derive their value from one or more underlying assets. The Company also classified