certain U.S. ABS CDO related securities as available-for-sale ("AFS"). Securities classified as AFS are deemed not to be trading nor intended to be held to maturity. (FAS 115 ¶12b).

348.    GAAP requires debt instruments classified as trading to be measured at fair value in the statement of financial position and changes in fair value (i.e., unrealized gains and losses) to be recognized in earnings. (FAS 115 ¶¶12a, 13).  GAAP requires debt instruments classified as AFS to be measured at fair value in the statement of financial position and requires changes in fair value (i.e., unrealized gains and losses) to be recognized in other comprehensive income (a component of equity) until realized; however, if the decline in fair value is judged to be other than temporary, the cost basis of the individual security shall be written down to fair value as a new cost basis and the amount of the write-down shall be included in earnings. (FAS 115 ¶¶12b, 13, 16). Further, GAAP requires derivative instruments, not specially designated as a hedge to be measured at fair value and requires changes in fair value to be recognized currently in earnings.  (FAS No. 133¸ *Accounting for Derivative Instruments and Hedging Activities* ("FAS 133"), ¶¶17, 18a.  FAS No. 107, *Disclosures about Fair Values of Financial Instruments* ("FAS 107") defines fair value as follows, in relevant part:

> …**[Q]uoted market prices, if available, are the best evidence of fair value of financial instruments.** Prices for financial instruments may be quoted in several markets; generally, the price in the most active market will be the best indicator of fair value.

(FAS 107 ¶20) (Emphasis added.)

> **For financial instruments that do not trade regularly, or that trade only in principal-to-principal markets, an entity should provide its best estimate of fair value.** Judgments about the methods and assumptions to be used in various circumstances must be made by those

who prepare and attest to an entity's financial statements. The following discussion provides some examples of how fair value might be estimated.

(FAS 107 ¶22) (Emphasis added).

> **An estimate of the fair value of a loan or group of loans may be based on the discounted value of the future cash flows expected to be received from the loan or group of loans.** The selection of an appropriate current discount rate reflecting the relative risks involved requires judgment, and several alternative rates and approaches are available to an entity. A single discount rate could be used to estimate the fair value of a homogeneous category of loans; for example, an entity might apply a single rate to each aggregated category of loans reported for regulatory purposes. **An entity could use a discount rate commensurate with the credit, interest rate, and prepayment risks involved, which could be the rate at which the same loans would be made under current conditions. An entity also could select a discount rate that reflects the effects of interest rate changes and then make adjustments to reflect the effects of changes in credit risk. Those adjustments could include (a) revising cash flow estimates for cash flows not expected to be collected, (b) revising the discount rate to reflect any additional credit risk associated with that group of loans, or some combination of (a) and (b).**

(FAS 107 ¶27) (Emphasis added.)

349.    Further, FAS No. 5, *Accounting for Contingencies* ("FAS 5") requires a loss to be recognized in the financial statements when it is both "probable" and "reasonably estimable." (FAS 5 ¶8).

350.    The Company's relevant 2007 interim financial statements materially overstated the fair value of its U.S. ABS CDO positions. For the reasons alleged elsewhere herein, the Exchange Act Defendants knew, or recklessly disregarded, that the U.S. ABS CDO positions were primarily concentrated in subprime-related securities and knew of, or recklessly disregarded, the inherent credit risk and the market factors indicating the true value of its subprime-related securities by at least February 26, 2007. Such indications are discussed in greater detail elsewhere herein.

351.    Additionally, the Exchange Act Defendants, because of the nature of the Company's business, had extensive nonpublic credit and market information indicating the true value of its subprime-related securities. The Company, a global financial institution, is involved in the origination, purchasing, trading, investing, structuring, and servicing of subprime-related securities. Further, the Company, by its own acknowledgment, is a "leading underwriter of CDOs." (Form 10-Q Q3 2007 p. 99, Form 10-K 2007 p. 61), and from 2004 to mid-2007 Merrill was the top underwriter of CDOs.

352.    Therefore, the Exchange Act Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. ABS CDO positions. However, Merrill avoided recognizing the related losses, which were *probable and reasonably estimable*, in violation of GAAP (FAS 5, FAS 107, FAS 115, and FAS 133), and thereby overstated its U.S. ABS CDO positions and artificially inflated its net revenues in the Company's relevant 2007 interim financial statements.

353.    In addition to its U.S. ABS CDO positions, the Company had exposure to subprime-related securities with respect to its U.S. subprime residential mortgage-related positions, including whole loans, residuals, residential mortgage-backed securities, and warehouse lending. For the reasons alleged elsewhere herein, the Exchange Act Defendants knew of or recklessly disregarded the significant declines in the fair value of its U.S. subprime residential mortgage-related positions.  However, the Exchange Act Defendants avoided recognizing losses, which were *probable and reasonably estimable*, in violation of GAAP (FAS 5, FAS 107, FAS 115, and FAS 133) and thereby artificially inflated its U.S. subprime residential mortgage-related positions and artificially inflated its net revenues in the Company's relevant 2007 interim financial statements.

354.    As a result of the material overstatement of the Company's U.S. ABS CDO and U.S. subprime residential mortgage-related positions and the related net revenues, the Company's relevant 2007 interim financial statements also materially overstated net earnings (or understated net losses, as applicable) and earnings per diluted common share (or understated losses per diluted common share, as applicable).  The Company's financial statements for the quarterly period ended June 29, 2007 overstated net earnings and earnings per diluted common share by, assuming the same effective tax rate as reported, respectively, *$11.6 billion and $12.54 per share*. The Company's financial statements for the quarterly period ended September 28, 2007 understated net losses and losses per diluted common share by, assuming the same effective tax rate as reported, respectively, *$7.5 billion and $9.18 per share*.

355.    Thus, statements made regarding the amount of, generally, the Company's results of operations, and more specifically, but not exclusively, revenues, net revenues, operating revenues, earnings, net earnings, and earnings per share or EPS, as described herein, were materially false and misleading, as those amounts disclosed were not derived in conformity with GAAP. Further, statements made regarding the value and/or valuation of, generally, the Company's U.S. ABS CDOs and other subprime-related securities, and more specifically, but not exclusively, mortgages, mortgage-back and asset-backed securities, contractual agreements, and investment securities, as described herein, were materially false and misleading, as those values disclosed were not derived in conformity with GAAP.

356.    For the three months ended September 28, 2007, the Company eventually recognized approximately $8.0 billion of losses on previously undisclosed subprime-

related securities, including at least $6.9 billion of losses on previously undisclosed U.S.

ABS CDO positions with underlying collateral of primarily subprime residential

mortgage loans. Finally, for the year ended December 28, 2007, the Company recognized

at least an additional $12.6 billion, for a total of $20.6 billion of losses on its subprime-

related securities, including at least an additional $9.8 billion, for a total of $16.7 billion

of losses on U.S. ABS CDO positions with underlying collateral of primarily subprime

residential mortgage loans.

*Lack of Sufficient Disclosures*

357.    In addition to the fundamental principles of financial reporting established

by the FASCONs above, GAAP requires certain disclosures to prevent financial

statements from being false and misleading. FAS No. 5, *Accounting for Contingencies*

("FAS 5") states as follows, in relevant part:

> If no accrual is made for a loss contingency because one or both of the
> conditions in paragraph 8 are not met, or if an exposure to loss exists in
> excess of the amount accrued pursuant to the provisions of paragraph 8,
> **disclosure of the contingency shall be made when there is at least a
> reasonable possibility that a loss or an additional loss may have been
> incurred.** [Footnote omitted.] The disclosure shall indicate the nature of
> the contingency and shall give an estimate of the possible loss or range of
> loss or state that such an estimate cannot be made…
>
> **After the date of an enterprise's financial statements but before those
> financial statements are issued, information may become available
> indicating that an asset was impaired or a liability was incurred after
> the date of the financial statements or that there is at least a
> reasonable possibility that an asset was impaired or a liability was
> incurred after that date.** The information may relate to a loss
> contingency that existed at the date of the financial statements, e.g., an
> asset that was not insured at the date of the financial statements. **On the
> other hand, the information may relate to a loss contingency that did
> not exist at the date of the financial statements**, e.g., threat of
> expropriation of assets after the date of the financial statements or the
> filing for bankruptcy by an enterprise whose debt was guaranteed after the
> date of the financial statements. In none of the cases cited in this

paragraph was an asset impaired or a liability incurred at the date of the financial statements, and the condition for accrual in paragraph 8(a) is, therefore, not met. **Disclosure of those kinds of losses or loss contingencies may be necessary, however, to keep the financial statements from being misleading. If disclosure is deemed necessary, the financial statements shall indicate the nature of the loss or loss contingency and give an estimate of the amount or range of loss or possible loss or state that such an estimate cannot be made. Occasionally, in the case of a loss arising after the date of the financial statements where the amount of asset impairment or liability incurrence can be reasonably estimated, disclosure may best be made by supplementing the historical financial statements with pro forma financial data giving effect to the loss as if it had occurred at the date of the financial statements. It may be desirable to present pro forma statements, usually a balance sheet only, in columnar form on the face of the historical financial statements.** (Emphasis added.) (FAS 5 ¶¶10-11)

358.    For the reasons alleged elsewhere herein, the Exchange Act Defendants knew of or recklessly disregarded the inherent credit risk and the market factors indicating the true value of its subprime-related securities and the resulting significant declines in the fair value of the Company's subprime-related securities by at least February 26, 2007, which was subsequent to the date of the 2006 annual financial statements (December 29, 2006), but prior to the date of issuance of such financial statements (February 26, 2007).  As such, disclosure of the material decline in the fair value and related losses of the Company's subprime-related securities, because of the significance to the financial statements, was necessary to prevent these financial statements from being misleading. Although the losses on its subprime-related securities were, at a minimum, *reasonably possible*, the Company's 2006 annual financial statements, in violation of GAAP (FAS 5), did not include such subsequent event disclosure.

359.     Furthermore, the Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in addition to failing to *recognize* the losses on its subprime-related securities as discussed above, did not even *disclose* such losses, which were, at a minimum, *reasonably possible*, in violation of GAAP (FAS 5), misleading investors with regard to its true financial position and results of operations.

360.     In addition to the aforementioned FAS 5 disclosure requirements, FAS 107, as amended by FAS 133, requires disclosure of all significant concentrations of credit risk arising from all financial instruments, including the following:

> a. **Information about the (shared) activity, region, or economic characteristic that identifies the concentration**
>
> b. **The maximum amount of loss due to credit risk that, based on the gross fair value of the financial instrument, the entity would incur if parties to the financial instruments that make up the concentration failed completely to perform according to the terms of the contracts** and the collateral or other security, if any, for the amount due proved to be of no value to the entity
>
> c. The entity's policy of requiring collateral or other security to support financial instruments subject to credit risk, information about the entity's access to that collateral or other security, and the nature and a brief description of the collateral or other security supporting those financial instruments
>
> d. The entity's policy of entering into master netting arrangements to mitigate the credit risk of financial instruments, information about the arrangements for which the entity is a party, and a brief description of the terms of those arrangements, including the extent to which they would reduce the entity's maximum amount of loss due to credit risk. (FAS 107, as amended by FAS 133, ¶15A) (Emphasis added).

361.     Additionally, SOP No. 94-6, *Disclosure of Certain Risks and Uncertainties* ("SOP 94-6") also requires disclosures to be made in financial statements

about the risks and uncertainties existing as of the date of those statements regarding the following:

  *a.* Nature of operations

  *b.* Use of estimates in the preparation of financial statements

  *c.* Certain significant estimates

  *d.* **Current vulnerability due to certain concentrations**

(SOP 94-6 ¶8) (Emphasis added.)

  362. With respect to disclosures of an entity's vulnerability due to certain concentrations, SOP 94-6 indicates:

> **Vulnerability from concentrations arises because an entity is exposed to risk of loss greater than it would have had it mitigated its risk through diversification.** Such risks of loss manifest themselves differently, depending on the nature of the concentration, and vary in significance.

> Financial statements should disclose the concentrations described in [subsequent paragraph] if, based on information known to management prior to issuance of the financial statements, *all* of the following criteria are met:

>  *a.* The concentration **exists at the date of the financial statements**.

>  *b.* The concentration makes the enterprise vulnerable to the risk of a **near-term severe impact**.

>  *c.* It is at least **reasonably possible** that the events that could cause the severe impact will occur in the near term.

> Concentrations, including known group concentrations, described below require disclosure if they meet the criteria of [preceding paragraph]. (Group concentrations exist if a number of counterparties or **items that have similar economic characteristics collectively expose the reporting entity to a particular kind of risk**.) Some concentrations may fall into more than one category.

*a. Concentrations in the volume of business transacted with a particular customer, supplier, lender, grantor, or contributor.* The potential for the severe impact can result, for example, from total or partial loss of the business relationship. For purposes of this SOP, it is always considered at least reasonably possible that any customer, grantor, or contributor will be lost in the near term.

*b.* **Concentrations in revenue from particular products***, services, or fund-raising events.* The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue.

*c. Concentrations in the available sources of supply of materials, labor, or services, or of licenses or other rights used in the entity's operations.* The potential for the severe impact can result, for example, from changes in the availability to the entity of a resource or a right.

*d.* **Concentrations in the market** *or geographic area* [footnote omitted] *in which an entity conducts its operations.* The potential for the severe impact can result, for example, from negative effects of the economic and political forces within the market or geographic area. For purposes of this SOP, it is always considered at least reasonably possible that operations located outside an entity's home country will be disrupted in the near term.

(SOP 94-6 ¶¶20-22) (Certain emphasis in the original, certain emphasis added).

363.    Further, the Company's significant concentration in subprime-related securities represented a material contingency *which was required to be disclosed* in the Company's condensed interim financial statements. APB No. 28, *Interim Financial Reporting* ("APB 28"), states:

Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial. (APB 28 ¶22) (Footnote omitted.)

176

364.    The Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in violation of GAAP, lacked the required disclosure regarding its significant concentration in subprime-related securities.

365.    The Company's 2006 annual financial statements contained only one instance of the term "subprime" or "sub-prime."  It appeared *in a footnote, further deemphasized by a diminutive font size,* below a table in the notes to the 2006 annual financial statements.  (Form 10-K 2006 p. 101).  The Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 each contained only one instance of the term "subprime" or "sub-prime."  The Company disclosed "a small portion of the retained interests represent residual interests from subprime mortgage securitizations." (Form 10-Q Q1 2007 p. 31, Form 10-Q Q2 2007 p. 31).

366.    The term "nonprime" is sometimes used synonymously with "subprime." The Company's 2006 annual financial statements contained only one instance of the term "nonprime" or "non-prime." It appeared in the final note to the 2006 annual financial statements which discussed the completion of the First Franklin acquisition in the first quarter of fiscal year 2007 as a subsequent event as follows, in relevant part:

> First Franklin originates non-prime residential mortgage loans through a wholesale network. (Form 10-K 2006 p. 129).

The Company's interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 each contained only one instance of the term "nonprime" or

"non-prime." It appeared in the acquisition note in similar context as excerpted above. (Form 10-Q Q1 2007 p. 48, Form 10-Q Q2 2007 p. 50).

367.    The Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007 did not contain any instances of the term "collateralized debt obligation," "collateralized-debt obligation," or "CDO."

368.    Although undisclosed in the 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, the Exchange Act Defendants eventually acknowledged the Company had a significant concentration in subprime-related securities.  Merrill disclosed as follows, in relevant part:

> …[L]osses on U.S. sub-prime residential mortgage-related exposures and U.S. ABS CDOs in 2007 reflected **a significant concentration** in securities that accumulated as a result of our activities as a leading underwriter of CDOs. (Form 10-K 2007 p. 61) (Emphasis added).

369.    Further, O'Neal, former-CEO, admitted as follows, in relevant part:

> The bottom line is, we got it wrong by being overexposed to subprime. (Q3 2007 Earnings Conference Call; October 24, 2007; Thomson Preliminary Transcript p. 2)

370.    In addition to the lack of disclosures required by GAAP, certain disclosures were materially false and/or misleading. For instance, in the 2006 annual financial statements, the Exchange Act Defendants caused the Company to disclose that it "originates and purchases portfolios that have certain features that may be viewed as increasing [the Company's] exposure to nonpayment risk by the borrower" including loans with negative amortization features, payment increases, and high loan-to-value

ratios. (Form 10-K 2006 p. 104). The Company disclosed its "exposure" to these types of loans as the dollar amount of the loans. These types of loans are not necessarily "subprime." However, these types of loans, based on the Company's own description, have a higher credit risk than a traditional loan. The lack of disclosure, throughout the 2006 annual financial statements, that the Company also had significant exposures to subprime-related securities through other financial instruments, i.e. U.S. ABS CDO positions, only served to further mislead investors that the Company's exposure to higher credit risk loans *was contained to the disclosure provided.*

371.    Thus, the statements made in the disclosures to, or about, the relevant financial statements regarding, generally, the Company's financial position and results of operations, and more specifically, but not exclusively, its risk profile and exposures, as described herein, were materially false and misleading as those financial statement disclosures were not in conformity with GAAP (FAS 5, FAS 107, FAS 133, and SOP 94-6).

372.    During the three months ended September 28, 2007 and for the year ended December 28, 2007, the Company eventually recognized, respectively, approximately $8.0 billion and $20.6 billion of losses on previously undisclosed subprime-related securities, including, respectively, at least, $6.9 billion and $16.7 billion of losses on previously undisclosed U.S. ABS CDO positions with underlying collateral of primarily subprime residential mortgage loans. For the three months ended September 28, 2007 and for the year ended December 28, 2007, the Company's performance deteriorated from reported net earnings in the previous comparative periods, to net losses.

373.    John Thain, the Company's current CEO, acknowledged:

> …But on the trading side in particular as it relates to CDOs, we did not do a good job… Trading businesses don't make money if they don't take risks but the risks they take will be sized appropriately to the businesses. None of the trading businesses should be taking risks either single positions or single trades that wipe out the entire years earnings of their own business and of course **certainly shouldn't take a risk to wipe out the earnings of the entire firm**…

(Emphasis added). (Q4 2007 Earnings Conference Call; January 14, 2008; Thomson Preliminary Transcript p. 3).

374. The Company did take such a concentrated risk, and the Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, in violation of GAAP, did not give any indication that the Company had such significant, let alone excessive, exposure concentrated in subprime-related securities.

375. In addition to the requirements of GAAP, Regulation S-K requires the Company to include certain disclosures in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") section of the Company's filing with the SEC. Regulation S-K states as follows, in relevant part:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. (17 C.F.R. § 229.303(a)(3)(ii)).

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. (17 C.F.R. § 229.303(a)).

376. The Company's MD&A, filed with the SEC as part of the Company's Form 10-K for the year ended December 29, 2006 and Forms 10-Q for the quarterly periods ended March 30, 2007, June 29, 2007 and September 28, 2007, in violation of

Regulation S-K, did not adequately disclose the material decline in the fair value and related losses of the Company's subprime-related securities indicating the reported financial information was not indicative of the Company's future financial position or results of operations.

*Ineffective Disclosure Controls and Procedures and Internal Control over Financial Reporting*

377.    The SEC defines "disclosure controls and procedures" as:

> …controls and other procedures of an issuer that are designed to ensure that **information required to be disclosed by the issuer in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized and reported, with the time periods specified in the Commissions rules and forms**…

(SEC Final Rule Release Nos. 33-8124, 34-46427, IC-25722; File No. S7-21-02)

(Emphasis added). (Footnotes omitted).

378.    Internal control over financial reporting is defined in Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements* ("AS 2"), as follows, in relevant part:

> A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with generally accepted accounting principles** and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with

generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Note: This definition is the same one used by the SEC in its rules requiring management to report on internal control over financial reporting, except the word "registrant" has been changed to "company" to conform to the wording in this standard.

(See Securities Exchange Act Rules 13a-15(f) and 15d-15(f).2/) (AS 2 ¶7)

(Emphasis added).

379.    Exchange Act Rules 13a-14 and 15d-14 require the Company's principal executive officer and principal financial officer to quarterly and annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures as of an assessment date within 90 days prior to the filing date of the report. Further, the Company is required to annually report on the effectiveness of its internal control over financial reporting. AS 2 states, in relevant part:

A company subject to the reporting requirements of the Securities Exchange Act of 1934 (an "issuer") is required to include in its annual report a report of management on the company's internal control over financial reporting… The report of management is required to contain management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective... (AS 2 ¶2).

380.    During the Class Period, the Exchange Act Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures, and internal control over financial reporting. Certain Defendants falsely represented that the Company's disclosure controls and procedures were effective

182

as of the date of each individual Exchange Act report filed during the Class Period (with the exception of a reclassification required for its cash flow statements for 2005 and 2006). Further, the Company falsely represented that it "maintained effective internal control over financial reporting as of December 29, 2006." (Form 10-K 2006 p. 78).

381.    The Company's disclosure controls and procedures, and internal control over financial reporting were not effective throughout the Class Period, as the Exchange Act Defendants caused the Company to issue the relevant financial statements that were materially misstated with respect to the valuation and disclosure of the Company's exposure concentrated in subprime-related securities. As a result of the Company's failure to maintain effective disclosure controls and procedures and internal control over financial reporting, the Exchange Act Defendants were not only able to delay recognizing material losses on its subprime-related securities, but were also able to avoid even disclosing that the Company had such a significant, let alone excessive, exposure concentrated in subprime-related securities, in violation of GAAP. The Company's true financial condition and results of operations were only further masked with false reassurances that the Company had an effective risk management process and adequate disclosures.

382.    In addition, statements made regarding, generally, the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and more specifically, but not exclusively, the identification, measurement, monitoring, management, and disclosure of risk, as described herein, were materially false and misleading for the reasons set forth above.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

383.    During the Class Period, as alleged herein, the Exchange Act Defendants engaged in a scheme to deceive the market and through a course of conduct that artificially inflated the value of Merrill's securities and operated as a fraud on Class Period purchasers of Merrill securities by misrepresenting the Company's risk management practices, balance sheet, and financial condition and performance.  Later, however, as the chart below reflects, when the truth concerning Merrill's risk management practices, balance sheet, and financial performance entered the market and became apparent to investors, the price of Merrill's securities materially declined as the prior artificial inflation dissipated.  As a result of their purchase of Merrill securities during the Class Period at artificially inflated prices and subsequent disclosures which removed the inflation from such securities, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.



185

384.    The Exchange Act Defendants' false and misleading statements and omissions caused Merrill's common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period and all time high closing price of $97.53 per share on January 24, 2007 (which was two weeks before the lion's share of the Exchange Act Defendants Merrill stock sales).  As a direct and proximate result of the various corrective disclosures set forth below, which, over time, revealed the truth about defendants' false and misleading statements and disclosed facts that had been previously concealed by the Exchange Act Defendants' wrongful conduct, by the end of the Class Period, the common stock had lost 49% of its value. The various issuances of Exchange-Traded Preferred Securities declined between 7% and 28%.  All of the Exchange-Traded Preferred Securities issued in 2007 were also trading below their issuance prices.

385.    On June 20, 2007, the *New York Times* reported that "an effort to save a troubled hedge fund at Bear Stearns hit a major hurdle yesterday when Merrill signaled that it would move forward with its plan to auction $850 million in subprime securities that had been held as collateral . . . [If] the assets – securities and bonds backed by subprime mortgages that can be difficult to value – are sold at prices well below where they are currently valued, the reverberations across Wall Street would be strong.  Not only would Merrill be forced to post losses on its holdings, but other banks, hedge funds and investors owning similar securities would have to mark down the value of those holdings to new, lower prices."

386.    On June 20, 2007, Merrill common stock declined from a closing price on June 19, 2007 of $90.04 per share to close at $87.68 per share, a decline of $2.36 per

share, or approximately 3%, on volume of approximately 7.1 million shares. Most of the Exchange-Traded Preferred Securities also suffered price declines on this date.

387.    Merrill's securities prices continued to be artificially inflated in part because the Exchange Act Defendants assured the investors that Merrill was not exposed to the risk that caused the Bear Stearns' hedge funds to collapse. For example, at a conference in London on or about the end of June 2007, defendant O'Neal stated that Merrill's exposure was "reasonably well contained." Further, on or about July 17, 2007, Defendant Edwards asserted that Merrill's exposure to subprime collateral assets seized from Bear Stearns was "limited" and "contained" and that Merrill's position with respect to the collateral was "appropriately marked."

388.    On July 17, 2007, Punk Ziegel & Co. published an analyst report on Merrill that stated, among other things, that "the confidence in the Company's balance sheet has been shaken by recent events in the high yield and subprime markets. It is not altogether clear that the firm is marking its book to market, or whether it is making smaller adjustments using a more complex modeling technique. Questions also exist as to how rigorous the Company's underwriting standards are."

389.    On July 17, 2007, Merrill's common stock declined from a closing price on July 16, 2007 of $87.39 per share to close at $86.20 per share, a decline of $1.19 per share, or approximately 1.36%, on volume of approximately 15.8 million shares.

390.    Merrill's securities prices continued to be artificially inflated, in part because the Company denied that there were issues concerning its accounting for the value of subprime debt on its balance sheet. Specifically, in response to a question about Merrill's CDO valuation on the Company's July 17, 2007 conference call with investors,

defendant Edwards stated, "[o]bviously, we have a very robust process around marking these assets and we are confident in how they were marked."

391.    On September 26, 2007, a Goldman Sachs analyst reported that Merrill might record losses of as much as $4 billion in the third quarter on its fixed-income assets. The price declined that day by $0.37 per share, from a closing price $72.12 per share on September 25, 2007, to close at $71.75 per share on exceptionally high trading volume of over 26 million shares, and Merrill's common stock declined an additional $0.47 per share over the next two trading days. Most of the Preferred Securities declined over this period as well.

392.    On October 5, 2007, the Company issued a press release concerning the impact of market conditions on the Company's financial results for the quarter ended September 28, 2007. The press release disclosed, among other things, that "challenging credit market conditions will have an adverse impact on its net earnings for the third quarter. The company expects to report a net loss pre-diluted share of up to $0.50 cents, resulting from significant negative mark-to-market adjustments to its positions in two specific asset classes: collateralized debt obligations (CDOs) and subprime mortgages; and leveraged finance commitments. . . ." The October 5, 2007 press release stated for the first time that Merrill would take an estimated write-down of $4.5 billion net of hedges.

393.    The next trading day, October 8, 2007, Merrill stock declined $2.55 per share, or approximately 3%, from a close on October 5, 2007 of $76.67 per share, to close at $74.12 per share on volume of over 10 million shares.

394.    On October 24, 2007, Merrill issued a press release that disclosed its financial results for the quarter ended September 28, 2007 and stated, among other things, that "[t]hird-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill disclosed at the time of its earnings pre-release.  This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral. FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing."

395.    On October 24, 2007, Merrill common stock declined from a closing price on October 23, 2007 of $67.12 per share, to close at $63.22 per share, a decline of $3.90 per share, or approximately 6%, on volume of approximately 52 million shares, and on October 25, 2007, Merrill stock declined an additional $2.32 per share, or approximately 4%, to close at $60.90 per share, on volume of approximately 41 million shares.  All of the Exchange-Traded Preferred Securities also suffered price declines on these dates.

396.    On November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages.  On November 1, 2007, Merrill's common stock declined from a closing price on October 31, 2007 of $66.02 per share to close at $62.19 per share, a decline of $3.83 per share, or approximately 6%, on volume of approximately 20 million shares.  On November 2, 2007, Merrill's stock declined an additional $4.91 per share, or approximately 8%, to close at $57.28 per share on volume of approximately 77

million shares.  All of the Exchange-Traded Preferred Securities declined on these dates as well.

397.    On January 17, 2008, before the market opened, the Company released its results for the year and quarter ended December 28, 2007, and announced additional write-downs of mortgage-related assets of over $16 billion.

398.    On January 17, 2008, Merrill's common stock declined from a closing price on January 16, 2008 of $55.09 per share, to close at $49.45 per share, a decline of $5.64 per share, or approximately 10%, on exceptional volume of over 70 million shares. All of the Exchange-Traded Preferred Securities declined on this date as well.

399.    The price declines directly and proximately resulting from the above discussed disclosures were not caused by industry news, randomness, or by Merrill-related information unrelated to the alleged fraud.  Each of the above referenced disclosures partially corrected the false and misleading information previously available to the market by the Exchange Act Defendants' wrongful course of conduct.  Lead Plaintiff seeks by this complaint to be compensated for those resulting economic losses.

## VIII.    FRAUD-ON-THE-MARKET DOCTRINE

400.    At all relevant times, the market for Merrill's securities was an efficient market for the following reasons, among others:

(a) The Company's common stock and each of the Exchange-Traded Preferred Securities listed in paragraph 13 above were actively traded on the New York Stock Exchange, a highly efficient market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC; and

190

(c) The Company regularly had conference calls with investors and issued

press releases which were carried by national news wires. Each of these

releases was publicly available and entered the public marketplace.

401.    As a result, the market for Merrill's securities promptly digested current

information with respect to Merrill from all publicly available sources and reflected such

information in the price of the Company's securities. Under these circumstances, all

purchasers of the Company's publicly traded securities during the Class Period suffered

similar injury through their purchase of the publicly traded securities of Merrill at

artificially inflated prices, and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

402.    To the extent that the statutory safe harbor may apply to any of these false

statements alleged herein, the Exchange Act Defendants are liable for those false

forward-looking statements because at the time each of those statements was made the

speaker actually knew the statement was false and the statement was authorized and/or

approved by an executive officer of Merrill who actually knew that those statements were

false when made.

## COUNT I

### (For Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Defendants Merrill, O'Neal, Fakahany, Fleming, and Edwards)

403.    Lead Plaintiff incorporates ¶¶1-402 by reference.

404.    During the Class Period, the Exchange Act Defendants named in this

Count: (a) deceived the investing public, including Lead Plaintiff and other Class

members, as alleged herein; (b) artificially inflated and maintained the market price of

Merrill's common stock and certain preferred stock; and (c) caused members of the Class

to purchase Merrill's common stock and certain preferred stock at artificially inflated prices.

405.    The Exchange Act Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, and/or substantially participated in the creation of the alleged misrepresentations, which operated as a fraud and deceit upon the purchasers of Merrill's common stock and certain of Merrill's preferred stock, in an effort to maintain artificially high market prices for Merrill's common stock and certain of Merrill's preferred stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

406.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, the Exchange Act Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance, so that the market prices of Merrill's publicly traded securities would be based on truthful, complete and accurate information.

407.    The Exchange Act Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce and/or the mails, made, or substantially participated in the creation of, untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made about the Company in light of the circumstances under which they were made, not misleading, as set forth herein.

408.    The Exchange Act Defendants named in this Count had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were unavailable to them. The facts alleged herein set forth a strong inference that each of the Exchange Act Defendants named in this Count acted with scienter.

409.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Merrill's common stock and certain of Merrill's preferred stock were artificially inflated throughout the Class Period. In ignorance of the fact that the market prices of Merrill's common stock and certain of Merrill's preferred stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which such shares trade, and the truth of any representations made to appropriate agencies and to the investing public, at the times at which any statements were made, and/or on the absence of material adverse information that was known or with recklessness disregarded by the Exchange Act Defendants but not disclosed in public statements by these defendants, Lead Plaintiff and the other members of the Class purchased Merrill's common stock and certain of Merrill's preferred stock at artificially high prices, and were damaged thereby.

410.    At the time of said misrepresentations and omissions, Lead Plaintiff and the other members of the Class were ignorant of their falsity, and believed the false statements to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the true nature of the operations of Merrill and the noncompliance

with federal law, which were not disclosed by defendants, Lead Plaintiff and the other members of the Class would not have purchased such stock or, if they had purchased such stock, they would not have done so at the artificially inflated prices which they paid.

411.    The Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of Merrill were materially false and misleading, knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.

412.    As alleged herein, the Exchange Act Defendants participated in the fraudulent scheme, by virtue of their receipt of information reflecting the true facts regarding Merrill, their control over, and/or receipt and/or modification of Merrill's allegedly materially misleading misstatements and/or their associations with Merrill which made them privy to confidential proprietary information concerning Merrill, participated in the fraudulent scheme alleged herein.

413.    The Exchange Act Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme alleged herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge or recklessness and complicity of the personnel at the highest level of the Company.

414.    The Exchange Act Defendants had the opportunity to perpetrate the fraudulent scheme and course of business described herein because they were the most senior officers and directors of Merrill, and they issued statements and press releases on

behalf of Merrill and had the opportunity to commit the fraud alleged herein.  As illustrated by the Exchange Act Defendants' respective positions with the Company, they had and used their influence and control to further the scheme alleged herein. The Exchange Act Defendants had broad responsibilities that included communicating with the financial markets and providing the markets with financial results.

415.    The Exchange Act Defendants were privy to and directed the making of financial projections and results. By making the misleading statements contained herein, the Exchange Act Defendants knew or recklessly disregarded that they would artificially inflate the price of the Company's common stock and certain of the Company's preferred stock.  Their respective actions resulted in damage to Lead Plaintiff and the Class.

416.    By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and are liable to Lead Plaintiff and the other members of the Class for damages which they suffered in connection with their purchases of Merrill common stock and certain preferred stock during the Class Period.

## COUNT II

### (For Violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) Against Defendants Merrill, MLPFS and O'Neal, Fakahany, Fleming and Edwards)

417.    Lead Plaintiff incorporates ¶¶ 1-402 by reference.

418.    This Count is brought against the Exchange Act Defendants and MLPFS.

419.    The Exchange Act Defendants and MLPFS knowingly or recklessly employed a manipulative and deceptive device, scheme or artifice to defraud, in violation of SEC Rule 10b-5(a), and engaged in an act, practice or course of business which

operated as a fraud or deceit in violation of SEC Rule 10b-5(c), in connection with the purchase of Merrill's common stock and other securities during the Class Period by Lead Plaintiff Ohio STRS and the other members of the proposed Class. The Exchange Act Defendants' and MLPFS's manipulative and deceptive devices and practices included, *inter alia*: disregarding and, in certain instances, overriding their internal risk controls and analyses concerning the issuance and sale of CDOs and related financial instruments, manipulating their pooling of assets within CDOs to issue and sell to investors tranches of securities with purported AAA ratings despite the fact that significant amounts of the assets underlying many such CDOs were at best highly risky assets rated less than AAA, lowering underwriting guidelines for subprime mortgage origination, entering into purported financial guarantees with insurers Merrill and MLPFS knew or disregarded were undercapitalized or highly leveraged, merely to create the appearance that Merrill was properly hedged against losses on CDOs and other financial instruments and guarantees which Merrill, MLPFS, and other Merrill subsidiaries had retained and/or to which they were committed, concealing Merrill's guarantee of billions of dollars in undisclosed liabilities from CDOs, MBSs, CDSs, TRSs, and other derivative contracts and financial instruments backed by, or relating to, subprime mortgages and foisting upon certain of MLPFS's brokerage clients' highly risky CDOs and related securities without such clients' authorization, all as alleged more fully above, and financing the purchase of CDO assets by Hedge Funds.

420. As a result of these manipulative and deceptive devices and practices alleged above, the market prices of Merrill's common stock and other securities were artificially inflated during the Class Period. Lead Plaintiff and other members of the

Class who acquired such securities during the Class Period were injured as a direct and proximate result of these manipulative and deceptive devices and practices.

421.     In connection with their manipulative and deceptive devices and practices alleged above, the Exchange Act Defendants and MLPFS used the means or instrumentalities of interstate commerce and the mails.

422.     By virtue of the foregoing, the Exchange Act Defendants and MLPFS have violated section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

423.     As a direct and proximate result of the wrongful conduct of defendants Merrill and MLPFS, Lead Plaintiff and the other members of the Class incurred damages in an amount to be proven at trial.

424.     This Count is brought solely under SEC Rules 10b-5(a) and (c). Accordingly, Lead Plaintiff need not allege nor prove in connection with this Count that the Exchange Act Defendants or MLPFS made any misrepresentation or omission of material fact or otherwise for which these defendants may also be liable under SEC Rule 10b-5(b) and/or any other provision of law.   Likewise, and for that same reason, the statutory safe harbor for certain forward-looking statements does not apply to this Count in any respect, as no false or misleading statements are alleged in this Count.

### COUNT III

**(For Violation of Section 20(a) of the 1934 Act Against Defendants O'Neal, Fakahany, Fleming and Edwards)**

425.     Lead Plaintiff incorporates ¶¶1-402 by reference.

426.     Defendants O'Neal, Fakahany, Fleming, and Edwards, by virtue of their respective offices and specific acts alleged above, including stock ownership, were, at the

time of the wrongs alleged herein, controlling persons of Merrill within the meaning of Section 20(a) of the Exchange Act.

427.    Defendants named in this count, had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein. Defendants O'Neal (Chief Executive Officer), Edwards (Senior Vice President and CFO), Fakahany (Co-President and COO), and Fleming (Co-President and COO) each controlled Merrill through their respective executive and/or board positions.

428.    As senior executive officers and/or directors of Merrill, defendants named in this count, had a duty to disseminate accurate and truthful information regarding Merrill's financial statements and to correct any previously issued statements that had become untrue so that the market price of Merrill's common stock and certain preferred stock would be based upon truthful and accurate information.

429.    Defendants named in this count, by reason of their executive or directorial positions with Merrill, were controlling persons of Merrill and had the power and influence, and exercised the same, to cause Merrill to engage in the conduct complained of herein. Defendants controlled the contents of Merrill's SEC filings, corporate reports and press releases. Each of the defendants participated in writing or reviewing the Company's corporate reports, press releases, and SEC filings alleged to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected and thereby culpably participated in the fraud alleged herein.

430.    Because of their positions and access to material non-public information available to them, the defendants named in this count knew or recklessly disregarded that

the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. Thus, each of these defendants is legally responsible for the falsification of Merrill's public reports, financial statements, press releases and other statements as alleged herein.

431.    By reason of the conduct alleged herein, defendants named in this count are liable for the aforesaid wrongful conduct, and are liable to Lead Plaintiff and to the other members of the Class for the damages which they suffered in connection with their purchases of Merrill common stock and certain preferred stock during the Class Period.

## X. CLAIMS AGAINST DEFENDANTS UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT AND SECTION 14(a) OF THE EXCHANGE ACT

432.    These counts are in effect a separate complaint.  For these claims there is no allegation of fraud, scienter or recklessness.  The only claim is that there were misrepresentations or omissions of material fact.

**A.    Overview of Securities Act and Proxy Claims**

433.    The Securities Act claims are brought on behalf of persons who purchased or acquired Merrill securities issued under or traceable to the registration statements and prospectuses set forth hereafter.  Each of these registration statements and prospectuses contained misrepresentations or omissions of material fact, or incorporated by reference documents that contained misrepresentations or omissions of material fact.

434.    The Securities Act and Proxy claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in paragraphs 5-431, including the allegations of scienter and fraud.

435.    The Securities Act and Proxy claims allege that by the end of 2006, Merrill was materially exposed to complex securities known as CDOs, which are securitized bundles of debt securities.  Specifically, Merrill had billions of dollars in exposure to U.S. subprime ABS CDOs.  Nevertheless, Merrill failed to disclose its U.S. subprime ABS CDO exposure to investors.

436.    Merrill's financials were materially exposed to the declining housing market and increasing default rates of borrowers.  Nevertheless, Merrill failed to disclose that its risk management systems and controls were insufficient and did not adequately protect the Company against the risks associated with the deteriorating housing market and increasing default rates.  Indeed, as reported in the *Wall Street Journal* on January 25, 2008, John Thain, the new CEO of Merrill, who replaced O'Neal, has admitted that Merrill's risk controls and its risk control committee did not function.

437.    The Merrill defendants are Merrill, O'Neal and Edwards (hereinafter referred to the "Merrill Defendants").

438.    The Merrill Defendants did not disclose that by the end of 2005, at least one top insurer, American International Group, Inc. ("AIG"), had advised Merrill that AIG would no longer underwrite insurance to protect Merrill's growing U.S. subprime ABS CDO exposure.  Merrill had been relying on insurance purchased from AIG to transfer significant portions of Merrill's residual risks created in the underwriting of CDOs.

439.    Merrill also entered into billions of dollars of CDSs with monoline insurers.  Although consummated via separate contracts, the economic substance of these transactions was that those insurers were supposedly insuring Merrill or the Merrill-sponsored CDO issuing-entity against any risk of loss to principal and/or interest on CDOs.  Sometimes these

insurance policies also purported to insure Merrill or Merrill's CDO issuing entity on the total return the particular CDO tranche would yield. These undercapitalized or over leveraged insurers included entities like ACA Capital Holdings Inc., ("ACA"), a single A rated insurance company with severely limited capital, as well as XL Capital Assurance Inc. ("XL"). These entities were themselves exposed to tens of billions in subprime debt. The effect of this insurance was that Merrill was buying protection from entities that were, in some instances, less creditworthy than the securities they were insuring and these monoline insurers were incapable of satisfying their insurance obligations.

440.    In February 2007, the ABX and TABX indices, two key indices for MBSs and CDOs, declined 15-40% on the very type of debt that Merrill belatedly wrote down in the third and fourth quarters of 2007. Further, by June 2007, the ABX and TABX had declined further and traded at discounts between 40-55%. The decline in these two indices required Merrill to write-down its exposure to U.S. subprime ABS CDOs by the first quarter of 2007.

441.    Investors began to learn of the falsity of the statements listed below in October 2007, when Merrill announced a series of write-downs of U.S. subprime ABS CDO exposures causing at least $24 billion in write downs to the Company in the third and fourth quarters of 2007.

442.    The particular registration statements and prospectuses issued which are alleged to be materially false and misleading are:

(a) Registration Statement Amendment No. 1 for the December 7, 2006 Offering;

(b) Series 5 Preferred Stock Prospectus for the March 15, 2007 Offering;

(c) Registration Statement Amendment No. 2 for the April 25, 2007 Offering;

    (d)  Registration Statement Amendment No. 3 for the August 15, 2007 Offering; and

    (e)  First Republic Registration Statement for the Merrill securities issued in exchange for First Republic securities (these registration statements and prospectuses are collectively referred to as the "Identified Registration Statements and Prospectuses").

443.    By January 17, 2008, all of the securities issued pursuant to the Identified Registration Statements and Prospectuses had declined in value since the date of their issuance. The largest decline is attributable to common stock issued pursuant to the First Republic Registration Statement, which declined from $75.02 per share at issuance on September 21, 2007, to $49.45 on January 17, 2008, a 34% drop in four months, and Series 5 Preferred, which declined from a $25/share issuance price on March 19, 2007, to $17.60/share on January 17, 2008 a 29.6% decline in less than a year.

444.    By the market's close on May 19, 2008, the price of each security had declined in value since the date of issuance. Common stock had declined from the $75.02 per share at issuance to First Republic shareholders, to $47.71. Merrill Lynch Capital Trust I Preferred 6.45% Securities had declined from $25 per share to $21.36. Series 5 Preferred Stock had declined from $25 per share to $16.40. Merrill Lynch Capital Trust III 7.375% Preferred Securities had declined from $25 per share to $24.11. Series 6 Preferred Stock had declined from $25 per share to $23.54. Series 7 Preferred Stock had declined from $25 per share to $20.36.

*1. December 7, 2006 Offering*

445. On December 6, 2006, Merrill and Merrill Lynch Capital Trust I ("ML Trust I") filed with the SEC a Post-effective Amendment to a March 31, 2006 automatic shelf registration ("Registration Statement Amendment No. 1").

446. On December 7, 2006, Merrill and ML Trust I filed with the SEC a Prospectus Supplement whereby Merrill offered 40 million shares of 6.45% Trust I Preferred Securities at $25 per share (the "6.45% Trust I Preferred Prospectus Supplement").

447. ML Trust I was the issuer of the securities issued under this registration statement ("December 7, 2006 Offering").

448. The December 7, 2006 Offering raised approximately $1 billion. After underwriting commissions, ML Trust I realized approximately $968.5 million.

449. Registration Statement Amendment No. 1 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

*2. March 15, 2007 Offering*

450. On March 12, 2007, Merrill filed with the SEC a product supplement related to the March 31, 2006 shelf registration statement and on March 16, 2007, Merrill filed with the SEC a term sheet/prospectus (collectively referred to as "Series 5 Preferred Stock Prospectus") under which it offered 60,000,000 depository shares each representing a 1/1200th interest in a share of Floating Rate Non-Cumulative Preferred Stock, Series 5 at $25 per depository share that raised $1.5 billion (50,000 shares of Floating Rate Non-Cumulative Preferred Stock, Series 5 were issued with a liquidation preference of $30,000 per preferred share).

451. The Series 5 Preferred Stock Product Prospectus incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, and Merrill's annual report on Form 10-K for the fiscal year ended December 29, 2006, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

452. Merrill was the issuer of the securities issued under this prospectus ("March 15, 2007 Offering").

453. The March 15, 2007 Offering raised approximately $1.5 billion. After underwriting commissions, Merrill realized approximately $1.47 billion.

***3. April 25, 2007 Offering***

454. On April 23, 2007, Merrill and Merrill Lynch Capital Trust II ("ML Trust II") filed with the SEC a Post-effective Amendment No. 2 to the shelf registration dated March 31, 2006 ("Registration Statement Amendment No. 2").

455. On April 25, 2007, Merrill and ML Trust II filed with the SEC a Prospectus Supplement whereby it offered 36 million shares of 6.45% Trust II Preferred Securities at $25 per share (the "6.45% Trust II Preferred Prospectus Supplement").

456. ML Trust II was the issuer of these securities ("April 25, 2007 Offering").

457. The April 25, 2007 Offering raised approximately $900 million. After underwriting commissions, ML Trust II realized approximately $871.6 million.

458. Registration Statement Amendment No. 2 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, Merrill's annual report on Form 10-K for the fiscal year ended December 29, 2006, and Merrill's report on Form 8-K dated April 19, 2007, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

### 4.    August 15, 2007 Offering

459.    On August 13, 2007, Merrill and Merrill Lynch Capital Trust III ("ML Trust III") filed with the SEC a post-effective amendment No. 3 to the shelf registration dated March 31, 2006 ("Registration Statement Amendment No. 3").

460.    On August 15, 2007, Merrill and ML Trust III filed with the SEC a Final Prospectus Supplement whereby it offered 30 million shares of 7.375% Trust III Preferred Securities at $25 per share ("7.375% Trust III Preferred Prospectus Supplement").

461.    ML Trust III was the issuer of these securities ("August 15, 2007 Offering").

462.    The August 15, 2007 Offering raised approximately $750 million.  After underwriting commissions, ML Trust III realized approximately $726 million.

463.    Registration Statement Amendment No. 3 incorporated by reference Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, Merrill's annual report on Form 10-K for the fiscal year ended December 29, 2006, Merrill's quarterly reports on Form 10-Q for the fiscal periods ended March 30, 2007 and June 29, 2007, and Merrill's reports on Form 8-K dated April 19, 2007, and July 17, 2007, which, as set forth hereafter, contained misrepresentations and omissions of material fact.

### 5.    First Republic Acquisition

464.    On January 29, 2007, Merrill announced that it would acquire First Republic Bank ("First Republic") for $1.8 billion.

465.    On or about May 8, 2007, Merrill filed with the SEC a Registration Statement on Form S-4 (the "May 8, 2007 S-4"), as amended on June 8, 2007 and June 21, 2007 (the "June 21, 2007 S-4/A"), which became effective on June 22, 2007 and a Proxy Statement and Prospectus dated June 22, 2007 (the "June 22, 2007

205

Proxy/Prospectus"), and the registration of Merrill 6.70% Noncumulative Perpetual

Preferred Stock, Series 6 ("Series 6 Preferred Stock") and Merrill 6.25% Noncumulative

Perpetual Preferred stock, Series 7 ("Series 7 Preferred Stock") filed with the SEC on

Form 8-A on September 21, 2007. The May 8, 2007 S-4, June 21, 2007 S-4/A and the

June 22, 2007 Proxy/Prospectus are collectively referred to as the "First Republic

Registration Statement."

466.    Under the First Republic Registration Statement, Merrill registered with

the SEC common and preferred stock with the SEC. The preferred stock was issued by

Merrill in two series: (1) Series 6; and (2) Series 7.

467.    On or about September 21, 2007, Merrill issued 11.6 million shares of

Merrill common stock, registered under the First Republic Registration Statement, to

First Republic shareholders in exchange for First Republic stock ("First Republic

Acquisition").

468.    Pursuant to the First Republic Registration Statement, Merrill also issued:

(1) 2.6 million depository shares, each representing a 1/40th interest in a share of Series 6

Preferred Stock in exchange for First Republic 6.70% Noncumulative Perpetual Preferred

Series A shares; and (2) 2 million depository shares, each representing a 1/40th interest in

a share of Series 7 Preferred Stock in exchange for First Republic 6.25% Noncumulative

Perpetual Preferred Series B shares.

469.    The First Republic Registration Statement incorporated by reference the

following documents: Merrill's quarterly report on Form 10-Q for the fiscal quarter

ended September 29, 2006, Merrill's annual report on Form 10-K for the fiscal year

ended December 29, 2006, Merrill's quarterly report on Form 10-Q for the fiscal period

ended March 30, 2007, Merrill's April 19, 2007 8-K, Merrill's July 17, 2007 8-K and the

July 19, 2007 Joint First Republic and Merrill Lynch Notice to shareholders of Extension

of Cash/Stock election deadline in connection with the pending merger filed pursuant to

SEC Rule 425, which as set forth hereafter contained misrepresentations and omissions

of material fact.

**B.**     **Securities Act and Proxy Claim Plaintiffs**

470.    Lead Plaintiff Ohio STRS acquired 788 shares of Merrill common stock

pursuant to the First Republic Registration Statement, as reflected in the supplemental

certification of Ohio STRS attached hereto.  Also, Ohio STRS was eligible to vote on the

First Republic Merger.  Ohio STRS is one of the largest pension funds in the nation.  Ohio

STRS serves approximately 400,000 active, inactive and retired Ohio public educators and

has assets of approximately $75 billion.

471.    Plaintiff Gary Kosseff purchased: (1) 6.45% Trust II Preferred Securities in its

initial public offering at the offering price; and (2) 7.375% Trust III Preferred Securities in its

initial public offering at the offering price, as reflected in the Supplemental Certification of

Gary Kosseff attached hereto.

472.    Lead Plaintiff Ohio STRS and Plaintiff Kosseff are hereinafter referred to as

the "Securities Act and Proxy Claim Plaintiffs".

**C.**     **Securities Act And Proxy Claim Defendants**

473.    Defendant Merrill is a Delaware corporation with its principal executive

offices in New York, New York.  The Company purports to offer a broad range of services to

private clients, small businesses, institutions and corporations, organizing its activities into

two interrelated business segments - Global Markets and Investment Banking Group

("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management. FICC is within the Global Markets & Investment Banking Group.

474. Defendant ML Trust I is a Delaware statutory trust wholly owned by Merrill and the issuer of the 6.45% Trust I Preferred Securities in connection with the December 7, 2006 Offering.

475. Defendant ML Trust II is a Delaware statutory trust wholly owned by Merrill and the issuer of the 6.45% Trust II Preferred Securities in connection with the April 25, 2007 Offering.

476. Defendant ML Trust III is a Delaware statutory trust wholly owned by Merrill Lynch and the issuer of the 7.375% Trust III Preferred Securities in connection with the August 15, 2007 Offering.

477. Defendant O'Neal was at all relevant times until October 2007, a Director, Chairman of the Board and CEO of Merrill. O'Neal signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Statement Amendment No. 3; and (5) First Republic Registration Statement.

478. Defendant Edwards is, and at all relevant times was, Senior Vice President and Chief Financial Officer ("CFO") of Merrill. Edwards signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Statement Amendment No. 3; and (5) First Republic Registration Statement.

479.    Defendants O'Neal and Edwards, because of their positions with the Company, possessed the power and authority to control the contents of the Identified Registration Statements and Prospectuses.

480.    Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill.  MLPFS provides investment, financing, advisory, insurance, banking, and related products and services. MLPFS was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) March 15, 2007 Offering; (3) April 25, 2007 Offering; and (4) August 15, 2007 Offering.

481.    Defendant Citigroup Global Markets ("Citigroup") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

482.    Defendant Morgan Stanley & Co. ("Morgan Stanley") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

483.    Defendant UBS Securities ("UBS") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

484.    Defendant Wachovia Capital Services ("Wachovia") was an underwriter for the following offerings:  (1) December 7, 2006 Offering; (2) April 25, 2007 Offering; and (3) August 15, 2007 Offering.

485.    Defendant Deloitte & Touche LLP ("Deloitte") at all times relevant served as the Company's outside auditor.  Deloitte consented to the incorporation by reference in the First Republic Registration Statement, of its unqualified opinions on the Company's financial

statements and management's assessment of internal controls for the fiscal year ended December 29, 2006. Deloitte is also named in the Series 5 Preferred Stock Product Supplement/Prospectus in connection with the March 15, 2007 Offering, Registration Statement Amendment No. 2 in connection with the April 25, 2007 Offering and Registration Statement Amendment No. 3 in connection with the August 15, 2007 Offering as having provided unqualified opinions stating that Merrill's consolidated financial statements for the fiscal year ending 2006 were fairly presented, in all material respects, in conformity with GAAP and that Merrill's management report on the effectiveness of internal control was fairly stated in all material respects. Deloitte's unqualified opinions were materially false and misleading because Deloitte did not perform its audit of Merrill's year end 2006 financial statements in accordance with generally accepted auditing standards and such financial statements were presented in a manner which violated GAAP for the reasons set forth below at paragraph 559. Deloitte maintains an office in New York, New York. Deloitte issued unqualified opinions on the Company's financial statements and management's assessment of internal controls for the fiscal year ended December 29, 2006.

**D.    Registration Statement Amendment No. 1 (December 7, 2006 Offering)**

486.    Registration Statement Amendment No. 1 incorporated by reference Merrill's October 17, 2006 report on Form 8-K and Merrill's quarterly report on Form 10-Q for the fiscal quarter ended September 29, 2006, both of which contained untrue statements of material fact and omitted material facts as set forth more specifically below.

### 1. October 17, 2006 Form 8-K

487.    On October 17, 2006, Merrill caused to be filed with the SEC a Form 8-K, attaching a press release that announced its financial results for the third quarter of 2006. In that press release, the Merrill Defendants represented:

- GMI's third-quarter 2006 net revenues were $4.4 billion, up 21 percent from the year-ago quarter.  Compared with the third quarter of 2005, net revenues increased in all three major business lines:

- Fixed Income, Currencies and Commodities (formerly Debt Markets) net revenues increased 26 percent, and were a quarterly record, driven primarily by record results in commodities and an increase from trading credit products, which more than offset declines from principal investing and trading interest rate products.

488.    The statements above in paragraph 487 were materially false and misleading because the Merrill Defendants failed to disclose that the reported increases in revenues came at the expense of exposing Merrill to billions of dollars of risk in U.S. subprime ABS CDO exposures.  In addition, Merrill failed to disclose that through these exposures, Merrill's financials were exposed to the deteriorating housing market and the material increase in defaults of subprime borrowers.

### 2. False Financial Results for the Fiscal Quarter Ended September 29, 2006

489.    On November 3, 2006, Merrill caused to be filed with the SEC on Form 10-Q, its financial results for the fiscal quarter ended September 29, 2006 ("November 3, 2006 10-Q").  In the November 3, 2006 10-Q, the Merrill Defendants represented the following, *inter alia*, concerning Merrill's risk management policies and practices:

Merrill Lynch continually evaluates its businesses for profitability, performance, and client service to ensure alignment with its long-term strategic objectives under varying market and competitive conditions. The

strategy of maintaining long-term client relationships, **_closely monitoring costs and risks, diversifying revenue sources_**, and growing fee-based and recurring revenues all continue as objectives to mitigate the effects of a volatile market environment on Merrill Lynch's business as a whole . . . .

\*  \*  \*

Risk-taking is integral to many of the core businesses in which Merrill Lynch operates. In the course of conducting its business operations, Merrill Lynch is exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of Merrill Lynch's core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, there are independent control groups that manage market risk, credit risk, liquidity risk and operational risk, among other functions, which fall under the management responsibility of the Chief Financial Officer. **_Along with other control units these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch._**

(Emphasis added).

  490.  In the November 3, 2006 10-Q, the Merrill Defendants made various representations concerning its market risk management, including *inter alia*:

   (a) That Merrill's Market Risk Management Group, which had responsibility for approving the markets and products that Merrill's business units would transact and take risk, used the following methods to assess the risk of Merrill's portfolios and positions:

      Market Risk Management quantifies the sensitivities of Merrill Lynch's current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that Merrill Lynch's current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

   (b) That Merrill's overall Value at Risk ("VaR") (VaR is defined in Appendix A) was only $43 million and:

> To calculate VaR, Market Risk Management aggregates sensitivities to market risk factors and combines them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options . . . .

(c) That in addition to VaR, Merrill also used other risk measurement methods to assess the Company's risk such as:

> These [additional risk measurement methods and tools] include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(d) That risk levels were monitored on a "daily basis to ensure they remain within corporate risk guidelines and tolerance levels."

491.   The statements in paragraphs 489-490 above were materially false and misleading because there were no disclosures concerning the following:

(a) Merrill had billions of dollars in U.S. ABS CDO exposures;

(b) Merrill's risk management systems and controls did not function to limit Merrill's exposure to U.S. ABS CDOs; and

(c) Merrill's VaR was materially understated.

492.   In the November 3, 2006 10-Q, the Merrill Defendants represented the following concerning Merrill's credit risk:

*Residential Mortgage Lending*

Merrill Lynch originates and purchases residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence***

*to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.*

(Emphasis added).

493.    The statements above in paragraph 492 concerning credit risk was materially false and misleading because at this time, Merrill had greatly expanded its origination and purchasing of subprime mortgages and had materially lowered "underwriting guidelines" both as to loans originated and loans purchased. Thus, contrary to these statements, Merrill's guidelines in originating and purchasing mortgage loans were not adequate.

494.    In the November 3, 2006 10-Q, the Merrill Defendants represented, *inter alia*, that:

> . . . to reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agency securities, on certain derivative transactions. From an economic standpoint, Merrill Lynch *evaluates risk exposures net of related collateral* . . . .
>
> In addition to obtaining collateral, Merrill Lynch *attempts to mitigate its default risk on derivatives whenever possible* by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of its derivative contracts.

(Emphasis added).

495.    The statements above in paragraph 494 were materially false and misleading with respect to Merrill's derivatives related to CDO and CDO-related assets because Merrill failed to disclose that it was becoming increasingly difficult to satisfactorily mitigate its risk with respect to derivatives based on U.S. subprime ABS CDO exposures. In particular, there were no disclosures that by 2005, at least one top tier insurer, AIG, had refused to sell insurance to Merrill to protect the Company's growing exposure to U.S. subprime ABS CDOs.

214

496.    The November 3, 2006 10-Q contained certifications, signed by

defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002

which made the following certifications:

> 1. I have reviewed this quarterly report on Form 10-Q of Merrill Lynch & Co., Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

497.    The statement above in paragraph 496 was materially false and misleading because the November 3, 2006 10-Q contained "untrue statement[s] of . . . material fact[s] or omit[ted] to state . . . material fact[s]" including that Merrill's risk control systems were not functioning and Merrill failed to disclose its billions of dollars in exposure to U.S. subprime ABS CDOs.

**E.    <u>Series 5 Preferred Stock Prospectus (March 15, 2007 Offering)</u>**

498.    The Series 5 Preferred Stock Product Prospectus incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's January 18, 2007 8-K, and Merrill's annual report on Form 10-K for the year ended December 29, 2006, all of which contained untrue statements of material fact and/or material omissions.  Merrill's quarterly report on Form 10-Q for the quarter ended September 29, 2006 was materially false and misleading for the reasons set forth above in paragraphs 488-496.

### 1.  Merrill's January 18, 2007 8-K

499.   On January 18, 2007, Merrill caused to be filed with the SEC a Form 8-K,

attaching a press release that announced the financial results for the fourth quarter and

year end December 29, 2006.

500.   In Merrill's January 18, 2007 press release for the fourth quarter and year

ended 2006, the Merrill Defendants represented:

> "We are extremely pleased with Merrill Lynch's performance for the year
> and the fourth quarter," said Stan O'Neal, chairman and chief executive
> officer.  "By virtually any measure, our company completed the most
> successful year in its history.  Revenues, earnings, earnings per share and
> return on equity all grew strongly as a result of our continued emphasis on
> broadening the asset classes and capabilities we can offer clients,
> expanding our geographic footprint, diversifying our business mix,
> managing and deploying our capital more effectively, and investing in top
> talent.  We finished the year positioned better than ever to capitalize on the
> array of opportunities still emerging around the world as a result of what
> we believe are fundamental and long-term changes in how the global
> economy and capital markets are developing."
>
> <div align="center">*     *     *</div>
>
> ■   GMI generated $18.9 billion in net revenues for the full year 2006,
> up 37 percent from 2005, driven by record revenues in both Global
> Markets and Investment Banking. Pretax earnings were $7.1
> billion, up 43 percent from the prior-year period. The pretax profit
> margin was 37.6 percent, up from 36.0 percent in 2005,
> demonstrating operating leverage even as substantial investments
> were made across the business.
>
> ■   GMI's fourth-quarter 2006 net revenues were $5.4 billion, up 55
> percent from the year-ago quarter.  Compared with the fourth
> quarter of 2005, net revenues increased in all three major business
> lines:
>
> > ■   Fixed Income, Currencies and Commodities net
> > revenues of $2.3 billion increased 70 percent,
> > setting a quarterly record, driven by every major
> > business line, in particular record revenues from
> > credit products, commodities and foreign exchange,

as well as strong growth from trading interest rate products.

501.    The statements above were materially false and misleading because the Merrill Defendants failed to disclose that the reported increases in revenues came at the expense of exposing Merrill to billions of dollars of risk in U.S. subprime ABS CDO exposures.  In addition, Merrill failed to disclose that through these exposures, Merrill's financials were exposed to the deteriorating housing market and the material increase in defaults of subprime borrowers.

### 2.    *False Financial Results for the Year Ended December 29, 2006*

502.    On February 27, 2007, the Merrill Defendants caused to be filed with the SEC, Merrill's report on Form 10-K for the fiscal year ended December 29, 2006 (the "2006 10-K").  In the 2006 10-K, Merrill reported, *inter alia*, net earnings of $7.5 billion and net earnings per diluted share of $7.59 per share.

503.    By the time Merrill filed its 2006 10-K, there was a sharp decline in the ABX and TABX, indices that tracked the values of U.S. subprime ABS CDOs.  See ¶440.  There was no disclosure that Merrill was materially exposed to these U.S. subprime ABS CDOs and that it was substantially likely that the decline in their value would materially impact its financials.

504.    The 2006 10-K stated the following concerning Non-Trading Related Assets and Liabilities:

**Loans, Notes, and Mortgages, net**

Our portfolio of loans, notes, and mortgages includes corporate and institutional loans, residential and commercial mortgages, asset-based loans and other loans to individuals and other businesses. We maintain collateral to mitigate risk of loss in the event of default on some of these extensions of credit in the form of securities, liens on real estate, perfected

security interests in other assets of the borrower or other loan parties, and guarantees. We also economically hedge portions of the credit risk in certain commercial loans by purchasing credit default swaps. Loans, notes, and mortgages were $73.0 billion at year-end 2006, up 11% from 2005 as a result of strong market demand driven by favorable borrower fundamentals and business growth.

505.    The 2006 10-K represented, *inter alia*, the following concerning

Residential Mortgage Lending:

We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines as described below. ***Credit risk is closely monitored in order to confirm that reserves are sufficient and valuations are appropriate. These loans are predominantly extended to high credit quality borrowers***.

*            *            *

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform which is focused on originating non-prime residential mortgage loans through a wholesale network. As a result of this acquisition which was completed in the fiscal first quarter of 2007, ***the credit profile of our mortgage lending portfolio may be impacted*** in future periods.

(Emphasis added).

506.    The statements above in paragraphs 504-505 were materially false and

misleading because during 2006, prior to the First Franklin acquisition, Merrill had

greatly expanded its origination and purchasing of subprime mortgages and had

materially lowered its credit standards both as to loans originated and loans purchased,

which had begun to default in large numbers by the end of the year and Merrill was

putting back to loan originators mortgages which had defaulted. Thus, contrary to

Merrill's statements, the credit profile of Merrill's mortgage lending portfolio had in fact

219

been impacted, but there was no disclosure of the actual risks associated with these assets.  Moreover, contrary to Merrill's representations Merrill was not adequately hedging risk.

507.    As set forth below, the documents incorporated in the Registration Statement falsely represented, in great detail, that Merrill had risk policies in place to minimize the exposures of Merrill's U.S. subprime ABS CDO portfolio.  However, Merrill has now admitted that these policies did not function to actually minimize Merrill's true exposure to U.S. subprime ABS CDOs.

508.    The 2006 10-K represented the following concerning Trading-Related Assets and Liabilities:

> Although trading-related balances comprise a significant portion of the Consolidated Balance Sheets, ***the magnitude of these balances does not necessarily result in an increase in risk***. The ***market and credit risks associated with trading-related balances are mitigated through various hedging strategies***, as discussed in the following section. . . .
>
> Trading Assets and Liabilities . . .
>
> We use both "cash instruments" (e.g., securities) and derivatives to manage trading inventory market risks. As a result of these economic hedging techniques, a significant portion of our trading assets and liabilities represents hedges of other trading positions. We may use long positions in U.S. Government securities, for example, to hedge our short positions in interest rate futures contracts. ***These hedging techniques, which are generally initiated at the trading unit level, are supplemented by corporate risk management policies and procedures*** . . .

(Emphasis added).

509.    Merrill's 2006 10-K represented that Merrill's risk management policies and practices were, *inter alia*, subject to regular review and control by senior management and were clearly defined, and that risk framework exceptions and violations were investigated and reported to management.

220

<u>Prudent Governance</u>

We manage the growth and composition of our assets and set limits on the overall level of unsecured funding. Funding activities are subject to regular ***senior management review and control*** through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ("ROC"), Merrill Lynch's executive management and the Finance Committee of the Board of Directors.

<div align="center">*       *       *</div>

Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, ***these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch.*** To accomplish this, we have established a risk management process which includes:

- A formal risk governance structure that defines the oversight process and its components;

- A ***regular review of the risk management process by the Audit Committee*** of the Board of Directors (the "Audit Committee") as well as a ***regular review of credit, market and liquidity risks and processes by the Finance Committee*** of the Board of Directors ("the Finance Committee");

- ***Clearly defined risk management policies and procedures*** supported by a rigorous analytical framework;

- Communication and coordination among the businesses, executive management, and risk functions while maintaining ***strict segregation of responsibilities, controls, and oversight***; and

- Clearly articulated risk tolerance levels, defined and ***regularly reviewed by the ROC***, that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process. While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to

<div align="center">221</div>

mitigate risk-related losses so that they fall within acceptable, predefined levels, under foreseeable scenarios.

<div align="center">*    *    *</div>

Market and credit risk tolerance levels are represented in part by framework limits, which are established by the ROC and *reviewed and approved annually by the Executive Committee*, which must also approve certain intra-year changes. Substantive market and credit risk framework limit changes are reported to the Audit and Finance Committees. The frameworks are reviewed by the Finance Committee in the context of its evaluation of market and credit risk exposures. *Risk framework exceptions and violations are reported and investigated at predefined and appropriate levels of management*.

Both the Audit Committee and the Finance Committee are provided with *regular risk updates,* and significant issues and transactions are reported to the Executive Committee, the Audit Committee and the Finance Committee. Various governance committees exist to create policy, review activity, *and verify that new and existing business initiatives remain within established risk tolerance levels*. Representatives of the independent risk and control groups participate as voting members of these committees. The activities of these committees are monitored by the ROC.

(Emphasis added).

510. The 2006 10-K represented the following concerning Merrill's management of market risk:

(a) That the groups responsible for approving the products and markets in which Merrill transacts and takes risk include Merrill's Market Risk Management Group as well as other independent risk and control groups and that:

. . . this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios

<div align="center">222</div>