would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $52 million and:

> To calculate VaR, we aggregate sensitivities to market risk factors and combine them with a database of historical market factor movements to simulate a series of profits and losses. The level of loss that is exceeded in that series 5% of the time is used as the estimate for the 95% confidence level VaR. The overall total VaR amounts are presented across major risk categories, which include exposure to volatility risk found in certain products, such as options.

*    *    *

> Trading VaR increased during 2006 due to increased levels of equity, commodity and credit trading. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels.***

> To complement VaR and in recognition of its inherent limitations, we use a number of additional risk measurement methods and tools as part of our overall market risk management process. These include stress testing and event risk analysis, which examine portfolio behavior under significant adverse market conditions, including scenarios that would result in material losses for the firm.

(c) That in addition to VaR, Merrill used other risk measurement methods to assess the Company's risk including stress testing and event risk analysis.

511.   The 2006 10-K made representations concerning the creditworthiness of Merrill's counterparties, including that these parties could satisfy their contractual obligations to Merrill.  However, these statements were materially false and misleading because these counterparties could not actually satisfy their obligations to Merrill because

223

they were undercapitalized.  Merrill represented the following concerning the management of credit risk, which it defined "as the potential for loss that can occur as a result of an individual, counterparty or issuer being unable or unwilling to honor its contractual obligations to [Merrill]":

> We have a Global Credit and Commitments Group that assesses the creditworthiness of existing and potential individual clients, institutional counterparties and issuers, and determines firm-wide credit risk levels within the Credit Risk Framework among other tools. This group reviews and monitors specific transactions as well as portfolio and other credit risk concentrations both within and across businesses. This group is also responsible for ongoing monitoring of credit quality and limit compliance and actively works with all of our business units to manage and mitigate credit risk.

> The Global Credit and Commitments Group uses a variety of methodologies to set limits on exposure and potential loss resulting from an individual, counterparty or issuer failing to fulfill its contractual obligations. The group performs analyses in the context of industrial, regional, and global economic trends and incorporates portfolio and concentration effects when determining tolerance levels. Credit risk limits take into account measures of *both current and potential exposure as well as potential loss and are set and monitored by broad risk type, product type, and maturity*. Credit risk mitigation techniques include, where appropriate, the right to require initial collateral or margin, the *right to terminate transactions or to obtain collateral should unfavorable events occur, the right to call for collateral when certain exposure thresholds are exceeded, the right to call for third party guarantees and the purchase of credit default protection. With senior management involvement, we conduct regular portfolio reviews, monitor counterparty creditworthiness, and evaluate potential transaction risks with a view toward early problem identification and protection against unacceptable credit-related losses.* We continue to invest additional resources to enhance Merrill Lynch's methods and policies to assist in managing our credit risk and to address evolving regulatory requirements.

> Senior members of the Global Credit and Commitments Group chair various commitment committees with membership across business, control and support units. These committees review and approve commitments, underwritings and syndication strategies related to debt, syndicated loans, equity, real estate and asset-based finance, among other products and activities . . .

> Further, to protect against declines in the value of the assets held by SPEs, for which Merrill Lynch provides either liquidity facilities or default

protection, ***Merrill Lynch economically hedges its exposure through derivative positions that principally offset the risk of loss arising from these guarantees.***

(Emphasis added).

512.    The 2006 10-K represented, *inter alia*, the following concerning the Company's liquidity and that it had risk management systems in place to ensure that the Company had sufficient liquidity and that it would not need to raise additional capital:

> Scenario analysis and stress testing is an important part of our liquidity management process. Our Liquidity Risk Management Group performs regular scenario-based stress tests covering credit rating downgrades and stressed market conditions both market-wide and in specific market segments. . .
>
> In our scenario analysis, we assume loss of access to unsecured funding markets during periods of financial stress. Various levels of severity are assessed through sensitivity analysis around key liquidity risk drivers and assumptions. Key assumptions that are stressed include diminished access to the secured financing markets, run-off in deposits, draws on liquidity facilities, and derivative collateral outflows. We assess the liquidity sources that can be accessed during the crisis and the residual positions.
>
> . . . The Liquidity Risk Management Group works with our Credit and Market Risk Management groups to incorporate the results of their judgment and analytics where credit or market risk implications exist. We assess the cash flow exposures under the various scenarios and use the results to refine liquidity assumptions, size our excess liquidity pools and/or adjust the asset-liability profiles.

513.    The statements above in paragraphs 508-512 were materially false and misleading because they failed to disclose the following:

(a)  Merrill had accumulated billions of dollars in exposure to U.S. subprime ABS CDOs;  and

(b)  Merrill's risk management policies and controls did not function.

514.    The Company's year ended December 29, 2006 financial statements were presented in violation of GAAP for the reason set forth at ¶559 below.

515.    The 2006 10-K contained certifications, signed by defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley Act of 2002 which made substantially similar certifications as set forth above in paragraph 496.  The certifications in the 2006 10-K were materially false and misleading because they contained "untrue statement[s] of material fact[s] or omit[ted] to state material fact[s]" namely that Merrill's risk control systems were not functioning and Merrill failed to disclose its billions of dollars in exposure to U.S. subprime ABS CDOs.

**F.**    **Registration Statement Amendment No. 2 (April 25, 2007 Offering)**

516.    Registration Statement Amendment No. 2 incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's 2006 10-K and Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007 and April 19, 2007.  The November 3, 2006 10-Q and 2006 10-K were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 489-497 and 502-515 respectively.  Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007 and April 19, 2007 were materially false and misleading and omitted material facts for the reasons set forth in paragraphs 487-488, 499-501 and 517-518 respectively.

**1.**    ***Merrill's April 19, 2007 Form 8-K***

517.    On April 19, 2007, Merrill filed a Form 8-K, attaching a press release that announced the financial results for the first quarter of 2007, ended March 30, 2007, that reported net earnings of $2.2 billion and (ii) net earnings per share of $2.50 per share, and stated the following:

> "This was a terrific quarter.  In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our customers," said Stan O'Neal, Chairman and Chief Executive Officer.

\*     \*     \*

Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination securitization and trading of non-prime mortgage loans and securities in the U.S. ***Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.***

518.    The statements in the April 19, 2007 8-K were materially false and misleading because Merrill did not disclose that:

(a) The Company had tens of billions of dollars in exposure to U.S. subprime ABS CDOs;

(b) Merrill's assets and liabilities were materially false because they did not account for impairment in the U.S subprime ABS CDO portfolio by at least 15%; and

(c) Merrill's risk management policies and controls did not function.

**G.    Registration Statement Amendment No. 3 (August 15, 2007 Offering)**

519.    Registration Statement Amendment No. 3 incorporated by reference Merrill's November 3, 2006 10-Q, Merrill's 2006 10-K, Merrill's quarterly reports on Form 10-Q for the periods ended March 30, 2007 and June 29, 2007, and Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007, April 19, 2007 and July 17, 2007, which contained untrue statements of material fact and omitted material facts. The Registration Statement and the November 3, 2006 10-Q and 2006 10-K were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 489-497 and 502-515 respectively. Merrill's Form 8-Ks dated October 17, 2006, January 18, 2007, April 19, 2007

227

and July 17, 2007 were materially false and misleading and omitted material facts for the reasons set forth above in paragraphs 487-488, 499-501, 517-518 and 536-537 respectively.

### 1.    *False Financial Results for the Quarter Ended March 30, 2007*

520.    On May 7, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended March 30, 2007 (the "May 7, 2007 10-Q"). The May 7, 2007 10-Q, represented, *inter alia*, that Merrill reported: (i) net earnings of $2.2 billion, an increase of 24% from the 2006 first quarter year results; and (ii) net earnings per share of $2.50 per share and $2.26 per diluted share.

521.    The May 7, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $7.3 billion at March 30, 2007.

522.    The May 7, 2007 10-Q represented that Merrill had mortgage loans of $21.0 billion and commitments to make mortgage loans of $7.995 billion as of March 30, 2007 and allowance for loan losses of $478 million.

523.    The May 7, 2007 10-Q represented that as of March 30, 2007 Merrill had assets of mortgages, mortgage-backed and asset backed assets of $42.8 billion, contractual agreements of $36.3 billion and investment securities of $80.3 billion.

524.    The May 7, 2007 10-Q categorized Merrill's assets into three types: levels 1, 2 and 3. Level 1 purported to represent those assets whose values were based on "unadjusted quoted prices for identical assets in an active market." Level 2 purported to represent those assets whose values were based on "quoted prices for similar assets in active markets . . . non-active markets . . . [p]ricing models whose inputs are observable for substantially the full term of the asset . . . [and] pricing models whose inputs are

derived principally from or corroborated by observable market data." Level 3 assets purported to represent those assets whose values were "based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement." Merrill represented that its Level 2 and Level 3 assets were the following amounts:

> (a) Level 2: (i) Trading assets, excluding contractual agreements were $79.408 billion; (ii) Contractual agreements were $184.552 billion minus a net adjustment of approximately $153 billion resulting in approximately $31 billion; (iii) Investment securities were $52.360 billion; and
>
> (b) Level 3: (i) Trading assets, excluding contractual agreements were $3.830 billion; (ii) Contractual agreements were $5.341 billion; (iii) Investment securities were $5.922 billion.

525.    The May 7, 2007 10-Q represented that "The Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

526.    The May 7, 2007 10-Q represented, *inter alia*, that Merrill's maximum exposure to loan and real estate VIEs was $196 million and $6.425 billion in guaranteed and other funds.

527.    The statements above in paragraphs 520-526 were materially false and misleading and omitted material facts, including that the statements were not presented in accordance with GAAP, because they did not disclose the following:

> (a) Merrill had billions of dollars in exposure to U.S. subprime ABS CDO exposures;

229

    (b)  Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q, were materially false and misleading and violated GAAP, based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures by at least 15%;

    (c)  Merrill's net earnings and earnings per share as reported in its May 7, 2007 10-Q were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures; and

    (d)  Merrill's risk management policies and controls did not function.

528.    The May 7, 2007 10-Q made representations concerning residential mortgage lending:

> We originate and purchase residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. The potential additional credit risk arising from these mortgages is addressed through ***adherence to underwriting guidelines.*** Credit risk is ***closely monitored in order to ensure that reserves are sufficient and valuations are appropriate***. For additional information on residential mortgage lending, see the 2006 Annual Report.

(Emphasis added).

529.    The May 7, 2007 10-Q incorporated by reference a section of the 2006 10-K, which stated that Merrill's residential mortgage loans, including such non-traditional features "are predominantly extended to high credit quality borrowers."

530.    The statements above in paragraphs 528-529 were materially false and misleading because during the first quarter of 2007, Merrill had greatly expanded its origination and purchasing of subprime mortgages and had decreased its credit standards

both as to loans originated and loans purchased, which had begun to default in large

numbers by the end of the year.

531.   The May 7, 2007 10-Q represented the following concerning derivatives:

Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

*        *        *

Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is determined that a derivative is not highly effective as a hedge, Merrill Lynch discontinues hedge accounting.

532.   The May 7, 2007 10-Q represented the following concerning Merrill's risk

management:

Risk-taking is integral to the core businesses in which we operate. In the course of conducting our business operations, we are exposed to a variety of risks including market, credit, liquidity, operational and other risks that are material and require comprehensive controls and ongoing oversight. Senior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities. In addition, independent risk groups manage market risk, credit risk, liquidity risk and operational risk. These independent risk groups fall under the management responsibility of our Chief Financial Officer. Along with other independent control groups, including Corporate Audit, Finance and the Office of General Counsel, these disciplines work to ensure risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. For a full discussion of our risk management framework, see our 2006 Annual Report.

533.   The May 7, 2007 10-Q represented the following concerning Merrill's

management of market risk:

(a) That the groups responsible for approving the products and markets in

which Merrill transacts and takes risk include Merrill's Market Risk

Management Group as well as other independent risk and control groups
and that:

Moreover, this group is responsible for identifying the risks to
which these business units will be exposed in these approved
products and markets. Market Risk Management uses a variety of
quantitative methods to assess the risk of our positions and
portfolios. In particular, Market Risk Management quantifies the
sensitivities of our current portfolios to changes in market
variables. These sensitivities are then utilized in the context of
historical data to estimate earnings and loss distributions that our
current portfolios would have incurred throughout the historical
period. From these distributions, Market Risk Management derives
a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $65 million and:

At March 30, 2007, trading VaR was higher than at year-end 2006
primarily due to increased interest rate exposures along with
modest increases to commodity exposures. This increase was offset
by reduced equity exposures. If market conditions are favorable,
we may increase our risk-taking in a number of our businesses,
including our proprietary trading activities. These activities provide
revenue opportunities while also increasing the loss potential under
certain market conditions. ***We monitor these risk levels on a daily
basis to verify they remain within corporate risk guidelines and
tolerance levels*** . . . .

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to
assess the Company's risk including stress testing and event risk analysis
"which examine portfolio behavior under significant adverse market
conditions, including scenarios that would result in material losses for
Merrill Lynch."

534. The statements above in paragraphs 531-533 concerning Merrill's
derivatives and risk management were materially false and misleading because they did
not disclose the following:

(a) Merrill's billions of dollars in exposure to U.S. subprime ABS CDO exposures;

(b) Merrill's trading assets and liabilities as reported in its May 7, 2007 10-Q, were materially false and misleading and violated GAAP, based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures by at least 15%;

(c) Merrill's net earnings and earnings per share as reported in its May 7, 2007 10-Q were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures; and

(d) Merrill's risk management policies and controls did not function.

535.    The May 7, 2007 10-Q contained certifications, signed by defendants O'Neal and Edwards, pursuant to Section 302 of Sarbanes Oxley which made substantially similar certifications as set forth above in paragraph 496. The certifications were materially false and misleading because they did not disclose that risk management control systems did not function. In addition, the statement that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of the Company, was materially false and misleading because Merrill's assets and liabilities did not take into consideration an impairment of at least 15% impairment in Merrill's U.S. subprime ABS CDO exposures.

### 2.    *Merrill's July 17, 2007 Form 8-K*

536.    On July 17, 2007, Merrill filed a Form 8-K, attaching a press release that announced its financial results for the second quarter of 2007. In that press release, Merrill

announced its financial results for the quarter ended June 29, 2007 and made the following statements:

> "We delivered another strong quarter in a volatile and, at times, hostile market environment," said **Stan O'Neal**, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."
>
> *        *        *
>
> ▪ GMI's second-quarter 2007 net revenues were $6.2 billion, up 36 percent from the second quarter of 2006, as net revenues increased in all three major business lines:
>
>> ▪ Fixed Income, Currencies and Commodities (FICC) net revenues increased 55 percent to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45 percent from 2006, reflecting increased diversity and depth across asset classes.

537.    The statements above were materially false and misleading because they did not disclose that:

(a) The Company had at least $40 billion in exposure to U.S. subprime ABS CDOs;

(b) Merrill's assets and liabilities were materially false because they did not account for impairment in the U.S subprime ABS CDO portfolio by at least 40%; and

(c) Merrill's risk management policies and controls did not function.

### 3. *False Financial Results for the Quarter Ended June 29, 2007*

538. On August 3, 2007, Merrill caused to be filed with the SEC, Merrill's report on Form 10-Q for the fiscal quarter ended June 29, 2007 (the "August 3, 2007 10-Q"). The August 3, 2007 10-Q, represented *inter alia*, that Merrill reported: (i) net earnings of $2.1 billion: and (ii) earnings per common share of $2.48 per share and $2.24 per diluted share, up 39% and 37%.

539. The August 3, 2007 10-Q represented that as of June 29, 2007, Merrill had assets of mortgages, mortgage-backed and asset backed assets of $34.5 billion, contractual agreements of $42.9 billion and investment securities of $86.4 billion.

540. The August 3, 2007 10-Q represented that Merrill's retained interests in securitized assets relating to residential mortgage loans were $8.6 billion at June 29, 2007.

541. The August 3, 2007 10-Q reported mortgage loans of $18.9 billion and commitments to make mortgage loans of $8.1 billion as of June 29, 2007 and allowance for loan losses of $435 million.

542. The August 3, 2007 10-Q categorized Merrill's assets into three levels: levels 1, 2 and 3. The categories were described in a substantially similar way in the August 3, 2007 10-Q as they were described in Merrill's May 7, 2007 10-Q. Merrill represented that its Level 2 and Level 3 assets were the following amounts:

(a) Level 2: (i) Trading assets, excluding contractual agreements were $86.611 billion; (ii) Contractual agreements were $216.321 billion minus a net adjustment of approximately $180 billion for a total of

approximately $36 billion; (iii) Investment securities were $58.519 billion; and

(b) Level 3: (i) Trading assets, excluding contractual agreements were $3.648 billion; (ii) Contractual agreements were $6.601 billion; (iii) Investment securities were $5.784 billion.

543.    The August 3, 2007 10-Q represented that "[t]he Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles, which include industry practices."

544.    The statements above in paragraphs 538-543 were materially false and misleading and omitted material facts, including that the statements were not presented in accordance with GAAP, because they did not disclose the following:

(a) Merrill had at least $40 billion in exposure to U.S. subprime ABS CDO exposures;

(b) Merrill's trading assets and liabilities, as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the U.S. subprime ABS CDO exposures by at least 40%;

(c) Merrill's net earnings and earnings per share as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures.  Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO

exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion and its earnings per diluted share would had declined from a reported profit of $2.24 per share to a loss of $10.30 per share; and

(d)  Merrill's risk management policies and controls did not function.

545.  The August 3, 2007 10-Q represented the following concerning residential mortgage lending:

> [Merrill Lynch] originate[s] and purchase[s] residential mortgage loans, certain of which include features that may result in additional credit risk when compared to more traditional types of mortgages. ***The potential additional credit risk arising from these mortgages is addressed through adherence to underwriting guidelines. Credit risk is closely monitored in order to ensure that reserves are sufficient and valuations are appropriate.***

(Emphasis added).

546.  The statements above in paragraph 545 were materially false and misleading because Merrill did not disclose that it had greatly expanded its origination and purchasing of subprime mortgages and had decreased its credit standards both as to loans originated and loans purchased, which had continued to default in large numbers during this period.

547.  The August 3, 2007 10-Q represented the following concerning derivatives:

> Derivative activity is subject to Merrill Lynch's overall risk management policies and procedures.

*      *      *

> Merrill Lynch formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items. When it is

determined that a derivative is not highly effective as a hedge, Merrill
Lynch discontinues hedge accounting.

548. The August 3, 2007 10-Q represented the following concerning Merrill's

risk management:

> While the outlook for growth in most global businesses in which we
> operate remains strong, the challenging market conditions in certain credit
> markets that existed during the first half of 2007 have intensified in the
> beginning of the third quarter. Characteristics of this environment include
> increased volatility, wider credit spreads, reduced price transparency, lower
> levels of liquidity, and rating agency downgrades. These factors have
> impacted and may continue to impact the sub-prime mortgage market,
> including certain collateralized debt obligations (CDOs), as well as other
> structured credit products and components of the leveraged finance
> origination market. Merrill Lynch continues to be a major participant in
> these markets with risk exposures through cash positions, loans, derivatives
> and commitments. Given current market conditions, significant risk
> remains that could adversely impact these exposures and results of
> operations. *We continue our disciplined risk management efforts to
> proactively execute market strategies to manage our overall portfolio of
> positions and exposures with respect to market, credit and liquidity risks.*

*        *        *

> Risk-taking is integral to the core businesses in which we operate. In the
> course of conducting our business operations, we are exposed to a variety
> of risks including market, credit, liquidity, operational and other risks that
> are material and require comprehensive controls and ongoing oversight.
> Senior managers of our core businesses are responsible and accountable
> for management of the risks associated with their business activities. In
> addition, independent risk groups manage market risk, credit risk, liquidity
> risk and operational risk. These independent risk groups fall under the
> management responsibility of our Chief Financial Officer. Along with
> other independent control groups, including Corporate Audit, Finance and
> the Office of General Counsel, these disciplines work to ensure risks are
> properly identified, measured, monitored, and managed throughout Merrill
> Lynch. For a full discussion of our risk management framework, see our
> 2006 Annual Report.

(Emphasis added).

549. The August 3, 2007 10-Q represented the following concerning Merrill's

management of market risk:

(a) That the groups responsible for approving the products and markets in

which Merrill transacts and takes risk include Merrill's Market Risk

Management Group as well as other independent risk and control groups

and that:

> Moreover, this group is responsible for identifying the risks to which these business units will be exposed in these approved products and markets. Market Risk Management uses a variety of quantitative methods to assess the risk of our positions and portfolios. In particular, Market Risk Management quantifies the sensitivities of our current portfolios to changes in market variables. These sensitivities are then utilized in the context of historical data to estimate earnings and loss distributions that our current portfolios would have incurred throughout the historical period. From these distributions, Market Risk Management derives a number of useful risk statistics, including VaR.

(b) That Merrill's overall VaR was only $71 million and:

> The average trading VaR was higher in the second quarter than in the first quarter due primarily to higher equity exposures and higher interest and credit spread exposures earlier in the period. If market conditions are favorable, we may increase our risk-taking in a number of our businesses, including our proprietary trading activities. These activities provide revenue opportunities while also increasing the loss potential under certain market conditions. ***We monitor these risk levels on a daily basis to verify they remain within corporate risk guidelines and tolerance levels.***

(Emphasis added).

(c) That in addition to VaR, Merrill used other risk measurement methods to

assess the Company's risk including stress testing and event risk analysis

"which examine portfolio behavior under significant adverse market

conditions, including scenarios that would result in material losses for

Merrill Lynch."

550. The August 3, 2007 10-Q represented that Merrill's maximum exposure to loan and real estate VIEs was $220 million and $6.65 billion in guaranteed and other funds.

551. The statements above in paragraphs 547-550 were materially false and misleading because they did not disclose the following:

(a) Merrill had at least $40 billion in exposure to U.S. subprime ABS CDO exposures and activities;

(b) Merrill's trading assets and liabilities, as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures by at least 40%;

(c) Merrill's net earnings and earnings per share as reported in its 10-Q for the period ending June 29, 2007, were materially false and misleading and violated GAAP based on the failure to properly mark to market the true value of the U.S. subprime ABS CDO exposures. Had Merrill's financial statements for the quarterly period ended June 29, 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion to a loss of $9.5 billion and its earnings per diluted share would had declined from a reported profit of $2.24 per share to a loss of $10.30 per share;

(d) Merrill had billions of dollars worth of credit default swaps with XL and ACA, which were highly leveraged; and

(e) Merrill's risk control systems did not function.

552.    The August 3, 2007 10-Q repeated substantially the same statements as those set forth in Merrill's November 3, 2006 10-Q, which are set forth above in paragraph 496.   The certifications were materially false and misleading because Merrill failed to disclose that its risk control systems did not function.  In addition, the statement that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of the Company, was materially false and misleading because Merrill's assets and liabilities did not take into consideration an impairment of at least 40% in Merrill's U.S. subprime ABS CDO exposures.

## H.    **First Republic Registration Statement**

553.    On or about May 8, 2007, Merrill filed a Registration Statement with the SEC on Form S-4 for shares to be issued pursuant to the First Republic merger.  Defendants O'Neal and Edwards signed the Form S-4, either individually or by an appointed attorney-in-fact.

554.    On June 8, 2007 and again on June 21, 2007, Merrill filed amendments to its Registration Statement with the SEC on Form S-4/A. Defendants O'Neal and Edwards signed the Form S-4/As, either individually or by an appointed attorney-in-fact.

555.    On June 22, 2007, Merrill filed a Proxy/Prospectus for the merger on Form 424B3. The merger was completed on September 21, 2007.

556.    The First Republic Registration Statement incorporated by reference the following documents:  the November 3, 2006 10-Q, the 2006 10-K, the May 7, 2007 10-Q, the July 17, 2007 8-K and the July 19, 2007 Joint First Republic and Merrill Lynch

Notice to shareholders of Extension of Cash/Stock election deadline in connection with the pending merger filed pursuant to Rule 425. Each of these SEC filings were materially false and misleading for the reasons set forth above.

557.     The First Republic Registration Statement was also false because it did not disclose material adverse events. Merrill signed the merger agreement with First Republic on January 29, 2007. The Registration Statement stated that Merrill made representations and warranties to First Republic concerning Merrill's "regulatory reports, financial and other reports and material adverse effects," and assured that "representations and warranties relating to events having a materially adverse effect on First Republic or Merrill…must be true in all respects." The merger agreement stated that the "term 'material adverse effect,' as used with respect to Merrill or First Republic, means an individual or aggregate effect that…has a material adverse effect on the financial condition, results of operations, assets or business of Merrill or First Republic, as the case may be, and their respective subsidiaries, taken as a whole."

558.     The First Republic Registration Statement represented that Merrill earned $7.499 billion in 2006 and $2.158 billion in the first three months of 2007.

## I.    **GAAP Violations**

559.     The Company's 2006 annual financial statements, incorporated into the following registration statements or prospectuses: (1) the Series 5 Preferred Stock Prospectus; (2) Registration Statement Amendment No. 2; (3) Registration Statement Amendment No. 3; and (4) the First Republic Registration Statement, were materially false and misleading because such financial statements omitted certain disclosure

regarding the Company's financial position and results of operations in a manner which violated the following, among other, fundamental GAAP:

(a) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASCON 1 ¶34);

(b) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (FASCON 1 ¶40);

(c) The principle that financial reporting should provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON 1 ¶42);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. "To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

243

responsibilities for accountability to prospective investors and to the public in general." (FASCON 1 ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASCON 2 ¶¶58-59);

(f)    The principle that financial reporting should be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASCON 2 ¶79);

(g)    The principle that financial reporting should be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent (FASCON 2 ¶81);

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶95, 97);

(i)    FAS 5 which requires disclosure be made of losses, including those incurred after the date of the financial statements, but prior to the issuance of such financial statements, that are reasonably possible in order to prevent the financial statements from being misleading (FAS 5 ¶¶10-11);

(j)     FAS 107, as amended by FAS 133, which requires disclosure of all

significant concentrations of credit risk arising from all financial

instruments (FAS 107, as amended by FAS 133, ¶15A); and

(k)     SOP 94-6, which requires disclosure of certain risks and uncertainties,

including an entity's vulnerability due to certain concentrations (SOP

94-6 ¶¶8, 20-22).

560.     The Company's relevant 2007 interim financial statements, incorporated

into Registration Statement Amendment No. 3, and First Republic Registration

Statement, were materially false and misleading because they presented the Company's

financial position and results of operations in a manner which violated the same

fundamental GAAP as was violated in connection with the Company's 2006 annual

financial statements.  In addition, the Company's 2007 interim financial statements were

presented in a manner that also violated FAS 115, FAS 133, and FAS 5, among other

provisions of GAAP, because the Company failed to report its subprime-related assets (or

liabilities, as applicable) at fair value and recognize the related losses due to the decline

in fair value that were both probable and reasonably estimable in such financial

statements.

**COUNT IV**

**(Against Defendants Merrill, ML Trust I, O'Neal, Edwards, MLPFS, Citigroup,
Morgan Stanley, UBS and Wachovia for Violations of Section 11 of the Securities Act in
Connection with the December 7, 2006 Offering)**

561.     Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they

pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For

purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

562.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the December 7, 2006 Offering against Merrill, ML Trust I, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia.

563.    Registration Statement Amendment No. 1 contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as set forth more fully above.

564.    Defendants O'Neal and Edwards signed Registration Statement Amendment No. 1 or authorized it to be signed on their behalf.

565.    Defendant Edwards signed Registration Statement Amendment No. 1 on behalf of defendant Merrill.

566.    ML Trust I is the issuer of Registration Statement Amendment No. 1. As issuer of the shares, ML Trust I is strictly liable to Plaintiffs and to the members of the Class who purchased shares pursuant to Registration Statement Amendment No. 1 for the materially untrue statements and omissions alleged herein.

567.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters of the December 7, 2006 Offering.

568.    Merrill was the sole structuring advisor and sole bookrunner for the December 7, 2006 Offering.

569.    Class members purchased securities issued under or traceable to Registration Statement Amendment No. 1.

570.    Class members who purchased securities pursuant to Registration Statement Amendment No. 1 were damaged by these defendants as a direct and proximate result of the untrue statements and omissions in Registration Statement Amendment No. 1.

571.    This claim is brought within the applicable statute of limitations.

572.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT V

**(Against Defendants ML Trust I, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia for Violations of Section 12(a)(2) of the Securities Act in Connection with the December 7, 2006 Offering)**

573.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

574.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of all purchasers of Merrill securities in the December 7, 2006 Offering against ML Trust I, Merrill, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia in connection with the December 7, 2006 Offering.

575.    ML Trust I was a seller, offeror, and/or solicitor of sales of the securities offered pursuant to Registration Statement Amendment No. 1, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

247

576.    MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters of the December 7, 2006 Offering.  As underwriters of the December 7, 2006 Offering, MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia participated in the December 7, 2006 Offering and sale of the stock to the investing public.

577.    Merrill was the sole structuring advisor and sole bookrunner for the December 7, 2006 Offering.

578.    Members of the class who purchased Merrill securities in or traceable to the December 6, 2006 Offering have sustained damages as a result of the untrue statements of material facts and omissions in Registration Statement Amendment No. 1, for which they hereby elect to rescind and tender their shares of Merrill securities to the defendants sued in this count in return for the consideration paid for Merrill securities with interest.

579.    This claim is brought within the applicable statute of limitations.

580.    By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT VI

**(Against Defendants Merrill, O'Neal, Edwards, MLPFS and Deloitte for Violations of Section 11 of the Securities Act in Connection with the March 15, 2007 Offering)**

581.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

582.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the March 15, 2007 Offering against Merrill, O'Neal, Edwards, MLPFS, and Deloitte.

248

583. The Series 5 Preferred Stock Prospectus filed in connection with the March 15, 2007 Offering contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading, as alleged more fully above.

584. Defendants O'Neal and Edwards signed the Series 5 Preferred Stock Prospectus or authorized it to be signed on their behalf.

585. Merrill is the issuer of the Series 5 Preferred Stock Prospectus. As issuer of the shares, Merrill is strictly liable to Plaintiffs and to the members of the Class who purchased shares pursuant or traceable to the Series 5 Preferred Stock Prospectus for the materially untrue statements and omissions alleged herein.

586. MLPFS was the underwriter for the March 15, 2007 Offering.

587. Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference in the Series 5 Preferred Stock Prospectus with Deloitte's consent. As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to the Series 5 Preferred Stock Prospectus.

588. Class members purchased securities pursuant or traceable to the Series 5 Preferred Stock Prospectus.

589. Class members who purchased securities pursuant or traceable to the Series 5 Preferred Stock Prospectus were damaged as a direct and proximate result of the untrue statements and omissions in the Series 5 Preferred Stock Prospectus.

590. This claim is brought within the applicable statute of limitations.

591.    By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.

## COUNT VII

### (Against Defendants Merrill and MLPFS for Violations of Section 12(a)(2) of the Securities Act in Connection with the March 15, 2007 Offering)

592.    Plaintiffs repeat and reallege the allegations above at paragraph 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

593.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of all purchasers of Merrill securities in or traceable to the March 15, 2007 Offering against Merrill and MLPFS.

594.    Merrill and MLPFS were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the Series 5 Preferred Stock Prospectus, which contained untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, as set forth more fully above.

595.    Members of the class who purchased Merrill securities in or traceable to the March 15, 2007 Offering have sustained damages as a result of the untrue statements of material facts and omissions in the Series 5 Preferred Stock Prospectus, for which they hereby elect to rescind and tender their Merrill securities to defendants sued in this count in return for the consideration paid for Merrill securities with interest.

596.    This claim is brought within the applicable statute of limitations.

597.    By virtue of the foregoing, the defendants named in this count violated Section 12(a)(2) of the Securities Act.

## COUNT VIII

**(Against Defendants Merrill, ML Trust II, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte for Violations of Section 11 of the Securities Act in Connection with the April 25, 2007 Offering)**

598.    Plaintiffs repeat and reallege the allegations above at paragraphs 2-4 as they pertain to the Securities Act and starting at paragraph 432, as if fully set forth herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

599.    This claim is brought pursuant to Section 11 of the Securities Act, on behalf of all purchasers of Merrill securities in or traceable to the April 25, 2007 Offering, against Merrill, ML Trust II, O'Neal, Edwards, MLPFS, Citigroup, Morgan Stanley, UBS, Wachovia and Deloitte.

600.    Registration Statement Amendment No. 2 contained untrue statements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading as alleged more fully above.

601.    Plaintiff Kosseff and other class members purchased securities pursuant to Registration Statement Amendment No. 2.

602.    Defendants O'Neal and Edwards signed Registration Statement Amendment No. 2 or authorized it to be signed on their behalf.

603.    Defendant Edwards signed Registration Statement Amendment No. 2 on behalf of defendant Merrill.

251

604.     ML Trust II is the issuer of Registration Statement No. 2. As issuer of the shares, ML Trust II is strictly liable to Plaintiff and to the members of the Class who purchased shares pursuant to Registration Statement Amendment No. 2 for the materially untrue statements and omissions alleged herein.

605.     MLPFS, Citigroup, Morgan Stanley, UBS and Wachovia were underwriters for the April 25, 2007 Offering.

606.     Merrill was the sole structuring advisor and sole bookrunner for the April 25, 2007 Offering.

607.     Defendant Deloitte issued unqualified audit opinions for Merrill's 2006 10-K, which were incorporated by reference to the Registration Statement Amendment No. 2 with Deloitte's consent.  As such, Deloitte expressly consented to serve as an accounting expert with respect to the offering of the securities issued pursuant to Registration Statement Amendment No. 2.

608.     Plaintiff and class members who purchased securities pursuant or traceable to Registration Statement Amendment No. 2 were damaged as a direct and proximate result of the untrue statements and omissions in Registration Statement Amendment No. 2.

609.     This claim is brought within the applicable statute of limitations.

610.     By reason of the foregoing, the defendants named in this count have violated Section 11 of the Securities Act.