Accumulated amortization of goodwill amounted to $314 million and $1,040 million at year-end 2006 and 2005, respectively.

## Intangible Assets

Intangible assets are tested annually (or more frequently under certain conditions) for impairment in accordance with SFAS 144, *"Accounting for the Impairment or Disposal of Long-Lived Assets"*. Intangible assets with definite useful lives are amortized over their respective estimated useful lives.

Intangible assets, net of accumulated amortization, were $248 million and $232 million at December 29, 2006 and December 30, 2005, respectively. Accumulated amortization of other intangible assets amounted to $70 million and $36 million at year-end 2006 and 2005, respectively.

## Other Assets

Other assets includes unrealized gains on derivatives used to hedge Merrill Lynch's non-trading borrowing and investing activities. All of these derivatives are recorded at fair value with changes reflected in earnings or accumulated other comprehensive loss (refer to the Derivatives section for more information). Other assets also includes prepaid pension expense related to plan contributions in excess of obligations, other prepaid expenses, and other deferred charges. Refer to Note 13 to the Consolidated Financial Statements for further information.

In addition, real estate purchased for investment purposes is also included in this category. Real estate held in this category may be classified as either held and used or held for sale depending on the facts and circumstances. Real estate held and used is valued at cost, less depreciation, and real estate held for sale is valued at the lower of cost or fair value, less estimated cost to sell.

## Short- and Long-Term Borrowings

Merrill Lynch's general-purpose funding is principally obtained from medium-term and long-term borrowings. Commercial paper, when issued at a discount, is recorded at the proceeds received and accreted to its par value. Long-term borrowings are carried at the principal amount borrowed, net of unamortized discounts or premiums, adjusted for the effects of fair-value hedges.

Merrill Lynch is an issuer of debt whose coupons or repayment terms are linked to the performance of debt or equity securities, indices, currencies or commodities. These debt instruments must be separated into a debt host and an embedded derivative if the derivative is not considered clearly and closely related under the criteria established in SFAS No. 133. Embedded derivatives are recorded at fair value and changes in fair value are reflected in earnings. Beginning in 2004, in accordance with SEC guidance, Merrill Lynch amortizes any observable upfront profit associated with the embedded derivative into income as a yield adjustment over the life of the related debt instrument or certificate of deposit. This resulted in deferred revenue, net of related amortization, of $218 million and $126 million for the years ended December 29, 2006 and December 30, 2005, respectively. See the Embedded Derivatives section above for additional information.

Merrill Lynch uses derivatives to manage the interest rate, currency, equity, and other risk exposures of its borrowings. See the Derivatives section for additional information on accounting policy for derivatives.

## Deposits

Savings deposits are interest-bearing accounts that have no maturity or expiration date, whereby the depositor is not required by the deposit contract, but may at any time be required by the depository institution, to give written notice of an intended withdrawal not less than seven days before withdrawal is made. Time deposits are accounts that have a stipulated maturity and interest rate. Depositors holding time deposits may recover their funds prior to the stated maturity but may pay a penalty to do so. In certain cases, Merrill Lynch enters into interest rate swaps to hedge the fair value risk in these time deposits. See the Derivatives section for additional information.

## New Accounting Pronouncements

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Liabilities* ("SFAS No. 159"). SFAS No. 159 provides a fair value option election that allows companies to irrevocably elect fair value as the initial and subsequent measurement attribute for certain financial assets and liabilities, with changes in fair value recognized in earnings as they occur. SFAS No. 159 permits the fair value option election on an instrument by instrument basis at initial recognition of an asset or liability or upon an event that gives rise to a new basis of accounting for that instrument. SFAS No. 159 is effective as of the beginning of an entity's first fiscal year that begins after November 15, 2007. Early adoption is permitted as of the beginning of a fiscal year that begins on or before November 15, 2007 provided that the entity makes that choice in the first 120 days of that fiscal year, has not yet issued financial statements for any interim period of the fiscal year of adoption, and also elects to apply the provisions of Statement No. 157, *Fair Value Measurements* ("SFAS No. 157"). We intend to early adopt SFAS No. 159 as of the first quarter of fiscal 2007 and are currently assessing the impact of adoption on the Consolidated Financial Statements.

In September 2006, the FASB issued SFAS No. 157. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and enhances disclosure about fair value measurements. SFAS No. 157 nullifies the guidance provided by the Emerging Issues Task Force on Issue 02-3, *Issues Involved in Accounting for Derivative Contracts Held for Trading Purposes and Contracts Involved in Energy Trading and Risk Management Activities* ("EITF 02-3") that prohibits recognition of day one gains or losses on derivative transactions where



model inputs that significantly impact valuation are not observable. In addition, SFAS No. 157 prohibits the use of block discounts for large positions of unrestricted financial instruments that trade in an active market and requires an issuer to incorporate changes in its own credit spreads when determining the fair value of its liabilities. SFAS No. 157 is effective for fiscal years beginning after November 15, 2007 with early adoption permitted provided that the entity has not yet issued financial statements for that fiscal year, including any interim periods. The provisions of SFAS No. 157 are to be applied prospectively, except that the provisions related to block discounts and existing derivative financial instruments measured under EITF 02-3 are to be applied as a one-time cumulative effect adjustment to opening retained earnings in the year of the adoption. We intend to early adopt SFAS No. 157 as of the first quarter of fiscal 2007 and do not expect the adoption to have a material impact on the Consolidated Financial Statements.

In September 2006, the FASB issued SFAS No. 158, *Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of FASB Statements No. 87, 88, 106 and 132R* ("SFAS No. 158"). SFAS No. 158 requires an employer to recognize the overfunded or underfunded status of its defined benefit pension and other postretirement plans, measured as the difference between the fair value of plan assets and the benefit obligation as an asset or liability in its statement of financial condition. Upon adoption, SFAS No. 158 requires an entity to recognize previously unrecognized actuarial gains and losses and prior service costs within accumulated other comprehensive income (loss), net of tax. In accordance with the guidance in SFAS No. 158, we adopted this provision of the standard for year-end 2006. The adoption of SFAS No. 158 resulted in a net credit of $65 million to accumulated other comprehensive loss recorded on the Consolidated Financial Statements at December 29, 2006. See Note 13 to the Consolidated Financial Statements for further information regarding the incremental effect of applying this provision. SFAS No. 158 also requires defined benefit plan assets and benefit obligations to be measured as of the date of the company's fiscal year-end. We have historically used a September 30 measurement date. Under the provisions of SFAS No. 158, we will be required to change our measurement date to coincide with our fiscal year-end. This provision of SFAS No. 158 will be effective for us in fiscal 2008. We are currently assessing the impact of adoption of this provision of SFAS No. 158 on the Consolidated Financial Statements.

In September 2006, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 108 ("SAB No. 108") to provide guidance on how the effects of the carryover or reversal of prior year unrecorded misstatements should be considered in quantifying a current year misstatement. SAB 108 requires a company to apply an approach that considers the amount by which the current year income statement is misstated ("rollover approach") and an approach that considers the cumulative amount by which the current year balance sheet is misstated ("iron-curtain approach"). Prior to the issuance of SAB No. 108, many companies applied either the rollover or iron-curtain approach for purposes of assessing materiality of misstatements. SAB No. 108 is effective for fiscal years ending after November 15, 2006. Upon adoption, SAB No. 108 allows a one-time cumulative effect adjustment against retained earnings for those prior year misstatements that were not material under a company's prior approach, but that are deemed material under SAB No. 108. Adoption of SAB No. 108 did not have a material impact on the Consolidated Financial Statements.

In June 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an Interpretation of FASB Statement No. 109* ("FIN 48"). FIN 48 clarifies the accounting for uncertainty in income taxes recognized in a company's financial statements and prescribes a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. The Interpretation also provides guidance on derecognition, classification, interest and penalties, accounting in interim periods, disclosure and transition. FIN 48 will be effective for us beginning in the first quarter of 2007. We do not expect the impact of adoption of FIN 48 to be material on the opening balance of retained earnings.

In April 2006, the FASB issued a FASB Staff Position FIN 46(R)-6, *Determining the Variability to be Considered in Applying FIN 46R* ("the FSP"). The FSP requires that the variability to be included when applying FIN 46R be based on a "by-design" approach and should consider what risks the variable interest entity was designed to create. We adopted the FSP beginning in the third quarter of 2006 for all new entities with which we became involved. We will apply the provisions of the FSP to all entities previously required to be analyzed under FIN 46R when a reconsideration event occurs as defined under paragraph 7 of FIN 46R. The adoption of the FSP during the third quarter did not have a material impact on the Consolidated Financial Statements.

In March 2006, the FASB issued Statement No. 156, *Accounting for Servicing of Financial Assets* ("SFAS No. 156"). SFAS No. 156 amends Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, to require all separately recognized servicing assets and servicing liabilities to be initially measured at fair value, if practicable. SFAS No. 156 also permits servicers to subsequently measure each separate class of servicing assets and liabilities at fair value rather than at the lower of amortized cost or market. For those companies that elect to measure their servicing assets and liabilities at fair value, SFAS No. 156 requires the difference between the carrying value and fair value at the date of adoption to be recognized as a cumulative-effect adjustment to retained earnings as of the beginning of the fiscal year in which the election is made. We will adopt SFAS No. 156 beginning in the first quarter of 2007. We do not expect the impact of adopting SFAS No. 156 to have a material impact on the Consolidated Financial Statements.

In February 2006, the FASB issued Statement No. 155, *Accounting for Certain Hybrid Financial Instruments an amendment of FASB Statements No. 133 and 140* ("SFAS No. 155"). SFAS No. 155 clarifies the bifurcation requirements for certain financial instruments

and permits hybrid financial instruments that contain a bifurcatable embedded derivative to be accounted for as a single financial instrument at fair value with changes in fair value recognized in earnings. This election is permitted on an instrument-by-instrument basis for all hybrid financial instruments held, obtained, or issued as of the adoption date. At adoption, any difference between the total carrying amount of the individual components of the existing bifurcated hybrid financial instruments and the fair value of the combined hybrid financial instruments will be recognized as a cumulative-effect adjustment to beginning retained earnings. We will adopt SFAS No. 155 on a prospective basis beginning in the first quarter of 2007. As a result, there will be no cumulative-effect adjustment on our Consolidated Financial Statements upon adoption of the standard.

During the first quarter of 2006, we adopted the provisions of Statement No. 123 (revised 2004), *Share-Based Payment,* a revision of SFAS No. 123, *Accounting for Stock-Based Compensation* ("SFAS No. 123R"). Under SFAS No. 123R, compensation expenses for share-based awards that do not require future service are recorded immediately, and share-based awards that require future service continue to be amortized into expense over the relevant service period. We adopted SFAS No. 123R under the modified prospective method whereby the provisions of SFAS No. 123R are generally applied only to share-based awards granted or modified subsequent to adoption. Thus, for Merrill Lynch, SFAS No. 123R required the immediate expensing of share-based awards granted or modified in 2006 to retirement-eligible employees, including awards that are subject to non-compete provisions.

Prior to the adoption of SFAS No. 123R, we had recognized expense for share-based compensation over the vesting period stipulated in the grant for all employees. This included those who had satisfied retirement eligibility criteria but were subject to a non-compete agreement that applied from the date of retirement through each applicable vesting period. Previously, we had accelerated any unrecognized compensation cost for such awards if a retirement-eligible employee left Merrill Lynch. However, because SFAS No. 123R applies only to awards granted or modified in 2006, expenses for share-based awards granted prior to 2006 to employees who were retirement-eligible with respect to those awards must continue to be amortized over the stated vesting period.

In addition, beginning with performance year 2006, for which we granted stock awards in January 2007, we accrued the expense for future awards granted to retirement-eligible employees over the award performance year instead of recognizing the entire expense related to the award on the grant date. Compensation expense for 2006 performance year and all future stock awards granted to employees not eligible for retirement with respect to those awards will be recognized over the applicable vesting period.

SFAS No. 123R also requires expected forfeitures of share-based compensation awards for non-retirement-eligible employees to be included in determining compensation expense. Prior to the adoption of SFAS No. 123R, any benefits of employee forfeitures of such awards were recorded as a reduction of compensation expense when the employee left Merrill Lynch and forfeited the award. In the first quarter of 2006, we recorded a benefit based on expected forfeitures which was not material to the results of operations for the quarter.

The adoption of SFAS No. 123R resulted in a first quarter charge to compensation expense of approximately $550 million on a pre-tax basis and $370 million on an after-tax basis.

The adoption of SFAS No. 123R, combined with other business and competitive considerations, prompted us to undertake a comprehensive review of our stock-based incentive compensation awards, including vesting schedules and retirement eligibility requirements, examining their impact to both Merrill Lynch and its employees. Upon the completion of this review, the Management Development and Compensation Committee of Merrill Lynch's Board of Directors determined that to fulfill the objective of retaining high quality personnel, future stock grants should contain more stringent retirement provisions. These provisions include a combination of increased age and length of service requirements. While the stock awards of employees who retire continue to vest, retired employees are subject to continued compliance with the strict non-compete provisions of those awards. To facilitate transition to the more stringent future requirements, the terms of most outstanding stock awards previously granted to employees, including certain executive officers, were modified, effective March 31, 2006, to permit employees to be immediately eligible for retirement with respect to those earlier awards. While we modified the retirement-related provisions of the previous stock awards, the vesting and non-compete provisions for those awards remain in force.

Since the provisions of SFAS No. 123R apply to awards modified in 2006, these modifications required us to record additional one-time compensation expense in the first quarter of 2006 for the remaining unamortized amount of all awards to employees who had not previously been retirement-eligible under the original provisions of those awards.

The one-time, non-cash charge associated with the adoption of SFAS No. 123R, and the policy modifications to previous awards resulted in a net charge to compensation expense in the first quarter of 2006 of approximately $1.8 billion pre-tax, and $1.2 billion after-tax, or a net impact of $1.34 and $1.21 on basic and diluted earnings per share, respectively. Policy modifications to previously granted awards amounted to $1.2 billion of the pre-tax charge and impacted approximately 6,300 employees.

Prior to the adoption of SFAS No. 123R, we presented the cash flows related to income tax deductions in excess of the compensation expense recognized on share-based compensation as operating cash flows in the Consolidated Statements of Cash Flows. SFAS No. 123R requires cash flows resulting from tax deductions in excess of the grant-date fair value of share-based awards to be included in cash flows



from financing activities. The excess tax benefits of $283 million related to total share-based compensation included in cash flows from financing activities in the first quarter of 2006 would have been included in cash flows from operating activities if we had not adopted SFAS No. 123R.

As a result of adopting SFAS No. 123R, approximately $600 million of liabilities associated with the Financial Advisor Capital Accumulation Award Plan ("FACAAP") were reclassified to stockholders' equity. In addition, as a result of adopting SFAS No. 123R, the unamortized portion of employee stock grants, which was previously reported as a separate component of stockholders' equity on the Consolidated Balance Sheets, has been reclassified to Paid-in Capital. Refer to Note 14 to the Consolidated Financial Statements for additional information.

In June 2005, the FASB ratified the consensus reached by the Emerging Issues Task Force on Issue 04-5, *Determining Whether a General Partner, or the General Partners as a Group, Controls a Limited Partnership or Similar Entity When the Limited Partners Have Certain Rights* ("EITF 04-5"). EITF 04-5 presumes that a general partner controls a limited partnership, and should therefore consolidate a limited partnership, unless the limited partners have the substantive ability to remove the general partner without cause based on a simple majority vote or can otherwise dissolve the limited partnership, or unless the limited partners have substantive participating rights over decision making. The guidance in EITF 04-5 was effective beginning in the third quarter of 2005 for all new limited partnership agreements and any limited partnership agreements that were modified. For those partnership agreements that existed at the date EITF 04-5 was issued, the guidance became effective in the first quarter of 2006. The adoption of this guidance did not have a material impact on the Consolidated Financial Statements.

In December 2005, the FASB issued FASB Staff Position ("FSP") SOP 94-6-1, *Terms of Loan Products That May Give Rise to a Concentration of Credit Risk*. The guidance requires the disclosure of concentrations of loans with certain features that may increase the creditor's exposure to risk of nonpayment or realization. These loans are often referred to as "non-traditional" loans and include features such as high loan-to-value ("LTV") ratios, terms that permit payments smaller than the interest accruals and loans where the borrower is subject to significant payment increases over the life of the loan. We adopted the provisions of this guidance in the fourth quarter of 2005. See Note 8 to the Consolidated Financial Statements for this disclosure.

## NOTE 2    BlackRock Merger

On September 29, 2006, Merrill Lynch completed the merger of its Merrill Lynch Investment Managers ("MLIM") business with BlackRock, Inc. ("BlackRock") (the "BlackRock merger"). In connection with the BlackRock merger, Merrill Lynch received 65 million BlackRock common and preferred shares and owns a 45% voting interest and approximately half of the economic interest of the combined company. At the completion of the BlackRock merger, Merrill Lynch recognized a pre-tax gain of $2.0 billion, along with related non-interest expenses of $202 million for a total after-tax net benefit of $1.1 billion. Merrill Lynch's initial investment in BlackRock as of September 29, 2006 was $7.7 billion and is included in investment securities on the Consolidated Balance Sheet and in the Global Wealth Management ("GWM") segment at December 29, 2006. Additionally, in connection with the BlackRock merger, the goodwill associated with the MLIM business was derecognized on the Consolidated Balance Sheet as of September 29, 2006. Merrill Lynch accounts for its investment in BlackRock under the equity method of accounting and records its share of BlackRock's earnings, net of expenses and taxes, in other revenues on the Consolidated Statement of Earnings. The results of operations and cash flows associated with the MLIM business for the first nine months of 2006 are included in Merrill Lynch's Consolidated Statement of Earnings and Consolidated Statement of Cash Flows, respectively.

## NOTE 3    Segment and Geographic Information

## Segment Information

Since the fourth quarter of 2006, Merrill Lynch's business segment reporting reflects the management reporting lines established after the BlackRock merger (see Note 2), as well as the economic and long-term financial performance characteristics of the underlying businesses. Merrill Lynch has restated prior period segment information to conform to the current period presentation.

Prior to the fourth quarter of 2006, Merrill Lynch reported its business activities in three operating segments: Global Markets and Investment Banking ("GMI"), Global Private Client ("GPC"), and MLIM. Effective with the BlackRock merger, MLIM ceased to exist as a separate business segment. Accordingly, a new business segment, GWM, was created, consisting of GPC and Global Investment Management ("GIM"). GMI continues to provide full service global markets and origination capabilities, products and services to corporate, institutional, and government clients around the world. GWM creates and distributes investment products and services for clients. GPC services include specialized brokerage, advisory, banking, trust, insurance, and retirement services. GIM creates and manages investment products, including creating and managing hedge fund and other alternative investment products for GPC clients, which had formerly been included within GPC; and records Merrill Lynch's share of net earnings from its ownership positions in other investment

management companies, including its investment in BlackRock. Apart from the new investment in BlackRock, earnings from such owner-ship positions in other investment management companies were previously reported in GMI.

The principal methodologies used in preparing the segment results in the table that follows are:

- Revenues and expenses are assigned to segments where directly attributable;
- Principal transactions, net interest and investment banking revenues and related costs resulting from the client activities of GWM are allocated among GMI and GWM based on production credits, share counts, trade counts, and other measures which estimate relative value;
- Through the third quarter of 2006, MLIM received a net advisory fee from GWM relating to certain MLIM-branded products offered through GWM's 401(k) product offering;
- Through the third quarter of 2006, revenues and expenses related to mutual fund shares bearing a contingent deferred sales charge were reflected in segment results as if MLIM and GWM were unrelated entities;
- Interest (cost of carry) is allocated by charging each segment based on its capital usage and Merrill Lynch's blended cost of capital;
- Acquisition financing costs and other corporate interest are included in the Corporate items because management excludes these items from segment operating results in evaluating segment performance;
- Merrill Lynch have revenue and expense sharing agreements for joint activities between segments, and the results of each segment reflect the agreed-upon apportionment of revenues and expenses associated with these activities; and
- Residual expenses (i.e., those related to overhead and support units) are attributed to segments based on specific methodologies (e.g., headcount, square footage, intersegment agreements).

Management believes that the following information by business segment provides a reasonable representation of each segment's contribution to the consolidated net revenues and pre-tax earnings, and represents information that is relied upon by management in its decision-making processes:

| (dollars in millions) | GMI | GWM | MLIM | Corporate | Total |
|---|---|---|---|---|---|
| **2006**[4][5] | | | | | |
| Non-interest revenues | $ 16,167 | $ 9,959 | $ 1,867 | $ 2,010[1] | $ 30,003 |
| Net interest profit[3] | 2,750 | 2,148 | 33 | (275)[2] | 4,656 |
| Net revenues | 18,917 | 12,107 | 1,900 | 1,735 | 34,659 |
| Non-interest expenses | 13,166 | 9,660 | 1,263 | 144[1] | 24,233 |
| Pre-tax earnings | $ 5,751 | $ 2,447 | $ 637 | $ 1,591 | $ 10,426 |
| Year-end total assets | $ 745,692 | $ 92,660 | $ — | $ 2,947 | $ 841,299 |
| **2005** | | | | | |
| Non-interest revenues | $ 10,295 | $ 9,112 | $ 1,780 | $ 38 | $ 21,225 |
| Net interest profit[3] | 3,549 | 1,690 | 27 | (469)[2] | 4,797 |
| Net revenues | 13,844 | 10,802 | 1,807 | (431) | 26,022 |
| Non-interest expenses | 8,854 | 8,587 | 1,221 | 129 | 18,791 |
| Pre-tax earnings (loss) | $ 4,990 | $ 2,215 | $ 586 | $ (560) | $ 7,231 |
| Year-end total assets | $ 590,054 | $ 76,908 | $ 7,470 | $ 6,583 | $ 681,015 |
| **2004** | | | | | |
| Non-interest revenues | $ 7,519 | $ 8,547 | $ 1,567 | $ (3) | $ 17,630 |
| Net interest profit[3] | 3,544 | 1,280 | 13 | (408)[2] | 4,429 |
| Net revenues | 11,063 | 9,827 | 1,580 | (411) | 22,059 |
| Non-interest expenses | 7,194 | 7,954 | 1,120 | (45) | 16,223 |
| Pre-tax earnings (loss) | $ 3,869 | $ 1,873 | $ 460 | $ (366) | $ 5,836 |
| Year-end total assets | $ 537,124 | $ 74,849 | $ 9,415 | $ 6,710 | $ 628,098 |

(1) Corporate's 2006 results include $2.0 billion of non-interest revenues (gain on merger) and $202 million of non-interest expenses related to the closing of the BlackRock merger.
(2) Includes the impact of junior subordinated notes (related to trust preferred securities) and other corporate items.
(3) Management views interest income net of interest expense in evaluating results.
(4) 2006 results include the impact of the $1.8 billion, pre-tax, one-time compensation expenses incurred in the first quarter of 2006. These one-time compensation expenses were recorded as follows: $1.4 billion to GMI, $281 million to GWM and $109 million to MLIM; refer to Note 1 to the Consolidated Financial Statements for further information.
(5) MLIM's 2006 results include revenues and earnings for the first nine months of 2006 prior to the BlackRock merger.

## Geographic Information

Merrill Lynch operates in both U.S. and non-U.S. markets. Merrill Lynch's non-U.S. business activities are conducted through offices in four regions:

- Europe, Middle East, and Africa;
- Pacific Rim;



- Latin America; and
- Canada.

The principal methodologies used in preparing the geographic data below are as follows:

- Revenue and expenses are generally recorded based on the location of the employee generating the revenue or incurring the expense;
- Pre-tax earnings include the allocation of certain shared expenses among regions; and
- Intercompany transfers are based primarily on service agreements.

The information that follows, in management's judgment, provides a reasonable representation of each region's contribution to the consolidated net revenues and pre-tax earnings:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Net revenues** | | | |
| Europe, Middle East, and Africa | $ 6,967 | $ 4,770 | $ 3,406 |
| Pacific Rim | 3,691 | 2,680 | 2,367 |
| Latin America | 1,020 | 839 | 656 |
| Canada | 378 | 229 | 251 |
| Total Non-U.S. | 12,056 | 8,518 | 6,680 |
| United States[1] | 22,603 | 17,504 | 15,379 |
| Total net revenues | $ 34,659 | $ 26,022 | $ 22,059 |
| **Pre-tax earnings**[2] | | | |
| Europe, Middle East, and Africa | $ 2,065 | $ 1,319 | $ 650 |
| Pacific Rim | 1,242 | 964 | 906 |
| Latin America | 390 | 344 | 203 |
| Canada | 175 | 46 | 82 |
| Total Non-U.S. | 3,872 | 2,673 | 1,841 |
| United States[1] | 6,554 | 4,558 | 3,995 |
| Total pre-tax earnings | $ 10,426 | $ 7,231 | $ 5,836 |

(1) United States 2006 net revenues and pre-tax earnings include $2.0 billion of revenues (gain on merger) and $202 million of expenses related to the closing of the BlackRock merger.

(2) 2006 pre-tax earnings include the impact of the $1.8 billion of one-time compensation expenses incurred in the first quarter of 2006. These costs have been allocated to each of the regions, accordingly. Refer to Note 1 to the Consolidated Financial Statements for further information.

## NOTE 4   Securities Financing Transactions

Merrill Lynch enters into secured borrowing and lending transactions in order to meet customers' needs and earn residual interest rate spreads, obtain securities for settlement and finance trading inventory positions.

Under these transactions, Merrill Lynch either receives or provides collateral, including U.S. Government and agencies, asset-backed, corporate debt, equity, and non-U.S. governments and agencies securities. Merrill Lynch receives collateral in connection with resale agreements, securities borrowed transactions, customer margin loans, and other loans. Under many agreements, Merrill Lynch is permitted to sell or repledge the securities received (e.g., use the securities to secure repurchase agreements, enter into securities lending transactions, or deliver to counterparties to cover short positions). At December 29, 2006 and December 30, 2005, the fair value of securities received as collateral where Merrill Lynch is permitted to sell or repledge the securities was $634 billion and $538 billion, respectively, and the fair value of the portion that has been sold or repledged was $497 billion and $402 billion, respectively. Merrill Lynch may use securities received as collateral for resale agreements to satisfy regulatory requirements such as Rule 15c3-3 of the SEC. At December 29, 2006 and December 30, 2005, the fair value of collateral used for this purpose was $19.3 billion, and $15.5 billion, respectively.

Merrill Lynch pledges firm-owned assets to collateralize repurchase agreements and other secured financings. Pledged securities that can be sold or repledged by the secured party are parenthetically disclosed in trading assets and investment securities on the Consolidated Balance Sheets. The carrying value and classification of securities owned by Merrill Lynch that have been pledged to counterparties where those counterparties do not have the right to sell or repledge at year-end 2006 and 2005 are as follows:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| **Trading asset category** | | |
| Mortgages, mortgage-backed, and asset-backed securities | $ 34,475 | $ 21,664 |
| U.S. Government and agencies | 12,068 | 6,711 |
| Corporate debt and preferred stock | 11,454 | 10,394 |
| Equities and convertible debentures | 4,812 | 4,019 |
| Non-U.S. Governments and agencies | 4,810 | 3,353 |
| Municipals and money markets | 975 | 100 |
| Total | $ 68,594 | $ 46,241 |

## NOTE 5  Investment Securities

Investment securities on the Consolidated Balance Sheets include:

- SFAS No. 115 investments held by ML & Co. and certain of its non-broker-dealer entities, including Merrill Lynch banks and insurance subsidiaries. SFAS No. 115 investments consist of:
  - Debt securities, including debt held for investment and liquidity and collateral management purposes that are classified as available-for-sale, debt securities held for trading purposes, and debt securities that Merrill Lynch intends to hold until maturity;
  - Marketable equity securities, which are generally classified as available-for-sale;
- Non-qualifying investments that do not fall within the scope of SFAS No. 115. Non-qualifying investments consist principally of:
  - Equity investments, including investments in partnerships and joint ventures. Included in equity investments are private equity investments that Merrill Lynch holds for capital appreciation and/or current income and which are accounted for in accordance with the Investment Company Guide. The investments are initially carried at cost and are adjusted when changes in the underlying fair values are readily ascertainable, generally based on specific events (for example, recapitalizations and IPOs), or expected cash flows and market comparables of similar companies. Equity investments held outside of investment companies, which are held for strategic purposes, are generally accounted for at LOCOM or under the equity method, depending on Merrill Lynch's ability to exercise significant influence.
  - Investments of insurance subsidiaries, which primarily represent insurance policy loans and are accounted for at amortized cost.
  - Deferred compensation hedges, which are investments economically hedging deferred compensation liabilities and are accounted for at fair value.

Fair value for non-qualifying investments is estimated using a number of methods, including earnings multiples, discounted cash flow analyses, and review of underlying financial conditions and other market factors. These instruments may be subject to restrictions (e.g., sale requires consent of other investors to sell) that may limit Merrill Lynch's ability to currently realize the estimated fair value. Accordingly, Merrill Lynch's current estimate of fair value and the ultimate realization for these instruments may differ.

Investment securities reported on the Consolidated Balance Sheets at December 29, 2006 and December 30, 2005 are as follows:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| **Investment securities** | | |
| Available-for-sale[1] | $56,294 | $54,471 |
| Trading | 6,512 | 5,666 |
| Held-to-maturity | 269 | 271 |
| Non-qualifying | | |
| Equity investments[2] | 21,288 | 9,795 |
| Investments of insurance subsidiaries | 1,360 | 1,174 |
| Deferred compensation hedges | 1,752 | 1,457 |
| Investments in trust preferred securities and other investments | 715 | 738 |
| Total | $88,190 | $73,572 |

(1) At December 29, 2006 and December 30, 2005, includes $4.8 billion and $4.3 billion, respectively, of investment securities reported in cash and securities segregated for regulatory purposes or deposited with clearing organizations.

(2) Includes Merrill Lynch's investment in BlackRock.

Investment securities accounted for under SFAS No. 115 are classified as available-for-sale, held-to-maturity, or trading as described in Note 1 to the Consolidated Financial Statements.



Information regarding investment securities subject to SFAS No. 115 follows:

| (dollars in millions) | December 29, 2006 | | | | December 30, 2005 | | | |
|---|---|---|---|---|---|---|---|---|
| | Cost/ Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value | Cost/ Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Estimated Fair Value |
| **Available-for-Sale** | | | | | | | | |
| Mortgage- and asset-backed | **$48,394** | **$104** | **$ (331)** | **$48,167** | $44,726 | $ 80 | $(400) | $44,406 |
| Certificate of deposits | **3,114** | **–** | **(2)** | **3,112** | 3,942 | – | (10) | 3,932 |
| Corporate debt | **2,242** | **9** | **(24)** | **2,227** | 2,338 | 15 | (34) | 2,319 |
| U.S. Government and agencies | **1,833** | **–** | **(28)** | **1,805** | 2,930 | 1 | (40) | 2,891 |
| Other[1] | **760** | **–** | **(3)** | **757** | 346 | 8 | (1) | 353 |
| Total debt securities | 56,343 | 113 | (388) | 56,068 | 54,282 | 104 | (485) | 53,901 |
| Equity securities | 213 | 19 | (6) | 226 | 507 | 69 | (6) | 570 |
| Total | **$56,556** | **$132** | **$(394)** | **$56,294** | $54,789 | $173 | $(491) | $54,471 |
| **Held-to-Maturity** | | | | | | | | |
| Municipals | **$  254** | **$  –** | **$  –** | **$  254** | $  254 | $  – | $  – | $  254 |
| Mortgage- and asset-backed | **15** | **–** | **–** | **15** | 17 | – | – | 17 |
| Total | **$  269** | **$  –** | **$  –** | **$  269** | $  271 | $  – | $  – | $  271 |

(1)  Includes investments in Non-U.S. Government and agency securities.

The following table presents fair value and unrealized losses, after hedges, for available-for-sale securities, aggregated by investment category and length of time that the individual securities have been in a continuous unrealized loss position at December 29, 2006 and December 30, 2005.

| (dollars in millions) Asset category | Less than 1 Year | | More than 1 Year | | Total | |
|---|---|---|---|---|---|---|
| | Estimated Fair Value | Unrealized Losses | Estimated Fair Value | Unrealized Losses | Estimated Fair Value | Unrealized Losses |
| **December 29, 2006** | | | | | | |
| Mortgage- and asset-backed | **$15,645** | **$  (28)** | **$10,243** | **$(253)** | **$ 25,888** | **$ (281)** |
| Certificate of deposits | **2,103** | **(2)** | **5** | **–** | **2,108** | **(2)** |
| U.S. Government and agencies | **151** | **(1)** | **1,629** | **(25)** | **1,780** | **(26)** |
| Corporate debt | **691** | **(2)** | **1,029** | **(23)** | **1,720** | **(25)** |
| Other[1] | **100** | **–** | **267** | **(9)** | **367** | **(9)** |
| Total debt securities | 18,690 | (33) | 13,173 | (310) | 31,863 | (343) |
| Equity securities | 19 | – | 57 | (5) | 76 | (5) |
| Total temporarily impaired securities | **$18,709** | **$  (33)** | **$13,230** | **$ (315)** | **$ 31,939** | **$ (348)** |
| **December 30, 2005** | | | | | | |
| Mortgage- and asset-backed | $20,867 | $(186) | $ 6,843 | $(158) | $ 27,710 | $ (344) |
| Certificate of deposits | 3,489 | (6) | 432 | (4) | 3,921 | (10) |
| U.S. Government and agencies | 2,369 | (32) | 228 | (3) | 2,597 | (35) |
| Corporate debt | 878 | (15) | 519 | (17) | 1,397 | (32) |
| Other[1] | 5 | – | 283 | (8) | 288 | (8) |
| Total debt securities | 27,608 | (239) | 8,305 | (190) | 35,913 | (429) |
| Equity securities | 49 | – | 59 | (6) | 108 | (6) |
| Total temporarily impaired securities | $27,657 | $(239) | $ 8,364 | $(196) | $ 36,021 | $ (435) |

(1)  Includes investments in Non-U.S. Government and agency securities.

The majority of the unrealized losses relate to mortgage- and asset-backed securities. The majority of these investments are AAA-rated debentures and mortgage-backed securities issued by U.S. agencies.

Merrill Lynch reviews its held-to-maturity and available-for-sale securities periodically to determine whether any impairment is other-than-temporary. Factors considered in the review include length of time and extent to which market value has been less than cost, the financial condition and near term prospects of the issuer, and Merrill Lynch's intent and ability to retain the security to allow for an anticipated recovery in market value. As of December 29, 2006, Merrill Lynch does not consider the securities to be other-than-temporarily impaired.

The amortized cost and estimated fair value of debt securities at December 29, 2006 by contractual maturity, for available-for-sale and held-to-maturity investments follow:

| | Available-for-Sale | | Held-to-Maturity | |
|---|---|---|---|---|
| (dollars in millions) | Amortized Cost | Estimated Fair Value | Amortized Cost | Estimated Fair Value |
| Due in one year or less | $ 5,139 | $ 5,129 | $ – | $ – |
| Due after one year through five years | 1,612 | 1,584 | – | – |
| Due after five years through ten years | 1,092 | 1,080 | 254 | 254 |
| Due after ten years | 106 | 108 | – | – |
| | 7,949 | 7,901 | 254 | 254 |
| Mortgage- and asset-backed securities | 48,394 | 48,167 | 15 | 15 |
| Total[1] | $56,343 | $56,068 | $ 269 | $ 269 |

(1) Expected maturities may differ from contractual maturities because borrowers may have the right to call or prepay obligations with or without prepayment penalties.

The proceeds and gross realized gains (losses) from the sale of available-for-sale investments are as follows:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Proceeds | $ 16,176 | $ 36,574 | $ 27,983 |
| Gross realized gains | 160 | 411 | 389 |
| Gross realized losses | (161) | (71) | (54) |

Net unrealized gains and (losses) from investment securities classified as trading included in the 2006, 2005, and 2004 Consolidated Statements of Earnings were $125 million, $(13) million, and $(275) million, respectively.

## NOTE 6   Trading Assets and Liabilities

As part of its trading activities, Merrill Lynch provides its clients with brokerage, dealing, financing, and underwriting services for a broad range of products. While trading activities are primarily generated by client order flow, Merrill Lynch also takes proprietary positions based on expectations of future market movements and conditions. Merrill Lynch's trading strategies rely on the integrated management of its client-driven and proprietary positions, along with related hedging and financing.

Interest revenue and expense are integral components of trading activities. In assessing the profitability of trading activities, Merrill Lynch views net interest and principal transactions revenues in the aggregate.

Trading activities expose Merrill Lynch to market and credit risks. These risks are managed in accordance with established risk management policies and procedures. Specifically, the independent risk and control groups work to ensure that these risks are properly identified, measured, monitored, and managed throughout Merrill Lynch. To accomplish this, Merrill Lynch has established a risk management process that includes:

- A formal risk governance structure that defines the oversight process and its components;
- A regular review of the risk management process by the Audit Committee of the Board of Directors as well as a regular review of credit, market and liquidity risks and processes by the Finance Committee of the Board of Directors;
- Clearly defined risk management policies and procedures supported by a rigorous analytical framework;
- Communication and coordination among the businesses, executive management, and risk functions while maintaining strict segregation of responsibilities, controls, and oversight; and
- Clearly articulated risk tolerance levels, defined and regularly reviewed by the ROC, that are consistent with its business strategy, capital structure, and current and anticipated market conditions.

The risk management and control process, combined with the independent risk and control groups and analytical infrastructure, ensures that Merrill Lynch's risk tolerance is well-defined and understood by the firm's risk-takers as well as by its executive management. Other groups, including Corporate Audit, Finance, and the Office of the General Counsel, partner with the independent risk groups to establish and maintain this overall risk management control process. While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to make certain that risk-related losses occur within acceptable, predefined levels.

Merrill Lynch documents its risk management objectives and strategies for undertaking various hedge transactions. The risk management objectives and strategies are monitored and managed by the independent risk and control groups in accordance with established risk management policies and procedures that include risk tolerance levels.



## Market Risk

Market risk is the potential change in an instrument's value caused by fluctuations in interest and currency exchange rates, equity and commodity prices, credit spreads, or other risks. The level of market risk is influenced by the volatility and the liquidity in the markets in which financial instruments are traded.

Merrill Lynch seeks to mitigate market risk associated with trading inventories by employing hedging strategies that correlate rate, price, and spread movements of trading inventories and related financing and hedging activities. Merrill Lynch uses a combination of cash instruments and derivatives to hedge its market exposures. The following discussion describes the types of market risk faced by Merrill Lynch.

### Interest Rate Risk

Interest rate risk arises from the possibility that changes in interest rates will affect the value of financial instruments. Interest rate swap agreements, Eurodollar futures, and U.S. Treasury securities and futures are common interest rate risk management tools. The decision to manage interest rate risk using futures or swap contracts, as opposed to buying or selling short U.S. Treasury or other securities, depends on current market conditions and funding considerations.

Interest rate agreements used by Merrill Lynch include caps, collars, floors, basis swaps, leveraged swaps, and options. Interest rate caps and floors provide the purchaser with protection against rising and falling interest rates, respectively. Interest rate collars combine a cap and a floor, providing the purchaser with a predetermined interest rate range. Basis swaps are a type of interest rate swap agreement where variable rates are received and paid, but are based on different index rates. Leveraged swaps are another type of interest rate swap where changes in the variable rate are multiplied by a contractual leverage factor, such as four times three-month London Interbank Offered Rate ("LIBOR"). Merrill Lynch's exposure to interest rate risk resulting from these leverage factors is typically hedged with other financial instruments.

### Currency Risk

Currency risk arises from the possibility that fluctuations in foreign exchange rates will impact the value of financial instruments. Merrill Lynch's trading assets and liabilities include both cash instruments denominated in and derivatives linked to more than 50 currencies, including the euro, Japanese yen, British pound, and Swiss franc. Currency forwards and options are commonly used to manage currency risk associated with these instruments. Currency swaps may also be used in situations where a long-dated forward market is not available or where the client needs a customized instrument to hedge a foreign currency cash flow stream. Typically, parties to a currency swap initially exchange principal amounts in two currencies, agreeing to exchange interest payments and to re-exchange the currencies at a future date and exchange rate.

### Equity Price Risk

Equity price risk arises from the possibility that equity security prices will fluctuate, affecting the value of equity securities and other instruments that derive their value from a particular stock, a defined basket of stocks, or a stock index. Instruments typically used by Merrill Lynch to manage equity price risk include equity options, warrants, and baskets of equity securities. Equity options, for example, can require the writer to purchase or sell a specified stock or to make a cash payment based on changes in the market price of that stock, basket of stocks, or stock index.

### Credit Spread Risk

Credit spread risk arises from the possibility that changes in credit spreads will affect the value of financial instruments. Credit spreads represent the credit risk premiums required by market participants for a given credit quality (i.e., the additional yield that a debt instrument issued by a AA-rated entity must produce over a risk-free alternative (e.g., U.S. Treasury instrument)). Certain instruments are used by Merrill Lynch to manage this type of risk. Swaps and options, for example, can be designed to mitigate losses due to changes in credit spreads, as well as the credit downgrade or default of the issuer. Credit risk resulting from default on counterparty obligations is discussed in the Credit Risk section.

### Commodity Price and Other Risks

Through its commodities business, Merrill Lynch enters into exchange-traded contracts, financially settled OTC derivatives, contracts for physical delivery and contracts providing for the transportation and/or storage rights on pipelines, power lines or storage facilities. Commodity, related storage, transportation or other contracts expose Merrill Lynch to the risk that the price of the underlying commodity may rise or fall. In addition, contracts resulting in physical delivery can expose Merrill Lynch to numerous other risks, including performance risk and other delivery risks.

## Credit Risk

Merrill Lynch is exposed to risk of loss if an individual, counterparty or issuer fails to perform its obligations under contractual terms ("default risk"). Both cash instruments and derivatives expose Merrill Lynch to default risk. Credit risk arising from changes in credit spreads was previously discussed in the Market Risk section.

Merrill Lynch has established policies and procedures for mitigating credit risk on principal transactions, including reviewing and establishing limits for credit exposure, maintaining qualifying collateral, purchasing credit protection, and continually assessing the creditworthiness of counterparties.

In the normal course of business, Merrill Lynch executes, settles, and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by Merrill Lynch. These activities may expose Merrill Lynch to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, Merrill Lynch may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to other customers or counterparties. Additional information about these obligations is provided in Note 12 to the Consolidated Financial Statements. In addition, Merrill Lynch seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

Liabilities to other brokers and dealers related to unsettled transactions (i.e., securities failed-to-receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged securities failed-to-receive, Merrill Lynch may purchase the underlying security in the market and seek reimbursement for losses from the counterparty.

**Concentrations of Credit Risk**

Merrill Lynch's exposure to credit risk (both default and credit spread) associated with its trading and other activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and monitored in light of changing counterparty and market conditions.

At December 29, 2006, Merrill Lynch's most significant concentration of credit risk was with the U.S. Government and its agencies. This concentration consists of both direct and indirect exposures. Direct exposure, which primarily results from trading asset and investment security positions in instruments issued by the U.S. Government and its agencies, excluding mortgage-backed securities, amounted to $15.0 billion and $11.9 billion at December 29, 2006 and December 30, 2005, respectively. Merrill Lynch's indirect exposure results from maintaining U.S. Government and agencies securities as collateral for resale agreements and securities borrowed transactions. Merrill Lynch's direct credit exposure on these transactions is with the counterparty; thus Merrill Lynch has credit exposure to the U.S. Government and its agencies only in the event of the counterparty's default. Securities issued by the U.S. Government or its agencies held as collateral for resale agreements and securities borrowed transactions at December 29, 2006 and December 30, 2005 totaled $116.3 billion and $140.7 billion, respectively.

At December 29, 2006, Merrill Lynch had other concentrations of credit risk, the largest of which was related to a U.S. subsidiary of a large foreign bank that has an internal credit rating of AAA, which reflects structural seniority and other credit enhancements. Total outstanding unsecured exposure to this counterparty was approximately $2.4 billion, or 0.3% of total assets.

Merrill Lynch's most significant industry credit concentration is with financial institutions. Financial institutions include banks, insurance companies, finance companies, investment managers, and other diversified financial institutions. This concentration arises in the normal course of Merrill Lynch's brokerage, trading, hedging, financing, and underwriting activities. Merrill Lynch also monitors credit exposures worldwide by region. Outside the United States, financial institutions and sovereign governments represent the most significant concentrations of credit risk.

In the normal course of business, Merrill Lynch purchases, sells, underwrites, and makes markets in non-investment grade instruments. Merrill Lynch also provides extensions of credit and makes equity investments to facilitate leveraged transactions. These activities expose Merrill Lynch to a higher degree of credit risk than is associated with trading, investing in, and underwriting investment grade instruments and extending credit to investment grade counterparties.

## Derivatives

Merrill Lynch's trading derivatives consist of derivatives provided to customers and derivatives entered into for proprietary trading strategies or risk management purposes.

Default risk on derivatives can also occur for the full notional amount of the trade where a final exchange of principal takes place, as may be the case for currency swaps. Default risk exposure varies by type of derivative. Swap agreements and forward contracts are generally OTC-transacted and thus are exposed to default risk to the extent of their replacement cost. Since futures contracts are exchange-traded and usually require daily cash settlement, the related risk of loss is generally limited to a one-day net positive change in market value. Generally such receivables and payables are recorded in customers' receivables and payables on the Consolidated Balance Sheets. Option contracts can be exchange-traded or OTC-transacted. Purchased options have default risk to the extent of their replacement cost. Written options represent a potential obligation to counterparties and typically do not subject Merrill Lynch to default risk except under circumstances such as where the option premium is being financed or in cases where Merrill Lynch is required to post collateral. Additional



information about derivatives that meet the definition of a guarantee for accounting purposes is included in Note 12 to the Consolidated Financial Statements.

Merrill Lynch generally enters into International Swaps and Derivatives Association, Inc. master agreements or their equivalent ("master netting agreements") with each of its counterparties, as soon as possible. Master netting agreements provide protection in bankruptcy in certain circumstances and, in some cases, enable receivables and payables with the same counterparty to be offset on the Consolidated Balance Sheets, providing for a more meaningful balance sheet presentation of credit exposure. However, the enforceability of master netting agreements under bankruptcy laws in certain countries, or in certain industries, is not free from doubt and receivables and payables with counterparties in these countries or industries are accordingly recorded on a gross basis.

To reduce the risk of loss, Merrill Lynch requires collateral, principally cash and U.S. Government and agencies securities, on certain derivative transactions. Merrill Lynch nets cash collateral paid or received under credit support annexes associated with legally enforceable master netting agreements against derivative inventory. For the year ended December 29, 2006, cash collateral netted against derivative inventory was $7.2 billion. From an economic standpoint, Merrill Lynch evaluates default risk exposures net of related collateral. In addition to obtaining collateral, Merrill Lynch attempts to mitigate default risk on derivatives by entering into transactions with provisions that enable Merrill Lynch to terminate or reset the terms of the derivative contract.

Many of Merrill Lynch's derivative contracts contain provisions that could, upon an adverse change in ML & Co.'s credit rating, trigger a requirement for an early payment or additional collateral support.

## NOTE 7    Securitization Transactions and Transactions with Special Purpose Entities ("SPEs")

### Securitizations

In the normal course of business, Merrill Lynch securitizes: commercial and residential mortgage loans; municipal, government, and corporate bonds; and other types of financial assets. SPEs, often referred to as Variable Interest Entities, or VIEs, are often used when entering into or facilitating securitization transactions. Merrill Lynch's involvement with SPEs used to securitize financial assets includes: structuring and/or establishing SPEs; selling assets to SPEs; managing or servicing assets held by SPEs; underwriting, distributing, and making loans to SPEs; making markets in securities issued by SPEs; engaging in derivative transactions with SPEs; owning notes or certificates issued by SPEs; and/or providing liquidity facilities and other guarantees to SPEs.

Merrill Lynch securitized assets of approximately $147.2 billion and $90.3 billion for the years ended December 29, 2006 and December 30, 2005, respectively. For the years ended December 29, 2006 and December 30, 2005, Merrill Lynch received $148.8 billion and $91.1 billion, respectively, of proceeds, and other cash inflows, from securitization transactions, and recognized net securitization gains of $535.5 million and $425.4 million, respectively, in Merrill Lynch's Consolidated Statements of Earnings.

The table below summarizes the cash flows received by Merrill Lynch from securitization transactions related to the following asset types:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| **Asset category** | | |
| Residential mortgage loans | $ 97,433 | $58,002 |
| Municipal bonds | 29,482 | 17,084 |
| Corporate and government bonds | 3,870 | 2,468 |
| Commercial loans and other | 17,984 | 13,569 |
| Total | $148,769 | $ 91,123 |

In certain instances, Merrill Lynch retains interests in the senior tranche, subordinated tranche, and/or residual tranche of securities issued by certain SPEs created to securitize assets. The gain or loss on the sale of the assets is determined with reference to the previous carrying amount of the financial assets transferred, which is allocated between the assets sold and the retained interests, if any, based on their relative fair value at the date of transfer.

Retained interests are recorded in the Consolidated Balance Sheets at fair value. To obtain fair values, observable market prices are used if available. Where observable market prices are unavailable, Merrill Lynch generally estimates fair value initially and on an ongoing basis based on the present value of expected future cash flows using management's best estimates of credit losses, prepayment rates, forward yield curves, and discount rates, commensurate with the risks involved. Retained interests are either held as trading assets, with changes in fair value recorded in the Consolidated Statements of Earnings, or as securities available-for-sale, with changes in fair value included in accumulated other comprehensive loss. Retained interests held as available-for-sale are reviewed periodically for impairment.

Retained interests in securitized assets were approximately $6.8 billion and $4.0 billion at December 29, 2006 and December 30, 2005, respectively, which related primarily to residential mortgage loan and municipal bond securitization transactions. The majority of the retained interest balance consists of mortgage-backed securities that have observable market prices. These retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity.

The following table presents information on retained interests, excluding the offsetting benefit of financial instruments used to hedge risks, held by Merrill Lynch as of December 29, 2006, arising from Merrill Lynch's residential mortgage loan, municipal bond and other securitization transactions. The sensitivities of the current fair value of the retained interests to immediate 10% and 20% adverse changes in assumptions and parameters are also shown.

| (dollars in millions) | Residential Mortgage Loans | Municipal Bonds | Other |
|---|---|---|---|
| Retained interest amount | $5,101 | $ 917 | $765 |
| Weighted average credit losses (rate per annum) | 1.0% | 0.0% | 0.2% |
| Range | 0.0–6.7% | 0.0% | 0.0–4.8% |
| Impact on fair value of 10% adverse change | $  (46) | $  – | $  (2) |
| Impact on fair value of 20% adverse change | $  (92) | $  – | $  (3) |
| Weighted average discount rate | 8.6% | 4.1% | 6.1% |
| Range | 0.0–99.0% | 3.5–55.0% | 0.0–25.1% |
| Impact on fair value of 10% adverse change | $ (139) | $ (89) | $ (15) |
| Impact on fair value of 20% adverse change | $ (273) | $(128) | $ (29) |
| Weighted average life (in years) | 3.4 | 1.1 | 0.6 |
| Range | 0.0–26.8 | 0.1–9.6 | 0.0–9.9 |
| Weighted average prepayment speed (CPR)[1] | 26.0% | 4.7% | 31.3% |
| Range[1] | 0.0–70.0% | 0.0–30.4% | 0.0–88.0% |
| Impact on fair value of 10% adverse change | $  (66) | $  – | $  (1) |
| Impact on fair value of 20% adverse change | $ (100) | $  – | $  (1) |

CPR=Constant Prepayment Rate
(1)   Relates to select securitization transactions where assets are prepayable.

The preceding sensitivity analysis is hypothetical and should be used with caution. In particular, the effect of a variation in a particular assumption on the fair value of the retained interest is calculated independent of changes in any other assumption; in practice, changes in one factor may result in changes in another, which might magnify or counteract the sensitivities. Further, changes in fair value based on a 10% or 20% variation in an assumption or parameter generally cannot be extrapolated because the relationship of the change in the assumption to the change in fair value may not be linear. Also, the sensitivity analysis does not include the offsetting benefit of financial instruments that Merrill Lynch utilizes to hedge risks, including credit, interest rate, and prepayment risk, that are inherent in the retained interests. These hedging strategies are structured to take into consideration the hypothetical stress scenarios above such that they would be effective in principally offsetting Merrill Lynch's exposure to loss in the event these scenarios occur.

The weighted average assumptions and parameters used initially to value retained interests relating to securitizations that were still held by Merrill Lynch as of December 29, 2006 are as follows:

| | Residential Mortgage Loans | Municipal Bonds | Other |
|---|---|---|---|
| Credit losses (rate per annum) | 1.0% | 0.0% | 0.1% |
| Weighted average discount rate | 9.2% | 4.0% | 4.6% |
| Weighted average life (in years) | 3.5 | 7.0 | 0.5 |
| Prepayment speed assumption (CPR) | 25.7% | 9.0% | 7.1% |

CPR=Constant Prepayment Rate

For residential mortgage loan and other securitizations, the investors and the securitization trust have no recourse to Merrill Lynch's other assets for failure of mortgage holders to pay when due.

For municipal bond securitization SPEs, in the normal course of dealer market-making activities, Merrill Lynch acts as liquidity provider. Specifically, the holders of beneficial interests issued by municipal bond securitization SPEs have the right to tender their interests for purchase by Merrill Lynch on specified dates at a specified price. Beneficial interests that are tendered are then sold by Merrill Lynch to investors through a best efforts remarketing where Merrill Lynch is the remarketing agent. If the beneficial interests are not successfully remarketed, the holders of beneficial interests are paid from funds drawn under a standby liquidity letter of credit issued by Merrill Lynch.

In addition to standby letters of credit, in certain municipal bond securitizations, Merrill Lynch also provides default protection or credit enhancement to investors in securities issued by certain municipal bond securitization SPEs. Interest and principal payments on beneficial interests issued by these SPEs are secured by a guarantee issued by Merrill Lynch. In the event that the issuer of the underlying municipal bond defaults on any payment of principal and/or interest when due, the payments on the bonds will be made to beneficial interest holders from an irrevocable guarantee by Merrill Lynch.



The maximum payout under these liquidity and default guarantees totaled $38.2 billion and $29.9 billion at December 29, 2006 and December 30, 2005, respectively. The fair value of the guarantee approximated $16 million and $14 million at December 29, 2006 and December 30, 2005, respectively, which is reflected in the Consolidated Balance Sheets. Of these arrangements, $6.9 billion at December 29, 2006 and December 30, 2005 represent agreements where the guarantee is provided to the SPE by a third-party financial intermediary and Merrill Lynch enters into a reimbursement agreement with the financial intermediary. In these arrangements, if the financial intermediary incurs losses, Merrill Lynch has up to one year to fund those losses. Additional information regarding these commitments is provided in Note 12 to the Consolidated Financial Statements.

The following table summarizes principal amounts outstanding and delinquencies of securitized financial assets as of December 29, 2006 and December 30, 2005:

| (dollars in millions) | Residential Mortgage Loans | Municipal Bonds | Other |
|---|---|---|---|
| **December 29, 2006** | | | |
| Principal Amount Outstanding[1] | $127,482 | $18,986 | $30,337 |
| Delinquencies[2] | 3,493 | – | 10 |
| December 30, 2005 | | | |
| Principal Amount Outstanding[1] | $ 82,468 | $ 19,745 | $ 10,416 |
| Delinquencies | 688 | – | – |

(1)  Merrill Lynch may retain an interest in the securitized financial assets.
(2)  Increase in delinquencies at year-end 2006 compared to year-end 2005 is due to higher defaults associated with sub-prime lending.

Net credit losses associated with securitized financial assets for the years ended December 29, 2006 and December 30, 2005 approximated $180 million and $73 million, respectively.

## Variable Interest Entities

In January 2003, the FASB issued FIN 46, which provides additional guidance on the application of Accounting Research Bulletin No. 51, *Consolidated Financial Statements*, for enterprises that have interests in entities that meet the definition of a VIE, and on December 24, 2003, the FASB issued FIN 46R. FIN 46R requires that an entity shall consolidate a VIE if that enterprise has a variable interest that will absorb a majority of the VIE's expected losses, receive a majority of the VIE's expected residual returns, or both. In April 2006, the FASB issued a FASB Staff Position FIN 46(R)-6, *Determining the Variability to be Considered in Applying FIN 46R* ("the FSP"). The FSP clarifies that the variability to be included when applying FIN 46R be based on a "by-design" approach, and should consider what risks the variable interest entity was designed to create.

QSPEs are a type of VIE that holds financial instruments and distributes cash flows to investors based on preset terms. QSPEs are commonly used in mortgage and other securitization transactions. In accordance with SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, and FIN 46R, *Consolidation of Variable Interest Entities*, Merrill Lynch does not consolidate QSPEs. Information regarding QSPEs can be found in the Securitization section of this Note and the Guarantees section of Note 12 to the Consolidated Financial Statements.

Merrill Lynch has entered into transactions with a number of VIEs in which it is the primary beneficiary and therefore must consolidate the VIE; or is a significant variable interest holder in the VIE. These VIEs are as follows:

- Merrill Lynch has investments in VIEs that hold loan assets or real estate, and as a result of these loans and investments, Merrill Lynch may be either the primary beneficiary of and consolidate the VIE, or may be a significant variable interest holder. These VIEs are primarily designed to provide on- or off-balance sheet financing to clients and/or to invest in real estate. Assets held by VIEs where Merrill Lynch has provided financing and is the primary beneficiary are recorded in other assets and/or loans, notes, and mortgages in the Consolidated Balance Sheets. Assets held by VIEs where Merrill Lynch has invested in real estate partnerships and is the primary beneficiary are included in other assets. The beneficial interest holders in these VIEs have no recourse to the general credit of Merrill Lynch; their investments are paid exclusively from the assets in the VIE.
- Merrill Lynch has entered into transactions with VIEs that are used, in part, to provide tax planning strategies to investors and/or Merrill Lynch through an enhanced yield investment security. These structures typically provide financing to Merrill Lynch and/or the investor at enhanced rates. Merrill Lynch may be either the primary beneficiary of and consolidate the VIE, or may be a significant variable interest holder in the VIE. Where Merrill Lynch is the primary beneficiary, the assets held by the VIEs are primarily included in either trading or investments.

Merrill Lynch entered into transactions with international financial institutions involving VIEs that provided to Merrill Lynch $11.75 billion in secured credit facilities and $1 billion of unsecured financing. These VIEs are also used as part of Merrill Lynch's overall tax-planning strategies and enable Merrill Lynch to borrow at more favorable rates. Merrill Lynch consolidates the VIEs as it is deemed to be the primary beneficiary of these VIEs.

- Merrill Lynch is the sponsor, guarantor, derivative counterparty, or liquidity and credit facility provider to certain mutual funds, investment entities, and conduits. Some of these funds provide a guaranteed return to investors at the maturity of the VIE. This guarantee may include a guarantee of the return of an initial investment or of the initial investment plus an agreed upon return depending on the terms of the VIE. Investors in certain of these VIEs have recourse to Merrill Lynch to the extent the value of the assets held by the VIEs at maturity is less than the guaranteed amount. In some instances, Merrill Lynch is the primary beneficiary and must consolidate the fund. Assets held in these VIEs are primarily classified in trading. In instances where Merrill Lynch is not the primary beneficiary, the guarantees related to these funds are further discussed in Note 12 to the Consolidated Financial Statements.

  In addition, Merrill Lynch has established two asset-backed commercial paper conduits ("Conduits") and holds a significant variable interest in the Conduits in the form of 1) liquidity facilities that protect commercial paper holders against short term changes in the fair value of the assets held by the Conduits in the event of a disruption in the commercial paper market, and 2) credit facilities to the Conduits that protect commercial paper investors against credit losses for up to a certain percentage of the portfolio of assets held by the respective Conduits. The liquidity and credit facilities are further discussed in Note 12 to the Consolidated Financial Statements.

- Merrill Lynch entered into a transaction with a VIE whereby Merrill Lynch arranged for additional protection for directors and employees to indemnify them against certain losses they may incur as a result of claims against them. Merrill Lynch is the primary beneficiary and consolidates the VIE because its employees benefit from the indemnification arrangement. As of December 29, 2006 and December 30, 2005 the assets of the VIE totaled approximately $16 million, representing a purchased credit default agreement, which is recorded in other assets on the Consolidated Balance Sheets. In the event of a Merrill Lynch insolvency, proceeds of $140 million will be received by the VIE to fund any claims. Neither Merrill Lynch nor its creditors have any recourse to the assets of the VIE.

## Other Involvement with VIEs

Merrill Lynch is involved with other VIEs in which it is neither the primary beneficiary or a significant variable interest holder; rather, its involvement relates to a significant program sponsored by Merrill Lynch. Significant programs sponsored by Merrill Lynch, which are disclosed in the table below, include the following:

- Merrill Lynch has entered into transactions with VIEs where Merrill Lynch typically purchases credit protection from the VIE in the form of a derivative in order to synthetically expose investors to a specific credit risk. These are commonly known as credit-linked note VIEs.
- Merrill Lynch has entered into transactions with VIEs where Merrill Lynch transfers convertible bonds to the VIE and retains a call option on the underlying bonds. The purpose of these VIEs is to market convertible bonds to a broad investor base by separating the bonds into callable debt and a conversion call option.

The following tables summarize Merrill Lynch's involvement with the VIEs listed above as of December 29, 2006 and December 30, 2005, respectively. The table below does not include information on QSPEs or those VIEs where Merrill Lynch is the primary beneficiary, and holds a majority of the voting interest in the entity. For more information on these entities (e.g. municipal bond securitizations), see the Securitizations section of this Note and the Guarantees section in Note 12 to the Consolidated Financial Statements.

Where an entity is a significant variable interest holder, FIN 46R requires that entity to disclose its maximum exposure to loss as a result of its interest in the VIE. It should be noted that this measure does not reflect Merrill Lynch's estimate of the actual losses that could result from adverse changes because it does not reflect the economic hedges Merrill Lynch enters into to reduce its exposure.

| (dollars in millions) | Primary Beneficiary | | | Significant Variable Interest Holder | | Other Involvement with VIEs | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Description | Total Asset Size[4] | Net Asset Size[5] | Recourse to Merrill Lynch[6] | Total Asset Size[4] | Maximum Exposure | Total Asset Size[4] | Maximum Exposure |
| **December 29, 2006** | | | | | | | |
| Loan and Real Estate VIEs | $ 4,265 | $3,787 | $ 557 | $ 278 | $ 182 | $ – | $ – |
| Guaranteed and Other Funds[1] | 2,476 | 1,913 | 564 | 6,156 | 6,142 | – | – |
| Credit-Linked Note and Other VIEs[2] | 518 | 518 | 302 | – | – | 11,069 | 927 |
| Tax Planning VIEs[3] | 230 | 225 | – | 483 | – | – | – |
| **December 30, 2005** | | | | | | | |
| Loan and Real Estate VIEs | $ 5,144 | $5,140 | $ – | $ 116 | $ 63 | $ – | $ – |
| Guaranteed and Other Funds[1] | 1,802 | 1,349 | 464 | 2,981 | 2,973 | – | – |
| Credit-Linked Note and Other VIEs[2] | 130 | 30 | – | – | – | 8,835 | 780 |
| Tax Planning VIEs[3] | 1,972 | 1,972 | – | 5,416 | 2,297 | – | – |

(1)  The maximum exposure for Guaranteed and Other Funds is the fair value of Merrill Lynch's investment, derivatives entered into with the VIEs if they are in an asset position and any recourse beyond the assets of the entity.

(2)  The maximum exposure for Credit-Linked Note and Other VIEs is the fair value of the derivatives entered into with the VIEs if they are in an asset position.

(3)  The maximum exposure for Tax Planning VIEs reflects the fair value of investments in the VIEs and derivatives entered into with the VIEs, as well as the maximum exposure to loss associated with indemnifications made by Merrill Lynch to investors in the VIEs.

(4)  This column reflects the total size of the assets held in the VIE.

(5)  This column reflects the size of the assets held in the VIE after accounting for intercompany eliminations and any balance sheet netting of assets and liabilities as permitted by FIN 39.

(6)  This column reflects the extent, if any, to which investors have recourse to Merrill Lynch beyond the assets held in the VIE.



# NOTE 8    Loans, Notes, and Mortgages and Related Commitments to Extend Credit

Loans, notes, and mortgages and related commitments to extend credit at December 29, 2006 and December 30, 2005, are presented below. This disclosure includes commitments to extend credit that will, if drawn upon, result in loans held for investment and loans held for sale.

| (dollars in millions) | Loans | | Commitments[1] | |
| --- | ---: | ---: | ---: | ---: |
| | **2006** | 2005 | **2006[2][3]** | 2005[3] |
| Consumer: | | | | |
| Mortgages | **$18,346** | $18,172 | **$ 7,747** | $ 6,376 |
| Other | **4,224** | 2,558 | **547** | 75 |
| Commercial and small- and middle-market business: | | | | |
| Secured | **43,267** | 36,571 | **46,807** | 34,583 |
| Unsecured investment grade | **2,870** | 3,283 | **30,069** | 22,061 |
| Unsecured non-investment grade | **1,745** | 869 | **9,015** | 980 |
| Small- and middle-market business | **3,055** | 4,994 | **2,185** | 3,062 |
| | **73,507** | 66,447 | **96,370** | 67,137 |
| Allowance for loan losses | **(478)** | (406) | **–** | – |
| Reserve for lending-related commitments | **–** | – | **(381)** | (281) |
| Total, net | **$73,029** | $66,041 | **$95,989** | $66,856 |

(1) Commitments are outstanding as of the date the commitment letter is issued and are comprised of closed and contingent commitments. Closed commitments represent the unfunded portion of existing commitments available for draw down. Contingent commitments are contingent on the borrower fulfilling certain conditions or upon a particular event, such as an acquisition. A portion of these contingent commitments may be syndicated among other lenders or replaced with capital markets funding.

(2) See Note 12 to the Consolidated Financial Statements for a maturity profile of these commitments.

(3) In addition to the loan origination commitments included in the table above, at December 29, 2006, Merrill Lynch entered into agreements to purchase $1.2 billion of loans that, upon settlement of the commitment, will be classified in loans held for investment and loans held for sale. Similar loan purchase commitments totaled $96 million at December 30, 2005. See Note 12 to the Consolidated Financial Statements for further information.

Activity in the allowance for loan losses is presented below:

| (dollars in millions) | 2006 | 2005 | 2004 |
| --- | ---: | ---: | ---: |
| Allowance for loan losses at beginning of year | **$406** | $283 | $ 318 |
| Provision for loan losses | **114** | 200 | 174 |
| Charge-offs | **(62)** | (88) | (209) |
| Recoveries | **18** | 12 | 4 |
| Net charge-offs | **(44)** | (76) | (205) |
| Other | **2** | (1) | (4) |
| Allowance for loan losses at end of year | **$478** | $406 | $ 283 |

Consumer loans, which are substantially secured, consisted of approximately 263,000 individual loans at December 29, 2006, and included residential mortgages, home equity loans, and other loans to individuals for household, family, or other personal expenditures. Commercial loans, which consisted of approximately 14,000 separate loans at December 29, 2006, include corporate and institutional loans, commercial mortgages, asset-based loans, small- and middle-market business loans, and other loans to businesses. The principal balance of nonaccrual loans was $209 million at December 29, 2006 and $256 million at December 30, 2005. The investment grade and non-investment grade categorization is determined using the credit rating agency equivalent of internal credit ratings. Non-investment grade counterparties are those rated lower than BBB. In some cases, Merrill Lynch enters into credit default swaps to mitigate credit exposure related to funded and unfunded commercial loans. The notional value of these swaps totaled $10.3 billion and $7.9 billion at December 29, 2006 and December 30, 2005, respectively. For information on credit risk management see Note 6 to the Consolidated Financial Statements.

The above amounts include $18.6 billion and $12.3 billion of loans held for sale at December 29, 2006 and December 30, 2005, respectively. Loans held for sale are loans that management expects to sell prior to maturity. At December 29, 2006, such loans consisted of $7.4 billion of consumer loans, primarily automobile loans and residential mortgages, and $11.2 billion of commercial loans, approximately 38% of which are investment grade counterparties. At December 30, 2005, such loans consisted of $3.4 billion of consumer loans, primarily automobile loans and residential mortgages, and $8.9 billion of commercial loans, approximately 22% of which are to investment grade counterparties. For information on the accounting policy related to loans, notes and mortgages, see Note 1 to the Consolidated Financial Statements.

The fair values of loans, notes, and mortgages were approximately $73.0 billion and $66.2 billion at December 29, 2006 and December 30, 2005, respectively. For commercial loans, fair value is estimated based on other market prices for similar instruments issued by the borrower or is estimated using discounted cash flows. Merrill Lynch's estimate of fair value for other loans, notes, and mortgages is determined based on loan characteristics. For certain homogeneous categories of loans, including residential mortgages

and home equity loans, fair value is estimated using market price quotations or previously executed transactions for securities backed by similar loans, adjusted for credit risk and other individual loan characteristics. For Merrill Lynch's variable-rate loan receivables, carrying value approximates fair value.

Merrill Lynch generally maintains collateral on secured loans in the form of securities, liens on real estate, perfected security interests in other assets of the borrower, and guarantees. Consumer loans are typically collateralized by liens on real estate, automobiles, and other property. Commercial secured loans primarily include asset-based loans secured by financial assets such as loan receivables and trade receivables where the amount of the loan is based on the level of available collateral (i.e., the borrowing base) and commercial mortgages secured by real property. In addition, for secured commercial loans related to the corporate and institutional lending business, Merrill Lynch typically receives collateral in the form of either a first or second lien on the assets of the borrower or the stock of a subsidiary, which gives Merrill Lynch a priority claim in the case of a bankruptcy filing by the borrower. In many cases, where a security interest in the assets of the borrower is granted, no restrictions are placed on the use of assets by the borrower and asset levels are not typically subject to periodic review; however, the borrowers are typically subject to stringent debt covenants. Where the borrower grants a security interest in the stock of its subsidiary, the subsidiary's ability to issue additional debt is typically restricted.

Merrill Lynch enters into commitments to extend credit, predominantly at variable interest rates, in connection with corporate finance and loan syndication transactions. Customers may also be extended loans or lines of credit collateralized by first and second mortgages on real estate, certain liquid assets of small businesses, or securities. Merrill Lynch considers commitments to be outstanding as of the date the commitment letter is issued. These commitments usually have a fixed expiration date and are contingent on certain contractual conditions that may require payment of a fee by the counterparty. Once commitments are drawn upon, Merrill Lynch may require the counterparty to post collateral depending on its creditworthiness and general market conditions.

Merrill Lynch originates and purchases portfolios of loans that have certain features that may be viewed as increasing Merrill Lynch's exposure to nonpayment risk by the borrower. Specifically, Merrill Lynch originates and purchases commercial and residential loans that:

- have negative amortizing features that permit the borrower to draw on unfunded commitments to pay current interest (commercial loans only);
- subject the borrower to payment increases over the life of the loan; and
- have high LTV ratios.

Although these features may be considered non-traditional for residential mortgages, interest-only features and high LTV ratios are considered traditional for commercial loans. Therefore, the table below includes only those commercial loans with features that permit negative amortization. Merrill Lynch does not originate or purchase residential loans that have terms that permit negative amortization features or are option adjustable rate mortgages.

The table below summarizes the level of exposure to each type of loan at December 29, 2006 and December 30, 2005:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| Loans with negative amortization features | $ 1,439 | $ 2,818 |
| Loans where borrowers may be subject to payment increases | 11,288 | 12,309 |
| Loans with high LTV ratios | 1,657 | 1,407 |
| Loans with both high LTV ratios and loans where borrowers may be subject to payment increases | 3,217 | 2,552 |

The negative amortizing loan products that Merrill Lynch issues include loans where the small- and middle-market or commercial borrower receives a loan and an unfunded commitment, which together equal the maximum amount Merrill Lynch is willing to lend. The unfunded commitment is automatically drawn on in order to meet current interest payments. These loans are often made to real estate developers where the financed property will not generate current income at the beginning of the loan term. This balance also includes working capital lines of credit that are issued to small- and middle-market investors and are secured by the assets of the business.

Loans where borrowers may be subject to payment increases primarily include interest-only loans. This caption also includes mortgages with low initial rates. These loans are underwritten based on a variety of factors including, for example, the borrower's credit history, debt to income ratio, employment, the LTV ratio, and the borrower's disposable income and cash reserves; typically using a qualifying formula that assesses the borrower's ability to make interest payments at a minimum of 2% above the initial rate. In instances where the borrower is of lower credit standing, the loans are typically underwritten to have a lower LTV ratio and/or other mitigating factors.

High LTV loans include all mortgage loans where the LTV is greater than 80% and the borrower has not purchased private mortgage insurance ("PMI"). High LTV loans also include residential mortgage products where a mortgage and home equity loan are simultaneously established for the same property. The maximum original LTV ratio for the mortgage portfolio with no PMI or other security is 95%. In addition, the Mortgage 100[SM] product is included in this category. The Mortgage 100[SM] product permits high credit quality borrowers to

pledge their securities portfolio in lieu of a traditional down payment. The securities portfolio is subject to daily monitoring, and additional collateral is required if the value of the pledged securities declines below certain levels.

The contractual amounts of these commitments represent the amounts at risk should the contract be fully drawn upon, the client defaults, and the value of the existing collateral becomes worthless. The total amount of outstanding commitments may not represent future cash requirements, as commitments may expire without being drawn upon. For a maturity profile of these and other commitments see Note 12 to the Consolidated Financial Statements.

## NOTE 9    Borrowings

ML & Co. is the primary issuer of all debt instruments. For local tax or regulatory reasons, debt is also issued by certain subsidiaries.

Total borrowings at December 29, 2006 and December 30, 2005, which is comprised of short-term borrowings, long-term borrowings and junior subordinated notes (related to trust preferred securities), consisted of the following:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| Senior debt issued by ML & Co. | $ 115,474 | $ 94,836 |
| Senior debt issued by subsidiaries — guaranteed by ML & Co. | 26,664 | 13,006 |
| Subordinated debt issued by ML & Co. | 6,429 | — |
| Structured notes issued by ML & Co. | 25,466 | 16,697 |
| Structured notes issued by subsidiaries — guaranteed by ML & Co. | 8,349 | 2,730 |
| Junior subordinated notes (related to trust preferred securities) | 3,813 | 3,092 |
| Other subsidiary financing — not guaranteed by ML & Co. | 4,316 | 3,776 |
| Other subsidiary financing — non-recourse | 12,812 | 10,351 |
| Total | $ 203,323 | $144,488 |

Borrowing activities may create exposure to market risk, most notably interest rate, equity, commodity and currency risk. Refer to Note 1 to the Consolidated Financial Statements, Derivatives section, for additional information on the use of derivatives to hedge these risks and the accounting for derivatives embedded in these instruments. Other subsidiary financing — non-recourse is primarily attributable to consolidated entities that are VIEs. Additional information regarding VIEs is provided in Note 7 to the Consolidated Financial Statements.

Borrowings at December 29, 2006 and December 30, 2005, are presented below:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| Short-term borrowings | | |
| Commercial paper | $ 6,357 | $ 3,420 |
| Secured short-term borrowings | 9,800 | 5,085 |
| Other unsecured short-term borrowings | 1,953 | 482 |
| Total | $ 18,110 | $ 8,987 |
| Long-term borrowings[1] | | |
| Fixed-rate obligations[2][4] | $ 58,366 | $ 51,012 |
| Variable-rate obligations[3][4] | 120,794 | 79,071 |
| Zero-coupon contingent convertible debt (LYONs®) | 2,240 | 2,326 |
| Total | $ 181,400 | $132,409 |

(1)  Excludes junior subordinated notes (related to trust preferred securities).
(2)  Fixed-rate obligations are generally swapped to floating rates.
(3)  Variable interest rates are generally based on rates such as LIBOR, the U.S. Treasury Bill Rate, or the Federal Funds Rate.
(4)  Included are various equity-linked or other indexed instruments.

At December 29, 2006, long-term borrowings, including adjustments related to fair value hedges and various equity-linked or other indexed instruments, mature as follows:

| (dollars in millions) | | |
|---|---|---|
| 2007 | $ 38,180 | 21% |
| 2008 | 33,654 | 19 |
| 2009 | 27,555 | 15 |
| 2010 | 18,521 | 10 |
| 2011 | 20,135 | 11 |
| 2012 and thereafter | 43,355 | 24 |
| Total | $ 181,400 | 100% |

Certain long-term borrowing agreements contain provisions whereby the borrowings are redeemable at the option of the holder at specified dates prior to maturity. These borrowings are reflected in the above table as maturing at their put dates, rather than their contractual maturities. Management believes, however, that a portion of such borrowings will remain outstanding beyond their earliest redemption date.

A limited number of notes whose coupon or repayment terms are linked to the performance of debt and equity securities, indices, currencies, or commodities, may be accelerated based on the value of a referenced index or security, in which case Merrill Lynch may be required to immediately settle the obligation for cash or other securities. Refer to Note 1 to the Consolidated Financial Statements (Embedded Derivatives) for further information.

Except for the $2.2 billion of aggregate principal amount of floating rate zero-coupon contingently convertible LYONs® ("LYONs®") that were outstanding at December 29, 2006, senior and subordinated debt obligations issued by ML & Co. and senior debt issued by subsidiaries and guaranteed by ML & Co. do not contain provisions that could, upon an adverse change in ML & Co.'s credit rating, financial ratios, earnings, cash flows, or stock price, trigger a requirement for an early payment, additional collateral support, changes in terms, acceleration of maturity, or the creation of an additional financial obligation.

The fair values of long-term borrowings and related hedges approximated the carrying amounts at year-end 2006 and 2005.

The effective weighted-average interest rates for borrowings, at December 29, 2006 and December 30, 2005 were:

|  | 2006 | 2005 |
|---|---|---|
| Short-term borrowings | 5.15% | 3.46% |
| Long-term borrowings, contractual rate | 4.23 | 3.70 |
| Junior subordinated notes (related to trust preferred securities) | 7.03 | 7.31 |

## Long-Term Borrowings

### Floating Rate LYONs®

At December 29, 2006, $2.2 billion of LYONs® were outstanding. The LYONs® are unsecured and unsubordinated indebtedness of Merrill Lynch and mature in 2032.

At maturity, holders of the LYONs® will receive the original principal amount of $1,000 increased daily by a rate that resets on a quarterly basis. Upon conversion, holders of the LYONs® will receive the value of 13.8679 shares of Merrill Lynch common stock based on the conditions described below. This value will be paid in cash in an amount equal to the contingent principal amount of the LYONs® on the conversion date and the remainder, at Merrill Lynch's election, will be paid in cash, common stock or a combination thereof.

In addition, under the terms of the LYONs®:

- Merrill Lynch may redeem the LYONs® at any time on or after March 13, 2008.
- Investors may require Merrill Lynch to repurchase the LYONs® in March 2007, 2008, 2012, 2017, 2022 and 2027. Repurchases may be settled only in cash.
- Until March 2008, the conversion rate on the LYONs® will be adjusted upon the issuance of a quarterly cash dividend to holders of Merrill Lynch common stock to the extent that such dividend exceeds $0.16 per share. In 2006, Merrill Lynch's common stock dividend exceeded $0.16 per share and, as a result, Merrill Lynch expects the conversion ratio to adjust during the first quarter of 2007 for those LYONs® that remain outstanding as of March 2007. In addition, the conversion rate on the LYONs® will be adjusted for any other cash dividends or distributions to all holders of Merrill Lynch common stock until March 2008. After March 2008, cash dividends and distributions will cause the conversion ratio to be adjusted only to the extent such dividends are extraordinary.
- The conversion rate on the LYONs® will also adjust upon: (1) dividends or distributions payable in Merrill Lynch common stock, (2) subdivisions, combinations or certain reclassifications of Merrill Lynch common stock, (3) distributions to all holders of Merrill Lynch common stock of certain rights to purchase the stock at less than the sale price of Merrill Lynch common stock at that time, and (4) distributions of Merrill Lynch assets or debt securities to holders of Merrill Lynch common stock (including certain cash dividends and distributions as described above).

The LYONs® may be converted based on any of the following conditions:

- If the closing price of Merrill Lynch common stock for at least 20 of the last 30 consecutive trading days ending on the last day of the calendar quarter is more than the conversion trigger price. The conversion trigger price for the LYONs® at December 29, 2006 was $90.44. That is, on and after January 1, 2007, a holder could have converted LYONs® into the value of 13.8679 shares of Merrill Lynch common stock if the Merrill Lynch stock price had been greater than $90.44 for at least 20 of the last 30 consecutive trading days ending December 29, 2006.
- During any period in which the credit rating of the LYONs® is Baa1 or lower by Moody's Investor Services, Inc., BBB+ or lower by Standard & Poor's Credit Market Services, or BBB+ or lower by Fitch, Inc.;
- If the LYONs® are called for redemption;
- If Merrill Lynch is party to a consolidation, merger or binding share exchange; or
- If Merrill Lynch makes a distribution that has a per share value equal to more than 15% of the sale price of its shares on the day preceding the declaration date for such distribution.

## Junior Subordinated Notes (related to trust preferred securities)

As of December 29, 2006, Merrill Lynch has created five trusts that have issued preferred securities to the public ("trust preferred securities"). Merrill Lynch Preferred Capital Trust II, III, IV and V used the issuance proceeds to purchase Partnership Preferred Securities, representing limited partnership interests. Using the purchase proceeds, the limited partnerships extended junior subordinated loans to ML & Co. and one or more subsidiaries of ML & Co. Merrill Lynch Capital Trust I directly invested in junior subordinated notes issued by ML & Co.

ML & Co. has guaranteed, on a junior subordinated basis, the payment in full of all distributions and other payments on the trust preferred securities to the extent that the trusts have funds legally available. This guarantee and similar partnership distribution guarantees are subordinated to all other liabilities of ML & Co. and rank equally with preferred stock of ML & Co.

On December 14, 2006 Merrill Lynch Capital Trust I issued $1,050 million of 6.45% trust preferred securities.

On December 29, 2006 Merrill Lynch Preferred Capital Trust I redeemed all of the outstanding $275 million of 7.75% trust preferred securities.

The following table summarizes Merrill Lynch's trust preferred securities as of December 29, 2006.

| (dollars in millions) Trust | Issue Date | Aggregate Principal Amount of Trust Preferred Securities | Aggregate Principal Amount of Notes | Annual Distribution Rate | Stated Maturity | Original Early Redemption Date |
|---|---|---|---|---|---|---|
| ML Preferred Capital Trust II | Feb-1997 | 300 | 360 | 8.00% | Perpetual | Mar-2007 |
| ML Preferred Capital Trust III | Jan-1998 | 750 | 901 | 7.00% | Perpetual | Mar-2008 |
| ML Preferred Capital Trust IV | Jun-1998 | 400 | 480 | 7.12% | Perpetual | Jun-2008 |
| ML Preferred Capital Trust V | Nov-1998 | 850 | 1,021 | 7.28% | Perpetual | Sep-2008 |
| ML Capital Trust I | Dec-2006 | 1,050 | 1,051 | 6.45% | Dec-2066[1] | Dec-2011 |
| **Total** | | **3,350**[2] | **3,813** | | | |

(1) Merrill Lynch has the option to extend the maturity of the junior subordinated note until December 2086.

(2) Includes related investments of $27 million, which are deducted for equity capital purposes.

## Borrowing Facilities

Merrill Lynch maintains credit facilities that are available to cover immediate funding needs. Merrill Lynch maintains a committed, multi-currency, unsecured bank credit facility that totaled $4.5 billion and $4.0 billion at December 29, 2006 and December 30, 2005, respectively. This 364-day facility permits borrowings by ML & Co. and select subsidiaries and expires in June 2007. The facility includes a one-year term-out feature that allows ML & Co., at its option, to extend borrowings under the facility for an additional year beyond the expiration date in June 2007. At December 29, 2006 and December 30, 2005, there were no borrowings outstanding under this credit facility, although Merrill Lynch borrows regularly from this facility.

Merrill Lynch also maintains two committed, secured credit facilities which totaled $7.5 billion at December 29, 2006 and $5.5 billion at December 30, 2005. One of these facilities is multi-currency and includes a tranche of $1.2 billion that is available on an unsecured basis, at Merrill Lynch's option. The facilities expire in May 2007 and December 2007. Both facilities include a one-year term-out option that allows ML & Co. to extend borrowings under the facilities for an additional year beyond their respective expiration dates. The secured facilities permit borrowings by ML & Co. and select subsidiaries, secured by a broad range of collateral. At December 29, 2006 and December 30, 2005, there were no borrowings outstanding under either facility.

In addition, Merrill Lynch maintains committed, secured credit facilities with two financial institutions that totaled $11.75 billion at December 29, 2006 and $6.25 billion at December 30, 2005. The secured facilities may be collateralized by government obligations eligible for pledging. The facilities expire at various dates through 2014, but may be terminated earlier with at least a nine month notice by either party. At December 29, 2006 and December 30, 2005, there were no borrowings outstanding under these facilities.

## Other

Merrill Lynch also obtains standby letters of credit from issuing banks to satisfy various counterparty collateral requirements, in lieu of depositing cash or securities collateral. Such standby letters of credit aggregated $2.5 billion and $1.1 billion at December 29, 2006 and December 30, 2005, respectively.

## NOTE 10   Deposits

Deposits at December 29, 2006 and December 30, 2005, are presented below:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| **U.S.** | | |
| Savings Deposits | $ 58,972 | $60,256 |
| Time Deposits | 3,322 | 1,528 |
| Total U.S. Deposits | 62,294 | 61,784 |
| **Non-U.S.** | | |
| Non-interest bearing | 688 | 670 |
| Interest bearing | 21,142 | 17,562 |
| Total Non-U.S. Deposits | 21,830 | 18,232 |
| Total Deposits | $ 84,124 | $80,016 |

The effective weighted-average interest rates for deposits, which include the impact of hedges, at December 29, 2006 and December 30, 2005, were 3.5% and 2.4%, respectively. The fair values of deposits approximated carrying values at December 29, 2006 and December 30, 2005.

## NOTE 11   Stockholders' Equity and Earnings Per Share

### Preferred Equity

ML & Co. is authorized to issue 25,000,000 shares of undesignated preferred stock, $1.00 par value per share. All shares of currently outstanding preferred stock constitute one and the same class and have equal rank and priority over common stockholders as to dividends and in the event of liquidation. All shares are perpetual, non-cumulative and dividends are payable quarterly when, and if, declared by the Board of Directors. Each share of preferred stock has a liquidation preference of $30,000, is represented by 1,200 depositary shares and is redeemable at Merrill Lynch's option at a redemption price equal to $30,000 plus declared and unpaid dividends, without accumulation of any undeclared dividends.

On February 28, 2006, Merrill Lynch issued an additional $360 million face value of Perpetual Floating Rate Non-Cumulative Preferred Stock, Series 4 on the same terms as the initial issuance on November 17, 2005.

The following table summarizes our preferred stock issued at December 29, 2006.

| Series | Description | Initial Issue Date | Total Shares Issued | Aggregate Liquidation Preference Amount (dollars in millions) | Dividend | Optional Early Redemption Date |
|---|---|---|---|---|---|---|
| 1 | Perpetual Floating Rate Non-Cumulative | Nov-2004 | 21,000 | $ 630 | 3-mo LIBOR + 75bps[3] | Nov-2009 |
| 2 | Perpetual Floating Rate Non-Cumulative | Mar-2005 | 37,000 | 1,110 | 3-mo LIBOR + 65bps[3] | Nov-2009 |
| 3 | Perpetual 6.375% Non-Cumulative | Nov-2005 | 27,000 | 810 | 6.375% | Nov-2010 |
| 4 | Perpetual Floating Rate Non-Cumulative | Nov-2005 | 20,000 | 600[1] | 3-mo LIBOR + 75bps[4] | Nov-2010 |
| Total | | | 105,000 | $3,150[2] | | |

(1)   Represents issuances of $240 million in November 2005 and $360 million in February 2006.
(2)   Preferred stockholders' equity reported on the Consolidated Balance Sheets is reduced by preferred shares held in inventory as a result of market making activities and other adjustments.
(3)   Subject to 3.00% minimum rate per annum.
(4)   Subject to 4.00% minimum rate per annum.

### Common Stock

On January 17, 2007, the Board of Directors declared a 40% increase in the regular quarterly dividend to 35 cents per common share, from 25 cents per common share. Dividends paid on common stock were $1.00 per share in 2006, $0.76 per share in 2005 and $0.64 per share in 2004.

In 2005 and 2006, the Board of Directors authorized three share repurchase programs to provide greater flexibility to return capital to shareholders. For the year ended December 30, 2005, Merrill Lynch repurchased a total of 63.1 million shares of common stock at a cost of $3.7 billion. For the year ended December 29, 2006, Merrill Lynch repurchased a total of 116.6 million common shares at a cost of $9.1 billion.

At December 29, 2006, Merrill Lynch had $3.2 billion of authorized repurchase capacity remaining from the $5 billion repurchase program authorized in October 2006. At December 29, 2006, Merrill Lynch had completed all other previously authorized share repurchase programs.

## Shares Exchangeable into Common Stock

In 1998, Merrill Lynch & Co., Canada Ltd. issued 9,662,448 Exchangeable Shares in connection with Merrill Lynch's merger with Midland Walwyn Inc. Holders of Exchangeable Shares have dividend, voting, and other rights equivalent to those of ML & Co. common stockholders. Exchangeable Shares may be exchanged at any time, at the option of the holder, on a one-for-one basis for ML & Co. common stock. Merrill Lynch may redeem all outstanding Exchangeable Shares for ML & Co. common stock after January 31, 2011, or earlier under certain circumstances. As of December 29, 2006 there were 2,659,926 Exchangeable Shares outstanding.

## Accumulated Other Comprehensive Loss

Accumulated other comprehensive loss represents cumulative gains and losses on items that are not reflected in earnings. The balances at December 29, 2006 and December 30, 2005 are as follows:

| (dollars in millions) | 2006 | 2005 |
|---|---|---|
| **Foreign currency translation adjustment** | | |
| Unrealized (losses), net of gains | $ (1,354) | $ (988) |
| Income taxes | 924 | 481 |
| Total | (430) | (507) |
| **Unrealized gains (losses) on investment securities available-for-sale** | | |
| Unrealized (losses), net of gains | (299) | (284) |
| Adjustments for: | | |
| Policyholder liabilities | (4) | (5) |
| Income taxes | 111 | 108 |
| Total | (192) | (181) |
| **Deferred gains (losses) on cash flow hedges** | | |
| Deferred gains (losses) | 4 | (3) |
| Income taxes | (2) | – |
| Total | 2 | (3) |
| **Defined benefit pension and postretirement plans** | | |
| Minimum pension liability | (334) | (224) |
| Adjustment to initially apply SFAS 158 | 129 | – |
| Income taxes | 41 | 71 |
| Total | (164) | (153) |
| **Total accumulated other comprehensive loss** | $ (784) | $ (844) |

## Stockholder Rights Plan

In 1997, the Board of Directors approved and adopted the amended and restated Stockholder Rights Plan. The amended and restated Stockholder Rights Plan provides for the distribution of preferred purchase rights ("Rights") to common stockholders. The Rights separate from the common stock 10 days following the earlier of: (a) an announcement of an acquisition by a person or group ("acquiring party") of 15% or more of the outstanding common shares of ML & Co., or (b) the commencement of a tender or exchange offer for 15% or more of the common shares outstanding. One Right is attached to each outstanding share of common stock and will attach to all subsequently issued shares. Each Right entitles the holder to purchase 1/100 of a share (a "Unit") of Series A Junior Preferred Stock, par value $1.00 per share, at an exercise price of $300 per Unit at any time after the distribution of the Rights. The Units are nonredeemable and have voting privileges and certain preferential dividend rights. The exercise price and the number of Units issuable are subject to adjustment to prevent dilution.

If, after the Rights have been distributed, either the acquiring party holds 15% or more of ML & Co.'s outstanding shares or ML & Co. is a party to a business combination or other specifically defined transaction, each Right (other than those held by the acquiring party) will entitle the holder to receive, upon exercise, a Unit of preferred stock or shares of common stock of the surviving company with a value equal to two times the exercise price of the Right. The Rights expire in 2007, and are redeemable at the option of a majority of the directors of ML & Co. at $.01 per Right at any time until the 10th day following an announcement of the acquisition of 15% or more of ML & Co.'s common stock.

## Earnings Per Share

Basic EPS is calculated by dividing earnings available to common stockholders by the weighted-average number of common shares outstanding. Diluted EPS is similar to basic EPS, but adjusts for the effect of the potential issuance of common shares. The following table presents the computations of basic and diluted EPS:

| (dollars in millions, except per share amounts) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Net earnings | $ 7,499 | $ 5,116 | $ 4,436 |
| Preferred stock dividends | (188) | (70) | (41) |
| Net earnings applicable to common shareholders — for basic EPS | $ 7,311 | $ 5,046 | $ 4,395 |
| Interest expense on LYONs[1] | 1 | 2 | 3 |
| Net earnings applicable to common shareholders — for diluted EPS | $ 7,312 | $ 5,048 | $ 4,398 |
| (shares in thousands) | | | |
| Weighted-average basic shares outstanding[2] | 868,095 | 890,744 | 912,935 |
| Effect of dilutive instruments | | | |
| Employee stock options[3] | 42,802 | 42,117 | 42,178 |
| FACAAP shares[3] | 21,724 | 22,140 | 23,591 |
| Restricted shares and units[3] | 28,496 | 20,608 | 21,917 |
| LYONs[1] | 1,835 | 2,120 | 3,158 |
| ESPP shares[3] | 10 | 7 | — |
| Dilutive potential common shares | 94,867 | 86,992 | 90,844 |
| Diluted shares[4] | 962,962 | 977,736 | 1,003,779 |
| Basic EPS | $ 8.42 | $ 5.66 | $ 4.81 |
| Diluted EPS | 7.59 | 5.16 | 4.38 |

(1)  See Note 9 to the Consolidated Financial Statements for further information on LYONs®.

(2)  Includes shares exchangeable into common stock.

(3)  See Note 14 to the Consolidated Financial Statements for a description of these instruments and issuances subsequent to December 29, 2006.

(4)  At year-end 2006, 2005, and 2004, there were 25,119, 40,889 and 52,875 instruments, respectively, that were considered antidilutive and thus were not included in the above calculations.

## NOTE 12    Commitments, Contingencies and Guarantees

### Litigation

Merrill Lynch has been named as a defendant in various legal actions, including arbitrations, class actions, and other litigation arising in connection with its activities as a global diversified financial services institution.

Some of the legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or otherwise in financial distress. Merrill Lynch is also involved in investigations and/or proceedings by governmental and self-regulatory agencies.

Merrill Lynch believes it has strong defenses to, and where appropriate, will vigorously contest, many of these matters. Given the number of these matters, some are likely to result in adverse judgments, penalties, injunctions, fines, or other relief. Merrill Lynch may explore potential settlements before a case is taken through trial because of the uncertainty, risks, and costs inherent in the litigation process. In accordance with SFAS No. 5, Merrill Lynch will accrue a liability when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. In many lawsuits and arbitrations, including almost all of the class action lawsuits, it is not possible to determine whether a liability has been incurred or to estimate the ultimate or minimum amount of that liability until the case is close to resolution, in which case no accrual is made until that time. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases in which claimants seek substantial or indeterminate damages, Merrill Lynch cannot predict what the eventual loss or range of loss related to such matters will be. Merrill Lynch continues to assess these cases and believes, based on information available to it, that the resolution of these matters will not have a material adverse effect on the financial condition of Merrill Lynch as set forth in the Consolidated Financial Statements, but may be material to Merrill Lynch's operating results or cash flows for any particular period and may impact ML & Co.'s credit ratings.

### Specific Litigation

#### IPO Allocation Litigation

*In re Initial Public Offering Antitrust Litigation:* Merrill Lynch is named as one of ten defendants in this consolidated class action filed in the United States District Court for the Southern District of New York. The complaint alleges that the defendants and unnamed co-conspirators violated antitrust laws by conspiring to "require from customers consideration in addition to the underwriters' discount for allocation of shares of initial public offerings of certain technology companies...and to inflate the aftermarket prices for such securities." On November 3, 2003, the district court granted the defendants' motions to dismiss the complaint on the ground that the conduct was immune from the antitrust laws.



On September 28, 2005, the Second Circuit reversed the district court's decision dismissing the case. In December 2006, the United States Supreme Court granted the defendants' petition for certiorari seeking review of the Second Circuit's decision. A decision by the Supreme Court is expected by the end of June 2007.

*In re Initial Public Offering Securities Litigation:* Merrill Lynch has been named as one of the defendants in approximately 110 securities class action complaints alleging that dozens of underwriter defendants, including Merrill Lynch, artificially inflated and maintained the stock prices of the relevant securities by creating an artificially high aftermarket demand for shares. On October 13, 2004, the district court, having previously denied defendants' motions to dismiss, issued an order allowing certain of these cases to proceed against the underwriter defendants as class actions. On December 5, 2006, the Second Circuit Court of Appeals reversed this order, holding that the district court erred in certifying these cases as class actions. Plaintiffs are seeking rehearing by the Second Circuit.

## Enron Litigation

*Newby v. Enron Corp. et al.:* On April 8, 2002, Merrill Lynch was added as a defendant in a consolidated class action filed in the United States District Court for the Southern District of Texas against 69 defendants purportedly on behalf of the purchasers of Enron's publicly traded equity and debt securities during the period October 19, 1998 through November 27, 2001. The complaint alleges, among other things, that Merrill Lynch engaged in improper transactions in the fourth quarter of 1999 that helped Enron misrepresent its earnings and revenues in the fourth quarter of 1999. The complaint also alleges that Merrill Lynch violated the securities laws in connection with its role as placement agent for and limited partner in an Enron-controlled partnership called LJM2. Plaintiff has argued that certain defendants, including Merrill Lynch, can potentially be liable for all of the losses caused by the alleged misconduct involving Enron, regardless of whether they knew of or participated in that conduct. The district court has denied Merrill Lynch's motions to dismiss, and has certified a class action by Enron shareholders and bondholders against Merrill Lynch and other defendants. On February 5, 2007, the United States Court of Appeals for the Fifth Circuit heard oral argument on Merrill Lynch's appeal of the district court's decision to certify a class action. In that appeal, Merrill Lynch argued that the district court had erred by 1) treating Merrill Lynch as a potential primary violator rather than an aider and abettor, which has no liability under the federal securities laws; 2) holding that plaintiffs could have relied on Merrill Lynch's conduct even though Merrill Lynch believes there has been no showing that such conduct inflated the price of Enron securities, and 3) holding that investment banks, including Merrill Lynch, could be liable for the losses caused by conduct in which they did not participate. Absent relief by the Fifth Circuit, the trial of the case is scheduled to begin on April 16, 2007.

## Commitments

At December 29, 2006, Merrill Lynch commitments had the following expirations:

| (dollars in millions) | Total | Less than 1 year | Commitment Expiration 1–3 years | 3+–5 years | Over 5 years |
|---|---|---|---|---|---|
| Commitments to extend credit[1] | $ 96,370 | $ 52,728 | $ 11,561 | $ 22,580 | $ 9,501 |
| Purchasing and other commitments | 14,439 | 10,597 | 1,224 | 566 | 2,052 |
| Commitments to enter into resale agreements | 10,304 | 10,304 | – | – | – |
| Operating leases | 3,275 | 567 | 1,067 | 850 | 791 |
| Total | $124,388 | $ 74,196 | $ 13,852 | $ 23,996 | $ 12,344 |

(1) See Note 8 to the Consolidated Financial Statements for additional details.

**Lending Commitments**

Merrill Lynch primarily enters into commitments to extend credit, predominantly at variable interest rates, in connection with corporate finance, corporate and institutional transactions and asset-based lending transactions. Clients may also be extended loans or lines of credit collateralized by first and second mortgages on real estate, certain liquid assets of small businesses, or securities. These commitments usually have a fixed expiration date and are contingent on certain contractual conditions that may require payment of a fee by the counterparty. Once commitments are drawn upon, Merrill Lynch may require the counterparty to post collateral depending upon creditworthiness and general market conditions. See Note 8 to the Consolidated Financial Statements for additional information.

The contractual amounts of these commitments represent the amounts at risk should the contract be fully drawn upon, the client defaults, and the value of the existing collateral becomes worthless. The total amount of outstanding commitments may not represent future cash requirements, as commitments may expire without being drawn upon.