## Purchasing and Other Commitments

In the normal course of business, Merrill Lynch enters into commitments for underwriting transactions. Settlement of these transactions as of December 29, 2006 would not have a material effect on the consolidated financial condition of Merrill Lynch.

In connection with trading activities, Merrill Lynch enters into commitments to enter into resale agreements.

In the normal course of business, Merrill Lynch enters into institutional and margin-lending transactions, some of which are on a committed basis, but most of which are not. Margin lending on a committed basis only includes amounts where Merrill Lynch has a binding commitment. These binding margin lending commitments totaled $782 million at December 29, 2006 and $381 million at December 30, 2005.

Merrill Lynch had commitments to purchase partnership interests, primarily related to private equity and principal investing activities, of $928 million and $734 million at December 29, 2006 and December 30, 2005, respectively. Merrill Lynch has also entered into agreements with providers of market data, communications, systems consulting, and other office-related services. At December 29, 2006 and December 30, 2005, minimum fee commitments over the remaining life of these agreements aggregated $357 million and $517 million, respectively. Merrill Lynch entered into commitments to purchase loans of $10.3 billion (which upon settlement of the commitment will primarily be included in trading assets) at December 29, 2006. Such commitments totaled $3.3 billion at December 30, 2005. Other purchasing commitments amounted to $2.1 billion and $856 million at December 29, 2006 and December 30, 2005, respectively. Included in other purchasing commitments at December 29, 2006 was $1.3 billion related to the acquisition of First Franklin during the first quarter of 2007. See Note 17 to the Consolidated Financial Statements for further information.

## Leases

Merrill Lynch has entered into various noncancellable long-term lease agreements for premises that expire through 2024. Merrill Lynch has also entered into various noncancellable lease agreements, which are primarily commitments of less than one year under equipment leases.

Merrill Lynch leases its Hopewell, New Jersey campus and an aircraft from a limited partnership. The leases with the limited partnership are accounted for as operating leases and mature in 2009. Each lease has a renewal term to 2014. In addition, Merrill Lynch has entered into guarantees with the limited partnership, whereby if Merrill Lynch does not renew the lease or purchase the assets under its lease at the end of either the initial or the renewal lease term, the underlying assets will be sold to a third party, and Merrill Lynch has guaranteed that the proceeds of such sale will amount to at least 84% of the acquisition cost of the assets. The maximum exposure to Merrill Lynch as a result of this residual value guarantee is approximately $322 million as of December 29, 2006 and December 30, 2005. As of December 29, 2006 and December 30, 2005, the carrying value of the liability on the Consolidated Balance Sheets is $17 million and $20 million, respectively. Merrill Lynch's residual value guarantee does not comprise more than half of the limited partnership's assets.

At December 29, 2006, future noncancellable minimum rental commitments under leases with remaining terms exceeding one year, including lease payments to the limited partnerships discussed above are as follows:

| (dollars in millions) | WFC[1] | Other | Total |
|---|---|---|---|
| 2007 | $ 179 | $ 388 | $ 567 |
| 2008 | 180 | 376 | 556 |
| 2009 | 180 | 331 | 511 |
| 2010 | 180 | 278 | 458 |
| 2011 | 180 | 212 | 392 |
| 2012 and thereafter | 314 | 477 | 791 |
| Total | $ 1,213 | $ 2,062 | $ 3,275 |

(1) World Financial Center Headquarters.

The minimum rental commitments shown above have not been reduced by $791 million of minimum sublease rentals to be received in the future under noncancellable subleases. The amounts in the above table do not include amounts related to lease renewal or purchase options or escalation clauses providing for increased rental payments based upon maintenance, utility, and tax increases.

Net rent expense for each of the last three years is presented below:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Rent expense | $ 651 | $ 615 | $ 582 |
| Sublease revenue | (154) | (140) | (137) |
| Net rent expense | $ 497 | $ 475 | $ 445 |



## Guarantees

Merrill Lynch issues various guarantees to counterparties in connection with certain leasing, securitization and other transactions. In addition, Merrill Lynch enters into certain derivative contracts that meet the accounting definition of a guarantee under *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indebtedness of Others* ("FIN 45"). FIN 45 defines guarantees to include derivative contracts that contingently require a guarantor to make payment to a guaranteed party based on changes in an underlying (such as changes in the value of interest rates, security prices, currency rates, commodity prices, indices, etc.), that relate to an asset, liability or equity security of a guaranteed party. Derivatives that meet the FIN 45 definition of guarantees include certain written options and credit default swaps (contracts that require Merrill Lynch to pay the counterparty the par value of a referenced security if that referenced security defaults). Merrill Lynch does not track, for accounting purposes, whether its clients enter into these derivative contracts for speculative or hedging purposes. Accordingly, Merrill Lynch has disclosed information about all credit default swaps and certain types of written options that can potentially be used by clients to protect against changes in an underlying, regardless of how the contracts are used by the client.

For certain derivative contracts, such as written interest rate caps and written currency options, the maximum payout could theoretically be unlimited, because, for example, the rise in interest rates or changes in foreign exchange rates could theoretically be unlimited. In addition, Merrill Lynch does not monitor its exposure to derivatives based on the theoretical maximum payout because that measure does not take into consideration the probability of the occurrence. As such, rather than including the maximum payout, the notional value of these contracts has been included to provide information about the magnitude of involvement with these types of contracts. However, it should be noted that the notional value is not a reliable indicator of Merrill Lynch's exposure to these contracts.

Merrill Lynch records all derivative transactions at fair value on its Consolidated Balance Sheets. As previously noted, Merrill Lynch does not monitor its exposure to derivative contracts in terms of maximum payout. Instead, a risk framework is used to define risk tolerances and establish limits to help to ensure that certain risk-related losses occur within acceptable, predefined limits. Merrill Lynch economically hedges its exposure to these contracts by entering into a variety of offsetting derivative contracts and security positions. See the Derivatives section of Note 1 to the Consolidated Financial Statements for further discussion of risk management of derivatives.

Merrill Lynch also provides guarantees to SPEs in the form of liquidity facilities, credit default protection and residual value guarantees for equipment leasing entities.

The liquidity facilities and credit default protection relate primarily to municipal bond securitization SPEs and Merrill Lynch-sponsored asset-backed commercial paper conduits. See Note 7 to the Consolidated Financial Statements for additional information regarding the conduits. Merrill Lynch acts as liquidity provider to municipal bond securitization SPEs. Specifically, the holders of beneficial interests issued by these SPEs have the right to tender their interests for purchase by Merrill Lynch on specified dates at a specified price. If the beneficial interests are not successfully remarketed, the holders of beneficial interests are paid from funds drawn under a standby facility issued by Merrill Lynch (or by third-party financial institutions where Merrill Lynch has agreed to reimburse the financial institution if a draw occurs). If the standby facility is drawn, Merrill Lynch may claim the underlying assets held by the SPEs. In general, standby facilities that are not coupled with default protection are not exercisable in the event of a downgrade below investment grade or default of the assets held by the SPEs. In addition, as of December 29, 2006, the value of the assets held by the SPE plus any additional collateral pledged to Merrill Lynch exceeded the amount of beneficial interests issued, which provides additional support to Merrill Lynch in the event that the standby facility is drawn. As of December 29, 2006, the maximum payout if the standby facilities are drawn was $32.5 billion and the value of the municipal bond assets to which Merrill Lynch has recourse in the event of a draw was $36.5 billion. However, it should be noted that these two amounts are not directly comparable, as the assets to which Merrill Lynch has recourse are on a deal-by-deal basis and are not part of a cross-collateralized pool.

In certain instances, Merrill Lynch also provides default protection in addition to liquidity facilities. Specifically, in the event that an issuer of a municipal bond held by the SPE defaults on any payment of principal and/or interest when due, the payments on the bonds will be made to beneficial interest holders from an irrevocable guarantee by Merrill Lynch (or by third-party financial institutions where Merrill Lynch has agreed to reimburse the financial institution if losses occur). If the default protection is drawn, Merrill Lynch may claim the underlying assets held by the SPEs. As of December 29, 2006, the maximum payout if an issuer defaults was $5.7 billion, and the value of the assets to which Merrill Lynch has recourse, in the event that an issuer of a municipal bond held by the SPE defaults on any payment of principal and/or interest when due, was $6.8 billion; however, as described in the preceding paragraph, these two amounts are not directly comparable as the assets to which Merrill Lynch has recourse are not part of a cross-collateralized pool. Merrill Lynch has established two asset-backed commercial paper conduits ("Conduits") and holds a significant variable interest in the Conduits. These variable interests represent $10 billion of liquidity facilities and $600 million of credit facilities. In the event of a disruption in the commercial paper market, the liquidity facilities protect commercial paper holders against short-term changes in the fair value of the assets held by the Conduits and the credit facilities protect commercial paper investors against credit losses for up to a certain percentage of the portfolio of assets held by the respective Conduits. The maximum exposure to loss for these two facilities combined is $7.4 billion

and assumes a total loss on the assets held in the conduit. As such, this measure significantly overstates Merrill Lynch's exposure or expected losses at December 29, 2006.

Further, to protect against declines in the value of the assets held by SPEs, for which Merrill Lynch provides either liquidity facilities or default protection, Merrill Lynch economically hedges its exposure through derivative positions that principally offset the risk of loss arising from these guarantees.

Merrill Lynch also provides residual value guarantees to leasing SPEs where either Merrill Lynch or a third-party is the lessee. For transactions where Merrill Lynch is not the lessee, the guarantee provides loss coverage for any shortfalls in the proceeds from asset sales greater than 75–90% of the adjusted acquisition price, as defined. Where Merrill Lynch is the lessee, it provides a guarantee that any proceeds from the sale of the assets will amount to at least 84% of the adjusted acquisition cost, as defined.

Merrill Lynch also enters into reimbursement agreements in conjunction with sales of loans originated under its Mortgage 100℠ program. Under this program, borrowers can pledge marketable securities in lieu of making a cash down payment. Upon sale of these mortgage loans, purchasers may require a surety bond that reimburses for certain shortfalls in the borrowers' securities accounts. Merrill Lynch provides this reimbursement through a financial intermediary. Merrill Lynch requires borrowers to meet daily collateral calls to verify that the securities pledged as down payment are sufficient at all times. Merrill Lynch believes that its potential for loss under these arrangements is remote. Accordingly, no liability is recorded in the Consolidated Balance Sheets.

In addition, Merrill Lynch makes guarantees to counterparties in the form of standby letters of credit. Merrill Lynch holds marketable securities of $539 million as collateral to secure these guarantees.

Further, in conjunction with certain principal-protected mutual funds, Merrill Lynch guarantees the return of the initial principal investment at the termination date of the fund. These funds are generally managed based on a formula that requires the fund to hold a combination of general investments and highly liquid risk-free assets that, when combined, will result in the return of principal at the maturity date unless there is a significant market event. At December 29, 2006, Merrill Lynch's maximum potential exposure to loss with respect to these guarantees is $634 million assuming that the funds are invested exclusively in other general investments (i.e., the funds hold no risk-free assets), and that those other general investments suffer a total loss. As such, this measure significantly overstates Merrill Lynch's exposure or expected loss at December 29, 2006. These transactions met the SFAS No. 149 definition of derivatives and, as such, were carried as a liability with a fair value of $7 million at December 29, 2006.

Merrill Lynch also provides indemnifications related to the U.S. tax treatment of certain foreign tax planning transactions. The maximum exposure to loss associated with these transactions is $165 million; however, Merrill Lynch believes that the likelihood of loss with respect to these arrangements is remote.

These guarantees and their expiration are summarized at December 29, 2006 as follows:

| (dollars in millions) | Maximum Payout/Notional | Less than 1 year | 1–3 years | 3⁺–5 years | Over 5 years | Carrying Value |
|---|---|---|---|---|---|---|
| Derivative contracts[1] | $ 1,772,646 | $ 495,033 | $ 361,739 | $ 278,521 | $ 637,353 | $ 32,509 |
| Liquidity and default facilities with SPEs[2] | 49,180 | 46,688 | 2,231 | 97 | 164 | 24 |
| Residual value guarantees[3] | 990 | 46 | 414 | 123 | 407 | 18 |
| Standby letters of credit and other guarantees[4] | 4,333 | 1,576 | 593 | 1,812 | 352 | 17 |

(1) As noted above, the notional value of derivative contracts is provided rather than the maximum payout amount, although the notional value should not be considered as a reliable indicator of Merrill Lynch's exposure to these contracts.

(2) Amounts relate primarily to facilities provided to municipal bond securitization SPEs and asset-backed commercial paper conduits sponsored by Merrill Lynch. Includes $6.9 billion of guarantees provided to SPEs by third-party financial institutions where Merrill Lynch has agreed to reimburse the financial institution if losses occur, and has up to one year to fund losses.

(3) Includes residual value guarantees associated with the Hopewell campus and aircraft leases of $322 million.

(4) Includes $66 million of reimbursement agreements with the Mortgage 100℠ program, guarantees related to principal-protected mutual funds, and certain indemnifications related to foreign tax planning strategies.

In addition to the guarantees described above, Merrill Lynch also provides guarantees to securities clearinghouses and exchanges. Under the standard membership agreement, members are required to guarantee the performance of other members. Under the agreements, if another member becomes unable to satisfy its obligations to the clearinghouse, other members would be required to meet shortfalls. Merrill Lynch's liability under these arrangements is not quantifiable and could exceed the cash and securities it has posted as collateral. However, the potential for Merrill Lynch to be required to make payments under these arrangements is remote. Accordingly, no liability is carried in the Consolidated Balance Sheets for these arrangements.

In connection with its prime brokerage business, Merrill Lynch provides to counterparties guarantees of the performance of its prime brokerage clients. Under these arrangements, Merrill Lynch stands ready to meet the obligations of its customers with respect to securities transactions. If the customer fails to fulfill its obligation, Merrill Lynch must fulfill the customer's obligation with the counterparty. Merrill Lynch is secured by the assets in the customer's account as well as any proceeds received from the securities transaction entered into by



Merrill Lynch on behalf of the customer. No contingent liability is carried in the Consolidated Balance Sheets for these transactions as the potential for Merrill Lynch to be required to make payments under these arrangements is remote.

In connection with providing supplementary protection to its customers, MLPF&S holds insurance in excess of that furnished by the Securities Investor Protection Corporation ("SIPC"). The policy provides coverage up to $600 million in the aggregate (including up to $1.9 million per customer for cash) for losses incurred by customers in excess of the SIPC limits. ML & Co. provides full indemnity to the policy provider syndicate against any losses as a result of this agreement. No contingent liability is carried in the Consolidated Balance Sheets for this indemnification as the potential for Merrill Lynch to be required to make payments under this agreement is remote.

In connection with its securities clearing business, Merrill Lynch performs securities execution, clearance and settlement services on behalf of other broker-dealer clients for whom it commits to settle trades submitted for or by such clients, with the applicable clearing-house; trades are submitted either individually, in groups or series or, if specific arrangements are made with a particular clearinghouse and client, all transactions with such clearing entity by such client. Merrill Lynch's liability under these arrangements is not quantifiable and could exceed any cash deposit made by a client. However, the potential for Merrill Lynch to be required to make unreimbursed payments under these arrangements is remote due to the contractual capital requirements associated with clients' activity and the regular review of clients' capital. Accordingly, no liability is carried in the Consolidated Balance Sheets for these transactions.

In connection with certain European mergers and acquisition transactions, Merrill Lynch, in its capacity as financial advisor, in some cases may be required by law to provide a guarantee that the acquiring entity has or can obtain or issue sufficient funds or securities to complete the transaction. These arrangements are short-term in nature, extending from the commencement of the offer through the termination or closing. Where guarantees are required or implied by law, Merrill Lynch engages in a credit review of the acquirer, obtains indemnification and requests other contractual protections where appropriate. Merrill Lynch's maximum liability equals the required funding for each transaction and varies throughout the year depending upon the size and number of open transactions. Based on the review procedures performed, management believes the likelihood of being required to pay under these arrangements is remote. Accordingly, no liability is recorded in the Consolidated Balance Sheets for these transactions.

In the course of its business, Merrill Lynch routinely indemnifies investors for certain taxes, including U.S. and foreign withholding taxes on interest and other payments made on securities, swaps and other derivatives. These additional payments would be required upon a change in law or interpretation thereof. Merrill Lynch's maximum exposure under these indemnifications is not quantifiable. Merrill Lynch believes that the potential for such an adverse change is remote. As such, no liability is recorded in the Consolidated Balance Sheets.

In connection with certain asset sales and securitization transactions, Merrill Lynch typically makes representations and warranties about the underlying assets conforming to specified guidelines. If the underlying assets do not conform to the specifications, Merrill Lynch may have an obligation to repurchase the assets or indemnify the purchaser against any loss. To the extent these assets were originated by others and purchased by Merrill Lynch, Merrill Lynch seeks to obtain appropriate representations and warranties in connection with its acquisition of the assets. Merrill Lynch believes that the potential for loss under these arrangements is remote. Accordingly, no liability is carried in the Consolidated Balance Sheets for these arrangements.

In connection with certain divestiture transactions, Merrill Lynch provides an indemnity to the purchaser, which will fully compensate the purchaser for any unknown liens or liabilities (e.g., tax liabilities) that relate to prior periods but are not discovered until after the transaction is closed. Merrill Lynch's maximum liability under these indemnifications cannot be quantified. However, Merrill Lynch believes that the likelihood of being required to pay is remote given the level of due diligence performed prior to the close of the transactions. Accordingly, no liability is recorded in the Consolidated Balance Sheets for these indemnifications.

## NOTE 13   Employee Benefit Plans

Merrill Lynch provides pension and other postretirement benefits to its employees worldwide through defined contribution pension, defined benefit pension and other postretirement plans. These plans vary based on the country and local practices. Merrill Lynch reserves the right to amend or terminate these plans at any time.

Merrill Lynch accounts for its defined benefit pension plans in accordance with SFAS No. 87, *Employers' Accounting for Pensions* and SFAS No. 88, *Employers' Accounting for Settlements and Curtailments of Defined Benefit Pension Plans and for Termination Benefits.* Its postretirement benefit plans are accounted for in accordance with SFAS No. 106, *Employers' Accounting for Postretirement Benefits Other Than Pensions.* Merrill Lynch discloses information regarding defined benefit pension and postretirement plans in accordance with SFAS No. 132R, *Employers' Disclosures about Pensions and Other Postretirement Benefits.* Postemployment benefits are accounted for in accordance with SFAS No. 112, *Employers' Accounting for Postemployment Benefits.*

In September 2006, the FASB issued SFAS No. 158, which requires an employer to recognize the overfunded and underfunded status of its defined benefit pension and other postretirement plans, measured as the difference between the fair value of plan assets and the benefit

obligation, as an asset or liability in its statement of financial condition. The benefit obligation is defined as the projected benefit obligation for pension plans and the accumulated postretirement benefit obligation for postretirement plans. Upon adoption, SFAS No. 158 requires an entity to recognize previously unrecognized actuarial gains and losses and prior service costs within accumulated other comprehensive income (loss), net of tax. The final net minimum pension liability ("MPL") adjustments are recognized prior to the adoption of SFAS No. 158. SFAS No. 158 also requires defined benefit plan assets and benefit obligations to be measured as of the date of the company's fiscal year end. Merrill Lynch has historically used a September 30 measurement date. Under the provisions of SFAS No. 158, Merrill Lynch will be required to change its measurement date to coincide with its fiscal year end. This provision of SFAS No. 158 will be effective for Merrill Lynch beginning with year end 2008. The following table illustrates the final net MPL adjustment and the incremental effect of the application of SFAS No. 158:

| (dollars in millions) | Balance before net MPL adjustment and SFAS No. 158 adjustment 12/29/06 | Final net MPL adjustment | SFAS No. 158 adjustments | Ending Balance 12/29/06 |
|---|---|---|---|---|
| Prepaid pension cost | $ 400 | $    – | $ 106 | $ 506 |
| Liability for pension and postretirement benefits | 752 | 110 | (23) | 839 |
| Accumulated other comprehensive loss, pre-tax | 224 | 110 | (129) | 205 |
| Deferred income taxes | 71 | 34 | (64) | 41 |
| Accumulated other comprehensive loss, net of tax | 153 | 76 | (65) | 164 |

## Defined Contribution Pension Plans

The U.S. defined contribution pension plans consist of the Retirement Accumulation Plan ("RAP"), the Employee Stock Ownership Plan ("ESOP"), and the 401(k) Savings & Investment Plan ("401(k)"). The RAP and ESOP cover substantially all U.S. employees who have met the service requirement. There is no service requirement for employee deferrals in the 401(k). However, there is a service requirement for an employee to receive corporate contributions in the 401(k).

Merrill Lynch established the RAP and the ESOP, collectively known as the "Retirement Program", for the benefit of employees with a minimum of one year of service. A notional retirement account is maintained for each participant. The RAP contributions are employer-funded based on compensation and years of service. Merrill Lynch made a contribution of approximately $165 million to the Retirement Program in order to satisfy the 2006 contribution requirement. Under the RAP, employees are given the opportunity to invest their retirement savings in a number of different investment alternatives including ML & Co. common stock. Under the ESOP, all retirement savings are invested in ML & Co. common stock, until employees have five years of service after which they have the ability to diversify.

Merrill Lynch guarantees the debt of the ESOP. The note bears an interest rate of 6.75%, has an outstanding balance of $1 million as of December 29, 2006, and matures on December 31, 2007. All dividends received by the ESOP on unallocated ESOP shares are used to pay down the note.

Merrill Lynch allocates ESOP shares of Merrill Lynch stock to all participants of the ESOP as principal from the ESOP loan is repaid. ESOP shares are considered to be either allocated (contributed to participants' accounts), committed (scheduled to be contributed at a specified future date but not yet released), or unallocated (not committed or allocated). Share information at December 29, 2006 is as follows:

| | |
|---|---|
| Unallocated shares as of December 30, 2005 | 412,113 |
| Shares allocated/committed[1] | (199,163) |
| Unallocated shares as of December 29, 2006 | 212,950 |

[1]  Excluding forfeited shares.

Additional information on ESOP activity follows:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Compensation costs funded with ESOP shares | $ 19 | $ 13 | $ 11 |

Employees can participate in the 401(k) by contributing, on a tax-deferred basis, a certain percentage of their eligible compensation, up to 25% since 2003, but not more than the maximum annual amount allowed by law. Beginning in 2005, employees may contribute up to 25% of eligible compensation in after-tax dollars up to an annual maximum of $10,000. Employees over the age of 50 may also make a catch-up contribution up to the maximum annual amount allowed by law. Employees are given the opportunity to invest their 401(k) contributions in a number of different investment alternatives including ML & Co. common stock. Merrill Lynch's contributions



are made in cash, and are equal to one-half of the first 6% of each participant's eligible compensation contributed to the 401(k), up to a maximum of $2,000 annually. Effective January 1, 2007, Merrill Lynch's contributions are equal to 100% of the first 4% of each participant's eligible compensation contributed to the 401(k), up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000. For employees with eligible compensation equal to or greater than $300,000 the maximum annual company contribution remains $2,000. Merrill Lynch makes contributions to the 401(k) on a pay period basis and expects to make contributions of approximately $96 million in 2007.

Merrill Lynch also sponsors various non-U.S. defined contribution pension plans. The costs of benefits under the RAP, 401(k), and non-U.S. plans are expensed during the related service period.

## Defined Benefit Pension Plans

In 1988 Merrill Lynch purchased a group annuity contract that guarantees the payment of benefits vested under a U.S. defined benefit pension plan that was terminated (the "U.S. Terminated Pension Plan") in accordance with the applicable provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). At year-end 2006 and 2005, a substantial portion of the assets supporting the annuity contract were invested in U.S. Government and agencies securities. Merrill Lynch, under a supplemental agreement, may be responsible for, or benefit from, actual experience and investment performance of the annuity assets. Merrill Lynch does not expect to make contributions under this agreement in 2007. Merrill Lynch also maintains supplemental defined benefit pension plans (i.e., plans not subject to Title IV of ERISA) for certain U.S. participants. Merrill Lynch expects to pay $23 million of benefit payments to participants in the U.S. non-qualified pension plans in 2007.

Employees of certain non-U.S. subsidiaries participate in various local defined benefit pension plans. These plans provide benefits that are generally based on years of credited service and a percentage of the employee's eligible compensation during the final years of employment. Merrill Lynch's funding policy has been to contribute annually the amount necessary to satisfy local funding standards. Merrill Lynch currently expects to contribute $70 million to its non-U.S. pension plans in 2007.

## Postretirement Benefits Other Than Pensions

Merrill Lynch provides health insurance benefits to retired employees under a plan that covers substantially all U.S. employees who have met age and service requirements. The health care coverage is contributory, with certain retiree contributions adjusted periodically. Non-contributory life insurance was offered to employees that had retired prior to February 1, 2000. The accounting for costs of health care benefits anticipates future changes in cost-sharing provisions. Merrill Lynch pays claims as incurred. Full-time employees of Merrill Lynch become eligible for these benefits upon attainment of age 55 and completion of ten years of service. Effective December 31, 2005, employees who turn age 65 after January 1, 2011 and are eligible for and elect supplemental retiree medical coverage will pay the full cost of coverage after age 65. Beginning January 1, 2006, newly hired employees and rehired employees will be offered retiree medical coverage, if they otherwise meet the eligibility requirement, but on a retiree-pay-all basis for coverage before and after age 65. Merrill Lynch also sponsors similar plans that provide health care benefits to retired employees of certain non-U.S. subsidiaries. As of December 29, 2006, none of these plans had been funded.

The following table provides a summary of the changes in the plans' benefit obligations, fair value of plan assets, and funded status, for the twelve-month periods ended September 30, 2006 and September 30, 2005, and amounts recognized in the Consolidated Balance Sheets at year-end 2006 and 2005 for Merrill Lynch's U.S. and non-U.S. defined benefit pension and postretirement benefit plans:

| (dollars in millions) | U.S. Defined Benefit Pension Plans 2006 | 2005 | Non-U.S. Defined Benefit Pension Plans[1] 2006 | 2005 | Total Defined Benefit Pension Plans 2006 | 2005 | Postretirement Plans[2] 2006 | 2005 |
|---|---|---|---|---|---|---|---|---|
| **Benefit obligations** | | | | | | | | |
| Balance, beginning of year | **$1,871** | $1,782 | **$1,291** | $1,186 | **$3,162** | $2,968 | **$ 360** | $ 552 |
| Service cost | – | – | 28 | 24 | 28 | 24 | 8 | 18 |
| Interest cost | 95 | 95 | 66 | 58 | 161 | 153 | 17 | 31 |
| Net actuarial losses (gains) | (54) | 60 | 166 | 189 | 112 | 249 | (60) | (143)[3] |
| Employee contributions | – | – | 2 | 2 | 2 | 2 | – | – |
| Amendments | – | – | – | – | – | – | – | (77)[3] |
| Acquisition/Merger[4] | – | 33 | (4) | – | (4) | 33 | – | – |
| Benefits paid | (108) | (99) | (33) | (33) | (141) | (132) | (18) | (18) |
| Curtailment and settlements[5] | – | – | (16) | (3) | (16) | (3) | (3) | – |
| Foreign exchange and other | – | – | 162 | (132) | 162 | (132) | 3 | (3) |
| **Balance, end of period** | **1,804** | 1,871 | **1,662** | 1,291 | **3,466** | 3,162 | **307** | 360 |
| **Fair value of plan assets** | | | | | | | | |
| Balance, beginning of year | **2,325** | 2,243 | **844** | 785 | **3,169** | 3,028 | – | – |
| Actual return on plan assets | 49 | 181 | 88 | 148 | 137 | 329 | – | – |
| Settlements[5] | – | – | (8) | – | (8) | – | – | – |
| Acquisition/Merger[4] | – | – | (8) | – | (8) | – | – | – |
| Contributions | 6 | – | 113 | 31 | 119 | 31 | 18 | 18 |
| Benefits paid | (107) | (99) | (33) | (33) | (140) | (132) | (18) | (18) |
| Foreign exchange and other | – | – | 107 | (87) | 107 | (87) | – | – |
| **Balance, end of period** | **2,273** | 2,325 | **1,103** | 844 | **3,376** | 3,169 | – | – |
| **Funded status end of period** | **469** | 454 | **(559)** | (447) | **(90)** | 7 | **(307)** | (360) |
| Unrecognized net actuarial losses (gains)[6] | **N/A** | (193) | **N/A** | 361 | **N/A** | 168 | **N/A** | 31 |
| Unrecognized prior service cost[6] | **N/A** | – | **N/A** | – | **N/A** | – | **N/A** | (76) |
| Fourth-quarter activity, net | – | – | 60 | 91 | 60 | 91 | 4 | 5 |
| **Amount recognized in Consolidated Balance Sheet[7]** | **$ 469** | $ 261 | **$ (499)** | $ 5 | **$ (30)** | $ 266 | **$(303)** | $(400) |
| Assets | **$ 500** | $ 298 | **$ 6** | $ 82 | **$ 506** | $ 380 | **$ –** | $ – |
| Liabilities | **(31)** | (42) | **(505)** | (296) | **(536)** | (338) | **(303)** | (400) |
| Accumulated other comprehensive loss[8] | – | 5 | – | 219 | – | 224 | – | – |
| **Amount recognized in Consolidated Balance Sheet** | **$ 469** | $ 261 | **$ (499)** | $ 5 | **$ (30)** | $ 266 | **$(303)** | $(400) |

N/A=Not Applicable

(1) Primarily represents the U.K. pension plan which accounts for 78% of the benefit obligation and 81% of the fair value of plan assets at the end of the period.

(2) Approximately 91% of the postretirement benefit obligation at the end of the period relates to the U.S. postretirement plan.

(3) Postretirement Plans net actuarial gains and plan amendments are due to changes in the U.S. postretirement plan.

(4) Relates to the BlackRock merger in 2006 and the acquisition of the Advest business in 2005, respectively.

(5) Curtailments and settlements primarily relate to the BlackRock merger.

(6) The unrecognized gain for the U.S. defined benefit pension plan relates to the U.S. terminated pension plan and the U.S. Supplemental Retirement Plan ("USSRP"). The unrecognized loss for the U.K. pension plan represents approximately 77% of the total unrecognized net actuarial loss for the non-U.S. pension plans in 2005. The U.S. postretirement plan accounts for 80% of the net unrecognized losses relating to the postretirement plans in 2005.

(7) Effective December 29, 2006 under SFAS No. 158, unrecognized net actuarial gains and losses and unrecognized prior service costs are recognized as an asset or liability in the Consolidated Balance Sheet.

(8) Represents the net minimum pension liability recorded within other comprehensive loss at December 30, 2005.

The accumulated benefit obligation for all defined benefit pension plans was $3,310 million and $3,021 million at September 30, 2006 and September 30, 2005, respectively.

The projected benefit obligation ("PBO"), accumulated benefit obligation ("ABO"), and fair value of plan assets for pension plans with ABO and PBO in excess of plan assets as of September 30, 2006 and September 30, 2005 are presented in the tables below. These plans primarily represent U.S. supplemental plans not subject to ERISA or non-U.S. plans where funding strategies vary due to legal requirements and local practices.



| (dollars in millions) | U.S. Defined Benefit Pension Plans | | Non-U.S. Defined Benefit Pension Plans | | Total Defined Benefit Pension Plans | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 |
| **Plans with ABO in excess of plan assets** | | | | | | |
| PBO | $32 | $42 | $1,501 | $1,144 | $1,533 | $1,186 |
| ABO | 32 | 42 | 1,363 | 1,030 | 1,395 | 1,072 |
| FV plan assets | – | – | 946 | 694 | 946 | 694 |
| **Plans with PBO in excess of plan assets** | | | | | | |
| PBO | $32 | $42 | $1,632 | $1,257 | $1,664 | $1,299 |
| ABO | 32 | 42 | 1,476 | 1,181 | 1,508 | 1,223 |
| FV plan assets | – | – | 1,069 | 802 | 1,069 | 802 |

Amounts recognized in accumulated other comprehensive loss, pre-tax, at year-end 2006 consisted of:

| (dollars in millions) | U.S. Defined Benefit Pension Plans | Non-U.S. Defined Benefit Pension Plans | Total Defined Benefit Pension Plans | Postretirement Plans |
|---|---|---|---|---|
| Net actuarial (gain)/loss | $ (183) | $ 530 | $ 347 | $ (29) |
| Prior service credit | – | – | – | (69) |
| Foreign currency translation gain | – | (44) | (44) | – |
| Total | $ (183) | $ 486 | $ 303 | $ (98) |

The estimated net loss for the defined benefit pension plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next fiscal year is approximately $28 million. The estimated prior service credit for the postretirement plans that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next fiscal year is approximately $6 million.

The weighted average assumptions used in calculating the benefit obligations at September 30, 2006 and September 30, 2005 are as follows:

| | U.S. Defined Benefit Pension Plans | | Non-U.S. Defined Benefit Pension Plans | | Total Defined Benefit Pension Plans | | Postretirement Plans | |
|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 | 2006 | 2005 |
| Discount rate | 5.5% | 5.2% | 4.9% | 4.9% | 5.2% | 5.1% | 5.5% | 5.3% |
| Rate of compensation increase | N/A | N/A | 4.5 | 4.3 | 4.5 | 4.3 | N/A | N/A |
| Healthcare cost trend rates[1] | | | | | | | | |
|   Initial | N/A | N/A | N/A | N/A | N/A | N/A | 9.5 | 10.3 |
|   Long-term | N/A | N/A | N/A | N/A | N/A | N/A | 5.0 | 4.9 |

N/A=Not Applicable
(1) The healthcare cost trend rate is assumed to decrease gradually through 2013 and remain constant thereafter.

Total net periodic benefit cost for the years ended 2006, 2005, and 2004 included the following components:

| (dollars in millions) | U.S. Pension Plans | | | Non-U.S. Pension Plans | | | Total Pension Plans | | | Postretirement Plans | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Defined contribution pension plan cost | $ 228 | $199 | $190 | $ 68 | $ 57 | $ 46 | $ 296 | $ 256 | $ 236 | N/A | N/A | N/A |
| **Defined benefit and postretirement plans** | | | | | | | | | | | | |
| Service cost[1] | – | – | – | 27 | 24 | 35 | 27 | 24 | 35 | $ 8 | $ 18 | $ 17 |
| Interest cost | 95 | 95 | 97 | 66 | 58 | 54 | 161 | 153 | 151 | 17 | 31 | 30 |
| Expected return on plan assets[2] | (112) | (96) | (96) | (63) | (49) | (46) | (175) | (145) | (142) | – | – | – |
| Amortization of (gains)/losses, prior service costs and other | – | – | – | 20 | 14 | 19 | 20 | 14 | 19 | (5) | 9 | 8 |
| Total defined benefit and postretirement plan costs | (17) | (1) | 1 | 50 | 47 | 62 | 33 | 46 | 63 | 20 | 58 | 55 |
| Total net periodic benefit cost | $ 211 | $198 | $191 | $118 | $104 | $108 | $ 329 | $ 302 | $ 299 | $ 20 | $ 58 | $ 55 |

N/A=Not Applicable
(1) The U.S. plan was terminated in 1988 and thus does not incur service costs. The U.K. defined benefit pension plan was frozen during the second quarter of 2004, which reduced service cost beginning in 2004.
(2) Effective 2006 Merrill Lynch modified the investment policy relating to the U.S. Terminated Pension Plan which increased the expected long-term rate of return on plan assets. The increase in the expected return on plan assets for the Non-U.S. plans can primarily be attributed to the U.K. Pension Plan as a result of increased contributions, favorable actual investment returns and exchange rate movements.

The unrecognized net actuarial losses (gains) represent changes in the amount of either the projected benefit obligation or plan assets resulting from actual experience being different than that assumed and from changes in assumptions. Merrill Lynch amortizes unrecognized net actuarial losses (gains) over the average future service periods of active participants to the extent that the loss or gain exceeds 10% of the greater of the projected benefit obligation or the fair value of plan assets. This amount is recorded within net periodic benefit cost. The average future service period for the U.K. defined benefit pension plan and the U.S. postretirement plan were 12 years and 13 years, respectively. Accordingly, the expense to be recorded in fiscal year ending 2007 related to the U.K. defined benefit pension plan unrecognized loss is $27 million. The U.S. postretirement plan unrecognized loss does not exceed 10% of the greater of the projected benefit obligation or the fair value of plan assets; however no significant loss will be amortized to expense in 2007. The U.S. defined benefit pension plan unrecognized gain does not exceed 10% of the greater of the projected benefit obligation or the fair value of plan assets; therefore the gain will not be amortized to expense in 2007.

The weighted average assumptions used in calculating the net periodic benefit cost for the years ended September 30, 2006, 2005, and 2004 are as follows:

| | U.S. Defined Benefit Pension Plans | | | Non-U.S. Defined Benefit Pension Plans | | | Total Defined Benefit Pension Plans | | | Postretirement Plans | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Discount rate | 5.3% | 5.5% | 5.8% | 4.9% | 5.3% | 5.2% | 5.1% | 5.4% | 5.6% | 5.3% | 5.7% | 6.0% |
| Expected long-term return on pension plan assets | 4.9 | 4.4 | 4.4 | 6.6 | 6.7 | 6.9 | 5.4 | 5.0 | 5.0 | N/A | N/A | N/A |
| Rate of compensation increase | N/A | N/A | N/A | 4.3 | 4.2 | 4.1 | 4.3 | 4.2 | 4.1 | N/A | N/A | N/A |
| Healthcare cost trend rates[1] | | | | | | | | | | | | |
| Initial | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 10.3 | 11.9 | 12.9 |
| Long-term | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 4.9 | 4.9 | 5.0 |

N/A=Not Applicable
(1) The healthcare cost trend rate is assumed to decrease gradually through 2013 and remain constant thereafter.

## Plan Assumptions

The discount rate used in determining the benefit obligation for the U.S. defined benefit pension and postretirement plans was developed by selecting the appropriate U.S. Treasury yield, and the related swap spread, consistent with the duration of the plan's obligation. This yield was further adjusted to reference a Merrill Lynch specific Moody's Corporate Aa rating. The discount rate for the U.K. pension plan was selected by reference to the appropriate U.K. GILTS rate, and the related swap spread, consistent with the duration of the plan's obligation. This yield was further adjusted to reference a Merrill Lynch specific Moody's Corporate Aa rating.

The expected long-term rate of return on plan assets reflects the average rate of earnings expected on the funds invested or to be invested to provide for the benefits included in the projected benefit obligation. The U.S. terminated pension plan, which represents approximately 67% of Merrill Lynch's total pension plan assets as of September 30, 2006, is solely invested in a group annuity contract which is currently 100% invested in fixed income securities. The expected long-term rate of return on plan assets for the U.S. terminated pension plan is based on the U.S. Treasury strip plus 50 basis points which reflects the current investment policy. The U.K. pension plan, which represents approximately 26% of Merrill Lynch's total plan assets as of September 30, 2006, is currently invested in 57% equity securities, 9% debt securities, 6% real estate, and 28% other. The expected long-term rate of return on the U.K. pension plan assets was determined by Merrill Lynch and reflects estimates by the plan investment advisors of the expected returns on different asset classes held by the plan in light of prevailing economic conditions at the beginning of the fiscal year. At September 30, 2006, Merrill Lynch increased the discount rate used to determine the U.S. pension plan and postretirement benefit plan obligations to 5.5%. The expected rate of return for the U.S. pension plan assets was increased from 4.4% in 2005 to 4.9% for 2006, which reduced expense by $12 million. The expected rate of return for 2007 was increased to 5.3%, which is consistent with the U.S. Treasury strip plus 50 basis points. The discount rate at September 30, 2006 for the U.K. pension plan was reduced from 5.3% in 2005 to 5.0% for 2006. The expected rate of return for the U.K. pension plan was unchanged.



Although Merrill Lynch's pension and postretirement benefit plans can be sensitive to changes in the discount rate, it is expected that a 25 basis point rate reduction would not have a material impact on the U.S. plan expenses for 2007. This change would increase the U.K. pension plan expense for 2007 by approximately $7 million. Also, such a change would increase the U.S. and U.K. plan obligations at September 30, 2006 by $59 million and $80 million, respectively. A 25 basis point decline in the expected rate of return for the U.S. pension plan and the U.K. pension plan would result in an expense increase for 2007 of approximately $6 million and $2 million, respectively.

The assumed health care cost trend rate has a significant effect on the amounts reported for the postretirement health care plans. A one percent change in the assumed healthcare cost trend rate would have the following effects:

| (dollars in millions) | 1% Increase | | 1% Decrease | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Effect on: | | | | |
| Other postretirement benefits cost | $ 10 | $ 10 | $ (8) | $ (8) |
| Accumulated benefit obligation | 31 | 44 | (27) | (37) |

## Investment Strategy and Asset Allocation

The U.S. terminated pension plan asset portfolio is structured such that the asset maturities match the duration of the plan's obligations. Consistent with the plan termination in 1988, the annuity contract and the supplemental agreement, the asset portfolio's investment objective calls for a concentration in fixed income securities, the majority of which have an investment grade rating.

The assets of the U.K. pension plan are invested prudently so that the benefits promised to members are provided, having regard to the nature and the duration of the plan's liabilities. The current planned investment strategy was set following an asset-liability study and advice from the Trustees' investment advisors. The asset allocation strategy selected is designed to achieve a higher return than the lowest risk strategy while maintaining a prudent approach to meeting the plan's liabilities. For the U.K. pension plan, the target asset allocation is 40% equity, 10% debt, 5% real estate, 45% target return (included in the table below in the non-U.S. "Other" category). As a risk control measure, a series of interest rate and inflation risk swaps have been executed covering a target of 60% of the plan's assets.

The pension plan weighted-average asset allocations and target asset allocations at September 30, 2006 and September 30, 2005, by asset category are presented in the table below. The Merrill Lynch postretirement benefit plans are not funded and do not hold assets for investment.

| | Defined Benefit Pension Plans | | | | | |
|---|---|---|---|---|---|---|
| | U.S. Plans | | | Non-U.S. Plans | | |
| | Target Allocation | 2006 | 2005 | Target Allocation | 2006 | 2005 |
| Debt securities | 100% | 100% | 100% | 17% | 16% | 22% |
| Equity securities | – | – | – | 41 | 54 | 71 |
| Real estate | – | – | – | 5 | 6 | 4 |
| Other | – | – | – | 37 | 24 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

## Estimated Future Benefit Payments

Expected benefit payments associated with Merrill Lynch's defined benefit pension and postretirement plans for the next five years and in aggregate for the five years thereafter are as follows:

| (dollars in millions) | Defined Benefit Pension Plans | | | Postretirement Plans[3] | | |
|---|---|---|---|---|---|---|
| | U.S.[1] | Non-U.S.[2] | Total | Gross Payments | Medicare Subsidy | Net Payments |
| 2007 | $122 | $ 37 | $159 | $ 22 | $ 3 | $ 19 |
| 2008 | 104 | 36 | 140 | 24 | 4 | 20 |
| 2009 | 107 | 38 | 145 | 26 | 4 | 22 |
| 2010 | 110 | 39 | 149 | 28 | 5 | 23 |
| 2011 | 113 | 40 | 153 | 30 | 5 | 25 |
| 2012 through 2016 | 602 | 219 | 821 | 168 | 38 | 130 |

(1)  The U.S. defined benefit pension plan payments are primarily funded under the terminated plan annuity contract.

(2)  The U.K., Japan and Swiss pension plan payments represent about 58%, 9% and 18%, respectively, of the non-U.S. 2007 expected defined benefit pension payments.

(3)  The U.S. postretirement plan payments, including the Medicare subsidy, represent approximately 95% of the total 2007 expected postretirement benefit payments.

## Postemployment Benefits

Merrill Lynch provides certain postemployment benefits for employees on extended leave due to injury or illness and for terminated employees. Employees who are disabled due to non-work-related illness or injury are entitled to disability income, medical coverage, and life insurance. Merrill Lynch also provides severance benefits to terminated employees. In addition, Merrill Lynch is mandated by U.S. state and federal regulations to provide certain other postemployment benefits. Merrill Lynch funds these benefits through a combination of self-insured and insured plans.

Merrill Lynch recognized $424 million, $226 million, and $165 million in 2006, 2005, and 2004, respectively, of postemployment benefits expense, which included severance costs for terminated employees of $417 million, $225 million, and $134 million in 2006, 2005, and 2004, respectively.

## NOTE 14   Employee Incentive Plans

Merrill Lynch adopted the provisions of SFAS No. 123R in the first quarter of 2006. See Note 1 to the Consolidated Financial Statements for further information.

To align the interests of employees with those of stockholders, Merrill Lynch sponsors several employee compensation plans that provide eligible employees with stock or options to purchase stock. The total pre-tax compensation cost recognized in earnings for stock-based compensation plans for 2006 was $3.2 billion which includes approximately $1.8 billion associated with one-time, non-cash compensation expenses further described in Note 1 to the Consolidated Financial Statements. The total pre-tax compensation cost recognized in earnings for stock-based compensation plans for 2005 and 2004 was $1.0 billion and $883 million, respectively, which includes the impact of accelerated amortization for terminated employees. Total related tax benefits recognized in earnings for share-based payment compensation plans for 2006, 2005, and 2004 were $1.2 billion, $381 million and $321 million, respectively. Total compensation cost recognized for share-based payments related to awards granted to retirement eligible employees prior to adoption of SFAS No. 123R was $617 million. Merrill Lynch also sponsors deferred cash compensation plans and award programs for eligible employees.

As of December 29, 2006, there was $1.9 billion of total unrecognized compensation cost related to non-vested share-based payment compensation arrangements. This cost is expected to be recognized over a weighted average period of 2.2 years.

Below is a description of our share-based payment compensation plans.

## Long-Term Incentive Compensation Plans ("LTIC Plans"), Employee Stock Compensation Plan ("ESCP") and Equity Capital Accumulation Plan ("ECAP")

LTIC Plans, ESCP and ECAP provide for grants of equity and equity-related instruments to certain employees. LTIC Plans consist of the Long-Term Incentive Compensation Plan, a shareholder approved plan used for grants to executive officers, and the Long-Term Incentive Compensation Plan for Managers and Producers, a broad-based plan which was approved by the Board of Directors, but has not been shareholder approved. LTIC Plans provide for the issuance of Restricted Shares, Restricted Units, and Non-qualified Stock Options, as well as Incentive Stock Options, Performance Shares, Performance Units, Performance Options, Stock Appreciation Rights, and other securities of Merrill Lynch. ESCP, a broad-based plan approved by shareholders in 2003, provides for the issuance of Restricted Shares, Restricted Units, Non-qualified Stock Options and Stock Appreciation Rights. ECAP, a shareholder-approved plan, provides for the issuance of Restricted Shares, as well as Performance Shares. All plans under LTIC Plans, ESCP and ECAP may be satisfied using either treasury or newly issued shares. As of December 29, 2006, no instruments other than Restricted Shares, Restricted Units, Non-qualified



Stock Options, Performance Options and Stock Appreciation Rights had been granted. Stock-settled Stock Appreciation Rights, which were first granted in 2004, were substantially all converted to Non-qualified Stock Options by December 31, 2004.

## Restricted Shares and Units

Restricted Shares are shares of ML & Co. common stock carrying voting and dividend rights. A Restricted Unit is deemed equivalent in fair market value to one share of common stock. Substantially all awards are settled in shares of common stock. Recipients of Restricted Unit awards receive cash payments equivalent to dividends. Under these plans, such shares and units are restricted from sale, transfer, or assignment until the end of the restricted period. Such shares and units are subject to forfeiture during the vesting period for grants under LTIC Plans, or the restricted period for grants under ECAP. Restricted share and unit grants made prior to 2003 generally cliff vest in three years. Restricted share and unit grants made in 2003 through 2005 generally cliff vest in four years. Restricted share and unit grants made in 2006 generally step vest in four years.

In January 2006, Participation Units were granted from the Long-Term Incentive Compensation Plan under Merrill Lynch's Managing Partners Incentive Program. The awards granted under this program are fully at risk, and the potential payout will vary depending on Merrill Lynch's financial performance against pre-determined return on average common stockholders' equity ("ROE") targets. One-third of the Participation Units will convert into Restricted Shares on each of January 31, 2007, January 31, 2008 and January 31, 2009, subject to the satisfaction of minimum ROE targets determined for the most recently completed fiscal year. Participation Units will cease to be outstanding immediately following conversion. If the minimum target is not met, the Participation Units will expire without being converted.

In connection with the BlackRock merger, 1,564,808 Restricted Shares held by employees that transferred to BlackRock were converted to Restricted Units effective June 2, 2006. The vesting period for such awards was accelerated to end on the transaction closing date of September 29, 2006. In addition, the vesting periods for 1,135,477 Restricted Share and 156,118 Restricted Unit awards that were not converted were accelerated to end on the transaction closing date of September 29, 2006.

The activity for Restricted Shares and Units under these plans during 2006 and 2005 follows:

| | LTIC Plans | | ECAP | ESCP | |
| --- | --- | --- | --- | --- | --- |
| | Restricted Shares | Restricted Units[2] | Restricted Shares | Restricted Shares | Restricted Units |
| **Authorized for issuance at:** | | | | | |
| December 29, 2006 | 660,000,000 | N/A | 104,800,000 | 75,000,000 | N/A |
| December 30, 2005 | 660,000,000 | N/A | 104,800,000 | 75,000,000 | N/A |
| **Available for issuance at:**[1] | | | | | |
| December 29, 2006 | 63,750,734 | N/A | 10,830,839 | 40,205,824 | N/A |
| December 30, 2005 | 65,412,219 | N/A | 10,832,121 | 57,158,319 | N/A |
| Outstanding, end of 2004 | 35,373,905 | 6,732,576 | 32,288 | – | – |
| Granted — 2005 | 3,816,323 | 970,647 | 8,244 | 16,240,185 | 2,340,815 |
| Paid, forfeited, or released from contingencies | (10,222,689) | (2,982,677) | (19,676) | (556,398) | (182,921) |
| Outstanding, end of 2005 | 28,967,539 | 4,720,546 | 20,856 | 15,683,787 | 2,157,894 |
| Granted — 2006 | 2,949,565 | 3,696,598 | 1,282 | 15,753,197 | 2,914,209 |
| Share to Unit conversion | (600,392) | 600,392 | – | (964,416) | 964,416 |
| Paid, forfeited, or released from contingencies | (2,044,374) | (1,100,611) | (2,253) | (1,391,381) | (323,530) |
| Outstanding, end of 2006 | 29,272,338 | 7,916,925 | 19,885 | 29,081,187 | 5,712,989 |

N/A=Not Applicable
(1) Includes shares reserved for issuance upon the exercise of stock options.
(2) Grants in 2006 include grants of Participation Units.

SFAS No. 123R requires the immediate expensing of share-based payment awards granted or modified to retirement-eligible employees in 2006, including awards that are subject to non-compete provisions. The above activity contains awards with or without a future service requirement, as follows:

| | No Future Service Required | | Future Service Required | |
| --- | --- | --- | --- | --- |
| | Shares/Units | Weighted Avg Grant Price | Shares/Units | Weighted Avg Grant Price |
| Outstanding at December 30, 2005 | 38,877,644 | $51.00 | 12,672,978 | $54.01 |
| Granted — 2006 | 7,429,380 | 71.57 | 17,885,471 | 72.21 |
| Delivered | (1,672,623) | 51.13 | | |
| Forfeited | (1,973,861) | 58.80 | (1,215,665) | 63.70 |
| Service criteria satisfied[1] | 21,412,853 | 63.93 | (21,412,853) | 63.93 |
| Outstanding at December 29, 2006 | 64,073,393 | 57.46 | 7,929,931 | 66.79 |

(1) Represents those awards for which employees attained retirement-eligibility during 2006, subsequent to the grant date.

The total fair value of Restricted Shares and Units granted to retirement-eligible employees, or for which service criteria were satisfied during 2006 was $2.2 billion. The total fair value of Restricted Shares and Units vested during 2006 was $303 million.

The weighted-average fair value per share or unit for 2006, 2005, and 2004 grants follows:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| **LTIC Plans** | | | |
| Restricted Shares | **$75.45** | $58.70 | $59.10 |
| Restricted Units | 71.63 | 58.60 | 54.38 |
| **ECAP Restricted Shares** | 70.22 | 60.37 | 58.30 |
| **ESCP Plans** | | | |
| Restricted Shares | 71.54 | 57.01 | – |
| Restricted Units | 71.67 | 57.01 | – |

## Non-Qualified Stock Options

Non-qualified Stock Options granted under LTIC Plans in 1996 through 2000 generally became exercisable over five years; options granted in 2001 and 2002 became exercisable after approximately six months. Option and Stock Appreciation Right grants made after 2002 generally become exercisable over four years. The exercise price of these grants is equal to 100% of the fair market value (as defined in LTIC Plans) of a share of ML & Co. common stock on the date of grant. Options and Stock Appreciation Rights expire ten years after their grant date.

The total number of Stock Appreciation Rights that remained outstanding at December 29, 2006 and December 30, 2005, were 304,774 and 344,627, respectively.

The activity for Non-qualified Stock Options under LTIC Plans for 2006, 2005, and 2004 follows:

|  | Options Outstanding | Weighted-Average Exercise Price |
|---|---|---|
| Outstanding, beginning of 2004 | 216,144,523 | $44.20 |
| Granted — 2004 | 9,842,371 | 59.85 |
| Exercised | (20,429,175) | 27.10 |
| Forfeited | (1,434,287) | 46.88 |
| Outstanding, end of 2004 | 204,123,432 | 46.64 |
| Granted — 2005 | 681,622 | 58.13 |
| Exercised | (26,849,096) | 30.91 |
| Forfeited | (1,242,883) | 43.48 |
| Outstanding, end of 2005 | 176,713,075 | 49.10 |
| Granted — 2006 | 368,973 | 72.72 |
| Exercised | (46,257,695) | 39.78 |
| Forfeited | (336,546) | 49.20 |
| Outstanding, end of 2006 | 130,487,807 | 52.47 |
| Exercisable, end of 2006 | 120,416,219 | 52.72 |

All Options and Stock Appreciation Rights outstanding as of December 29, 2006 are fully vested or expected to vest.

At year-end 2006, the weighted-average remaining contractual terms of options outstanding and exercisable were 4.11 years and 3.93 years, respectively.

The weighted-average fair value of options granted in 2006, 2005, and 2004 was $18.46, $18.04, and $20.46, per option, respectively. The fair value of each option award is estimated on the date of grant based on a Black-Scholes option pricing model using the following weighted-average assumptions. Expected volatilities are based on historical volatility of ML & Co. common stock. The expected term of options granted is equal to the contractual life of the options. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant. The expected dividend is based on the current dividend rate at the time of grant.

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Risk-free interest rate | **4.40%** | 3.80% | 3.27% |
| Expected life | **4.5 yrs.** | 4.6 yrs. | 5.0 yrs. |
| Expected volatility | **28.87%** | 35.31% | 37.36% |
| Expected dividend yield | **1.37%** | 1.14% | 1.07% |



Merrill Lynch received approximately $1.8 billion and $817 million in cash from the exercise of stock options during 2006 and 2005, respectively. The net tax benefit realized from the exercise of these options was $394 million and $179 million for 2006 and 2005, respectively.

The total intrinsic value of options exercised during 2006 and 2005 was $1.8 billion and $800 million, respectively. As of December 29, 2006, the total intrinsic value of options outstanding and exercisable was $5.3 billion and $4.9 billion, respectively. As of December 30, 2005, the total intrinsic value of options outstanding and exercisable was $3.3 billion and $2.8 billion, respectively.

## Employee Stock Purchase Plans ("ESPP")

ESPP, which is shareholder approved, allows eligible employees to invest from 1% to 10% of their eligible compensation to purchase ML & Co. common stock, subject to legal limits. For 2006 and 2005, the maximum annual purchase was $23,750. For 2004, the maximum annual purchase was $21,250. Beginning January 15, 2005, purchases were made at a discount equal to 5% of the average high and low market price on the relevant investment date. Purchases for the 2004 plan year were made without a discount. Up to 125,000,000 shares of common stock have been authorized for issuance under ESPP. The activity in ESPP during 2006, 2005, and 2004 follows:

|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Available, beginning of year | 23,462,435 | 24,356,952 | 24,931,909 |
| Purchased through plan | (889,564) | (894,517) | (574,957) |
| Available, end of year | 22,572,871 | 23,462,435 | 24,356,952 |

The weighted-average fair value of ESPP stock purchase rights exercised by employees in 2006, 2005, and 2004 was $3.75, $2.67, and $3.95 per right, respectively.

## Director Plans

Merrill Lynch provides stock-based compensation to its non-employee directors under the Merrill Lynch & Co., Inc. Deferred Stock Unit Plan for Non-Employee Directors, which was approved by shareholders in 2005 ("New Directors Plan") and the Deferred Stock Unit and Stock Option Plan for Non-Employee Directors ("Old Directors Plan") which was adopted by the Board of Directors in 1996 and discontinued after stockholders approved the New Directors Plan. In 2005, shareholders authorized Merrill Lynch to issue 500,000 shares under the New Directors Plan and also authorized adding all shares that remained available for issuance under the Old Directors Plan to shares available under the New Directors Plan for a total of approximately 1 million shares.

Under both plans, non-employee directors are to receive deferred stock units, payable in shares of ML & Co. common stock after a deferral period of five years. Under the Old Directors Plan, 29,573 and 41,558 deferred stock units were outstanding at year-end 2006 and 2005, respectively. Under the New Directors Plan, 55,735 and 34,306 deferred stock units remained outstanding at year-end 2006 and 2005, respectively.

Additionally, the Old Directors Plan provided for the grant of stock options which the New Directors Plan eliminated. There were approximately 121,051 and 142,117 stock options outstanding under the Old Directors Plan at year-end 2006 and 2005, respectively.

## Book Value Plan

Merrill Lynch also has instruments representing the right to receive 1,143,000 shares under Merrill Lynch's Investor Equity Purchase Plan ("Book Value Plan"). Issuances under the Book Value Plan were discontinued in 1995 and no further shares are authorized for issuance.

## Financial Advisor Capital Accumulation Award Plans ("FACAAP")

Under FACAAP, eligible employees in GPC are granted awards generally based upon their prior year's performance. Payment for an award is contingent upon continued employment for a period of time and is subject to forfeiture during that period. Awards granted in 2003 and thereafter are generally payable eight years from the date of grant in a fixed number of shares of ML & Co. common stock. For outstanding awards granted prior to 2003, payment is generally made ten years from the date of grant in a fixed number of shares of ML & Co. common stock unless the fair market value of such shares is less than a specified minimum value, in which case the minimum value is paid in cash. Eligible participants may defer awards beyond the scheduled payment date. Only shares of common stock held as treasury stock may be issued under FACAAP. FACAAP, which was approved by the Board of Directors, has not been shareholder approved.

At December 29, 2006, shares subject to outstanding awards totaled 35,299,336 while 15,339,922 shares were available for issuance through future awards. The weighted-average fair value of awards granted under FACAAP during 2006, 2005, and 2004 was $79.70, $59.92, and $57.73 per award, respectively.

## Other Compensation Arrangements

Merrill Lynch sponsors deferred compensation plans in which employees who meet certain minimum compensation thresholds may participate on either a voluntary or mandatory basis. Contributions to the plans are made on a tax-deferred basis by participants.

Participants' returns on these contributions may be indexed to various mutual funds and other funds, including certain company-sponsored investment vehicles that qualify as employee securities companies.

Merrill Lynch also sponsors several cash-based employee award programs, under which certain employees are eligible to receive future cash compensation, generally upon fulfillment of the service and vesting criteria for the particular program.

When appropriate, Merrill Lynch maintains various assets as an economic hedge of its liabilities to participants under the deferred compensation plans and award programs. These assets and the payables accrued by Merrill Lynch under the various plans and grants are included on the Consolidated Balance Sheets. Such assets totaled $2.5 billion at December 29, 2006 and December 30, 2005. Accrued liabilities at year-end 2006 and 2005 were $2.4 billion and $2.0 billion, respectively. Changes to deferred compensation liabilities and corresponding returns on the assets that economically hedge these liabilities are recorded within compensation and benefits expense on the Consolidated Statements of Earnings.

## NOTE 15   Income Taxes

Income tax provisions (benefits) on earnings consisted of:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| **U.S. federal** | | | |
| Current | $1,579 | $1,016 | $ 861 |
| Deferred | 389 | 261 | 152 |
| **U.S. state and local** | | | |
| Current | 276 | 50 | 73 |
| Deferred | (119) | (43) | (39) |
| **Non-U.S.** | | | |
| Current | 1,432 | 817 | 464 |
| Deferred | (630) | 14 | (111) |
| **Total** | $2,927 | $2,115 | $1,400 |

The corporate statutory U.S. federal tax rate was 35% for the three years presented. A reconciliation of statutory U.S. federal income taxes to Merrill Lynch's income tax provisions for earnings follows:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| U.S. federal income tax at statutory rate | $3,649 | $2,531 | $2,043 |
| U.S. state and local income taxes, net of federal | 102 | 4 | 22 |
| Non-U.S. operations | (539) | (155) | (204) |
| Tax-exempt interest | (163) | (175) | (160) |
| Dividends received deduction | (54) | (62) | (42) |
| Valuation allowance[1] | – | – | (281) |
| Other | (68) | (28) | 22 |
| Income tax expense | $2,927 | $2,115 | $1,400 |

(1) 2004 amount reflects the reversal and utilization of the Japan valuation allowance.

The 2006, 2005 and 2004 effective tax rates reflect net benefits (expenses) of $496 million, $156 million, and $(33) million, respectively, related to changes in estimates for prior years, and settlements with various tax authorities. The 2005 tax rate also included $97 million of tax expense ($113 million tax expense recorded in the fourth quarter less $16 million tax benefit recorded in the second quarter) associated with the foreign earnings repatriation of $1.8 billion.



Deferred income taxes are provided for the effects of temporary differences between the tax basis of an asset or liability and its reported amount in the Consolidated Balance Sheets. These temporary differences result in taxable or deductible amounts in future years. Details of Merrill Lynch's deferred tax assets and liabilities follow:

| (dollars in millions) | 2006 | 2005 | 2004 |
|---|---|---|---|
| **Deferred tax assets** | | | |
| Deferred compensation | **$2,220** | $1,379 | $1,360 |
| Stock options | **1,265** | 1,219 | 1,298 |
| Valuation and other reserves | **941** | 991 | 986 |
| Employee benefits and pension | **603** | 508 | 477 |
| Foreign exchange translation | **289** | 352 | 285 |
| Deferred interest | **149** | 240 | 250 |
| Net operating loss carryforwards | **100** | 120 | 292 |
| Restructuring related | **45** | 48 | 79 |
| Other | **604** | 268 | 450 |
| Gross deferred tax assets | 6,216 | 5,125 | 5,477 |
| Valuation allowances | (19) | (44) | (66) |
| Total deferred tax assets | 6,197 | 5,081 | 5,411 |
| **Deferred tax liabilities** | | | |
| BlackRock investment | **1,186** | – | – |
| Partnership activity | **264** | (72) | (166) |
| Deferred income | **242** | 276 | 331 |
| Interest and dividends | **186** | 221 | 85 |
| Deferred acquisition costs | **163** | 157 | 181 |
| Depreciation and amortization | **77** | 186 | 161 |
| Goodwill | **8** | 539 | 613 |
| Other | **99** | 199 | 380 |
| Total deferred tax liabilities | 2,225 | 1,506 | 1,585 |
| **Net deferred tax assets** | **$3,972** | $3,575 | $3,826 |

At December 29, 2006, Merrill Lynch had U.S. net operating loss carryforwards of approximately $1,261 million and non-U.S. net operating loss carryforwards of $36 million. The U.S. amounts are primarily state carryforwards expiring in various years after 2006. Merrill Lynch also had approximately $76 million of state tax credit carryforwards expiring in various years after 2006.

Merrill Lynch is under examination by the Internal Revenue Service ("IRS") and other tax authorities including Japan and the United Kingdom, and states in which Merrill Lynch has significant business operations, such as New York. The tax years under examination vary by jurisdiction. An IRS examination covering the years 2001-2003 was completed in 2006, subject to the resolution of the Japanese issue discussed below. As previously disclosed, there were carryback claims from the years 2001 and 2002 which were under Joint Committee review. During the third quarter of 2006, Merrill Lynch received notice that the Joint Committee had not taken exception and the refund claims have now been received. As a result, Merrill Lynch's 2006 effective tax rate reflects a $296 million reduction in the tax provision. IRS audits are also in progress for the tax years 2004-2006. The IRS field audit for the 2004 and 2005 tax years is expected to be completed in 2007. New York State and City audits for the years 1997-2001 were also completed in 2006 and did not have a material impact on the Consolidated Financial Statements. In the second quarter of 2005, Merrill Lynch paid a tax assessment from the Tokyo Regional Tax Bureau for the years 1998-2002. The assessment reflected the Japanese tax authority's view that certain income on which Merrill Lynch previously paid income tax to other international jurisdictions, primarily the United States, should have been allocated to Japan. Merrill Lynch has begun the process of obtaining clarification from international authorities on the appropriate allocation of income among multiple jurisdictions to prevent double taxation. Merrill Lynch regularly assesses the likelihood of additional assessments in each of the tax jurisdictions resulting from these examinations. Tax reserves have been established, which Merrill Lynch believes to be adequate in relation to the potential for additional assessments. However, there is a reasonable possibility that additional amounts may be incurred. The estimated additional possible amounts are no more than $120 million. Merrill Lynch adjusts the level of reserves and the reasonably possible amount when there is more information available, or when an event occurs requiring a change. The reassessment of tax reserves could have a material impact on Merrill Lynch's effective tax rate in the period in which it occurs.

Income tax benefits of $501 million, $317 million, and $248 million were allocated to stockholders' equity related to employee stock compensation transactions for 2006, 2005, and 2004, respectively.

Cumulative undistributed earnings of non-U.S. subsidiaries were approximately $9.8 billion at December 29, 2006. No deferred U.S. federal income taxes have been provided for the undistributed earnings to the extent that they are permanently reinvested in Merrill Lynch's non-U.S. operations. It is not practical to determine the amount of additional tax that may be payable in the event these earnings are repatriated.

## NOTE 16   Regulatory Requirements and Dividend Restrictions

Effective January 1, 2005, Merrill Lynch became a Consolidated Supervised Entity ("CSE") as defined by the SEC. As a CSE, Merrill Lynch is subject to group-wide supervision, which requires Merrill Lynch to compute allowable capital and risk allowances on a consolidated basis. Merrill Lynch is in compliance with applicable CSE standards.

Certain U.S. and non-U.S. subsidiaries are subject to various securities, banking, and insurance regulations and capital adequacy requirements promulgated by the regulatory and exchange authorities of the countries in which they operate. These regulatory restrictions may impose regulatory capital requirements and limit the amounts that these subsidiaries can pay in dividends or advance to Merrill Lynch. Merrill Lynch's principal regulated subsidiaries are discussed below.

### Securities Regulation

As a registered broker-dealer and futures commission merchant, MLPF&S is subject to the net capital requirements of Rule 15c3-1 under the Securities Exchange Act of 1934 ("the Rule"). Under the alternative method permitted by the Rule, the minimum required net capital, as defined, shall be the greater of 2% of aggregate debit items ("ADI") arising from customer transactions or $500 million. At December 29, 2006, MLPF&S's regulatory net capital of $2,719 million was approximately 16.3% of ADI, and its regulatory net capital in excess of the minimum required was $2,213 million.

MLPF&S is also subject to the capital requirements of the Commodity Futures Trading Commission ("CFTC"), which requires that minimum net capital should not be less than 8% of the total customer risk margin requirement plus 4% of the total non-customer risk margin requirement. MLPF&S substantially exceeds both standards.

MLI, a U.K. regulated investment firm, is subject to capital requirements of the FSA. Financial resources, as defined, must exceed the total financial resources requirement of the FSA. At December 29, 2006, MLI's financial resources were $11,664 million, exceeding the minimum requirement by $1,759 million.

MLGSI, a primary dealer in U.S. Government securities, is subject to the capital adequacy requirements of the Government Securities Act of 1986. This rule requires dealers to maintain liquid capital in excess of market and credit risk, as defined, by 20% (a 1.2-to-1 capital-to-risk standard). At December 29, 2006, MLGSI's liquid capital of $1,644 million was 199.0% of its total market and credit risk, and liquid capital in excess of the minimum required was $652 million.

MLJS, a Japan-based regulated broker-dealer, is subject to capital requirements of the Japanese Financial Services Agency ("JFSA"). Net capital, as defined, must exceed 120% of the total risk equivalents requirement of the JFSA. At December 29, 2006, MLJS's net capital was $1,369 million, exceeding the minimum requirement by $714 million.

### Banking Regulation

Merrill Lynch Bank USA ("MLBUSA") is a Utah-chartered industrial bank, regulated by the Federal Deposit Insurance Corporation ("FDIC") and the State of Utah Department of Financial Institutions ("UTDFI"). Merrill Lynch Bank & Trust Co., FSB ("MLBT-FSB") is a full service thrift institution regulated by the Office of Thrift Supervision ("OTS"). Both MLBUSA and MLBT-FSB are required to maintain capital levels that at least equal minimum capital levels specified in federal banking laws and regulations. Failure to meet the minimum levels will result in certain mandatory, and possibly additional discretionary, actions by the regulators that, if undertaken, could have a direct material effect on the banks. The following table illustrates the actual capital ratios and capital amounts for MLBUSA and MLBT-FSB as of December 29, 2006.

| (dollars in millions) | Well Capitalized Minimum | MLBUSA | | MLBT-FSB | |
|---|---|---|---|---|---|
| | | Actual Ratio | Actual Amount | Actual Ratio | Actual Amount |
| Tier 1 leverage | 5% | 8.92% | $5,524 | 7.18% | $ 941 |
| Tier 1 capital | 6% | 9.24 | 5,524 | 8.35 | 941 |
| Total capital | 10% | 10.75 | 6,429 | 11.74 | 1,323 |

As a result of its ownership of MLBT-FSB, ML & Co. is registered with the OTS as a savings and loan holding company ("SLHC") and subject to regulation and examination by the OTS as a SLHC. ML & Co. is classified as a unitary SLHC, and will continue to be so classified as long as it and MLBT-FSB continue to comply with certain conditions. Unitary SLHCs are exempt from the material restrictions imposed upon the activities of SLHCs that are not unitary SLHCs. SLHCs other than unitary SLHCs are generally prohibited from engaging in activities other than conducting business as a savings association, managing or controlling savings associations, providing services to subsidiaries or engaging in activities permissible for bank holding companies. Should ML & Co. fail to continue to qualify as a unitary SLHC, in order to continue its present businesses that would not be permissible for a SLHC, ML & Co. could be required to divest control of MLBT-FSB.

In July 2006, Merrill Lynch Trust Company, FSB ("MLTC-FSB") received approval from the OTS to become a full service thrift institution as part of an internal reorganization of certain banking businesses of Merrill Lynch. On August 5, 2006, Merrill Lynch Bank & Trust Co. ("MLB&T"), an existing FDIC-insured depository institution, was merged into MLTC-FSB, and MLTC-FSB was renamed Merrill Lynch Bank & Trust Co., FSB.

MLIB, an Ireland-based regulated bank, is subject to the capital requirements of the Financial Regulator of Ireland. MLIB is required to meet minimum regulatory capital requirements under the European Union ("EU") banking law as implemented in Ireland by the Financial Regulator. At December 29, 2006, MLIB's capital ratio was above the minimum requirement at 11.06% and its financial resources were $6,646 million, exceeding the minimum requirement by $1,840 million.

Prior to April 28, 2006, MLIB was an indirect subsidiary of Merrill Lynch International Finance Corporation ("MLIFC") and was subject to capital requirements imposed by the State of New York Banking Department. Pursuant to an internal corporate reorganization, MLIFC is no longer an indirect parent company of MLIB, and therefore MLIB is no longer subject to such capital requirements.

On September 30, 2006, Merrill Lynch completed an internal reorganization of its international banking structure, when the entire business of mlib (historic) (the UK entity previously known as Merrill Lynch International Bank Limited, and authorized by the FSA) was transferred to MLIB after obtaining all necessary regulatory approvals and pursuant to High Court Orders granted in London and Singapore. The two entities were renamed as part of this reorganization. Following the transfer, mlib (historic) has been deauthorized by the FSA and is therefore no longer subject to any capital requirements imposed by the FSA.

## Insurance Regulation

Merrill Lynch's insurance subsidiaries are subject to various regulatory restrictions and at December 29, 2006, $664 million, representing 90% of the insurance subsidiaries' net assets, was available, but subject to regulatory approval, for distribution to Merrill Lynch.

## Other

Approximately 60 other subsidiaries are subject to regulatory and other requirements of the jurisdictions in which they operate.

With the exception of regulatory restrictions on subsidiaries' abilities to pay dividends, there are no restrictions on ML & Co.'s present ability to pay dividends on common stock, other than ML & Co.'s obligation to make payments on its preferred stock and trust preferred securities, and the governing provisions of the Delaware General Corporation Law.

## NOTE 17   Subsequent Events

During the third quarter of 2006, Merrill Lynch announced an agreement to acquire the First Franklin mortgage origination franchise and related servicing platform from National City Corporation for $1.3 billion. First Franklin originates non-prime residential mortgage loans through a wholesale network. The First Franklin acquisition was completed at the beginning of the fiscal first quarter of 2007. The results of operations of First Franklin will be included in our GMI segment.

On January 29, 2007, Merrill Lynch announced that it had entered into a definitive agreement with First Republic to acquire all of the outstanding common shares of First Republic in exchange for a combination of cash and stock for a total transaction value of $1.8 billion. First Republic is a private banking and wealth management firm focused on high-net-worth individuals and their businesses. The transaction is expected to close in or about the third quarter of 2007, pending necessary regulatory and shareholder approvals. Following the closing, the results of operations of First Republic will be included in our GWM segment.

## Supplemental Financial Information (Unaudited)

### Quarterly Information

The unaudited quarterly results of operations of Merrill Lynch for 2006 and 2005 are prepared in conformity with U.S. generally accepted accounting principles, which include industry practices, and reflect all adjustments that are, in the opinion of management, necessary for a fair presentation of the results of operations for the periods presented. Results of any interim period are not necessarily indicative of results for a full year.

| (dollars in millions, except per share amounts) | For the Quarter Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 29, 2006 | Sept. 29, 2006[1] | June 30, 2006 | Mar. 31, 2006[2] | Dec. 30, 2005 | Sept. 30, 2005 | July 1, 2005 | Apr. 1, 2005 |
| Total Revenues | $18,959 | $19,357 | $16,704 | $15,571 | $13,505 | $12,399 | $11,328 | $10,564 |
| Interest Expense | 10,350 | 9,452 | 8,531 | 7,599 | 6,720 | 5,717 | 5,007 | 4,330 |
| Net Revenues | 8,609 | 9,905 | 8,173 | 7,972 | 6,785 | 6,682 | 6,321 | 6,234 |
| Non-Interest Expenses | 5,253 | 5,777 | 5,824 | 7,379 | 4,754 | 4,746 | 4,726 | 4,565 |
| Earnings Before Income Taxes | 3,356 | 4,128 | 2,349 | 593 | 2,031 | 1,936 | 1,595 | 1,669 |
| Income Tax Expense | 1,010 | 1,083 | 716 | 118 | 638 | 560 | 460 | 457 |
| Net Earnings | $ 2,346 | $ 3,045 | $ 1,633 | $ 475 | $ 1,393 | $ 1,376 | $ 1,135 | $ 1,212 |
| Earnings Per Common Share: | | | | | | | | |
| Basic | $ 2.71 | $ 3.50 | $ 1.79 | $ 0.49 | $ 1.56 | $ 1.54 | $ 1.25 | $ 1.33 |
| Diluted | $ 2.41 | $ 3.17 | $ 1.63 | $ 0.44 | $ 1.41 | $ 1.40 | $ 1.14 | $ 1.21 |

(1) Amounts include $2.0 billion of net revenues, $202 million of non-interest expenses and $662 million of income tax expense, associated with the BlackRock merger.

(2) Reflects one-time expenses related to the adoption of SFAS 123R of $1.8 billion in non-interest expenses and a $582 million income tax benefit.

The principal market on which ML & Co. common stock is traded is the New York Stock Exchange. ML & Co. common stock also is listed on the Chicago Stock Exchange, the London Stock Exchange and the Tokyo Stock Exchange. Information relating to the high and low sales prices per share for each full quarterly period within the two most recent fiscal years, the approximate number of holders of record of common stock, and the frequency and amount of cash dividends declared for the two most recent fiscal years is below.

### Dividends Per Common Share

| (declared and paid) | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter |
|---|---|---|---|---|
| 2006 | $ .25 | $ .25 | $ .25 | $ .25 |
| 2005 | $ .16 | $ .20 | $ .20 | $ .20 |

With the exception of regulatory restrictions on subsidiaries' abilities to pay dividends, there are no restrictions on ML & Co.'s present ability to pay dividends on common stock, other than ML & Co.'s obligation to make payments on its preferred stock, trust preferred securities, and the governing provisions of Delaware General Corporation Law. Certain subsidiaries' ability to declare dividends may also be limited. See Note 16 to the Consolidated Financial Statements.

### Stockholder Information

Consolidated Transaction Reporting System prices for ML & Co. common stock for the specified calendar quarters are noted below.

| (at calendar period-end) | 1st Quarter | | 2nd Quarter | | 3rd Quarter | | 4th Quarter | |
|---|---|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low | High | Low |
| 2006 | $78.82 | $67.95 | $80.33 | $65.41 | $79.09 | $67.49 | $93.56 | $78.44 |
| 2005 | $61.99 | $56.01 | $57.50 | $52.00 | $61.67 | $54.36 | $69.34 | $58.64 |

The approximate number of holders of record of ML & Co. common stock as of February 16, 2007 was 22,741. As of February 16, 2007, the closing price of ML & Co. common stock as reported on the New York Stock Exchange was $92.79.



## Stock Performance Graph

The following performance graph compares the performance of our common stock for the last five years to that of the S&P 500 Index, the S&P 500 Financial Index and our Peer Group. The Peer Group is comprised of the following companies: The Bear Stearns Companies Inc.; Citigroup Inc.; The Goldman Sachs Group, Inc.; JPMorgan Chase & Co.; Lehman Brothers Holdings Inc.; and Morgan Stanley. The graph assumes that the value of the investment in our common stock and of each of the three named indices was $100 at December 28, 2001 and that all dividends were reinvested. Points on the graph represent the performance as of the last Friday in December of the specified year, the day of our fiscal year end. Stock price performance shown on the graph is not necessarily indicative of future price performance.



Indexed Returns to Shareholders

- Merrill Lynch & Co., Inc.
- S&P 500 Index
- S&P 500 Financials Index
- Peer Group

(1)Base period 12/28/2001

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| Merrill Lynch & Co., Inc. | 100.00 | 73.75 | 112.50 | 118.12 | 135.57 | 188.82 |
| S&P 500 Index | 100.00 | 76.65 | 97.71 | 109.92 | 115.32 | 133.54 |
| S&P 500 Financials Index | 100.00 | 84.16 | 109.10 | 122.87 | 130.83 | 155.94 |
| Peer Group | 100.00 | 74.02 | 106.54 | 112.93 | 122.85 | 158.06 |

Other Information (Unaudited)

## Regulation and Supervision

Certain aspects of our business, and the business of our competitors and the financial services industry in general, are subject to stringent regulation by U.S. federal and state regulatory agencies and securities exchanges and by various non-U.S. government agencies or regulatory bodies, securities exchanges, self-regulatory organizations, and central banks, each of which has been charged with the protection of the financial markets and the interests of those participating in those markets.

- These regulatory agencies in the United States include, among others, the SEC, the CFTC, the Federal Energy Regulatory Commission ("FERC"), the FDIC, the Municipal Securities Rulemaking Board ("MSRB"), the UTDFI and the OTS.

- Outside the United States, these regulators include the FSA in the United Kingdom; the Irish Financial Regulator; the Federal Financial Supervisory Authority in Germany; the Commission Bancaire, the Comite des Establissements de Credit et des Enterprises d'Investissement and the Autorite des marches financiers in France; the Swiss Federal Banking Commission; the Johannesburg Securities Exchange ("JFSA"); the Japanese Securities and Exchange Surveillance Commission; the Monetary Authority of Singapore; the Office of the Superintendent of Financial Institutions in Canada; the National Securities Commission in Argentina; the Securities and Exchange Commission in Brazil; the National Securities and Banking Commission in Mexico; and the Securities and Futures Commission in Hong Kong, among many others.

Additional legislation and regulations, and changes in rules promulgated by the SEC or other U.S. federal and state government regulatory authorities and self-regulatory organizations and by non-U.S. government regulatory agencies may directly affect the manner of our operation and profitability. Certain of our operations are subject to compliance with privacy regulations enacted by the U.S. federal and state governments, the EU, other jurisdictions and/or enacted by the various self-regulatory organizations or exchanges.

ML & Co. and certain U.S. and non-U.S. regulated subsidiaries are subject to regulatory capital requirements. Many of the principal regulators for these legal entities are in the process of revising their capital requirements to be consistent with the Basel II capital standards issued by the Basel Committee on Banking Supervision. We continue to address implementation of these revised regulatory capital requirements for ML & Co. and the relevant subsidiaries, as required. We are investing in enhancements to our measurement and reporting systems to support effective implementation across the firm.

## United States Regulatory Oversight and Supervision

### Holding Company Supervision

In June 2004, the SEC approved the Consolidated Supervised Entity rule that created a voluntary framework for comprehensive group-wide risk management procedures and consolidated supervision of certain financial services holding companies by the SEC. We are a consolidated supervised entity subject to group-wide supervision by the SEC and capital requirements generally consistent with the standards of the Basel Committee on Banking Supervision. As such, we are computing allowable capital and risk allowances thereto; permitting the SEC to examine the books and records of ML & Co. and any affiliate that does not have a principal regulator; and have adopted various additional SEC reporting, record-keeping, and notification requirements.

### Broker-Dealer Regulation

MLPF&S, Merrill Lynch Professional Clearing Corp. ("ML Pro") and certain other subsidiaries of ML & Co. are registered as broker-dealers with the SEC and, as such, are subject to regulation by the SEC and by self-regulatory organizations, such as securities exchanges (including NYSE and the National Association of Securities Dealers, Inc. ("NASD")). Certain Merrill Lynch subsidiaries and affiliates, including MLPF&S, are registered as investment advisers with the SEC.

The Merrill Lynch entities that are broker-dealers registered with the SEC are subject to Rule 15c3-1 under the Securities Exchange Act of 1934 ("Exchange Act") which is designed to measure the general financial condition and liquidity of a broker-dealer. Under this rule, these entities are required to maintain the minimum net capital deemed necessary to meet broker-dealers' continuing commitments to customers and others. Under certain circumstances, this rule limits the ability of such broker-dealers to allow withdrawal of such capital by ML & Co. or other Merrill Lynch subsidiaries. Additional information regarding certain net capital requirements is set forth in Note 16 to the Consolidated Financial Statements.

We formed the Special Structured Products Committee as part of an agreement with the Department of Justice. This Committee, which is comprised of senior managers across business, support and risk functions, reviews a variety of transactions with the objective of advancing the appropriateness and integrity of such client transactions.

Broker-dealers are also subject to other regulations covering the operations of their business, including sales and trading practices, use of client funds and securities and the conduct of directors, officers and employees. Broker-dealers are also subject to regulation by state securities administrators in those states where they do business. Violations of the regulations governing the actions of a broker-dealer can result in the revocation of broker-dealer licenses, the imposition of censures or fines, the issuance of cease and desist orders and the suspension or expulsion from the securities business of a firm, its officers or its employees. The SEC and the national securities exchanges emphasize in particular the need for supervision and control by broker-dealers of their employees.



**Sarbanes-Oxley and Related Rules**

Aspects of our public disclosure, corporate governance principles and the roles of auditors and counsel are subject to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and certain related regulations and rules proposed and/or adopted by the SEC, the NYSE and other self-regulatory organizations. Sarbanes-Oxley requirements include requiring our Chief Executive Officer and Chief Financial Officer to certify that our financial information is fairly presented and fully complies with disclosure requirements. Additionally, they must evaluate the effectiveness of disclosure controls and procedures and disclose the results of their evaluation. Additional areas of focus as a result of Sarbanes-Oxley include: disclosures of off balance sheet arrangements and contractual obligations; management's assessment of internal controls and procedures for financial reporting; the adoption of a code of ethics for the Chief Executive Officer and senior financial and accounting officers; and disclosure of whether the Audit Committee of the Board of Directors includes an Audit Committee financial expert. Related NYSE and other self-regulatory organization rules require that our Chief Executive Officer certify compliance with applicable corporate governance standards. These rules also require listed companies to, among other items, adopt corporate governance guidelines and a code of business conduct, tighten applicable criteria for determining director and audit committee member independence, and increase the authority and responsibilities of the Audit Committee.

**Mutual Fund Industry Regulation**

During 2003 and continuing into 2004, abuses by certain participants in the mutual fund industry, including those relating to market timing, late trading, selective disclosure, and certain sales-related practices, prompted legislative and regulatory scrutiny of a wide range of fund-related activities. This scrutiny resulted in the adoption of new rules and a number of legislative and regulatory proposals relating to fund practices. In this regard, the SEC proposed rules designed to strengthen existing prohibitions relating to late trading and adopted rules to require enhanced disclosure and supervision of market timing policies and pricing. In addition, the SEC proposed and adopted rules requiring additional disclosure concerning portfolio managers, breakpoint discounts on the sale of fund shares, and the process for approving advisory contracts, as well as enhanced periodic reports. The SEC also adopted and proposed additional rules requiring corporate governance changes including the adoption of compliance policies and requiring that funds designate a single chief compliance officer. It is expected that these actions and any additional legislative and regulatory actions taken to address abuses will affect the manner in which funds and their service providers conduct business and could increase fund expenses and therefore adversely affect the profitability of these businesses. As a result of the BlackRock merger, we do not expect that this regulation will have a significant impact on our future operations.

**Research Related Regulation**

Over the previous several years, the research function at integrated broker-dealers has been the subject of substantial regulatory and media attention. As a result of regulatory and legal mandates as well as firm initiatives, we enacted a number of new policies to enhance the quality of our research product including: modifying the compensation system for research analysts; forming a Research Recommendations Committee to review equity analysts' investment recommendations; adopting a new simplified securities rating system; implementing new policies and procedures to comply with all legal requirements, including those limiting communications between equity research analysts and investment banking and other origination personnel; and adding additional disclosures on research reports regarding potential conflicts of interest. We also appointed an independent consultant who identified independent third-party research providers to provide fundamental research on certain companies that we cover. This research has been made available to our clients in the United States beginning in July 2004 in accordance with legal requirements. Under the terms of the global research settlement, in 2005 we appointed an independent monitor who reported on our compliance with the terms of the settlement.

The compensation system for research analysts includes an evaluation of the performance of analysts' recommendations, including the extent to which the analyst's insights and recommendations have benefited investors. The compensation of all analysts responsible for the substance of an equity research report is required to be reviewed and approved by a committee reporting to the Board of Directors of MLPF&S. The Management Development and Compensation Committee of the ML & Co. Board of Directors, a Committee consisting entirely of independent directors, is also required to review this compensation process for consistency with certain legal requirements. The Audit Committee of the ML & Co. Board of Directors is required to review the budget and expense allocation process for research for consistency with the terms of the global research settlement. Our Investment Banking Group has no input into research analyst compensation or the research budget.

The NYSE and the NASD continue to consider and propose changes to regulations relating to equity research and amendments to their rules are expected to be adopted in 2007. Research activities also remain a focus of securities regulators' rulemaking outside the U.S.

**Client Information Regulation**

Broker-dealers and certain other financial institutions are subject to the USA PATRIOT Act of 2001 (the "USA PATRIOT Act"), which amends the Bank Secrecy Act and was designed to detect and deter money laundering and terrorist financing activity. The USA PATRIOT Act requires broker-dealers and other financial institutions to establish anti-money laundering compliance programs which must include

policies and procedures to verify client identity at account opening and to detect and report suspicious transactions to the government. Institutions subject to the USA PATRIOT Act must also implement specialized employee training programs, designate an anti-money laundering compliance officer and submit to independent audits of the effectiveness of the compliance program. We have established policies, procedures and systems designed to comply with these regulations. Among other initiatives, we have adopted a Customer Identification Program in October 2003.

We have also become subject to increasingly comprehensive legal requirements concerning the use and protection of certain client information including those adopted pursuant to the Gramm-Leach-Bliley Act in the United States and the European Union Data Protection Directive in EU countries. Many states have also recently passed new privacy and information security laws. We have adopted additional policies and procedures in response to such requirements and continue to track and respond to new requirements.

## Additional Regulation of Certain U.S. Entities

MLPF&S and ML Pro are registered futures commission merchants and, as such, are regulated by the CFTC and the National Futures Association ("NFA"). The CFTC and the NFA impose net capital requirements on these companies. In addition, these companies are subject to the rules of the futures exchanges and clearing associations of which they are members.

Merrill Lynch Commodities, Inc. ("MLCI") is subject to regulation by the FERC, CFTC and other agencies with respect to certain aspects of its activities. MLCI is also a member of the New York Mercantile Exchange and is subject to its rules.

Merrill Lynch Alternative Investments LLC is registered with the CFTC as a commodity pool operator and a commodity trading advisor and is a member of the NFA in such capacities. IQ Advisors is registered with the CFTC.

MLGSI is subject to regulation by the NASD and, as a member of the Chicago Board of Trade, is subject to the rules of that exchange. It is required to maintain minimum net capital pursuant to rules of the U.S. Department of the Treasury. Merrill Lynch's municipal finance professionals are subject to various trading and underwriting regulations of the MSRB.

MLBT-FSB, a federal savings bank, is subject to regulation by the OTS and the FDIC. Merrill Lynch Credit Corporation is a subsidiary of MLBT-FSB.

MLBUSA is regulated primarily by the UTDFI and the FDIC. Merrill Lynch Business Financial Services Inc., ("MLBFS"), ML Private Finance LLC and Merrill Lynch Commercial Finance Corp. are wholly-owned subsidiaries of MLBUSA, and their activities are regulated and subject to examination by the FDIC and the UTDFI. In addition to the UTDFI and the FDIC, MLBFS is licensed or registered in eight jurisdictions, subjecting it to regulation and examination by the appropriate authorities in those jurisdictions.

Merrill Lynch's insurance subsidiaries are subject to state insurance regulatory supervision. ML Life is subject to regulation and supervision by the New York State Insurance Department. MLLIC is subject to regulation and supervision by the Insurance Department of the State of Arkansas. Both MLLIC and ML Life are subject to similar regulation in the other states in which they are licensed.

MLML is licensed or registered to conduct its commercial mortgage conduit business and its residential mortgage trading business in multiple jurisdictions.

Merrill Lynch Financial Markets, Inc. ("MLFM") is registered with, and received approval in January 2005 from, the SEC to act as an OTC Derivatives Dealer. A special set of SEC rules apply to OTC Derivatives Dealers. MLFM is in an initial stage of operations.

## Non-U.S. Regulatory Oversight and Supervision

Merrill Lynch's business is also subject to extensive regulation by various non-U.S. regulators including governments, securities exchanges, central banks and regulatory bodies. Certain Merrill Lynch subsidiaries are regulated as broker-dealers under the laws of the jurisdictions in which they operate. Subsidiaries engaged in banking and trust activities outside the United States are regulated by various government entities in the particular jurisdiction where they are chartered, incorporated and/or conduct their business activities. In some cases, the legislative and regulatory developments outside the U.S. applicable to these subsidiaries may have a global impact.

MLI is regulated and supervised in the United Kingdom by the FSA and by local regulators in certain other jurisdictions with respect to its branch offices. MLIB is authorized and regulated by the Irish Financial Regulator and by local regulators in certain other jurisdictions with respect to its branch offices and subsidiaries. Merrill Lynch's activities in Australia are regulated by the Australian Securities and Investments Commission or the Australian Prudential Regulatory Authority, and its Hong Kong and Singapore operations are regulated and supervised by the Hong Kong Securities and Futures Commission and the Monetary Authority of Singapore, respectively. Merrill Lynch's Japanese business is subject to the regulation of the JFSA as well as other Japanese regulatory authorities.

Merrill Lynch Bank (Suisse) S.A. is regulated by the Swiss Federal Banking Commission. Merrill Lynch Bank and Trust (Cayman) Limited is regulated by the Cayman Islands Monetary Authority and its international representative office by the Federal Reserve and the Florida Department of Banking.



Merrill Lynch Commodities (Europe) Ltd. ("MLCE") is a member of the International Petroleum Exchange, Nordpool and other exchanges and is subject to their rules. Merrill Lynch Commodities (Europe) Trading Limited ("MLCETL") is regulated in the United Kingdom by the FSA.

Merrill Lynch's activities in Canada, Mexico, Brazil and Argentina are regulated by their respective securities commissions and exchanges as well as other regulatory authorities.

## Legal Proceedings

ML & Co., certain of its subsidiaries, including MLPF&S, and other persons have been named as parties in various legal actions and arbitration proceedings arising in connection with the operation of ML & Co.'s businesses. In most cases, plaintiffs seek unspecified damages and other relief. These actions include the following:

### IPO Allocation Litigation

*In re Initial Public Offering Antitrust Litigation:* Merrill Lynch is named as one of ten defendants in this consolidated class action filed in the United States District Court for the Southern District of New York. The complaint alleges that the defendants and unnamed coconspirators violated antitrust laws by conspiring to "require from customers consideration in addition to the underwriters' discount for allocation of shares of initial public offerings of certain technology companies...and to inflate the aftermarket prices for such securities." On November 3, 2003, the district court granted the defendants' motions to dismiss the complaint on the ground that the conduct was immune from the antitrust laws. On September 28, 2005, the Second Circuit reversed the district court's decision dismissing the case. In December 2006, the United States Supreme Court granted the defendants' petition for certiorari seeking review of the Second Circuit's decision. A decision by the Supreme Court is expected by the end of June 2007.

*In re Initial Public Offering Securities Litigation:* Merrill Lynch has been named as one of the defendants in approximately 110 securities class action complaints alleging that dozens of underwriter defendants, including Merrill Lynch, artificially inflated and maintained the stock prices of the relevant securities by creating an artificially high aftermarket demand for shares. On October 13, 2004, the district court, having previously denied defendants' motions to dismiss, issued an order allowing certain of these cases to proceed against the underwriter defendants as class actions. On December 5, 2006, the Second Circuit Court of Appeals reversed this order, holding that the district court erred in certifying these cases as class actions. Plaintiffs are seeking rehearing by the Second Circuit.

### IPO Underwriting Fee Litigation

*In re Public Offering Fee Antitrust Litigation and In re Issuer Plaintiff Initial Public Offering Fee Antitrust Litigation:* Merrill Lynch is one of approximately two dozen defendants that have been named in purported class actions filed in the United States District Court for the Southern District of New York alleging that underwriters conspired to fix the "fee" paid to purchase certain initial public offering securities at 7% in violation of antitrust laws. These complaints have been filed by both investors and certain issuers in initial public offerings. On September 25, 2002, the court denied defendants' motion to dismiss the issuer claims. On February 24, 2004, the court granted defendants' motion to dismiss the investor claims for damages and penalties, and permitted the case to proceed only with regard to claim for injunctive relief. On July 16, 2006, the Second Circuit Court of Appeals agreed to hear plaintiff's appeal of the district court's decision not to certify a broader class. The parties are awaiting a decision by the Second Circuit.

### Enron Litigation

*Newby v. Enron Corp. et al.:* On April 8, 2002, Merrill Lynch was added as a defendant in a consolidated class action filed in the United States District Court for the Southern District of Texas against 69 defendants purportedly on behalf of the purchasers of Enron's publicly traded equity and debt securities during the period October 19, 1998 through November 27, 2001. The complaint alleges, among other things, that Merrill Lynch engaged in improper transactions in the fourth quarter of 1999 that helped Enron misrepresent its earnings and revenues in the fourth quarter of 1999. The complaint also alleges that Merrill Lynch violated the securities laws in connection with its role as placement agent for and limited partner in an Enron-controlled partnership called LJM2. Plaintiff has argued that certain defendants, including Merrill Lynch, can potentially be liable for all of the losses caused by the alleged misconduct involving Enron, regardless of whether they knew of or participated in that conduct. The district court has denied Merrill Lynch's motions to dismiss, and has certified a class action by Enron shareholders and bondholders against Merrill Lynch and other defendants. On February 5, 2007, the United States Court of Appeals for the Fifth Circuit heard oral argument on Merrill Lynch's appeal of the district court's decision to certify a class action. In that appeal, Merrill Lynch argued that the district court had erred by 1) treating Merrill Lynch as a potential primary violator rather than an aider and abettor, which has no liability under the federal securities laws; 2) holding that plaintiffs could have relied on Merrill Lynch's conduct even though Merrill Lynch believes there has been no showing that such conduct inflated the price of Enron securities, and 3) holding that investment banks, including Merrill Lynch, could be liable for the losses caused by conduct in which they did not participate. Absent relief by the Fifth Circuit, the trial of the case is scheduled to begin on April 16, 2007.