## Other Enron Litigation

Over a dozen other actions have been brought against Merrill Lynch and other investment firms in connection with their Enron-related activities. There has been no adjudication of the merits of these claims.

## Allegheny Energy Litigation

*Merrill Lynch v. Allegheny Energy, Inc.:* On September 24, 2002, Merrill Lynch filed an action in the United States District Court for the Southern District of New York against Allegheny Energy, Inc. The complaint alleged that Allegheny owed Merrill Lynch the final $115 million payment due in connection with Allegheny's purchase of Merrill Lynch's energy trading business and assets in 2001. The following day, Allegheny filed an action against Merrill Lynch in the Supreme Court of the State of New York claiming misrepresentations in connection with Merrill Lynch's sale of the energy trading business to Allegheny. On July 18, 2005, following a bench trial, the court issued a decision holding that Allegheny is required to pay Merrill Lynch $115 million plus interest and that Allegheny is not entitled to any recovery against Merrill Lynch. On September 22, 2005, Allegheny appealed the court's July 18, 2005 decision awarding Merrill Lynch $115 million plus interest on its claim and denying Allegheny any relief on its claim. The parties are awaiting a decision on that appeal.

## Short Sales Litigation

*Electronic Trading Group, LLC v. Banc of America Securities LLC, et al:* On April 12, 2006, a purported class action was filed against eleven financial services firms, including Merrill Lynch, in the United States District Court for the Southern District of New York. The case alleges that the defendants violated federal antitrust laws by charging unearned fees on short sales by their clients even when they failed to borrow and/or deliver stock in support of those short sales. Merrill Lynch is vigorously defending itself against these charges.

*Avenius v. Banc of America Securities LLC, et al:* On June 22, 2006, 37 purchasers of securities of NovaStar Financial filed an action against eleven financial services firms, including Merrill Lynch, in the California Superior Court in San Francisco. The case alleges that the defendants improperly depressed the price of NovaStar Financial shares by facilitating short sales that did not comply with regulatory requirements. Merrill Lynch is vigorously defending itself against these charges.

*Overstock.com, Inc. v. Morgan Stanley & Co., et al:* On February 2, 2007, Overstock.com brought an action in the Superior Court of the State of California, County of San Francisco, against approximately a dozen investment banks, including Merrill Lynch, alleging that they violated state law by improperly facilitating short sales of Overstock.com, which artificially depressed the price of its shares. Merrill Lynch is vigorously defending itself against these charges.

## Bank Sweep Programs Litigation

*DeBlasio v. Merrill Lynch, et al:* On January 12, 2007, a purported class action was brought against Merrill Lynch and three other securities firms in the United States District Court for the Southern District of New York alleging that their bank sweep programs violated state law because their terms were not adequately disclosed to customers. Merrill Lynch believes that the complaint mischaracterizes those disclosures, and that in fact full disclosure was made of the terms of the bank sweep programs. Merrill Lynch intends to move to dismiss the complaint.

## Employment Litigation

*McReynolds v. Merrill Lynch:* On November 18, 2005, a purported class action was filed in the United States District Court for the Northern District of Illinois seeking to certify a class of current and former African American Merrill Lynch employees, as well as African Americans who applied for employment. Plaintiff alleges that the firm has engaged in a pattern and practice of discrimination against African Americans in violation of federal Civil Rights statutes. Merrill Lynch is vigorously contesting these claims.

## Parmalat Litigation

Merrill Lynch Capital Markets Bank Limited is one of dozens of defendants sued in Italy by Dr. Enrico Bondi, the specially appointed administrator of Parmalat Finanziaria S.p.A. ("Parmalat"). Parmalat was admitted into insolvency proceedings in Italy on December 27, 2003. One of the claims against Merrill Lynch Capital Markets Bank Limited is that in 2003 it wrongfully helped Parmalat stay in business, and thus continue to lose money, by buying options from Parmalat prior to Parmalat being admitted into insolvency proceedings. Merrill Lynch is vigorously contesting these claims.

## SwissAir Litigation

Merrill Lynch Capital Markets Bank AG ("MLCMB AG") was one of several defendants sued in Zurich, Switzerland by the Liquidator of SAirGroup ("SwissAir"). The Liquidator claimed that SwissAir lacked authority to enter into certain transactions with MLCMB AG in 1999 and 2000 pursuant to which SwissAir received an economic interest in additional SwissAir shares, and that MLCMB AG should pay the



Liquidator losses on those shares. On March 1, 2006, the commercial court of Zurich declined to dismiss the case on procedural grounds, but did not rule on the substance of any of the claims. In December 2006, the matter was settled for an amount that is confidential and not material to Merrill Lynch's financial statements.

Other

Merrill Lynch has been named as a defendant in various other legal actions, including arbitrations, class actions, and other litigation arising in connection with its activities as a global diversified financial services institution. Some of the legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. In some cases, the issuers that would otherwise be the primary defendants in such cases are bankrupt or otherwise in financial distress. Merrill Lynch is also involved in investigations and/or proceedings by governmental and self-regulatory agencies.

Merrill Lynch believes it has strong defenses to, and where appropriate, will vigorously contest, many of these matters. Given the number of these matters, some are likely to result in adverse judgments, penalties, injunctions, fines, or other relief. Merrill Lynch may explore potential settlements before a case is taken through trial because of the uncertainty, risks, and costs inherent in the litigation process. In accordance with SFAS No. 5, Merrill Lynch will accrue a liability when it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. In many lawsuits and arbitrations, including the class action lawsuits disclosed in ML & Co.'s public filings, it is not possible to determine whether a liability has been incurred or to estimate the ultimate or minimum amount of that liability until the case is close to resolution, in which case no accrual is made until that time. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases in which claimants seek substantial or indeterminate damages, Merrill Lynch cannot predict what the eventual loss or range of loss related to such matters will be. Subject to the foregoing, Merrill Lynch continues to assess these cases and believes, based on information available to it, that the resolution of these matters will not have a material adverse effect on the financial condition of Merrill Lynch as set forth in the Consolidated Financial Statements, but may be material to Merrill Lynch's operating results or cash flows for any particular period and may impact ML & Co.'s credit ratings.

## Properties

Merrill Lynch has offices in various locations throughout the world. Other than those described below as being owned, substantially all Merrill Lynch offices are located in leased premises. Facilities owned or occupied by Merrill Lynch are believed to be adequate for the purposes for which they are currently used and are well maintained. Set forth below is the location and the approximate square footage of the principal facilities of Merrill Lynch. Each of these principal facilities supports various Merrill Lynch business segments. Information regarding Merrill Lynch's property lease commitments is set forth in "Leases" in Note 12 to the Consolidated Financial Statements.

## Principal Facilities in the United States

Merrill Lynch's executive offices and principal administrative offices are located in leased premises at the World Financial Center in New York City. Merrill Lynch affiliates lease portions of 4 World Financial Center (1,800,000 square feet) and 2 World Financial Center (2,500,000 square feet); both leases expire in 2013. Another Merrill Lynch affiliate is a partner in the partnership that holds the ground lessee's interest in 4 World Financial Center. As of December 2006, Merrill Lynch occupied the entire 4 World Financial Center and approximately 20% of 2 World Financial Center.

In New York City, MLPF&S leases 662,000 square feet in lower Manhattan. The lease expires in 2007. Merrill Lynch occupies 91% of a 760,000 square foot building at 222 Broadway, New York that is owned by a Merrill Lynch subsidiary. In New Jersey, a Merrill Lynch affiliate owns a 669,000 square foot office building in Plainsboro. MLPF&S leases 494,000 square feet (reduced to 236,350 square feet after March 2007) at 101 Hudson Street in Jersey City, New Jersey. This lease expires in 2017 unless renewal rights are exercised. A Merrill Lynch affiliate leases and occupies, pursuant to an operating lease with an unaffiliated lessor, 1,251,000 square feet of office space and 273,000 square feet of ancillary buildings in Hopewell, New Jersey. The Merrill Lynch affiliate that is the lessee under such operating lease owns the underlying land upon which the Hopewell facilities are located. Merrill Lynch affiliates own a 54-acre campus in Jacksonville, Florida, with four buildings.

## Principal Facilities Outside the United States

Merrill Lynch occupies various sites in London. Merrill Lynch owns and occupies 100% of its 560,000 square foot London headquarters facility known as Merrill Lynch Financial Centre. In addition to the Merrill Lynch Financial Centre, Merrill Lynch leases approximately 425,473 square feet in other London locations with various terms, the longest of which lasts until 2015. It occupies 203,104 square feet of this space and has either sublet or is currently marketing the remainder. In Tokyo, a Merrill Lynch affiliate leases 280,000 square feet until 2014 for its headquarters.

## Securities Issued Under Merrill Lynch's Equity Compensation Plans

The following table provides information on the shares that are available under Merrill Lynch's equity compensation plans and, in the case of plans where stock options may be granted, the number of shares of common stock issuable upon exercise of those stock options.

Merrill Lynch has five shareholder approved plans — the Long-Term Incentive Compensation Plan for executive officers (for stock grants made to executive officers) ("LTICP-Executive"), the Equity Capital Accumulation Plan (for restricted share grants made to a broad group of employees) ("ECAP"), the Merrill Lynch & Co., Inc. 1986 Employee Stock Purchase Plan ("Employee Stock Purchase Plan"), the Merrill Lynch & Co., Inc. Employee Stock Compensation Plan (for stock grants made to key managers and producers) ("ESCP") and the Merrill Lynch & Co., Inc. Deferred Stock Unit Plan for Non-Employee Directors (for deferred stock unit grants to non-employee directors) ("New Director Plan").

Merrill Lynch has adopted stock compensation plans that are used to compensate non-executive employees — the Financial Advisor Capital Accumulation Award Plan (stock-based compensation to the financial advisor population) ("FACAAP") and the Long-Term Incentive Compensation Plan for Managers and Producers (for stock grants made to key managers and producers) ("LTICP-M&P").

Merrill Lynch provided for the issuance of deferred stock units and non-qualified stock options to the Merrill Lynch non-employee Directors as compensation for their Director services under the Merrill Lynch & Co., Inc. Deferred Stock Unit and Stock Option Plan for Non-Employee Directors ("Old Director Plan"). The New Director Plan was approved by stockholders in 2005 and replaced the Old Director Plan.

The numbers in the table are as of December 29, 2006, the last day of Merrill Lynch's 2006 fiscal year.

| Equity Compensation Plan Category | Securities Issuable Upon Exercise of Outstanding Options, Warrants, and Rights[1] | Weighted-average Exercise Price of Outstanding Options, Warrants and Rights | Securities that Remain Available for Issuance Under Plans |
|---|---|---|---|
| Plans approved by shareholders | 9,202,520 | $53.67 | 107,664,077 |
| Plans not approved by shareholders[2] | 121,354,274 | $52.38 | 46,003,698 |
| Total | 130,556,794 | $52.47 | 153,667,775[3] |

(1) Merrill Lynch also has made the following grants under its stock compensation plans that remain outstanding as of December 29, 2006 and are not included in this column: 35,299,336 units (payable in stock) under FACAAP and 72,003,324 restricted shares and restricted units granted under LTICP-Executive, LTICP-M&P and ESCP. In addition, in January 2007, 16,238,969 restricted shares and 2,773,969 restricted units were granted under both ESCP and LTICP-Executive, 204,998 stock options were granted under LTICP-M&P and 2,753,394 units (payable in stock) were granted under FACAAP.

(2) These plans are: (i) FACAAP, (ii) LTICP-M&P and (iii) the Old Director Plan. The material features of FACAAP, LTICP-M&P and the Old Director Plan are described in Note 14 to the Consolidated Financial Statements included in this Annual Report on Form 10-K. Those descriptions do not purport to be complete and are qualified in their entirety by reference to the plan documents that are exhibits to this Annual Report on Form 10-K.

(3) This amount includes, as of December 29, 2006: 33,114,136 shares available for issuance under LTICP-Executive; 30,636,598 shares available for issuance under LTICP-M&P; 10,830,839 shares available for issuance under ECAP; 22,572,871 shares available for issuance under the Employee Stock Purchase Plan; 15,339,922 shares available for issuance under FACAAP; 940,796 and 26,789 shares available for issuance under the New and Old Director Plans, respectively; and 40,205,824 shares available for issuance under ESCP.

## Unregistered Sales of Equity Securities, Use of Proceeds and Issuer Purchases of Equity Securities

On December 8, 2006, ML & Co. issued 1,222,102 shares of unregistered ML & Co. common stock with an aggregate value on the date of issue of $111 million in connection with its acquisition of Petrie Parkman & Co., Inc. ("Petrie"). The ML & Co. common stock was issued to the former holders of the common stock of Petrie in a private placement exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended, and is subject to an escrow arrangement. The exemption from registration was based on, among other things, the nature of former holders of the common stock of Petrie who received ML & Co. common stock and on the representations such persons made to Merrill Lynch in the Agreement and Plan of Merger dated as of October 22, 2006. Under the escrow arrangement, subject to the satisfaction of certain post-closing conditions and indemnity obligations, 50% of the stock will be released eighteen months after the closing date, with the remainder to be released 36 months after the closing date. ML & Co. does not plan to file a registration statement under the Securities Act of 1933 to register the resale of the ML & Co. shares by the counterparties.

Refer to Management's Discussion and Analysis of Financial Condition and Results of Operations — Capital and Funding — Equity Capital for details on purchases made by or on behalf of us or any "affiliated purchaser" of our common stock for the year ended December 29, 2006.



## Executive Officers of Merrill Lynch & Co., Inc.

The following list sets forth the name, age, present title, principal occupation and certain biographical information for ML & Co.'s executive officers, all of whom have been elected by the ML & Co. Board of Directors. Unless otherwise indicated, the officers listed are of ML & Co. Under ML & Co.'s By-Laws, elected officers are elected annually to hold office until their successors are elected and qualify or until their earlier resignation or removal.

**E. Stanley O'Neal (55)** Chairman of the Board since April 2003; Chief Executive Officer since December 2002; President and Chief Operating Officer since July 2001; Executive Vice President from April 1997 to July 2001; President of U.S. Private Client (now a part of Global Private Client) from February 2000 to July 2001; Chief Financial Officer from March 1998 to February 2000.

**Rosemary T. Berkery (53)** Executive Vice President since October 2001; General Counsel since September 2001; Senior Vice President and Head of U.S. Private Client (now a part of Global Private Client) Marketing and Investments from June 2000 to September 2001; Co-Director of Global Securities Research & Economics Group from April 1997 to June 2000.

**Jeffrey N. Edwards (45)** Senior Vice President since April 2005; Chief Financial Officer since March 2005; Senior Vice President and Head of Investment Banking for Americas region from September 2004 to March 2005; Head of Global Capital Markets and Financing from August 2003 to September 2004; Co-Head of Global Equity Markets (covering trading, sales and origination activities) from October 2001 to August 2003; prior to that, in March 2000, appointed Co-Head of Global Equity Capital Markets.

**Ahmass L. Fakahany (48)** Executive Vice President since December 2002; Vice Chairman and Chief Administrative Officer since March 2005; Chief Financial Officer from November 2002 to March 2005; Chief Operating Officer for Global Markets and Investment Banking ("GMI") from October 2001 to November 2002; Senior Vice President and Finance Director from December 1998 to October 2001.

**Gregory J. Fleming (44)** Executive Vice President since October 2003; President of GMI since August 2003; Chief Operating Officer of the Global Investment Banking Group of GMI from January 2003 to August 2003; Co-Head of the Global Financial Institutions Group of GMI from April 2001 to August 2003; Head of the United States Financial Institutions Group of GMI from June 1999 to April 2001; Managing Director of the Global Investment Banking Group of GMI from February 1999 to October 2003.

**Dow Kim (44)** Executive Vice President since October 2003; President of GMI since August 2003; Head of the Global Debt Markets Group of GMI from October 2001 to August 2003; Managing Director and Head of Global Enterprise Risk Management within the Global Debt Markets Group of GMI from April 2000 to October 2001; Head of the Fixed Income business in Japan from July 1997 to March 2000.

**Robert J. McCann (48)** Executive Vice President since August 2003; Vice Chairman and President of Global Private Client since June 2005; Vice Chairman, Wealth Management Group from August 2003 to June 2005; Vice Chairman and Director of Distribution and Marketing for AXA Financial Inc. from March 2003 to August 2003; Head of the Global Securities Research & Economics Group of Merrill Lynch from October 2001 to March 2003; Chief Operating Officer of GMI from September 2000 to October 2001; Head of the Global Institutional Client Division of GMI from August 1998 to September 2000.

# Corporate Information

## Common Stock

### Exchange Listings

Our common stock (trading symbol MER) is listed on the New York Stock Exchange, the Chicago Stock Exchange, the London Stock Exchange and the Tokyo Stock Exchange.

### Transfer Agent and Registrar

Wells Fargo Bank, N.A. is the recordkeeping transfer agent for Merrill Lynch & Co., Inc. common stock. Questions from registered shareholders on dividends, lost or stolen certificates, the transfer of their physical stock certificates, direct registration of common stock, changes of legal or dividend addresses and other matters relating to registered shareholder status should be directed to:

Wells Fargo Bank, N.A.
Shareowner Services
161 North Concord Exchange
South St. Paul, MN 55075
1-888-460-7641

## Preferred Stock

### Exchange Listing

Depositary Shares representing 1/1200 of a share of Floating Rate Non-Cumulative Preferred Stock, Series 1, Depositary Shares representing 1/1200 of a share of Floating Rate Non-Cumulative Preferred Stock, Series 2, Depositary Shares representing 1/1200 of a share of 6.375% Non-Cumulative Preferred Stock, Series 3, and Depositary Shares representing 1/1200 of a share of Floating Rate Non-Cumulative Preferred Stock, Series 4, are listed on the New York Stock Exchange.

### Transfer Agent and Registrar

The Bank of New York
101 Barclay Street
New York, NY 10286
Attn: Corporate Trust Administration

**Form 10-K Annual Report for 2006** For copies of our 2006 Annual Report on Form 10-K (including financial schedules but excluding other exhibits), visit our Investor Relations website at www.ir.ml.com or write to Judith A. Witterschein, Corporate Secretary, Merrill Lynch & Co., Inc., 222 Broadway, 17th Floor, New York, NY 10038-2510.

**Equal Employment Opportunity** We are fully committed to Equal Employment Opportunity and to attracting, retaining, developing and promoting the most qualified employees regardless of race, national origin, religion, sexual orientation, gender, age, disability or veteran status or any other characteristic prohibited by state or local law. For more information, write to Judith A. Witterschein, Corporate Secretary, Merrill Lynch & Co., Inc., 222 Broadway, 17th Floor, New York, NY 10038-2510.

**Charitable Contributions** A summary of our charitable contributions is available on our Global Philanthropy website at www.ml.com/philanthropy or upon written request to Judith A. Witterschein, Corporate Secretary, Merrill Lynch & Co., Inc., 222 Broadway, 17th Floor, New York, NY 10038-2510.

**Annual Meeting** The 2007 Annual Meeting of Merrill Lynch & Co., Inc. shareholders will take place at the Merrill Lynch Hopewell Campus, 1550 Merrill Lynch Drive, Hopewell, New Jersey. The meeting is scheduled for April 27, 2007, at 10:00 a.m. Eastern Time.

**Corporate Governance** We have long adhered to best practices in corporate governance in fulfillment of our responsibilities to shareholders. Our practices align management and shareholder interests. Highlights of our corporate governance practices include:

- A Board of Directors composed of twelve directors — eleven of whom are independent — and Board Committees composed solely of independent directors;
- Corporate Governance Guidelines that set forth specific criteria for director qualifications, Board and Board Committee composition, director responsibilities, orientation and education requirements and annual Board self-evaluation;
- Director Independence Standards adopted by the Board of Directors to form the basis of director independence determinations required by NYSE rules;
- Charters for each of our Board Committees reflecting current best corporate governance practices;
- Guidelines for Business Conduct adopted by the Board of Directors as our code of ethics for our directors, officers and employees and supplemented by our Code of Ethics for Financial Professionals;
- Designation of two Audit Committee members as audit committee financial experts in accordance with SEC regulations; and
- A formal disclosure committee composed of senior officers for the purpose of implementing, monitoring and evaluating our disclosure controls and procedures.

Our Corporate Governance Guidelines, Director Independence Standards, charters for our Board Committees, Guidelines for Business Conduct, Related Party Transactions Policy and Code of Ethics for Financial Professionals are available on our Investor Relations website at www.ir.ml.com. Shareholders may obtain copies of these materials, free of charge, upon written request to Judith A. Witterschein, Corporate Secretary, Merrill Lynch & Co., Inc., 222 Broadway, 17th Floor, New York, NY 10038-2510.

We have included as exhibits to our Annual Report on Form 10-K for the 2006 fiscal year filed with the Securities and Exchange Commission certificates of our Chief Executive Officer and Chief Financial Officer certifying the quality of our public disclosure. We have submitted to the New York Stock Exchange a certificate of our Chief Executive Officer certifying that he is not aware of any violation by Merrill Lynch of their corporate governance listing standards.

www.ml.com

**EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

**Documents filed as part of this Report:**

1.  Consolidated Financial Statements
    The consolidated financial statements required to be filed in this Annual Report on Form 10-K are listed on page 19
2.  Financial Statement Schedule
    The financial statement schedule required to be filed in this Annual Report on Form 10-K is listed on Exhibit 99.9.
    The schedule also appears in Exhibit 99.9 and is incorporated herein by reference.
3.  Exhibits
    An exhibit index has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

# 10-K CROSS-REFERENCE INDEX

This Annual Report on Form 10-K incorporates the requirements of the accounting profession and the Securities and Exchange Commission, including a comprehensive explanation of 2006 results.

**Item Number**  ·  **Page**

**Part I**

1. Business — 21-22, 24-129, 132-135, 137
1A. Risk Factors — 23-24
1B. Unresolved Staff Comments — None
2. Properties — 137
3. Legal Proceedings — 135-137
4. Submission of Matters to a Vote of Security Holders — Not Applicable

**Part II**

5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities — 45-46, 130-131, 138
6. Selected Financial Data — 20
7. Management's Discussion and Analysis of Financial Condition and Results of Operations — 21-66
7A. Quantitative and Qualitative Disclosures about Market Risk — 51-61, 96-99
8. Financial Statements and Supplementary Data — 69-130
9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure — Not Applicable
9A. Controls and Procedures — 67-68
9B. Other Information — Not Applicable

**Part III**

10. Directors, Executive Officers and Corporate Governance — 21, 139*
11. Executive Compensation — **
12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters — 138***
13. Certain Relationships and Related Transactions, and Director Independence — ****
14. Principal Accounting Fees and Services — *****

**Part IV**

15. Exhibits and Financial Statement Schedules — 141, E-1-E-4
SIGNATURES — 143

\*    For additional information regarding Directors, see the material under the captions "Election of Directors," "CORPORATE GOVERNANCE," and "OTHER MATTERS" in the definitive Proxy Statement for Merrill Lynch's Annual Meeting of Stockholders to be held on April 27, 2007, to be filed with the SEC (Proxy Statement), incorporated herein by reference.

\*\*   See the material under the captions "DIRECTOR COMPENSATION" and "EXECUTIVE COMPENSATION" in the Proxy Statement, incorporated herein by reference.

\*\*\*  See also the material under the caption "BENEFICIAL OWNERSHIP OF OUR COMMON STOCK" in the Proxy Statement, incorporated herein by reference.

\*\*\*\* See the material under the captions "CORPORATE GOVERNANCE" and "Certain Relationships and Transactions" in the Proxy Statement, incorporated herein by reference.

\*\*\*\*\* See the material under the captions "Pre-Approval of Services Provided by Our Independent Registered Public Accounting Firm" and "Fees Paid to Our Independent Registered Public Accounting Firm" in the Proxy Statement, incorporated herein by reference.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on the 26th day of February 2007.

**Merrill Lynch & Co., Inc.**
**Registrant**

| | | |
|---|---|---|
| JUDITH A. WITTERSCHEIN | **/s/  Judith A. Witterschein** | |
| | **Judith A. Witterschein**<br>**Secretary** | |

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant in the capacities indicated on the 26th day of February 2007.

| | |
|---|---|
| E. STANLEY O'NEAL | **/s/  E. Stanley O'Neal** |
| | **E. Stanley O'Neal**<br>**Director, Chairman of the Board and Chief Executive Officer**<br>**(Principal Executive Officer)** |
| JEFFREY N. EDWARDS | **/s/  Jeffrey N. Edwards** |
| | **Jeffrey N. Edwards**<br>**Senior Vice President and Chief Financial Officer**<br>**(Principal Financial Officer)** |
| LAURENCE A. TOSI | **/s/  Laurence A. Tosi** |
| | **Laurence A. Tosi**<br>**Senior Vice President and Finance Director**<br>**(Principal Accounting Officer)** |

| | |
|---|---|
| ARMANDO M. CODINA | **/s/  Armando M. Codina** |
| | **Armando M. Codina**<br>**Director** |
| VIRGIS W. COLBERT | **/s/  Virgis W. Colbert** |
| | **Virgis W. Colbert**<br>**Director** |
| JILL K. CONWAY | **/s/  Jill K. Conway** |
| | **Jill K. Conway**<br>**Director** |
| ALBERTO CRIBIORE | **/s/  Alberto Cribiore** |
| | **Alberto Cribiore**<br>**Director** |
| JOHN D. FINNEGAN | **/s/  John D. Finnegan** |
| | **John D. Finnegan**<br>**Director** |
| JUDITH MAYHEW JONAS | **/s/  Judith Mayhew Jonas** |
| | **Judith Mayhew Jonas**<br>**Director** |
| DAVID K. NEWBIGGING | **/s/  David K. Newbigging** |
| | **David K. Newbigging**<br>**Director** |
| AULANA L. PETERS | **/s/  Aulana L. Peters** |
| | **Aulana L. Peters**<br>**Director** |
| JOSEPH W. PRUEHER | **/s/  Joseph W. Prueher** |
| | **Joseph W. Prueher**<br>**Director** |
| ANN N. REESE | **/s/  Ann N. Reese** |
| | **Ann N. Reese**<br>**Director** |
| CHARLES O. ROSSOTTI | **/s/  Charles O. Rossotti** |
| | **Charles O. Rossotti**<br>**Director** |

# EXHIBIT INDEX

Certain exhibits were previously filed by Merrill Lynch as exhibits to other reports or registration statements and are incorporated herein by reference as indicated parenthetically below. ML & Co.'s Exchange Act file number is 001-07182. For convenience, Quarterly Reports on Form 10-Q, Annual Reports on Form 10-K, Current Reports on Form 8-K and Registration Statements on Form S-3 are designated herein as "10-Q," "10-K," "8-K" and "S-3," respectively.

**Plan of Acquisition, Reorganization, Arrangement, Liquidation or Succession**

2        Transaction Agreement and Plan of Merger, dated February 15, 2006, by and among Merrill Lynch & Co., Inc., BlackRock Inc., New Boise, Inc. and Boise Merger Sub, Inc. (Exhibit 2.1 to 8-K dated February 22, 2006).

**Articles of Incorporation and By-Laws**

3.1      Restated Certificate of Incorporation of ML & Co., effective as of May 3, 2001 (Exhibit 3.1 to 8-K dated November 14, 2005).

3.2      Certificate of Designations for ML & Co. Floating Rate Non-Cumulative Preferred Stock, Series 1, par value $1.00 per share, effective as of October 25, 2004 (Exhibit 3.2 and 4.1 to 8-K dated November 14, 2005).

3.3      Certificate of Designations for ML & Co. Floating Rate Non-Cumulative Preferred Stock, Series 2, par value $1.00 per share, effective as of March 9, 2005 (Exhibit 3.3 and 4.2 to 8-K dated November 14, 2005).

3.4      Certificate of Designations for ML & Co. 6.375% Non-Cumulative Preferred Stock, Series 3, par value $1.00 per share, effective as of November 14, 2005 (Exhibit 3.4 and 4.3 to 8-K dated November 14, 2005).

3.5      Certificate of Designations for ML & Co. Floating Rate Non-Cumulative Preferred Stock, Series 4, par value $1.00 per share, effective as of November 14, 2005 (Exhibit 3.5 and 4.4 to 8-K dated November 14, 2005).

3.6      Restated By-Laws of ML & Co., effective as of December 11, 2006 (Exhibit 3.1 to 8-K dated December 12, 2006).

**Instruments Defining the Rights of Security Holders, Including Indentures**

ML & Co. hereby undertakes to furnish to the SEC, upon request, copies of any agreements not filed defining the rights of holders of long-term debt securities of ML & Co., none of which authorize an amount of securities that exceed 10% of the total assets of ML & Co.

4.1      Senior Indenture, dated as of April 1, 1983, as amended and restated as of April 1, 1987, between ML & Co. and The Bank of New York[1], as Trustee ("1983 Senior Indenture") and the Supplemental Indenture thereto dated as of March 15, 1990 (filed as Exhibit 4(i) to 10-K for fiscal year ended December 29, 1999 ("1999 10-K")).

4.2      Sixth Supplemental Indenture to the 1983 Senior Indenture, dated as of October 25, 1993, between ML & Co. and The Bank of New York (filed as Exhibit 4(ii) to 1999 10-K).

4.3      Twelfth Supplemental Indenture to the 1983 Senior Indenture, dated as of September 1, 1998, between ML & Co. and The Bank of New York (filed as Exhibit 4(a) to 8-K dated October 21, 1998).

4.4      Fifteenth Supplemental Indenture to the 1983 Senior Indenture, dated as of October 14, 2003, between ML & Co. and The Bank of New York (filed as Exhibit 4(b)(ix) to S-3 (file no. 333-109802)).

4.5      Senior Indenture, dated as of October 1, 1993 between ML & Co. and The Bank of New York ("1993 Senior Indenture") (filed as Exhibit(4)(iv) to 10-K for fiscal year ended December 25, 1998 ("1998 10-K")).

4.6      First Supplemental Indenture to the 1993 Senior Indenture, dated as of June 1, 1998, between ML & Co. and The Bank of New York (filed as Exhibit 4(a) to 8-K dated July 2, 1998).

4.7      Form of Subordinated Debenture Indenture, dated as of December 17, 1996, between ML & Co. and The Bank of New York ("1996 Subordinated Indenture") (filed as Exhibit 4.7 to S-3 (file no. 333-16603).

4.8      Supplemental Indenture to the 1996 Subordinated Indenture, dated as of May 16, 2006, between ML & Co. and The Bank of New York (filed as Exhibit 4(a) to ML & Co.'s Report on Form 8-K dated May 16, 2006).

4.9      Indenture, dated as of May 23, 2001, between ML & Co. and The Bank of New York relating to ML & Co.'s Liquid Yield Option™ Notes due 2031 (Zero Coupon — Senior) (filed as Exhibit 4.4 to 10-Q for the quarter ended September 24, 2004 ("Third Quarter 2004 10-Q").

4.10     First Supplemental Indenture, dated as of November 1, 2004, between ML & Co. and The Bank of New York relating to ML & Co.'s Liquid Yield Option™ Notes due 2031 (Zero Coupon — Senior) (filed as Exhibit 4.5 to Third Quarter 2004 10-Q).

4.11     Second Supplemental Indenture, dated as of November 9, 2004, between ML & Co. and The Bank of New York relating to ML & Co.'s Liquid Yield Option™ Notes due 2031 (Zero Coupon — Senior) (filed as Exhibit 4 to 8-K dated November 10, 2004).

4.12     Indenture, dated as of March 13, 2002, between ML & Co. and The Bank of New York relating to ML & Co.'s Liquid Yield Option™ Notes due 2032 (Zero Coupon — Floating Rate — Senior) (filed as Exhibit 4.6 to Third Quarter 2004 10-Q).

---

[1] As used in this section of this Report, "The Bank of New York" means The Bank of New York, a New York banking corporation and successor to the corporate trust business of JPMorgan Chase Bank, N.A., the entity formerly known as JPMorgan Chase Bank, The Chase Manhattan Bank and Chemical Bank (successor by merger to Manufacturers Hanover Trust Company).

4.13    First Supplemental Indenture, dated as of November 1, 2004, between ML & Co. and The Bank of New York relating to ML & Co.'s Liquid Yield Option ™ Notes due 2032 (Zero Coupon — Floating Rate — Senior) (filed as Exhibit 4.7 to Third Quarter 2004 10-Q).

4.14    Indenture, dated as of December 14, 2004, between ML & Co. and The Bank of New York, relating to ML & Co.'s Exchange Liquid Yield Option™ Notes due 2032 (Zero Coupon — Floating Rate — Senior) (filed as Exhibit 4(a)(vii) to S-3 (file no. 333-122639)).

4.15    Deposit Agreement, dated as of November 1, 2004, between ML & Co., The Bank of New York, as Depositary, and the holders from time to time of the Floating Rate Non-Cumulative Preferred Stock, Series 1 depositary shares of ML & Co. (Form of Deposit Agreement filed as Exhibit 2 to Form 8-A dated October 26, 2004).

4.16    Deposit Agreement, dated as of March 14, 2005, between ML & Co., The Bank of New York, as Depositary, and the holders from time to time of the Floating Rate Non-Cumulative Preferred Stock, Series 2 depositary shares of ML & Co. (Form of Deposit Agreement filed as Exhibit 2 to Form 8-A dated March 11, 2005).

4.17    Deposit Agreement, dated as of November 17, 2005, between ML & Co., The Bank of New York, as Depositary, and the holders from time to time of the 6.375% Non-Cumulative Preferred Stock, Series 3 depositary shares of ML & Co. (Form of Deposit Agreement filed as Exhibit 2 to Form 8-A dated November 14, 2005).

4.18    Deposit Agreement, dated as of November 17, 2005, between ML & Co., The Bank of New York, as Depositary, and the holders from time to time of the Floating Rate Non-Cumulative Preferred Stock, Series 4 depositary shares of ML & Co. (Form of Deposit Agreement filed as Exhibit 2 to Form 8-A dated November 14, 2005).

4.19    Form of Amended and Restated Rights Agreement dated as of December 2, 1997, between ML & Co. and Wells Fargo Bank, N.A. (successor to Mellon Investor Services, L.L.C.) (filed as Exhibit 4 to 8-K dated December 2, 1997).

## Material Contracts

10.1†    ML & Co. Equity Capital Accumulation Plan, as amended through July 26, 1999 (Exhibit 10(iii) to 10-Q for the quarter ended June 25, 1999).

10.2†    Written description of retirement program for non-employee directors (pages 29 and 30 of ML & Co.'s Proxy Statement for the 2006 Annual Meeting of Shareholders contained in ML & Co.'s Schedule 14A filed on March 10, 2006).

10.3†    Form of Severance Agreement between ML & Co. and certain of its directors and executive officers (Exhibit 10.3 to 10-K for the fiscal year ended December 31, 2004).

10.4    Form of Indemnification Agreement entered into with all current directors of ML & Co. and to be entered into with all future directors of ML & Co. (Exhibit 10(viii) to 1998 10-K).

10.5†    Written description of ML & Co.'s incentive compensation programs (Exhibit 10(ix) to 1998 10-K).

10.6†    Written description of ML & Co.'s compensation policy for directors and executive officers (pages 28 to 30 and pages 37 to 47 of ML & Co.'s Proxy Statement for the 2006 Annual Meeting of Shareholders contained in ML & Co.'s Schedule 14A filed on March 10, 2006).

10.7    Form of Amended and Restated Agreement of Limited Partnership of Merrill Lynch KECALP L.P. 1994 (Exhibit(a)(ii) to Registration Statement on Form N-2 (file No. 333-51825)).

10.8    Form of Amended and Restated Agreement of Limited Partnership of Merrill Lynch KECALP L.P. 1997 (Exhibit(a)(ii) to Registration Statement on Form N-2 (file No. 333-15035)).

10.9    Form of Amended and Restated Agreement of Limited Partnership of Merrill Lynch KECALP L.P. 1999 (Exhibit(a)(ii) to Registration Statement on Form N-2 (file No. 333-59143)).

10.10†    ML & Co. Deferred Restricted Unit Plan for Executive Officers (Exhibit 10(xxiii) to 10-K for fiscal year ended December 27, 1996 ("1996 10-K")).

10.11†    Amendment dated February 12, 1998 to the ML & Co. Deferred Restricted Unit Plan for Executive Officers (Exhibit 10.32 to 10-K for the fiscal year ended December 26, 1997 ("1997 10-K")).

10.12†    ML & Co. Fee Deferral Plan for Non-Employee Directors, as amended through April 15, 1997 (Exhibit 10 to 10-Q for the quarter ended March 28, 1997).

10.13†    Form of ML & Co. Amended and Restated 1994 Deferred Compensation Agreement for a Select Group of Eligible Employees, as amended through November 10, 1994 (Exhibit 10(ii) to 1999 10-K).

10.14†    ML & Co. 1995 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(xix) to 1999 10-K).

10.15†    ML & Co. 1996 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(i) to 10-Q for the quarter ended September 29, 1995).

10.16†    ML & Co. 1997 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(xxvii) to 1996 10-K).

10.17†    ML & Co. 1998 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(i) to 10-Q for the quarter ended September 26, 1997).

10.18†    ML & Co. 1999 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10 to 10-Q for the quarter ended September 25, 1998).

10.19†  ML & Co. 2000 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(xxiv) to 1999 10-K).

10.20†  ML & Co. 2001 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(xxiii) to 10-K for the fiscal year ended December 28, 2001 ("2001 10-K").

10.21†  ML & Co. 2002 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(xxv) to 2001 10-K).

10.22†  ML & Co. 2003 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10.26 to 10-K for the fiscal year ended December 27, 2002 ("2002 10-K")).

10.23†  ML & Co. 2004 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10 to 10-Q for the quarter ended September 26, 2003).

10.24†  ML & Co. 2005 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10 to 8-K dated October 8, 2004).

10.25†  ML & Co. 1997 KECALP Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10(i) to 10-Q for the quarter ended June 27, 1997).

10.26†  Amendment dated September 18, 1996 to Deferred Compensation Plans (amending the Amended and Restated 1994 Deferred Compensation Agreement for a Select Group of Eligible Employees, the ML & Co. 1995 Deferred Compensation Plan for a Select Group of Eligible Employees and the ML & Co. 1996 Deferred Compensation Plan for a Select Group of Eligible Employees) (Exhibit 10(xxxii) to 1996 10-K).

10.27†  Amendment dated February 12, 1998 to the ML & Co. Deferred Compensation Plans for a Select Group of Eligible Employees for the years 1994, 1995, 1996 and 1997 (Exhibit 10.31 to 1997 10-K).

10.28†  Merrill Lynch Financial Advisor Capital Accumulation Award Plan (Exhibit 10.30 to 2002 10-K).

10.29†  ML & Co. Deferred Stock Unit and Stock Option Plan for Non-Employee Directors (Exhibit 10.32 to 10-K for the fiscal year ended December 26, 2003).

10.30†  ML & Co. Long-Term Incentive Compensation Plan for Managers and Producers, as amended April 27, 2001 (Exhibit 10(xxx) to 2001 10-K).

10.31†  ML & Co. Long-Term Incentive Compensation Plan for executive officers, as amended April 27, 2001 (Exhibit 10(i) to 10-Q for the quarter ended June 29, 2001).

10.32†  Form of Executive Annuity Agreement by and between ML & Co. and certain of its high level senior executive officers (Exhibit 10(xxxii) to 2001 10-K).

10.33†  ML & Co. Employee Stock Compensation Plan (Exhibit C to ML & Co.'s Proxy Statement for the 2003 Annual Meeting of Shareholders contained in ML & Co.'s Schedule 14A filed on March 14, 2003).

10.34†  Form of grant document for executive officers under the ML & Co. Long-Term Incentive Compensation Plan (Exhibit 10.1 to 10-Q for the quarter ended September 24, 2004).

10.35†  Form of Restricted Covenant Agreement between ML & Co. and its executive officers (Exhibit 10 to 8-K dated September 17, 2004).

10.36†  ML & Co. Deferred Stock Unit Plan For Non-Employee Directors (Exhibit A to ML & Co.'s Proxy Statement for the 2005 Annual Meeting of Shareholders contained in ML & Co.'s Schedule 14A filed on March 15, 2005).

10.37†  ML & Co. 2006 Deferred Compensation Plan for a Select Group of Eligible Employees (Exhibit 10 to Registration Statement on Form S-8 (file No. 333-125109)).

10.38†  Form of grant document under ML & Co. Managing Partner Incentive Program (Exhibit 10 to 8-K dated January 23, 2006).

10.39†*  ML&Co. 2007 Deferred Compensation Plan for a Select Group of Eligible Employees.

11  Statement re: computation of earnings per common share (the calculation of per share earnings is in Part II, Item 8, Note 11 to the Consolidated Financial Statements (Stockholders' Equity and Earnings Per Share) and is omitted in accordance with Section(b)(11) of Item 601 of Regulation S-K).

12*  Statement re: computation of ratios.

14.1  ML & Co. Guidelines for Business Conduct: Merrill Lynch's Code of Ethics for Directors, Officers and Employees (Exhibit 14.1 to 10-K for the fiscal year ended December 30, 2005).

14.2  ML & Co. Code of Ethics for Financial Professionals (Exhibit 99.1 to 10-Q for the quarter ended September 26, 2003).

21*  Subsidiaries of ML & Co.

23*  Consent of Independent Registered Public Accounting Firm, Deloitte & Touche LLP.

31.1*  Rule 13a-14(a) Certification of the Chief Executive Officer.

31.2*  Rule 13a-14(a) Certification of the Chief Financial Officer.

32.1*  Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

32.2*  Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

**Additional Exhibits**

99.1*    Reconciliation of Non-GAAP Measures.

99.2*    Report of Independent Registered Public Accounting Firm, Deloitte & Touche LLP, with respect to the information set forth in Exhibit 12 under the captions "Ratio of Earnings to Fixed Charges" and "Ratio of Earnings to Combined Fixed Charges and Preferred Stock Dividends".

99.3*    Report of Independent Registered Public Accounting Firm, Deloitte & Touche LLP, with respect to information set forth in the "Selected Financial Data" table set forth in this Report.

99.4    Charter of the Audit Committee of the ML & Co. Board of Directors (Exhibit 99.3 to 10-K for the fiscal year ended December 30, 2005).

99.5    Charter of the Finance Committee of the ML & Co. Board of Directors (Exhibit 99.4 to 10-K for the fiscal year ended December 30, 2005).

99.6    Charter of the Management Development and Compensation Committee of the ML & Co. Board of Directors (Exhibit 99.5 to our 10-K for the fiscal year ended December 30, 2005).

99.7    Charter of the Nominating and Corporate Governance Committee of the ML & Co. Board of Directors (Exhibit 99.6 to our 10-K for the fiscal year ended December 30, 2005).

99.8    Charter of the Public Policy and Responsibility Committee of the ML & Co. Board of Directors (Exhibit 99.1 to 10-Q for the quarter ended June 27, 2003).

99.9*    Condensed Financial Information of Registrant Merrill Lynch & Co., Inc. (Parent Company Only).

*    Filed herewith

†    Management contract or compensatory plan or arrangement

Exhibit 10.39

Exhibit 10.39

**MERRILL LYNCH & CO., INC.**

**2007 DEFERRED COMPENSATION PLAN**

**FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES**

**DATED AS OF MAY 24, 2006**

**THIS DOCUMENT CONSTITUTES PART OF A PROSPECTUS COVERING SECURITIES THAT HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933.**

**MERRILL LYNCH & CO., INC.**
**2007 DEFERRED COMPENSATION PLAN**
**FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES**

**Table of Contents**

| | Page |
|---|---|
| I. GENERAL | 1 |
| 1.1  Purpose and Intent | 1 |
| 1.2  Definitions | 1 |
| II. ELIGIBILITY | 5 |
| 2.1  Eligible Employees | 5 |
| (a)  General Rule | 5 |
| (b)  Individuals First Employed During Election Year or Plan Year | 5 |
| (c)  Disqualifying Factors | 5 |
| III. DEFERRAL ELECTIONS; ACCOUNTS | 5 |
| 3.1  Deferral Elections | 5 |
| (a)  Timing and Manner of Making of Elections | 5 |
| (b)  Irrevocability of Deferral Election | 5 |
| (c)  Application of Election | 6 |
| 3.2  Crediting to Accounts | 6 |
| (a)  Initial Deferrals | 6 |
| (b)  Private Fund Return Options | 6 |
| 3.3  Minimum Requirements for Deferral | 6 |
| 3.4  Return Options; Adjustment of Accounts | 6 |
| (a)  Selection of Mutual Fund Return Option and Income Builder Return Option | 6 |
| (b)  Selection of Private Fund Return Option | 7 |
| (c)  Adjustments of Income Builder Return Option and Other Special Rules | 7 |
| (d)  Adjustment of Mutual Fund Return Balances | 7 |
| (e)  Adjustment of Private Fund Return Options | 8 |
| (f)  Annual Charge | 8 |
| (g)  Rollover Option | 9 |
| IV. STATUS OF DEFERRED AMOUNTS AND ACCOUNT | 9 |
| 4.1  No Trust or Fund Created; General Creditor Status | 9 |
| 4.2  Non-Assignability | 9 |
| 4.3  Effect of Deferral on Benefits Under Pension and Welfare Benefit Plans | 9 |

|  |  | Page |
|---|---|---|
| V. | PAYMENT OF ACCOUNT | 10 |
| 5.1 | Manner of Payment | 10 |
| 5.2 | Termination of Employment | 10 |
| (a) | Death, Retirement, Rule of 60 | 10 |
| (b) | Other Termination of Employment; Treatment of Key Employees | 10 |
| (c) | Leave of Absence, Transfer or Disability | 11 |
| 5.3 | Withholding of Taxes | 11 |
| 5.4 | Beneficiary | 11 |
| (a) | Designation of Beneficiary | 11 |
| (b) | Change in Beneficiary | 11 |
| (c) | Default Beneficiary | 11 |
| (d) | If the Beneficiary Dies During Payment | 11 |
| 5.5 | Distributions Upon Unforeseeable Emergency | 11 |
| 5.6 | Domestic Relations Orders | 12 |
| 5.7 | No Actions Permitted that Would Cause Constructive Receipt or Violate Section 409A of the Code | 12 |
| VI. | ADMINISTRATION OF THE PLAN | 12 |
| 6.1 | Powers of the Administrator | 12 |
| 6.2 | Grantor Trust | 13 |
| 6.3 | Payments on Behalf of an Incompetent | 13 |
| 6.4 | No Right of Set Off | 13 |
| 6.5 | Corporate Books and Records Controlling | 13 |
| VII. | MISCELLANEOUS PROVISIONS | 13 |
| 7.1 | Litigation | 13 |
| 7.2 | Headings Are Not Controlling | 13 |
| 7.3 | Governing Law | 13 |
| 7.4 | Amendment and Termination | 14 |

MERRILL LYNCH & CO., INC.
2007 DEFERRED COMPENSATION PLAN
FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

ARTICLE I
GENERAL

**1.1  Purpose and Intent.**

The purpose of the Plan is to encourage the employees who are integral to the success of the business of the Company to continue their employment by providing them with flexibility in meeting their future income needs. This Plan is unfunded and maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees within the meaning of Title I of ERISA, and all decisions concerning who is to be considered a member of that select group and how this Plan shall be administered and interpreted shall be consistent with this intention.

**1.2  Definitions.**

For the purpose of the Plan, the following terms shall have the meanings indicated.

"Account" means the notional account established on the books and records of ML & Co. for each Participant to record the Participant's interest under the Plan.

"Account Balance" means, as of any date, the Deferred Amounts credited to a Participant's Account, adjusted in accordance with Section 3.4 to reflect the performance of the Participant's Selected Benchmark Return Options, the Annual Charge, the Debit Balance, (if any) any adjustments in the event of a Capital Call Default, and any payments made from the Account under Article V to the Participant prior to that date.

"Adjusted Compensation" means the financial advisor incentive compensation, account executive incentive compensation or estate planning and business insurance specialist incentive compensation, in each case exclusive of base salary, earned by a Participant during the Fiscal Year ending in 2007, and payable after January 1, 2007, as a result of the Participant's production credit level, or such other similar items of compensation as the Administrator shall designate as "Adjusted Compensation" for purposes of this Plan.

"Administrator" means the Head of Rewards and Recognition Planning for ML & Co., or his or her functional successor, or any other person or committee designated as Administrator of the Plan by the Administrator or the MDCC.

"Affiliate" means any corporation, partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50% of the total combined voting power of all classes of stock or other equity interests.

"Annual Charge" means the charge to a Participant's Account provided for in Section 3.4(h).

"Available Balance" means amounts in a Participant's Account that are indexed to liquid Benchmark Return Options after the Account's Debit Balance has been reduced to zero.

"Benchmark Return Options" means such investment vehicles as the Administrator may from time to time designate for the purpose of indexing Accounts hereunder. In the event a Benchmark Return Option ceases to exist or is no longer to be a Benchmark Return Option, the Administrator may designate a substitute Benchmark Return Option for such discontinued option.

"Board of Directors" means the Board of Directors of ML & Co.

"Capital Call" means the periodic demands for funds from a Participant's Account that will be equal to and occur simultaneously with capital calls made by private equity funds chosen as a return option by the Participant.

"Capital Call Default" means that there is an insufficient Liquid Balance in the Participant's Account to fund a Capital Call.

"Capital Demand Default Adjustment" means the negative adjustment described in Section 3.4 in the number of "units" attributed to a Private Equity Fund Return Options that will be the result of a Capital Call Default.

"Cash Compensation" means (1) (for VICP eligible employees) salary in the reference year plus VICP earned in the reference year and paid in January or February of the next calendar year or (2) (for Financial Advisors and other employees receiving Adjusted Compensation) base salary plus Adjusted Compensation paid in the reference year.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Company" means ML & Co. and all of its Affiliates.

"Compensation" means, as relevant, a Participant's Adjusted Compensation, Variable Incentive Compensation and/or Sign-On Bonus, or such other items or items of compensation as the Administrator, in his or her sole discretion, may specify in a particular instance.

"Debit Balance" means, as of any date, the dollar amount, if any, representing the accrued aggregate Annual Charge not deducted from the Liquid Balance.

"Deferral Percentage" means the percentage (which, unless the Administrator, in his or her sole discretion, determines otherwise, shall be in whole percentage increments and not more than 90%) specified by the Participant to be the percentage of each payment of Compensation he or she wishes to defer under the Plan.

"Deferred Amounts" means, except as provided in Section 5.6, the amounts of Compensation actually deferred by the Participant under this Plan.

"Election Year" means the 2006 calendar year.

"Eligible Compensation" means (1) for persons eligible for the Variable Incentive Compensation Program or other similar programs: (A) a Participant's 2005 base earnings plus (B) any cash bonus awarded in early 2006, and (2) for persons ineligible for such bonus programs, a Participant's 2005 Adjusted Compensation.

"Eligible Employee" means an employee eligible to defer amounts under this Plan, as determined under Section 2.1 hereof.

"ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

"Excess Deferred Amounts" means the amount, if any, of a Participant's Deferred Amounts in excess of the lesser of 10% of the Participant's Compensation or $150,000.

"Fiscal Month" means the monthly period used by ML & Co. for financial accounting purposes.

"Fiscal Year" means the annual period used by ML & Co. for financial accounting purposes.

"Full-Time Domestic Employee" means a full-time employee of the Company paid from the Company's domestic based payroll (other than any U.S. citizen or "green card" holder who is employed outside the United States).

"Full-Time Expatriate Employee" means a U.S. citizen or "green card" holder employed by the Company outside the United States and selected by the Administrator as eligible to participate in the Plan (subject to the other eligibility criteria).

"Income Builder Return Option" means the option of receiving returns hereunder equal to the yield of the Moody's Long-Term Aa Corporate Bond Yield Average (or its successor). Such yield shall be reset annually as of the last business day of each calendar year, shall remain in effect until the last business day of the following calendar year, and shall be credited annually. If the Moody's Long-Term Aa Corporate Bond Yield Average is no longer in existence, a new crediting index rate for the Income Builder Return Option will be choosen by the Administrator.

"Liquid Balance" means, as of any date, the Deferred Amounts credited to a Participant's Account, not including amounts that represent future commitments to Private Equity Funds adjusted (either up or down) to reflect: (1) the performance of the Participant's Mutual Fund Return Balances or the Income Builder Return Option, as provided in Section 3.4(f); (2) reduction of any Debit Balance; and (3) any payments to the Participant under Article V hereof.

"Maximum Deferral" means the whole dollar amount specified by the Participant to be the amount of Compensation he or she elects to be deferred under the Plan.

"MDCC" means the Management Development and Compensation Committee of the Board of Directors.

"ML & Co." means Merrill Lynch & Co., Inc.

"Moody's Long-Term Aa Corporate Bond Yield Average" means the average yield-to-maturity of a selection of long-term bonds rated "Excellent" (2nd highest rating) by the Moody's Investor Service.

"Mutual Fund Return Options" means the mutual funds chosen as Benchmark Return Options by the Administrator.

"Net Asset Value" means, with respect to each Benchmark Return Option that is a mutual fund or other commingled investment vehicle for which such values are determined in the normal course of business, the net asset value, on the date in question, of the vehicle for which such value is being determined.

"Participant" means an Eligible Employee who has elected to defer Compensation under the Plan.

"Plan" means this Merrill Lynch & Co., Inc. 2007 Deferred Compensation Plan for a Select Group of Eligible Employees.

"Plan Year" means the Fiscal Year ending in 2007.

"Private Fund Return Option(s)" means one or more private funds that are chosen by the Administrator to be offered — with such limitations as may be required — to eligible Participants as Benchmark Return Options.

"Private Fund Unit(s)" means the record-keeping units credited to the Accounts of Participants who have chosen one or more Private Fund Return Options.

"Retirement" means a Participant's (i) termination of employment with the Company for reasons other than for cause on or after the Participant's 65th birthday, or (ii) termination of employment on or after the Participant's 55th birthday if the Participant has at least 10 years of service.

"Remaining Deferred Amounts" means the product of a Participant's Deferred Amounts times a fraction equal to the number of remaining installment payments divided by the total number of installment payments.

"Remaining Excess Deferred Amounts" means the portion, if any, of a Participant's Remaining Deferred Amounts attributable to Excess Deferred Amounts.

"Rule of 60" means a Participant's termination of employment with the Company for reasons other than cause on or after (A) having completed at least five (5) years of service and (B) reaching any age, that, when added to service with the Company (in each case, expressed as completed years and completed months), equals at least 60; provided that, a Participant shall not qualify for the Rule of 60 if he or she engages in a business which the Administrator, in his or her sole discretion, determines to be in competition with the business of the Company.

"Selected Benchmark Return Option" means a Benchmark Return Option selected by the Participant in accordance with Section 3.4.

"Sign-On Bonus" means a single-sum amount paid or payable to a new Eligible Employee during the Plan Year upon commencement of employment, in addition to base pay and other Compensation, to induce him or her to become an employee of the Company, or any similar item of compensation as the Administrator shall designate as "Sign-On Bonus" for purposes of this Plan.

"Undistributed Deferred Amounts" means, as of any date on which the Annual Charge is determined, a Participant's Deferred Amounts (exclusive of any appreciation or depreciation) minus, for each distribution to a Participant prior to such date, an amount equal to the product of the Deferred Amounts and a fraction the numerator of which is the amount of such distribution and the denominator of which is the combined Net Asset Value (prior to distribution) of the Participant's Account as of the date of the relevant distribution.

"Variable Incentive Compensation" means the variable incentive compensation or office manager incentive compensation that is paid in cash to certain employees of the Company generally in January or February of the Plan Year with respect to the prior Fiscal Year, which for purposes of this Plan is considered earned during the Plan Year regardless of when it is actually paid to the Participant, or such other similar items of compensation as the Administrator shall designate as "Variable Incentive Compensation" for purposes of this Plan.

4

"401(k) Plan" means the Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan.

## ARTICLE II
## ELIGIBILITY

**2.1  Eligible Employees.**

(a)  **General Rule.** An individual is an Eligible Employee if he or she (i) is a Full-Time Domestic Employee or a Full-Time Expatriate Employee, (ii) has at least $300,000 of Eligible Compensation for the year prior to the Election Year, and (iii) has attained the title of Vice President or higher.

(b)  **Individuals First Employed During Election Year or Plan Year.** Subject to the approval of the Administrator in his or her sole discretion, an individual who is first employed by the Company during the Election Year or the Plan Year is an Eligible Employee if his or her Eligible Compensation, together, if applicable, with the amount of any Variable Incentive Compensation that will be payable to such individual in the next annual bonus cycle pursuant to a written bonus guarantee, is greater than $300,000, and he or she is employed as or is to be nominated for the title of Vice President or higher at the first opportunity following his or her commencement of employment with the Company.

(c)  **Disqualifying Factors.** An individual shall not be an Eligible Employee if either (i) as of the deadline for submission of elections specified in Section 3.1(a), the individual's wages have been attached or are being garnished or are otherwise restrained pursuant to legal process, or (ii) within 13 months prior to the deadline for submission of elections specified in Section 3.1(a), the individual has made a hardship withdrawal of Elective 401(k) Deferrals as defined under the 401(k) Plan.

## ARTICLE III
## DEFERRAL ELECTIONS; ACCOUNTS

**3.1  Deferral Elections.**

(a)  **Timing and Manner of Making of Elections.** An election to defer Compensation for payment in accordance with Article V shall be made by submitting to the Administrator such forms as the Administrator may prescribe in whatever manner that the Administrator directs. Each election submitted must specify a Maximum Deferral and a Deferral Percentage with respect to each category of Compensation to be deferred. All elections by a Participant to defer Compensation under the Plan must be received by the Administrator or such person as he or she may designate for the purpose by no later than June 30 of the Election Year or, in the event such date is not a business day, the immediately preceding business day; provided, however, that (1) an Eligible Employee's election to defer a Sign-On Bonus must be part of such Eligible Employee's terms and conditions of employment agreed to prior to the Eligible Employee's first day of employment with the Company and (2) an Eligible Employee's election to defer pursuant to Section 2.1(b) must occur no later than 30 days after his or her first day of employment with the Company.

(b)  **Irrevocability of Deferral Election.** Except as provided in Section 5.5, an election to defer the receipt of any Compensation made under Section 3.1(a) is irrevocable once submitted to the Administrator or his or her designee. The Administrator's acceptance of an election to defer Compensation shall not, however, affect the contingent nature of such Compensation under the plan or program under which such Compensation is payable.

(c) **Application of Election.** The Participant's Deferral Percentage will be applied to each payment of Compensation to which the Participant's deferral election applies, provided that the aggregate of the Participant's Deferred Amounts shall not exceed the Participant's Maximum Deferral. If a Participant has made deferral elections with respect to more than one category of Compensation, this Section 3.1(c) shall be applied separately with respect to each such category.

**3.2 Crediting to Accounts.**

(a) **Initial Deferrals.** A Participant's Deferred Amounts will be credited to the Participant's Account as soon as practicable (but in no event later than the end of the following month) after the last day of the Fiscal Month during which such Deferred Amounts would, but for deferral, have been paid and will be accounted for in accordance with Section 3.4. No interest will accrue, nor will any adjustment be made to an Account, for the period until the Deferred Amounts are credited.

(b) **Private Fund Return Options.** Upon the closing of any Private Return Option, a Participant's Account will be credited with a number of units determined by dividing by $1,000 the portion of the Account Balance that the Participant has elected to allocate to the Private Return Option, as of the day prior to the closing date.

**3.3 Minimum Requirements for Deferral.**

Notwithstanding any other provision of this Plan, no deferral will be effected under this Plan with respect to a Participant if:

(i) the Participant is not an Eligible Employee as of December 31, 2006, or

(ii) the Participant's election as applied to the Participant's Variable Incentive Compensation (determined by substituting the Election Year for the Plan Year) or Adjusted Compensation (determined by substituting the Fiscal Year immediately prior to the Fiscal Year ending in the Election Year for the Fiscal Year ending in the Plan Year) would have resulted in an annual deferral of less than $15,000:

provided, that any Participant who first becomes an employee of the Company during the Plan Year shall not be required to satisfy conditions (i) and (ii). Condition (ii) does not require a Participant's elections to result in an actual deferral of at least $15,000.

**3.4 Return Options; Adjustment of Accounts.**

(a) **Selection of Mutual Fund Return Options and Income Builder Return Option.** Coincident with the Participant's election to defer Compensation, the Participant must select the percentage of the Participant's Account to be adjusted to reflect the performance of Mutual Fund Return Options and the Income Builder Return Option, for use when a Participant's Account has a Liquid Balance. All elections shall be in multiples of 1%. A Participant may, by complying with such procedures as the Administrator may prescribe on a uniform and nondiscriminatory basis, including procedures specifying the frequency with respect to which such changes may be effected (but not more than 12 times in any calendar year), change the Selected Benchmark Return Options to be applicable with respect to his or her Account. Notwithstanding the foregoing, (i) a Participant may not elect to index more than the lesser of 10% of the Participant's Compensation or $150,000 to the performance of the Income Builder Return Option, (ii) no amounts initially indexed to the performance of the Income Builder Return Option may subsequently be changed to another Selected Benchmark Return Option, and (iii) no amounts initially indexed to the performance of another Selected Benchmark Return Option may subsequently be changed to the Income Builder Return Option.

6

(b)    **Selection of Private Fund Return Options.** In any year that a Private Fund partnership is offered as a return option, an eligible Participant may select the Private Fund Return Option, provided that the selection of such return option is consistent with the Participant's payment election under the terms of the Plan and applicable law. Upon the closing of a selected Private Fund Return Option, the selecting Participant will not be able to change his or her selection of such return option. In addition, upon a Capital Call Default with respect to certain Private Fund Return Options, the defaulting Participant may be penalized by having his or her Account adjusted downward in accordance with Section 3.4 (d).

(c)    **Adjustment of Income Builder Return Option Balances and Other Special Rules.**

(i)    **Crediting.** The portion, if any, of a Participant's Account Balance attributable to the Income Builder Return Option shall be credited annually to reflect the rate of return under such Return Option. Such amounts shall not be reduced by the annual fee.

(ii)    **Restatement.** Notwithstanding the foregoing, if a Participant terminates employment with fewer than 5 years of Merrill Lynch service and 12 months of participation in the Plan, the portion of the Participant's Balances attributable to the Income Builder Return Option shall be restated to reflect crediting for all periods based on the performance of the Merrill Lynch Premier Institutional Money Market Fund Return Option instead of the rate of return under the Income Builder Return Option.

(iii)    **Death Benefit.** In the event of a Participant's death while still employed by the Company, the portion of the Participant's Account Balance attributable to the Income Builder Return Option shall be credited with an additional investment return calculated as if such portion of the Balances had been credited with the then current rate of return under the Income Builder Return Option until the later of the fifth anniversary of the Participant's death or the date on which the Participant would have attained age 60. In order for the Participant's Balances to be eligible for this additional investment return, the Participant must provide consent to the Company (in accordance with rules and procedures established by the Administrator) for the Company to purchase, and be the beneficiary of, one or more insurance policies on the Participant's life.

(d)    **Adjustment of Mutual Fund Return Balances.** While the Participant's Balances do not represent the Participant's ownership of, or any ownership interest in, any particular assets, the Balances attributable to Mutual Fund Return Options shall be adjusted to reflect credits or debits relating to distributions from any Private Fund Return Options or chargeoffs against the Debit Balance and to reflect the investment experience of the Participant's Mutual Fund Return Options in the same manner as if investments or dispositions in accordance with the Participant's elections had actually been made through the ML Benefit Services Platform and ML II Core Recordkeeping System, or any successor system used for keeping records of Participants' Accounts (the "ML II System"). In adjusting Accounts, the Participant will give instructions to the ML Benefit Services Platform which will be reflected as credits or debits as of the weekly processing of such instructions through the ML II System. This processing shall control the timing and pricing of the notional investments in the Participant's Mutual Fund Return Options in accordance with the rules of operation of the ML II System and its requirements for placing corresponding investment orders, as if orders to make corresponding investments or dispositions were actually to be made on the transaction processing date. In connection with the crediting of Deferred Amounts or distributions to the Participant's Account and distributions from or debits to the Account, appropriate deferral allocation instructions shall be treated as received from the Participant prior to the close of transactions through the ML II System on the relevant transaction processing date. Each Mutual Fund Return Option shall be valued using the Net Asset Value of the Mutual Fund Return Option as of the relevant transaction processing date; provided, that, in valuing a Mutual Fund Return Option for which a Net Asset Value

7

is not computed, the value of the security involved for determining Participants' rights under the Plan shall be the price reported for actual transactions in that security through the ML II System on the relevant transaction processing date, without giving effect to any transaction charges or costs associated with such transactions; provided, further, that, if there are no such transactions effected through the ML II System on the relevant day, the value of the security shall be:

(i)    if the security is listed for trading on one or more national securities exchanges, the average of the high and low sale prices for that day on the principal exchange for such security, or if such security is not traded on such principal exchange on that day, the average of the high and low sales prices on such exchange on the first day prior thereto on which such security was so traded;

(ii)   if the security is not listed for trading on a national securities exchange but is traded in the over-the-counter market, the average of the highest and lowest bid prices for such security on the relevant day; or

(iii)  if neither clause (i) nor (ii) applies, the value determined by the Administrator by whatever means he considers appropriate in his or her sole discretion.

All debits and charges against a Participant's Account shall be applied as a pro rata reduction of the portion of the Account Balance indexed to each of the Participant's Mutual Fund Return Options and to the Income Builder Return Option.

(d)    **Adjustments of Private Fund Return Options.**

(i)    Whenever a distribution is paid on an actual unit of a Private Fund Return Option, an amount equal to such per unit distribution times the number of units in the Participant's Account will first be applied against any Debit Balance, as provided in Section 3.4(e), and then, if any portion of such distribution remains after the Debit Balance is reduced to zero, be credited to the Participant's Account to be indexed initially to ML Premier Institutional Fund and then to the Mutual Fund Return Option(s) chosen by the Participant.

(ii)   In the event of a Capital Call Default, a Participant's notional investment in the relevant fund will be capped. If this occurs, the number of units represented by the return option will be adjusted downward to reflect a smaller investment.

(f)    **Annual Charge.** As of the last day of each Fiscal Year or such earlier day in December as the Administrator shall determine, an Annual Charge of 2.0% of the Participant's Excess Deferred Amounts (exclusive of any appreciation or depreciation determined under Section 3.4 (f) or 3.4(g)) shall be applied to reduce the Account Balance.

(i)    In the event that all or any portion of the Account Balance is indexed to a Benchmark Return Option with less than daily liquidity, the Annual Charge, if any, will accrue as a Debit Balance and be paid out of future amounts credited to the Account Balance.

(ii)   In the event that the Participant elects to have the Account Balance paid in installments, the Annual Charge, if any, will be charged on the Remaining Excess Deferred Amounts after giving effect to the installment payments.

(iii)  In the event that the Account Balance is paid out completely during a Fiscal Year prior to the date upon which the Annual Charge is assessed, a pro rata Annual Charge will be deducted from amounts to be paid to the Participant to cover that fraction of the