UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>Securities Actions | FILED ELECTRONICALLY<br><br>MASTER FILE NO.<br>07cv9633 (LBS)(AJP)(DFE) |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**KAPLAN FOX & KILSHEIMER LLP**

Robert N. Kaplan
Frederic S. Fox
Joel B. Strauss
Donald R. Hall
Jeffrey P. Campisi
Aviah Cohen Pierson
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714

**BERGER & MONTAGUE, P.C.**

Lawrence J. Lederer
Merrill G. Davidoff
Arthur Stock
Robin Switzenbaum
Lane L. Vines
Jon Lambiras
1622 Locust Street
Philadelphia, PA 19103-6365
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

**BARRACK, RODOS & BACINE**

M. Richard Komins
Robert A. Hoffman
Jeffrey A. Barrack
Beth T. Seltzer
Julie B. Palley
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
            and
Regina M. Calcaterra
1350 Broadway, Suite 1001
New York, NY 10018
Telephone: (212) 688-0782
Facsimile: (212) 688-0783

*Co-lead Counsel for the State Teachers
Retirement System of Ohio and the Proposed Class*

TABLE OF CONTENTS

PAGE

I.    Preliminary Statement.................................................................................................. 1

   A.   The Complaint Alleges Adequately Claims Under Section 10(b)
        of the Exchange Act ............................................................................................. 3

      1. False Statements................................................................................................. 3

      2. Scienter ............................................................................................................. 6

      3. Loss Causation .................................................................................................. 8

   B.   The Complaint Alleges Adequately Claims Under Sections 11
        and 12 of the Securities Act and Section 14(a) of the Exchange Act ................. 9

II.   Statement of Facts...................................................................................................... 10

   A.   Defendants Engaged in a Massive Fraud by Concealing from
        Investors Merrill's Exposure to CDOs Backed by Subprime Mortgages ......... 10

      1.  Merrill Rapidly Expanded, and Became a Leader in, CDO Underwriting ..... 10

      2. As the Market for CDOs Declined, Merrill Was Forced to Accumulate
         Billions of Dollars of CDOs on its Balance Sheet .......................................... 12

      3. Defendants Secretly Sought Insurance from Less Creditworthy Insurers
         and Left Merrill's Balance Sheet Exposed ...................................................... 12

      4. Kronthal, a Senior Merrill Executive, and His Team Were Fired for
         Warning Defendants that Merrill Was Taking on Excessive Risk ................... 13

      5. By the Beginning of the Class Period, Loans Purchased by Merrill
         from Subprime Originators Experienced Huge Increases in Early
         Payment Defaults ............................................................................................ 14

      6. Defendants Further Increased Risk by Creating Synthetic Securities
         Which Were Undisclosed Side Bets on CDOs ................................................ 15

      7. Bear Stearns Hedge Funds Collapsed and Merrill Was Unable to
         Sell its Assets .................................................................................................. 16

      8. Merrill Attempted to Dump Accumulated CDOs on Unsuspecting
         Customers ........................................................................................................ 17

      9. The CDO Assets Merrill Was Forced to Retain Became Impaired ................. 18

B.   The Market Is Stunned as Merrill Belatedly Reveals its Enormous
     Concentration of CDOs and Related Subprime-based Assets and
     Takes Unprecedented $30 Billion Write-Downs in Assets .............................. 19

III.   Argument ........................................................................................................ 20

A.   Defendants Had a Duty to Disclose the Massive Accumulation of
     CDOs on Merrill's Balance Sheet .................................................................. 20

     1. The Facts Known to Defendants During the Class Period and
        Defendants' Statements Gave Rise to a Duty to Disclose the True
        Extent of Merrill's CDO Exposure ............................................................. 23

     2. GAAP Required the Disclosure of Merrill's Concentration of
        CDO Assets .................................................................................................. 30

     3. The Complaint Properly Alleges that Merrill Violated GAAP by
        Misstating the Value of its CDOs .............................................................. 32

B.   The Complaint Pleads Cogent and Compelling Facts that Give Rise
     to a Strong Inference of Scienter .................................................................. 37

     1. Standards for Pleading Scienter ................................................................. 40

     2. Numerous Red Flags Compel a Strong Inference of Scienter ................... 42

        a.   The Firing of Dissenting Employees, and Defendants' Receipt
             of Specific Warnings Before and During the Class Period,
             Compel a Strong Inference of Scienter .................................................. 44

        b.   Merrill's Role as Both "Front-End" Subprime Mortgage Originator,
             and "Back-End" Securitizer, Compels a Strong Inference of Scienter ................... 46

        c.   Merrill Being Forced to Resort to Undercapitalized or Highly
             Leveraged Bond Insurers Following AIG's Withdrawal Was
             a Red Flag ............................................................................................. 49

        d.   The Fall of CDO Market Indices and Merrill's Inability to
             Sell CDO Assets Is Strong Evidence of Scienter ................................... 52

     3. Defendants' Attempts to Conceal Merrill's Exposure is a Clear
        Indication of Their Scienter ....................................................................... 53

     4. Defendants' Admission of Their Responsibilities for Monitoring
        Risk Raises a Strong Inference of Scienter ............................................... 55

     5. The Magnitude of the Write-Downs and the Pervasive Nature of
        GAAP Violations Strongly Suggest Scienter ............................................. 58

6. Resignations of O'Neal and Fakahany, Insider Stock Sales and
   Merrill's Stock Issuances Strongly Suggest Scienter ...................................... 60

   a. The Forced Resignations of O'Neal and Fakahany Create
   an Inference of Scienter ........................................................................... 60

   b. Defendants' Stock Sales, Compensation and Merrill's Stock
   Issuances Are Further Indicia of Scienter ............................................... 62

   c. Merrill's Stock Issuances Are Evidence of Scienter ............................... 66

7. Defendants' Suggestions of Innocent or Honest Conduct Are Implausible .................... 68

C. The Complaint Identifies Actionable Misstatements with the
   Specificity Required by the PSLRA and Fed. R. Civ. P. 9(b) ......................................... 70

1. Standards for Pleading Claims under Rule 10b-5(b) ...................................... 70

2. The Complaint Properly Identifies Defendants' False or
   Misleading Statements and States Why the Statements Are
   False or Misleading .......................................................................................... 71

3. The Complaint's Allegations Regarding Risk Management Are
   Actionable and Are Pleaded with Particularity ................................................ 72

4. Defendants' Statements Are Not Entitled to Protection Under the
   PSLRA Safe Harbor Provision ........................................................................ 78

5. The Complaint May Rely on Facts Alleged in other Actions,
   Media Reports and Adequately Identifies Sources of Facts Alleged .............................. 79

   a. Plaintiffs May Rely Upon Complaints in Other Actions ........................................ 79

   b. Plaintiff Properly Relies Upon Media Reports to Form Part
   of the Basis of the Complaint .................................................................. 81

   c. Plaintiff Adequately Identifies the Sources of the Facts Alleged ............................ 84

6. The Group Pleading Doctrine Applies to Merrill's SEC Filings,
   Press Releases and Registration Statements ...................................................... 86

D. The Complaint Adequately Pleads "Scheme Liability" Under
   Rules 10b-5(a) and (c) ...................................................................................... 89

E. The Complaint Sufficiently Alleges Loss Causation ...................................................... 93

1. The Standard for Pleading Loss Causation ...................................................... 94

2. Plaintiffs Have Sufficiently Alleged that the Prices of Merrill
Common Stock and Preferred Securities Declined After the
Disclosure of Previously Hidden Facts.................................................................. 95

F.  Plaintiff Has Adequately Alleged that the Preferred Stock
Traded In An Efficient Market ...................................................................... 102

G.  Plaintiffs Have Adequately Alleged Claims under Sections 11
and 12(a)(2) of the Securities Act of 1933 and Section 14(a) of
the Exchange Act against Defendants............................................................ 103

1. Legal Standard for Pleading Sections 11 and 12(a)(2) Claims..................... 103

2. The Section 11 and 12(a)(2) Claims Adequately Allege Untrue
Statements and Material Omissions under Rule 8(a)..................................... 105

3. The Section 11 and 12 Claims Do Not Require Allegations
of Loss Causation......................................................................................... 107

4. Rule 9(b) Does Not Apply to Plaintiffs' Securities Act and
Proxy Claims............................................................................................... 108

a.  Plaintiffs Have Physically Separated the Securities Act and
Proxy Claims from the Exchange Act Claims.................................... 109

b.  The Complaint Alleges Additional Reasons for the Falsity
of the Statements in the Exchange Act Section of the Complaint ......... 112

c.  Securities Act and Proxy Claims against Deloitte Do Not
Sound in Fraud................................................................................ 113

H.  Lead Plaintiff Ohio STRS and Plaintiff Kosseff Have Standing
to Assert Claims Under Section 11 and Section 12(a)(2) with
Respect to Certain of the Preferred Stock Offerings ...................................... 114

1. Lead Plaintiff Ohio STRS Has Standing to Assert All Securities
Act Section 11 and Section 12(a)(2) Claims by Virtue of its
Position as Lead Plaintiff .............................................................................. 115

2. Plaintiff Kosoff Has Standing to Assert Securities Act Section 11
Claims on Behalf of ML Trust I, II, III and Series 5 Preferred
Shareholders................................................................................................ 115

3. Ohio STRS Has Standing to Assert Claims Under Section 11
of the Securities Act on Behalf of Series 6 and Series 7 Preferred
Shareholders................................................................................................ 119

4. Plaintiffs Have Standing to Assert Claims Under Section 12(a)(2) of the Securities Act ................................................................................ 120

5. Lead Plaintiff Adequately States a Section 11 Claim Against Deloitte ......................... 120

    a.    The Complaint States Securities Act Claims Against Deloitte Relating to the March 15, 2007, April 25, 2007 and August 15, 2007 Offerings and the First Republic Registration Statement ............................ 120

    b.    Deloitte Is Liable under Section 14(a) ................................................. 123

I.    The Complaint Adequately Alleges that Defendants Are Liable as Control Persons under Section 20(a) of the Exchange Act and Section 15 of the Securities Act .................................................................... 126

IV.    Conclusion ......................................................................................................... 128

TABLE OF AUTHORITIES

PAGE

**Cases**

*In re 2007 Novastar Financial, Inc. Sec. Litig.*,
No. 07 Civ. 0139, 2008 U.S. Dist. LEXIS 44166 (W.D. Mo. June 4, 2008) .................... 60, 68

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995) ................................................................................................ 63, 68

*Adair v. Bristol Tech. Systems*,
179 F.R.D. 126 (S.D.N.Y. 1998) ............................................................................................ 107

*In re Adams Gold, Inc. Sec. Litig.*,
381 F.3d 267 (3d Cir. 2004) ........................................................................................ 104, 122

*In re Adaptive Broadband Sec. Litig.*,
No. 01 Civ. 1092 SC, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ......................................... 61

*In re Aegon N.V. Sec. Litig.*,
No. 03 Civ. 0603, 2004 U.S. Dist. LEXIS 11466 (S.D.N.Y. June 23, 2004).......................... 69

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972).............................................................................................................. 90

*In re AIG Advisor Group Sec. Litig.*,
No. 06 Civ. 1625, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007)........................................... 108

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
525 F.3d 8 (D.C. Cir. 2008) ................................................................................................ 105

*In re Alamosa Holdings, Inc. Sec. Litig.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) ................................................................................ 122

*In re Alcatel Sec. Litig.*,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ................................................................... 71, 114, 122

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)................................................................................................... 60

*In re Allied Capital Corp. Sec. Litig.*,
No. 02 Civ. 3812, 2003 U.S. Dist. LEXIS 6962 (S.D.N.Y. Apr. 25, 2003)............................ 43

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 402 (S.D.N.Y. 2005) ................................................................................ 110

*In re American Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000) ................................................................ 113

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ..................................................... 79, 93, 125

*In re AOL TimeWarner, Inc. Sec. Litig.*,
    503 F. Supp. 2d 666 (S.D.N.Y. 2007) ................................................................ 94

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ..................................................... 58, 66, 89

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................... 42, 109, 113

*Atlas v. Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (C.D. Cal. 2008) ......................................................... 39, 43

*ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................... 39, 92, 127

*In re Authentidate Holding Corp. Sec. Litig.*,
    No. 05 Civ. 5323, 2006 WL 2034644 (S.D.N.Y. July 14, 2006) ........................................... 118

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................... 28, 112

*Azzolini v. CorTS Trust for Provident Fin. Trust I*,
    No. 03Civ. 1003, 03 Civ. 1005, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) ................. 107

*Ballan v. Wilfred American Educational Corp.*,
    720 F. Supp. 241 (E.D.N.Y. 1989) ................................................................. 77

*In re Bally Total Fitness Sec. Litig.*,
    No. 04 Civ. 3530, 2006 WL 3714708 (N.D. Ill. July 12, 2006) ........................................... 101

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007)..................................................................... *passim*

*Berson v. Applied Signal Technology, Inc.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................. 55

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) .......................................................... 61, 87-89

*In re Blech Sec. Litig.*,
    961 F. Supp. 569 (S.D.N.Y. 1997) ................................................................. 90

*BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp.*,
    508 F. Supp. 2d 1287 (N.D. Ga. 2007) ................................................................. 105

*Bond Opp'ty Fund v. Unilab Corp.*,
    No. 99 Civ. 11074 (JSM), 2003 U.S. Dist. LEXIS 7838 (S.D.N.Y. May 9, 2003) ................. 89

*Borochoff v. GlaxoSmithKline*,
    No. 07 Civ. 5574, 2008 U.S. Dist. LEXIS 38784 (S.D.N.Y. May 9, 2008) ............................ 64

*In re Bradley Pharms Inc. Sec. Litig.*,
    421 F. Supp. 2d 822 (D.N.J. 2006) ........................................................................... 99

*Branch v. Tower Air Inc.*,
    No. 94 Civ. 6625, 1995 WL 649935 (S.D.N.Y. Nov. 3, 1995) ............................................ 124

*In re Bristol-Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ...................................................................... 84

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ................................................................................ 33

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ...................................................................... 49

*CALPERS v. Chubb*,
    394 F.3d 126 (3d Cir. 2004) ................................................................................. 83

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ........................................................................... 103

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................... 33, 85

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
    497 F.3d 546 (5th Cir. 1997) ............................................................................... 56

*Central Bank of Denver, N.A. Petitioner, v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ......................................................................................... 90

*Cherednichenko v. Quarterdeck Corp*,
    No. 97 Civ. 4320, 1997 WL 809750 (C.D. Cal. Nov. 26, 1997) ........................................ 50

*Chill v. General Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) ................................................................................ 122

*Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*,
    413 F.3d 324 (2d Cir. 2005) ................................................................................ 60

*Ciresi v. Citigroup,*
    782 F. Supp. 819 (S.D.N.Y. 1991) ...................................................... 69

*In re CIT Group, Inc. Sec. Litig.,*
    349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................ 106

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom.*,
    *Albert Fadem Trust v. Citigroup, Inc.* 165 F. Appx. 928 (2d Cir. 2006)..................... 70, 77, 89

*City of Hialeah Employees' Retirement System v. Toll Bros., Inc.*,
    No. 07 Civ. 1513, 2008 WL 4058690 (E.D. Pa. Aug. 29, 2008)..................................... 40, 101

*City of Sterling Heights Police and Fire Retirement Systems v. Abbey National, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ...................................................... 96

*In re Coca-Cola Enterprises Inc. Sec. Litig*.,
    510 F. Supp. 2d 1187 (N.D. Ga. 2007) ...................................................... 57

*In re Complete Mgmt. Sec. Litig*.,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ...................................................... 121

*In re Comverse Tech., Inc. Sec. Litig*.,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) ...................................................... 42

*In re Comverse Technology, Inc. Sec. Litig.*,
    No. 06 Civ. 1825, 2006 WL 2792757 (E.D.N.Y. Sept. 27, 2006)........................... 96

*In re Connetics Sec. Litig.*,
    No. 07 Civ. 02940, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 14, 2008)....................... 80

*Connolly v. Havens*,
    763 F. Supp. 6 (S.D.N.Y. 1991) ...................................................... 91

*In re Converium Holding AG Sec. Litig.*,
    No. 04 Civ. 7897, 2007 WL 2684069 (S.D.N.Y. Sept. 14, 2007)........................... 60

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989) ...................................................... 69

*In re Cross Media Mktg. Corp. Sec. Litig.*,
    314 F. Supp. 2d 256 (S.D.N.Y. 2004) ...................................................... 89

*In re Cyberonics Sec. Litig.*,
    523 F. Supp. 2d 547 (S.D. Tex. 2007) ...................................................... 61

*In re Cylink Sec. Litig.,*
    178 F. Supp. 2d 1077 (N.D. Cal. 2001) ...................................................... 79

*Darquea v. Jarden Corp.*,
    No. 06 Civ. 0722, 2007 WL 1610146 (S.D.N.Y. May 21, 2007)............................................ 79

*In re DDi Corp. Sec. Litig.*,
    No. 03 Civ. 7063, 2005 WL 3090882 (C.D. Cal. July 21, 2005) .................................. 114, 119

*DeMarco v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004) ................................................................................. 102

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) .................................................................................................. 21

*Denny v. Barber*,
    576 F.2d 465 (2d Cir. 1978) .................................................................................................. 68

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999) .................................................................................... 91

*Dileo v. Ernst & Young*,
    901 F.2d 624 (7th Cir. 1990) ................................................................................................ 43

*In re DoubleClick Inc. Privacy Litig.*,
    154 F. Supp. 2d 497 (S.D.N.Y. 2001) ................................................................................ 104

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02 Civ. 6478, 2003 U.S. Dist. LEXIS 21319 (S.D.N.Y. Nov. 25, 2003) .......................... 72

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................................... *passim*

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008) .................................................................................. 57

*Emergent Capital Inv. Mgmt. LLC v. Stonepath Group*,
    343 F.3d 189 (2d Cir. 2003) ................................................................................................ 101

*Endo v. Albertine*,
    147 F.R.D. 164 (N.D. Ill. 1993)........................................................................................... 114

*Erickson v. Pardus*,
    127 S. Ct. 2197 (2007)......................................................................................................... 105

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)..................................................................................................... 91, 103

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) .................................................................................... 50

*Exxon Shipping Co. v. Baker*,
128 S. Ct. 2605 (2008) ................................................................................... 41

*Fadem v. Ford Motor Co.*,
352 F. Supp. 2d 501 (S.D.N.Y. 2005) .......................................................... 35

*Fadem v. Ford Motor Co.*,
No. 02 Civ. 0686, 2003 U.S. Dist. Lexis 16898 (S.D.N.Y. Sept. 25, 2003) .......................... 69

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) .......................................................... 77

*In re FirstEnergy Corp. Sec. Litig.,*
316 F. Supp. 2d 581 (N.D. Ohio 2004) ........................................................ 109

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004) ................................................... 57, 120

*In re Fleming Companies Inc. Sec. & Deriv. Litig.*,
No. 03 MDL 1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ................. 114, 117

*Forgarazzo v. Lehman Bros., Inc.,*
341 F. Supp. 2d 274 (S.D.N.Y. 2004) .......................................................... 26

*In re Friedman's, Inc. Sec. Litig.*,
385 F. Supp. 2d 1345 (N.D. Ga. 2005) ........................................................ 117

*Funke v. Life Financial Corp.,*
237 F. Supp. 2d 458 (S.D.N.Y. 2002) .......................................................... 122

*Garber v. Legg Mason*,
537 F. Supp. 2d 597 (S.D.N.Y. 2008) .......................................................... 123

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) .................................................................... 56

*In re Gilead Sciences Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ...................................................................... 99

*In re Glenayre Technologies, Inc. Sec. Litig.*,
No. 96 Civ. 8252, 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ...................... 64

*Glickman v. Alexander Services, Inc.,*
No. 93 Civ. 7594, 1996 U.S. Dist. LEXIS 2325 (S.D.N.Y. Feb. 27, 1996) ............ 58

*In re Global Crossing, Ltd. Sec. Litig.*,
313 F. Supp. 2d 189 (S.D.N.Y. 2003) .......................................................... 119

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F. Supp.2d 319 (S.D.N.Y 2004) ....................................................................90-93

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) ........................................................................ 37, 66

*Gould v. American-Hawaiian S.S. Co.*,
   535 F.2d 761 (3d Cir. 1976) .............................................................................. 125

*Greenapple v. Detroit Edison Co.*,
   618 F.2d 198 (2d Cir. 1980) ................................................................................ 21

*Greenberg v. Crossroads Systems Inc.*,
   364 F.3d 657 (5th Cir. 2004) .............................................................................. 99

*Guerra v. Teradyne Inc.*,
   No. 91 Civ. 11789, 2004 WL 1467069 (D. Mass. Jan. 16, 2004) ......................... 100

*In re Guilford Mills Inc. Sec. Litig.*,
   No. 98 Civ. 7739, 1999 WL 33248953 (S.D.N.Y. July 21, 1999) .......................... 67

*Gustafson v. Alloyd Co., Inc.*,
   513 U.S. 561 (1995).......................................................................................... 119

*Hall v. Children's Place Retail Stores, Inc.*,
   No. 07 Civ. 8252, 2008 WL 2791526 (S.D.N.Y. July 18, 2008) ............... 53, 59, 127

*Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*,
   No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261 (S.D.N.Y. Mar. 30, 2005) ........... 57

*In re Health Mgmt., Inc. Sec. Litig.*,
   970 F. Supp. 192 (E.D.N.Y. 1997) ...................................................................... 70

*Herman & MacLean v. Huddleston*,
   459 U.S. 375 (1983)........................................................................... 103, 107, 122

*Hershfang v. Citicorp*,
   767 F. Supp. 1251 (S.D.N.Y. 1991) .................................................................... 84

*Herskowitz v. Nutri/System, Inc.*,
   857 F.2d 179 (3d Cir. 1988) .............................................................................. 125

*Hevesi v. Citigroup, Inc.*,
   366 F.3d 70 (2d Cir. 2004) ............................................................................... 115

*Higginbotham v. Baxter International*,
   495 F.3d 753 (7th Cir. 2007) .............................................................................. 64

*Holmes v. Baker*,
    166 F. Supp. 2d 1362 (S.D. Fla. 2001) ............................................................... 109

*In re IAC/InterActiveCorp. Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ................................................................. 112

*In re Initial Public Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................... 91

*Iqbal v. Hasty*,
    490 F.3d 143 (2d Cir. 2007), *cert. granted sub nom.*,
    *Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008) ......................................................... 123

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ............................................................................................. 125

*Joffee v. Lehman Bros.*,
    410 F. Supp. 2d 187 (2006) ................................................................................... 51

*Johnson v. NYFIX*,
    399 F. Supp. 2d 105 (D. Conn. 2005) ................................................................. 112

*In re JP Morgan Chase & Co. Sec. Litig.*,
    No. 06 Civ. 4675, 06 Civ. 4676, 06 Civ. 4674, MDL 1783, 2007
    WL 4531794 (N.D. Ill. Dec. 18, 2007) ............................................................ 81-83

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......................................................... 76, 111

*In re JP Morgan Chase Sec. Litig.*,
    No. 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948 (S.D.N.Y. Mar. 28, 2007) ......... 60

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal. 2008) ...................................................... 114, 119

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................................. 63

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1999) ............................................................................... 66

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) .................................................................. 58

*Krim v. pcOrder.com*,
    402 F.3d 489 (5th Cir. 2005) ............................................................................. 118

*Lapin v. Goldman Sachs Group Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ...................................................................... 78

*Lazzaro v. Mamber*,
    701 F. Supp. 353 (E.D.N.Y. 1988) ....................................................................... 124

*In re LDK Solar Sec. Litig.*,
    No. 07 Civ. 05182, 2008 WL 2242185 (N.D. Cal. May 29, 2008) ......................... 60

*Lehocky v. Tidel Technologies, Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) ........................................................................... 99

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................... 92, 94, 100

*Lerner v. FNB Rochester Corp.*,
    841 F. Supp. 97 (N.D.N.Y. 1993) .......................................................................... 69

*In re Lernout & Hauspie Sec. Litig.*,
    236 F. Supp. 2d 161 (D. Mass. 2003) .................................................................... 93

*Levine v. Atricure, Inc.*,
    508 F. Supp. 2d 268 (S.D.N.Y. 2007) ............................................. 107-108, 116-117

*Lewis v. Curtis*,
    671 F.2d 779 (3d Cir. 1982), *abrogated on other grounds by,*
    *Garber v. Lego*, 11 F.3d 1197 (3d Cir. 1993) ....................................................... 82

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976) ................................................................................. 81

*In re Livent Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................... 103, 122

*Luce v. Edelstein*,
    802 F.2d 49 (2d Cir. 1986) ................................................................................... 86

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 116

*In re Majesco Sec. Litig.*,
    No. 05 Civ. 3557 (PGS), 2006 WL 2846281 (D.N.J. Sept. 29, 2006) ............. 60, 109

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006) ................................................................................ 83

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ........................................................................... 46, 55

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (S.D.N.Y. 2007) ........................................................................ 64

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    536 F. Supp. 2d 313 (S.D.N.Y. 2007) ...................................................................... 114

*Matthews v. Centex Telemanagement*,
    No. 92 Civ. 1837, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. June 8, 1994) ............................ 67

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ...................................................................... 102

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ............................................................................ 117

*In re MCI WorldCom, Inc. Sec. Litig.*,
    93 F. Supp. 2d 276 (E.D.N.Y. 2000) ........................................................................ 70

*In re McKesson HBOC, Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................81-82, 126

*McMahan & Co. v. Wherehouse Entertainment, Inc.*,
    900 F.2d 576 (2d Cir. 1990), *cert. denied*, 501 U.S. 1249 (1991)....................................21, 71

*McNamara v. Pre-Paid Legal Svcs.*
    189 F. Appx. 702 (10th Cir. 2006) .......................................................................... 67

*Mendell v. Greenberg*,
    612 F. Supp. 1543 (S.D.N.Y. 1985) ........................................................................ 124

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    No. 02 Civ. 9690, 02 MDL 1484, 2008 WL 2324111 (S.D.N.Y. June 4, 2008)............. 94, 107

*Merrill Lynch International v. XL Capital Assurance, Inc.*
    No. 08 Civ. 2893, 2008 U.S. Dist. LEXIS 53467 (S.D.N.Y. July 15, 2008) ........................ 80

*In re Metropolitan Sec. Litig.*,
    532 F. Supp. 2d 1260 (E.D. Wash. 2007)................................................................. 122

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007) ...................................................................... 112

*Milman v. Box Hill Systems, Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999) ....................................................................... 104

*Mishkin v. Ageloff*,
    No. 97 Civ. 2690, 1998 U.S. Dist. LEXIS 14890 (S.D.N.Y. Sept. 23, 1998) ...................... 90

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ................................................................ 114

*Nappier v. Pricewaterhouse Coopers*,
    227 F. Supp. 2d 263 (D.N.J. 2002) ................................................................. 33

*In re Nat'l Golf Properties, Inc. Sec. Litig.*,
    No. 02 Civ. 1383, 2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) .................................... 25, 32

*In re New York Community Bancorp, Inc. Sec. Litig.*,
    448 F. Supp. 2d 466 (E.D.N.Y. 2006), *reconsideration denied*,
    244 F.R.D. 156 (2007) ................................................................................ 77

*No. 84 Employer-Teamster Joint Council Pension Fund Trust v.*
*America West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) .......................................................................... 99

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................. 54

*Nolte v. Capital One Financial Corp.*,
    390 F.3d 311 (4th Cir. 2004) ........................................................................ 28

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000) .......................... *passim*

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
    98 F.3d 2 (2d Cir.1996) ............................................................................. 106

*Ong v. Sears, Roebuck & Co.*,
    388 F. Supp. 2d 871 (N.D. Ill. 2004) ............................................................ 118

*Openwave Systems Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ............................................................. 96

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................... *passim*

*Palklovic v. Johnson*,
    No. 04 Civ. 5757, 2008 WL 2415274 (2d Cir. June 13, 2008) ............................... 37

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008) ...................................................... 106, 123

*In re Par Pharmaceuticals, Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990) ................................................................ 21

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ............................................................92, 95, 102-103

*In re Parmalat Sec. Litig.*,
    383 F. Supp. 2d 616 (S.D.N.Y. 2005) ............................................................ 54

*In re Parmalat Sec. Litig.*,
    497 F. Supp. 2d 526 (S.D.N.Y. 2007) ............................................................ 127

*Pavelic & LeFlore v. Marvel Entm't Group*,
    493 U.S. 120, 110 S. Ct. 456 (1989) ............................................................ 81

*In re Pfizer, Inc. Sec. Litig.*,
    No. 04 Civ. 9866, 2008 WL 2627131 (S.D.N.Y. July 1, 2008) ........................................87-88

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d (S.D.N.Y. 2004) ............................................................ 114

*In re PMA Capital Corp. Sec. Litig.*,
    No. 03 Civ. 6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005) ............................................ 115

*Podany v. Robertson Stephens, Inc.*,
    318 F. Supp. 2d 146 (S.D.N.Y. 2004) ............................................................ 51

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) ............................................................ 33

*In re Quintel Entertainment Inc. Sec. Litig.*
    72 F. Supp. 2d 283 (S.D.N.Y. 2000) ............................................................ 64

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001) ............................................................ 33

*In re Read-Rite Corp. Sec. Litig.*,
    115 F. Supp. 2d 1181 (N.D. Cal. 2000) ............................................................ 49

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................ *passim*

*In re Refco, Inc. Sec. Litig.*,
    No. 05 Civ. 8626 (GEL), 2007 WL 1280649, at *5 (S.D.N.Y. Apr. 30, 2007) ...................... 37

*Ressler v. Liz Claiborne*,
    75 F. Supp. 2d 43 (E.D.N.Y. 1998) ............................................................ 66

*Rivell v. Private Health Care Sys., Inc.*,
    520 F.3d 1308 (11th Cir. 2008) ............................................................ 105

*Roberts v. Heim*,
   670 F. Supp. 1466 (N.D. Cal. 1987) ...................................................................... 118

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................. *passim*

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ................................................................. 43, 58, 60

*Royal American Managers, Inc. v. IRC Holding Corp.*,
   885 F.2d 1011 (2d Cir.1989) ................................................................. 91

*S.E.C. v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) ................................................................. 88

*In re Salomon Analyst AT&T Litig.*,
   350 F. Supp. 2d 455 (S.D.N.Y. 2004) ................................................................. 51, 118

*In re Salomon Analyst Level 3 Litig.*,
   373 F. Supp. 2d 248 (S.D.N.Y. 2005) ................................................................. 51

*Santa Fe Industries, Inc. v. Green*,
   430 U.S. 462 (1977)................................................................. 69, 90, 93

*In re Saxon Sec. Litig.*,
   No. 82 Civ. 3103, 1984 WL 2399 (S.D.N.Y. Feb. 23, 1984) ................................................................. 114

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974)................................................................. 37

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007)................................................................. 101

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................. 43, 58-59, 61

*SEC v. Caserta*,
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ................................................................. 33

*SEC v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) ................................................................. 90

*SEC v. U.S. Envtl., Inc.*,
   155 F.3d 107 (2d Cir. 1998) ................................................................. 90

*SEC v. Zandford*,
   535 U.S. 813 (2002)................................................................. 90

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) ................................................................ 101

*In re Sept. 11 Property Damage and Business Loss Litig.*,
481 F. Supp. 2d 253 (S.D.N.Y. 2007) ................................................................ 122

*Shapiro v. UJB Financial Corp.*,
964 F.2d 272 (3d Cir.), *cert. denied*, 506 U.S. 934 (1992) .................................... 76

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994) ............................................................................ 68

*In re Sina Corp. Sec. Litig.*,
No. 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089 (S.D.N.Y. Sept. 25, 2006) ............ 72

*In re Sipex Corp. Sec. Litig.*
No. 05 Civ. 00392, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ............................ 61

*Sloman v. Presstek, Inc.*,
No. 06 Civ. 377, 2007 WL 2740047 (D.N.H. Sept. 18, 2007) ................................ 41

*South Ferry LP v. Killinger*,
No. 06 Civ. 35511, 2008 WL 4138237 (9th Cir. Sept. 9, 2008) ............................... 55

*Stafford v. Bakke*,
No. 02 Civ. 1132, 2005 WL 1656855 (S.D. Ind. July 7, 2005) ............................... 107

*Stavros v. Exelon Corp.*,
266 F. Supp. 2d 833 (E..D. Ill. 2003) ................................................................ 43

*Steinberg v. Sherman*,
No. 07 Civ. 1001, 2008 U.S. Dist. LEXIS 37367 (S.D.N.Y. May 8, 2008) ............... 89

*In re Sterling Foster & Co., Inc., Sec. Litig.*,
222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...................................................... 91, 126

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
128 S. Ct. 761 (2008) ..................................................................................... 90

*In re Storage Tech. Corp. Sec. Litig.*,
630 F. Supp. 1072 (D. Colo. 1986) ................................................................... 118

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) .............................................................................. 94

*Superintendent of Ins. v. Bankers Life & Cas. Co.*,
404 U.S. 6 (1971) .......................................................................................... 90

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ........................................................................... 109

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................ 39

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) .............................................................. 41-42, 46, 68

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988) ................................................................ 118

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)............................................................................... *passim*

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ................................................................................. 63

*In re Tower Automotive Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ................................................. 94, 97, 101

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002)..................................................................... 81

*In re Tyco Intern., Ltd. Multidistrict Litig.*,
    No. 03 Civ. 1352, 02 MDL 1335, 2007 WL 1703067 (D.N.H. June 12, 2007) ...... 96

*U.S. v. Bongiorno*,
    No. 05 CR. 390, 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ............................. 92

*United States v. O'Hagan*,
    521 U.S. 642 (1997)........................................................................................... 90

*In re USA Talks.com Inc. Sec. Litig.*,
    No. 99 Civ. 0162, 2000 WL 1887516 (S.D. Cal. Sept. 14, 2000) ....................... 103

*In re Van der Moolen Holding N.V. Sec. Litig.*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ..................................................... 29, 86, 88

*Vandenberg v. Adler*,
    No. 98 Civ. 3544, 2000 U.S. Dist. LEXIS 4050 (S.D.N.Y. Mar. 31, 2000) ...... 90, 91

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y 2006) ............................................................... 53, 70

*Virginia Bankshares v. Sandberg*,
    501 U.S. 1083 (1991)........................................................................................ 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003), *reconsideration denied*,
No. 02 Civ. 5571, 2004 WL 2375830 (Oct. 22, 2004) ................................................. 29, 78, 89

*Watts v. Fla. Int'l Univ.*,
495 F.3d 1289 (11th Cir. 2007) ........................................................................... 105

*Wieland v. Stone Energy Corp.*,
No. 05 Civ. 2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007) ............................................ 96

*In re Winstar Communications Sec. Litig.*,
No. 01 Civ. 3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .............................................. 98

*In re WorldCom Sec. Litig.*,
294 F. Supp. 2d 392, (S.D.N.Y. 2003), *aff'd*, 366 F.3d 70 (2d Cir. 2004) .................... 104, 122

*In re WorldCom, Inc. Sec. Litig.*,
No. 02 Civ. 3288, 2004 WL 555697 (S.D.N.Y. Mar. 19, 2004) ........................................... 114

*In re WRT Energy Sec. Litig.*,
No. 96 Civ. 3610, 96 Civ. 3611, 2005 WL 323729 (S.D.N.Y. Feb. 9, 2005),
*vacated in part on other grounds,* 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) ................ 111

*In re WRT Energy Sec. Litig.*,
Nos. 96 Civ. 3610-3611, 1997 WL 576023 (S.D.N.Y. Sept. 15, 2007) ................................... 58

*In re Xcelera Com Sec. Litig.*,
430 F.3d 503 (1st Cir. 2005) ............................................................................. 99

*In re Xerox Corp. Sec. Litig.*,
165 F. Supp. 2d 208 (D. Conn. 2001) .............................................................. 54, 84

*In re Yukos Oil Co. Sec. Litig.*,
No. 04 Civ. 5243, 2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. Oct. 25, 2006) ........................... 89

*Yung v. Lee*,
432 F.3d 142 (2d Cir. 2005) ............................................................................ 120

**Statutes**

15 U.S.C. §77k(a) ................................................................................. 103, 119, 123

15 U.S.C. §77k(b)(3) ..................................................................................... 122

15 U.S.C. §77k(b)(3)(A) ................................................................................. 103

15 U.S.C. §77k(e) ......................................................................................... 107

15 U.S.C. §77l ........................................................................................ *passim*

15 U.S.C. §77l(a)(2) ................................................................................. 104

15 U.S.C. §78j(b) ................................................................................. *passim*

15 U.S.C. §78n ................................................................................. *passim*

15 U.S.C. §78t(a) ................................................................................. *passim*

15 U.S.C. §78u-4(b)(1) ................................................................... 70, 84

**Rules**

17 C.F.R. §230.415 ................................................................................. 116

17 C.F.R. §240.10b-5 ................................................................... *passim*

Fed. R. Civ. P. 8 ................................................................... *passim*

Fed. R. Civ. P. 8(a) ................................................................... 9

Fed. R. Civ. P. 9(b) ................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ................................................................... *passim*

Fed. R. Civ. P. 15(a) ................................................................... 128

Fed. R. Civ. P. 41(a)(1) ................................................................... 1

**Secondary Authorities**

2 Restatement §50, Comment *a,* (1964) ............................................ 41

5B Wright & Miller (3d ed. 2004 and Supp. 2007) ............................ 39

Proposed Agency Information Collection Activities, Comment Request,
    67 Fed. Reg. 46,250 (July 12, 2002) ............................................ 28

Shelf Registration, Release No. 6499,
    S.E.C. Docket 138, 1983 WL 408321 (S.E.C. Release No. Nov. 17, 1983) .................... 116

Lead plaintiff, State Teachers Retirement System of Ohio ("Lead Plaintiff") and plaintiff Gary Kosseff (together, "Plaintiffs"), respectfully submit this memorandum in opposition to defendants' motions to dismiss the Consolidated Amended Class Action Complaint ("Complaint").[1]

## I.     Preliminary Statement

Defendants' motions are based on the faulty premises that there is no way that they could have foreseen Merrill's exposure to the billions of dollars of risky U.S. subprime residential mortgage-related and asset-backed securities, collateralized debt obligations ("CDOs"), and related exposures and activities (hereinafter referred to as U.S. subprime ABS CDOs" or "U.S. subprime ABS CDO exposures"), which were hidden on the bank's balance sheet, and that the Complaint alleges nothing more than "fraud by hindsight." They construct these premises by distorting the allegations of the Complaint and, when that is not sufficient, relying on factual materials from outside the four-corners of the pleading that are not properly considered on a motion to dismiss. In contrast to the alternative factual assumptions that Defendants improperly ask the Court to accept on a motion to dismiss, the Complaint alleges that Merrill and its top

---

[1]     The Complaint alleges a class period of October 17, 2006 to January 16, 2008 (the "Class Period"). There are, in effect, two separate complaints pleaded in the Complaint. The first part of the Complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5(b) and Rules 10b-5(a) and (c). The Exchange Act section alleges knowing or reckless behavior by the defendants. The defendants in this section are Merrill Lynch & Co., Inc. ("Merrill" or the "Company") and four of its present or former officers: Stanley O'Neal ("O'Neal"), Ahmass L. Fakahany ("Fakahany"), Gregory J. Fleming ("Fleming") and Jeffrey N. Edwards ("Edwards") ("Individual Defendants" and collectively with Merrill the "Defendants"), as well as Merrill's wholly-owned broker/dealer subsidiary, Merrill Lynch Pierce Fenner & Smith Inc. ("MLPFS"). The plaintiff in the Exchange Act section is Lead Plaintiff. The second section of the Complaint is brought by both Plaintiffs and is pleaded, in effect, as a separate complaint. It alleges that certain offerings of Merrill securities contained misrepresentations and omissions of material fact. There are no allegations of knowing or reckless behavior. The defendants are Merrill, the issuers, persons who signed the registration statements and Deloitte & Touche LLP ("Deloitte"), Merrill's outside auditor. The lead underwriters of those offerings were also named as defendants in the Complaint. However, Lead Plaintiff voluntarily dismissed those defendants without prejudice in accordance with Fed. R. Civ. P. 41(a)(1) with the approval of this Court on August 5, 2008 (Doc. No. 93).

executives were anything but unwitting victims of the subprime crisis that was threatening Merrill.

As alleged, Merrill was involved in all stages of the subprime mortgage business.  It had investments in subprime originators.  It originated loans through its own subprime loan origination unit and purchased billions of dollars of loans from other subprime originators.  It pooled and securitized these loans and then financed and underwrote billions of dollars of subprime CDOs.  All along the way, Merrill charged massive fees for its services.  In addition, when Merrill could not unload tranche after tranche of the CDOs – because there were no buyers – tens of billions of dollars of these risky, illiquid products built up on its balance sheet.  Indeed, during the Class Period, Merrill amassed $40 billion of unsold CDOs, backed in large part by subprime mortgages.

Thus, the Complaint alleges that Merrill, by virtue of its central role in all stages of the subprime process, had special access to, and detailed knowledge of, the very information that was not available to the investing public and that showed that the CDOs, hidden from view on its books, were risky, overvalued and subject to collapse.  Defendants had this knowledge well before Merrill began to make its first corrective disclosures in October 2007.  Combined with the other specific allegations of knowledge, this is anything but a case of failure to predict or "fraud by hindsight."

On the contrary, Merrill's ship was sinking.  It had hit a rocky shoal and its hold was filling with water.  Defendants hid Merrill's problems for as long as possible, while giving assurances that its risk management process was well structured, closely monitored, carefully adhered to and controlled, and that its risks were hedged and minimal.  Merrill's ship did not right itself, and its deceptions have cost Lead Plaintiff and other investors billions of dollars.

When the truth about Merrill's exposure to more than $40 billion in subprime-backed debt was revealed, Merrill took belated write-offs in excess of $30 billion. Merrill's stock traded as high as $97.53 per share while Defendants hid Merrill's $40 billion-plus exposure and Merrill's stock plummeted to $49.45 per share when the truth was revealed. Indeed, Merrill's hidden subprime-related problems were so severe that Merrill's record profits for 2006 and the first quarters of 2007 have been more than wiped out by the over $30 billion of write-downs Merrill took in the third and fourth quarters of 2007 and the first quarter of 2008.

A.     **The Complaint Alleges Adequately Claims Under Section 10(b) of the Exchange Act**

1.     **False Statements**

Defendants concentrate most of their arguments on Lead Plaintiff's claim under Section 10(b) and Rule 10b-5(b) thereunder. As alleged, Defendants did not disclose, and actively concealed, that Merrill was rapidly stockpiling tens of billions of dollars of risky CDOs on its balance sheet.

Contrary to Defendants' assertion that the CDO market remained liquid until August 2007 (Merrill Br. at 3, 24), the Complaint alleges that Merrill had difficulty selling CDO tranches it was underwriting (including mezzanine and super senior tranches) and that it was forced to retain material portions of the CDO debt. (¶¶89-91, 274).[2] Since Merrill could not sell these CDO tranches, it was forced to retain the CDO debt and became a major, but undisclosed, holder of U.S. subprime ABS CDOs. Based on Merrill's inability to sell the CDO debt, its balance sheet piled up from approximately $1 billion in July 2006 to over $40 billion worth of risky subprime ABS CDOs as of June 29, 2007. (¶¶21, 32, 274). None of this was disclosed to investors until October 2007 and even then Merrill continued to mislead investors.

---

[2]     Paragraph references are to the Complaint.

These mortgage-backed products were a material risk to Merrill's existence, yet they were hidden from the investing public by a web of false statements and omissions alleged in the Complaint. Incredibly, despite containing mountains of facts, figures and details, the words "collateralized debt obligations" or "CDO" do not even appear in Merrill's annual report filed on Form 10-K with the SEC for the fiscal year ended December 29, 2006 ("2006 10-K"). Worse yet, as analysts and investors became increasingly concerned about how the looming subprime crisis might affect Merrill, Defendants deliberately misled them into believing that the Company did not have significant exposure to U.S. subprime ABS CDOs. Compounding their failure to disclose the truth concerning Merrill's CDOs, Defendants touted Merrill's aggressive risk management system, thus further lulling the investing public into believing that Merrill was a sound financial institution protected by rigorous internal controls, when in fact the opposite was true. These allegations are largely ignored in Defendants' motions.

Defendants contest, however, that the false statements alleged in the Complaint are actionable under Section 10(b), basically arguing three points: (1) Defendants had no duty to provide or clarify the true facts regarding Merrill's CDO exposure; (2) the Complaint did not plead the facts with sufficient particularity; and (3) Defendants did not misstate or omit material facts. Defendants miss the mark at every turn.

*First*, Defendants had a duty to disclose information about the CDOs. Deliberately and repeatedly throughout the Class Period, Defendants gave investors the misleading impression that Merrill's exposure to subprime mortgages was minimal. Defendants made these statements, even though they knew of additional information that made those statements false, including that Merrill had abandoned its time-tested risk management guidelines and had allowed CDO tranches to build up. But the undisclosed truth, which was known to Defendants, was that the

4

CDO market had been in significant decline during the Class Period. By failing to disclose this, Defendants violated, at a minimum, the duty imposed upon them by Rule 10b-5(b), which prohibits the maker of a statement from omitting information that would make a statement not misleading.

*Second*, Lead Plaintiff's allegations regarding Defendants' misstatements are pleaded with ample detail and specificity. The Complaint identifies all of the relevant actors, dates, places and other detail needed to identify the "who, what, when, where and why" demanded by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants misrepresented, *inter alia*, that (a) Merrill adhered to underwriting standards to manage the credit risk, (b) any additional credit risk resulting from certain riskier mortgage loans was addressed through "adherence to underwriting guidelines," and (c) loans were "predominantly extended to high credit quality borrowers." Defendants knew how they ran their own business, and they knew that these statements were false. Further, Defendants cannot neutralize these misstatements by arguing that they were mere opinions or puffery or that they fell under the PSLRA's safe harbor provision for forward-looking statements precisely because these statements were, by definition, statements of purportedly then-existing and historical fact.

*Third*, Lead Plaintiff has properly alleged that Defendants violated Generally Accepted Accounting Principles ("GAAP") and, in doing so, misstated Merrill's earnings. At a very minimum, Statement of Financial Accounting Standards ("FAS") No. 107, among other provisions of GAAP cited in the Complaint, required Defendants to disclose Merrill's concentration of risky CDO assets by at least the beginning of the Class Period. Merrill failed to disclose the risk and instead waited until it had begun to disclose its losses. Further, Merrill does not dispute that GAAP required it to carry the CDOs at fair value and to write down to fair value

the CDOs if their value became impaired.  Plaintiff alleges that, despite knowledge of these

GAAP requirements and the decline in the value of Merrill's CDOs during the Class Period,

Merrill's financial statements during the Class Period were false and misleading because they

failed to disclose Merrill's exposure to the concentration of risky CDO assets on its books and

then misstated the value of these assets.

## 2.    Scienter

Defendants devote the bulk of their discussion to scienter, arguing that Merrill's losses

were an unforeseeable consequence of the subprime debt crisis, and as noted at the outset, that

Lead Plaintiff's claims are merely "fraud by hindsight."  Their scienter argument is founded on

three fundamental legal errors.

*First*, under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499 (2007), this

Court must consider all of the allegations of the Complaint as a whole and determine whether the

inference that Defendants acted with scienter is at least as likely as non-culpable explanations

that one could infer from the allegations of the Complaint.  In direct contravention of this rule,

Defendants attempt to atomize the Complaint and argue that each particular allegation is

insufficient, on its own, to establish a strong inference of scienter.  When viewed holistically, as

the law requires, the Complaint easily satisfies the *Tellabs* standard.

*Second*, in arguing that each scienter allegation, when considered on its own, is

insufficient to support a strong inference of scienter, Defendants make factual arguments, often

based on materials outside the four corners of the complaint (and documents referred to therein),

that are simply not permissible on a motion to dismiss.[3]  For example, Defendants rely on

statements by the current and former chairmen of the Federal Reserve.  The allegations of the

---

[3]      Filed concurrent herewith is Plaintiffs' Motion to Strike Extrinsic Documents and Certain Arguments Made by the Merrill Defendants and Defendants Edwards, O'Neal, Fakahany and Fleming in their Motions to Dismiss the Consolidated Amended Class Action Complaint ("Plaintiffs' Motion to Strike").

Complaint must be taken as true for purposes of this motion (*see* n.18, *infra*), and must be used as the basis for the *Tellabs* analysis. Defendants' efforts to argue that the facts are different, and that non-culpable explanations can be inferred from those different facts, should be rejected.

*Third*, Merrill distorts the case law holding that, in certain circumstances, a plaintiff can establish scienter by alleging that the defendants had access to reports showing adverse information. Defendants misinterpret these cases to mean that its executives had to see reports stating that the Company's valuation of the CDOs was wrong. That is not a requirement for pleading fraud. More fundamentally, Merrill's argument misperceives one of the bases for the Complaint – namely, that Merrill was intimately involved in all stages of the subprime lending and securitization process; that Defendants had a wealth of information indicating that the CDOs were risky and illiquid; that Merrill was carrying these assets at inflated values at which they could not be sold; and that the products were amassing on Merrill's balance sheet at an alarming rate. The information available was more than sufficient to demonstrate a high degree of risk and establish scienter as to Defendants' numerous false statements and material omissions.

Moreover, there is extensive additional evidence alleged establishing Defendants' scienter. Two examples illustrate the wealth of detail alleged. Michael Blum ("Blum"), a Merrill Managing Director, was Merrill's designee on the board of Ownit Mortgage Solutions, Inc. ("Ownit"), a subprime originator in which Merrill owned a 20% interest. In early 2006, Blum, who was the head of the Merrill Global Credit Real Estate and Structured Products group, instructed Ownit's president to relax the originator's underwriting standards, so that it could sell more loans, $6 billion of which Merrill purchased in 2006 alone. (¶¶129-37). Indeed, these facts also support Lead Plaintiff's claims of scheme liability under Rules 10b-5(a) and (c), which Merrill's motion largely ignores.

7

Another illustration of facts alleged that further supports scienter involves Jeffrey Kronthal ("Kronthal"), head of Merrill's Global Credit Real Estate and Structured Products, Global Markets and Investment Banking, who then ran Merrill's CDO business.  Lead Plaintiff details with specificity that Kronthal told senior Merrill executives in July 2006 – before the Class Period even began – that the Company's CDO business model was broken, that Merrill was taking too much risk onto its balance sheet, and that to continue underwriting these deals would require the firm to assume tens of billions of dollars of market and credit risk.  Rather than heeding these warnings, CEO O'Neal fired Kronthal and five other members of his group that very month (July 2006).

These and other alleged facts easily overcome the non-culpable litigation-driven explanations offered by Defendants.  When the facts alleged are considered as a whole, it is not possible to ascribe the Company's demise to an unexpected market meltdown and nothing else.  There were not only red flags waving, but a field of red flags known to Defendants that Merrill's situation was precarious and that the hidden CDOs presented an undisclosed, material risk to the Company.  Defendants were not spectators who were unexpectedly swept up in an unforeseen flood of misfortune as their motions portray, but, in fact, they had built, and were well aware of, the very subprime securitization machine that, in the end, blew up and sank their ship.  Defendants' intimate involvement in this securitization process establishes their scienter.

### 3.    Loss Causation

Defendants also argue that Lead Plaintiff has failed to plead loss causation.  Although under Fed. R. Civ. P. 8(a)(2), plaintiffs are only required to allege "a short and plain statement" with regard to loss causation, Plaintiff here alleges far more.  The Complaint alleges that Defendants made materially misleading statements and omitted material facts during the Class

Period concerning, *inter alia*, the risks to Merrill's financial condition posed by its exposure to subprime-related assets. Plaintiff alleges in detail that the risks materialized, the truths behind these misrepresentations and omissions were revealed, and Merrill's stock price declined as a result of each revelation. There is no question that the Complaint adequately pleads loss causation, including, for example, with respect to the October 24, 2007 and January 16, 2008 (the last day of the Class Period) disclosures which Defendants' motions do not even specifically address, much less refute. This is more than sufficient to meet the standards for pleading loss causation at the motion to dismiss stage.

B.    **The Complaint Alleges Adequately Claims Under Sections 11 and 12 of the Securities Act and Section 14(a) of the Exchange Act**

With respect to the Securities Act and Proxy claims, Defendants argue that these claims do not meet the pleading requirements of Fed. R. Civ. P. 8(a) and that they "sound in fraud."[4] Defendants are wrong since the Securities Act and Proxy claims allege that facts existed at the time Defendants made untrue statements or omitted material facts, including concerning Merrill's massive exposure to U.S. subprime ABS CDOs throughout the Class Period. These claims do not sound in fraud because the Complaint carefully and systemically segregates the fraud allegations from the non-fraud allegations. In analogous circumstances, numerous courts have squarely rejected the same shopworn "sound in fraud" argument that Defendants make here.

---

[4]    The "Securities Act and Proxy claim" section of the Complaint refers to ¶¶432-68.

## II.    Statement of Facts

### A.    Defendants Engaged in a Massive Fraud by Concealing from Investors Merrill's Exposure to CDOs Backed by Subprime Mortgages

#### 1.    Merrill Rapidly Expanded, and Became a Leader in, CDO Underwriting

In 2002, Merrill underwrote approximately $2.2 billion in CDOs and was not a major player in the CDO market.  (¶18).  By 2005, however, Merrill's total CDO underwriting increased to approximately $35 billion, of which $14 billion was backed by securities tied to subprime mortgages.  (*Id.*).  In 2006, Merrill underwrote $53.7 billion of CDOs, of which more than two-thirds were backed by subprime mortgages.  (*Id.*).

O'Neal, who became Merrill's CEO in late 2002, viewed the CDO market as an untapped resource for expanding Merrill's revenue and profits.  (¶17).  Based on Merrill's increased underwriting of CDOs and its typical fee of at least 1.25% to 1.5% of the face value of the CDO, Merrill's underwriting fees alone for CDOs grew to $400 million in 2005 and $700 million in 2006.  (¶18).  However, the increased underwriting fees also resulted in Merrill being forced to retain approximately $40 billion of U.S. subprime ABS CDOs on its balance sheet.

Merrill played an active role in compiling the pools of loans that served as the collateral for the residential mortgage-backed securities ("RMBS") and other assets that backed CDOs.  To help fuel Merrill's increasing issuances of CDOs, Merrill provided warehouse lines of credit to subprime mortgage originators who, in turn, sold the mortgages to Merrill to securitize into mortgage-backed securities ("MBS"), which were then pooled and securitized into CDOs.  (¶¶81-82).

Starting well before the October 17, 2006 commencement of the Class Period, Merrill began to purchase large quantities of "subprime mortgages" – *i.e.*, mortgage loans to borrowers

who could not meet the credit requirements necessary to receive conforming loans. This was a plentiful, if risky, source of additional collateral to back new CDO underwritings. (¶¶77, 79-80).

Merrill's CDO machine took advantage of, and also helped fuel, the unprecedented growth of mortgage lending to unsophisticated and/or poor credit borrowers. By 2006, a great majority of the loans that Merrill purchased from specialized subprime loan originators such as Ownit, Mortgage Lenders Network USA, Inc. ("MLN") and ResMAE, as well as those originated by its First Franklin unit purchased in December 2006, were made to borrowers with poor credit history, no income verification, and/or loans with high loan-to-value ratios, such as 100% financing (typically referred to as subprime loans). (¶77).

Thus, even though the highest rated notes issued by the CDOs, called the "super senior" tranches, were AAA-rated, they were for the most part backed by and dependent on payments from cash flows from BBB-rated RMBSs comprised of subprime loans which were BBB-rated assets. In other words, while the debt may have been AAA-rated or super senior, that rating simply meant that holders of the debt were in a superior position to other holders of the debt in the CDO. It in no way meant that the underlying assets shared this high rating. In addition, the debt layers below the AAA and super senior tranches were often as little as 10% of the CDO debt (¶89), so in practice it did not take a large amount of losses before the AAA or super senior portions of the debt were negatively affected. When the U.S. housing market began to show signs of deterioration in 2006, instead of scaling back their risk, Defendants increased Merrill's risk dramatically by purchasing subprime lender First Franklin, and by otherwise placing Merrill's CDO machine into overdrive. (¶¶77, 80-82). At the same time, Defendants continued to publicly minimize the Company's exposure to U.S. subprime ABS CDOs.

11

### 2.     As the Market for CDOs Declined, Merrill Was Forced to Accumulate Billions of Dollars of CDOs on its Balance Sheet

By 2006, the housing market slowed, and demand for CDOs backed by subprime debt also slowed due to market concerns about the growing default rates in the underlying subprime mortgages.  Merrill experienced increasing difficulties selling the CDO tranches, including the super senior tranches of the CDOs (¶¶31, 90, 274), which were often as much as 90% of the debt issued by each CDO.  (¶89).  As a result, Merrill's role secretly expanded from primarily being an underwriter of CDOs to also being a major holder of risky U.S. subprime ABS CDOs.  While Merrill was still able to purportedly earn profits from underwriting CDOs, the larger the CDOs became, the more undisclosed risk it undertook because it had to retain a growing concentration of U.S. subprime ABS CDOs on its balance sheet.  (¶22).  By mid-2006, Merrill began to accumulate $5-$6 billion per quarter in risky CDO assets.  (*Id.*).  However, at no time prior to October 2007 was this increasing exposure disclosed to investors.

### 3.     Defendants Secretly Sought Insurance from Less Creditworthy Insurers and Left Merrill's Balance Sheet Exposed

In 2005, American International Group, Inc. ("AIG"), aware of the decline in the quality of mortgage loans, stopped insuring Merrill's growing CDO exposure.  Previously, Merrill relied on insurance purchased from AIG to "hedge" significant balance sheet risks created through Merrill's accumulation of unsold portions (including the so called "super-senior" tranches) of CDOs it underwrote.  (¶100).  Thus, Merrill began holding larger portions of CDO debt on its own books which it could not sell and could not adequately offset its risk.

With AIG no longer insuring CDOs, in late 2006 and 2007 and as Merrill's balance sheet became bloated with additional billions in unsold CDO tranches, Merrill's top managers embarked on a new plan, internally referred to as the "mitigation strategy." (¶102).  Knowing that Merrill's CDO exposure had ballooned out of control and fearful of disclosing this to the

market, Defendants attempted to hedge Merrill's exposure through financial guarantee deals with smaller and lower capitalized bond insurers.  (¶¶101-03).

Merrill entered into billions of dollars of credit default swaps ("CDS") with these insurers.[5]  The insurers included entities like ACA, a single A-rated insurance company with severely limited capital (which insured AAA-rated debt), as well as XL, an over-leveraged insurer.  These entities were themselves exposed to tens of billions in subprime debt.  (¶39).  It was undisclosed that AIG would no longer insure Merrill CDOs and that Merrill attempted to partially hedge its exposure through these insurers, but Merrill's risk exposure had greatly increased since, at the time, these insurers were not nearly as financially secure as AIG.

Nevertheless, Merrill's public statements during the Class Period falsely assured investors that risk was being managed by effective hedges, when in fact the opposite was the case.  (¶¶41-52, 92-110, 179-84).  Since October 2007, Merrill has written down approximately $6.1 billion in essentially worthless financial guarantees from these insurers.  (¶¶103, 107, 235, 238(d)).

### 4. Kronthal, a Senior Merrill Executive, and His Team Were Fired for Warning Defendants that Merrill Was Taking on Excessive Risk

Among Kronthal's responsibilities as head of the CDO business was to determine how much CDO exposure Merrill could afford to take on, consistent with the Company's overall risk guidelines.  Kronthal had imposed a limit on the amount of CDO exposure the firm could keep on its books of approximately $3-$4 billion.  In the summer of 2006, Kronthal warned top Merrill executives that Merrill's CDO business model was adding too much risk to the Company's balance sheet, that Merrill was too exposed to U.S. subprime ABS CDOs, and that to

---

[5]     CDSs were similar to insurance policies in that they required Merrill to make periodic payments, in exchange for which the "counterparty" would be required to make payments to Merrill in the event of credit defaults in the referenced assets, which were typically MBSs or CDOs.

continue underwriting these deals would require Merrill to assume tens of billions of dollars of additional market and credit risk. (¶109). Nonetheless, Merrill's top management did not heed Kronthal's warning. Instead, O'Neal fired Kronthal and five other members of his group, including Douglas DeMartin and Harry Lengsfield. (*Id.*). Even in light of decreased underwriting standards and AIG's exit from the market, O'Neal wanted to continue increasing Merrill's CDO businesses because the fees it generated were enabling Merrill to report purportedly improved financial results and enabling him and other senior Merrill executives to receive higher bonuses and other compensation. (¶¶8, 16(b), 34-36, 92-115).

After Kronthal was fired, Defendants totally ignored Kronthal's established limits, eventually causing Merrill to exceed them more than ten-fold, as the amount of U.S. subprime ABS CDO exposure on Merrill's books increased to more than $40 billion by June 2007. (¶¶8, 36, 38, 101, 109).

>      **5.    By the Beginning of the Class Period, Loans Purchased by Merrill from Subprime Originators Experienced Huge Increases in Early Payment Defaults**

By the end of 2005, the upsurge in appreciation of home prices had peaked and began to materially decline, as did the quality of subprime mortgage loans that were securitized. (¶¶116-17). As a result of the lowered underwriting guidelines which Merrill first encouraged and eventually mandated, by the beginning of the Class Period, Merrill had experienced at least $400 million of early defaults on loans it purchased from subprime originators such as ResMAE, MLN and Ownit. Consequently, Merrill began exercising "put" options and attempted to force these subprime originators to take back the defaulting loans. (¶¶16(i), 37, 116-41, 292). However, by the beginning of the Class Period, the subprime originators were in great financial difficulty or

bankrupt (*see, e.g.,* ¶118) and, therefore, Defendants knew the so-called put rights were essentially worthless.  (¶124).

An example of how Merrill encouraged and financed loans to subprime borrowers (so that it could have more and more product to feed its CDO machine) is demonstrated by Ownit. (¶¶129-37).  In late 2005, Merrill purchased a 20% interest in Ownit, a subprime mortgage originator.  (*Id.*).  Merrill exerted substantial control over Ownit through its ownership interest. In addition, Merrill extended Ownit a $3.5 billion line of credit and two-thirds of Ownit's mortgage originations were sold to Merrill.  (*Id.*).  Blum, a Merrill Managing Director and its Head of Global Structured Finance and Investment ("GSFI") group, was Merrill's designated representative on the Ownit board.  A Merrill executive worked out of Ownit's office to oversee the origination of loans for Merrill.  In early 2006, Blum instructed Bill Dallas ("Dallas"), the President of Ownit, to reduce Ownit's underwriting standards so Ownit could issue more subprime mortgages, thereby giving Merrill more product for its securitizing practices.  (¶¶7, 16(h), 129-35).  Dallas told Blum that materially lowering underwriting standards virtually guaranteed materially greater defaults, but Ownit lowered the standards anyway.  (¶¶7, 133). Between September 2005 and December 2006, Ownit originated approximately $6 billion of loans that were sold to Merrill.  (¶129).  Predictably, as a direct result of the lowering of underwriting guidelines, Ownit began to experience increased defaults.  Ownit declared bankruptcy in December 2006.  (¶136).  Thus, Merrill sought another source of subprime loans through its acquisition of First Franklin.  (¶¶77, 80, 135).

### 6.    Defendants Further Increased Risk by Creating Synthetic Securities Which Were Undisclosed Side Bets on CDOs

Even though Merrill instructed Ownit to reduce underwriting standards to obtain more subprime mortgages, Merrill still did not have enough subprime debt to increase the size or

number of its CDOs. (¶26). To continue churning out new CDOs, Defendants created derivative securities such as CDSs and total return swaps and used these "synthetic" financial instruments as collateral for new CDOs. (¶85). These derivatives are contractual arrangements where one party agrees to pay a counterparty a fee in exchange for protection in the event of defaults in referenced assets – *e.g.*, subprime mortgage-backed securities. Thus, they are based upon and mimic the performance and risks of the underlying subprime MBS. (¶213). Often MBS were only a small portion – 10% to 20% – of the collateral for the CDOs. The remainder was typically made up of financial derivative instruments such as CDSs. By creating derivatives, the same assets could simultaneously serve as collateral for more than one CDO.

This enabled Merrill to increase the size of CDOs and its purported revenue and profits from CDOs, since its underwriting fees were based upon the size of the CDOs. (¶¶87-89). But by entering into these speculative derivative contracts, Merrill was making an undisclosed side bet of billions of dollars that the underlying MBS would perform as required by the CDO. (¶¶26, 29, 84-86). Additionally, as Merrill underwrote more CDOs of greater size, it was forced to acquire and retain on its books increasing portions of CDOs it was unable to sell. Consequently, while Merrill was able to report purported increased revenues and profits in the short term, it also secretly magnified its risks exponentially since these tens of billions of dollars of additional side bets were built on a shaky foundation of subprime mortgages. (¶¶9, 28).

### 7. Bear Stearns Hedge Funds Collapsed and Merrill Was Unable to Sell its Assets

In or around April 2007, two hedge funds run by Bear Stearns containing significant subprime holdings including CDOs (some of which were underwritten by Merrill), had become significantly impaired. (¶156). Merrill had loaned approximately $850 million to the Bear Stearns hedge funds so that they could buy CDO assets underwritten by Merrill. The Complaint

further alleges that in June 2007, the hedge funds' creditors, including Merrill, met to discuss the financial condition of these hedge funds and Merrill moved to seize the assets that were collateral for its loans and attempted to auction them. (¶¶157-59). When the bids came in for the $850 million in collateral, many bids were materially below market prices (some were as low as 30% of par value and for others there were no bids). (¶160). Thus, Merrill was unable to sell all of these CDO assets or sold only a small portion of them at a steep discount. (¶161). This was an indication that these assets, and other similar assets on Merrill's balance sheet, had severely deteriorated in value.

### 8.    Merrill Attempted to Dump Accumulated CDOs on Unsuspecting Customers

At least two proceedings have been recently commenced alleging that during the Class Period, MLPFS, engaged in unauthorized sales of CDOs. (¶170). One such proceeding was brought by the Commonwealth of Massachusetts Securities Division. It alleged that MLPFS improperly sold the City of Springfield, Massachusetts approximately $13.9 million of CDOs in April and June of 2007. Merrill acknowledged that it improperly sold those CDOs and has agreed to reimburse Springfield the entire $13.9 million "purchase price" of these CDOs. (¶177). The other action, brought by MetroPCS Communications and MetroPCS Wireless, Inc., alleges that Merrill caused it to make $133.9 million in unauthorized purchases of CDOs and related securities. (¶¶170-73).

In addition, Merrill was accused of transferring the same control rights to certain CDOs with face values of billions of dollars to more than one counterparty in order to obtain financial guarantees to hedge its exposure on the CDOs. (¶¶179-84).

These actions are a clear indication both of the pressure that was on Defendants by the second quarter of 2007 to reduce Merrill's CDO exposure, and their knowledge that the CDO market had declined significantly by this time.

### 9. The CDO Assets Merrill Was Forced to Retain Became Impaired

In February 2007, the ABX and the TABX indices, which track prices of certain CDOs and CDO tranches, both started to show signs of material weakening due to rising defaults in subprime mortgages. (¶¶142-53). Merrill used the ABX to value CDOs. (¶329). By the end of the first quarter of 2007, the ABX and TABX declined significantly, by up to 40% at the BBB level, and by at least 15% at the super senior AAA level. However, despite this then-existing additional evidence of a downturn in the market for subprime-based CDOs, Defendants did not begin to write down the value of Merrill's U.S. subprime ABS CDOs until October 2007. (¶40).

Merrill's first and second quarter 2007 financial statements were false because Defendants failed properly to mark-to-market the true value of Merrill's U.S. subprime ABS CDOs and to recognize known losses (*i.e.*, impairments) related to the then-known significant declines in the value of its subprime-related securities. (¶¶142-61, 337-82). By the end of the first fiscal quarter of 2007 (March 30, 2007), Merrill was required by GAAP to write down at least 15% of its U.S. subprime ABS CDOs. (¶¶16(c)-(d), 40, 45, 259(e)). Further, these financial statements also failed to disclose Merrill's concentration of such highly risky securities and related losses and its financial exposure to such securities. (¶¶342, 350).[6]

By the end of June 2007, the ABX and the TABX continued to decline and the senior TABX tranche dropped in price to the mid-60s, losing close to 40% of its value. (¶152). Thus,

---

[6]     Similarly, by at least February 26, 2007, the date when Merrill's 2006 financial statements were filed with the SEC, there was a significant decline in market indices indicating that Merrill's subprime-related securities were overstated and impaired. This impairment was a "subsequent event" that was required to be disclosed in the 2006 10-K. (¶358). The Company's 2006 annual financial statements did not contain such a subsequent event disclosure, in violation of FAS No. 5. (*Id.*)

18

by June 29, 2007, Merrill was required by GAAP to write down at least $16 billion of its U.S. subprime ABS CDO exposure. (¶¶51-52, 99, 143, 151-52, 161, 276, 290(c)). Had Merrill's financial statements for the second quarter of 2007 properly accounted for the impairment of over $16 billion on U.S. subprime ABS CDO exposures, Merrill's reported net earnings would have declined from a reported profit of $2.1 billion, to a loss of $9.5 billion, and its earnings per diluted share would have declined from a reported profit of $2.24 per share, to a loss of $10.30 per share (¶¶290(c)).

FAS No. 5 as well as FAS No. 107, as amended by FAS No. 133, required disclosure of significant concentrations of credit risk arising from financial instruments. (¶360). The Company's 2006 annual financial statements and interim financial statements for the quarterly periods ended March 30, 2007 and June 29, 2007, failed to disclose its significant concentration in subprime-related securities (¶364) and, in particular, Merrill's huge concentration of credit risk to U.S. subprime ABS CDOs in violation of GAAP. (¶¶92-99, 142-53, 238, 259(e), 290(e), 337-82).

> **B.    The Market Is Stunned as Merrill Belatedly Reveals its Enormous Concentration of CDOs and Related Subprime-based Assets and Takes Unprecedented $30 Billion Write-Downs in Assets**

When Defendants began to disclose Merrill's CDO losses and exposures, the amounts were staggering. On October 5, 2007, the Company announced that it would take a charge of approximately $4.5 billion due to mortgage and credit problems. (¶198). Then, on October 24, 2007, Merrill announced that its third quarter charge related to CDOs and subprime mortgages would be $7.9 billion, nearly twice the amount disclosed less than three weeks earlier. (¶199). The price of Merrill's common stock and other securities it issued during the Class Period declined as a result. (¶¶15, 56, 306, 309, 312, 314, 395).

In the Company's 10-Q for the third quarter of 2007 filed on November 7, 2007, signed by Fakahany and Edwards, Merrill admitted for the first time that "[t]he losses in U.S. Sub-prime Residential Mortgage-related and ABS CDO activities in the third quarter reflect *a significant concentration in securities that accumulated as a result of our activities as a leading underwriter of CDOs*." (¶97) (emphasis added). Shortly before this announcement, on October 30, 2007, Merrill announced that O'Neal had decided to retire "effective immediately." (¶199). This announcement was followed with an announcement on November 1, 2007 that the SEC had begun an investigation of Merrill's valuation of, and disclosures regarding, its subprime mortgage-based securities. (¶200).

On January 17, 2008, Merrill announced a further write-down of $16.7 billion relating to its CDO and other subprime mortgage-related assets, and on April 17, 2008, Merrill disclosed another $9 billion in write-downs, which included $1.5 billion in CDOs and disclosed "credit valuation adjustments related to hedges with financial guarantors" of negative $3.4 billion. (*Id.*). In all, as of the date of the Complaint, Merrill had written down more than $30 billion in U.S. subprime ABS CDO exposures.

## III.    Argument

### A.    Defendants Had a Duty to Disclose the Massive Accumulation of CDOs on Merrill's Balance Sheet

SEC Rule 10b-5(b) prohibits "mak[ing] any untrue statement of material fact or . . . *omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading*." 17 C.F.R. §240.10b-5 (emphasis added). "Under this provision, even though no duty to make a statement on a particular matter has arisen, once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid

rendering the statements made misleading." *In re Par Pharmaceuticals, Inc. Sec. Litig.,* 733 F.

Supp. 668, 675 (S.D.N.Y. 1990).  *See also Virginia Bankshares v. Sandberg*, 501 U.S. 1083,

1098 n.7 (1991) (when a company chooses to speak, "there can be no question that the statement

[it] do[es] make carrie[s] with it no option to deceive").  "A statement is misleading if a

reasonable investor, in the exercise of due care, would have received a false impression from the

statement." *In re Par Pharmaceuticals,* 733 F. Supp. at 677.

Even literally true statements, when read as a whole and in context, can be misleading if

they fail to disclose material information.  As the Second Circuit observed in reversing a grant of

summary judgment based on statements that were deemed "literally true" by the district court:

> The central issue . . . is not whether the particular statements, taken separately,
> were literally true, but whether defendants' representations, taken together and in
> context, would have misled a reasonable investor about the nature of the
> debentures.
>
> Some statements, although literally accurate, can become, through context and
> manner of presentation, devices which mislead investors.  For that reason, the
> disclosure required by the securities laws is not measured by the literal truth, but
> by the ability of the material to accurately inform, rather than mislead prospective
> buyers.  *Greenapple v. Detroit Edison Co*., 618 F.2d 198, 205 (2d Cir. 1980)
> (where method of presentation or "gloss" placed on information obscures or
> distorts significance of material facts, it is misleading).

*McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), *cert.*

*denied*, 501 U.S. 1249 (1991).  The purpose of the disclosure requirements of the securities laws

is "to inform, not to challenge the reader's critical wits." *Virginia Bankshares*, 501 U.S. at 1097.

Accordingly, the Second Circuit has observed that a disclosure violates the federal securities

laws when material objective factual matters are "burie[d]" beneath other information "or treats

them cavalierly." *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (quotations omitted).

Assessed against the standards articulated above, there is no question that Merrill had a

duty to disclose its exposure to U.S. subprime ABS CDOs from the beginning of the Class

Period.  As the subprime mortgage market was imploding during the Class Period, Defendants

failed to disclose the build up of subprime assets on Merrill's balance sheet and the attendant

increased risk to Merrill.  In addition, Defendants made a series of statements calculated to

convey a highly misleading impression that the Company's exposure to subprime mortgages was

minimal and its risk exposure was being well-managed even though they had been warned by

Kronthal and they had lowered underwriting standards and were aware of the decline in the ABX

and CDOs.

In addition, in response to questions about Merrill's exposure, Defendants repeatedly and

falsely assured the market that Merrill had minimal exposure.  Defendants insisted that only a

tiny portion of Merrill's revenue was generated from the securitization of subprime mortgages

and origination of CDOs (¶243) and concealed Merrill's accumulation on its balance sheet of

tens of billions of dollars of CDO securities.  (¶¶20-21).  Moreover, Defendants hid the fact that

these securities had materially declined in value by the first quarter of 2007.  (¶150).  Instead of

disclosing the risk that this huge and growing accumulation represented, and the declining value

of these securities that stuffed Merrill's balance sheet, Defendants' statements were framed to

make it impossible even for an expert to glean the amount of assets backed by subprime

mortgages, or to get any meaningful sense of how large this exposure was.  (*See, e.g.,* ¶¶364-67).

Merrill does not attempt to argue that it was unaware of the massive concentration of

CDO holdings it had during the Class Period, or that the market was aware of it.  Instead, Merrill

makes the baseless assertion that prior to the announcement of its third quarter 2007 financial

statements, the Company was under no obligation to disclose this enormous concentration of

debt securities backed primarily by subprime mortgages, despite Defendants' public statements

explicitly downplaying Merrill's exposure. Merrill's argument is wrong. Merrill was in fact required to disclose this material risk, under both the federal securities laws and accounting rules.

> **1.    The Facts Known to Defendants During the Class Period and Defendants' Statements Gave Rise to a Duty to Disclose the True Extent of Merrill's CDO Exposure**

As stated above, by the beginning of the Class Period, Defendants had caused Merrill to accumulate billions in unsold CDO tranches on its balance sheet. Moreover, Defendants knew that the subprime market was negatively affected (¶120); that Merrill was knowingly or recklessly ignoring its risk management guidelines (¶¶92-99) by allowing CDO tranches to build up on its balance sheet; that Merrill had lowered its underwriting guidelines with respect to Ownit and others (¶¶124-41); that Merrill had experienced at least $400 million in early payment defaults (¶16(i)); and that AIG would no longer insure the CDO debt including the super senior debt, which had piled up on Merrill's balance sheet because it could not be sold (¶35). During this period, Defendants nevertheless failed to disclose the build up of Merrill's unsold CDO interests and their implications for Merrill's risk profile, and affirmatively misled investors regarding Merrill's financial operations and results.

For example, during an April 19, 2007 conference call with analysts to discuss Merrill's first quarter 2007 financial results, Edwards falsely claimed that the "clear dislocation" of the subprime mortgage market "did not impede the overall momentum of our franchise." (¶245). He then engaged in a lengthy and deliberately misleading discussion of Merrill's subprime mortgage activities. (*Id.*). Edwards was aware that the turmoil in the U.S. subprime market and Merrill's exposure to this market was of great concern to the investment community. However, he told investors that the proper "context" for viewing Merrill's subprime mortgage activities was from the standpoint of the revenues the Company generated. (*Id.*). At best, Edwards'

statement was a blatantly misleading half-truth that failed to disclose the concentration of tens of billions of dollars in CDOs on the Company's balance sheet and the risk exposure that Merrill faced as a result.

Edwards was asked explicitly by an analyst about Merrill's CDO exposure:

> I'm wondering if you guys have kind of changed your appetite in this environment or kind of rethinking what you put on your balance sheet or what type of risks you might take or if it has changed how you're approaching the business right now . . . I think there is a lot of concern out there because you guys are pretty active on the CDO side and on the warehouse side of that business. (¶246).

Edwards' response (quoted below) suggests that Merrill was selling all of the CDOs it had then been underwriting, although the undisclosed truth was that Merrill was experiencing increased problems selling its CDOs and had to retain billions of dollars in CDO tranches and was accumulating them on its balance sheet:

> In CDOs, in addition to having a very active ABS calendar, we saw attention in that business broadening out to other asset classes as well. But I would point out that even during the most uncertain times during the quarter, we were able to price transactions. We priced 28 CDO transactions in the quarter.  19 of them were ABS/CDOs, and more than ten of those deals were in the first couple of weeks of March. So while it was certainly a more difficult environment, ***we continued to see an ability to transact and to move volume.***  (*Id.*) (emphasis added).

Edwards also deceived investors by failing to disclose that Merrill was able to "price" the CDOs by "selling" some of them to unsuspecting public clients, using some as backing for new CDOs, and retaining huge amounts for its own balance sheet as trading assets.  (¶¶168-78, 246, 248).

But Edwards did not stop there.  His remarks to analysts also extolled the purported effectiveness of Merrill's risk management practices in mitigating the impact of the deterioration in the market:

> ***I would also point out that our risk management capabilities are better than ever, and crucial to our success in navigating turbulent markets.***  In fact, we've been capitalizing on the market dislocation by recruiting the best talent from

competitors, and we fully expect to emerge from this cyclical downturn even better positioned. At this point, we believe the issues in this narrow slice of the market remain contained and have not negatively impacted other sectors.

\*                    \*                    \*

**[R]isk management, as I said in the prepared remarks, is a crucial aspect of our business and I think we've done a very good job in negotiating these markets as a result of that.** (¶246) (emphasis added and in Complaint).

Because Defendants made statements that minimized the risks from Merrill's subprime mortgage securitization activities, they had a duty to disclose Merrill's concentration of CDO assets. *See, e.g., In re Nat'l Golf Properties, Inc. Sec. Litig.*, No. 02 Civ. 1383, 2003 WL 23018761, at \*5 (C.D. Cal. Mar. 19, 2003) (failure to disclose concentration of receivables in single entity deemed a "material omission"). In addition, these statements were also highly misleading because, as alleged in the Complaint, they failed to disclose that Merrill's risk management policies and guidelines were being ignored or overridden and that Kronthal and other Merrill executives were fired for their refusal to increase Merrill's U.S. subprime ABS CDO exposures beyond $3-$4 billion. (¶¶36-38, 101, 108-11).

Defendants reiterated and amplified these misleading statements in connection with Merrill's release of earnings for the second quarter of 2007. During the Company's July 17, 2007 earnings conference call, analysts clearly expressed concern about Merrill's subprime exposure in the face of worsening market conditions. Instead of candidly addressing these concerns by revealing Merrill's massive concentration of credit risk brought about through the accumulation of CDOs on the Company's balance sheet, Defendants continued to mislead investors by asserting that subprime mortgage activities were only a minor part of Merrill's business, and by maintaining that risk management and other measures were effectively mitigating the impact of the collapse of the subprime market on Merrill's financial results. For

example, Edwards, while acknowledging that "the environment for U.S. subprime mortgages and related CDOs has yet to fully stabilize," nevertheless asserted that "[r]isk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and **ours have proven to be effective in mitigating the impact on our results**." (¶278) (emphasis added).  When asked specifically about Merrill's "subprime and CDO exposure," Edwards stated that "**this is another example where I think proactive, aggressive risk management has put us in an exceptionally good position**." (*Id.*) (emphasis added).  Edwards reiterated that subprime mortgage activity represented less than 1% of Merrill's revenues. (¶245).  Also, in response to direct questions about how much of Merrill's capital was at risk, Edwards responded:

> Well, we obviously have a robust economic capital model that we employ, to address risk around all of our different assets.  From an overall asset standpoint, again the point I would make there is that there has been we think an important transformation of the components of the asset base, where the exposure that we retain is in the higher rated tranches of the exposure.  And what we have done is reduce exposure in some of the broader lower rated categories. (¶279).

Edwards argues that Lead Plaintiff fails to allege that statements he made during the April 19, 2007 and July 17, 2007 conference calls were false.  This argument again misses the mark.  These statements were false and misleading because they were designed to convince the market that Merrill's exposure to U.S. subprime ABS CDOs was minimal.  *See Forgarazzo v. Lehman Bros., Inc.,* 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact").

Edwards also contends that Plaintiffs have failed to allege that his statement made during the July 17, 2007 earnings call that Merrill had reduced its "exposure to lower-rated segments of the market for CDOs and mortgage-backed securities" was false.  (Edwards Br. at 11) (internal quotations omitted).  As set forth above, Merrill was not proactively reducing risks.  Instead, the

Company was taking on more risk because it could not sell CDO tranches, including the super senior tranches. Moreover, the Complaint points to this statement to show that Edwards gave the market the impression that Merrill was reducing its exposure to subprime CDOs and MBS when, in fact, it was being forced to amass large amounts of CDOs on its balance sheet, and those assets had become impaired, even at the AAA level, by more than 40% by June 29, 2007.[7]

Edwards argues that he disclosed during the April 19, 2007 analyst call that Merrill's "retained interests will be up because the retention of investment grade rated securities was increasing." (Edwards Br. at 11 (internal quotations omitted)). Saying that retained interests will be "up" gives investors no indication of the level of risk to which their investments will be exposed and is meaningless unless investors know from what level such interests will be "up." In fact, the Complaint alleges that these interests had declined in value by at least 40% by June 29, 2007. (¶52). Thus, this statement fails to correct the materially misleading statements discussed above that led the investing public to believe that Merrill retained a very small interest of CDOs, whether investment grade or residual. (¶¶44, 247, 249, 260, 278, 365).

The highly misleading nature of these and similar statements is readily apparent from analyst reports issued after the first and second quarter earnings conference calls that expressed the belief that Merrill's subprime exposure was limited. For example, after the first quarter conference call, one analyst reported that "CFO Edwards believes that the subprime mortgage downturn is contained and *MER's exposure is small* as subprime-related revenue was < 1% of firm revs." (¶44) (emphasis added). After the second quarter conference call, another analyst stated that "this is the second quarter in a row that *fears of sub-prime losses have been*

---

[7]    Edwards also argues that the Complaint effectively admits that Merrill had reduced its exposure to lower-rated segments by alleging that Merrill's losses almost entirely arose from the super senior AAA-rated CDOs. (Edwards Br. at 11-12). Nevertheless, even if most of the Company's losses arose entirely from super senior AAA-rated CDOs, that was because Merrill could not sell these tranches.

*unfounded*." (¶50) (emphasis added).  Still another analyst reported that "as for

CDO/MBS/leveraged loan risk, *mgmt. was sanguine about Merrill's exposure* and implied

successful hedging outcomes, although specifics were limited." (*Id.*) (emphasis added).

Merrill contends that it had no duty to either pejoratively characterize or "disaggregate"

particular assets, such as CDOs.[8]  (Merrill Br. at 65).  These arguments are red herrings.

Regardless of whether Merrill was required to break out its subprime-related CDOs from other

trading assets on its balance sheet, especially in light of the severe dislocation in the subprime

mortgage market, GAAP required disclosure of the massive concentration of these assets in light

of the risks posed by that concentration.[9]  In addition, disclosure of such concentration was

necessary to correct Defendants' false and misleading statements.  Far from being in "an

exceptionally good position," (¶¶49, 169) as described by Edwards, the reality was that Merrill's

reported financial results during the Class Period were materially inflated due to its massive

subprime CDO exposure.

---

[8]    *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006), cited by Merrill, is
easily distinguished.  In that case, unlike in this case, plaintiffs contended that the defendant was required to
disaggregate certain contingent commissions from acquisition costs on the company's balance sheet but did not
allege that defendant's financials were misstated.  The complaint in *Axis Capital* did not allege defendants failed to
disclose a concentration of credit risk.  While GAAP requires disclosure of concentration of credit risk, such as
Merrill's subprime-related CDO exposure, Plaintiffs do not contend that this exposure had to be broken out as a
separate line item on the balance sheet.  In addition, in *Axis Capital*, the court found that "plaintiffs point to no
accounting or reporting requirements which would require the disaggregation of acquisition costs."  456 F. Supp. 2d
at 590.  Here, by contrast, Plaintiffs have cited specific GAAP provisions requiring disclosure of Merrill's
concentration of subprime-related CDO exposure because of the risk it posed.  Indeed, Merrill began to disclose its
concentration as required by GAAP beginning in the third quarter of 2007.

[9]    Merrill's reliance on *Nolte v. Capital One Financial Corp.*, 390 F.3d 311 (4th Cir. 2004), is misplaced.  In
that case, the court held that Capital One was not required to disclose the extent of its subprime holdings because
"[S]ubprime lenders are discouraged from publicly reporting the size of their subprime portfolios because 'there is
no standard industry-wide approach to the definitions of either 'subprime' or 'program,' which means that the
meanings of these terms are institution-specific.  Thus, the reported information will not be entirely comparable
from one institution to the next, leading to potential misinterpretation of the data by the public.'"  *Id.* at 317 (quoting
Proposed Agency Information Collection Activities, Comment Request, 67 Fed. Reg. 46,250, 46,253 (July 12,
2002)).  *Nolte* did not hold that disclosure of a particular asset category representing a known credit risk is never
required, particularly where, as here, such disclosure is required by a particular GAAP provision.

In similar circumstances, courts within this district have left no doubt that statements professing a company's financial well-being can give rise to a duty to disclose known risks that could undermine such statements. For example, in *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 420 (S.D.N.Y. 2005), a case arising from alleged illegal forms of proprietary trading by a New York Stock Exchange specialist firm, plaintiffs asserted claims based on the company's statement that: "In exceedingly turbulent market circumstances we were able to maintain our second quarter result at almost the level we achieved in the first quarter. The development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade." On defendants' motion to dismiss, the court rejected defendants' contention that the statement was not actionable, stating that "although a defendant does not have a Rule 10b-5 duty to speculate about the risk of future investigation or litigation, if it puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information.'" *Id.* at 400-01. *See also In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003), *reconsideration denied*, No. 02 Civ. 5571, 2004 WL 2375830 (Oct. 22, 2004) (defendant's representation that company was financially solid "despite being aware of the financial precipice on which it stood" held actionable). Thus, the statements made by Defendants gave rise to an obligation to inform investors of then existing risks and then existing deterioration of the value of these assets.[10]

---

[10]     Merrill also contends that it should be excused from liability because it informed investors that it does not disclose specific asset allocations and that its policy was consistent with those of its competitors in the industry. (Merrill Br. at 64-66). Merrill asserts that such disclosures are not required where they could potentially put a company at a competitive disadvantage. This argument should be rejected because it not only raises matters beyond the scope of the Complaint, but is also irrelevant. Merrill's disclosure obligations were triggered by its own statements, GAAP and the provisions of the federal securities laws. The practices of other companies have absolutely no bearing on the information that Merrill was required to disclose.

2.    **GAAP Required the Disclosure of Merrill's Concentration of CDO Assets**

Among other authoritative pronouncements requiring disclosure of concentrations of risk, FAS No. 107, *Disclosures About Fair Values of Financial Instruments,* requires disclosure of significant concentrations of credit risk arising from financial instruments including, *inter alia,* "information about the (shared) . . . economic characteristic that identifies the concentration" and the loss in value to the financial instruments that could be expected to occur if the credit risk materialized. (¶360).[11]  Merrill argues that its failure to disclose the risk posed by its CDO portfolio did not violate this GAAP provision because the risk to its CDO portfolio was not a credit risk (but, rather, was a market risk) caused by the supposed sudden illiquidity (in itself a highly factual question) of the market for CDOs. (Merrill Br. at 64-67).  Merrill also argues that while FAS No. 107 encourages disclosure of concentrations of market risk, it does not require such disclosure. (*Id.* at 74 & n.33).

As an initial matter, Merrill's argument again is aimed to dispute the merits based upon its own self-serving narrative of the facts, which has no place on a motion to dismiss.  Moreover, the factual story Merrill tells in its motion to dismiss, is contradicted by its own explanation of its write-downs in its Statement of Facts. (Merrill Br. at 25-26).

---

[11]      FAS No. 107 explains that "***Group concentrations*** of credit risk exist if a number of counterparties are engaged in similar activities and have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions." (Emphasis in original). CDOs based on subprime mortgages indisputably meet the definition of a "group concentrations of credit risk."

As alleged in the Complaint, SOP 94-6 also required disclosure of the extent of Merrill's CDO holdings. (¶¶361-62).  SOP 94-6 requires disclosure of concentrations of credit risks existing as of the date of the financial statements that make an enterprise vulnerable to a near-term (*i.e.*, within one year) severe impact, and it is at least reasonably possible that the events that will cause the severe impact will occur in the near term.  Merrill argues that this provision does not apply because SOP 94-6 contains an exclusion for "financial instruments." (Merrill Br. at 75 n.33).  Merrill is mistaken.  FASB Staff Position ("FSP") SOP 94-6-1, which was issued in December 2005 in response to the growing use of subprime and other non-traditional mortgages, makes it clear that, notwithstanding the exclusion of financial instruments from SOP 94-6, disclosure of concentrations of loan products, such as CDOs, is required where the terms or other features of the loan products give rise to a significant credit risk.  Although SOP 94-6 is an alternative basis for Defendants' duty to disclose the concentration of subprime-related CDOs held by Merrill, we focus here on FAS No. 107, which specifically applies to financial instruments such as CDOs.

For example, in its 10-Q for the third quarter of 2007, filed on November 7, 2007, Merrill explains why it wrote down its CDO portfolio, stating: "Despite the high *credit* rating of these CDO securities (typically AAA), their fair value at September 28, 2007 reflects unprecedented market illiquidity *and the deterioration of underlying sub-prime collateral*." (¶322) (emphasis added). This statement shows that Merrill's present attempt to artificially separate market risk from credit risk in its CDO portfolio is baseless.[12] Likewise, in its January 17, 2008 press release disclosing further write-downs, issued months after the initial complaints in this proceeding had been filed, Merrill explained that a substantial part of its write-down for the fourth quarter of 2007 was due to "credit valuation adjustments," including $2.6 billion related to U.S. super-senior ABS CDOs. (¶329). Merrill states that "[t]hese amounts reflect the write-down of the firm's current exposure to a non-investment-grade counterparty from which the firm had purchased hedges covering a range of asset classes including U.S. super-senior ABS CDOs." (*Id.*). Merrill's claim that it was valuing its CDO portfolio properly according to the market also contradicts the allegations in the Complaint that Merrill could not sell CDO assets and was forced to keep tranches, especially the super senior tranches, on its balance sheet. (¶¶154-62).

It is undisputed that Merrill had a huge undisclosed concentration of subprime assets on its balance sheet during the Class Period. The failure to disclose the resulting concentration of credit risk is a proper basis to impose liability under the federal securities laws. *See, e.g., In re*

---

[12]    Credit risk is inherent in the CDO securities because the value of such securities is, in large part, dependent upon the cash flows of the underlying collateral. (¶83). As the expected and actual collectability of the cash flows of the underlying subprime mortgages and related collateral decreases from increases in delinquencies and defaults, the value of the CDO securities declines. Thus, the value of Merrill's CDO securities was directly related to the credit-worthiness of the underlying subprime borrowers. Attempting to separate the credit risk of the underlying collateral from the CDO security is a violation of the fundamental accounting concept of GAAP which requires financial reporting to consider substance over form, as well as a violation of the various provisions of FASB Concept Statements No. 1 and No. 2 as alleged in the Complaint. Furthermore, FSP SOP 94-6-1 explicitly provides that a concentration of loan products with certain terms, similar to those in many subprime mortgages, may create a significant concentration of credit risk.

*Nat'l Golf Properties*, 2003 WL 23018761, at *5 (failure to disclose concentration of receivables deemed a "material omission").

In fact, Merrill later did make the type of disclosures that Plaintiffs contend it should have been making throughout the Class Period – albeit incompletely and inaccurately – after it began to write down these assets. For example, in Merrill's 10-Q for the third quarter of 2007, Merrill stated that "[t]he losses on U.S. Sub-prime Residential Mortgage-Related and ABS CDO activities in the third quarter reflect ***a significant concentration*** in securities that accumulated as a result of our activities as a leading underwriter of CDOs." (¶97) (emphasis added). Merrill's third quarter 2007 10-Q disclosed for the first time a somewhat detailed, but still incomplete, description of Merrill's securitization activities, its generation and underwriting of CDOs and its tens of billions of dollars in exposures relating to the CDO tranches retained, but previously undisclosed, on its balance sheet. (¶¶321-23).

Merrill contends that these disclosures were timely under GAAP because it made these disclosures when it significantly re-valued its CDO assets in the third quarter of 2007. Even assuming, *arguendo*, that Defendants had no basis to write down Merrill's CDO portfolio until the third quarter of 2007, that fact would not justify Defendants' failure to timely disclose the concentration of these risky assets. FAS No. 107 required Defendants to disclose this concentration when they knew of its existence because it requires disclosure of ***risk***, not merely disclosure of ***loss***. Defendants do not and cannot contend that they did not know that huge portions of unsold securities were accumulating on Merrill's balance sheet.

> ### 3. The Complaint Properly Alleges that Merrill Violated GAAP by Misstating the Value of its CDOs

The Complaint also sufficiently alleges that Merrill's assets and earnings disclosed in its financial statements for the first and second quarters of 2007 were misstated as a result of the

failure to properly value its CDO assets, as required by GAAP. (¶¶259(c)-(d), 290(b)-(c)).

Merrill does not dispute that GAAP requires that financial instruments such as CDOs be carried

at fair value, and that if that value is impaired after such assets are initially recorded in the

entity's books, the assets must be "written down" to fair value. This rule is clearly established

by the GAAP provisions set forth in the Complaint, specifically FAS No. 115 and FAS No. 133.

(¶348).[13]

As an initial matter, Merrill's arguments as to applicability of certain GAAP sections are

inappropriate for a motion to dismiss. The resolution of such issues requires expert opinion and

testimony. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1421 (3d Cir. 1997)

(reversing 12(b)(6) dismissal because "it is a factual question whether BCF's accounting

practices were consistent with GAAP"); *Nappier v. Pricewaterhouse Coopers,* 227 F. Supp. 2d

263, 276 (D.N.J. 2002) ("the determination of 'what accounting practices comprise GAAP is a

question of fact best addressed through expert testimony and thus is inappropriate for a motion to

dismiss'") (quoting *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 592 (D.N.J.

2001)); *see also Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996); *In re Raytheon Sec.

Litig.*, 157 F. Supp. 2d 131, 147 (D. Mass. 2001); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91

(E.D.N.Y. 1999).

---

[13]    Merrill quibbles over whether FAS No. 107 governed the valuation of its CDO assets, arguing that
beginning with the first quarter of 2007 it adopted FAS 157, which superseded the paragraphs in FAS No. 107
dealing with valuation of financial instruments. (Merrill Br. at 74-75). It is, however, of no consequence which of
these pronouncements applies to Merrill's 2007 financial statements because the requirements as to how financial
assets are to be valued are essentially the same in these two pronouncements. As FAS No. 157 states, it was
intended to clarify, not change, the application of FAS No. 107. Indeed, in Merrill's 10-Q for the first quarter of
2007, Merrill states: "We adopted SFAS No. 157 in the first quarter of 2007. . . . The impact of adopting SFAS was
not material to our Condensed Consolidated Statement of Earnings." Moreover, as noted in FAS No. 157, FAS No.
157 did not change a business entity's obligation to comply with long-standing FASB Conceptual Statements
concerning accurate and complete financial reporting, including the measurement of fair value. *See* FAS 157.
(¶344).

GAAP required Merrill to report its CDO assets at their "fair value" and required Merrill to write down the value of CDOs held for trading if and when these assets were impaired – *i.e.*, their fair value was less than the amount at which they were valued on Merrill's books. GAAP requires an entity to estimate the fair value of financial assets such as CDOs once market prices could not be relied on to value them. (¶348).[14]

While Merrill argues that the ABX and TABX indices are not useful in valuing CDOs, this argument depends on purported facts not found in the Complaint, which also go to the merits and cannot be considered on this motion. (Merrill Br. at 53-54). More important, however, this argument ignores Defendants' previous admission that Merrill in fact utilizes ABX indices to help determine the current values of its CDOs for financial statement purposes. (*See* ¶329, quoting Merrill's January 17, 2008 press release, in which Merrill states, in relevant part: "The valuation for these [ABS CDOs] is based upon cash flow analysis, including cumulative loss assumptions . . . ***Relevant ABX indices are also analyzed as part of the overall valuation process***.") (emphasis added).

Merrill's failure to utilize evidence of market value in the form of ABX and TABX indices prior to the third quarter of 2007 was particularly significant because, as Defendants were aware, Merrill could not simply rely on the prices at which it purportedly "sold" the CDOs it underwrote during this period. The Complaint pleads facts showing that Merrill was unable to sell many of the CDOs it underwrote during the first two quarters of 2007 and, as a result, foisted

---

[14]    Merrill does not dispute that GAAP required the CDOs to be reported at fair value based on observable data, when available. The Complaint sufficiently pleads facts existing as of the date Merrill filed its 2006 10-K (February 27, 2007) that were observable to Defendants, making it clear that by such date, there was inadequate disclosure in Merrill's year-end 2006 financial statements that the U.S. subprime ABS CDOs and other subprime-based assets on Merrill's balance sheet were not properly valued. In particular, the Complaint alleges that the ABX and TABX indices had declined by 15% to 40% by February 2007 and continued to decline after that. (¶¶142-53). By way of example, Merrill was unable to sell the CDO securities it seized when the Bear Stearns hedge funds collapsed. (¶¶154-61). Moreover, the Complaint alleges that Merrill was having extreme difficulty selling CDO tranches, which caused a huge build-up on Merrill's balance sheet. (¶31). Therefore, there were no objective market prices for these CDO tranches.

some of them on unsuspecting institutional customers such as the City of Springfield, Massachusetts (¶¶168-78) and used portions of them as collateral for new CDOs, called "CDO squareds."  (¶84).  Most important, however, unbeknownst to investors, Merrill ended up simply retaining large amounts of the CDOs on its own balance sheet as trading assets.  Therefore, in the absence of market prices, GAAP (FAS Nos. 107 and 157) required Merrill to use other observable inputs, such as the ABX and TABX indices, to value these assets during the first two quarters of 2007.  Merrill could not have relied on its own CDO transactions to value these assets because, as alleged in the Complaint, many of Merrill's transactions were not at arm's-length, and were hardly a valid indicator of the value of these assets.  ABX and TABX indices, on the other hand, are publicly available, objective, non-biased indicators of value, which should have been used by Merrill.

Similarly, FAS No. 5, *Accounting for Contingencies*, requires an entity to record the amount of a loss in value of its assets when the loss is both probable and reasonably estimable.  (¶349).  FAS No. 5 provides further that when there is at least a ***reasonable possibility*** of a loss, but the amount may not be reasonably estimable, the existence of the loss should be disclosed in the footnotes to the financial statements.  (¶357).[15]  Despite Defendants' knowledge of many billions of dollars in CDO securities on Merrill's balance sheet, the mounting subprime crisis, and the lack of markets for these securities, Merrill's financial statements prior to the third

---

[15]    Merrill relies on *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501 (S.D.N.Y. 2005) for the proposition that FAS 5 does not apply when other GAAP provisions such as FAS No. 107 and FAS No. 157 apply specifically to financial instruments like CDOs.  But *Fadem* did not address the situation here.  FAS No. 5 contains a provision that is not discussed in either FAS No. 107 or FAS No. 157, which is therefore relevant and applicable here.  FAS No. 5 requires ***disclosure*** of contingencies, such as potential losses, when it is "reasonably possible" that such contingencies exist.  Merrill not only failed to disclose such a contingency with respect to its CDOs, it failed to provide any information as to the amount of CDOs it held, so even sophisticated investors who were aware of the potential for losses in such instruments could not determine Merrill's exposure to such losses.

quarter of 2007 were silent as to whether there was a reasonable possibility that it had incurred

such a loss.

Merrill points to a single statement in its 10-Q for the second quarter of 2007, published

approximately ten months after the beginning of the Class Period, to argue that it satisfied its

disclosure obligations during the Class Period.  There, Merrill stated that "challenging market

conditions in certain credit markets that . . . have intensified in the beginning of the third

quarter . . . have impacted and may continue to impact the sub-prime mortgage market, including

certain collateralized debt obligations (CDOs) as well as other structured credit products."

(Merrill Br. at 23).  This disclosure did not provide the information required by FAS No. 5, it did

not state that it was at least reasonably possible that Merrill would experience losses, and did not

provide investors with a meaningful understanding of the nature and extent of the risk posed to

Merrill from the mounting subprime mortgage crisis.  Although Merrill stated for the first time in

this 10-Q that "significant risks remain that adversely impact these exposures," nowhere did

Defendants quantify these exposures or give any inkling as to the enormous magnitude to Merrill

(amounting to over $40 billion by the end of June 2007, as Defendants belatedly disclosed).

Therefore, it would have been impossible for an investor to determine that the subprime

mortgage crisis could result in losses to Merrill in the billions of dollars, let alone losses in

excess of $30 billion.[16]  Defendants could have provided this information, but deliberately chose

to omit it.

---

[16]    Merrill's year-ended 2006 financial statements and interim financial statements (which includes footnotes
to the financial statements) for the quarterly periods ended March 30, 2007 and June 29, 2007 failed to disclose the
Company's exposure to significant, let alone excessive, concentration of highly risky subprime-related securities.
(*See, e.g.,* ¶¶342-43).

36

### B.     The Complaint Pleads Cogent and Compelling Facts that Give Rise to a Strong Inference of Scienter

The Complaint presents cogent and compelling facts that make it at least as likely as not that the Defendants engaged in a calculated scheme to hide Merrill's risk exposure to U.S. subprime ABS CDOs that were deteriorating in value throughout the Class Period. This case is not about "fraud by hindsight," failing to predict a crisis, or corporate mismanagement. It is about material adverse facts that Defendants knowingly misrepresented and failed to disclose. The Complaint alleges, and the Court must accept as true on this motion, the following facts:[17]

- Defendants knew of but concealed that beginning in 2006, Merrill was accumulating on its balance sheet $5-$6 billion per quarter of unsold U.S. subprime ABS CDOs that reached at least $40 billion by June 29, 2007. (¶¶22, 32). These unsold U.S. subprime ABS CDOs accumulated on Merrill's balance sheet because Merrill could not sell them. (¶90);

- As Merrill began to build up this huge stake in unsold CDO interests, AIG stopped insuring Merrill's mortgage debt. This forced Merrill to seek insurance for the billions of dollars of U.S. subprime ABS CDOs accumulating on its balance sheet from entities such as ACA, a single A rated insurer, which were not as highly rated or diversified as AIG or could not insure the risk at all. (¶¶100-07);

- During the summer of 2006, when this build-up of unsold U.S. subprime ABS CDOs on Merrill's balance sheet began, Kronthal explicitly warned top Merrill management that building up such a high level of unsold CDO assets on Merrill's balance sheet was very dangerous and exposed Merrill to virtually unlimited risk. Shortly after he issued this warning Kronthal and his team were fired by O'Neal. (¶¶108-09);

---

[17]     "When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiff and decide whether the plaintiffs ha[ve] pled a plausible claim for relief." *Palkovic v. Johnson*, No. 04 Civ. 5757, 2008 WL 2415274, at *2 (2d Cir. June 13, 2008) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007)). The court's task is "'not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient.'" *In re Refco, Inc. Sec. Litig.*, No. 05 Civ. 8626 (GEL), 2007 WL 1280649, at *5 (S.D.N.Y. Apr. 30, 2007) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

- In 2006, Michael Blum, a Merrill managing director who was the designee of Merrill's top management on the board of subprime loan originator Ownit (due to Merrill's $100 million investment in Ownit), instructed Bill Dallas, the president of Ownit, to materially lower underwriting guidelines and therefore the credit quality of the loans it originated which were purchased by Merrill for securitization into MBS and CDOs. Dallas told Merrill, and Merrill acknowledged, that lowering the underwriting guidelines would result in greater credit risk and more early payment defaults. (¶¶129-37);

- By the beginning of 2007, Merrill was aware of at least $400 million in early payment defaults on loans it purchased from subprime originators including Ownit. (¶¶124-41);

- By February 2007, the ABX and TABX indices which track the value of CDSs and CDO tranches had declined by 15% at the AAA level and 40% at the BBB level and by June 2007 the ABX and TABX indices had declined between 40%-55%. (¶¶142-53);

- By letter of April 13, 2007, Merrill admitted that it believed the subprime mortgage market had been adversely affected by the end of 2006. In the April 13, 2007 letter, Merrill asserted that subprime loans it acquired though its purchase of First Franklin from National City Bank were overvalued by at least $43 million because of adverse conditions which existed at the end of 2006 in the subprime mortgage market. (¶¶122-23);

- By June 2007, two Bear Stearns hedge funds imploded. As a major lender to these funds, Merrill witnessed first-hand that the value of subprime assets that were the collateral for these loans massively deteriorated. When Merrill tried to sell this collateral it received few bids and the ones it did receive were at prices as low as 30% of par value. (¶¶154-61);

- During 2007, O'Neal, Fleming and Fakahany sold more than $35 million in Merrill stock and made no open market purchases of Merrill stock; and

- Defendants' salaries and bonuses were tied to Merrill's revenues and earnings. (¶¶192-97).

Defendants ask this Court to disregard all of the above facts, individually and as a whole, and conclude based upon facts not alleged in the Complaint that Defendants' conduct was

completely innocent and that the $30 billion plus in write-downs was due to an unprecedented "credit crisis" that struck like a bolt of lightning on August 9, 2007. (Merrill Br. at 1, 3, 5-7).

There are at least three major problems with Defendants' argument. First, it relies almost exclusively on facts not pled in the Complaint.[18] As such it would be improper for the Court to consider them on this motion. Under *Tellabs*, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 127 S. Ct. at 2509 (citing 5B Wright & Miller §1357 (3d ed. 2004 and Supp. 2007)); *see also ATSI Commc'ns, Inc. v. The Shaar Fund, Ltd,* 493 F.3d 87, 98 (2d Cir. 2007) (the court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

Second, all of the facts and risks set forth above existed and Defendants knew or had access to these facts months before the "credit crisis" supposedly struck on August 9, 2007 as argued by Defendants. Thus, what Defendants refer to as a "credit crisis" was, in reality, the materialization of risks and exposures known to Defendants but concealed by them from investors.

---

[18]     As discussed in more detail in the memorandum accompanying Plaintiffs' Motion to Strike filed contemporaneously herewith, certain of Defendants' arguments rely upon documents that are outside the Complaint, not relied upon by Plaintiffs, and do not mention or involve Merrill. The documents and sources that Plaintiffs ask the Court to strike are the types of documents that courts have declined to consider on a motion to dismiss. *See, e.g., In re Take-Two Interactive Sec. Litig*., 551 F. Supp. 2d 247, 262 n.4 (S.D.N.Y. 2008) (where court declined to consider defendant's submission of industry guidelines that were not cited in the complaint); *Atlas v. Accredited Home Lenders Holding Co.,* 556 F. Supp. 2d 1142, 1161 n.7 (C.D. Cal. 2008) (where court declined to consider "(1) several newspaper articles regarding Accredited and/or the subprime mortgage market, (2) a transcript of remarks made by the chairman of the Federal Reserve Bank, and (3) various press releases and SEC filings of companies not defendants here . . . which are neither referenced in Plaintiff's complaint nor the subject of a proper request for judicial notice . . .").

Third, even assuming, *arguendo*, that some meteoric event (which Defendants do not identify) occurred on August 9, 2007 which made Defendants realize for the first time there were problems with Merrill's subprime portfolio, why did Defendants not disclose Merrill's admitted severe subprime portfolio issues or exposure of $40 billion shortly thereafter?  Instead, they continued their cover-up and waited almost three months, until October 24, 2007, to disclose Merrill's $40 billion exposure to U.S. subprime ABS CDOs.

### 1.    Standards for Pleading Scienter

The Supreme Court's recent decision in *Tellabs*, 127 S. Ct. at 2505, held that in order to plead a strong inference of scienter in a securities fraud case under the PSLRA, the facts alleged in a complaint must give rise to an inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent suggested by defendants.  In *Tellabs*, the Supreme Court defined the "strong inference" standard as follows: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id.* at 2511.  The strong inference test is satisfied where the complaint alleges sufficiently that the defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000) (internal citations omitted).

Significantly, while Defendants' motions are replete with misguided attempts to refute Lead Plaintiff's scienter allegations piecemeal, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."  *Id.* at 2511; *see also City of Hialeah Employees' Retirement System v. Toll Bros., Inc.*, No. 07 Civ. 1513, 2008 WL 4058690, at *4 (E.D. Pa. Aug. 29, 2008) (noting importance of viewing complaint as a whole).  Further,

"faced with a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509. "The inference that the defendants acted with scienter need not be irrefutable, *i.e.* of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Id.* at 2510.

Scienter is adequately pleaded where the inference of fraud is *equally* as likely as any non-culpable explanation of defendants' alleged conduct. *Id.* "In other words, a tie now goes to the plaintiff." *Sloman v. Presstek, Inc.*, No. 06 Civ. 377, 2007 WL 2740047, at *7 (D.N.H. Sept. 18, 2007). Thus, a plaintiff "alleging a fraud in a 10(b) action must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference. . . ." *Tellabs*, 127 S. Ct. at 2513.[19]

In *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008)*,* the Second Circuit discussed what a plaintiff must plead in order to create a strong inference of scienter with respect to a corporate entity:

> When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant. *But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.* As the Seventh Circuit recently observed in the wake of the Supreme Court's remand in *Tellabs*, "[I]t is possible to draw a strong inference of corporate scienter without being able to name the individual who concocted and disseminated the fraud. Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There

---

[19] The Supreme Court recently explained that "[r]eckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it." *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2621-22 (2008) (citing 2 Restatement Torts §50, Comment *a,* pp. 587-88 (1964)) ("Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of ... harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.").

would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."

*Dynex*, 531 F.3d at 195-96 (emphasis added).  The Complaint satisfies these standards.

## 2.    Numerous Red Flags Compel a Strong Inference of Scienter

As highlighted in the Statement of Facts, the Complaint alleges numerous "red flags" – that is, facts known to the Company and its highest officers that either did or should have made them aware that their public statements were misleading – which, when viewed collectively and holistically as required by *Tellabs*, raise a strong and compelling inference that Defendants' misstatements were made with scienter.  *See, e.g., In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142 (E.D.N.Y. 2008) (finding scienter where it was alleged that red flags were so obvious that defendants "must have been aware" of the alleged fraud); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007) ("The inquiry into whether corporate officers should have known of facts indicating the falsity of public statements is a fact-specific one; scienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2004).

Some of the more glaring red flags alerting Defendants that their public statements concerning Merrill's financial performance and risk management practices were materially misleading include:  Kronthal's internal warnings of inappropriate risk concentration and his subsequent firing; information of which Merrill was aware from its extensive dealings in all aspects of the subprime market as a warehouser, underwriter, and engineer of bundled subprime loans and derivative products; the decline in the CDO market indices during the Class Period; and Merrill's switch to less financially secure insurers.  (¶¶108-61, 168-84).  These red flags were "staring [defendants] in the face" by the first and second quarters of 2007; several were

known to Defendants even before the beginning of the Class Period. *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007); *see also Atlas v. Accredited Home Lenders*, 556 F. Supp. 2d at 1142 (allegations that defendants failed to increase reserves when they became aware that the company had begun to deviate from its underwriting policies and that the quality of the company's loan portfolio would begin to decrease stated a claim for securities fraud). They are inconsistent with Defendants' claim that Lead Plaintiff alleges only "fraud by hindsight."

These red flags compel an inference that Defendants knew that Merrill was required, but failed, to disclose its asset concentrations in ABS CDOs, and the risks that concentration posed, by the beginning of the Class Period. These red flags also compel the inference that Merrill was required, but failed, to take material write-downs on its CDO and subprime-related debt for the periods ended at least as of March 30, June 29, and September 29, 2007. (¶¶142-43, 350, 353-54). Where, as here, defendants knew or recklessly disregarded facts that existed at the time a write-down should have occurred, courts have upheld allegations of securities fraud. *See Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (where court denied motion to dismiss Section 10(b) claim where plaintiff alleged defendants failed "to expense royalty advances *after* poor sales during the Class Period were known.") (emphasis in original); *Scottish Re*, 524 F. Supp. 2d at 394.[20]

---

[20] Merrill states that allegations of accounting fraud for failing to timely write down assets cannot support a securities fraud claim. (Merrill Br. at 35). The cases cited above in which courts in this Circuit have upheld such claims demonstrate that Merrill's contention is false. Moreover, the cases cited by Defendants are distinguishable. *See Dileo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (complaint against auditor failed to allege why an increase to reserves should have occurred sooner than it did); *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 852 (E..D. Ill. 2003) (allegations of defendants' failure to timely write down assets lacked particularity and, with respect to an impairment to goodwill, "largely lack[ed] detail as to which businesses or assets were impaired and by how much and why the write down was necessary . . . ."). Similarly, Defendants' reliance on *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 U.S. Dist. LEXIS 6962, at *15 (S.D.N.Y. Apr. 25, 2003), is misplaced because the Court dismissed the complaint there on the ground that plaintiffs failed to allege that Allied Capital concealed any facts from investors.

a.    **The Firing of Dissenting Employees, and Defendants' Receipt of Specific Warnings Before and During the Class Period, Compel a Strong Inference of Scienter**

One of the more significant red flags facing the Defendants in this case for which there is no non-culpable explanation, at least none proffered in Defendants' motions to dismiss, is the firing of Jeffrey Kronthal and his team.  (¶¶36, 38, 101, 109).  Indeed, the only compelling inference from the firing of these employees is that they were fired so that Defendants could ignore Merrill's risk practices and build up a huge undisclosed concentration in subprime-related CDOs.  The Complaint alleges with particularity that before the beginning of the Class Period, Kronthal warned top Merrill executives of the following specific facts:

- that Merrill's continued underwriting of CDOs would require that the firm assume tens of billions of dollars of additional market and credit risk;
- that Merrill should limit the amount of CDO exposure Merrill should keep on its books to between $3-$4 billion; and
- that Merrill's balance sheet would assume an open-ended risk if these highly illiquid securities ran into credit trouble.  (¶101).

Instead of heeding Kronthal's warnings, O'Neal fired him.  With Kronthal out of the way, Defendants proceeded to ramp up Merrill's CDO business and acquired their own personal production line of subprime loans via Merrill's acquisition of First Franklin.  (¶36).

Defendants claim that these allegations "lack particularity because the Complaint does not allege which executives received Kronthal's warnings or details sufficient to evaluate their basis and severity" and are "vague."  (Merrill Br. at 49).  Defendants are simply wrong.  The allegations set forth the nature of the warnings, to whom the warnings were delivered and refer to specific memos and writings.  (¶101).  For example, Kronthal internally warned top Merrill executives about Merrill's exposure to U.S. subprime ABS CDOs, although his warnings reportedly were met with skepticism by both then-bond chief Dow Kim and O'Neal because

Merrill's CDO business had been generating big fees.  (*Id.*).[21]  Then, instead of reducing

Merrill's CDO exposure, O'Neal fired Kronthal in July 2006.  (*Id.*).

Kronthal, of course, was not the only Merrill employee to go to Defendants to protest

regarding Merrill's undisclosed and ever-increasing exposure.  There was a continuing wave of

employees constantly urging Defendants throughout the Class Period to rethink their risky

behavior and reverse course, including in particular, the following:

- senior Merrill executives asked Ranodeb Roy, a senior trader with little experience in mortgage securities, to oversee the job of taking CDOs that Merrill could not sell onto its books.  Like Kronthal, Roy objected to the practice of loading up Merrill's balance sheet with mortgage securities and CDOs, but ultimately relented, stating that he was simply "following orders."  (¶110);
- in August 2006, a Merrill trader warned his superior, Harin De Silva ("De Silva"), one of the heads of Merrill's U.S. CDO origination business, about the risks associated with retaining on Merrill's balance sheet $975 million of a $1.5 billion CDO named Octans.  Nevertheless, De Silva urged the trader to accept the securities despite the fact that the trader stated that he did not know enough about the CDO to feel comfortable committing to the deal.  (¶111);
- at the end of July 2007, Fakahany, who had assumed broad responsibility over Merrill's risk exposure, warned Merrill's board of directors and others, including specifically O'Neal, Charles Rossotti (a director in charge of Merrill's Risk Committee), and Rosemary Berkery ("Berkery") (General Counsel), of the mounting risk Merrill faced from CDOs and subprime MBS.  (¶112);
- on August 9, 2007, Fakahany and Fleming sent a three-page letter entitled "Board Market Update End July Results: Note from Fakahany and Fleming", to Merrill's directors, O'Neal and Berkery, discussing the mounting losses and troubles facing the Company's CDO exposure and explaining that significant deterioration in this business had taken place in July. (¶113);[22] and

---

[21]    Fleming states that he was only named Co-President and Co-Chief Operating Officer of Merrill in May 2007.  (Fleming Br. at 1).  He further states that he never "had [a] direct line of responsibility for any of the fixed income businesses within the Company that generated the losses from subprime investments at issue here."  (*Id.*).  However, prior to that time, he was responsible for the investment banking business at Merrill.  (*Id.* at 7).  Thus, as head of Merrill's investment banking, there is a strong inference that Fleming was aware of or recklessly disregarded Merrill's exposure to U.S. subprime ABS CDOs.

[22]    Fakahany argues that the alleged reports to Merrill's board in July and August 2007 suggest a "good faith effort" to manage the Company through a difficult market and that he did not mislead Merrill's Board.  (Fakahany Br. at 10, 16).  However, the Complaint alleges that Fakahany is culpable because he was aware of the Company's exposure to U.S. subprime ABS CDOs and the risk such exposure posed to Merrill, but failed to disclose it to *investors*.  Notably, Fakahany does not dispute that he was aware of Merrill's exposure to U.S. subprime ABS CDOs as of July and August 2007.  As someone responsible for risk management, Fakahany's failure to disclose these facts to investors cannot plausibly be considered acts of "good faith."  Moreover, had Fakahany been truly acting in good faith, it is not plausible that he would have "resigned" after 20 years just days after the Company

- in August 2007, Keishi Hotsuki, Merrill's Co-Head of Risk Management, warned his superiors that the Company's exposure to mortgage-related securities was too big. (¶114).

These allegations provide sufficient details concerning Defendants' knowledge or reckless disregard of Merrill's exposure to U.S. subprime ABS CDOs. *See Novak*, 216 F.3d at 308. These facts also provide especially strong evidence that all of the Defendants, and particularly Merrill, were keenly aware of, but chose not to disclose, the risks concerning Merrill's increasing accumulation of huge amounts of subprime securities. *Dynex*, 531 F.3d at 195 ("It is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.") (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008)).

> **b.    Merrill's Role as Both "Front-End" Subprime Mortgage Originator, and "Back-End" Securitizer, Compels a Strong Inference of Scienter**

While Defendants seem to suggest there was no way for them to know prior to their initial disclosures in October 2007 that their CDO assets were impaired, the Complaint alleges numerous facts that directly refute that contention. The Ownit allegations (¶¶129-37) are particularly instructive. Merrill had a significant investment in Ownit ($100 million, amounting to 20% of Ownit's equity) through which it exerted control of Ownit. Merrill was also a major lender to Ownit, and acquired from Ownit some $6 billion in loans in 2006 alone which Ownit had originated. (¶¶129-37). Merrill also had a managing director, Blum, who sat on Ownit's board and participated in controlling Ownit's underwriting standards, as well as a Merrill representative monitoring the loan production directly at Ownit's offices. Based on these

---

announced, among other things, i) an additional $16.7 billion in write-downs of the value of Merrill's U.S. subprime ABS CDOs and related debt, and ii) that the Company's hedges with insurers were ineffective. (¶¶57, 329-31). At bottom, while it is implausible that Fakahany acted in good faith given his failure to disclose timely Merrill's CDO exposures, whether he acted in good faith as he claims, or with scienter as Plaintiffs claim, is a factual dispute that should be decided by the jury.

allegations alone, it is clear that Merrill had an intimate understanding of the subprime market and witnessed firsthand the early stages of that market crumbling. These facts simply belie any notion that Defendants were caught unaware as they claim, or that they "simply did not predict the crisis that erupted in August 2007[.]" (Merrill Br. at 3).

Beyond Merrill's knowledge of the inner workings of the subprime industry given its significant relationship to Ownit, the Complaint also alleges that Merrill, through Blum, had instructed Ownit's CEO, Dallas to loosen lending standards and originate more stated income and other subprime-related loans during Ownit's January 2006 pre-board meeting in Arizona. (¶131-35). Specifically, the Complaint alleges that Blum, head of Merrill's GSFI Group, and Merrill's representative on Ownit's board of directors, Matt Whalen ("Whalen"), a Merrill managing director and a mortgage specialist who assisted Blum, and Ketan Parekh, were the Merrill representatives who directed Dallas to lower Ownit's underwriting guidelines. (¶130-31). As was the case with Kronthal's firing, Defendants fail to identify a non-culpable explanation for engaging in this behavior. Rather, Defendants contend that the allegations concerning Ownit were "an isolated instance of reduced underwriting standards." (Merrill Br. at 46). While this particular dispute is one best suited for the trier of fact, the fact that Merrill had to write down more than $30 billion in assets is a strong indication that it was not an isolated instance.

Merrill's attempts to "put back" at least $400 million in loans it purchased from originators such as ResMAE, Ownit and MLN as a result of the borrowers' increasing early payment defaults, are also probative of Merrill's knowledge that the subprime market was

47

imperiled.  (¶¶124-40, 292).[23]  Like the warnings of Kronthal and others, however, Merrill's

experiences with these subprime originators were deliberately concealed from investors.

Defendants also knew or ignored that there were adverse conditions in the secondary

market for mortgage loans by the end of 2006, as Merrill subsequently admitted.  Specifically, on

April 13, 2007, Merrill privately sent a demand to National City Bank (the bank from which

Merrill acquired subprime lender First Franklin on December 30, 2006) stating that:

> Merrill Lynch is entitled to an adjustment of $43.65 million because of Nat.
> City's failure to value these loans appropriately . . . Nat City calculated the value
> of mortgages held by First Franklin for sale by looking at the historical average of
> sale prices for comparable mortgage loans during the prior six months . . . This
> method of valuing First Franklin's mortgage loans held for sale *failed to take into
> account the adverse conditions in the secondary market for mortgage loans that
> existed at the end of 2006, and resulted in an overstatement of such loans held
> for sale of approximately $43.65 million*.  (¶123) (emphasis as in Complaint).

O'Neal and Edwards also specifically knew of the increasing adverse secondary

mortgage market as a result of their intimate involvement with the First Franklin acquisition.  For

example, O'Neal was aware of the impact of the acquisition on Merrill's MBS business, and that

First Franklin provided scale to Merrill's mortgage platform and a "robust source of origination."

(¶224).  Edwards similarly claimed knowledge of minute details concerning First Franklin, such

as first-payment default levels.  (¶278).  Further, on April 19, 2007, Edwards told investors that

through First Franklin's origination and servicing business, he was aware of trends in the

---

[23]     Merrill's assertion that "Merrill was requiring Ownit to take back early defaulted loans . . . suggests, if
anything, that Merrill was enforcing, not ignoring, underwriting standards" (Merrill Br. at 46) is both irrelevant and
meritless in light of the facts alleged in the Complaint.  This case concerns Defendants' misstatements of Merrill's
CDO exposures, not whether Merrill was seeking money from Ownit for defaults.  Further, Merrill's suggested
inference completely ignores the particular allegations that Merrill executives instructed Dallas to materially *lower*
underwriting guidelines.  (¶¶129-37).  And Merrill's suggestion that it was "enforcing" underwriting guidelines is
inapt in any event given that the Complaint alleges that Merrill was not concerned with defaults, and that Blum told
Dallas, in response to Dallas' concerns about defaults, to "produce your way out of it."  (¶134).  If anything, the fact
that Merrill had to enforce these rights shows it knew of material problems with how the loans were originated, that
the subprime mortgage market was declining, and that Defendants had a duty to disclose these problems to
investors.

subprime mortgage market that had emerged during the quarter.[24]  (¶245).  Edwards also knew

of First Franklin's coupon and default rates, and indicated that he monitored these trends during

the first quarter of 2007.  (¶246).  In sum, Defendants were aware of First Franklin's

deteriorating performance, knew that loans acquired by Merrill in the First Franklin acquisition

were overvalued due to adverse conditions in the CDO and MBS market, and knew that the

secondary market for mortgage loans had declined significantly by year-end 2006.

Merrill was also having extreme difficulty selling CDO tranches.  This, in turn, caused a

huge build up of billions of dollars of unsold CDO assets on Merrill's balance sheet.  (¶¶38-39, 100,

161).  The inability of Merrill to sell CDO tranches was yet another red flag that made Defendants

aware of the material decline in the subprime markets during the Class Period.

> ### c.    Merrill Being Forced to Resort to Undercapitalized or Highly Leveraged Bond Insurers Following AIG's Withdrawal Was a Red Flag

Merrill's shift from AIG to less creditworthy insurers also raises a strong inference that

Defendants knew that the subprime mortgage market and the subprime build-up on Merrill's

balance sheet had greatly increased Merrill's risk exposure.  At the end of 2005, Merrill

encountered a material hurdle in its efforts to churn out more CDOs.  At that time, insurance

giant AIG reportedly stopped insuring the AAA-rated slice of Merrill's CDOs.  (¶100).[25]

---

[24]    Edwards mischaracterizes the Complaint when he asserts that his "statements in analyst conference calls
provide no basis to infer his scienter."  (Edwards Br. at 10).  It is entirely appropriate to charge Edwards with
knowledge of portions of Merrill's business where he himself claimed in his public statements that he had such
personal knowledge.  As such, Edwards' reliance on *In re Read-Rite Corp. Sec. Litig.*, 115 F. Supp. 2d 1181, 1184
(N.D. Cal. 2000) (where the complaint contained "no factually particular allegations which strongly imply
Defendants' contemporaneous knowledge that the statements were false when made"), is misplaced.  Plaintiffs have
also sufficiently alleged the facts Edwards knew when he made his false statements.

Edwards also asserts that John Thain's post-Class Period statements concerning Merrill's deficient risk
management systems (¶373) do not support an inference of scienter, citing *Caiafa v. Sea Containers Ltd.*, 525 F.
Supp. 2d 398, 412-14 (S.D.N.Y. 2007).  However, unlike here, the plaintiffs in *Sea Containers* did not allege other
facts, including red flags and motive, that strongly suggest an inference of scienter.

[25]    Merrill asserts that AIG's decision to exit the market for insuring U.S. subprime ABS CDOs was "reported
in the press."  (Merrill Br. at 47).  The media report on which Merrill relies is outside the pleadings, not subject to

Without AIG providing credit insurance, Merrill did not find a replacement insurer of comparable capital strength, but instead effectively bore the risk of default itself of the billions of subprime exposure that had accumulated on Merrill's balance sheet. Knowing that Merrill's CDO exposure had ballooned out of control and fearful of disclosing this to the market, Defendants attempted to hedge Merrill's exposure through financial guarantee deals with bond insurers. (¶101). Thus, in late 2006 and 2007, Merrill's top managers embarked on a new plan, internally referred to as the "mitigation strategy." (¶102).

The Complaint alleges with particularity the details of Merrill's "mitigation strategy" and that Defendants knew or recklessly disregarded facts that strongly suggest that Merrill entered into "hedges" with less creditworthy counterparties. (*Id.*). Beginning as early as January 2007, in order to help mask the true risk of Merrill's CDO exposure, Merrill entered into billions of dollars of CDSs with insurers ACA and XL. (¶¶103-04).

This shift to less creditworthy insurers significantly increased Merrill's financial risk because there was a greater likelihood that these hedges would fail.[26] The Individual Defendants

judicial notice, and thus is part of Plaintiffs' Motion to Strike submitted herewith. Even if admitted at this juncture, whether this document was among the mix of information available to investors is a question of fact that should not be resolved on a motion to dismiss. *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 98 (S.D.N.Y. 2006) (holding that which party's version of the facts is correct is "unsuited for resolution on a motion to dismiss."). Further, it is not reasonable to conclude that the information contained in this report was among the information available to Merrill's investors in any event, because it appeared in an obscure specialized publication. *See, e.g., Cherednichenko v. Quarterdeck Corp*, No. 97 Civ. 4320, 1997 WL 809750, at *4 n.5 (C.D. Cal. Nov. 26, 1997) ("Defendants request that we take judicial notice of information published in *Computer Reseller News* . . . Even if considered, this information would not support a motion to dismiss on 'truth on the market' grounds. The publication of the average prices of DRAM chips in one magazine in a neutral format with no reference to [Defendant] cannot be reasonably viewed as sufficiently 'intense' and 'credible' to 'effectively counterbalance' defendants' allegedly optimistic statements about [Defendant's] products.") (citations omitted). And finally, even if this information was widely publicized, it would not relieve Defendants from liability because this report does not even address, much less refute, Lead Plaintiff's claim that the Defendants failed to disclose the impact of AIG's withdrawal on Merrill's CDO business; indeed, that report does not even mention Merrill.

[26]    Merrill asserts that the Complaint is "devoid of facts showing that anyone at Merrill was aware of" the reason AIG exited the market for insuring U.S. subprime ABS CDOs. (Merrill Br. at 47). However, this is completely irrelevant. There can be no question that senior Merrill executives were aware of AIG's exit from this market. Nor is it disputable that AIG's withdrawal from the market increased the risk to Merrill. Accordingly, the issue is not what Merrill's executives knew about AIG's motives, but what they disclosed or failed to disclose to investors concerning the impact of AIG's withdrawal on Merrill's CDO business.

were also each aware of this fact because, as members or attendees of meetings of the Executive

Committee, they each monitored, or were entrusted with monitoring, risk and counterparty risk.

(*See, e.g.,* ¶235; "With **senior management involvement, we conduct regular portfolio reviews,**

**monitor counterparty creditworthiness**, and **evaluate potential transaction risks** with a view

toward early problem identification and protection against unacceptable credit-related losses.")

(emphasis as in Complaint).[27]

    As part of their evaluation of counterparty risk, Defendants knew or recklessly

disregarded: 1) that ACA had severely limited capital and was a single A-rated insurer that

purported to insure AAA-rated debt; 2) that ACA was highly leveraged (its publicly reported

financial information indicated that the Company was leveraged); 3) that by July 2007, ACA was

insuring more than $60 billion of debt securities, a third of which were mortgage-related, yet had

a capital base of $236 million and few other resources to cover claims; and 4) that XL was an

over-leveraged insurer, which Merrill knew, *inter alia,* because it had served as an underwriter in

2006 for the IPO of XL's parent.[28]   (¶¶103-07).  Edwards also claimed to be knowledgeable of

---

[27]    Edwards disputes that he was a member of Merrill's Executive Committee.  (Edwards Br. at 2 n.1).  But Edwards' admission that "as CFO he was often invited to its meetings by Merrill's" management strongly supports the inference that he participated in Executive Committee meetings and knew of the adverse facts affecting Merrill that were not disclosed to investors.

    Furthermore, Edwards asserts that the Complaint seeks to hold him liable for his "honest opinions." (Edwards Br. at 12-19).  However, the Complaint alleges that Edwards made false and misleading statements about provable facts, not opinions.  (¶¶16(a)-(m)).  Hence, the cases he cites are distinguishable because they involved claims arising from stock research analysts' *opinions*.  *See Joffee v. Lehman Bros.*, 410 F. Supp. 2d 187 (2006); *In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248 (S.D.N.Y. 2005); *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004); *In re Salomon Analyst AT&T Litig.*, 350 F. Supp. 2d 455 (S.D.N.Y. 2004).  Further, unlike stock research analysts, Edwards is alleged to have made false and misleading statements about the financial condition of Merrill, not another company.

[28]    Merrill claims that "there is not a single allegation suggesting that the monoline . . . had become uncreditworthy before the fourth quarter of 2007."  (Merrill Br. at 47).  This is irrelevant.  The Complaint states that Merrill's business shifted away from highly rated insurer AIG to more risky insurers, such as ACA and XL, which materially increased the risk to Merrill's financial condition.  Again, the point of this allegation is that Defendants falsely and misleadingly touted the quality of their hedging and risk management while knowing, or recklessly disregarding, that these insurers were **less creditworthy** than AIG and were overleveraged and/or undercapitalized, and thus could not serve properly to insure Merrill from risk.  (¶¶39, 103).

these risks because he explicitly told investors on July 17, 2007 that "we are constantly reevaluating these [subprime] assets and related hedges." (¶279). Based on these facts, it is simply implausible that Defendants were unaware of the increased risk resulting from Merrill's forced reliance on other insurers to hedge its subprime-based asset exposure, or that this information was unavailable to them.

It was not until the end of the Class Period that investors learned what the Defendants knew all along – that Merrill's deals with these risky, over-leveraged financial guarantors did not materially reduce the Company's exposure to CDOs. In fact, because of the inability of these insurers to pay, during the fourth quarter of 2007 Merrill reported a "credit valuation" adjustment relating to the firm's hedges with "financial guarantors" of $3.0 billion, $2.2 billion of which related to so-called super senior debt. (¶107).

> ### d.    The Fall of CDO Market Indices and Merrill's Inability to Sell CDO Assets Is Strong Evidence of Scienter

The material decline in the ABX and TABX indices and Merrill's inability to sell the assets it held as collateral in the collapsed Bear Stearns hedge funds were red flags to Defendants that the value of Merrill's CDO assets was declining. Defendants knew or recklessly disregarded that two key indices that tracked the value of CDOs and MBS materially declined as early as February 2007, including at the AAA level. (¶40). By the end of the first quarter of 2007, the ABX and TABX had declined up to 40% at the BBB level, and by at least 15% at the super senior AAA level. By the end of June 2007, the ABX and the TABX continued to decline and the senior TABX tranche had dropped in price to the mid-60s, losing close to 40% of its value. (¶51). The inference is compelling that Defendants either knowingly or recklessly disregarded, as of February 2007, the impact the decline in these indices was having on Merrill's CDO exposure.

Defendants admittedly analyzed "Relevant ABX indices" "as part of the overall valuation process of CDOs" (¶329). Edwards claimed specific knowledge of the process Merrill used in "marking" or valuing its U.S. subprime ABS CDOs. (¶¶278-79). Edwards told investors that Merrill's assets and hedges were "directly affected" by, *inter alia*, the ABX index. (¶279).

Another fact strongly suggesting Defendants knew of the decline in the value of Merrill's U.S. subprime ABS CDOs was Merrill's inability to sell, and/or ability to only sell at very low prices, collateral that Merrill seized in its capacity as lender to collapsed Bear Stearns hedge funds. (¶¶154-61). Specifically, the Defendants knew that:

- if Merrill sold the bonds at prices being offered for them, the Company would have locked in losses for itself and many clients;
- bids on certain bonds were as low as 30% of par value and for others, there were no bids; and
- as a result, Merrill only sold a fraction of the assets and carried the assets it was forced to retain at inflated values.

(¶¶154-61). Defendants were aware, by at least June 2007, of the deterioration of these assets. (¶¶157-60). For example, Edwards and O'Neal discussed the collapse of the Bear Stearns hedge funds with investors on July 17, 2007. (¶281).

### 3.    Defendants' Attempts to Conceal Merrill's Exposure Also Establishes Their Scienter

Specific facts known to Defendants that contradict their public statements strongly suggest an inference of scienter. *See Novak*, 216 F.2d at 311 (where defendants were allegedly aware or disregarded the need to write down inventory); *Hall v. Children's Place Retail Stores, Inc.*, No. 07 Civ. 8252, 2008 WL 2791526, at *5-*6 (S.D.N.Y. July 18, 2008) (same); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y 2006) (stating that "the Second Circuit has held that securities fraud claims typically have sufficed to state a claim based on recklessness 'when they have specifically alleged defendants' knowledge of facts or access to

information contradicting their public statements.'"") (citing *Novak*); *In re Xerox Corp. Sec. Litig.,* 165 F. Supp. 2d 208, 223 (D. Conn. 2001) (finding scienter allegations adequately pleaded where "members of the company's sales force personally communicated to the individual defendants" information that contradicted their public representations).

When questions arose in April 2007 regarding Merrill's exposure to U.S. subprime ABS CDOs, Defendants intentionally concealed Merrill's exposure, falsely representing that Merrill's risk controls and hedging techniques were effectively mitigating and minimizing any impact that the subprime market would have on Merrill.  (¶6).  In their Class Period press releases and statements during conference calls, O'Neal and Edwards falsely assured investors that Merrill's financial condition was strong without giving any indication that Merrill's exposure to the subprime market, through CDOs, had increased by tens of billions of dollars.  For example, instead of disclosing Merrill's U.S. subprime ABS CDO exposures, defendant Edwards affirmatively minimized the importance of Merrill's subprime business by reiterating the highly misleading purported fact that it represented only less than 1% of Merrill's revenues.[29]

Actions of Defendants to conceal Merrill's exposure to U.S. subprime ABS CDOs also strongly suggest an inference of scienter.  *See, e.g., In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 616, 626 (S.D.N.Y. 2005) (finding scienter adequately pleaded where Defendants engaged in transactions designed to hide defendant's debt).  Here, the Complaint alleges that Defendants

---

[29]    Citing *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) and *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004), Defendants argue that their disclosures starting in October 2007 negate an inference of scienter because they occurred prior to the deadline for Merrill to file its quarterly report with the SEC.  (Merrill Br. at 37).  Defendants' argument is meritless given that Defendants' disclosures of Merrill's exposure to U.S. subprime ABS CDOs started 12 months after they knew of the risk.  (Merrill Br. at 37, 51).  The Complaint alleges that Defendants knew of Merrill's undisclosed exposure to U.S. subprime ABS CDOs since the beginning of the Class Period (October 17, 2006).  (¶204(a)).  Moreover, the October 5, 2007 disclosure was incomplete and deceptive, as the write-down disclosed on that date was several billion dollars smaller than the write-down actually taken only three weeks later.  The more cogent inference is that when asked about Merrill's exposure earlier in the Class Period, the Defendants, lied to investors until the October 2007 disclosures (which themselves concealed the full truth).

engaged in multiple acts to cover up Merrill's CDO activities, including affirmatively misleading analysts about Merrill's true U.S. subprime ABS CDO exposure (¶¶43-44, 50); surreptitiously dumping risky pieces of U.S. subprime ABS CDOs on Merrill customers without its customers' knowledge (¶¶168-78);[30] and simultaneously committing the same control rights on CDOs to more than one counterparty in order to insure more, and therefore sell more, CDO tranches. (¶¶179-84).

### 4. Defendants' Admission of Their Responsibilities for Monitoring Risk Raises a Strong Inference of Scienter

"Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *South Ferry LP v. Killinger*, No. 06 Civ. 35511, 2008 WL 4138237, at *6 (9th Cir. Sept. 9, 2008); s*ee also Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (finding scienter adequately alleged as to Company's CEO and CFO because their responsibilities for the day-to-day operations made it "hard to believe that they would not have known about stop-work orders."); *Makor Issues & Rights, Inc.,* 513 F.3d at 709 ("The 5500 and 6500 were Tellabs' most important products. . . That no member of the Company's senior management who was involved in authorizing or making public statements about the demand for the 5500 and 6500 knew they were false is hard to credit.").

---

[30]     Defendants claim that "Plaintiffs do not allege who at Merrill was involved or that senior management knew of any issues with the transactions." (Merrill Br. at 48). This is inaccurate. The Complaint alleges that with respect to MLPFS's unauthorized CDO sales to the City of Springfield, Massachusetts, two individuals, Carl Kipper and Manuel Choy, were directly involved. (¶170). Further, the Complaint alleges that V. James Mann, First Vice President and Assistant General Counsel of Merrill, was negotiating the dispute between Merrill and the City of Springfield and participated in a conference on November 15-16, 2007 with the Treasurer of the City of Springfield concerning the dispute. (¶176). Further, on February 1, 2008, Merrill admitted that it had improperly sold the City of Springfield the CDOs at issue and agreed to "reimburse" the City of Springfield $13.9 million, which was the entire amount that Merrill invested in CDOs on behalf of the City of Springfield. (¶177).

Risk management was central to Merrill's business. Risk was monitored on a day-to-day basis. Each Individual Defendant, as a member of top management, had a duty to monitor risk. The Complaint contains detailed, specific facts concerning Defendants' own description of Merrill's risk management practices and policies. (¶¶205-06, 208, 212, 214, 220, 230, 232-37, 246, 262-63, 265-67, 269, 279, 281, 291, 293-95, 298, 301, 325).

Furthermore, O'Neal and Edwards admitted that they were intimately involved in monitoring Merrill's CDO business. For example, Edwards was aware of the number of CDO transactions involving Merrill during the quarter ended March 30, 2007 (according to Edwards, there were 28 deals, 19 of which were U.S. subprime ABS CDOs), the timing of when they occurred (10 occurred in the first weeks of March 2007), and how Merrill's U.S. subprime ABS CDOs were valued. (¶¶246, 275, 279).[31]  Defendants also told investors during the Class Period, *inter alia,* that:

- Edwards was responsible for control groups that managed market risk, credit risk, liquidity risk and operational risk, which along with other control units, worked to ensure that risks were properly identified, measured, monitored, and managed throughout Merrill (¶¶205, 233, 266, 294);
- With respect to Merrill's management of its subprime assets: "***having both origination and servicing capabilities, enabled us to see trends emerge sooner and adjust underwriting standards and pricing more rapidly***" and "***[R]isk management, as I said, in the prepared remarks, is a crucial aspect of our business and I think we've done a very good job in negotiating these markets as a result of that.***" (¶¶245-46);
-  "***Risk management, hedging, and cost controls in this business are especially critical during such periods of difficulty, and ours have proven to be effective in mitigating the impact on our results***" (¶278);

---

[31]     Edwards argues that his certification of Merrill's financial statements is insufficient to infer scienter. (Edwards Br. at 9) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 1997)).  However, the cases relied upon by Edwards recognize that signing a Sarbanes-Oxley certification can support an inference of scienter where, as here, accounting issues or red flags are alleged.  *See Integrated Elec. Servs. Inc.*, 497 F.3d at 555 ("if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags', that the financial statements contained material misstatements or omissions" the signing of a Sarbanes-Oxley certification would support an inference of scienter) (citing *Garfield*, 466 F.3d at 1266).

- Merrill's risk management policies and practices were subject to "***regular senior management review and control***."  (¶233);

- Risk levels were monitored on a "daily basis to ensure they remain within corporate risk guidelines and tolerance levels." (¶¶206, 234, 267, 295);

- "Funding activities are subject to regular ***senior management review and control*** through Asset/Liability Committee meetings with Treasury management and other independent risk and control groups. Our funding strategy and practices are reviewed by the Risk Oversight Committee ('ROC'), Merrill Lynch's executive management and the Finance Committee of the Board of Directors." (¶233);

- The Executive Committee (of which O'Neal, Fakahany, Edwards and Fleming were members) "***pays particular attention to risk concentrations*** and liquidity concerns."  (¶94);

- Market and credit risk tolerance levels are represented in part by framework limits, that are established by the ROC and ***reviewed and approved annually by the Executive Committee***, which must also approve certain intra-year changes. (¶233);

- "The risk management and control process ensures that our risk tolerance is well-defined and understood by our . . . executive management."  (¶233);

- "[S]ignificant issues and transactions are reported to the Executive Committee" (¶233);

- "[S]enior management" monitored the creditworthiness of Merrill's counterparties, including whether these parties could satisfy their contractual obligations to Merrill: "***With senior management involvement, we conduct regular portfolio reviews, monitor counterparty creditworthiness, and evaluate potential transaction risks with a view toward early problem identification and protection against unacceptable credit-related losses.***"  (¶235);

- Credit risk is ***closely monitored in order to ensure that reserves are sufficient and valuations are appropriate***.  (¶¶262, 291); and

- As late as August 3, 2007, Merrill maintained "***We continue our disciplined risk management efforts to proactively execute market strategies to manage our overall portfolio of positions and exposures with respect to market, credit and liquidity risks***."  (¶294).  (emphasis added).[32]

---

[32]     Edwards argues that the Complaint's scienter allegations against him do not give rise to a strong inference of scienter because they are "boilerplate".  However, the Complaint alleges that Edwards knew of Merrill's exposure to billions of dollars of U.S. subprime ABS CDOs, and that he affirmatively misled investors when asked about Merrill's exposure.  Consequently, the cases cited by Edwards are distinguishable.  *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 (S.D.N.Y. 2008) (complaint failed to adequately plead that informants were in a position to know of communications with or conclusions of "senior management"); *In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1201 (N.D. Ga. 2007) (dismissing complaint that failed to allege that any defendants had knowledge of alleged channel stuffing fraud by low-level managers who did not communicate with individual defendants); *Hampshire Equity Partners II, L.P. v. Teradyne, Inc.*, No. 04 Civ. 3318, 2005 U.S. Dist. LEXIS 5261, at *11-12 (S.D.N.Y. Mar. 30, 2005) (finding complaint deficient where only scienter allegation was that senior executives "were made aware of the false and fraudulent statements" made on defendants' behalf and was "unsupported by a single additional reference in the Complaint"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 267-68 (S.D.N.Y. 2004) (dismissing claims that forward-looking optimistic statements were actionable where it was "impossible to determine whether Flag or the individual defendants were painting a rosy picture while receiving contrary information"); *Glickman v. Alexander Services, Inc.,* No. 93 Civ. 7594, 1996 U.S.

These representations were made in press releases, conference calls or public filings that were signed, in many instances, by the Individual Defendants. As such, based on Defendants' admission that they monitored Merrill's risk exposure, there is a strong inference that Defendants knew that Merrill's financial condition had materially declined because of its exposure to billions of dollars in subprime securities. In short, the Court should reject Defendants' preferred inference that they would not have been aware of Merrill's exposure to U.S. subprime ABS CDOs, the material decline in the value of U.S. subprime ABS CDO assets, and Merrill's need to write down timely the value of these assets given Defendants' own statements concerning management of the firm's risk.

### 5. The Magnitude of the Write-Downs and the Pervasive Nature of GAAP Violations Strongly Suggest Scienter

The magnitude of the write-downs alleged in the Complaint – over $30 billion – is an additional indicator of Defendants' scienter. *See Rothman*, 220 F.3d at 92; *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding the magnitude of the alleged fraud provides some additional circumstantial evidence of scienter). In *Rothman*, plaintiff argued on appeal that the "magnitude of this write-off renders less credible the proposition" that during the class period defendants believed that they were properly capitalizing certain expenses. 220 F.3d at 92. The Second Circuit agreed. Reversing the district court, the court found that the magnitude of the write-down was significant and supported a strong inference of scienter. *Id.*; *accord Scottish Re*, 524 F. Supp. 2d at 394.

---

Dist. LEXIS 2325, at *46 (S.D.N.Y. Feb. 27, 1996) (allegations that CEO of parent company would have to know of fraud at subsidiary company were inadequate to plead scienter).

Fakahany wrongly claims that the Complaint relies upon the "group pleading" doctrine to allege scienter. (Fakahany Br. at 17). The Complaint does not rely on the group pleading doctrine to allege his scienter. Unlike *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008), and *In re WRT Energy Sec. Litig.*, Nos. 96 Civ. 3610-3611, 1997 WL 576023, at *14 (S.D.N.Y. Sept. 15, 2007) on which Fakahany relies, the Complaint alleges numerous specific red flags of which Fakahany was aware, and does not simply rely upon his executive position.

The magnitude of the write-downs here is astounding by any measure.  The alleged record profits for all of 2006 and the first two quarters of 2007 were more than wiped out – indeed, dwarfed – by the over $30 billion of write-downs that Merrill took in the third and fourth quarters of 2007 and the first quarter of 2008 alone.  These massive write-downs were a direct result of Merrill's undisclosed exposures to, and activities in, risky U.S. subprime ABS CDOs.  Even Merrill's present CEO John Thain acknowledged the massive magnitude of the write-downs.  (¶373).

The Complaint also alleges extensive GAAP violations, including failing to disclose the concentration of credit risk in subprime-related CDOs (¶¶363-64), overvaluing CDO and other subprime-related securities (¶350) and earnings due to the failure to timely write down CDOs and other subprime-related securities by at least March 30, 2007.  (¶¶142, 352-53).  Further, the decline in the ABX and TABX indices required a "subsequent event" disclosure in Merrill's 2006 Form 10-K.  (¶358).  These facts, along with the other particular allegations of risk that Defendants knew or disregarded, also strongly suggest an inference of scienter.  *See Novak*, 216 F.3d at 309; *Scottish Re*, 524 F. Supp. 2d at 393 ("where such allegations [of GAAP violations] are coupled with evidence of corresponding fraudulent intent they might be sufficient" to give rise to a strong inference of scienter); *Children's Place*, 2008 WL 2791526, at *9 (finding scienter was adequately alleged where allegations of GAAP violations were coupled with evidence of corresponding fraudulent intent).

Defendants assert that the absence of a restatement of Merrill's financial statements, and the fact that Merrill's financial statements were audited by an independent auditor, preclude an inference of scienter.  (Merrill Br. at 37).[33]  However, there is no requirement that financial

---

[33]     Because a Section 10(b) claim does not require plaintiff to identify a restatement of financial statements, Defendants' reliance on *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948, at *39-

statements be restated in order to plead a violation of Section 10(b). Indeed, numerous courts have upheld securities fraud claims involving GAAP violations where there was no restatement of a Company's audited financial statements.[34]

### 6. Resignations of O'Neal and Fakahany, Insider Stock Sales and Merrill's Stock Issuances Strongly Suggest Scienter

#### a. The Forced Resignations of O'Neal and Fakahany Create an Inference of Scienter

Within weeks of disclosing that Merrill was exposed to tens of billions of dollars of risk to U.S. subprime ABS CDOs, the Company forced the resignation of O'Neal, who is alleged to have led the Company's drive into risky U.S. subprime ABS CDOs. (¶¶17-18, 199). In addition, on January 28, 2008, shortly after Merrill disclosed an additional $16 billion in write-downs, Merrill announced that Fakahany would "retire" from the Company as of February 1, 2008. (¶¶71, 329, 331).[35]

---

40 (S.D.N.Y. Mar. 28, 2007) and *In re 2007 Novastar Financial, Inc. Sec. Litig.*, No. 07 Civ. 0139, 2008 U.S. Dist. LEXIS 44166, at *12 (W.D. Mo. June 4, 2008), is misplaced.

[34]  *See, e.g., Rothman*, 220 F.3d at 93 (denying motion to dismiss Section 10(b) claim where plaintiff alleged defendant improperly capitalized royalty advances even though there was no restatement and defendant's auditor issued a clean audit opinion); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 72 (1st Cir. 2002) ("[T]he fact that the financial statements for the year in question were not restated does not end [the plaintiff's] case when he has otherwise met the pleading requirements of the PSLRA."); *In re LDK Solar Sec. Litig.*, No. 07 Civ. 05182, 2008 WL 2242185, at *11 (N.D. Cal. May 29, 2008) (upholding Section 10(b) claims of accounting fraud even though defendants argued that there was no restatement and KPMG issued an unqualified audit opinion); *In re Majesco Sec. Litig.*, No. 05 Civ. 3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006) (denying motion to dismiss Section 10(b) claim where plaintiffs alleged accounting fraud even though there was no restatement and the company's auditor issued an unqualified audit opinion). To hold otherwise would shift to accountants the responsibility that belongs to the courts.

Furthermore, Defendants' "no restatement" argument improperly asks the court to weigh evidence at the pleading stage of this action. *See In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2007 WL 2684069, at *3 (S.D.N.Y. Sept. 14, 2007) (rejecting defendants' argument that "the existence of an unchallenged audit opinion by Price Waterhouse Coopers undercuts Lead Plaintiffs' claim that loss reserves were deficient"; holding that at the pleading stage "a court may not 'weigh the evidence that might be presented at trial.'") (*id.* citing *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005)).

[35]  Fakahany argues that the Complaint makes "no claim" that his resignation was connected to Merrill's CDO business or any wrongdoing. (Fakahany Br. at 17 n.4). However, Fakahany offers no plausible explanation unrelated to the alleged fraud, why he resigned from Merrill after 20 years of service. Even if he had offered such an explanation, Plaintiffs' scienter allegations are sufficient. Given that Fakahany was in charge of risk management and knew of Merrill's exposure to U.S. subprime ABS CDOs but did not disclose this to investors

The Board's decision to force the resignation of O'Neal, which was disclosed on October 30, 2007 shortly after Merrill began telling investors about its exposure to U.S. subprime ABS CDOs, strongly suggests that O'Neal committed wrongdoing and was held responsible for the Company's losses from U.S. subprime ABS CDOs.  Hence, these facts also strongly suggest scienter.  *See Scottish Re*, 524 F. Supp. 2d at 394 n.176 ("Moreover, the additional 'highly unusual and suspicious facts' lend further support to the inference of scienter in this case.  For example, the resignations of Willkomm and Vance, although not sufficient in and of themselves, add to the overall pleading of circumstantial evidence of fraud."); *see also In re Adaptive Broadband Sec. Litig.*, No. 01 Civ. 1092 SC, 2002 WL 989478, at 14 (N.D. Cal. Apr. 2, 2002) (stating that a CFO reassignment is highly suspicious and this fact "add[s] one more piece to the scienter puzzle.").  Similarly, the announcement of Fakahany's resignation on January 28, 2008 (¶331) strongly suggests that Fakahany was, at least in part, responsible for the deterioration of Merrill's financial condition.

The inference of scienter is even stronger where, as here, a forced resignation occurs around the same time as investigations are commenced.  *See In re Sipex Corp. Sec. Litig.* No. 05 Civ. 00392, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) (finding that the "forced resignation" of the CEO days before the commencement of legal and accounting investigations are among "house-cleaning and reforms" that are "strong medicine" and "do not follow innocent mistakes.").  The Complaint alleges that just two days after O'Neal's forced resignation, on November 1, 2007, it was disclosed that the SEC was investigating Merrill's disclosures of

---

(¶¶112-13), it is more plausible than not that Fakahany's resignation a few days after Merrill wrote down an additional $16.7 billion in U.S. subprime ABS CDOs and other subprime related debt (¶57) was related to the write-downs. As such, Fakahany's reliance on *In re Cyberonics Sec. Litig.*, 523 F. Supp. 2d 547, 553 (S.D. Tex. 2007) (complaint alleged facts that indicated plausible nonfraudulent explanations for resignations), and *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005) (same), is misplaced.

losses from its subprime business, and its valuation of securities based on subprime mortgages. (¶314).

### b.    Defendants' Stock Sales, Compensation and Merrill's Stock Issuances Are Further Indicia of Scienter

The Complaint alleges that O'Neal, Fakahany and Fleming sold over $35 million of their personal holdings of Merrill stock at artificially inflated prices during the Class Period. (¶¶195-97). The Complaint also alleges that Merrill sold over $17 billion of common stock and preferred securities during the Class Period at artificially inflated prices. (¶¶185-90). Large stock sales by defendants are further evidence from which to infer scienter. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (finding the "plaintiffs' allegations of unusually large insider trades at suspicious times are sufficient to create, along with the other allegations, a strong inference of scienter"). By contrast, O'Neal, Fakahany and Fleming did not make an open market purchase of even a single share of Merrill stock during the Class Period. (¶197).

In addition, CDO volume, Merrill's annual reported profit, and each Individual Defendant's compensation were directly linked. (¶¶23, 24, 192). In 2006, the Individual Defendants reaped over $126 million in compensation, which included massive cash payments. O'Neal received $48 million in overall compensation, of which $18.5 million was cash. Edwards received $14.75 million in overall compensation, of which $5.6 million was cash. Fakahany received $30 million in overall compensation, of which $11.65 million was cash, and Fleming received $34 million in overall compensation, of which $13.2 million was cash. Absent their misrepresentation of Merrill's true performance and risk management practices, the Individual Defendants would have received materially smaller cash bonuses as well as materially smaller compensation. (¶193).

The Complaint further alleges that Merrill was motivated to artificially inflate its reported financial status and results so that it could issue over $6 billion of common stock and $11 billion of preferred securities, during the Class Period, at artificially inflated prices.  (¶¶185-90).  *See In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 270 (2d Cir. 1993) (defendants motivated to artificially inflate stock price because "the defendants would have been able to raise the needed capital on a higher rights offering pricing, thereby issuing fewer shares and lessening the dilutive effect").[36]

The three selling defendants claim that their massive profits from stock sales are not "unusual" or "suspicious" because they could have sold more shares, but did not.[37]  However, the Complaint further alleges that during the Class Period, as the build-up of unsold CDO tranches on Merrill's balance sheet occurred, O'Neal, Fleming and Fakahany sold $35 million in stock.  The fact that the Defendants failed to sell even more stock does not undermine an inference of fraudulent intent.  *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 647.

The selling defendants claim that their sales were a relatively low percentage of their overall holdings of Merrill common stock.  (Merrill Br. at 43; O'Neal Br. at 3; Fakahany Br. at 12; Fleming Br. at 5).  However, since the selling defendants do not state what amount of the unsold shares were restricted from sale due to compensation contracts, their figures cannot be considered reliable, particularly since Merrill compensated its highest executives to a great

---

[36]     Defendants' reliance on *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) is misplaced.  (Merrill Br. at 33, 37-38).  In *Kalnit*, the court found that allegations of conscious misbehavior or recklessness must be greater where "motive is not apparent." 264 F.3d at 142.  The court determined that the plaintiff's motive allegations were deficient because plaintiffs failed to allege "any specific benefit that would inure to the defendants" such as insider selling of stock at materially inflated prices at suspicious times.  *Id.*  Here, by contrast, motive allegations are pleaded with particularity and allegations concerning Defendants' insider sales support a finding of scienter.

[37]     Defendants rely heavily on *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) to support their claim that insider trading may be "non-suspicious" in some circumstances.  (Merrill Br. at 35, 42-43; Fleming Br. at 5; Fakahany Br. at 11-12, 14; Edwards Br. at 4).  However, that case featured *no* insider sales *by any officers* of the Company, and no allegations of any connection to the fraud by the single outside director who sold a modest amount of shares (excluding sales that had been disclosed before the class period, they totaled only $1.2 million).

degree with restricted stock, and the amounts had increased vastly for these defendants in recent years. Moreover, a jury is entitled to judge whether "only" $35 million of insider stock sales, with expectations of much larger amounts for as long as the scheme could be maintained, is sufficient motivation to cause these defendants to conceal risks and inflate asset values.

Further, O'Neal and Fleming each present comparisons of their stock sales in 2007 with those of previous years in order to persuade the Court that their sales were part of an innocent pattern. Assuming for argument's sake that the data these defendants present is accurate, it does not support the inferences they wish the Court to draw. According to his data, O'Neal sold $18.4 million of his personal stock during the Class Period, a 70% increase from the previous year and more than a 300% increase from 2005. *Compare In re Quintel Entertainment Inc. Sec. Litig.* 72 F. Supp. 2d 283, 297 (S.D.N.Y. 2000) (156% increase in insider sales sufficiently "suspicious", no discussion of percentage of holdings sold).[38] Even by O'Neal's preferred method of calculating the percentage of total holdings, (O'Neal Br. at 13), O'Neal's sales were 50% larger during the Class Period than in any previous year. *Compare In re Glenayre Technologies, Inc. Sec. Litig.*, No. 96 Civ. 8252, 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (Merrill Br. at 43) (no suspicion where selling defendants had sold higher value of shares in years before class period, and neither CEO, nor CFO, nor company had any sales during class period). O'Neal's calculation method is also inappropriate, because the number of shares he held during the Class Period was inflated by increases in his holdings of restricted stock that he could not legally sell.

---

[38]    The Complaint in this action, unlike in *Borochoff v. GlaxoSmithKline,* No. 07 Civ. 5574, 2008 U.S. Dist. LEXIS 38784 (S.D.N.Y. May 9, 2008), cited by Defendants, specifies the increase in sales by defendants during the Class Period over previous years. Several defendants in *Malin v. XL Capital Ltd.,* 499 F. Supp. 2d 117 (S.D.N.Y. 2007), also cited by Merrill Lynch, had sold **more** shares before the class period than during the period of alleged fraud. (Merrill Br. at 43-44).

Defendants' reliance on *Higginbotham v. Baxter International*, 495 F.3d 753, 759 (7th Cir. 2007) is also misplaced. (Merrill Br. at 47). In that case the insider trading allegations were found to be unpersuasive because the alleged fraud involved less than 1.5% of Baxter's operating profits. In this case, the write-downs subsequent to the insider stock sales of $35 million represent over **400%** of 2006 reported net earnings of $7.5 billion.

Fleming also admits that he sold an increased amount of Merrill shares during the Class Period, and that this increase was substantial: his sales were approximately $960,000 in 2006, as compared to $4,236,000 in 2007, a 400% increase. (Fleming Br. at 6).

Similarly, a jury could easily find that Fakahany's sale of over $13 million of stock during the Class Period, following no sales at all in the previous three years (that is, an infinite percentage increase), is a "suspicious" fact. Fakahany's claim that he continued to hold a large percentage of shares (Fakahany Br. at 12), which he concedes included an unspecified amount of restricted shares that could not be sold, provides, at best, a basis for argument before a jury.

The selling defendants argue that the increase in the number of shares they owned between the beginning and the end of the Class Period is inconsistent with fraudulent intent. (Fleming Br. at 6; *see also* O'Neal Br. at 2; Fakahany Br. at 12-13). But none of these defendants purchased a single share of Merrill stock on the open market during the Class Period. The acquisition of shares through the exercise of warrants already owned at below market prices or through issuance of warrants, pursuant to their employment agreements, is not evidence of defendants' intent. Defendants received these shares (or the underlying warrants) as employment compensation and did not pay for them. *See, Oxford Health Plans*, 187 F.R.D. at 133 (declining to count options as stock). By contrast, their sales were on the open market at open market prices.

The timing of O'Neal, Fleming and Fakahany's sales also appears suspicious because the sales came just after the disclosure of Merrill's fourth quarter operating results and year ended December 29, 2006 financial results, which contained numerous material omissions (¶221), at a time that the scheme was most successful, when the stock price reached its all-time high of $90-$97 per share. (¶197(iii)). Thus, the sales came at the time when they could have been

"calculated to maximize personal benefit from inside information." *Ressler v. Liz Claiborne*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (quoted in O'Neal Br. at 9). In addition, the Complaint alleges that the stock sales were suspicious because they came just as two major subprime loan originators, to whom Merrill had put back millions in defective loans, were entering bankruptcy (¶197(i)), events that these defendants, but not the investing public, knew would have material adverse consequences for Merrill.[39] The sales were also suspicious because they occurred around the same time as certain events that signaled a material decline in the subprime market, *i.e.*, the material decline in the ABX Index and increasing default rates.[40] (¶197). Plainly, the suspiciousness of these sales is a question for the jury.

### c.  Merrill's Stock Issuances Are Evidence of Scienter

Merrill's issuances of $17.85 billion in common stock and preferred securities during the Class Period were enormous and also provided strong motivation to artificially inflate the price of Merrill stock.[41]

---

[39]   O'Neal's assertion that the bankruptcies were public knowledge, (O'Neal Br. at 11), misconstrues Plaintiffs' claim. The consequences of these bankruptcies, each caused by rising default rates on subprime loans, for Merrill were not publicly known because *Defendants* had concealed the Company's high concentration of risk in subprime-related investments from the public and Merrill's reliance on these subprime originators.

[40]   The selling Defendants also claim that sales on February 5 and 6, 2007, months before the end of the Class Period, cannot raise an inference of scienter. (O'Neal Br. at 9-10; Fakahany Br. at 13; Fleming Br. at 6-7). While a stock sale very close to a disclosure of a fraud may be evidence of suspicious timing, it is not the only form of persuasive evidence. *AstraZeneca*, 559 F. Supp. 2d at 453 (cited by Defendants) is readily distinguishable. The alleged scheme in that case would inevitably end on the date of FDA action concerning approval of a drug, which had been scheduled for a public hearing and vote on a particular date. Defendants did not sell shares before that meeting, negating any inference that they anticipated bad news. Here, by contrast, since the Defendants could not have known how long the scheme could continue, the absence of sales later in the Class Period does not permit any exculpatory inference. Also, the total amount of insider trading in that case, $2.7 million among four Defendants, was tiny, and there is no comparison to previous years' sales.

O'Neal also claims that his stock sales in early February 2007 were not "suspiciously timed" because he had previously sold much smaller amounts of stock at the same time of year, shortly after the publication of Merrill's annual financial statements. (O'Neal Br. at 9-11). However, a preconceived plan to sell shares at a particular time of year provides a strong motivation to artificially inflate the price of those shares at that time of year. *Kaplan v. Rose*, 49 F.3d 1363, 1380 (9th Cir. 1999); *see also Goldman v. Belden*, 754 F.2d at 1071.

[41]   Merrill states that Plaintiffs allege that it issued only $5.24 billion in common and preferred stock during the Class Period. (Merrill Br. at 41). However, Plaintiffs actually allege Merrill stock issuances in excess of $17 billion, and that all of these issuances were at inflated prices of Merrill stock. (¶¶189-91).

Merrill's claim that it repurchased common stock during the same period that it was marketing preferred securities to new investors is nowhere in the Complaint, and should not be considered by this Court. Even if these facts were to be considered, Merrill's argument that its stock buyback program negates an inference of fraudulent intent rests on Defendants' misunderstanding of the Complaint. (Merrill Br. at 41). The Complaint alleges that Merrill sold or contracted to sell $17.85 billion of its common stock and preferred securities at artificially inflated prices during the Class Period. (¶¶189-92). Unquestionably, the Company's securities sales during the Class Period overwhelmed its alleged stock purchases, and indeed, common stock sales alone exceeded the stock buyback by over $1.5 billion. (¶¶185-90; compare to Merrill Br. at 41).[42]

Moreover, insider buying (in this case, by the corporation, and not individuals) is not inconsistent with scienter where the parties causing the acquisition may have believed that the scheme could remain hidden indefinitely. *Refco*, 503 F. Supp. 2d at 647. It is well-recognized that stock buybacks using corporate funds are sometimes employed to prop up the price of the stock, not exclusively because management believes that the stock is the best investment for the Company. *See In re Guilford Mills Inc. Sec. Litig.*, No. 98 Civ. 7739, 1999 WL 33248953 *5 (S.D.N.Y. July 21, 1999) ("buying back stock, however, does not, in and of itself, refute the strong inference of scienter raised by plaintiffs' other allegations of motive and opportunity").

---

[42]    The number of common shares outstanding rose from 873 million in the end of the third quarter of 2006 to 974 million by the end of the first quarter of 2008. Merrill omits the allegations concerning securities sales contained in ¶¶189-90 of the Complaint, which clearly states that these sales were completed at prices that reflected the artificially inflated price of Merrill securities.

The large amount of Company stock issuances distinguishes this case from *McNamara v. Pre-Paid Legal Svcs.* 189 F. Appx. 702 (10th Cir. 2006) and *Matthews v. Centex Telemanagement*, No. 92 Civ. 1837, 1994 U.S. Dist. LEXIS 7895 (N.D. Cal. June 8, 1994), cited by Merrill.

### 7.    Defendants' Suggestions of Innocent or Honest Conduct Are Implausible

Defendants claim that it is more plausible that they "acted honestly" and that the "only cogent and compelling inference is that Merrill . . . simply did not predict the crisis that erupted in August 2007 and the magnitude of losses that would be incurred by holders of highly-rated mortgage securities."  (Merrill Br. at 3, 9; *see also* Edwards Br. at 5-7).  Citing *Dynex*, 531 F.3d at 190, Merrill asserts that the Complaint fails to allege contemporaneous facts known or recklessly disregarded by Defendants that contradicted their public statements.  (Merrill Br. at 11).  But as explained above, the Complaint charges Defendants with failing to disclose known, existing exposures and risks, *not* Defendants' failure to "fully predict" that those risks would materialize.

Defendants' contention that at most, they failed to predict a market crisis, is an after-the-fact, litigation-driven excuse.  This case is not about Defendants' failure to predict; it is about Defendants' misstatements and concealment concerning risk and exposure.  Simply stated, the contention that Lead Plaintiff has failed to allege adequately any contemporaneous facts and circumstances of which the Defendants were aware during the Class Period that contradicted their public statements ignores the allegations in the Complaint.  As such, Defendants' citations to cases involving failures to predict "market-wide downturns" or other unexpected events are simply inapplicable.[43]

---

[43]    *See, e.g., Acito*, 47 F.3d at 53 (where complaint failed to allege contemporaneous facts that demonstrate defendants knew a plant would fail an FDA inspection); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (where scienter allegations were insufficient because plaintiff did "not allege that the company's disclosures were incompatible with what the most current reserve reports showed at the time the disclosures were made."); *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir. 1978) (where court determined that plaintiff simply seized upon disclosures made post class period and alleged that they should have been made earlier and complaint failed to identify false statements and the date defendants learned of risk from certain allegedly speculative loans); *Novastar*, 2008 U.S. Dist. LEXIS 44166, at *15 (scienter allegations failed because plaintiff did not compare an allegedly false and misleading statement with Defendants' receipt of information demonstrating Defendants knew or recklessly disregarded the falsity of the statement); *In re Aegon N.V. Sec. Litig.*, No. 03 Civ. 0603, 2004 U.S. Dist. LEXIS

Contrary to Defendants' mischaracterization of Lead Plaintiff's allegations, Defendants' violations of the securities laws arises not from taking risk, but from failing to provide required disclosures that would allow Merrill's investors – including Plaintiff and members of the Class – to make informed decisions concerning their investment in Merrill's securities.

Nor is there merit to Defendants' assertions that the Complaint alleges claims for mere negligent mismanagement. (Merrill Br. at 34-36). This case arises not from Defendants' management of Merrill, but from their misrepresentations and omissions concerning Merrill's massive undisclosed exposures to CDOs.[44] Thus, cases applying the doctrine of *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 493 (1977) (holding that a claim for breach of fiduciary duty does not give rise to a claim under Section 10(b) of the Exchange Act) are not applicable. *See Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 638-39 (3d Cir. 1989) (finding that the *Santa Fe* doctrine does not preclude liability for false statements of material fact that conceal mismanagement).[45]

---

11466, at *48 (S.D.N.Y. June 23, 2004) (finding scienter allegations deficient because plaintiffs did not "set forth any evidence of reports or data to establish that the Defendants knew that their reserves were inadequate or that their economic assumptions were improper . . . this is not a case where Plaintiffs have presented a contrast between what the Defendants were 'hearing internally about [the problematic area] and what the company was telling the public at the same time.'").

[44] Defendants' claim that Merrill's disclosure of its practice not to disclose "'capital allocation against any specific or even broader group,' including CDOs" purportedly undercuts an inference of scienter. (Merrill Br. at 38). However, as alleged Defendants had a duty to disclose Merrill's exposure. Defendants' argument also ignores the allegations in the Complaint that, when asked about Merrill's exposure, Defendants gave misleading responses. (*See, e.g.,* ¶¶245, 248(b), 279, 280(c)). Thus, the inference of nonfraudulent conduct Merrill attempts to draw is not as likely as the inference that Defendants' failure to disclose Merrill's exposure to U.S. subprime ABS CDOs was known, and that Defendants knowingly or recklessly hid the exposure from investors.

[45] *See Ciresi v. Citigroup,* 782 F. Supp. 819, 821-22 (S.D.N.Y. 1991) (complaint failed to "aver any facts which would give rise to an inference that defendants were aware" of inadequate loan loss reserves and loans of "a high-risk nature."); *see also Fadem v. Ford Motor Co.,* No. 02 Civ. 0686, 2003 U.S. Dist. Lexis 16898, at *26 (S.D.N.Y. Sept. 25, 2003) (complaint's scienter allegations failed because plaintiff failed to allege defendants' knowledge of facts or access to information contradicting their public statement at the time defendants purchased certain allegedly speculative futures contracts); *Lerner v. FNB Rochester Corp.,* 841 F. Supp. 97, 101 (N.D.N.Y. 1993) (complaint was "missing" facts that indicate defendants engaged in misstatements or omission).

The Individual Defendants each wrongly contend that the Complaint's scienter allegations are based only on their positions at Merrill. (O'Neal Br. at 15; Edwards Br. at 9; Fleming Br. at 11; Fakahany Br. at 2). As discussed above, the Complaint alleges facts that demonstrate each Individual Defendant's knowing or reckless

### C.    The Complaint Identifies Actionable Misstatements with the Specificity Required by the PSLRA and Fed. R. Civ. P. 9(b)

#### 1.    Standards for Pleading Claims under Rule 10b-5(b)

To satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"), a complaint alleging claims under SEC Rule 10b-5(b) must:  (1) specify the alleged fraudulent statements; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.  *Novak*, 216 F.3d at 306; *In re Veeco*, 235 F.R.D. at 227; *see also In re MCI WorldCom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 280 (E.D.N.Y. 2000) (the requirements of the PSLRA and Rule 9(b) are met where the "[c]omplaint alleges the specific statement, the reasons why they believe the statement is misleading, and the facts on which that belief is formed").  *Accord* 15 U.S.C. §78u-4(b)(1) (requiring securities fraud plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.").

"The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based."  *Novak,* 216 F.3d at 314 (internal quotations and citations omitted).  However, a plaintiff is not required to plead "with particularity every single fact upon which their beliefs concerning false or misleading statements are based."  *Id.*  at 313.

---

disregard of Merrill's exposure to U.S. subprime ABS CDOs.  As such, the cases Defendants cite are distinguishable.  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381-82 (S.D.N.Y. 2004), *aff'd sub nom.*, *Albert Fadem Trust v. Citigroup, Inc.* 165 F. Appx. 928 (2d Cir. 2006) (dismissing complaint that failed to allege Citigroup CEO knew of or recklessly disregarded fraudulent transactions that allegedly occurred at another company (Enron), holding that such transactions were immaterial to Citigroup's overall business and failed to allege that the allegedly improper transactions were undertaken with contemporaneous knowledge that such transactions did not comply with GAAP); *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 204-05 (E.D.N.Y. 1997) (where complaint failed to plead scienter of outside director based on her status as a board member).

2.    **The Complaint Properly Identifies Defendants' False or Misleading Statements and States Why the Statements Are False or Misleading**

Plaintiff has met the standards for pleading claims under SEC Rule 10b-5(b).  The Complaint identifies in detail numerous materially false and misleading statements and omissions made by Defendants in SEC filings, press releases, analyst conference calls and other means during the Class Period.  The material statements and omissions concerned, *inter alia*: Merrill's exposure to the subprime housing market, the extent and value of Merrill's holdings of U.S. subprime ABS CDOs, the risks associated with such holdings, its hedges on U.S. subprime ABS CDO exposures, Merrill's underwriting guidelines concerning both the mortgages it and its affiliates originated and acquired (*see, e.g.,* ¶¶16(c)-(d), 142-61, 337-82), and Merrill's risk management practices (*see, e.g.,* ¶¶16, 34-66, 92-115, 162-67, 179-84).  The Complaint identifies the speaker of the statements and the date each statement was made.  It also sets forth the factual basis as to why each of the statements was materially false or misleading.  (*See generally* ¶¶202-325).[46]

For example, the Complaint alleges that Defendants made statements in an April 19, 2007 press release and subsequent earnings conference calls claiming that revenues from activities relating to Merrill's U.S. non-prime mortgages comprised less than 1% of Merrill's

---

[46]      Merrill argues that the way Plaintiff identifies false and misleading statements by block-quoting large sections of press releases, investor conference call transcripts, and SEC filings is defective under Rule 9(b).  (Merrill Br. at 62-63).  However, Plaintiff sufficiently identifies the sections within the quoted passages they allege to be false and misleading, by italics or bold font.  Furthermore, the length of the statement provides the appropriate context in which the statements were made to enable the Court to determine why these statements are misleading.  *McMahan,* 900 F.2d. at 579 ("The central issue on all three claims is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the debentures.").  It is for this reason that Defendants' reliance on *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) to support its argument that Plaintiff failed to make clear the portion of each quotation that constitutes a false representation, "or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts" is misplaced.  (Merrill Br. at 63).

total net revenues.  (¶¶41-44, 243-45, 248-50).  The Complaint alleges that these statements were false because, among other things:

> the statement suggested that the subprime business was a minor part of Merrill's business.  In fact, subprime MBSs were the principal cash asset backing virtually all of the CDOs and related derivative instruments underwritten, sold, swapped, traded and held by Merrill.  (¶248).

Merrill attempts to defend these statements by claiming that Plaintiff has not pleaded facts demonstrating that the 1% number is inaccurate.  (Merrill Br. at 66-67).  However, the Complaint makes no claim as to whether or not this revenue figure is accurate.  Instead, as set forth above, the Complaint alleges with particularity that these statements were materially misleading both because they were part of Defendants' efforts to convince the market that Merrill's exposure to U.S. subprime ABS CDOs was minimal (¶41), and because these statements omitted the truth (undisputed by Defendants) that Merrill in fact had billions of dollars in undisclosed exposures to subprime debt.  (¶50).[47]

### 3.    The Complaint's Allegations Regarding Risk Management Are Actionable and Are Pleaded with Particularity

Merrill wrongly contends that the statements in the Complaint regarding risk management are not actionable and are not pleaded with particularity.  (Merrill Br. at 62-74).  However, the Complaint identifies the specific false and misleading risk management statements made by Defendants, and it explains why those representations were false and misleading.[48]

---

[47]    Relying on *In re Sina Corp. Sec. Litig.*, No. 05 Civ. 2154, 2006 U.S. Dist. LEXIS 71089, at *26 (S.D.N.Y. Sept. 25, 2006) and *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 U.S. Dist. LEXIS 21319, at *22 (S.D.N.Y. Nov. 25, 2003), Merrill also argues that the 1% statement is not actionable because it was an "[a]ccurate statement of historical financial results."  (Merrill Br. at 66).  As discussed above, because Plaintiff alleges that it is not the *literal* truth of this statement that is at issue, but rather the statement's misleading nature, Merrill's reliance on these cases is misplaced.

[48]    Merrill's risk management representations included verbal and written statements made in conferences, analyst calls, press releases, and SEC filings.  (¶16).  The Complaint also alleges the source of each statement.

(*See, e.g.,* ¶¶16, 34-66, 92-115, 162-67, 179-84, 204(b), 215(b), 232, 238(b), 268(b), 280(c), 282, 290(b)).

For example, Defendants represented that (i) Merrill adhered to underwriting standards to manage the credit risk arising, (ii) any additional credit risk resulting from mortgage loans was addressed through "adherence to underwriting guidelines," and (iii) loans were "predominantly extended to high credit quality borrowers." (¶¶208, 230, 262-63). The Complaint also pleads in great detail that these representations omitted certain material facts, including for example that a material portion of the RMBS underlying Merrill's CDOs contained assets with a weighted average of BBB or lower (¶91), due to the fact that the underlying borrowers were not "high quality." Moreover, Defendants not only failed to employ rigorous underwriting standards, but they actually directed Ownit to lower its underwriting standards in order to fill the shortage of mortgages needed to build new CDOs, and Merrill also purchased mortgages made to borrowers with poor credit histories and/or who provided no proof of income. (¶¶9, 16(h), 26, 79, 116-41). These lower standards virtually guaranteed materially greater defaults, which occurred as alleged in the Complaint. (¶¶7, 16(h), 116-41, 209). Moreover, Merrill continued to pool loans from originators that were near insolvency or had filed for bankruptcy. (¶¶124-41). In sum, Merrill reassured the public as part of the Company's risk management practices that it was adhering to underwriting standards and extending credit to "high credit quality borrowers" when, in fact, it was not. (¶¶208, 230, 263).

Defendants made many additional risk management representations designed to convey that Merrill employed a highly developed, structured process and that it went to great lengths to control market and credit risk. For example, Defendants represented that Merrill closely evaluated, measured, monitored and managed risks; made senior managers accountable for

managing risk; used independent control groups to manage risks; quantified risk measurements; created and adhered to risk level profiles that would not be altered materially; hedged its risks properly; employed structure, controls, oversight and reviews; and had systems in place to ensure that Merrill had sufficient liquidity.  (¶¶205-06, 208, 220, 230, 232-36, 262-67, 294-95).  Again, these specific representations regarding Merrill's risk management practices were false and misleading because Defendants overrode or disregarded the systems that they represented were in place.  (¶¶16(b), 16(e), 95, 204(b), 211(c), 215(b), 221, 225).  In short, while repeatedly reassuring the public that Merrill had employed a strategy for managing market and credit risk, the reality throughout the Class Period was that Defendants had caused Merrill to ignore and override that strategy.

Merrill also wrongly contends that the Complaint fails to allege why Defendants' statements concerning Merrill's risk management policies were false or misleading.  In fact, Defendants ignore that for each statement, or group of statements, that are alleged to be false and misleading, the Complaint sets forth in detail why the particular statement(s) are false and misleading.  (*See, e.g.,* ¶¶218-31).  Defendants touted Merrill's purported risk management policies in numerous public statements and filings.  (*See, e.g.,* ¶¶43, 205, 214, 224, 230, 232-36, 246, 265-67, 278-79, 281, 294, 301, 307).  For example, in Merrill's 10-Q for the third quarter 2006, the Company stated that its risk levels were monitored on a "daily basis to ensure they remain within corporate risk guidelines and tolerance levels."  (¶206).  The Complaint further alleges that these statements were false because, *inter alia*, top Merrill executives were warned in the summer of 2006 by Kronthal that Merrill's U.S. subprime ABS CDO exposures were exceeding guidelines he established, creating intolerable risk, and therefore CDO underwriting activity should be curtailed.  (¶¶8, 16(b), 34-66, 92-115).

Merrill does not dispute these facts.  Nor does it dispute Plaintiff's allegations that shortly after these warnings, Kronthal and members of his team were fired by O'Neal.  Instead, Merrill attempts to discount this allegation by making the unsupported assertion that these risk management policies were "informal," non-official guidelines.  (Merrill Br. at 49).  This version of the facts is not only outside the Complaint and should be stricken, but it is also directly contradicted by the statement in Merrill's 2006 10-K that "[s]enior managers of our core businesses are responsible and accountable for management of the risks associated with their business activities."  (¶233).[49]  It is also contradicted by logic, as the Court should not give credit to Merrill's revisionist attempt to distance itself from its own purportedly critical risk management policies.[50]

Unlike the cases cited by Defendants where the allegations were found not to be actionable because they were generic or amounted to mere puffery, the allegations here involve Defendants' own detailed false and misleading statements concerning Merrill's risk management policies purportedly in place during the Class Period.  In addition, the risk management representations are not opinions because they were statements of Merrill's policies which are

---

[49]    It is for this reason that Edwards' argument that the Complaint "does not specifically allege that any particular information or warning was given *to Mr. Edwards*" is without merit.  (Edwards Br. at 3) (emphasis in original).  To the contrary, the Complaint specifically alleges that "senior managers" received the warnings from Kronthal.  Therefore, it is at least as likely as not that Edwards, as the Company's CFO, is among the "senior managers" that received such warnings.

[50]    Another allegation that Merrill wrongly contends is not well-pleaded is that Merrill misled the investing public by stating in its 2006 10-K and subsequent 10-Qs that its mortgage loans were primarily to "high credit quality borrowers." (¶¶119, 230, 263).  Merrill focuses on its portfolio of residential loans as of the end of the second quarter of 2007 and argues that Plaintiffs do not dispute that Merrill's portfolio of residential loans was, in fact, predominantly comprised of loans to high credit quality borrowers.  (Merrill Br. at 73-74).  Again, however, Merrill misses the point.  It is not disputed that the financial assets on Merrill's balance sheet included individual residential loans that it had originated or purchased, MBS, and CDOs, as well as many other types of financial instruments.  The quality of the individual mortgage loans held by Merrill as of June 29, 2007 is irrelevant to the undisputed and well-pleaded allegations that over the course of the Class Period, Merrill purchased and originated billions of dollars of subprime mortgages, it created tens of billions of dollars of CDOs from these subprime loans, and that as of June 29, 2007, it had more than $40 billion in undisclosed exposure from unsold portions of these subprime CDOs.  The statement that Merrill dealt primarily with "high quality borrowers" in its mortgage lending is another way that Defendants sought to conceal this exposure from the public.

historical fact.  However, even if they were to be viewed as opinions, they still are actionable because the Complaint alleges that Defendants neither genuinely, nor reasonably, believed in the truth of their statements.

While Merrill argues that mere "generalizations regarding integrity, fiscal discipline and risk management" may be inactionable puffery (Merrill Br. at 69) (citation omitted), statements describing specific policies and procedures are not puffery.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005).  The statements at issue here are not the type that have been rejected as puffery, such as, when a company states that it will continue to focus on "fiscal discipline" and that it "set the standard for integrity."  *See id.* at 612.  Here, the Complaint alleges that Defendants made numerous statements about how Merrill was handling specific market and credit risks.  (*See, e.g.,* ¶¶205-06, 208, 210, 214, 220, 224, 230, 233), and that these statements falsely represented that Merrill had a very thorough and well-structured process in place to mitigate the impact of difficult market conditions.  (¶¶205-06, 208, 220, 230, 232-36, 262, 267, 294-95).  Additionally, these statements were false or misleading because Defendants overrode Merrill's risk management process.  (¶¶16(b), 16(e), 95, 204(b), 211(c), 215(b), 221, 225).

In *Novak*, the court held that an issuer's public filings were materially misleading when the "disclosed policy no longer reflected actual practice."  *Novak,* 216 F.3d at 311.  That is precisely what Plaintiff alleges here – that because Defendants overrode the Company's stated policies the "disclosed policy no longer reflected the actual practice."  *Id.*; *see also Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 283 (3d Cir.), *cert. denied*, 506 U.S. 934 (1992) (holding that defendants' statement that "internal controls not only existed, but were properly centralized, supervised, and managed" could be actionable); *Ballan v. Wilfred American Educational Corp.*,

720 F. Supp. 241, 245 (E.D.N.Y. 1989) (defendants were alleged to have misled investors by claiming the existence of "additional, elaborate compliance and control steps which [they believed to be] the best procedures in the industry.").[51]

Defendants also argue that their misstatements about risk management are not actionable because the statements were merely opinions, *i.e.*, statements expressing optimism about risk. Edwards points to the fact that certain of his statements were prefaced with the words, "I think" or "we think."  (Edwards Br. at 17).  But an analogous argument was rejected in *In re Oxford Health Plans, Inc.*, 187 F.R.D. at 141-42, which held that statements that rely on factual assertions are not opinions because the word "belief" prefaced the beginning of the statement. "It is disingenuous to suggest that factual assertions are puffery and opinion that no reasonable

---

[51]    Defendants cite *In re New York Community Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006), *reconsideration denied*, 244 F.R.D. 156 (2007).  However, that case is distinguishable for at least two reasons.  First, the alleged statements concerning risk management were generalizations (e.g., "risk-adverse . . . strategy permeates every decision the company makes").  *Id.* at 478.  Here, Defendants' false statements concerning Merrill's risk management practices were specific and are pleaded as set forth above with a great degree of particularity.  Second, the *New York Community Bancorp* court concluded that the plaintiffs could not rely upon defendants' statements in light of the "numerous disclosures [defendant] NYCB made regarding the magnitude of its investments in mortgage-backed securities and the risk associated with such investments."  *Id.* at 467.  Here, the Complaint alleges that Merrill's financial disclosures prior to the Company's November 7, 2007 10-Q provided no information regarding the extent of Merrill's investment in U.S. subprime ABS CDOs.  *See, e.g.,* ¶¶343, 358.  In fact, as stated earlier, the term CDO or "collateralized debt obligation" does not even appear in the Company's 2006 10-K and Merrill did not disclose subprime exposure until October 2007, when it had already begun to write down U.S. subprime ABS CDOs.  (¶¶307, 310).  The other cases cited by Merrill, *In re Citigroup*, 330 F. Supp. 2d at 376 and *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008) are similarly inapplicable.  In *Citigroup*, the court dismissed securities fraud claims arising out of Citigroup's dealings with a third party.  The court dismissed the complaint in *Citigroup* because the allegations were not focused on "specific factual or opinion disclosures alleged to have been false or misleading, or on omissions of specific facts . . ."  *Id.*  Here, as set forth above, Plaintiff's Rule 10b-5(b) claims are premised entirely on specific alleged statements and omissions of material fact. Merrill cites *In re FBR Inc.* to support its argument "that company's risk management program failed to root out alleged insider trading did not mean that statements regarding risk management were false when made."  (Merrill Br. at 70).  Here, the Complaint's risk management allegations are not premised on the failure of the Defendants to find the fraud, but rather, that Merrill not only ignored its risk management policies, but also took on even greater exposure to U.S. subprime ABS CDOs while telling the investing public that the Company had proper risk management controls.

investor could reasonably rely on for their truth simply because [defendant] Oxford claims only to have stated that it believes in their truth." *Id.* at 141.[52]

### 4.    Defendants' Statements Are Not Entitled to Protection Under the PSLRA Safe Harbor Provision

Defendants' risk management statements are not protected by the PSLRA's safe-harbor provision for forward-looking statements.  As set forth above, these statements are not forward looking because they contain assertions of existing and historical facts.  Even if the statements were deemed forward-looking, they are not protected by the safe harbor provision because they were not accompanied by meaningful cautionary statements and, as alleged in the Complaint, were made with actual knowledge that the statements were false or misleading.[53]

"It is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply."  *Darquea v. Jarden Corp.*, No. 06 Civ. 0722, 2007 WL

---

[52]    Even if the Court were to find that Defendants' statements constitute opinions, such statements are still actionable because the Complaint sufficiently alleges that Defendants could not have reasonably believed such statements at the time they were made.  (*See, e.g.*, ¶¶16(b), 16(e), 34-40, 92-161, 402).  *Lapin v. Goldman Sachs Group Inc.*, 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006) ("[O]ptimistic statements may be actionable upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted [i.e., the opinion was without a basis in fact or the speakers were aware of facts undermining the positive statements], or that the opinions imply certainty.") (citing cases). The Complaint alleges that Defendants were aware of deteriorating market conditions, declining underwriting standards, and at least $400 million in early payment defaults, a dramatic increase in Merrill's risk profile, internal warnings from senior managers, rising default rates, the consequences to Merrill as a result of the collapse of the Bear Stearns hedge funds, the sharply discounted value of the related collateral, and multiple other red flags.  (¶¶7, 8, 34-38, 108-61).  Hence, the Complaint asserts that these Defendants neither genuinely nor reasonably believed in the truth of their risk management statements.  Furthermore, "[w]hether the opinion or 'soft information' is indeed actionable 'depends on all relevant circumstances of the particular case' . . . and is generally not an appropriate basis on which to dismiss a complaint" at the motion to dismiss stage.  *In re Vivendi, S.A.*, 381 F. Supp. 2d at 182.

[53]    Merrill argues that the Complaint does not allege the reason why its VaR calculation was false and misleading.  (Merrill Br. at 72-73).  The Complaint alleges that Merrill's VaR did not adequately reflect that Merrill's U.S. subprime ABS CDOs were backed by subprime assets, many of which were BBB-rated or below, and for which Merrill would ultimately bear financial responsibility.  Merrill's VaR was also materially understated because Defendants carried CDOs on Merrill's balance sheet at inflated amounts.  As a result, Defendants falsely convinced analysts and the market that Merrill was a less risky company than its peers.  (¶¶162-67).  Merrill's actual VaR was materially greater than reported and therefore the stated VaR materially understated Merrill's exposure to risk.  Merrill itself admitted that the VaR calculation in its financial statements prior to the 2007 10-K did not include Merrill's U.S. subprime ABS CDO exposure and residual securities positions.  (¶165).

1610146, at *7 (S.D.N.Y. May 21, 2007) (quoting *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 221 (S.D.N.Y. 2004)); *cf. Novak*, 216 F.3d at 315 ("defendants may be liable for misrepresentations of existing facts"). Defendants' statements about risk management contain representations of present fact and were not accompanied by meaningful cautionary language.

### 5. The Complaint May Rely on Facts Alleged in other Actions, Media Reports and Adequately Identifies Sources of Facts Alleged

Merrill argues that the Complaint does not satisfy Rule 9(b) because the allegations: (1) rely upon "uncorroborated and unproven allegations from pleadings in other cases"; (2) are "based solely on media reports and are. . .uncorroborated by any investigation of counsel"; and (3) sometimes are "attributed to no source." (Merrill Br. at 30-32). Each of these arguments is meritless.

#### a. Plaintiffs May Rely Upon Complaints in Other Actions

Plaintiff has conducted a thorough investigation and has adequately attributed its allegations to credible sources. Plaintiff conducted a thorough, independent investigation of the facts alleged in the Complaint by analyzing, *inter alia,* the Company's public statements, SEC filings, analyst reports, media reports, transcripts of conference calls involving the Individual Defendants, and other publicly available data.

In addition, Plaintiff may rely on allegations in other complaints where no party challenges the authenticity of the complaint. *See, e.g., In re Cylink Sec. Litig.,* 178 F. Supp. 2d 1077, 1080-81 (N.D. Cal. 2001) (where "no party challenges the SEC complaint's authenticity, the court may also consider allegations contained therein when evaluating the sufficiency of plaintiffs' allegations under the PSLRA."). Here, as in *In re Cylink,* Merrill does not challenge the authenticity of the other complaints cited in the Complaint. Thus, Plaintiff may reference

other complaints and the court may consider the allegations therein.  *See, e.g., In re Connetics*

*Sec. Litig.*, No. 07 Civ. 02940, 2008 U.S. Dist. LEXIS 62515 (N.D. Cal. Aug. 14, 2008).

      For example, Plaintiff references statements made in a complaint filed in federal court

that relate to a now-settled breach of contract claim between XL Capital Assurance Inc. ("XL

Capital") and Merrill.[54]  These references are provided only as further evidence of the

Complaint's allegations that Merrill was desperate to insure a large volume of CDOs for which

the Company lacked adequate insurance, and which Merrill was increasingly desperate to sell.

Similarly, the Complaint cites to the complaint in *MetroPCS Communications, Inc. et al. v.*

*Merrill Lynch & Co., Inc. et al.* ("MetroPCS"), as evidence supporting the specific allegations

that the Company engaged in unauthorized trading of its CDOs.  (¶170-73).  Defendants' briefs

are virtually silent on Plaintiff's core underlying allegations that throughout the Class Period,

Merrill had been experiencing increasing but undisclosed difficulties selling CDOs.  Even if

Defendants could refute, at this procedural juncture, Plaintiff's claim that MLPFS had been

engaging in unauthorized CDO sales – and they cannot – that defense hardly renders deficient

Plaintiff's core allegation that Merrill had been suffering significant and known decreases to its

ability to sell CDOs during the Class Period.[55]

---

[54]    *Merrill Lynch International v. XL Capital Assurance, Inc.* No. 08 Civ. 2893, 2008 U.S. Dist. LEXIS 53467 (S.D.N.Y. July 15, 2008).

[55]    Merrill argues that Plaintiff improperly relies on allegations made by XL Capital because the court granted Merrill's summary judgment motion.  This fact is of no consequence.  The basis for granting summary judgment in that contract dispute was that the court found that Merrill had not repudiated its previous contracts with XL Capital, as XL Capital claimed it did.  *XL Capital Assurance, Inc.*, 2008 U.S. Dist. LEXIS 53467, at *1.  Judge Rakoff did not find that the factual averments upon which plaintiffs relied were false and did not *address* whether Merrill properly disclosed its exposures to U.S. subprime ABS CDOs, much less rule in Merrill's favor on this issue.  In fact, the court accepted as true the fact that Merrill entered into CDSs with MBIA, which supports Plaintiff's allegations that Merrill turned to bond insurers to hedge its risk on CDO holdings.   In short, nothing in the *XL Capital* decision calls into question the veracity of the facts pleaded in the Complaint.

Merrill cites a number of irrelevant or distinguishable cases where courts reject allegations relying upon complaints in other actions.[56]  None of these cases prohibits Plaintiff from relying on allegations from other pleadings where, as here, the statements in other pleadings are cited as supporting evidence, as Plaintiff has done here.[57]

### b.    Plaintiff Properly Relies Upon Media Reports to Form Part of the Basis of the Complaint

Courts have found that "at a minimum, newspaper articles satisfy the heightened PSLRA pleading requirements if:  (1) they are based on an independent investigative effort; (2) they are sufficiently particular and detailed to indicate their reliability; and (3) Plaintiffs' counsel conducted its own investigation which corroborates the information in the article."  *In re JP Morgan Chase & Co. Sec. Litig.*, No. 06 Civ. 4675, 06 Civ. 4676, 06 Civ. 4674, MDL 1783, 2007 WL 4531794, at *5 (N.D. Ill. Dec. 18, 2007); *see also Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 79 (D. Del. 2002) (finding plaintiffs' allegations to the extent that they clearly identify the media sources upon which they rely, are sufficient to satisfy the heightened pleading standards under the federal securities laws); *In re McKesson HBOC, Sec. Litig.,* 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("To the extent that a newspaper article corroborates plaintiff's own investigation and provides detailed factual allegations, it can – at least in

---

[56]    For this reason, Merrill's motion to strike Plaintiff's allegations referencing complaints in other actions (Merrill Br. at 28-30) lacks merit and should be denied.

[57]    The issue in *Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 110 S. Ct. 456 (1989), was whether a Rule 11 sanction could be imposed jointly on the signing attorney and his law firm as opposed to only on the signing attorney.  *See* 493 U.S. at 457-58.  The court did not say anything about what constitutes an adequate investigation in a securities fraud class action lawsuit (in *dicta* or otherwise), nor did it mention whether a securities fraud plaintiff may rely on allegations from pleadings in other litigation.

Merrill's reliance on *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), is also misplaced.  *Lipsky* was not concerned with whether a securities fraud plaintiff may cite other lawsuits in a complaint.  Rather, the issue in *Lipsky* was whether a plaintiff may support an allegation that a registration statement is false and misleading by pointing to an allegation by the SEC in a separate lawsuit, that a **different** registration statement was false, where the SEC action resulted in a consent decree in that other action.  *See Id.* at 891-92.

combination with plaintiff's investigative efforts – be a reasonable source of information and belief allegations.").[58]

Here, Plaintiff cites well-known, widely circulated, reputable publications such as *The Wall Street Journal* (¶¶100, 109, 111, 159). Moreover, "[r]eliance on an article in *The Wall Street Journal* is not reliance on an insubstantial or meaningless investigation." *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir. 1982), *abrogated on other grounds by, Garber v. Lego,* 11 F.3d 1197 (3d Cir. 1993). The newspapers cited by Plaintiff are "well-known and reputable paper[s], read nationally and internationally." *In re JP Morgan Chase*, 2007 WL 4531794, at *5. Articles from the *New York Times* are similarly "both independent and reliable." *Id.* "In the present case, the Plaintiffs have asserted, which this court must accept as true, that an independent investigation was conducted by journalists." *Id.* Further, the articles cited are "sufficiently particular and detailed to indicate their reliability." *Id.* For example, the Complaint refers to articles that provide significant detail about the warning statements made to Merrill's senior management and about the risk related to CDO exposure. (*See, e.g.*, ¶¶109, 111).[59] Plaintiff does not merely "delegate their investigative responsibilities to newspaper reporters" as Merrill claims. (Merrill Br. at 31). Rather, Plaintiff's counsel conducted their own extensive

---

[58]     Moreover, "if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter." *In re McKesson HBOC*, 126 F. Supp. 2d at 1272.

[59]     Merrill's contention that the Complaint "takes liberties with the press reports" (Merrill Br. at 31-32) is without merit. The article cited by Merrill is not the sole source for allegations concerning Merrill's risk management policies and guidelines, as is obvious from the Complaint. For example, Dallas, who does not appear in the article cited by Merrill, is cited in several places as a source of information respecting both the firing of Kronthal and the reduction of risk management policies and underwriting standards. (*Eg.*, ¶¶36, 131-33). Nor would it be an unwarranted leap to describe limits on CDO exposure imposed by the Merrill executive responsible for setting such limits, as Merrill "policies and guidelines." Finally, Plaintiffs had no obligation to quote or give any credence to the self-serving purportedly exculpatory statement by unnamed "executives" in the same article when it is contradicted by the weight of the facts in the Complaint, and was made several months after securities fraud complaints had been lodged against several such executives. The Court should consider the statements of these "executives" as an unsworn assertion of fact by a self-interested defendant, entitled to no weight at this stage of litigation.

investigation by, *inter alia,* comparing press releases, earnings calls, and SEC filings with information found in reputable newspapers.[60]

The Complaint provides further support that Plaintiff independently investigated the information learned from newspaper articles.  For example, Plaintiff alleges that the risk controls at Merrill were insufficient.  This is supported by statements made by John Thain, Merrill's current CEO who succeeded defendant O'Neal.  During a January 14, 2008 earnings conference call, Thain recognized that "[n]one of the trading businesses should be taking risks...that wipe out the entire year's earnings of their own business and of course ***certainly shouldn't take a risk to wipe out the earnings of the entire firm*** . . ."  (¶373) (emphasis in Complaint).

A reasonable investigation has been found where, as here, Plaintiff's counsel has "conducted a thorough investigation of all reasonably available sources of information" including Defendants' public filings, securities analysts' reports, pleadings in other related cases, Merrill's press releases, and other publicly disseminated statements and reports.  *In re JP Morgan Chase*, 2007 WL 4531794, at *6.  Merrill does not argue, nor can it, that Plaintiff does

---

[60]     Merrill's reliance on *CALPERS v. Chubb*, 394 F.3d 126, 147 (3d Cir. 2004) and *Novak*, 216 F.3d at 314, to argue that Plaintiff may not rely upon anonymous sources cited in newspaper articles is misplaced.  (Merrill Br. at 31).  In *JPMorgan Chase*, 2007 WL 4531794, the court rejected the identical argument.  There, the court stated:

> Defendants rely on *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006), in arguing that Plaintiffs must describe confidential sources with "sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged.'"  Defendants argue that because the sources of the New York Times are confidential, they do not meet this requirement.  *Makor*, however, is not directly applicable to the present case. In *Makor*, the standard is applied to plaintiffs counsels' confidential sources, not the confidential sources of a reliable and independent newspaper.  A reputable newspaper, where an independent investigation was conducted, provides an additional layer of reliability in reporting.  Further, the confidential nature of a journalist's source is used to encourage reporting and accuracy.  In the present case, the confidential source is the informant to a newspaper, not to the Plaintiffs' counsel directly.

*Id.* at *5.  Similarly, here, Merrill's reliance on cases discussing the requirements for using confidential witnesses is not applicable because Plaintiff is permitted to cite media reports that may contain statements of confidential witnesses.  In addition, because the articles are considered reputable, anonymous sources in such articles may properly be cited to support Plaintiff's position.

not rely upon these multiple sources.[61]   In sum, the Complaint is based on a proper investigation and meets the applicable pleading requirements.

### c.    Plaintiff Adequately Identifies the Sources of the Facts Alleged

Merrill erroneously claims that the Complaint fails to identify the basis for many facts alleged.  (Merrill Br. at 32).  Courts in this Circuit have not required plaintiffs to plead the basis for every fact alleged.  Rather, "[i]n our view, notwithstanding the use of the word 'all,' paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.  Rather, plaintiffs need only plead with particularity *sufficient* facts to support those beliefs."  *Novak,* 216 F.3d at 313-14 (*citing* PSLRA) (emphasis added).  "In fact, the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts.  *See* 15 U.S.C §78u-4(b)(1)."  *Id.* at 313; *accord In re Xerox,* 165 F. Supp. 2d at 223. Plaintiff has pleaded the who, what, where, when and why of the alleged securities fraud, which are sufficient facts to support the allegations of fraud, and Plaintiff has also adequately identified the sources it has used to allege those facts.  Moreover, Plaintiff does in fact attribute its allegations to specific sources, including press releases, SEC filings, newspaper articles, conference call transcripts and market indices.  (*See, e.g.,* ¶¶62-65, 81, 273, 334).

---

[61]    Defendants rely on two distinguishable cases:  *Hershfang v. Citicorp*, 767 F. Supp. 1251 (S.D.N.Y. 1991), and *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004).  (Merrill Br. at 29).  In *Hershfang*, there were two basic problems, neither of which exists in the instant litigation.  First, the *Hershfang* "allegations consist[ed] of little more than unremarkable facts and excerpts from newspaper articles."  *Id.* at 1252.  Second, the *Hershfang* plaintiffs were relying on the authors' opinions in the articles to allege that the statements made by the defendants were fraudulent.  *See id.* at 1255.  The court held that such opinions "represent the reporters' independent editorial commentary and accordingly can not provide the basis for a claim that *defendants* made fraudulent misrepresentations."  *Id.* (italics in original and citation omitted).  Here, Plaintiff is relying on newspaper articles to demonstrate that certain events occurred, and to introduce direct quotes by Defendants.  Neither category involves a reporter's opinions and editorial commentary.  *In re Bristol-Myers Squibb Sec. Litig.*, makes the same point – namely, that "conclusory allegations and opinions" issued by journalists are not appropriate evidence of a defendant's state of mind.  312 F. Supp. 2d at 563.  Here, Plaintiff has not relied on journalists' judgments and opinions.

Defendants argue that Plaintiff's allegations that "[b]y the beginning of the Class Period, [Defendants] knew of or received warnings that the market for CDOs was materially deteriorating" (¶34) are improperly without attribution.  To the contrary, the Complaint provides a basis for these facts.  Plaintiff cites, *inter alia*, AIG's failure to continue underwriting insurance to protect Merrill's CDO exposure (¶35); direct statements from Bill Dallas, the owner of Ownit, regarding Merrill's direction to lower underwriting standards (¶¶131-33); a third quarter 2006 Standard & Poor's report, which noted that issuers (of subprime mortgage loans) were "tightening their underwriting standards in response to rising delinquencies and early payment defaults"  (¶116); a Moody's statement that noted for the first quarter of 2007 "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters" (¶117); as well as warnings from Kronthal. (¶¶36, 101, 109).

The Complaint, therefore, meets the specificity requirements of the PSLRA and Rule 9(b).  "This specificity strongly suggests that Plaintiffs, without the benefit of discovery, have adequately investigated and substantiated their allegations and, as a result, have allayed the PSLRA's concerns about frivolous and abusive fraud suits."  *In re Campbell Soup,* 145 F. Supp. 2d at 595-96.[62]

---

[62]    In addition, Merrill argues that Plaintiff's allegation that Defendants "were discussing at the time [September 14] [of] the announcement of massive writedowns which would not be announced until after the First Republic Merger" was not attributed to any source and was fabricated.  (Merrill Br. at 32, 68).  However, the Complaint adequately alleges facts supporting this allegation, namely that only one month prior to this announcement, defendants Fleming and Fakahany had warned Merrill's board about the expensive nature of Merrill's U.S. subprime ABS CDO exposures.  From this fact, a compelling inference can be drawn that in September 2007 Defendants were discussing the anticipated write-downs.

6.      **The Group Pleading Doctrine Applies to Merrill's SEC Filings, Press Releases and Registration Statements**

The Second Circuit adopted the group pleading doctrine in *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986) as a means of satisfying the requirement that the complaint identify who made the false or misleading statements for a Section 10(b) claim.[63]   In that case, the court stated that "no specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."   *Id.*

Since Merrill's SEC filings, press releases and registration statements were the result of a group effort and the collective work of Defendants, Plaintiff properly relies on the group pleading doctrine in asserting claims against these Defendants.  *See In re Van der Moolen*, 405 F. Supp. 2d at 399 (group pleading doctrine applies to "clearly cognizable corporate insiders with active daily roles").  Plaintiff has invoked the group pleading doctrine as against four of Merrill's highest corporate executives, *i.e.*, senior officers with daily responsibility for the management and operation of Merrill.  As alleged in the Complaint, Edwards was Senior Vice President and

---

[63]      Each Individual Defendant signed an increasing amount of false and misleading documents, and each Individual Defendant is directly responsible for the false and misleading statements he signed even without the group pleading doctrine.  O'Neal signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Statement Amendment No. 3; and (5) First Republic Registration Statement. (¶¶477, 553-54, 564, 584, 602, 622, 643, 660, 671).  O'Neal also signed (1) Merrill's 2006 10-K; and (2) the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 in the quarterly reports filed with the SEC on Form 10-Q for the quarters ended September 29, 2006, March 30 and June 29, 2007 and in Merrill's 2006 10-K. (¶¶70, 212, 237, 269, 496, 515, 535).  Fakahany signed the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, submitted with Merrill's 10-Q for the quarter ended September 28, 2007.  (¶¶71, 325).  Fleming signed the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 in the 10-Q for the quarter ended September 28, 2007.  (¶¶72, 325).  During the Class Period, Edwards signed or caused to be signed on his behalf the following documents: (1) Registration Statement Amendment No. 1; (2) Series 5 Preferred Stock Prospectus; (3) Registration Statement Amendment No. 2; (4) Registration Amendment No. 3; and (5) First Republic Registration Statement.  (¶¶478, 553-54, 564, 584, 603, 622-23, 643, 660, 671).  Edwards also signed the following documents: (1) Merrill's 10-Q for the quarters ended September 29, 2006, March 30, June 29 and September 28, 2007; (2) Merrill's Report on Form 10-K for the fiscal year ended December 29, 2006; and (3) the certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 in the quarterly reports filed with the SEC on Form 10-Q for the quarters ended September 29, 2006, March 30, 2007, June 29, 2007, September 28, 2007 and in Merrill's 2006 10-K.  (¶¶73, 212, 237, 269, 496, 515, 535).  Each defendant is also directly responsible for the verbal statements he made, again even without applying the group pleading doctrine.

CFO, Fleming was President and COO, Fakahany was Co-President and COO and O'Neal was both CEO and Chairman of the Board.  Due to their positions of power and direct involvement in the every day business of the Company, it is reasonable to presume that the annual statements, SEC filings, press releases and offering documents were the result of a group effort that included Defendants.  *In re Pfizer, Inc. Sec. Litig.*, No. 04 Civ. 9866, 2008 WL 2627131, at *12 (S.D.N.Y. July 1, 2008).  For all of the reasons set forth above, the group pleading doctrine applies here.

Fakahany argues that the PSLRA has abolished the group pleading doctrine, relying mainly on decisions *outside* the Second Circuit.  (Fakahany Br. at 6-9).[64]  Judge Swain recently rejected this argument in a decision which also discussed the nature and contours of the group pleading doctrine.  *See Pfizer*, 2008 WL 2627131.  The *Pfizer* opinion states:

> [U]nder the group pleading doctrine, a plaintiff may "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (citation omitted).  The group pleading doctrine permits plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (internal quotation marks omitted).

*Pfizer*, 2008 WL 2627131, at *11-12.

Although Fakahany argues that courts in other circuits have rejected the group pleading doctrine following passage of the PSLRA, *Pfizer* correctly holds both that the PSLRA is consistent with the group pleading doctrine, and that a majority of cases within the Second Circuit have sustained the validity of the doctrine:

> [T]he PSLRA does not explicitly abolish the doctrine, and, as Judge Lynch has observed, there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]."  *In re Refco, Inc. Sec.*

---

[64]    Fleming and O'Neal incorporate Fakahany's brief by reference.

> *Litig.*, 503 F. Supp. 2d 611, 641-42 (S.D.N.Y. 2007).  Indeed, consistent with the
> limits of particularized pleading, it is reasonable to assume that the kinds of
> documents Plaintiffs seek to impute to the Individual Defendants would, in a large
> company such as Pfizer, not only be the product of a group effort but also be the
> responsibility of top management such as the Individual Defendants. Moreover,
> though "[t]he Second Circuit has not addressed this issue, . . . the majority of
> courts in this district have found that the PSLRA does not abrogate group
> pleading." *S.E.C. v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 489 n.101
> (S.D.N.Y. 2007) (collecting cases); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430,
> 439 n.42 (S.D.N.Y. 2005) (collecting cases).  Therefore, this Court joins the
> others in this district that have held the group pleading doctrine is "alive and well"
> following the passage of the PSLRA.  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at
> 439.

*Pfizer*, 2008 WL 2627131, at *11-*12; *accord Van der Moolen*, 405 F. Supp. 2d at 399 ("The

majority rule in this district is that the group pleading doctrine has survived the PSLRA.")

(citations omitted).[65]

In any event, with respect to Fakahany, the Complaint specifies that he specifically

learned of facts that made Merrill's disclosures regarding its CDO business false or misleading

and specifies how he participated in making these disclosures.  It is obvious that Fakahany knew

of these facts because he warned Merrill's board of directors and defendant O'Neal of the

mounting risk Merrill faced from U.S. subprime ABS CDO exposure on at least two occasions in

the summer of 2007.  (¶¶71, 112-13).[66]  Such reports to the board and O'Neal show Fakahany's

and O'Neal's knowledge of, and participation in, the fraud.  Thus, Fakahany's contention that

providing reports to Merrill's board and members of senior management does not establish his

---

[65]    As a fall-back position, Fakahany argues that if this Court allows Plaintiff to use the group pleading
doctrine, then the Court should limit its use to written statements and should not allow the doctrine to be used as a
substitute for pleading scienter.  In this case, Plaintiff relies on the group pleading doctrine only as to written
statements, and Plaintiff does not rely upon the doctrine to demonstrate that Defendants possessed scienter.
(Fakahany Br. at 8-9).  Therefore, Plaintiff's group pleading fits within the boundaries set by the majority of courts
in the Second Circuit.  The Complaint's satisfaction of the scienter requirement is addressed here in Section III.B.

[66]    Fakahany's contention that the entirety of the relevant allegations regarding his role and responsibilities as
COO and co-president is that he "along with Edwards, was responsible for and managed the control groups that
managed credit and risk" is erroneous.  The Complaint describes in detail Fakahany's role as COO and co-
president.  For example, "Fakahany signed the certification [contained in the 10-Q for the quarter-ended September
28, 2007] pursuant to Section 302 of Sarbanes Oxley Act of 2002" which were materially false and misleading
(¶¶71, 325).

role in the fraud is without merit.  Read together with the other facts set forth in the Complaint, such as Fakahany's signing of false and misleading certifications (¶¶71, 325) and his substantial stock sales during the Class Period (¶¶10, 25, 197), Fakahany's role in the fraud is established.

The two Second Circuit cases that Fakahany cites as rejecting the group pleading doctrine are distinguishable because those decisions disallow using group pleading to satisfy the scienter requirement.[67]  The remaining Second Circuit cases cited by Fakahany do not reject the group pleading doctrine in its entirety, but rather merely hold that the group pleading doctrine only applies to documents rather than oral statements,[68] and that scienter must be established without resort to the group pleading doctrine.[69]

### D. The Complaint Adequately Pleads "Scheme Liability" Under Rules 10b-5(a) and (c)

The Complaint adequately pleads claims under both Rules 10b-5(a) and (c) because it alleges that Defendants and MLPFS were primary participants in a deceptive scheme which defrauded Merrill's securities purchasers.  (¶¶418-24).  Claims under 10b-5(a) and (c) for scheme liability are separate and distinct claims from a claim under Rule 10b-5(b) for material misrepresentations.  Rule 10b-5(a) makes it unlawful for any person, directly or indirectly, "to employ any device, scheme or artifice to defraud" in connection with the purchase or sale of any security.  Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, "to engage in

---

[67]     *See In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 263 (S.D.N.Y. 2004) ("the Amended Complaint utilizes group pleading for the scienter allegations"); *Bond Opp'ty Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 U.S. Dist. LEXIS 7838, at *14 (S.D.N.Y. May 9, 2003) ("Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held").

[68]     *See Steinberg v. Sherman*, No. 07 Civ. 1001, 2008 U.S. Dist. LEXIS 37367, at *12 (S.D.N.Y. May 8, 2008); *In re Vivendi*, 381 F. Supp. 2d at 192.

[69]     *See In re Citigroup*, 330 F. Supp. 2d at 381 (quoted, *supra*, by the *Pfizer* decision); *In re AstraZeneca*, 559 F. Supp. 2d at 472 ("The group pleading doctrine cannot apply to create a presumption of scienter as to individual defendants.") (citing *BISYS* and *Citigroup*); *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 U.S. Dist. LEXIS 78067, at **62-63 (S.D.N.Y. Oct. 25, 2006) (quoting *BISYS*, 397 F. Supp. 2d at 440, for proposition that "[T]he group pleading doctrine has no effect on the PSLRA's scienter requirement.") (brackets in original).

any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" in connection with the purchase or sale of any security.

Liability may be imposed under Section 10(b) not only upon those who make materially false statements or omissions, but also those who participate in a fraudulent or deceptive scheme. *See Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,* 128 S. Ct. 761, 769 (2008) (rejecting theory that "there must be a specific oral or written statement before there could be liability under § 10(b)"; holding that "[c]onduct itself can be deceptive, as respondents concede"); *SEC v. Zandford,* 535 U.S. 813, 820 (2002) (holding that neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of Section 10(b)); *United States v. O'Hagan,* 521 U.S. 642, 651 (1997) ("The statute thus proscribes (1) using any deceptive device (2) in connection with the purchase or sale of securities, in contravention of rules prescribed by the Commission.").[70]

"All that is required in order to state a claim for a primary violation under Rule 10b-5(a) or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act, (2) in

---

[70]    *See also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152-53 (1972) (holding that while Rule 10b-5(b) prohibits material misrepresentations and omissions, Rules 10b-5(a) and (c) "are not so restricted"); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) ("[Section] 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception"); *Santa Fe*, 430 U.S. at 477 (holding that there is "[n]o doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices").

Precedent in this Circuit is in accord. *See, e.g., SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) (holding that the defendant stockbroker "himself 'committed a manipulative act,' *Central Bank of Denver, N.A. Petitioner, v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994) by effecting the very buy and sell orders that manipulated USE's stock upward."); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 335 (S.D.N.Y 2004); *Vandenberg v. Adler*, No. 98 Civ. 3544, 2000 U.S. Dist. LEXIS 4050, at *20 (S.D.N.Y. Mar. 31, 2000); *Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 U.S. Dist. LEXIS 14890, at *53 (S.D.N.Y. Sept. 23, 1998) (citations omitted); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 585 (S.D.N.Y. 1997).

Based on the holdings of *Stoneridge, Zandford* and *O'Hagan*, it is now clear that allegations of deceptive conduct alone, absent any allegation of material misrepresentation or omission, may give rise to liability under Section 10(b).

furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *Global Crossing,* 322 F. Supp. 2d at 336.[71]

The Complaint alleges in detail that Defendants and MLPFS engaged in multiple fraudulent and deceptive practices during the Class Period concerning Merrill's mortgage and CDO businesses (¶¶92-99, 100-07, 109-15, 119-41, 150-53, 168-79), including foisting high risk CDOs without client authorization,

The Complaint also alleges that: (1) as a result of these manipulative and deceptive devices and practices, the market prices of Merrill's common stock and other securities were artificially inflated (¶420); and (2) Defendants undertook this scheme with the requisite scienter, as described more fully in Section III.B above. Finally, loss causation is likewise properly pleaded, as discussed in Section III.E below. In sum, these allegations sufficiently plead cognizable Rule 10b-5(a) and (c) claims under even the highest scrutiny of Rule 9(b), and satisfy the standards set forth in *ATSI Communications*, *Global Crossing*, *Sterling Foster* and other cases.

Defendants' attempt to pigeonhole Plaintiff's Rule 10b-5(a) and (c) manipulative and deceptive conduct claims into Plaintiff's Rule 10b-5(b) misrepresentation and omission claim is unpersuasive. The 10b-5(b) and 10b-5(a) and (c) claims are independently pleaded. The fact

---

[71]    *Accord In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 216, 269 (E.D.N.Y. 2002). *In re Blech*, 961 F. Supp. at 582 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)); *see Vandenberg*, 2000 U.S. Dist. LEXIS 4050, at *18-20; *see also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989); *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991)). Significantly, the *Sterling Foster* court noted that the particularity requirements for pleading fraud under Rule 9(b) may be relaxed where, as here, plaintiffs bring a claim under Rules 10b-5(a) and (c) for participating in a fraudulent scheme or course of business that operates as a fraud or deceit upon investors. *Sterling Foster*, 222 F. Supp. 2d at 269-70. *Accord In re Initial Public Offering*, 241 F. Supp. 2d at 385 ("Moreover, the 'deceptive or manipulative conduct' in a market manipulation claim, while still requiring particularity, may be pled with less specificity than that required in claims alleging material misstatements or omissions."); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 339 (S.D.N.Y. 1999) (in pleading a deceptive scheme claim under Rule 10b-5(a) or (c), "the level of specificity required by Rule 9(b) is somewhat relaxed").

that the Complaint incorporates both its preceding factual allegations of securities fraud does not change that result.

Moreover, the Complaint's Rule 10b-5(a) and (c) claims are not dependent upon any affirmative misrepresentation under Rule 10b-5(b), but instead are cognizable properly under Rules 10b-5(a) and (c) alone. *See, e.g., In re Parmalat Sec. Litig.,* 376 F. Supp. 2d 472, 489-90, 505 (S.D.N.Y. 2005) (Kaplan, J.); *In re Global Crossing,* 322 F. Supp. 2d at 342-43 (upholding Rule 10b-5(a) and (c) claims alleging a failure to timely write down the value of certain assets).[72]

Defendants cite *ATSI Commc'ns,* 493 F.3d at 101 to argue that Rules 10b-5(a) and (c) apply only to narrow, technical forms of stock market manipulation, such as matched orders or wash sales. (Merrill Br. at 77). However, the court there held that Section 10(b) "prohibits not only material misstatements but also manipulative acts," (*ATSI Commc'ns*, 493 F.3d. at 99), which "'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.' . . . The critical question then becomes what activity 'artificially' affects a security's price in a deceptive manner." *Id* at 100.

Indeed, the argument that Rules 10b-5(a) and (c) are limited to only technical forms of market manipulation is a "crabbed interpretation [that] would narrow the reach of section 10(b) in a way inconsistent with the statute's text and purposes." *U.S. v. Bongiorno,* No. 05 CR. 390, 2006 WL 1140864, at *6 (S.D.N.Y. May 1, 2006). *Accord In re Parmalat*, 376 F. Supp. 2d at 492 ("subsections (a) and (c) apply to at least some deceptive acts as much as to certain technical

---

[72]     For these reasons, the cases Merrill cites dismissing Rule 10b-5(a) and (c) claims are distinguishable. *See ATSI Communications*, 493 F.3d at 103 (affirming dismissal not because plaintiff relied improperly on its misrepresentation claims to state a market manipulation claim as Merrill Lynch asserts, but instead because "ATSI has offered no specific allegations that the defendants did anything to manipulate the market; it relies, at best, on speculative inferences."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (holding "that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA"). (Merrill Br. at 77).

forms of market manipulation"). More fundamentally, Defendants' argument ignores the plain text of Section 10(b) which prohibits the use of "any manipulative or deceptive device or contrivance." 15 U.S.C. §78j(b). It does not prohibit merely "market manipulation."

The court in *In re Global Crossing*, 322 F. Supp. 2d at 336-37, also decisively rejected Defendants' argument. That case involved Rule 10b-5(a) and (c) claims against an accounting firm for its role in swap and related transactions allegedly designed to inflate Global Crossing's revenues. The complaint alleged that the firm "actively participated in structuring each swap" and "directly participated in the creation of the misleading 'pro forma' numbers that concealed these practices from investors." *Id.* at 336. In denying the motion to dismiss, Judge Lynch explicitly rejected the accounting firm's argument that Rules 10b-5(a) and (c) apply only to certain types of manipulative acts. *In re Global Crossing*, 322 F. Supp. 2d at 336-37 (emphasis added and in original). Here, moreover, the Rule 10b-5(a) and (c) claims are even stronger because Defendants and MLPFS are alleged to have directed Merrill's manipulative CDO practices, not just actively participated in them as in *Global Crossing*.[73]

### E.    The Complaint Sufficiently Alleges Loss Causation

The Complaint meets the standard for pleading loss causation. Moreover, the Complaint's allegations are specific to Merrill and do not, as Defendants argue, implicate declines in Merrill's stock price caused by unrelated issues.

---

[73]    *See also In re AOL Time Warner,* 381 F. Supp. 2d at 217 (sustaining claims stated under Rule 10b-5(a) and (c); holding that "the *Santa Fe* list of manipulative practices is clearly not exhaustive; 10b-5(a) and (c) claims need not contain the magic words 'wash sales, matched orders, or rigged prices' to be valid"); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (claim stated under Rules 10b-5(a) and (c) where defendants were alleged to have participated in a fraudulent scheme to create fictitious revenue through bogus transactions).

1.        **The Standard for Pleading Loss Causation**

Defendants do not dispute that loss causation need not be pleaded with particularity.

Rather, a short and plain statement in accordance with Federal Rule of Civil Procedure 8(a)(2) is

sufficient.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (plaintiff is required

to give a "'short and plain statement'" that provides defendant with "'fair notice'") (citation

omitted); *In re Tower Automotive Sec. Litig.,* 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) (Sweet,

J.) ("The *Dura* Court assumed *arguendo* that the notice pleading standards of Rule 8 govern the

pleading of loss causation, and nearly all courts addressing the issue since have also applied Rule

8, rather than the heightened pleading standards of Rule 9.").

One method of drawing the requisite causal connection is to demonstrate a decline in the

security's price upon disclosure of the deception:

> [T]o establish loss causation, "a plaintiff must allege … that the subject of the
> fraudulent statement or omission was the cause of the actual loss suffered," *Suez
> Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)
> i.e., that the misstatement or omission concealed something from the market that,
> when disclosed, negatively affected the value of the security.

*Lentell,* 396 F.3d at 173.

Thus, where the alleged fraud concerns concealment of risk, the Plaintiff may allege that

the stock price dropped upon materialization of the risk.  *In re AOL TimeWarner, Inc. Sec. Litig.*,

503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (Kram, J.); *see also In re Merrill Lynch & Co.*

*Research Reports Sec. Litig.*, No. 02 Civ. 9690, 02 MDL 1484, 2008 WL 2324111, at *5

(S.D.N.Y. June 4, 2008) (Keenan, J.) (cited by defendants).  With respect to claims brought

under Rule 10b-5(a) and (c), "the loss causation requirement will be satisfied if such conduct had

the effect of concealing the circumstances that bore on the ultimate loss." *In re Parmalat,* 376 F. Supp. 2d at 510.[74]

### 2. Plaintiffs have Sufficiently Alleged that the Prices of Merrill Common Stock and Preferred Securities Declined After the Disclosure of Previously Hidden Facts

The Complaint alleges that Defendants made materially misleading statements and omitted material facts concerning, *inter alia*, the risk to Merrill's financial condition posed by its exposure to its subprime-related assets and liabilities, the value of these securities, and Merrill's risk control systems. The risks that materialized and the truths behind these misrepresentations and omissions were disclosed over several disclosures beginning at least by June 2007, and Merrill's stock price declined as a result of each disclosure. (¶¶383-99). This is more than sufficient to meet the Rule 8 standard for pleading loss causation at the motion to dismiss stage.[75]

Defendants wrongly argue that the disclosures do not relate to the alleged deception, (Merrill Br. at 60). Each of the statements alleged to be false and misleading, and each of the risks concealed concern the same subjects: Merrill's exposure to the U.S. subprime ABS CDOs; the impairment of Merrill's subprime-related assets; and the effectiveness of Merrill's risk control systems. (¶¶202-336). The Complaint alleges that when these concealed risks were disclosed and when investors learned of Merrill's exposure to the CDO market and the inadequacy of its risk controls, the price of Merrill securities materially declined. Substantially identical claims were found to demonstrate loss causation in *City of Sterling Heights Police and*

---

[74]    Contrary to Merrill's argument, there is no requirement that the fraud be disclosed on the date of the materialization of the risk. Nor is there any requirement that Defendants' scienter be revealed to investors at the same time. (Merrill Br. at 61-62).

[75]    While Defendants attempt to dispute whether some of the disclosures can demonstrate loss causation, they say nothing specifically about the two largest price drops, those accompanying the release of third and fourth quarter 2007 financial results, on October 24, 2007 and January 16, 2008.

*Fire Retirement Systems v. Abbey National, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006)

(Chin, J.):

> [P]laintiff adequately alleges loss causation. It alleges that Abbey concealed the magnitude of the risk associated with its portfolio and the inadequacy of its credit provisioning, which led plaintiff to purchase Abbey's securities at inflated prices. When the concealed risk materialized following Abbey's June 10, 2002 announcement, exposing Abbey's lack of adequate provisions, Abbey's share price foreseeably declined. Unlike the plaintiffs in *Dura Pharmaceuticals*, plaintiff here sets out a claim that defendants' "share price fell significantly after the truth became known" and not merely that their loss consisted of artificial inflated purchase price. 544 U.S. at 346. This allegation sufficiently establishes that causal connection between economic loss and the misrepresentation at the pleading stage.[76]

The Complaint goes beyond what is necessary under Rule 8(a) and identifies with particularity the impact of each disclosure of a prior misrepresentation or concealment of a material fact on Merrill's stock price. First, Defendants fail to specifically address, and therefore concede, that the Complaint adequately pleads loss causation with respect to the October 24, 2007 and January 16, 2008 (the last day of the Class Period) disclosures. On October 24, 2007, the Company announced that the actual third quarter write-down would be $7.9 billion, attributed to CDOs and U.S. subprime mortgages. (¶¶199, 394). On that date, Merrill common stock declined by over 6%, closing at $63.22 per share, on extraordinary volume of 52 million shares. The following day, the stock further declined by an additional 4% closing at $60.90 per

---

[76] Although the Complaint has specifically alleged that each revelation set forth below revealed some part of the truth of Defendants' false statements, the falsity of the statements and whether they were honestly believed by Defendants, are questions of fact that have no bearing on the loss causation analysis and need not be answered at this stage of the litigation. *See Wieland v. Stone Energy Corp.*, No. 05 Civ. 2088, 2007 WL 2903178, at *11 (W.D. La. Aug. 17, 2007) ("Loss causation need not be pled with particularity at this stage, since this issue turns primarily on questions of fact."); *In re Tyco Intern., Ltd. Multidistrict Litig.*, No. 03 Civ. 1352, 02 MDL 1335, 2007 WL 1703067, at *4 (D.N.H. June 12, 2007) ("Disputes about loss causation turn primarily on questions of fact."); *In re Comverse Technology, Inc. Sec. Litig.*, No. 06 Civ. 1825, 2006 WL 2792757, at *3 (E.D.N.Y. Sept. 27, 2006) ("a court must conduct a loss causation analysis based solely on the allegations in the complaint.") (citations omitted). Similarly, whether some stock price declines may have been immaterial, and whether others may have causes not alleged in the Complaint, cannot be resolved at this time. *In re Openwave Systems Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) (Cote, J.).

share, on volume of over 41 million shares.  All of the exchange-traded preferred securities at issue fell on these dates as well.  (¶¶15, 394-95).

Second, before the market opened on January 17, 2008, Merrill announced its fourth quarter and full-year financial results, which included an *additional* asset write-down relating to CDOs and subprime mortgages of over $16 billion.  In addition, there were disclosures for the first time that Merrill's hedges were ineffective, causing Merrill to write off a material portion of its hedges with certain bond insurers.  (¶¶15, 200, 397-98).  On this date, the common stock declined by $5.64 per share to $49.45, a decline of 10%, the largest single day decline in the relevant time period, on extraordinary volume of 70 million shares, and all of the exchange-traded preferred securities declined.  (¶398).  This decline again dissipated artificial inflation caused by Defendants' earlier statements respecting the value of the Company's assets and the risks it faced.  Again, Defendants do not discuss these allegations in their briefs therefore conceding it is properly pleaded.

There is no question that the Complaint adequately alleges loss causation as to *at least* these corrective disclosures.  Therefore, the loss causation element of Plaintiffs' Rule 10b-5 claims have been adequately pleaded.  *In re Tower Automotive,* 483 F. Supp. 2d at 348.

Merrill contests Plaintiff's allegations of loss causation as to certain other disclosures. However, with respect to each of the other disclosures, Plaintiff has alleged what the disclosure was, why it revealed a materialization of undisclosed risk or prior misrepresentation, the prior misstatements or omissions and what the impact was on Merrill's stock price.  The allegations easily comply with *Dura* and Second Circuit law.

Beginning in June of 2007, news and analyst reports began to question whether Merrill was carrying subprime securities on its books at values greater than their actual market value,

97

and might have to write down those assets.  On June 20, 2007, the *New York Times* reported that

Merrill was moving forward with an auction of $850 million of subprime securities it had

repossessed from failing Bear Stearns hedge funds, an action that might force Merrill to post

significant losses on its own subprime portfolio.  On this news, Merrill's common stock declined

by over 3% on high volume, and most of the exchange-traded preferred securities declined.

(¶¶385-86).  The need to recognize losses on subprime assets had been concealed by Merrill in

its previous public statements, and was also concealed, in part, by the manipulations described in

¶¶168-84.  Therefore, these losses are alleged to have been caused by this disclosure.

On October 5, 2007, Merrill issued a press release stating that it estimated the third

quarter write-down of subprime related securities would be $4.5 billion.  (¶307).  Defendants

emphasize that this was ***Merrill's*** first statement to which price deflation is attributed (Merrill

Br. at 59), apparently to suggest that the Court should ignore the earlier price declines caused by

these disclosures by stock analysts concerning Merrill.[77]  Indeed, it appears that significant

portions of the Company's October 5 press release were anticipated in both the Punk Ziegel and

---

[77]     Similar disclosures affecting Merrill's stock price were made on July 17, 2007 and September 26, 2007. On July 17, 2007, Merrill common stock declined by 1.36% following a Punk Ziegel analyst report that Merrill might not be marking its subprime assets to market, as the Company had previously claimed, and might need to take significant write downs.  (¶¶388-89).  On September 26, 2007, a Goldman Sachs analyst reported that Merrill might record losses of as much as $4 billion in the third quarter on its fixed-income assets as those were marked to market (common stock price decline of $0.84 per share over two days with exceptionally high trading volume, and declines in most of the exchange-traded preferred securities).  (¶391).  Defendants' claim that the disclosures between June and September cannot be considered for loss causation purposes because the Complaint elsewhere accurately states that "Merrill began to disclose the truth" on October 5, 2008, is unsupported by legal precedent or logic.  (Merrill Br. at 59, 61).  None of the earlier disclosures came directly from Merrill (although it is an easy inference that the underlying information originated from a knowledgeable source within the Company); however, each provided important information to the market concerning the actual value of Merrill Lynch's real estate portfolio, and each affected the stock price.  Plainly, a disclosure of deception by a credible third party disclosing prior misrepresentations can cause investors' losses.  *In re Winstar Communications Sec. Litig.,* No. 01 Civ. 3014, 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.) (loss causation demonstrated where stock price fell due to analysts' report).

the Goldman Sachs reports.  The October 5 press release caused a $2.55 per share, or over 3%

decline in the common stock price on the next trading day, which was a Monday.  (¶¶392-93).[78]

On November 1, 2007, a disclosure that the SEC was investigating Merrill's disclosures

of subprime losses and valuation practices led to common stock price declines of 6% on

November 1 and 8% on November 2, on volume of 20 million and 77 million shares

respectively, and declines in the prices of all of the exchange-traded preferred securities.  (¶396).

In this instance, the price decline was a direct response to disclosure that the SEC was

investigating whether Merrill had engaged in the precise practices alleged in this case.  Contrary

to Defendants' assertions, a stock price decline following announcement of an SEC investigation

can demonstrate that prior false statements caused Plaintiffs' losses.  *In re Bradley Pharms Inc.*

*Sec. Litig.,* 421 F. Supp. 2d 822, 824-28 (D.N.J. 2006).  Defendants' claim that a different news

story on the same date, one part of which was later retracted, caused the decline, cannot be

evaluated on the basis of current record and presents a question of fact.[79]

---

[78]     Defendants' claim that the Court should ignore the two-day stock price effect in evaluating whether Plaintiff has pleaded loss causation has no merit.  (Merrill Br. at 59-60).  Whether the stock decline occurred over a two day period, after stock analysts reported their interpretation of the news, must be decided on a more complete record.  Numerous courts have accepted damage theories where the stock price decline occurred over a two day period or longer.  *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) ("a limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation *per se* implausible"); *In re Xcelera Com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) ("Defendants' arguments concerning, the multiday windows are unavailing"); *Greenberg v. Crossroads Systems Inc.*, 364 F.3d 657, 660 (5th Cir. 2004) ("The district court concluded that an efficient market will digest unexpected new information within two days of its release"); *No. 84 Employer-Teamster Joint Council Pension Fund Trust v. America West Holding Corp.,* 320 F.3d 920, 934 (9th Cir. 2003) ("we reject Defendants' argument for adoption of a bright-line rule requiring an immediate market reaction."); *see also Lehocky v. Tidel Technologies, Inc.,* 220 F.R.D. 491, 506-507 (S.D. Tex. 2004) (two day price movements "sufficient to demonstrate, for class certification purposes, that a cause and effect relationship between company-specific announcements and stock price may exist.").

[79]     Defendants assert that "Plaintiffs . . . disingenuously try to attribute the [November 2] decline to alleged fraud, but omit that a negative Wall Street Journal article was issued that day but was subsequently retracted on November 26, 2007 because the article was based on incorrect information."  (Merrill Br. at 62).  However, the November 26, 2007 article did not retract information concerning the SEC investigation.  Instead, it retracted information concerning Merrill's purported off-balance sheet deals with hedge funds.  Plaintiff does not plead facts concerning these deals.  Instead, the information that Plaintiff alleges which caused Merrill's price to decline pertained to the disclosure of the SEC investigation of Merrill.

Defendants assert that other financial stocks also declined. (Merrill Br. at 58). This argument should not even be considered by the Court, as it relies on materials outside the Complaint. *Guerra v. Teradyne Inc.*, No. 91 Civ. 11789, 2004 WL 1467069, at *3 (D. Mass. Jan. 16, 2004) (striking submission of stock index on motion to dismiss because "the state of the industry in general is not relevant to whether the complaint states a cause of action."). (*See also* Motion to Strike filed herewith). However, even if the Court did consider this argument, Defendants are wrong. Plaintiff does not premise loss causation on a general market decline, but instead, on specific announcements on specific dates that related only to Merrill. In addition, Defendants' assertion that Plaintiff contends that the "entire 49% decline in Merrill's stock price" is attributed to the fraud is wrong. (Merrill Br. at 58). The precise extent to which Merrill's stock price declined was due to disclosure of the fraud will be the subject of expert testimony.

Merrill asserts that *Lentell* requires a Complaint to plead a detailed refutation of any conceivable loss causation defense, such as a claim that other, similar stocks, did not decline in value in the same amounts on the same dates. (Merrill Br. at 58). Merrill is wrong. As the language Merrill cites makes clear, the Complaint must be analyzed based on its contents, not on additional information offered by Defendants. Nor can the Complaint's exclusion of irrelevant facts about companies unrelated to this case be deemed either "conclusions of law or unwarranted deductions of fact." *Lentell*, 396 F.3d at 175. The Court has no basis to consider, and Plaintiff has moved to strike, Defendants' fact-dependent claim that "the financial crisis has caused declines in the stock of not only Merrill but also its peer institutions." (Merrill Br. at 58). Whether there was an industry-wide financial meltdown cannot be the basis for dismissal without expert discovery. *Lentell*, 396 F.3d at 175 ("'If the loss was caused by an intervening

event, like a general fall in the price of internet stocks, the chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.'" (ellipsis in original) (quoting *Emergent Capital Inv. Mgmt. LLC v. Stonepath Group*, 343 F.3d 189, 198 (2d Cir. 2003)).

Each of the revelations and subsequent stock price declines are adequately pleaded. Allegations of multiple corrective disclosures of prior misrepresentations do not undermine loss causation, and loss causation cannot be rejected at the pleading stage on this basis. *See In re Tower Automotive*, 483 F. Supp. 2d at 348-49 ("Here, Plaintiffs have more than met their burden with regard to all claims under Count One. Plaintiffs identify six distinct corrective disclosures and specify the immediate negative impact of each upon Tower's stock price. Plaintiffs also tie the identified disclosures to each of the five claims Count One comprises. This amply satisfies the requirement that Defendants be provided 'with some indication of the loss and the causal connection that the plaintiff[s have] in mind.'") (citations omitted); *Toll Bros.*, 2008 WL 4058690, at *5 (sustaining complaint where "Plaintiffs have alleged, first, that each of the four revelations, and the subsequent drop in stock price are actionable. Second, Plaintiffs have alleged that Defendants, through these four revelations, gradually revealed the truth . . ."). These multiple disclosures may each partially reveal the truth of prior misrepresentations.[80]

---

[80]     *See also Schleicher v. Wendt,* 529 F. Supp. 2d 959, 967 (S.D. Ind. 2007) ("As noted, during the Class Period, Conseco management issued a series of public statements that shared a great deal of bad news with investors . . . At later stages of the case, loss causation is likely to present a very complex problem, as a factual matter . . . At the pleading stage of the case, however, plaintiffs have alleged enough in the second amended complaint to survive a motion to dismiss on this basis . . ."); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 713 (S.D. Tex. 2006) ("Defendants fact-based argument disputes the allegations in the Complaint and, therefore, requires a fact-specific inquiry at the summary judgment or trial stage. But such an argument is not appropriately made at this stage on a Rule 12(b)(6) motion to dismiss. . . Accordingly, the Court rejects Defendant E & Y's argument that Plaintiff has not sufficiently pled loss causation and reliance."); *In re Bally Total Fitness Sec. Litig.*, No. 04 Civ. 3530, 2006 WL 3714708, at *14 (N.D. Ill. July 12, 2006) ("Defendants maintain that plaintiffs have failed to plead loss causation because the 'truth' actually became known in an earlier announcement. . . Defendants frame their position as a *Dura* argument, but in reality it goes to the merits of plaintiffs' case. The essence of defendants' arguments is that plaintiffs cannot prove loss causation. But that is not an appropriate consideration on a motion to dismiss. . .

**F**.      **Plaintiff Has Adequately Alleged that the Preferred Stock Traded in an Efficient Market**

The Complaint sufficiently alleges that the market for Merrill's securities was efficient. (¶¶400-01).  The Complaint alleges that "the Company's common stock and each of the Exchange-Traded Preferred Securities listed in paragraph 13 . . . were actively traded on the New York Stock Exchange, a highly efficient market."  (¶¶400-01).  Nothing more is required to be pleaded.  On a motion to dismiss, a court must accept the non-moving party's factual allegations as true. *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).  "It is not for the Court to decide, on a motion to dismiss…whether or to what extent the market functioned efficiently.  These are issues of fact for trial." *DeMarco v. Robertson Stephens, Inc.,* 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004).

Defendants cite no authority for a contrary conclusion.  (Merrill Br. at 62, 77).  As Judge Kaplan noted in *In re Parmalat Sec. Litig.*, "the question on a motion to dismiss is not whether plaintiff has proved an efficient market, ***but whether he has pleaded one***."  *In re Parmalat*, 376 F. Supp. 2d at 509 (emphasis added) (rejecting the defendants' contention that the "plaintiffs may not rely on the fraud-on-the-market doctrine because the complaint failed to specify the markets for Parmalat's various securities, the market makers, the weekly trading volume, and empirical evidence that the price of Parmalat securities moved in response to announcements and events").

Indeed, there is no requirement under the PSLRA or elsewhere for market efficiency to be pleaded with specificity in the complaint.[81]  Defendants' suggestion that *Cammer v. Bloom*,

---

Plaintiffs have sufficiently alleged loss causation in accord with *Dura*, and that is all that is required of them at this juncture.").

[81]      The PSLRA's heightened pleading requirements for claims brought pursuant to Section 10(b) of the Exchange Act do not pertain to market efficiency.  Additionally, market efficiency is not even an element in Securities Act Section 11 and 12 claims.

711 F. Supp. 1264, 1278 (D.N.J. 1989), requires more at the pleading stage, (Merrill Br. at 77),

is misplaced.  Judge Kaplan in *Parmalat* concluded that "[a] showing of whether the *Cammer*

elements are met requires a factual exploration which is premature at the motion to dismiss

stage."  *In re Parmalat,* 376 F. Supp. 2d at 509 (citing *In re USA Talks.com Inc. Sec. Litig*., No.

99 Civ. 0162, 2000 WL 1887516, at *6 (S.D. Cal. Sept. 14, 2000)).

### G.    Plaintiffs Have Adequately Alleged Claims under Sections 11 and 12(a)(2) of the Securities Act of 1933 and Section 14(a) of the Exchange Act against Defendants[82]

### 1.    Legal Standard for Pleading Sections 11 and 12(a)(2) Claims

Section 11 of the Securities Act establishes a private cause of action against, *inter alia*,

issuers and signers of a registration statement if "any part of the registration statement . . .

contain[s] an untrue statement of a material fact or omitted to state a material fact required to be

stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k(a);

*see also Herman & MacLean v. Huddleston,* 459 U.S. 375, 382 (1983).  "Section 11 'places a

relatively minimal burden on a plaintiff,' requiring simply that the plaintiff allege that he

purchased the security and that the registration statement contains false or misleading statements

concerning a material fact."  *See In re Livent Sec. Litig.,* 151 F. Supp. 2d 371, 408 (S.D.N.Y.

2001) (citations omitted).

Under Section 11, the issuer is strictly liable for any material misrepresentation or

omission in the registration statement/prospectus. 15 U.S.C. §77k(b)(3)(A); *see Ernst & Ernst v.

Hochfelder,* 425 U.S. at 208.  There is no requirement to plead or to prove at trial scienter or

reliance.  *See* 15 U.S.C. §77k(a); *see also Herman*, 459 U.S. at 382.  Issuers are strictly liable

under Section 11, although other defendants under Section 11 have an affirmative defense of due

---

[82]    In this section of the brief, "Defendants" refers to those defendants named in the Securities and Proxy claim section of the Complaint.  (¶¶473-80).

diligence. Plaintiffs are not required to plead the negative of an affirmative defense. *See, e.g., In re Adams Gold, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) (an affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)); *In re DoubleClick Inc. Privacy Litig.,* 154 F. Supp. 2d 497, 507 (S.D.N.Y. 2001).

Section 12(a)(2) of the Securities Act imposes liability upon "[a]ny person who . . . offers or sells a security . . . by the use of any means or instruments . . . in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. §77l(a)(2). Section 12 establishes liability "for statements made in connection with the offering and sale of a security." *See Milman v. Box Hill Systems, Corp.,* 72 F. Supp. 2d 220, 228 (S.D.N.Y. 1999). Like Section 11, Section 12 does not require a plaintiff to plead scienter or reliance, and provides for an affirmative defense of "reasonable care." 15 U.S.C. §77l(a)(2).

When pleading a Section 11 violation, a plaintiff need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" in compliance with Rule 8(a) of the Federal Rules of Civil Procedure. *See In re WorldCom Sec. Litig.,* 294 F. Supp. 2d 392, 406 (S.D.N.Y. 2003), *aff'd,* 366 F.3d 70 (2d Cir. 2004). Rule 8(a) requires only that a plaintiff puts a defendant on notice of the alleged claims. *Tellabs,* 127 S. Ct. at 2507 (for non-fraud claims "the complaint must say enough to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting *Dura Pharms.,* 544 U.S. at 346-47). Here, Merrill and the ML Trusts[83] were the issuers of certain preferred securities pursuant to registration statements and prospectuses which are identified in the Complaint. (¶442). In

---

[83]     The term ML Trusts refers to Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II and Merrill Lynch Capital Trust III.

addition, Deloitte issued an unqualified audit opinion associated with Merrill's year end 2006 financial statements that was included or otherwise incorporated by reference in the registration statements associated with the March 15, 2007, April 25, 2007, and August 15, 2007 offerings as well as the First Republic registration statement.  (*See* ¶¶485, 587, 607, 628, 645).[84]

### 2. The Section 11 and 12(a)(2) Claims Adequately Allege Untrue Statements and Material Omissions under Rule 8(a)

Defendants argue that under Rule 8(a) pleading standards and the Supreme Court's recent *Twombly* decision, Plaintiffs do not sufficiently allege untrue statements or material omissions in the identified registration statements and prospectuses. (Merrill Br. at 81-82).  In addition, Defendants argue that the Securities Act and Proxy claims fail because these claims allege "fraud by hindsight," matters of opinion, or merely claims of mismanagement.  (*Id.* at 80-81).  Defendants are wrong both as a matter of law and because they distort the Complaint's allegations.[85]

First, as stated in further detail below, the Securities Act and Proxy claims are not premised on "fraud."  Second, these claims are premised on the nondisclosure of material facts that existed at the time Defendants made untrue statements or omitted material facts.  Third, Defendants' statements were not merely opinions but instead, as detailed below, represented historical statements of material fact.  Therefore, the Complaint sufficiently alleges untrue statements of material fact and material omissions in violation of the federal securities laws.

---

[84]     Plaintiffs only seek to hold Deloitte responsible for these four registration statements, all of which incorporated Deloitte's audit report on Merrill's year end 2006 financial statements with Deloitte's consent.

[85]     *Twombly* dealt with the issue of what a plaintiff must plead to sufficiently allege a conspiracy under Section 1 of the Sherman Act.  As several courts have recognized, *Twombly* did not change the notice pleading requirements under Rule 8(a).  *See Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam) (the complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'"); *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008);  *BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp.*, 508 F. Supp. 2d 1287, 1290 (N.D. Ga. 2007); *see also Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008) ("*Twombly* leaves the long-standing fundamentals of notice pleading intact.").

For example, Defendants failed to disclose that as early as October 2006 Merrill was accumulating a huge concentration of unsold CDOs on its balance sheet, that it had mounting exposure as a result of this concentration.  (¶¶488, 536-37).  In addition, Merrill's risk management systems were insufficient and did not protect Merrill against the risks associated with the deteriorating housing market and increased default rates (¶436) and that Merrill's financial statements violated GAAP because, *inter alia*, Merrill failed to write-down billions of dollars in impaired assets.  (¶¶527(b), 537(b), 559-60).

Even as the cases cited by Merrill make clear, where plaintiffs have alleged material facts that existed at the time of defendants' false statements, these claims are actionable under the securities laws.  *See, e.g., Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir.1996) (recognizing that "[a] prospectus will violate federal securities laws if it does not disclose material objective factual matters") (internal citations omitted); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,* 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (observing that "[t]he law is clear that what must be disclosed are material 'known trends' or 'uncertainties,' or the 'most significant' risk factors with respect to an offering, which are known to the offering company at the time the registration statements were made.").[86]  Here, Plaintiffs have alleged such "objective factual matters," including billions of dollars in exposure that Merrill had accumulated, deficient risk management, and multiple GAAP violations that existed at the time the registration statements and prospectuses became effective.  Accordingly, Plaintiffs have met the notice requirements of Rule 8(a), which is all that is required.

---

[86]    The cases cited by Defendants are distinguishable because unlike the Complaint here, plaintiffs in those cases did not allege facts that showed then-existing falsity of the statements.  *See, e.g., Panther Partners*, 538 F. Supp. 2d at 664 (finding that the allegations pertained to events that were either unknown or unknowable at the time of defendants' disclosures); *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) (other than the fact that defendants "decided to increase loan loss reserves . . . . three weeks after the IPO . . . Plaintiffs provide no additional facts from which to infer that defendant did not believe that reserves were adequate or had no reasonable basis for such belief).

3.    **The Section 11 and 12 Claims Do Not Require Allegations of Loss Causation**

Loss causation is not required to be pleaded by a plaintiff asserting a Section 11 or Section 12(a)(2) claim. *See Herman*, 459 U.S. at 382; *Rombach*, 355 F.3d at 169 n.4; *Adair v. Bristol Tech. Systems*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998). Moreover, Section 11 contains its own damage formula. *See* 15 U.S.C. §77k(e) and Section 12 provides the remedy of rescission. *See* 15 U.S.C. §77l.

"A plaintiff need only plead a material misrepresentation or omission in the registration statement to establish a prima facie fraud claim under § 11 of the Securities Act; a plaintiff is not required to plead loss causation." *Levine v. Atricure, Inc.,* 508 F. Supp. 2d 268, 272 (S.D.N.Y. 2007). Defendants concede that loss causation is indeed "a *defense* to claims under both Sections 11 and 12(a)(2) of the Securities Act." (Merrill Br. at 83) (emphasis added). "As an affirmative defense, the burden of disproving loss causation falls on defendants[.]" *Levine,* 508 F. Supp. 2d at 272. Moreover, *Levine* expressly rejected the court's reasoning in *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d at 243, on which Defendants rely for the proposition that loss causation must be affirmatively pled in Section 11 and 12 claims. As the *Levine* court explained, *In re Merrill Lynch & Co.* cites "no other cases in which a 12(b)(6) motion to dismiss was granted based on the absence of loss causation in a § 11 claim." *Levine,* 508 F. Supp. 2d at 273.[87] Moreover, the decisions relied upon by the court in *In re Merrill*

---

[87]    The court in *In re Merrill Lynch & Co.* permitted the affirmative defense of loss causation raised by defendants' Rule 12 (b)(6) motion where the plaintiffs' alleged losses occurred before any corrective disclosure. 272 F. Supp. 2d at 254. In the case at bar, the Section 11 and Section 12(a)(2) plaintiffs have alleged that the decline in the price and their securities followed corrective disclosures. *Azzolini v. CorTS Trust for Provident Fin. Trust I*, No. 03 Civ. 1003, 03 Civ. 1005, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) and *Stafford v. Bakke,* No. 02 Civ. 1132, 2005 WL 1656855 (S.D. Ind. July 7, 2005), also cited by defendants for the same proposition as *In re Merrill Lynch & Co.* are inapplicable here for the same reasons.

*Lynch & Co.* were "either made on motions for summary judgment or after trial or involving claims where the burden of proving loss causation fell on the plaintiff." *Id.*

In any event, Defendants' negative causation affirmative defense is baseless. Section 11 creates a "factual presumption that any decline in value is…caused by the misrepresentation in the registration statement." *Id.* at 272. Plaintiffs also sufficiently have alleged injury in connection with the purchase of securities pursuant to Registration Statement Amendment Nos. 1, 2 and 3, the Series 5 Preferred Stock Prospectus and the First Republic Registration Statement that was a direct and proximate result of the untrue statements and omissions contained in those documents. (*See, e.g.,* ¶¶ 570, 578, 589, 595, 608, 616, 629, 637, 648 and 654). Here, the theories of loss causation are discernable from the Complaint. *See In re AIG Advisor Group Sec. Litig.*, No. 06 Civ. 1625, 2007 WL 1213395, at *10 (E.D.N.Y. Apr. 25, 2007). Consequently, Defendants' motions to dismiss neither do nor could conclusively establish "negative loss causation" at this stage of the proceedings as a matter of fact or law.

### 4. Rule 9(b) Does Not Apply to Plaintiffs' Securities Act and Proxy Claims

Defendants argue that the Securities Act and Proxy claims must comply with the heightened pleading requirements of Rule 9(b) because these claims "sound in fraud." (Merrill Br. at 78; Deloitte Br. at 11).[88] The Complaint carefully and systematically segregates the allegations in the Exchange Act counts from the Securities Act and Proxy counts. The Securities Act and Proxy counts are, in effect, a stand-alone complaint. There are no allegations of scienter or fraudulent intent with respect to these claims because, as stated above, scienter is not an element of these claims. In addition, in the Exchange Act section, Plaintiffs allege additional

---

[88] Deloitte's Rule 9(b) argument essentially mirrors Merrill's. Thus, Plaintiffs' response is directed to both arguments.

statements as well as additional reasons for the falsity of Defendants' statements. Thus, the Securities Act and Proxy claims sound in strict liability or negligence, not fraud, and Rule 9(b) does not apply to these claims.

> **a.**    **Plaintiffs Have Physically Separated the Securities Act and Proxy Claims from the Exchange Act Claims**

As several courts have recognized, where plaintiffs have pleaded Securities Act and Exchange Act claims in the same complaint, but carefully crafted the complaint to physically segregate the Securities Act claims from the Exchange Act claims, the Securities Act claims typically do not sound in fraud. *See, e.g., In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) (finding where plaintiffs asserted Securities Act and Exchange Act claims in the same complaint and ordinary negligence was alleged, the Securities Act claims did not sound in fraud); *In re Refco,* 503 F. Supp. 2d at 632 (recognizing that the "complaint in this case is carefully structured so as to draw a clear distinction between negligence and fraud claims"); *In re Majesco,* 2006 WL 2846281, at *1 (finding that Rule 9(b) did not apply to Securities Act claims where plaintiff *inter alia* "systematically separated" Securities Act claims from Exchange Act claims); *In re Atlas Air,* 324 F. Supp. 2d at 503 (concluding that Section 11 claims against certain individual defendants did not sound in fraud where, among other things, plaintiffs "alleged facts independent of their scienter allegations").[89]

Here, there are in effect, two complaints. For example, the first paragraph of the Securities Act and Proxy claims describes these counts in the following way: "[t]hese counts are in effect a separate complaint. For these claims there is **no allegation of fraud, scienter or**

---

[89]    *See also In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 (N.D. Ohio 2004) (declining to apply heightened pleading standard to Securities Act claims where plaintiffs "have purposely not premised their claims on any allegations of fraud"); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1372 (S.D. Fla. 2001) (declining to apply heightened pleading to Section 11 claim where plaintiff does not "rel[y] on the Exchange Act claims under the Section 11 claim of the complaint" and plaintiff "steadfastly does not allege scienter" in the Section 11 claim).

*recklessness*.  The *only* claim is that there were misrepresentations or omissions of material fact."  (¶432) (emphasis added).  In addition, in the section entitled "Overview of Securities Act and Proxy Claims", the Complaint states:  "The Securities Act and Proxy claims expressly ***do not make any allegations of fraud or scienter*** and do not incorporate any of the allegations contained in paragraphs 5-431, ***including the allegations of scienter and fraud***."  (¶434) (emphasis added).  Furthermore, for each Securities Act and Proxy count (Counts IV-XV at ¶¶561-680), Plaintiffs only re-allege paragraphs 2-4 of the Complaint (section concerning Jurisdiction and Venue) as well as the paragraphs beginning at ¶432.  In so doing, Plaintiffs here, as in the cases cited above, carefully separated the Securities Act and Proxy claims from the claims alleging fraud, scienter or recklessness.  This separation is far beyond a mere blanket disclaimer or "nominal efforts" which courts have rejected as insufficiently separating fraud claims from non-fraud claims.[90]

In support of their argument that Plaintiffs' claims sound in fraud, Defendants rely primarily on *Rombach*.  In *Rombach*, the Second Circuit ruled that if the underlying allegations are "predicated on fraud," rather than mere negligence, then the claims "sound in fraud" and require the heightened pleading requirements of 9(b).  *Rombach*, 355 F.3d at 172.  However, *Rombach* is easily distinguishable because the complaint there in fact alleged fraud as part of its

---

[90]    In fact, in one case cited by Merrill, *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 411 n.3 (S.D.N.Y. 2005) the court elaborates on an approach that Plaintiffs may take in avoiding having their securities act claims sound in fraud, which is precisely the approach Plaintiffs have taken here.  The court states:

> plaintiffs would have to draft ***two-part complaints***, ***each portion sufficient to stand alone for its respective pleading purposes, though essentially duplicating and overlapping large components of the other.***  One section would assert facts detailing fraudulent acts and culpable intent for the purposes of satisfying the higher pleading requirements of Section 10(b) claims.  The other segment ***would relate to the same underlying events but somehow antiseptically excise all references to the dreaded "fraud" word or any deed imputing such behavior.***  Whether [this option] is practical or feasible is uncertain.  (Emphasis added).

Securities Act claims.[91]  In *Rombach*, unlike the Complaint at issue here, plaintiffs recited a litany of fraud-related allegations against the defendants.  Then, for the Securities Act counts, plaintiffs stated these claims did not sound in fraud.[92]

Defendants also argue that as in *Rombach*, here the Complaint is "replete with allegations of statements that were 'materially false and misleading' and contain 'untrue statements of material facts,'" which Defendants view as synonymous with fraud.  (Merrill Br. at 78-79).  Nevertheless, the language that Defendants cite merely refers to the text of Sections 11 and 12 of the Securities Act, which are not fraud claims.  *See, e.g., In re WRT Energy Sec. Litig.,* No. 96 Civ. 3610, 96 Civ. 3611, 2005 WL 323729, at *6 (S.D.N.Y. Feb. 9, 2005), *vacated in part on other grounds,* 2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005) (stating "[t]he phrases 'materially incorrect,' 'untrue statements' . . . merely allude to language in Section 11 of the 1933 Act.").  In addition, as at least one court has observed "the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent."  *Refco,* 503 F. Supp. 2d at 632.  Hence, there is simply no basis for the Court to accept Defendants' argument and transform Plaintiffs' well-pleaded non-fraud allegations into fraud allegations.

In addition, Defendants argue that Plaintiffs' attempt to divide the Complaint into separate parts has been rejected as a means to avoid Rule 9(b).  (Merrill Br. at 79-80, Deloitte Br. at 13).  They state that the allegations concerning the Securities Act and Proxy claims are "based on the same course of conduct as [Plaintiffs'] fraud claims" and therefore the "wording and imputations" in the Complaint are "classically associated with fraud."  (Merrill Br. at 78-79).  As

---

[91]     Defendants also rely on *In re JP Morgan Chase,* 363 F. Supp. 2d at 595.  As with *Rombach,* however, there the only indication of what plaintiffs did to separate the Securities Act claims from the Exchange Act claims was to disclaim any claim of fraud with respect to the Securities Act claim.  *Id.* at 635.  There is no indication that plaintiffs separated the Securities Act claims from the Exchange Act claims as carefully as Plaintiffs have here.

[92]     Plaintiffs can submit the *Rombach* complaint for the Court's reference.

set forth above, several courts have permitted that pleading technique. Moreover, taken to its logical conclusion, Defendants argue that complaints alleging both Securities Act and Exchange Act claims will always sound in fraud.[93]

**b.    The Complaint Alleges Additional Reasons for the Falsity of the Statements in the Exchange Act Section of the Complaint**

The Complaint goes beyond physical separation in distinguishing the Securities Act and Proxy claims from the Exchange Act claims. Plaintiffs have also alleged additional reasons for the falsity of Defendants' statements in the Exchange Act section of the Complaint. Here the Exchange Act section contains more false statements as well as additional reasons for the falsity of these statements than does the Securities Act and Proxy claim section of the Complaint. (Compare ¶¶297 and 551). Thus, Plaintiffs have not only physically separated the Securities Act and Proxy claims from the Exchange Act claims, but they also have substantively distinguished the fraud claims from the non-fraud claims by stating additional false statements in the Exchange

---

[93]    The cases cited by Defendants in support of this argument are distinguishable. For example, in *Johnson v. NYFIX,* 399 F. Supp. 2d 105, 122 (D. Conn. 2005), the court stated that plaintiffs "include several allegations in the [Section 11 count] that they later cite in support of their scienter arguments for the 10(b) claim." Defendants also rely on *In re Axis Capital,* 456 F. Supp. 2d at 598. (Merrill Br. at 79-80). In that case, the court stated "[b]ecause the sole allegations supporting the falsity element of the Section 11 and Section 12(a)(2) claims are all inextricably intertwined with the allegations underlying plaintiffs' fraud claims" against the defendants, these claims sounded in fraud. However, here, the allegations supporting the falsity element of the Securities Act and Proxy claims are not "inextricably intertwined" with the fraud allegations. While Plaintiffs cite some similar facts in the Securities Act and Proxy Claim section as are cited in the Exchange Act section, the facts in the Securities Act and Proxy Claim section are alleged in support of the falsity of the statements in the registration statements and prospectuses and do not sound in fraud. (*See, e.g.,* ¶¶435-36, 440). Defendants argue that the Securities Act and Proxy claims section is merely a less detailed version of the Exchange section of the Complaint. (Merrill Br. at 78). However, the additional facts alleged in the Exchange Act section of the Complaint illustrate that the Defendants acted with scienter. For example, the Exchange Act section alleges that the Defendants overrode and/or ignored Merrill's risk controls as reflected by the limits established by Kronthal. (¶¶93, 109). The Securities Act and Proxy claims do not allege that Kronthal had established limits on Merrill's CDO exposure and was fired by O'Neal because those facts go to Defendants' scienter, rather than the falsity of Merrill's statements.

Deloitte points to two additional cases, neither of which is on point. In *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 585 (S.D.N.Y. 2007), the court found that the fraud allegations were made "throughout the Complaint," and the plaintiffs did not bifurcate their complaint, as Plaintiffs have done in the present case. *See also IAC/InterActiveCorp. Sec. Litig.*, 478 F. Supp. 2d 574, 595-96 (S.D.N.Y. 2007) (court did not consider the effect of bifurcating the complaint).

Act section as well as additional reasons for the falsity of the statements and additional facts relating to Defendants' scienter.

### c. Securities Act and Proxy Claims against Deloitte Do Not Sound in Fraud

Deloitte also argues that the Securities Act and Proxy claims against it sound in fraud. (Deloitte Br. at 11-13). In this regard, Deloitte argues that "because this Complaint . . . sounds in fraud, all the claims against [Deloitte] are subject to . . . Rule 9(b)." (*Id.* at 11). As Plaintiffs have stated in greater detail above, the Complaint does not sound in fraud and therefore is not subject to the heightened pleading requirements of Rule 9(b).

Specifically, with respect to Deloitte, Plaintiffs have not alleged any Exchange Act claims and have not attempted to plead facts showing a compelling inference of fraudulent intent by Deloitte.[94] Instead, Plaintiffs only allege claims against Deloitte for Securities Act and Proxy Claim violations. *See* Counts VI, VIII, X, XII, and XV. Thus, as to Deloitte, there are no allegations anywhere in the Complaint that Deloitte acted knowingly, recklessly, or with intent to deceive and any allegations of fraud or intentional misconduct are expressly disclaimed. (*See* ¶¶581, 598, 619, 640, 668). Courts have held that where certain defendants are only named as Securities Act defendants and those claims disclaim allegations of fraud, Rule 9(b) is not applicable. *See Rombach*, 355 F.3d at 178 (finding Securities Act claims against underwriters were not subject to the heightened pleading requirements of Rule 9(b)); *In re Atlas Air Worldwide*, 324 F. Supp. 2d at 502; *In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 440 (S.D.N.Y. 2000) (finding claims against underwriters did not sound in

---

[94] Similarly, certain Merrill Defendants are not named as Exchange Act Defendants. These entities include the ML Trusts and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

fraud because the complaint did not allege a claim against underwriters under Section 10(b) and

"the Complaint expressly disclaims fraud claims against the Underwriters").[95]

### H. Lead Plaintiff Ohio STRS and Plaintiff Kosseff Have Standing to Assert Claims Under Section 11 and Section 12(a)(2) with Respect to Certain of the Preferred Stock Offerings

It is well-settled in this district[96] and in federal courts around the country[97] that a plaintiff

with standing to pursue a Securities Act claim on behalf of purchasers of one security of a

particular issuer may represent the interests of purchasers of other types of securities of the same

issuer in a class action where the alleged harm stems from the same allegedly improper conduct.

This rule applies here.

As set forth below, both Lead Plaintiff and plaintiff Kosseff have standing to assert

claims under Section 11 and 12(a)(2) and thus have standing to represent purchasers of preferred

stock offered ("Preferred Offerings") during the Class Period and at issue here.  There is no

dispute that Lead Plaintiff and plaintiff Kosseff have standing to pursue their claims relating to

---

[95]    Because Plaintiffs' Securities Act and Proxy claims are not premised on fraud and do not incorporate any fraud allegations, the remaining cases cited by Deloitte are not applicable.  *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 316 (S.D.N.Y. 2007) (plaintiff's Section 14(a) claim alleged "fraudulent omissions"); *In re Alcatel*, 382 F. Supp. 2d at 530 (plaintiffs incorporated their fraud allegations into the Section 11 and 12(a)(2) claims and merely disclaimed that the incorporation of such fraud allegations should be taken as sounding in fraud); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d (S.D.N.Y. 2004) (Section 11 allegations against Deloitte were premised on Section 10(b) fraud allegations against Deloitte).

[96]    *See, e.g., In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2004 WL 555697, at *7 (S.D.N.Y. Mar. 19, 2004) (purchasers of one type of debt security (domestic) had standing to pursue claims of purchasers of a second type of debt security (foreign) issued pursuant to the same registration statement); *In re Saxon Sec. Litig.*, No. 82 Civ. 3103, 1984 WL 2399, at *7 (S.D.N.Y. Feb. 23, 1984) ("[d]ebenture holders have an interest identical to that of the holders of common stock in demonstrating a common course of fraudulent conduct").

[97]    *See, e.g., In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037 (N.D. Cal. 2008); *In re DDi Corp. Sec. Litig.*, No. 03 Civ. 7063, 2005 WL 3090882, at *6 (C.D. Cal. July 21, 2005) ("Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification."); *In re Fleming Companies Inc. Sec. & Deriv. Litig.*, No. 03 MDL 1530, 2004 WL 5278716, at *48-49 (E.D. Tex. June 16, 2004) ("class representative who purchased stocks can represent purchasers of debt instruments in the same lawsuit"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 911 (D.N.J. 1998) (plaintiff who purchased equities who had alleged cognizable injury under section 11 had standing to bring claims for bondholders who purchased traceable to the same offering); *Endo v. Albertine*, 147 F.R.D. 164, 167 (N.D. Ill. 1993) ("[A] class of plaintiffs who purchased different types of securities may properly be certified with a representative party who only purchased one type of security.").

securities they respectively purchased.  Defendants only challenge Plaintiffs' standing to assert claims on behalf of purchasers in the ML Trust I offering, the Series 5 Preferred Stock, Series 6 Preferred Stock and Series 7 Preferred Stock Offerings.  This argument should be rejected.

      **1.**      **Lead Plaintiff Ohio STRS Has Standing to Assert All Securities Act Section 11 and Section 12(a)(2) Claims by Virtue of its Position as Lead Plaintiff**

Lead Plaintiff has standing to assert all Securities Act Section 11 and Section 12(a)(2) claims by virtue of its position as Lead Plaintiff.  This very issue was addressed by the court in *In re PMA Capital Corp. Sec. Litig.*, No. 03 Civ. 6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005), where the Court denied a motion to dismiss and found the plaintiffs to have standing to pursue both Sections 11 and 12 claims for a debenture offering despite the fact that none of the plaintiffs had purchased senior debentures.  The court stated:  "Lead Plaintiffs may pursue claims on behalf of the entire class because they were appointed to oversee litigation on behalf of the class. The PSLRA does not require that the lead plaintiff have standing to sue on every available cause of action." *Id.* at *18 (citing *Hevesi v. Citigroup, Inc.,* 366 F.3d 70, 82-83 (2d Cir. 2004)) (refusing to adopt a *per se* rule that the district court must choose a lead plaintiff with standing to sue on every available cause of action because the PSLRA requires courts choose a party who has the largest financial stake in the outcome).  Here, Lead Plaintiff was appointed by this Court to represent the entire Class of purchasers.  Thus, Lead Plaintiff may pursue claims on behalf of those purchasers regardless of whether it purchased all of the securities at issue.

      **2**.      **Plaintiff Kosseff Has Standing to Assert Securities Act Section 11 Claims on Behalf of ML Trust I, II, III and Series 5 Preferred Shareholders**

In addition to Lead Plaintiff being able to pursue claims on behalf of purchasers, Kosseff has standing to assert claims against Defendants on behalf of the purchasers of the ML Trust I,

II, III and Series 5 preferred securities. This is because Kosseff purchased securities pursuant or traceable to the Company's shelf registration statement ("Shelf Registration Statement"), filed with the SEC on or about March 31, 2006, that formed the basis for all four of these offerings. (¶¶445-63, 471).

On April 25, 2007 and August 15, 2007, Kosseff purchased the 6.45% ML Trust II preferred securities and the 7.375% Trust III preferred securities pursuant to the Shelf Registration Statement. (¶¶454-63, 471). The 6.45% ML Trust I and Series 5 preferred securities were issued under the same Shelf Registration Statement. Because these Preferred Offerings were conducted pursuant to the same Shelf Registration Statement (¶¶454, 459), the Preferred Offerings were part of a single, continuous offering designed to give Merrill substantial "procedural flexibility" to vary "the structure and terms of securities on short notice" and to "time its offering to avail itself of the most advantageous market conditions." Shelf Registration, Release No. 6499, S.E.C. Docket 138, 1983 WL 408321, at *4 (S.E.C. Release No. Nov. 17, 1983). In fact, the same materially false and misleading financial statements that were incorporated by reference in Post-Effective Amendments No. 1 and the Product Prospectus for the December 7, 2006 and March 15, 2007 Preferred Offerings were incorporated into Post-Effective Amendments Nos. 2 and 3 for the April 25, 2007 and August 15, 2007 Preferred Offerings. (¶¶445-63).[98]

"The three prongs of Constitutional standing are familiar: (1) an 'injury in fact'; (2) the injury is 'fairly traceable to the challenged action of the defendant'; and (3) the injury is redressable by a favorable decision by the court." *Levine*, 508 F. Supp. 2d at 275 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

_____

[98]     Moreover, by operation of SEC Rule 415, once the foregoing amendment or prospectus became effective, it was incorporated into the Shelf Registration Statement and became part of the "Base Registration Statement" by the time of the next offering. 17 C.F.R. §230.415.

To survive a constitutional challenge to Section 11 and 12(a)(2) standing, "a plaintiff need only allege that he purchased a security pursuant to a false or misleading registration statement, and *that at the time of the sale of the security or at the end of the class period, the value of the security had declined*." *Levine*, 508 F. Supp. 2d at 275 (emphasis added). Here, each of the preferred securities traded in concert with the other. As set forth in the Complaint, by the market's close on May 19, 2008, all of the securities issued pursuant to the Shelf Registration Statement had declined in price since the date of their issuance: the ML Trust I preferred securities had declined from $25 per share to $21.36 per share, the ML Trust II preferred securities had declined to $21.05 per share, the Series 5 preferred securities had declined from $25 per share to $16.40 per share, and the ML Trust III preferred securities had declined from $25 per share to $24.11 per share. (¶444).[99] Each of the preferred shareholders suffered the same type of injury suffered by plaintiff Kosseff. Therefore, Kosseff has standing to assert Section 11 claims in connection with each of those offerings.[100]

Defendants assert that Kosseff lacks standing because the securities purchased by Plaintiff are purportedly of a different type. (Merrill Br. at 82, Deloitte Br. at 8-9). But this is a distinction without a difference. The standing requirement ensures "that the named plaintiff has a personal stake in the outcome of the litigation and that the plaintiff purchases 'securities' as that term is defined by the [Securities] Act issued pursuant to a particular registration statement." *Fleming Companies*, 2004 WL 5278716, at *48-49. *See also Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (the named plaintiffs who had invested in

---

[99]    The ML Trust II preferred securities were not trading as of May 19, 2008, however all of the securities, including ML Trust II had declined in value by January 17, 2008. (¶443).

[100]    *See In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1373 (N.D. Ga. 2005) (court denied their motion to dismiss, finding that because the two offerings arose from the same registration statement containing the same allegedly false information, the plaintiff had standing to assert claims based on both offerings).

two partnerships could represent those who had invested in a third partnership); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335 (S.D.N.Y. 1988) (holding that "to satisfy the typicality requirement, it is not necessary for the named plaintiffs to have invested in all of the investment vehicles. The supplemental amended complaint alleges a single pattern of fraud. The named plaintiffs' claims arise out of that scheme, which also gives rise to the claims of the other class members."); *Roberts v. Heim*, 670 F. Supp. 1466, 1490-91 (N.D. Cal. 1987) (investors in four partnerships could represent class of investors who invested in 40 partnerships). Here, the injury to Kosseff, through his purchase of ML Trust II and III securities, is tied to the same type of misleading statements and omissions in the Shelf Registration Statement, the Post-Effective Amendments, and Product Prospectus that injured the purchasers of the ML Trust I and Series 5 preferred securities. For these reasons a finding of standing as to all of the securities issued pursuant to the shelf registration statements does not offend the constitutional requirements for standing.[101]

---

[101]        Because the ML Trust I and Series 5 preferred securities were issued pursuant to the same Shelf Registration Statement, and because the same type of misleading statements and omissions appeared in all of the Post-Effective Amendments and Product Prospectuses, this case is distinguishable from the cases cited by Deloitte, such as *In re Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ. 5323, 2006 WL 2034644 (S.D.N.Y. July 14, 2006). Instead, this case closely resembles another case cited by Deloitte: *In re Salomon*, 350 F. Supp. 2d at 497 (refusing to dismiss claims on behalf of purchasers of different classes of bonds where named plaintiff "only purchased one class of the apparently numerous outstanding classes of [the issuer's] debt securities"). The other three cases cited by Merrill are distinguishable for the same reason, namely that in those cases the plaintiffs' securities were issued pursuant to registration statements that had nothing in common with the registration statements pursuant to which the securities not owned by the plaintiffs were issued. *See Krim v. pcOrder.com*, 402 F.3d 489, 495 (5th Cir. 2005) (plaintiffs were unable to trace their stock back to the allegedly false registration statement); *Ong v. Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 891-92 (N.D. Ill. 2004) (no finding that registration statements tied to several different offerings had anything in common); *In re Storage Tech. Corp. Sec. Litig.*, 630 F. Supp. 1072, 1078 (D. Colo. 1986) (plaintiffs purchased stock in 1982-84 pursuant to "several registration statements for employee stock purchase plans," but plaintiffs did not purchase stock issued in 1993 pursuant to a different allegedly "fraudulent prospectus and registration statement").

> **3.    Ohio STRS Has Standing to Assert Claims under Section 11 of the Securities Act on Behalf of Series 6 and Series 7 Preferred Shareholders**

As set forth in the Complaint, Lead Plaintiff acquired 788 shares of Merrill common stock pursuant to the First Republic Registration Statement.  (¶470 and the supplemental certification of Lead Plaintiff attached to the Complaint).  Pursuant to the First Republic Registration Statement, Merrill issued, in addition to common stock: (1) 2.6 million depository shares, each representing a 1/40th interest in a share of Series 6 Preferred Stock in exchange for First Republic 6.70% Noncumulative Perpetual Preferred Series A shares; and (2) 2 million depository shares, each representing a 1/40th interest in a share of Series 7 Preferred Stock in exchange for First Republic 6.25% Noncumulative Perpetual Preferred Series B shares. (¶468).

The Complaint sets forth in detail the materially false and misleading statements in the First Republic Registration Statement.  (¶¶553-58).  Lead Plaintiff Ohio STRS has properly alleged that it acquired Merrill shares "'pursuant to' or 'traceable to'" that First Republic Registration Statement.  (¶¶470, 647); 15 U.S.C. §77k(a); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995).[102]  Because of the similarity in the harm done to both the common and preferred shareholders and because both the common and preferred shares were issued pursuant to the First Republic Registration Statement, Lead Plaintiff has standing to prosecute the claims of the Series 6 and 7 Preferred Shareholder Class.  *See Juniper Networks Sec. Litig.*, 542 F. Supp. 2d at 1052; *In re DDi*, 2005 WL 3090882, at *6; *In re WorldCom,* 2004 WL 555697, at **6-7.

---

[102]    *Global Crossing*, cited by Defendants, is distinguishable.  (Merrill Br. at 82-83, Deloitte Br. at 8-9).  There, the court dismissed the Section 11 claim because the plaintiffs failed to allege "general allegations that plaintiff purchased pursuant to or traceable to the false registration statement."  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003). Here, as more fully discussed above, Plaintiffs have pled those allegations.

4.    **Plaintiffs Have Standing to Assert Claims under Section 12(a)(2) of the Securities Act**

The Complaint alleges that Lead Plaintiff Ohio STRS and plaintiff Kosseff obtained their common and preferred stock in public offerings pursuant to materially false and misleading Post-effective Amendments. (¶¶470-71). As such, Ohio STRS and Kosseff have asserted sufficient facts to establish standing under Section 12. *See Yung v. Lee*, 432 F.3d 142, 149 (2d Cir. 2005) (plaintiff who acquired securities in a public offering by means of a prospectus has standing to assert claims under 12(a)(2)).[103]

5.    **Lead Plaintiff Adequately States a Section 11 Claim Against Deloitte**

Merrill's auditor, Deloitte, violated Section 11 of the Securities Act, 15 U.S.C. §77k(a), by issuing an unqualified audit opinion for Merrill's year end 2006 financial statements that was included or otherwise incorporated by reference in the registration statements associated with the March 15, 2007, April 25, 2007, and August 15, 2007 Offerings as well as the First Republic registration statement (hereinafter collectively referred to as the "Offerings"). (*See* ¶¶485, 587, 607, 628, 645). Because Lead Plaintiff has pleaded adequately that Deloitte's audit opinion was materially false and misleading, the Complaint states a Section 11 claim upon which relief may be granted.

a.    **The Complaint States Securities Act Claims Against Deloitte Relating to the March 15, 2007, April 25, 2007 and August 15, 2007 Offerings and the First Republic Registration Statement**

The Complaint contains facts sufficient to state a claim upon which relief may be granted. The registration statements associated with the Offerings incorporated with its consent

---

[103]    *In re Flag Telecom,* 308 F. Supp. 2d at 249 is distinguishable. In *Flag Telecom*, the Court dismissed the plaintiffs' Section 12 claim because the complaint failed to plead that the prospectus contained any actionable misstatements or omissions and that the plaintiffs purchased securities in the IPO. *Id.* at 257. By contrast, here the Complaint does allege that plaintiffs acquired securities in public offerings by means of a prospectus which contained misrepresentations or omissions of material fact, or incorporated by reference documents that contained misrepresentations or omissions of material fact. (*See, e.g.,* ¶¶433, 442, 451, 485, 498, 559, 583 and 594).

contained Deloitte's unqualified audit opinion on Merrill's year end 2006 financial statements, which was originally issued in connection with Merrill's 2006 10-K. (¶¶587, 607, 628, 645). The Complaint adequately alleges that the audit opinion was materially false and misleading because "Deloitte did not perform its audit of Merrill's year end 2006 financial statements in accordance with generally accepted auditing standards [("GAAS")] and such financial statements were presented in a manner which violated GAAP . . ." (¶485). Nothing more is required to state a Section 11 claim against Deloitte. Deloitte's audit opinion on Merrill's year end 2006 financial statements was false and misleading in two respects. Deloitte's statement therein that it had conducted a GAAS compliant audit was false and misleading. (¶485).[104] Indeed, the Complaint specifically states that: "Deloitte did not perform its audit of Merrill's year end 2006 financial statements in accordance with generally accepted auditing standards . . ." (*Id.*). Moreover, the Complaint adequately alleges the GAAP violations at issue in this case. (¶559). The allegations specify the provisions of GAAP - certain financial accounting standard concepts, or FASCONs, financial accounting standards, and statements of principle - that were violated here. (*Id.*). The Complaint sets forth how the Company's financials were not prepared in accordance with GAAP.[105] Therefore, the Complaint states a Section 11 claim against Deloitte

---

[104]    Deloitte points to *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001), to argue that Plaintiffs' allegations with regard to GAAS violations are not sufficient to sustain a cause of action. (Deloitte Br. at 20-21). The Court was discussing whether plaintiffs adequately alleged scienter as to defendant Arthur Andersen, LLP. As discussed above, the pleading requirements are different for pleading Section 10(b) claims as opposed to Section 11, where a plaintiff is not required to plead that defendants acted with fraud or recklessness.

[105]    Deloitte argues that the Complaint does not identify the portions of the financials that contain false and misleading statements made by Deloitte. Deloitte also argues that the Complaint does not allege that Deloitte made any false and misleading statements. These arguments ignore that Deloitte's liability is predicated on its unqualified audit report on Merrill's year-end 2006 financial statements, notwithstanding that such financial statements were presented in a manner that violated GAAP. (*See* ¶485).

for issuing a false and misleading audit opinion associated with Merrill's year end 2006 financial statements.[106]  Deloitte's motion should be denied.[107]

Deloitte's arguments that the Complaint fails to adequately allege elements of a fraud claim, such as causation or that the Complaint fails to allege Deloitte's failure to perform due diligence fails because plaintiffs are not required to plead these elements for a Section 11 claim. (Deloitte Br. at 11-15).  *See Herman,* 459 U.S. at 381-82; *In re WorldCom,* 294 F. Supp. at 406; *Funke v. Life Financial Corp.*, 237 F. Supp. 2d 458, 473 (S.D.N.Y. 2002); *In re Livent*, 151 F. Supp. 2d at 408-09.  Courts refrain from considering affirmative defenses on a motion to dismiss.  *See, e.g., In re Adams Gold*, 381 F.3d at 277; *In re Sept. 11 Property Damage and Business Loss Litig.,* 481 F. Supp. 2d 253 (S.D.N.Y. 2007) (affirmative defense is normally asserted in an answer); *In re Livent*, 151 F. Supp. 2d at 408-09 (citing 15 U.S.C. §77k(b)(3)).

Citing *Twombly,* Deloitte argues that an alleged violation of Section 11 must be plausible to survive a motion to dismiss.  (Deloitte Br. at 11).  *Twombly* concerned allegations of an anti-trust conspiracy.  There is no authority or rationale for applying the *Twombly* plausibility

---

[106]    Because the Complaint ties the audit opinion to the reasons why that opinion is false and misleading, the cases cited by Deloitte are not controlling.  For example, in two cases cited by Deloitte, *In re Metropolitan Sec. Litig.*, 532 F. Supp. 2d 1260, 1279-80 (E.D. Wash. 2007), and *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005), plaintiffs did not connect the allegedly false statements to the reasons why they were false, and in each case the court was required to piece the statements together with the reasons.  In the present case, by contrast, the Complaint states in paragraph 485 that Deloitte's audit of the 2006 10-K violated GAAP for the reasons stated in paragraph 559.  Paragraph 559, in turn, alleges that the 2006 10-K violates GAAP, because certain required disclosures were omitted from the financial statement, and the omitted disclosures are set forth.  The Complaint does not require the Court to solve a puzzle, and the Complaint meets the requirement that Plaintiffs give Deloitte a short and plain statement of Plaintiffs' claim for relief.  The other case cited by Deloitte is even less on point.  In *In re Alcatel*, 382 F. Supp. 2d 513, the court held that the complaint did not even identify the "speaker, time, and place" of the false statements or explain why the statements were false.  *Id.* at 534.  Deloitte cites *Alcatel* for a second reason, *i.e.*, to argue that the Complaint does not give sufficient reasons why the 2006 10-K violated GAAP.  Unlike paragraph 559 of the Complaint in the present case, the complaint in *Alcatel* made the bare assertion that defendants "engaged in . . . GAAP violations."  382 F. Supp. at 532-33 (ellipsis in original).

[107]    Deloitte relies on two additional cases to support its argument that the Complaint inadequately alleges violations of GAAP: *Novak*, 216 F.3d at 309 and *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996).  However, those cases are irrelevant, because the issue in each of those two cases was whether the complaint's allegations of GAAP violations were sufficient to support a Section 10(b) claim of recklessness.  As stated above, Plaintiffs' Section 11 and Section 12(a)(2) claims against Deloitte are subject to a negligence standard, not recklessness.

analysis to a negligence-based claim in which neither motive nor intent is an element of the claim. Instead, the allegation is simply that Deloitte misapplied GAAS. Although Deloitte labels Plaintiffs' Section 11 claims implausible, there is no plausibility requirement and even if there were one, Deloitte does not articulate any reasons for its conclusory statement.[108]

In the present case, even assuming, *arguendo*, that *Twombly* applies, Plaintiffs have satisfied *Twombly's* plausibility test by alleging the following facts: Deloitte audited Merrill's year-end 2006 financial statements in a manner inconsistent with GAAS requirements and falsely stated that the audited financial statements were presented in conformity with GAAP, the financial statements and Deloitte's audit opinion were incorporated into registration statements and the First Republic Registration Statement and according to the formula in the statute, there is damage. Together, these facts create a plausible claim that Deloitte's audit opinion on the 2006 financial statements contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. 15 U.S.C. §77k(a).

### b.    Deloitte Is Liable under Section 14(a)

Deloitte's attempt to read an implied protection for auditors into Section 14(a) (Deloitte Br. at 22-24) ignores the clear language of the statute. Section 14(a), by its plain terms,

---

[108]    The cases cited by Deloitte are not dispositive. For example, *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted sub nom.*, *Ashcroft v. Iqbal*, 128 S. Ct. 2931 (2008), a prisoner rights case, examined the "pleading standard to overcome a qualified immunity defense." 490 F.3d at 153. The motion to dismiss in that case was denied for the most part and the decision says nothing about what renders a Section 11 claim "plausible." *Id.* at 178; *Panther Partners*, 538 F. Supp. 2d at 662, also did not involve a Section 11 claim. The court concluded that either the company was unaware of problems or the problems themselves were immaterial. *See id.* at 669-74. As discussed above, Defendants' misstatements and omissions were both material and known to the defendants. In *Garber v. Legg Mason*, 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), the most significant alleged omission was deemed immaterial by the court, not only because the risk of key personnel leaving the company was disclosed in the prospectus, but also because the departure of one key employee that resulted in a loss of income had been reported in several news articles before the stock offering. Two of the other three claims were dismissed, because the complaint provided no specifics and failed to quantify the risks. *Id.* The fourth claim was dismissed because the loss was less than half of one percent of the company's annual revenue. *Id.* at 613-14. In the present case, by contrast, the extent of Merrill's CDO holdings was not public knowledge and the amounts involved, in excess of $40 billion, are clearly material.

expressly reaches those that "permit the use of [their] name to solicit any proxy" in violation of SEC Rule 14a-9.[109] Deloitte does not and cannot dispute that it consented to Merrill's use of Deloitte's name to give credibility to false financial statements used to solicit proxies in favor of the First Republic merger. (¶673).

The Complaint demonstrates that the use of Deloitte's name was a substantial part of, not incidental to, the solicitation effort. Deloitte offered an unqualified opinion endorsing Merrill's 2006 financial statements even though such statements were presented in material violation of GAAP. (¶¶559, 674). Deloitte expressly consented to Merrill including its unqualified opinion endorsing Merrill's financial statements in the June 22, 2007 proxy solicitation, where the opinion was used to substantiate a false picture of Merrill's financial position to First Republic shareholders.[110] (¶673). Deloitte also expressly consented to being named as an accounting expert with respect to the offering of shares to First Republic shareholders. (¶¶645, 673). Thus, the facts here bear no resemblance to those cases cited by Deloitte rejecting or limiting Section 14(a) claims because there was no meaningful connection between the use of a defendant's name and the solicitation effort. *See, e.g., Branch v. Tower Air Inc.*, No. 94 Civ. 6625, 1995 WL 649935 (S.D.N.Y. Nov. 3, 1995); *Lazzaro v. Mamber*, 701 F. Supp. 353 (E.D.N.Y. 1988); *Mendell v. Greenberg,* 612 F. Supp. 1543 (S.D.N.Y. 1985).

---

[109]    Rule 14a-9(a) provides that:

No solicitation subject to this regulation shall be made by means of any proxy statement… containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

[110]    Deloitte's naked assertion that it did not have a pecuniary interest in this transaction (*See* Deloitte Br. at 24 n.14) defies credulity and, at any rate, is not an appropriate matter for judicial notice. Plaintiffs believe discovery will confirm that Deloitte, as a for-profit accounting firm, did obtain additional business (and thus pecuniary advantage) as a result of the completion of the merger, in reviewing and auditing the financial statements of the integrated company.

Since Deloitte allowed its name to be used to lend credibility to the false financial statements used to justify the value of the merger to First Republic shareholders, the plain language and statutory purpose of Section 14(a) requires that Deloitte be held to the same standard of liability as management. *Herskowitz v. Nutri/System, Inc*., 857 F.2d 179, 190 (3d Cir. 1988) (rejecting imposing a scienter standard on investment bank for fairness opinion issued with proxy). *Herskowitz* rejected any artificial limitation of the plain text of Section 14(a) to protect financial service providers, who know "full well that [their opinions] will be used to solicit shareholder approval, and [are] well paid for the service [they] perform[]." *Id.*; *see also In re AOL Time Warner*, 381 F. Supp. 2d at 241 (holding that an Ernst & Young audit report incorporated into an AOL proxy statement was "actionable under Section 14(a)"). There is "no convincing reason for not holding [them] to the same standard of liability as the management [they are] assisting." *Herskowitz,* 857 F.2d at 190; *see also J.I. Case Co. v. Borak*, 377 U.S. 426 (1964) (concluding that since the purpose of Section 14(a) is to ensure a fair vote, a private cause of action should be implied to prevent "management or others" from making false or inadequate disclosures in proxy solicitations).

Nor is there any support in the language of the statute or modern case law for Deloitte's proposition that auditors, if not entirely immune from liability under Section 14(a), can only be reached upon a showing of scienter that is not normally an element under Section 14(a). We are aware of no Second Circuit or Supreme Court decision imposing such a requirement. *Herskowitz,* the most recent appellate court decision to consider the issue, rejected Deloitte's argument and held that *scienter* was not an element of Section 14(a) claims against financial service providers lending their name to further a proxy solicitation effort. 857 F.2d at 190; *see also Gould v. American-Hawaiian S.S. Co*., 535 F.2d 761 (3d Cir. 1976) (holding same);

*McKesson*, 126 F. Supp. 2d at 1264 ("concerns about holding outside auditors liable for minor

mistakes seems misplaced, because even under a negligence standard plaintiffs only prevail if

they prove that the misstatements were material and that the defendants deviated from an

appropriate standard of care.").  Further, courts have allowed Section 14(a) claims against

accountants and investment bankers who are not soliciting proxies at all.  According to

*McKesson,* 126 F. Supp. 2d at 1266, "[t]his follows directly from Section 14(a), which makes it

'unlawful for any person ... to solicit *or to permit the use of his name to solicit* any proxy or

consent or authorization in respect to any security' in contravention of SEC regulations."

(*quoting* 15 U.S.C. §78n) (emphasis added).  Therefore, Deloitte cannot escape liability under

Section 14(a) for allowing its name to be used in connection with false financial statements to

solicit proxies in favor of the First Republic merger.

I.    **The Complaint Adequately Alleges that Defendants Are Liable as Control Persons under Section 20(a) of the Exchange Act and Section 15 of the Securities Act**

Defendants O'Neal, Fakahany, Fleming, and Edwards are properly alleged to be control

persons of Merrill and are liable under the control person provision of the Exchange Act.  *See* 15

U.S.C. §78t(a).  As set forth above, the Complaint adequately alleges primary violations of

Section 10(b) of the Exchange Act.  *See, e.g., In re Sterling Foster*, 222 F. Supp. 2d at 277, 282-

83 (denying motion to dismiss Section 20(a) claim where Section 10(b) claim survives).

Plaintiffs have adequately alleged that Defendants controlled Merrill.  Each of the control

persons was among the highest officers of Merrill:  O'Neal was President and Chief Executive

Officer (¶70); Fakahany and Fleming were Co-Presidents and Chief Operating Officers (¶¶71-

72); and Edwards was Chief Financial Officer (¶73).  None of these Defendants disputes their

status as a control person.

The law in the Second Circuit is unsettled on the question of whether culpable participation must be alleged to adequately plead a Section 20(a) claim.[111]  In any event, the Complaint pleads culpable conduct with respect to each Defendant.  Culpable conduct includes insider trading in suspicious amounts by O'Neal, Fleming, and Fakahany (¶¶195-97); false oral statements by defendants Edwards (¶¶245-47, 278-80) and O'Neal (¶214); and signatures on materially misleading quarterly reports (O'Neal), annual reports (O'Neal and Edwards) and Sarbanes-Oxley certifications (O'Neal, Fakahany, and Fleming) (¶¶70-73).

The Complaint also properly pleads control person liability against defendants O'Neal, Edwards, and Merrill for violations of the Securities Act.  For these counts, there is no clear requirement that "culpable conduct" be pleaded. O'Neal and Edwards do not dispute that they were control persons of Merrill.  Merrill does not dispute that it was a control person of the trust entities that issued prospectuses for each of the Preferred Securities offerings, and of its wholly-owned underwriting subsidiary, MLPFS.  In addition, Plaintiffs have adequately alleged primary violations of the Securities Act as demonstrated above.  Accordingly, the Section 20(a) and 15 claims must be sustained.

---

[111]    *Compare In re Parmalat Sec. Litig.*, 497 F. Supp. 2d 526, 532 (S.D.N.Y. 2007) ("This Court repeatedly has held that culpable participation need not be alleged to state a claim under and is not an element of Section 20(a) liability. . . the Second Circuit [in *ATSI Communications, Inc.*, 493 F.3d at 108] recently listed culpable participation as an element of liability under Section 20(a). . . . [t]he statement in *ATSI*, however, was *dictum*," which appears to "be at odds with the language of Section 20(a) of the Exchange Act.")  (Alteration added), with *ATSI*, 493 F.3d at 108 and *Children's Place*, 2008 WL 2791526, at *6 ("in order to plead a prima facie case of control person liability under section 20(a), a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'  'Allegations of control are not averments of fraud and therefore need not be pleaded with particularity.'  Thus '[a]t the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard.'").  (Footnotes omitted).

127

## IV.    Conclusion

Defendants' motions to dismiss should be denied in their entirety.  In the event the Court grants, in whole or in part, the motions to dismiss the claims, Lead Plaintiff requests leave to amend.  *See* Fed. R. Civ. P. 15(a) (stating "leave [to amend] shall be freely given when justice so requires.").

Dated: September 19, 2008                    Respectfully submitted,

                              **KAPLAN FOX** & **KILSHEIMER LLP**


                              By:      */s/ Frederic S. Fox*
                                      Robert N. Kaplan
                                      Frederic S. Fox
                                      Joel B. Strauss
                                      Donald R. Hall
                                      Jeffrey P. Campisi
                                      Aviah Cohen Pierson
                                      850 Third Avenue
                                      New York, NY 10022
                                      Telephone: (212) 687-1980
                                      Facsimile: (212) 687-7714


                              **BERGER** & **MONTAGUE, P.C.**


                              By:      */s/ Lawrence J. Lederer*
                                      Lawrence J. Lederer
                                      Merrill G. Davidoff
                                      Arthur Stock
                                      Robin Switzenbaum
                                      Lane L. Vines
                                      Jon Lambiras
                                      1622 Locust Street
                                      Philadelphia, PA 19103-6365
                                      Telephone: (215) 875-3000
                                      Facsimile: (215) 875-4604

128

**BARRACK, RODOS** & **BACINE**

By:    */s/ M. Richard Komins*
       M. Richard Komins
       Robert A. Hoffman
       Jeffrey A. Barrack
       Beth T. Seltzer
       Julie B. Palley
       3300 Two Commerce Square
       2001 Market Street
       Philadelphia, PA 19103
       Telephone: (215) 963-0600
       Facsimile: (215) 963-0838

            and

       Regina M. Calcaterra
       1350 Broadway, Suite 1001
       New York, NY 10018
       Telephone: (212) 688-0782
       Facsimile: (212) 688-0783

       *Co-Lead Counsel for the State*
       *Teachers' Retirement System of Ohio*
       *and the Proposed Class*

**MURRAY, FRANK & SAILER LLP**
       Marvin L. Frank
       Lee Albert
       Gregory B. Linkh
       275 Madison Avenue, Suite 801
       New York, NY 10016
       Telephone: (212) 682-1818
       Facsimile: (212) 682-1892

       *Counsel for Plaintiff Gary Kosseff*

**Certificate of Service**

I, Frederic S. Fox , declare that on September 19, 2008 I caused true and correct copies of the Plaintiffs' Consolidated Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint to be served upon all counsel of record by filing the same via the Court's ECF system.


September 19, 2008                                    ___/s/ Frederic S. Fox___
                                                              Frederic S. Fox