UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | : : : | Master File No.: 07cv9633(JSR) (DFE) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| This Document Relates to: Securities Action, 07cv9633(JSR) (DFE) | : : : | **ECF Case** **Electronically Filed** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMBINED MEMORANDUM OF LAW OF DEFENDANTS MERRILL LYNCH & CO., INC., MERRILL LYNCH CAPITAL TRUST I, MERRILL LYNCH CAPITAL TRUST II, MERRILL LYNCH CAPITAL TRUST III AND MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED:

      (A) IN REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND TO STRIKE CERTAIN ALLEGATIONS; AND

      (B) IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE EXTRINSIC DOCUMENTS

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
Jay B. Kasner
Christopher P. Malloy
Scott D. Musoff
Joanne Gaboriault
Four Times Square
New York, NY  10036
(212) 735-3000

Attorneys for Defendants
 Merrill Lynch & Co., Inc.,
 Merrill Lynch Capital Trust I,
 Merrill Lynch Capital Trust II,
 Merrill Lynch Capital Trust III and
 Merrill Lynch, Pierce, Fenner &
 Smith Incorporated

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................................iv

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I.   PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER SECTION 10(b)
     OF THE EXCHANGE ACT OR SEC RULE 10b-5 ...................................................... 4

     A.   The Complaint Fails To Allege a Strong Inference of Scienter ........................... 4

          1.   Plaintiffs' Entire Theory of Fraud Is Implausible ...................................... 4

          2.   Plaintiffs Have Not Alleged Scienter Based on GAAP Violations ............ 6

               (a)   Plaintiffs Have Not Alleged Merrill Failed To Disclose a
                     Credit Risk Concentration With Fraudulent Intent........................ 6

               (b)   Plaintiffs Have Not Alleged That Merrill Failed To Write
                     Down Its CDOs With Fraudulent Intent ........................................ 8

               (c)   The Fact That Merrill Received Clean Audit Opinions and
                     Followed Prevalent Accounting Practices Undercuts Any
                     Inference of Scienter ................................................................. 11

               (d)   The Magnitude of the Write Down Does Not Create a
                     Strong Inference of Scienter....................................................... 12

          3.   The Complaint Fails To Identify Contemporaneous Facts
               Contradicting Merrill's Public Statements ............................................... 13

               (a)   Alleged Employee Warnings ...................................................... 15

               (b)   Alleged Trends in Subprime Market ........................................... 17

               (c)   AIG and the Monolines............................................................... 18

               (d)   The Complaint Does Not Allege that Defendants
                     Concealed Merrill's CDO Exposure ........................................... 19

          4.   Defendants' Alleged Role in Monitoring Risk Does Not Support an
               Inference of Scienter ............................................................................... 20

          5.   The Alleged Resignations of Certain Employees Do Not Raise
               Any Inference of Scienter........................................................................ 21

i

6.     The Allegations Fail to Raise a Cogent and Compelling Inference of Scienter Based on Motive and Opportunity .......................................... 22

B.     The Court May Consider the Documents Submitted by Defendants ................... 23

    1.     Plaintiffs' Motion To Strike Is Procedurally Defective ............................ 24

    2.     The Court Need Not Close its Eyes to the Worst Economic Crisis Since the Great Depression ..................................................................... 25

    3.     The Court May Consider the Effects of the Market Downturn on Merrill's Competitors ................................................................................ 28

    4.     The Court May Consider Materials Explaining the Structure of CDOs and the ABX and TABX Indices ................................................... 29

C.     Plaintiffs' Information and Belief Allegations Are Not Well-Pleaded and Should Not Be Accepted as True ........................................................................ 31

D.     Plaintiffs Have Not Alleged Loss Causation ..................................................... 36

    1.     Plaintiffs' Failure To Account for the Market Wide Collapse of the Credit Markets Is Fatal to Their Claims .................................................. 36

    2.     Plaintiffs Have Failed To Plead a Decline in Merrill's Stock Price Upon Any Disclosure of the Alleged Deception ...................................... 37

E.     Plaintiffs Fail To Allege That Merrill Made Any False Statement or Actionable Omission ......................................................................................... 40

    1.     Merrill Did Not Violate GAAP by Failing to Disclose a "Concentration of CDO Assets" ........................................................... 40

    2.     Merrill Did Not Violate GAAP by Misstating the Value of Its CDOs .................................................................................................... 43

    3.     Plaintiffs Have Not Pleaded Any Misleading Statements About Merrill's Subprime Exposure .................................................................. 43

    4.     Plaintiffs Have Failed To Allege Any False Statement Regarding Risk Management .................................................................................. 47

F.     Plaintiffs' Rule 10b-5(a) and (c) Claims Fail as a Matter of Law ....................... 48

II.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT ................................................................. 50

A.     Pleading Standards ............................................................................................. 50

        1.     Plaintiffs' Allegations Sound in Fraud and Are Subject to Rule 9(b) ....... 50

    B.    Plaintiffs Fail To Plead Any Untrue Statements or Actionable Omissions .......... 52

    C.    Plaintiffs Lack Standing Under Section 11 and Section 12(a)(2) With Respect to Certain of the Preferred Stock Offerings ............................................ 53

    D.    Plaintiffs' Claims Also Fail for Lack of Loss Causation ..................................... 54

III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(A) ......................... 54

IV.    LEAVE TO AMEND SHOULD BE DENIED ............................................................... 55

CONCLUSION .................................................................................................................... 55

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                           <u>Page</u>

<u>60223 Trust v. Goldman, Sachs & Co.</u>, 540 F. Supp. 2d 449 (S.D.N.Y. 2007)...........................36

<u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47 (2d Cir. 1995) .........................................................8

<u>In re Aegon N.V. Securities Litigation</u>,
      03 Civ. 0603, 2004 U.S. Dist. LEXIS 11466 (S.D.N.Y. June 23, 2004) .......................12

<u>AIG Global Securities Lending Corp. v. Banc of America Securities LLC</u>,
      254 F. Supp. 2d 373 (S.D.N.Y. 2003) ...........................................................................44

<u>Aldridge v. A. T. Cross Corp.</u>, 284 F.3d 72 (1st Cir. 2002)......................................................12

<u>In re Alstom SA Securities Litigation</u>, 406 F. Supp. 2d 402 (S.D.N.Y. 2005) ...........................51

<u>In re American Express Co. Securities Litigation</u>,
      02 CV 5533, 2008 U.S. Dist. LEXIS 74372 (S.D.N.Y. Sept. 26, 2008)................... passim

<u>In re Arbinet-thexchange, Inc. Securities Litigation</u>,
      05-4404, 2006 U.S. Dist. LEXIS 93580 (D.N.J. Dec. 22, 2006).....................................52

<u>Atlas v. Accredited Home Lenders Holding Co.</u>,
      556 F. Supp. 2d 1142 (S.D. Cal. 2008) .........................................................................10

<u>In re Atlas Air Worldwide Holdings, Inc. Securities Litigation</u>,
      324 F. Supp. 2d 474 (S.D.N.Y. 2004) .............................................................. 10, 15, 52

<u>ATSI Communications, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87 (2d Cir. 2007)...........................48

<u>In re AXIS Capital Holdings Ltd. Securities Litigation</u>,
      456 F. Supp. 2d 576 (S.D.N.Y. 2006) ...........................................................................44

<u>In re Authentidate Holding Corp. Securities Litigation</u>,
      05 Civ. 5323, 2006 U.S. Dist. LEXIS 47971 (S.D.N.Y. July 14, 2006).........................53

<u>Azzolini v. CorTS Trust II for Provident Financial Trust I</u>,
      03-CV-1003, 2005 U.S. Dist. LEXIS 31853 (E.D. Tenn. Sept. 16, 2005).................45-46

<u>Ballan v. Wilfred American Educational Corp.</u>, 720 F. Supp. 241 (E.D.N.Y. 1989) .................47

<u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007)..........................................................37

<u>Belodoff v. Netlist, Inc.</u>,
      SA CV 07-00677, 2008 U.S. Dist. LEXIS 45289 (C.D. Cal. May 30, 2008) .................51

iv

Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Management L.P.,
    435 F.3d 396 (3d Cir. 2006) ...................................................................... 26

In re BISYS Securities Litigation, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................... 21

In re Blech Securities Litigation, 961 F. Supp. 569 (S.D.N.Y. 1997) ......................................... 49

In re Bradley Pharmaceuticals, Inc. Securities Litigation,
    421 F. Supp. 2d 822 (D.N.J. 2006) .............................................................. 40

Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398 (S.D.N.Y. 2007) ......................................... 7

Campbell v. Shearson/American Express, Inc.,
    Civil No. 82-70594, 1985 U.S. Dist. LEXIS 16975 (E.D. Mich. Aug. 9, 1985).............. 41

In re Cardinal Health Securities Litigation, 426 F. Supp. 2d 688 (S.D. Ohio 2006).................... 28

Castlerock Management Ltd. v. Ultralife Batteries, Inc.,
    114 F. Supp. 2d 316 (D.N.J. 2000) .............................................................. 52

Catogas v. Cyberonics, Inc.,
    07-20787, 2008 U.S. App. LEXIS 19258 (5th Cir. Sept. 8, 2008) ................................. 39

In re Ceridian Corp. Securities Litigation, 542 F.3d 240 (8th Cir. 2008)............................. 16, 21

In re CIT Group, Inc. Securities Litigation, 349 F. Supp. 2d 685 (S.D.N.Y. 2004) .............. 51, 53

In re Citigroup, Inc. Securities Litigation,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004), aff'd, 165 Fed. Appx. 928 (2d Cir. 2006)............ 20

City of Brockton Retirement System v. Shaw Group Inc.,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................... 15, 23

City of Sterling Heights Police & Fire Retirement System v. Abbey National,PLC,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) .......................................................... 39

In re Comverse Technology, Inc. Securities Litigation,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) .......................................................... 15

Construction Laborers Pension Trust v. Neurocrine Biosciences, Inc.,
    07-CV-1111, 2008 U.S. Dist. LEXIS 38899 (S.D. Cal. May 12, 2008) ......................... 31

Construction Laborers Pension Trust v. Neurocrine Biosciences, Inc.,
    07-CV-1111, 2008 U.S. Dist. LEXIS 73020 (S.D. Cal. Sept. 23, 2008) ........................ 16

In re Converium Holding AG Securities Litigation,
    04 Civ. 7897, 2007 U.S. Dist. LEXIS 67660 (S.D.N.Y. Sept. 14, 2007).........................12

In re Dell Inc. Securities Litigation,
    06-CA-726-SS, 2008 U.S. Dist. LEXIS 86054 (W.D. Tex. Oct. 6, 2008)............... 21, 37,
                                                                                    39, 40

DeMaria v. Andersen, 318 F.3d 170 (2d Cir. 2003).....................................................44

In re Doral Financial Corp. Securities Litigation,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008)..............................................................6

Doron Precision Systems, Inc. v. FAAC, Inc.,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006)..............................................................26

In re Duke Energy Corp. Securities Litigation,
    282 F. Supp. 2d 158 (S.D.N.Y. 2003), aff'd, 113 Fed. Appx. 427 (2d Cir. 2004).....8-9, 47

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)..................................37, 42

In re Elan Corp. Sec. Litigation, 543 F. Supp. 2d 187 (S.D.N.Y. 2008) ......................16

Fadem v. Ford Motor Co.,
    352 F. Supp. 2d 501 (S.D.N.Y.), aff'd, 157 Fed. Appx. 398 (2d Cir. 2005) ...................26

In re Federated Department Stores, Inc. Securities Litigation,
    00 Civ. 6362, 2004 U.S. Dist. LEXIS 3769 (S.D.N.Y. Mar. 11, 2004).........................20

In re Federated Department Stores, Inc. Securities Litigation,
    00 Civ. 6362, 2005 U.S. Dist. LEXIS 4743 (S.D.N.Y. Mar. 25, 2005).........................17

In re Flag Telecom Holdings, Ltd. Securities Litigation,
    308 F. Supp. 2d 249 (S.D.N.Y. 2004)..............................................................53

Fogarazzo v. Lehman Bros., Inc. , 341 F. Supp. 2d 274 (S.D.N.Y. 2004) ...................44

Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597 (S.D.N.Y. 2008)...........................52

In re GeoPharma, Inc. Securities Litigation, 399 F. Supp. 2d 432 (S.D.N.Y. 2005) ...............5, 17

In re Gilead Sciences Securities Litigation, 536 F.3d 1049 (9th Cir. 2008) ...............38

In re Global Crossing Ltd. Securities Litigation,
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)..........................................................53, 54

In re Global Crossing, Ltd. Securities Litigation,
 322 F. Supp. 2d 319 (S.D.N.Y 2004) ............................................................. 49

Good Hill Partners L.P. v. WM Asset Holdings Corp.,
 08 Civ. 3730, 2008 WL 4761921 (S.D.N.Y. Oct. 31, 2008) ........................ 2, 9,
                       42, 45, 46

Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir. 2004) ...................................... 38

In re Guilford Mills Inc. Securities Litigation,
 98 Civ. 7739, 1999 U.S. Dist. LEXIS 21690 (S.D.N.Y. July 21, 1999) ........................ 23

Gurary v. Winehouse, 235 F.3d 792 (2d Cir. 2000) .................................................... 55

Harrell v. Primedia, Inc.,
 02 CV 2893, 2003 U.S. Dist. LEXIS 13595 (S.D.N.Y. Aug. 5, 2003) ............................ 26

Hevesi v. Citigroup, Inc., 366 F.3d 70 (2d Cir. 2004) ................................................ 53

Hinerfeld v. United Auto Group,
 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15, 1998) ......... 42-43, 52-53

Hoffman v. UBS AG,
 05 Civ. 6817, 2008 U.S. Dist. LEXIS 85065 (S.D.N.Y. Oct. 22, 2008) ......................... 54

In re IAC/InterActiveCorp Securities Litigation,
 478 F. Supp. 2d 574 (S.D.N.Y. 2007) ............................................................ 18

IIT v. Cornfeld, 619 F.2d 909 (2d Cir. 1980) ....................................................... 5, 55

Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group Inc.,
 537 F.3d 527 (5th Cir. 2008) ................................................................ 11, 12

In re Initial Public Offering Securities Litigation,
 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ............................................................ 49

Joffee v. Lehman Bros., Inc.,
 410 F. Supp. 2d 187 (S.D.N.Y.), aff'd, 209 Fed.  Appx. 80 (2d Cir. 2006) .................... 38

Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105 (D. Conn. 2005) .................................. 50

In re JP Morgan Chase & Co. Securities Litigation,
 MDL No. 1783, 2007 U.S. Dist. LEXIS 93877 (N.D. Ill. Dec. 18, 2007) ................. 33, 34

In re JPMorgan Chase Securities Litigation, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) .................. 52

In re JP Morgan Chase Securities Litigation,
    02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948 (S.D.N.Y. Mar. 28, 2007) ........................ 11

Kairalla v. Advanced Medical Optics, Inc.,
    CV 07-05569, 2008 U.S. Dist. LEXIS 76987 (C.D. Cal. June 6, 2008) .................... 22-23

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ................................................................. 7

Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269 (S.D.N.Y. 2008) ...................... 10

Ladmen Partners, Inc. v. Globalstar, Inc.,
    07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670 (S.D.N.Y. Sept. 30, 2008) .................. 50, 51

L.C. Capital Partners, L.P. v. Frontier Insurance Group, Inc.,
    318 F.3d 148 (2d Cir. 2003) .................................................................................... 27

In re LDK Solar Securities Litigation,
    07 Civ. 05182, 2008 U.S. Dist. LEXIS 42425 (N.D. Cal. May 29, 2008) ........................ 12

Lehocky v. Tidel Technologies, Inc., 220 F.R.D. 491 (S.D. Tex. 2004) .................................... 38

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005) ............................................. 28, 36,
    39, 48

In re Lernout & Hauspie Securities Litigation,
    236 F. Supp. 2d 161 (D. Mass. 2003) .......................................................................... 49

Levine v. Atricure, Inc., 508 F. Supp. 2d 268 (S.D.N.Y. 2007) .......................................... 53

Locksley v. United States,
    05 Civ. 2593, 2005 U.S. Dist. LEXIS 12123 (S.D.N.Y. June 10, 2005) ........................ 24

In re Majesco Securities Litigation,
    05 Civ. 3557, 2006 U.S. Dist. LEXIS 73563 (D.N.J. Sept. 29, 2006) ........................... 12

McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576 (2d Cir. 1990) .................. 44

Merrill Lynch International v. XL Capital Assurance Inc.,
    564 F. Supp. 2d 298 (S.D.N.Y. 2008) ........................................................................ 36

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
    540 F.3d 1049 (9th Cir. 2008) ............................................................................ 40, 43

Mizzaro v. Home Depot, Inc.,
    07-13810, 2008 U.S. App. LEXIS 21091 (11th Cir. Oct. 8, 2008) ................................. 12

Morrison v. National Australia Bank, Ltd.,
    07-0583-cv, 2008 U.S. App. LEXIS 21986 (2d Cir. Oct. 23, 2008) ..............................49

In re National Golf Properties, Inc. Securities Litigation,
    02 Civ. 1383, 2003 U.S. Dist. LEXIS 4321 (C.D.Cal. Mar. 19, 2003)............................43

National Union Fire Insurance Co. v. Hicks, Muse, Tate & Furst, Inc.,
    02 Civ. 1334, 2002 U.S. Dist. LEXIS 10672 (S.D.N.Y. June 13, 2002) .........................24

New York State Teachers' Retirement System v. Fremont General Corp.,
    2:07-cv-05756, 2008 WL 4812021 (C.D. Cal. Oct. 28, 2008) ..................................21, 46

Nix v. Hedden, 149 U.S. 304 (1893) .........................................................................30

No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,
    320 F.3d 920 (9th Cir. 2003) .........................................................................38

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000)........................................... 13, 32, 35

In re Optionable Securities Litigation,
    07 Civ. 3753, 2008 U.S. Dist. LEXIS 69573 (S.D.N.Y. Sept. 15, 2008).................. 32, 33,
    34, 35

In re Par Pharmaceutical, Inc. Securities Litigation,
    733 F. Supp. 668 (S.D.N.Y. 1990)....................................................................44

In re Parmalat Securities Litigation, 376 F. Supp. 2d 472 (S.D.N.Y. 2005)..........................37, 49

In re Parmalat Securities Litigation, 383 F. Supp. 2d 616 (S.D.N.Y. 2005)..............................19

In re PMA Capital Corp. Securities Litigation,
    03 Civ. 6121, 2005 U.S. Dist. LEXIS 15696 (E.D. Pa. July 27, 2005) ..........................53

Polite v. Dougherty County School System,
    No. 07-14108, 2008 U.S. App. LEXIS 17128 (11th Cir. Aug. 11, 2008)........................24

In re Razorfish, Inc. Securities Litigation,
    00 Civ. 94747, 2001 U.S. Dist. LEXIS 14756 (S.D.N.Y. Sept. 19, 2001)......................45

In re Refco, Inc. Securities Litigation, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) ...................... 5, 15,
    23, 51

Resnik v. Swartz, 303 F.3d 147 (2d Cir. 2002).........................................................44

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) ......................................................50

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ................................................................. 10, 12

In re Salomon Analyst Level 3 Litigation, 350 F. Supp. 2d 477 (S.D.N.Y. 2004) ...................... 53

In re Saxon Securities Litigation,
    80 Civ. 3103, 1984 U.S. Dist. LEXIS 19223 (S.D.N.Y. Feb. 23, 1984) ......................... 53

In re Scottish Re Group Securities Litigation,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ....................................................... 10, 30

SEC v. Universal Express, Inc., 546 F. Supp. 2d 132 (S.D.N.Y. 2008) ................................. 26-27

Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992) ............................................. 30, 47

Sierra v. United States,
    97 Civ. 9329, 1998 U.S. Dist. LEXIS 14135 (S.D.N.Y. Sept. 9, 1998) .......................... 24

South Ferry LP, #2 v. Killinger, 542 F.3d 776 (9th Cir. 2008) ................................................ 20

In re Sterling Foster & Co. Securities Litigation,
    222 F. Supp. 2d 216 (E.D.N.Y. 2002) ............................................................. 49

Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,
    128 S. Ct. 761 (2008) .................................................................................... 49

In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256 (3d Cir. 2006) .................... 51

In re Take-Two Interactive Securities Litigation,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ............................................................. 24

Teachers' Retirement System v. Hunter, 477 F.3d 162 (4th Cir. 2007) ...................................... 37

Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,
    531 F.3d 190 (2d Cir. 2008) ................................................................... 13, 17

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ............................... 2, 4, 13

United States v. Bongiorno,
    05 Cr. 390, 2006 U.S. Dist. LEXIS 24830 (S.D.N.Y. May 1, 2006) ............................. 49

In re Van der Moolen Holding N.V. Securities Litigation,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................. 45

Vandenberg v. Adler,
    98 Civ. 3544, 2000 U.S. Dist. LEXIS 4050 (S.D.N.Y. Mar. 31, 2000) .......................... 49

In re Vivendi Universal, S.A. Securities Litigation,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ........................................................... 45

Virginia Bankshares v. Sandberg, 501 U.S. 1083 (1991) ............................................ 44

Wagner v. First Horizon Pharmaceutical Corp., 464 F.3d 1273 (11th Cir. 2006) ........................ 50

In re WorldCom, Inc. Securities Litigation, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) .................... 53

In re Xcelera.com Securities Litigation, 430 F.3d 503 (1st Cir. 2005) ........................................ 38


Statutes and Rules

15 U.S.C. § 78u-5(i)(B) ............................................................................................ 41

15 U.S.C. § 78u-5(i)(C) ............................................................................................ 41

Fed. R. Civ. P. 12(f) ................................................................................................... 24

Fed. R. Evid. 201(b) .................................................................................................. 30

Fed. R. Evid. 402 ...................................................................................................... 28

17 C.F.R. § 229.305(d) (2008) .................................................................................. 41


Other Authorities

American Institute of Certified Public Accountants, Statement of Auditing
    Standards No. 69, The Meaning of Present Fairly in Conformity with
    Generally Accepted Accounting Principles (1992)........................................ 8

Consolidated Securities Class Action Complaint, In re UBS AG Securities
    Litigation, 07-CV-11225 (S.D.N.Y. filed Dec. 13, 2007)............................. 29

Financial Accounting Standards Board, Statement of Financial Accounting
    Standards No. 105, Disclosure of Information about Financial Instruments
    with Off-Balance Sheet Risk and Financial Instruments with
    Concentrations of Credit Risks (superseded 1998)................................... 7, 41

Financial Accounting Standards Board, Statement of Financial Accounting
    Standards No. 107, Disclosures about Fair Value of Financial Instruments
    (2008) ........................................................................................................ 7

Financial Accounting Standards Board, Statement of Financial Accounting
  Standards No. 157, Fair Value Measurements (2008) .................................................... 10

Gary L. Gastineau & Mark P. Kritzman, Dictionary of Financial Risk Management (1996).. 6, 41

Clark Hoyt, The Public Editor: Culling the Anonymous Sources, N.Y. Times,
  June 8, 2008, at WK12 ..................................................................................................... 33

Ben Logan, The ABX Index:  A Pricing Conundrum, Credit, May 1, 2008, at 48...................... 29

Merrill Lynch, Press Release, Ahmass L. Fakahany to Retire from Merrill Lynch,
  Jan. 28, 2008 (Kasner Reply Decl. Ex. BBB)................................................................. 21

Merrill Lynch, Press Release, Stan O'Neal Retires from Merrill Lynch; Alberto
  Cribiore to Serve as Interim Non-Executive Chairman and Chair Search
  Committee, Oct. 30, 2007 (Kasner Reply Decl. Ex. AAA)............................................. 21

Susan Pulliam et al., Merrill Upped Ante as Boom in Mortgage Bonds Fizzled,
  Wall St. J., Apr. 16, 2008, at A1 (Kasner Decl. Ex. L)............................................. 32, 34

Standard & Poor's, Insurer Financial Strength Rating Definitions (Dec. 2002), available at
  http://www2.standardandpoors.com/spf/pdf/fixedincome/IFS%20
  Definitions_Dec2002.pdf ............................................................................................... 19

State Teachers Retirement System of Ohio, Fiscal 2009 Investment Plan,
  dated June 19, 2008 (Kasner Reply Decl. Ex. WW)............................................. 3, 25, 26

Olivia Thetgyi, AIG Steps Back from ABS CDO Super-seniors, Securitization
  News, Apr. 3, 2006 (Kasner Decl. Ex. O)....................................................................... 18

## PRELIMINARY STATEMENT

In the short time since Merrill[1] submitted its motion to dismiss in July 2008, Lehman Brothers has filed for bankruptcy; Goldman Sachs and Morgan Stanley have converted from investment banks to bank holding companies; Wachovia and Washington Mutual have failed and become the subject of acquisitions; insurance giant AIG has been nationalized; and Merrill itself has agreed to be acquired by Bank of America. The ongoing governmental efforts to rescue the financial system – through capital investments and asset purchases – and to aid mortgage holders were unthinkable just a year ago.

The continuing historic rate of mortgage foreclosures, decline of housing prices, and the resulting havoc in the credit markets underscore that even the leading practitioners, academics, regulators, and legislators in our government and industry failed fully to anticipate how the unprecedented downturn in the housing market would impact broad ranges of securities, assets, and markets. Yet, here, Plaintiffs ask the Court to hold that Merrill – alone among financial institutions and regulators – understood as far back as October 2006 that holding AAA-rated CDOs with underlying subprime mortgage collateral would lead to tens of billions of losses. No matter how Plaintiffs try to dress it up, however, at its core this is just an old-fashioned fraud by hindsight case, with Plaintiffs second-guessing business and investment decisions and complex accounting judgments by pointing to losses taken in the aftermath of the downturn.

---

[1]    Unless otherwise noted, capitalized terms used in this reply brief shall have the same meaning as set forth in the Merrill Defendants' Memorandum of Law (cited herein as "ML Mem. at __") in support of their motion to dismiss the Complaint. Plaintiffs' opposition to the Merrill Defendants' Motion to Dismiss will be cited herein as ("Opp'n at __"). Plaintiffs' memorandum in support of their Motion to Strike Certain Documents and Certain Arguments will be cited herein as ("MTS at __"). Merrill incorporates the arguments made by the Individual Defendants in their reply briefs to the extent applicable to it.

With an avalanche of subprime litigation working its way through this and other Courts' dockets, now is a critical time to enforce the letter and spirit of the PSLRA to winnow out unwarranted fraud claims before the cost and burden of defending them causes still more damage to the financial services industry and its shareholders.  See Good Hill Partners L.P. v. WM Asset Holdings Corp., 08 Civ. 3730, 2008 WL 4761921, at *1 (S.D.N.Y. Oct. 31, 2008) (Rakoff, J.) (noting proliferation of subprime suits).  Here, the Complaint contains an unsurprising collection of allegations that one would expect plaintiffs could easily assemble from the wreckage of a market crash – such as vague reports of employees who supposedly had predicted the historic downturn and whose warnings were not heeded, unhappy customers and suppliers, and executives who resigned – that are now twisted in an attempt to state a claim.

None of these "facts," which Plaintiffs unearthed by reading newspapers, is remarkable.  If these generic, unsupported allegations are deemed sufficient, then virtually every case in the subprime litigation pipeline will move forward.  What is missing here are allegations of hard facts from reliable sources showing that defendants' statements were knowingly false at the time they were made and that give rise to a "strong inference" of scienter, i.e., an inference that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504-05 (2007).

In their opposition to the motions to dismiss and their separate, procedurally defective Motion to Strike,[2] Plaintiffs' primary attack is to ask the Court to ignore what they incredibly call the "supposed 'credit crisis.'"  (Opp'n at 3; MTS at 9.)  Plaintiffs need the Court to

---

[2]    As explained below, infra, at 24, there is no provision in the rules for a motion to strike a brief or an affidavit and such a motion is an inappropriate method for opposing a motion to dismiss.  Plaintiffs apparently interposed their Motion to Strike as a means for garnering what would otherwise be an unauthorized sur-reply, given that all the arguments raised in that motion are directed to what the Court may consider on the motions to dismiss.

close its eyes to the catastrophic events that have transpired, because consideration of these

events would make even more implausible Plaintiffs' theory that Merrill, which was among the

first financial institutions to announce CDO write downs, supposedly knew before the third

quarter 2007 that AAA-rated super-senior CDOs posed a massive credit risk and that these assets

had already lost most of their market value.  But Plaintiffs really do not (and cannot) dispute

what occurred.  Indeed, here is how Lead Plaintiff (an Ohio retirement fund) itself described the

events to its constituents:

> The credit markets changed abruptly in the early months of fiscal 2008 [i.e., the
> third calendar quarter of 2007] as the decline in the housing market accelerated
> and unexpected subprime losses accumulated in a wide variety of financial
> institutions and investment portfolios.  The subprime losses became a contagion
> that spread quickly, seizing up key areas of the credit markets.

(Fiscal 2009 Investment Plan, dated June 19, 2008, at 27.)[3]  (See also infra, at 25-26 for further

quotations from the Ohio STRS Investment Plan.)

Ultimately, whether or not the Court takes judicial notice of what indisputably has

been occurring outside the Court's window for the past year, Plaintiffs have failed to satisfy the

pleading requirements of the PSLRA and Rule 9(b).  For this reason, and the reasons expressed

below and in Merrill's opening brief, the Complaint should be dismissed with prejudice.

---

[3]    Ohio STRS operates on a June 30 fiscal year, so its "fiscal 2008" ran from July 1, 2007 to
June 30, 2008.  Excerpts from the Ohio STRS Fiscal 2009 Investment Plan, dated June 19,
2008, are attached as Exhibit WW to the Reply Declaration of Jay B. Kasner ("Reply Decl.")
dated November 14, 2008.

<u>ARGUMENT</u>

I.    **PLAINTIFFS HAVE FAILED TO ALLEGE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5**

    A.    **The Complaint Fails To Allege a Strong Inference of Scienter**

        1.    **Plaintiffs' Entire Theory of Fraud Is Implausible**

Plaintiffs accuse Merrill of treating their scienter theories piecemeal, rather than "holistically." (Opp'n at 40 (quoting <u>Tellabs</u>, 127 S. Ct. at 2511).) But taking a holistic view of the Complaint is precisely what Merrill did in its opening brief, where it explained the multiple reasons why Plaintiffs' allegations, individually and collectively, fail to present a cogent or compelling inference of scienter.

Plaintiffs contend that in mid-2006, Merrill's executives supposedly <u>knew</u> that the market for CDOs had dried up and that by early 2007 they knew that the value of the CDOs was supposedly declining precipitously. (Opp'n at 23.) Rather than use that knowledge to profit by shorting the mortgage and CDO markets, as any financial institution with that knowledge would have, the defendants instead allegedly increased Merrill's exposure to the supposedly toxic CDOs at a rate of $5-6 billion per quarter. (Opp'n at 37-38.) But why would anyone do that? Plaintiffs cannot answer this simple question, and their central theory thus defies logic.

Plaintiffs' <u>only</u> attempted response is to argue that perhaps the Individual Defendants "may have believed that the scheme could remain hidden indefinitely." (Opp'n at 67.) This response not only fails to explain why Merrill Lynch would ever "load up" on "ultra risky" securities in the first place, but also flies in the face of Plaintiffs' theory that Defendants already knew that "Merrill's ship was sinking. It had hit a rocky shoal and its hold was filling with

water."  (Opp'n at 2.)[4]  As explained in Merrill's opening brief, this is precisely the type of

"recipe for economic disaster" that would inevitably come to light, and cause the Individual

Defendants great personal harm, which courts have held <u>undercuts</u> any inference of scienter.

(ML Mem. at 38-39 (citing cases).)  Indeed, rather than <u>hide</u> information, it is undisputed that

Merrill voluntarily <u>pre-announced</u> the impact of deterioration in the credit markets on the market

value of its CDOs and other subprime related exposures.  Plaintiffs offer <u>no</u> response to these

authorities.  <u>See</u> <u>IIT v. Cornfeld</u>, 619 F.2d 909, 916 n.8 (2d Cir. 1980) (failure to respond to

argument is a concession).

       The more plausible inference arising from the allegations is that the defendants

honestly believed that the AAA-rated super senior CDOs, which have historically had extremely

low loss expectations (ML Mem. at 19-20), were protected from losses in the underlying

collateral and that Merrill had reason to believe that, despite rising foreclosure rates, the

mortgage sector would not face historically unprecedented declines.  Otherwise, why would

Merrill continue to accumulate CDOs?  Indeed, many of the sparse allegations actually support

the inference of non-fraudulent intent, including that Merrill allegedly continued to increase its

CDO holdings into 2007 (Compl. ¶ 78), and purchased First Franklin, a mortgage originator, in

December 2006 (<u>id.</u> ¶ 120).  Even as to Kronthal, Plaintiffs allege that in mid-2006 he

supposedly warned senior Merrill executives about the risks of continued investments in CDOs,

but that the warnings were "met with skepticism."  (Compl. ¶ 101; Opp'n at 44.)  Thus, at best,

---

[4]    Plaintiffs cite <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 646-47 (S.D.N.Y. 2007)
(Opp'n at 67), but there it was reasonable to believe the alleged fraud could be concealed
indefinitely because the scheme had been hidden from the public for eight years.  <u>Compare</u> <u>In
re GeoPharma, Inc. Sec. Litig.</u>, 399 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2005) ("alleged
scheme could not possibly have succeeded" given regulatory and media scrutiny of the
company).

Plaintiffs allege that Merrill's executives simply did not agree that the risks were as severe as Kronthal purportedly implied. A difference of opinion is not scienter. (<u>See</u> ML Mem. at 50.)

  2.  **Plaintiffs Have Not Alleged Scienter Based on GAAP Violations**

  Plaintiffs argue that they have alleged scienter based on two purported GAAP violations, <u>i.e.</u>, Merrill's supposed failure to disclose a "credit risk concentration" and its purported failure to mark its CDOs to fair value on a timely basis. But Plaintiffs cannot dispute that suggested GAAP violations – which Merrill disputes – are not indicative of scienter absent well-pleaded allegations of "fraudulent intent." <u>See</u> <u>In re Doral Fin. Corp. Sec. Litig.</u>, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (Rakoff, J.) (GAAP allegations "*may* be sufficient to establish scienter" only with evidence of corresponding fraudulent intent). (<u>See also</u> ML Mem. at 56-57.) Here, Plaintiffs have not even come close to alleging fraudulent intent with respect to the purported GAAP violations.

  (a)  **Plaintiffs Have Not Alleged Merrill Failed To Disclose a Credit Risk Concentration With Fraudulent Intent**

  First, as explained in more detail below, Plaintiffs have not alleged that Merrill breached any duty to disclose a known credit risk concentration. As Merrill explained in its opening brief, accounting rules do not require disclosure of "market risk" concentration and Plaintiffs cannot contend that Merrill's extensive disclosures regarding market risk and "VaR" were insufficient. (<u>See</u> ML Mem. at 17, 21-22, 23, 72-73.) Instead, Plaintiffs go to lengths to confuse market risk and credit risk. "Market risk" is exposure to loss "resulting from a change in a market price," Gary L. Gastineau & Mark P. Kritzman, <u>Dictionary of Financial Risk Management</u> 182 (1996), while "credit risk" is "exposure to loss as a result of a default on a swap, debt or other counterparty instrument." <u>Id.</u> at 78-79. Plaintiffs have not alleged particularized facts showing that, prior to the third quarter 2007, defendants had reason to believe

that AAA-rated super senior CDOs, with their extremely low historic loss expectations, posed any significant credit risk (or market risk, for that matter).  There is no allegation that any of the CDOs had defaulted or that their credit ratings had been downgraded, and Plaintiffs admit that the high ratings on the CDOs "signif[ied] lower credit risk."  (Compl. ¶ 83.)

Plaintiffs argue that it is a question of fact whether GAAP required disclosure of a credit risk concentration, which the Court should not decide on a motion to dismiss.[5]  But that argument is self-defeating on the question of scienter.  As the Second Circuit held in Kalnit v. Eichler, 264 F.3d 131, 143 (2d Cir. 2001), the alleged failure to make a disclosure required by GAAP does not support a strong inference of scienter unless the duty of disclosure is "not seriously disputed."  Id.  Plaintiffs again offer no response to this point.  Indeed, the decision whether a "concentration" of credit risk exists and is significant enough to require disclosure is a complex judgment for management – an opinion – and Plaintiffs have not alleged facts showing that management did not honestly believe that opinion.[6]

Moreover, there is no dispute that, as the world's number-one-ranked CDO originator, Merrill's extensive exposure to the mortgage securitization business was well known to investors.  (ML Mem. at 20-22.)  There is no allegation that Merrill's senior executives were

---

[5]    Contrary to Plaintiffs' contention (Opp'n at 33), courts regularly consider the applicability of GAAP provisions in determining whether a plaintiff has alleged scienter.  See, e.g., Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 412-14 (S.D.N.Y. 2007) (considering applicability of SFAS No. 144).

[6]    The provisions of SFAS No. 107 which Plaintiffs cite were derived from SFAS No. 105, Disclosure of Information about Financial Instruments with Off-Balance Sheet Risk and Financial Instruments with Concentrations of Credit Risks ¶ 113 (superseded 1998), which expressly recognized the highly judgmental nature of a decision whether to disclose credit risk concentrations.  See id. ("The degree of judgment needed, for example, to identify significant industry or regional concentrations is similar to that needed to comply with other longstanding accounting and reporting requirements, such as determining allowances for losses on loans, inventory obsolescence, and litigation.").

advised that the failure to provide a further breakdown of the Company's subprime backed investments supposedly violated GAAP.  See In re Am. Express Co. Sec. Litig., 02 CV 5533, 2008 U.S. Dist. LEXIS 74372, at *20-21 (S.D.N.Y. Sept. 26, 2008) (allegations that "Amex did not separately account for [its high-yield debt investments], but rather lumped together all corporate debt securities in its financial statements" insufficient where plaintiffs failed to allege facts showing individual defendants were made aware that accounting practice violated GAAP).

Indeed, it bears emphasis that, although many companies have written down subprime assets, and there are over 100 subprime related securities class actions pending (ML Mem. at 6, 27), Plaintiffs do not allege a single example of a bank or other financial institution that separately disclosed its "subprime exposure" to super senior CDOs prior to the third quarter of 2007, as the Plaintiffs would have required of Merrill.  Merrill disclosed that it was following the prevalent practice when defendant Edwards told investors that it was the Company's policy not to disclose its subprime or other asset allocations.  (Compl. ¶ 279.)  The far more compelling inference, therefore, is that Merrill's executives honestly believed they had no duty of disclosure. Plaintiffs cannot explain why it could be reckless to follow the prevalent practice.[7]

### (b)    Plaintiffs Have Not Alleged That Merrill Failed To Write Down Its CDOs With Fraudulent Intent

On the argument that Merrill failed to take timely write-downs of the CDOs, Plaintiffs again simply cannot get around the prohibition on pleading fraud by hindsight.  See Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements

---

[7]    Plaintiffs argue that what other companies did is irrelevant, but as the American Institute of Certified Public Accountants recognizes, GAAP specifically includes the "prevalent practice in a particular industry."  Am. Inst. of Certified Pub. Accountants, Statement of Auditing Standards No. 69, The Meaning of Present Fairly in Conformity with Generally Accepted Accounting Principles ¶ 5(d) (1992).

in one report should have been made in earlier reports do not make out a claim of securities fraud."). Similar to this Court's holding in <u>In re Duke Energy Corp. Sec. Litig.</u>, 282 F. Supp. 2d 158, 160 (S.D.N.Y. 2003), <u>aff'd</u>, 113 Fed. Appx. 427 (2d Cir. 2004), Plaintiffs' failure here to allege that Merrill's mark-to-market accounting was fraudulent is fatal to their claims. Plaintiffs do not dispute that the valuation of complex securities is a highly judgmental business decision that involves consideration of multiple factors. (ML Mem. at 51-53.) Although Plaintiffs do not dispute that such valuations are a matter of opinion and that they must therefore allege particularized facts demonstrating that the statement of opinion was both objectively and subjectively false, they make no effort to explain how they have met that standard. (ML Mem. at 51-52.) <u>See also</u> <u>Good Hill Partners L.P.</u>, 2008 WL 4761921, at *3 (statements of opinion generally not actionable).

        Plaintiffs argue that Merrill should have written down the CDOs as early as February 2007 because (a) the ABX and TABX had declined; (b) Merrill was supposedly having difficulty selling portions of its CDOs; and (c) in June 2007, Merrill had trouble selling tranches of CDOs it held as collateral for loans to Bear Stearns. (Opp'n at 34-35 & n.14.) However, Plaintiffs do not respond to the argument that their allegations say nothing about what was wrong with Merrill's actual valuation methodology or if, how or when Merrill's senior management concluded that it produced incorrect valuations. Simply pointing in hindsight to a collection of alternative factors that, in Plaintiffs' view, might affect the value of complex securities is insufficient to raise a strong inference of scienter. <u>See</u> <u>In re Am. Express</u>, 2008 U.S. Dist. LEXIS 74372, at *16-17 (allegations that defendants were reckless in ignoring that "'persistent, record high, and ascending default rates among high-yield debt instruments' were impacting" company's high-yield debt portfolio were "not entitled to any weight").

As explained below, see infra, at 29-31, there is no basis alleged for directly equating the ABX and TABX indices, which track credit default swaps on MBSs, with the value of Merrill's CDO holdings or for the assertion that Merrill was having such difficulty selling CDO tranches that it should have written down the value of its inventory. And "fire sales," such as the hurried liquidation of the Bear Stearns collateral, should not be considered in assessing fair value. (ML Mem. at 56.) See Fin. Accounting Standards Bd., Statement of Financial Accounting Standards No. 157, Fair Value Measurements (2008) (distressed sales not indicative of fair value). Plaintiffs do not respond to this point either. Plaintiffs argue that there "was an absence" of market activity in CDOs, so Merrill had no choice but to look to the ABX and TABX to value the CDOs. However, Plaintiffs concede that Merrill was able to sell CDOs and find hedge counterparties into the third quarter. (Compl. ¶ 106.) Moreover, the Complaint's anecdotal allegations say nothing about the level of market activity in CDOs underwritten by other companies or address any of the other factors that might be relevant in estimating the fair value of *Merrill's* CDOs. (ML Mem. at 54-55.)

Plaintiffs strain to analogize this case to those rare situations in which contemporaneous facts known to management made it almost certain they understood the need to take a loss earlier. (Opp'n at 43.) In In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007), for example, the complaint alleged that Scottish Re had entered into a transaction to securitize certain assets that had an immediate impact on the value of its deferred tax asset, but it waited months before taking a reserve against the tax asset.[8] Plaintiffs do not

---

[8]    See also Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (defendants failed to write off royalty advances despite knowing poor sales in prior quarters meant advances would not be earned) (Opp'n at 43); Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (majority of 2004 sales were fictitious) (Opp'n at 58); In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 496 n.13 (S.D.N.Y. 2004)

*(cont'd)*

allege any such relevant, concrete event or directly applicable pricing information that would have indicated to Merrill the need to write down its CDOs before the third quarter. Instead, Plaintiffs simply argue for their own alternative valuation methodology. Importantly, in none of the cases Plaintiffs cite was there an intervening and unprecedented credit crisis or similar market event that explained the timing of the losses.

### (c) The Fact That Merrill Received Clean Audit Opinions and Followed Prevalent Accounting Practices Undercuts Any Inference of Scienter

Moreover, the fact that Merrill received clean audit opinions on its financial statements and has never been required to restate them, even after change in senior management, undercuts any suggestion that GAAP violations occurred, let alone that they were made with fraudulent intent. While they argue that a restatement is not <u>required</u> to establish scienter, Plaintiffs cannot dispute that the absence of a restatement undercuts any inference of scienter, since it shows that reasonable accountants could agree with Merrill's accounting, which "defeats plaintiffs' claim of recklessness." <u>In re JP Morgan Chase Sec. Litig.</u>, 02 Civ. 1282, 2007 U.S. Dist. LEXIS 22948, at *39-40 (S.D.N.Y. Mar. 28, 2007); <u>see also</u> <u>Indiana Elec. Workers'</u> <u>Pension Trust Fund IBEW v. Shaw Group Inc.</u>, 537 F.3d 527, 537 (5th Cir. 2008) (that defendant "never corrected, repudiated or recalculated" its financials undercut claims of fraud). Plaintiffs' failure to allege that any other major investor in super-senior CDOs disclosed a "credit risk concentration," took substantial write downs before the third quarter 2007, or has been required

---

*(cont'd from previous page)*

specific allegations that defendant had first-hand knowledge of failure to timely write-down obsolete inventory) (Opp'n at 42); <u>Atlas v. Accredited Home Lenders Holding Co.</u>, 556 F. Supp. 2d 1142, 1156 (S.D. Cal. 2008) (defendants had reports "regarding widespread deviations from company policy" and allegations showed "that Defendants actually directed these deviations") (Opp'n at 43).

11

by its auditors to issue a restatement for failure to do so, confirms that reasonable accountants could agree with Merrill's approach.[9]

>    **(d)    The Magnitude of the Write Down Does Not Create a Strong Inference of Scienter.**

Lastly, Plaintiffs' argument that the magnitude of the write-down is an "additional indicator of scienter" is wrong.  (Opp'n at 58.)  Unlike the cases Plaintiffs cite,[10] there is simply nothing suspicious about the size of the write-down and it can be explained by the unprecedented economic conditions that arose in the quarter the losses were recognized.  See <u>Mizzaro v. Home Depot, Inc.</u>, 07-13810, 2008 U.S. App. LEXIS 21091, at *37-43 (11th Cir. Oct. 8, 2008) (alleged "widespread nature" and amount of purported fraud did not raise strong inference of scienter); <u>Indiana Elec. Workers' Pension</u>, 537 F.3d at 535-36 (assertion that executive "must have known of the alleged accounting irregularities because they [we]re so massive, disprove[d] itself" where company had received clean audit opinion); <u>In re Aegon N.V. Sec. Litig.</u>, 03 Civ. 0603, 2004 U.S. Dist. LEXIS 11466, at *18-19 (S.D.N.Y. June 23, 2004) (allegations regarding size of

---

[9]    None of Plaintiffs' cases (Opp'n at 60 n.34), holds that the absence of a restatement is not a competing inference of non-fraudulent intent in the scienter calculus.  Moreover, in each of the cited cases there were particularized allegations showing knowing GAAP violations that are absent here.  See <u>Rothman</u>, 220 F.3d at 86-87 (royalty prepayments were improperly recorded as revenue on products defendants knew were failing); <u>Aldridge v. A. T. Cross Corp.</u>, 284 F.3d 72, 79 (1st Cir. 2002) (defendants knew of undisclosed contingent sales); <u>In re LDK Solar Sec. Litig.</u>, 07 Civ. 05182, 2008 U.S. Dist. LEXIS 42425, at *38 (N.D. Cal. May 29, 2008) (auditors informed defendants of accounting and inventory discrepancies); <u>In re Majesco Sec. Litig.</u>, 05 Civ. 3557, 2006 U.S. Dist. LEXIS 73563, at *14, 24-25 (D.N.J. Sept. 29, 2006) (defendants received reports indicating revenue recognition violated GAAP).  In <u>In re Converium Holding AG Sec. Litig.</u>, 04 Civ. 7897, 2007 U.S. Dist. LEXIS 67660, at *6-9 (S.D.N.Y. Sept. 14, 2007) (complaint identified specific studies and reports prepared on loss reserves that were contrary to defendants' public statements).

[10]    In <u>Rothman</u> (Opp'n at 60 n.34), for example, in the last quarter of 1997, the company wrote off 84% of the royalty advances it had capitalized earlier in the year due to slow sales that were obvious to management earlier, undercutting any inference that management "suddenly realized" the need for the write-down at year end.  See <u>Rothman</u>, 220 F.3d at 92.

accounting charge for losses in bond portfolio, majority of which were rated "A" and above, amounted to fraud by hindsight).

### 3. The Complaint Fails To Identify Contemporaneous Facts Contradicting Merrill's Public Statements

Plaintiffs have not come close to alleging scienter based on the defendants' purported knowledge of contemporaneous facts contradicting their public statements. To survive dismissal under Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc., a plaintiff must "'specifically identify the reports or statements containing this information.'" 531 F.3d 190, 196 (2d Cir. 2008) (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)). In Dynex, it was not enough that the complaint alleged the existence of "raw data" that might have given the defendants access to contrary facts, because it was not alleged that the data was compiled into reports demonstrating that, contrary to the defendants' statements, loan administration practices were undermining the bond collateral at issue. See id. Plaintiffs do not discuss this standard or explain why this case is distinguishable from Dynex.[11]

Judge Pauley's recent decision in In re American Express Co. Securities Litigation illustrates the type of information that must be alleged in order to plead scienter based on

---

[11] Instead, they attempt to rely on the Dynex court's discussion of "corporate scienter" (Opp'n at 41), where the court hypothesized that "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." 531 F.3d at 195-96. But the court recognized that corporate scienter could be inferred only for frauds so extreme — for example if GM falsely stated it had "'sold one million SUVs in 2006, and that actual number was zero'" — that it could be inferred that the officials making the announcement were sufficiently knowledgeable to know it was false. Id. (quoting Tellabs, 127 S. Ct. at 2504-05). Here, the CDO business was only one small slice of Merrill's sprawling operations and there is no allegation that Merrill fabricated tens of billions of dollars in revenue. In any event, the Second Circuit stressed that, at the very least, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Dynex, 531 F.3d at 195 (emphasis added). Plaintiffs have not alleged such facts with respect to any of the Individual Defendants or any other senior Merrill officer.

13

extreme recklessness under <u>Dynex</u>. <u>See Am. Express</u>, 2008 U.S. Dist. LEXIS 74372, at \*14-25. There, plaintiffs alleged that American Express's executives ignored the risks associated with the company's high-yield corporate debt investments, which led to write-downs of more than $1 billion over two quarters in 2001, and that American Express misrepresented its risk management policies that related to these investments and overstated their value by failing to take impairment charges. <u>See id.</u> at \*5-10. Similar to Plaintiffs' allegations here regarding the decline in the housing market and ABX indices, the plaintiffs alleged that American Express officials ignored adverse "significant defaults, increasing and persistently high default rates, and bankruptcy filings that negatively impacted the high-yield debt market." <u>Id.</u> at \*9. And similar to Plaintiffs' allegations here regarding Merrill's supposed failure to make separate disclosures regarding its CDOs, it was alleged that "Amex did not separately account for the High Yield Debt, but rather lumped together all corporate debt securities in its financial statements." <u>Id.</u> at \*9-10. Unlike this case, the <u>American Express</u> plaintiffs supported their pleading with at least nine confidential informants formerly employed by the company. <u>See id.</u> at \*17-19.

   The court dismissed the complaint, holding that the scienter allegations were insufficient because, despite the air of detail pleaded, none of the confidential sources had knowledge that any individual defendant had information or access to information indicating that American Express was not properly valuing the high yield debt, that its risk control policies were inadequate, or that it was violating GAAP. <u>See id.</u> at \*20-21 ("Allegations that [Amex official] and senior management were warned of the risks or that senior management should not have been surprised by the charges relating to High Yield Debt show only that the Individual Defendants may have been made aware of the risks associated with the High Yield Debt, not that Amex was not properly valuing the debt or monitoring its risk.").

Here, as in <u>Dynex</u> and <u>American Express</u>, Plaintiffs have failed to allege that the Individual Defendants (or any other senior Merrill executive) were provided with the type of concrete, specific, contemporaneous information contradicting their statements that would support a strong inference of scienter. Characterizing their allegations as a "field of red flags" does not help Plaintiffs. <u>See</u> <u>City of Brockton Ret. Sys. v. Shaw Group Inc.</u>, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) ("amalgam of suggestions" insufficient).[12]

### (a)    Alleged Employee Warnings

Plaintiffs' allegations regarding the purported warnings by Kronthal and others regarding the risks of further investment in tranches of CDOs (Opp'n at 44), are even less indicative of scienter than the inadequate confidential witness allegations regarding the risks of high yield debt rejected in <u>American Express</u>. <u>See</u> 2008 U.S. Dist. LEXIS 74372, at *21-22 (allegations of awareness of risks of investments did not show awareness of improper valuations). Plaintiffs cannot explain where the required details are alleged, such as how Kronthal arrived at his purported risk limits or how his warnings put Merrill senior management on notice that months after he departed Merrill would not be properly valuing its CDO positions to track subsequent declines in the ABX. Plaintiffs argue "the allegations set forth the nature of the warnings, to whom the warnings were delivered and refer to specific memos and writings" (Opp'n at 44), but no such facts appear in the paragraph cited or anywhere else in the Complaint.

---

[12] In the cases Plaintiffs cite (Opp'n at 42), unlike here, the "red flags" showed that the defendants knew they had violated GAAP or that their statements were false. <u>See</u> <u>supra</u>, at 10 & n.8; <u>see also</u> <u>In re Comverse Tech., Inc. Sec. Litig.</u>, 543 F. Supp. 2d 134, 142-43 (E.D.N.Y. 2008) (defendants read and signed unanimous consent forms forming the basis for an options backdating fraud); <u>Atlas Air</u>, 324 F. Supp. 2d at 494-95 (company had restated financials; confidential witnesses and other red flags showed management knew of accounting errors). The court in <u>Refco</u> based its scienter holding on motive and opportunity allegations. <u>See</u> <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 646-48 (S.D.N.Y. 2007).

(Compl. ¶ 101)  See Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc., 07-CV-1111, 2008 U.S. Dist. LEXIS 73020, at *12 (S.D. Cal. Sept. 23, 2008) (complaint failed to allege basis for purported warning, how defendants responded, and why response was inadequate).

Moreover, as Merrill explained in its opening brief, at best Kronthal presented Merrill management with his opinions, months before the Class Period even started, not facts contradicting the later public statements.  Plaintiffs never address this point and concede that a disagreement over strategy is not fraud.  As was disclosed to its investors, Merrill is in the business of taking risks (Merrill 10-K (2006), at 50 (Reply Decl. Ex. XX)), so differences of opinion about which risks to take are wholly unremarkable.  See In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 247-48 (8th Cir. 2008) (disagreement between controller and fired employee regarding interpretation of GAAP did not support inference of scienter); see also In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 213 (S.D.N.Y. 2008) (warnings of potential drug risks were not red flags unless defendants knew risks were substantiated).[13]

Similarly, although Plaintiffs repeat their allegations regarding other Merrill employees, such as Messrs. Roy and De Silva (Opp'n at 45-46), they do not address Merrill's point that these allegations are too lacking in detail to support an inference of scienter.  (ML Mem. at 50.)  Further, Fakahany's purported warning "at the end of July 2007," the "August 9, 2007 letter" and Hotsuki's supposed warning all occurred within Merrill's third quarter, when it was among the very first on Wall Street to begin announcing its write-downs, and there is no indication that these reports contradicted any public statement.  (ML Mem. at 48-51.)

---

[13]  Plaintiffs have alleged no factual basis for their allegation that Kronthal was fired for his warnings relating to CDOs.  Even if they did, it would not be indicative of fraud.  See infra, at 34.

**(b)    Alleged Trends in Subprime Market**

Plaintiffs' miscellaneous allegations regarding information supposedly known to defendants about trends in the subprime lending market is no different from the "raw data" that was held to be insufficient in Dynex, 531 F.3d at 196, or the reports of "'persistent, record high, and ascending default rates among high-yield debt investments'" alleged to be known by management rejected in American Express, 2008 U.S. Dist. LEXIS 74372, at *16-17.  Moreover, it is difficult to perceive how Merrill could have committed fraud by concealing macro-economic events presumably known to the market.  See In re GeoPharma, 399 F. Supp. 2d at 452-53 & n.152 (scienter may not be inferred based on defendants' knowledge of *public* information contradicting their statements). What is missing are concrete allegations that Merrill management ignored specific reports or other information regarding *Merrill's* structurally protected AAA-rated super-senior CDO holdings.

For example, even if the Court were to credit Plaintiffs' fallacious argument that the ABX and TABX credit default swap indices were a direct proxy for the value of CDO tranches with different underlying collateral, as in Dynex Plaintiffs here have failed to allege that this data was collected into reports provided to Merrill senior management showing the impact on the value Merrill's of CDO positions.  Likewise, Plaintiffs offer no explanation why the events at Ownit, a small mortgage originator, bear on, let alone contradict, Merrill's disclosures regarding its exposure to AAA-rated CDO tranches.  See In re Federated Dep't Stores, Inc. Sec. Litig., 00 Civ. 6362, 2005 U.S. Dist. LEXIS 4743, at *4 (S.D.N.Y. Mar. 25, 2005) (allegation that parent encouraged its subsidiary to loosen its credit lending policies did not create strong inference of scienter).  Moreover, as explained in Merrill's opening brief, Plaintiffs themselves allege that Merrill supposedly forced mortgage originators such as Ownit to repurchase early defaulted loans.  (ML Mem. at 46.)  Plaintiffs say these allegations are actually irrelevant

17

because they also allege (without adequate basis) that Merrill was "not concerned with defaults." (Opp'n at 48 n.23.)[14]  But these allegations show that Merrill was concerned with, not ignoring, underwriting standards and that the problem loans were being weeded out before they were included in Merrill's securitizations.  Again, it defies logic that Merrill was taking large CDO positions while at the same time intentionally diminishing the quality of those positions.

### (c)    AIG and the Monolines

Plaintiffs continue to exaggerate their vague allegations regarding AIG's 2005 decision to stop insuring super senior CDOs.  Plaintiffs do not point to any allegation that Merrill knew why AIG left this business, nor do they have any basis for contending that AIG's departure from the business signaled a decline in the market that was so severe Merrill should have written off all its inventory of super-senior CDOs.  See In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 592-93 (S.D.N.Y. 2007) (loss of one customer was "hardly evidence that the 'entire supply and demand structure of that segment [was] evaporating'") (citation omitted). Plaintiffs have not alleged that AIG was in such a dominant position in this market that its stepping back from the market would be a signal akin to, say, Microsoft ceasing to make PC software.  Indeed, after AIG stepped back from this market, the press reported that "monolines and European banks have stepped in . . . to take up the slack."[15]

---

[14]  It was well known in the market that subprime defaults and foreclosures were increasing, so the allegations about First Franklin's alleged overstatement of its loan values in 2006 does not suggest that Merrill had any unique insight to predict the unprecedented events in the third quarter of 2007.  (Opp'n at 49.)

[15]  Olivia Thetgyi, AIG Steps Back from ABS CDO Super-seniors, Securitization News, Apr. 3, 2006 (Kasner Decl. Ex. O).  In the Motion to Strike, Plaintiffs contend the Court should ignore this article because shareholders may not have known about it.  (MTS at 21.)  But that is a non sequitur.  The article merely confirms that AIG was replaceable.  Regardless, Plaintiffs have no basis for their assertion that Merrill was unable to find substitute investors

*(cont'd)*

18

The remaining allegations as to monoline insurers all fail under <u>Dynex</u>. Plaintiffs concede that they have not alleged Merrill knew the monoline insurers with which it was hedging its CDO exposure were not creditworthy. (Opp'n at 51 n.28.) Plaintiffs argue that the real point is that the monolines were "less creditworthy" than AIG.[16] (<u>Id.</u>) Even if the Individual Defendants knew that the monolines were "less" creditworthy than AIG, that does not suggest they knew the hedges provided no protection at all, as Plaintiffs contend in hindsight (Opp'n at 49-50), let alone that Merrill was committing accounting fraud. Indeed, historically, single-A-rated insurers, by definition, have "STRONG financial security characteristics." Standard & Poor's, <u>Insurer Financial Strength Rating Definitions</u> (Dec. 2002).

### (d)    The Complaint Does Not Allege that Defendants Concealed Merrill's CDO Exposure

Plaintiffs contend that scienter has been pleaded because, in April 2007, defendants O'Neal and Edwards supposedly misled investors regarding the efficiency of Merrill's hedges and the impact the subprime market was having on Merrill. But Plaintiffs have failed to allege facts showing that before the third quarter 2007, the Individual Defendants had reason to believe that the strategy of shifting subprime exposure to the highest-rated securities and engaging in hedges was not effectively managing the Company's subprime exposure at that time. (ML Mem. at 34.) Plaintiffs rely upon <u>In re Parmalat Sec. Litig.</u>, 383 F. Supp. 2d 616, 626 (S.D.N.Y. 2005) (Opp'n at 54), but in that case defendants used shell entities to conceal losses,

_____

*(cont'd from previous page)*
    or insurers after AIG decided to leave the business. So, even if the article is not considered, Plaintiffs' allegations relating to AIG are insufficient.

[16]   This is a remarkable assertion, given the current financial circumstances for AIG. Presumably, Plaintiffs would have faulted Merrill for not predicting that, too.

which the court considered as "more than sufficient circumstantial evidence of conscious misbehavior." There are no such allegations of affirmative deceptive steps here.

### 4. Defendants' Alleged Role in Monitoring Risk Does Not Support an Inference of Scienter

Plaintiffs invoke the so-called "core operations" inference to argue that the Individual Defendants were aware of purported misrepresentations concerning Merrill's risk management function. (Opp'n at 55 (citing South Ferry LP, #2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008)).) But they can cite no post-Dynex case in this Circuit applying that approach. As discussed above, in Dynex, the Second Circuit recognized that only in extreme circumstances could it be presumed that corporate officials had knowledge that an announcement was false, such as the hypothetical situation of GM announcing it had sold one million SUVs but had really sold none. (See supra, at n.11.) So, the applicability of a broad-reaching core operations inference in this Circuit is questionable. Indeed, the Ninth Circuit has held that a strong inference of scienter based on the core operations inference would be "exceedingly rare." South Ferry LP, #2 v. Killinger, 542 F.3d 776, 785 n.3 (9th Cir. 2008).

Even if it were viable, no such inference could be drawn here because Merrill's CDO business represented only 1-2% of Merrill's revenue, a small part of its wide-ranging global operations and scores of business lines. (ML Mem. at 2.) See, e.g., In re Federated Dep't Stores, Inc. Sec. Litig., 00 Civ. 6362, 2004 U.S. Dist. LEXIS 3769, at *14-15 (S.D.N.Y. Mar. 11, 2004) (rejecting core operations theory because financial controls over subsidiary representing 10% of assets of corporation were not essential to corporation's survival). Plaintiffs argue that risk management is important to Merrill. But even if risk management failed to function in one part of the business, that would not imply the misrepresentation of a "core operation." See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) (allegations that risk

management was a "core element" of Citigroup's business amounted to nothing more than inactionable mismanagement), aff'd, 165 Fed. Appx. 928 (2d Cir. 2006).  Indeed, in N.Y. State Teachers' Retirement Sys. v. Fremont General Corp., 2008 WL 4812021, at *5 & n.3 (C.D. Cal. Oct. 28, 2008), the court refused to apply the core operations inference to claims that Fremont's management knew of faulty underwriting procedures – even though Fremont's core business was subprime lending.

### 5.  The Alleged Resignations of Certain Employees Do Not Raise Any Inference of Scienter

Plaintiffs argue that the alleged "forced resignations" of O'Neal and Fakahany "strongly suggest" they committed wrongdoing.  (Opp'n at 60.)  As the Eighth Circuit recently held, however, the competing inference that corporate officers are fired or resigned for reasons other than fraud "are more compelling in the absence of particular facts giving rise to a strong inference of fraud."  Ceridian, 542 F.3d at 248-49; see also In re Dell Inc. Sec. Litig., 06-CA-726-SS, 2008 U.S. Dist. LEXIS 86054, at *39 (W.D. Tex. Oct. 6, 2008) (resignation of CEO and CFO not indicative of fraud); In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005) ("[A]bsent any alleged facts linking the two resignations and the alleged fraud, the resignations of [two former CFOs] do not support an inference of conscious misbehavior or recklessness.").[17] CEOs and senior managers are paid to deliver results.  So it should be unsurprising that management changes were made in the aftermath of the worst losses in Merrill's storied history.[18]

---

[17]   In the cases Plaintiffs cite, there were allegations showing that defendants who resigned were involved in deliberate misconduct.  (Opp'n at 61.)

[18]   Indeed, the press releases Plaintiffs reference, (Compl. ¶¶ 313, 331), show that both O'Neal and Fakahany retired and were complimented for their past commitment to the Company. (See Reply Decl. Exs. AAA & BBB.)

6.    **The Allegations Fail to Raise a Cogent and Compelling Inference of Scienter Based on Motive and Opportunity**

Plaintiffs' arguments as to how they have alleged scienter based on insider sales by the Individual Defendants and stock issuances by Merrill all fail to paint a cogent, compelling inference of scienter. First, Plaintiffs have absolutely no response to the argument that their failure to allege that Merrill's CFO – defendant Edwards, the alleged speaker of many of the allegedly false oral statements – made any Class Period stock sales "undermines [their] claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'" Acito, 47 F.3d at 54. (See also ML Mem. at 42.) With respect to the other individuals, Plaintiffs persist in focusing on the gross proceeds of the stock sales, and not on the percentage of stock sold, which in each case was less than 10% of the Individual Defendants' holdings. Plaintiffs quibble with the way in which the defendants calculate the percentages, but the point they miss is that it was their burden to plead this information and they did not do so. (ML Mem. at 43.)

The fact that the Individual Defendants retained the vast majority of their holdings (and suffered losses along with the Plaintiffs) takes on added significance given the nature of the fraud claims. Plaintiffs allege that the Individual Defendants took actions – such as increasing Merrill's holdings of allegedly "ultra risky" super-senior CDOs before and during the Class Period – that would have seriously jeopardized their personal investment in the Company, all for reasons that remain unexplained. Thus, viewed "holistically" as Plaintiffs insist (Opp'n at 6), the facts alleged undermine any inference of scienter.

In addition, Plaintiffs have not alleged that the timing of the sales was suspicious. Plaintiffs argue that it is suspicious that O'Neal's, Fleming's and Fakahany's sales came shortly after Merrill's fourth quarter 2006 earnings release, but that is the usual time window in which insiders are permitted to trade. See Kairalla v. Advanced Med. Optics, Inc., CV 07-05569, 2008

U.S. Dist. LEXIS 76987, at *28 (C.D. Cal. June 6, 2008) (stock sales following the release of

earnings statements is common, not suspicious); City of Brockton, 540 F. Supp. 2d at 475 (no

inference of motive from sale of stock in trading window after issuance of financials).

Furthermore, Plaintiffs' proposed motive makes no sense given that the purported fraud

continued for months after the last alleged sale in February 2007. Plaintiffs again suggest that

the Individual Defendants must have believed the fraud could have continued. (Opp'n at 66 n.40.)

But, again, that runs contrary to Plaintiffs' theory that these defendants knew "Merrill's ship was

sinking." If the defendants were really motivated to bail out before the ship sunk, they would not

have retained the vast majority of their holdings.

Finally, Plaintiffs offer no response to the many cases holding that stock offerings

are not indicative of scienter. (ML Mem. at 67.) And the fact that the offerings were offset by

Merrill's repurchase of (allegedly known to be overvalued) stock diminishes whatever inference

could be drawn from the stock offerings.[19]

## B.    The Court May Consider the Documents Submitted by Defendants

In their Opposition and in their separate Motion to Strike, Plaintiffs argue that the

Court must disregard the materials attached to the Kasner Declaration and other materials cited

---

[19]  Plaintiffs cite cases for the proposition that stock repurchases do not undercut scienter, where
the company could have believed the fraud could be sustained, an inference that is not
plausible here. (Opp'n at 67.) See supra, at 4-5; cf. Refco, 503 F. Supp. 2d at 646-477; In re
Guilford Mills Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 21690, at *13-14 (S.D.N.Y. July 21,
1999). Moreover, Plaintiffs argue that Merrill supposedly erred in calculating the number of
shares issued during the Class Period. (Opp'n at 66.) Apparently, Plaintiffs included in their
tally of common and preferred securities offerings the sales of common and convertible
preferred stock to sovereign wealth funds announced on December 24, 2007 and January 15,
2008. (Compl. ¶¶ 327, 328.) Plaintiffs do not even attempt to explain how these sales –
which were made to shore up Merrill's capital position at the tail end of the Class Period
months after Merrill had announced billions in losses on subprime assets and after O'Neal,
one of the supposed masterminds of the fraud scheme, had retired – were the motive for a
fraud that commenced in 2006.

in Merrill's opening brief because these materials are supposedly either "disputed" and therefore not subject to judicial notice or supposedly "immaterial." (Opp'n at 1, 6-7; MTS at 1, 3-22.) Plaintiffs are wrong. The documents Defendants submitted with their Motion to Dismiss may all be considered without converting the motion to dismiss into a summary judgment motion.

### 1.    Plaintiffs' Motion To Strike Is Procedurally Defective

The Motion to Strike should be denied in its entirety because it is directed to responding to arguments in Merrill's opening brief. (ML Mem. at 16 n.9.) As Judge Sweet noted in Sierra v. United States, 97 Civ. 9329, 1998 U.S. Dist. LEXIS 14135, at *28 (S.D.N.Y. Sept. 9, 1998): "[T]he filing of a motion to strike . . . is not a proper way to challenge a motion to dismiss."[20] Presumably, Plaintiffs filed the separate Motion to Strike to garner the last word through a reply brief that will really be an unauthorized sur-reply.

In all events, Plaintiffs' alternative request that the Court convert the motions to dismiss into motions for summary judgment and grant them discovery should be denied. (MTS at 21-22.) While Defendants believe that the Court may properly consider all materials submitted, should the Court reach the opposite conclusion as to some of the materials submitted, it may simply disregard them, as Plaintiffs' own cases show. See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 262 (S.D.N.Y. 2008) (disregarding extrinsic materials not deemed judicially noticeable or relevant) (MTS at 17-18).

---

[20]  Motions to dismiss are not pleadings under the Federal Rules of Civil Procedure and Fed. R. Civ. P. 12(f) provides no basis for a court to strike "documents other than pleadings." Sierra, 1998 U.S. Dist. LEXIS 14135, at *28 (MTS at 7 n.5); see also Polite v. Dougherty County Sch. Sys., 2008 U.S. App. LEXIS 17128, at *9 n.7 (11th Cir. Aug. 11, 2008) (motion to strike affidavit inappropriate); Nat'l Union Fire Ins. Co. v. Hicks, Muse, Tate & Furst, Inc., 2002 U.S. Dist. LEXIS 10672, at *24 (S.D.N.Y. June 13, 2002) ("Declarations and affidavits are not pleadings."); Locksley v. United States, 2005 U.S. Dist. LEXIS 12123, at *10 (S.D.N.Y. June 10, 2005) (motion to strike reply brief inappropriate).

2.    **The Court Need Not Close its Eyes to the Worst Economic Crisis Since the Great Depression**

Plaintiffs ask the Court to disregard newspaper reports, IMF reports, observations by government officials and other materials that discuss the credit crisis that emerged in August 2007 and quickly caused the market for asset backed securities to seize up.  (MTS at 9-13; see Exs. B-C, G-H, and materials cited in ML Mem. at 3-4, 7, 18-19, 22-23, 25, 46, 65.)  But the fact that Merrill's losses were incurred during a credit crisis is important in evaluating the strength of Plaintiffs' proposed inference that Merrill was concealing risks known before the crisis emerged. (ML Mem. at 33.)

Although Plaintiffs pretend that the credit crisis is some sort of illusion (Opp'n at 39-40), they cannot legitimately dispute the economic events that unfolded beginning in August 2007 and their effect on the markets.  Indeed, Lead Plaintiff's own investment materials posted on its website for the benefit of its constituents describe the events of the third quarter 2007 in terms strikingly similar to the materials submitted by Defendants.  Lead Plaintiff Ohio STRS operates on a June 30 fiscal year.  In its Fiscal 2009 Investment Plan, Lead Plaintiff made the following observations about the credit crisis:

▸   "The credit markets were in disarray in fiscal 2008 [i.e., July 1, 2007 to June 30, 2008], as the subprime mortgage problem spread and created a confidence crisis.  Investors fled to the safety of Treasury securities, forcing yield spreads on other fixed-income securities to widen excessively."  (Reply Decl. Ex. WW, Ohio STRS Fiscal 2009 Investment Plan at 7.)

▸   "Entering fiscal 2008 [i.e., July 2007], the U.S. economy appeared to have weathered the crushing housing downturn that began a year-and-a-half earlier." (Id. at 13.)

▸   "Credit market liquidity problems developed in August 2007 when investors worried about subprime mortgages in the face of higher home foreclosure rates.  Credit market spreads to safer Treasury securities widened significantly, indicating that greater risks needed to be priced into credit instruments." (Id.)

▸ In June 2007, "[w]e observed fixed-income investors pursuing aggressive yield enhancing strategies by extrapolating a benign credit environment well into the future. The credit market changed abruptly in the early months of fiscal 2008 [i.e., beginning July 2007] as the decline in the housing market accelerated and unexpected subprime losses accumulated in a wide variety of financial institutions and investment portfolios. The subprime losses became a contagion that spread quickly, seizing up key areas of the credit markets. Many institutions and investors were forced to deleverage and shed assets as quickly as possible, causing market liquidity to evaporate. Interest rates on Treasuries declined rapidly and yield spreads widened substantially, increasing in some sectors to the widest levels ever observed. (Id. at 27.)

Even if the Court were to ignore all of the materials submitted by Defendants, there is no question that on a Rule 12(b)(6) motion it may take judicial notice of statements Lead Plaintiff posted *on its own website*. See, e.g., Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 178-79 (S.D.N.Y. 2006).

In any event, Plaintiffs miss the point of why the materials included with defendants' motions to dismiss were submitted. As Plaintiffs' cases confirm, even if they could dispute the substance of the materials Merrill submitted, the Court may take judicial notice where the materials at issue "serve . . . to indicate what was in the public realm at the time, not whether the contents . . . were in fact true." Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt. L.P., 435 F.3d 396, 401 n.15 (3d Cir. 2006).[21] Courts routinely consider well publicized economic phenomena, such as the dot-com bubble burst or the housing crisis, when weighing competing inferences of scienter.[22] (ML Mem. at 16 n.9.) See also SEC v.

---

[21] Even before Tellabs, courts considered extrinsic materials in assessing the strength of scienter allegations. See Fadem v. Ford Motor Co., 352 F. Supp. 2d 501, 520, 522-23 (S.D.N.Y.) (noting that plaintiffs' scienter argument "hinge[d] on defendants' knowledge of future technology validation," the court considered articles submitted by defendants that portrayed the alleged technology breakthrough as less certain), aff'd, 157 Fed. Appx. 398 (2d Cir. 2005). See also ML Mem. at 33-35 (collecting cases).

[22] See, e.g., Harrell v. Primedia, Inc., 2003 U.S. Dist. LEXIS 13595, at *6 (S.D.N.Y. Aug. 5, 2003) ("Viewed in the context of the well-publicized dot.com boom and bust that occurred

*(cont'd)*

Universal Express, Inc., 546 F. Supp. 2d 132, 137 n.7 (S.D.N.Y. 2008) ("The Court can take judicial notice of the widespread decline in property values over the past year."). Here, Plaintiffs do not contest that in the first half of 2007 knowledgeable market observers like the IMF and Federal Reserve Chairman Bernanke expressed views that the problems in the subprime market would not spread and would not cause losses to higher-rated securities. (ML Mem. at 22-23.) The very fact that these views were being expressed at a time when Plaintiffs contend defendants knew or should have known otherwise makes less plausible any inference of fraudulent intent. Similarly, the Court may consider in evaluating the non-fraud explanations for what occurred the fact that prominent journalists, IMF officials, Alan Greenspan and others believe the credit crisis was unforeseen by most and not, as Plaintiffs argue, the result of fraud. (ML Mem. at 6-7.)

A good analogy is that courts routinely take judicial notice of press reports and other public information in determining whether it is reasonable to infer that shareholders were on inquiry notice of an alleged fraud for statute of limitations purposes. See, e.g., L.C. Capital Partners, L.P. v. Frontier Ins. Group, Inc., 318 F.3d 148, 155 (2d Cir. 2003) (press reports and court ruling). Here, Plaintiffs argue that the defendants were on notice of various public "red flags," like the ABX, suggesting the facts were contrary to Merrill's public statements, and that defendants were therefore acting recklessly. (Opp'n at 42-53.) It is thus appropriate for the Court to consider other public domain information (green flags) available to defendants in determining whether there is strong inference that they were acting with scienter.

_____

*(cont'd from previous page)*
during 1999 and 2000, [Plaintiffs' scienter allegations] do[] not support an inference that the Defendants engaged in the massive conspiracy to defraud which the Plaintiffs purport to allege."). ML Mem. at 8, 33-34 (collecting cases).

### 3.     The Court May Consider the Effects of the Market Downturn on Merrill's Competitors

Plaintiffs ask the Court to ignore SEC filings, stock trading data and press reports relating to Merrill's peers, not because they dispute what happened at those companies, but because these facts supposedly are "irrelevant" under Fed. R. Evid. 402.  (MTS at 17-18; see Exs. Q-U, and materials cited in ML Mem. at 18-19, 21, 27-28 n.13-15, 46, 65.)  But the very cases Plaintiffs cite hold that materials outside the Complaint relating to a defendant's competitors may properly be considered to show that losses may have been caused by "a general market downturn, not fraudulent misstatements."  In re Cardinal Health Sec. Litig., 426 F. Supp. 2d 688, 713 (S.D. Ohio 2006) (MTS at 2, 8, 15).  As detailed in Merrill's opening brief, Citigroup, UBS, Morgan Stanley and other major financial institutions began announcing write-downs on subprime CDOs beginning in October 2007, around the time Merrill announced losses on similar holdings.  (ML Mem. at 6, 27, 59.)  That other market participants did not recognize such losses sooner on similar investments is highly relevant because it makes much less plausible any inference that Merrill had identified a decline in market value long before others with access to the same information.  Moreover, the effect of the crisis on Merrill's and its competitors' stock price is relevant to loss causation since the Court must consider whether "'the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors.'"  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (citation omitted).  Merrill is not asking the Court to resolve disputed issues regarding loss causation (MTS at 11), it is merely supplying the undisputed information needed to conduct the analysis required by Lentell.

Plaintiffs also argue that the scores of lawsuits that have been filed in the wake of the credit crisis are irrelevant.  (MTS at 14-15; see materials cited in ML Mem. at 6 n.7, 18-19, 46.)  But the fact that similar charges of fraud have been lodged against virtually every player in

28

the mortgage securities business bears on scienter. The notion that such an industry-wide fraud could be perpetrated for even a short period of time is just not plausible. Indeed, even with hindsight, the plaintiffs' bar cannot agree when write-downs should have been taken. Before Judge Sullivan, the plaintiffs allege that UBS, another major investor in super-senior CDOs, committed fraud *by failing to follow Merrill's lead* in writing down CDOs in October 2007. See Consol. Sec. Class Action Compl. ¶ 693, In re UBS AG Sec. Litig., 07-CV-11225 (S.D.N.Y. filed Dec. 13, 2007) ("Merrill Lynch, who possessed just a third of UBS's exposure to mezzanine CDO positions backed by subprime mortgages, had written down these assets by $12.4 billion as of October 26, 2007, thereby providing UBS with notice that its $4 billion write-down of similar assets was insufficient to correct its material overvaluation of these assets . . . ."). Viewed in context, the more plausible inference is that this action is one part of the feeding frenzy that typically accompanies economic downturns and should be viewed with great skepticism.

### 4. The Court May Consider Materials Explaining the Structure of CDOs and the ABX and TABX Indices

Merrill submitted explanatory materials relating to the ABX and TABX, (Exs. A, D, F, J, and materials cited in ML Mem. at 4, 19-20, 54), to put into context Plaintiffs' demonstrably false allegation that "the ABX and TABX indices . . . track prices of certain CDOs and CDO tranches" and that the alleged 40% decline in one TABX tranche by June 2007 meant that Merrill was required to mark down its super senior CDOs by a like percentage. (Opp'n at 18-19; MTS 13-14; Compl. ¶¶ 51, 142-43, 152, 244, 440.) The submitted sources explain the real structure of these indices (they track prices for a small handful of credit default swaps on MBSs, not the value of CDOs) and highlight the many reasons why the indices were neither "designed to be uncritically extrapolated to the broader [Asset Backed Securities] market . . . [nor] as a valuation tool for individual securities." Ben Logan, The ABX Index:  A Pricing

29

<u>Conundrum</u>, Credit, May 1, 2008, at 48 (Ex. J). The components of, and limiting factors affecting, the ABX and TABX are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), and the concept that an index tracking insurance contracts on a small number of securities is not a direct proxy for the value of a CDO made up of a larger and more diverse group of securities (not insurance contracts) is common sense.

Even cases Plaintiffs cite recognize that it is proper for a court to look to dictionaries, treatises and other readily available materials to educate itself about matters before it. <u>See, e.g.</u>, <u>Shapiro v. UJB Financial Corp.</u>, 964 F.2d 272, 281 (3d Cir. 1992) (surveying banking and accounting literature to educate itself about loan loss reserves) (Opp'n at 76); <u>Scottish Re</u>, 524 F. Supp. 2d at 376 & n.22 (looking to "Coordinated Portfolio Investment Survey Guide" by the IMF to inform itself about income-related effects of securitization of assets) (Opp'n at 43, 58-59, 61). Contrary to Plaintiffs' assertions, such sources are not submitted for judicial notice of the truth of the matter asserted. <u>See</u> <u>Nix v. Hedden</u>, 149 U.S. 304, 307 (1893) ("[D]ictionaries are admitted, not as evidence, but only as aids to the memory and understanding of the court.").

Similar defects plague Plaintiffs' arguments as to why the Court should ignore sources explaining the structure of a CDO. (Exs. A, D, F; ML Mem. at 18-20.) Plaintiffs do not dispute Comptroller of the Currency Dugan's observation that the super-senior CDOs were "supposed to be the <u>least</u> risky parts of the subprime pyramid." (Dugan Remarks at 1, 4.) Indeed, Plaintiffs themselves agree that the "higher tranches [of CDOs] are typically rated higher, signifying lower credit risk." (Compl. ¶ 83.) Nor do they dispute Yale Professor Fabozzi's observation that CDOs include credit enhancements that further protect higher-rated tranches

30

from credit losses in the underlying collateral. (Ex. D.) Nevertheless, Plaintiffs' entire theory of the case depends on the Court inferring that AAA-rated securities are really just as risky as the underlying collateral, which lack those protections, because to conclude otherwise would "ignore[] economic reality" given "there is an inextricable relationship between the two." (MTS at 13 n.10; Opp'n at 7; Compl. ¶¶ 74-91, 166, 419.) In evaluating how cogent and compelling that ipse dixit is, the Court is entitled to understand the nature of the complex securities at issue.

Lastly, it bears emphasis that if the Court disregards the materials Defendants submitted relating to the structure of CDOs and the nature of ABX indices, Plaintiffs' allegations would still fail because there is no basis alleged in the Complaint for their conclusory allegations relating to these issues. For example, other than a few graphics copied from a newspaper article, there is no source at all alleged for Plaintiffs' entire discourse on the structure of subprime CDOs and the risks attendant to the super senior tranches (Compl. ¶¶ 74-91), and there is no basis alleged for Plaintiffs' conclusion that the ABX and TABX represent the value of CDOs.[23]

**C.    Plaintiffs' Information and Belief Allegations Are Not Well-Pleaded and Should Not Be Accepted as True**

Plaintiffs do not even attempt to argue that they undertook any of the investigative steps that have become common in securities class actions, such as interviewing confidential

---

[23]   Plaintiffs also seek to strike references to Merrill's status as a CSE, which required it to submit to on-site inspections by the SEC of its procedures for valuing complex securities. (MTS at 18; see materials cited in ML Mem. at 18.) The Court may take judicial notice of the SEC's CSE requirements. See, e.g., Constr. Laborers Pension Trust v. Neurocrine Biosciences, Inc., 07-CV-1111, 2008 U.S. Dist. LEXIS 38899, at *21-22 (S.D. Cal. May 12, 2008) (taking judicial notice of FDA approval process). Plaintiffs argue that this undisputed fact is immaterial because there is no indication the SEC would have "discovered the truth." (MTS at 18.) That again misses the point. Plaintiffs' theory is that Merrill supposedly perpetrated a "massive" accounting fraud by concealing its CDO exposure. But it is not reasonable to infer that Merrill's executives believed they could conceal alleged CDO losses for any length of time with auditors and regulators looking on. (ML Mem. at 39-40.)

informants, and concede that their pleading was pieced together from a collection of newspaper clippings, pleadings in unrelated lawsuits and other public information. Even worse, in casting their allegations, Plaintiffs took liberties with the press reports upon which they relied and have now distorted these reports even further in their opposition brief.[24]

A prime example is Plaintiffs' pervasive distortion of a statement in an April 16, 2008 Wall Street Journal article that "some former Merrill executives say [that] Jeffrey Kronthal . . . had imposed informal limits on the amount of CDO exposure the firm could keep on its books ($3 billion to $4 billion)" to allege (without any basis) that Merrill disregarded established risk management procedures.[25] In their brief, Plaintiffs assert that they have even identified "specific memos and writings" relating to Kronthal's purported warnings and that Merrill "had abandoned its *time-tested management guidelines*."[26] (Opp'n at 4, 44 (citing Compl. ¶ 101).) Nothing in the Complaint or the Wall Street Journal article supports these contentions – Plaintiffs simply made them up. Because Plaintiffs failed to comply with the PSLRA's pleading requirements, the inadequately sourced allegations must be disregarded. See In re Optionable Sec. Litig., 07 Civ. 3753, 2008 U.S. Dist. LEXIS 69573, at *16-17 (S.D.N.Y. Sept. 15, 2008).

First, the allegations drawn from press reports based on anonymous sources lack an adequate basis. Plaintiffs argue that Novak, 216 F.3d at 313-14 – which requires plaintiffs to

---

[24]  In their opposition, Plaintiffs repeatedly reference factual points that the defendants supposedly do not dispute. (Opp'n at 30, 45 n.22, 72, 74.) Defendants are not required to admit or deny the facts at this stage. For purposes of this motion only, the allegations are assumed to be true, but only to the extent they satisfy the applicable pleading requirements.

[25]  Susan Pulliam et al., Merrill Upped Ante as Boom in Mortgage Bonds Fizzled, Wall St. J., Apr. 16, 2008, at A1 (cited in Compl. ¶ 109).

[26]  Plaintiffs even chide Merrill for making the supposedly "unsupported assertion that these risk management policies were 'informal,' non-official guidelines," even though that is all the source they relied upon suggests. (Opp'n at 75.)

allege facts supporting the probability that anonymous sources were in a position to possess the information alleged – only applies to statements made to plaintiffs' counsel and not to sources that form the basis for newspaper reports because newspaper reporters are supposedly more reliable.  (Opp'n at 83 n.60.)[27]  But the sole case Plaintiffs cite does not explain why statements by counsel in a complaint, which are subject to the PSLRA and Rule 11, should be deemed less reliable than news reports.  See In re JP Morgan Chase & Co. Sec. Litig., MDL No. 1783, 2007 U.S. Dist. LEXIS 93877, at *14 (N.D. Ill. Dec. 18, 2007).  In this Circuit, Novak's requirements apply to facts garnered from news articles.  See Optionable, 2008 U.S. Dist. LEXIS 69573, at *16-17 ("'Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel.'") (citation omitted).

Even if the Court applied Plaintiffs' proposed test (Opp'n at 81), the allegations would fail.  Plaintiffs do not allege any details of the investigation undertaken by the journalists.  See JP Morgan Chase, 2007 U.S. Dist. LEXIS 93877, at *14.  Plaintiffs cite two paragraphs that supposedly set forth the "significant detail about the warning statements made to Merrill's senior management and about the risk related to CDO exposure" (Opp'n at 82 (citing Compl. ¶¶ 109, 111)), but these paragraphs do not say who received the alleged warnings, their basis and severity, or why the anonymous sources were likely to know the alleged facts.  Indeed, the majority of Plaintiffs' allegations do not cite any source at all.[28]  Critically, unlike the plaintiffs in

---

[27]  Contrary to Plaintiffs' position, journalists share the courts' concerns regarding anonymous sources.  See Clark Hoyt, The Public Editor: Culling the Anonymous Sources, N.Y. Times, June 8, 2008, at WK12 ("Readers hate anonymous sources because they cannot judge the sources' credibility for themselves . . . .  How did they know their information?  Why did they need anonymity?").

[28]  See Compl. ¶¶ 5-11, 20-23, 25-35, 37-40, 45-47, 51-52, 74-96, 98-99, 101-103, 106, 109-110, 112-114, 120, 124-128, 130, 136-146, 149-156, 160-162, 179-182, 188, 191, 193, 204, 207,

*(cont'd)*

JP Morgan, 2007 U.S. Dist. LEXIS 93877, at *14, who had interviewed witnesses and obtained

emails corroborating their fraud charges, Plaintiffs cannot point to any source corroborating the

allegations drawn from press reports.  For example, although they repeat and distort at least 10

times their assertions regarding Jeffrey Kronthal's alleged warnings to senior management, there

is nothing in the Complaint suggesting any source for this allegation.

Plaintiffs also cannot justify their attempt to stretch the "facts" well beyond what

the source articles actually say.  As Judge Kaplan observed recently in Optionable, 2008 U.S.

Dist LEXIS 69573, at *16-17, if based on press reports, allegations may be credited only to the

extent supported by the source.  If the cited articles do not purport to describe a fraud, one cannot

be inferred.[29]  See id.  Here, for example, the Wall Street Journal article referenced in the

Complaint at most reports a difference of opinion between Kronthal and Merrill's management

regarding the future growth of the CDO business, not any fraud.[30]  The article also states that

"executives believed that so long as all they retained on their books were super-senior tranches,

they would be shielded from falls in the prices of mortgage securities."  Pulliam et al., supra,

_____

(cont'd from previous page)
211, 213, 215, 221, 223, 228, 231-232, 235, 238, 244, 248, 259, 274, 280, 282, 290, 297(a)-
(e), 302, 304, 311, 317, 324, 342-344, 346, 350-355, 358-359, 364, 380-382.

[29]  In Optionable, the court observed that the articles cited in the complaint did not provide
sufficient detail for believing the unidentified sources were likely to know the alleged facts
attributed to them.  For purposes of the motion to dismiss – which was granted – the court
nevertheless assumed there was an adequate source for what was actually reported (as
opposed to plaintiffs' characterization).  See 2008 U.S. Dist. LEXIS 69573, at *17.

[30]  Plaintiffs assert that Bill Dallas, the CEO of Ownit, is an additional "source of information
respecting both the firing of Kronthal and the reduction of risk management policies and
underwriting standards."  (Opp'n at 82 n.59 (citing Compl. ¶¶ 36, 131-33).)  Yet Plaintiffs do
not explain the basis for the Dallas allegations – for example, they do not claim to have
interviewed Dallas – and they do not allege how Dallas, who was not a Merrill employee,
would be knowledgeable about Kronthal's purported firing or would be in a position to know
Merrill's (as opposed to Ownit's) risk management policies.

n.25, at A1.  But as the Court recognized in Optionable, contrary to their argument here (Opp'n at 82 n. 59), Plaintiffs may not simply ignore passages they find inconvenient.  See 2008 U.S. Dist LEXIS 69573, at *17 n.65 (considering that the article cited in complaint "includes a paragraph – omitted from the Complaint – that attributes the losses" to sources other than the alleged fraud).

Second, Plaintiffs concede they have no source for many of their allegations – for example that the defendants were internally discussing "massive write-downs" at the time of the September 14, 2007 Form 8-K, weeks before Merrill disclosed its estimated write-downs for the third quarter on October 5, 2007.[31]  (Compl. ¶ 302.)  Instead, they argue that, under Novak, they are not required to allege the source for every allegation.  But nothing in Novak suggests that Plaintiffs may make allegations of fraud without any basis.  See 216 F.3d at 312-14.  Indeed, Judge Kaplan recently confirmed that allegations of fraud unattributed to any source may not be credited.  See Optionable, 2008 U.S. Dist LEXIS 69573, at *19-20.

Lastly, Plaintiffs cannot distinguish the authority requiring allegations copied from unrelated lawsuits to be stricken.  (ML Mem. at 30.)  Instead, they argue that such allegations may be repeated in their Complaint if offered only as "further evidence" of other allegations.  (Opp'n at 80.)  But, for example, there is no other source alleged in the Complaint regarding the unauthorized trading in CDOs supposedly drawn from the unrelated complaints.  Moreover, Plaintiffs attempt to side-step the significance of this Court's decision granting

---

[31]  Plaintiffs argue that there is a "compelling inference" that the defendants were discussing write-downs in early September because in August 2007 – before the effects of the credit crisis became apparent – defendants Fleming and Fakahany reported to the Merrill Board regarding Merrill's "CDO exposures."  (Opp'n at 85 n.62.)  But Plaintiffs have alleged no source for the alleged report by Fleming and Fakahany either, and, since Plaintiffs have no information regarding the report, they have no basis to fabricate the allegation that the defendants must have known the CDO exposure would lead to large write-downs.  This is precisely the kind of speculation that is impermissible under the PSLRA.

summary judgment in <u>Merrill Lynch International v. XL Capital Assurance Inc.</u>, 564 F. Supp. 2d

298 (S.D.N.Y. 2008), by arguing that they are not relying on the rejected claims.  (Opp'n at 80.)

But elsewhere in their brief, they argue that Merrill's allegedly improper transfer of control rights

over CDOs – the very claim rejected by the Court – supports their scienter arguments.  (<u>Id.</u> at 55.)

### D.    Plaintiffs Have Not Alleged Loss Causation

#### 1.    Plaintiffs' Failure To Account for the Market Wide Collapse of the Credit Markets Is Fatal to Their Claims

As explained in Merrill's opening brief, under <u>Lentell</u>, where, as here, plaintiffs'

"'loss coincides with a marketwide phenomenon causing comparable losses to other

investors,' . . . a plaintiff's claim fails when 'it has not adequately pled facts which' if proven,

would show that its loss was caused by the alleged misstatements as opposed to intervening

events.'"  <u>Lentell</u>, 396 F.3d at 174 (citation omitted).  Although they now disclaim having done

so (Opp'n at 100), in the Complaint Plaintiffs allege that the entire 49% decline in Merrill's stock

price that occurred during the Class Period, while Defendants were supposedly making

misleading optimistic comments, is attributable to the corrective disclosure of the fraud.  (Compl.

¶ 384.)  Plaintiffs argue that the Court "has no basis to consider . . . Defendants' fact dependent

claim" regarding the effect of the credit crisis on other financial stocks.  (Opp'n at 100.)

However, there is no question that the Court may take judicial notice of marketwide events in

evaluating loss causation under <u>Lentell</u>.  <u>See</u> <u>supra</u>, at 28-29.  Resting on their faulty analysis of

<u>Lentell</u>, Plaintiffs conclude that they are not required to "plead a detailed refutation" of other

possible causes for the decline in Merrill's stock and do not even try to do so.  Under <u>Lentell</u> and

36

its progeny, their claims must be dismissed.[32]  See, e.g., 60223 Trust v. Goldman, Sachs & Co.,

540 F. Supp. 2d 449, 461 (S.D.N.Y. 2007).

> **2.    Plaintiffs Have Failed To Plead a Decline in Merrill's Stock Price Upon Any Disclosure of the Alleged Deception**

Plaintiffs correctly state that loss causation may be pleaded by "demonstrat[ing] a

decline in the security's price upon disclosure of the deception" (Opp'n at 94; see Compl. ¶¶ 384-

99 (describing "corrective disclosures")), but their attempts to comply with this requirement

fail.[33]  See Dell, 2008 U.S. Dist. LEXIS 86054 at *67-71 (plaintiffs must allege stock decline

following announcement that specifically discloses fraud or wrongdoing).  For example,

Plaintiffs argue that the decline in Merrill's stock price *going back to June 2007* is attributable to

the revelation of a fraud Plaintiffs contend was not first disclosed until October 5, 2007.  (Opp'n

at 97-98.)  They argue confusingly that on June 20, 2007, the market began to realize that

Merrill's subprime assets were overvalued because the New York Times reported that it could

not sell collateral belonging to Bear Stearns.  (Compl. ¶ 385.)  But the article said nothing about

---

[32]  Plaintiffs argue that Merrill supposedly conceded that loss causation is not subject to any heightened pleading requirement.  (Opp'n at 94.)  However, as noted in Merrill's opening brief, a plaintiff must, at the very least, plead loss causation with 'sufficient specificity to enable the court to evaluate whether the necessary causal link exists.'"  (ML Mem. at 57 (quoting Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 186 (4th Cir. 2007)).)  Plaintiffs also misstate the holding of Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005) (Opp'n at 94), which did not purport to state the pleading standard applicable to loss causation.

[33]  Plaintiffs focus on the effect of various disclosures on Merrill's common stock, but they do not even attempt to defend the lack of detail in the Complaint regarding the preferred stock.  (ML Mem. at 62 n.25.)  Likewise, Plaintiffs fail to allege facts showing the preferred stock traded in an efficient market.  (ML Mem. at 77.)  Plaintiffs argue that they need not plead market efficiency with what Judge Kaplan termed "exquisite specificity."  In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 508 (S.D.N.Y. 2005) (Opp'n at 102-03).  Under Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), however, they are required to do more than allege "labels and conclusions, and a formulaic recitation of the elements of a cause of action," id. at 1965, which is all that was done here.

Merrill's own subprime exposure, which Plaintiffs maintain was concealed. To diffuse the fact that Merrill's stock price *increased* by $1.89 on October 5, when it first announced the need to write down its CDOs, Plaintiffs argue that "significant portions" of the release had already been anticipated by analysts.[34]  (Opp'n at 98.) Since Plaintiffs do not allege that Merrill supplied the information to these analysts, what can be inferred is that, in reality, Merrill's exposure to the subprime market was known (ML Mem. at 20-22), and its stock declined with other financial stocks as the problems in the market worsened.

    None of the alleged "corrective disclosures" revealed any prior deception. As set forth in Merrill's opening brief (ML Mem. at 61-62), where the fraud relates to statements of opinion, such as the valuation of complex assets, "it is critical for Plaintiffs to allege that the relevant truth, i.e., the alleged dishonesty of the opinions is revealed to the market." Joffee v. Lehman Bros., Inc., 410 F. Supp. 2d 187, 193 (S.D.N.Y.), aff'd, 209 Fed. Appx. 80 (2d Cir. 2006).  Plaintiffs do not bother to address this authority and nowhere contest that the valuations

---

[34]  Because they are grasping at straws, Plaintiffs continue argue that the decline in Merrill's stock on October 8 is somehow attributable to the October 5, 2007 announcement. But none of the authorities cited (Opp'n at 99 n.78), holds that a disclosure followed by an increase in the issuer's trading price can be the proximate cause of a decline in trading price on the next trading day. In re Xcelera.com Sec. Litig., 430 F.3d 503, 506, 508 (1st Cir. 2005), the stock declined on the day of alleged corrective disclosure and the court stressed that in an efficient market "*prices respond so quickly to new information that it is impossible for traders to make trading profits on the basis of that information.*" Id. at 508 (emphasis added); Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 506 (S.D. Tex. 2004) (market efficiency involves "immediate[]" reaction to public disclosure). In Greenberg v. Crossroads Sys., Inc., 364 F.3d 657, 659-61 & n.3 (5th Cir. 2004), the use of a two-day window was not challenged by plaintiffs. The Ninth Circuit's holding in In re Gilead Sciences Sec. Litig., 536 F.3d 1049 (9th Cir. 2008), to the effect that a public revelation of an FDA warning letter could cause a loss *three months after its disclosure* is not the law of the Second Circuit. The other Ninth Circuit opinion, issued pre-Dura, is even farther off the mark. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 933-46 (9th Cir. 2003) (reversing district court's holding of immateriality based on lack of stock price movement at time of alleged misrepresentation).

of Merrill's CDO positions were matters of opinion or argue that the falsity of any valuation was ever revealed to the market.  (See Opp'n at 96 n.76.)[35]

Plaintiffs argue that they have "at least" alleged loss causation for the October 24, 2007 and January 16, 2008 earnings releases and that Defendants have supposedly conceded as much.  (Opp'n at 97.)  But the problem with Plaintiffs' theory is that the information disclosed on October 5, 2008 – Merrill's exposure to losses on CDOs, that its risk mitigation strategy had not avoided losses and O'Neal's statement that risk management could have been better – had already been revealed before the later announcements of the quarter-end and year-end results on October 24 and January 17.  There are no allegations showing that these later announcements revealed a fraud or anything other than timely additional write downs attributable to the continued deterioration in the markets.  (ML Mem. at 62.)  See Lentell, 396 F.3d at 175 & n.4; see also Catogas v. Cyberonics, Inc., 07-20787, 2008 U.S. App. LEXIS 19258, at *12 (5th Cir. Sept. 8, 2008) ("For the stock-option issue, the only information in the [later] press release *not* previously disclosed to the market – potential delistment – did nothing to reveal previous misstatements with respect to Cyberonics' stock option accounting.");  Dell, 2008 U.S. Dist. LEXIS 86054, at *73 ("disappointing earnings" did not reveal falsity of prior representations).  Plaintiffs quote from the October 24, 2007 press release that "[t]hird quarter writedowns of $7.9 billion . . . [were] significantly greater than the incremental $4.5 billion write-downs Merrill disclosed at the time of its earnings pre-release" (Compl. ¶ 394), but they do not, and cannot, allege that this

---

[35]  Plaintiffs' reliance on City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC, 423 F. Supp. 2d 348, 360 (S.D.N.Y. 2006) (Opp'n at 95-96), is thus misplaced.  That case concerned valuation of the company's investments in the common stock of WorldCom and Tyco International, which were matters of objective fact, capable of ready and accurate determination by reference to published quotes.

disclosure revealed that the October 5 estimated writedown was not genuinely believed on October 5.

Finally, as set forth in Merrill's opening brief, the alleged disclosure on November 1, 2007 "that the SEC was investigating Merrill's disclosures of losses from its subprime business, and its valuation of securities based on subprime mortgages" (Compl. ¶ 396), is not a corrective disclosure because it did not reveal any previously concealed fraud.  (ML Mem. at 62.) See also Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1063-64 (9th Cir. 2008) (loss causation not pleaded as to declines on news report disclosing DOE investigation because a "'risk' or 'potential' for widespread fraudulent conduct" is not a corrective disclosure); Dell, 2008 U.S. Dist. LEXIS 86054, at *73-74 (disclosure of SEC investigation did not reveal any prior wrongdoing).[36]

### E.    Plaintiffs Fail To Allege That Merrill Made Any False Statement or Actionable Omission

#### 1.    Merrill Did Not Violate GAAP by Failing to Disclose a "Concentration of CDO Assets"

Plaintiffs argue that Merrill supposedly failed to disclose concentrations of credit risk as to its CDOs under SFAS No. 107 (Opp'n at 30-32), but they again attempt to muddle the concepts of credit risk with market risk and ignore the structure of a CDO, which separates the senior securities from the credit risk of the underlying collateral.  As one court observed, "Credit risk is a function of the issuer's solvency and ability to pay off interest and principal . . . .  Market

---

[36]  In In re Bradley Pharms., Inc. Sec. Litig., 421 F. Supp. 2d 822, 829 (D.N.J. 2006), cited by Plaintiffs (Opp'n at 99), the court incorrectly reasoned backwards to infer a "corrective disclosure" from the stock's decline that day.  Further, although Plaintiffs contend that Merrill may not refer to the November 2, 2007 retracted report of the Wall Street Journal because it is not referenced in the Complaint (Opp'n at 99 n.79), Plaintiffs themselves cited and referred to it in the prior complaint.  (Kosseff Compl. ¶¶ 37-38.)

risk 'is the risk that the market value of the bond, at any given time prior to maturity, will be less than the price paid for the bond.'" Campbell v. Shearson/Am. Express, Inc., 82-70594, 1985 U.S. Dist. LEXIS 16975, at *12 n.5 (E.D. Mich. Aug. 9, 1985); see also Gary L. Gastineau & Mark P. Kritzman, Dictionary of Financial Risk Management 78-79, 182 (1996).[37]

There are no facts alleged showing that the super senior tranches of CDOs represented a disclosable credit risk concentration. It is undisputed that the CDOs were investment grade, AAA-rated securities, and none had defaulted or been downgraded. CDOs are structured to protect, and until recently had protected the AAA-rated tranches from the credit risk arising from the underlying subprime collateral. (ML Mem. at 19-20.) And Plaintiffs have not alleged facts showing that the defendants knew defaults on the underlying collateral were so extreme that the senior CDO tranches were at risk of any impairment. Even if the CDO structure could be ignored, Plaintiffs' argument that the underlying collateral posed a "group concentration" of credit risk to the underlying borrowers is not supported by their allegations. (Opp'n at 30 n.11, 31 n.12.) A given CDO might ultimately be backed by thousands of underlying loans of different types, with geographically diverse borrowers. Although they generalize about the credit profile of some "subprime" borrowers, Plaintiffs do not allege specifics about any CDO in Merrill's portfolio that would suggest a credit risk concentration.

---

[37] The distinction between credit and market risk is relevant for two reasons. First, while part of SFAS No. 107 may require disclosure of credit risk, it also provides that "[a]n entity is encouraged, but not required, to disclose quantitative information about the market risks of financial instruments." Id. (emphasis added). Second, disclosures regarding market risk are subject to the SEC's Regulation S-K, Item 305, Quantitative and qualitative disclosures about market risk, which specifically provides that the required disclosures are deemed to be forward looking statements under the PSLRA. See 17 C.F.R. § 229.305(d) (2008); 15 U.S.C. § 78u-5(i)(B), (C). Plaintiffs cannot allege any false statement by Merrill regarding market risk, let alone a statement that falls outside the safe harbor. See infra, at 47-48.

Plaintiffs implicitly acknowledge their Complaint is about market risk, rather than credit risk, by claiming Merrill should have measured the value of its CDOs by reference to the ABX and TABX, two market indices reflecting the prices of credit default swaps on MBSs. Plaintiffs argue (incorrectly) that these indices purportedly "track prices of certain CDOs." (Opp'n at 18.)  Even if that were so, there are a great number of factors that might affect the market price of debt securities, including interest rate fluctuations and liquidity.  See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343 (2005) (noting the "tangle of factors affecting price" of a security).  Plaintiffs do not allege facts showing that the decline in market value of CDOs they claim occurred in the first half of 2007 was tied to the realization of a credit risk concentration.  Indeed, they focus on Merrill's supposed inability to sell CDO tranches, i.e., illiquidity, as evidence of the purported market value decline.  (Opp'n at 16.)

Plaintiffs point to Merrill's disclosures in its November 7, 2007 third quarter 10-Q as a supposed concession that it had a significant credit risk concentration in CDOs.  (Opp'n at 32.)  But that disclosure concerned the decline in market value of the CDOs after the third quarter credit crisis emerged and after the credit rating agencies first began downgrading senior CDO tranches.[38]  (ML Mem. at 4 n.4.)  As this Court recently noted, the fact that defendants make a disclosure in one document does not mean their failure to make a similar disclosure in other documents is a material omission.  Good Hill Partners, 2008 WL 4761921, at *3.

Ultimately, Plaintiffs' argument that Merrill failed to disclose a credit risk is, as with their ABX argument, a nonactionable disagreement with Merrill's business decisions.  See Hinerfeld v. United Auto Group, 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601, at *20-21

---

[38]  Similarly, Plaintiffs point to Merrill's third quarter disclosure of credit valuation adjustments related to hedges with monoline insurers (Opp'n at 31), but cannot allege that Merrill knew earlier that the credit crisis would undermine the credit worthiness of the monolines.

(S.D.N.Y. July 15, 1998) (failure to disclose "substantial" credit risks from rapid expansion amounted to inactionable disagreement over adequacy of loan loss reserves). In <u>In re National Golf Properties, Inc. Sec. Litig.</u>, 02 Civ. 1383, 2003 U.S. Dist. LEXIS 4321 (C.D.Cal. Mar. 19, 2003) (Opp'n at 25, 31-32), the alleged credit risk concentration included a $27 million note defendants knew the borrower could not repay and which represented 28% of National Golf's assets. <u>Id.</u> at *15-16. There is no analogy to be drawn to the facts alleged here.

## 2. Merrill Did Not Violate GAAP by Misstating the Value of Its CDOs

As discussed above, Plaintiffs have not alleged that Merrill failed to appropriately mark its CDOs. <u>Supra</u>, at 8-11. Plaintiffs do not contest that the valuation of complex, illiquid securities is highly judgmental and amounts to an opinion. And they allege no facts relating to the many factors that may be considered in valuing CDOs. They also cannot point to any other financial institution that began marking down super senior CDOs before Merrill or any basis for concluding that Merrill's valuations were both objectively and subjectively false. (ML Mem. at 51-55.) As such, their claim that Merrill violated GAAP is meritless.

## 3. Plaintiffs Have Not Pleaded Any Misleading Statements About Merrill's Subprime Exposure

According to Plaintiffs, Merrill undertook additional disclosure obligations because the defendants supposedly "made a series of statements calculated to convey a highly misleading impression that the Company's exposure to subprime mortgages was minimal and its risk exposure was being well-managed." (Opp'n at 22.) Plaintiffs argue, citing pre-PSLRA cases, that it is enough for them to allege that the disclosures left them with an inaccurate "impression" of Merrill's subprime exposure. (Opp'n at 20-22.)

Plaintiffs' "impression" approach is at odds with the PSLRA, which requires Plaintiffs to plead what was false and why. <u>See</u> <u>Metzler Inv.</u>, 540 F.3d at 1070-71 (claim that

43

statements created a "'false impression'" that defendants ran their business properly insufficient under PSLRA); Resnik v. Swartz, 303 F.3d 147, 153-54 (2d Cir. 2002) (rejecting argument that challenged statement "misleadingly minimize[d]" compensation scheme by creating "false impression" that stock option plans had no value until date of exercise"); In re AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576, 589-90 (S.D.N.Y. 2006) (rejecting "false impression" approach of In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990)); AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 382 n.2 (S.D.N.Y. 2003) ("overall impression" approach does not meet pleading requirements).[39]

        In any event, Plaintiffs challenge defendant Edwards' opinion that the dislocation in the subprime mortgage market "did not impede the overall momentum of our franchise," but they cannot explain why a statement of opinion regarding Merrill's entire, wide-ranging businesses gave a false impression regarding the CDO business, which Plaintiffs concede accounted for only 1 to 2% of revenues at the time.[40]  Merrill and Edwards repeatedly warned of the potential risks.  (ML Mem. at 17; Edwards Mem. at 17.)  The "overall momentum" statement was made at a time (April 2007) before the credit crisis had seriously undermined the value of

---

[39]  Likewise, McMahan & Co. v. Wherehouse Entm't, Inc., 900 F.2d 576 (2d Cir. 1990) (Opp'n at 21), predates the PSLRA and was decided on summary judgment.  Virginia Bankshares v. Sandberg, 501 U.S. 1083 (1991) (Opp'n at 21), addressed, like Fogarazzo v. Lehman Bros., Inc., 341 F. Supp. 2d 274 (S.D.N.Y. 2004) (Opp'n at 26), the falsity of an opinion and not the PSLRA pleading standards.  DeMaria v. Andersen, 318 F.3d 170 (2d Cir. 2003) (Opp'n at 21), held that the failure to include revenue information in a prospectus did not render the prospectus materially misleading, and contrary allegations were "demonstrably untrue."

[40]  Similarly, Plaintiffs allege in the second quarter of 2007, Merrill disclosed that "significant risks remain that adversely impact these exposures" (Opp'n at 36) (when Merrill really stated "significant risk remains that could adversely impact . . . " (Compl. ¶ 294 (emphasis added).)  Plaintiffs fault Merrill for failing to "quantify these exposures."  Yet, examining the context of the statement, Merrill was clear that:  the CDO market was challenging, those challenges were intensifying, and Merrill was a significant participant in that market.  Plaintiffs do not posit how Merrill had any duty speculate about these exposures.  See Par Pharm., 733 F. Supp. at 678 (no duty to speculate) (cited in Opp'n at 21).

Merrill's CDO holdings.[41]  In this pre-credit crisis context, Edward's opinion cannot reasonably be viewed as false.

For the same reasons, Plaintiffs cannot explain why Merrill's disclosure that its CDO business amounted to 1-2% of revenues "suggested that the subprime business was a minor part of Merrill's business."  (Opp'n at 72.)  Plaintiffs cannot argue that the statement regarding revenue was itself inaccurate, or that the revenues, as this Court held in In re Razorfish, Inc. Sec. Litig., 00 Civ. 94747, 2001 U.S. Dist. LEXIS 14756, at *6 (S.D.N.Y. Sept. 19, 2001) (Rakoff, J.) "had not in fact occurred."  Viewed in context, there is nothing about the statements regarding Merrill's revenues that could be taken as a comment on its exposure to asset write-downs.  (ML Mem. at 67.)  Instead, the more compelling inference is that they reflect a then-held belief that the only risk to Merrill was from the possibility that revenue from its CDO business would slow down, not that the CDOs themselves would lose value.  As this Court held in Good Hill, a plaintiff may not support a securities fraud claim based on its beliefs and interpretations of factually true statements.  See 2008 WL 4761921, at *3-4.

Moreover, Plaintiffs cannot grapple with the undisputed fact that Edwards specifically advised investors that Merrill would not disclose its asset allocations.  (Compl. ¶ 279.)  In light of this admonition, no reasonable investor could believe Merrill's statement regarding its revenues from the CDO business was meant to imply the Company had minimal CDO holdings.  See Azzolini v. CorTS Trust II for Provident Fin. Trust I, 03-CV-1003, 2005

---

[41]   In In re Van der Moolen Holding N.V. Sec. Litig., 405 F. Supp. 2d 388 (S.D.N.Y. 2005) (Opp'n at 29), and In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (Opp'n at 29), the defendants were alleged to know facts rendering their disclosures false.  Van der Moolen, 405 F. Supp. 2d at 400-01 (illegal proprietary trading); Vivendi Universal, 381 F. Supp. 2d at 182 (debt rating downgrade).  As discussed supra, at 13-20, no such knowledge before the 2007 third quarter is sufficiently alleged here.

U.S. Dist. LEXIS 31853, at *20-22 (E.D. Tenn. Sept. 16, 2005) (no duty to disclose lack of due diligence regarding certain assets where Defendants advised they would not be conducting due diligence).  That Merrill had extensive exposure to subprime assets was apparent from its disclosures regarding the volume of its securitization business (ML Mem. at 21-22), the "large and increasing amount of its proprietary trading positions in fixed income . . . investments" (ML Mem. at 17), and its undisputed position as a leader in securitizing and trading financial products backed by subprime mortgages (Compl. ¶¶ 18, 219).

        Similarly, Plaintiffs cannot back up their charge that Edwards' statement in April 2007 that, while acknowledging "a more difficult environment, we continued to see an ability to transact and to move volume" was deceptive.  As discussed above, the anecdotal, insufficiently sourced allegations regarding customer complaints do not show that Merrill's CDO business had dried up in the first quarter.  Indeed, Plaintiffs admit that CDO volume remained high during the first half of 2007.  (Compl. ¶¶ 24, 246.)  They have simply not pleaded a false statement.

        Lastly, Plaintiffs concede their failure to allege that Edwards' July 17, 2007 statements regarding his views of the effectiveness of Merrill's risk management and hedging strategy were false.  Instead Plaintiffs argue that the statements were misleading because "they were designed to convince the market" that Merrill's exposure to CDOs was minimal.  (Opp'n at 26.)  But, as explained in Merrill's opening brief, Plaintiffs cannot point to facts showing that Merrill's risk management procedures were not, as of July 17, 2007, effective, let alone that Edwards did not honestly believe the opinion he was expressing.  (ML Mem. at 68-69.)  As this Court recently held, these opinions cannot serve as the basis for actionable misstatements.  See Good Hill Partners, 2008 WL 4761921, at *3-4; see also Fremont Gen. Corp., 2008 WL 4812021, at *10-11 (statement of opinion as to quality of underwriting practices not actionably false).

4.    **Plaintiffs Have Failed To Allege Any False Statement Regarding Risk Management**

As explained in Merrill's opening brief, Plaintiffs have failed to allege any false statements regarding Merrill's overall risk management procedures. (ML Mem. at 68-73.) See also Duke Energy, 282 F. Supp. 2d at 160 (failure to allege how controls were falsely represented was fatal to plaintiffs' claim). First, Plaintiffs allegations regarding how risk management supposedly failed or was overridden (Kronthal, Ownit, etc.) are not pleaded with particularity and are unsourced. But even accepting Plaintiffs' hyperbole, at best they have alleged a failure of risk management in one of Merrill's many businesses. That does not equate to alleging that Merrill's statements regarding its firm-wide procedures were false. (ML Mem. at 71.) Plaintiffs do not respond to this point.[42]

Second, Plaintiffs cannot contest that many of the statements they challenge amount to opinions and nonactionable generalizations. They do not respond to the examples Merrill gave (ML Mem. at 69-70) and instead simply string cite, without explanation, other paragraphs of the Complaint they contend are more specific. (Opp'n at 73.) They are not.

Third, Plaintiffs cannot refute that the statements relating to market risk, including Merrill's VaR calculation, and statements regarding how it expected its hedges to perform, are protected by the safe harbor for forward-looking statements. SEC Rules, which Plaintiffs do not discuss, specifically provide that market risk disclosures are covered by the safe harbor. (ML Mem. at 71.) Plaintiffs offer the canned response that the statements are not protected because they "contain assertions of existing and historical fact" but do not explain what these are. (Opp'n

---

[42]    In the cases Plaintiffs cite (Opp'n at 76-77), the defendants allegedly knew facts about internal controls rendering their disclosures false. See Shapiro, 964 F.2d at 276 n.6 (defendants knew collateralization, recognition and accounting for problem loans were not "conservative"); Ballan v. Wilfred Am. Educ. Corp., 720 F. Supp. 241, 253 (E.D.N.Y. 1989) (defendants knew of ongoing criminal activity).

at 78.) They also say that Merrill's extensive risk disclosures (<u>see</u> Merrill 10-K (2006), at 52 (Ex.

V)), do not qualify as "meaningful cautionary language" within the meaning of the safe harbor,

but do not explain why. These half-hearted responses are tantamount to conceding the argument.

Lastly, Plaintiffs cannot explain how Merrill's statements regarding its

underwriting practices for its residential real estate portfolio were false and misleading. Among

other things, the challenged statements describe Merrill's overall direct loan portfolio, not the

subprime collateral purchased for its securitization business. In any event, the allegations

regarding supposed lapses in underwriting standards at Ownit and other originators lack an

adequate source, as discussed above, and concern the originators' practices, not Merrill's.

Plaintiffs cite a statement that Merrill-originated loans were extended "predominantly" to high

credit quality borrowers (Opp'n at 72-73), and argue that Merrill failed to disclose that

purportedly low credit quality borrowers were a "material portion" of its RMBS portfolio. Even

if the statements about loans could be read to apply to the RMBS portfolio (they cannot),

Plaintiffs do not allege what this "material" portion is, or why the use of the term

"predominantly" was misleading.

### F.    Plaintiffs' Rule 10b-5(a) and (c) Claims Fail as a Matter of Law

Plaintiffs argue that they need not plead the falsity of any statement because they

pleaded "scheme liability" under Rule 10b-5(a) and (c). (Opp'n at 89-93.) But Plaintiffs do not

address the fundamental defect undermining their Rule 10b-5(a) and (c) claim alleging a

"manipulative and deceptive device" (Compl. ¶ 419), namely, that where the heart of the

purported "scheme" is allegedly defective disclosures, a claim alleging a "manipulative and

deceptive device" does not lie. <u>See</u> <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 101

(2d Cir. 2007) ("A market manipulation claim . . . cannot be based solely upon

misrepresentations or omissions.") (citing <u>Lentell</u>, 396 F.3d at 177).

48

Here, the allegedly manipulative acts, such as overriding risk controls, lowering underwriting standards and concealing losses (Compl. ¶ 419), could not have misled the market, since they allegedly were concealed.  At best, these acts are alleged to have contributed to or facilitated the subsequent misstatements that form the basis for the disclosure claim under Rule 10b-5(b).  In Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 769-70 (2008), the Supreme Court held that conduct giving rise to, or facilitating, the making of misstatements is not independently actionable apart from any alleged misstatements because investors do not rely on such conduct, rejecting the logic of cases such as In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 489-90, 505 (S.D.N.Y. 2005), In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319, 335 (S.D.N.Y 2004), and In re Lernout & Hauspie Sec. Litig., 236 F. Supp. 2d 161, 171-73 (D. Mass. 2003), relied upon by Plaintiffs (Opp'n at 92-93 & n.73).  See also Morrison v. Nat'l Australia Bank, Ltd., 07-0583-cv, 2008 U.S. App. LEXIS 21986, at *28-29 (2d Cir. Oct. 23, 2008) (noting "lengthy chain of causation" between public misstatements and accounting manipulations).[43]

---

[43]  Plaintiffs do not plead a claim for "market manipulation" and accordingly their other authorities (Opp'n at 91 n.71), are also inapposite.  In re Sterling Foster & Co. Sec. Litig., involved manipulative trading conduct, not alleged here, that affected the market for certain securities independent of any alleged misstatements.  See 222 F. Supp. 2d 216, 228-29 (E.D.N.Y. 2002); see also In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 345-46 (S.D.N.Y. 2003) (customers required to enter into tie-in agreements to purchase additional stock at higher prices in order to obtain shares in IPO allocation); In re Blech Sec. Litig., 961 F. Supp. 569, 576 (S.D.N.Y. 1997) (sham transactions and manipulative trading); Vandenberg v. Adler, 2000 U.S. Dist. LEXIS 4050, at *2-3 (S.D.N.Y. Mar. 31, 2000) (pump and dump scheme); United States v. Bongiorno, 05 Cr. 390, 2006 U.S. Dist. LEXIS 24830, at *4-6 (S.D.N.Y. May 1, 2006) (illegal trading practices by a NYSE specialist) (Opp'n at 92).

## II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTIONS 11 AND 12(A)(2) OF THE SECURITIES ACT

### A.    Pleading Standards

#### 1.    Plaintiffs' Allegations Sound in Fraud and Are Subject to Rule 9(b)

Plaintiffs have failed to explain why their allegations should not be subject to Rule 9(b) given that, as Judge Preska recently observed in dismissing a complaint alleging violations of Section 11, "at its core, the complaint is predicated on allegations of fraudulent conduct." Ladmen Partners, Inc. v. Globalstar, Inc., 07 Civ. 0976, 2008 U.S. Dist. LEXIS 76670, at *32, 35-36 (S.D.N.Y. Sept. 30, 2008). In determining whether Plaintiffs' stratagem of "physically separating" the complaint into two parts should absolve them from complying with Rule 9(b), the policy underlying the rule must be considered. As the Eleventh Circuit observed, adopting Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004), in Wagner v. First Horizon Pharmaceutical Corp., 464 F.3d 1273, 1278 (11th Cir. 2006), "[t]he purpose of the rule is to protect a defendant's good will and reputation when that defendant's conduct is alleged to be fraudulent." Thus, the '33 Act claims "must be pled with particularity when the facts underlying the misrepresentation at stake are said to be part of a fraud claim, as alleged elsewhere in the complaint." Id. at 1296; see also Johnson v. NYFIX, Inc., 399 F. Supp. 2d 105, 122 (D. Conn. 2005).

Here, while Plaintiffs argue that their fraud claims are supported by additional facts (Opp'n at 112), they do not deny that every supposed "fact" supporting the Securities Act claims – the GAAP, AIG and monoline allegations – is "said to be part of" the fraud alleged in the first part of their Complaint. Having made the charge of fraud, Plaintiffs must back it up with particularity, no matter how they structure their Complaint.

The cases Plaintiffs cite as supposedly permitting their physical separation approach did not consider how that approach would undermine the policies behind Rule 9(b). (Opp'n at 109.)  See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 272-73 (3d Cir. 2006); Refco, 503 F. Supp. 2d at 633.  Moreover, in Refco the court required more than just a physical separation of the claims, it also required a separation of "the substance of the allegations."  Id.  In Refco, the plaintiffs satisfied this requirement because the '33 Act claims were "carefully couched in the language of negligence."  503 F. Supp. 2d at 632.[44]  Here, no effort was made to couch the claims in negligence.  To the contrary, Plaintiffs' claim that Merrill overvalued its CDO holdings sounds in fraud because, as discussed above, the valuation of a complex security is a matter of informed opinion that may be considered false only if it is both objectively and subjectively false.  Infra, at 9.  (ML Mem. at 81.)  Plaintiffs' allegation that Merrill's press release and other disclosures about its performance were false because defendants supposedly "failed to disclose that the reported increases in revenue came at the expense of exposing Merrill to billions of dollars of risk in U.S. subprime exposures" implies that the defendants knew but intentionally withheld known adverse information.  See Ladmen Partners, 2008 U.S. Dist. LEXIS 76670, at *35-36 (allegations that imply contrary knowledge when "reviewing and/or disseminating the misleading statements and information" are tantamount to allegations of fraudulent conduct); In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 690 n.4 (S.D.N.Y. 2004) ("[A]n allegation that defendants reported that loan loss reserves were adequate despite "already knowing at the time of filing. . .that the Company did not have

---

[44]  Similarly, the *dicta* of In re Alstom SA Sec. Litig., which Plaintiffs attempt to portray as "precisely the approach [they] have taken" (Opp'n at 110 n.90), requires that the Securities Act claims be couched in negligence while "antiseptically excis[ing] all references to . . . 'fraud' . . . or any deed imputing [fraud]."  406 F. Supp. 2d 402, 411 n.3 (S.D.N.Y. 2005).

adequate reserves," unquestionably sounds in fraud. . . .") (citation omitted); <u>Belodoff v. Netlist,</u> <u>Inc.,</u> SA CV 07-00677, 2008 U.S. Dist. LEXIS 45289, at *16-17 (C.D. Cal. May 30, 2008) (allegation of failure to disclose act that was necessarily "deliberate" in nature "carries the implied allegation of intent to [deceive]" and thus necessarily sounds in fraud).[45]

### B.    Plaintiffs Fail To Plead Any Untrue Statements or Actionable Omissions

Even under the less stringent Rule 8(a) requirements, Plaintiffs' '33 Act claims fail.  Plaintiffs disingenuously contend that their "claims are premised on the nondisclosure of material facts that existed at the time Defendants made untrue statements or omitted material facts."  (Opp'n at 105-06.)  But, because their claims are premised on hindsight, they fail to explain why "defendant[s] possessed the omitted information at the time the registration statement became effective."  <u>In re JPMorgan Chase Sec. Litig.,</u> 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005); <u>Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,</u> 114 F. Supp. 2d 316, 323 (D.N.J. 2000) (plaintiffs failed "to allege contemporaneous facts to support their theory that the . . . problems that materialized" "were known or knowable . . . at the time of the offering."); <u>In re</u> <u>Arbinet-thexchange, Inc. Sec. Litig.,</u> 05-4404, 2006 U.S. Dist. LEXIS 93580, at *27 (D.N.J. Dec. 22, 2006) ("Plaintiffs merely ask the Court to draw that inference based on subsequent events[.]").  Plaintiffs also completely fail to address Merrill's argument that the conclusory allegations' lack of specificity does not allow a court to determine materiality.  <u>See</u> <u>Garber v.</u> <u>Legg Mason, Inc.,</u> 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008).  Plaintiffs contend that they adequately allege Merrill's purported "huge concentration" of CDOs its allegedly "insufficient"

---

[45]    In <u>Atlas Air</u> (Opp'n at 109), the court observed:  "The application of Rule 9(b) to § 11 claims is logical when the plaintiffs employ . . . [fraud by hindsight] pleading . . . because *the only allegations supporting falsity are the plaintiffs' allegations relating to fraudulent intent.*" <u>Atlas Air</u>, 324 F. Supp. 2d at 503 (emphasis added).  Plaintiffs' '33 Act and Proxy Claims fit squarely into this scenario.

risk management and its supposed GAAP violations.  (Opp'n at 105-06.)  Yet they fail to address

the argument that these allegations are either, at best, claims of mismanagement, see Hinerfeld,

1998 U.S. Dist. LEXIS 10601, at *21, or matters of opinion which must be subjectively and

objectively false to be actionable, see In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477,

489 (S.D.N.Y. 2004); CIT Group, 349 F. Supp. 2d at 691.  (ML Mem. at 80-81.)

## C. Plaintiffs Lack Standing Under Section 11 and Section 12(a)(2) With Respect to Certain of the Preferred Stock Offerings

Plaintiffs' contention that "Lead Plaintiff has standing to assert all Securities Act

Section 11 and Section 12(a)(2) claims by virtue of its position as Lead Plaintiff" (Opp'n at 115)

is not the law of this Circuit.  See In re Global Crossing Ltd. Sec. Litig., 313 F. Supp. 2d 189,

205 (S.D.N.Y. 2003) (no standing where neither lead plaintiff nor any named plaintiff could

trace his, her or its shares to offering); accord In re Authentidate Holding Corp. Sec. Litig., 05

Civ. 5323, 2006 U.S. Dist. LEXIS 47971, at *19-21 (S.D.N.Y. July 14, 2006).[46]  The one case

Plaintiffs cite (Opp'n at 115), In re PMA Capital Corp. Sec. Litig., 03 Civ. 6121, 2005 U.S. Dist.

LEXIS 15696, at *58-59 (E.D. Pa. July 27, 2005), misconstrued the Second Circuit's decision in

Hevesi v. Citigroup, Inc., 366 F.3d 70, 82-83 (2d Cir. 2004), as not requiring any named plaintiff

to have standing, when all the Second Circuit held was that lead plaintiff need not have standing

to pursue every claim on behalf of the class *where other named plaintiffs did have standing*.  In

---

[46]  See also In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 257 (S.D.N.Y. 2004) (lead plaintiff need not have standing to sue on every claim "so long as other named plaintiffs have standing to pursue the claims at issue").  In In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 422 (S.D.N.Y. 2003) (Opp'n at 122), the court simply held that lead plaintiff was not required to have standing where other named plaintiffs had standing to assert the claims lead plaintiff did not.  In re Saxon Sec. Litig., 80 Civ. 3103, 1984 U.S. Dist. LEXIS 19223, at *18-19 (S.D.N.Y. Feb. 23, 1984) (Opp'n at 114), did not address standing.  Levine v. Atricure, Inc., 508 F. Supp. 2d 268, 273-74 (S.D.N.Y. 2007) (Opp'n at 116-17), did not concern whether a plaintiff could assert claims based on shares it did not purchase.

this Circuit, Lead Plaintiff has the "responsibility to identify and include named plaintiffs who have standing to represent the various . . . subclasses of plaintiffs, and has failed to do so here." Global Crossing, 313 F. Supp. 2d at 205.

Plaintiffs also argue that plaintiff Kosseff has standing to assert claims on behalf of all purchasers of all classes of Merrill stock issued pursuant to a March 31, 2006 shelf registration. (Opp'n at 115-16.) But Plaintiffs' claims are not based on the pre-class period shelf registration and they cannot allege that Kosseff can trace his shares to the post-effective amendments, which were different for each offering, that supposedly incorporated misleading statements. (Compl. ¶¶ 449, 451, 458, 463.) All of Plaintiffs' standing arguments ultimately fail because they "lack standing for claims relating to [securities] in which they did not personally invest." Hoffman v. UBS AG, 05 Civ. 6817, 2008 U.S. Dist. LEXIS 85065, at 19-20 (S.D.N.Y. Oct. 22, 2008) (even where securities were "substantially identical," plaintiffs must show individual standing for each mutual fund offering).[47]

### D.    Plaintiffs' Claims Also Fail for Lack of Loss Causation

Plaintiffs' drawn-out discussion of the burden of proof on loss causation in Securities Act cases does not change the fact that courts routinely dismiss section 11 and section 12(a)(2) claims where it is apparent that the losses were not attributable to the allegedly untrue statement or omission. (ML Mem. at 83.) As shown above, Plaintiffs' alleged losses are not attributable to any alleged misrepresentations. (ML Mem. at 57-62.)

## III.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 14(A)

Plaintiffs completely fail to address Defendants' arguments that the Section 14(a) claims are, among other things, subject to the PSLRA and require allegations of loss causation.

---

[47] Merrill incorporates Deloitte & Touche's arguments in its reply brief on this point.

(ML Mem. at 84.)  Accordingly, they have conceded their failure to plead a claim under Section

14(a).  See IIT v. Cornfeld, 619 F.2d 909, 916 n.8 (2d Cir. 1980).

## IV.    LEAVE TO AMEND SHOULD BE DENIED

Plaintiffs – who have already filed five complaints and had more than six months

to investigate their claims – include a pro forma request to amend in the conclusion of their brief.

Such a "bare request" for leave to amend is properly denied.  See Gurary v. Winehouse, 235 F.3d

792, 801 (2d Cir. 2000) (citation omitted).

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York
             November 14, 2008

                                                      /s/ Jay B. Kasner
                                    Jay B. Kasner (jay.kasner@skadden.com)
                                    Christopher P. Malloy (christopher.malloy@skadden.com)
                                    Scott D. Musoff (scott.musoff@skadden.com)
                                    Joanne Gaboriault (joanne.gaboriault@skadden.com)
                                    SKADDEN, ARPS, SLATE,
                                       MEAGHER & FLOM LLP
                                    Four Times Square
                                    New York, New York  10036
                                    (212) 735-3000

                                    Attorneys for Defendants
                                       Merrill Lynch & Co., Inc.,
                                       Merrill Lynch Capital Trust I,
                                       Merrill Lynch Capital Trust II,
                                       Merrill Lynch Capital Trust III and
                                       Merrill Lynch, Pierce, Fenner &
                                       Smith Incorporated