# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (JSR) (DFE) |
| This Document Relates to: Louisiana Sheriffs' Pension and Relief Fund, et al. v. Conway, et al., 08cv9063 (JSR)(DFE) | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 11, 12 and 15 OF THE SECURITIES ACT OF 1933** |

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
John P. Coffey
Mark Lebovitch
Kurt Hunciker
Bruce Bernstein
Karine Louis
Sean O'Dowd
1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Bond Counsel and Attorneys for Louisiana Sheriffs' Pension and Relief Fund and Louisiana Municipal Police Employees' Retirement System*

Dated:  March 13, 2009

I.     INTRODUCTION ................................................................ 2

II.    JURISDICTION AND VENUE .......................................... 7

III.   PARTIES ............................................................................ 8

       A.  Plaintiffs ................................................................... 8

       B.  Defendants ............................................................. 10

            1.   Merrill ............................................................ 10

            2.   Individual Defendants .................................. 10

            3.   Underwriter Defendants ............................... 14

IV.    SUBSTANTIVE ALLEGATIONS ................................. 16

       A.  The Offering Materials Made Material Misstatements And Omissions
           Regarding The Amount Of Merrill's Subprime Mortgage-Linked Exposures .......... 17

            1.   Merrill Misstated and Omitted Material Facts Concerning
                 the Company's Exposure to CDOs Backed by Non-Prime Mortgages ........ 17

                 (i)     Overview of Merrill's CDO and RMBS Business ............................ 17

                 (ii)    Beginning in 2006, the Housing Market Plummeted, Exposing the
                         Holders of CDO Securities to Large Losses ...................................... 22

                 (iii)   Merrill Belatedly Disclosed Its Exposure to Subprime-Backed CDOs
                         and RMBS ........................................................................................ 27

            2.   Merrill Misstated the Amount of the Company's Monoline Exposures ......... 32

            3.   Merrill Violated GAAP By Failing To Properly Disclose The Amount of Its
                 Subprime-linked Exposures ........................................................................ 36

       B.  The Offering Materials Made Material Misstatements And Omissions Regarding The
           Value of Merrill's Mortgage-related Assets ............................................................. 38

       C.  The Offering Materials Made Specific Misstatements and Omissions Regarding
           Merrill's Internal Controls ...................................................................................... 45

       D.  The BofA Acquisition and U.S. Government Bailout Revealed The Full Amount and
           Toxic Nature of Merrill's Mortgage-Related Assets ................................................ 50

V.     SUMMARY OF MERRILL'S SECURITIES OFFERINGS ........................................... 54

VI.   MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS......................................................................................... 57

    A. Misstatements and Omissions in Offering Materials Prior to October 2007.............. 58

    B. Misstatements and Omissions in Offering Materials Beginning October 2007 ......... 65

        1.    The October 5, 2007 Press Release and Form 8-K......................................... 65

        2.    The October 24, 2007 Press Release and November 7, 2007 Form 10-Q ...... 65

        3.    The January 17, 2008 Press Release and 2007 Form 10-K ........................... 67

        4.    First Quarter 2008 Disclosures ..................................................................... 69

VII.   CLASS ACTION ALLEGATIONS ............................................................... 70

VIII.  CAUSES OF ACTION ................................................................................... 72

COUNT I  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST MERRILL ............................................................................................... 72

COUNT II  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST THE INDIVIDUAL SECTION 11 DEFENDANTS ........................................ 73

COUNT III  FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST THE UNDERWRITER DEFENDANTS ........................................ 76

COUNT IV  FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT AGAINST MERRILL ................................................................................. 79

COUNT V  FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT AGAINST THE UNDERWRITER DEFENDANTS ....................................... 81

COUNT VI  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT  AGAINST THE INDIVIDUAL DEFENDANTS .................................................................. 83

COUNT VII  FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST MERRILL AS THE CONTROLLING ENTITY OF UNDERWRITER MLPF&S ........ 85

Plaintiffs Louisiana Sheriffs' Pension and Relief Fund ("Louisiana Sheriffs"), Louisiana Municipal Police Employees' Retirement System ("LAMPERS"), National Electrical Contractors Association – International Brotherhood of Electrical Workers ("NECA-IBEW"), Iron Workers Locals 40, 361, 417 Union Security Funds ("Iron Workers"), Iron Workers Local 580 Joint Funds ("Iron Workers 580"), City of Pontiac Police and Fire Retirement System ("Pontiac Police"), and City of Pontiac General Employees Retirement System ("Pontiac General") (collectively, "Plaintiffs"), bring this action individually and on behalf of all persons and entities, except Defendants (listed at ¶¶ 28-56 below) and their affiliates, who acquired securities in or traceable to the publicly registered offerings set forth in Appendix A, and were damaged by the circumstances described herein.

Plaintiffs allege the following based upon personal knowledge as to themselves and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, among other things, the investigation of Bond Counsel, Bernstein Litowitz Berger & Grossmann LLP. This investigation included, but was not limited to, (1) interviews with former employees of Merrill; (2) a review of public filings with the Securities and Exchange Commission ("SEC"), available news and research reports by securities analysts, transcripts of Merrill investor conference calls, economic analyses of securities pricing data, and publicly available legal actions involving Merrill; and (3) consultation with various relevant experts. Plaintiffs' investigation continues, and many of the facts related to Plaintiffs' allegations are exclusively within the custody of the Defendants named herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# I.     INTRODUCTION

1.      Between October 2006 and May 2008, Merrill Lynch & Co., Inc. ("Merrill") – once one of the leading investment banks on Wall Street – sold to the investing public more than $25 billion of debt and preferred securities pursuant to a shelf registration statement and numerous prospectuses (the "Offering Materials," as further identified at ¶¶ 157-58 below) containing material misstatements and omissions. Specifically, the Offering Materials failed to accurately disclose the existence and value of tens of billions of dollars of complex derivative securities linked to subprime residential mortgages.

2.      These undisclosed and (once disclosed) misvalued mortgage-linked securities nearly wiped Merrill out by September 2008. Indeed, these exposures nearly toppled Merrill's white knight acquirer, banking giant Bank of America Corporation ("BofA"), just a few months later. BofA initially agreed to pay $50 billion for the much smaller Merrill after reviewing, at least, the periodic filings incorporated into the Offering Materials. After BofA gained full access to Merrill's non-public business records, however, BofA informed the U.S. government that, in the absence of a staggering $138 billion bailout, BofA would refuse to close its purchase of Merrill's toxic security-ridden balance sheet. This stunning turn of events, even viewed in isolation, strongly supports an inference that the Offering Materials failed to portray accurately Merrill's financial position and exposure to risky mortgage-linked securities.

3.      Based on the material misstatements and omissions alleged herein, Plaintiffs, on behalf of all aggrieved purchasers of the securities at issue in this case (the "Offerings," which are listed at ¶ 157), allege strict liability claims against Merrill and certain directors, officers, and underwriters pursuant to Sections 11, 12 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77l(a) and 77o ("Securities Act"). Merrill's and the other Defendants' conduct or state of

mind is not an element of any of the claims stated herein. Accordingly, Plaintiffs do not accuse any Defendants of making misrepresentations with fraudulent intent.

4. To the contrary, as explained herein, during the time of the Offerings, Merrill's risk controls and risk management processes failed, and as a result, Merrill's complex web of global banking and trading operations failed to accurately report and value tens of billions of dollars of its wide variety of mortgage-linked exposures. To the extent any Defendant's conduct is described herein, Plaintiffs intend only to suggest that the alleged misstatements and omissions arise from that Defendant's error or negligence and that reasonable diligence by the Defendants other than Merrill (which has no affirmative defense based on its investigation) would have uncovered these defects in the Offering Materials.

5. Between 2004 and 2007, Merrill was among the world's leading originators and sellers of collateralized debt obligations ("CDOs") backed by subprime mortgages. Merrill failed to inform investors in the Offerings, however, that by mid-2006, Merrill's CDO underwriters and traders were largely unable to sell billions of dollars of CDO paper, which therefore accumulated on the Company's balance sheet. Merrill's undisclosed exposure to subprime mortgage-backed CDOs was highly material and constituted a significant concentration of credit risk, exceeding $50 billion by the middle of 2007.

6. As the Company's cumulative exposure to subprime-backed CDOs was ballooning, its public reports made material misstatements and omissions to investors regarding Merrill's exposure to subprime-related securities. For example, in its April 19, 2007 earnings press release, Merrill reported limited exposure to subprime mortgages, stating that "U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters." Not only did this

disclosure ignore Merrill's subprime CDO-related revenues, which exceeded the reported 1% threshold, but this statement also omitted that the amount of Merrill's exposure to CDOs was more than enough to wipe out several years' profits.

7.     On October 5, 2007, Merrill first disclosed that it would take a $4.5 billion loss from CDO and subprime exposures.  On October 24, 2007, Merrill revised these write-downs to $7.9 billion.  This amount, taken alone, wiped out all of Merrill's reported earnings for the year.  Nevertheless, the Offering Materials omitted to disclose Merrill's full gross exposure to CDOs until January 17, 2008, when the Company admitted that its ownership of CDOs was more than $50 billion before its reported write-downs.

8.     Confirming that severe defects in Merrill's risk controls and financial reporting were central to Merrill's repeated misstatements in the Offering Materials, incoming CEO John Thain told *The Wall Street Journal* in January 2008 that the most "shocking" thing he found upon his arrival was Merrill's "lack of understanding of the risk in these positions and the lack of balance sheet control."  He added that the Company's key risk control committee "just didn't function."  During a January 16, 2008 investor conference call, Thain explained that due to these risk control failures, trading desks not only assumed risks that could wipe out their business' annual earnings, but that they took risks that could – and did – "wipe out the earnings of the entire firm."  Having admitted Merrill's prior risk management failures, however, Thain was unable to solve these problems over the next year.

9.     Merrill's failure to disclose to investors in the 2008 Offerings the amount and value of other types of mortgage-linked exposures illustrates how Merrill's reporting problems persisted.  Investors became concerned when Merrill disclosed, in late 2007 and in its fourth quarter 2007 earnings release, that Merrill had hedged its CDO exposures with a material $19.9

billion of credit default swaps ("CDS") with financially decimated monoline financial guarantors. Notwithstanding these concerns, Merrill failed to disclose for another year the full scope of its non-CDO exposure to monolines.

10.     The truth only emerged on January 16, 2009, when BofA's Chief Financial Officer reported that the U.S. government's historic bailout covered about $50 billion of "credit default swaps with monoline financial guarantors, excluding those I just mentioned covering the U.S. ABS CDOs." Then, having never before detailed the Company's non-CDO related monoline exposures in any of the Offering Materials, Merrill's 2008 Form 10-K, filed on February 24, 2009, included for the first time a table disclosing the existence and composition of this $50 billion in risky exposure.

11.     Merrill's reporting of the *value* of its mortgage-linked exposures in the Offering Materials was also deeply flawed and misstated. By late 2006, there was a significant spike in defaults in the mortgages that provided the cash flows needed to support Merrill's mortgage-linked derivatives. In June 2007, multiple funds investing in CDO paper had imploded, as there were no buyers for such exposure and the underlying collateral faced extreme distress.

12.     In January 2008, following Merrill's first rounds of CDO and subprime write-downs, Thain stated that Merrill's CDOs were "valued conservatively" and that its then-current CDO prices "are either saleble [sic] or actually represent good value." Thain was wrong. Merrill's carrying values were far higher than market analysts and indices were indicating and, as a result, Merrill did not find bids even approaching the Company's marks when it tried to sell its CDO portfolio in the first half of 2008. As a result, the late April and May 2008 Offering Materials severely misstated the value of Merrill's failing CDOs.

13.     Investors in the Offerings learned that, in fact, Merrill's CDOs were nearly worthless on July 28, 2008, when Merrill finally completed an actual sale, of about $30 billion par value of CDOs, in a transaction that garnered between six and twenty-two cents on the dollar. This amount was dramatically lower than the values Merrill had reported in its Offerings Materials just weeks earlier.  As one analyst observed, the wide difference between the actual sale value and the reported "saleable" values for the same portfolio strongly suggested that Merrill had widely missed the mark with its prior pricing of those assets: "Why these assets were written down when you're selling them and weren't written down in your earnings is a question . . . .  This kind of announcement is surprising and a little disheartening."  That Merrill took substantial write-downs at the time of this sale, when it should have been pricing its CDOs at around twenty-two cents long before July 2008 (*see* ¶¶ 122, 127 below), illustrated to investors that Merrill had been carrying its CDOs at excessive values through the first half of 2008.

14.     Subsequent events further indicated that the Offering Materials had been materially misstated.  In early September 2008, Lehman Brothers, Inc. ("Lehman"), one of Merrill's Wall Street peers, reported massive write-downs on mortgage-related securities similar to those held by Merrill.  Investors quickly suspected that Merrill was still overvaluing its own positions and inferred that Merrill's days as an independent Wall Street firm were numbered. After the Secretary of the Treasury implored Merrill CEO Thain to find a buyer or face bankruptcy, BofA, then one of the world's largest and most stable banks, agreed to buy Merrill to save it from failure.

15.     BofA naturally had the chance to review the Offering Materials when negotiating its acquisition price for Merrill.  After BofA gained an understanding of Merrill's books, however, it learned the true toxic nature of Merrill's "legacy" assets (as Merrill's Thain

described them).  In December 2008, BofA informed the U.S. government that without massive financial assistance it would cancel the buyout rather than acquire the derivative securities that had effectively destroyed the 94-year old Merrill.  On January 15, 2009, the U.S. Government disclosed a $138 billion financial bailout to induce BofA to complete the acquisition, which included Merrill's remaining CDOs, as well as a $50 billion balance on derivative contracts with failed financial guarantors, an amount that had never before been disclosed.

16.     In sum, considering the haphazard way that Merrill disclosed its highly material exposures to over $100 billion of complex mortgage-linked derivative securities, Merrill's January 2008 concession by its own CEO that the Company's key risk controls "just didn't function," and the highly material discrepancies between Merrill's reported valuations and their then-current true values, it is inescapable that the Offering Materials misstated or omitted to disclose and describe the very exposures that played a central role in destroying Merrill and, absent the U.S. bailout of BofA, would have caused what BofA's CEO, Kenneth Lewis, described as "serious systemic harm."

## II.     JURISDICTION AND VENUE

17.     The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act.  Jurisdiction is conferred over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), and 28 U.S.C. §§ 1331, 1337, and 1367.

18.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v), and 28 U.S.C. §§ 1391(b) and (c).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District, and Merrill maintains its principal executive office in New York, New York.

19.     In connection with the misstatements and omissions of material facts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the mails and telephonic communications, and the facilities of the national securities exchanges.

### III.   PARTIES

**A.   PLAINTIFFS**

20.     Plaintiff Louisiana Sheriffs is a defined-benefit pension fund for sheriffs in the State of Louisiana with $1.6 billion in net assets as of September 30, 2007.  As indicated on the attached certification attached hereto as Exhibit 1, Louisiana Sheriffs purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

21.     Plaintiff LAMPERS is a retirement system under the laws of the state of State of Louisiana, established by Act 189 of 1973, enabling legislation for the purpose of investing and providing retirement allowances and other benefits for full-time municipal police officers and employees in the State of Louisiana, secretaries to chiefs of police and employees of LAMPERS. LAMPERS has total assets of approximately $1.18 billion under investment for its beneficiaries and maintains its principal place of business in East Baton Rouge Parish, Louisiana.  As indicated on the attached certification attached hereto as Exhibit 2, LAMPERS purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

22.     Plaintiff NECA-IBEW, more commonly known as the Decatur Plan, is located in Decatur, Illinois.  The Fund provides benefits to members of thirteen local unions in four different states and is governed by a board of trustees comprised of a union and management trustee from each local area.  Currently, over 2,000 active pensioners receive monthly benefit payments from the Fund.  As indicated on the attached certification attached hereto as Exhibit 3,

NECA-IBEW purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

23.     Plaintiff Iron Workers provides pension benefits to Ironworkers in the New York area.   As indicated on the attached certification attached hereto as Exhibit 4, Iron Workers purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

24.     Plaintiff Iron Workers 580 provides pension benefits to Ironworkers in the New York area.  As indicated on the attached certification attached hereto as Exhibit 5, Iron Workers 580 purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

25.     Pontiac Police is contributory single-employer retirement plan that oversees more than $200 million in assets.  It covers all the police and fire employees of the City of Pontiac. Pontiac Police provides retirement benefits, as well as death and disability benefits to its members.  As indicated on the attached certification attached hereto as Exhibit 6, Pontiac Police purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

26.     Pontiac General is a single-employer retirement plan that oversees more than $330 million in assets.  It covers all the non-police and fire employees of the City of Pontiac. Pontiac General provides retirement benefits, as well as death and disability benefits to its members.   As indicated on the attached certification attached hereto as Exhibit 7, Pontiac General purchased certain of the Merrill securities pursuant to the Offering Materials and was damaged by the circumstances described herein.

**B.** D<small>EFENDANTS</small>

    **1.** **Merrill**

27.    Defendant Merrill is a Delaware corporation with its principal executive office in New York, New York. The Company purports to offer a broad range of services to private clients, small businesses, institutions and corporations, organizing its activities into two interrelated business segments – Global Markets and Investment Banking Group ("GMI") and Global Wealth Management, which is comprised of Global Private Client and Global Investment Management. Fixed Income, Currencies & Commodities ("FICC") is within the Global Markets & Investment Banking Group.

    **2.** **Individual Defendants**

28.    E. Stanley O'Neal ("O'Neal") served as Merrill's Chief Executive Officer and as Chairman of the Board of Directors from 2002 through his resignation on October 30, 2007. O'Neal signed the Shelf Registration Statement (as defined at ¶ 158 below), Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

29.    John A. Thain ("Thain") served as Merrill's Chief Executive Officer, Chairman of Merrill's Board of Directors and a Merrill director from December 1, 2007 through his resignation on January 22, 2009.

30.    Jeffrey N. Edwards ("Edwards") served as Merrill's Senior Vice President and Chief Financial Officer from March 2005 until December 2007. He currently serves as Merrill's Vice Chairman and Member of the Executive Client Coverage Group. Edwards signed the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

31.    Laurence A. Tosi ("Tosi") served as a Merrill Vice President and Merrill's Finance Director from November 2004 until May 2007. Tosi signed the Shelf Registration

Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3.

32.     Ahmass L. Fakahany ("Fakahany") was Co-President and Chief Operating Officer of Merrill from May 2007 through January 2008, and is named as a defendant herein solely in his capacity as a control person pursuant to Section 15 of the Securities Act.

33.     Gregory J. Fleming ("Fleming") has served as Merrill's President and Chief Operating Officer of Merrill from May 2007 to the present, and is named as a defendant herein solely in his capacity as a control person pursuant to Section 15 of the Securities Act.

34.     Defendant Director Armando M. Codina ("Codina") was a member of the Board of Directors of Merrill from July 2005 to December 2008.  Codina is liable for Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings completed during his tenure as a Merrill Director.

35.     Defendant Director Jill K. Conway ("Conway") was a member of the Board of Directors of Merrill from 1978 to May 2007.  Conway is liable for Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1 and Post-Effective Amendment No. 2, which she signed, and for all Offerings completed during her tenure as a Merrill Director.

36.     Defendant Director Alberto Cribiore ("Cribiore") was a member of the Board of Directors of Merrill from June 2003 to September 2008.  Cribiore is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings completed during his tenure as a Merrill Director.

37. Defendant Director John D. Finnegan ("Finnegan") was a member of the Board of Directors of Merrill from June 2004 to December 2008. Finnegan is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings completed during his tenure as a Merrill Director.

38. Defendant Director Heinz-Joachim Neubürger ("Neubürger") was a member of the Board of Directors of Merrill from 1989 to May 2006. Neubürger is liable for the Offerings pursuant to the Shelf Registration Statement, which he signed, and for all Offerings completed during his tenure as a Merrill Director.

39. Defendant Director David K. Newbigging ("Newbigging") was a member of the Board of Directors of Merrill from October 1996 to April 2007. Newbigging is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1 and Post-Effective Amendment No. 2, which he signed, and for all Offerings completed during his tenure as a Merrill Director.

40. Defendant Director Aulana L. Peters ("Peters") was a member of the Board of Directors of Merrill from 1994 to December 2008. Peters is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which she signed, and for all Offerings completed during her tenure as a Merrill Director.

41. Defendant Director Joseph W. Prueher ("Prueher") was a member of the Board of Directors of Merrill from July 2001 to December 2008. Prueher is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings

completed during his tenure as a Merrill Director. Prueher is currently a member of the Board of Directors of BofA following its acquisition of Merrill.

42.     Defendant Director Ann N. Reese ("Reese") was a member of the Board of Directors of Merrill from October 2004 to December 2008. Reese is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which she signed, and for all Offerings completed during her tenure as a Merrill Director.

43.     Defendant Director Charles O. Rossotti ("Rossotti") was a member of the Board of Directors of Merrill from October 2004 to December 2008. Rossotti is liable for the Offerings pursuant to the Shelf Registration Statement, Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings completed during his tenure as a Merrill Director. Rossetti is currently a member of the Board of Directors of BofA following the merger a BofA subsidiary with Merrill.

44.     Defendant Director Virgis W. Colbert ("Colbert") was a member of the Board of Directors of Merrill from October 2006 to December 2008. Colbert is liable for the Offerings pursuant to the Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-Effective Amendment No. 3, which he signed, and for all Offerings completed during his tenure as a Merrill Director. Colbert is currently a member of the Board of Directors of BofA following its acquisition of Merrill.

45.     Defendant Director Judith Mayhew Jonas ("Jonas") was a member of the Board of Directors of Merrill from October 2006 to December 2008. Jonas is liable for the Offerings pursuant to the Post-Effective Amendment No. 1, Post-Effective Amendment No. 2 and Post-

Effective Amendment No. 3, which she signed, and for all Offerings completed during her tenure as a Merrill Director.

46.     Defendant Director Carol T. Christ ("Christ") was a member of the Board of Directors of Merrill from July 2007 to December 2008. Christ is liable for the Offerings pursuant to the Post-Effective Amendment No. 3, which she signed, and for all Offerings completed during her tenure as a Merrill Director.

47.     Each of these Individual Defendants, in their roles as officers and directors of Merrill, participated in the operation and management of Merrill and MLPF&S and thus were controlling persons of the Company and possessed the power and authority to control the contents of Merrill's reports to the SEC, and the Offering Materials. As controlling persons of Merrill, the Individual Defendants owed a duty to purchasers of securities sold in the Offerings to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

48.     All Individual Defendants other than Fakahany and Fleming are referred to as the "Individual Section 11 Defendants." Each of the Individual Section 11 Defendants, in their roles as directors of Merrill or signatories of the registration statement and Offering Materials pursuant to which the Offerings were made, owed to the purchasers of the securities sold in the Offerings the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

### 3.     Underwriter Defendants

49.     Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S") is incorporated in Delaware and is a wholly-owned subsidiary of Merrill. MLPF&S provides investment, financing, advisory, insurance, banking, and related products and services. As an underwriter of

the Offerings, MLPF&S failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

50. Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Citigroup failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

51. Morgan Stanley & Co. Incorporated ("Morgan Stanley") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Morgan Stanley failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

52. SunTrust Robinson Humphrey, Inc. ("SunTrust Robinson"), formerly SunTrust Capital Markets, Inc., was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, SunTrust Robinson failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

53. UBS Securities LLC ("UBS") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, UBS failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

54. Wachovia Capital Markets, LLC ("Wachovia Capital") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wachovia Capital failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

55. Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Offerings as specified herein. As an underwriter of the Offerings, Wells Fargo failed in its duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials.

56. The Underwriter Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act to investors who purchased Merrill securities on or traceable to the respective Offerings each underwrote. The amount that each Underwriter Defendant specifically underwrote with respect to each of the Offerings is set forth in the attached Appendix A. Plaintiffs have entered into a Tolling Agreement dated March 12, 2009 with additional underwriters on the Offerings, who are therefore not listed above.

## IV. SUBSTANTIVE ALLEGATIONS

57. Between November 2006 and May 2008, Merrill conducted twenty-one public Offerings of the Securities that are at issue in this Complaint. The Offering Materials associated with each Offering made misstatements and/or omitted material facts concerning: (i) Merrill's direct exposure to tens of billions of dollars of CDOs, which were backed by, among other things, non-prime mortgage-linked assets; (ii) Merrill's highly material exposure to non-prime residential mortgage-backed securities ("RMBS"); (iii) Merrill's material dependence on failing "monoline" financial guarantors to provide tens of billions of dollars of insurance against losses on its mortgage-linked securities; (iv) the true value of Merrill's mortgage-related derivative securities; and (v) Merrill's risk control and risk management failures that contributed directly to the Company's accumulation of billions of dollars of risky mortgage-backed assets.

58. The Offering Materials' material inaccuracies regarding the total amount and value of Merrill's mortgage-linked exposures resulted from a complete breakdown in the Company's risk management practices and procedures, which continued even after Merrill corrected the material misstatements and omissions made during 2006 and 2007 regarding the operation of its risk controls and risk management. This failure, which Defendants O'Neal and Thain have both publicly confirmed, allowed Merrill's mortgage business to balloon beyond

16

control, thereby jeopardizing the Company's ability to exist as an independent financial company and, in the process, seriously damaging the world economy.

A.  **THE OFFERING MATERIALS MADE MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING THE AMOUNT OF MERRILL'S SUBPRIME MORTGAGE-LINKED EXPOSURES**

### 1. Merrill Misstated and Omitted Material Facts Concerning the Company's Exposure to CDOs Backed by Non-Prime Mortgages

59.  Prior to 2003, Merrill was not a major player in the market for securitizing mortgages and mortgage-backed securities. Merrill thus did not have as much institutional experience and infrastructure in the securitization business as some of its Wall Street peers. By 2006, however, Merrill had become the world's leading underwriter of CDOs backed by subprime mortgages. Merrill made hundreds of millions of dollars in fees for structuring CDOs, as well as income on the trade or transfer of these securities.

60.  The Offering Materials failed to disclose that by ***mid-2006***, Merrill was unable to sell billions of dollars of subprime-backed CDOs off its balance sheet. As explained below, until the third quarter of 2007, the Offering Materials omitted any information regarding the amount of Merrill's CDO exposure. Merrill first disclosed this information after these exposures had already caused billions of dollars in losses. As discussed in Section VI.C, Merrill's failure to monitor, manage, and accurately report to investors the magnitude of its exposure and the loss of value of its mortgage-linked assets resulted from the fact that Merrill's risk control and management structures failed to keep Merrill within its "risk tolerance levels."

#### (i)  Overview of Merrill's CDO and RMBS Business

61.  Merrill originated and acquired billions of dollars of RMBS. These securities as well as other asset-backed securities ("ABS") served as the building blocks needed for Merrill's CDO business, which is described immediately below. The RMBS collateralizing Merrill's CDOs included substantial amounts of "subprime" mortgages. Subprime mortgages carry a

higher risk of default than "prime" mortgages because they are loans made to riskier borrowers, are made with less than complete documentation, or provide fewer protections to lenders. When a CDO is collateralized primarily by RMBS, the quality and performance of the underlying mortgage pool is the key factor in determining whether CDO investors will be repaid.

62. A CDO is a special purpose vehicle that uses the funds raised by selling CDO certificates to investors in order to purchase a pool of assets that are supposed to provide the cash flow needed to satisfy the CDO's obligations to the certificate holders. (Unless otherwise indicated by the context, references to "CDO" herein refer to the CDO certificates that Merrill held on its balance sheet.)

63. Instead of entitling the CDO investors to a claim on particular underlying, or "reference," collateral, the certificates entitle CDO investors to a priority in repayment from the overall cash flow created by the collateral. Specifically, the total potential cash inflow of a CDO vehicle is distributed to investors on the basis of different "tranches" of certificates. The higher the tranche in the CDO's capital structure, *i.e.*, the higher its credit rating and priority of payment of the CDO's incoming cash flows, the lower the interest rate paid, and *vice versa*. Thus, tranches of a CDO can be distinguished by their "attachment point" or "subordination level," both of which refer to the percentage of shortfall to the CDO vehicle that can take place before the holder of the relevant tranche incurs losses. The "senior" or "super senior" tranches of a CDO (sometimes referred to as "high-grade" tranches) typically would not incur losses until the lower rated tranches (sometimes referred to as the "mezzanine" tranches) have been wiped out.

64. A "high-grade CDO" is based on collateral with a credit rating of "A" or better from an independent rating agency. A "mezzanine CDO" is based on collateral that is rated "BBB" or less. This difference does not mean, however, that the senior tranches of a high-grade

CDO are less risky than the senior tranches of a mezzanine CDO. The rating agencies made it a policy to equalize risk across asset classes, so that a certificate rated "AAA" in one class should bear substantially the same risk as a "AAA" certificate of a different quality class. For example, S&P explained in 2001 that its method "in both policy and practice, is intended to provide a consistent framework for risk assessment that builds a reasonable ratings consistency within and across sectors…." The rating system "uses the same credit rating scale across the structured finance, corporate, and government sectors" and the ratings are designed to "provide a common language for evaluating and comparing creditworthiness."

65. Thus, the ratings agencies allowed the senior tranches of a high grade CDO to have a lower attachment point than the similarly rated tranches of a mezzanine grade CDO, in order to equalize ratings across different perceived default risk for the underlying collateral. Thus, the attachment point on senior tranches of a high-grade CDO was often above 90% (meaning that the subordination level, or cushion of acceptable loss, was less than 10%), while the attachment point for senior tranches of a mezzanine CDO would be in the 30-35% range.

66. As the chart below illustrates, a CDO comprised largely of subprime collateral would still have so-called "super senior" and "senior" tranches and losses in the lower tranches of subprime RMBS would rapidly lead to material losses in the "super senior" CDO tranches backed by that collateral.



67.     The key difference between the above diagram and a "high grade" CDO is that the "underlying" collateral for the latter is comprised of A or better rated collateral and that the diagram focuses on RMBS or ABS tranches rated A or better rather than BBB or lower.

68.     The early 2000s were marked by rapid and historic home price appreciation, which often allowed borrowers who could not otherwise meet their loan terms to simply refinance rather than become delinquent.  By 2004, however, amidst historically low delinquency rates, mortgages originators and lenders from whom Merrill purchased mortgages relaxed their lending standards by, among other things, issuing: (i) low or no documentation loans, otherwise referred to as "Liar Loans," in which a borrower provided little or no documentation of income, assets, employment or ability to repay; (ii) first and second mortgage loans with high loan to property value ratios ("LTV"), *i.e.*, the loan balance was greater than 90% of the property's value, so that the borrower had little or no equity in the property and was

therefore more likely to default if home prices declined; and (iii) loans with a wide-range of risky structural terms, including loans with very low "teaser rates" that would materially increase after an initial time period and loans giving the borrowers options for repayment that increased risk to the holder of the loan.

69.     As the CDO market evolved, resulting in dramatic fee revenue growth for the investment banks that structured these CDOs, the banks sought to structure larger deals. However, because there was a finite number of mortgages to provide the collateral for ABS, investment banks created more highly leveraged investment vehicles. CDOs structured solely with asset-backed securities are called "cash CDOs." In a cash CDO, the total principal amount of the RMBS or ABS collateral closely approximates the total value of the CDO certificates sold to investors.

70.     Many of the CDOs underwritten by Merrill during the Offering period, however, used derivative securities as reference collateral in addition to RMBS. CDOs that include some ABS "cash" collateral and large portions of derivative securities were called "synthetic CDOs." The synthetic derivative securities were in the form of credit default swaps, in which the CDO-issuing vehicle provided protection to a counterparty in exchange for a stream of premium payments. The CDS was tied to an RMBS or similar cash-creating security, and the synthetic CDO would use the premium income to pay its certificate holders, but would incur losses if the referenced RMBS declined in value. Notably, because synthetic CDOs did not require "hard asset" collateral to support the whole deal, synthetic CDOs could be assembled faster than cash deals, since the huge number of counterparties willing to take a short position against subprime RMBS (by buying credit default swaps that pay out if the referenced RMBS declined in value) provided a seemingly endless supply of CDS collateral.

71.     Finally, Merrill often used unsold CDO certificates as collateral for other CDOs, thereby materially concentrating the risk to Merrill.  Merrill's high-grade CDOs often contained substantial percentages of mezzanine CDO collateral, which was ultimately backed by BBB or lower collateral.  Thus, if a Merrill CDO-structuring desk that could not quickly sell the A or AA tranches of a mezzanine CDO to third parties, the desk could transfer those tranches to another Merrill structuring desk that needed A or AA collateral to support a high-grade CDO.  Thus, multiple Merrill CDO deals would effectively remain exposed to the same underlying collateral and Merrill's high-grade CDOs were backed by substantial amounts of lower-rated collateral.

### (ii)     Beginning in 2006, the Housing Market Plummeted, Exposing the Holders of CDO Securities to Large Losses

72.     Initially, Merrill was in the business of underwriting and selling CDOs, not in the business of buying and holding them.  According to an article in *The Wall Street Journal* dated April 16, 2008, by late 2005 American Insurance Group, Inc. ("AIG") (which was the world's largest insurer) stopped insuring subprime mortgage CDO securities, including Merrill's super senior CDO tranches.  Instead of slowing down its CDO business, however, Merrill's CDO structuring desks "put the business on overdrive" by "holding on [Merrill's] own books large chunks of the highest-rated parts of CDOs whose risk it couldn't offload."  Thus, as the risk of the subprime loans underlying Merrill's cash and synthetic CDOs grew in 2005 and 2006, the Company increasingly packaged and held exposure to the top 65-90% of its own CDOs – leaving itself massively exposed to securities whose cash flow was increasingly sensitive to home price declines or other credit stress.

73.     By 2006, the housing market began to collapse.  As illustrated in the chart below, U.S. home prices, which had been increasing at an unprecedented pace in the mid-2000s, slowed their growth and then fell precipitously throughout 2006 and 2007:



74.     As a direct result of the slowdown and subsequent collapse of U.S. home prices, the market for CDOs backed by subprime mortgages were showing signs of impairment by the first quarter of 2006.  Indeed by the end of 2005, investors were increasingly concerned about financial institutions' exposure to subprime-backed securities.  On November 12, 2005, in an article entitled "Is Getting a Home Loan Becoming Too Easy? – Lenders Seek Fewer Documents To Verify a Borrower's Income; Homeowners, Investors at Risk," *The Wall Street Journal* reported that the "much less demanding" mortgage underwriting standards of the prior years were "putting everyone . . . at risk," including the "bond investors" who purchased mortgage-backed securities.  Specifically, the article noted that, "[u]pon default, the lender loses.  In many cases the ultimate lender isn't a bank but a bond investor whose securities provide a return based on payments made out of a pool of mortgages."

75.     Similarly, on February 15, 2006, *Barron's* published an article entitled "Coming Home to Roost," in which it reported that investors were experiencing "much anxiety" about "mortgage-backed securities" given the "easy lending practices" that prevailed in recent years. The article reported that "[v]arious doomsday scenarios are being posited" regarding CDOs backed by subprime mortgages, and warned that, "***These CDOs . . . could get completely wiped***."[1]   The article also noted that "The liquidity of the sub-prime market depends on continued purchases by CDOs of the randier tranches of subprime securitizations.  Should this funding dry up, the sector's financing structure could seize up.  And that would spell big trouble not only for sub-prime borrowers, but for the entire U.S. housing market . . . and economy."

76.     These concerns, which should have alerted Defendants to enhance their monitoring of Merrill's subprime-related exposures, continued throughout 2006, as borrowers continued to default in record numbers.  A Standard & Poor's report for the third quarter of 2006 noted that mortgage lenders were experiencing rising delinquencies and early payment defaults. Similarly, an April 20, 2007 Moody's report on the U.S. subprime mortgage market noted that "loans securitized in the first, second and third quarters of 2006 have experienced increasingly higher rates of early default than loans securitized in previous quarters."   With reasonable diligence, Defendants could have obtained the data underlying these reports and attempted to determine the extent to which Merrill's CDOs contained problematic collateral.

77.     On February 15, 2007, Professor Joseph R. Mason and Joshua Rosner, a managing director of Graham Fischer & Co. (an investment bank), issued a widely circulated academic paper on CDOs.  According to a February 18, 2007 article in *The New York Times*, Mason and Rosner found that "it is only a matter of time before defaults in mortgage pools hit returns in collateralized debt obligation pools."   Significantly, Mason and Rosner concluded that

---

[1]      Unless otherwise noted, emphasis is added.

"no one knows who is holding the risk," – *i.e.*, who owned the CDOs. The article concluded, "[u]nfortunately, the damage of the mortgage mania has been done and its effects will be felt. It's only a matter of when."

78. In the Company's Form 10-Q for the first quarter 2007, Merrill acknowledged that "the steady rise in global equity markets since mid-2006 was interrupted in late February [2007] over concerns surrounding sub-prime lending losses." The Offering Materials, however, did not accurately disclose the Company's significant exposure to subprime-backed CDOs. For example, Merrill's April 19, 2007 press release reporting the Company's earnings for the first quarter of 2007, which was included in certain Offering Materials (as set forth in Appendix A), stated that "U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters." Merrill's 2007 Forms 10-Q for the first and second quarters of 2007, the latter of which was the most current quarterly disclosure in the August 15 and August 28, 2007 bond offerings through which Merrill raised $5.5 billion in new capital, reported that although the Company retained interests in certain mortgage-backed securities, "only a small portion of the retained interests represent residual interests from sub-prime mortgage securitizations."

79. The above statements did not take into account the significant risk Merrill bore on account of its subprime CDO holdings, or, for that matter, the fact that the Company's financial well-being depended upon those activities. Indeed, after Merrill disclosed, for the first time, the nature of its CDO business in October 2007 (*see* ¶¶ 83-90), one analyst observed, in a Credit Sights report dated October 24, 2007, that "the new-age structured finance markets have been a ***significantly more important driver of Merrill's top line than it had disclosed***, and in turn,

earnings power for the [Fixed Income, Currencies & Commodities] business could continue to decelerate as a result."

80.     Nevertheless, the words "collateralized debt obligation" do not appear in any Offering Materials prior to the Company's Form 10-Q for the second quarter of 2007. Even then, Merrill merely stated that "challenging market conditions" have "impacted and may continue to impact the sub-prime mortgage market, including certain collateralized debt obligations (CDOs), as well as other structured credit products." The Form 10-Q failed to disclose the material amount of Merrill's significant CDO, subprime, and other non-prime exposure, the fact that Merrill was largely unable to sell to third parties billions of dollars of CDO assets, and the fact that losses arising from its unsellable CDO positions could leave Merrill woefully undercapitalized. This final point was particularly material to investors in the Company's 2007 Offerings, for whom there was a major difference between funding to replace lost capital versus funding to support new growth.

81.     Based upon the pre-October 2007 Offering Materials' misstatements and omissions, securities analysts issued reports describing Merrill's subprime CDO exposure as "small" and "immaterial," and rating the Company's securities as a "buy" or "strong buy." For example, on July 17, 2007, HSBC issued an analyst report (based upon the Company's press release of the same date announcing 2007 second quarter earnings), that stated that any "problem in [Merrill's] subprime mortgage/CDO business . . . [is] immaterial in the context of an USD9.7bn net revenue quarter," and "[t]o reach a 5% materiality threshold, Merrill would have had to have an *USD500M problem* after whatever risk management mitigations were factored in."

82.     In reality, unbeknownst to investors in the Offerings, the Company's exposure to these toxic assets dwarfed the "USD $500M problem" materiality threshold identified by securities analysts.  Indeed, by the end of September 2007, the Company was exposed to more than *$50 billion* of failing subprime-backed CDOs.  As a result of the material omissions and misstatements contained in Merrill's Offering Materials, investors were left with the mistaken impression that the Company had successfully avoided existential risks to its financial condition arising from subprime mortgage securities.

**(iii)     Merrill Belatedly Disclosed Its Exposure to Subprime-Backed CDOs and RMBS**

83.     Despite the market's focus on the risks of subprime-backed CDOs, Merrill did not disclose *any* dollar figures for its subprime-backed CDO exposures until the third quarter of 2007, even as Merrill raised $5.5 billion in two separate bond offerings, on August 15 and 28, 2007.  *See* Chart at ¶ 157 below.  On October 5, 2007, however, Merrill issued a press release announcing the Company's preliminary financial results for the third quarter of 2007.  The Company stunned investors by announcing that it would take a $4.5 billion charge for the quarter ended September 30, 2007 because of its CDOs and other subprime exposures.  Merrill, however, did not report the company's overall amount of exposure to these toxic assets.

84.     Confirming that the prior Offering Materials had material omissions, a Deutsche Bank analyst report dated October 5, 2007, stated that "[w]e are somewhat frustrated for not having the total exposure for either CDOs or subprime mortgages and therefore can't give context to the writedowns."  That same day, Fitch downgraded Merrill's credit rating from stable to negative, noting that "[t]he size of Merrill's CDO position and subsequent loss indicates the business was oversized relative to other fixed income products."

85.     On October 24, 2007, Merrill announced its final results for the quarter ended September 30, 2007.  The release stated that Merrill was increasing its third quarter CDO and subprime charge, which it had first reported less than three weeks earlier, *from $4.5 billion to $7.9 billion*.  As analysts recognized, Merrill's inability to report a reasonably accurate figure in its initial press release was symptomatic of a serious financial reporting and risk monitoring failure.

86.     During a conference call with securities analysts later on October 24, 2007, Merrill's then-CEO, O'Neal, admitted that, although the Company had sold lower-rated tranches of CDOs, Merrill's "hedging of higher-rated tranches was not sufficiently aggressive. . . . Despite the fact that nearly all of our remaining CDO exposure is supersenior, it turned out that both our assessment of the potential risk and mitigation strategies were inadequate."  O'Neal also stated:

> We're not – I'm not – going to talk around the fact that there were some mistakes that were made.  We – I am accountable for these mistakes as I am accountable for the performance of the firm overall, and my job, our job, the leadership team's job is to address where we went wrong, what changes were necessary to make sure we respond to changes in risk dynamics early, correctly and in every asset class at every stage of market's evolution.

O'Neal also acknowledged that:

> *[T]he losses here are outside the parameters of our risk appetite*.  And there were some mistakes made and us having these results.  Primary mistakes were errors of judgment and understanding the nature of the risk as the markets were changing for these securities.

87.     Thus, O'Neal squarely placed the cause of Merrill's CDO problems as resulting from risk control and risk management failures that allowed Merrill's accumulation of CDOs to grow unchecked, rather than from fraud or ill-intent.

88.     Numerous securities analysts and market professionals were stunned by Merrill's disclosures.  For example, on October 24, 2007, HSBC issued an analyst report that commented

Merrill was "[d]oing the unthinkable [by] taking its USD4.5bn writedown estimate of CDOs and subprime mortgage assets to USD 7.9bn" and that since "[d]isclosure remains poor and management remains fluid" there was the "possibility of more losses in the future." Similarly, CIBC issued an analyst report that expressed frustration that Merrill "did not and would not disclose its gross writedown." In addition, as noted in the HSBC analyst report, rating agencies cut the Company's ratings and downgraded their respective outlooks. S&P described the developments as "startling." Moody's commented that *Merrill's management "did not fully understand" the exposures*.

89.     On October 30, 2007, six days after Merrill's announcement, the Company announced that O'Neal was retiring, effective immediately, from his position as Chairman and CEO.

90.     Unfortunately for investors in the Offerings, Merrill's inability to manage and accurately report its sprawling structured finance exposures continued long past October 2007. On January 17, 2008, in a Company press release announcing the Company's financial results for the fourth quarter and full-year 2007, Merrill revealed, *for the first time*, Merrill's *gross* exposure as of September 28, 2007 of *more than $46.1 billion* to U.S. super senior ABS CDOs. The $46.1 billion figure came after deducting Merrill's $5.8 billion third quarter write-down on Super Senior CDO exposures. Therefore, Merrill's CDO exposure (before write-downs) was more than $50 billion. For the year, Merrill reported a loss of $8.6 billion, driven primarily by the CDO and other subprime-related write-downs over the past two quarters.

91.     Securities analysts promptly expressed their dismay about Merrill's revelation. For example, in a January 18, 2008 analyst report, Wachovia commented that "[t]he sheer size of the exposures after write-downs begs the question what was going on in the last two years."

Even after Merrill began to disclose its CDO exposures, it materially misstated them or omitted to include material information. Specifically, Merrill's reported "net" CDO positions were materially misstated or contained material omissions because in reporting "net" figures, Merrill did not take into account the severe ineffectiveness of its monoline hedges. Indeed, Merrill itself was acknowledging the low credit quality of the monoline insurers for other purposes. Specifically, Merrill set forth on another table in its 2008 quarterly filings the increase in value of CDO hedges from financial guarantors. *See, e.g.*, Form 10-Q for 1Q 08 at 79. On this chart, as CDO positions lost value and the monoline hedges therefore increased in value and were supposed to offset the CDO losses, Merrill acknowledged the inability of the monolines to pay by discounting the benefit of the hedge offset through a "Credit Valuation Adjustment."

92. Once Merrill acknowledged the credit distress of the monolines for purposes of reporting income and losses, however, the Offering Materials should have reported the adjusted nominal amount of Merrill's monoline hedges ***after*** taking into account their credit distress. The fact that the Offering Materials did not do so resulted in a lower-reported "net CDO exposure." Thus, if Merrill took, for example, a 20% "credit valuation discount" when the monoline hedges were actually in the money, it should have reported a "net" CDO exposure comprised of the gross CDO balance, minus mark-to-market write-downs, ***and*** minus the notional amount of remaining monoline hedges, discounted by the same 20% adjustment. In this example, since Merrill was already acknowledging that the monolines were unlikely to satisfy more than 80% of the amounts owed on their CDS obligations, Merrill's failure to report proportionate discounts to all existing insurance from failing financial guarantors when reporting the Company's "net" CDO positions was itself a materially misstated description of Merrill's remaining CDO exposures.

93.     As with its CDOs, Merrill did not disclose its non-prime RMBS positions until October 2007.  Moreover, the seemingly haphazard manner in which Merrill reported its non-prime RMBS exposures during the fall of 2007 suggests that Merrill did not even know the actual amount of its exposure to these securities.  Specifically, it appears that Merrill simply did not or could not adequately track the magnitude of its various exposures to mortgage-related assets.

94.     In its Form 8-K filed on October 24, 2007, Merrill disclosed $5.7 billion of net "sub-prime mortgage-related exposures."  This figure was never before disclosed.  Then, in its third quarter 10-Q filed on November 7, 2007, Merrill disclosed that through "its U.S. bank subsidiaries, Merrill has SFAS 115 investment securities and off-balance sheet arrangements that have exposure to U.S. sub-prime residential mortgage-related assets of $5.7 billion."  Two charts in the November 7, 2007 Form 10-Q confirmed that $5.7 billion of U.S. bank subsidiaries' holdings were incremental to the exposures reported on October 24.  The first chart listed "U.S. sub-prime residential mortgage-related net exposures, ***excluding net exposures to residential mortgage-backed securities held in our U.S. banks for investment purposes***…" of $5.663 billion.   The second chart listed subprime RMBS exposures at Merrill's U.S. banking subsidiaries of an additional $5.7 billion.

95.     When Merrill issued its fourth quarter 2007 earnings press release on January 17, 2008, it disclosed another material non-prime exposure for the very first time.  In the January 17 release (on Attachment IX of the release), Merrill reported that it had accumulated more than $7.9 billion of "Alt-A residential mortgage-backed securities."  "Alt-A" is a mortgage that does not qualify as "prime."  Moreover, all of these RMBS exposures were reported as net as opposed

to gross positions, which left investors unable to assess the Company's remaining exposure to risk.

### 2. Merrill Misstated the Amount of the Company's Monoline Exposures

96.     The Offering Materials also misstated the material amount of Merrill's structured finance hedging activities with shaky monoline financial guarantors. Even when Merrill first disclosed $13.8 billion of CDO-related hedges with monolines in January 2008, it did not accurately report over $50 billion of non-CDO related hedges with monolines until the government bailout of BofA was completed in 2009. In fact, the Offering Materials' disclosure of Merrill's exposures to monolines through the last of the Offerings suggested to investors that the Company's non-CDO hedges were far smaller than its CDO-related hedges.

97.     Financial guarantors historically insured municipal and other-government-issued bonds, which rarely defaulted. By the mid-2000s, the monoline insurers agreed to insure ever-increasing amounts of mortgage-backed securities and CDOs. Monolines insured these products by issuing CDS that provided payments to the CDS holder in proportion to losses on the insured security. If the monolines were credit-worthy, the CDS could remove risk of loss from the balance sheets of CDO or RMBS holders.

98.     During the booming structured finance markets of 2005-2007, however, monolines insured obligations many times greater than their available capital. The monolines had a razor-thin margin for error, as losses in the riskiest "tail" of their insured portfolios would quickly wipe out their capital and destroy their ability to operate. MBIA, Inc. ("MBIA"), for example, was the largest financial guarantor. As of June 30, 2007, MBIA insured nearly $1 trillion in obligations, including $48.3 billion of U.S. mortgage-backed securities and U.S. CDOs with mortgage exposures, yet MBIA's capital base (which included readily accessible capital to pay claims) was only $6.55 billion. Another monoline, ACA Capital Holdings ("ACA"),

maintained only $400 million of equity and had few additional claims-paying resources, yet insured $60 billion of securities, including $20 billion of CDOs and other mortgage-related exposures. During the third quarter of 2007, both ACA and MBIA provided CDS hedges for Merrill's "AAA" CDO certificates. In other words, Merrill was attempting to hedge its exposures with entities that posed a greater default risk than the securities Merrill was insuring.

99.     By 2007, investor concerns turned to the monolines. For example, *The Wall Street Journal* reported on March 14, 2007 that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a waive of defaults." In May 2007, in a presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and its next-largest competitor, Ambac Financial Guarantee Inc. ("Ambac") were "effectively insolvent" on account of predicted losses arising from their insurance of CDOs and RMBS.

100.     Throughout the period of 2006 and 2007 Offerings, investors were informed that Merrill engaged in hedging activities in general, but Merrill never disclosed that it relied on failing insurance carriers for material amounts of hedging of CDO and other mortgage-related exposures. This non-disclosure was a natural consequence of the fact that Merrill did not monitor and adequately report the amount of its CDO and RMBS exposures in the first place. On January 17, 2008, Merrill disclosed, for the first time, that it had maintained monoline hedges on ***$19.9 billion*** par value of CDOs (which was reduced to $13.8 billion after eliminating Merrill's hedges with already defunct ACA).

101.     Merrill's monoline exposure was material to investors both because of its magnitude and because it represented a concentration of risk to a small group of financial

33

counterparties whose own balance sheets had already been devastated by CDO and subprime exposures. Indeed, Merrill's 2007 Form 10-K, filed on February 25, 2008, disclosed (for the first time) that Merrill had a "Concentration of Risk to Financial Guarantors."

102.     Doubts about the viability of the financial guarantors accelerated in early 2008, as they began to report billions of dollars in CDO and RMBS-related losses, which rapidly ate into their scarce capital. By January 24, 2008, *The Wall Street Journal* reported that New York state regulators were "trying to spur a Wall Street bailout of bond insurers," and that "[t]he bond insurers' solvency has become one of Wall Street's biggest preoccupations."

103.     Indeed, beginning with the fourth quarter of 2007, Merrill reported quarterly "credit valuation adjustments," *i.e.*, write-downs, against the fair value of its $13.8 billion in nominal amount of CDO related hedges with monolines.

104.     Even though Merrill had disclosed in January 2008 the notional amount of CDOs that were hedged by monoline insurers, the Offering Materials did not disclose that Merrill had more than $50 billion notional amount of monoline hedges on other risky assets, including mortgage-backed securities. Indeed, while Merrill quantified its material CDO-hedge exposure to monolines, it merely stated that it had other monoline hedges on non-CDO assets and discussed credit valuation adjustments that were significantly smaller than the adjustments made on its non-CDO insurance. In light of the Offering Materials' minimal reference to non-CDO monoline exposure, investors would reasonably conclude that the notional amount of these hedges was materially lower than the notional amount of the Company's CDO hedges.

105.     As it turned out, any such conclusion was misplaced. In fact, Merrill had monoline protection on *$50 billion* of risky non-CDO structured assets, including RMBS,

commercial mortgage-backed securities ("CMBS"), and collateralized loan obligations.[2]  This fact was disclosed only on January 16, 2009, when BofA's Chief Financial Officer stated during a conference call that "credit default swaps with monoline financial guarantors, excluding those that I just mentioned covering the US ABS CDOs, total notional was $50 billion with a mark-to-market before any adjustment."  Moreover, since Merrill disclosed the amounts of its RMBS and CMBS exposures on a *net* basis, investors were unaware that Merrill's actual exposure to these assets was substantially greater than what Merrill had disclosed.

106.    In Merrill's 2008 Form 10-K, filed on February 28, 2009, the Company finally reported, for the first time, a chart detailing its non-CDO monoline exposures, including the notional amount of such insurance.  This chart, reproduced below, detailed the notional amount of monoline protection that was only disclosed on January 16, 2009, as set forth in the paragraph above.  This information should have been in the Offering Materials.

*(dollars in millions)*

| Credit Default Swaps with Financial Guarantors (Excluding U.S. Super Senior ABS CDO) | Notional of CDS[1] | Net Exposure[2] | Mark-to-Market Prior to Credit Valuation Adjustments | Life-to-Date Credit Valuation Adjustments | Carrying Value |
|---|---|---|---|---|---|
| By counterparty credit quality[3] | | | | | |
| AAA | $(17,293) | $(13,718) | $ 3,575 | $  (804) | $2,771 |
| AA | (16,672) | (11,851) | 4,821 | (1,832) | 2,989 |
| A | (1,197) | (879) | 318 | (118) | 200 |
| BBB | (5,570) | (4,522) | 1,048 | (440) | 608 |
| Non-investment grade or unrated | (9,581) | (6,570) | 3,011 | (1,809) | 1,202 |
| Total financial guarantor exposures | $(50,313) | $(37,540) | $12,773 | $(5,003) | $7,770 |

*(1) Represents the gross notional amount of CDS purchased as protection to hedge predominantly Corporate CDO, CLO, RMBS and CMBS exposure. Amounts do not include exposure with financial guarantors on U.S. super senior ABS CDOs which are reported separately above.*
*(2) Represents the notional of the total CDS, net of gains prior to credit valuation adjustments.*
*(3) Represents S&P rating band as of December 26, 2008.*

---

[2]      A collateralized loan obligation ("CLO") is substantially similar to a CDO, except that the underlying assets are corporate loans or bonds rather than asset-backed securities.

### 3. Merrill Violated GAAP By Failing To Properly Disclose The Amount of Its Subprime-linked Exposures

107.    Merrill violated GAAP by failing to properly disclose material concentrations of risk and exposures to risk arising from subprime-backed CDOs and non-prime mortgage-related assets.

108.    Paragraph 15A of the Statements of Financial Accounting Standards ("SFAS") 107, Disclosures about Fair Value of Financial Instruments, required Merrill to disclose "all significant concentrations of credit risk from all financial instruments, whether from an individual counterparty or groups of counterparties." Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions. Further, if a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with APB No. 28, Interim Financial Reporting. The reason for the concentration of risk provisions in GAAP is to warn about concentrations that *may* result in losses under changed conditions – not to wait until those losses become substantial and disclose the concentration after the losses are already harming investors.

109.    For Merrill, subprime mortgage borrowers and nonprime mortgage-linked securities plainly constituted a group concentration of risk. Thus, Merrill was required to disclose the concentration, the maximum amount of loss, and any mitigation strategies to reduce the risk of loss. Because Merrill did not disclose as much as $50 billion of CDO tranches linked to subprime mortgages, coupled with the fact that it omitted to adequately disclose other mortgage-linked securities, its financial statements violated SFAS 107.

110.     Merrill was also heavily reliant on monoline financial guarantors to hedge the risk and limit mark-to-market write-downs on its CDO and other exposures.  The nominal amount of these hedges consisted of $13.8 billion of CDO protection (as of the end of 2007) and $50 billion of "insurance" on non-CDO assets.  Because Merrill did not disclose its massive concentration of credit risk to monolines – and did not disclose the $50 billion non-CDO hedges at all – it also violated SFAS 107.

111.     Indeed, once Merrill disclosed its CDO exposures beginning in October 2007 and then partially disclosed its monoline exposures beginning in January 2008, Merrill also revealed that it had accumulated significant concentrations of credit risk in these instruments.  Merrill's November 5, 2007 Form 10-Q disclosed, for example, that "[t]he losses on U.S. Sub-prime Residential Mortgage-Related and ABS CDO activities in the third quarter reflect *a significant concentration in securities that accumulated as a result of our activities as a leading underwriter of CDOs*."   The 2007 Form 10-K went further, expressly stating that one of Merrill's "Concentrations of Credit Risk" was a "Concentration of Risk to the U.S. Sub-Prime Residential Mortgage Market" through "U.S. sub-prime residential mortgage-related positions," "super senior U.S. ABS CDOs and second trading exposures related to the ABS CDO business," and "sub-prime residential mortgage-backed securities."  The 2007 Form 10-K also disclosed a "Concentration of Risk to Financial Guarantors."

112.     These disclosures should have been made in every one of the Offering Materials. Notably, Merrill's omissions concerning its concentrations of risk are indicative of the risk control failures described at Section VI(A)(1)(iii).  Indeed, for a global investment firm as large as Merrill, which has numerous bankers, traders and portfolios trading independently of each other while simultaneously buying and selling similar types of exposures, a failure in firm-wide

risk management would reasonably be expected to lead to a failure to report significant concentrations of credit risk.

**B.     THE OFFERING MATERIALS MADE MATERIAL MISSTATEMENTS AND OMISSIONS REGARDING THE VALUE OF MERRILL'S MORTGAGE-RELATED ASSETS**

113.    Merrill was required pursuant to federal disclosure laws and GAAP to accurately report the true value of its assets, including subprime-linked assets, as of the dates of its periodic financial reports.  As explained herein, both prior to and after Merrill disclosed the notional amount of its significant exposure to subprime CDOs, the Company misstated the current value of these assets (which by early 2008 were near worthless).  These misstatements resulted in corresponding overstatements of pre-tax income, financial instruments owned, total assets, retained earnings, and total shareholders equity within Merrill's consolidated financial statements.  The effect of these misstatements was also to overstate Merrill's Tier 1 capital ratios.

114.    Throughout the Offering Period, Merrill publicly classified its CDOs and CDO-related exposures as "trading securities" because they were supposedly bought and held principally for the purpose of being sold *in the near term*.  Under SFAS 115, Accounting for Investments in Certain Debt Securities, Merrill's CDO exposures were to be measured at fair value in the statement of financial position, with any changes to fair value charged against earnings.

115.    Starting on January 1, 2007, Merrill applied SFAS 157 to define "fair value" in its financial statements.  According to SFAS 157, fair value is "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants." SFAS 157 emphasizes that fair value is "not an entity specific measurement," and "should be determined based on the assumptions that market participants would use in pricing the asset or

liability." Indeed, pursuant to SFAS 157, "valuation techniques used to measure fair value shall maximize the use of observable inputs and minimize the use of unobservable inputs." (SFAS 157, ¶ 21). Further, unlike future loss reserves or other disclosures that are reported as estimates or predictions based on future unknown events, pursuant to SFAS 157, the value of an asset, as well as any required write-down of the value of that asset as of the reporting date, is based upon current, objective facts.

116. In early 2007, Merrill began to misstate the true value of its CDOs backed by non-prime mortgage-related assets. Indeed, throughout the first and second quarters of 2007, Merrill carried its mortgage-linked exposures at or near par notwithstanding numerous events suggesting that the market for CDO securities backed by subprime mortgages was significantly impaired. As explained above, by no later than 2006, U.S. home prices significantly slowed, and, by 2007, had largely collapsed. As a result, non-prime borrowers were defaulting in record numbers. These borrowers were supposed to provide the cash flow needed to support Merrill's mortgage-linked derivatives.

117. Early 2007 signs of distress turned into actual CDO failures by April 2007, when two Bear Stearns hedge funds, the High Grade Structured Credit Strategies Fund and High Grade Structured Credit Strategies Enhanced Leverage Funds (the "Bear Funds"), began to report material losses arising from the Bear Funds' subprime-linked CDOs. On June 14, 2007, representatives of the Bear Funds' creditors, including Merrill, met at Bear Stearns' offices. The next day, Merrill seized at least $850 million worth of collateral assets from the Bear Funds to protect its position in the funds.

118. The meltdown of the Bear Stearns Funds was a key indicator that CDO holdings could not be sold at or near par, and that banks exposed to such paper faced substantial losses.

On June 22, 2007, *The New York Post,* in an article entitled "Merrill Blinks," reported that Merrill had cancelled planned auctions for most of the securities that it had seized from the Bear Funds and, instead, "[took them] in-house." According to the article, investors were "too baffled by the ultra-complex securities, known as collateral debt obligations, to offer attractive bids." The article also noted that "CDOs are so illiquid that Merrill's trades – even at fire sale prices – would have forced a wide scale re-evaluation of prices across the sector, perhaps leading to some CDO issues to be marked down as much as 30 percent." Nevertheless, the Offering Materials did not reflect CDO write-downs until the end of the third quarter of 2007.

119.    As reported in a March 20, 2008 article in *The National Business Review*, entitled "Taxpayers may have to rescue failing banks," the failure of the Bear Funds led directly to that company's collapse, since Bear "had invested in collateralised [sic] debt obligations (CDOs) that were exposed to mortgage-backed security (MBS) bonds based on subprime mortgages. The exotic securities firewalled by Bear Stearn's [sic] imploding hedge funds were revealed as toxic, being hard to value and having little by way of a secondary market. ***The credit crunch's evil genie had escaped from its bottle***."

120.    Even when Merrill started to disclose (for the first time) the Company's subprime-backed CDO exposures in October 2007, the Offering Materials continued to misstate the value of these assets by billions of dollars. On October 24, 2007, Merrill revised its super senior CDO write-downs to $5.8 billion. This charge did not reflect the greatly impaired value of the CDOs at that time.

121.    The 2008 Offering Materials continued to misstate the value of Merrill's CDOs. According to a January 30, 2008 *Bloomberg* article entitled "Merrill Plans to Cut Back on CDOs, Structured Finance," Thain asserted that Merrill's CDOs had been valued "conservatively," and

stated that Merrill planned to liquidate its CDO positions by selling them to funds looking to buy assets at distressed prices. Moreover, on Merrill's January 17, 2008 earnings conference call, Thain stated that Merrill had marked down its CDOs to levels that were "saleble [sic]" and "represent good value."

122.    Critically, the Offering Materials did not disclose the carrying value of Merrill's CDOs, *i.e.*, the price at which Merrill valued its CDOs in relation to par. Since this information was not disclosed, sophisticated market analysts incorrectly calculated carrying values based on the limited information Merrill had disclosed. Specifically, numerous sophisticated analysts published reports inferring that Merrill's CDOs had been written down to about 30% of their original par value. On January 18, 2008, Oppenheimer analyst Meredith Whitney wrote: "Based on [our] calculations, we approximate that the carrying-values for [Merrill's] high-grade [CDOs] at 40 cents on the dollar and mezzanine at 26 cents on the dollar." On March 13, 2008, Standard & Poors reported its own calculation indicating that Merrill was valuing its high-grade CDO exposures at thirty-two cents on the dollar and its mezzanine CDOs at twenty-eight cents on the dollar. As explained below, had these analysts been correct in their understanding of Merrill's reported write-downs, the subsequent write-downs that Merrill reported until it sold $30 billion of CDOs at twenty-two cents on the dollar would not have been possible. In other words, the write-downs on the Lone Star deal described below proved that Merrill's carrying values were in fact materially higher than its prior CDO-related disclosures had suggested to investors and market professionals.

123.    As explained below, the Lone Star deal (and more particularly, the $4.1 billion additional write-down that Merrill reported on that sale) indicated to investors that Merrill was marking its CDOs at more than fifty cents on the dollar at the end of the first quarter 2008.

Notably, this pricing bore little relation to observable market data, including industry-accepted market-based indicators for the pricing of RMBS and CDOs, known as the TABX and ABX indices. The ABX index tracks the value of credit default swaps insuring dozens of representative RMBS, much like the S&P 500 index is a proxy for the performance of large publicly-traded corporations. As the price of buying credit protection for the RMBS underlying the relevant ABX index increases, that ABX index declines. The TABX, launched in February 2007, tracks the price of CDS insuring the BBB and BBB- tranches of the ABX indices, but also takes into account varying levels of subordination. The TABX mimics the capital structure of a typical mezzanine CDO because it differentiates six BBB or lower-rated tranches from the first dollar of loss to the most senior tranches.

124. The most highly protected TABX tranche is the TABX 40-100, which provides 40% subordination, or an attachment point at the 60% level. This is substantially higher than the subordination of Merrill's own AAA exposures (typically 10-15% for a "high-grade" and 30-35% for a mezzanine super senior CDO), and therefore provided an appropriate benchmark to measure the decline in value of the Company's CDOs. The TABX was directly analogous to the mezzanine CDOs held by Merrill. TABX is also an appropriate comparator for Merrill's high-grade CDOs, considering their lower attachment points and because Merrill's high-grade CDOs generally contained substantial percentages of mezzanine CDO certificates as underlying collateral.

125. Nevertheless, in order to be conservative, Plaintiffs estimated the value of Merrill's CDOs holdings as of the first quarter of 2008 by calculating a weighted average of pertinent ABX and TABX indices. Merrill reported that approximately two-thirds of Merrill's "net" Super Senior CDO exposures were labeled as high grade and approximately one-third was

mezzanine.  *See, e.g.*, Merrill January 17, 2009 press release, Attachment IX; Merrill April 17, 2008 press release, Attachment V.   Giving ABX pricing a 70% weight and the lower TABX pricing a 30% weight, Plaintiffs derived an implied value of Merrill's CDO portfolio at the end of the first quarter of 2008 of about twenty-four cents on the dollar and twelve cents on the dollar at the end of the second quarter 2008.

126.     The Offering Materials should have reported much lower CDO values in 2008, as the extreme distress facing the CDOs' underlying collateral was ascertainable by the beginning of 2008.   By the end of Merrill's first quarter of that year, ***each of the thirty different CDO transactions that the Company originated during 2007 saw at least one of its respective AAA tranches downgraded to below investment grade***.   Of these deals, eighteen saw the most senior tranche downgraded.   By the end of the second quarter 2008, each of these CDOs was either: (i) in technical default; (ii) being liquidated; or (iii) in danger of liquidation.

127.     The drastic deficiencies of the write-downs Merrill reported in the 2008 Offering Materials were revealed on July 28, 2008.   Specifically, Merrill announced the sale of $30.6 billion of CDOs to an affiliate of the Lone Star hedge fund for a total of $1.7 billion in cash, plus a $5 billion note secured *solely* by the CDOs being transferred.   The cash payment represented just *six cents* on the dollar of par CDO paper.   If the Merrill loan to Lone Star is fully credited, the deal priced Merrill's CDOs at *twenty-two cents* on the dollar.

128.     The Lone Star sale confirms that Merrill's CDO assets were misstated in 2008.   In connection with the sale, Merrill announced an additional $4.1 billion write-down on the sold CDOs.   According to the Company's July 28, 2008 press release, the CDOs – which had a par value of $30.6 billion – "were carried at $11.1 billion" at the end of the second quarter of 2008.   As several financial commentators noted, including *Bloomberg* and a Deutsche Bank analyst,

Merrill was thus valuing these CDOs at thirty-six cents on the dollar as of June 30, 2008, *i.e.*, more than 50% higher than the Lone Star sale price. Further, by taking the acknowledged thirty-six cents on the dollar mark as of the second quarter of 2008 and reversing Merrill's $4.4 billion write-down in that quarter, it is apparent that Merrill was valuing its CDOs at more than fifty cents on the dollar as of the end of the first quarter 2008, *i.e.*, in the Offering Materials for the April and May 2008 Offerings.

129.    The reaction of various securities analysts confirms that Merrill had been overstating the value of its CDO assets. For example, a July 28, 2008 JPMorgan report noted that the sale clearly "implie[d] [that] MER's recently announced 2Q08 [CDO] write-downs were inadequate." Similarly, an analyst from Ferguson Wellman Capital Management, quoted in a *Bloomberg.com* article dated July 29, 2008 entitled "Merrill Sells $8.55 Billion of Stock, Unloads CDOs (Update2)," found the sale price to be "surprising and a little disheartening," and observed that "[w]hy these assets are written down when you're selling them and weren't written down in your earnings is a question."

130.    As noted above, the pertinent ABX and TABX indices indicated that Merrill should have been reporting its CDOs at ***twenty-five cents on the dollar*** in the 2008 Offering Materials, which is roughly in line with the Lone Star sale price and above the carrying values that Wall Street analysts calculated based on the company's prior disclosures, which were proven misstated by Merrill's 2008 write-downs. The fact that Merrill reported about $10 billion in CDO write-downs in 2008 illustrates that its carrying values were materially misstated.

131.    Moreover, Merrill's sale of the CDOs to Lone Star surely took months to complete. Even the syndication of a single large CDO can easily take several weeks. It likely took three or more months for Merrill to have: (i) "shopped" the opportunity to buy $30 billion

of CDOs; (ii) narrowed the bidding field to a small number of bidders; (iii) given the competing bidders sufficient time to conduct their own due diligence on the transaction; (iv) provided the "final bidder" sufficient time to obtain third party valuations of the underlying collateral; and (v) negotiated and finalized the legal documentation of the transaction.

C.    **THE OFFERING MATERIALS MADE SPECIFIC MISSTATEMENTS AND OMISSIONS REGARDING MERRILL'S INTERNAL CONTROLS**

132.    Merrill's disastrous accumulation of CDOs and other mortgage-linked securities and its failure to report true values of these exposures once they were first disclosed did not necessarily arise because of any particular Defendant's ill-intent or unlawful conduct.  Rather, the Company's derivative exposures to risky mortgages grew unchecked until they reached tens of billions of dollars because Merrill's internal risk control and risk management processes, to say the least, failed miserably.  Indeed, as the *Denver Post* reported on September 21, 2008, in an article entitled "Pink slips, some with a green lining," Merrill's "[p]oor risk controls did what the Great Depression couldn't: end Merrill Lynch's 94-year run as the world's largest retail brokerage."

133.    The Offering Materials between October 2006 and the end of 2007 included misstatements and omissions of specific fact regarding the manner in which Merrill's risk controls and management operated.  In its 2007 Form 10-K and in numerous admissions by its CEO, Merrill squarely placed the blame for its problems on failed risk controls and management. Although Merrill acknowledged its prior risk control failures by the beginning of 2008, it remained unable to get its risk controls and risk management to operate sufficiently to allow the Company to properly report its exposures in the 2008 Offerings.

134.    The quarterly reports on Form 10-Q that Merrill issued in 2006 and 2007 stated that Merrill's "independent risk groups" and "independent control groups" "work to ensure risks

are properly identified, measured, monitored and managed throughout Merrill Lynch." The Forms 10-Q also referred investors in the Offerings to the prior-filed Form 10-K for a more specific and detailed description of Merrill's internal risk control policies and practices. In particular, the 2006 Form 10-K specifically informed investors in the Offerings that:

> The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process.

135. Merrill's Form 10-K for fiscal 2006 also specified that Merrill "established a risk management process" based on:

- A formal risk governance structure that defines the oversight process and its components;

- A regular review of the risk management process by the Audit Committee of the Board of Directors (the "Audit Committee") as well as a regular review of credit, market and liquidity risks and processes by the Finance Committee of the Board of Directors ("the Finance Committee");

- Clearly defined risk management policies and procedures supported by a rigorous analytical framework;

- Communication and coordination among the businesses, executive management, and risk functions while maintaining strict segregation of responsibilities, controls, and oversight; and

- Clearly articulated risk tolerance levels, defined and regularly reviewed by the [Risk Oversight Committee], that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

136. As a direct result of Merrill's ineffective risk controls and management procedures, the Company did not report its significant concentrated exposure in subprime mortgage securities until Merrill reported a $7.9 billion write-down on its CDO and subprime exposures on October 24, 2007. Former CEO O'Neal admitted on October 24, 2007, that the company's "assessment of the potential risk [in its CDO positions] and mitigation strategies were inadequate."

137.    Analysts quickly pinned the blame for Merrill's CDO problems on a severe departure from the "rigorous analytical framework" that kept Merrill's businesses within proper "risk tolerance levels" and that was detailed in the Offering Materials.  An HSBC analyst report dated October 24, 2007 expressly stated that the write-down revealed "serious risk management deficiencies."  The same analyst described Merrill's accumulation of mortgage-related exposures as a "disaster in terms of degree of concentration of risk . . . a disaster in terms of managing/hedging down the risk, and a disaster in terms of ultimately dimensioning the risk."  Also, in an October 24, 2007 release, Moody's stated: (1) "our view that the firm suffered a risk control failure;" (2) "[t]he jump in the write-down suggests that management did not fully understand their exposures;" (3) "[i]n the specific case of Merrill Lynch's CDO business, profit growth targets apparently superseded risk considerations;" and (4) "Management allowed a sizeable concentration to develop and the resulting markdowns overwhelmed the benefits of Merrill Lynch's business and revenue diversification."

138.    Shortly after O'Neal initially disclosed Merrill's CDO exposures in October 2007, Merrill's board of directors asked him to resign.  In a January 18, 2008 article in *The Wall Street Journal* entitled "Merrill's Risk Manager -- New Chief John Thain on What Led to the Losses and Why He's Hiring Goldman Sachs Executives," Thain admitted just a few weeks after taking over for O'Neal that Merrill's risk controls were the key to understanding how its exposures and losses became so highly material:

> WSJ: Risk management is a priority for you.  How was it being handled before your arrival and how does it work now?
>
> Mr. Thain: ***There were at least two major problems.  One was that credit risk management was separate from market risk management***, and that doesn't make sense, because they are both permutations of the other.  We are combining market and credit risk….

***Merrill had a risk committee. It just didn't function***.  So now when we have a weekly meeting, the head of fixed income and equities show up.  I show up, and the risk heads show up. It functions and functions across the businesses.

\*   \*   \*

WSJ: What shocked you the most when you arrived at Merrill in early December?

Mr. Thain: Two things.  One was ***the lack of understanding of the risk in these positions and the lack of balance-sheet control***.  The balance sheet really got out of control, and traders were able to put on positions that were way too big, and I don't there was a good understanding of what the risk was.

139.    Further, during a January 17, 2008 investor conference call, Thain explained that due to these risk control failures, Merrill's structured finance bankers and traders allowed Merrill to assume imprudent risks that exceeded Merrill's risk management capacity.   Specifically, Thain said "on the trading side in particular, as it relates to CDOs, we did not do a good job… None of the trading businesses should be taking risks, either single positions or single trades, that wipe out the entire year's earnings of their own business and they of course, certainly shouldn't take a risk to wipe out the earnings of the entire firm."

140.    Merrill's 2007 Form 10-K effectively admitted that Merrill's prior disclosures about its risk management process, including that "[t]he risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management," were misstated.   Specifically, Merrill's 2007 Form 10-K description of its risk management control processes corrected Merrill's 2006 Form 10-K disclosures on the topic by adding the following:

> ***We are reinforcing risk management control processes to ensure that our risk tolerance is well-defined and understood by our businesses as well as by our executive management.  In particular, we are working to ensure that all material single-name, sector and product concentrations are appropriately recognized and managed. We are undertaking efforts to ensure that all highly correlated risks across different products and strategies are appropriately aggregated and monitored. We are also paying special attention to ensure that***

***the risks taken by any business are well proportioned to its earnings potential.*** ... Overall, these enhancements include improvements to our methodologies and changes in risk management and governance structure that are intended to bring experience and seasoned judgment to risk management decisions.

141.    In contrast with the earlier disclosures, which spoke of specific processes as current statements of fact, the 2007 Form 10-K plainly spoke of goals for risk management, improving processes in the future and attempting to fix Merrill's flawed risk controls.

142.    Although in the first quarter of 2008, Merrill's description of its risk controls was couched in less absolute and less specific terms, Merrill was not actually able to improve its risk controls to the extent needed to effectively manage and report the Company's mortgage-linked exposures. It is reasonable to infer – as supported by the need for a massive U.S. bailout to protect BofA from Merrill's previously undisclosed losses arising from these toxic assets – that Merrill's internal controls remained inadequate through 2008.  As detailed in a February 7, 2009 article in *The New York Times* entitled "For Bank of America and Merrill, Love Was Blind," which analyzed the events leading up to the bailout and Thain's resignation, it is evident that Merrill, even in 2008, was unable to adequately correct the deficiencies in Merrill's risk management procedures and policies that caused its CDO problems to begin with.

143.    *The New York Times* article notes several facts gleaned from interviews with current and former BofA and Merrill executives.  The article spoke of "gridlock" ensuing when potential buyers sought information regarding a range of mortgage assets.  For example, responses to queries about Merrill's mortgage assets and securities went unanswered because "management refused to agree on market estimates" of its products.  Thain also recognized, in the second quarter of 2008, that he did not have a handle on Merrill's mortgage mess, and was angry and surprised to learn that the firm's second quarter 2008 earnings "were devastated by mortgage losses."

144.     Indeed, more recent reports confirm that Merrill's risk controls were so flawed and dysfunctional during the 2006 to 2007 period – when Merrill took on the "legacy" assets that brought down the Company – that a full year later the Company is still struggling to maintain order in its trading books.  As reported in an article in *The New York Times* entitled "Undisclosed Losses at Merrill Lynch Lead to Trading Inquiry," dated March 6, 2009, Merrill traders and risk managers continue to be unable to set agreed upon values for CDS exposures and "[e]ven now, Merrill seems to be struggling to manage risk effectively in its trading operation, where some traders seem to flout the rules."  An analyst quoted in the article added that "It would be a tragedy if Bank of America shuts down much of the institutional trading business of Merrill Lynch, but on the other hand, it was trading that brought Merrill down."

145.     In sum, Merrill's risk controls, in the words of John Thain, "just didn't function" prior to his arrival at the end of 2007.  Nor did they function under Thain, who never fully grasped the extent of Merrill's exposures or losses.  This failure prevented Merrill from disclosing and describing accurately the value of its mortgage-backed securities and from apprising investors of the magnitude of the losses arising from Merrill's over-exposure to subprime-linked securities.  This negligence has contributed not only to the destabilization of the world's economy but also destroyed Merrill and is now jeopardizing BofA.

**D.     THE BOFA ACQUISITION AND U.S. GOVERNMENT BAILOUT REVEALED THE FULL AMOUNT AND TOXIC NATURE OF MERRILL'S MORTGAGE-RELATED ASSETS**

146.     On September 10, 2008, Merrill's peer Wall Street investment bank, Lehman, reported massive write-downs on mortgage-related assets similar to those on Merrill's books.  As reported by *The New York Times* on September 15, 2008 in an article entitled "Lehman files for bankruptcy; Merrill is sold," investors recognized that Lehman's write-downs left the company woefully undercapitalized to operate its business, and over the course of the following week led

to the collapse of Lehman and to its September 15, 2008 bankruptcy filing, the largest in U.S. history to date.

147. Critically, immediately after Lehman disclosed its own valuations for mortgage-linked securities, the market recognized, as reported in *The Wall Street Journal* on September 13, 2008 in an article entitled "Lehman Woes Pressure AIG, Merrill Lynch--Falling Shares Raise Questions About Capital," that if Lehman's reported valuations of mortgage-linked holdings were even remotely indicative of the valuations of similar securities in Merrill's portfolio, Merrill's prior write-downs were understated and the remaining value of Merrill's "Lehman-like" holdings was overstated. The same *The Wall Street Journal* article reported:

> ***The concerns about Merrill center on its holdings of the same kinds of assets, commercial real estate and residential mortgages that required write-downs by Lehman***. Those write-downs fueled the need for Lehman's own restructuring plan, announced Wednesday.
>
> Investors also are concerned that Merrill, despite having purged itself of most of its exposure to toxic mortgage assets, could have the weakest balance sheet of the three major independent securities firms that would remain after the demise of Bear Stearns in March and a sale of Lehman. The other independents are Goldman Sachs Group Inc. and Morgan Stanley.
>
> Some Wall Street analysts estimate that if Merrill took markdowns comparable to Lehman's, it could face an additional $3.5 billion beyond the $5.7 billion hit announced on July 28 that accompanied Merrill's sale of mortgage assets to Lone Star Funds. That, some analysts say, could require Merrill to raise even more capital, further diluting investors.

Thus, the Lehman bankruptcy revealed to the market that Merrill's write-downs to date had still missed the mark by a substantial margin.

148. By this point, the Company's days as an independent Wall Street firm were numbered. Over the weekend of September 13-14, 2008 it became clear that, without an acquirer, Merrill could suffer the same fate as Lehman. According to an article in the *Financial Times*, dated January 26, 2009, that weekend, Treasury Secretary Henry Paulson pulled Thain

aside and, in a private exchange, sternly advised him to quickly find a buyer for Merrill. Thain complied. On September 15, 2008, the Company announced that Thain had successfully brokered a merger with BofA, in which BofA would acquire Merrill in a $50 billion stock transaction. Merrill shareholders approved the merger on December 5, 2008.

149. When BofA negotiated its $50 billion acquisition price for Merrill, it naturally had access to the Offering Materials. Based on that initial due diligence, BofA publicly stated that Merrill was financially healthier and more viable than Lehman had been.[3] BofA CEO Ken Lewis said during a press conference on September 15, 2008 that, at the time of the merger, "[w]e actually thought Merrill Lynch's capital structure was very good."

150. After BofA gained access to Merrill's internal records, however, it discovered the deeply toxic nature of what then-CEO Thain described as Merrill's "legacy" assets. BofA's review of Merrill's internal documentation revealed that Merrill still held a highly material amount of undisclosed mortgage-linked exposures and that even the exposures that had been disclosed previously were worth far less than described in the Offering Materials.

151. Recognizing that he had dramatically overpaid for Merrill and that Merrill's true balance sheet could topple BofA itself, BofA CEO Ken Lewis approached the U.S. Government on December 17, 2008, seeking a $20 billion capital infusion. Lewis informed the Government that, without this substantial financial assistance, BofA would cancel the acquisition rather than acquire the derivative securities that had effectively destroyed Merrill.

152. During a January 16, 2009 investor conference call recounting the events of the prior months, Lewis explained that "we went to our regulators and told them that we would not – that we could not close the [Merrill] deal without their assistance" in light of Merrill's

---

[3] David Mildenberg, et al., *Bank of America to Acquire Merrill as Crisis Deepens*, Bloomberg.com (Sept. 15, 2008) (citing John Medlin, Jr., retired CEO of Wachovia Corp.).

unexpected and highly material losses. Lewis stated that "[t]he government was firmly of the view that terminating or delaying the closing of the transaction could . . . result in serious systemic harm." Therefore, "the Federal Reserve gave us assurances . . ." including "putting a fence around some of the [Merrill] assets that we were most concerned about." *Id*. Lewis added that, with the bailout in hand, "we just thought it was in the best interest of our Company and our stockholders, and the country, to move forward with the original terms and the timing."

153. In other words, BofA – as sophisticated an investor as can be imagined – reviewed the Offering Materials and conducted other inquiries into Merrill's financial condition and agreed to pay $50 billion to acquire the Company. Within months of accessing the Company's books, however, BofA determined that it could not proceed on the negotiated terms. Assuming BofA was acting in good faith, one must conclude that BofA itself concluded that the Offering Materials had not portrayed Merrill's mortgage-linked exposures accurately.

154. Under the terms of the bailout, which was first disclosed on January 15, 2009, the U.S. Government purchased $20 billion of preferred stock in BofA and guaranteed $118 billion in assets, primarily from Merrill's balance sheet. The assets to be "ring fenced" under the guarantee, and therefore protected from BofA's balance sheet, include billions of dollars of securities backed by residential and commercial real estate loans and "derivative transactions that reference such securities." The bailout included Merrill's remaining CDOs, but more importantly, as detailed in Section IV.A.2 above, it included over $50 billion of exposure to derivative contracts with financial guarantors that had not previously been disclosed to investors.

155. The mortgage-linked positions that required this historic government guarantee were "legacy assets." In a CNBC interview on January 25, 2009, Thain confirmed that "virtually all of the losses [that triggered the bailout] were from the legacy positions that had already been

there" when he became Merrill's CEO and that the loss "was concentrated in primarily mortgage and credit-related assets." This further confirms that the Offering Materials after November 2007 contained misstatements or omissions at the time of the Offerings.

156. Merrill's toxic mortgage assets not only destroyed Merrill, but they continue to haunt BofA. As noted by the February 8, 2009 *The New York Times* article, "the merger, in which Bank of America agreed to pay about $50 billion in stock for Merrill, soured at light speed. Back [in September 2008], the combined companies would have been valued by the stock market at about $176 billion. ***Today, the combination has a market capitalization of only $39 billion***."

## V.    SUMMARY OF MERRILL'S SECURITIES OFFERINGS

157. The Securities Act claims alleged herein are brought on behalf of investors who purchased Merrill preferred stock or bonds on or traceable to the following Offerings:

| OFFERING DATE | SECURITY (CUSIP) | VOLUME |
|---|---|---|
| **PREFERRED STOCK OFFERING** | | |
| April 29, 2008 (the "April 29 Preferred Offering") | 8.625% Non-Cumulative Preferred Stock, Series 8 (59023V373) | $2.673 billion (106.92 million depositary shares at $25 per share)[4] |
| **BOND OFFERINGS** | | |
| November 6, 2006 (the "November 6 Bond Offering") | Medium Term Notes, Series C (59018YYP0) | $100 million |
| November 27, 2006 (the "November 27 Bond Offering") | Floating Rate Subordinated Notes (5901886X1) | $165 million |
| December 4, 2006 (the December 4 $600 million Bond Offering") | Medium Term Notes, Series C (59018YYV7) | $600 million |

---

[4]     Each depositary share represents 1/1200 interest in a share of Merrill Series 8 8.625% Non-Cumulative Preferred Stock. 102 million depositary shares were initially issued, and 4.92 million additional depositary shares were sold through an over-allotment conducted pursuant to the same Offering Materials

| OFFERING DATE | SECURITY (CUSIP) | VOLUME |
|---|---|---|
| January 29, 2007 (the "January 29 Bond Offering") | 6.11% Subordinated Notes due January 29, 2037 (59022CAJ2) | $2 billion |
| March 23, 2007 (the "March 23 $600 million Bond Offering") | Medium-Term Notes, Series C (59018YB34) | $600 million |
| March 23, 2007 (the "March 23 $585 million Bond Offering") | Medium-Term Notes, Series C (59018YB26) | $585 million |
| May 2, 2007 (the "May 2 Bond Offering") | 5.70% Subordinated Notes due May 2, 2017 (59022CCS0) | $1 billion |
| May 2, 2007 (the "May 2 $400 million Bond Offering") | Floating Rate Subordinated Notes (59022CCT8) | $400 million |
| May 8, 2007 (the "May 8 $825 million Bond Offering") | Medium-Term Notes, Series C (59018YD32) | $825 million |
| May 8, 2007 (the "May 8 $1.350 billion Bond Offering") | Medium-Term Notes, Series C (59018YC90) | $1.350 billion |
| May 8, 2007 (the "May 8 $1 billion Bond Offering") | Medium-Term Notes, Series C (59018YD24) | $1 billion |
| June 5, 2007 (the "June 5 Bond Offering") | Medium-Term Notes, Series C (59018YE72) | $2 billion |
| August 15, 2007 (the "August 15 Bond Offering") | 6.05% Medium-Term Notes, Series C (59018YJ36) | $2.75 billion |
| August 28, 2007 (the "August 28 Bond Offering") | 6.40% Medium-Term Notes, Series C (59018YJ69) | $2.75 billion |
| September 7, 2007 (the "September 7 Notes Offering") | Accelerated Return Notes (59022W356) | $516 million (51.6 million units at $10 per unit) |
| February 5, 2008 (the "February 5 Bond Offerings") | 5.45% Medium-Term Notes, Series C (59018YM40) | $2.25 billion |
| April 25, 2008 (the "April 25 6.15% Bond Offering") | 6.15% Medium-Term Notes, Series C (59018YN56) | $1.5 billion |
| April 25, 2008 (the "April 25 6.875% Bond Offering") | 6.875% Medium-Term Notes, Series C | $5.5 billion |

| Offering Date | Security (Cusip) | Volume |
|---|---|---|
| | (59018YN64) | |
| May 12, 2008 (the "May 12 Bond Offering") | Medium-Term Notes, Series C (59018YP70) | $1.2 billion |
| May 14, 2008 (the "May 14 Bond Offering") | 7.75% Subordinated Notes Due May 14, (59023VAA8) | $1.75 billion |

158.    Each of the Offerings was conducted pursuant to a shelf registration statement dated March 31, 2006 (the "Shelf Registration Statement"), and filed with the SEC pursuant to Form S-3, a prospectus dated March 31, 2006 (the "Base Prospectus"), and either a prospectus supplement or pricing supplement issued in connection with such Offering.  The Form S-3 "shelf registration" permits an issuer to register numerous different securities for later issuance in a single SEC filing.  Once this "shelf" is established, the issuer may later "take down" securities from the shelf by issuing them to the public pursuant to a later-filed prospectus, prospectus supplement, and/or pricing supplement that refers investors to the underlying Form S-3.  As to each Offering, the Shelf Registration Statement, Base Prospectus, and the prospectus or pricing supplement for that Offering are referred to collectively as the "Offering Materials."

159.    Because the above Offerings were conducted pursuant to a shelf registration statement, the date of each offering – and not the prior date of the registration statement – is the "effective date" of the Shelf Registration Statement for purposes of Section 11 liability under 17 C.F.R. § 230.415 and 17 C.F.R. § 229.512(a)(2).

160.    The Base Prospectus expressly incorporates by reference Merrill's Forms 10-K, 10-Q, and 8-K that were filed with the SEC prior to the date of every Offering.  Specifically, the Base Prospectus states:

> We incorporate by reference the documents listed below which were filed with the SEC under the Exchange Act (other than information in the documents that is deemed not to be filed):

    ○   annual report on Form 10-K for the year ended December 30, 2005;

    ○   current report on Form 8-K filed with the SEC on March 7, 2006

We also incorporate by reference each of the following documents that we will file with the SEC after the date of this general prospectus supplement until this offering is completed or after the date of this registration statement and before the effectiveness of the registration statement (other than information in the documents that is deemed not to be filed):

    ○   reports filed under Section 13(a) and (c) of the Exchange Act;

    ○   definitive proxy or information statements filed under Section 14 of the Exchange Act in connection with any subsequent stockholders' meeting; and

    ○   any reports filed under Section 15(d) of the Exchange Act.

161.    Accordingly, on the date of each of the Offerings set forth above, the Base Prospectus and Shelf Registration Statement incorporated by reference each of the materially misstated documents or documents containing material omissions filed pursuant to Forms 10-K, 10-Q, or 8-K, including the financial statements, that had been filed prior to the date of each respective Offering. The misstated documents or documents containing material omissions that were incorporated in the Shelf Registration Statement and Base Prospectus for each individual Offering are set forth in the attached Appendix A.

## VI.    MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING MATERIALS

162.    The SEC filings listed on Appendix A, beginning with Merrill's Form 10-Q for the third quarter of 2006, contained material misstatements or omitted to disclose material facts. In sum, Merrill failed to accurately disclose the true amounts of its exposures to CDOs backed by subprime mortgages, the RMBS that were to provide collateral for additional CDOs, and hedges with monoline financial guarantors, while also omitting to accurately report the true values of these exposures to the extent they were belatedly disclosed. Because Merrill misstated

its mortgage-linked exposures, Merrill's reported assets, earnings, and capital position were also misstated, as set forth below.

163.    Before filing each of the Forms 10-K and 10-Q incorporated into the Offering Materials, Merrill issued press releases announcing its financial results for the relevant period, which were filed with the SEC on Forms 8-K (and were incorporated into the Offering Materials as indicated in Appendix A).  Beginning in the third quarter of 2006 and continuing through the first half of 2007, Merrill's earnings announcements regularly highlighted the Company's "record" revenues and earnings.  For example, on January 18, 2007, Merrill announced "record full year net revenues and net earnings for the year 2006 of $34.7 billion and $7.5 billion, respectively."[5]  O'Neal commented that 2006 was "the most successful year in [Merrill's] history."

164.    Similarly, on April 19, 2007, Merrill reported net revenues of $9.9 billion and net earnings of $2.2 billion for the first quarter of 2007.  The net revenues were "the second-highest quarterly net revenues Merrill Lynch has ever generated."[6]  O'Neal stated that "[t]his was a terrific quarter."  Merrill's earnings releases, however, contained the same materially misstated financial information or material omissions as the subsequent Form 10-Q or 10-K, all of which were incorporated into relevant Offering Materials set forth in Appendix A.

A.    **MISSTATEMENTS AND OMISSIONS IN OFFERING MATERIALS PRIOR TO OCTOBER 2007**

165.    Merrill's Forms 10-Q issued for the third quarter of 2006 and the first two quarters of 2007, and Merrill's Form 10-K for the year ended December 31, 2006, as well as the

---

[5]    Merrill Press Release, "Merrill Lynch Reports Record Net Revenues, Net Earnings and Diluted EPS For Full Year 2006," at 1 (Jan. 18, 2007).  The 2006 10-K also described "record" net earnings and net earnings per diluted share for 2007.  Merrill 2006 Form 10-K, at 28.  Similarly, the 10-Q for the third quarter of 2006 described "record net revenues" for the first nine months of 2006.  Merrill Form 10-Q 3Q 2006, at 49.

[6]    The 10-Q for the first quarter of 2007 also stated that FICC included "higher revenues in nearly every major product as revenues in credit products, commercial real estate, interest rate products and currencies increased to record levels."  Merrill Form 10-Q 1Q 2007, at 60.  Similarly, the 10-Q for the second quarter of 2007 described "record net revenues . . . [f]or the first six months of 2007." Merrill Form 10-Q 2Q 2007, at 61.

corresponding earnings releases, (collectively, the "Pre-October 2007 Filings") were each, except as otherwise noted, materially misstated for the same reasons, which are summarized below.

166.     First, as detailed above (Section IV.A-C), each of the Pre-October 2007 Filings described Merrill as an originator ***and seller*** of mortgage-linked securitizations (which investors learned referred to CDOs and RMBS), but omitted to disclose that Merrill had tens of billions of dollars of exposure to CDO tranches backed by subprime mortgages, its direct ownership of billions of subprime RMBS, and its exposure to long and short positions on credit default swaps linked to mortgage-linked securities.  Until Merrill's second quarter 2007 Form 10-Q (filed with the SEC on August 3, 2007), the words "collateralized debt obligation" did not even appear in any of the Offering Materials.  Although Merrill referenced "collateralized debt obligations" ***for the first time*** in the second quarter 2007 Form 10-Q, that document was still materially misstated because it omitted to disclose the amounts of any of these toxic exposures, or the fact that, by the fourth quarter of 2006, the defaults in the mortgages supporting these exposures were spiking dramatically and Merrill's ability to sell the CDOs it originated was substantially impaired.  As investors in the Offerings only learned later, Merrill's direct CDO exposures began to grow no later than the first quarter of 2006, after AIG ceased insuring subprime CDOs and Merrill could not sell all of its CDO paper to third parties, and as a result the balance exceeded $50 billion by the second quarter of 2007.

167.     In each of the Pre-October 2007 Filings, Merrill also omitted to disclose its material concentration of CDOs and other subprime-related risk (a concentration that was admitted in Merrill's third quarter 2007 Form 10-Q, below at ¶¶ 179-83).  In addition, Merrill omitted to take appropriate mark-to-market write-downs on its CDOs and related derivative

securities linked to non-prime mortgages on account of its inability to sell the paper at par, and on account of the spike in defaults of the underlying mortgages.

168.     Second, all of the Pre-October 2007 Filings omitted to disclose the amount of Merrill's billions of dollars of exposure to subprime and "Alt-A" RMBS holdings.  Merrill's Form 10-K for the fiscal year 2006 (filed with the SEC on March 17, 2007) stated that Merrill had "unencumbered liquid assets of $57 billion . . . in the form of unencumbered *high investment grade asset-backed securities and prime residential mortgage-backed securities*."  Merrill's Forms 10-Q described its RMBS exposure as focusing almost entirely on prime mortgages.  For example, in the Company's Form 10-Q for the first quarter 2007, Merrill stated that:  "[r]etained interests in securitized assets . . . related primarily to residential mortgage loan and municipal bond securitization transactions. . . . The majority of these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity, and *only a small portion of the retained interests represent residual interests from subprime mortgage securitizations*."  These statements, however, were materially misstated because they omitted to disclose that tens of billions of dollars of these "high investment grade," "AAA-rated," and "senior" securities were in fact backed by high-risk subprime and other non-prime loans.

169.     The Company thus misstated its total subprime exposure in the Pre-October 2007 Filings.  In its April 19, 2007 press release on first quarter earnings, Merrill minimized its exposure to subprime mortgages, stating that "U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1% of Merrill Lynch's total net revenues over the past five quarters."  Merrill's first and second quarter 2007 Form 10-Qs stated that Merrill's retained interests in "securitized assets," were approximately $8.3 billion and $10.3

billion, respectively, that "[t]he majority of the these retained interests include mortgage-backed securities that Merrill Lynch expects to sell to investors in the normal course of its underwriting activity," and that "only a small portion of the retained interests represent residual interests from subprime mortgage securitizations." These statements were materially misstated and omitted to disclose Merrill's material CDO and RMBS holdings balances, for which subprime mortgages were ultimately the underlying collateral (*see* ¶¶ 61, 83-94 above).

170.    Third, the Pre-October 2007 Filings materially misstated Merrill's exposure to, and the effectiveness of, hedges issued by monoline insurance companies on the Company's CDOs and other assets.  Specifically, the Pre-October 2007 Filings explained that Merrill uses derivative securities to hedge its trading positions, but added that "Merrill Lynch *formally assesses, both at the inception of the hedge and on an ongoing basis, whether the hedging derivatives are highly effective in offsetting changes in fair value or cash flows of hedged items*."[7]  This statement in the Pre-October 2007 Filings was materially misstated because it omitted to disclose the extent of Merrill's exposure to hedges on CDOs and other mortgage-backed securities issued by over leveraged monoline financial guarantors.  Merrill's monoline exposures not only became a significant concentration of risk, but also represented an ineffective hedge because, by no later than the first quarter of 2007, there was considerable concern about the viability of these insurers (*see* ¶¶ 98-102 above).  As discussed above, Merrill first reported $13.8 billion of CDO-related hedges with the monolines in January 2008 (by which time these financial guarantors were financially devastated by their own mortgage-linked exposures), and investors only learned of an additional $50 billion of non-CDO-related hedges with these monolines in January 2009.

---

[7]    Form 10-Q for the First Quarter of 2007, at 14, 16; Form 10-Q for the Second Quarter of 2007, at 15, 16. *See also* 2006 10-K, at 83, 84 (containing virtually identical language).

171. Fourth, the Pre-October 2007 Filings materially misstated Merrill's risk management policies and controls. The Pre-October 2007 Filings stated that Merrill's "independent risk groups" and "independent control groups" "work to ensure risks are properly identified, measured, monitored and managed throughout Merrill Lynch." In addition, Merrill's 2006 Form 10-K stated that

> ***The risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process.*** While no risk management system can ever be absolutely complete, the goal of these independent risk and control groups is to mitigate risk-related losses so that they fall within acceptable, predefined levels, under foreseeable scenarios.

172. The 2006 Form 10-K also stated that Merrill has "established a risk management process which includes":

- A formal risk governance structure that defines the oversight process and its components;

- A regular review of the risk management process by the Audit Committee of the Board of Directors (the "Audit Committee") as well as a regular review of credit, market and liquidity risks and processes by the Finance Committee of the Board of Directors ("the Finance Committee");

- Clearly defined risk management policies and procedures supported by a rigorous analytical framework;

- Communication and coordination among the businesses, executive management, and risk functions while maintaining strict segregation of responsibilities, controls, and oversight; and

- Clearly articulated risk tolerance levels, defined and regularly reviewed by the ROC [Risk Oversight Committee], that are consistent with our business strategy, capital structure, and current and anticipated market conditions.

173. After Merrill first disclosed (and potentially first uncovered) the true depth of its concentration of CDO and RMBS risk in the fall of 2007, Merrill effectively acknowledged that its prior description of the Company's risk control processes had been misstated and that its

entity-threatening exposures to these risky derivatives could not have taken place but for serious risk control and management failures had taken place.  In particular, the above-quoted language was changed in Merrill's Form 10-K for fiscal year 2007, as set forth in ¶ 140.  Moreover, once Merrill's CDO losses were first disclosed beginning October 5, 2007, then-CEO Stan O'Neal and incoming CEO John Thain repeatedly attributed the accumulation of such massive risky positions to flawed and omitted risk controls, as set forth at, *e.g.*, ¶¶ 136, 138-39 above.

174.    That Merrill's risk management practices and procedures were in disarray is further evidenced by the fact that Merrill accumulated and maintained tens of billions of dollars of CDO and other non-prime mortgage-related positions in 2006 and 2007, a time when the housing market was experiencing an unprecedented decline.  Indeed, Merrill's risk controls allowed its traders to accumulate huge amounts of these exposures notwithstanding that: (i) in 2005, AIG stopped insuring future CDO tranches underwritten by Merrill because of the insurer's concerns about inherent risks concerning mortgage-related CDOs; (ii) Merrill had been unable to sell its "super senior" CDO holdings to customers at par; and (iii) in June 2007, Merrill (as a lender) seized billions of dollars of CDO assets from two Bear Stearns hedge funds that contained significant CDO holdings and was unable to sell those CDO assets except at prices materially below par value.

175.    Fifth, the Pre-October 2007 Filings, starting with the 2006 10-K, created the mistaken impression that Merrill had the capability to properly account for its various mortgage-related assets and liabilities, including CDOs.  Indeed, the Pre-October 2007 Filings stated that: (i) Merrill "regularly assess[es] the adequacy of our equity capital base relative to the estimated risks and needs of our businesses" which "allow[s] us to attribute an amount of equity to each of our businesses that reflects the risks of that business, both on- and off-balance sheet" and that

"[w]e developed economic capital models to determine the amount of equity capital we need to cover potential losses arising from market, credit and operational risks."[8] The pre-October 2007 Filings also stated that, "[w]hen we assess our capital adequacy, we consider more sophisticated measures [than leverage ratios] that capture the risk profiles of the assets, the impact of hedging, off-balance sheet exposures, operational risk and other considerations."[9] These statements were materially misstated or contained material omissions because, in reality, the method that Merrill used to "assess" capital adequacy either failed to take into account the same subprime-linked exposures that were not otherwise disclosed to investors, or they failed to properly value these exposures and assess the amount of capital necessary to account for reasonably possible losses arising from those exposures.

176. Sixth, the Pre-October 2007 Filings stated that Merrill's financial statements complied with GAAP.[10] As explained in Sections IV.A.3 and IV.B, Merrill's financial statements violated GAAP by not disclosing material risk concentrations and exposures and by misstating the fair value of its subprime-backed CDOs and other non-prime assets. Indeed, in light of the misstatements and omissions outlined above regarding Merrill's subprime-linked exposures, Merrill's assets and earnings were overstated, liabilities were understated, and its capital position misstated.

---

[8] 2006 10-K, at 45; First Quarter 2007 10-Q, at 69 (nearly identical language); Second Quarter 2007 10-Q, at 73 (nearly identical language). *See also* Third Quarter 2006 10-Q, at 59 ("Merrill Lynch regularly reviews overall equity capital needs to ensure that its equity capital base can support the estimated risks and needs of its businesses, the regulatory and legal capital requirements of its subsidiaries, and standards pursuant to the Consolidated Supervised Entity rule.").

[9] 2006 10-K, at 46. *See also* First Quarter 2007 10-Q, at 70, Second Quarter 2007 10-Q, at 74. *See also* Third Quarter 2006 10-Q, at 60 ("When assessing its capital adequacy, Merrill Lynch considers the risk profiles of the assets, the impact of hedging, off-balance sheet exposures, operational risk and other considerations. As leverage ratios are not risk sensitive, Merrill Lynch does not rely on them as a measure of capital adequacy.").

[10] 2006 10-K, at 77 ("The Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles"); First Quarter 2007 10-Q, at 8 ("The Condensed Consolidated Financial Statements are presented in accordance with U.S. Generally Accepted Accounting Principles"); Second Quarter 2007 10-Q, at 9 (same). *See also* Third Quarter 2006 10-Q, *passim.*

**B.**    <u>MISSTATEMENTS AND OMISSIONS IN OFFERING MATERIALS BEGINNING OCTOBER 2007</u>

**1.    The October 5, 2007 Press Release and Form 8-K**

177.    On October 5, 2007, Merrill issued a press release filed as an exhibit to a Form 8-K (the "October 5, 2007 Press Release") announcing the Company's preliminary financial results for the third quarter of 2007.  In the October 5, 2007 Press Release, Merrill stated that due to "challenging market conditions" it expected to report a net loss of up to fifty cents per share. Merrill attributed the loss to "significant negative mark-to-market adjustments" to its positions in two asset classes (CDOs backed by subprime mortgages and leveraged finance commitments), with $4.5 billion of the total $4.9 billion in write-downs arising from CDOs and subprime. Nevertheless, the October 5, 2007 Press Release stated that "[d]uring the quarter, the Company significantly reduced its overall exposure to these [subprime-backed] asset classes."

178.    The October 5, 2007 Press Release contained material misstatements and omissions because it omitted to disclose: (i) the gross amount of Merrill's CDO, subprime and other non-prime exposures; and (ii) that Merrill "significantly reduce[d] its overall exposure to these exposures" by purchasing CDS protection from poorly capitalized and highly leveraged monoline counterparties (including XL and ACA), as opposed to actually selling these toxic assets to market participants and thereby ensuring that they would not further harm the Company's financial position.  In addition, the October 5, 2007 Press Release omitted to take an adequate write-down for its CDOs and subprime assets, and thereby materially overstated the Company's net income and assets.

**2.    The October 24, 2007 Press Release and November 7, 2007 Form 10-Q**

179.    Three weeks later, on October 24, 2007, Merrill issued a press release filed as an exhibit to a Form 8-K (the "October 24, 2007 Press Release"), announcing the Company's financial results for the third quarter 2007.  Merrill shocked investors by reporting a third quarter

CDO and subprime-related **net** write-down of $7.9 billion, a more than 175% increase over the $4.5 billion write-down that Merrill had disclosed just three weeks earlier, as well as a loss of $2.3 billion from continuing operations, or $2.85 per share.

180.    In the October 24, 2007 Press Release, Merrill disclosed that, after the write-downs, its **net**: (i) "ABS CDO related exposure" was $15.2 billion, and (ii) "Total U.S. subprime mortgage-related exposures" were $5.7 billion.  Merrill also disclosed for the first time that at the end of the previous quarter (*i.e.*, the quarter ending June 30, 2007), the Company's **net** "ABS CDO related exposure" and "Total U.S. subprime mortgage-related exposures" had been $32.1 billion and $6.9 billion, respectively.  During a conference call that day, Merrill attributed the significant reduction in its "ABS CDO related exposure" and "Total U.S. subprime mortgage-related-exposures" between the second and third quarters of 2007 to the write-downs and to CDO "market transactions."

181.    The October 24, 2007 Press Release was materially misstated because, while it disclosed that Merrill maintained $5.7 billion of net subprime mortgage-related exposures, it omitted to disclose: (i) the fact that Merrill, through its banking subsidiaries, had an **additional** $5.7 billion of subprime **net** exposures; (ii) Merrill's net exposure to $9.8 billion of non-prime Alt-A RMBS exposure; (iii) Merrill's **gross** exposure to subprime mortgage-related assets, *i.e.*, its exposure without taking into account monoline or other hedges; and (iv) Merrill's exposure to tens of billions of dollars of hedges and guarantees issued by monoline insurers (which was necessary for investors in the Offerings to assess the ineffectiveness of those hedges).

182.    On November 7, 2007, Merrill filed its Form 10-Q for the quarter ending September 30, 2007 (the "third quarter 2007 Form 10-Q").  The third quarter 2007 Form 10-Q disclosed that "through its U.S. Bank subsidiaries" Merrill had an **additional** $5.7 billion

"exposure to U.S. sub-prime residential mortgage-related assets." Nevertheless, the third quarter 2007 Form 10-Q included substantially the same material misstatements and omissions set forth in the October 24, 2007 Press Release referred to above.

183.    The Form 10-Q for the third quarter 2007 also stated that Merrill's financial statements complied with GAAP.  As explained above in Section IV.A.3, Merrill's financial statements violated GAAP by not disclosing material risk concentrations (*i.e.*, to monolines and the gross amount of CDO and subprime RMBS exposures) and by misstating the fair value of its subprime-backed CDOs and other non-prime mortgage-linked assets.

### 3.    The January 17, 2008 Press Release and 2007 Form 10-K

184.    On January 17, 2008, Merrill issued a press release that was filed as an exhibit to a Form 8-K (the "January 17, 2008 Press Release"), announcing the Company's financial results for the fourth quarter and full-year 2007.  Merrill reported a loss for the fourth quarter of $14.9 billion, which included $11.5 billion in write-downs on subprime-related direct exposures.  For the year, Merrill reported a loss of $8.6 billion (driven primarily by the subprime-related write-downs over the past two quarters), total stockholders' equity of $31.9 billion, and book value per share of $29.34.

185.    In addition, Merrill, ***for the first time***, disclosed the Company's ***gross*** subprime-backed CDO exposure, which purportedly amounted to $30.4 billion as of year end after write-downs (of which $23.6 billion was purportedly hedged).  The press release also disclosed that Merrill's gross subprime CDO balance at the second quarter of 2007 – before it began to take write-downs – was over $50 billion.

186.    The January 17, 2008 press release also disclosed, for the first time, that Merrill had $9.8 billion of Alt-A exposures (as of year-end) consisting of: (i) $7.1 billion of Alt-A RMBS; and (ii) $2.7 billion of Alt-A exposures.

187.    The January 17, 2008 Press Release contained misstatements of material fact or material omissions because it, among other things: (i) omitted to disclose Merrill's **gross** exposures to subprime and non-prime RMBS; (ii) omitted to disclose Merrill's reliance on **$50 billion** of monoline financial guarantor swaps to offset its RMBS and other non-CDO exposures (¶ 96); and (iii) materially misstated the Company's reported earnings, assets, stockholders' equity, and book value per share by failing to accurately report the severe impairments to the Company's direct CDO, non-prime RMBS and monoline exposures. *See* ¶¶ 121-22.

188.    On February 25, 2008, Merrill filed its Form 10-K for the year ended December 31, 2007 (the "2007 Form 10-K"). The Form 10-K contained substantially the same misstatements of material fact and had the same material omissions as the January 17, 2008 press release referred to above. In addition, the 2007 Form 10-K largely repeated the misstatements and omissions about Merrill's risk management set forth above (¶¶ 171-72), but Merrill's statement concerning risk management control processes corrected Merrill's 2006 Form 10-K disclosures on the topic by stating the following:

> Independent risk and control groups interact with the core businesses to establish and maintain this overall risk management control process. *We are reinforcing risk management control processes to ensure that our risk tolerance is well-defined and understood by our businesses as well as by our executive management. In particular, we are working to ensure that all material single-name, sector and product concentrations are appropriately recognized and managed. We are undertaking efforts to ensure that all highly correlated risks across different products and strategies are appropriately aggregated and monitored. We are also paying special attention to ensure that the risks taken by any business are well proportioned to its earnings potential* . . . Overall, these enhancements include improvements to our methodologies and changes in risk management and governance structure that are intended to bring experience and seasoned judgment to risk management decisions.

189.    The 2007 Form 10-K's risk management disclosures acknowledged that Merrill's prior statement, "[t]he risk management and control process ensures that our risk tolerance is well-defined and understood by our businesses as well as by our executive management,"

contained misstatements or omissions. As described above at ¶¶ 138-39, Thain noted in a January 18, 2008 article in *The Wall Street Journal* that "[t]here were at least two major problems [with internal controls when he arrived at Merrill in December 2007]. One was that credit risk management was separate from market risk management, and that doesn't make sense, because they are both permutations of the other" and the other was that "Merrill had a risk committee. It just didn't function." Thain added that he was shocked by "the lack of understanding of the risk in these positions and the lack of balance-sheet control."

190.    The 2007 Form 10-K stated that Merrill's financial statements complied with GAAP. As explained above in Section IV, Merrill's financial statements violated GAAP by not disclosing material risk concentrations with respect to monoline insurers (*see* ¶¶ 110-11) and by misstating the fair value of its subprime-backed CDOs and other non-prime assets (*see* ¶¶ 116, 120-22). Indeed, in light of the misstatements and material omissions outlined above regarding Merrill's subprime-linked exposures, Merrill's assets and earnings were overstated, liabilities were understated, and its capital position misstated.

### 4.    First Quarter 2008 Disclosures

191.    On April 17, 2008, Merrill issued a press release filed as an exhibit to a Form 8-K (the "April 17, 2008 Press Release"), announcing its first quarter 2008 financial results. Merrill reported a net loss of $1.96 billion for the first quarter of 2008, including a net write-down of $1.5 billion on CDOs and a further "credit valuation adjustment" write-down of $3 billion on hedges with financial guarantors, including $2.2 billion for CDO related hedges. The April 17, 2008 Press Release also reported total stockholders' equity of $36.5 billion and book value per share of $25.93, and quoted Thain as stating that "[t]he firm's $82 billion excess liquidity pool has increased from year-end levels, and we remain well-capitalized."

192.    The April 17, 2008 Press Release contained misstatements of material fact and material omissions because, among other things: (i) it omitted to disclose Merrill's gross exposures to subprime and non-prime RMBS; (ii) it omitted to disclose Merrill's reliance on $50 billion of non-CDO insurance with failing monoline financial guarantors (indeed, by taking $2.2 billion in credit valuation adjustments on CDO exposure to monolines but only $0.8 billion on non-CDO exposure, Merrill implied a far lower value of the latter); (iii) it materially misstated the Company's reported earnings, assets, stockholders' equity and book value per share by omitting to disclose and account for the severe impairments to the Company's direct CDO, non-prime RMBS, and monoline exposure (*see* Section IV.B); and (iv) it overstated the true value of Merrill's CDOs and hedges with financial guarantors when it announced a net write-down of $1.5 billion on CDOs and an additional write-down of $3 billion on hedges.

193.    On May 6, 2008, Merrill filed its Form 10-Q for the quarter ended March 30, 2008 (the "Form 10-Q for the first quarter 2008").  The First Quarter 2008 Form 10-Q contained substantially the same material misstatements and omissions contained in the April 17, 2008 Press Release referred to above.

## VII.    CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all persons and entities who purchased or otherwise acquired the debt securities and series of preferred stock (collectively, "Bond Class Securities") set forth at ¶ 157 above, and were damaged by the circumstances described herein (the "Bond Class").  Excluded from the Bond Class are Defendants, BofA, their respective officers and directors (current and former), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest.

195.    The members of the Bond Class are so numerous that joinder of all members is impracticable.    While the exact number of Bond Class members is presently unknown to Plaintiffs and can only be ascertained through appropriate discovery, Plaintiffs reasonably believe that there are thousands of members in the Bond Class.    Record owners and other members of the Bond Class may be identified by records maintained by Defendants and their transfer agents, and may be notified of the pendency of the action by mail, the internet, or publication using the form of notice similar to that customarily used in securities class actions.

196.    Plaintiffs' claims are typical of the claims of the members of the Bond Class as all members of the Class are similarly affected by Defendants' violations of the Securities Act of 1933.

197.    Plaintiffs will fairly and adequately represent the interests of the members of the Bond Class and have retained counsel competent and experienced in class and securities litigation.

198.    Common questions of law and fact exist as to all members of the Bond Class and predominate over any questions solely affecting individual members of the Bond Class.    These common questions of law and fact include:

      a.    whether Defendants violated the Securities Act of 1933 as alleged herein;

      b.    whether the Shelf Registration Statements and the Offering Materials contained misstatements or omissions of material fact; and

      c.    the proper measure of damages.

199.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Bond Class to obtain individual redress. There will be no difficulty in the management of this action as a class action.

## VIII.   CAUSES OF ACTION

### COUNT I

**For Violations of Section 11 of The Securities Act**
**Against Merrill**

200.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

201.    This Count is asserted against Merrill Lynch & Co., Inc. for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Bond Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the Shelf Registration Statement and Offering Materials, and were damaged by the circumstances described herein.

202.    As to each of the Bond Class Securities, the pertinent Offering Materials contained misstatements of material facts and omitted other material facts.

203.    Merrill, for each offering of the Bond Class Securities, is strictly liable under Section 11 for the material misstatements and omissions in the Offering Materials for that Offering.

204.    Plaintiffs and members of the Bond Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statement.

205.    Plaintiff and the Bond Class did not know, nor in the exercise of reasonable diligence could have known, of the misstatements or omissions of material facts in the Shelf Registration Statement and incorporated Offering Materials when they purchased or acquired their Bond Class Securities.

206. The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Bond Class have sustained damages.

207. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.

208. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Merrill acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. Rather, Plaintiffs allege that Merrill is liable for the misstatements and/or omissions in the Offering Materials on a strict liability or negligence basis.

209. By reason of the foregoing, Merrill is liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Bond Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

## <u>COUNT II</u>

**For Violations Of Section 11 Of The Securities Act**
**<u>Against The Individual Section 11 Defendants</u>**

210. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

211. This Count is asserted against the Individual Section 11 Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Bond Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the

Shelf Registration Statement and Offering Materials, and were damaged by the circumstances described herein.

212.    Each Defendant named in this Count is liable in connection with those Offerings: (a) made at a time when the Defendant was a director of Merrill, or (b) made pursuant to a Shelf Registration Statement that the Defendant signed.  The descriptions of each Individual Section 11 Defendant at ¶¶28-31, 34-46 above describe the Offerings for which such Individual Section 11 Defendant is liable pursuant to this Count.

213.    As to each of the Bond Class Securities, the pertinent Offering Materials contained misstatements of material fact and omitted other material facts.

214.    Each of the Defendants named in this Count is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement and incorporated Offering Materials.  The Defendants named in this Count did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact.  Accordingly, the Defendants named in this Count are liable to Plaintiffs and the other members of the Bond Class who purchased Bond Class Securities.

215.    Plaintiffs and members of the Bond Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statement.

216.    Plaintiffs and the Bond Class did not know, nor in the exercise of reasonable diligence could have known, of the misstatements or omissions of material facts in the Shelf Registration Statement and incorporated Offering Materials when they purchased or acquired their Bond Class Securities.

217.    The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Bond Class have sustained damages.

218.    Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.

219.    This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that any Individual Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.  Rather, Plaintiffs allege that the Individual Section 11 Defendants are liable for the misstatements and/or omissions in the pertinent Offering Materials on a strict liability or negligence basis.

220.    By reason of the foregoing, the Individual Section 11 Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

# COUNT III

### For Violations of Section 11 of The Securities Act
### Against The Underwriter Defendants

221.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

222.    This Count is asserted against the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of members of the Bond Class who purchased or otherwise acquired the Bond Class Securities pursuant to or traceable to the Shelf Registration Statement and Offering Materials, and were damaged by the circumstances described herein.

223.    Each of the Underwriter Defendants was an underwriter of certain of the Bond Class Securities, as set forth in Appendix A.

224.    As to each of the Bond Class Securities, the pertinent Offering Materials contained misstatements of material fact and omitted other material facts.

225.    Although it was a subsidiary of the issuer of the securities at issue in this case, MLPF&S was an underwriter of each of these same securities and, in that capacity, MLPF&S had the same obligations of independent due diligence toward the issuer as any other underwriter.  If MLPF&S had properly satisfied its due diligence duties in this case, it would have discovered management's errors and negligence and the failed risk controls that led to the misstatements and omissions in the Offering Materials.  The red flags that should have been uncovered by MLPF&S (as well as each of the other underwriters) include, among other things:

- The fact that disclosures of CDO exposures were limited to *net* exposures.  This would normally imply that there were offsetting long and short positions of similar securities, which would mean that there would have been gains on short positions as the CDO market fell;

- The wide knowledge of lax lending standards in the residential mortgage market;

- The acceleration of CDO underwriting after AIG backed away from insuring subprime securities;

- The fact that Merrill increased its CDO and subprime write-down from $4.5 billion to $7.9 billion in October 2007;

- The deterioration of the monolines (*see*, *e.g.*, ¶¶ 58, 91-92, 99);

- The fact that risk controls and risk management were failing and that certain risk management committees "just didn't function;"

- The fact that write-downs continued for multiple quarters in the same asset class and the inability to reconcile exposure balances and write-downs from quarter-to-quarter; and

- Merrill's failure to sell the super senior tranches of CDOs it was underwriting.

226. Each of the Defendants named in this Count is unable to establish an affirmative defense based on a reasonable and diligent investigation of the statements contained in the Shelf Registration Statement and incorporated Offering Materials. The Defendants named in this Count did not make a reasonable investigation or possess reasonable grounds to believe that those statements were true and that there were no omissions of any material fact. Accordingly, the Defendants named in this Count are liable to Plaintiffs and the other members of the Bond Class who purchased Bond Class Securities.

227. Plaintiffs and members of the Bond Class purchased Bond Class Securities issued under or traceable to the Shelf Registration Statement.

228. Plaintiffs and the Bond Class did not know, nor in the exercise of reasonable diligence could have known, of the misstatements of material fact or omissions of material facts in the Shelf Registration Statement and incorporated Offering Materials when they purchased or acquired their Bond Class Securities.

229.     The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Bond Class have sustained damages.

230.     Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.  Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.

231.     This claim does not sound in fraud.  For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that any Underwriter Defendant acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.  Rather, Plaintiffs allege that the Underwriter Defendants are liable for the misstatements and/or omissions in the pertinent Offering Materials on a strict liability or negligence basis.

232.     By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Bond Class who purchased or otherwise acquired Bond Class Securities pursuant to the Shelf Registration Statements.

## COUNT IV

### For Violations of Section 12(a)(2) of The Securities Act
### Against Merrill

233.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

234.     This Count is asserted against Merrill for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Bond Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged by the circumstances described herein.

235.     Merrill was a seller, offeror, and/or solicitor of sales of the Bond Class Securities issued in the Offerings pursuant to the Shelf Registration Statement and Offering Materials. These materials contained misstatements of material fact and omitted other materials facts, as set in Appendix A.

236.     Merrill directly solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Bond Class by means of the Shelf Registration Statement and related Prospectuses, motivated by the desire to serve its own financial interests.

237.     Merrill used means and instrumentalities of interstate commerce and the U.S. mails.

238.     Plaintiffs and other members of the Bond Class purchased or otherwise acquired Bond Class Securities in the Offerings pursuant to the Shelf Registration Statement and Offering Materials, which contained material misstatements and omissions, and did not know, nor in the exercise of reasonable diligence could have known, of the misstatements and omissions contained therein.

239.     At least one Plaintiff purchased on the Offerings for each of the Bond Class Securities and as such has direct standing to bring a claim under Section 12(a)(2), except with

respect to the April 25 6.15% Bond Offering (CUSIP 59018YN56) and the June 5 Bond Offering (CUSIP 59018YE72), for which the named Plaintiffs did not purchase directly on the Offerings.

240. The value of the Bond Class Securities declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Bond Class have sustained damages.

241. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.

242. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Merrill acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim. Rather, Plaintiffs allege that Merrill is liable for the misstatements and/or omissions in the pertinent Offering Materials on a strict liability or negligence basis.

243. By virtue of the conduct alleged herein, Merrill violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and other members of the Bond Class who purchased in Offerings pursuant to the Shelf Registration Statement and incorporated Offering Materials and have retained their securities, have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to Merrill. In addition,

Plaintiffs and the members of the Bond Class who have sold their securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT V

### For Violations of Section 12(a)(2) of The Securities Act
### Against The Underwriter Defendants

244.  Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

245.  This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Bond Class who purchased or otherwise acquired Bond Class Securities in the Offerings and were damaged by the circumstances described herein.

246.  At least one Plaintiff purchased on the Offerings for each of the Bond Class Securities and as such has direct standing to bring a claim under Section 12(a)(2), except with respect to the April 25 6.15% Bond Offering (CUSIP 59018YN56) and the June 5 Bond Offering (CUSIP 59018YE72), for which the named Plaintiffs did not purchase directly on the Offerings.

247.  The Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the Bond Class Securities issued in the Offerings pursuant to the Shelf Registration Statement and Offering Materials.  These materials contained misstatements of material fact and omitted other material facts, as set forth herein.

248.  The Underwriter Defendants: (a) transferred title to Plaintiffs and other members of the Bond Class who purchased Bond Class Securities; (b) transferred title of Bond Class Securities to other underwriters and/or broker-dealers that sold those securities as agents for the Underwriter Defendants; and (c) solicited the purchase of Bond Class Securities by Plaintiffs and other members of the Bond Class by means of the Shelf Registration Statement and related Prospectuses, motivated at least in part by the desire to serve the Underwriter Defendants' own

financial interest and the interests of Merrill, including but not limited to commissions on their own sales of Bond Class Securities and separate commissions on the sale of those securities by non-underwriter broker-dealers.

249. The Underwriter Defendants used means and instrumentalities of interstate commerce and the U.S. mails.

250. Plaintiffs and other members of the Bond Class purchased or otherwise acquired Bond Class Securities in the Offerings pursuant to the Shelf Registration Statement and Offering Materials and did not know, or in the exercise of reasonable diligence could not have known, of the misstatements and omissions contained therein.

251. The value of the Bond Offering Securities declined substantially subsequent to the consummation of the Offerings and Plaintiffs and the other members of the Bond Class have sustained damages.

252. Less than one year elapsed between the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials. Less than three years elapsed between the time that the securities at issue in this complaint were bona fide offered to the public and the time that the first complaint was filed asserting claims arising out of misstatements and omissions in the disclosures comprising or incorporated into the Offering Materials.

253. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim. Rather, Plaintiffs allege that the

Underwriter Defendants are liable for the misstatements and/or omissions in the pertinent Offering Materials on a strict liability or negligence basis.

254. By virtue of the conduct alleged herein, the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and other members of the Bond Class who purchased in Offerings pursuant to the Shelf Registration Statements and incorporated Offering Materials have the right to rescind and recover the consideration paid for their securities, and hereby elect to rescind and tender their securities to the Underwriter Defendants and the Underwriter Defendants. In addition, Plaintiffs and the members of the Bond Class who have sold their securities that they originally purchased through the Offerings are entitled to rescissory damages.

## COUNT VI

### For Violations of Section 15 of The Securities Act
### Against The Individual Defendants

255. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

256. This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Bond Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

257. During their times as directors and/or officers of Merrill, the Individual Defendants were controlling persons of Merrill within the meaning of Section 15 of the Securities Act.

258. Each Individual Defendant, at the time he or she was a director or officer of the Company, participated in the operation and management of Merrill and MLPF&S, and conducted and participated, directly and indirectly, in the conduct of the business affairs of

Merrill and MLPF&S. Because of their positions of control and authority as officers and/or directors of Merrill, the Individual Defendants were able to, and did, control (a) the contents of the Shelf Registration Statement and the incorporated Offering Materials, which contained materially misstated financial and other information, and (b) the activities of MLPF&S as an underwriter of Bond Class Securities.

259. This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. Rather, Plaintiffs allege that the Individual Defendants are liable in their capacity as control persons of the liable entities. By virtue of the Individual Defendants' control over Merrill and by virtue of Merrill's control over MLPF&S, the Individual Defendants are named herein as Defendants under Section 15 of the Securities Act with respect to the Bond Class Securities issued by Merrill or underwritten by MLPF&S.

260. By reason of the aforementioned conduct, each of the Individual Defendants named in this Count is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Bond Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of the Individual Defendants, Plaintiffs and the other members of the Bond Class suffered damages in connection with their purchase or acquisition of Bond Class Securities.

## COUNT VII

### For Violations of Section 15 of The Securities Act
### Against Merrill as the Controlling Entity of Underwriter MLPF&S

261.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

262.    This Count is asserted against Merrill for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the other members of the Bond Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above.

263.    At all times relevant hereto, Merrill was a controlling entity of MLPF&S within the meaning of Section 15 of the Securities Act. Because of its position of control and authority over MLPF&S, Merrill was able to, and did, control the actions of MLPF&S as an underwriter of Bond Class Securities.

264.    By virtue of Merrill's control over MLPF&S, Merrill is named herein as a Defendant under Section 15 of the Securities Act with respect to the Bond Class Securities underwritten by MLPF&S.

265.    This claim does not sound in fraud. For purposes of asserting this claim under the 1933 Act, Plaintiffs do not allege that Merrill acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. Rather, Plaintiffs allege that Merrill is liable under Section 15 on a strict liability or negligence basis.

266.    By reason of the aforementioned conduct, Merrill is liable under Section 15 of the Securities Act to Plaintiffs and the other members of the Bond Class who have asserted claims pursuant to Sections 11 or 12(a)(2) of the Securities Act, as set forth above. As a direct and proximate result of the conduct of Merrill, Plaintiffs and the other members of the Bond Class suffered damages in connection with their purchase or acquisition of Bond Class Securities.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.      Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Bond Class defined herein;

b.      Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiff and all members of the Bond Class against Defendants in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Bond Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial.

Dated: March 13, 2009
New York, New York

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: _____

John P. Coffey (sean@blbglaw.com)
Mark Lebovitch (markl@blbglaw.com)
Kurt Hunciker (kurt@blbglaw.com)
Bruce Bernstein (bruce@blbglaw.com)
Karine Louis (karine@blbglaw.com)
Sean O'Dowd (seano@blbglaw.com)

1285 Avenue of the Americas
New York, New York 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Bond Counsel and Attorneys for Louisiana Sheriffs'
Pension and Relief Fund and Louisiana Municipal
Police Employees' Retirement System*

Robert D. Klausner
**KLAUSNER & KAUFMAN, P.A.**
10059 Northwest 1st Court
Plantation, Florida 33324
Tel:    (954) 916-1202
Fax:    (954) 916-1232

*Additional Counsel for Louisiana Sheriffs'
Pension and Relief Fund*

Maya Saxena
SAXENA WHITE P.A.
2424 North Federal Highway
Suite 257
Boca Raton, Florida 33431
Tel:    (561) 394-3399
Fax:    (561) 394-3082

*Counsel for National Electrical Contractors
Association – International Brotherhood of
Electrical Workers*

Marc I. Gross
THE POMERANTZ LAW FIRM
100 Park Avenue
New York, NY 10017-5516
Tel:    (212) 661-1100
Fax:    (212) 661-8665

*Counsel for Iron Workers Locals 40, 361, 417
Union Security Funds and Iron Workers Local 580
Joint Funds*

Cynthia J. Billings
Sullivan, Ward, Asher & Patton, PC
1000 Maccabees Center
25800 Northwestern Highway
Southfield, Michigan 48075
Tel:    (248) 746-0700

*Counsel for City of Pontiac Police and Fire
Retirement System and City of Pontiac General
Employees Retirement System*