**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No.: 07cv9633 (JSR)(DFE) |
| This Document Relates To: Derivative Action, 07cv9696 (JSR)(DFE) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE VERIFIED THIRD AMENDED
SHAREHOLDER DERIVATIVE AND CLASS ACTION COMPLAINT**

**BROWER PIVEN**
  A Professional Corporation
David A.P. Brower
Jessica J. Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Counsel For Derivative Plaintiff*

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………………iii

I.    Introduction……………………………..……………………………………………1

II.   Factual Background……………………………………………………………………5

      A.    Statement of Facts……………………………………………………………5

      B.    Procedural History……………………………………………………….……12

      C.    Demand Futility……………………………………………………………13

      D.    The Claims Asserted…………………………………………………………20

III.  Argument…………………………………………………………………………...22

      A.    Plaintiff Has Standing to Pursue the Double Derivative Claims………………...22

            1.    Federal Procedural Law Governs Plaintiff's Standing…………………23

            2.    Delaware Law Recognizes Double Derivative Plaintiff Standing……….27

            3.    Demand Futility as a Requisite of Standing……………………………38

      B.    BofA Demand Is Excused………………………………………………………44

            1.    Indemnification and Insurance Provisions of Merger Agreement……….46

            2.    Liability on Claims Arising Out of the Merger…………………………48

            3.    Prejudgment of the Merits of the Complaint……………………………52

            4.    Conflicts of Interest……………………………………………………...53

            5.    BofA Board's Rejection of Lambrecht's Demand
                  Demonstrates Futility………………………………………………54

      C.    Demand Futility Merrill………………………………………………………55

            1.    Demand Requirements are Properly Considered Under Rales of the
                  Merrill Board Before the Merger……………………………………...55

i

D.      Merrill Demand Is Excused……………………………………………………..58

        1.      Individual Defendants Cannot Seek Protection for Breach of Fiduciary
                Duties Under Merrill's Certificate of Incorporation………….…………58

        2.      The Former Merrill Board Faces Substantial Likelihood of Liability…..63

E.      Plaintiff Adequately States Claims Pursuant to Rule 12(b)6…………………91

        1.      Breach of Fiduciary Duties, Gross Mismanagement and
                Abuse of Control…………………………………………….…………..91

        2.      Plaintiff Has Demonstrated Individual Defendants' Breach
                of the Duty of Oversight………………………………………………93

        3.      Plaintiff Has Demonstrated Individual Defendants' Breach
                of Fiduciary Duty for Misappropriation of Information and
                Insiders Stock Sales……………………………………….…………..95

        4.      Plaintiff Has Demonstrated Individual Defendants' Breach of
                Aiding and Abetting Breach of Fiduciary Duty…………………………96

        5.      Plaintiff Has Established Corporate Waste Claims……………………...97

        6.      Plaintiff Has Established Claim for Unjust Enrichment……………….....99

        7.      Plaintiff Has Established Claim for Contribution and Indemnification...100

        8.      Plaintiff Has Established Claim for Violations of Section 10(b)
                and Rule 10b-5 in connection with the Stock Repurchase and Against the
                Insider Selling Defendants…………………………………………...…101

V.      Conclusion………………………………………………………………………...115

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Abbott Laboratories Derivative S'Holders Litigation*, 325 F.3d 795 (7th Cir. 2003) ................................................................................................63, 95

*Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538 (D. Del. 2008)..................................................................60

*Adelphia Recovery Trust v. Bank of America, N.A.*, No. 05-9050, 2009 U.S. Dist. LEXIS 38834 (S.D.N.Y. May 4, 2009) ....................................................104

*In re Advanta Corp. Sec. Litigation*, 180 F.3d 525 (3d Cir. 1999) ...................113

*Arcadia v. Ohio Power Co.*, 498 U.S. 73 (1990) .............................................102

*Arnett v. Gerber Scientific, Inc.*, 566 F. Supp. 1270 (S.D.N.Y. 1983) .............24

*In re BISYS Sec. Litigation*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) ...............104

*Board of Natural Resource v. Brown*, 992 F.2d 937 (9th Cir. 1993)...............23

*Blasband v. Rales*, 917 F.2d 1034 (3d Cir. 1992).........................30, 35, 39, 40

*In re Brown Sch.*, 368 B.R. 394 (Bankr. D. Del. 2007) ....................................61

*Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150 (E.D.N.Y. 2006)......................92

*In re CNET Networks, Inc. Shareholders Derivative Litigation*, No. C06-03817, 2008 U.S. Dist. LEXIS 51309 (N.D. Cal. June 16, 2008) ..........................56

*In re Cendant Corp. Derivative Action Litigation*, 189 F.R.D. 117 (D.N.J. 1999) .....45, 91

*Chiarella v. U.S.*, 445 U.S. 222 (1980).........................................................102

*In re Countrywide Finance Corp. Derivative Litigation*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).......................................................................76, 81, 82

*In re Credit Suisse First Boston Corp. Sec. Litigation*, No. 97-4760, 1998 U.S. Dist. LEXIS 16560 (S.D.N.Y. Oct. 20, 1998) .........................................108

*Dirks v. SEC*, 436 U.S. 646 (1983) ................................................................102

*Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1971)........................................23

*Falkenberg*, No. 76-2409, 1977 U.S. Dist. LEXIS 15456 (S.D.N.Y. Jun. 13, 1977) ................................................................................................106

*First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5th Cir. 1977) ............................108

*Fischer v. CF & I Steel Corp.*, 599 F. Supp. 340 (S.D.N.Y. 1984)...................................23

*Fleet National Bank v. Boyle*, No. 04-1277, 2005 U.S. Dist. LEXIS 44036 (E.D. Pa. Sept. 12, 2005) .....................................................................................61

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) ......................................................5

*Gollust v. Mendell*, 501 U.S. 115 (1991) ...................................................................31, 32

*In re Mutual Funds Inv. Litig.,* 07-1607, 2009 U.S. App. LEXIS 9829 (4th Cir. May 7, 2009)...........................................................................................103

*Johnston v. Arbitrium (Cayman Islands ) Handels AG*, 198 F.3d 342 (2d Cir. 1999) ...........................................................................................................26

*Kamen v. Kemper Finance Services., Inc.*, 500 U.S. 90 (1991) ...............................40, 102

*Keyser v. Commonwealth National Finance Corp.*, 120 F.R.D. 489 (M.D. Pa. 1988) ...........................................................................................................23

*Kona Enterprises v. Bishop*, 179 F.3d 767 (9th Cir. 1999) ..............................................23

*Kunica v. St. Jean Finance, Inc.*, 233 B.R. 46 (S.D.N.Y. 1999) ......................................27

*LaSala v. Bordier Et Cie*, 519 F.3d 121 (3d Cir. 2008)....................................................98

*Lewis v. Chiles*, 719 F.2d 1044 (S.D.N.Y. 1983) .............................................................24

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 437 F.3d 588 (7th Cir. 2007)....................112

*Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 513 F.3d 702 (7th Cir. 2008).............112, 113

*McCall v. Scott*, 250 F.3d 997 (6th Cir. 2001)............................................................63, 82

*McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004)......................................................92

*In re Mercury Interactive Corp. Deriv. Litigation*, 487 F. Supp. 2d 1132 (N.D. Cal. 2007)....................................................................................................23

*Miller v. Steinbach*, 268 F. Supp. 255 (S.D.N.Y. 1967).......................................23, 24, 26

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)..........................................106

*Mroz v. Hoaloha Na Eha, Inc.*, 360 F. Supp. 2d 1122 (D. Haw. 2005)............................23

*In re NYFIX, Inc. Derivative Litigation*, 567 F. Supp. 2d 306 (D. Conn. 2008) ..............56

*Number 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003) ............................................................114

*Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416 (S.D.N.Y. 2006)....................................................5, 7, 8, 9, 10, 20

*In re Omnicom Group, Inc. Sec. Litigation*, No. 02-4483, 2007 WL 2376170 (S.D.N.Y. Aug. 10, 2007) ...................................................................................27

*In re Oxford Health Plans, Inc.*, 192 F.R.D. 111 (S.D.N.Y. 2000) ...............51, 53, 65, 104

*In re Pfizer Inc. Sec. Litigation*, 584 F. Supp. 2d 621 (S.D.N.Y. 2008).........................104

*Phillips v. Investors Diversified Services, Inc.*, 426 F. Supp. 208 (S.D.N.Y. 1976) .......102

*Priestley v. Comrie*, No. 07-1361, 2007 U.S. Dist. LEXIS 87386 (S.D.N.Y. Nov. 27, 2007) ....................................................................................................92

*In re Refco, Inc. Sec. Litigation*, 503 F. Supp. 2d 611 (S.D.N.Y. 2007) .......................104

*In re Reliance Sec. Litigation*, 91 F. Supp. 2d 706 (D. Del. 2000)............................61, 63

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)..........................................103, 106, 112

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)............................................................112

*Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994) ........................................................108

*Sax v. World Wide Press, Inc.*, 809 F.2d 610 (9th Cir. 1987)...........................................23

*Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989)................................................108

*Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir. 1968) ...............................................105

*In re Scott Acquisition Corp.*, 344 B.R. 283 (Bankr. D. Del. 2006) .................................98

*Shaw v. Digital Equipment Corp.*, 82 F.3d 1194 (1st Cir. 1996)....................................109

*Simon v. American Power Conversion Corp.*, 945 F. Supp. 416 (D. R.I. 1996) ............109

*Southland Sec. Corp. v. INSpire Insurance Solutions, Inc.*, 365 F.3d 353 (5th Cir. 2004) ................................................................................................112

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008)....................................................................................................103

*Strougo v. BEA Associates*, No. 98-3725, 2000 U.S. Dist. LEXIS 346 (S.D.N.Y. Jan. 19, 2000)....................................................................................42

*Superintendent of Insurance of New York v. Bankers' Life & Casualty Co.*, 404 U.S. 6 (1971)....................................................................................102, 105

*In re Suprema Specialties, Inc. Sec. Litigation*, 438 F.3d 256 (3d Cir. 2006)................113

*In re Taser International Shareholder Derivative Litigation*, No. 05-123, 2006 U.S. Dist. LEXIS 11554 (D. Ariz. Mar. 17, 2006) ................................61, 94

*Tellabs*, 551 U.S. 308 (2007) ..........................................................103, 111, 112, 113

*In re Time Warner, Inc. Sec. Litigation*, 9 F.3d 259 (2d Cir. 1993) ...............................109

*In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. Del. 2005)....................................................61

*In re Trump Hotels Shareholder Derivative Litigation*, No. 96-7820, 2000 U.S. Dist. LEXIS 13550 (S.D.N.Y. Sept. 21, 2000)................................61, 63, 64

*United Canso Oil & Gas Ltd. v. Catawba Corp.*, 566 F. Supp. 232 (D. Conn. 1983) ....................................................................................................105

*U.S. v. O'Hagan*, 521 U.S. 642 (1997) ........................................................................102

*In re Veeco*, 434 F. Supp. 2d 267......................................47, 50, 52, 77, 78, 79, 80, 86. 92

## STATE CASES

*ATR-Kim Eng Finance Corp. v. Araneta*, No. 489-N, 2006 Del. Ch. LEXIS 215 (Del. Ch. Dec. 21, 2006) ................................................................................95

*Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988) ......................................................................................................43

*Arnold v. Society for Sav. Bancorp*, 678 A.2d 533 (Del. 1996)........................................92

*Aronson v. Lewis*, 437 A.2d 805 (Del. 1984)................................40, 41, 42, 45, 46, 66, 67

*Ash*, 2000 Del. Ch. LEXIS 144 ................................................................35

    *Ash*, 2000 Del. Ch. LEXIS 144 ..........................................................40

*Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144
    (Del. Ch. Sept. 15, 2000) ....................................................34, 40, 80

*In re Atmel Corp. Derivative Litigation*, No. C06-4592, 2008 WL 2561957 (N.D.
    Cal. June 25, 2008) ............................................................................57

*BelCom, Inc. v. Robb*, No. 14663, 1998 Del. Ch. LEXIS 58 (Del. Ch. Apr. 28,
    1998) ..................................................................................................92

*Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006)................................56, 57

*Bradley v. First Interstate*, 748 A.2d 913 (Del. 2000)....................................38

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ..................68, 69, 70, 71, 74, 75

*California Public Employees' Retirement System v. Coulter*, No. 19191, 2002
    Del. Ch. LEXIS 144 ..........................................................................87

*In re Caremark Deriv. Litigation*, 698 A.2d 959 (Del. 1996) ............34, 35, 92

*In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106 (Del. Ch.
    2009) ............................................................................................62, 68

*David B. Shaev Profit Sharing Account v. Armstrong*, 2006 Del. Ch. LEXIS 33,
    2006 WL 391931 (Del.Ch. Feb 13, 2006) ............................................79, 95

*Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999)................................60

*In re First Interstate Bancorp Shareholder Litigation*, 729 A.2d 851 (Del. Ch.
    1998) ........................................................................................38, 39, 40

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060 (Del. 1988)..........100

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996)....................................45, 46, 66

*Grobow v. Perot*, 539 A.2d 180 (Del. 1988) ................................................46

*Guttman v. Jen-Hsun Huang*, 823 A.2d 492 (Del. Ch. 2003)....................91, 95

*Harbor Finance Partners v. Huizenga*, 751 A.2d 879 (Del. Ch. 1999) ............99

*Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990) ...........................................42, 44, 45, 57

*Heller v. Kiernan*, No. 1484, 2002 Del. Ch. LEXIS 17 (Del. Ch. Feb. 27, 2002).............93

*Jackson _Nat'l Life Insurance Co. v. Kennedy*, 741 A.2d 377 (Del. Ch. 1999) ...............92

*Lewis v. Anderson*, 477 A.2d 1040 (Del. 1983).................................27, 28, 29, 30, 40, 39

*Lewis v. Vogelstein*, 699 A.2d 327 (Del. Ch. 1997).....................................................98, 99

*Lewis v. Ward*, No. 15255, 2003 Del. Ch. LEXIS 111 (Del. Ch. Oct. 29, 2003) ........39, 40

*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) ...............................................................93

*Marra v. Telegraph-Save Holdings, Inc.*, No. 98-3145, 1999 WL 317103 (E.D. Pa. May 18, 1999) ............................................................................................113

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ..............................................89

*Miller v. Schreyer*, 257 A.D.2d 358 (1st Dep't 1999).......................................42

*In re Morgan Stanley Derivative Litigation*, No. 05-6516, 2008 WL 820718 (S.D.N.Y. Mar. 27, 2008) ...............................................................................57

*In re NVF Co. Litigation*, No. 9050, 1989 Del. Ch. LEXIS 167 (Del. Ch. Nov. 21, 1989) ................................................................................................65, 75

*In re New Valley Corp. Derivative Litigation, Number C.A. 17649*, 2001 WL 50212 (Del. Ch. Jan. 11, 2001) ......................................................................54

*Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002).......................................................64

*Pogostin v. Rice*, 480 A.2d 619 (Del. 1984) .....................................................41

*Rales v. Blasband*, 634 A.2d 927 (Del. 1993) .....................27, 40, 41, 42, 45, 46, 64, 65

*Ryan v. Maxim Integrated Products, Inc.*, 918 A.2d 341 (Del. Ch. 2007) .......................88

*Saito v. McCall*, No. 17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004) ................................................................................................33, 40

*Schock v. Nash*, 732 A.2d 217 (Del. 1999) ......................................................100

*Sternberg v. O'Neil*, 550 A.2d 1105 (Del. 1988) .....................................................2, 29, 30

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ......................................................94

*Zimmerman v. Braddock*, 2005 Del. Ch. LEXIS 135 (Del. Ch. Sept. 8, 2005)...........96, 97

# FEDERAL STATUTES

17 C.F.R. 229.303 ...............................................................................................109

Fed. R. Civ. P. 8.........................................................................................93, 103

Fed. R. Civ. P. 15 ........................................................................................ passim

Fed. R. Civ. P. 23.1 ..................................................................................... passim

Rule 10b-5, 17 C.F.R. 240.10b-5(b) .........................................................103, 108

 Fed. R. Civ. P. 9(b) ...................................................................................103, 106

Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b)...........................................103, 106

# STATE STATUTES

Del Code Ann. § 102(b)(7) ...............................................................................61

Delaware Court of Chancery Rule 23.1 ..........................................................28

# MISCELLANEOUS

13 Charles R.P. Keating, Gail A. O'Gradney, *Fletcher Cyclopedia of
   Corporations* § 5977, at 240 (rev. ed. 1991)...............................................30

Plaintiff Miriam Loveman ("Plaintiff") submits this memorandum in opposition to the motions to dismiss filed by nominal defendants Bank of America Corporation ("BofA"), and its wholly-owned subsidiary, Merrill Lynch & Co., Inc. ("Merrill"), Dkt. No. 110, and defendants Jeffrey N. Edwards, Dkt. No. 91; E. Stanley O'Neal, Dkt. No. 93; Carol T. Christ, Armando M. Codina, Virgis W. Colbert, Alberto Cribiore, John D. Finnegan, Judith Mayhew Jonas, Aulana L. Peters, Joseph W. Prueher, Ann N. Reese and Charles O. Rossotti, Dkt. No. 94; Ahmass L. Fakahany, Dkt. No. 99; Gregory J. Fleming, Dkt. No. 104; John A. Thain, Dkt. No. 107.[1]

## I.    INTRODUCTION

Although Defendants have made virtually every conceivable argument to escape reaching the merits of their misconduct alleged in Plaintiff's Verified Third Amended Shareholder Derivative and Class Action Complaint (the "Complaint"), the ultimate issues before this Court at this stage of litigation are whether Plaintiff has standing to pursue this double derivative action and whether demand upon the Board of Directors of BofA was futile. The Complaint makes allegations that, without fear of gainsay, demonstrate that Plaintiff has standing to pursue this action and pre-suit demand was futile.

The Defendants make several convoluted, often self-contradictory arguments, regarding standing and demand requirements, which confuse and misconstrue the law, so as to suggest that a double derivative action can never be brought.

Defendants argue that demand should have been made on the current Merrill Board notwithstanding that Merrill is a wholly owned subsidiary of BofA and that Merrill's Board serves at the pleasure of the BofA Board. First, this argument is clearly inconsistent with this

---

[1] References to the Memoranda of Law in Support of Defendants' Motions to Dismiss Plaintiffs' Third Amended Complaint will be referred to as "BofA Br. at __," "Merrill Directors Br. at_," "O'Neal. Br. at _" "Thain Br. at _," "Fleming Br. at _," "Edwards Br. at _," and "Fakahany's Br. at _."

Court's instruction in its Opinion and Order on February 17, 2009, Dkt. No. 75 (the "February 2009 Order"), that Plaintiff may re-file her complaint as a double derivative after making demand on the BofA Board (or, implicitly, demonstrating such demand was futile) and the fact that double derivative actions are permissible under Delaware law. *See Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del. 1988). Second, this argument fails under the leading Delaware Supreme Court case that teaches in a ***double derivative*** context, allegations of demand futility should be made with respect to the parent's board (here the BofA Board at the time the most recent, post-Merger Complaint was filed in July 27, 2009), and as against the pre-merger board of the subsidiary (here the Merrill Board at the time the initial complaint was filed in 2007). Plaintiff has satisfied both of these requirements.

Indeed, no other rule would make any logical sense. The current Merrill Board is controlled by the current BofA Board. If demand on the BofA Board would be futile, demand on those who they can replace at their whim, is equally futile. But the Defendants' argument makes no sense for another reason: Plaintiff is a current owner of BofA shares. BofA is now the only shareholder of Merrill. The demand requirement, by definition, requires that demand be made by a shareholder. In theory, only BofA can make a legally cognizable demand on the Merrill Board. A demand by a former Merrill/current BofA shareholder on the current Merrill Board would be a nullity. Of course, BofA does not need to make a demand on Merrill's Board—all it needs to do is order its subordinate to do as it says. But, even following Defendants' circular logic to its inevitable conclusion, if demand on the BofA Board to take action with respect to Merrill's pre-Merger claims is futile, by definition, it would include the futility of a demand that the BofA Board should take the demanded action by demanding the Merrill Board (it controls) take the action. The facts that Merrill is controlled in all respects by BofA – its 100%

2

shareholder – is further evidenced here by the fact that BofA filed a motion to dismiss and brief on behalf of itself **and** Merrill, *see* Dkt. No. 110, at 2 – graphically demonstrating any arguments about Merrill's separate existence or its board's ability to independently consider a demand is one of form over substance, and the cases under Delaware law have recognized that argument as nothing more.

Defendants' next arguments is that (1) Plaintiff must have held both BofA and Merrill stock at the time of the wrongdoing at Merrill, and (2) BofA must have held Merrill stock at the time of the wrongdoing. This argument defies logic and is inconsistent with the concept of a double derivative claim where a shareholder has been deprived of standing through a stock-for-stock merger. Defendants' arguments would confuse what is required of a derivative action where a BofA shareholder brings a ***derivative*** action on behalf of BofA with what is required where a BofA shareholder (and former Merrill shareholder) brings a ***double derivative*** action on behalf of BofA -- which acquired Merrill's claims against its former officers and directors along with all of Merrill's other assets -- to recover for injuries to its own subsidiary. It does not matter when BofA acquired Merrill to pursue Merrill's claims directly, because they are BofA's direct claims and Plaintiff's double derivative claim is "derivative" of that BofA right.

Once these facially absurd hurdles to this double derivative action are swept away, Defendants' other arguments easily fall away. At the time the Complaint was filed, there is no question that the BofA Board was disabled from properly considering a shareholder demand to pursue the claims in this action. Indeed, BofA may now be judicially estopped from arguing that demand on BofA Board is not futile based on the October 12, 2009 Delaware Chancery Court's decision in *Nancy Rothbaum v. Kenneth D. Lewis*, No. CA4307 (Del. Ch. Oct. 12, 2009), at 112-128, where Vice-Chancellor Strine refused to grant the BofA Board's motion to dismiss the

shareholders' derivative suit for failure to make demand on the BofA Board in connection with, *inter alia*, BofA's decision to proceed with the acquisition of Merrill, its agreement to allow Merrill to pay bonuses, and its disclosures in connection with obtaining shareholder approval of that transaction.[2]  The demand futility allegations in this Delaware case are similar to those in the Complaint here.   They raise a sufficiently reasonable doubt as to the BofA Board's disinterestedness and independence to consider a demand to sue the Merrill Defendants for their misconduct leading to the massive losses and write offs at Merrill that the BofA Board intentionally blinded itself to in acquiring Merrill.  For instance, in reaching its decision that demand on the BofA Board was futile, the *Rothbaum* court found that when BofA considered terminating the Merger after learning of Merrill's substantially greater than previously disclosed operating losses, U.S. Treasury Secretary Henry M. Paulson Jr. warned BofA that if it backed out, the directors would be removed from their jobs.  As Vice Chancellor Strine stated, in finding the demand futility standard had been met by plaintiffs under Delaware law, "[e]ntrenchment motives and, frankly circle-the wagons motives around prior decisions are just too well known in the lineage of corporate law to rule out being a motivating factor in a situation where a long-standing chief executive officer, who was responsible for the building of an institution, and its board of directors is threatened with removal." Brower Decl., Exhibit A, at 126.; *see also id*. at 28, 33-34, 39-40, 50-51, 56, 81-85.  For BofA to now argue here that these same directors, who could not properly consider a demand regarding their decision to proceed with the Merger, could have properly considered a demand to pursue claims based on the very problems that led them to

---

[2]  This decision was made on the record at a hearing, and the transcript of the hearing is attached as Exhibit A to the Declaration of David A.P. Brower In Support of Plaintiff's Opposition to Defendants Motions to Dismiss ("Brower Decl.").

consider terminating the transaction entirely, but which they did not do to entrench themselves at the cost of BofA shareholders, cannot be credited.

Plaintiff should now be permitted to proceed with her derivative claims.[3]

## II.    FACTUAL BACKGROUND

### A.    Statement of Facts

Until consummation of the Merger between BofA and Merrill, Plaintiff was a long term owner of Merrill common stock.  Plaintiff is now a current owner of shares of BofA common

---

[3]    Under pressure from the government and following the announcement of BofA Chairman Lewis' pending resignation, BofA agreed on October 12, 2009, to produce some documents to the SEC and other governmental authorities involving the joint proxy statement between Merrill and BofA; considerations involving whether to invoke the material adverse change clause of the Merger Agreement; matters relating to any potential impairment of Merrill's goodwill during the fourth quarter of 2008; Merrill's financial performance, forecasts, and/or preliminary and interim results for the fourth quarter of 2008; and BofA's communications with the Federal Reserve Board, the U.S. Department of Treasury and other Federal officials regarding the provision and terms of federal assistance in connection with the BofA-Merrill Merger and BofA's consideration of disclosure of such assistance and possible assistance.  *See SEC v. Bank of America*, No. 09-6829, Dkt. No. 33, (S.D.N.Y. Oct. 14, 2009) (where this Court recently approved the proposed "cabined waiver" of attorney-client privilege and work-product protection.)  However, in the Stipulation BofA made clear that it was not waiving its attorney-client privilege and/or work-product protection "with respect to any documents, communications or information . . . that relate solely to the legal defense of the Private Litigations." *Id.* at 4 (Disclosure Stipulation at 2).  This Court also ruled perhaps foreshadowing this action that "the Protective Order in no way precludes any party in this or any other case from challenging on any other ground Bank of America's assertion of attorney-client privilege or work-product protection regarding any information." *Id.* at 2.  One reason that BofA has so desperately sought dismissal of this action may relate to the fact that if discovery proceeds, the so-called *Garner* doctrine would prevent them from asserting attorney-client privilege against Plaintiff in this action. *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-4 (5th Cir. 1970) (holding that in a derivative action "where the corporation is in suit against its stockholders on charges of acting inimically to stockholders interests, protection of these interests as well as those of the corporation and of the public require that the availability of the [attorney-client] privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance."); *see also Official Committee of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 342 B.R. 416, 424-25 (S.D.N.Y. 2006)(recognizing the *Garner* doctrine's applicability, even beyond derivative suits context, as a "fiduciary exception" to the attorney-client privilege where "good cause" is established based on different factors).

stock which she received in exchange for her Merrill common stock in connection with the stock-for-stock acquisition of Merrill by BofA.[4]

This is a shareholders' double derivative action[5] brought for the benefit of Nominal Defendants Bank of America Corporation ("Bank of America" or "BofA") and Merrill Lynch & Co., Inc. ("Merrill") and against certain former members of Merrill's Board of Directors (*i.e.*, the "Merrill Board"), and certain current an former members of Merrill's Board of Directors and executive officers, including the former Chairman of the Merrill Board and the Chief Executive Officer, E. Stanley O'Neal ("O'Neal"), defendant O'Neal's replacement, former Chairman and Chief Executive Officer of Merrill, John A. Thain ("Thain"), former Co-Chief Operating Officer of Merrill and Merrill's Co-President, Ahmass L. Fakahany ("Fakahany"), former President and Chief Operating Officer of Merrill, Gregory J. Fleming ("Fleming"), former Senior Vice President and Chief Financial Officer of Merrill, Jeffrey N. Edwards ("Edwards") (collectively the "Individual Defendants"), and Merrill Board members, Carol T. Christ ("Christ"), Armando M. Codina ("Codina"), Virgis W. Colbert ("Colbert"), Alberto Cribiore ("Cribiore"), John D. Finnegan ("Finnegan"), Judith Mayhew Jonas ("Jonas"), Joseph W. Prueher ("Prueher"), Ann N.

---

[4]  Although not alleged in the Complaint, Plaintiff is also a long term owner of BofA common stock that she has owned and continuously held since the merger of BofA and NationsBank in 1998.  *See* Brower Decl., Exhibit B.  All of those shares have been held in Ms. Loveman's brokerage account at Merrill throughout this litigation.

[5]  Plaintiffs' Verified Third Amended Shareholder Derivative and Class Action Complaint (the "Complaint") includes double derivative claims (Counts I-XII) for Defendants' breaches of fiduciary duty and other violations of law, class action claims in relation to the proposed merger between Merrill and BofA, and "holder" claims asserting fraud and misrepresentation class action claims by people induced to "hold" the Company's stock.  Plaintiffs and Defendants reached a settlement regarding Plaintiffs' class action and holder claims, leaving Plaintiffs' double derivative claims outstanding.

Reese ("Reese"), Charles O. Rossotti ("Rossotti"),[6] and Aulana L. Peters ("Peters") (with defendants O'Neal and Thain, collectively the "Director Defendants"). Defendants Rossotti, Prueher and Colbert became members of BofA's Board as of January 28, 2009.[7] Plaintiff seeks, on behalf of nominal defendants, Merrill and BofA, recover derivatively the damage caused by the Merrill Defendants to Merrill and, therefore, to its current owner, BofA, due to their violations of the federal securities laws, breaches of fiduciary duties, corporate mismanagement, waste of corporate assets and unjust enrichment relating to claims that arose prior to the Merger and have remain unaddressed by BofA after the Merger. ¶3.[8] These claims arise from Merrill's massive overexposed to high-risk collateralized debt obligations ("CDOs"). ¶89.

Under the leadership of Merrill's former chief executive officer, defendant O'Neal, Merrill was the lead underwriter of billions of dollars of "CDOs" secured by risky, under-collateralized subprime mortgages. ¶¶20, 94-97. As the subprime market began to show signs of collapse, most investment banks reduced their exposure to CDOs. ¶108. The Individual Defendants, however, charged forward and maintained Merrill's investments in these risky securities. *Id*. When demand for CDO securities waned in late 2005, the Individual Defendants were unwilling to give up the lucrative underwriting fees so they caused Merrill to begin purchasing the AAA tranches of the CDO securities with its own capital. ¶112. In addition, Defendants were motivated to continue their wrongdoing, resulting in the artificial inflation of

---

[6] Defendants O'Neal, Fakahany, Fleming, Edwards and Thain are sometimes collectively referred to as the "Merrill Officer Defendants." Defendants O'Neal, Fakahany, and Fleming are also sometimes collectively referred to in this Complaint as the "Insider Selling Defendants." Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Peters, Prueher, Reese, Rossotti, and Thain are sometimes collectively referred to in this Complaint as the "Merrill Director Defendants." Defendants and Merrill Director Defendants are sometimes collectively referred to herein as the "Merrill Defendants."

[8] All paragraph references (¶) are to the Complaint unless otherwise noted.

Merrill's stock, in order to allow certain of the Individual Defendants to profit from their sales of Merrill common stock during the relevant period.  ¶¶384-89.

Despite being aware of the risks involved due to Merrill's overexposure to CDOs, several of Merrill's senior management and directors approved, and at times turned a blind eye to, O'Neal's mismanagement.  ¶¶121.  In fact, the Individual Defendants ignored repeated warnings from its own analysts and executives to lower Merrill's exposure to CDOs.  Specifically, the Individual Defendants were warned by Merrill fixed income adviser Jeff Kronthal in 2006 (¶112), from Merrill's own analyst Kenneth Bruce in September 2006 (¶118), by Company Co-Presidents Fakahany and Fleming in July 2007 and on August 9, 2007 (¶¶185-87), and by Merrill's Co-Head of Risk Management Keishi Hotsuki in August 2007 (¶188).   The Individual Defendants dismissed these warnings and continued to push forward with their high-risk business strategy in order to boost Merrill's earnings and increase their substantial executive compensation.  ¶189.

In January 2007, to gain access to an even larger number of subprime mortgages, Merrill purchased First Franklin, a mortgage company, for $1.3 billion.   ¶124.  As *Reuters* reported: "The First Franklin deal puzzled analysts because the souring of the market for subprime loans was escalating when the deal was announced.  Home price appreciation that allowed subprime borrowers to refinance and escape sharp increases in mortgage payments had also come to a halt."  *Id.*  The Individual Defendants also caused Merrill to purchase First Republic Bank in September 2007 for $1.8 billion, which consideration would be paid with 50% Merrill common stock and 50% cash.  ¶135.[9]  By the spring of 2007, the collapse of the subprime lending industry

---

[9] Individual Defendants have also been accused of failing to disclose the truth about Merrill's exposure and losses to CDO and subprime securities in the registration statements for this transaction in order to lock in attractive financial terms for the merger consideration.  *See, e.g.,*

was well underway as more than two dozen subprime mortgage lenders had failed or filed for bankruptcy. ¶126. Nonetheless, Merrill underwrote $28 billion in mortgage CDO securities in the first half of 2007, a pace which would have exceeded the record-breaking $44 billion in CDO securities Merrill underwrote in 2006. ¶127.

The Individual Defendants also authorized a $6 billion Stock Repurchase Plan in April 2007 that allowed Merrill to waste a substantial amount of capital at what the Merrill Defendants knew or should have known were artificially inflated market prices, a time when the eventual need to raise additional capital to repair Merrill's balance sheet after the impact of the impending write-downs should have been readily apparent. ¶¶150-55.

During the summer of 2007, the credit crunch intensified and demand for CDOs completely stagnated, leading to the collapse of the housing market and the downfall of Merrill. ¶131. In addition to the CDO securities that Merrill purchased, the Individual Defendants caused Merrill to hold subprime assets they had intended to eventually place in CDO entities and, as underwriters of the deals, large amounts of CDO bonds they could no longer sell. *Id*. By the end of June 2007, Merrill had accumulated at least $43 billion in net exposure to CDO securities and subprime mortgages. ¶132. Over the next few months, Merrill worked feverishly to sell down that position but was able to unload only about half of its untenable position. ¶133. Merrill wound up at the end of the 2007 fiscal third quarter still holding $15 billion in unattractive CDOs that have not been sold to investors. *Id*.

The Individual Defendants' wrongful conduct forced Merrill to write down more than $8 billion in the value of its CDOs and led to a $2.2 billion loss in the third quarter of 2007 alone— the largest quarterly loss in the 93-year history of Merrill. ¶24. Defendant O'Neal then

---

¶136, n. 47.

compounded his mounting mistakes by attempting to negotiate a merger with Wachovia Bank without informing the Merrill Board or obtaining its permission. ¶214. O'Neal stood to make $250 million in severance pay if there was a change in control of Merrill. *Id*. Instead of terminating O'Neal with cause for his conduct, the Merrill Board ignored the resounding cries of Wall Street and shareholders and instead rewarded him with an outrageous $160 million retirement package. ¶215.

On January 17, 2008, Merrill released the 2007 year-end financial results which included $23.2 billion in write-downs from CDO and subprime exposure and a $10.3 billion net loss from continuing operations for the fourth quarter. ¶237. The ramifications of the Individual Defendants' misconduct continued throughout 2008 until the panic sale of Merrill to BofA in September 2008. ¶¶291-96. During the negotiations with BofA, the Merrill Defendants, undisclosed to Merrill shareholders and BofA, formulated a provision to guarantee billions of dollars of bonus compensation to Merrill's officers and employees. ¶301. The terms of the Merger also included indemnification and insurance provisions as the Merrill Defendants insulated themselves from liability due to their wrongdoing that led up to hasty 48 hour Merger Agreement with BofA. ¶¶301-2. Even when the Joint Proxy Statement was issued to Merrill and BofA shareholders on November 3, 2008, which shareholders were intended to rely on when they voted to approve the Merger on December 5, 2008, it failed to reveal the $3.62 billion in bonus compensation to Merrill employees that was accelerated to before the Merger, with BofA's consent, and the extent of Merrill's financial losses. ¶306, 314.

Subsequent revelations, most after January 1, 2009 when the Merger consummated, included many disturbing facts that were concealed from shareholders. ¶307. When Defendant Thain's ill-fated attempts to get himself an additional (not including his piece of the Merrill

$3.62 billion bonus provision) bonus became public, he withdrew his request and later was forced to resign.  ¶309, 315.  BofA tried to plead innocence in regard to payment of the last minute billions in bonuses, however, revelations from Thain himself suggested otherwise that Thain had at least two conversations with BofA's management regarding the bonuses prior to the December 8, 2008 Board meeting where their payment was approved. ¶316-17.  Questions also began to arise as to why BofA did not disclose the Merrill losses prior to the shareholder vote to approve the Merger and that BofA had not performed due diligence involving the acquisition. ¶311.  Further eye-opening information revealed that BofA in mid-December of 2008 was seeking to terminate the Merger after being informed, unbeknownst to public shareholders of either company, beginning in mid-November that Merrill's pre-tax quarterly loss approached $9 billion and later swelled after the shareholder approval of the merger to $19 billion.  ¶¶9, 310, 312.  Despite BofA and the Merrill Defendants' attempts to deny their knowledge of Merrill's losses prior to the shareholder vote, information surfaced that BofA and the Merrill Defendants were indeed aware of Merrill's problems. ¶¶312-13.  On December 17, 2008, BofA Chairman and CEO, Kenneth Lewis ("Lewis") met with then-Secretary of Treasury Henry Paulson and Federal Reserve Chairman Ben Bernanke to inform them of BofA's decision to invoke the Material Adverse Change clause in the Merger Agreement to cancel the Merger. ¶¶10, 310, 319, 325.  However, Lewis was informed that it was in his interest and that of the BofA Board in retaining their directorial positions at BofA to consummate the Merger, which BofA, with the ascent of its Board, did. ¶¶10-11, 311.  The Merrill Defendants knowledge of the losses as well as BofA's awareness of the losses and payment of the bonuses prior to shareholders vote on the Merger, was belatedly revealed through the media.  ¶¶312-17.

Since NY Attorney General initiated an investigation into the bonus payments and wrote

a letter to Congress that stated "instead of disclosing their bonus plans in a transparent way as requested by my Office, Merrill Lynch secretly moved up the planned date to allocate bonuses and then richly rewarded their failed executives." ¶321.  In his testimony before Congress, former Treasury Secretary Paulson on July 16, 2009 confirmed that he had threatened to remove BofA management and its Board if BofA failed to follow through with the Merrill Merger. ¶325. Finally on July 16, 2009, the media exposed that BofA is operating under a secret regulatory sanction, MOU-the most serious procedural action taken against BofA by federal regulators since the financial crisis erupted, and requires it to overhaul its board including with a majority of new directors (six have resigned since May 26, 2009) and address perceived problem with risk and liquidity management.  ¶326.  The slew of litigation that followed this deal and Defendants' wrongdoing persists and includes the SEC and NY Attorney General's Office in addition to numerous civil lawsuits against Defendants. ¶¶ 318, 321, 325-26.

As a result of the Individual Defendants' wrongful conduct during the Relevant Period, Merrill suffered billions of dollars in losses and came under a firestorm of scrutiny through government investigations and lawsuits alleging fraud and misrepresentation.  ¶¶224-33, 366.

## B.    Procedural History

Plaintiff filed her initial verified shareholder derivative complaint against certain of the Merrill Defendants in November 2007.  There were initially three such actions, which were consolidated on March 12, 2008. Dkt No. 7.[10]  On May 21, 2008, Plaintiffs filed their amended complaint.  Dkt. No. 11.  Defendants filed their motion to dismiss the amended complaint on July 21, 2008.  Dkt. Nos. 22, 24.  On September 15, 2008, as a last ditch effort to save the Merrill Defendants' jobs and avoid bankruptcy, it was announced that Merrill's Board agreed to

---

[10] The docket numbers refer to this derivative action's, case number 07-9696, docket, although they are also available through the master docket, case number 07-9393.

sell Merrill to BofA.    Thereafter, on September 23, 2008, Plaintiffs filed a complaint incorporating additional claims related to the BofA transaction.    Dkt. No. 35.    Defendants filed their motion to dismiss that complaint on November 7, 2008.    Dkt. Nos. 55, 59.    Plaintiffs filed their Opposition on December 23, 2008. Dkt. No. 67.    On January 1, 2009, BofA officially became the owner of its now subsidiary Merrill.    Defendants filed their Reply to their motion on January 9, 2009. Dkt. No. 74.    Oral argument was held over an extensive two day time period on January 14 and 20, 2009.    The Court issued its February 2009 Order, which was later amended on March 3, 2009 to reflect that only the derivative Counts I-VIII, not the class claims, Third Amended Complaint Counts XIII-XVI (that were subject to a settlement initially negotiated prior to the Merger), were dismissed without prejudice for lack of standing and no judgment was entered against the complaint. Dkt. No. 76.

On July 27, 2009, Plaintiff pursuant to the Court's February 2009 Order, filed an amended complaint (the "Complaint" or "Third Amended Complaint").    Dkt. No. 82.    On August 4, 2009, the Court entered its Final Judgment and Order relating to settlement of the then pending federals securities and ERISA class actions using over $600 million more in Merrill's declining capital, which released the Merrill Defendants for their liability to investors for misstatements and omissions regarding Merrill's financial reports, see Master Dkt. Nos. 265-67; 272.  On September 21, 2009, Defendants filed their *seven* motions to dismiss the Complaint that are now before the Court.  Dkt. Nos. 91, 93, 94, 99, 104, 107, 110.

All of these disclosures which finally begin to uncover the truth of BofA's and Merrill's wrongdoing clearly illustrate that their Boards were conflicted and face substantial liability which make demand futile.

### C.    Demand Futility

Merrill's claims passed by operation of law to BofA, the surviving corporation. The Complaint makes particularized allegation of demand futility as to the BofA Board at the time the Complaint was filed. The BofA Board was comprised of the following sixteen individuals, including two from Merrill's pre-Merger Board: Massey, Barnet, Bramble, Colbert, Collins, Countryman, Gifford, Lewis, Lozano, May, Rossotti, Ryan, Susan S. Bies ("Bies"), William P. Boardman ("Boardman"), D. Paul Jones ("Jones"), and Donald E. Powell ("Powell"). All of these BofA Director were director of BofA or director of Merrill at the time the Merger was consummated except Bies, Boardman, Jones, and Powell. Thus, the vast majority of the then BofA Board approved the Merger or, like Rossotti approved the merger at Merrill.

First, pursuant to the Merger Agreement, a majority of the BofA Board caused BofA to agree to indemnify and hold harmless each present and former director and officer of Merrill Lynch from liability for matters arising out of *or prior to* the completion of the merger to the fullest extent provided by applicable law. *See* Merger Agreement, ¶ 6.6 (Attached to Joint Proxy as Appendix A). BofA also agreed pursuant to the Merger Agreement to maintain in place, for a period of six years after completion of the merger, Merrill's current directors' and officers' liability insurance policy or equivalent policies. In so doing, a majority of the BofA Board effectively waived on behalf of BofA the ability of BofA to pursue the claims of Merrill alleged herein. Moreover, by agreeing to the directors' insurance provision, a majority of the BofA Board made BofA directly liable for the costs of recovery on any such claims by BofA based on the insured versus insured exclusion contained in typical directors' and officers' insurance polices. As a result, the cost of any defense of the claims of BofA against the former Merrill Lynch officers and directors would be borne by BofA. Moreover, a majority of the BofA Board agreed to these broad indemnification provisions of the Merrill Defendants without any

consideration of the substance or merits of the claims. Therefore, in agreeing to these terms, a majority of the BofA Board failed to exercise any business judgment and rendered themselves liable to BofA shareholders for that conduct. Consequently, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

Also pursuant to the Merger Agreement, a majority of the BofA Board were required to grant "**prior written consent**," for Merrill to "pay any amounts to [Merrill Lynch] Employees . . . **other than base salary in the ordinary course of business**." *See* Merger Agreement, ¶ 5.2(c) (Attached to Joint Proxy as Appendix A). Nevertheless, a majority of the BofA Board approved this provisions and agreed to $3.6 billion in 2008 bonuses to Merrill officers and employees without determining the amount of such bonuses or to whom they would be awarded before approving them. In so doing, a majority of the BofA Board is faced with substantial personal liability to BofA shareholders for their breached of their duties of care and loyalty. Consequently, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

Both the Merrill Defendants and a majority of the BofA Board authorized the issuance of the Joint Proxy pursuant to which Merrill and BofA sought their respective shareholders' approval of the Merger. The Joint Proxy failed to disclose material facts concerning the 2008 Merrill bonuses and, consequently, both the Merrill and BofA face a substantial liability to BofA shareholders based on material omissions in the Proxy Statement utilized to solicit their approval of the Merger. In order to pursue the claims alleged herein, the BofA Board would have to admit to the material omissions in the Proxy Statement used to solicit the approval of BofA shareholders and render BofA and themselves liable for the violations of the federal securities

laws. Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

Both the Merrill Defendants and a majority of the BofA Board authorized the issuance of the Joint Proxy pursuant to which Merrill and BofA sought their respective shareholders' approval of the Merger. The Joint Proxy failed to disclose material facts concerning additional losses that Merrill was suffering in the fourth quarter of 2008. By virtue of the reckless failure of BofA to conduct a meaningful due diligence of Merrill Lynch before the BofA Board approved the Merger, a majority of the BofA Board face substantial liability for misrepresenting and omitting material information concerning the true financial condition of Merrill in the Proxy Statement issued in connection with soliciting BofA shareholder approval of the merger. Moreover, a majority of the BofA Board face substantial liability to BofA for their approval of the Merger in violation of their fiduciary duties of care, loyalty and candor. In order to pursue the claims alleged herein, the BofA Board would have to admit to the material omissions in the Proxy Statement used to solicit the approval of BofA shareholders or violation of their duties of care and loyalty in failing to conduct a reasonable due diligence of Merrill before approving the Merger. In either event, pursuit of the claims alleged in the Complaint would result in a majority of the BofA Board making themselves liable for the violations of their fiduciary duties to BofA shareholders as directors of BofA. Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

Moreover, as discussed above, following the disclosure of the amount of the Merrill 2008 bonuses that a majority of the BofA Board approved blindly and the growth in losses at Merrill following approval of the Merger by the BofA Board, but before consummation of the Merger itself, BofA considered terminating the Merger, as permitted by the Merger Agreement, based on

a "material change."  As reported in the financial press and during hearings before Congress, BofA was warned by the United States Secretary of the Treasury that if BofA attempted to terminate the acquisition of Merrill Lynch, the U.S. Government would remove then current BofA management, including Lewis and the other members of the BofA Board.  Faced with the choice between exercising their fiduciary duties to BofA and its shareholders by terminating the transaction with a company that had concealed astronomical additional losses in the billions of dollars and the size of proposed bonus payments to Merrill officers and employees in the billions of dollars, but face the real and immediate threat of termination from the BofA Board, or terminate the Merger as permitted by the Merger Agreement (including all of its liability-protective provisions for the Merrill Defendants arising from their pre-consummation conduct and the payment of billions of dollars in Merrill assets that would have become the property of BofA), a majority of the current BofA Board resolved that conflict in their own favor by preserving their positions as directors of BofA and consummated the Merger.

As a result of these machinations (which are the subject of various governmental investigations), and by virtue of failing to disclose these matters before the Merger was consummated, BofA and a majority of the BofA Board face substantial liability to BofA and its shareholders and investors.  Thus, for a majority of the BofA Board, pursuit of the claims alleged herein would result in a majority of the BofA Board making themselves liable for the violations of the federal securities laws and the common law to BofA and its shareholders.  Therefore, a majority of the BofA Board can not disinterestedly and independently assess a demand to prosecute this action.

Furthermore, demand on the BofA Board would also be futile because a majority of the BofA Board has already pre-judged the merits of this action, and offered their opinion on the merits of the claims in this action in the Joint Proxy:

> Merrill Lynch and Bank of America believe that the class claims asserted by Merrill Lynch stockholders relating to the merger are without merit and intend to contest them vigorously. Upon consummation of the merger, the plaintiffs who have asserted derivative claims on behalf of Merrill Lynch may lose standing to assert such claims on behalf of Merrill Lynch because they will no longer be Merrill Lynch stockholders.

Additionally, a majority of the BofA Board was aware that the Merrill Board had already flatly rejected shareholder demands to pursue the claims alleged in this action as those demands, and the rejection of those demands, were the subject of discussion in the Proxy Statement. Having already reached its conclusions, there is reasonable doubt whether the a majority of the BofA Board is capable of impartially considering a demand to bring suit against the Merrill Defendants based on the allegations contained herein.

Furthermore, having stated its opinion in the Proxy Statement as part of the concerted effort between BofA and Merrill to obtain shareholder approval of the Merger from both Merrill and BofA shareholders, for BofA to pursue the claims alleged in this action against the Merrill Defendants would, effectively, be an admission that the above quoted statements in the Proxy Settlement were false and that the proxy statement solicited approval of the Merger through false and misleading statements. That, in turn, would make BofA and a majority of the BofA Board liable to BofA shareholders for soliciting their proxies through false and misleading statements and make them liable for the losses suffered by BofA resulting from consummation of the Merger. Thus any demand on the BofA Board would be futile.

Importantly, the threat of personal liability of a majority of the BofA Board for its conduct in approving the Merger Agreement and consummating the Merger with Merrill is not

hypothetical.  BofA and a majority of the BofA Board are now defendant-parties in BofA investor securities fraud class actions, BofA shareholder derivative actions and BofA employee ERISA class actions.  The alleged liability of the BofA defendants in these actions arise out of the majority of the BofA Board approving the terms of the Merger Agreement complained of herein and failing to disclose material information regarding the terms of the Merger, the condition of Merrill and the involvement of the Treasury Department in the BofA Board's decision to proceed with consummation of the Merger.  These suits seek billions of dollars in compensation from BofA and a majority of the BofA Board.  Given pursuit of the claims in this action would make its nearly impossible for BofA or the BofA officers and directors who are the subjects of those to defend against the claims in those cases, a demand to pursue the claims in this action would certainly be futile as it would expose these individual to ruinous personal liability.

Moreover, demand on the BofA Board is also excused because there is a reasonable doubt as to whether the BofA directors could independently and disinterestedly consider a demand to sue other members of the BofA Board due to disabling personal and professional conflicts of interest, including (i) Former Merrill director, Merrill Defendant Reese, served on the CBS Corporation board of directors (the "CBS Board") with current, non-independent, BofA director, Defendant Gifford.  Defendant Gifford currently also serves on the CBS Board with BofA director, Defendant Countryman; (ii) BofA director Bramble, served as a senior executive of MBNA Corporation ("MBNA") when it was acquired by BofA and received significant compensation therefrom.  In fact, for both 2006 and 2007, BofA openly conceded that Bramble

was not an independent director;[11] and (iii) BofA directors Countryman, Gifford and May serve as trustees of NSTAR, an energy utility company, where May also serves as Chairman, President and CEO.[12]

Finally, following consummation of the Merger, Ms. Lambrecht made demand upon the BofA Board to pursue the claims in this action. Upon information and belief, the BofA Board has formally rejected that demand without forming a special litigation committee or excluding the members of the BofA Board who approved the Merger and who did not seek to terminate the Merger Agreement based on threats of their termination as directors of BofA by the U.S. Treasury. Thus, any question that demand -- if it were necessary under the circumstances here -- would have been futile has been resolved.

The Complaint alleges the reasons, with particularity, that demand on the Merrill Board at the time the action was initially commenced was futile. ¶¶328-95. The Complaint also alleges that Plaintiff also did not make a demand on the then current Merrill Board at the time the Complaint was filed because: (1) all such directors serve at the pleasure of the BofA Board; and (2) such a demand is not required under Delaware law subsequent to the consummation of the Merger.

### D. The Claims Asserted

Plaintiff alleges the following state-law claims: Count I is asserted a double derivative claim against the Merrill Defendants for breach of fiduciary duties of care, loyalty and good

---

[11]  *See* Bank of Am. Corp., Definitive Proxy (Schedule 14A), at 4 (Apr. 25, 2007) ("The Board has determined that Frank P. Bramble, Sr., Charles K. Gifford, [and] Kenneth D. Lewis . . . do not meet the independence standards."); Bank of Am. Corp., Definitive Proxy (Schedule 14A), at 4 (Apr. 26, 2006) ("The Board has determined that Frank P. Bramble, Sr., Charles K. Gifford, [and] Kenneth D. Lewis . . . do not meet Bank of America's independence standards.").

[12]  *Id.*

faith.  Count II is asserted as a double derivative claim against defendant O'Neal and the Merrill Directors for corporate waste involving the failure to monitor and evaluate Merrill's exposure in the CDO market, approving O'Neal's excessive retirement package and approving the acquisitions of First Franklin and First Republic.  Count III is asserted as a double derivative claim against the Merrill Defendants for abuse of control.  Count IV is asserted as a double derivative claim against the Merrill Defendants for gross mismanagement.  Count V is asserted as a double derivative claim against the Merrill Defendants for contribution, indemnification and declaratory relief.  Count VI is asserted a double derivative claim against the Merrill Defendants for aiding and abetting the breaches of fiduciary duty of the other Merrill Defendants.  Count VIII is asserted a double derivative claim against the Merrill Defendants for breaches of their duties of care, loyalty and candor in connection with the purchases of Merrill stock by Merrill under the Stock Repurchase Plan.  Count IX is asserted as a double derivative claim against the Insider Selling Defendants for breach of fiduciary duties for Insider Selling and Misappropriation of Information. Count XI is asserted a double derivative claim against the Merrill Defendants for unjust enrichment.  Count XII is asserted a double derivative claim against Thain, Fleming and the Director Defendants for corporate waste in respect to authorizing and approving the $3.62 billion bonus compensation for Merrill's senior management.

In addition to Plaintiff's federal law claims, Plaintiff Count VII asserts a double derivative claim against the Merrill Defendants for violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 involving the Stock Repurchase Plan; and Count X asserts a double derivative claim against the Insider Selling Defendants for violation of the Exchange Act Section 10(b) and Rule 10b-5.

The direct class claims asserted in Counts XIII-XVII have been settled and are subject to a Stipulation and Proposed Order dismissing them that is submitted with this memorandum.

## III.    ARGUMENT

### A.    Plaintiff Has Standing to Pursue the Double Derivative Claims

Defendants falsely claim that for a plaintiff to have standing in a ***double derivative*** action must be a shareholder of ***both*** the acquiring company and the acquired company at the time of the alleged wrongdoing, and that the acquiring company was a shareholder of the acquired company at that time as well.  In sum, Defendants would create a rule making it virtually impossible for a shareholder of a company to pursue the claims of a company's wholly owned subsidiary if that subsidiary was acquired after the wrongdoing at the subsidiary occurred.  This argument, of course, confuses the position of a shareholder who must pursue claims derivatively and the right of a corporation to pursue its and its division's claims directly.  The parent corporation, which owns 100% of the subsidiary, can directly pursue the claims of the subsidiary, whether it owned the subsidiary before or after the wrongdoing occurred, because the parent acquires, with the shares, all of the assets of the acquired entity, including whatever legal claims it might have.  In sum, a corporation that acquires another corporation is not subject to a "contemporaneous ownership" rule to pursue the latter's preexisting rights.  As such, this argument fails.  Likewise, since the right of a shareholder to pursue a derivative action turns on the rights of the corporation in which the shareholder holds shares, the question is whether BofA has the legal power to pursue the claims against the Merrill Defendants, which it certainly does as the owner of Merrill.

Additionally, Defendants correctly argue that demand must be made on the Board of Directors of BofA, or that plaintiff must allege why such demand was futile, but contend that

demand was also required on the current board of directors of BofA's wholly owned subsidiary, Merrill, which serves at the pleasure of the BofA board, and therefore would be plainly futile if demand on the controlling BofA board was futile. Defendants' arguments, however, distort the legal standing requirements of a **double** derivative action. Moreover, even if these requirements existed — which they do not – plaintiff satisfies these requirements.

### 1.    Federal Procedural Law Governs Plaintiff's Standing

As an initial matter, since this is a double derivative action brought in federal court, Fed. R. Civ. P. 23.1 governs the standing requirements of the action. *See* Fed. R. Civ. P. 23.1 (a) ("This rule applies when one or more shareholders or members of a corporation . . . bring a derivative action to enforce a right that the corporation . . . may properly assert but has failed to enforce."); *see Drachman v. Harvey,* 453 F.2d 722, 727 (2d Cir. 1971) ("Federal law must be consulted to decide whether there is standing to sue under the Exchange Act."), *modified en banc on other grounds,* 453 F.2d at 736 (2d Cir. 1972).[13] Federal law also more broadly recognizes exceptions to the requirement when the plaintiff maintains an interest in the litigation, and when the general rule **would lead to an inequitable result**. *See, e.g., Miller v. Steinbach,* 268 F. Supp. 255, 267-69 (S.D.N.Y. 1967).[14] Such exceptions may permit waiver of the prudential standing requirements, such as continuous standing, where it does not frustrate the Rule and to apply such requirements would hinder the purpose of a federal statute. *See, e.g., Bd. of Natural Res. v.*

---

[13] *See also Kona Enters. v. Bishop*, 179 F.3d 767, 769 (9th Cir. 1999); *Sax v. World Wide Press, Inc.,* 809 F.2d 610, 613 (9th Cir. 1987) ("In federal courts, derivative suits are subject to the procedural requirements of Fed. R. Civ. P. 23.1."); *Fischer v. CF & I Steel Corp.*, 599 F. Supp. 340, 344 (S.D.N.Y. 1984) ("…the question of derivative shareholder standing under Fed. R. Civ. P. 23.1 is controlled by federal law.") (citation omitted); *Mroz v. Hoaloha Na Eha, Inc.*, 360 F. Supp. 2d 1122, 1135-36 (D. Haw. 2005).

[14] *See also Keyser v. Commonwealth Nat'l Fin. Corp.*, 120 F.R.D. 489, 491 (M.D. Pa. 1988); *see also Kona*, 179 F.3d at 770; *In re Mercury Interactive Corp. Deriv. Litig.*, 487 F. Supp. 2d 1132, 1136-38 (N.D. Cal. 2007).

*Brown*, 992 F.2d 937, 946 (9th Cir. 1993). For instance, here the Complaint alleges that Defendants defrauded Merrill in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. *See* Complaint, Counts VII, X. Therefore, whether plaintiff has standing to assert those federal securities claims acquired by BofA for violations against Merrill is governed by the federal, and not the state, standing rules. *See, e.g., Miller*, 268 F. Supp. at 268 (rejecting defendants' premise that state law applied to federal derivative case alleging federal securities laws violations); *Arnett v. Gerber Scientific, Inc.,* 566 F. Supp. 1270, 1272-73 (S.D.N.Y. 1983) (holding that "federal law determines standing to assert derivatively a violation of Section 10(b) of the Securities Exchange Act").

The federal derivative standing rule requires that the complaint must "allege that the plaintiff was a ***shareholder or member at the time of the transaction complained of***, or that the plaintiff's share or membership later devolved on it by operation of law . . . and state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." [15] Clearly, the Complaint alleges that Plaintiff was a shareholder of Merrill at the time of the Defendants' alleged wrongdoing; that she held those shares until they were exchanged for BofA shares in connection with the Merger; and that she retains those BofA shares that she received to this date. The Complaint also alleges, with particularity, why demand on the Merrill Board sitting at the time of the Merger was futile, and, again with particularity, why demand on the BofA Board at the time the Complaint was

---

[15] Although some courts have implied a "continuing ownership" requirement under Fed. R. Civ. P. 23.1, *see, e.g.*, *Lewis v. Chiles*, 719 F.2d 1044, 1047 n.1 (S.D.N.Y. 1983), those cases turned on the facts that were completely different than those alleged here. In fact, in *Lewis*, the court found that the defendants were not "insulating themselves from liability." *Id.* at 1048. Further, the court even noted that the case is distinguishable from mergers involving an exchange of shares. *Id.* at 1047 n.2. Those are the exact two factors relevant here.

filed was futile.  Therefore, based on its plain language, plaintiff meets each of the express requirements of Fed. R. Civ. P. 23.1.

Defendants' argument, which finds no linguistic support in Fed. R. Civ. P. 23.1, is (1) that Plaintiff must have been a shareholder of BofA prior to the merger ***and*** (2) that BofA must have been a shareholder of Merrill at the time the wrongdoing at Merrill occurred prior to the Merger.  These requirements would create an illogical "Catch 22" situation, making a double derivative action, where a stock-for-stock merger deprived the shareholders of standing to pursue the claims of the acquired corporation almost impossible to bring, unless a shareholder "lucked" into owning shares in two companies who end up merging ***and*** that the acquiring company for some reason held stock in the acquired company prior to the merger.  Not surprisingly, defendant cite no federal case to support these arguments, which, under their rationale, would mean that a company that acquired another company is barred from pursuing the acquired company's pre-merger claims (assuming they are otherwise timely), because the acquirer had to be a shareholder of the acquired entity at the time the wrongdoing occurred.  This is simply absurd. The board has exclusive control over the affairs of the corporation "including the disposition of all choses in action" and in the event of a merger this responsibility passes not to the pre-merger company's shareholder, but to the surviving company and the fact that BofA would make this argument, *see* BofA Br. at 6-8 -- essentially arguing it has no right to pursue the valuable claims against the Defendants it purchased along with its acquisition of Merrill's other assets – demonstrates, by itself, that BofA will not pursue those claims and that only a shareholder derivative action can provide a means to do so.

Second, where a plaintiff was a former shareholder of the subsidiary and a current shareholder of the parent, federal courts have held that the derivative plaintiff retains an interest

in the outcome of the litigation through continuing stock ownership after a stock-for-stock merger. *See, e.g., Miller,* 268 F. Supp. at 267-69.

Third, Defendants' argument flies in the face of this Court's ruling in this very case. This Court granted Defendants' prior motions to dismiss the Merrill derivative claims for lack of standing where former Merrill Shareholder could not bring derivative claim on behalf of Merrill once Merrill merged with BofA on January 1, 2009. Dkt. No. 75, Opinion and Order, at 4. Defendants previously argued to this Court, successfully, that plaintiff lost standing to sue derivatively by virtue of the BofA acquisition of Merrill because only BofA had standing to pursue the claims plaintiff alleged. *See* Dkt. No. 74, Reply Memorandum of Law in Further Support of Defendants' Motions to Dismiss the Derivative Claims in Plaintiffs' Complaints, at 4-18. In fact, Defendants explicitly stated "Bank of America's new subsidiary (Merrill) is the owner of these derivative claims; plaintiff (and other Bank of America shareholders) are not. Indeed Lambrecht understands this new status, and has already asked Bank of America to evaluate these claims." *Id*. at 17. Thus, Defendants agreed that as the Complaint alleges these claims must be brought as a double derivative on behalf of BofA and Merrill, and even acknowledges that BofA is the proper board to receive demand concerning them. Now Defendants argue that was not so. They argue, instead, whether or not plaintiff made demand on BofA's board based on her receipt of BofA shares in the Merger, if she were not a pre-existing BofA shareholder at the time of the wrongdoing at Merrill (notwithstanding she was shareholder of Merrill at the time of the wrongdoing), she can never pursue derivative claim on behalf of BofA or Merrill. This argument is not only disingenuous, but barred by the doctrine of judicial estoppel. *See Johnston v. Arbitrium (Cayman Islands ) Handels AG*, 198 F.3d 342, 346 (2d Cir. 1999) ("[c]ollateral estoppel . . . bars the relitigation of issues actually litigated and decided in

the prior proceeding, as long as that determination was essential to that judgment") (citation omitted); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 57 (S.D.N.Y. 1999) (Judicial estoppel requires that a "clearly inconsistent position" must be adopted by the court in a prior proceeding; *In re Omnicom Group, Inc. Sec. Litig.*, No. 02-4483, 2007 WL 2376170, at *6 (S.D.N.Y. Aug. 10, 2007) ("[T]he Second Circuit has consistently required as a prerequisite that the inconsistent position be taken in a 'prior preceding'"). Moreover, this Court's Opinion and Order, Dkt. No. 75 at 7, made it clear that, if plaintiff made demand on the board of directors of BofA (or, implicitly, if such demand was futile), plaintiff could pursue a derivative or double derivative action to seek to recover for the damage done to Merrill by the defendants. That ruling is law of the case and Defendants make no effort to explain how, after succeeding on their original standing arguments, they can now abandon those positions, skirt what is the law of this case,[16] and invent new hurdles to the procedure this Court described in its February 17, 2009 opinion.

### 2.    Delaware Law Recognizes Double Derivative Plaintiff Standing

To the extent that this Court finds that the standing requirement is substantively governed by state law, namely Delaware, that requires continuous ownership from the time of the wrongdoing alleged to the time the action is filed to the conclusion of the litigation,[17] Plaintiff

---

[16]  The law of the case doctrine holds that, when an issue of law or fact has been determined by a valid and final judgment, that issue of law or fact cannot again be litigated in the 'same litigation.'"  *Hamilton v. Leavy*, 322 F.3d 776, 786-87 (3d Cir. 2003); see *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("The law of the case doctrine has two branches **. . .** [t]he second and more flexible branch is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court. It holds 'that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case,' unless 'cogent' and 'compelling' reasons militate otherwise.")  (citations omitted). *See also Rales*, 634 A.2d at 931 (holding that the Third Circuit's determination that the plaintiff had standing was "the law of the case, and cannot be reconsidered by this court in the present proceeding.").

[17]  Aside from the double derivative structure, Delaware case law recognizes two exceptions to continuous ownership in the merger context when (1) the merger itself is the subject of fraud

27

also meets this standard by virtue of the structure of the double derivative action. To understand the standing requirements under Delaware law, the requirements to structure of a double derivative action must be assessed.

Like Fed. R. Civ. P. 23.1 and Delaware Court of Chancery Rule 23.1, Delaware Corporation Law, 8 Del. C. § 327 states that "[i]n any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains *or* that his stock thereafter devolved upon him by operation of law." *Lewis*, 477 A.2d at 1044 (emphasis added). However, Delaware case law has evolved to find a continuous ownership requirement in a ***derivative*** action that "a shareholder must not only be a stockholder at the time of the alleged wrong and at time of commencement of suit but that he must also maintain shareholder status throughout the litigation." *Id*. at 1046. Delaware Section 261 provides that "[a]ny action or proceeding, whether civil, criminal or administrative, pending by or against any corporation which is a party to a merger or consolidation shall be prosecuted as if such merger or consolidation had not taken place, or the ***corporation surviving*** or resulting from such merger or consolidation may be ***substituted in such action or proceeding***." *Id*. at 1044. Delaware Section 259(a) further states that all rights, privileges, powers and franchises pass to the surviving corporation in the event of a merger. *Id*. Derivative claims of the merged corporation constitute "choses in action" that pass to the surviving corporation by operation of § 259(a). *Id*. Thus, as clearly set forth in Delaware

---

designed to thwart derivative plaintiffs standing; and (2) if the merger in reality is reorganization, which does not affect plaintiff's ownership in the business enterprise. *Lewis v. Anderson*, 477 A.2d at 1047 n. 10. Therefore, the continuous ownership requirement would not even apply here because the merger is clearly subject to fraud as the allegations bolstered by recent revelations in the Complaint state "[i]n an attempt to eliminate their personal liability for the wrongdoing, the Individual Defendants . . . hastily and without appropriate due diligence agreed to sell Merrill to Bank of America…", ¶¶4-5, and attempt to thwart derivative plaintiff's ability to bring the claims.

case law, "plaintiff's derivative claim against the individual defendants of [the formerly independent, now subsidiary company] was a property right of the [former company] . . . upon [the former company's] merger into the [parent company], [the former company's] assests and liabilities, in general, passed under sect. 259(a) to, and became vested in, the surviving corporation, [parent company or new subsidiary]" *Id*.  Thus, under controlling Delaware law, the claims of Merrill (and, therefore, the right of a shareholder to bring claims on behalf of Merrill) passed to BofA upon the Merger closing.  See *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 (Del. 1988) ("in a double derivative suit against a subsidiary [ ] any recovery for losses suffered by the subsidiary that were being sued upon would go to the parent.").

For example, *Lewis v. Anderson* involved a ***former*** shareholder of an acquired  company who brought a case ***derivatively*** prior to a merger on behalf of the ***former company*** who attempted to continue that action after the merger.  The court in *Lewis* found (as did this Court here) that the plaintiff lost standing once the merger was consummated because the shareholder did not meet the continuous ownership requirement, because he was no longer a shareholder of the former company and the right to pursue the claims asserted in the shareholder derivative action now belonged to the acquiring company, not the former shareholders.   *Id*. at 1049. Importantly, *Lewis* was not a double derivative action, like the one asserted here.  While the plaintiff in *Lewis* alleged demand futility as against the former members of the acquired corporation, he did not make a post-merger demand on the board of the new parent corporation or allege futility as to those directors.  Thus, the plaintiff was subject to dismissal.  The situation in *Lewis* mirrors the situation of Plaintiff at the previous motion to dismiss stage of this litigation.  This Court also ruled consistent with *Lewis* that Plaintiff as a former Merrill shareholder did not have standing to bring a derivative case on behalf of Merrill after the merger

with BofA because Merrill's claims asserted by Plaintiff now belonged to BofA.  Dkt. No. 75.

Also, consistent with *Lewis*, this court stated that "its dismissal is without prejudice to plaintiffs'

filing with this Court, if and ***when they have standing***, a renewed action, ***recast as a derivative***

***action against Bank of America, or*** as a so-called "***double derivative***" action, or otherwise, ***but***

***based on the same underlying allegations as the actions here dismissed***."  Dkt. No. 75, at 7.

Based on the controlling Delaware precedent, as interpreted by this Court, Plaintiff did just

that.[18]   Furthermore, a double derivative action as alleged here is the only means to bring

Merrill's claims and is consistent with established law on bringing double derivative actions.

Delaware law recognizes the ability of a plaintiff to bring a double derivative action. *See*

*Sternberg,* 550 A.2d at 1107.   *Blasband v. Rales,* 917 F.2d 1034, 1043 (3d Cir. 1992), is

instructive.  Although *Blasband* involved a derivative action, like in *Lewis v. Anderson* and the

situation of Plaintiff in the prior motion to dismiss stage here, it provides guidance on how to

bring a double derivative action under Delaware law.  In *Blasband*, the Third Circuit found that

even though the situation was the same as *Lewis v. Anderson*, namely a derivative action by a

former shareholder of a company that merged with another and is now the surviving company's

subsidiary, the fact that it mirrored the substance of a ***double derivative*** action permitted the

court to find that plaintiffs had post merger standing to assert their claims.  *Id.* at 1046 ("any

disagreement lies in the name accorded the cause of action, not its substance").[19] The indirect

---

[18]   *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1983), was one of the cases that Defendants
previously relied heavily upon in seeking dismissal of Plaintiff's derivative claims on the
grounds of standing.  *See* Dkt 74 at 8-10.

[19] The *Blasband* court quotes in a footnote that "[i]n a 'double derivative' action, the shareholder
is effectively maintaining the derivative action on behalf of the subsidiary, based upon the fact
that the parent or holding company has derivative rights to the cause of action possessed by the
subsidiary. The wrong sought to be remedied by the complaining shareholder is not only that
done directly to the parent corporation in which he or she owns stock, but also the wrong done to

financial interest, as a current shareholder of the parent company (and former shareholder of the subsidiary) who owned the subsidiary was sufficient for standing.  *See id.* at 1042; *see also Gollust v. Mendell*, 501 U.S. 115, 117 (1991) (the Supreme Court held that under federal law that derivative plaintiff "may continue to prosecute the action after his interest in the issuer is exchanged in a merger for stock in the issuer's new corporate parent" because the plaintiff's indirect financial interest in the outcome of the litigation attributable to his stock interest in the parent was sufficient to satisfy the requirement of continued standing).  The *Blasband* court distinguished *Lewis* asserting that the plaintiff never argued that he had standing as a ***shareholder of the parent company*** because if the court had considered this and rejected it, it would have "call[ed] into question the standing of anyone in Delaware to bring a double derivative suit."  *Id.* at 1044.  That is now exactly what the Defendants are doing here.  However, the Third Circuit in *Blasband* found the vehicle of a double derivative action was necessary to effectuate an equitable result to prevent the situation of a wrong being unredeemed.  *Id.* Defendants now ask this court to essential write out of Delaware law the entire concept of a double derivative action where one corporation acquires another.

Not surprisingly, the *Blasband* court also rejected the argument that plaintiff had to allege that the parent company owned stock of the company it had acquired at the time of the alleged wrong, finding that 8 Del. C. § 327 requires that "in any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a

---

the corporation's subsidiaries which indirectly, but actually, affects the parent corporation and its shareholders. ***Notwithstanding that the recognition of double derivative suits relaxes the plaintiff's contemporaneous ownership requirement, the acceptance of the action acknowledges the realities of the changing techniques and structures of the modern corporation.*** The ultimate beneficiary of a double derivative action is the corporation that possesses the primary right to sue." *Blasband*, 971 F.2d at 1043 n.9 (quoting 13 Charles R.P. Keating, Gail A. O'Gradney, *Fletcher Cyclopedia of Corporations* § 5977, at 240 (rev. ed. 1991)) (citing *Sternberg*, 550 A.2d at 1107 n.1 (citing *Fletcher*)) (emphasis in original).

stockholder of the corporation at the time of the transaction of which he complains." *Id*. at 1046, n.14. The court found this was adequately alleged where the plaintiff was a shareholder of former company when the wrongdoing occurred, which is likewise alleged here.

The *Blasband* court also rejected the interpretation of Delaware law that would require the plaintiff to also be a shareholder of the parent corporation also at the time of the alleged wrongdoing because it is inconsistent with the statute that states the corporation made the nominal defendant at the time of the complaint be the ***same corporation*** that was allegedly harmed by the challenged transaction. *See id.* at 1046. Therefore under this reasoning, the Complaint here sufficiently alleges that Plaintiff was a shareholder of Merrill prior to the Merger and BofA post-merger.[20] Moreover, the *Blasband* court found that the plaintiff alleged that the boards of both the former company/subsidiary and parent refused to assert the claims in question as is also required in a double derivative action. *Id*. at 1044. The Complaint also sufficiently establishes demand futility against the former, pre-Merger Merrill Board and the post-Merger BofA Board as will be addressed more fully below.

Finally, the policy behind the requirement that the plaintiff owned shares at the time of the wrongdoing is to prevent persons from acquiring shares to bring a derivative suit; this policy is not implicated here. Plaintiff was a long time stockholder of Merrill, exchanged those shares for BofA shares in connection with the merger and continues to own those shares, and was already a long term owner of BofA stock; thus, neither her Merrill nor BofA shares were conceivably acquired to bring this action. *See Id*. at 1041.

---

[20] Plaintiff simply reiterates here that the arguments relating to ownership of BofA shares before the Merger and at the time of the wrongs complained of is a red herring, since Plaintiff was a long time shareholder of BofA before the Merger and, since her BofA, as well as her Merrill shares, are held at Merrill, Defendants should have known their argument was factually baseless. *See* Brower Declaration, Exhibit B. Nevertheless, whether Ms. Loveman owned BofA shares before the Merger or not, Defendants argument is still be meritless.

Defendants rely on a single Delaware lower court case for their standing argument, *Saito v. McCall*, No. 17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004). The reasoning of the Chancery Court decision in *Saito* is facially flawed. The *Saito* court, purporting to rely on *Lewis v. Anderson's* requirement of continuous ownership, found that because the plaintiffs were not shareholders of the parent before the merger they were unable to bring the derivative suit, double or otherwise. *Id*. at *40-42. The court, however, also noted that another plaintiff could not pursue the post-merger subsidiary's claim because he was never a shareholder of the subsidiary and because the plaintiffs failed to allege that the parent was a shareholder of the subsidiary at the time the alleged harm occurred. The *Saito* court provides no rationale or support for these inconsistent "head you lose tails I win" rules, which would, as Defendants arguments here would lead, that a double derivative action could virtually never be brought. [21] Indeed, in a different footnote the court stated that the parent inherited the subsidiary's "choses in action" including the claim, and "[i]f [the parent] fails to pursue [this claim], [the parent's] shareholders could bring an action for failure to assert a claim." *Id*. n.80. This provides the only possible coherent insight for the *Saito* court's sketchy conclusions: that demand or demand futility was not alleged as required for double derivative standing. This footnote suggests that the appropriate structure for a "double derivative" requires that the plaintiffs be former shareholder of the subsidiary and current shareholders of the parent, both the parent and subsidiary be named as nominal defendants ***and*** alleging either that demand ***was rejected or futile as to both the boards*** of the current parent (which the court indicates was not alleged in

---

[21] The argument that *Saito*, as Defendants urge this Court to adopt, requires that a plaintiff be a shareholder of the parent company pre-merger and that the parent also be a shareholder of the former company pre-merger as previously addressed are illogical and are not supported by the language of Fed. R. Civ. P. 23.1 or Delaware law and do not serve the policy behind the standing requirement in derivative actions, to prevent strike suits.

*Saito*) and subsidiary at the time of alleged wrongdoing, as correctly alleged in the Complaint here.

Further, support that this can be the only rational interpretation of *Saito* can be found in the cases the *Saito* court cites as its support. In *Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000), at an earlier opinion on a motion to dismiss in the same case as *Saito*, shareholders of the ***parent*** brought a ***derivative*** clam post merger on behalf of the ***parent***. The *Ashe* court dismissed the complaint "to the extent that it purports to assert claims on behalf of former [company's] shareholders for pre-merger acts or omissions of the [former company's] directors." *Id.* at *46. However, the court notes the persuasiveness of the Third Circuit's opinion in *Blasband v. Rales* and states "I do not think that a principled economic argument exists for denying standing to a former [company] shareholder who continues to hold an equity interest, albeit diluted, in the [] subsidiary through the controlling interest of the combined entity . . . Like the Third Circuit in *Blasband*, I do not understand how the concerns that animate § 327 are implicated in stock-for-stock mergers of this kind. Indeed, the Court of Chancery has suggested that former stockholders of the subsidiary who held stock in the parent post-merger should nonetheless have standing to assert derivative claims in exactly this type of situation." *Id.* at *46 (citing *In re Caremark Deriv. Litig.*, 698 A.2d 959 (Del. 1996)).

The *Ash* court stated that even though it was dismissing the oversight claim for lack of standing it was doing so without prejudice for several reasons, including that plaintiffs' claims did not implicate an exception to the standing requirement in the merger context, such as fraud or reorganization, and they did "not asserted a double derivative claim on behalf of the parent corporation to enforce a cause of action (the oversight claim against the directors and management of [the subsidiary]) in favor of a related corporation (the subsidiary)." *Id.* at *48.

Instead the *Ash* court found that "the plaintiffs have not adequately pled such a claim at this juncture, not having (apparently) made demand on the boards of the subsidiary company and the parent company. Here, plaintiffs appear to contend that demand is futile as to both boards. But plaintiffs have not identified the members of the [subsidiary's] board, much less pled explicitly that making a demand on them would be futile. Furthermore, plaintiffs have not named [the subsidiary] as a party, also a prerequisite for asserting a double derivative action." *Id.* at *48-9.

This prior opinion in *Ash* assists the understanding of the later opinion in *Saito* because it directed plaintiffs as to how to bring their double derivative action by naming both the parent and subsidiary in the action and either making demand on both the parent and subsidiary's boards or alleging demand futility as to both. With this understanding in mind, the footnote in the *Saito* opinion, regarding the shareholders' right to bring the action if the parent did not, suggests that in the *Saito* double derivative action, that part of the standing analysis was that demand futility (or that demand was made) was not accurately alleged as to both the parent and subsidiary's boards. The *Saito* court simply failed to fully discuss the plaintiff's efforts to obtain the relief sought through the demand process from the post-merger parent's directors even though it must clearly have influenced its decision. This is the only cognizable explanation for the court's actions in light of its *Ash* opinion and Delaware's recognition of double derivative actions and equitable considerations as addressed in *Blasband*.[22] *See Blasband*, 971 F.2d at 1043-44 (in construing

---

[22] The *Saito/Ash* situation is also distinguishable from the present Merger because it involved allegations that when McKesson acquired HBOC, HBOC concealed accounting improprieties that forced the surviving corporation, McKesson-HBOC, to make major downward revisions in its finances following the merger. *Ash* was originally brought as a derivative action on behalf of the parent-surviving company asserting claims against the parent (the subsidiary, HBOC, was not even named as a defendant), and the court clearly found "the complaint is dismissed to the extent that it purports to assert claims on behalf of former HBOC shareholders for pre-merger acts or omissions of the HBOC directors" implying direct claims were being asserted for the benefit of the former company's shareholders. *Ash*, 2000 Del. Ch. LEXIS 144, *46. Later in *Saito*,

Delaware's controlling *Lewis v. Anderson*, "the merger would have implicated the adequacy of the plaintiff's demand efforts which is a further reason why it may have been premature for the court to address this potential standing argument . . . the court could not have implicitly rejected the plaintiff's standing to bring an action on behalf of the parent without thereby calling into question the standing of anyone in Delaware to bring a double derivative suit.").

The *Saito* court also relied on *In re First Interstate Bancorp Shareholder Litigation*, 729 A.2d 851, 867-68 (Del. Ch. 1998), *aff'd sub. nom. Bradley v. First Interstate*, 748 A.2d 913 (Del. 2000). In *In re First Interstate* plaintiffs were shareholders of First Interstate Bancorp prior to a stock-for-stock merger. First Interstate initially entered an agreement with First Bank Systems, Inc. which was later terminated for a more favorable transaction and subsequent merged with Wells Fargo. After the merger, plaintiffs, current shareholder of Wells Fargo, brought an action against the former directors of First Interstate for their actions relating to aborted First Bank because certain deal protections reduced the value of the merger consideration to First Interstate shareholders in connection with its merger with Wells Fargo. Thus, the plaintiff was seeking a direct recovery. *See id.* at 858. The court, however, determined those claims were **derivative** in nature. In responding to the plaintiff's argument that his ownership of pre-merger First Interstate stock and post-merger Wells Fargo stock met the requirement of continuous ownership under Lewis v. Anderson, the court found that his derivative action failed because "***[plaintiff] never***

---

plaintiffs attempted to recast their action as a double derivative action on behalf of the parent and subsidiary but involving claims against both. This would obviously force a plaintiff to argue that the price paid for the company was too high and too low at the same time depending on which company you are arguing for. The Court dismissed the claims involving the subsidiary and its former board for lack of standing. In contrast, this Complaint alleges a double derivative on behalf of Merrill and BofA, but only involving claims relating to pre-Merger Merrill. BofA is only named as a nominal defendant and the suit solely seeks to recover for BofA so it does not create any issues of direct or conflicting claims against both the acquirer and acquired company, as appeared to be raised in the *Ash/Saito* litigation. Thus, here, Plaintiff does not argue that the former shareholders of Merrill should recover damages.

*purported to satisfy the demand requirements for a derivative suit on behalf of [the parent*]." *Id*. at 868 (emphasis added).    Additionally, while declining to follow the Third Circuit's *Blasband* opinion to find post-merger derivative standing, the court noted that *Blasband* "would recognize plaintiff['s] [] ability to proceed **double derivatively** in the name of [the parent], something which plaintiff does not purport to do." *Id*. at 868 n. 17 (citing *Blasband*, 971 F.2d at 1040-46) (emphasis added).    The court went on to find that an exception to continuous standing in the merger context that the merger was merely a reorganization did not apply because the merger involved two different companies with substantial assets.    The *In re First Interstate* opinion, thus, when viewed in its entirety, again clarifies what the *Saito* court omitted from its opinion that its ruling was premised on the absence of the requisite demand or demand futility allegations relating to the parent and subsidiary which were necessary to satisfy standing for a double derivative action.

Likewise, the *Saito* court cites to *Lewis v. Ward*, No. 15255, 2003 Del. Ch. LEXIS 111 (Del. Ch. Oct. 29, 2003), which also rejected the application of *Blasband* to a **derivative** case*,* citing its predecessors *In re First Interstate* and *Lewis v. Anderson,* but noting "the key issue is whether the parties can cause a double derivative suit to be brought in the interest of [the parent of the subsidiary] . . . In this regard, the plaintiff's pleas about equity are far less convincing because in the *five* years since the merger she never attempted to assert a double derivative action on behalf of [the parent] or to demand that [the parent] cause [the subsidiary] to press her claims." *Lewis*, 2003 Del. Ch. LEXIS 111 at *7 n. 9 (emphasis in original).    Further, the court dismissed plaintiff's argument that because she might have been able to bring a post-merger double derivative suit but did not, she should maintain standing to pursue the derivative suit. *Id*. at *13 n.15.    The court appears to rely on the fact that plaintiff did not bring a double derivative

action even after the ability to do so for five years. The court went on to find that the plaintiff failed to plead facts supporting the applicability of the fraud exception to continuous ownership in the merger context that the sole basis for the merger was to divest the plaintiff of derivative standing. *Id*. at \*22. Therefore, this case, as also implied in *Ash*, *Saito*, *In re First Interstate*, supports the conclusion that a properly pled double derivative action, like the Complaint sets forth here, should move forward.

### 3.    Demand Futility as a Requisite for Standing

Fed. R. Civ. P. 23.1(b)(3) requires that a plaintiff in a shareholder derivative action must allege "with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." As also pointed out in these prior cases, demand futility must be alleged as to both the parent and subsidiary's boards as a pre-requisite of standing. *Saito*, 2004 Del. Ch. LEXIS 205 at \*41 n.80; *Ash*, 2000 Del. Ch. LEXIS 144 at \*44; *In re First Interstate,* 729 A.2d at 868; *Lewis*, 2003 Del. Ch. LEXIS 111 at \*7 n.9; *Blasband,* 917 F.2d at 1044. Since both BofA and Merrill Lynch are incorporated in Delaware, ¶¶35, 36, the demand requirements for the derivative suit are determined by the law of Delaware, the state of incorporation. *Kamen v. Kemper Fin. Services., Inc.*, 500 U.S. 90, 98-99 (1991). Defendants correctly direct this Court to *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) as the authority for determining demand futility in the double derivative context. However, Defendants distort the law as set forth in *Rales* to suggest that demand futility must be alleged against the current subsidiary's board at the time this Complaint was refiled on July 27, 2009. *Rales* clearly states that instead, demand futility must be assessed in accordance with *Aronson v. Lewis***,** 437 A.2d 805, 814-15 (Del. 1984), as to the subsidiary's board when the action was

originally filed which coincides with the time of the alleged transaction.  The Complaint appropriately alleges demand futility as to the current BofA Board at the time the current Complaint was filed and demand futility on the Merrill Board when the action was initiated.

The seminal case in Delaware on demand futility in a derivative context is *Aronson,* which requires a court to determine:

> whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. Hence the [court] must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof . . . the alleged wrong is substantively reviewed against the factual background alleged in the complaint. As to the former inquiry, directorial independence and disinterestedness, the court reviews the factual allegations to decide whether they raise a reasonable doubt, as a threshold matter, that the protections of the business judgment rule are available to the board.  Certainly, if this is an "interested" director transaction, such that the business judgment rule is inapplicable to the ***board majority approving the transaction***, then the inquiry ceases. . .the mere threat of  personal liability for ***approving a questioned transaction***, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability exists . . . In sum the entire review is factual in nature.  The [court] in the exercise of its sound discretion must be satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt that the ***challenged transaction*** was the product of a valid exercise of business judgment."

437 A.2d at 814-15.

Both prongs of the determination of demand futility look to the board's interests, substantial liability, independence and business judgment of the transaction or wrongdoing based on the complaint allegations at the time of the alleged wrongdoing.  *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), also supports this reading of *Aronson*.   "Directorial interest exists whenever divided loyalties are present, or a director has received, or is entitled to receive, a personal financial benefit ***from the challenged transaction*** which is not equally shared by the

stockholders. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to *the challenged transaction*. The second, or business judgment inquiry of *Aronson*, focuses on the substantive nature of the *challenged transaction* and the board's approval thereof." *Id*. at 624.

*Rales*, 634 A.2d 927, came to the Delaware Supreme Court as a certified question of law regarding the application of the *Aronson* test in a double derivative context following the Third Circuit's *Blasband* decision that the plaintiff had standing to proceed. [23] *Id*. at 932. However, the court in *Rales*, pointed out that *Aronson's* focus on the wrongdoing and the board's approval of it assumes that the board to which demand futility is alleged is the same board that approved the transaction. *Id*. at 933. "A court should not apply the *Aronson* test for demand futility where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit. This situation would arise in three principal scenarios: (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where, as here, *the decision being challenged was made by the board of a different corporation*." *Id*. at 933-34. Instead, the court found whether the parent board that would be addressing the demand could impartially consider its merits without being influenced by improper considerations. "Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt

---

[23] Since this was a certified question of law, the Third Circuit's determination was considered "the law of the case" and could not be reconsidered by the court in the decision. *Id*. at 931. Thus, the Delaware Supreme Court considered this a "double derivative" suit, even though it technically was not brought as one. *Id*. at 932.

that, *as of the time of the complaint is filed*, the board of directors could have properly exercised

its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

Defendants failed to mention in their argument, "[a] plaintiff in a double derivative suit is

still required to satisfy the *Aronson test* in order to establish that demand on the *subsidiary's*

*board* is futile." *Id*.  Demand futility is assessed as of the time that the original complaint was

filed, not as of the filing of an amended complaint containing further factual allegations in

support of the same claims.  *See, e.g., Harris v. Carter*, 582 A.2d 222, 231 (Del. Ch. 1990) (A

subsequent change to the composition of the board "does not require a derivative plaintiff to

present a demand to the new board, or to allege facts that would excuse demand as of the time a

plaintiff elects to amend his pleadings."); *Miller v. Schreyer*, 257 A.D.2d 358, 360 (1st Dep't

1999); *accord Aronson v. Lewis*, 473 A.2d 805, 809-10 (Del. Ch. 1984) ("futility is gauged by

the circumstances existing at the *commencement* of a derivative suit"); *see also Strougo v. BEA*

*Assocs.*, No. 98-3725, 2000 U.S. Dist. LEXIS 346 (S.D.N.Y. Jan. 19, 2000) (R. 698-704).  The

*Aronson* test requires a derivative plaintiff "make a *threshold* showing, through the allegation of

particularized facts, that his claims have some merit." *Rales*, 634 A.2d at 934 (citing *Aronson*,

437 A.2d at 811-12).  Based on this legal determination, the court went on to consider the parent

board's "interests" and "independence" in regard to the complaint's allegations and determined

that reasonable doubt existed that a majority of the parent board could exercise properly its

business judgment in a decision on demand had one been made at the time this action was filed.

*Aronson*, 437 A.2d at 937.

Under the framework of *Rales* and *Aronson*, Plaintiff correctly argues that demand is

futile against the current BofA Board (the BofA Board includes at least three former Merrill

Directors) as the BofA Board indisputably controls the current Merrill Board because Merrill is a

wholly-owned subsidiary of BofA.[24]  *See also Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del. 1988) (Delaware law provides that "in a parent and wholly owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.")  Simply, a shareholder of BofA has no duty to make demand on the board of a wholly owned subsidiary.

Indeed, Defendants argument that Plaintiff needed to make demand on the current Merrill Board flies in the face of their own arguments about standing.[25]  Only a shareholder under Delaware or federal law can make a demand on a board of director to take action which, if they fail to do so or demand would be futile, that shareholder can pursue a derivative action.  By virtue of the merger, BofA is now the sole shareholder of Merrill; thus, BofA is the ***only shareholder*** and only BofA would capable of making a proper demand on the new Merrill Board if such a demand were necessary for BofA to instigate pursuit of the claims of Merrill it acquired with Merrill in the Merger.  Therefore, as a former Merrill shareholder and current BofA shareholder, Plaintiff cannot now make a demand on the current post-Merger Merrill Board and, if she did, it would be properly ignored because she is not a current Merrill shareholder and has no legal basis to make such a demand.

On the other hand, even assuming BofA could not proceed (or direct Merrill to proceed) with the claims that Plaintiff asserts here for BofA, the only place to which Plaintiff could make

---

[24] Further evidence of BofA's control is indicated by the fact that the new Merrill Board's membership is not generally available public information and is only available through BofA itself.  Also, the fact that BofA filed its dismissal brief here on behalf of itself, and Merrill, and that it is BofA in that joint brief that makes the arguments here on behalf of both the BofA's Board and the current Merrill's Board, the Court can readily observe that BofA controls every aspect of Merrill business.

[25] Also as discussed previously in their Reply brief, Dkt. No. 74 at 17, Defendants previously conceded that the BofA Board is the proper board for receiving demand regarding the claims asserted here, as it received Lambrecht's demand which it later rejected.

a demand to take the action she seeks to pursue here would be through a demand on the BofA Board to pursue the claims itself or direct Merrill (or direct Merrill's current board which serves at the current BofA Board's pleasure) to pursue those claims. Thus, if demand at the time this Complaint was filed on the BofA Board was futile, *ipso facto* demand on the Merrill Board (even assuming Plaintiff had standing to make such a demand, which she does not), was also futile.

The Complaint also alleges demand futility as to the Merrill Board pursuant to the *Aronson* test that considers the Merrill directors' interests, independence and business judgment at the time of the alleged wrongdoing when this suit was initiated that occurred before the merger, thus the pre-merger Board.[26] Under Fed. R. Civ. P. 15 the claims here relate back to the original pleading because the Court permitted the refiling of the derivative claims, the case was still pending as to the direct claims that were subject to settlement even after the February 17, 2009 Opinion and Order, as reflected in the amended Order of Dismissal, Dkt. 76, and Defendants even consented to the amended filing. Thus, Merrill demand was futile as of the filing of the original complaint on November 1, 2007, Dkt. No. 1, and Plaintiff is not required to make an additional demand or futility arguments. To follow Defendants' convoluted argument that Plaintiff, a BofA shareholder had to allege demand futility (or make a demand) against the current Merrill Board is illogical, eviscerate the entire concept of a double derivative action, and is based on circular reasoning. Plaintiff is not a shareholder of the post-Merger Merrill; only BofA is, and therefore only BofA can bring a derivative suit or make a cognizable demand on the

---

[26] Should this Court decide it is necessary to allege demand futility as to the new Merrill Board, the same well-pleaded reasons that demand on the pre-merger Merrill Board was futile would apply. Furthermore, plaintiff is not necessarily obligated to make another allegation of demand futility (or make demand) which would include the same allegations against it. *See Harris v. Carter*, 582 A.2d 222, 230 (Del. Ch. 1990) (The policy of not interfering, by requiring another demand be made or alleging demand futility as to a Board again, once a derivative action is validly brought does not thwart the new Board's option of overtaking the litigation if necessary or battling against it.)

current Merrill Board. Essentially then it is the same as BofA making demand on itself or bringing its own derivative suit when it could simply direct institution of a direct action. Of course, if demand upon BofA to assert the claims against Defendants would be futile, a demand on the BofA Board to make a demand on its wholly controlled subsidiary's board would be equally futile. Thus, any of the routes that Defendants' argument lead, it ends in the same place: if demand on BofA's Board was futile, then a BofA shareholder has no recourse other than through a double derivative action.

### B. BofA Demand Is Excused

Under Delaware law, in order to satisfy demand futility against the BofA Board under *Rales*, as previously explained, the Complaint has to create "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to demand." *Rales,* 634 A.2d at 934. Further to excuse demand, "plaintiff need only allege specific facts; he need not plead evidence." *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Courts must then examine the totality of the circumstances and consider all relevant factors. *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990). Further, "the court is required to accept all allegations in the complaint, and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable" to the plaintiff. *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 127 (D.N.J. 1999) (citation omitted).

The term "reasonable doubt" as applied by the Delaware courts can be said to mean "reason to doubt" that a board is capable of making an independent or disinterested decision. *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996). In *Rales*, the Delaware Supreme Court expressly rejected a request for a more stringent standard, holding:

44

> [W]e *reject* the defendants' proposal that, for purposes of this derivative suit and future similar suits, we adopt either a universal demand requirement or a requirement *that a plaintiff must demonstrate a reasonable probability of success on the merits*.

634 A.2d at 934*; see also Grobow v. Perot*, 539 A.2d 180, 186-87 (Del. 1988), *overruled in part on other grounds by Brehm*, 746 A.2d at 244 (rejecting the more stringent "judicial finding" standard for pleading director interest). Under the "reasonable doubt" standard, Plaintiff need only allege with particularity facts that would give a reasonable shareholder reason to doubt the ability of the Board to consider disinterestedly a demand. *See Grimes*, 673 A.2d at 1217 n.17 ("the concept of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

As previously addressed, since the board's actions being challenged here are of a subsidiary and not the parent corporation, all that must be shown is that "the board [BofA] that would be addressing the demand" could not "impartially consider its merits without being influenced by improper considerations." *Rales*, 634 A.2d at 934. Specific factual allegations that a director faces a "substantial likelihood of liability" establish a reasonable doubt as to a director's disinterestedness. *Id*. at 936; *Aronson*, 473 A.2d at 805. Allegations of facts supporting a reasonable inference that a director is so beholden to an interested party that his "discretion would be sterilized" establish a reasonable doubt as to the director's independence. *Rales*, 634 A.2d at 936. A demand on BofA's Board to institute this action would be futile because there is a reasonable doubt that the BofA Board would be able to impartially consider the merits of this action without being influenced by improper consideration and thus it could not properly exercise its independent and disinterested business judgment in responding to such a demand. ¶ 398.

Despite, Defendants' assertions to the contrary, BofA was not independent or disinterested for demand purposes for at least the following reasons: 1) the BofA Board without consideration of the substance or merits of the claims agreed to broad indemnification and insurance provisions for the Merrill Defendants (¶¶399-400); 2) filing suit for the wrong alleged in this action is a breach of BofA's fiduciary duties as it would constitute an admission that BofA underpaid for the shares of Merrill and did not perform due diligence concerning the merger, payment of Merrill bonuses and issuance of the Joint Proxy Statement (¶¶401-7; 410); 3) the BofA Board pre-judged the merits of this action as stated in its Joint Proxy (¶¶407-9); 4) the members of the BofA Board have disabling personal and professional conflicts of interest. (¶411); and 5) the rejection of a previous demand (Lambrecht) on the BofA Board (¶412).

### 1.    Indemnification and Insurance Provision of Merger Agreement

Defendants argue that the indemnification to the "fullest extent provided by applicable law" and insurance coverage for six years terms for Merrill's pre-Merger directors and officers in the Merger Agreement without any consideration were merely "standard" [27] provisions and do not demonstrate the BofA Board's lack of disinterestedness or independence with respect to demand to sue Merrill's board.  Although these provisions by themselves do not necessarily indicate that the BofA Board would not properly consider demand, the provisions, in the context of the questionable merger and allegations preceding it, demonstrate the BofA Board's interest in considering demand involving the claims here. ¶399; *see In re Veeco*, 434 F. Supp. 2d 267

---

[27] Defendants seem to suggest that this Court ruled that the indemnification and insurance provisions were standard terms and not evidence of demand futility.  BofA Br. at 11.  However, the Court's opinion about these provisions was in regard to whether they substantiated that the merger was fraud in order for Plaintiffs to come within the "fraud exception" to continuous standing under *Lewis v. Ward*, which is a wholly inapplicable comparison to a determination of reasonable doubt in relation to a director's disinterest and independence.  *See* Opinion and Order, Dkt. No. 75 at 4-5.

(noting that plaintiffs are entitled to all reasonable factual inferences that logically flow from particularized facts alleged including the determination of whether alleged facts sufficiently create a reasonable doubt concerning disinterestedness and independence of a majority of the board from the accumulation of all the facts taken together).

The lack of consideration to BofA for granting these provisions for the benefit of the former Merrill officers and directors under the egregious circumstances that BofA was aware of detailed in the allegations indicates the BofA Board's failure to exercise business judgment, which would in turn make them liable to their own shareholders, who, not surprisingly, are already pursing them through separate shareholder derivative litigation that has survived the futility of demand contest. *See* Brower Decl., Exhibit A. This substantial liability illustrates the BofA Board's lack of disinterest and independence in prosecuting this action. Under these provisions, BofA was contractually required to hold the Defendants harmless for the claims asserted here and defend them in the claims as it is doing, thereby rendering the BofA Board conflicted in a choice to prosecute them instead. In the context of this situation, where subsequent disclosures indicated that BofA did not perform due diligence in its deal with Merrill and involved including these provisions as part of the Agreement without consideration, the so-called "standard" indemnification and insurance terms have an entirely different meaning especially in determining demand futility compared to other merger contexts where companies diligently consider such claims and liability of the former company members before agreeing to a merger and indemnification.

Furthermore, BofA asserts that it did not waive its right to prosecute an action against the Merrill Defendants because the indemnification provisions would not apply if Merrill's officers and directors were adjudged liable for a breach of their fiduciary duty to Merrill. Of course, this

is a circular "chicken or the egg" argument.  Unless BofA's claims against the Merrill defendants are asserted, there will never be an adjudication of the Merrill Defendant's liability; if it pursues the claims, it will have to indemnify the Merrill defendants throughout thus placing BofA in the untenable position of defending the Merrill Defendants so that they will not be found liable their claims under the indemnification and insurance provisions, and only if BofA loses will the insurance provisions not apply.  Moreover, since BofA may ultimately pay in the event of a settlement or judgment against the Merrill Defendants, the BofA Board does have an interest in whether to subject itself to prosecuting such an action.

BofA insists that the insurance provision that would make BofA liable for the costs of recovery on any of its claims against the Merrill Defendants under the "insured versus insured exclusion" is irrelevant to its directors' independence and interests.  However, since BofA would be responsible to pay for any recovery against its subsidiary Merrill, it is of course relevant in the consideration of the BofA Board's interest and independence in considering whether to bring the Merrill claims.  Therefore, the indemnification and insurance provisions for the benefit of former Merrill Defendants without consideration by BofA does indicate that the BofA Board cannot disinterestedly and independently assess a demand to prosecute this action.

### 2.    Liability on Claims Arising out of the Merger

Defendants argue that the BofA Board's potential liability for decisions in connection with its approval of the Merger, the Merger Agreement and the Proxy Statement do not create a reasonable doubt as to BofA Board's disinterestedness and independence.  The Defendants rely on the fact that the potential liability stems from the Merrill Defendants pre-Merger conduct.  However, Defendants fail to note that the allegations relate to the entire scheme by the Merrill

Defendants that lead up to the Merger and that also involved BofA through the commencement of the Merger.

The Merrill Defendants back in 2006 began their wrongdoing involving a build-up of CDO exposure, but the true nature of their losses was not disclosed until after the Merger and the exorbitant bonuses were paid to their executives which BofA helped accomplish. ¶¶312-24. The lack of BofA's due diligence in agreeing to the Merger terms - which included agreeing to payment of the bonuses prior to determining what they would be, without considering the economic context of their payment, and failing to exercise the material adverse effect clause to cease the Merger - further indicates the BofA Board's substantial liability to its own shareholders for breach of its own duties of care and loyalty that renders its consideration of demand concerning these claims useless. *Id.*, ¶401. Concrete evidence of this liability is that on October 13, 2009 a Delaware Chancery Court rejected a motion to dismiss a shareholder derivative suit on the failure to make demand on the BofA Board challenging the BofA acquisition of Merrill. *Nancy Rothbaum v. Kenneth D. Lewis*, No. CA4307 (Del. Ch. Oct. 13, 2009), Brower Decl. Exhibit A. The court found that the BofA Board had information relevant to a vote by shareholders "and consciously chose not to disclose it." Brower Decl. Exhibit A. The lawsuit contends that BofA Chairman, Lewis and other BofA Board members knew the broker's financial condition was worse than disclosed, with an eventual $15.4 billion fourth-quarter loss, and completed the buyout anyway. *Id*. The BofA plaintiffs further argued that the BofA Board showed a lack of care and that directors faithlessly subverted the best interest of BofA and its shareholders. *Id*.

BofA's Board agreed to, and then permitted the bonuses to be paid despite the fact that the U.S. Government was infusing the companies solely to keep them alive and instead they

were throwing the bonuses out like nothing had changed.  BofA argues that substantial liability does not exist for its potential breach of its fiduciary duties in agreeing to Merrill's payment of bonuses because BofA did not receive the compensation or personal financial benefit from the decision to pay them.  This argument ignores the lack of due diligence BofA performed in agreeing to something before it even knew what it was.  Also, the fact that BofA's prior approval was required in the Merger Agreement and BofA's entanglement with the Government for its own infusion of Government money, suggest that BofA was in fact receiving a benefit by going through with the Merger including payment of the bonuses.

Furthermore, the Joint Proxy that was issued to shareholders was a product of both companies and therefore omissions and misrepresentations and any breach of fiduciary duty within it render both the Merrill Defendants and BofA liable to investors contrary to Defendants' argument is clearly alleged. ¶¶402-3; *see In re Oxford*, 192 F.R.D. at 188 ("violations of the law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment, and therefore protected from a demand futility allegation by the case law" therefore finding that under Rales demand is excused).  The BofA Board, as well as the Merrill Board, touted to its shareholders the fairness and its recommendation of the Merger based on Merrill's stated financial condition and without disclosing the pending bonus payments.

Moreover, the BofA Board's own conduct in, first considering exercising the material Adverse Change clause of the Merger Agreement following the revelation of Merrill's significantly greater post-Merger Agreement losses, which demonstrated the BofA Board's initial failure to conduct a proper due diligence of Merrill before rushing into the Merger Agreement, followed by the decision not to exercise that right, further demonstrates the lack of

independence and inability of the BofA Board to respond to a demand. These event were ultimately capped by the fateful meeting between BofA Chairman Lewis and Treasury Secretary Paulson in which BofA was informed that if it invoked the material adverse change clause to terminate the Merger, the Government would replace the BofA Board. The decision to proceed with a merger that the BofA Board had already realized was not in the company's best interests to retain their positions, indicates the very type of and bad faith (self-dealing) that could not have been a product of proper business judgment. ¶¶325, 404-5; *see In re Veeco*, 434 F. Supp. 2d at 278 ("this is not a case where the directors had no 'no grounds for suspicion' or 'were blamelessly unaware of the conduct leading to the corporate liability'")(internal citation omitted).

Having made their bed, for the BofA Board to pursue this action against Merrill, despite the BofA Board's decision to move forward with the Merger, presents precisely the circumstances for which the demand futility rule was invented: pursuit of the claims against the Merrill Defendants would constitute an admission that BofA failed to conduct a reasonable due diligence before entering into the Merger Agreement, subjecting the BofA Board to liability in the BofA derivative suits; or admitting that BofA concealed material adverse information from shareholder in connection with approval of the Merger, subjecting BofA to liability in the legion of federal securities fraud actions pending against it relating, *inter alia*, to the Proxy Statement. Thus, the BofA Board faces a "Hobson's dilemma" that no board can be permitted to resolve for itself. As numerous other governmental investigations against BofA and Merrill for this same wrongdoing also demonstrate (even if this action does not specifically assert claims against BofA and its Board for those misdeeds), the substantial liability the BofA Board faces adequately

establishes that its Board cannot disinterestedly and independently assess a demand to prosecute this action. ¶¶ 406, 410.  Demand is, thus, futile.

### 3.    Prejudgment of Merits of Complaint

Defendants attempt to "balance angels on the head of a pin" by arguing that the Proxy Statement only said that the class claims were "without merit," not the derivative ones, and that even though BofA was aware that Merrill rejected the shareholder demands to pursue these claims (attempting to track this Court's earlier decision), that BofA had a different board and it did not show that the BofA Board pre-judged the merits of these claims.  However, Plaintiff indicates that BofA, *prior* to the time demand could have been made on it, refuted the claims in regard to plaintiff's standing, rendering demand on it useless.  ¶ 407.  Obviously even though the previous grounds for Defendants' Motion to Dismiss did indeed focus on standing, they also argued failure to state a claim-as they are also asserting here.  Likewise, the class claims that Merrill and BofA believed were without merit, involved the same underlying misconduct of the Merrill Defendants as the derivative claims did then and now.  Therefore, a logical conclusion is that Merrill and BofA believed the derivative claims were without merit as well, but the loss of standing would ultimately be the grounds for dismissal, indicating BofA's pre-judgment of the action.

Even to date, after revelations have exposed the true extend of the Merrill wrongdoing including its substantial losses which were not revealed until after shareholders approved the merger, BofA has not taken action to remedy any of the Merrill conduct relating to the allegations here, and certainly did not take any action by the time of this action's filing further indicating that demand is futile on the BofA Board.  *See In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 116 (S.D.N.Y. 2000)(stating "the totality of their actions to date suggest most

strongly that they will not take action, and would not have done so as of [the filing of the action]"). Even though BofA is technically a different Board, it now owns Merrill and Merrill's decision to reject demand of these claims would likely have a bearing on the BofA Board's decision, especially in light of the fact that some of the Former Merrill Directors now serve on the BofA Board. Therefore, the BofA Board's prejudgment of the merits of the claims alleged demonstrates that demand is indeed futile against them.

### 4.    Conflicts of Interest

Plaintiff adequately alleges that demand on the BofA Board is also excused because there are disabling personal and professional conflicts of interest that indicate that a majority of the BofA Board lacks independence. ¶ 411. The allegations detail that certain members of the BofA Board served with other BofA Board members and one former Merrill director. Defendants argue that these allegations are not enough to create a lack of independence regarding the BofA Board in considering a demand. However, Delaware court's have concluded that where facts alleged in a complaint give the court some reason to believe that a Board is not disinterested or independent based on ties between Board members past or current professional or personal relationships, even where "the actual extent of these relationships is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss, and the court reserved judgment on the ultimate nature of these relationships until an adequate record exists, after further discovery and factual development." *In re New Valley Corp. Derivative Litigation*, No. C.A. 17649, 2001 WL 50212, **7-8 (Del. Ch. Jan. 11, 2001). Further, the significant relationships alleged make the BofA Board members less likely to pursue actions which may implicate their other Board members and compromise their relationships on other boards. Although the personal relationships between the Board members

are not dispositive, they add another layer of disinterest that relates to the "totality" of facts that demonstrate that demand is futile.

5.    **BofA Board's Rejection of Lambrecht's Demand Demonstrates Futility**

Plaintiff alleges that following the merger another BofA shareholder made demand on BofA to pursue the claims asserted here which the BofA Board formally rejected and did so "without forming a special litigation committee or excluding the members of the BofA Board who approved the Merger and who did not seek to terminate the Merger based on threat of their own termination as directors of BofA by the U.S. Treasury."  ¶412.  Defendants contend that this rejection of the Lambrecht demand without allegations that the BofA Board's rejection was wrongful does not demonstrate that demand on BofA Board is excused.  However, Defendants fail to explain how demand by another BofA shareholder asserting that the BofA Board bring the same claims would conclude any differently than the rejection of Lambrecht's demand.  Thus, Defendants' argument that its rejection of Lambrecht's demand does not indicate that another demand would likewise be refused, does not sound in logic especially whereas here despite the disclosures of Merrill's wrongdoing the BofA Board has still failed to bring any action to date.  To follow what Defendants suggest that Plaintiff must allege that ***another*** shareholder's demand was wrongfully rejected, as well as allege her own demand futility against the BofA Board, is just more circular reasoning that would force Plaintiff to speak out of both sides of her mouth.  If as alleged here, demand is futile against the BofA Board, it does not make sense that the Plaintiff must also argue that demand was made (even if futile) and wrongfully rejected as well - especially in light of the fact that another shareholder already made demand which was rejected.  Therefore, the rejection of Lambrecht's demand as alleged further bolsters the fact that demand is futile against the BofA Board.

54

C.     **Demand Futility of Merrill**

1.     **Demand Requirements are Properly Considered under *Rules* of the Merrill Board before the Merger**

As previously addressed in the standing argument section, III.A.3., the correct Merrill Board for assessing demand futility against, under *Aronson*, is the former Merrill Board, as is appropriately alleged here. ¶¶328-95.  Defendants make a convoluted argument that because the prior complaint was dismissed and the current Complaint contains a new corporate waste claim in Count XII, the claims were not "validly in litigation" and therefore demand on the new Merrill subsidiary Board must be made or alleged futile.  However, since the alleged wrongdoing at issue in the Complaint, as well as alleged in prior versions, took place at Merrill before the merger, the proper Merrill Board for considering demand futility arguments in this double derivative action must necessarily be the pre-Merger Merrill Board which is also as previously discussed consistent with Delaware law under *Rules* and Fed. R. Civ. P. 15.   Therefore, Defendants' arguments to the contrary are irrelevant, indeed even the cases that BofA cites for support cannot be analogized to the ***double derivative*** action and posture of the case here.  *See, e.g., Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006) (finding that demand needed to be made or futility alleged against the new board in place when the most recent-not initial-complaint was filed that did ***not include a majority from the old board*** where the ***derivative*** action was previously dismissed for failure to meet the derivative requirements); *In re CNET Networks, Inc. Shareholders Derivative Litigation*, No. C06-03817, 2008 U.S. Dist. LEXIS 51309 (N.D. Cal. June 16, 2008) (same); *In re NYFIX, Inc. Derivative Litigation*, 567 F. Supp. 2d 306 (D. Conn. 2008) (finding that new demand requirements needed to be satisfied as to the board at the time of the newly filed complaint because the prior ***derivative*** action did not assert that plaintiffs were shareholders of the company at the time of the alleged wrongdoing).

Notably, Defendants never mention that the composition of the Merrill Board has changed (or even who the members of the Merrill Board are) and that the demand futility allegations as to the current BofA Board satisfy these standards and *Rales*.

Furthermore, consistent with *Harris v. Carter*, 582 A.2d 222 (Del. Ch. 1990), which is cited by *Braddock v. Zimmerman*, 906 A.2d 776,[28] the Delaware courts have held that a reasonable doubt must be raised as to the disinterestedness or independence of a majority of the board of directors sitting at the time the original complaint was filed, not as of the filing of an amended complaint containing further factual allegations in support of the same claims.  *See Harris*, 582 A.2d at 228; *see In re Morgan Stanley Derivative Litig.*, No. 05-6516, 2008 WL 820718, at *4 n.9 (S.D.N.Y. Mar. 27, 2008) (in context of second amended complaint, court analyzed demand futility with regard to the board as comprised at time of filing of original complaint).  When an amendment or supplement to a complaint elaborates upon facts relating to acts or transactions alleged in the original pleading, or asserts new legal theories of recovery based upon the acts or transactions that formed the substance of the original pleading, it does not "constitute a matter that would require a derivative plaintiff to bring any part of an amended or supplemental complaint to the board for filing." *Harris*, 582 A.2d at 231; *see also In re Atmel Corp. Derivative Litig.*, No. C06-4592, 2008 WL 2561957, at *5 (N.D. Cal. June 25, 2008).  Therefore, plaintiff was not required to make demand on the current Merrill Board (which is obviously completely controlled by its owner-parent BofA) and instead has properly

---

[28]  If this Court found *Braddock's* "validly in litigation" requirements applicable, the fact that this action was previously dismissed for loss of standing due to the Merger could meet the "proceeding that can or has survived a motion to dismiss" definition based on its allegations because it was not dismissed on the merits and in fact the case was still ongoing pursuant to the direct claims, Dkt. No. 76.  This Court's decision on the prior motion to dismiss did not even touch the demand futility allegations.  Thus, a new demand would not have been required on the new Merrill Board consistent with *Harris* discussed below.

demonstrated that demand is futile on the Merrill Board at the time of filing the initial complaint before the Merger.

Despite Defendants insistence that specifically the corporate waste claim is not properly before this court as, the only legitimate inquiry as to the subsequent information in the allegations and claim for corporate waste is under Fed. R. Civ. P. 15 as to whether the claim is timely under the Statute of Limitations. Fed. R. Civ. P. 15 (2) "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Also, notable under Rule 15 is: (c)(1) "[a]n amendment relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading; **or** (C) the amendment changes the party or the naming of the party against whom the claim is asserted . . ."

This Court granted Plaintiff, whose complaint was never dismissed in its entirety, *see* Dkt. No. 76, leave to recast her complaint as a double derivative consistent with the prior allegations that are again repeated here and supplemented by the further revelations of the BofA board and Merrill Defendants' misconduct involving the Merger and the payment of excessive bonuses. When the prior complaint was filed in September 2008, the information about the Merrill bonuses (and the extent of Merrill's massive losses) was concealed from the public and even from the shareholders when they were voting to approve the merger, therefore Plaintiff could not have made the claim for corporate waste regarding the bonuses prior to the current Complaint.

Plaintiff complied with Rule 15(2) in that she received the Court's leave in its Opinion and Order on February 17, 2009, Dkt. No. 75, to amend her complaint. Further, the new allegations and claim involving corporate waste and the allegations involving the accelerated, secretive payment of Merrill's excessive bonuses clearly fall with in the applicable statute of limitations since they were paid the end of December of 2008 and they were plead on July 27, 2009 and therefore relate back to the original filing. Fed. R. Civ. P. 15(c)(1)(A). Also, they "assert a claim that arose out of the conduct, transaction or occurrence set out-or attempted to be set out-in the original pleading" namely Merrill's wrongdoing regarding the huge losses from the investments in CDOs and attempts to cover their tracks at the expense of their shareholders and to their own benefit. Fed. R. Civ. P. 15(c)(1)(B). Therefore it is evident that Defendants' argument that this Court should disregard the allegations that only recently were revealed to the public regarding the Merrill Defendants' wrongdoing and consider them as dispositive proof that demand on the new Merrill Board is required, simply runs afoul of Fed. R. Civ. P. 15 where the new claims and allegations clearly relate back to the prior complaint. Defendants' desperate attempt to ask this Court to write those allegations out of the Complaint, however, speaks volumes as to their strength against Defendants on the merits.

### D. Merrill Demand is Excused

**1.    The Individual Defendants Cannot Seek Protection For Their Breaches Of Fiduciary Duties Under Merrill's Certificate Of Incorporation**

Defendants argue that the claims in the Complaint against the Individual Defendants for breach of fiduciary duty, aiding and abetting that breach, gross mismanagement and abuse of control, those not based on breach of duty of loyalty or intentional or bad faith conduct, should be dismissed because Merrill included in its Restated Certificate of Incorporation ("Certificate of

Incorporation") a provision limiting the director's personal liability. BofA Br. at 22-23; Merrill

Directors Br. at 7-9. This provision was adopted pursuant to Section 102(b)(7) of the Delaware

General Corporation Law.[29]

As an initial matter, the Individual Defendants' argument that Plaintiff's duty of care

claims should be rejected because of the exculpation provision in Merrill's Certificate of

Incorporation is in the form of an affirmative defense. *Emerald Partners v. Berlin*, 726 A.2d

1215, 1223 (Del. 1999) ("the shield from liability provided by a certificate of incorporation

provision adopted pursuant to 8 Del. C. § 102(b)(7) is in the nature of an affirmative defense.").

Courts have routinely held that affirmative defenses and, in particular, defenses in which

directors seek the protection of an exculpatory charter provision, cannot form the basis for

dismissal at the motion to dismiss stage of litigation:

> Delaware state courts characterize a § 102(b)(7) charter provision as in the nature
> of an affirmative defense. At least two federal courts have cited Tower Air in
> denying motions to dismiss duty of care claims based on exculpation provisions.
> Because a section 102(b)(7) provision is in the nature of an affirmative defense
> and following the statement of the Third Circuit that such defenses will generally
> not form the basis of a Rule 12(b)(6) dismissal, defendants' motion to dismiss the
> duty of care claims is denied.

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561

---

[29] Section 102(b)(7) of the Delaware General Corporation Law permits limiting the liability of
directors, with the following exceptions:

> A provision eliminating or limiting the personal liability of a director to the
> corporation or its stockholders for monetary damages for breach of fiduciary duty
> as a director, provided that such provision shall not eliminate or limit the liability
> of a director: (i) for any breach of the director's duty of loyalty to the corporation
> or its stockholders; (ii) for acts or omissions not in good faith or which involve
> intentional misconduct or a knowing violation of law; (iii) under § 174 of this
> title; or (iv) for any transaction from which the director derived an improper
> personal benefit. No such provision shall eliminate or limit the liability of a
> director for any act or omission occurring prior to the date when such provision
> becomes effective.

(D. Del. 2008); *see also In re Tower Air, Inc.*, 416 F.3d 229, 242 (3d Cir. Del. 2005) ("the protection of an exculpatory charter provision appears to be in the nature of an affirmative defense.  As we have said, affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6).").[30]

The Individual Defendants' behavior is not protected under § 102(b)(7) because, contrary to Defendants' argument, Plaintiff's allegations do implicate the four exceptions in Section 102(b)(7).  An exculpatory provision adopted pursuant to § 102(b)(7) "does not release directors from liability for breaches of the duty of loyalty, or for intentional misconduct done in bad faith." *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 732 (D. Del. 2000).  In addition, the intentional withholding of information from a company's shareholders "would not warrant immunity under the exculpatory clause of [a company's] corporate charter." *Id.*  Accordingly, Delaware law strictly limits the scope of indemnification provided by § 102(b)(7):

> The indemnification provision is pursuant to Del Code Ann. § 102(b)(7), which allows a corporation to limit or eliminate directors' liability for monetary damages for breach of fiduciary duty by including an exculpatory provision in its certificate of incorporation. However, the statute is strictly limited, prohibiting indemnification for any breach of the director's duty of loyalty to the corporation or its stockholders, for acts or omissions not in good faith or involving intentional misconduct or for any transaction for which the director derived an improper personal benefit.  (emphasis added)

*In re Trump Hotels S'holder Derivative Litig.*, No. 96-7820, 2000 U.S. Dist. LEXIS 13550, at *53-54 (S.D.N.Y. Sept. 21, 2000).

Here, Plaintiff has alleged, in non-conclusory detail, that the Individual Defendants

---

[30] *See also In re Brown Sch.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007) (denying a motion to dismiss based on a § 102(b)(7) exculpatory clause because the "exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at this stage."); *In re Taser Int'l S'holder Derivative Litig.*, No. 05-123, 2006 U.S. Dist. LEXIS 11554, *59 (D. Ariz. Mar. 17, 2006); *Fleet Nat'l Bank v. Boyle*, No. 04-1277, 2005 U.S. Dist. LEXIS 44036, at *54-55 (E.D. Pa. Sept. 12, 2005) ("affirmative defenses generally will not form the basis for dismissal under Rule 12(b)(6)").

breached their fiduciary duties to Merrill, aided and abetted such breaches, grossly mismanaged Merrill, and abused their control of Merrill through their illicit and improper course of conduct. Specifically, the Individual Defendants had actual knowledge of or consciously disregarded increased risks to Merrill's subprime investments, resulting in substantial harm to it. *See, e.g.*, ¶¶194-96, 344-45.

The Individual Defendants also caused Merrill to issue false and misleading financial statements and press releases, and intentionally or recklessly failed to disclose material, non-public information necessary to make such press releases and financial reports not false and misleading. ¶¶195, 361. These Defendants were motivated to engage in this wrongdoing in order to artificially inflate the stock price of Merrill, thereby allowing certain of the Individual Defendants to personally gain from their improper sales of 717,044 shares of Merrill stock during the Relevant Period for total proceeds of $67,261,348. ¶¶385-89.

The Individual Defendants also allowed defendant O'Neal to retire rather than terminating him with cause and unanimously voted to grant him an exorbitant retirement package worth more than $161 million. ¶¶ 215, 362. *See In re Citigroup Inc. Shareholder Derivative Litigation*, 964 A.2d 106, 138 (Del. Ch. 2009) (finding that demand was excused with regard to a waste claim based on the board's approval of a letter agreement paying the "[$68 million] compensation package to a departing CEO whose failures as CEO were allegedly responsible, in part, for billions of dollars of losses at Citigroup"). These Defendants also authorized the purchases of First Franklin and First Republic, as well as the massive Stock Repurchase Program, to keep Merrill's stock inflated until the exchange ratio for the First Republic merger was fixed. ¶¶367-82.

While Defendants attempt to minimize Plaintiff's allegations as falling solely under the

duty of care, the fact remains that the Individual Defendants' wrongful course of conduct, by its very nature, implicates violations of the fiduciary duties of loyalty and good faith. *See In re Abbott Labs. Derivative S'Holders Litig.*, 325 F.3d 795, 811 (7th Cir. 2003) ("Although plaintiffs' complaint alleged breach of duty of care, it also "alleged 'omissions not in good faith' and 'intentional misconduct' concerning 'violations of law,' which conduct falls outside of the [§ 102(b)(7)] exemption."). Under Delaware law, the fiduciary duties of good faith and loyalty may be breached where, as here, directors consciously disregard their duties to the corporation.

Here, the Individual Defendants' consciously disregard, whether intentional or reckless, of the known risks involved in Merrill's subprime investments violated their duty of good faith:

> To the extent that recklessness involves a conscious disregard of a known risk, it could be argued that such an approach is not one taken in good faith and thus could not be liability exempted under the new statute . . . . regardless of how plaintiffs style their duty of care claims, we find that they have alleged a conscious disregard of known risks, which conduct, if proven, cannot have been undertaken in good faith. Thus, we hold that plaintiffs' claims are not precluded by [defendants'] § 102(b)(7) waiver provision.

*McCall v. Scott*, 250 F.3d 997, 1000-01 (6th Cir. 2001). Similarly, the Individual Defendants' intentional withholding of material information, and their personal gain from such omissions through insider selling, also constitute a violation of their fiduciary duties of loyalty and good faith. *See In re Reliance*, 91 F. Supp. 2d at 732. Faced with similar allegations as those in this action, this Court has found that a plaintiff's claims of breaches of fiduciary duty are not protected by § 102(b)(7). *See Trump Hotels*, 2000 U.S. Dist. LEXIS 13550, at *53-54.

Plaintiff's allegations demonstrate that the Individual Defendants, through their improper and illegal course of conduct, have (i) violated their fiduciary duty of loyalty to Merrill and its stockholders; (ii) committed acts or omissions not in good faith and which involve intentional misconduct or a knowing violation of law; (iii) engaged in insider sales from which certain of the

Individual Defendants derived an improper personal benefit. Therefore, Merrill's exculpatory provision does not insulate the defendants from liability; and (iv) defrauded Merrill into purchasing Merrill stock at artificially inflated prices in violation of their fiduciary duties and the federal securities laws.

### 2. The Former Merrill Board Faces a Substantial Likelihood of Liability

Defendants argue that the former Merrill Board does not face a substantial likelihood of liability. BofA Br. at 23. They insist that a failure of oversight of Merrill's risk and corporate waste claims for waste of corporate assets are not established. *Id.; see also* Merrill Directors Br. at 10-12. Defendants also argue that the acquisitions of First Franklin and First Republic Bank, the stock repurchase program and approval of O'Neal's retirement agreement fail under *Aronson* demand futility determination because the Merrill Board did not have a material financial interest or derive a personal benefit from these transactions and they are the product of proper business judgment. BofA Br. at 23-24. Finally, Defendants insist that the insider trading allegations against O'Neal, Fakahany and Fleming do not excuse demand because none of the individuals were on the former Merrill Board. *Id.* at 25

The allegations set forth in the Complaint cast more than a reasonable doubt as to the independence and disinterestedness of the Defendants with respect to the challenged transactions and meet the requirements of the *Aronson* test. A director is not considered independent if he is dominated by another party who is the proponent of the challenged transaction "whether through close personal or familial relationship or through force of will." *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002). A director also lacks independence if he is so under the influence of the controlling party that its discretion is sterilized. *See Rales*, 634 A.2d at 936. Each of the factors alleged in the Complaint demonstrate reasonable doubt as to the Board's independence and

disinterest, but, in totality, these factors indicate that demand should be excused. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 192 F.R.D. 111, 118 (S.D.N.Y. 2000) (applying Delaware law; considering the totality of the circumstances in evaluating demand futility); *NVF,* 1989 Del. Ch. LEXIS 167, at *15 (same).[31]  In considering all of the factors alleged individually, or in totality, which is the appropriate standard, more than a reasonable doubt is created that the majority of the Board members are independent, disinterested, or able to properly evaluate demand.

As an initial matter, Defendants' demand futility arguments are disingenuous at best since they have ***explicitly*** admitted that making a demand on Merrill's Board was a futile endeavor.[32]  Despite their admission, the Director Defendants are now arguing the other side of this position in stating that Plaintiff has not established demand futility.  This argument is not rooted in logic or consistency, but rather shows the lengths to which the Board will go to avoid responsibility for their self-serving actions.  This level of duplicity on the part of the Board demonstrates that the Director Defendants could not have properly exercised their independent and disinterested business judgment in responding to a demand.  *Rales*, 634 A.2d at 934. Further, the Complaint's particularized allegations relating to the claims relating to the failure of Oversight, the Board approved transactions and corporate waste establish the substantial liability the former Merrill Board faced that a reasonable shareholder would have reason to doubt the

---

[31] Further allegations indicate that Defendants had personal and professional ties with Defendant O'Neal as well which rendered them interested. ¶¶364-65.  Additionally, several Merrill Director Defendants have already been named as defendants in ERISA litigation which is more indicia of the likelihood of liability Defendants face.  ¶366.

[32] The Lambrecht Letter and Merrill Board response were previously submitted as Exhibits A and B, respectively, with the prior Opposition to the Motion to Dismiss. *See* Dkt. No. 67.  In the response the Merrill Board cited the negative consequences a derivative lawsuit would have on existing securities and ERISA litigation and the liability exposure to Merrill and Defendants for the alleged wrongdoing.

ability of the Board to consider disinterestedly a demand.  *See Grimes,* 673 A.2d at 1217 n.17.

Thus, demand on the Merrill Board was futile.

> **a.  The Complaint Properly Pleads Particularized Facts Creating a Reasonable Doubt that the Approval of Defendant O'Neal's Retirement Agreement Was A Valid Exercise Of The Board's Business Judgment**

The central issue regarding the board's approval of O'Neal's lavish $161 million severance package is whether the detailed facts alleged in the Complaint regarding this transaction are sufficient to raise a reasonable doubt as to the directors' right to the protection of the business judgment rule.  Under *Aronson*, demand is excused if the facts in the complaint raise a reasonable doubt that the transaction at issue "was otherwise the product of a valid exercise of business judgment."  473 A.2d at 814.  The protections of the business judgment rule can only be "claimed by disinterested directors whose conduct otherwise meets the test of business judgment."  *Id.* at 812.  Further, "to invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them."  *Id.*

Plaintiff alleges that notwithstanding that defendant O'Neal should have been fired for cause which "he would have been required to forfeit [the largest component of his retirement package]," Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jones, Peters, Prueher, Reese, and Rossotti voted to award Defendant O'Neal a completely unwarranted and unjustified gift of a $161 million "retirement" package.  ¶362.  Each of these defendants also voted on October 30, 2007 to modify O'Neal noncompetition agreement to make such agreement less favorable to Merrill for no apparent reason.  *Id.;* Merrill Directors Br. at 15.  Defendants' arguments that Merrill's reciprocal consideration received of O'Neal's agreement  not to seek a bonus for 2007 and waiver of 6 month of his right to base compensation under his non-compete

agreement is hardly adequate.  In fact O'Neal's driving Merrill into the ground and a faltering financial condition by his aggressive exposure of CDOs would never warrant a performance based-bonus and as alleged should have led instead to Merrill firing him where he would certainly have not received any additional compensation that he agreed to waive.

O'Neal's conduct was so egregious that in March 2008 the House Committee on Oversight and Government Reform called O'Neal before it to testify about its investigation into "CEO Pay and the Mortgage Crisis."  ¶362.  After reviewing "Merrill Lynch's Board minutes, emails and SEC filings, as well as its consultations with leading experts in executive compensation, the majority staff" reached the following conclusions:  (1) "***No documents were provided to the Committee that indicated that the board ever debated terminating Mr. O'Neal for cause or considered withholding all or part of Mr. O'Neal's $131 million in unvested stock and options***"; and (2) "***The documents the Committee received provide no explanation why the narrowing of Mr. O'Neal's noncompetition agreement was determined to be in the best interests of Merrill Lynch and its shareholders***."  *See Id.* (emphasis added).

These detailed facts pled in the Complaint are more than sufficient to raise a reasonable doubt as to the objectivity of Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jones, Peters, Prueher, Reese, and Rossotti, thus excusing any demand on them.  They cannot be said to have fully informed themselves about the decision to pay O'Neal $161 million when Congress found that there were "no documents" to demonstrate that the board even considered firing O'Neal for cause or withholding all or part of O'Neal's $131 million in ***unvested*** stock and options.  Any other employee who left with unvested stock or options would have forfeited such stock and options.  Moreover, to say that such directors could not objectively consider a demand to bring suit against Mr. O'Neal would be an understatement, to say the least.  If these

defendants chose to bring any action against O'Neal, they would be admitting that they committed a huge error by paying O'Neal $161 million instead of firing him for cause and authorizing Merrill to bring suit against him.

Notably, *In re Citigroup*, 964 A.2d 106, a Delaware court found demand was excused where the board approved a $68 million compensation, which is less not even half of the amount O'Neal walked away with $161 million, to the CEO of Citigroup who was responsible, like O'Neal for billions of dollars in losses at Citigroup. *Id*. at 138. The court found that a reasonable doubt existed as to whether the letter agreement paying the compensation met the admittedly stringent "so one sided" standard or whether the letter agreement awarded compensation that is beyond the "outer limit" described by the Delaware Supreme Court. *Id*. The court went on to determine that for the same reason that it found demand futility regarding the claim for waste for approval of the executive compensation, it likewise could not dismiss the corporate waste claim under Rule 12(b)(6). *Id*. at 139. This decision is especially persuasive in regard to the Merrill Board's approval of O'Neal's retirement package, over twice the amount of the CEO of Citigroup, in midst of his destruction of Merrill, which even worst than Citigroup, leading to Merrill being bought out by BofA.

In their motion to dismiss, Defendants improperly rely on *Brehm*, 746 A.2d 244. BofA Br. at 24. *Brehm* is completely distinguishable because there the CEO had an *employment agreement* that contractually obligated Walt Disney to pay the executive severance payments. *Brehm*, 746 A.2d at 252 ("it is important to note that Ovitz and Disney had negotiated for that severance payment at the time they initially contracted in 1995, and in the end the payout to Ovitz did not exceed the 1995 contractual benefits."). Here, in stark contrast, as Congress determined, "***O'Neal did not have an employment agreement with Merrill Lynch, [and thus] he***

*was not entitled to continued perquisites after he departed.*" ¶362 (emphasis added). Obviously, it is a much different thing to allege that directors wrongfully caused a company to honor a contractual employment agreement than, as here, allege that directors wrongfully caused a company to pay $161 million to a former CEO who had no contractual right to a single penny of severance and who was directly responsible for write downs and losses to Merrill which had surpassed *$29 billion*. *Id.*[33]

*Brehm* is also distinguishable because, as noted above, the directors there relied on an expert compensation consultant in negotiating Ovitz's employment agreement, thus entitling the board to the protections of 8 Del. Code § 141(e). *Brehm*, 746 A.2d at 261-62. Here, in contrast, there are no allegations that the Merrill directors relied on a compensation expert when calculating O'Neal's severance agreement. In fact, the allegations are exactly the opposite. *See* ¶362 (the House Committee report concluded that "no documents were provided to the Committee that indicated that the board ever debated terminating Mr. O'Neal for cause or considered withholding all or part of Mr. O'Neal's $131 million in unvested stock and options."). Thus, because Plaintiff has alleged detailed facts demonstrating that the board failed to inform itself regarding O'Neal severance, and failed to rely on experts, a reasonable doubt is raised as to the board's right to the protection of the business judgment rule. Thus, demand is excused as futile.

The Complaint here alleges particularized facts that after discovery, should lead to a

---

[33] In addition, in *Brehm*, a central focus was whether the board had unduly deferred to a compensation expert *at the time the board initially approved the Ovitz employment contract in 1995*. *Brehm*, 746 A.2d at 260. One of the main contentions was that the consultant and board members did not calculate at the time the full range of potential benefits Ovitz could earn later at the time of termination. *Id.* Here, in contrast, since O'Neal had no employment agreement, the focus is on the board's conduct at the time of O'Neal's "resignation," by which time the board was well-informed as to the nature of O'Neal's mismanagement and the gargantuan amount of write downs Merrill was forced to take due to O'Neal's misconduct.

different result at the trial on the merits.  Demand is excused here because the Complaint alleges the following:

- O'Neal had no employment agreement with Merrill and, at the time of his severance, he had $131 million in unvested stock and options that would have been forfeited had O'Neal been terminated for cause.  ¶362.

- Merrill's annual returns during O'Neal's tenure were "far and away worse than those of any of Merrill Lynch's competitors."  ¶212.

- O'Neal had contacted a competitor – Wachovia – about a potential merger without permission from or notice to Merrill's Board because he "stood to make $250 million in severance pay if there was a change in control of the Company."  ¶214.

- Just days after rumors spread about O'Neal's unauthorized merger overtures to Wachovia, Merrill announced that "O'Neal had retired" with a severance package worth more than $160 million.  ¶215.  The Board unanimously voted to give O'Neal the package.  *Id*.

- In March 2008, the House Committee on Oversight and Government Reform called O'Neal before it as part of its investigation into "CEO Pay and the Mortgage Crises."  Before the hearing, "[b]ased on its review of Merrill's Board minutes, emails and SEC filings, as well as its consultations with leading experts in executive compensation, the majority staff" released a report detailing its concerns.  ¶362.

- The Congressional report stated the Committee's concern that the Board never even considered terminating Defendant O'Neal for cause based on his poor performance or "withholding all or part of Mr. O'Neal's $131 million in unvested stock and options," which he would have been required to forfeit if he was terminated for cause.  *Id*.

- O'Neal also signed a non-compete agreement when he began work for Merrill, which was modified as part of his retirement package and approved by the compensation committee and the full board.  Only one board member objected.  There is no explanation provided how this was "in the best interests of Merrill and its shareholders."  *Id*.

- O'Neal did not have an employment agreement with Merrill, yet the Board agreed to "provide O'Neal with office space in New York for his personal use and the services of full-time executive assistant for a period of three years."  "The documents do not reflect what shareholder value the board hoped to obtain by providing these perquisites to Mr. O'Neal."  *Id*.

These allegations regarding Defendant O'Neal's retirement package raise a reasonable

doubt about the Board's entitlement to the protection of the business judgment rule.  The Board

failed to rely on an expert to determine O'Neal's compensation (in direct contrast to *Brehm*, 746

A.2d at 261-62), and the report of the House Committee makes it clear that the Board hastily

decided O'Neal's severance package just days after public disclosure of O'Neal's unauthorized

merger talks with Wachovia and without consideration of any relevant documents concerning

O'Neal compensation or severance benefits.  ¶¶212-15, 362.  Thus, demand futility is adequately

alleged with respect to the Board's decision to award O'Neal's retirement package.

> **b.  The Complaint Properly Pleads Particularized Facts Creating a Reasonable Doubt that the Approval of the First Franklin and First Republic Acquisitions Were Valid Exercises Of The Board's Business Judgment**

A reasonable doubt is also raised as to the Board's entitlement to the protection of the

business judgment rule with respect to the Board's conduct in causing Merrill to pay $1.3 billion

to purchase subprime originator First Franklin at the peak of the market in December 2006

(¶¶124, 175) and the board's decision to consummate the purchase of First Republic on

September 21, 2007, just weeks before the October 5, 2007 disclosure by Merrill of massive

write-downs related to its subprime investments.  ¶¶135-37.   The facts pled with regard to the

First Republic transaction are egregious, and have subjected Merrill to potentially massive

damages for "strict liability" claims under Section 11 of the Securities Exchange Act asserted by

former First Republic shareholders due to the numerous false and misleading statements that the

director defendants caused Merrill to make in the First Republic Registration Statement.  *See*

Consolidated Amended Class Action Complaint, ¶¶464-469, 553-558, 640-50.[34]

---

[34] In the Plaintiffs' prior Opposition to the Motion to Dismiss, Dkt. No. 67, Plaintiffs requested the Court take judicial notice of the allegations in the companion class action Consolidated Amended Class Action Complaint ("CAC") against Merrill and certain of the Individual Defendants filed on May 21, 2008, which was subsequently and hastily settled prior to the

Plaintiff alleges that when Merrill announced its intention to purchase First Republic for $1.8 billion on January 29, 2007, it needed to keep Merrill's stock inflated since the transaction was structured partly as a stock-for-stock transaction and Merrill wanted and needed to keep its stock inflated so that it could issue as few shares of Merrill stock as possible to First Republic shareholders.[35]   If Merrill's stock price declined in the February to September 2007 time period, then Merrill would have to issue more shares of its stock to First Republic shareholders, which would cause dilution and impair Merrill's acquisition strategy.  ¶135-38.  As part of the strategy to keep Merrill's stock price inflated for this purpose, the director defendants wrongfully approved the $6 billion stock repurchase program, which was publicly announced on April 30, 2007.  ¶150.  The directors approved the repurchase program also because analysts had begun to actively question Merrill's huge risk to the subprime market near this time.  ¶375.

Notwithstanding their direct receipt of these warnings, the directors not only authorized a collective $3.1 billion to be spent to purchase First Franklin and First Republic, but the directors also permitted Merrill to file a false Registration Statement and amendments thereto for the First Republic acquisition on May 8, 2007, June 8, 2007, and June 22, 2007 which the securities plaintiffs alleged subject Merrill to strict liability because they allegedly contain untrue

---

Merger.

[35] The exchange rate used to calculate the number of Merrill shares paid to First Republic shareholders was based on Merrill's average closing price over the five trading days preceding September 21, 2007, which was $75.02 per share.  ¶135.  The Director Defendants caused Merrill to delay disclosing Merrill's massive write-downs until October 5, 2007, just weeks after the close of the First Republic merger on September 21, 2007, in order to avoid having to pay more to the First Republic shareholders.  ¶137.  Moreover, as discussed below, the Board had received multiple, specific warnings regarding Merrill's overexposure to the subprime and CDO investments well before this time – from Kronthal in 2006 (¶347), from Merrill's own analyst Kenneth Bruce in September 2006 (¶118), by Merrill Co-Presidents Fakahany and Fleming in July 2007 and on August 9, 2007 (¶¶355-56), and Co-Head of Risk Management Keishi Hotsuki in August 2007 (¶188).

statements.    Given the sequence of these events concerning the directors' approval and consummation of the First Republic acquisition, a reasonable doubt is raised as to the directors' entitlement to the protection of the business judgment rule.

With respect to the First Franklin purchase, while it is true that the acquisition proved in hindsight to be a disastrous decision since First Franklin became worthless just 15 months later,[36] Defendants contend that the allegations themselves provide a rational business purpose to supply loans used for the creation of CDOs.  BofA Br. at 24.  This is wrong, since the Complaint does plead particularized facts demonstrating that the board recklessly disregarded material facts at the time they approved the purchase of First Franklin such as its failing CDO business which makes this decision without sound business judgment.

Furthermore, the allegations regarding the First Franklin acquisition are made as part and parcel of Plaintiff's allegations that such transaction was an integral part, along with the First Republic acquisition and the Stock Repurchase Plan, of an intentional, concerted effort by Merrill to continue a supply of toxic subprime mortgages for its CDOs well after the market and the Board knew that Merrill was massively overexposed to such investments, that the value of such investments was declining precipitously, and that the declines would require Merrill to take massive write-downs and then seek a massive infusion of capital.  Prior to the time the board authorized the purchase of First Franklin for $1.3 billion on December 30, 2006, the risks of the subprime market were already known to the Board which had been warned by Merrill analyst Kenneth Bruce in September 2006 "that demand for subprime bonds 'could dissipate quickly,' exposing their holders to losses.  Bruce specifically warned that an 'asset fire-sale' could cause

---

[36] Merrill had to shutter First Franklin in March 2008, and had to spend $60 million to "pay for severance and other real estate costs linked to unwinding First Franklin's operations."  ¶250.

prices to fall." ¶118.[37]

Moreover, in addition to these specific facts, on April 10, 2008 Merrill Lynch Bank & Trust Co. filed a verified petition in New York State Supreme Court which demonstrates that Merrill knew the very facts at the end of 2006 that it disclaims in its motion to dismiss this complaint.  Merrill filed the April 10, 2008 petition against National City Bank, from whom Merrill had purchased First Franklin.  ¶368.  In the petition, Merrill argued that National City Bank owed Merrill money since the First Franklin merger agreement contained a provision obligating National City Bank to adjust the purchase price for First Franklin if First Franklin's estimated final pro forma net asset statement as of December 30, 2006 was lower than the pro forma net asset statement as of June 30, 2006.  *Id.*

On March 16, 2007, National City Bank wrote a letter to Merrill indicating it would adjust the purchase price downward by $30 million.  ¶369.  This was not enough for Merrill, however, which responded by letter dated April 13, 2007 demanding a further adjustment of $67 million, for a total adjustment of $97 million.  *Id*.  The biggest reason that Merrill claimed for the requested adjustment pertained to mortgage loans held for sale by First Franklin which Merrill had acquired.  Merrill's letter claimed that First Franklin had not properly valued these mortgage loans since it had allegedly "***failed to take into account the adverse conditions in the secondary market for mortgage loans that existed at the end of 2006***, and resulted in an overstatement of such loans held for sale of approximately $43.65 million."  *Id*.

These admissions by Merrill in April 2007 directly contradict Defendants' arguments that Merrill's decision to purchase First Franklin was of sound business judgment.  In addition, such

---

[37] At the end of 2005, Merrill encountered a material hurdle in its quest to churn out more CDOs. At that time, insurance giant AIG reportedly stopped insuring the AAA rated slice of Merrill CDO deals knows as AAA rated 'super-senior' pieces of Merrill's CDOs.  ¶255.

contention is also belied by the allegations that Merrill Lynch had intentionally and significantly lowered the underwriting standards for subprime loans purchased from subprime originators such as ResMae, MLN, and Ownit.  ¶371.  For example, Michael Blum, a Managing Director and Head of Global Structure Finance & Investment Group at Merrill and Merrill's designee to the board of subprime originator Ownit, instructed Ownit founder Bill Dallas in January 2006 to materially lower its underwriting standards so Merrill had access to a greater number of subprime mortgages.  *Id.*[38]

Because of these specific, material risks which the board knew about when it authorized, pursued, and consummated the First Republic and First Franklin acquisitions, a reasonable doubt is raised as to the Board's entitlement to the protection under the business judgment rule.

### c.    The Complaint Properly Pleads Particularized Facts Creating a Reasonable Doubt that the Approval of the Repurchase Program Was A Valid Exercise Of The Board's Business Judgment

When read together with all Plaintiff's allegations, as opposed to in isolation as Defendants do, the Complaint's allegations regarding the April 2007 stock repurchase plan raise a reasonable doubt that it was a valid exercise of business judgment.  In fact, as the Complaint alleges, the stock repurchase plan had no legitimate business purpose and was a waste of corporate assets.  ¶¶153-55.  In a recent shareholder derivative action involving, as does this case, a company's exposure to the subprime market, the Court found that demand was futile due to directors' conduct in approving a stock repurchase plan.  The Court concluded that:

> A strong inference of scienter attaches to the allegations in this Complaint, and it follows that Plaintiffs have stated a claim that the repurchase is not subject to

---

[38] Furthermore, analysts were puzzled by the deal because the "market for subprime loans was souring in a hurry" and made clear that the acquisition of First Franklin "threatened Merrill's ability to make other strategic acquisitions."  ¶124.  "The business judgment rule provides no protection for directors who have made an unintelligent or unadvised judgment."  *In re NVF Co. Litig.*, No. 9050, 1989 Del. Ch. LEXIS 167, at *18 (Del. Ch. Nov. 21, 1989).

protection by the business judgment rule because, as the Court observed, it may have served to delay the eventual impairment caused by unsound business practices. Thus, Plaintiffs have stated a claim for corporate waste with respect to the stock repurchase program.[39]

The "members of the Finance Committee[40] authorized, and the full Board approved, a massive $6 billion stock repurchase program . . . intended and designed to keep Merrill's stock artificially inflated," so Merrill would have to issue less shares to First Republic shareholders and ensure that the merger went through. ¶¶375-80. The stock was artificially inflated, as in *Countrywide*, due to false and misleading statements disguising the extent of Merrill's exposure to the subprime crisis. In fact, after the truth leaked out, First Republic shareholders sued Merrill for fraud. ¶376-77. As the Complaint alleges, Defendants ignored red flags, exacerbated the problem (instead of correcting it), and continued to make statements deceiving the market. ¶347-60.

Moreover, the stock repurchase plan was directly contrary to what Merrill needed at the time because the "Board allowed the Company to waste a substantial amount of capital . . . at a time when the eventual need to raise additional capital . . . after the impact of the impending write-downs should have been readily apparent." ¶153. Therefore, Defendants' argument that the allegations regarding the repurchase plan defy "economic reason" and should not excuse demand is without merit. The Complaint plainly alleges that the decision to enter into the $6 billion repurchase plan was not the product of a reasonable business judgment and had no legitimate business purpose and was instead employed for the improper purpose of hiding Merrill's massive and unwarranted exposure to the subprime crisis. ¶375-77.

The Complaint alleges, not based on hindsight, that Defendants were aware of the

---

[39] *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1078 (C.D. Cal. 2008).
[40] It is important to note that two members of the Finance Committee, including the Chairman, had previous personal and business relationships with Defendant O'Neal. ¶¶364-65.

widespread subprime meltdown,[41] but chose to continue in their risky practices and refused to suspend the repurchase program. Instead, the Board approved the repurchase program knowing full well at the time that the price of the stock was inflated and that Merrill had extensive exposure to the subprime market and would suffer material losses once the truth came out. This conduct gives rise to a claim by Merrill for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because Merrill was the subject of a manipulative and deceptive scheme to cause it to purchase securities (its own) at artificially inflated prices. Those shares ultimately decline materially in value, resulting in compensable damages to Merrill for which the Merrill defendants are liable. *See* Complaint, Count VII. Additionally, based on Defendants' knowledge at the time of approving the plan, the actions taken were not the product of a valid business judgment and demand is futile.

### d.    Demand is Excused With Respect to Plaintiff's Oversight Claims

#### i.    The Director Defendants Consciously Ignored Actual Notices (Not Just "Red Flags") of the Huge Risks Facing Merrill

Consciously or recklessly ignoring red flags is sufficient to establish demand futility as to directors. Much more than that is alleged here. Not only were there numerous red flags that alerted all the board members to Merrill's overexposure to the CDO and subprime mortgage market (and especially the members of the Audit and Finance Committees),[42] but each and every member of the board of directors ***consciously ignored multiple direct notices to them*** advising them of exactly these risks.

The present case is starkly similar to this Court's decision in *In re Veeco Instruments,*

---

[41] *See, e.g.,* ¶¶141-49, 347-60 (discussing how well-documented the imminent collapse of the subprime industry was and that Merrill received substantial warnings).

[42] During the Relevant Time Period, defendants Cribiore, Finnegan, Reese, and Rossotti were members of Merrill's Finance Committee. ¶333. Defendants Reese and Rossotti were also members of Merrill's Audit Committee, along with Defendants Jonas and Prueher. ¶338.

*Inc. Sec. Litig.*, 434 F.Supp.2d 267 (S.D.N.Y. 2006).  In *Veeco*, the court denied the defendants'
motion to dismiss a *Caremark* claim in a shareholder derivative case where the board of directors
was alleged to have consciously ignored a whistleblower's report that the company had allegedly
violated export control laws.  *Veeco*, 434 F. Supp. 2d at 272, 278.  The facts here are much
stronger than in *Veeco* because Merrill's directors consciously ignored multiple direct warnings
about the unreasonable risks Merrill faced regarding its massive exposure to CDOs.[43]  Plaintiff
alleges that "Merrill Lynch's Board had been informed of its subprime exposure and CDO
obligations as early as April and July 2007, respectively."  ¶184.  Moreover, the directors
ignored a three-page letter sent on August 9, 2007 from Defendants Fakahany and Fleming—the
Co-Presidents and Chief Operating Officers of Merrill.  The letter was entitled 'Board Market
Update End July Results: Note From Fakahany and Fleming,' and was sent to Merrill's directors,
O'Neal and Rosemary Berkery, discussing the mounting losses and troubles facing Merrill's
exposure and explaining that significant deterioration in this business had taken place in July
2007.  ¶186.

Moreover, before sending this letter, at the end of July 2007, Defendant Fakahany, who
had assumed broad responsibility over Merrill's risk exposure, warned Merrill's board of
directors and others, including specifically defendant O'Neal, Charles Rossotti (a director in
charge of Merrill's Risk Committee), and Rosemary Berkery (General Counsel), of the mounting
risk Merrill faces from CDOs and subprime MBS.  ¶185.  The repeated, specific warnings from
Fakahany and Fleming were particularly credible since such individuals were the Co-Presidents

---

[43]  "By the end of June 2007, Merrill Lynch had accumulated at least $43 billion in net exposure
to CDO securities and subprime mortgages. As commentators have acknowledged, Merrill was
'sitting on rotting piles [of] highly suspect, thinly traded securities [that nobody wanted to
touch].'  ¶132.  Merrill had incredibly amassed subprime CDO exposure which was "***3.3x the
group average***."  ¶345.

and COOs of Merrill. In addition, Fakahany was responsible for Merrill's market risk management, and the Board subsequently placed Fakahany and Fleming in charge of Merrill's day-to-day affairs and risk management after O'Neal resigned. ¶187. Moreover, in August 2007 Merrill's Co-Head of Risk Management Keishi Hotsuki warned his superiors that Merrill was over-exposed to mortgage-related securities. ¶188.

If consciously ignoring a whistleblower is sufficient to plead a *Caremark* claim, then certainly ignoring multiple warnings from Merrill's Co-Presidents and COOs is more than sufficient to meet Plaintiff's pleading hurdle here. Ignoring the two July and August 2007 warnings from Merrill's Co-Presidents was also egregious because such written notices came one year after the directors had ignored notices from Jeff Kronthal, one of Merrill's top traders, who objected in 2006 to Merrill's wildly-excessive increased exposure to the subprime market. ¶347. Kronthal urged O'Neal and others at Merrill to curb Merrill's exposure to the subprime market in light of increasing public indications of credit deterioration and lax underwriting standards in the origination of mortgages. *Id.* When Kronthal continued to object to Merrill's policies, O'Neal, who was Chairman of the Board and CEO at the time, fired him. *Id.* "Ironically, in December 2007 Merrill's new CEO Thain hired Kronthal back." ¶348.

Plaintiff alleges the very conscious abdication of duties and reckless disregard of red flags that the *Veeco* court made clear is sufficient to withstand a motion to dismiss on demand futility grounds:

> This is precisely the type of case the Delaware Chancery Court was contemplating when it recently held: "A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and otherwise functioning." *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 Del. Ch. LEXIS 33, 2006 WL 391931, *5 (Del.Ch. Feb 13, 2006). If true, plaintiffs allegations that the Committee failed to exercise appropriate attention to potentially illegal corporate activities would constitute a breach of loyalty,

subjecting [the director-Committee members] to a substantial likelihood of liability. Thus, plaintiffs' allegations raise a reasonable doubt that these director-Committee members were disinterested and capable objectively deciding whether or not to prosecute this litigation on the corporation's behalf.    Accordingly, demand would have been futile.

434 F. Supp. 2d at 278.  *See also Ash v. McCall*, No. 17132, 2000 Del. Ch. LEXIS 144, at *37 (Del. Ch. Sept. 15, 2000).  The same is true here.  The Merrill Board ignored warnings in 2006 from Jeff Kronthal.  ¶347.  A year later, they were advised yet again of Merrill's catastrophic overexposure to CDOs through the July 2007 warning and the August 9, 2007 letter of Co-Presidents Fakahany and Fleming.  ¶¶186-87.  Despite these direct warnings, the Board ***took no action*** in response to these ***multiple actual notices over a one year period*** to curb Merrill's overexposure to high-risk CDOs.  As a result, Merrill had to restate their earnings by billions of dollars—restatements which more than erased all the profit Merrill made in the last several years and contributed to the collapse of Merrill.  *See, e.g.*, ¶237-38, 258.

### ii.    In Addition to Ignoring Actual Notices, the Board Ignored Multiple Red Flags

Here, in addition to the ***actual notices*** from Bruce, Kronthal, Fakahany, Fleming, and Hotsuki given to the director defendants concerning Merrill's overexposure to the subprime and CDO market, there were also numerous ***red flags*** concerning Merrill's overinvestment in the CDO market that the members of Merrill's Audit and Finance Committees could not, or should not, have ignored.  To begin, the committee members knew that Merrill went from a minor player to the number one holder of risky CDOs in just a few years.  Indeed, O'Neal bragged in 2005: "In CDO's, collateralized debt, we were almost nonexistent in 2000 – ranked 13th.  Today we're ranked number one."  ¶104.  According to a July 2007 *Euromoney* article:  "It is hard to ignore Merrill Lynch in the CDO market – it is just so big.  Its global issuance grew from $26.5 billion to $55 billion last year – a jump of 110%."  ¶134.

Surely, Merrill's meteoric rise in the CDO market did not escape the attention of those directors charged with overseeing Merrill's financial performance – and hedging against the risk of overexposure to CDOs. Indeed, Merrill's Board had been informed of its subprime exposure and CDO obligations as early as April and July 2007. ¶184. Despite Merrill's vast exposure to these investments, the Board failed to take any action to decrease the risks facing it. ¶189. Given the huge fees Merrill was earning from CDOs, and the large percentage of Merrill's profits derived from the CDOs, the Court can infer that the Audit and Finance Committee directors deliberately ignored the risks from these investments. *See Countrywide*, 554 F. Supp. 2d at 1063 ("At the very least, given that these two loan categories ultimately accounted for 74% of Countrywide's loan portfolio, or $59 billion worth of investments, there is a strong inference that Committee members proceeded with deliberate recklessness.").

The fact that Merrill earned nearly $1 billion in underwriting fees as the lead underwriter of CDOs does not, as Defendants suggest, immunize their failure to manage Merrill's risk exposure. Lucrative as these fees were in the short term, the directors charged with overseeing Merrill's investment strategy should have known that investing so heavily in risky CDOs would be counterproductive in the long term. *See Countrywide,* 554 F. Supp. 2d at 1063 ("Committee members either knew, or proceeded with deliberate recklessness with respect to the fact that originating loans to borrowers who could not pay back their mortgages would ultimately be counterproductive, lucrative as it was in the short term."). Indeed, Defendants' justification of their conduct based on short-term profits at the risk of the viability of the entire enterprise -- ***even now*** -- provides strong evidence of how Defendants flagrantly disregarded their duty to prudently manage Merrill.

Further, the committee members knew or should have known that Merrill went from

merely an underwriter of CDOs to a major holder of these risky investments. When demand for CDO securities waned in late 2005, Merrill began purchasing the CDO securities that its own customers were rejecting. ¶¶112-14. By mid-2007, Merrill had $150 billion in illiquid investments—four times its equity. ¶352. The committee members ignored these known risks which sat on Merrill's balance sheet like a ticking time bomb. *See Countrywide,* 554 F. Supp. 2d at 1064 ("On such a large scale, the resulting issues of credit risk become matters of operational risk for the entire Company. For these reasons, Plaintiff's facts give rise to an inference that members on this Committee proceeded, at the very least, with deliberate recklessness in the facts of a number of red flags which they could not miss.").

Also, the members of Merrill's Audit and Finance Committees could not ignore what was going on in the industry.[44] As early as July 2005, press reports began correctly predicting the pending disaster in the CDO and subprime markets. ¶¶106-10. By the spring of 2007, the collapse of the subprime lending industry was well underway. As of March 2007, more than two dozen subprime mortgage lenders had failed or filed for bankruptcy. *Countrywide,* 554 F. Supp. 2d at 1063, n. 17 (other red flags the Credit Committee should have considered were "historic rates of loss and current economic and market conditions."). Nonetheless, Merrill pushed forward in the CDO market, underwriting an additional $28 billion worth of CDOs. ¶127.

If all these red flags were not enough, the Board also consciously or recklessly ignored the following additional red flags regarding Merrill's overexposure to the subprime market and

---

[44] Defendant Reese is the former CFO of ITT Corporation. ¶52. Defendant Rossotti is the former Commissioner of the IRS. ¶53. Thus, even Merrill labels these directors as "Audit Committee Financial Experts." ¶349. It defies logic that these particular Defendants were blind to what was going on in the subprime market and did not recognize the serious consequences of Merrill's heavy involvement in CDOs. *See McCall,* 298 F.3d 808, 819 (recognizing that the director's relevant prior experience was a "significant factor" in considering demand futility).

Merrill's investment in CDOs:

1)      Demand for CDO securities waned in late 2005. In response, the Individual Defendants caused Merrill to begin purchasing CDO securities with Merrill's own capital. ¶112.

2)      In September 2006, Merrill's own analyst Kenneth Bruce "warned the Individual Defendants that demand for subprime bonds 'could dissipate quickly,' exposing their holders to losses. Bruce specifically warned that an 'asset fire-sale' could cause prices to fall." ¶118.

3)      After Bruce's warning, Merrill began purchasing and taking onto its own books the very CDO securities that its own analyst warned against purchasing, for the very reason that Merrill's customers were rejecting, all "despite the deterioration of the subprime and CDO markets and warnings from its own analyst that a subprime meltdown was imminent." ¶119.

4)      Despite the deterioration in the CDO market, "in 2006, Merrill sharply boosted its issuance of CDO securities to $44 billion, compared to $14 billion in 2005." ¶127.

5)      "Since subprime loans were vulnerable to falling home prices, all of Merrill Lynch's subprime related securities (e.g., residential mortgage backed securities (RMBS), CDOs and CDO squared securities) had the same vulnerabilities." ¶106.

6)      Despite being advised of these unwarranted risks and the potential for a "fire sale" of CDOs and other subprime investments, "the Board failed to take any action to decrease the risks faced by the Company." ¶354.

In sum, Plaintiff has sufficiently pleaded detailed facts regarding all directors, and especially Defendants Cribiore, Finnegan, Reese, Rossotti, Jonas and Prueher, who were members of the Finance and Audit Committees. Because the director defendants consciously ignored multiple **_actual notices_** to them of Merrill's overexposure to the subprime and CDO market, as well as consciously or recklessly ignored multiple **_red flags_** concerning these same issues, there is a reasonable doubt as to whether they can make an impartial decision with respect to this action. Thus, demand is excused.

### iii.      The Members of Merrill Lynch's Audit and Finance Committee Utterly Failed in their Oversight Role

During the Relevant Time Period, defendants Cribiore, Finnegan, Reese, and Rossotti were members of Merrill's Finance Committee. ¶333. Defendants Reese and Rossotti were also

members of Merrill's Audit Committee, along with Defendants Jonas and Prueher.  ¶338.  The Finance Committee is responsible for reviewing Merrill's "policies and procedures for managing exposure to market and credit risk" and is supposed to review "significant risk exposures and trends in these categories of risk."  ¶333.[45]  The Audit Committee is responsible for reviewing "the framework established by management to assess and manage the major categories of risk" and is also in charge of reviewing Merrill Lynch's "policies and processes for managing operational, legal and reputation risk."  ¶338.[46]

Put another way, the buck stopped with these two committees when it came to making sure Merrill did not get in over its head with risky investments like CDOs.  By allowing Merrill to take on billions of dollars in CDO and subprime debt—$50 billion of which has already been written down—the members of the Finance and Audit Committees failed miserably in fulfilling their oversight task.  Again, as set out above in great detail, these defendants were repeatedly made aware, over a period of more than one year, of Merrill's overexposure to CDOs and subprime securities, they "consciously disregarded unacceptable and huge financial risks" (¶345), and they "did not take adequate steps in 2006 and 2007 to curb Merrill's unreasonable risk in subprime investments."  ¶347.  As noted above, these allegations are sufficient to excuse a demand on such directors.

iv.    **The Directors Failed to Take Action to Address the Risks They Became Aware of Through Merrill's Reporting and Control Systems**

Defendants mischaracterize and misconstrue Plaintiff's allegations concerning Merrill's reporting and internal control systems.  Defendants argue that "the Complaint does not allege 'an

---

[45] The specific responsibilities and duties of the Finance Committee are described in ¶¶333-37 of the Complaint.

[46] The specific responsibilities and duties of the Audit Committee are described in ¶¶338-43 of the Complaint.

utter failure to attempt' to put a monitoring system in place.  Instead, the Complaint describes rigorous monitoring functions implemented by Merrill's Board."  *See* Merrill Directors Br. at 11. Plaintiff agrees.  It is only the legal significance of such allegations upon which Plaintiff and Defendants disagree.

Plaintiff's point is not that Merrill had no reporting system.  To the contrary, Merrill had a sophisticated reporting and control system which was continuously monitored by the Director Defendants especially by the members of the Audit and Finance Committees.  However, in response to such monitoring, the Director Defendants had ***actual knowledge*** of Merrill's subprime problems ***and took no action in response to such knowledge*** to address the billions of dollars of risk faced by Merrill due to the subprime and CDO securities which Merrill had moved onto its own balance sheet by fundamentally shifting its role from that of a financial intermediary to a purchaser of such assets for its own balance sheet.  ¶¶347-60.  Defendants apparently agree with Plaintiff that the directors vigorously monitored Merrill's financial condition, and yet attempt to have it both ways by denying that the directors learned anything about Merrill's overexposure to the subprime crisis through their frequent and continuous monitoring of Merrill's financial condition and risk metrics.  Since this argument is directly contrary to Plaintiff's well-pled and particularized allegations, the Court must reject this contention on this motion to dismiss.

Merrill's Finance and Audit Committees were required to meet at least three and six times a year, respectively (¶¶ 334, 340); they had full, free, and unrestricted access to Merrill's senior management and employees (¶336); and the power to retain their own independent advisors (¶343).  These Committees' systematic ***failure to take corrective action***, in light of the huge, unreasonable risks that such directors learned of through their monitoring of the internal

controls, allowed Merrill to continue its disastrous foray into the CDO market well beyond the time that they knew such risks would result in Merrill's need to drastically write down the value of its CDO securities and raise billions of dollars of new capital.  *See Veeco*, 434 F.Supp.2d at 277 (despite the fact that the Audit Committee met 27 times in two years, the Audit Committee failed to implement or enforce adequate internal accounting controls).  Plaintiff has alleged, and the financial community has recognized, that:

> Although it is O'Neal who is being held accountable, the board bears a fair measure of blame as well for catching on to the firm's mushrooming exposure to potentially risky derivatives – amounting to $32 billion at the end of June [2007] just before the market started to crater.

¶344.  As summarized by one independent management expert, "the Merrill Lynch situation looks like a systemic problem in terms of risk management and risk control – the whole nine yards . . . There seems to be some blame to go around."  ¶358.  One corporate and securities law professor put it this way:  "[There are] no free lunches in the capital markets . . . If you were on the board, you want to make especially sure that the risk-control mechanisms are really effective. It turns out, they weren't."  ¶201.

As detailed in the Complaint, one of Merrill's largest institutional investors has recommended that shareholders vote against re-electing members of the Finance Committee based on the systematic failure of Merrill's risk control mechanisms.  Specifically, the CTW Investment Group, a coalition of union pension funds with about $1.4 trillion in assets, noted likely causes behind the Finance Committee's complete failure in its oversight role.  ¶359.

Plaintiff has alleged other specific facts regarding the directors' failure to take corrective action in response to the immense risks to Merrill that they learned of by monitoring Merrill's internal control and risk management systems, including the following:  (1) the Finance Committee's chairman during 2007, Defendant Finnegan, has a long personal and business

relationship with Defendant O'Neal.  That relationship compromised his willingness to reign in O'Neal's aggressive risk and outsized compensation"[47]  (¶359); (2) Finnegan is the Chairman, CEO, and President of the Chubb Corporation.  As such, he did not have time to effectively monitor Merrill's exposure to mortgage risk and fully understand its investments in complex derivatives.  For this very reason, many institutional investors have proxy voting policies that dictate that CEOs should restrict their service on outside boards (*Id.*); (3) the Board's decision to split responsibility for risk oversight between the Audit and Finance Committees may have had the effect of diffusing responsibility to the detriment of the corporation and its shareholders.  *Id*. Taken together, these detailed allegations raise a reasonable doubt as to the ability of the directors who sat on Merrill's Audit and Finance Committees to impartially consider a demand in this case.

<strong>v.    Several directors face a substantial threat of civil and criminal liability</strong>

In addition to its role in managing risk, the Audit Committee is responsible for ensuring the integrity of Merrill's financial statements.  ¶361.  Among other things, the Committee was required to meet, review, and discuss with management and the independent auditor Merrill's annual audited and quarterly financial statements and financial press releases.  ¶¶341.

---

[47]  Forbes.com also questioned Finnegan's ability to reign in O'Neal given their long-time friendship. ¶365.  Likewise, press reports have described Defendant Cribiore as close to O'Neal, and the *New York Times* has reported that, in the late 1990s, Cribiore came close to recruiting O'Neal away from Merrill to work at Brera Capital.  While Defendants are correct that O'Neal's close relationship with Finnegan and Cribiore does not, by itself, give rise to an indication that Finnegan and Cribiore could not act impartially on a demand, this fact, coupled with Finnegan's and Cribiore's failure of oversight along with their intentional misconduct described above, is more than enough to raise a reasonable doubt that these two directors are capable of making an impartial decision towards this litigation.  *See California Pub. Employees' Ret. Sys. v. Coulter*, No. 19191, 2002 Del. Ch. LEXIS 144, at *30 ((Del. Ch. Dec. 18, 2002) (CEO's relationship with directors must be "taken together, with all facts alleged," when determining whether directors can impartially evaluate a demand.)

As detailed in the Complaint, the Individual Defendants caused Merrill to issue numerous SEC filing and press releases that hid Merrill's huge exposure to CDOs. ¶361. For example, despite the fact that Merrill was exposed to billions of dollars of CDOs by the end of 2006, the word "CDO" does not appear in Merrill's annual report on Form 10-K for the period ending December 29, 2006. ¶163. Notably, Defendants Codina, Cribiore, Finnegan, Rossotti, and Prueher signed this Form 10-K. ¶166. Thus, they each face a substantial threat of civil and criminal liability for their actions.

In *Ryan v. Maxim Integrated Products, Inc.*, 918 A.2d 341, (Del. Ch. 2007), members of the company's audit committee falsely represented that they granted all stock options according to the company's option plans. In ruling that demand was futile, the court noted "[w]ere the board to pursue a derivative suit, it might unearth facts that would subject directors to further civil and criminal liability." *Id*. at 356, n.38. In particular, the *Ryan* court held that the members of the audit committee were directly responsible for approving any false financial statements that resulted from mischaracterization of these option grants and, "[t]hus, they might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud."

Here, the threat of criminal liability for Merrill's directors is more than theoretical. Indeed, the U.S. Attorney's Office for the Southern District of New York is investigating Merrill's subprime-related activities. ¶329. The SEC is also conducting a formal investigation. *Id*. New York Attorney General Andrew Cuomo reported his findings to the Congress after subpoenaing Merrill and other investment banks seeking information on how billions of dollars in complex securities backed by mortgages were packaged and sold to yield-hungry investors all over the world. ¶317-18, 321. Under these circumstances, it would be futile to demand the directors initiate an action that will reveal their complicity in Merrill's involvement in the wide-

spread mortgage fraud currently crippling the American economy.

        **e.**    **The Claims of Corporate Waste are Properly Alleged and Indicate Defendants Substantial Likelihood of Liability**

The allegations of Director Defendants' failure to adequately evaluate and monitor Merrill's risk in the CDO market (¶422), authorizing and approving O'Neal's exorbitant severance package (¶423), authorizing and approving the acquisitions of First Franklin and First Republic (¶424) and authorizing and approving payment of exorbitant bonuses for Merrill's officers and employees (¶490) adequately indicate that Defendants face a substantial likelihood of liability under the claim of corporate waste detailed in the Complaint which further illustrates the futility of bringing demand on the former Merrill Board. A claim for waste is "the diversion of corporate assets for improper or unnecessary purposes." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). Defendants do not here provide explanation as to why any of the above detailed actions were appropriate under the circumstances of the economic collapse of Merrill and its sudden impending acquisition. Ironically, Defendants only seem to suggest that the "threshold for liability on such a claim" is only the most egregious of circumstances, which unfortunately for Defendants is the type of situation detailed in the Complaint. Thus, the allegations regarding the claim for corporate waste by the Merrill Board for overextending Merrill into the risky CDO market, permitting O'Neal's severance package, approving the First Franklin and First Republic acquisitions and approving payment of the excessive bonuses - which importantly were not revealed to shareholders before the vote to approve the Merger- are sufficient to raise a reasonable doubt as to the Merrill Directors' right to the protection of the business judgment rule.

Defendants cannot argue that they made a proper business decision to continue increasing their exposure to CDOs and subprime mortgage backed securities when they were aware of the

risk and had actual knowledge of it. ¶¶344-60. Furthermore, the approval of O'Neal's severance was also clearly not rational when he should have been terminated for cause due to his ruinous reign over Merrill which was investigated by the House Oversight and Government Reform Committee. ¶362.  The acquisition of First Franklin was egregious in its context as indicated by the almost immediate need to write-down Merrill's value relating to its CDOs, its request to reduce the purchase price of the subprime originator, and actually closing First Franklin down all together in March 2008.  *See* ¶367.  The circumstances surrounding the acquisition of First Republic indicate Board approval was certainly not proper where a $6 billion stock repurchase program was needed and immediately following the acquisition, Merrill belated revealed a massive write-down.  ¶¶374-76.  The First Republic acquisition resulted in First Republic shareholders suing Merrill for securities fraud for failing to disclose the truth about its inflated stock until three weeks after the merger. ¶¶ 377.

In regard to the approval of the bonuses, the allegations clearly depict the Merrill's Board's purported "negotiation" with BofA for a guaranteed billions of dollars in bonus compensation to Merrill's officers and employees during the 48 hour ordeal in September of 2008. ¶¶300-1.  Further, at the time of the approval of the Merger, the Merrill Board failed to disclose the $3.62 billion in bonus compensation. ¶306.  Later disclosures revealed that the bonus payments were accelerated to right before the official consummation of the Merger and were coinciding with the enormous losses Merrill endured during the same time. ¶¶308-24. Other allegations in the Complaint reveal the still ongoing NY Attorney General's investigation into the Merrill colossal bonus payments which further demonstrates the Merrill Board's liability for corporate waste.  ¶323.  Therefore, the allegations regarding the Merrill Board's approval of the payment of exorbitant bonuses clearly illustrate exactly the situation of corporate greed for

improper and unnecessary purposes that constitutes corporate waste and therefore likewise creates a reasonable doubt as to whether the former Merrill Board would have properly considered demand, thus establishing demand futility.

> f.   **The Complaint Allegations of Failure to Prevent Insider Selling Shows that the Director Defendants Are Not Independent and Disinterested**

As set forth in the Complaint, three of the Defendants face a substantial likelihood of liability for engaging in illegal insider trading, O'Neal, Fakahany and Fleming, and, therefore, demand is futile because the Board, knowing that these Defendants had material information, failed to take any action to prevent the insider trading. "[P]laintiffs [must plead] particularized facts . . . that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition." *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 502 (Del. Ch. 2003).

Here, as the Complaint alleges, three of Merrill's officers engaged in insider trading in excess of $67 million while in possession of material, non-public information. ¶387. The Defendants knew that the stock was inflated due to their false and misleading statements regarding Merrill's exposure to the subprime market, but still sold 717,044 shares of their stock. *Id.* Pleading that the Defendants occupied fiduciary positions, owed Merrill a duty, and breached that duty through use of inside knowledge to sell stock for their own personal gain, which the Complaint does, is more than sufficient at this stage. *See In re Cendant*, 189 F.R.D. at 130.

Although the officers were not on the Board, demand on the Board would still be futile because, as "the Chancery Court recognized . . . director liability may arise from, *inter alia*, 'unconsidered failure of the board to act in circumstances in which due attention would,

arguably, have prevented the loss.'" *Veeco*, 434 F. Supp. 2d at 274 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)). Thus, in failing to take action to prevent the insider trading by the officers of Merrill, the Board is liable for its inaction and is therefore interested, making demand on the Board futile.

### E.    Plaintiff Adequately States Claims Pursuant Rule 12(b)6

Pursuant to Rule 12(b)(6), to prevail, a moving party must establish that the plaintiff has failed to "state a claim upon which relief can be granted." In deciding a Rule 12(b)(6) motion to dismiss, the Court must construe all factual allegations in the complaint in favor of the plaintiff. *Priestley v. Comrie*, No. 07-1361, 2007 U.S. Dist. LEXIS 87386, *12 (S.D.N.Y. Nov. 27, 2007). In addition, "the facts as alleged in the complaint are assumed to be true and are construed in a light most favorable to plaintiffs." *Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150, 153 (E.D.N.Y. 2006). A motion to dismiss should be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

### 1.    Breach of Fiduciary Duties, Gross Mismanagement and Abuse of Control

It is well-established that the officers and directors of a Delaware corporation owe fiduciary duties to both the corporation they serve and its stockholders. *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 386 (Del. Ch. 1999); *Arnold v. Soc'y for Sav. Bancorp*, 678 A.2d 533, 539 (Del. 1996). "This duty has been consistently defined as 'broad and encompassing,' demanding of a director 'the most scrupulous observance.'" *BelCom, Inc. v. Robb*, No. 14663, 1998 Del. Ch. LEXIS 58, at *10 (Del. Ch. Apr. 28, 1998) (citation omitted). As such, "[w]henever directors communicate publicly or directly with shareholders about the corporation's affairs . . . directors have a fiduciary duty to shareholders to exercise due care,

good faith and loyalty.  It follows a fortiori that when directors communicate publicly or directly with shareholders about corporate matters the sine qua non of directors' fiduciary duty to shareholders is honesty."  *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) (holding that "directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances").

Under Delaware law, "[t]he elements of breach of fiduciary duty that must be proven by a preponderance of evidence by the plaintiff are:  (i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."  *Heller v. Kiernan*, No. 1484, 2002 Del. Ch. LEXIS 17 (Del. Ch. Feb. 27, 2002). Plaintiff must plead her breach of fiduciary claims in adherence with Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment for the relief the pleader seeks."  Fed. R. Civ. P. 8(a). Here, Plaintiff's allegations comply with Fed. R. Civ. P. 8 and are sufficient to establish the Individual Defendants' breaches of their fiduciary duties.

Plaintiff has alleged that Defendants breached their fiduciary duties of due care, loyalty, and good faith through their gross mismanagement and abuse of their control positions at Merrill, including:  (i) intentionally or recklessly disregarding increased risks to Merrill's subprime investments; (ii) causing or allowing Merrill to issue false and misleading statements and press releases and failing to disclose material information necessary to make such statements not false and misleading; (iii) authorizing Merrill's acquisitions of First Franklin and First Republic, the Stock Repurchase Program, and Defendant O'Neal's exorbitant retirement package; and (iv) allowing certain of the Individual Defendants to personally profit from their control positions through insider selling while in possession of material information regarding

Merrill. *See* ¶¶98-215, 384-89.

Despite these allegations, Defendants argue that the breach of fiduciary duty and gross mismanagement claims merely amount to duty of care allegations without any showing of bad faith or personal benefit. The Complaint clearly alleges, however, that the Defendants had knowledge of Merrill's risky investment practices and lax internal controls, but concealed this information from the market through false and misleading statements, and at the same time forced Merrill to spend billions of dollars on acquisitions and a stock repurchase program while certain of the Individual Defendants sold millions of dollars of their own stock.

Such facts, taken together, create "reasonable inferences" that Defendants breached their duties of care, loyalty and good faith. *See In re Taser*, 2006 U.S. Dist. LEXIS 11554, at *50 ("the various disclosure allegations were part of a scheme to artificially inflate [the company's] stock price so that Defendants could sell material portions of their holdings around the same time, [as such] the Court concludes that at this stage of the proceedings that Plaintiffs have adequately pleaded that the alleged disclosure violations implicated the duties of good faith, due care and loyalty.")

The Individual Defendants' failure to meet their obligations by consciously disregarding their responsibilities to Merrill constitutes breaches of their fiduciary duties. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."). Accordingly, Plaintiff has adequately pled the Individual Defendants' breach of fiduciary duty, gross mismanagement and abuse of control.

**2.    Plaintiff Has Demonstrated the Individual Defendants' Breach of the Duty of Oversight**

Plaintiff has alleged that the Individual Defendants breached their duty of oversight "by utterly failing to exercise oversight of the corporation." Armstrong, 2006 Del. Ch. LEXIS 33, at *11. Under Delaware law, "liability may arise for the breach of the duty to exercise appropriate attention to potentially illegal corporate activities from 'an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss.'" *Abbott Labs.*, 325 F.3d at 808 (quoting *In re Caremark Int'l*, 698 A.2d 959, 967 (Del. Ch. 1996)).

Thus, "'a sustained or systematic failure of the board to exercise oversight . . . will establish the lack of good faith that is a necessary condition to liability.'" *Id.* A breach of the duty of oversight might also take the form of facts showing that Merrill lacked "important supervisory structures," or that "the directors were conscious of the fact that they were not doing their jobs" and that they ignored "red flags" indicating misconduct in defiance of their duties. *Guttman*, 823 A.2d at 506-07.

As discussed above, Plaintiff has demonstrated that the Individual Defendants breached their duty of oversight by consciously failing to monitor or oversee Merrill's operations during the Relevant Period. Specifically, the members of Merrill's Audit and Finance Committees utterly failed in their oversight role by failing to monitor or oversee Merrill's risk management, by failing to ensure the integrity of its financial statements, and by failing to take any action to address the huge risks posed by Merrill's investments in CDOs. Thus, the Individual Defendants failed to take adequate steps to assure that they satisfied their oversight responsibilities to Merrill, thereby breaching their fiduciary duties. *ATR-Kim Eng Fin. Corp. v. Araneta*, No. 489-N, 2006 Del. Ch. LEXIS 215 (Del. Ch. Dec. 21, 2006) ("it is the directors' charge to exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a

timely manner as a matter of ordinary questions, so that it may satisfy its responsibility.")
(citations omitted).

### 3. Plaintiff Has Demonstrated the Individual Defendants' Breach of Fiduciary Duty for Misappropriation of Information and Insider Stock Sales

To proceed on an insider trading claim, a plaintiff must show that such sales "were entered into and completed on the basis of, and because of, adverse material non-public information." *Zimmerman v. Braddock*, 2005 Del. Ch. LEXIS 135, at *32 (Del. Ch. Sept. 8, 2005). Here, the Complaint specifically alleges that while in possession of the undisclosed material adverse information regarding Merrill's investments in subprime securities and the resulting false and misleading financial statements, Defendants O'Neal, Fakahany, and Fleming collectively sold 717,044 shares of their Merrill stock for total proceeds of $67,261,348. ¶383-89. While the Individual Defendants argue that the insider trading allegations lack particularity, the Complaint adequately pleads facts demonstrating that these Defendants' stock sales during the Relevant Period occurred while they possessed material, non-public information.

Specifically, Defendant O'Neal was Chairman of the Board and Chief Executive Officer of Merrill during the Relevant Period (¶37); Defendant Fakahany was Co-Chief Operating Officer and Co-President, and also served as an Executive Vice President, Chief Financial Officer, Chief Administrative Officer, and Vice Chairman, among other positions, at Merrill (¶39); and Defendant Fleming was President and Chief Operating Officer. (¶40). Because of their positions with Merrill, these Defendants had the power and authority to control the contents of Merrill's financial statements and press releases to the investing public. ¶¶43-44. In addition, these Defendants had access to and, in fact, received material, non-public information regarding the adverse facts concerning Merrill that had not been disclosed to and were being concealed

from the public.  *Id.*

Moreover, as discussed above, these Defendants had been repeatedly informed of Merrill's subprime exposure and CDO obligations.  Jeff Kronthal, one of Merrill's top traders, objected in 2006 to Merrill's wildly-excessive increased exposure to the subprime market.  ¶288.  Merrill's own analyst, Kenneth Bruce, also provided these Defendants with a warning in September 2006.  ¶118.  This information led Defendants Fakahany and Fleming themselves to send a letter to Merrill's Board, Defendant O'Neal and Rosemary Berkery, discussing the mounting losses and troubles facing Merrill's CDO exposure and explaining that significant deterioration in this business had taken place.  ¶154.  Of course, this letter from Fakahany and Fleming came months after they had already personally profited from their insider sales in February of 2007.

By selling stock while in possession of this material adverse information regarding Merrill, Defendants O'Neal, Fakahany, and Fleming were able to benefit from their sale of Merrill stock at artificially inflated prices, reaping huge profits from their own misconduct.  ¶¶ 383-89.  *See Zimmerman*, 2005 Del. Ch. LEXIS 135, at *32-33 ("Accepting all the well-pled allegations the Plaintiff has presented as true, the Plaintiff has made out a prima facie case that the Selling Defendants sold [the company's] stock with the benefit of the Company's adverse material, confidential information . . . . For motion to dismiss purposes, the Plaintiff has met [his] burden.  A reasonable inference from the Plaintiff's allegations is that the Selling Defendants had knowledge—directly and by imputation—of [the company's] problems.").  Defendants breached their fiduciary duty to Merrill by personally profiting from their positions of control and power.  Plaintiff's allegations are sufficient to support a finding of liability for insider trading.

### 4. Plaintiff Has Demonstrated the Individual Defendants' Aiding and Abetting Breach of Fiduciary Duty

Under Delaware law, aiding and abetting a breach of fiduciary duty has three elements: (1) a breach of fiduciary duty, (2) knowing participation in that breach by the defendant, and (3) damages. *LaSala v. Bordier Et Cie*, 519 F.3d 121, 130 (3d Cir. 2008). The Complaint alleges sufficient facts demonstrating aiding and abetting a breach of fiduciary duty as the Individual Defendants assisted one another in a deliberate course of action designed to allow certain of the Individual Defendants to personally profit from their sales of Merrill's stock while in possession of material information regarding Merrill's true financial condition and future business prospects. Such allegations of a deliberate course of action are sufficient to state a claim for aiding and abetting liability. *See In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006) (because the plaintiff alleged that defendants had knowledge of the facts and circumstances constituting the challenged conduct, and because "the allegations of the complaint must be accepted as true and read in the light most favorable to the non-moving party . . . the plaintiff has stated a claim upon which relief can be granted.").

### 5. Plaintiff Has Established Claims for Corporate Waste

A claim of corporate waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997). Defendants challenge the claim of waste for failing to show that the Board made a bad-faith judgment in failing to adequately evaluate and monitor Merrill's risk in the CDO market, when the Board awarded Defendant O'Neal an exorbitant retirement package, and when for authorizing and approving the acquisitions of First Franklin and First Republic. ¶¶362-63, 367-77. Defendants Thain, Fleming and the Directors contend that the claim for corporate waste involving the payment of excessive

bonuses,[48] ¶¶ 487-94, does not fall within the exceptional situation that is the threshold for such a claim. They claim that the payment of bonuses was a preventive measure to retain Merrill employees once the Merger with BofA commenced. Thain Br. at 10-12. The arguments, however, are inappropriate at the motion to dismiss stage in the context of a waste claim that concerns "a transfer of corporate assets that serves no corporate purpose," as is alleged here. *Lewis*, 699 A.2d at 336. Such allegations of waste are "inherently factual and not easily amenable to determination on a motion to dismiss." *Id.* at 339.

Even if such argument were appropriate at the motion to dismiss stage, the complaint sufficiently alleges Defendants' bad-faith judgment when increasing its CDO exposure, authorizing the acquisitions of First Republic and First Republic, when approving Defendant O'Neal's retirement package and when approving the excessive bonuses payment under the circumstances. The egregious context of these decisions indicates that no reasonable person "could view the benefits received in the transaction as 'a fair exchange' for the consideration paid by the corporation." *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999). The allegations of Defendants actions resulted in a hasty 48 hour negotiated sale to BofA which failed to even reveal to BofA[49] certain aspects of Merrill's business, including its enormous

---

[48] Defendant attempt to argue that the Claim of Corporate Waste involving the excessive bonus payments was not properly brought under the Court's February 17, 2009 Order. This argument has already been addressed previously in Section III.C.1 as the allegations and this claim are consistent with the Order and Fed. R. Civ. P. 15 regarding amendments to pleadings.

[49] Defendant Fleming contends that the allegations regarding BofA's approval of the bonuses are inconsistent and should therefore be disregarded. Fleming Br. at 15. However, the allegations clearly indicate that when BofA negotiated the Merger provision relating to the bonuses, the Defendants concealed the amount of this payment. ¶¶ 294, 301, 491. Therefore, BofA did approve the provision at the time of the negotiation of the Merger, but not the amount, which indicates that the allegations are indeed consistent and adequately detail Defendants wrongdoing regarding their non-disclosure (even to shareholders at the time of the Joint Proxy Statement what the bonus payment would be). Fleming also argues that since he was not a BofA employee he did not owe BofA a duty to disclose the amount of the bonus payment. Fleming Br. at 16.

losses and the guarantee of excessive bonus payments. ¶¶291-302. Further, the amount of liability resulting from these actions, including ongoing investigations, raises serious concern as to how the decisions such as to approve excessive bonuses in the midst of colossal losses could potentially be within a sound business judgment. ¶¶ 224-33, 307-27. No person of ordinary sound business judgment could view these decisions in this context as benefits to the corporation, and thus the actions of these executives could not have been a fair exchange for the consideration paid by Merrill.

### 6.    Plaintiff Has Established a Claim for Unjust Enrichment

"Unjust enrichment is defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)). To obtain restitution, Plaintiff is "required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit." *Schock*, 732 A.2d at 232 (quoting *Fleer*, 539 A.2d at 1063).

Plaintiff has adequately pled the necessary elements since the Complaint details that Defendant O'Neal received an exorbitant and unnecessary retirement package,[50] and that Defendants O'Neal, Fakahany, and Fleming personally profited from their sales of Merrill stock while in possession of material, adverse information regarding Merrill. ¶¶362, 384-89, 483-86.

---

However, it is clear pursuant to the Merger provision that Defendants did require "prior written consent" from BofA for the payment of the bonuses. ¶¶ 324, 491. Thus, Defendants were under a contractual obligation pursuant to the Merger to BofA in regard to the payment of bonuses.

[50] Defendants attempts to argue that any compensation O'Neal received based on his retirement was based on previous performance and thus was justified. Merrill Directors Br. at 14-15 However, this is in direct contrast with the allegations detailing that ***based on his performance*** O'Neal should have been ***terminated for cause,*** not given any additional "benefits," which would have forced him to forfeit his unvested stock and options totally $131 million. ¶¶362-63.

The substantial profits gleaned from these awards and sales are undeniably a benefit to these individuals, to the detriment of both Merrill and its shareholders. Defendants are not entitled to a dismissal of Plaintiff's unjust enrichment claim at the pleading stage, and Defendants' motions to dismiss should be denied.

### 7. Plaintiff Has Established a Claim for Contribution and Indemnification

The Complaint states a claim for contribution, indemnification and declaratory relief against Defendants for Merrill's liability stemming from Defendants' wrongful acts, practices and misconduct. ¶¶438-42. Such misconduct arises from Defendants' intentional or reckless acts and omissions described in the complaint and discussed above. ¶446. Although Defendants argue that Plaintiff fails to state a claim for contribution and indemnification, the Complaint alleges damages to Merrill including the damages from the Individual Defendants' breach of fiduciary duties, gross mismanagement and abuse of control of Merrill exceed billions. ¶¶89-93. The Complaint clearly alleges a scheme of common liability contrary to Defendants' contentions. Edwards Br. at 16-17. The common liability is specifically addressed in ¶441: "Merrill Lynch's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless disloyal and/or bad faith acts or omissions of the Merrill Defendants as alleged above, and Merrill Lynch is entitled to contribution and indemnification from each of the Merrill Defendants in connection with all such claims that have been, are or may in the future be asserted against Merrill Lynch by virtue of the Merrill Defendants' misconduct." Since Merrill is now a subsidiary of BofA, Plaintiff as a former shareholder of Merrill and current shareholder of Merrill is an appropriate plaintiff in any other situation where Merrill as BofA's subsidiary may be liable for their wrongful acts.

Also, as previously addressed Merrill's Certificate of Incorporation does not provide for the payment of the Individual Defendants' legal fees in connection with this action. Merrill is not required to bear the expense of the Individual Defendants' legal fees when such Defendants are liable for misconduct in the performance of their duties.

> A corporation may indemnify any person made, or threatened to be made, a party to an action by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he . . . is or was a director or officer of the corporation . . . against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually and necessarily incurred by him in connection with the defense or settlement of such action . . . if such director or officer acted, in good faith . . . ***except that no indemnification under this paragraph shall be made in respect of . . . any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation***. (emphasis added)

NY CLS Bus Corp § 722(c). Since Plaintiff has alleged that the Individual Defendants breached their fiduciary duties to Merrill, it is improper to dismiss Plaintiff's claim for declaratory relief at this stage of the proceedings. *See Phillips v. Investors Diversified Servs., Inc.*, 426 F. Supp. 208, 213 (S.D.N.Y. 1976).

The Complaint states a claim for contribution, indemnification and declaratory relief against Defendants for Merrill's liability stemming from Defendants' wrongful acts, practices, and misconduct. ¶¶438-42. Such misconduct arises from the knowing, recklessly disloyal, and/or bad-faith acts or omissions of Defendants alleged in the Complaint and discussed above. Accordingly, Plaintiff's claim for relief is proper.

### 8. Plaintiff Has Established Claims for Violations of Section 10(b) and Rule 10b-5 in connection with its Stock Repurchase Plan and Against the Insider Selling Defendants[51]

---

[51] Even though the prior rendition of the complaint did not explicitly label the insider trading allegations and Section 10(b) as federal claims, they were in substance alleged. See *Chiarella v. U.S.,* 445 U.S. 222 (1980); *Dirks v. SEC,* 436 U.S. 646 (1983); and *U.S. v. O'Hagan,* 521 U.S. 642 (1997), discussing federal claims for insider trading under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and the

a.    **Plaintiff's Claim Under Section 10(b) of the Exchange Act Satisfies the Pleading Requirements**

Under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5(b) a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation" (that is, the economic loss must be proximately caused by the misrepresentation or omission). *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008)). Further, the heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and the Supreme Court's elucidation of the application of that standard in *Tellabs*, 551 U.S. 308, only applies to the element of scienter, and, therefore, all of the other elements of a Section 10(b) claim are governed by only by the traditional pleading standard under Fed. R. Civ. P. 8(a) and 9(b). *See, e.g., In re Mutual Funds Inv. Litig.*, 07-1607, 2009 U.S. App. LEXIS 9829, at *15-17 (4th Cir. May 7, 2009). Under Fed R. Civ. P. 9(b), particularity of pleading merely requires that the Complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statement were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004).

---

availability of that claim to Plaintiff in this Action under *Superintendent of Insurance of New York v. Bankers' Life & Casualty Co.,* 404 U.S. 6 (1971). A court's finding of a federal claim where one is not specifically alleged is wholly consistent with the practice of the courts. *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 99 (1991) (citing *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)) ("When an issue or claim is properly before the court, the court is not limited to the particular theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.").

Plaintiff adequately alleges that the Director Defendants and Insider Selling Defendants[52]: (1) made misstatements or omissions of material fact by failing to disclose Merrill's subprime losses; (2) those statements were made/omitted with the requisite degree of scienter; (3) in connection with Merrill's share repurchases and the Insider Selling Defendants stock sales; (4) upon which Merrill relied to purchase stock at an artificially inflated price; and (5) was the direct and proximate cause of Merrill's massive losses.

The Complaint also satisfies the applicable pleading standard in this Circuit with respect to the Individual Defendants under the "group-pleading doctrine."[53]   That doctrine permits a plaintiff, "for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (internal quotations and citations omitted). *See also In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (same).[54]

---

[52] Defendant Thain, *see* Thain Br. at 7-8, argues that he cannot be held liable for the wrongdoing that occurred before his tenure at Merrill, however the allegations in the Complaint clearly show that Thain continued to conceal the issues at Merrill relating to the subprime mortgage investments, *see, e.g.*, ¶¶ 238-45, 251-54, 287-89.  Therefore Thain's continued to perpetrate the wrongdoing and did not disclose material information to the shareholders and he cannot escape liability for his wrongful conduct even if he did not join the scheme from its beginning.

[53] Individual Defendants were each individuals with direct involvement in the everyday business of Merrill. *See, e.g.*, ¶¶37-59 (describing the Individual Defendants' particular roles and their involvement with the everyday business of Merrill). *See In re Pfizer Inc. Sec. Litig.,* 584 F. Supp. 2d 621, 637-38 (S.D.N.Y. 2008) ("Plaintiffs allege that all of the Individual Defendants . . . were directly involved with the day-to-day operations of the company, and that all participated in drafting, reviewing, approving, ratifying, and/or disseminating the [] financial statements and press releases during the Class Period . . . these allegations are sufficient"). *See also In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999).

[54] "Grouping of defendants will be allowed if the defendants had drafted, prepared or approved collectively a document and the defendants had knowledge and involvement in the everyday business of the company."  *Adelphia Recovery Trust v. Bank of Am., N.A.*, No. 05-9050, 2009 U.S. Dist. LEXIS 38834, at *70-71 (S.D.N.Y. May 4, 2009).

The Complaint adequately alleges that Merrill was deceived because it was the purchaser of its stock in the Stock Repurchase. In *United Canso Oil & Gas Ltd. v. Catawba Corp.*, 566 F. Supp. 232 (D. Conn. 1983), the court held that "[i]n a derivative suit it must be the corporation that is considered to be deceived because ***the corporation is the purchaser or seller of stock.***." *Id*. at 239-240 (citing *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968)) (emphasis added); *see also Superintendent of Insurance of New York v. Bankers' Life & Casualty Co.*, 404 U.S. 6, 10-12 (1971) (finding that Section 10(b) "protects corporations as well as individuals who are sellers of a security" and that the corporation had an implied private right against its officers and collaborators under Section 10(b)). Therefore, the allegations in the Complaint clearly establish that Merrill was a (re)purchaser and seller of its stock and BofA purchased Merrill securities during the Class Period when the fraud occurred.

### b.    Facts that Show "Reliance" by Merrill

Defendants failed to allege that Merrill or BofA relied upon any alleged fraud that caused them to be deceived and therefore under Section 10(b) Plaintiff failed to allege reliance. The Demand is Futile Section ¶¶328-95 clearly indicates that the Merrill Board was not disinterested when it approved the actions of Merrill and therefore that knowledge cannot be imputed to Merrill and bar the claims alleged. In the derivative context, courts have rejected that the company itself must rely on the information and be deceived. *See United Canso Oil & Gas Ltd. v. Catawba Corp.*, 566 F. Supp. 232, 239-240 (D. Conn. 1983) ("[i]n a ***derivative suit it must be the corporation that is considered to be deceived*** because the corporation is the purchaser or seller of stock. Since the acts complained of in derivative suits are accomplished through the board of directors, the shareholders temporarily become the repository of the ***corporation's capacity to be deceived***. If misleading voluntary communications are made to shareholders,

*deception is clearly present even in derivative suits*.") (citing *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968)) (emphasis added). Here, it is clearly alleged that Merrill repurchased its own securities during the time of alleged fraud and once the merger price and disclosures unfolded about Merrill's subprime securities investments, the stock plummeted and Merrill was forced into a merger with BofA, indicating the materiality of the prior non-disclosures of information. *See* ¶¶ 150-55. Therefore, the allegations in the Complaint indicate the "essential link between defendants' actions and the injury to the corporate entity." *See Falkenberg*, 1977 U.S. Dist. LEXIS 15456 at *9.

### c. Complaint Specifies Alleged Misstatements or Actionable Omissions

Defendants persist that the Complaint fails to identify fraudulent statements with particularity as required under Rule 9(b) and the PSLRA. When making a claim under Section 10(b), Fed. R. Civ. P. 9(b) and the PSLRA require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). The allegations in the Complaint sufficiently meet the pleading standard of Fed. R. Civ. P. 9(b) and the particularity required under the PSLRA. It is clear that Defendants were under a duty to disclose the information regarding the health of Merrill and its subprime securities investments.

The Complaint's allegations, *see* ¶¶156-290, indicate that "Merrill Lynch repeatedly made false statements regarding its financial condition and false assurances regarding the sufficiency of its risk-management processes" during the class period. ¶156. The allegations indicate that Merrill or a specific member of it, such as Defendant O'Neal, *see, e.g.*, ¶160, made each statement in Merrill's public filings, either as SEC filings or press releases or both. The

allegations include the date when each statement was made.  Throughout the Complaint, the allegations clearly state why these statements were fraudulent.  For example, ¶163 indicates that the 2006 Form 10-K omitted material facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, are as follow: the filing only mentioned "subprime" three times and never mentioned the word "CDO" and falsely represented its "risk management and control process ensures that our risk tolerance is well-defined and understood by our business as well as by our executive management." At the same time $6.8 billion and $4 billion at December 29, 2006 and December 30, 2005 respectively related primarily to mortgage-backed securities. *See, e.g.,* ¶¶163-65.  Furthermore, ¶195 states explicitly that "[t]he statements made or authorized by the Merrill defendants . . . were materially false and misleading because they failed to disclose and misrepresented the following material, adverse information: (a) that Merrill Lynch was more exposed to CDOs backed by high-risk subprime debt than it publicly disclosed and (b) that the Merrill Defendants failed to inform the market of the extent of likely write-downs in Merrill Lynch's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill Lynch's portfolio to be impaired."

Defendants painted an optimistic picture for investors and reassured them that risk management controls were in place to thwart any problems instead of revealing the true state of Merrill.  *See, e.g.,* ¶¶160.  Merrill's disclosures, *see, e.g.,* ¶¶203-23, also only somewhat belatedly revealed what the previous statements had omitted regarding Merrill's mortgage portfolio.  For example, the write down in October 2007 of over $4.5 billion relating to the value of its CDOs and then just three weeks later increasing its losses to a total of $7.9 billion, still failed to reveal the actual nature of Merrill's failing mortgage-backed securities investments.  The allegations of the Complaint clearly illustrate that: Defendants failed to inform shareholders

of the true health of Merrill and its subprime securities exposure. ¶¶450-62. In regard to the Insider Selling Defendants, the allegations clearly state that the Insider Selling Defendants knew the non-public information regarding Merrill's financial condition and future business prospects and sold their stock based on it. ¶¶474-88. The subsequent disclosures, some that did not reveal the true state of Merrill until after it became a subsidiary of BofA, also indicate the information that the Insider Selling Defendants knew when they sold their stock.

Further, Defendants were required to fully disclose information relating to Merrill's subprime mortgage securities. As courts have repeatedly found, it is not enough for information disclosed by a defendant to be accurate; it must be complete as well, because "duty to speak the full truth arises when a defendant undertakes a duty to say anything." *Rubinstein v.* Collins, 20 F.3d 160, 170 (5th Cir. 1994). Consequently, once a defendant chooses to make a material public statement, that defendant then has an obligation to speak fully and truthfully: "Silence, or omission to state a fact, is proscribed . . . where the defendant has revealed some relevant, material information even though he had no duty (i.e., a defendant may not deal in half-truths)." *In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 U.S. Dist. LEXIS 16560, *17 (S.D.N.Y. 1998) (citing *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977)); *see also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) ("incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements."). The text of Rule 10b-5(b) specifically states that: "it shall be unlawful for any person, directly or indirectly . . . to 'omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ." 17 C.F.R. § 240.10b-5(b). Moreover, "where a corporation is pursuing a specific business goal and announces that goal as well as an intended approach to reaching it, it

may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration." *In re Time Warner, Inc. Sec. Litig.*, 9 F. 3d 259, 268 (2d Cir. 1993).

Likewise, the duty to disclose is not fettered by a defendant's inability to accurately quantify the risk where the risk is known.  In *Simon v. American Power Conversion Corp.,* 945 F. Supp. 416 (D. R.I. 1996), the court explained:

> . . . plaintiffs claim that APC's discussion of inventories was misleading by omission, in that by the time the 10-Q was filed (May 12, 1995) APC had become aware of the defect, and should have discussed in the 10-Q how the discovery might further influence inventories in the next quarter. . . . *17 C.F.R. § 229.303(b)*, or Item 303(b), prescribes the information that must be provided in the "Management Discussion" section of the 10-Q disclosure.  Under this section, management is required to discuss any "material changes in those items specifically listed in paragraph (a) of this Item."

> The Court concludes that this provision imposed an obligation to disclose the discovery of the defect in its first quarter 10-Q report, even though the effects of the discovery would not be realized for accounting purposes until the next quarter . . . Even if, as APC argues, they were not able to quantify the exact impact of the defect at the time of the filing, at the very least this was a "known uncertainty" that APC would have reasonably expected to influence its operations. Accordingly, because APC was under an affirmative duty to disclose the discovery of the defect and did not, the Court finds this omission to be actionable.

*Id.* at 430-32 (footnotes and citations omitted).   Thus, Item 303(a) requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).

Finally, as the Complaint alleges, Defendants sold Merrill stock during the Class Period while in possession of material adverse non-public information.  ¶475.  Sales of shares by a corporation or its insiders trigger a duty to disclose all undisclosed material information to the market.  *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1210, 1222 (1st Cir. 1996) (The court found a duty to disclose existed under Rule 10b-5 to intra-quarterly information by the

corporation before it engaged in a secondary public offer by analogy to the insider seller obtain or disclose rule because "[a] different rule would lead to the anomalous result of a Rule 10b-5 plaintiff being able to sue an individual insider selling his company's securities for the nondisclosure of material nonpublic information, but not being able to sue the issuer itself for failing to disclose the same information").  Therefore, the allegations of the Complaint indicate that a duty to disclose information relating to the subprime mortgage securities existed, and the allegations meet the pleading standards of Rule 9(b).

### d.  Plaintiff's Allegations Giving Rise to Strong Inference that Defendants Acted With Scienter as Required Under the PSLRA

Defendants argue that the Complaint failed to allege scienter as required under *Tellabs* and the PSLRA in respect to showing a motive and opportunity, specifically in regard to insider stock sales and the immunity from suit under the merger terms, or strong circumstantial evidence surrounding defendants' knowledge of the subprime market and its portfolio involving those securities.  Under *Tellabs,*

> *First*, . . . courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .
>
> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss in particular documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
>
> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . . The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? . . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" -- it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc.,* 551 U.S. at 322-23.  Thus, when examining a plaintiff's scienter allegations, "[t]he inquiry ... is whether ***all of the facts*** alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard."  *Id..* at 323.  This "holistic" approach, *id.* at 326, no longer permits courts to ignore any factual allegations that could support scienter simply because, standing alone, that fact would not suffice to meet the requisite strong inference of scienter; rather each such fact must be given some weight, and all facts are weighed together to determine whether the totality of the facts alleged gives rise to a strong inference of scienter.  Additionally, "[t]he inference that the defendant acted with scienter need not be irrefutable . . . or even the 'most plausible of competing inferences,'" but merely "at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  The inference also need not be of the "smoking-gun" genre, or even the 'most plausible of competing inferences.'"  *Id.* at 324 (citations omitted).  Finally, as with any motion to dismiss, in conducting "its comparative assessment of plausible inferences," the Court must do so "constantly assuming plaintiff's allegations to be true," *Tellabs, Inc.,* 551 U.S. at 326-27, and the Court may only consider inferences that can be "draw[n] from the facts alleged [in the Complaint.]."  *Id.* at 324.  A plaintiff can meet this standard by alleging that the defendants knew facts, or had access to information, contradicting their public statements such that the defendants knew or, should have known, that they were misrepresenting material facts related to the corporation.  *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 308 (2nd Cir. 2000) (allegations of recklessness are sufficient "where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud').  "A complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants

had both motive and opportunity to commit fraud." *Rombach*, 355 F.3d at 176 (quoting *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)).

Plaintiff's scienter allegations, discussed in detail below, readily meet this standard. In *Makor Issues & Rights Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 707 (7th Cir. 2008), on remand from the Supreme Court, the Seventh Circuit found that because the alleged statements in *Makor* concerned the company's "flagship" product, the Court found such an inference of innocence "exceedingly unlikely." *Id.* at 709. "That no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [core product] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel out incredulity." *Id.*

In *Makor Issues*, the Seventh Circuit rejected the Tellabs defendants' argument that allegations of a personal financial motive on the part of senior management was a *sine quo non* of scienter, recognizing the admonition of the Supreme Court that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, . . . the absence of a motive allegation is not fatal. . . . allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." 551 U.S. 325 (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 437 F.3d 588, 601 (7th Cir. 2007)). Instead, the Seventh Circuit explained that a motive to benefit the corporation can be both compelling and cogent, *see id*., at 708 (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 366 (5th Cir. 2004)), and that defendants' desire to artificially inflate the issuer's stock price, alone, can suffice as compelling and cogent evidence of scienter:

> *…defendants argue that they could have had no motive to paint the prospects for the 5500 and 6500 systems in rosy hues because within months they*

111

*acknowledged their mistakes and disclosed the true situation of the two products, and because there is no indication that Notebaert or anyone else who may have been in on the fraud profited from it financially. The argument confuses expected with realized benefits.* Notebaert may have thought that there was a chance that the situation regarding the two key products would right itself. *If so, the benefits of concealment might exceed the costs. Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later.* Suppose the situation had corrected itself. Still, investors would have discovered that the stock was more volatile than they thought, and risk-averse investors (who predominate) do not like volatility and so, unless it can be diversified away, demand compensation in the form of a lower price; consequently the stock might not recover to its previous level. *The fact that a gamble--concealing bad news in the hope that it will be overtaken by good news -- fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble. It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.*

*So the inference of corporate scienter is not only as likely as its opposite, but more likely. And is it cogent? Well, if there are only two possible inferences, and one is much more likely than the other, it must be cogent.*

*Makor Issues,* 513 F.3d at 710 (emphasis added; citation omitted); *Marra v. Tel-Save Holdings, Inc.*, No. 98-3145, 1999 WL 317103 at *9 (E.D. Pa. May 18, 1999) ("With respect to Plaintiffs' allegations that Tel-Save wanted to facilitate a merger with and acquire other companies using Tel-Save common stock to fund the transactions, the Court concludes that Plaintiffs have successfully pled facts establishing a strong inference of *scienter* as required under the PSLRA."). "[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs,* 551 U.S. at 325. This is especially so where stock sales by insiders are "unusual in scope or timing." *In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 277 (3d Cir. 2006) (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999)). "Whether a sale is 'unusual in scope' depends on factors such as 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Id.* (citation omitted). However, "[s]cienter can be established even if the officers who made the misleading

statements did not sell stock during the class period . . . the lack of stock sales by a defendant is not dispositive as to scienter." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (finding that plaintiffs provided specific, particularized allegations to infer scienter under Section 10(b) even though defendants did not engage in insider selling, but were motivated by potential stock options and executive bonuses based on the company's financial condition). Further as alleged in the Complaint, the Merrill Officers were also motivated to inflate the stock and conceal the true financial state of Merrill to increase their own executive compensation. *See, e.g.,* ¶¶120-21.

Despite the Insider Selling Defendants' arguments that they retained much of their stock and also made purchases of more stock during the time of stock sales, this is not dispositive on the issue of scienter.[55] It must be considered in the context of the material information that was subsequently disclosed and the fact that they were making sales of stock during this time. ¶¶387-88. Between 2006 and mid-2007, Merrill earned over $800 million in underwriting fees as the lead underwriter on 136 CDO deals with a dollar value of $93 billion, which would have been impossible for Defendants to ignore, ¶120, and even acquired First Franklin, a mortgage company, for $1.3 billion, ¶124, and First Republic Bank for $1.8 billion to accomplish this goal, ¶135. Furthermore, the Defendants' positions within Merrill, as officers and directors and members of the Finance and Risk Committee and Audit Committee, provided them with access to internal reports and communications, such as review of earnings reports. ¶¶56, 58-59. Contrary to Defendants' assertions, their positions are not the only allegations relating to

---

[55] Defendant O'Neal also attempts to argue that the gap of time between his sale of stock and when the allegations of the "house of cards began to collapse" refutes the inference of scienter. O'Neal Br. at 13. However, even though write-downs and evidence of the CDO collapse occurred months before O'Neal's stock sales, this ignores the reality that early on O'Neal knew about the financial problems associated with subprime mortgages and concealed those problems for his own benefit to keep the stock inflated. *See, e.g.,* ¶121.

undisclosed information they possessed. Therefore, as alleged in the Complaint, Defendants knew about non-public information in connection with Merrill's health in respect to its subprime mortgage portfolio. ¶¶91-93. In contrast to the Insider Selling Defendants' arguments that the only evidence of scienter against them was the 2007 Memo against Fleming (Fleming Br. at 12-14) and the Board updates in August of 2007 against Fakahany (Fakahany Br. at 10), the allegations clearly include much more than this in what the Insider Selling Defendants knew regarding Merrill's financial condition relating to its subprime investments at the time they sold their Merrill stock. Further, based on this confidential information, the Insider Selling Defendants traded large amounts of shares (thousands of shares at a time) and gained large profits (millions of dollars per transaction) because of the inflated stock price during this time period. ¶¶387-88. Defendants' failure to reveal the financial state of Merrill relating to its subprime investment exposure damaged Merrill by artificially inflating its stock price and understating its liabilities for Defendants' own benefit.

In addition to the personal financial gain, Defendants were further self-motivated by indemnification and dismissal of the derivative litigation against them by agreeing to the acquisition with BofA. ¶5. This satisfies the pleading requirements under *Tellabs* to infer scienter because it indicates that Defendants were personally motivated through their own insider selling of stock and personal benefit of immunity and indemnification in connection with their actionable conduct as a result of the acquisition by BofA. Defendants' participation in partial disclosures or issuing warnings does not immunize them from liability for the false statements they issued, to find otherwise is illogical and impractical with the damage inflicted on Merrill. Additionally, these allegations provide circumstantial evidence of conscious misbehavior or recklessness, based on Defendants' positions and the non-public information they received about

Merrill's obviously, prominent subprime mortgage securities' portfolio during this relevant time that that further demonstrates scienter.

Defendants attempt to argue the market conditions effected many companies, as well as Merrill.  However, the allegations of disclosures and other circumstantial evidence involving Merrill's exposure to subprime securities contrasted with the rest of the market.  In particular, the enormous plummet of Merrill stock and the sudden sale to BofA were specific to Merrill and its portfolio and did not befall every company with subprime investments. *See, e.g.,* ¶¶9-10, 16-20. Therefore, the allegations in the Complaint show both motive and opportunity, as well as circumstantial evidence of conscious misbehavior or recklessness, to strongly infer scienter under the *Tellabs* standard and the PSLRA.

## V.  CONCLUSION

For these reasons, Defendants' motion to dismiss the Complaint should be denied.

Dated:  October 19, 2009    Respectfully submitted,

**BROWER PIVEN**
  A Professional Corporation


By:   /s/   David A.P. Brower
David A.P. Brower
Jessica J. Sleater
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile: (212) 501-0300

*Derivative Plaintiff's Executive Committee and Liaison Counsel and Counsel for Derivative Plaintiff Miriam Loveman*

115

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Verified Third Amended Shareholder Derivative and Class Action Complaint and the Declaration of David A.P. Brower in Support of Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Verified Third Amended Shareholder Derivative and Class Action Complaint, with the attached Exhibits A and B, were filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on October 19, 2009.


<u>  /s/  David A.P. Brower         </u>
David A.P. Brower