UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MERRILL LYNCH & CO., INC. SECURITIES, DERIVATIVE AND ERISA LITIGATION | Master File No. 07-cv-9633 (JSR)(DFE) |
| This Document Relates To: Louisiana Sheriffs' Pension and Relief Fund, et al. v. Conway, et al., 08cv9063 (JSR)(DFE) | |

### DECLARATION OF MAX W. BERGER AND MARK LEBOVITCH IN SUPPORT OF BOND PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF THE BOND CLASS AND MOTION FOR APPROVAL OF PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS, AND BOND COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

We, MAX W. BERGER and MARK LEBOVITCH, under the penalty of perjury, declare as follows:

1.     We are members of the law firm of Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), counsel to Plaintiffs Louisiana Sheriffs' Pension and Relief Fund and Louisiana Municipal Police Employees' Retirement System (the "Bond Plaintiffs") in the consolidated class action styled *Louisiana Sheriffs' Pension and Relief Fund, et al. v. Conway, et al.*, 08cv9063 (JSR)(DFE) (the "Bond Action" or "Action"). Collectively, we have personal knowledge of the matters set forth herein based on our active participation in all aspects of the prosecution and settlement of the Action.

2.     We respectfully submit this Declaration in support of Bond Plaintiffs' motion for final approval of the proposed settlement (the "Settlement") that will resolve the claims asserted in the Bond Action on behalf of a class of all persons and entities who purchased or otherwise

acquired any of the Bond Class Securities[1] of Merrill Lynch & Co., Inc. ("Merrill" or the "Company") from the dates they were first offered to the public for sale through and including January 15, 2009 (the "Class Period"), and were damaged thereby (the "Bond Class" or "Class"). By an Order Preliminarily Approving Settlement and Providing for Notice dated August 21, 2009 (the "Preliminary Approval Order"), the Court preliminarily approved the Settlement and directed that notice of the Settlement be sent to the Class. Notice was duly mailed commencing on September 4, 2009 and published on September 14, 2009.

      3.     We also respectfully submit this Declaration in support of Bond Plaintiffs' motion for approval of the proposed plan of allocation of the Settlement proceeds (the "Plan of Allocation") and Bond Counsel's motion for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application").[2]

## I.    TERMS OF THE SETTLEMENT AND NOTICE

      4.     Bond Plaintiffs have achieved a settlement on behalf of the Class of $150 million in cash (the "Settlement Amount"). As discussed at ¶ 52 below, the Settlement Amount represents about 15-16.7% of the recoverable damages that Bond Plaintiffs expect they would present to a jury had the Action proceeded to trial with respect to each of the ten Bond Class Securities included in the Amended Bond Complaint. Defendants contended that damages were

---

[1] The Bond Class Securities are 8.625% Non-Cumulative Preferred Stock, Series 8 (Cusip: 060505559 formerly known as 59023V373); 6.11% Subordinated Notes due January 29, 2037 (Cusip: 59022CAJ2); 5.70% Subordinated Notes due May 2, 2017 (Cusip: 59022CCS0); Medium-Term Notes, Series C (Cusip: 59018YE72); 6.05% Medium-Term Notes, Series C (Cusip 59018YJ36); 6.40% Medium-Term Notes, Series C (Cusip: 59018YJ69); 5.45% Medium-Term Notes, Series C (Cusip: 59018YM40); 6.15% Medium-Term Notes, Series C (Cusip: 59018YN56); 6.875% Medium-Term Notes, Series C (Cusip: 59018YN64); and 7.75% Subordinated Notes (Cusip: 59023VAA8).

[2] Unless otherwise indicated, all capitalized terms are used as defined in the Stipulation and Agreement of Settlement dated as of August 12, 2009 (the "Stipulation") attached hereto as Exhibit 1.

dramatically lower, or even nonexistent, based upon multiple damage models accounting for negative causation. Also, had any of the Bond Class Securities been dismissed or eliminated from the case at summary judgment, the percentage recovered naturally increases significantly. Bond Plaintiffs' and Bond Counsel's achievement in recovering such a significant dollar amount is underscored by the fact that (i) the Initial Bond Complaint (as defined below) was filed after Bond Plaintiffs discovered that Bonds were not represented in the Consolidated Securities Action pending before this Court; (ii) the statute of limitations was about to run on Bond claims; (iii) Bond Counsel marshaled resources in order to file the Initial Bond Complaint just two days before the statute of limitations likely would have run; (iv) the Court, on an expedited schedule, dismissed the Initial Bond Complaint following two separate hearings with detailed oral argument; and (v) the Settlement was achieved on the eve of oral argument with respect to Defendants' motions to dismiss the Amended Bond Complaint. Moreover, the proposed Settlement is the result of hard fought litigation on a highly accelerated basis that involved full briefing on five separate motions to dismiss, the submission of a detailed Amended Bond Complaint in response to the concerns expressed by the Court in connection with the first round of motions to dismiss, and extensive, arm's-length, intense settlement negotiations.

5.      As explained in detail below, we respectfully submit that the Settlement represents an excellent recovery for the Class, which recovery likely would not have been attained but for the commitment of Bond Plaintiffs to file the Action at the time they did and the willingness of Bond Counsel and Bond Plaintiffs to marshal the resources required to prosecute the litigation well after numerous parallel actions arising from similar Merrill securities-related claims had settled.

3

6.      The terms of the Settlement are set forth in the Stipulation and in the Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice"). The Notice has been mailed to over 100,000 potential Bond Class Members pursuant to the Court's Preliminary Approval Order. *See* Affidavit of Richard W. Simmons of Analytics, Inc. Re: (A) Mailing of the Notice and the Claim Form; (B) Publication of Notice; and (C) Report on Exclusion Requests Received (the "Simmons Affidavit" or "Simmons Aff."), attached hereto as Exhibit 2 at ¶ 15. In addition, on September 14, 2009, the Summary Notice of Pendency of Class Action and Proposed Settlement, Settlement Fairness Hearing and Motion for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Summary Notice") was published in *The Wall Street Journal* and over the *PR Newswire*. *Id.* at ¶ 16. The Claims Administrator also posted information regarding the Settlement on the website it established for this Action, www.merrillbondactionsettlement.com, which provides access to, among other documents, downloadable copies of the Notice and Proof of Claim and Release form ("Proof of Claim"). *Id.* at ¶ 18.

7.      The Notice advised all recipients, *inter alia*: (i) of their right to exclude themselves from the Class; (ii) of their right to object to any aspect of the Settlement, including the Plan of Allocation and Bond Counsel's request for attorneys' fees and reimbursement of expenses; and (iii) of the manner for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.

8.      The Class's reaction thus far has been overwhelmingly positive. As of the filing of this Declaration, not one Class Member has filed any objection to the Settlement, to the Plan of Allocation, or to Bond Counsel's request for attorneys' fees and reimbursement of litigation

expenses. As of October 16, 2009, only eleven (11) requests for exclusion, of which only 6 appear to comply with the requirements set forth in the Notice, have been received. The apparently valid requests represent a total of 15,499 shares of 8.625% Non-Cumulative Preferred Stock, Series 8 and ten 6.40% Medium-Term Notes, Series C.[3] *See* Ex. 2, Simmons Aff. ¶ 23 and Exs. A at ¶¶ 76-77 and Ex. E thereto.

9.      Upon approval of the Settlement, the claims asserted in the Action shall be dismissed with prejudice, subject to the terms of the Stipulation. For the reasons set forth below, Bond Plaintiffs respectfully submit that the terms of the Settlement of this class action are fair, reasonable and adequate in all respects and, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, should be approved by this Court.

10.      For creating this substantial benefit for the Class, Bond Counsel seek a fee of 15% of the Settlement Fund (*i.e.*, 15% of the Settlement Amount plus interest thereon at the same rate as earned by the Settlement Fund), plus reimbursement of litigation expenses in the amount of $507,794.07.[4] Bond Counsel's request is well within the range of fees typically awarded in securities class actions in this and other Circuits. The requested fee is also reasonable when viewed in light of the time expended in prosecuting the Action, the risk of continued litigation relative to the exceptional result obtained, and the quality of Bond Counsel's efforts in the Action.

---

[3]   Pursuant to the terms of the Preliminary Approval Order, the deadline for submitting objections or requests for exclusion is November 9, 2009. Should any objections or any additional requests for exclusion be received, they will be addressed in Bond Plaintiffs' reply submission.

[4]   The Settlement Amount was deposited on September 4, 2009 in an escrow account at Valley National Bank. It has been invested in United States Treasury Bills. As is Bond Counsel's practice, the Escrow Agreement provides that any instructions for distributions from the account must be in writing signed by any two individuals from an enumerated group of authorized signatories. *See* Declaration of Stephen J. Gudelski, attached hereto as Exhibit 3.

11.    Bond Plaintiffs also submit that the Plan of Allocation, which allocates the proceeds of the Settlement based on Bond Class Members' relative losses attributable to the alleged wrongdoing, is fair and reasonable and should be approved.

## II.    PROCEDURAL HISTORY AND SUBSTANTIVE CLAIMS

### A.    Commencement of the Action and the Motions to Dismiss the Initial Bond Complaint

12.    On March 12, 2008, this Court consolidated several securities class actions in the case captioned *In re Merrill Lynch & Co., Inc. Securities, Derivative, and ERISA Litigation*, No. 07-CV-09633-JSR-DFE (the "Consolidated Securities Action"), appointed State Teachers Retirement System of Ohio as Lead Plaintiff and approved its selection of Co-Lead Counsel. The Consolidated Securities Action, which alleged claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934, was brought on behalf of purchasers of Merrill common stock between October 17, 2006 and January 16, 2008, as well as purchasers in several offerings of Merrill preferred stock.

13.    In the fall of 2008, it came to Bond Plaintiffs' attention that the Consolidated Securities Action did not include Merrill bonds, notes or certain issues of preferred stock. After an initial investigation into Merrill's securities offerings during the class period covered by the complaint in the Consolidated Securities Action, it quickly became clear that Merrill had issued bonds and certain additional preferred securities offerings that appeared to present valuable claims under the securities laws and were not being prosecuted by any investor. As a result of its substantive investigation into the underlying events giving rise to the Merrill-related claims, Bond Counsel determined that October 5, 2007 was a significant disclosure date and that the statute of limitations for certain bond-related claims would arguably expire on the one year anniversary of that day, leaving zero recovery for investors in securities offered before that date.

14.    To preserve these claims, at the instruction of Bond Plaintiffs, Bond Counsel investigated and prepared a complaint asserting claims under the Securities Act which was approved by Bond Plaintiffs (the "Initial Bond Complaint").  The Initial Bond Complaint was filed on October 3, 2008 in the Supreme Court of the State of New York, New York County.[5] The Initial Bond Complaint was brought on behalf of Bond Plaintiffs and on behalf of purchasers of certain preferred stock and debt offerings issued by Merrill from 2007 through 2008.

15.    Following removal of the Bond Action under 28 U.S.C. § 1441, Bond Plaintiffs agreed not to seek remand, allowing the matter to remain in this District Court.  On December 3, 2008, the Court issued an order coordinating the Consolidated Securities Action and the Bond Action for pre-trial purposes and directing Bond Plaintiffs and Bond Counsel (Bernstein Litowitz) to be primarily responsible for prosecuting all claims on behalf of the investors in Merrill bonds and preferred shares that were identified in the Bond Action but not in the Consolidated Securities Action.

16.    Bond Counsel promptly began to prepare an amended complaint, including assembling a team of attorneys and investigators to further investigate the underlying events at Merrill that gave rise to the claims, including detailed legal and factual assessments of the complex structured finance transactions at the heart of the Action.  Bond Counsel conducted an extensive investigation, which included interviewing former Merrill employees with pertinent information, consulting with experts, including with respect to the applicable accounting issues, the structured finance industry, and damages, and further analyzing the issues pleaded and briefed in the Consolidated Securities Action in anticipation of drafting an amended complaint.

---

[5]  Section 22(a) of the Securities Act provides for concurrent state and federal court jurisdiction.

17.    In December 2008, Lead Counsel in the Consolidated Securities Action informed Bond Counsel that settlement negotiations with the defendants in the Consolidated Securities Action were proceeding rapidly.  Lead Counsel advised Bond Counsel that Merrill sought to resolve the Bond Action at the same time as the Consolidated Securities Action.  During the period from mid-December through early January, Bond Counsel participated in extensive discussions with Lead Counsel regarding the amount that could be obtained from Merrill and other defendants to resolve the Bond Action.

18.    Bond Plaintiffs were advised by Bond Counsel regarding the relative strength of the claims likely to be alleged in the amended complaint to be filed in the Bond Action, as well as the extensive risks of continued litigation in the event the amount offered was not accepted. In addition, Bond Counsel relied upon preliminary damage analyses by the economic expert retained in connection with determining the potential value of the action to the members of the Bond Class.  Bond Plaintiffs, based on the advice of Bond Counsel, determined to reject proposals to settle the Bond Action with the Consolidated Securities Action as being inadequate under the circumstances.   Said proposed settlement offers, while representing significant amounts of money, were substantially less than the proposed Settlement.

19.    A preliminary settlement agreement of the Consolidated Securities Action was announced on January 15, 2009, without any involvement or participation by Bond Plaintiffs and Bond Counsel.  At Bond Plaintiffs' instruction, Bond Counsel continued thereafter to prepare an amended complaint to be filed in the Bond Action.

20.    On February 4, 2009, the parties to the Bond Action called the Court to schedule the time for filing an amended complaint and for briefing of the anticipated motions to dismiss by Defendants.  At that time, the Court instructed the parties to brief a motion to dismiss based

on the Initial Bond Complaint immediately. Accordingly, per the Court's order, on February 9, 2009, Defendants moved to dismiss the Initial Bond Complaint. That day, the Merrill Defendants filed three separate memoranda in support of their respective motions to dismiss the Initial Bond Complaint.

21.    In summary, the Merrill Defendants' motion asserted (i) that Bond Plaintiffs lacked standing to assert claims under Section 11 and Section 12(a)(2) of the Securities Act because not every security at issue was purchased by at least one of the named plaintiffs and because plaintiffs did not actually purchase in the subject offerings; (ii) that the complaint was required to satisfy the heightened pleading requirements of Rule 9(b) because it described "massive" misrepresentations, but it failed to do so; and (iii) that the complaint failed to satisfy even the less stringent pleading requirements of Rule 8(a) – because it did not allege any actionable statement or omission that was false when made but instead relied upon non-actionable "hindsight" allegations. The Merrill Defendants also asserted that Bond Plaintiffs failed to state a claim under Section 15 of the Securities Act because there were no allegations of "meaningful culpable conduct" by the Individual Defendants.

22.    The motion from Merrill's auditor, Deloitte & Touche LLP ("Deloitte") asserted generally that the complaint failed to state a claim against Deloitte because it did not adequately allege improper valuation of mortgage-backed securities, improper accounting for auction rate securities, false certifications by Deloitte, or a material violation of the relevant accounting standards. Deloitte also contended that Bond Plaintiffs lacked standing.

23.    Finally, the Underwriters' motion asserted that the Section 11 and Section 12(a)(2) claims should be dismissed for lack of standing because Bond Plaintiffs failed to allege that they purchased securities in the offerings at issue or that they purchased any security directly

from an Underwriter Defendant. The Underwriters emphasized that Bond Plaintiffs had only alleged they had purchased "certain" of the Merrill securities pursuant to a Shelf Registration statement, but failed to specify which securities were purchased by the two named plaintiffs.

24.     On February 13, 2009, Bond Plaintiffs filed an omnibus opposition brief. Bond Plaintiffs firmly argued that, if the Court decided to apply the liberal pleading standards of Fed. R. Civ. P. 8(a), there would be ample basis to deny the substantive arguments made in Defendants' motions to dismiss. Bond Plaintiffs recognized that, if the Court accepted Defendants' arguments in favor of applying the heightened pleading standard of Fed. R. Civ. P. 9(b), dismissal was more likely. Because the Initial Bond Complaint was filed at the possible termination of the statute of limitations for certain claims and did not include every detail that could be provided to satisfy a heightened pleading standard, in addition to defending the specific allegations in the Initial Bond Complaint, Bond Plaintiffs also articulated in their briefs numerous supporting facts and theories that they anticipated would appear in an amended complaint.

25.     On February 17 and 19, 2009, this Court heard oral argument on Defendants' motions to dismiss. At the hearings, Bond Counsel urged the Court either to decline to apply any heightened pleading standard or to find that the Initial Bond Complaint satisfied the applicable standard and that it was appropriate for the case to proceed to discovery immediately. The Court repeatedly challenged Bond Counsel with respect to the "sounds in fraud doctrine," indicating that the Court was inclined to apply the heightened pleading standard to the Initial Bond Complaint. For example, although Bond Plaintiffs attempted not to include any direct allegations of fraud at Merrill in the Initial Bond Complaint, the Court had expressed its belief that it "ha[d] to apply 9(b)" because of the holding of *Rombach v. Chang,* 355 F.3d 164 (2d Cir.

2004). *See* February 17, 2009 Tr. 50:16, *see also id.* at 38:14-16. During the second day of argument, the Court expanded on this view by stating, "[a]nyone looking at this complaint would see that you're alleging that the company repeatedly, in document after document, promulgated false and misleading statements that were not only material but were hugely material. . . . Why isn't the natural inference that the company was doing this knowingly?" February 19, 2009 Tr. 13:11-18. The Court also suggested that "the natural and probable inference" from the "huge numbers that were allegedly so materially misstated ... again and again and again and again" is that such misstatements "could only have occurred knowingly." *Id.* at 13:25-14:3.

26.     In addition, and notwithstanding Bond Counsel's arguments to the contrary, the Court made clear that it would not allow claims on particular offerings to proceed unless at least one named plaintiff had direct standing for the pertinent offering. Accordingly, it became apparent that Bond Plaintiffs would need an opportunity to file an amended complaint.

27.     With respect to the timing for filing an amended pleading, Bond Counsel advised the Court that numerous investors, including certain of Bond Counsel's institutional investor clients, were likely to join the Bond Action in order to assure that valuable claims were not allowed to expire without being prosecuted, but that such investors would require several weeks to properly assess and formally approve joining the Bond Action. In response, the Court gave Bond Plaintiffs until March 13, 2009 to file the Amended Bond Complaint.

28.     On February 27, 2009, the Court issued a written opinion dismissing the Initial Bond Complaint and providing Bond Plaintiffs an opportunity to replead. (Docket # 31). In the February 27, 2009 Memorandum Order, the Court made clear that, notwithstanding Bond Counsel's arguments, it applied the "sounds in fraud" doctrine to the Initial Bond Complaint. The Court found that the Initial Bond Complaint contained "many insinuations of fraud."

2/27/09 Mem. Order at 2. The Court concluded that "on any fair reading, much of the 'wording and imputations of the complaint are classically associated with fraud.'" *Id.*[6] The Court specifically advised Bond Plaintiffs to avoid asserting any allegations that accuse any Defendant of acting with fraudulent intent.

**B.    Preparation and Filing of the Amended Bond Complaint**

29.    Prior to and following the briefing and oral argument on the first round of motions to dismiss, Bond Counsel continued its investigation into the matter. Bond Counsel's investigation included, among other things:

- Interviewing 87 former Merrill employees at all levels of the Company after identifying over 560 potential witnesses;

- Retaining and consulting with experienced derivative securities originators, underwriters and analysts, and other experts in the pricing of collateralized debt obligations ("CDOs") and structured finance, as well as forensic accounting and damages experts;

- Researching the subprime market in general and CDOs and monoline insurance practices in particular; and

- Reviewing all publicly available information concerning Merrill, including statements made by the Company in registration statements and prospectuses and in other regulatory filings, press releases, conference calls, news articles, and analysts' reports.

30.    The Action presented numerous complex issues that required Bond Counsel to work closely with their expert consultants. Bond Counsel's CDO experts – who had structured CDOs at some of the nation's leading investment banks – shared valuable insights into the way that CDOs and other mortgage-backed securities are created, structured and marketed. The

---

[6]    Bond Counsel explained at argument that these investigations were not included for the purpose of alleging fraud, but to demonstrate the materiality of Merrill's misstatements. The Court found that these explanations "ring hollow to say the least."

discussions between Bond Counsel and their experts started out as tutorials and, as Bond Counsel gained fluency with structured finance, evolved into sophisticated conversations regarding the complex instruments at the center of the Bond Action Complaint. In addition, these experts reviewed and helped edit the complaint to ensure technical precision.

31.    Bond Plaintiffs filed the amended complaint as directed by the Court, which they corrected with the Amended Bond Complaint on March 18, 2009. Certain investors joined Bond Plaintiffs as additional named plaintiffs in the Bond Action to protect their own interests and the interests of the Bond Class.[7] In particular, taking heed of the Court's guidance with respect to standing, the Amended Bond Complaint did not pursue claims for Offerings unless at least one of the named plaintiffs purchased securities in or traceable to such Offering.

32.    The Amended Bond Complaint identifies a variety of allegedly material misstatements and omissions in the Offering Materials regarding Merrill's exposures to and true value of its mortgage-related derivative securities. Among other things, it was alleged that the Offering Materials omitted to disclose material facts concerning: (i) Merrill's direct exposure to CDOs and residential mortgage backed securities ("RMBSs") linked to non-prime mortgages; (ii) Merrill's material dependence on failing "monoline" insurers (including Ambac and MBIA, Inc.) to hedge those mortgage-linked exposures; and (iii) the remaining value of Merrill's belatedly-disclosed mortgage-linked CDOs.

33.    The Amended Bond Complaint alleges that, between 2004 and 2007, Merrill was among the world's leading originators and sellers of CDOs backed by subprime mortgages. The

---

[7] These investors are: the NECA-IBEW Pension Trust Fund Pension Plan; Iron Workers Locals 40, 361, 417 Union Security Funds; Iron Workers Local 570 Joint Funds; City of Pontiac Police and Fire Retirement System; and City of Pontiac General Employees Retirement System. Each of these named plaintiffs reviewed the complaint and has approved the proposed settlement and fee request, which is based upon retainer agreements negotiated with Bond Plaintiffs.

Offering Materials, however, allegedly failed to inform investors that by mid-2006, Merrill's CDO underwriters and traders were largely unable to sell billions of dollars of CDO paper, which therefore accumulated on the Company's balance sheet. This alleged exposure was highly material and constituted a significant concentration of credit risk, exceeding *$50 billion* by mid-2007. The Amended Bond Complaint alleges that, even when Merrill began to disclose in October 2007 that it would be forced to take billions of dollars in write-downs because of its CDO and subprime exposure, Merrill still omitted to accurately disclose the Company's over $50 billion gross exposure to mortgage-linked CDOs until January 2008.

34.    The Amended Bond Complaint also alleges that, throughout 2007, Merrill failed to accurately disclose balances of Alt-A and other risky types of RMBS, as well as the amount of its exposure to insurance on derivative securities provided by so-called monoline financial guarantors. Bond Plaintiffs attributed Merrill's alleged failure to accurately disclose its net and gross balances of mortgage-linked derivative securities to alleged pervasive failures in Merrill's risk controls and risk management processes.

35.    Notwithstanding the material disclosures in January 2008 pertaining to the gross CDO balance and the net amount of its CDO-related monoline exposure, Merrill allegedly failed to disclose its exposure to other types of mortgage-linked securities for another year. The Amended Bond Complaint alleges that, in January 2009, investors learned for the first time that Merrill had "hedged" its non-CDO derivative exposures with more than $50 billion of "credit default swaps" with financially decimated monoline guarantors.

36.    In addition, the Amended Bond Complaint alleges that Merrill's reporting of the *value* of its mortgage-linked exposures in the Offering Materials was deeply flawed. In January 2008, Merrill CEO John Thain stated that Merrill's CDOs were "valued conservatively" and that

its then-current CDO prices "are either saleable [sic] or actually represent good value." In fact, according to the Amended Bond Complaint, Merrill's carrying values were far higher than market analysts and indices were indicating. As alleged, Merrill tried, in the first half of 2008, to sell its CDO portfolio but could not find bids approaching its marks.

37.     On July 28, 2008, investors learned that Merrill's CDOs were in fact nearly worthless. On that date, the Company announced that it had sold about $30 billion par value of CDOs that only garnered between six and twenty-two cents on the dollar. This amount was far lower than the values Merrill had suggested in its Offering Materials just weeks earlier.

38.     Subsequent events allegedly further indicated that the Offering Materials had been materially misstated. In early September 2008, Lehman Brothers Holdings Inc. reported massive write-downs on mortgage-related securities similar to those held by Merrill. Market analysts and news sources inferred based on Lehman's disclosures that Merrill was still overvaluing its own similar positions, which indicated that Merrill's balance sheet was still misstated and that its days as an independent Wall Street firm were numbered. After Treasury Secretary Paulson implored Merrill's CEO to find a buyer for the Company or face bankruptcy, Bank of America ("BofA"), then one of the world's largest and most stable banks, agreed to step in by buying Merrill to save it from failure.

39.     When BofA negotiated and agreed to purchase Merrill, it necessarily had the chance to review the publicly available Offering Materials. Several months later, however, BofA informed the U.S. government that, without massive financial assistance, it would cancel the buyout rather than acquire the derivative securities that had effectively destroyed the 94-year old Merrill. On January 15, 2009, the U.S. government disclosed a $138 billion financial bailout to induce BofA to complete the acquisition, which included Merrill's remaining CDOs, as well as

the previously unreported $50 billion balance on derivative contracts with failed financial guarantors.   Bond Plaintiffs alleged that BofA's stunning early 2009 disclosures further supported the conclusion that Merrill's Offering Materials had been misstated.

**C.     Plaintiffs Faced Significant Risks If They Continued the Litigation Rather Than Lock In the $150 Million Recovery for the Class**

40.     It is well-recognized that securities actions are fraught with risks.   In this case, the risks were particularly significant.   Notwithstanding the complexity of the issues and the rigors of satisfying the heightened pleading standard that Bond Plaintiffs understood would likely be applied to the Amended Bond Complaint, in accordance with the schedule established by the Court at the February 17 and 19, 2009 oral argument on Defendants' first round of motions to dismiss, Bond Plaintiffs filed the amended complaint in mid-March.   On March 27, 2009, the Merrill Defendants and the Underwriter Defendants filed a second round of motions to dismiss.

41.     Although Bond Plaintiffs vigorously contested Defendants' arguments in their briefing on the motions to dismiss and strongly believe that their claims had merit, Defendants raised serious and potentially fatal legal issues.   For example, as detailed below, Defendants raised colorable legal arguments concerning whether the Offering Materials materially misstated the amount and value of Merrill's subprime exposures, whether Bond Plaintiffs had standing to prosecute all of the alleged Securities Act claims, whether Bond Plaintiffs could have recovered damages on all of the Offerings, and whether the Amended Bond Complaint should be dismissed for failure to satisfy the applicable legal standard.

42.     **Risks relating to Merrill's duty to disclose the amount of CDO exposures:** With regard to the Offering Materials' statements about the *amount* of Merrill's CDO exposure, Defendants argued that, among other things, Merrill had no duty to disclose the amount of its subprime-related exposures prior to the fall of 2007.   In essence, Defendants contended that,

16

before 2007, the public knew Merrill had subprime exposure, so the Company had no duty to disclose the specific amounts of that exposure.  Although Bond Counsel vigorously opposed this view of Merrill's disclosure obligations, there was a risk that the Court may have found no duty to disclose the amount of exposures, particularly with respect to certain of the early Offerings. Notably, based on Bond Plaintiffs' extensive consultation with their experienced securities damages expert, Bond Plaintiffs and Bond Counsel appreciated that, even if the Court rejected Defendants' dismissal arguments in large part but dismissed the claims regarding the early 2007 Offerings, the total amount of recoverable damages would be materially reduced.

43.    **Risk that Merrill's lengthy disclosures would have been deemed sufficient:** Defendants also argued that, particularly after October 2007, Merrill fully disclosed the amount of its subprime-related exposures, and that the 2008 Offerings therefore were not actionable. Defendants highlighted, among other things, information disclosed in connection with Merrill's repeated CDO write-downs.   In particular, Defendants emphasized the  volume of  Merrill's disclosures, pointing to the 28-pages of subprime-related disclosures in the Company's Form 10-Q for the 3rd quarter of 2007.   In Bond Plaintiffs' view, this argument elevated the quantity of Merrill's disclosures over their quality.   Nevertheless, the sheer length of these disclosures (coupled with what appeared to be a good faith effort to make adequate disclosures) presented a risk that the Court could hold that the post-October 2007 disclosures concerning the Company's mortgage-linked exposures were legally sufficient.   Bond Plaintiffs and Bond Counsel recognized that, if the Court rejected Defendants' arguments as to a majority of Offerings but dismissed the late-period Offerings, Bond Plaintiffs' potentially recoverable damages would have been substantially reduced.

44.    **Risk relating to GAAP accounting disclosures:** Defendants argued that Merrill was not required to disclose the Company's concentrations of credit risk in CDOs and monolines. This argument could have carried weight with the Court, especially in the context of a devastating credit and financial crisis that apparently caught many financial institutions by surprise. Although Bond Plaintiffs opposed this argument, the Court may have been reluctant to conclude that Merrill should have identified CDO and monoline exposures as a concentrated risk before, as Defendants maintained, the most severe parts of the credit crisis even began.

45.    **Risks relating to falsity:** With regard to the Offering Materials' statements about the *value* of Merrill's CDOs, Defendants argued that the disclosures were not actionable because they were accurate *at the time they were made*. For example, Defendants contended that Merrill's multiple CDO write-downs were not the result of previous misstatements, but rather the result of the precipitous and ongoing decline in housing prices and the historic credit crisis. In other words, Defendants contended that the Amended Bond Complaint impermissibly pled "negligence by hindsight," as opposed to alleging facts demonstrating that the subject statements were materially false when made, as required by the federal securities laws.

46.    **Risk that Merrill's valuations of CDOs would have been deemed "opinions":** In support of their hindsight argument, Defendants attacked Bond Plaintiffs allegation of alternative valuations for Merrill's CDO exposure during the Offering Period. Defendants argued that, among other things, Merrill's valuations of CDOs should be considered nonactionable "judgments" or "opinions." On this issue, Defendants cited to several authorities, including this Court's decision in *Good Hill Partners L.P. v. WM Asset Holdings Corp.*, 583 F. Supp. 2d 517, 520 (S.D.N.Y. 2008) (Rakoff, J.), in which the Court found that "graphs and tables … [showing] loss scenarios" cannot "generally serve as a basis for actionable misstatements

because they are opinions and not objective facts." Defendants contended that the valuation of complex securities like CDOs is analogous to loss projections in the most important respects, namely that it requires highly complex judgments and a series of assumptions.

47.    Bond Plaintiffs strongly disagreed with this argument, emphasizing in their briefing that the *Good Hill* valuations are distinguishable from Merrill's current CDO exposure in that the former pertain to loss **projections**, which are inherently forward-looking, while the challenged disclosures of CDO valuations pertain to statements of current value. Nevertheless, Bond Plaintiffs faced a real risk that the Court could have agreed with Defendants' interpretation of its *Good Hill* decision.

48.    **Risk that the ABX and TABX indices would have been deemed irrelevant:** In furtherance of their "valuation" arguments, Defendants also attacked Bond Plaintiffs' reliance on the ABX and TABX indices as contemporaneous benchmarks to calculate the value of Merrill's CDOs. Defendants noted that there was no allegation that Merrill's CDOs consist of the same underlying securities that these indices rely upon. Defendants also emphasized that Merrill's CDOs were more diversified than these indices, and quoted the creator of the ABX index as saying that it is inappropriate to extrapolate from such indices the value of the ABX market generally or a single security specifically. Accordingly, although Bond Plaintiffs asserted that their valuation allegations were based on the best analysis available absent discovery and raised factual issues that they believed should not have been resolved on a motion to dismiss, there was a real risk that the Court could have disagreed.

49.    **Risks relating to standing:** As noted above, at oral argument on the first round of motions to dismiss, the Court focused specifically on standing issues. Indeed, the Court conveyed its belief that for a Class to have standing to bring a Securities Act claim for a certain

security, a named plaintiff must have purchased that specific security (as opposed to purchasing other securities issued pursuant to the same registration statement). Although Bond Plaintiffs believe that the Amended Bond Complaint adequately addressed the standing "deficiencies" identified by the Court, Defendants still vigorously contended that Bond Plaintiffs lacked standing with respect to certain of the Offerings.

50.    In particular, Defendants challenged the Bond Action's named plaintiffs' standing to assert claims on two substantial bond Offerings, the January 29, 2007 Offering and the June 5, 2007 Offering. Defendants argued that the named plaintiffs who purchased on these Offerings either sold their shares for profits, sold before Merrill made corrective disclosures about its CDO exposure, or purchased after Merrill's write-downs and, thus, had knowledge of any untruths or omissions. Although Bond Plaintiffs vigorously disputed Defendants' formulations of the pertinent law of standing to pursue securities claims, they also recognized that Defendants had strategically targeted the early 2007 Offerings that accounted for material portions of potentially recoverable damages.

51.    **Risks relating to negative causation:** Perhaps most important, not only with respect to the dismissal motions but also because they affected Bond Plaintiffs' assessment of the value of the case in general, Defendants raised a number of issues with respect to damages that would have persisted even if Bond Plaintiffs' claims survived the motions to dismiss. First, Defendants argued that Merrill was victimized by the global financial system meltdown. Because Bond Plaintiffs' claims were asserted under the Securities Act, Defendants have the burden of establishing that all or part of the price decline was not due to the alleged misrepresentations. 15 U.S.C. § 77k(e). Nevertheless, Defendants would have presented strong

negative causation arguments that most of the price declines in the securities at issue were attributable to the global financial crisis or were unrelated to specific Merrill-related disclosures.

52.     **Risks relating to damage calculations:**  A material factor that would continue to weigh on the value of the action even if the motions to dismiss were denied is the difficulty of presenting damage calculations as to multiple debt and preferred securities to a jury.  As set forth in the Declaration of Chad Coffman ("Coffman Declaration"), attached hereto as Exhibit 4, Bond Counsel commissioned multiple types of damage analyses and preliminarily concluded that – even if all Offerings remained part of the case until trial – the most aggressive damage calculation their expert would likely present to a jury would be in the range of $900 million to $1 billion in recoverable damages.[8]  *Id.* at ¶ 15.  Because certain Offerings accounted for material portions of the volume and recoverable losses, Defendants' success with respect to even one or two of their numerous arguments could have substantially reduced the amount of recoverable damages.

53.     **Risk that the Court would apply a heightened pleading standard:**    While claims arising under Sections 11 and 12 of the Securities Act sound in strict liability or negligence and are thus subject to the lenient "notice pleading" requirements of Fed. R. Civ. P. 8(a), consistent with the Second Circuit's 2004 decision in *Rombach*, Courts in this Circuit have held that certain Securities Act cases may be found to "sound in fraud," and thus must be pled "with particularity" pursuant to the heightened standards of Fed. R. Civ. P. 9(b).  Bond Plaintiffs faced the risk that the Court would apply a heightened pleading standard under Fed. R. Civ. P. 9(b) to the Amended Bond Complaint, as it had done with respect to the Initial Bond Complaint.

---

[8]   Thus, the $150,000,000 Settlement achieved represents a recovery of 15%-16.7% of the estimated recoverable damages.

54.     Responding to the Court's instructions in its February 27, 2009 Opinion, Bond Plaintiffs and their counsel took great pains to draft the Amended Bond Complaint so that it did not contain any possible "imputations of fraud." Any and all references to government investigations of Merrill, as well as potentially problematic words, were removed. In addition, the Amended Bond Complaint emphasized that Merrill's misstatements were the direct result of risk management failures and, thus, grounded in negligence.

55.     The Court's prior statements suggested th e distinct possibility that the Court might, nevertheless, apply Rule 9(b) to the Bond Plaintiffs' Securities Act claims in the Amended Bond Complaint. Anticipating that risk, Bond Plaintiffs and Bond Counsel took pains to particularize the Amended Bond Complaint's allegations by detailing the "who, what, where, when, and why" of their Securities Act claims. Bond Plaintiffs remained cognizant, however, that the Court could apply the heightened pleading standard of Rule 9(b) and find that the complaint did not satisfy that standard.

56.     **Risk that the case would be decided by a "battle of experts":** The multiple complex issues in this case – particularly issues relating to the valuation and pricing of CDOs, asset-backed securities, and other structured finance instruments in addition to accounting and damages issues – would have required a significant amount of expert testimony from a substantial number of experts on both sides, thereby establishing the well-recognized risks attendant to a "battle of the experts."

**D.     Negotiation of the Settlement**

57.     The Settlement is the result of intensive, substantive, arm's-length negotiations between the parties. As noted above, when negotiating the settlement of the Consolidated Securities Action, the Merrill Defendants had attempted to negotiate through Lead Counsel a settlement of the Bond Action. However, Bond Plaintiffs, on advice of Bond Counsel and after

due consideration and recognizing the meaningful risk that rejection of the proverbial "bird in hand" could result in the Class receiving less or even nothing for their claims, rejected the proposals made in late 2008 and early 2009 for resolving the Bond Action along with the Consolidated Securities Action.

58.    No negotiations took place until after the February 4, 2009 call to the Court, at which the expedited schedule for briefing the first round of motions to dismiss was put in place. During the time period between February 4 and February 17, extensive negotiations took place between Bond Plaintiffs, represented by Bond Counsel, and the Merrill Defendants, represented for negotiation purposes by a senior member of Merrill's internal legal department. At all times, Bond Counsel's negotiations with Defendants were supervised by Bond Plaintiffs. These negotiations occurred while the litigation was proceeding rapidly.

59.    Notwithstanding the short time period, the parties conducted several rounds of in-person and telephonic negotiations, which included presentation of the merits of each sides' respective legal and factual arguments, as well as a thorough vetting of the parties' respective damage analyses. Prior to the February 17, 2009 oral argument, the Merrill Defendants made additional significant proposals to settle the Bond Action. Bond Plaintiffs, after receiving advice from Bond Counsel, again rejected the settlement proposals as inadequate, notwithstanding the recognized risks of pressing for a greater recovery.

60.    The oral argument on the initial motions to dismiss significantly sharpened the parties' respective assessments of the Bond Action. On the one hand, the Court dismissed the Initial Bond Complaint and indicated that it would strictly apply the "sounds in fraud" doctrine to the Amended Bond Complaint. On the other hand, it was Bond Counsel's view and hope that,

through the extensive argument, the Court reached a view that Bond Plaintiffs presented significant claims that warranted further discovery, at the least.

61.    Negotiations started again in earnest following the filing of the Amended Bond Complaint. In a series of personal and telephone meetings, the parties focused more closely on competing damage theories. In particular, the parties took the unusual step of permitting their damages experts to communicate directly (both with and without the participation of attorneys) and to directly exchange work product. This open and atypically frank process led to modifications of each side's damages calculations. Though Bond Counsel did not agree with the principles driving Defendants' damages calculations, Bond Counsel recognized that these calculations (which naturally resulted in far lower damage figures than Bond Plaintiffs were presenting) could have had considerable persuasive force before the Court or a jury.

62.    The negotiating process also made clear, however, that once the parties' respective damages calculations were adjusted for assumptions about which claims would survive until trial and how they would be presented to the jury, they were not fundamentally different. Of course, Defendants repeatedly raised arguments – as to liability and as to damages – that would have supported the elimination of specific Offerings from the case, thus reducing the total potential damages by as much as 90%. For example, while Bond Counsel and their damages expert were capable of presenting a wider range of potential damage outcomes for negotiating purposes, they recognized that, if the case were presented to a jury, they would likely present the jury with a total damage amount of between $900 million and $1 billion, assuming all Offerings remained in the case. Defendants correctly observed that the total recoverable damages would be a fraction of that amount in the event the Court granted dismissal or summary judgment as to just a few Offerings.

24

63.     In this regard, the negotiations made clear that Bond Plaintiffs were not materially discounting their demand based on the Court's prior dismissal Order.  Even if one assumed the Court would reject the pending second round of motions to dismiss entirely, however, Bond Plaintiffs would continue to face difficulties establishing the full amount of damages at summary judgment and at trial, not to mention the expected vigorous defense as to liability.

64.     The negotiation process, including the direct communications among the parties' respective damages experts, led to a meaningful breakthrough in the days before the arguments on the second round of motions to dismiss.  Specifically, on April 21, 2009, less than two days before the arguments, the parties agreed in principle to the Settlement.  Defendants agreed to pay $150 million in cash for the benefit of the Bond Class in exchange for the release of all pending claims against all Defendants.  Bond Plaintiffs accepted the offer, subject to their being satisfied with the results of the due diligence that they insisted on as a condition of the Settlement.

65.     After the agreement in principle was reached, further extensive negotiations ensued with respect to the terms of the Memorandum of Understanding, and then the Stipulation and the exhibits thereto.  In addition, in late April 2009, Bond Counsel provided detailed memoranda and other information to Lead Counsel and Lead Plaintiff in the Consolidated Securities Action regarding the prosecution of the Action and proposed Settlement.  Lead Plaintiff then formally approved the terms of the Settlement and authorized Bond Counsel to take all action necessary to gain Court approval of the Settlement.

E.     **Due Diligence Discovery**

66.     Promptly after reaching an agreement in principle on the Settlement amount, the parties began the process of allowing Bond Plaintiffs to conduct due diligence to confirm that the Settlement Amount was, in fact, a proper basis for resolving the Bond Action.  Merrill and its outside auditor during the Class Period, Deloitte, collectively produced over three million

documents relevant to the claims asserted in the Bond Action, which included: (i) documents that had previously been produced during investigations by the Securities Exchange Commission and the New York Attorney General on issues closely related to the Amended Bond Complaint; (ii) documents relating to 2008 presentations to Merrill's Board; (iii) documents relating to Merrill's merger with BofA that were previously produced in a derivative action pending in the District of Delaware; (iv) documents relating to transactions in Merrill securities by certain employee benefit plans related to the related Employee Retirement Income Security Act ("ERISA") litigation; and (v) documents relating to the 2006 though 2008 audits of Merrill. Bond Counsel assembled a team of dozens of attorneys to analyze the productions.

67.    In addition to analyzing this enormous quantity of documentary materials, Bond Plaintiffs participated in witness interviews of eight former or current Merrill officers and employees. Specifically, former CEO Stanley E. O'Neal, former CFO Jeffrey N. Edwards, former co-president and COO Greg Fleming, former co-president and COO Ahmass L. Fakahany, former COO for Global Markets and Investment Banking Laurence A. Tosi, and former Senior Vice President and Assistant General Counsel Jonathan N. Eisenberg (now Special Counsel at BofA) were each extensively interviewed by Bond Counsel and counsel for plaintiffs in the related common stock and ERISA actions. In addition, Head of Global Benefits Louis Di Maria and former head of the Global Credit, Real Estate, and Structured Products group Jeffrey W. Kronthal were also interviewed.

68.    At the conclusion of the due diligence discovery process, Bond Plaintiffs determined that, while they still believed that the claims in the Amended Bond Complaint had merit, the risks they perceived when negotiating the Settlement were well grounded, including the risks associated with establishing false and misleading statements and proving damages. In

short, the exhaustive due diligence process confirmed that the respective negotiation postures of the parties represented a sober assessment on both sides of the risks of continued litigation. Accordingly, Bond Plaintiffs are confident that the proposed Settlement is in the best interests of the Class.

## III.     NOTICE PROGRAM AND RESPONSE OF THE CLASS

69.     The Preliminary Approval Order required that notice be disseminated to the Class; set November 9, 2009 as the deadline for Bond Class Members to submit objections to the Settlement, the Plan of Allocation and the Fee and Expense Application, or to request exclusion from the Class; and set a final approval hearing date of November 23, 2009.[9]

70.     Pursuant to the Preliminary Approval Order, Bond Counsel instructed Analytics, the Claims Administrator for the Settlement, to begin disseminating copies of the Notice by mail, to publish the Summary Notice in accordance with the Preliminary Approval Order.  The Notice contains a thorough description of the Settlement, the Plan of Allocation and Bond Class Members' rights to: (i) participate in the Settlement; (ii) object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application; or (iii) exclude themselves from the Class. The Notice informs Bond Class Members of Bond Counsel's intent to apply for an award of attorneys' fees in an amount equal to 15% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $750,000.  To disseminate the Notice, pursuant to the terms of the Preliminary Approval Order, Analytics obtained the names and addresses of potential Bond Class Members from listings provided by the Company and its transfer agent, the Underwriter Defendants, and from banks, brokers and other nominees.  *See* Ex. 2, Simmons Aff. ¶¶ 4-7.

---

[9]  The deadlines for objections and exclusion requests are based on reference to dates set out in the Preliminary Approval Order.

71.     On September 4, 2009, Analytics disseminated over 82,000 copies of the Notice and Proof of Claim Forms (the "Claim Packet") by first-class mail. *Id.* at ¶ 11. As of October 16, 2009, Analytics had disseminated over 100,000 Claim Packets. *Id.* at ¶ 15.

72.     On September 14, 2009, in accordance with the Preliminary Approval Order, Analytics caused the publication of the Summary Notice in the national edition of *The Wall Street Journal*, as well as over the *PR Newswire* and, though not required by the Preliminary Approval Order, Analytics also requested that the securities clearing agency, the Depository Trust Company ("DTC") post the Summary Notice on its Electronic Legal Notice System which may be accessed by any DTC participant. *See id.* at ¶¶ 16-17.

73.     Bond Counsel also caused Analytics to establish a dedicated website, www.merrillbondactionsettlement.com to provide potential Bond Class Members with detailed information concerning the Settlement, including a history of the litigation, copies of the Amended Bond Complaint and the Court's Order on the motions to dismiss, as well as downloadable copies of the Notice and Claim Form. *Id.* at ¶¶ 18-19. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, is also available on Bond Counsel's website (www.blbglaw.com).

74.     As set forth above, the deadline for Bond Class Members to file objections to the Settlement, the Plan of Allocation and/or the Fee and Expense Application is November 9, 2009. Despite the dissemination of over 100,000 Claim Packets, as of October 16, 2009, only 11 requests for exclusion have been received, of which only six appear to be valid (*see* Ex. 2,

Simmons Aff. ¶ 23); and no objections to the Settlement, the Plan of Allocation or Bond Counsel's Fee and Expense Application have been received.[10]

## IV.    PLAN OF ALLOCATION AND CLAIMS ADMINISTRATION PROGRAM

75.    Bond Counsel has worked with Bond Plaintiffs' damages expert to develop a Plan of Allocation that equitably distributes the net proceeds of the Settlement to Bond Class Members who submit valid Claim Forms that are approved for payment by the Court ("Authorized Claimants").  Bond Counsel has also worked with the Claims Administrator to assure that the Plan of Allocation is implemented and Claims are processed as efficiently as possible with due consideration to assuring the accuracy of the process and fairness to Claimants.

### A.    **Plan of Allocation**

76.    A plan of allocation is a means by which to fairly and reasonably allocate the proceeds of a settlement.  In order to do so, what is required is to establish the relative positions of class members in terms of the losses they suffered as a result of the alleged wrongdoing.

77.    Bond Counsel developed the Plan of Allocation in consultation with Bond Plaintiffs' damages expert and believes that the Plan of Allocation provides a fair and reasonable method to equitably distribute the "Net Settlement Fund" (*i.e.*, the Settlement Fund less all appropriate Taxes, administrative costs, attorneys' fees, and reimbursement of litigation expenses as awarded by the Court) among Bond Class Members.  If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Bond Class Members who timely submit appropriate Claim Forms.

---

[10] Should additional requests for exclusion or any objections be received, they will be addressed by Bond Counsel in reply papers to be submitted, pursuant to the terms of the Preliminary Approval Order, no later than November 16, 2009 (the "Supplemental Submission").

78.    In developing the Plan of Allocation, Bond Plaintiffs' damages expert considered the extensive analyses he had performed for Bond Plaintiffs during the course of the litigation and in connection with settlement negotiations, which entailed analyses of market losses, loss causation and estimated damages.  Bond Plaintiffs' damages expert had developed damages estimates based on the statutory measure of damages under Section 11 of the Securities Act, an index approach to negative causation, and an event-based approach.  *See* Ex. 4, Coffman Decl. ¶¶ 11-15.  In performing these analyses, Mr. Coffman, among other things, compared each Merrill security against a broad based market index, and performed an in-depth review and analysis of articles, press releases, SEC filings, and analyst reports covering Merrill and other financial companies during the Class Period.  *Id.* at ¶¶ 8-9, 11-15.

79.    The Plan of Allocation, which is set forth at pages 8-12 of the Notice, is designed to fairly and reasonably allocate the proceeds of the Net Settlement Fund among Bond Class Members who suffered losses as result of the alleged wrongdoing pursuant to the statutory measure of damages set forth in Section 11 of the Securities Act.  It is structured so that, with respect to the Merrill Bond Class Securities that were sold before the close of trading on October 24, 2007, the first day that any of the allegedly wrongfully withheld or misrepresented information entered the market, there is no recoverable loss because any loss*es* suffered would not have been caused by the alleged misrepresentations or omissions.  *See* Ex. 4, Coffman Decl. ¶¶ 18-25; Notice ¶¶ 48-50.

80.    The relative difficulty of establishing a Section 11 claim with respect to the various Bond Class Securities was also considered and provided for.  Under Section 11, purchasers of securities after the issuer has made generally available an earnings statement covering a period of at least twelve months beginning after the effective date of the registration

statement face a burden to show reliance that is not present with respect to earlier purchases of those securities. Recognizing this fact, the Plan of Allocation provides that the calculated Recognized Loss Amount for purchases or acquisitions of such Bond Class Securities will be reduced by 20%. *See* Ex. 4, Coffman Decl. ¶ 26; Notice ¶ 51.

81.     Additionally, in the interest of fairness, the Plan of Allocation provides that, to the extent a Claimant had an overall market gain with respect to his, her or its Class Period purchases of Bond Class Securities, that person or entity will not be entitled to a distribution from the Net Settlement Fund, and, if a Claimant had an overall market loss but that loss was less than the total Recognized Claim calculated under the Plan of Allocation, that Claimant's recovery will be limited to the amount of his, her or its actual market loss. *See* Ex. 4, Coffman Decl. ¶ 28; Notice ¶ 60.

82.     Analytics, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim," calculated in accordance with the Plan of Allocation. Calculation of the Recognized Claim will depend upon when the securities were purchased during the Class Period, and whether those securities were held until the conclusion of the Class Period or sold during the Class Period, and if so, when.

83.     In sum, the Plan of Allocation, developed in consultation with Bond Plaintiffs' damages expert, was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Bond Class Members based on the strength of their claims and whether they actually suffered losses on their transactions in the Bond Class Securities attributable to the alleged wrongdoing. Accordingly, Bond Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved.

84.    As noted above, as of October 16, 2009, more than 100,000 copies of the Notice, which contains the Plan of Allocation, and advises Bond Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Bond Class Members. *See* Ex. 2, Simmons Aff. at ¶ 15. While over 3,900 Claim Forms have been received as of October 16, 2009 (*id.* at ¶ 26), not a single objection has been received to date to the proposed Plan of Allocation.

**B.    Claims Administration**

85.    Bond Counsel recognizes that its reputation is tied, not only to its ability to achieve exceptional results for class members, but also on delivering the settlement proceeds to class members here as efficiently as possible.

86.    Prior to retaining a claims administrator, Bond Counsel solicited bids from multiple firms. While cost was clearly a significant consideration, the determination was also based on, among other things, an assessment of each applicant firm's overall experience (including, in particular, its experience in handling settlements in which there were multiple securities of different types), an analysis of each firm's quality control and fraud detection procedures, and assurances that sufficient resources would be dedicated to the project to assure that the claims processing would be handled as efficiently and expeditiously as possible without compromising the accuracy of the process. After reviewing the proposals received and follow-up communications, Bond Counsel retained Analytics, Inc. as the Claims Administrator.

87.    Bond Counsel has been in regular communication with Analytics since its retention and has reviewed with Analytics senior management and the senior members of the team assigned to the Merrill Bond Action engagement the steps that need to be undertaken, the processes in place, and what additional steps can be taken to expedite the completion of the process. Additionally, Bond Counsel will continue to monitor the progress of the claims

administration process. We have requested weekly written reports from Analytics as to the number of Claims received and processed, and we will obtain bimonthly updates once the initial distribution has occurred through the final distribution of the Net Settlement Fund. Additionally, we are in ongoing telephone communications regarding the progress of the administration.

88.    Pursuant to the terms of the Preliminary Approval Order, Bond Class Members have until January 4, 2010 to submit Claim Forms. Experience has shown that the vast majority of Claims are submitted at or close to the cut off, and those Claims usually include Claims submitted by institutions, which are the most complex. Based on this pattern, and the need to allow Claimants the opportunity to cure deficient Claims and/or seek Court review of the recommendation to reject their Claims,[11] it is estimated that completion of claims processing will take, at a minimum, between four to six months from the Claim filing deadline.

89.    Once all timely submitted Claims have been processed, Bond Counsel will move the Court for an order authorizing the initial distribution from the Net Settlement Fund (the "Distribution Order"). When the Distribution Order becomes final, Analytics will require about four weeks to issue and mail the checks. *See* Ex. 2, Simmons Aff. at ¶ 28.

90.    While Bond Counsel anticipates being able to move for an initial Distribution Order four to six months after the Claims filing deadline, the date upon which all the proceeds of the Net Settlement Fund will have been distributed will, of necessity, extend well beyond that.

---

[11] Any Claimant whose Claim is deemed deficient or is to be rejected in whole or part must be advised in writing of the determination and the reasons therefore and given twenty (20) days after the date of mailing of such notice to respond. *See* Ex. 1, Stipulation ¶ 23(d) and (e). Claimants who attempt, but fail to cure deficiencies, are then sent a rejection letter advising them of the determination and affording them twenty (20) days to advise the Claims Administrator of their desire for a Court review of the determination. Bond Counsel specifically reviewed with Analytics its procedures for providing these notifications and obtained assurance that they will be sent on a rolling basis so as to avoid, to the extent possible, delay caused by the need to afford Claimants the opportunity to cure their Claims or request Court review.

Even if the Court were to immediately enter the Distribution Order, the appeals period must run before a distribution could be made and, depe nding on the circumstances, it  might not be practical for the Claims Administrator to begin the check cutting process (which, as noted above, will take about four weeks) until the order is no longer subject to appeal.  We would ask the Court to authorize a void date for distribution checks that is less than the standard six months. Bond Counsel believe, however, that, in order to afford Authorized Claimants a fair amount of time to cash their checks, that date should be no less than ninety (90) to one-hundred-twenty (120) days from the date of issuance.  Once all checks become stale-dated (which regularly extends beyond the initial void date because of the need to replace or reissue checks), Bond Counsel and the Claims Administrator would confer to determine if, in their opinion, all Authorized Claimants who had not yet cashed their distribution checks have in fact had every opportunity to do so and, thus, it was now appropriate to seek a ruling from the Court that any checks that had not been cashed shall be deemed forfeited.  Based on the amount remaining in the Net Settlement Fund, Bond Counsel and the Claims Administrator will determine if it is economically practical to make a second distribution.  Bond Counsel will then move the Court for an Order approving a final distribution plan for the balance remaining in the Net Settlement Fund.

91.    Notwithstanding Bond Counsel's and the Claims Administrator's commitment to have an initial distribution of the Settlement proceeds as expeditiously as possible, based on our experience, it can easily be a year after the Claim filing deadline before the entirety of the Net Settlement Fund can be distributed, even assuming the best of circumstances.

## V.    THE FEE APPLICATION

92.    Bond Counsel is applying for a fee award of 15% of the Settlement Fund (the "Fee Application") on behalf of Plaintiffs' Counsel.[12]  As discussed below, this fee represents a multiplier of approximately 2.3 on Plaintiffs' Counsel's lodestar.  Bond Counsel also requests reimbursement of expenses incurred in connection with the prosecution of this Action in the amount of $507,794.07.

### A.    Bond Plaintiffs Support the Fee Application

93.    Bond Plaintiffs, sophisticated institutional investors with extensive experience in negotiating fees with counsel and in evaluating the results in securities class action settlements, have evaluated the Fee Application and believe it to be fair and reasonable.

94.    As noted above, Bond Plaintiffs became aware that the complaint in the Consolidated Securities Action did not pursue claims with respect to certain bond securities that Bond Plaintiffs held.  In connection with the approval and filing of the Initial Bond Complaint, Bond Plaintiffs negotiated retainer and fee agreements with Bond Counsel.  Bond Plaintiffs required that Bond Counsel agree to apply for a fee of 15% of the total amount recovered in the event a settlement was reached while motions to dismiss remained pending.  The retainers provide for a 20% fee following the commencement of fact discovery through the date of completion of all discovery.

95.    After the Settlement was achieved, Bond Plaintiffs reassessed the appropriate amount of the fee award.  Notwithstanding that Bond Counsel engaged in extensive fact discovery and, thus, arguably were entitled to seek attorneys' fees in the amount of 20% of the recovery, Bond Plaintiffs and Bond Counsel agreed that the fee request would be limited to 15%.

[12]  In addition to Bond Counsel, the application is supported by the time and expenses of the firms of Saxena White P.A. and Pomerantz Haudek Grossman & Gross, LLP.

Bond Plaintiffs were involved in all aspects of the prosecution of the Action and negotiation of the Settlement. Bond Plaintiffs also considered the outstanding recovery obtained and the risks of litigation. *See* Joint Declaration of Randall Roche, General Counsel of Louisiana Municipal Police Employees' Retirement System, and Osey McGee, Jr., Director of Louisiana Sheriffs' Pension and Relief Fund, in Support of Bond Plaintiffs' Motion for Final Approval of Class Action Settlement and Certification of the Bond Class and Motion for Approval of Plan of Allocation of Settlement Proceeds, and Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Bond Plaintiffs' Declaration" or "Bond Plaintiffs' Decl."), attached hereto as Exhibit 5, at ¶ 13. Bond Plaintiffs believe that Bond Counsel should seek approval of a fee reflecting the outstanding benefits achieved for the Class and know that, under similar circumstances, larger fees are routinely requested and awarded. Bond Plaintiffs endorse Bond Counsel's application for an award of attorneys' fees constituting 15% of the Settlement Fund (*i.e.*, 15% of the Settlement Amount with interest thereon at the same rate as earned by the Settlement Fund), which is consistent with the retainer agreement. *See id.*

96.    Consistent with Bond Plaintiffs' endorsement, the Notice informed Bond Class Members of Bond Counsel's intent to apply for an award of attorneys' fees in an amount equal to 15% of the Settlement Fund. And, as stated, to date there has been no objection to the fee request.

B.    **The Work and Experience of Counsel**

97.    Attached hereto as Exhibit 6 are declarations from Plaintiffs' Counsel in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. Included with counsel's declarations is a schedule that summarizes the lodestar of the firm, as well as the

expenses incurred by category (the "Fee and Expense Schedule").[13]    The Fee and Expense Schedule and attached declarations indicate the amount of time spent by each attorney and paraprofessional employed by Plaintiffs' Counsel, and the lodestar calculations based on their current billing rates.    As attested in each declaration, the declarations were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.    The hourly rates for attorneys and paraprofessionals included in these schedules are the same as the regular current rates charged for their services in non-contingent matters and/or which have been accepted in other securities or shareholder litigation.    For attorneys or paraprofessionals who are no longer employed by Plaintiffs' Counsel, the lodestar calculations are based upon the billing rates for such person in his or her final year of employment.

98.    Plaintiffs' Counsel have expended 27,231 hours in the prosecution and investigation of this Action.    The resulting lodestar is approximately $9,757,000.    Under the lodestar approach, the requested fee of $22,500,000 (without interest) yields a multiple of approximately 2.3 — that is, a multiple of 2.3 times the value of the time expended by Plaintiffs' Counsel.    As discussed in the accompanying Memorandum of Law in Support of Bond Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses, this multiplier is well within the range of multipliers awarded in actions where similar settlements have been achieved.

99.    Plaintiffs' Counsel are experienced in prosecuting securities class actions, and worked diligently and efficiently in prosecuting this Action.    As demonstrated by the firm resumes attached to Plaintiffs' Counsel's declarations, they are among the most experienced and

---

[13]    The first page of Exhibit 6 is a summary chart of the lodestars and expenses of all of the firms.

skilled practitioners in the securities litigation field, and have long and successful track records in such cases.

**C.    Standing and Caliber of Defense Counsel**

100.    The quality of the work performed by Bond Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Defendants were represented by some of the country's most prestigious law firms, including: Skadden, Arps, Slate, Meagher & Flom LLP (on behalf of Defendants Merrill, Merrill Lynch Capital Trust I, Merrill Lynch Capital Trust II, Merrill Lynch Capital Trust III, and Merrill Lynch, Pierce, Fenner & Smith Incorporated); Willkie Farr & Gallagher LLP (on behalf of Defendant Jeffrey N. Edwards); Clifford Chance US LLP (on behalf of the Underwriter Defendants); and Paul, Weiss, Rifkind, Wharton & Garrisson LLP (on behalf of Deloitte).    In the face of this knowledgeable, formidable, and well-financed opposition, Bond Counsel was nonetheless able to present a case that was sufficiently strong so as to be able to negotiate a settlement that provides a very substantial benefit to the Class.

**D.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Securities Cases**

101.    This prosecution was undertaken by Plaintiffs' Counsel entirely on a contingent-fee basis.  The risks assumed by Plaintiffs' Counsel in bringing these claims to a successful conclusion are described above.  Those risks are also relevant to an award of attorneys' fees. Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive, and are described in detail above.

102.    From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In

undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of this Action, and that funds were available to compensate staff and to cover the considerable out-of-pocket costs that a case such as this requires. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

103.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed herein, from the outset, this case presented a number of risks and uncertainties that could have prevented any recovery whatsoever; indeed, the Initial Bond Complaint was dismissed. Additionally, as set forth above, Bond Plaintiffs, upon the advice of Bond Counsel, rejected very substantial offers of settlement that they deemed inadequate. Bond Counsel, has, throughout this Action, kept the interests of the Class paramount in its consideration knowing that, despite the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.[14]

104.    Courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), vigorous private enforcement of the federal securities laws can only occur if private investors, particularly institutional investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

---

[14]    Bond Counsel fully appreciates the risk of no fees and no reimbursement of expenses after years of litigation. Thus, for example, after four years of litigation *In re Omnicom Group, Inc. Securities Litigation*, 02-CV-4483 (RCC) was dismissed on summary judgment.

E.    **The Timing of the Payment of the Fee Award**

105.    Bond Counsel respectfully requests that the payment of any attorneys' fees awarded by the Court be allowed at the time of the award.

106.    As is common in securities class actions, Bond Plaintiffs negotiated for and obtained the agreement of Defendants' Counsel that any attorneys' fees awarded by the Court would be payable immediately upon award.  Stipulation at ¶ 17.  When entering the Preliminary Approval Order, however, the Court stated that "no attorneys' fees shall be paid or otherwise distributed until after all other authorized distributions of funds have occurred."  Preliminary Approval Order ¶ 29.

107.    Bond Counsel infers that the Court's concern in adding this provision is its interest in assuring the most expeditious distribution of settlement proceeds to class members.  Bond Counsel shares the concern of the Court.

108.    Bond Counsel has been prosecuting securities class actions for over twenty-six (26) years.  While the vast majority of a securities plaintiff's attorney's ability to create value for a class comes in the prosecution stage of a litigation, we hold as a core value that class members receive the benefits of our efforts as soon as practical, consistent with ensuring the fairness and reliability of the distribution process.  We have historically been deeply involved in the administration of the settlements we achieve and our lawyers regularly devote hundreds of hours to the administration of settlements for which we do not seek additional compensation.

109.    As set forth in paragraphs 85 to 91 above, Bond Counsel has and will continue to work with the Claims Administrator to assure that the distribution of the Net Settlement Fund to Bond Class Members occurs as expeditiously as possible.  We engage in extensive oversight of the Claims Administrator and take all reasonable steps to ensure that the Claims Administrator remains accountable for its work and that its interests remain consistent only with effective and

prompt distribution of Settlement funds. *Id.* However, notwithstanding all efforts and the continuing involvement of Bond Counsel, there are limitations, many of which are simply beyond our control, that affect the date by which all proceeds of the Settlement can be distributed. *See* ¶¶ 88-91 above.

110.    Bond Counsel appreciates the Court's concerns with assuring that the proceeds of the Settlement are disbursed as expeditiously as possible to Authorized Claimants. However, we respectfully submit that delaying the payment of attorneys' fees will not impact the timing of the distribution of the Settlement proceeds. As described above, Bond Counsel has been diligently working with the Claims Administrator to assure that the proceeds of the Settlement are distributed as expeditiously as possible and will continue to do so until the entirety of the Net Settlement Fund is distributed. Notwithstanding Bond Counsel's and the Claims Administrator's focus on streamlining the process as much as possible, it will still take approximately four to six months from the Claim filing deadline before a motion for an initial distribution can be made; approximately four weeks after the Distribution Order becomes final before and initial distribution can be made; and, in fairness to Authorized Claimants, approximately three to four months thereafter before a recommendation that all uncashed checks should be deemed forfeited and a motion for a final distribution of the balance in the Net Settlement fund can be made. *See* ¶¶ 88 -90 above. Moreover, unforeseen complications – typically having nothing to do with the actions or inactions of counsel – can easily cause delay extending far beyond this timeframe.

111.    We respectfully submit that barring payment of attorneys' fees until the entirety of the Net Settlement Fund has been distributed will be punitive to counsel and will not provide a concomitant benefit to Authorized Claimants.

112.    Bond Counsel relies almost exclusively on contingent fees to operate our firm which, in turn, can put severe strains on cash flow. When an action is commenced, there is no way of knowing how long it will take to resolve or even if there will be a successful resolution. Bond Counsel has repeatedly demonstrated that we are prepared to go to trial, if necessary, notwithstanding the risk and expense of doing so against the most well-financed and capable defendants and defense counsel in the world. However, once a settlement is achieved in one case and we focus on preparing another for trial, we rely, as we must, on being able to predict within a reasonable range, the time when payment of attorneys' fees will occur.

113.    We respectfully request that the Court reconsider its addition to the Preliminary Approval Order. If the Court is not inclined to authorize payment pursuant to the terms of the Stipulation, we ask the Court to modify the provision such that no more than a reasonable percentage of any fee awarded be withheld until the time of the initial distribution.

F.    **The Reaction of the Class to the Fee Application**

114.    As noted above, over 100,000 Claim Packets have been mailed to potential Bond Class Members advising them that Bond Counsel would apply for an award of attorneys' fees equal to 15% of the Settlement Fund, and for reimbursement of litigation expenses in an amount not to exceed $750,000 (*see* Ex. 2, Simmons Aff. ¶ 15 and Ex. A thereto at ¶¶ 4, 71), and the Summary Notice of the Settlement was published in the national edition of *The Wall Street Journal* as well as over the *PR Newswire* (Ex. 2, Simmons Aff. ¶ 16). To date, no objections to the fee request have been received. Should any objections be received, they will be addressed in Bond Counsel's Supplemental Submission.

## VI.    REIMBURSEMENT OF THE REQUESTED LITIGATION EXPENSES IS FAIR AND REASONABLE

115.    Plaintiffs' Counsel also seek reimbursement of $507,794.07 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting the claims against the Defendants.  Bond Plaintiffs have reviewed the expense application and believe that they are reasonable and appropriate.  *See* Ex. 5, Bond Plaintiffs' Decl. ¶ 14.

116.    From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover any of their expenses and, at the very least, would not recover anything until the action was successfully resolved.  Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute this Action.  Thus, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

117.    As set forth in the Fee and Expense Schedules (provided in Exhibit 6 hereto), Plaintiffs' Counsel have incurred a total of $507,794.07 in unreimbursed litigation expenses in connection with the prosecution of this Action.  As attested to, these expenses are reflected on the books and records maintained by Plaintiffs' Counsel.  These books and records are prepared from expense vouchers, check records and other source materials, and are an accurate record of the expenses incurred.  Plaintiffs' Counsel's expenses are set forth in detail in each firm's declaration, each of which identifies the specific category of expense, *e.g.*, experts' fees, transcripts, travel costs, photocopying, telephone, fax and postage expenses, and other costs actually incurred for which Plaintiffs' Counsel seek reimbursement.  These expense items are billed separately by Plaintiffs' Counsel, and such charges are not duplicated in the respective firms' billing rates.

118.   The litigation expenses for which Plaintiffs' Counsel seek reimbursement were largely incurred for professional fees and the costs associated with the review of the massive electronic document production for due diligence in this case.

119.   Of the total amount of expenses, more than $288,000, or approximately 57%, was expended on experts in derivative securities origination, structured finance, forensic accounting and damages.   The expertise and assistance provided by these experts was critical to the prosecution and successful resolution of this Action.

120.   Bond Counsel retained accounting, structured finance, and damages experts to assist in the preparation of the Amended Bond Complaint and to analyze the allegations against Defendants.  The accounting and structured finance experts, which included former credit default swap originators and traders, provided substantial assistance to Bond Counsel in the prosecution of this Action by, among other things, assisting Bond Counsel in understanding the complex accounting and structured finance issues raised in the Company's disclosures.

121.   Similarly, the damages expert, who has extensive defense experience, provided substantial assistance to Bond Counsel in the prosecution and resolution of this Action.  The damages expert helped Bond Counsel during the preparation of the two complaints and briefing on the motions to dismiss and, as described above, actively participated in settlement negotiations with Defendants and their damages expert.

122.   Another very large component of the litigation expenses necessarily incurred in this Action relate to the size of the document production for due diligence, and the fact that much of the production here was in electronic format.  Bond Counsel thus had to retain the services of a firm selected by Defendants, Kroll Ontrack, to host the electronic database through which the

millions of documents were produced, searched, reviewed, and coded. These charges amounted to $72,000.00, or 14% of the litigation costs incurred.

123. The other expenses for which Plaintiffs' Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, long distance telephone and facsimile charges, postage and delivery expenses, computerized research, overtime expenses, filing fees, photocopying, and travel expenses.

124. All of the litigation expenses incurred, which total $507,794.07, were necessary to the successful prosecution and resolution of the claims against the Defendants. These expenses have been reviewed and approved by Bond Plaintiffs. *See* Ex. 5, Bond Plaintiffs' Decl. ¶ 14. In addition, the Notice apprised potential Bond Class Members that Bond Counsel would be seeking reimbursement of expenses in an amount not to exceed $750,000 and, as with Bond Counsel's fee request, no objection has been raised as to Bond Counsel's request for reimbursement of litigation expenses.

125. In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Bond Counsel respectfully submits that the expenses incurred by Plaintiffs' Counsel should be reimbursed in full.

## VII.    CONCLUSION

126. In view of the outstanding recovery to the Class, the very substantial risks of this litigation, the efforts of Bond Counsel and the other Plaintiffs' Counsel, the quality of work performed, the contingent nature of the fee, the complexity of the case and the standing and experience of both Plaintiffs' and Defendants' Counsel, Bond Counsel respectfully submits that the Settlement should be approved as fair, reasonable and adequate; that the Plan of Allocation

should be approved as fair and reasonable; that a fee in the amount of 15% of the Settlement Fund be awarded; and that Plaintiffs' Counsel's litigation expenses be reimbursed in full.

We declare, under penalty of perjury, that the foregoing facts are true and correct.

Executed on October 23, 2009.

_____
Max W. Berger

_____
Mark Lebovitch

# 413260.11

46